IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FAYETTEVILLE PUBLIC LIBRARY, a political
subdivision in the City of Fayetteville, State of
Arkansas; EUREKA SPRINGS CARNEGIE PUBLIC
LIBRARY; CENTRAL ARKANSAS LIBRARY
SYSTEM; NATE COULTER; OLIVIA FARRELL;
JENNIE KIRBY, as parent and next friend of HAYDEN
KIRBY; LETA CAPLINGER; ADAM WEBB;
ARKANSAS LIBRARY ASSOCIATION;
ADVOCATES FOR ALL ARKANSAS LIBRARIES;
PEARL'S BOOKS, LLC; WORDSWORTH
COMMUNITY BOOKSTORE LLC d/b/a
WORDSWORTH BOOKS; AMERICAN
BOOKSELLERS ASSOCIATION; ASSOCIATION OF
AMERICAN PUBLISHERS, INC.; AUTHORS
GUILD, INC.; COMIC BOOK LEGAL DEFENSE
FUND; FREEDOM TO READ FOUNDATION                                              PLAINTIFFS


V.                                          NO. 5:23-CV-05086-TLB

CRAWFORD COUNTY, ARKANSAS; CHRIS
KEITH, in his official capacity as Crawford County
Judge; TODD MURRAY; SONIA FONTICIELLA;
DEVON HOLDER; MATT DURRETT; JEFF
PHILLIPS; WILL JONES; TERESA HOWELL; BEN
HALE, CONNIE MITCHELL, DAN TURNER, JANA
BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE
HUNTER; DANIEL SHUE; JEFF ROGERS; DAVID
ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; TONY
ROGERS; NATHAN SMITH; CAROL CREWS;
KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each in his or her official capacity as a
prosecuting attorney for the State of Arkansas;                              DEFENDANTS

1

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION
## FOR A PRELIMINARY INJUNCTION
## OR, IN THE ALTERNATIVE, A TEMPORARY RESTRAINING ORDER

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs have filed a motion for preliminary injunction asking this Court to preliminarily enjoin Defendants from enforcing parts of Arkansas Act 372, codified at Ark. Code Ann. §§ 5-27-212 (eff. August 1, 2023) and 13-2-106 (eff. August 1, 2023), as these statutes impermissibly abridge Plaintiffs' constitutional rights to free speech and due process under the First and Fourteenth Amendments to the United States Constitution.

## I.    BACKGROUND

### A.    Act 372

Governor Sanders signed Arkansas Act 372 of 2023 ("Act 372") on March 31, 2023, and it is scheduled to go into effect on August 1, 2023. Two portions of Act 372 are relevant to this case: Section 1 (the "Availability Provision") and Section 5 (the "Challenge Procedure").

Section 1, the Availability Provision, makes it a criminal offense, punishable by imprisonment for up to a year, to make available, provide, or show to a minor an item that meets the definition of "harmful to minors."[1]

Under the Availability Provision, which constitutes a misdemeanor criminal offense,

---

[1] Act 372's definition of "harmful to minors" is incorporated from Arkansas' variable obscenity statute, which defines the term to mean "that quality of any description, exhibition, presentation, or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when the material or performance, taken as a whole, has the following characteristics: (A) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest in sex to minors; (B) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance depicts or describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse in a manner that it patently offensive to prevailing standards in the adult community with respect to what it suitable for minors; and (C) The material or performance lacks serious literary, scientific, medical, artistic, or political value for minors." Ark. Code Ann. § 5-68-501(2) (2017).

[a] person commits furnishing a harmful item to a minor if, knowing the character of the item involved, the person knowingly . . . [f]urnishes, presents, provides, makes available, gives, lends, shows, advertises, or distributes to a minor an item that is harmful to minors.

The term "item" encompasses every form of expressive material that one could expect to find in a public library or bookstore, including books, magazines, and motion pictures. *See* Act 372 § 1(a)(4)(B).

Just like a predecessor statute enjoined by a federal court, *see Shipley, Inc. v. Long*, 454 F. Supp. 2d 819 (E.D. Ark. 2004) (*Shipley III*), the Availability Provision prohibits librarians and booksellers from making an item available to an older minor even if the item "is only harmful to the youngest of the minors . . . [and] would not be harmful to adults or older minors." *Id.* at 829; *see also Shipley, Inc. v. Long,* 359 Ark. 208, 216, 195 S.W.3d 911, 915 (2004) (*Shipley II*).

The Availability Provision does not define what it means to "make [an item] available" to minors. Nor does it explain what steps are sufficient for a library or bookstore to ensure that no covered items are available to minors, in contrast to existing law regulating sale or display of actual pornography to minors. *See* Ark. Code 5-68-502(a)(1)(B) (2015).

Section 5, the Challenge Procedure, requires public libraries to establish a process through which any "person affected by [a] material"[2] in their collection can challenge the "appropriateness" of that material's inclusion in the library's main collection (the "Challenge Procedure"). Act 372 § 5(c)(1). A successful challenge would result in the work being "withdrawn" from the library's main collection, *see id.* § 5(c)(7)(B), and (if the work remains in the library) "relocated . . . to an area that is not accessible to minors." *Id.* § 5(c)(11)(A). Section 5

---

[2] As with regards to the term "item" in the Availability Provision, the term library "materials" may include magazines and other printed materials, as well as DVDs and other forms of motion pictures. While this brief will refer to *book* challenges as the common likely use of the Challenge Procedure, the same analysis will apply to library materials like DVDs.

3

provides no guidance to libraries, cities, or counties as to what may be considered "appropriate," or what makes an area "accessible" to minors; it provides for the removal of works while a challenge is pending, *id.* § 5(c)(2), while failing to provide any timeline for resolution of a challenge; it does not allow for judicial review of a removal decision; and, should the library decline to remove the works, it provides opponents the opportunity to appeal to political leaders, *id.* § 5(c)(12), while denying a similar right of petition to supporters of a work who oppose its removal.

### B.   Effects of Act 372 on Plaintiffs

Plaintiffs are libraries, librarians, library patrons, and booksellers whose rights will be significantly infringed in a variety of ways if these provisions of Act 372 take effect, along with associations of libraries, librarians, patrons, and booksellers.

### 1.   The Availability Provision

The Availability Provision threatens librarians and booksellers with criminal prosecution for providing protected expression to people with a constitutional right to receive it. Under the statute, librarians and booksellers could face criminal liability for providing a 17-year-old with a book that was only potentially "harmful" to a 5- or 6-year-old. *See Shipley III*, 454 F. Supp. 2d at 829.

Even if the statute did not criminalize protected speech, the attached declarations show that, if the Availability Provision takes effect, public libraries and bookstores will be faced with a series of untenable choices in order to avoid potential criminal liability and imprisonment. Depending on their respective budgets and tolerance for criminal legal risk, bookstores and libraries may respond by banning patrons under 18 years old altogether; by ridding their shelves of all books that Arkansas law would treat as "harmful," regardless of their literary or scientific

value; or by segregating huge swaths of their collections into "adult-only" sections or placing them behind counters, as if they were pornography, and cutting older minors off from access to a wide variety of age-appropriate materials, while undertaking prohibitively costly renovations to secure the materials.

Any of these options would severely and irreparably harm libraries, librarians, booksellers, and their patrons. Barring all patrons under the age of 18 from entry would be antithetical to the purpose of public libraries, which exist to foster reading and education among people of all ages and, in particular, to make reading material available to minors without the means of purchasing books themselves. *See*, *e.g.*, Declaration of David Johnson ("Johnson Decl.") at ¶ 12; Declaration of Deborah Caldwell-Stone ("Caldwell-Stone Decl.") at ¶ 4 (testifying that the "core function of public libraries is to provide all patrons with access to a broad spectrum of information and ideas that are of interest to them and to provide access to all points of view on current and historical issues"). It would similarly constrict the mission and actions of bookstores and their owners, dramatically affect their sales of children and young adult books, and imply the store only sold "adult" or pornographic books, which would be immensely detrimental to business. And it would harm older minors by preventing them from perusing and purchasing materials constitutionally protected as to them. *See* Declaration of David Grogan ("Grogan Decl.") at ¶ 7(a); Declaration of Kandi West ("West Decl.") at ¶ 7(a); Declaration of Daniel Jordan ("Jordan Decl.") at ¶ 7(a); Declaration of Jeff Trexler ("Trexler Decl.") at ¶ 6(a); Caldwell-Stone Decl. at ¶ 11(a).

Alternatively, a library or bookstore could limit its inventory to books or other items not regulated by the Availability Provision. However, that would curtail the availability of a number of popular books, including bestsellers and literary classics, and thus, this alternative is not practically or commercially feasible. In addition, this alternative would create practical difficulties

in ordering new books because bookstores and libraries rarely have the opportunity to review books before ordering them. This would also restrict the ability of adults and older minors to peruse, borrow, and purchase materials constitutionally protected as to them, including not only literary works but educational materials on subjects such as human biology. *See* Grogan Decl. at ¶ 7(b); West Decl. at ¶ 7(b); Jordan Decl. at ¶ 7(b); Trexler Decl. at ¶ 6(b); Caldwell-Stone Decl. at ¶ 11(b).

Perhaps some bookstores or libraries could place all materials that could be "harmful to minors" behind a counter, but, given the large number of constitutionally protected books involved, that may entail a restructuring of the store or library to ensure space, a costly prospect noted by multiple Plaintiffs. *See* Declaration of Carol Coffey ("Coffey Decl.") at ¶ ¶ 11-13; Declaration of Adam Webb ("Webb Decl.") at ¶¶ 10-11; Grogan Decl. at ¶ 7©; Jordan Decl. at ¶ 7(c); West Decl. at ¶ 7(c); Trexler Decl. at ¶ 6(c); Caldwell-Stone Decl. at ¶ 11(c). This option would also necessitate that employees perform the difficult task of designating books across multiple genres as "harmful to minors." This, too, would restrict the ability of adults and older minors to peruse, borrow, and purchase materials deemed "harmful," as such materials—despite being protected speech—could not be organized and presented by subject matter as library and bookstore offerings commonly are. *Id.*

A bookstore or library could also designate a room "Adults-only." This would, like the "behind the counter" option, potentially involve costly renovations and burden employees with the task of separating books. As Mr. Coulter notes in his declaration, across the entire Central Arkansas Library System, there are not currently "any rooms in which targeted materials could be segregated and kept physically secure from younger readers that are not presently being used for some other purpose, such as a community meeting space." Declaration of Nate Coulter ("Coulter Decl.") at ¶

6

10. As Ms. Coffey explained, libraries today typically "maintain their collections on open shelves . . . which are designed so that patrons may access them without requiring assistance from library staff," and "lack the physical space or financial resources to restructure their library to provide the segregated space they would need to prevent any risk of availability to minors." Coffey Decl. at ¶ ¶ 11-13, Ex. A-D (describing certain ArLA member library spaces and attaching photos). Creating adult-only rooms is impracticable for smaller libraries, such as the Yell County Library, whose "space already limits their ability to do basic programming, let alone to create an adult-only space," or the Calhoun County Library, which "consists of only one room, with a desk at the back, shelves along the middle, and seats around the edge," and does not even have an "office or staff break room." *Id.* at ¶ 13; *see also* Johnson Decl. at ¶ 12 (the Fayetteville Public Library "does not have floorspace for an 'adults only' section. So creating such a section would require FPL to convert space currently utilized by patrons (such as study rooms) for other valuable reasons."); Coulter Decl. at ¶ 10-12; Webb Decl. at ¶ ¶ 10-12 (describing the logistical difficulties of creating an adults-only section, as well as the impossibility of existing staff undertaking timely review of vast quantities of challenged material). Further, this new room would be difficult to monitor, necessitating either keys or electronic access (which would also entail additional costs), and would be confusing to patrons. *See* Grogan Decl. at ¶ 7(d); Jordan Decl. at ¶ 7(d); West Decl. at ¶ 7(d); Trexler Decl. at ¶ 6(d); Caldwell-Stone Decl. at ¶ 11(d).

Moreover, it is not even clear that the "behind the counter" and "adults-only" approaches would suffice to protect librarians and booksellers from liability if a minor obtained a restricted item notwithstanding the librarian's or bookseller's efforts. The statute creates no safe harbor, so it is unclear whether, say, a librarian could be prosecuted if a book is misshelved, or a bookseller could be prosecuted if a customer leaves an "adults-only" book in a section that minors can access.

Segregation of "adults-only" books would also lead to a drop in sales and readership of the segregated books, as some adults would be hesitant to go into the room. *See, e.g.*, Declaration of Olivia Farrell ("Farrell Decl.") at ¶ 7 (library patron stating concerns that she would no longer be able to search for books for herself in an "adults-only" section because she would fear "signal[ing] to others that [she is] interested in reading pornography"); Declaration of Leta Caplinger ("Caplinger Decl.") at ¶ 7 (patron "would find it chilling to enter a section" of a library "segregated as 'adults only,'" as she believes "that would signal to others that [she was] interested in reading pornography. Requesting permission or access to a segregated area from a staff member would also deter her, in part because she "do[es] not think [she] should be subjected to this kind of scrutiny" and that her "choice of reading material should be unfettered and private."); West Decl. at ¶ 7(d), Jordan Decl. at ¶ 7(d) (bookstore owners stating that an "adults-only" room would lead to drop in sales of books therein "as many adults would be hesitant to go into the 'adults only' room"). It would also hamper the ability of adults to access materials appropriate for them when, by choice or necessity, they are accompanied to the library by minors. *See, e.g.*, Farrell Decl. ¶ 7 (patron volunteers to aid an Afghan refugee family in Little Rock, with three children ages 6, 8, and 14, and sometimes brings them to the library, where she would no longer be able to search for books for herself while accompanied by these children); *see also* Coulter Decl. at ¶ 9 (noting that the CALS system requires all visitors under 11 to be accompanied by someone 16 or older); Caldwell-Stone Decl. at ¶ 11(d) ("Freedom to Read Foundation's library members are also frequently visited by families that include children too young to be left unattended while a parent or older sibling peruses, either as a matter of library policy or parental judgment.").

Additionally, it would restrict the ability of older minors to peruse, borrow, and purchase materials that the state deems harmful to younger minors. *See* Declaration of Hayden Kirby

("Kirby Decl.") at ¶ 4-5 (Act 372 will block 17-year-old library patron from "finding books I either want to read or might want to read," and Act 372's protections for access to young minors "cannot be done without also restricting access to [materials] by minors of my age," listing a number of young adult books that would likely be removed from the library's general collection under Act 372 because of some passages involving sexual activity).

The uncertainty associated with the vast and breathtaking scope of Act 372 is already affecting library operations. *See* Webb Decl. at ¶ 14 (Executive Director of the Garland County Library notes that he is "waiting for clarity about how Act 372 will operate" before responding to a request from high school students to partner with the library as volunteers through the National Honors Society, given the potential legal risks associated with minor volunteers working at the library under Act 372).

For authors, represented by plaintiff Authors Guild, and creators in the comic book arts, represented by the Comic Book Legal Defense Fund, any of these alternatives would substantially limit their ability to write on topics of their choosing and to have their work available through bookstores and libraries. *See* Declaration of Mary E. Rasenberger ("Rasenberger Decl.") at ¶ ¶ 5-6; Trexler Decl. at ¶ 7. Further, publishers, represented by the Association of American Publishers, cannot fulfill their mission if their books are not available for readers to browse and peruse, nor can publishers commercially succeed if their customers (such as libraries, bookstores, and other retailers) are unable to sell or lend a large amount of constitutionally protected books because of the inability to properly display them. *See* Declaration of Matthew D. Stratton ("Stratton Decl.") at ¶ ¶ 5-6.

2.     The Challenge Procedure

The Challenge Procedure will impact libraries, librarians, and patrons in many of the same ways as the Availability Provision. By providing a new, sweeping process for any person to challenge the "appropriateness" of any book in an Arkansas library in order to remove it from the library's general collection, the Challenge Procedure forces the same set of choices upon Arkansas libraries to come into compliance: banning minors from libraries, undertaking prohibitive physical restructuring of their libraries to ensure that "inappropriate" books are not "accessible" to minors, or altogether removing "inappropriate" books from their collections.

The Challenge Procedure imposes those burdens while providing libraries with even less guidance than the Availability Provision, leaving libraries to guess at what books Arkansas would consider "appropriate," or whether "inappropriate" works have been rendered adequately "not accessible to minors." And, in contrast to the current procedures of many libraries, it imposes a requirement that, at the demand of *any* person who feels affected by a book, not just residents or members, library staff undertake a resource-intensive review proceeding for any book in its collection. *See* Johnson Decl. at ¶ ¶ 17-18 (describing FPL's current reconsideration policy and noting that it may only be initiated by Fayetteville citizens with a current library card). This is a particularly troubling feature that will allow even a small, but vocal, number of activists to substantially increase the volume of challenges that libraries expect to see to works in their collections. *See* Webb Decl. at ¶ 22 (noting that recent nationwide reporting has shown that just 11 people have been responsible for over 1,000 book challenges).

Indeed, Mr. Webb notes that Garland County Library has already received a "blanket request" to remove "all materials with LGBTQ characters," and expects to see challenges to "those same books, as well as others dealing with similar themes," made "repeatedly under Act 372." *See*

*id.* at ¶ 21. Under current policy, his library is able to deny such broad requests without undertaking a resource-intensive re-review of each book. *See id.* But the unlimited challenges invited by Act 372 will impose a far greater burden on libraries, which will be practically impossible to meet. *See* Johnson Decl. at ¶ 19 (noting the practical impossibility of existing staff undertaking timely review of vast quantities of challenged material); Caldwell-Stone Decl. at ¶ 11(c) (noting that a large library "might need an entire department of employees charged with screening materials to be sure they can be placed in the general section of the libraries").

The Challenge Procedure's vague standards, its grant of unfettered discretion to remove titles pending review, the lack of a time limitation on how long those reviews may last, and the unavailability of judicial review of the decision by a library, city, or county to remove a book from the main collection also raises the specter that library patrons will see their access to library materials disappear based on political disagreements about the content of books, and lack any recourse to reverse those decisions. *See* Webb Decl. at ¶ 27 (noting that many "smaller libraries have only a single copy of some of the books that are likely to be challenged").

These concerns are not hypothetical. In January 2023, Crawford County's public library announced that all branches had "moved their LGBTQ children's books out of the children's section into a new area within their respective adult sections." *See* Declaration of John Adams ("Adams Decl.") at ¶ 3, Ex. 1 (citing Tomas Saccente, *Crawford County Library Board Looks to Create New A Public Comment Policy After Increased Engagement At Meetings*, N.W. Ark. Democrat Gazette (May 14, 2023), https://tinyurl.com/29mvtzbp). In defending the Crawford County Library's decision to segregate LGBTQ-themed children's books, Defendant Crawford County, through its attorney, noted the interest of the county in "protecting children from exposure to materials that might harm their innocence" given that "sexualized material was in the children's

section of the libraries." *See id.* at ¶ 4, Ex. 2 (May 23, 2023 letter from Crawford County attorney, Gentry Wahlmeier). He also connected this decision to Act 372's forthcoming requirement that libraries "have a section that is inaccessible to minors" and a process through which quorum courts can "hear appeals on relocation of books within county library systems." *See id.* Crawford County's attorney also advised Crawford County Library that, to comply with Act 372, it should "create a section that is not accessible to those under eighteen (18) and create a policy for challenging physical materials," thereby treating all minors alike, regardless of age or maturity level. *See id.* at ¶ 5, Ex. 3 (May 23, 2023 letter from Gentry Wahlmeier to the Crawford County Library Board).

Nor are these concerns confined to Crawford County. As soon as Act 372 was signed by Governor Sanders, Jennifer Chilcoat, the Director of the Arkansas State Library, sent an email to every public library director in the state and noted that the Challenge Procedure was likely to cause public libraries "heartburn" because there would be "locations where certain citizens are marking their calendars for this law to take effect so they can begin filing scores of challenges." *See* Adams Decl. at ¶ 6, Ex. 4 (April 20, 2023 email from Jennifer Chilcoat to public library directors in Arkansas).[3]

---

[3] A few hours after sending her initial, extensive candid guidance, Ms. Chilcoat sent a subsequent message, asking the public library directors to "please disregard and delete [her] previous email and any technical assistance it contained." *See id.* She contended that Act 372 required further review, that her "email was premature," and that she would "follow up . . . at a later date with further information, once we have had adequate time to review the law." *See id.* Ms. Chilcoat did not explain which portion of her "technical assistance," in particular, was ill-considered. *See id.* „*see* ., nor has any replacement guidance been circulated by her office to public library directors.

With the irreparable harms arising from the Availability Provision and the Challenge Procedure in plain view, Plaintiffs now move for a preliminary injunction or, in the alternative, a temporary restraining order, to prevent enforcement of these provisions of Act 372.

## II.     ARGUMENT

### A.     Plaintiffs Have Standing

Plaintiffs have standing to bring a facial challenge to the statute. See *Virginia v. American Booksellers Ass'n,*, 484 U.S. 383, 392-93 (1988) ("[I]n the First Amendment context, '[l]itigants ... are permitted to challenge a statute not [only] because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"). In addition to this chilling effect, Plaintiffs have standing due to their own activities and actual injuries.

To maintain an action in federal court, each Plaintiff must show: (1) an injury-in-fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent"; (2) the injury is "fairly ... trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted). In the context of a First Amendment challenge, the "standing inquiry is lenient and forgiving," particularly with regards to "the doctrine's first element: injury-in-fact." *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (internal quotations and citations omitted). "[W]hen . . . threatened enforcement effort implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." *Id.* (internal quotations and citations omitted). In the context of First Amendment litigation, the law does not require Plaintiffs

13

to "await and undergo a criminal prosecution as the sole means of seeking relief." *Holder v. Humanitarian Law Project.*, 561 U.S. 1, 15 (2010) (internal quotation and citation omitted).

As described above, *supra* § I.B, and documented extensively in the declarations filed in support of this motion, Plaintiff librarians and booksellers have shown that the Availability Provision creates a risk of prosecution and burdens to their ability to conduct ordinary First Amendment protected activities. Plaintiff librarians have made a similar showing regarding the Challenge Procedure. Library patrons and bookstore customers have described their interest in accessing materials that will be moved and removed as a result of the Availability Provision and Challenge Procedure, and the manner in which the Challenge Procedure's imbalanced design denies them a right to petition their government based entirely on their viewpoint.

### B.       Preliminary Injunction Standard

Federal Rule of Civil Procedure 65 governs the Court's issuance of temporary restraining orders and preliminary injunctions.[4] Whether to issue injunctive relief is a matter addressed to the sound discretion of the trial court. *See Benson Hotel Corp. v. Woods*, 168 F.2d 694, 696-97 (8th Cir. 1948). Preliminary injunctions exist to "prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated." *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 n.5 (8th Cir. 1981) (en banc); *see also Benson*, 168 F.2d at 696 ("[T]he purpose of an injunction . . . [is] to prevent a threatened wrong or any further perpetration of injury, or the doing

---

[4] A preliminary injunction may only be issued upon notice to the other party.  *See* Fed. R. Civ. P. 65(a). A temporary restraining order requires notice to the other party unless "specific facts in ... a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and the "movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b). Concurrently with filing, undersigned counsel are providing copies of this Motion to the defendants' counsel.

of any act pending the final determination of the action whereby rights may be threatened or endangered, and to maintain things in the condition in which they are at the time and thus to protect property or rights from further complication or injury until the issues can be determined after a full hearing.").

In determining whether to grant a motion for preliminary injunction, a district court weighs the following four considerations: (1) the threat of irreparable harm to the moving party; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant if the injunction is denied and the harm to other party if the injunction is granted; and (4) the public interest. *Dataphase Sys.*, 640 F.2d at 114. "While no single factor is determinative, the probability of success factor is the most significant." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (internal citation and quotation omitted).

In particular, "[w]hen a Plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman,* 662 F.3d 485, 488 (8th Cir. 2011).*Willson v. City of Bel-Nor, Mo.*, 924 F.3d 995, 999 (8th Cir. 2019); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op).).

**C.      Plaintiffs are likely to succeed on the merits.**

1.      <u>Plaintiffs Are Likely to Prove That the Availability Provision Is Unconstitutional</u>

The Availability Provision imposes an unconstitutional prior restraint on the availability, display, distribution, receipt, and perusal of constitutionally protected, non-obscene material to both adults and older minors, is unconstitutionally overbroad, and is unconstitutionally vague.

*a)      The Availability Provision is an unconstitutional prior restraint.*

Prior restraints like the Availability Provision are "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). They may stand only when necessary for "the essential needs of the public order." *Carroll v. President & Comm'rs of Princess Ann*, 393 U.S. 175, 183 (1968). Therefore, like any "system of prior restraints," *id.* at 181, the Availability Provision faces a "heavy presumption" of unconstitutionality. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (quoting *Carroll*, 393 U.S. at 181). Where a "scheme" of "prior restraint" creates a "risk of delay, such that every application of the statute creates an impermissible risk of suppression of ideas," courts have "permitted parties to bring facial challenges." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223-24 (1990) (internal quotations and citations omitted).

As a content-based restriction on protected, non-obscene speech, the Availability Provision is "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotation marks omitted). The Availability Provision must survive strict scrutiny—meaning it must: (1) serve a compelling governmental interest, (2) be narrowly tailored to achieve that interest, and (3) be the least restrictive means of advancing that interest. *Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989). The Availability Provision does not meet this standard.

While the state can have an interest in protecting minors from materials that are obscene and harmful as to them, *see Ginsberg v. New York*, 390 U.S. 629, 636-43 (1968), "the government's role in helping parents to be the guardians of their children's well-being is [not] an unbridled license to governments to regulate what minors read and view." *Interactive Digital Software Ass'n v. St. Louis Cnty. Mo.*, 329 F.3d 954, 959-60 (8th Cir. 2003). *See also American Booksellers Association, Inc. v. McAuliffe,* 533 F. Supp. 50 (N.D. Ga. 1981)); *Tattered Cover, Inc. v. Tooley,* 696 P.2d 780 (Colo. 1985); *American Booksellers Association, Inc. v. Superior Court of Los Angeles Cnty.,* 129 Cal. App. 3d 197, 181 Cal. Rptr. 33 (1982). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).

Nor can the state's ostensible goal of protecting minors be pursued by means which effectively stifle the access of an older minor or adult to communications he or she is entitled to receive. *See Reno v. ACLU*, 521 U.S. 844, 874-75 (1997) (recognizing that "sexual expression which is indecent but not obscene is protected by the First Amendment" and that the government cannot pursue its interest in protecting minors through an "unnecessarily broad suppression of speech addressed to adults"). Thus, the level of discourse reaching commercial bookshelves and public libraries cannot be limited to what might be appropriate for an elementary school library. As the District Court for the Eastern District of Arkansas has explained, it is unconstitutional to "effectively stifle[] the access of adults and older minors to communications and materials they are entitled to receive and view" just because such material may be "harmful to the youngest of minors." *Shipley III*, 454 F. Supp. 2d at 829-30. Rather, material must be considered in the context of the age and maturity of the specific minor to which the material is sold, shown, or given.

17

The Availability Provision entirely fails to regulate with the nuance required by the First Amendment, treating all minors under the age of 18 as a monolith. *See, e.g.*, Act 372 § 1(b)(1) (prohibiting furnishing "to a minor an item that is harmful to minors"). Lest there be any doubt about the breadth of this language, the Arkansas Supreme Court definitively interpreted indistinguishable language in a 2003 statute (discussed further below) to refer to all minors, not just younger minors. *See Shipley II,* 195 S.W.3d at 915 ("There is no limitation or qualification to this definition; thus, we construe the phrase 'any person [under the age of eighteen]' to mean 'every person' under the age of eighteen."). While the intended effect of Section 1 may be to prevent examination and perusal by minors of certain "harmful" materials, the unavoidable collateral effect of the law is to severely limit the ability of older minors and adults to examine these protected materials—and to criminally penalize librarians and booksellers who provide such materials to older minors.

The State has known for nearly 20 years that this type of provision is unconstitutional. In 2003, it enacted a statute that made it unlawful to "[s]ell, furnish, present, distribute, allow to view, or otherwise disseminate to a minor, with or without consideration, any material which is harmful to minors." *Id.* at 914 (quoting Ark. Code Ann. § 5-68-502(1)(A) (Supp. 2003). The District Court for the Eastern District of Arkansas came to the same conclusion that should carry the day here— that such a provision is unconstitutional. *Shipley III*, 454 F.Supp.2d at 829-31. The court in *Shipley III* concluded that the law was "overbroad and impose[d] unconstitutional prior restraints on the availability of constitutionally protected, non-obscene materials to both adults and older minors." *Id.* at 831.

Similarly, another judge in this district has previously examined a school district's policy of restricting students' access to certain books in school libraries, such as the *Harry Potter* series,

without a parental permission slip, and found that policy constitutionally infirm. *Counts v. Cedarville School Dist.*, 295 F.Supp.2d 996 (W.D. Ark. 2003). In *Counts*, the Court found that the student's First Amendment rights were burdened by the stigmatization of books she sought to read as well as the procedural barriers erected to her access to those books, and found that those burdens could not stand in the face of clear Supreme Court precedent calling for exacting scrutiny of regulations that suppress, disadvantage, or place differential burdens on speech because of its content. *Id.* at 999-1000, 1002-05 (citing *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994)) (internal quotations omitted). Notably, the *Counts C*ourt came to this conclusion despite the fact that the state's ability to regulate First Amendment activity is heightened within schools. *See id.* at 1003 (noting narrow exceptions to the First Amendment rights of primary and secondary school students to avoid interference with schoolwork or discipline, as well as the "important, delicate, and highly discretionary functions" of boards of education) (citing *Tinker v. Des Moines Indep. Cmty. School Dist.*, 393 U.S. 503 (1969) (internal quotations omitted). This Court should reach the same result as the courts in *Shipley III* and *Counts.*

The Availability Provision is a clear violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution. It imposes substantial burdens on libraries and librarians that want to make available and lend non-obscene protected materials, booksellers that want to make available and sell non-obscene protected materials, publishers and authors who want to have their non-obscene protected works available and read, and older minor and adult readers who want to peruse, purchase, or borrow non-obscene protected material.

Moreover, none of the conceivable methods of complying with the Availability Provision described above, *see supra* § I.B.1, allows older minors to access material "harmful" to younger minors but constitutionally protected as to them. None of these methods give adults unrestricted

access to material "harmful" to minors of any age but constitutionally protected as to them. And none of these methods give libraries and booksellers a reasonable way to offer to adults and older minors the constitutionally protected works they desire and that libraries and booksellers are entitled to offer. The Availability Provision therefore must be enjoined.

> b)   *The Availability Provision is both constitutionally overbroad and vague.*

A statute that burdens otherwise protected speech is facially invalid when that burden is not only real, but "substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Put another way, the overbreadth doctrine prohibits the Government from restricting even unprotected speech where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal*., 535 U.S. at 237. An overbreadth analysis often engages in the same questions as the narrow tailoring prong of a strict scrutiny analysis. *See ACLU v. Ashcroft*, 322 F.3d at 266 ("Overbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner.").

So, too, may overbreadth challenges overlap substantially with Fourteenth Amendment void-for-vagueness challenges. *See Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines."). A regulatory scheme is void for vagueness if it "forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application," or if it enables "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to [government officials] for resolution on an ad hoc and

subjective basis." *Stephenson v. Davenport Cmty. School Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (internal citations and quotations omitted).

To avoid unconstitutional vagueness, regulations must define their prohibitions and requirements "with sufficient definiteness that ordinary people can understand" what is required, and "establish standards to permit [government officials] to enforce the law in a non-arbitrary, non-discriminatory manner." *Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998) (citations omitted). Where "the literal scope of the [] regulation is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Stephenson*, 110 F.3d at 1308-09 (internal quotations and citations omitted); *see also Reno v. ACLU*, 521 U.S. at 871-72 (1997) (where the vagueness arises amidst a "content-based regulation of speech[,] the vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech"). Imprecise statutory terms that leave "grave uncertainty" about how to understand their scope are void for vagueness, even if some parts of what the terms encompass might be "straightforward" exercises of government power. *Johnson v. United States*, 576 U.S. 591, 597, 602 (2015) ("[O]ur holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."). "[T]he failure to define the pivotal term of a regulation can render it fatally vague," particularly where common tools courts use to interpret imprecise terms, such as "the common usage of statutory language, judicial explanations of its meaning, and previous applications of the statute to the same or similar conduct," fail to provide necessary clarity. *Stephenson*, 110 F.3d at 1309 (internal quotations and citations omitted).

The Availability Provision makes it a crime "if, knowing the character of the item involved, the person knowingly. . . furnishes, presents, provides, makes available, gives, lends,

shows, advertises, or distributes to a minor an item that is harmful to minors." Act 372 § 1(b)(1).
As an initial matter, there can be no dispute that the Availability Provision implicates
constitutionally protected expression, and therefore must provide heightened specificity and clarity
in its definitions and in its protections against arbitrary enforcement. *See Stephenson*, 110 F.3d at
1308-09.

The Availability Provision's broad approach to criminalizing those responsible for
minors' access to ostensibly harmful materials cannot meet these heightened standards. Many of
these terms are obviously overbroad. The terms "presents" and "shows" encompass substantially
the same conduct as the term "display," which was struck down as overbroad in *Shipley III*. 454
F. Supp. At 831.

The prohibition on the advertisement of material harmful to minors is also obviously
overbroad. It would prohibit an Arkansas bookseller from even advertising a book that would
arguably be harmful to a young minor on TV or in a local paper where someone under 18 may see
it. But as the Supreme Court has explained, "[t]he level of discourse reaching a mailbox simply
cannot be limited to that which would be suitable for a sandbox." *Bolger v. Youngs Drug Products
Corp.*, 463 U.S. 60, 71, 74 (1983) (holding unconstitutional a ban on mail advertisements that
would expose children to "sensitive and important subjects such as birth control"). "[A] restriction
of this scope is more extensive than the Constitution permits," because the government "may not
reduce the adult population to reading only what is fit for children." *Id.* at 73 (internal citation and
quotation omitted).

Finally, the prohibition on "making available" harmful material goes even beyond the
unconstitutional 2003 statute, establishing a prohibition far too vague to provide adequate notice
of what conduct is prohibited. For example, does a library that segregates material to an adults-

only room but does not lock the door or staff its entrance to verify the age of entrants run afoul of the Availability Provision because they have "made available" harmful material? If a library knowingly lends a book to a patron who is accompanied by a minor, and the patron then gives the book to the minor, has the library "made it available"?

A comparison to Arkansas's current statute regulating the sale, lending, or display of material harmful to minors illustrates just how troublingly vague the Availability Provision is. That statute makes clear that "a person is deemed not to have displayed material harmful to minors if," inter alia, the material is behind "blinder racks" that obscure "the lower two-thirds of the material." Ark. Code 5-68-502(a)(1)(B) (2015). The new Availability Provision contains no such clear guidance or safe harbor. Instead, it leaves libraries with guesswork as their only tool to determine whether they are complying with Arkansas law, resulting in precisely the sort of "grave uncertainty" that renders a statute unconstitutionally vague. *Johnson*, 576 U.S. at 597.

The Availability Provision was not crafted with the careful, precise, and clear tailoring of language that due process demands when imposing criminal penalties, particularly in the First Amendment context, and must be struck down.

2.      The Challenge Procedure is unconstitutional.

Alongside Section 1's threats of criminal prosecution for individual librarians, Arkansas has in Section 5 created a sweeping, vague, and unaccountable new Challenge Procedure that would drown Arkansas libraries in an endless and virtually standardless cycle of reviews and removals. This Procedure would empower objectors to achieve via administrative mischief the objectives that they may struggle to achieve through direct censorship, while denying supporters

of a book any voice in the administrative process or any recourse via the judiciary. Like Section 1, the Challenge Procedure is a clear affront to the First Amendment and the Due Process Clause.

On its face, Act 372's Challenge Procedure violates the Constitution in four separate ways: First, the Challenge Procedure's "appropriateness" and "inaccessible to minors" standards are unconstitutionally vague. Second, the Challenge Procedure's sweeping approach to identifying material for removal from libraries' general collections cannot survive strict scrutiny. Third, the Challenge Procedure fails to comply with longstanding precedent requiring state censorship procedures to be subject to prompt judicial review. Finally, the Challenge Procedure unconstitutionally enshrines viewpoint discrimination in its guarantee of preferential access to parties favoring restrictions.

a)      *The Challenge Procedure is void for vagueness.*

Like the Availability Provision, the Challenge Procedure is unconstitutionally vague, particularly in light of the heightened protections against vagueness that attach to attempts to regulate protected expression. *See supra* § II.C.1.b. It is excessively vague in its definition of the content it purports to reach, and it is excessively vague in describing the steps libraries must take to be in compliance with Act 372. *See, e.g.*, Adams Decl. ¶ 6, Ex. 4 (email from Ms. Chilcoat, noting that the Challenge Procedure contains "several terms that we (who are not attorneys!) don't quite know how to interpret," including "affected" and "withdrawn").

The Challenge Procedure requires libraries to evaluate "the appropriateness of material available in the county or municipal library." Act 372 § 5(c)(1). "Appropriateness" is not a term that is defined in the statute, nor does the statute reference a definition anywhere else in Arkansas laws. Nor does there appear to be any caselaw interpreting the term "appropriate" within the context of the long line of First Amendment jurisprudence guiding the regulation of obscenity. The

24

use of such a vague, ambiguous, and undefined "pivotal term" in the Challenge Procedure renders the scheme "fatally vague." *Stephenson*, 110 F.3d at 1310.

The Challenge Procedure's process requiring the restriction of "inappropriate" books must fail for the same reasons that the prohibition on "gang related symbols" in *Stephenson* failed. *See id.* at 1305, 1310-11. The Procedure leaves library patrons and staff with no meaningful guidance as to what constitutionally protected expression may be deemed inappropriate, and, perhaps by design, vests officials with "unfettered discretion" to restrict access to such materials. *Id.* at 1310. Such limitless discretion is particularly concerning when it comes to the sudden removal of books which have long been deemed appropriate for inclusion in libraries' collections. *See United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 204 (2003) (finding that "libraries collect only those materials deemed to have requisite and appropriate quality" and "seek to provide materials that would be of the greatest direct benefit or interest to the community") (internal citations and quotations omitted); *cf. Stephenson*, 110 F.3d at 1310 (noting that there was "no evidence that District students had perceived Stephenson's tattoo as a gang symbol or complained about the tattoo during the thirty months Stephenson had it on her other hand").

The Challenge Procedure's requirement that inappropriate books be "relocated . . . to an area that is not accessible to minors" is similarly impermissibly vague. *See* Act 372 § 5(c)(11)(A). Act 372 does not define what makes a space "accessible to minors," leaving libraries in a position of guessing what level of security is necessary to meet the law's requirements. Indeed, at one point the Challenge Procedure confusingly refers to materials being "withdrawn" rather than relocated, Act 372 § 5(c)(7)(B)(i) ("Material being challenged [s]hall not be withdrawn solely for the viewpoints expressed within the material"), a complication noted in the State Librarian's quickly-

withdrawn guidance to libraries, in which she recommended that libraries "discuss with your board and attorney the ramifications of this wording."Adams Decl. ¶ 6, Ex. 4

Many potential measures could reduce the access minors have to "inappropriate" materials, but what is necessary to make them legally inaccessible? Is it sufficient to label sections of bookshelves "adults-only," or must they be segregated in a separate room? Must libraries lock them behind closed doors and have library staff physically limit entry and seek age verification for patrons entering the area? Depending on how strictly the vague term "an area that is not accessible to minors" is interpreted, libraries may need to spend a million dollars or more to come into compliance. *See* Webb Decl. at ¶ 11; *see also supra* at I.B.1. And what if, despite a library's best efforts, a minor accesses a prohibited book? The statute provides no clarity as to whether a library could be found in violation.

As above, a comparison to current Arkansas law regulating the distribution of material harmful to minors is instructive. *See supra* § II.C.1.b (examining Ark. Code 5-68-502(a)(1)(B) (2015). The Challenge Procedure targets a broader range of material with far less clarity, piling vague term upon vague term and leaving libraries with exceedingly little guidance.

> b)      *The Challenge Procedure is a content-based restriction that*
> *cannot survive strict scrutiny.*

Like the Availability Provision, the Challenge Procedure is also a content-based restriction on expression and is therefore "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The fact that the Challenge Procedure may result in the movement of library materials to an area inaccessible to minors, rather than in the removal of the materials completely, does not immunize it from First Amendment scrutiny. *See*, *e.g.*, *Counts*, 295 F.Supp.2d at 999 (requiring parental permission slip to check out certain books from school

26

library was an impermissible burden on student's First Amendment rights). In *Sund v. City of Wichita Falls, Tex.,* 121 F.Supp.2d 530 (N.D. Tex. 2000), a city adopted a rule allowing 300 library card holders the right to have books removed from the children's section of the municipal public library and placed in the adult book section. Rejecting the city's argument that the First Amendment was not implicated because the books were moved rather than removed, the district court found a "significant burden on the Library patron's ability to gain access to the Books." *Id.* at 541. The burden here is even greater than the one addressed in *Sund,* because the materials will not be in a library's main adult collection, but rather a separate, stigmatized area inaccessible to minors.

Established precedent makes clear that the Challenge Procedure unavoidably fails to meet its burden for one of two reasons: either (1) the Challenge Procedure does not serve a compelling interest, or (2) the Challenge Procedure ostensibly serves a compelling interest but is not narrowly tailored. Either way, it fails strict scrutiny.

As discussed above, if the Challenge Procedure restricted its reach solely to materials that are obscene as to minors, then it might conceivably further a legitimate interest. But, by its own terms, the Challenge Procedure does not review for obscenity; its prohibitions turn on library material's "appropriateness." Act 372 at § 5(c)(1). If the Challenge Procedure term "appropriateness" extends to materials that are not *obscene* – even to young children – then it does not serve a compelling state interest. It is immaterial that the Defendants or private citizens find the materials' content or viewpoints offensive, immoral, or otherwise objectionable, because the First Amendment protects such materials. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

27

The Supreme Court recently reinforced this principle in *Iancu v. Brunetti*, in which the Court struck down the Lanham Act's prohibition on "immoral or scandalous" trademarks, finding that term to be inherently and facially "viewpoint-based" for favoring ideas "aligned with conventional moral standards" and disfavoring ideas "hostile to them." 139 S. Ct. 2294, 2299-2300 (2019). The government may not justify viewpoint-based restrictions on protected speech by claiming to prevent harms to minors; "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. 213-14.

Obscenity falls within the "well-defined and narrowly limited classes of speech" that may be restricted without violating the First Amendment, *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 791 (2011) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)), but "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated," *id.* at 791. Yet that is exactly what the Challenge Procedure seeks to do.

If the Legislature had intended to confine the Challenge Procedure's reach to materials that are obscene to minors, then it knew how to do so: it could have incorporated the "harmful to minors" standard of Ark. Code § 5-68-501 (2019), which tracks the definition of obscenity as to minors approved of by *Ginsberg*, 390 U.S. at 642. Instead, it chose to proscribe an indefinite, broader category that the Supreme Court has never sanctioned, and that smacks of enabling the sort of viewpoint discrimination that courts have not tolerated.

While the Challenge Procedure clearly reaches beyond the permissible scope of unprotected speech such as obscenity, even if the Challenge Procedure's "appropriate" standard could be limited to restricting younger minors' access to materials obscene to them, it would fail

strict scrutiny because it is not narrowly tailored. Rather than narrowly targeting young minors' access to materials obscene to them, the Challenge Procedure also inhibits older, more mature minors and adults from accessing these materials, which are not obscene as to them.

Specifically, when books or other library materials are deemed inappropriate for young children, they are segregated in areas accessible only to adults. *See* Act 372 at § 5(c)(11)(A). As described above, this approach discourages adult library patrons from visiting a stigmatized area of the library and this deprives all access to older, more mature children for whom the materials are not obscene. This violates the First Amendment. *See Butler v. State of Michigan*, 352 U.S. 380, 383 (1957) ("We have before us legislation not reasonably restricted to the evil with which it is said to deal. The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children."); *see also Shipley III*, 454 F. Supp. 2d at 831 (censorship scheme was unconstitutional because it "impose[d] unconstitutional prior restraints on the availability and display of constitutionally protected, non-obscene materials to both adults and older minors").

The Challenge Procedure segregation requirement is precisely what Judge Eisele indicated would have rendered a segregation requirement invalid in *Shipley III*. The 2003 statute created a safe harbor under which "a person shall be deemed not to have displayed material harmful to minors if the lower two-thirds (2/3) of the material is not exposed to view and [is] segregated in a manner that physically prohibits access to the material by minors." *Shipley II*, 195 S.W.3d at 919. On a set of certified questions, the Arkansas Supreme Court in *Shipley II* was presented with alternative interpretations of the segregation requirement in the challenged statute. The *Shipley* plaintiffs contended that the challenged statute required booksellers to "create a separate room or physically segregated area, with one or more entryways, with entry limited to adults either through

technology or human control." *Shipley II*, 195 S.W.3d at 920. The Arkansas Supreme Court, however, read it more narrowly, concluding "that the 'safe harbor' provision requires only that some physical obstacle stand between minors and the area where prohibited material is displayed, so that minors have no access to such material." *Id.* Under that interpretation, the federal court concluded that, although a "close[ ] question," the segregation requirement did not facially violate the Constitution. *Shipley III*, 454 F. Supp. 2d at 831.

Unlike the 2003 statute, the statute here requires more than simply "some physical obstacle" between minors and "inappropriate" books. Rather, it requires *relocation* of these books to an *area* that is not accessible to minors, Act 372 § 5(c)(11)(A), closer to the interpretation put forward by the *Shipley* plaintiffs. As described above, the burden of this requirement is likely to be substantial, and potentially impossible for libraries to comply with. And the creation of an "adults-only" room would create its own needless burdens on the ability of adults and older minors to access materials similar to the burdens struck down in *Counts*. 295 F. Supp. 2d at 1005. This failure to serve its ostensible purpose through a narrowly tailored approach renders the Challenge Procedure unconstitutional. *See Butler*, 352 U.S. at 383.

c)      *The Challenge Procedure lacks a mechanism for judicial review.*

As a prior restraint, the Challenge Procedure faces a "heavy presumption" of unconstitutionality. *Org. for a Better Austin*, 402 U.S. at 419. By erecting a process that exists solely to restrain dissemination and availability of books and other library materials, the Challenge Procedure "freezes" First Amendment activity—the "immediate and irreversible" result of any prior restraint. *Nebraska Press Ass'n*, 427 U.S. at 559. That the Challenge Procedure provides for *withdrawing* books and other materials from a library's general collection (rather than preventing

their inclusion in the first place) is irrelevant to library patrons who hope to access the materials; it *restrains* their access *prior* to viewing, reading, or otherwise consuming the materials.

Whenever a state system of censorship imposes a prior restraint on expression, it must provide for prompt judicial review. Because the protection of free expression requires sensitive, legally intensive analysis, state censors may not remove speech from public view "in a manner which would lend an effect of finality to the censor's determination" about a particular work's protection under the First Amendment. *Freedman v. State of Md.*, 380 U.S. 51, 58 (1965); *see also City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.,* 541 U.S. 774 (2004) (noting the heightened need for special procedural rules to provide speedy access to judicial review where the state seeks to impose content-based restrictions using subjective, discretionary criteria). The proper venue for such a determination is the judiciary: "only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression," *Freedman*, 380 U.S. at 58 (collecting cases), "[b]ecause the censor's business is to censor" and he therefore "may well be less responsive than a court" to First Amendment interests, *id.* at 57. Moreover, the burden of showing that the expression is unprotected and may be silenced "must rest on the censor," and the censor must, "within a specified brief period," either allow the expression "or go to court to restrain [it]." *Id.* at 58-59; *see also Teitel Film Corp. v. Cusack*, 390 U.S. 139, 142 (1968) (holding censorship procedures are unconstitutional in "[t]he absence of any provision for a prompt judicial decision by [a] … court").

The Challenge Procedure does none of the above. It provides no mechanism for judicial review, let alone a path to a "prompt judicial decision." There is no "specified brief period" within which the Library Committee must make a decision. The only review the Procedure does contemplate is by the "governing body" of the municipality or county where the library is located,

whose decision is "final." Act 372 at § 5(c)(12)(C)(ii). Even if executive review could take the place of judicial review, such appeals are tilted in favor of removal: appeal to the governing body is available only where the Library Committee *declines* to remove a book from library shelves, Act 372 at § 5(c)(12)(A), thus reversing *Freedman*'s directive that the decision to *restrict* a work must be appealable. *Freedman*, 380 U.S. at 51. The Challenge Procedure provides no mechanism for challenging a decision to restrain expression, and it places no burden on the "governing body" as censor to justify to the public or to a court its decision to impose a final restraint on speech.

The Challenge Procedure therefore builds in Potemkin procedural protections when a challenge is taken up by the library committee, then ultimately puts unreviewable authority over a content- or viewpoint-based decision to a simple up-or-down vote by the governing body. Like the flawed city resolution at issue in *Sund,* the Challenge Procedure "actually facilitates an infinite number of content- and viewpoint-based speech restrictions," 121 F. Supp. 2d at 549, and does so without contemplating any involvement by the judiciary.[5]

Even where a challenge is denied and a book retained, the statute provides no limit on the number of times a book may be challenged, resulting in an indefinite threat of suppression. The Challenge Procedure therefore fails to "assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license" for a book to remain on shelves, *Freedman*, 380 U.S. at 59, and precludes judicial determination of whether an item may be removed consistent with the First Amendment. This process is unaccountable to the judiciary

---

[5] The lack of judicial review in the Challenge Procedure is even more troubling when viewed in connection with the Availability Provision. A local governing body's "final" decision that a library collection contains "inappropriate" material, *see* Act 372 § 5(c)(12)(C)(ii), will be easily confused for—or, worse, readily used as—evidence that the library's employees furnished "harmful" material available to minors, in violation of the Availability Provision. *See, e.g.*, Adams Declaration at ¶ 4, Ex. 2 (Wahlmeier letter discussed *supra* at I.B.2, connecting the Challenge Procedure to "protecting children from exposure to materials that might harm their innocence").

and designed with a thumb on the scale in *favor* of restriction. It shifts the burden of bringing the issue before the court (and thus indirectly shifts the burden of persuasion) from the government imposing restraint to the party seeking to lift it. That is precisely what the Constitution forbids.

*Freedman* is instructive on this point. In that case, the Supreme Court struck down a censorship system even though it included a mechanism for judicial review because 1) the censorship system required the party advocating in favor of free expression to "assume the burden of instituting judicial proceedings"; 2) once censored, the expression would be "prohibited pending judicial review, however protracted"; and 3) there was "no assurance of prompt judicial determination." *Id.* at 59-60. The Challenge Procedure, by contrast, has no mechanism for judicial review at all (let alone one that properly places the burden on the censor), and provides for the removal of books from shelves during review, *see* Act 372 § 5(c)(2) ("The county or municipal library shall decide if material being challenged shall remain available throughout the challenge process."), with no corresponding "pending judicial review" and "no assurance" of alacrity during the library's review. *Freedman*, 380 U.S. at 60. It also impermissibly "places 'unbridled discretion in the hands of [] government'" and, during the library's review, provides the government with "unlimited time within which" to decide whether it will suppress expression, which "creates the risk of indefinitely suppressing permissible speech." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-27 (1990).

Because the Challenge Procedure, like the system the Court struck down in *Freedman*, "fails to provide adequate safeguards against undue inhibition of protected expression," it thus constitutes "an invalid [prior] restraint." *Freedman*, 380 U.S. at 60.

> d)      *The Challenge Procedure discriminates on the basis of viewpoint.*

The Challenge Procedure further offends the First Amendment by providing different rights to individuals based on the content of their viewpoint. The First Amendment's "protections are at the core of our democratic society" and "include the ability to petition the government," consistent with our nation's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 686 (8th Cir. 2012) (internal quotations omitted). "[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based," and the courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens on speech because of its content." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642-43 (1994). By actively empowering and providing formal procedural protections to parties petitioning their government to restrict access to materials in libraries while failing to provide any similar avenue for parties favoring access to petition the government, the Challenge Procedure fails to ensure equal treatment of these opposing views. *Cf., e.g., Boos v. Barry*, 485 U.S. 312, 318-21 (1988) (finding that a law that prohibited picketing on sidewalks in front of foreign embassies where the messages on the signs were critical of those governments—but would allow picketing if the messages were favorable—constituted a content-based restriction subjected to strict scrutiny).

The Challenge Procedure requires county and municipal libraries to adopt written policies for challenges against material's inclusion within a library's collection. The policy must allow "[a] person affected by the material" to "challenge the appropriateness of material available in the . . . library." Act 372 at § 5(c)(1). Following a meeting between the librarian and the "affected" person, *id.* at § 5(c)(3), the librarian must assemble a committee of library personnel to review materials

in response to a challenge. *Id.* at § 5(c)(6). The "affected" person must be permitted to present their request to the committee, *id.* at § 5(c)(9), after which the committee "shall vote to determine whether the material being challenged shall be relocated within the library's collection to an area that is not accessible to minors under the age of eighteen (18) years," *id.* at § 5(c)(11)(A).

If the committee votes in favor of the challenge, then the process ends without any recourse for library patrons aggrieved by the material's segregation. Only if the committee rejects the challenge is there a right of review, and only for those who seek removal—not for those seeking retention. Specifically, if the librarian's committee votes against a challenge, then "the person who submitted the request" for removal may appeal "to the governing body of the county or city." *Id.* at § 5(c)(12)(A). Once the appeal is received, the county or city's executive head must present the challenge to the county or city's governing body, and may include a recommendation for how to rule. *Id.* at § 5(c)(12)(B)(ii). The challenge is then decided by the members of the governing body, which must "review" the challenge and make a decision within 30 days but need not hear from a book's supporters in any fashion before rendering a decision to remove material from a library's main collection. *See id.* at § 5(c)(12)(C)(i). Act 372 describes the resulting decision as "final." *See id.* § 5(c)(12)(C)(ii).

In sum, people who hold the view that a book should be withdrawn from the library's collection or segregated have a right to file a formal challenge, meet with the library, and appeal to the local government. But people who hold the view that a book should *not* be withdrawn have no such rights. They do not even have an opportunity to comment in the process or hear the reasons for withdrawing a book. If you oppose a book, Act 372 gives you extensive procedural rights to

petition the government; if you support a book, Act 372 does not allow you to be heard.[6] Such viewpoint discrimination cannot survive First Amendment scrutiny. *Turner*, 512 U.S. at 642.

### D.    Irreparable Harm

In addition to having a high likelihood of success on the merits, Plaintiffs will suffer irreparable harm if the preliminary injunction is not granted because the Availability Provision and Challenge Procedure abridge their First Amendment rights. *Phelps-Roper,* 662 F.3d at 488. No legal remedy exists which could compensate for their loss of protected constitutional rights. *Nat'l People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990).

As described extensively, above, Plaintiffs' First Amendment rights stand to be impacted in a variety of ways should the challenged provisions of Act 372 go into effect, including librarians and booksellers facing prosecution for failing to censor constitutionally-protected speech, libraries and bookstores struggling to comply with the vague mandates of the Availability Provision and Challenge Procedure, and bookstore and library patrons being faced with a rapid erosion in their access to constitutionally-protected materials, without procedural protections allowing them to advocate for retention of challenged materials.

These "loss[es] of First Amendment freedoms . . . unquestionably constitute[] irreparable injury," and the "public interest" always favors the "protect[ion of] constitutional rights." *Nixon*, 545 F.3d at 690.

---

[6] As with the lack of judicial review, *see supra* n. 5, Plaintiffs' concerns about the Challenge Procedure's viewpoint discrimination are heightened by the proximity of that process to the Availability Provision's criminal liability. Specifically, Plaintiffs are concerned that a local governing body's "final" decision that a library collection contains inappropriate material, *see* Act 372 § 5(c)(12)(C)(ii), will be used as evidence that the employees of that library made "harmful" material available to minors, in violation of the Availability Provision. This Court should not permit the Challenge Procedure's one-sided process to jeopardize Arkansas librarians' liberty in this manner.

### E.       Balance of the Equities and Public Interest

When the government opposes the issuance of a preliminary injunction, the final two factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of the equities and public interest here decidedly favor the Plaintiffs, given the infringement on their First Amendment rights. *See Troutman,* 662 F.3d at 488. If a preliminary injunction is not granted, enforcement of the Availability Provision and Challenge Procedure will prevent Plaintiffs from exercising their First Amendment rights. Defendants have no legitimate interest in enforcing a statute that violates the First Amendment, so the principal public interest at stake here is the constitutionally guaranteed right to free expression.

By contrast, Defendants will suffer no harm if the preliminary injunction is granted. Existing state laws prohibit evils associated with displaying or furnishing materials harmful to minors. *See* Ark. Code Ann. § 5-68-502. Laws the State considered adequate for decades will remain on the books throughout this litigation, mitigating any conceivable harm to whatever interests the State purports to advance.

## III.    CONCLUSION

The Availability Provision and Challenge Procedure violate the First Amendment on their face. Plaintiffs respectfully request that this Court (1) upon hearing, find that the Availability Provision and Challenge Procedure violate the First and Fourteenth Amendments and issue a Preliminary Injunction pending final adjudication of this litigation; or, in the alternative, grant a Temporary Restraining Order barring the application of the Availability Provision and Challenge Procedure pending a decision on Plaintiffs' Motion for a Preliminary Injunction; and (2) award any other relief that the Court may deem just and proper to vindicate the rights of the Plaintiffs.

Respectfully submitted,

/s/ John T. Adams
David M. Fuqua
Ark. Bar No. 80048
John T. Adams
Ark. Bar No. 2005013
Attorneys for Plaintiffs Central Arkansas
Library System, Nate Coulter, and the Eureka
Springs Carnegie Public Library
FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Telephone: (501) 374-0200
E-Mail: dfuqua@fc-lawyers.com
E-Mail: jadams@fc-lawyers.com

Bettina Brownstein
Ark. Bar No. 85019
BETTINA E. BROWNSTEIN LAW FIRM
Attorney for Olivia Farrell, Jennie Kirby,
Hayden Kirby, and Leta Caplinger
904 West 2nd Street, Suite 2
Little Rock, AR 72201
Telephone: (501) 920-1764
E-Mail: bettinabrownstein@gmail.com
On Behalf of the Arkansas Civil Liberties
Union Foundation, Inc.

Will Bardwell*
Ben Seel*
Aman George*
Orlando Economos*
Attorneys for the Arkansas Library Association,
Advocates for All Arkansas Libraries, and Adam
Webb, in his individual capacity
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34554
Washington, DC 20043
Telephone: (202) 448-9090
E-Mail: wbardwell@democracyforward.org
E-Mail: bseel@democracyforward.org
E-Mail: ageorge@democracyforward.org
E-Mail: oeconomos@democracyforward.org

Vincent O. Chadick
Ark. Bar No. 94075
Brandon B. Cate
Ark. Bar No. 2001203
Glenn V. Larkin
Ark. Bar No. 2020149
Attorneys for Plaintiff Fayetteville Public
Library
QUATTLEBAUM, GROOMS & TULL
PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
E-Mail: bcate@qgtlaw.com
E-Mail: vchadick@qgtlaw.com
E-Mail: glarkin@qgtlaw.com

Michael A. Bamberger*
Kristen Rodriguez*
Rebecca Hughes Parker*
Attorneys for Pearl's Books, LLC,
Wordsworth Community Bookstore LLC,
American Booksellers Association,
Association of American Publishers, Inc.,
Authors Guild, Inc. Comic Book Legal
Defense Fund, and Freedom to Read
Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
E-Mail: michael.bamberger@dentons.com
E-Mail: kristen.rodriguez@dentons.com
E-Mail: rebeccahughes.parker@dentons.com

* Admitted pro hac vice

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on June 22, 2023, a copy of the foregoing was served upon all counsel of record contemporaneously with its filing in the CM/ECF system, and was sent by e-mail and United States mail, postage prepaid, to:

Gentry Wahlmeier
Attorney for Crawford County, Arkansas
and County Judge Chris Keith
WAHLMEIER LAW FIRM, P.A.
P.O. Box 1811
Van Buren, AR 72957
Telephone: (479) 431-3366
E-Mail: gentry@wahlmeierlaw.com

/s/ John T. Adams
John T. Adams