IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FAYETTEVILLE PUBLIC LIBRARY, a political
subdivision in the City of Fayetteville, State of
Arkansas; EUREKA SPRINGS CARNEGIE PUBLIC
LIBRARY; CENTRAL ARKANSAS LIBRARY
SYSTEM; NATE COULTER; OLIVIA FARRELL;
JENNIE KIRBY, as parent and next friend of HAYDEN
KIRBY; LETA CAPLINGER; ADAM WEBB;
ARKANSAS LIBRARY ASSOCIATION;
ADVOCATES FOR ALL ARKANSAS LIBRARIES;
PEARL'S BOOKS, LLC; WORDSWORTH
COMMUNITY BOOKSTORE LLC d/b/a
WORDSWORTH BOOKS; AMERICAN
BOOKSELLERS ASSOCIATION; ASSOCIATION OF
AMERICAN PUBLISHERS, INC.; AUTHORS
GUILD, INC.; COMIC BOOK LEGAL DEFENSE
FUND; FREEDOM TO READ FOUNDATION                    PLAINTIFFS


V.                          NO. 5:23-CV-05086-TLB

CRAWFORD COUNTY, ARKANSAS; CHRIS
KEITH, in his official capacity as Crawford County
Judge; TODD MURRAY; SONIA FONTICIELLA;
DEVON HOLDER; MATT DURRETT; JEFF
PHILLIPS; WILL JONES; TERESA HOWELL; BEN
HALE, CONNIE MITCHELL, DAN TURNER, JANA
BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE
HUNTER; DANIEL SHUE; JEFF ROGERS; DAVID
ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; TONY
ROGERS; NATHAN SMITH; CAROL CREWS;
KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each in his or her official capacity as a
prosecuting attorney for the State of Arkansas;       DEFENDANTS

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE,
A TEMPORARY RESTRAINING ORDER**

Plaintiffs submit this Reply Brief to respond to the Prosecuting Attorneys' (the "PA Defendants") Response to the Plaintiffs' Motion for a Preliminary Injunction (the "PA Response") (Doc. 37) and Separate Defendants Crawford County and County Judge Chris Keith's (the "Crawford County Defendants") Response to Plaintiffs' Motion for a Preliminary Injunction, Or, In the Alternative, a Temporary Restraining Order (the "County Response") (Doc. 38). *See* Pls.' PI Mot. (Doc. 22); Opening Brief (Doc. 23). The PA Response and County Response are each shot through with legal and factual errors, and their arguments against the issuance of a preliminary injunction fail.

## I.     The PA Response and County Response Mischaracterize Key Facts and Law

In addition to Defendants' misstatements of the evidence supporting the Court's jurisdiction and Plaintiffs' entitlement to preliminary relief, discussed further below, Plaintiffs wish to address two overarching factual errors as an initial matter.

### a.   The Availability Provision Prohibits Plaintiffs from Making Available a Substantial Amount of Non-Obscene Material

Throughout their brief, the PA Defendants continuously make the erroneous claim that Plaintiffs "ask this Court to create a constitutional right to provide obscenity to minors." PA Response at 2; *see also, e.g.*, *id.* at 6, 9 (contending the Court lacks jurisdiction because Plaintiffs do not claim to have material that would violate Arkansas' obscenity statute). To support this inflammatory assertion, the PA Defendants incorrectly conflate Arkansas' variable obscenity— i.e., "harmful to minors"—statute, Ark. Code Ann. § 5-68-501(2), which Plaintiffs do not challenge, with the facially unconstitutional and sweeping manner in which Arkansas wields its variable obscenity law in Section 1 (the "Availability Provision") of Act 372 of 2023 ("Act 372"),

to unconstitutionally restrict booksellers and libraries from making available to adults and older minors materials that are not obscene—and, thus, constitutionally protected—to those readers.

The Availability Provision has nothing to do with obscenity *as a general category of unprotected speech*; it regulates material deemed *harmful to minors*. But a book that is "harmful to minors" under Arkansas law is still *constitutionally protected*, for readers who are of the age and maturity to derive literary, scientific, medical, artistic, or political value from the book, such as adults and older minors. *See* Ark. Code Ann. § 5-68-501(3)(B)(i) (prior Arkansas law establishing that the defendant must have had knowledge of "[t]he age of the minor"); *see also Shipley, Inc. v. Long,* 359 Ark. 208, 218 (2004) (*Shipley II*) (noting that "statutes restricting the distribution of sexually explicit materials to children" are constitutional, "so long as they do not unreasonably restrict adults' access to material which is not obscene as to them") (citing *Ginsberg v. State of New York*, 390 U.S. 629, 636-37 (1968) and *Upper Midwest Bookseller Ass'n v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1986)).  *Cf. Miller v. California*, 413 U.S. 15, 24 (1973).

Rather than responding to Plaintiffs' attack on restrictions on "availability," the PA Defendants repeatedly state that Plaintiffs seek to "furnish" harmful materials to minors; that is not the case. *See, e.g.*, PA Response at 6. It is the Availability Provision's failure to account for that fact—that older minors and adults derive legitimate value from books that younger minors might not—that Plaintiffs challenge. Courts dealing with laws that have similarly restricted access to or display of material that is harmful to minors have, accordingly, either invalidated those laws, *see, e.g.*, *PSINet, Inc. v. Chapman,* 362 F.3d 227 (4th Cir. 2004), *and Shipley, Inc. v. Long*, 454 F. Supp. 2d 819 (E.D. Ark. 2004) (*Shipley III*), or limited their scope so that any restriction is at its most *de minimis*, *see, e.g.*, *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993) ("the display statute applies only to those materials which lack serious literary,

artistic, political, or scientific value for a reasonable 17–year–old minor"); *American Booksellers Ass'n v. Webb*, 919 F.2d 1493, 1508-09 (11th Cir. 1990) (saving the statute by assuming that the use of so-called blinder racks would satisfy the statute and render the burden on adults constitutionally insignificant).

Properly construed, the Availability Provision is not amenable to any saving construction so, for the reasons explained below, preliminary relief is warranted.

### b. The Challenge Procedure Facilitates Viewpoint Discrimination

Throughout the PA Response, the PA Defendants argue that Section 5 of Act 372 (the "Challenge Procedure") actually "provides protection from viewpoint discrimination." PA Response at 17 (emphasis omitted). To make this claim, the PA Defendants inaccurately paraphrase or elide the statutory text in a way that substantially changes its meaning. According to the PA Defendants, the Challenge Procedure provides that "[t]he selection criteria '[s]hall not be' based on 'the viewpoints expressed within the material.'" *Id.* at 18 (first alteration in original) (quoting Act 372 § 5(c)(7)(B)); *accord. id.* at 19-20; *see also id.* at 4 ("In no case, however, can the relocation be based on viewpoint.") (citing Act 372 § 5(c)(7)(B)(i)). This surgically removes a key term: "solely." Read in full, the Challenge Procedure states only that challenged material "shall not be withdrawn *solely* for the viewpoints expressed within the material." Act 372 § 5(c)(7)(B) (emphasis added). Thus, by its terms, it readily permits—rather than forbids—a committee of librarians to withdraw library materials from circulation based *substantially* or *predominantly* or *almost completely* on the viewpoint expressed in the materials, so long as it can claim that the decision was not *solely* based on the viewpoint expressed. *See id.* And this minor hurdle to viewpoint discrimination does not clearly apply to governing bodies at all. *Id.*

Accordingly, any amount of pretext will allow a viewpoint-based withdrawal decision to stand under the Challenge Procedure. Moreover, even if the PA Defendants were correct that the

Challenge Procedure prohibited a library from *withdrawing* materials from its collection based on viewpoint, the law says nothing that would prohibit a library committee from looking solely to the viewpoint expressed in a book when deciding to *segregate* that book in an area inaccessible to older minors. *See id.*

## II.    The Plaintiffs Have Article III Standing and This Case Is Ripe

### a.    Plaintiffs Have Standing to Challenge the Availability Provision

When the chilling of constitutional speech is at stake, "an actual and well-founded fear that the law will be enforced" against the plaintiff suffices for standing. *Virginia v. Am. Bookseller's Assn., Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit…Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."). An actual arrest is not a "prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (finding that the threat of enforcement amounts to an Article III injury in fact).

Defendants here claim that Plaintiffs lack standing to sue because they "do not identify any obscene item that they have that they want to give children." PA Response at 4, 6, 9. But, as explained above, Plaintiffs do not want to give any obscene item to a minor and their standing does not turn on a desire to do so. Rather, Plaintiffs have listed over two dozen non-obscene books in their stores and in their collections that might nevertheless be considered "harmful to minors" under Act 372, many of which might be appropriate for a 17-year-old but not a 10-year-old, and multiple Plaintiffs have expressed a well-founded concern that they will be charged with violating Act 372 for displaying these items or making them accessible. *See* Declaration of Carol Coffey ("Coffey Decl.") at ¶ 16 (Doc. 22-4); Declaration of Nate Coulter ("Coulter Decl.") at ¶¶ 8, 16 (Doc. 22-5); Declaration of Christina Danos ("Danos Decl.") at ¶¶ 7, 15 (Doc. 22-6); Declaration of David Johnson ("Johnson Decl.") at ¶¶ 7, 8, 13 (Doc. 22-9); Declaration of Adam Webb ("Webb

Decl.") at ¶¶ 8, 17 (Doc. 22-15); Declaration of Daniel Jordan ("Jordan Decl.") at ¶¶ 4, 5 (Doc. 22-10); Declaration of Kandi West ("West Decl.") at ¶¶ 4, 5 (Doc. 22-16); *see also* Exhibit A (attached hereto).

Accordingly, this case is on all fours with *Commonwealth v. American Booksellers Ass'n*, 236 Va. 168 (1988), where the Court found standing for plaintiffs who identified 16 books they thought would be implicated by the statute and the defendant had not disclaimed an intention to enforce the statute.

### b. Library Plaintiffs[1] Have Standing to Sue Over the Challenge Procedure

### i. The PA Defendants' Standing Arguments Fail.

The PA Defendants further contend that Plaintiffs lack standing because injuries they assert in connection with the Challenge Procedure are (1) "wholly speculative," and (2) not caused by any of the Defendants and, therefore, unlikely to be redressed by an order enjoining Defendants or declaring the Challenge Procedure to be unlawful. *See* PA Response at 7-9. In reality, Plaintiffs' injuries are straightforward, caused by county governments and county officials, like Crawford County and Judge Keith, and, accordingly, are redressable by the Court.

First, the PA Defendants' argument that Plaintiffs have not suffered an injury-in-fact fails because Plaintiffs have shown, among other things, straightforward injuries to their constitutional rights and economic interests.

For instance, Plaintiffs who are library patrons have established that the segregation of books under the Challenge Procedure will burden their ability to access books at their local library. *See* Declaration of Leta Caplinger ("Caplinger Decl.") at ¶ 7 (Doc. 22-3) (adult patron of Crawford

---

[1] Plaintiffs refer to the "Library Plaintiffs" and "Bookseller Plaintiffs" as those terms are defined in the complaint. *See* Compl. at 2 n.1 (Doc. 2).

County Library describing how she will be deterred from freely browsing if books that would appeal to her were segregated into a secure, adults only section that she would be disinclined to enter); Declaration of Hayden Kirby ("Kirby Decl.") at ¶¶ 4-5 (Doc. 22-11) (17-year-old library patron listing young adult novels with passages describing sexual activity, in which she has found literary value); Declaration of Oliva Farrell ("Farrell Decl.") at ¶ 7 (Doc. 22-7) (describing the burden she would face if books that might appeal to her are segregated into an adults only area, particularly when she visits the library with minor children who would not be permitted into that area). And the Library Plaintiffs have demonstrated the tremendous monetary costs they will incur if they are forced by the Challenge Procedure to create areas that are inaccessible to minors. *See* Declaration of Deborah Caldwell-Stone ("Caldwell-Stone Decl.") at ¶¶ 11(c)-(d) (Doc. 22-2); Coffey Decl. at ¶¶ 12-13; Coulter Decl. at ¶ 10-12; Danos Decl. at ¶¶ 9-11; Johnson Decl. at ¶¶ 12, 14; Webb Decl. at ¶¶ 10-12. These classic injuries suffice for standing purposes.

Second, the PA Defendants are wrong when they argue that Plaintiffs' asserted injuries can only be traced to public libraries, which are tasked with developing the "criteria of selection" against which challenged books are evaluated. PA Response at 7-8.[2] In the PA Defendants' telling, the Challenge Procedure is merely a self-accountability mechanism for public libraries. *Id.* But this argument ignores the fact that the Challenge Procedure assigns local governments and their

---

[2] The PA Defendants imply that the "appropriateness" standard in the Challenge Procedure is meant to be coextensive with libraries' criteria of selection. See PA Response at 4. On that reading, there would have been no need for the Legislature to clarify that these challenges should not be decided "solely on the basis of viewpoint," rather than merely inviting parties to challenge whether books included in libraries' collections meet libraries' criteria of selection. *See* Act 372 § 5 (c)(7)(B)(i). Moreover, the Challenge Procedure determines only "whether the material being challenged shall be relocated within the library's collection to an area that is not accessible to minors under the age of eighteen (18) years," *see id.*, at § 5 (c)(11)(A), which would make no sense if the procedure was meant to address any criterion of selection other than appropriateness for minors.

executive heads, such as Crawford County and Judge Keith, final authority over book challenges, including the authority to render final judgment about whether and where a particular book will be located in the library. *See* Act 372 § 5(c)(12). Moreover, even if the library's criteria of selection are relevant on appeal—and the Challenge Procedure does not specify a governing appellate standard—those terms are not self-executing; the county's governing body retains ample (and unreviewable) discretion to apply that standard in whatever manner it sees fit. *See id.* Thus, Plaintiffs' injuries are plainly traceable to the process overseen and implemented by Judge Keith and Crawford County.[3]

### ii. The County Defendants' Standing Arguments Fail.

The County Defendants also assert that Plaintiffs lack standing, although they do so by broadly incorporating arguments made in their pending motion to dismiss. *See* County Response at 4; *see also* County Defs.' MTD (Doc. 36). In support of that motion, the County Defendants argue that Plaintiffs lack standing with respect to their Section 5 claims because (1) Crawford County has not yet implemented the Challenge Procedure and will not do so if the Court enjoins that portion of the law or declares it unconstitutional; (2) any injuries stemming from the Challenge Procedure cannot be attributable to the County Defendants because the State of Arkansas, not Crawford County, wrote and passed Act 372; and (3) declaratory or injunctive relief against the

---

[3] As a general matter, the role of local government executives is central to implementing state and local policy over libraries. Ark. Code Ann §§ 13-2-502 and 14-14-705. City mayors and county judges appoint the board members of municipal and county libraries in Arkansas. *Id.* Judge Keith's predecessor presided over and was instrumental in implementing the material-segregation plan. *See* Exhibit B (CCQC J, of Pro., Dec. 19, 2022) (attached).  Keith has appointed the majority of the members of the Crawford County Library Board. See Exhibit C (CCQC J. of Pro., Jan. 17, 2023) (attached).

County Defendants will not redress Plaintiffs' injuries because Crawford County has not yet implemented the Challenge Procedure. *See id.* at 5-7.

These arguments are easily dispatched. First, Plaintiffs' injuries are certain to occur once Crawford County implements the Challenge Procedure, which Plaintiffs have shown is likely once the law goes into effect. *See* Declaration of John Adams ("Adams Decl.") ¶¶ 4-5, Exs. 2, 3 (Doc. 22-1). Crawford County does not dispute that it intends to implement the Challenge Procedure, and thus there is no dispute about the injury's imminence. Second, like the PA Defendants, the County Defendants' causation argument overlooks entirely the role that county governments and officials, like the County Defendants, are assigned by the Challenge Procedure. *See supra* at 5-7. Finally, an order enjoining Crawford County from implementing the Challenge Procedure and declaring that provision unlawful will plainly redress Plaintiffs' injuries, as the County Defendants readily acknowledge. Declaration of Chris Keith ("Keith Decl.") at ¶¶ 3-4 (Doc. 38-1) (asserting that the County Defendants will comply with a court order enjoining or declaring unlawful portions of Act 372). While the County Defendants assert that they will not implement the Challenge Procedure if this Court strikes it down, *see* County Defs.' MTD at 5; Keith Decl. at ¶¶ 3-4, the test for causation and redressability is not whether a defendant would voluntarily abide by the ruling in a case against a different defendant.

### c. This Case Is Ripe for Judicial Review

The PA Defendants concede that the standing and ripeness issues in this case "essentially 'boil down to the same question.'" PA Response at 9 (quoting *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608 (8th Cir. 2022)). For many of the same reasons the Plaintiffs have standing to challenge both the Availability Provision and the Challenge Procedure, the issues they present are ripe for adjudication. With respect to the Availability Provision, this case closely resembles *Commonwealth v. American Booksellers*, in which the Supreme Court found standing

for booksellers seeking pre-enforcement review of a law criminalizing the display of material harmful to minors where the booksellers had "an actual and well-grounded fear that the law [would] be enforced against them." 484 U.S. at 393. Moreover, the PA Defendants have not disclaimed an intention to enforce the Availability Provision, once it goes into effect.

With respect to the Challenge Procedure, the Library Plaintiffs have likewise established both the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas v. United States*, 523 U.S. 296, 300-01 (1998). As further explained below, the Challenge Procedure, on its face, will immediately violate the First and Fourteenth Amendments by creating a procedure for restricting speech through a vague mechanism, shielded from judicial review, that facilitates viewpoint discrimination. *Infra* § IV.

### III. The Availability Provision Is Unconstitutional

#### a. The Availability Provision Is a Content-Based Restriction That Is Subject to Strict Scrutiny

The PA Defendants would have the Court believe that the Availability Provision regulates only unprotected, obscene speech and, thus, must pass only rational basis review. *See* PA Response at 10 (first citing *United States v. Williams*, 553 U.S. 285, 287 (2008), and then citing *Ginsberg*, 390 U.S. at 640). But, as Plaintiffs have taken pains to explain, the Availability Provision also prohibits bookstores and libraries from making available material that is not obscene for adults and older minors. *See supra* at 1-3. The Availability Provision regulates this non-obscene material, moreover, based on "the topic discussed or the idea or message expressed" therein. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). It is, accordingly, a content-based regulation on protected speech, which makes strict scrutiny the proper test. Thus, to pass muster, the Availability Provision must serve a compelling interest, be narrowly tailored to achieve that interest, and be the least restrictive means of advancing that interest. *Id.* at 163-64. The Availability Provision,

which broadly blocks adults and older minors from accessing protected material as it tries to keep unprotected, obscene material away from younger minors, does not pass that test. *See Reno v. ACLU*, 521 U.S. 844, 875 (1997) ("[T]he governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults."); *see also Davis-Kidd*, 866 S.W.2d at 524-25 (applying strict scrutiny to a statute that criminalized the display of books and films that contain material harmful to minors).

Moreover, the PA Defendants' reliance on *Ginsberg* to support their argument that the Availability Provision need only survive rational basis review is misplaced. *Ginsberg* upheld a harmful to minors statute used to regulate *sales* to minors under 17; it did not relate to availability or access restrictions that affected adults. 390 U.S. at 645-647.[4] Banning the sale of material that is harmful to minors does not curtail the availability of the material to adults and thus does not inhibit First Amendment rights. It is thus a far more tailored approach to regulating minors' access to obscenity than bans on making material that is harmful to minors available for browsing, which substantially impairs the ability of adults and older minors, for whom the material is protected and not obscene, to access it. *See Shipley III*, 454 F. Supp at 825.

As a fallback, the PA Defendants argue that, at the least, the Court should apply intermediate scrutiny because the Availability Provision "regulates conduct—*furnishing* obscenity to minors—not speech." *See* PA Response at 10 (emphasis added)(citing *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 756 (8th Cir. 2019)). However, intermediate scrutiny only applies to content-*neutral* regulations, *see Holder v. Humanitarian L. Project*, 561 U.S. 1, 26-27 (2010), and

---

[4] The majority in *Ginsberg* was also persuaded of the statute's constitutionality because parents were explicitly permitted to acquire the material for their children if they thought it appropriate for their particular child. *See Ginsberg*, 390 U.S. at 639. That reasoning does not apply here, because the Availability Provision would punish booksellers, librarians, and parents all equally for making available, presenting, or showing the same (again, non-obscene as to adults) material to a minor.

the Availability Provision is a content-*based* regulation, *supra* at 9-11. But even if intermediate scrutiny does apply, the PA Defendants must still show that the Availability Provision "'does not burden substantially more speech than necessary to further [the governmental] interests.'" *Id.* (quoting *Turner Broad Sys., Inc. v. FCC,* 520 U.S. 180, 189 (1997)).

Ultimately, the Availability Provision fails under either test because it impermissibly burdens the rights of adults and older minors, *see* Opening Brief at 16-20, and Defendants make no effort to argue that it is sufficiently tailored to avoid that result.

### b. The Availability Provision is Overbroad

The Availability Provision is unconstitutionally overbroad because it restricts even unprotected speech, *i.e.*, materials that are not obscene as to adults and older minors, in its attempt to keep unprotected, obscene materials from minors. *See id.* at 20-23. The PA Defendants passingly assert that the Availability Provision has only "incidental effects on speech," PA Response at 12, but primarily argue that Plaintiffs cannot prevail on a facial overbreadth challenge because they have failed to show how expansive the harms from the Availability Provision are to non-parties to this case. *Id.* As a practical matter, it does not matter whether the Court finds that Plaintiffs have a facial or as-applied overbreadth challenge to the Availability Provision. Plaintiffs are located in every judicial district in Arkansas and, thus, only an injunction that applies statewide will afford complete relief. *See* Coffey Decl. ¶ 7 ("ArLA has at least one active and dues-paying member in 56 of 75 counties in Arkansas, including Crawford County, and has at least one active and dues-paying member in each judicial district in the state.").

Nevertheless, it cannot be reasonably disputed that Plaintiffs—which range from booksellers to individuals to authors to publishers to libraries—supported their motion with substantial evidence describing the many and varied harms that the Availability Provision will cause all across Arkansas. *See* Opening Brief at 4-9. If Plaintiffs have failed to provide evidence

concerning nonparties, it is only because their harms comprehensively illustrate the scope of the problem. Plaintiffs should not be penalized for the size or diversity of their co-Plaintiff roster.

### c. The Availability Provision Imposes a Prior Restraint

In arguing that "Plaintiffs offer no reason why they believe the [Availability Provision] is a prior restraint," the PA Defendants again miss the consistent logic of First Amendment cases. *See* PA Response at 11. Plaintiffs have provided the Court with a thorough explanation of how the overbroad statute will affect their ability to do their jobs or operate their businesses, which they will now do in the shadow of prosecution. Even the possibility of prosecution serves to chill speech, notwithstanding the availability of First Amendment defenses, so the Availability Provision will inevitably force Plaintiffs to undertake preemptive self-censorship. It is thus "overbroad *and impose[s] unconstitutional prior restraints* on the availability and display of constitutionally protected, non-obscene materials to both adults and older minors." *Shipley III,* 454 F. Supp. 2d at 831 (emphasis added).[5] Similarly, the library patron Plaintiffs have shown that the law's sweep curtails their access to material that is constitutionally protected as to them, making it stigmatized or practically impossible to access. *See* Opening Brief at 16-20; *see also* Caplinger Decl. at ¶¶ 5-8; Farrell Decl. at ¶¶ 5-7; Kirby Decl. at ¶¶ 4-5.

---

[5] The PA Defendants further conflate and muddle the applicable doctrine by relying on two cases involving high schools to assert that "prior restraints are not per se unconstitutional when related to minors." PA Response at 11. This rule applies only in the school context, where school officials' "legitimate pedagogical concerns," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), and responsibility to make curricular decisions allow them greater leeway. Prior restraints placed on bookstores and public libraries do not receive the same deference. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 915 (1982) (Rehnquist, J., dissenting) (noting that public libraries are "designed for freewheeling inquiry").

### d. The Availability Provision Is Vague

The prosecuting attorneys argue that "makes available" is not vague.[6] Although that key term is not defined by Act 372, the PA Defendants confidently assert that "[t]here's 'no guess[ing]' required,'" PA Response at 13 (quoting *Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018), and declare by ipse dixit that the real-world examples Plaintiffs give would fall outside the statute, *id.* at 14. But the question is not whether a lawyer can make an argument for a particular interpretation; the question is whether the statute itself provides "sufficient definiteness" and precludes arbitrary application. *Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1988). The PA Defendants' interpretation in a response brief will not bar arrest or prosecution by a law enforcement officer who reads the statute differently, which is why "the failure to define the pivotal term of a regulation can render it fatally vague." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1310 (8th Cir. 1997). Act 372 failed to do so despite the "greater degree of specificity" demanded in this context, where the Availability Provision "'is capable of reaching expression sheltered by the First Amendment." *Id.* at 1308-09 (quoting *Smith v. Goguen,* 415 U.S. 566, 573 (1974)).

Curiously, the PA Defendants next argue that Plaintiffs have not set forth realistic hypotheticals to illustrate their confusion over how to do their work without risking incarceration. *See* PA Response at 14. But Plaintiffs have set forth their concerns stemming from their confusion in great, vulnerable detail, even going so far as to identify specific books that have them fearing prosecution. *See, e.g.*, Coulter Decl. at ¶¶ 8, 16; Danos Decl. at ¶¶ 7, 15; Johnson Decl. at ¶¶ 7-9,

---

[6] Although the PA Defendants assert that "Plaintiffs challenge only one phrase as vague— "make[es] available," this is incorrect; Plaintiffs also challenge as vague "[t]he terms 'presents' and 'shows.'" *See* Opening Brief at 22. The PA Defendants have offered no defense of those terms, which provide equal grounds for granting relief on this claim.

15 (explaining the lack of guidance in Act 372 to help librarians know "what it means to make something available to minors," or what steps libraries should take to ensure compliance); Jordan Decl. at ¶¶ 4-5; Webb Decl. at ¶¶ 8, 14, 17 (describing confusion over whether Garland County Library may continue to have interns and volunteers who are minors); West Decl. at ¶¶ 4-5.

### e. States May Not Restrict Materials Based on Effects on the Youngest Minors

The prosecuting attorneys allege that, based *Ginsburg* and *Upper Midwest*, the Court must uphold the Availability Provision's uniform treatment of "all minors—younger and older." PA Response at 15. If all PA Defendants mean is that Arkansas may act to keep material fitting the definition "harmful to minors" out of the hands of all children, Plaintiffs agree. *See, e.g.*, *Ginsberg*, 390 U.S. at 636-43.[7] But the First Amendment rights of adults and older minors limit the means by which the state may pursue this goal. "Such prohibitions are permissible," only "so long as they do not unreasonably restrict adults' access to material which is not obscene as to them." *Shipley III*, 454 F. Supp. 2d at 825. The Availability Provision does precisely that by treating all minors alike within the context of an access and availability law, which restricts the First Amendment rights of adults and older minors.[8]

Unable to distinguish *Shipley III*, Defendants urge the Court to disregard it and to expand on *Upper Midwest*, 780 F.2d 1389. PA Response at 14. The Court should decline PA Defendants'

---

[7] PA Defendants argue that "the State acts well within the First Amendment when it 'accord[s] minors under 1[8] a more restricted right than that assured to adults,' even with a one-size-fits-all-minors approach." PA Response at 15 (quoting *Ginsburg*, 390 U.S. at 637). However, the New York statute at issue there applied to those under 17, not those under "1[8]," *id. see* 390 U.S. at 631. Thus, *Ginsburg* itself upheld a law that distinguished 17-year-olds from younger minors and cannot support the unqualified proposition that a state may treat all minors alike when regulating material "harmful to minors."

[8] Faced with similar arguments, and in order to save comparable statutes, the attorneys general of Arkansas, Tennessee, and Virginia have asked their respective Supreme Courts to assume that the question of whether an item is harmful to a minor should be examined from a 17-year-old's

invitation because, after the U.S. Supreme Court's decision in *Commonwealth v. American Booksellers*, *Upper Midwest* is no longer good law on the issue of whether a state may prohibit the display of materials that are harmful to minors.

In that case, Virginia argued that a Fourth Circuit decision in favor of booksellers created a split with the Eighth Circuit's decision in *Upper Midwest*. *See Shipley II*, 359 Ark. at 216 (summarizing procedural history). After accepting the appeal, the U.S. Supreme Court certified questions to the Virginia Supreme Court, which limited the definition of harmful to minors under Virginia law. *See id.* at 217. The Fourth Circuit sustained the statute in its narrowed form. *See Am. Booksellers Ass'n.*, 882 F.2d 125. In subsequent cases involving challenges to laws outlawing displaying or providing access to material that is harmful to minors, courts have uniformly either enjoined the law or, to save it, read in a substantial limitation. *See, e.g.*, *Davis-Kidd Booksellers*, 866 S.W.2d 520; *Shipley III*, 454 F.Supp.2d 819. Accordingly, "[o]ne cannot carefully review the *Upper Midwest* . . . in the aftermath of the full development of the 'Virginia Case' without concluding that" it should "not control the disposition of this case." *Id.*

Even if *Upper Midwest* remains good law, it should not govern the Court's analysis of the Availability Provision's constitutionality because the law at issue in *Upper Midwest* did far less to burden the access and browsing rights of adults than Act 372 does. *See Upper Midwest*, 780 F.2d

---

perspective, as opposed to the less mature minor's perspective. *See Shipley II*, 359 Ark. at 218-19 (discussing Arkansas' "proposed 'narrowing' interpretation"); *Davis-Kidd*, 866 S.W.2d at 528 (discussing the "narrowing construction advanced by the State"); and *Commonwealth v. American Booksellers Assn.*, 236 Va. 168, 176 ("The attorney general responds that the focus of the inquiry is not upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class.") But while that may have saved some statutes, *see Am. Booksellers Ass'n Inc. v. Com. of Va.*, 882 F.2d 125, 128 (4th Cir. 1989), the Availability Provision is not susceptible to such an interpretation. *See Shipley II*, 359 Ark. at 218-19 (rejecting a "'narrowing interpretation'" that would evaluate whether an item was "harmful to minors" from the perspective of a 17-year-old).

at 1390. Indeed, the display restriction at issue applied only to material "whose 'cover, covers, or packaging, standing alone, is harmful to minors.'" *Id.* Even then, a proscribed item could be displayed so long as it was placed in a wrapper or under an opaque cover. *Id.* Thus, *Upper Midwest* approved a less stringent regulation than the Availability Provision.

## IV. The Challenge Procedure is Unconstitutional[9]

### a. Relocating Library Materials Is Not Government Speech

In defending Plaintiffs' attacks on the Challenge Procedure, the PA Defendants begin by arguing that the "selection of library materials is government speech," which "is wholly under state control and outside First Amendment analysis." PA Response at 16-18 (citing *Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022)). This suggestion, that state officials' discretion to purge content from libraries is entirely unbounded, fundamentally misapplies government-speech doctrine and completely ignores the common-sense distinction courts have drawn between the necessary selectivity that goes into creating a library collection and the kind of invidious content discrimination the Challenge Procedure facilitates. It is also not the law. *See Pico*, 457 U.S. at 870-71 (explaining that discretion to determine the content of libraries "may not be exercised in a narrowly partisan or political manner") (plurality opinion); *id.* at 907 (Rehnquist, J., dissenting) ("cheerfully conced[ing]" this point); *id.* at 883 (White, J., concurring) (noting that the trial court should determine "the reason or reasons underlying the school board's removal of the books").[10]

---

[9] Defendants have failed to respond to Plaintiffs' arguments that the Challenge Procedure is unconstitutionally vague, Opening Brief at 23-26, and that it discriminates on the basis of viewpoint by providing an opportunity for those who believe a book should be withdrawn to express that view, but provides no comparable opportunity for those who hold the view that a book should not be withdrawn, *id.* at 34-35. *See generally* PA Response; County Response. Accordingly, relief on these claims is warranted.

[10] The Court need not engage in the head counting the PA Defendants ask it to undertake to apply the rule in *Marks v. United States*, 430 U.S. 188 (1977) to *Pico* (a case on which Plaintiffs did not

Unsurprisingly, the PA Defendants' far-reaching argument for unbounded state power has also been soundly and repeatedly rejected. *See, e.g.*, *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *7 (W.D. Tex. Mar. 30, 2023) (rejecting argument "that removal decisions were 'government speech to which the First Amendment does not apply'"). Thus, it could not be clearer that removal decisions "are subject to the First Amendment and are evaluated based on whether the governments' 'substantial motivation in arriving at the removal decision' was discriminatory." *Id.* (quoting *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 190 (5th Cir. 1995)); *accord. Pico*, 457 U.S. at 870-71.

"[T]he history of the expression at issue"—i.e., library curation and book removal— provides further reason to reject PA Defendants' argument. *Shurtleff*, 142 S. Ct. at 1589-1590. PA Defendants claim that history supports their argument because public libraries wield delegated state power, which can be modified or withdrawn. PA Response at 16. But regardless of where the authority to curate a public library collection resides, it remains true that the discretion to remove books may not be exercised "in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870-871 (observing that a Democratic school board could not permissibly order the removal of books written by or supporting Republicans, just as an all-white school board cannot remove all books written by Black authors or supporting racial equality). In practice, historical and modern, libraries that are spared from the political fray follow the American Library Association's Code of Conduct and Bill of Rights, both of which are "unequivocal in [their] condemnation of censorship and other attempts to limit information based on viewpoint or preference." *See* Caldwell-Stone Decl. at ¶ 3.

Bizarrely, the PA Defendants also assert that "Plaintiffs argue that the library must carry

---

rely in their opening brief) because the critical point, that libraries cannot engage in viewpoint discrimination, was unanimous.

materials of their choice." PA Response at 18. That assertion does not appear anywhere in Plaintiffs' complaint or opening brief and Plaintiffs do not argue that any particular book must be carried in any library. *See generally* Compl. (Doc. 2); Opening Brief. But the absence of a right to dictate which books your local library carries does not mean, as the PA Defendants claim, that "States may add and remove materials from public libraries at will." PA Response at 20. Rather, the Constitution limits the reasons that government officials may remove books from public libraries or segregate books with disfavored viewpoints. *See Pico*, 457 U.S. at 870-71. Plaintiffs challenge the ways in which the Challenge Procedure provides an unreviewable mechanism through which government officials may violate the First Amendment by exceeding those limits on a routine basis.

### b. The Challenge Procedure Is a Prior Restraint

The State's final defense of the Challenge Procedure rests on erroneous legal assertions that Plaintiffs have already rebutted. First, PA Defendants would have the court ignore entirely the prior restraint that results when adults and older minors are discouraged from visiting a stigmatized area of the library containing materials that are not obscene as to them. *See* Opening Brief at 29. As recent events in Crawford County illustrate, librarians will have to bow to pressure to discriminate on the basis of viewpoint (or be replaced by those who will). *See* Adams Decl. at ¶ 3, Ex. 1. The Challenge Procedure facilitates precisely this kind of pressure and will have its desired effect if it is not enjoined.

In any event, the State Librarian's opinion provides compelling reason for the Court to find that there is likely to be a rash of challenges to books if the Challenge Procedure goes into effect on August 1, and the state has not attempted to dispute the likelihood of numerous challenges. Library staff will be forced either to take books out of circulation so that the library committees have time to review them in their entirety, or to buy additional copies of the most controversial

titles on their shelves—either effectively granting a unilateral right to take books out of circulation for long periods, or creating further pressure on librarians purchasing additional copies of the most controversial titles. By including Act 372 § 5(c)(2), the state has ensured that a single individual can file a long list of challenges and thereby use the Challenge Procedure to create a prior restraint, or at a minimum additional pressure on libraries to avoid controversial titles.

Finally, PA Defendants attempt to distinguish *Freedman v. Maryland*, 380 U.S. 51 (1965), on the grounds that "[t]he [Challenge Procedure] does not have a criminal component nor does it involve licensing." PA Response at 21. But *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), which PA Defendants cite for the premise that *Freedman* dealt with the "peculiar dangers" of licensing regimes, itself upheld a license ordinance with no criminal component because the ordinance was a content-neutral time, place and manner regulation of the use of a public forum. *See Thomas*, 534 U.S. at 322; *cf. Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498-99 (1982) (noting that the Court has "greater tolerance of enactments with civil rather than criminal penalties," but that the standards for evaluating vagueness "should not . . . be mechanically applied"). PA Defendants do not and cannot maintain that the Challenge Procedure is content-neutral, which leaves them talking out of both sides of their mouth: arguing that municipal governments, including the County Defendants, have free rein to discriminate on the basis of viewpoint as a form of government speech, and, contradictorily (and erroneously), suggesting that the state is not regulating content at all. The Court need not reconcile these conflicting arguments, because they each fail for the reasons explained herein.

## V. The Remaining Factors Support a Preliminary Injunction

The PA Defendants concede that the additional preliminary-injunction factors—irreparable harm, the balance of the equities, and the public interest—all turn on the likelihood of success on the underlying First Amendment claims. PA Response, at 21-22. Plaintiffs have explained in their

opening brief and above why they are likely to succeed on their claims. The PA Defendants' only substantive additional argument is that the balance of the equities and the public interest factors weight in their favor in view of their "'transcendent interest in protecting the welfare of children'" by shielding them from obscenity. *Id.* at 22 (quoting *Upper Midwest,* 780 F.2d at 1389 (quoting *Ginsberg*, 390 U.S. at 640)). Plaintiffs have already corrected the PA Defendants' confusion about the relationship between "obscenity" and "material harmful to minors" in the context of the Availability Provision, *see supra* at 9-11, which makes clear that an injunction against Act 372 will do nothing to prevent the PA Defendants from keeping obscene materials from children. Moreover, as explained in Plaintiffs' opening brief, enjoining Act 372 will not impair the State's ability to prohibit the furnishing of obscenity to minors; that will continue to be barred by the same laws that have protected the children of Arkansas for decades. *See* Opening Brief at 37; Ark. Code Ann. § 5-68-502.

The County Response claims that Act 372 has nothing to do with it and that the state must defend the constitutionality of its own statute. County Response, at 2-4. But Crawford County and Judge Keith are assigned specific roles under the Challenge Procedure and they are obligated to act in accordance with the First Amendment when performing their official duties. The County Defendants have made clear that they will implement Act 372 unless it is enjoined, Keith Decl. at ¶¶ 3-4, making preliminary relief necessary to avoid the incompensable loss of First Amendment rights while this case proceeds.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant its Motion for a Preliminary Injunction or, in the alternative, Temporary Restraining Order.

Respectfully submitted,

/s/ John T. Adams
David M. Fuqua
Ark. Bar No. 80048
John T. Adams
Ark. Bar No. 2005013
Attorneys for Plaintiffs Central Arkansas
Library System, Nate Coulter, and the Eureka
Springs Carnegie Public Library
FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Telephone: (501) 374-0200
E-Mail: dfuqua@fc-lawyers.com
E-Mail: jadams@fc-lawyers.com

Bettina Brownstein
Ark. Bar No. 85019
BETTINA E. BROWNSTEIN LAW FIRM
Attorney for Olivia Farrell, Jennie Kirby,
Hayden Kirby, and Leta Caplinger
904 West 2nd Street, Suite 2
Little Rock, AR 72201
Telephone: (501) 920-1764
E-Mail: bettinabrownstein@gmail.com
On Behalf of the Arkansas Civil Liberties
Union Foundation, Inc.

Will Bardwell*
Ben Seel*
Aman George*
Orlando Economos*
Attorneys for the Arkansas Library Association,
Advocates for All Arkansas Libraries, and Adam
Webb, in his individual capacity
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34554
Washington, DC 20043
Telephone: (202) 448-9090
E-Mail: wbardwell@democracyforward.org
E-Mail: bseel@democracyforward.org
E-Mail: ageorge@democracyforward.org
E-Mail: oeconomos@democracyforward.org

Vincent O. Chadick
Ark. Bar No. 94075
Brandon B. Cate
Ark. Bar No. 2001203
Glenn V. Larkin
Ark. Bar No. 2020149
Attorneys for Plaintiff Fayetteville Public
Library
QUATTLEBAUM, GROOMS & TULL PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
E-Mail: bcate@qgtlaw.com
E-Mail: vchadick@qgtlaw.com
E-Mail: glarkin@qgtlaw.com

Michael A. Bamberger*
Kristen Rodriguez*
Rebecca Hughes Parker*
Attorneys for Pearl's Books, LLC, Wordsworth
Community Bookstore LLC, American
Booksellers Association, Association of
American Publishers, Inc., Authors Guild, Inc.
Comic Book Legal Defense Fund, and Freedom
to Read Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
E-Mail: michael.bamberger@dentons.com
E-Mail: kristen.rodriguez@dentons.com
E-Mail: rebeccahughes.parker@dentons.com

* Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2023, a copy of the foregoing was served upon all counsel of record contemporaneously with its filing in the CM/ECF system.

/s/ John T. Adams
John T. Adams