IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FAYETTEVILLE PUBLIC LIBRARY, a political subdivision
in the City of Fayetteville, State of Arkansas;
EUREKA SPRINGS CARNEGIE PUBLIC LIBRARY;
CENTRAL ARKANSAS LIBRARY SYSTEM;
NATE COULTER; OLIVIA FARRELL; JENNIE KIRBY,
as parent and next friend of HAYDEN KIRBY;
LETA CAPLINGER; ADAM WEBB;
ARKANSAS LIBRARY ASSOCIATION;
ADVOCATES FOR ALL ARKANSAS LIBRARIES;
PEARL'S BOOKS, LLC; WORDSWORTH COMMUNITY
BOOKSTORE, LLC d/b/a WORDSWORTH BOOKS;
AMERICAN BOOKSELLERS ASSOCIATION;
ASSOCIATION OF AMERICAN PUBLISHERS, INC.;
AUTHORS GUILD, INC.;
COMIC BOOK LEGAL DEFENSE FUND;
and FREEDOM TO READ FOUNDATION                    PLAINTIFFS

V.                    CASE NO. 5:23-CV-05086

CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH,
in his official capacity as Crawford County Judge;
TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
MATT DURRETT; JEFF PHILLIPS; WILL JONES;
TERESA HOWELL; BEN HALE, CONNIE MITCHELL,
DAN TURNER, JANA BRADFORD; FRANK SPAIN;
TIM BLAIR; KYLE HUNTER; DANIEL SHUE; JEFF ROGERS;
DAVID ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C. LAWRENCE;
DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
CAROL CREWS; KEVIN HOLMES; CHRIS WALTON;
and CHUCK GRAHAM, each in his or her official capacity
as a prosecuting attorney for the State of Arkansas          DEFENDANTS

MEMORANDUM OPINION AND ORDER

1

# TABLE OF CONTENTS

I.   BACKGROUND ................................................................................. 3

    A.  Libraries and Librarians .............................................................. 6

    B.  Act 372 ...................................................................................... 13

        1.  Section 1, The Criminal Provision ....................................... 13

        2.  Section 5, The Challenge Provision ..................................... 15

II.  LEGAL STANDARD ..................................................................... 18

III. DISCUSSION ................................................................................. 19

    A.  Standing, Ripeness, and Injuries Associated with Censorship ............. 19

    B.  Likelihood of Success on the Merits ......................................... 24

        1.  Section 1, Criminal Provision................................................ 24

            a. Meaning of "Harmful to Minors" under Arkansas Law ............. 24

            b. Overbreadth ................................................................. 34

        2.  Section 5, Challenge Provision .......................................... 39

            a. Vagueness .................................................................. 39

            b. Content-Based Restriction ............................................ 42

    C.  Irreparable Harm .................................................................... 48

    D.  Balance of the Equities and the Public Interest ...................... 49

IV.  CONCLUSION .............................................................................. 49

*"There is more than one way to burn a book. And the world is full of people running about with lit matches."* –Ray Bradbury, author of *Fahrenheit 451*

## I.      BACKGROUND

The Bill of Rights to the United States Constitution guarantees the right of every American to speak freely and to receive speech. This freedom of speech, codified in the First Amendment, is enjoyed by everyone—even children. However, by virtue of the fact that minors are "not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees," *Ginsberg v. New York*, 390 U.S. 629, 649–50 (1968) (Stewart, J., concurring), the rights of persons under the age of 18 to speak and receive speech are not "co-extensive with those of adults," *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 515 (1969) (Stewart, J., concurring). In other words, minors' First Amendment rights are limited in some way. While those boundaries are not clearly defined in law, common sense tells us that "[i]n assessing whether a minor has the requisite capacity for individual choice[,] the age of the minor is a significant factor." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 n.11 (1975). Obviously, a seven-year-old's capacity is far different from that of a seventeen-year-old.

Over the past year, a number of states have passed laws seeking to protect children from harmful and inappropriate reading materials that public libraries allegedly make available to the public. Arkansas joins those states with the passage of Act 372 which is set to take effect on August 1, 2023. The Plaintiffs are a coalition of parties who contend their First and Fourteenth Amendment rights will be violated by certain sections

of this new law. Categorically, the Plaintiffs include public libraries, library organizations, professional librarians, library patrons, booksellers, patrons of bookstores, booksellers' associations, and authors' associations. Plaintiffs brought this suit to challenge the constitutionality of Sections 1 and 5 of Act 372. Section 1 imposes a new criminal penalty on librarians, booksellers, (and others) for making available materials that are deemed obscene as to minors. Section 5 mandates a new procedure that public libraries, city councils, and quorum courts must follow when evaluating citizens' requests to censor library books.[1]

Plaintiffs have named as defendants a group of people they contend will be responsible for effectuating these new laws. Regarding Section 1, Defendants include each of Arkansas's 28 elected prosecuting attorneys, in their official capacities.[2] As for Section 5, Defendants are Crawford County, Arkansas, and County Judge Chris Keith, in his official capacity.

Now before the Court is Plaintiffs' Motion to Preliminarily Enjoin Sections 1 and 5 of Act 372 (Doc. 22). The issues have been fully briefed. *See* Docs. 23, 37, 38, 42. On July 25, 2023, the parties participated in a day-long evidentiary hearing, during which joint

---

[1] Act 372 targets more than just books. *See* 2023 Ark. Acts § 1(a)(4)(B)(i) (defining a broad category of media subject to the Act, including books, magazines, motion pictures, photographs, articles, and recordings). However, throughout this Opinion, the Court will refer to the law's treatment of books, specifically, for the purpose of providing the reader with a concrete example when discussing the statute's impact.

[2] The prosecutors are represented by the Arkansas Attorney General, who has assumed the broader responsibility of defending the constitutionality of both sections of the law being challenged here. For simplicity, the Court will refer to the prosecutors and the Attorney General's office collectively as "the State."

stipulations of fact and other documents were received into evidence.[3]  Counsel for all sides then presented oral argument.

Section 1 of Act 372 makes librarians and booksellers the targets of potential criminal prosecution for "[f]urnishing a harmful item to a minor." Plaintiffs contend that if Section 1 goes into effect, public librarians and bookstore owners will face a grim choice:

- Remove all books from the "young-adult" and "general" collections that mention sex or sexual conduct, as that material may be deemed harmful to the youngest minors—even though the same material would not be harmful to the oldest minors or adults; or

- Ban all persons under the age of 18 from entering public libraries and bookstores due to the risk of endless criminal prosecution.

Arkansas already criminalizes providing obscenity to minors. But it has long maintained a safe harbor for librarians "acting within the scope of [their] regular employment duties" if prosecuted for disseminating material "that is claimed to be obscene." *See* Ark. Code Ann. § 5-68-308(c).  That immunity has not been questioned since the Arkansas Supreme Court found the exemption "reasonable on its face" nearly four decades ago.  *See 4000 Asher, Inc. v. State*, 290 Ark. 8, 13 (1986).  The *Asher* Court assumed with little discussion that the exemption guarded against "the possibility that someone might check a book out of a public library and contend that the librarian was

---

[3] Plaintiffs proffered certain other documents as well, but the Court did not admit them during the hearing because of Defendants' foundational objections.  The Court took those objections under advisement, and the objected-to exhibits were collectively marked as Court's Exhibit 2.  Those same exhibits can also be found on the docket as attachments to Document 51, where they appear as Exhibits 1-1, 1-2, 1-3, 28, 29, 31, 32, and 33. Because the Court did not rely on any of these exhibits in deciding the motion for preliminary injunction, it finds it unnecessary to rule on their admissibility.

disseminating obscene matter." *Id.* at 13–14. In other words, the notion that a professional librarian *might actually* disseminate obscene material in the course of his or her regular employment duties was inconceivable to the state's highest court. *See id.* The statutory exemption protected librarians from meritless claims. Act 372 signals a fundamental change in how librarians are treated under the law.[4]

Plaintiffs separately challenge Section 5 of the Act, which purports to protect minors from the dangers of inappropriate books at the public library by requiring libraries to adopt a process for challenging books in their collections. The term "appropriateness," as used in Section 5, is not defined there or anywhere in the Arkansas Code. Plaintiffs worry that huge swaths of books will face challenges based on their content or viewpoint. Plaintiffs are also concerned that the book-challenge procedure will shift ultimate censorship authority from professional librarians to the politically elected members of local county quorum courts and city councils. According to Plaintiffs, Section 5 will empower a vocal minority to dictate to the entire community what its citizens may and may not read.

## A.     Libraries and Librarians

*"A library outranks any other one thing a community can do to benefit its people. It is a never failing spring in the desert."* –Andrew Carnegie, philanthropist

For more than a century, librarians have curated the collections of public libraries to serve diverse viewpoints, helped high school students with their term papers, made

---

[4] For decades, Arkansas's criminal obscenity statute contained an express exemption for librarians. Section 2 of Act 372 now eliminates that immunity (although that Section is not being challenged here). Section 1 of Act 372 does not exempt librarians from prosecution.

recommendations to book clubs, tracked down obscure books for those devoted to obscure pastimes, and mesmerized roomfuls of children with animated storytelling. So, the passage of Act 372 prompts a few simple, yet unanswered questions. For example: What has happened in Arkansas to cause its communities to lose faith and confidence in their local librarians? What is it that prompted the General Assembly's newfound suspicion? And why has the State found it necessary to target librarians for criminal prosecution? To better understand the present moment and why these questions have surfaced, we must first understand the history, purpose, and function of public libraries in America.

Our founding fathers understood the necessity of public libraries for a well-functioning democracy. Benjamin Franklin is widely credited with founding the country's first lending library in 1731.[5] After the British burned Washington's congressional library during the War of 1812, Thomas Jefferson sold his personal collection of 6,487 books to start what is now the Library of Congress.[6] He famously said, "I have often thought that nothing would do more extensive good at small expense than the establishment of a small circulating library in every county . . . ."[7]

_____

[5] *See Ben Franklin: Inventor and Innovator*, University of Pennsylvania Almanac, Vol. 66, Issue 18, Jan. 14, 2020, https://almanac.upenn.edu/articles/ben-franklin-inventor-and-innovator (last accessed July 28, 2023).

[6] *See History of the Library of Congress*, https://www.loc.gov/about/history-of-the-library (last accessed July 28, 2023).

[7] *See Library of Congress, Selected Quotations from the Thomas Jefferson Papers*, http://www.loc.gov/collections/thomas-jefferson-papers/articles-and-essays/selected-quotations-from-the-thomas-jefferson-papers (last accessed July 28, 2023).

Public libraries were first founded through private donations and bequests, then later through public financial support. By the latter part of the 1800s, most major metropolitan cities in the country had a public library. The most significant benefactor of public libraries was industrialist Andrew Carnegie, who donated more than $40 million between 1886 and 1919 to establish more than 1,600 new library buildings in small and large communities across America.[8] Four Carnegie libraries were built in Arkansas between 1906 and 1915 in Eureka Springs, Fort Smith, Little Rock, and Morrilton.[9]

By 1956, Congress formally acknowledged the need for all citizens to have access to free, public libraries by enacting the Library Services Act, which authorized millions of dollars in federal funds to develop and improve rural libraries and fund traveling bookmobiles to serve rural communities.[10] Through public libraries, free access to knowledge became possible for all Americans, regardless of geography or wealth.

As libraries became ubiquitous fixtures in American cities and towns, the role of the professional librarian gained importance in public life. The American Library Association ("ALA") was founded in 1876 during a Philadelphia convention attended by 103 librarians from across the country.[11] The ALA is the sole accrediting body for library

---

[8] *See Carnegie Libraries: The Future Made Bright (Teaching with Historic Places)*, Nat'l Park Serv., https://www.nps.gov/articles/carnegie-libraries-the-future-made-bright-teaching-with-historic-places.htm (last accessed July 28, 2023).

[9] *See* John Spurgeon, *Encyclopedia of Arkansas, Carnegie Libraries*, Apr. 23, 2023, https://encyclopediaofarkansas.net/entries/carnegie-libraries-6466/ (last accessed July 28, 2023).

[10] *See* Library Services Act, Pub. L. No. 597-407, 70 Stat. 293–96 (1956).

[11] *See* https://www.ala.org/aboutala/history (last accessed July 28, 2023).

and information science schools in the United States.[12]  Professional librarians hold

advanced degrees from ALA-accredited institutions, and all librarians are taught to adhere

to the ALA's Code of Ethics and Library Bill of Rights in their professional lives.[13]

According to their Code of Ethics, librarians promise:

- [to] uphold the principles of intellectual freedom and resist all efforts to censor library resources;

- not advance private interests at the expense of library users, colleagues, or our employing institutions; [and]

- distinguish between [their] personal convictions and professional duties and . . . not allow [their] personal beliefs to interfere with fair representation of the aims of [their] institutions or the provision of access to their information resources.[14]

According to the Library Bill of Rights, librarians commit to the following basic

principles:

- Books and other library resources should be provided for the interest, information, and enlightenment of all people of the community the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation.

- Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

_____

[12] (Doc. 22-2, p. 2, Declaration of Deborah Caldwell-Stone, Executive Director of the Freedom to Read Foundation established by the ALA).

[13] *Id.*

[14] *See* https://www.ala.org/tools/ethics (last accessed July 28, 2023).

- A person's right to use a library should not be denied or abridged because of origin, age, background, or views.[15]

Librarians—much like doctors and lawyers—are afforded significant professional responsibility and deference with respect to their area of expertise. Just as a licensed physician's mission is "to provid[e] competent medical care, with compassion and respect for human dignity and rights,"[16] and a licensed attorney is regarded as "an officer of the legal system and a public citizen having special responsibility for the quality of justice,"[17] a professional librarian is tasked with the safeguarding of the public's First Amendment right to receive information by "resist[ing] all efforts to censor library resources."[18]

The vocation of a librarian requires a commitment to freedom of speech and the celebration of diverse viewpoints unlike that found in any other profession. The librarian curates the collection of reading materials for an entire community, and in doing so, he or she reinforces the bedrock principles on which this country was founded. According to the United States Supreme Court, "Public libraries pursue the worthy missions of facilitating learning and cultural enrichment." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003). To fulfill those missions, "public libraries must have broad

---

[15] *See* https://www.ala.org/advocacy/intfreedom/librarybill (last accessed July 28, 2023).

[16] *See* Am. Med. Ass'n Principles of Medical Ethics (June 2001), https://code-medical-ethics.ama-assn.org/principles (last accessed July 28, 2023).

[17] *See* Am. Bar Ass'n Model Rules of Professional Responsibility, "Preamble: A Lawyer's Responsibilities" (updated Aug. 2020), https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct_preamble_scope/ (last accessed July 28, 2023).

[18] *See* ALA Code of Ethics, https://www.ala.org/tools/ethics.

discretion to decide what material to provide to their patrons." *Id.* at 204. The librarian's only enemy is the censor who judges contrary opinions to be dangerous, immoral, or wrong.

The public library of the 21st century is funded and overseen by state and local governments, with the assistance of taxpayer dollars. Nonetheless, the public library is not to be mistaken for simply an arm of the state. By virtue of its mission to provide the citizenry with access to a wide array of information, viewpoints, and content, the public library is decidedly not the state's creature; it is the people's. "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386–90 (1969).

"[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)). As a result, the government's content-based restrictions on speech are presumed to be invalid. *United States v. Alvarez*, 567 U.S. 709, 716–17 (2012). In fact, the *only* categories of content-based speech unprotected by the First Amendment are:

- Incitement,

- obscenity,

- defamation,

- speech integral to criminal conduct,

- so-called "fighting words,"

- child pornography,

- fraud,

- true threats, and

- speech presenting some grave and imminent threat the government has the power to prevent.

*Id.* at 717. The First Amendment protects all other categories of speech, and no government restriction can stand unless it satisfies a heavy burden.

Our founding fathers understood that "novel and unconventional ideas might disturb the complacent"; yet in authoring the First Amendment, they sought "to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943). Silencing unpopular speech is contrary to the principles on which this country was founded and stymies our collective quest for truth. As philosopher John Stuart Mill observed in his treatise *On Liberty*[19]:

> If all mankind minus one, were of one opinion, and only one person were of the contrary opinion, mankind would be no more justified in silencing that one person, than he, if he had the power, would be justified in silencing mankind.

---

[19] John Stuart Mill, On Liberty, Utilitarianism and Other Essays 19 (Mark Philp & Frederick Rosen eds. Oxford University Press 2015).

## B.     Act 372

### 1.     Section 1, The Criminal Provision

The stated purpose of Section 1 of Act 372 is to define a new Class A misdemeanor offense called "furnishing a harmful item to a minor."  One commits this crime "if, knowing the character of the item involved, the person knowingly . . . [f]urnishes, presents, provides, makes available, gives, lends, shows, advertises, or distributes to a minor an item that is harmful to minors."  § 1(b)(1).

The terms "minor" and "harmful to minors" are separately defined in Arkansas's variable obscenity statute, found at Title 5, Chapter 68 of the criminal code.  A minor is "any person under eighteen (18) years of age." Ark. Code Ann. § 5-68-501(7).  The term "harmful to minors" incorporates the Supreme Court's three-part definition of "obscenity."  Importantly, this notion of "obscenity" refers only to materials having sexually explicit descriptions or representations.[20]  Accordingly, under Arkansas law, "harmful to minors" means:

> any description, exhibition, presentation, or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when the material or performance, taken as a whole, has the following characteristics:
>
> > (A) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest in sex to minors;

---

[20] Though in everyday speech the terms "obscene" or "obscenity" refer broadly to things that are offensive, distasteful, or immoral—such as violent images or the use of profanity—the *legal definition* of obscenity is narrow and only refers to sexually explicit nudity, sexual conduct, sexual excitement, or sadomasochistic abuse.

(B) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance depicts or describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse in a manner that is patently offensive to prevailing standards in the adult community with respect to what is suitable for minors; and

(C) The material or performance lacks serious literary, scientific, medical, artistic, or political value for minors.

Ark. Code Ann. § 5-68-501(2)(A)–(C).

Plaintiffs contend that Section 1 is unconstitutional because it is overbroad and certain terms are too vague to be understood. A law is overbroad and facially invalid when "the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1157 (8th Cir. 2014) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). If Section 1 goes into effect, Plaintiffs believe that their existing practice will prove inadequate to guard against criminal liability.

The State responds that Plaintiffs lack Article III standing to bring suit and that this case is not yet ripe for judicial review. As for the merits, the State explains that it has a paramount interest in protecting minors from accessing obscene materials. They correctly note that obscenity is not protected speech under the First Amendment, and therefore, they argue, no minor has a constitutional right to receive material that is "harmful to minors," regardless of how earnestly these minors wish to view this material and regardless of whether they have their parents' blessing.[21]

---

[21] As an aside, § 1 prohibits any person—not just librarians and booksellers—from making

14

## 2. Section 5, The Challenge Provision

This provision has nothing to do with private booksellers or criminal penalties. Instead, Section 5 concerns the "[e]stablishment of guidelines for selection, relocation, and retention of [library] materials." Act 372 § 5. First, Section 5 mandates that "[e]ach county or municipal library shall have a written policy for addressing challenged material that is physically present in the library and available to the public." *Id.* at § 5(b). It also establishes the minimum criteria that libraries must incorporate when drafting their policies. *Id.*

Any "person affected by . . . material" in a library's collection may "challenge the appropriateness" of that material's inclusion in the main collection. *Id.* at § 5(c)(1). Material subject to challenge is not limited to sexual content. There is no definition of "appropriateness," so any expression of ideas deemed inappropriate by the challenger is fair game. Section 5 does not require a book challenger to be a patron of the library where the challenge is made, nor does it impose a residency requirement.

A person who seeks to withdraw or relocate any library material must first meet with the librarian in person to discuss the grievance. If the challenger is dissatisfied with the librarian's response, he or she must then fill out a form supplied by the library to explain the nature of the grievance. *Id.* at § 5(c)(3)–(5). That initiates the formal challenge

---

harmful materials available to minors. And unlike Arkansas's prior iterations of this type of law, there is no exemption for parents. *See,* e.g., Ark. Code Ann. § 5-68-502(a)(2)(B)(i). Arguably, if a parent were to act as a straw buyer or borrower of a book that is deemed harmful to a young minor, criminal liability would attach if the parent then provided the material to his 17-year-old child.

process.  The library is given discretion to decide whether to leave the book on the shelf during the pendency of a challenge or remove it from the collection.  *Id.* at § 5(c)(2).

Next, the written grievance is forwarded to "a committee of library personnel" who have "knowledge appropriate for the material being challenged" and possess "diverse viewpoints."  *Id*. at § 5(c)(6).  "The librarian or his or her designee" may chair the committee.  *Id.*  Other than screening for "appropriateness," Section 5 offers the library committee no evaluation criteria except the following:

Material being challenged:

> (i)     Shall not be withdrawn *solely* for the viewpoints expressed within the material; and
>
> (ii)    Shall be reviewed in its entirety and shall not have selected portions taken out of context.

*Id.* at § 5(c)(7)(B)(i)–(ii) (emphasis added).  After meeting with the challenger in person, the library committee then "vote[s] to determine whether the material being challenged shall be relocated within the library's collection to an area that is not accessible to minors under the age of eighteen (18) years."  *Id.* at § 5(c)(11)(A).  Somewhat confusingly, despite this provision, Section 5 is not actually limited to challenges for appropriateness as to minors.   In any event, the statute does not define or offer guidance about what relocating a book to an area "that is not accessible to minors" really means.

After the library committee votes on the book challenge, Section 5 requires the committee to send a written summary of its decision to the challenger.  If the committee agrees to segregate or "withdraw" the challenged material, that ends the matter.  However, if the committee rejects the challenge, the challenger "may appeal the

committee's decision to the governing body of the county or city" that financially supports the library, "by filing a written appeal to the executive head of the governing body of the county or city." *Id.* at § 5(c)(12)(A).

Governing bodies, i.e., quorum courts and city councils, are afforded wide latitude in reviewing the challenged material. On appeal, they are only required to consider:

(1) the challenged material itself,

(2) the written challenge that was submitted to the library committee,

(3) the library committee's written explanation for its decision, and, if submitted,

(4) the mayor's or county judge's recommendation.

*Id.* at § 5(c)(12)(B)(i)–(ii). Section 5 does *not* require the quorum court or city council members to adopt—or even be provided a copy of—the library's selection criteria. *Id.*

The quorum court or city council members then meet to consider and vote on whether to censor the material, either by withdrawing it from the library's main collection or relocating it, and their decision is final. Section 5 does not require the governing body to issue a written explanation for its decision. *Id.* at § 5(c)(12)(C).

Plaintiffs argue that Section 5 is void for vagueness because librarians, library patrons, members of local governmental bodies, and the public at large will have no meaningful way to discern pivotal terms, such as whether materials are "[in]appropriate." They also describe the appeal process as: (1) unnecessary, as most, if not all, public libraries in Arkansas already have internal procedures in place to evaluate requests by members of the public to move or remove certain library materials, *see, e.g.*, Doc. 22-5, ¶¶ 19–20 (Central Arkansas Library System); Doc. 22-6, ¶ 18 (Eureka Springs Carnegie

17

Public Library); Doc. 22-9, ¶ 17 (Fayetteville Public Library); Doc. 22-15, ¶ 20 (Garland County Library); and (2) likely to invite content-based restrictions on public access to library materials without regard for the First and Fourteenth Amendments.

The State responds that "appropriateness" may mean whatever librarians choose it to mean, since librarians and library committees have unfettered discretion as state actors to curate the library's material—because it is government speech—and patrons have no right to compel them to make available any particular book. The State also contends that the local governing body will evaluate challenges using the same criteria that the librarian and library committee use, rather than invent their own criteria.

## II.     LEGAL STANDARD

In determining whether to grant a motion for preliminary injunction, the Court must weigh the following four considerations: (1) the threat of irreparable harm to the moving party; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant if the injunction is denied and the harm to other party if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "While no single factor is determinative, the probability of success factor is the most significant." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (citation and quotation omitted). In particular, "[w]hen a Plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied."

*Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam), *vacated on reh'g on other grounds*, 705 F.3d 845 (8th Cir. 2012).

## III.    DISCUSSION

### A.    Standing, Ripeness, and Injuries Associated with Censorship

To bring a cause of action in federal court, Plaintiffs must establish they have standing to sue. *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). Standing requires: (1) an injury in fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent"; (2) "fairly . . . traceable to the challenged action of the defendant[s]"; and (3) "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations, brackets, and quotations omitted).

Defendants maintain that Plaintiffs' claims of imminent injury are merely speculative or hypothetical and that the lawsuit's pre-enforcement facial challenge to Act 372 is premature or "unripe." Standing and ripeness questions are generally the same. *See Rel. Sisters of Mercy v. Becerra*, 55 F.4th 583, 608 (8th Cir. 2022). The ripeness doctrine "prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been

formalized and its effects felt in a concrete way by the challenging parties." *Id.* (brackets omitted).

The Supreme Court has issued helpful guidance on these issues. In *Virginia v. American Booksellers Association, Inc.*, the Court was "not troubled by the pre-enforcement nature" of a lawsuit very similar to this one. 484 U.S. 383, 393 (1988) ("*Virginia II*"). *Virginia II* involved a pre-enforcement, facial challenge to a state law criminalizing the commercial display of materials considered "harmful to juveniles"— exactly the issue the bookseller-Plaintiffs face under Section 1. *See id.* at 387. The Virginia statute defined "harmful to juveniles" almost identically to the way Arkansas defines "harmful to minors" in Act 372. Both statutes refer to materials considered obscene to those under the age of 18. *Id.* at n.2.

The *Virginia II* Court held that the bookseller-plaintiffs subject to the law's criminal penalties had standing to sue because "if their interpretation of the statute [was] correct, [they would] have to take significant and costly compliance measures or risk criminal prosecution." *Id.* at 392; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (finding plaintiffs are not required to "await and undergo a criminal prosecution as the sole means of seeking relief"). Accordingly, the bookseller-Plaintiffs in the instant case likewise have standing to sue under Section 1.[22] Since the librarian-Plaintiffs also

---

[22] In a multi-plaintiff suit, only one plaintiff needs to satisfy the constitutional standing requirements. *See Horne v. Flores*, 557 U.S. 433, 446–47 (2009). In the context of associations or organizations made up of individual members, "in the absence of injury to itself, an association may have standing solely as the representative of its members." *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To establish associational standing, the entity must prove the following three elements: (1) "its members would otherwise have

risk criminal prosecution, they, too, have standing to sue. Further, the 28 prosecuting attorneys are the correct Defendants as to Section 1 because they will be responsible for prosecuting the librarians and booksellers. Plaintiffs' injuries will be fairly traceable to the actions of these Defendants, and a decision in Plaintiffs' favor on Section 1 would redress their injuries.[23]

The library- and bookstore-patron-Plaintiffs possess standing to challenge Section 1. The library-patron-Plaintiffs possess standing to challenge Section 5. They assert they will suffer imminent, particularized injuries under those respective sections of the Act, arising from undue and unjustified burdens on their constitutional right to receive protected speech. They further claim there is a likelihood that libraries and bookstores may eliminate many, if not all, books from their collections that contain any sexual content in order to avoid violating Section 1 of the new law. If merely having a book accessible

---

standing to sue in their own right"; (2) the suit "seeks to protect interests germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Court finds that the booksellers-association-Plaintiffs have standing to sue as representatives of their members from Arkansas. Similarly, the library-association-Plaintiffs have standing to sue on behalf of their members who are Arkansas librarians.

The Court is less certain that the public library Plaintiffs have standing to sue. But because many other Plaintiffs have standing, the Court need not decide that issue today.

[23] These Plaintiffs also purport to represent the interests of Arkansas citizens across the state who will suffer the same injuries. This is proper. "[I]n the First Amendment context, litigants are permitted to challenge a statute not [only] because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Virginia II*, 484 U.S. at 392–93 (cleaned up).

on the shelf where a minor can reach it will potentially subject librarians and booksellers to criminal penalties, such books may simply be removed.  As a result, these patrons claim their First Amendment right to access non-obscene (i.e., constitutionally protected) reading material will be dramatically curtailed.[24]

The declarations of various witnesses demonstrate that Plaintiffs' fears are not speculative.  They state the following:

- Librarians will be disinclined to risk the criminal penalty that may follow from lending or selling an older minor a book that could be considered "harmful" to a younger minor, since the new law makes no distinctions based on age and lumps "minors" into one homogenous category.  *See* Doc. 22-9, p. 3 (Declaration of David Johnson, Executive Director of the Fayetteville Public Library).

- Librarians and booksellers fear exposure under Section 1 to the risk of criminal prosecution merely by allowing anyone under the age of 18 to browse the collection.  *See* Doc. 22-6, p. 4 (Declaration of Christina Danos, Director of Eureka Springs Carnegie Public Library); Doc. 22-15, p. 6 (Declaration of Adam Webb, Executive Director of Garland County Library); Doc. 22-10, p. 2 (Declaration of Daniel Jordan, co-owner of Pearl's Books, LLC); Doc. 22-16, p. 2 (Declaration of Kandi West, co-owner of Wordsworth Community Bookstore, LLC).

- Booksellers are worried that the only failsafe way to avoid liability is to transform their businesses into adults-only bookstores—a decision they contend is neither desirable nor financially viable.  *See* Doc. 22-10, p. 2 (Declaration of Daniel Jordan).

---

[24] Older-minor-Plaintiffs particularly fear that if Section 1 goes into effect, their access to any age-appropriate reading material at the library will be limited, if not completely eliminated. Seventeen-year-old library patron Hayden Kirby stated in her declaration that she often goes to the library "unaccompanied by a parent" and is "free to look at whatever [she] want[s]" but believed that if Act 372 went into effect, it would "prevent [her] from browsing and finding books and other materials" that are suitable for her reading level "because they might be considered harmful [or] obscene . . . for young minors."  (Doc. 22-11, p. 2).

- Librarians maintain that a quantity of books in their collections very likely qualify as "harmful to [younger] minors" under the law. Even if any such book is successfully identified and relocated to the "adult" section, librarians will have to closely police the browsing habits of all minors to make sure they do not stray outside the marked "children's" or "young-adult" sections of the library—a task librarians maintain is physically impossible and antithetical to the mission and purpose of public libraries. *See* Doc. 22-9, p. 3 (Declaration of David Johnson, observing that if Section 1 went into effect, "no amount of effort on [Fayetteville Public Library's] part to guard against minors accessing 'harmful' material would stave off criminal prosecution").

- Librarians and booksellers anticipate they will have to remove all books that could possibly be considered harmful to the youngest minors from the shelves entirely. *See* Doc. 22-9, p. 3 (Declaration of David Johnson, stating there is a likelihood that "FPL could remove potentially offending materials from its collection and cease acquiring such materials in the future"); Doc. 22-10, p. 3 (Declaration of Daniel Jordan, considering "limit[ing] our inventory to books or other items not regulated by Section 1").

As for Section 5, the library-patron-Plaintiffs point out that "appropriateness" challenges rejected by the library committee will nonetheless be given a second look on appeal by the local governmental body associated with the public library. Section 5 provides no criteria to guide the governmental body's evaluation, which means these elected officials are free to decide—on any basis they choose—whether the challenged work should be withdrawn or else relocated to another part of the library. *See* Act 372 § 5(c)(7)(B)(i).

Here, again, the Court finds that Plaintiffs' concerns about Section 5 curtailing their right to receive constitutionally protected speech in the public library are not speculative:

- Plaintiff Adam Webb, Garland County Library's Executive Director, states that his library has already received a "blanket request" to remove books from the collection due to their content and/or viewpoint, namely, "all materials with LGBTQ characters"; and he expects to see challenges

to "those same books, as well as others dealing with similar themes," made "repeatedly under Act 372." (Doc. 22-15, ¶ 21).

- According to the Complaint, Crawford County's library board, whose members are appointed by County Judge Keith, interpreted Section 5 to mean they were permitted to "segregate constitutionally protected materials" on the basis of viewpoint alone. (Doc. 2, ¶ 79).

- There is photographic evidence to prove Crawford County has already moved many books from the children's section to a restricted "adults-only" section in keeping with its interpretation of Section 5. *See* Plaintiffs' Hearing Exhibit 30.

For all these reasons, the Court concludes that the constitutional injuries the patron-Plaintiffs will suffer due to the implementation of Section 5 can be traced back to the local governmental bodies, which have fiscal and regulatory control over the public libraries. Plaintiffs have sued one of those bodies and its chief executive, and that is sufficient to satisfy standing requirements at this stage in the proceedings.

## B.     Likelihood of Success on the Merits

### 1.     Section 1, Criminal Provision

As explained, Section 1 imposes criminal liability on any person who furnishes harmful material to a minor.

#### a.     *Meaning of "Harmful to Minors" under Arkansas Law*

In 1933, federal agents blocked the importation of James Joyce's novel *Ulysses* as obscene because it contained multiple passages describing sex acts. The district court judge considering the matter found the book to be deserving of First Amendment protection. He held that reading the work "in its entirety," rather than only isolated

passages, revealed its overall literary value.  *See United States v. One Book Called "Ulysses"*, 5 F. Supp. 182, 185 (S.D.N.Y. 1933), *aff'd sub. nom. United States v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705 (2d Cir. 1934). Today, just over a century after its first publication, *Ulysses* is widely viewed as one of the most influential modernist novels in the English language.  The idea of banning it would seem absurd to most modern Americans.

The Supreme Court's definition of obscenity continued to evolve throughout the first half of the 20th century.  In 1973, the Court announced a revised definition intended to draw a sharper line between the obscene and non-obscene. *Miller v. California* involved a challenge to the application of California's criminal obscenity statute by a man who was prosecuted for mailing unsolicited brochures advertising pornographic books.  413 U.S. 15, 18 (1973).  Prior to this case, in the 1960s, the Supreme Court had struggled mightily with how to define pornography, with Justice Potter Stewart famously concluding, "I know it when I see it."  *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).  Obscenity was then defined as being "utterly without redeeming social importance" and undeserving of constitutional protection.  *See Roth v. United States*, 354 U.S. 476, 484–85 (1957).  The *Miller* Court reaffirmed that obscene materials were not entitled to First Amendment protection but changed the definition of "obscene" from "utterly without redeeming social value" to lacking "serious literary, artistic, political, or scientific value."  413 U.S. at 24.

*Miller* and its predecessor cases defined obscenity as to adults.  But a few years before *Miller*, the Court evaluated the constitutionality of a New York criminal statute

involving the sale of certain materials to minors. In *Ginsberg v. New York*, the owner of a luncheonette in Long Island sold two "girlie magazines"—depicting women wearing "less than a full opaque covering"—to a 16-year-old boy. 390 U.S. 629, 631–32 (1968). The minor's parents called the police, and Mr. Ginsberg, who admitted he knew the boy's age before selling him the magazines, was prosecuted and convicted of a misdemeanor offense. *Id.* at 631. The magazines were *not* obscene for adults. *See id.* at 634. So, the question before the Supreme Court was whether New York was permitted to criminalize the sale of non-obscene material to minors, who were then defined as persons under the age of 17. The Court answered in the affirmative, opining that minors had "a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see." *Id.* at 637. It held, in essence, that a given publication may simultaneously occupy two different positions under the Constitution. Courts may find a particular book non-obscene—and thus protected by the First Amendment—for adults, while also finding it obscene—and thus unprotected by the First Amendment—for minors.

New York's law defined material that was "harmful to minors" as works that "predominantly appeal[ed] to the prurient, shameful or morbid interest of minors," were "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable to minors," and were "utterly without redeeming social importance for minors." *Id.* at 633. In affirming Mr. Ginsberg's conviction, the Court held that the imposition of a misdemeanor penalty bore "a rational relation to the [legislature's] objective of safeguarding such minors from harm." *Id.* at 643.

Soon after *Ginsberg* and *Miller*, state legislatures looking to restrict minors' access to materials with sexual content began crafting laws that combined the definition of "harmful to minors" from the New York statute approved in *Ginsberg* with the revised definition of adult obscenity announced in *Miller*. Act 372's definition of "harmful to minors" precisely tracks the Supreme Court-approved definitions from *Ginsberg* and *Miller*; this definition appears in Arkansas's variable obscenity statute, found at Title 5, Chapter 68 of the criminal code. *See* Ark. Code Ann. § 5-68-501(2)(A)–(C).

In the mid-1980s, the Eighth Circuit considered the constitutionality of an ordinance criminalizing the display of material deemed "harmful to minors." *See Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389, 1391 (8th Cir. 1985). *Upper Midwest* involved a constitutional challenge to a Minneapolis ordinance requiring businesses to place material that was "harmful to minors" in sealed wrappers and opaque coverings. *Id.* at 1390. The regulated material was not obscene to adults, and the law only criminalized the material's display and sale to minors. *Id.* at 1393–94. Schools, public libraries, and religious institutions were specifically exempted from prosecution. *Id.* at 1391.

The court decided that the Minneapolis ordinance was constitutional, noting that the ordinance's definition of "harmful to minors" tracked the definition approved by the Supreme Court in *Ginsberg* and *Miller*. *Id.* The court then decided that even though the "sealed wrapper provision" prevented adults from thumbing through the restricted materials before purchasing them, the burden imposed on adult access to non-obscene speech was not too heavy to render the law unconstitutional. *Id.* at 1395. After all,

27

reasoned the court, adults could always visit adults-only bookstores if they really wanted to peruse the magazines before buying them. *Id.* at 1396.

The *Upper Midwest* plaintiff did not argue to the court that some materials implicated by the Minneapolis ordinance might be "harmful" to younger minors but not to older minors, particularly 17-year-olds. The court only considered whether the burden the ordinance placed on adults' access to protected speech was too great. The court observed that "any material covered by the Minneapolis ordinance is likely to be on the borderline between pornography and artistic expression," which seems to mean the court was only considering materials that would be harmful to all minors, regardless of age, such as adult pornography.

A couple of years prior to the decision in *Upper Midwest*, the Tenth Circuit approved the constitutionality of a similar ordinance proscribing the display of obscene material as to minors in bookstores. *See M.S. News v. Casado*, 721 F.2d 1281, 1288 (10th Cir. 1983). That ordinance provided that a bookstore could comply with the law by placing the offensive material behind blinder racks, "so that the lower two-thirds of the material [was] not exposed to view." *Id.* at 1287. The Tenth Circuit also appears to have assumed without discussion that the materials subject to the ordinance would be "harmful" to older and younger minors alike and, thus, harmful to all minors as a class. The court analogized the statute at issue to the one described in *Ginsberg*, which "proscribe[d] the sale of 'girlie magazines' to minors." *Id.* at 1286.

Around the same time, the Fourth Circuit weighed in on a variable obscenity law enacted by the Commonwealth of Virginia. *See Am. Booksellers Ass'n, Inc. v. Virginia*,

792 F.2d 1261, 1262 (4th Cir. 1986) ("*Virginia I*"). The plaintiffs in that case were booksellers' associations and retail bookstores, and the law involved criminalizing the commercial display of sexually explicit material that was "harmful to minors." *Id.* However, the Virginia law differed a bit from the laws at issue in *Upper Midwest* and *Casado* and raised new questions not addressed in the Eighth and Tenth Circuits' cases. The Virginia law prohibited a bookstore from displaying materials "in a manner whereby juveniles may examine and peruse them." *Id.* at 1263 n.2.

The Fourth Circuit disagreed with the approach adopted by the Eighth and Tenth Circuits. In the Fourth Circuit's view, the Virginia law was no mere time/place/manner restriction on speech; instead, it "impose[d] restrictions based on the content of publications." *Id.* at 1265. The Fourth Circuit also declined to credit the state's assertion that "only a small percentage of the inventory in bookstores could be classified as harmful to juveniles." *Id.* The court worried that "an older minor's first amendment rights [could] be limited by the standards applicable to younger juveniles" once the law was enforced. *Id.* at 1264 n.7. In other words, the Fourth Circuit did not assume that the only material subject to Virginia's regulation was the kind of pornographic material that would be considered "harmful" to the oldest of minors and therefore harmful to all minors as a class. As a result, the court found the law would burden both adults' and older-minors' First Amendment rights. The Virginia law was ultimately struck down as a content-based, overbroad regulation restricting protected speech, and the Commonwealth appealed. *Id.* at 1265.

The Supreme Court accepted certiorari of the Fourth Circuit's decision in *Virginia*

*I* to resolve the circuit split involving the Fourth, Eighth, and Tenth Circuits. *See Virginia v. Am. Booksellers, Inc.*, 484 U.S. 383 (1988) ("*Virginia II*"). On appeal to the high Court, the booksellers made a number of arguments that Plaintiffs now make in the case at bar: (1) "the State's interest in restricting the display of these works is insubstantial and the law does not further this interest by the least restrictive means available"; (2) "the law is overbroad in that it restricts access by mature juveniles to works that are 'harmful' only to younger children"; and (3) the law is "unconstitutionally vague . . . because it is . . . impossible to determine what standard should be used in deciding whether a work is appropriate for juveniles of different ages and levels of maturity." *Id.* at 389–90.

The key issue before the Supreme Court in *Virginia II* seems not to have been raised before the Eighth and Tenth Circuits. That issue was whether the term "harmful to minors" included speech that would be harmful to younger minors but protected as to older minors and adults. In an unusual move, the Supreme Court put the question of what "harmful to minors" meant to the Virginia Supreme Court despite the fact that the Commonwealth's Attorney General "argue[d] that the statute's coverage [was] much narrower than plaintiffs allege" and would cover "only a very few 'borderline' obscene works" as to older minors. *Id.* at 394.

The Court noted that the opinion of "the Attorney General does not bind the state courts or local law enforcement authorities," so the Court found itself "unable to accept [the Attorney General's] interpretation of the law as authoritative." *Id.* at 395. The Court also considered that if the Attorney General were wrong and the law actually applied broadly "to a huge number of works" otherwise acceptable for both adults and older

minors, "*[t]his broader reading of the statute would raise correspondingly greater First Amendment questions*." *Id.* at 394 (emphasis added). The U.S. Supreme Court therefore certified to the Virginia Supreme Court the question of "what general standard should be used to determine the statute's reach in light of juveniles' differing ages and levels of maturity." *Id.* at 395.

The Virginia Supreme Court's answers to the certified questions determined the fate of the challenged law. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618 (Va. 1988) ("*Virginia III*"). The Virginia Supreme Court agreed in *Virginia III* with the Commonwealth's Attorney General "that the focus of the inquiry [regarding material that is harmful to minors] is not upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class." *Id.* at 623. Instead, "A book will pass statutory muster . . . if it has serious value for a legitimate minority of juveniles, and in this context, a legitimate minority may consist of older, normal (not deviant) adolescents." *Id.* Put simply, the Virginia statute reached only those publications deemed harmful (i.e., obscene) for all minors, regardless of age. Upon receipt of the answers to the certified questions, the U.S. Supreme Court vacated the opinion of the Fourth Circuit and remanded the case. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988). With the universe of possible "harmful" materials considerably narrowed, the statute was deemed constitutional because it imposed only "a minimal burden on booksellers and represent[ed] a constitutionally permissible exercise of the state's police powers." *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127–28, *cert. denied*, 494 U.S. 1056 (1990).

Which brings us to Arkansas:  Twenty years ago, Arkansas amended a law nearly identical to Section 1 of Act 372.  Act 858 of 2003 amended Arkansas Code § 5-68-502(1), making it a crime to "display material which is harmful to minors in such a way that minors, as part of the invited general public, will be exposed to view such material" and to "[s]ell, furnish, present, distribute, allow to view, or otherwise disseminate to a minor, with or without consideration, any material which is harmful to minors."  When Arkansas bookstore owners, booksellers' associations, librarians, and publishers challenged the law's constitutionality, the Honorable G. Thomas Eisele of the District Court for the Eastern District of Arkansas followed the U.S. Supreme Court's lead by certifying key questions of statutory interpretation to the Arkansas Supreme Court.  *See Shipley, Inc. v. Long*, 454 F. Supp. 2d 819 (E.D. Ark. 2004).  The certified questions included whether the statute "intended to protect *all* minors, i.e., all persons 17-years-of-age and younger, from exposure to 'materials harmful to minors," and, if so, whether the statute could "nevertheless be interpreted under Arkansas law to protect only those who are the older, more mature minors from exposure to such materials, if that interpretation is the only way to protect the statute from a successful attack under the United States Constitution."  *Id.* at 820 (emphasis in original).

The Arkansas Supreme Court then considered the meaning of "materials harmful to minors" in the context of Arkansas Code § 5-68-502, as amended by Act 858 of 2003. The Court's answer to the first part of the certified question was "yes": The statute "obviously intended to protect all minors from exposure to material deemed 'harmful to minors.'" *See Shipley, Inc. v. Long*, 359 Ark. 208, 216 (2004).  The second part of the

question was "no," which meant the Arkansas Supreme Court interpreted "materials harmful to minors" to apply to materials considered harmful *to the youngest of minors*. The Court acknowledged that its interpretation of "harmful to minors" was diametrically opposite to the Virginia Supreme Court's:

> The Virginia high court concluded that the focus of the inquiry should not be upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class . . . .
>
> In the present case, the State urges us to adopt the same "narrowing" interpretation utilized by the Virginia court, reminding this court that it is our duty, if it is at all possible, to adopt an interpretation of an act that preserves its constitutionality. However, under the Virginia court's so-called "variable obscenity" interpretation, works which are plainly inappropriate for younger children would not fall within the scope of the statute, because those works would have some serious literary, artistic, political, or scientific value for an older adolescent . . . .
>
> If the younger minors are to be protected from "harmful" materials, surely the General Assembly did not intend for those younger children to be permitted to access materials that would arguably be "harmful" to them, even though not "harmful" to an older child. We cannot construe Arkansas' statutory law in such a way as to render it meaningless, and we will not interpret a statute to yield absurd results that are contrary to legislative intent.

*Id.* at 219. With the Arkansas Supreme Court's guidance in hand, Judge Eisele's decision was easy. He struck down the "display" provisions of the 2003 act as facially unconstitutional due to overbreadth, reasoning:

> It is now clear that under the Arkansas statute, as authoritatively interpreted by the Arkansas Supreme Court, material which is only harmful to the youngest of the minors may not be displayed by Plaintiffs even though such material would not be harmful to adults or older minors. The statute therefore effectively stifles the access of adults and older minors to communications and material they are entitled to receive and view.

*Shipley*, 454 F. Supp. 2d at 829–30.

### b.    *Overbreadth*

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). The second step is to examine "whether the statute" as construed "criminalizes a substantial amount of expressive activity." *Id.* at 297. "A statute is facially invalid if it prohibits a substantial amount of protected speech." *Id.* at 292.

First, in construing Section 1 of the Act, the Court finds, as the State conceded at oral argument, that the Arkansas Supreme Court's responses to the certified questions in *Shipley* are binding. However, the State requested at the motion hearing that the Court decline to follow Judge Eisele's ultimate conclusion and find that Section 1 is constitutional. In support of this argument, the State cites the fact that the definition of "harmful to minors" in Section 1 meets the approved definition from *Ginsberg* and *Miller* and a statute similar to Section 1 was approved in *Upper Midwest*.

The Court is persuaded that *Ginsberg* and *Upper Midwest* are not helpful to resolving the issues at hand. Those courts never discussed whether the term "harmful to minors," if construed broadly, burdens large amounts of speech for older minors and adults. It appears the ordinances at issue in *Ginsberg* and *Upper Midwest* covered such "harmful" items as pornography, which would have been obscene as to all minors.

More instructive is what happened in *Virginia II*. The Supreme Court signaled how it would rule on the overbreadth issue if the Virginia Supreme Court interpreted the definition of "harmful to minors" to apply broadly to a great number of works, including

34

ones acceptable for adults and older minors to view. The Supreme Court opined that "[t]his broader reading of the statute would raise correspondingly greater First Amendment questions" than a narrow interpretation. 484 U.S. at 394. Here, it is that "broader reading of the statute," authoritatively put forth by the Arkansas Supreme Court, that this Court must now evaluate.

Other courts besides *Shipley* have relied on *Virginia II*. For example, some courts grappling with these same issues saved their respective variable obscenity statutes from invalidity by construing "harmful to minors" narrowly, just as the Virginia Supreme Court did. *See, e.g., Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993) (limiting interpretation of state statute to mean material "harmful to minors" was only what was considered obscene to a 17-year-old minor); *Am. Booksellers Ass'n v. Webb*, 919 F.2d 1493, 1508–09 (11th Cir. 1990) (finding that Georgia courts would interpret their own variable obscenity statute with reference to what is "harmful" to a reasonable 17-year-old minor, thus saving the statute from overbreadth).

Turning back to the text of Section 1, it is clear that there is no way to save this statute from overbreadth. The Arkansas Supreme Court has already determined that "harmful to minors" includes a broad category of protected speech. Take for example, a paperback romance novel, which contains descriptions of sex. It is unlikely young minors would be interested in reading such a book, but if for some reason it were "made available" to them in bookstores or libraries, booksellers and librarians could possibly face

penalties—depending on how that term was construed.[25]

The doctrine of overbreadth is appropriately applied in a facial challenge where "the enactment reaches a substantial amount of constitutionally protected conduct." *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489, 494 (1982). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of Council v. Taxpayers for Vincent,* 466 U.S. 789, 801 (1984).

Plaintiffs have established this "realistic danger." If libraries and bookstores continue to allow individuals under the age of 18 to enter,[26] the only way librarians and booksellers could comply with the law would be to keep minors away from any material

_____

[25] The State's attorney's colloquy with the Court during the hearing makes clear that all parties agree about the breadth of material that would fall under the ambit of "harmful to minors" if Section 1 went into effect:

> THE COURT: And librarians and booksellers and every person to whom Section 1 will become applicable to, in curating their content and offerings, will have to apply the test for what is harmful to minors to what is harmful to a 5-year-old without regard to the fact that that may not be harmful to a 17-year-old. Do you disagree with anything I have said so far?
>
> STATE: No, Your Honor.

[26] Banning those under the age of 18 from entering public libraries is no solution. It compromises the mission of public libraries and prohibits young minors from accessing constitutionally protected speech that would otherwise be available to them on the library shelves. Requiring those under the age of 18 to enter the library with an adult is also a nonstarter. That, in it of itself, will burden older minors' First Amendment rights. Moreover, it would not protect librarians from possible prosecution. Section 1 affords no exemption or safe harbor to librarians. Therefore, even if a parent gave written approval for her child to browse the shelves and check out books at will, this would be insufficient to immunize the librarian from possible criminal penalties. *See also* n. 21, *supra*.

considered obscene as to the youngest minors—in other words, any material with any amount of sexual content. This would likely impose an unnecessary and unjustified burden on any older minor's ability to access free library books appropriate to his or her age and reading level. It is also likely that adults browsing the shelves of bookstores and libraries with their minor children would be prohibited from accessing most reading material appropriate for an adult—because the children cannot be near the same material for fear of accessing it. The breadth of this legislation and its restrictions on constitutionally protected speech are therefore unjustified.[27]

The Court's final comment on Section 1 is that certain terms are too vague to be understood in relation to the other terms. Like the overbreadth doctrine, a First Amendment vagueness challenge will invalidate an unclear law that "chills" protected First Amendment activities. A law must sufficiently define terms so "that ordinary people can understand what conduct is prohibited." *United States v. Washam*, 312 F.3d 926, 930 (8th Cir. 2002). Otherwise, those who attempt to interpret and comply with the law will "necessarily guess at its meaning and differ as to its application." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (citations and quotations omitted). Such vagueness leads to "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to [government officials] for resolution on

---

[27] Defendants argue that Section 1 is not a content-based restriction and should be subject only to rational-basis review—since the time/place/manner restriction in *Ginsberg* was subject to rational-basis review. *See* Doc. 37, p. 10. The Court rejects this argument but finds that Section 1 would not even survive rational-basis scrutiny. Defendants offer no basis—let alone a rational one—to justify the burdens Section 1 would impose on older-minor and adult access to protected reading materials in the public library and bookstore settings.

an ad hoc and subjective basis." *Id.* Where "the literal scope of the . . . regulation is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Id.* at 1308–09 (quotations and citations omitted); *see also Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (where the vagueness arises amidst a "content-based regulation of speech[,] [t]he vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech").

"[T]he failure to define the pivotal term of a regulation can render it fatally vague," particularly where the tools courts regularly use to interpret imprecise terms, such as "the common usage of statutory language, judicial explanations of its meaning, and previous applications of the statute to the same or similar conduct," fail to provide necessary clarity. *Stephenson*, 110 F.3d at 1309. Here, the Court finds that Section 1's use of "presents," "makes available," and "shows" leaves librarians and booksellers unsure about whether placing books known to contain sexual content on the bookshelves may subject them to liability once a minor walks through the front door.

During the evidentiary hearing, the Court asked the State whether "makes available" meant "merely having [a book] on a bookshelf with nothing harmful on the cover or the spine, merely having it on a shelf with other books," and the response was, "I'm not sure we go that far." The State's attorney suggested, however, that it was possible that liability could attach to booksellers or librarians "if there was an open book that was just on the shelf" and the bookseller or librarian "kn[ew] for a fact the minor was actually viewing the material and then willfully turn[ing] a blind eye to it." This explanation

demonstrates the challenge facing booksellers and librarians. There is no clarity on what affirmative steps a bookseller or librarian must take to avoid a violation.

For all these reasons, the Court finds that Plaintiffs have established a likelihood of success in proving that Section 1 is unconstitutional due to overbreadth and vagueness.

## 2.      Section 5, Challenge Provision

Section 5 articulates a procedure by which anyone "affected" by a book may challenge its placement in the library or its inclusion in the library's collection on the ground that it is "[in]appropriate."

### *a.      Vagueness*

Section 5 of Act 372 is very poorly drafted.  The State offered various explanations for the terms at issue in Section 5, and it did its his best to harmonize inconsistent provisions and fill in the gaps where the law fails to provide crucial guidance to libraries, library committees, and local governmental bodies.  Nevertheless, the State conceded—more than once—that such explanations appear nowhere in the text of the law and simply represent the State's "best construction" of the statute's plainly ambiguous terms. Perhaps any vagueness may be chalked up to the General Assembly's haste to enact Act 372, but the lack of clarity seems to have been by design.  After all, by keeping the pivotal terms vague, local governing bodies have greater flexibility to assess a given

challenge however they please rather than how the Constitution dictates.

In Section 5, the term "appropriateness" is fatally vague, all but guaranteeing that the challenge procedure will result in books removed or relocated based on the content or viewpoint expressed therein. "Appropriateness" does not mean "harmful to minors," but instead means something else. When the Court asked the State how library committees and local governmental bodies should interpret the term "appropriateness" in the context of a challenge to a library book, its counsel responded that these entities should simply consider the library's "criteria of selection." This is problematic, since Section 5 does not require the local governmental body to rely on the library's "criteria of selection." In fact, the library's selection criteria policy did not even make the list of items that must be submitted to the governing body on appeal. *See* § 5(c)(12)(B)(i).

In the absence of a statutory definition, the Court turns to the dictionary, which defines "appropriateness" as "the state of being suitable for a particular person, condition, occasion or place." New College Edition, The American Heritage Dictionary, New College Ed. 64 (William Morris, ed. 1976). Given this definition, it is difficult, if not impossible, to assess a challenged book's "appropriateness" without considering its content, message, and/or viewpoint. In fact, Section 5 specifically contemplates that a library review committee or local governmental body may consider the material's "viewpoint." *See* Act 372 § 5(c)(7)(B)(i). The law cautions only that a book should not be withdrawn from the library's shelves "*solely* for the viewpoints expressed within the material." *Id.* (emphasis added). Asked whether Section 5 permitted a book to be withdrawn if "90 percent of the reason" was the book's viewpoint, the State simply asserted that the analysis turns on

40

"the text" of Section 5, which "only says 'solely.'"

Other provisions of Section 5 reinforce the role of viewpoint in assessing a challenge. Section 5 specifically contemplates that members of a library review committee or local governmental body will bring their "diverse viewpoints," *see id.* § 5(c)(6), to evaluate the appropriateness of a book. Why include such a requirement if viewpoint may play no part in judging appropriateness?

The State also concedes that Section 5 is not limited to challenges about children's books:  *Any book* could be challenged by any member of the public who believed it was "[in]appropriate" for minors *or* for adults.  The Court agrees. After all, the statute contains no limiting language that would restrict the challenge procedure's scope.

Does the challenge procedure contemplate that materials will be withdrawn from a library's collection or relocated to a restricted section in the library? The Court cannot say. The statute uses both "withdraw" and "relocate." *See id.* §§ 5(c)(7)(B)(i) & 5(c)(11)(A).  Nor does Section 5 specify whether materials subject to a challenge may be "withdrawn" only temporarily or for good.  A permanent ban would pose a greater burden on access to protected speech than relocating the book to another section of the library, and Section 5 presents both options as though they were equivalent.

Furthermore, if a library committee or local governmental body elected to relocate a book instead of withdrawing it, Section 5 only contemplates relocating it "within the library's collection to an area that is not accessible to minors under the age of eighteen (18) years." *Id.* at § 5(c)((11)(A). But the law also contemplates challenges to appropriateness writ large, not just with respect to minors. The law, then, must allow for

withdrawal. Otherwise, where would such a book—deemed broadly inappropriate for all readers, regardless of age—be placed?

Finally, Section 5 does not define what makes a space "accessible to minors," leaving libraries to guess what level of security meets the law's requirements. For example, it might mean the use of physical barriers, such as walls, doors, and locks. Or, it might mean a sign saying, "No minors allowed beyond this point."

For all these reasons, the Court finds that Plaintiffs have a high likelihood of success in proving that several critical terms in Section 5 are too vague to be understood and implemented effectively without also allowing those tasked with enforcing the law to adopt unconstitutional, impermissible interpretations.

### b.    Content-Based Restriction

Even if the Court put aside its concerns about vagueness, Section 5 unnecessarily imposes content-based restrictions on protected speech, thereby rendering this section of the law unconstitutional.

The challenge procedure in Section 5 merits strict scrutiny because it threatens a content-based restriction on permissible speech. At each step in the appeal process, evaluators must consider the content of the library material—to screen for "appropriateness"—before deciding whether the public should be deprived access to the material. [28]    Therefore, *any* successful challenge would result in a content-based

---

[28] It is important to note that even with respect to obscenity, the Supreme Court has not suggested "that the question of the value of an allegedly obscene work is to be determined by reference to community standards." *Pope v. Illinois*, 481 U.S. 497, 499 (1987). A

restriction on otherwise constitutional speech—unless the challenged book met the legal definition of obscenity.

 "[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based," and the courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens on speech because of its content." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642–43 (1994). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

After extensive briefing and a day-long hearing, the Court cannot discern what compelling state interests justify Section 5. The law creates a poorly defined method for persons to challenge the "appropriateness" of a book, be it a children's book or an adult book. If the law is intended to protect minors, it is not narrowly tailored to that purpose.

---

work's "value" is not subject to the artistic tastes, religious sensibilities, or "morality" of a given community. Whether or not a work has serious literary or artistic value as a whole does not depend on what the majority of a given community thinks, which means a work cannot be deemed "obscene" in Alma, Arkansas, but "not obscene" in Little Rock.

> Just as the ideas a work represents need not obtain majority approval to merit protection, neither, insofar as the First Amendment is concerned, does the value of the work vary from community to community based on the degree of local acceptance it has won. The proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole.

*Id.* at 500–01.

Nor is Section 5 limited to reading material in public libraries that is obscene or "harmful to minors," which makes the law likely to significantly burden constitutionally protected speech.

Even if the Court disregarded the statute's text, it remains impossible to construe constitutionally. If the Court limited "appropriateness" to mean "harmful to minors," this change would raise the same issues discussed with respect to Section 1 of Act 372. In the context of a public library, the term "harmful to minors" would sweep in materials that are constitutionally protected as to older minors and place unjustified burdens on their access.

During the hearing, the State made little effort to defend the vague terms in Section 5 and instead focused its attention on a broader point made in its brief, that "[*s*]*tates may add and remove materials from public libraries at will*." (Doc. 37, p. 20) (emphasis added). The State seemed to argue that content-based censorship of otherwise constitutionally protected speech, as contemplated by the Section 5 challenge process, was perfectly acceptable. The State further implied that a professional librarian's decision to *stock* the shelves with books representing diverse topics and viewpoints—which does not offend the Constitution—is equivalent to a local governing body's decision to *strip* the shelves of books espousing unpopular or minority viewpoints.

The Court followed up on this point in the hearing:

COURT: Does the government have the same right to take out of the public domain something that it finds at a current point in history to be undesirable?

STATE: I think that under the full extent of the government speech doctrine, yes, Your Honor . . . .

COURT: But you believe that the government speech argument that you're making applies equally to removing a book from the shelf as it does to the decision to place it on the shelf in the first place?

STATE: Yes, Your Honor.

The Court then asked the State what recourse a citizen would have if one, two, or dozens of books on a particular topic or expressing a particular viewpoint were deemed "inappropriate" and removed from the library's general collection by the local governmental body in a "final" decision without any written explanation. Incredibly, the State responded:

We live in a democracy. If the citizens are unhappy with how the quorum court or whatever the governing body is exercising their power, they are allowed to vote them out.

The State then doubled down on its argument, that under the First Amendment "there was no right to receive information"—something "the state believes . . . is the correct position."[29] To support that claim, the State's attorney pointed to "the dissent" in the Supreme Court case of *Board of Education, Island Trees Union Free School District Number 26 v. Pico*, 457 U.S. 853 (1982)—a case he also urged the Court to ignore because it had "no controlling decision."

The State is wrong on all fronts, starting with its treatment of *Pico*. The *Pico* case certainly does not stand for the proposition that there is no constitutional right to receive information. *Pico* concerned the permissible limits of state censorship in a school library setting, not a public library setting. Under the law, schools are permitted to censor student

---

[29] County Defendants made a similar argument in their brief, claiming "Plaintiffs cannot in good faith argue that, based on precedent, the First Amendment protects—outright—the right to receive information in a County Library." (Doc. 36, p. 11).

access to speech to some degree "in light of the special characteristics of the school environment," *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969). Nevertheless, *Pico* held that school children "have a First Amendment right to receive information and . . . school officials are prohibited from exercising their discretion to remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 188 (5th Cir. 1995) (quoting *Pico*, 457 U.S. 853, 872 (1982) (plurality opinion) (cleaned up).

The majority of justices in *Pico* agreed that the state's censorship power could not be exercised "in a narrowly partisan or political manner"—*even in a school library setting*. *See Pico*, 457 U.S. at 870 (Brennan, J., plurality opinion); *id.* at 879 (agreeing that the Supreme Court's "precedents command the conclusion that the State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons") (Blackmun, J., concurring); *id.* at 907 ("cheerfully conced[ing]" this point") (Rehnquist, J., dissenting); *id.* at 883 (noting that the trial court should determine "the reason or reasons underlying the school board's removal of the books") (White, J., concurring in judgment).

Setting aside *Pico*, Defendants are unable to cite any legal precedent to suggest that the state may censor non-obscene materials in a public library because such censorship is a form of government speech. Clearly, placing library materials in the public domain is not equivalent to censoring them. *See Kreimer v. Bur. of Police for Town of*

*Morristown*, 958 F.2d 1242, 1254 (3d Cir. 1992) ("Our review of the Supreme Court's decisions confirms that the First Amendment does not merely prohibit the government from enacting laws that censor information, but additionally encompasses the positive right of public access to information and ideas . . . . [T]his right . . . includes the right to some level of access to a public library, the quintessential locus of the receipt of information.").

With respect to the First Amendment rights of adults, "[t]he right of freedom of speech . . . includes not only the right to utter or to print, but the right to distribute, the right to receive, *the right to read* and freedom of thought . . . ." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (emphasis added and citation omitted). In circumstances that present no threat to others' welfare, an individual has the "right to read or observe what he pleases," and that right is "fundamental to our scheme of liberty" and cannot be restricted. *Stanley v. Georgia*, 394 U.S. 557, 568 (1969). "[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Griswold*, 381 U.S. at 482. This does not mean that librarians lack discretion to select library materials in the first instance; it simply means that their selection criteria must serve the First Amendment's vital "role in fostering individual self-expression [and] . . . in affording the public access to discussion, debate, and the dissemination of information and ideas." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978). In the instant case, no party has expressed concern that professional librarians violate the First Amendment in selecting works for the library. Instead, it is the threat of state censorship that is at issue here.

When it comes to children, it is well established that "minors are entitled to a significant measure of First Amendment protection" and the government may restrict these rights "only in relatively narrow and well-defined circumstances." *Erznoznik,* 422 U.S. at 212–13. It is also well established that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 213–14. Finally, when it comes to public spaces, like public libraries, "the governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults." *Reno*, 521 U.S. at 875.

The Court finds that Plaintiffs have established a likelihood that Section 5 would permit, if not encourage, library committees and local governmental bodies to make censorship decisions based on content or viewpoint, which would violate the First Amendment. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). For the above reasons, Plaintiffs are likely to prevail on their claim that Section 5 works an unconstitutional content-based restriction on protected speech.

### C. Irreparable Harm

Because Sections 1 and 5 of Act 372 are likely to result in the abridgment of Plaintiffs' First Amendment rights, Plaintiffs will suffer irreparable harm if a preliminary injunction is not granted. *See Phelps-Roper*, 662 F.3d at 488. No legal remedy exists that

48

could compensate Plaintiffs for their loss of their protected constitutional rights. *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990). "Loss of First Amendment freedoms, even for minimal periods of time, constitute[s] irreparable injury." *Ingebretsen v. Jackson Public Sch. Dist.,* 88 F.3d 274, 280 (5th Cir. 1996) (citing *Elrod v. Burns,* 427 U.S. 347, 373 (1976)).

### D.     Balance of the Equities and the Public Interest

When the government opposes the issuance of a preliminary injunction, the final two factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of the equities and public interest here decidedly favor Plaintiffs, given the likelihood of the infringement of their First and Fourteenth Amendment rights.  Defendants will suffer no harm if the preliminary injunction is granted.

### IV.     CONCLUSION

For the reasons explained herein, Plaintiffs' Motion for Preliminary Injunction (Doc. 22) is **GRANTED**.  Sections 1 and 5 of Arkansas Act 372 are **PRELIMINARILY ENJOINED** under Federal Rule of Civil Procedure 65(a), pending final disposition of the issues on the merits.

**IT IS SO ORDERED** on this 29th day of July, 2023.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

49