# In The Matter Of:

*Fayetteville Public Library, et al v.*
*Crawford County, Arkansas, et al*

---

*Donald Nathan Coulter, Esq.*
*April 1, 2024*
*CERTIFIED ORIGINAL/COPY TRANSCRIPT*

---

*Michelle Satterfield, CCR*
*1955 Little River Drive*
*Conway, Arkansas  72034*
*(501)336-7414*
*Satterfield@conwaycorp.net*

Original File Donald Nathan Coulter, Esq..txt
**Min-U-Script® with Word Index**

1          IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF ARKANSAS
2                 FAYETTEVILLE DIVISION

3    FAYETTEVILLE PUBLIC LIBRARY, a political
     subdivision in the City of Fayetteville,
4    State of Arkansas; EUREKA SPRINGS CARNEGIE
     PUBLIC LIBRARY; CENTRAL ARKANSAS LIBRARY
5    SYSTEM; NATE COULTER; OLIVIA FARRELL;
     HAYDEN KIRBY;MIEL PARTAIN, in her own capacity
6    and as parent and next friend of MADELINE PARTAIN;
     LETA CAPLINGER; ADAM WEBB;
7    ARKANSAS LIBRARY ASSOCIATION; ADVOCATES FOR
     ALL ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
8    WORDSWORTH COMMUNITY BOOKSTORE, LLC, d/b/a
     WORDSWORTH BOOKS; AMERICAN BOOKSELLERS ASSOCIATION;
9    ASSOCIATION OF AMERICAN PUBLISHERS,INC.; AUTHORS
     GUILD, INC.; COMIC BOOK LEGAL DEFENSE FUND
10   and FREEDOM TO READ FOUNDATION,          PLAINTIFFS

11   vs.                        NO. 5:23-CV-05086-TLB

12   CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH, in his
     official capacity as Crawford County Judge;
13   TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
     MATT DURRETT; JEFF PHILLIPS; WILL JONES; TERESA
14   HOWELL; BEN HALE; CONNIE MITCHELL; DAN TURNER;
     JANA BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE HUNTER;
15   DANIEL SHUE; JEFF ROGERS; DAVID ETHREDGE; TOM TATUM,
     II; DREW SMITH; REBECCA REED MCCOY; MICHELLE C.
16   LAWRENCE; DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
     CAROL CREWS; KEVIN HOLMES; CHRIS WALTON; and CHUCK
17   GRAHAM, each and in his or her official capacity as a
     prosecuting attorney for the State of Arkansas, DEFENDANTS
18

19

                    ORAL DEPOSITION
20
                         OF
21
               DONALD NATHAN COULTER, ESQ.
22

23   ***** THE ABOVE-STYLED MATTER was reported by Michelle R.
     Satterfield, CCR, LS Certificate No. 570, at the Fuqua
24   Campbell, P.A., located at 3700 Cantrell Road, Suite 205,
     Little Rock, Arkansas, commencing on the 1st day of April
25   2024, at 9:07 a.m.  *****

1                    I N D E X

2      TOPIC                                      PAGE

3   APPEARANCES                                   2-3

4   STIPULATIONS                                    5

5   WITNESS SWORN:  Donald Nathan Coulter, Esq.     6

6           Examination by Mr. Watson               6

7           Examination by Mr. McLelland          121

8           Examination by Mr. Adams              149

9           Further Examination by Mr. Watson     155

10  REPORTER'S CERTIFICATE                        160

11                  E X H I B I T S

12  NUMBER               DESCRIPTION               PAGE

13  Exhibit 1     Bates No. CALS00067               36

14  Exhibit 2     Bates No. CALS00066               37

15  Exhibit 3     Bates Nos. CALS00001-CALS00004    42

16  Exhibit 4     Bates No. CALS00005               53

17  Exhibit 5     Bates Nos. CALS00006-CALS00008    66

18  Exhibit 6     Bates Nos. CALS00009-CALS00025    66

19  Exhibit 7     CALS Internet Use Disclaimer      78

20  Exhibit 8     20 U.S.C.A. 9134 State Plans      79

21  Exhibit 9     Three-Page Email Thread           91

22  Exhibit 10    Two-Page Email Thread             95

23  Exhibit 11    List of Thirty Books            151
            (COPIES OF EXHIBITS SCANNED INTO ETRANSCRIPT)
24

25

1   Jacksonville, Little Rock, Perry County and Pulaski

2   County.

3       So, essentially, the three organizations or three

4   entities, Perry, Pulaski County and Little Rock Library

5   added Maumelle, Sherwood, Jacksonville to the system under

6   a fairly complicated statutory framework that had to be --

7   an ordinance had to be approved by the municipalities of

8   those cities and by the counties for those two counties,

9   Pulaski and Perry, to join the system, and that,

10  essentially, has been the configuration since

11  approximately 1999.

12  Q    So it was created completely by government entities?

13  A    Yes, by municipalities, by cities to create a

14  separate organization to conduct library business.  We

15  don't get our funding directly from any of those public

16  entities, and there were a number of places, over the

17  course of my tenure there, where distinctions between

18  those municipalities and county subdivisions of state

19  government, have clearly been illustrated, and, you know,

20  we're not a subdivision of state government, we're not a

21  subdivision of any of those municipalities.

22      We essentially, under the statute, have the authority

23  to run the library that those entities had.  In some

24  instances the communities deeded their real estate to the

25  organization that runs the library.  In two instances they

1   did not.

2       So it's a hybrid.  I think it's called an interlocal

3   government agreement that essentially creates the

4   operating rules for the library, but we are not a

5   subdivision of any of those municipal or county entities.

6   Q   Okay.  And I didn't print this off.  I should have,

7   but Paragraph 14 of the Complaint says that CALS is a,

8   quote, "body politic."

9       How are you defining that, or what is your

10  understanding --

11  A   I think the language is a body politic and corporate.

12  Q   Right.

13  A   It comes right out of the statute that creates the

14  opportunity for entities to form these kinds of

15  organizations that I've described.

16  Q   So does CALS consider itself a government body of

17  sorts?

18  A   No.

19  Q   No?

20  A   We obviously are funded by government sources, namely

21  the taxing authority of the county that I described

22  earlier.  We get government funds, therefore, we are

23  subject to open records, open meetings laws.  We do things

24  in accordance with those fastidiously, but we are not a

25  governmental entity in the sense that the City of Little

1  Rock is.

2  Q    Okay.  And you say in a sense that the City of Little

3  Rock is.  I mean, obviously CALS is not a city.  Is there

4  any other, you know, comparison in the state government

5  you can think of, because it is a little strange to be

6  able to have taxing powers and say, but we're not a

7  government entity?

8  A    We don't have the taxing power.

9  Q    Okay.

10  A    The taxing power rests in the hands of the county.

11  Q    Sure.

12  A    And under constitutional amendment, that tax revenue

13  under that authority is collected by the collector,

14  assessed and collected by the -- well, I guess it's

15  assessed by the treasurer, collected by the treasurer.

16       But -- but we, by a matter of constitutional

17  provision, get that money, but we can't collect that tax,

18  we can't enforce that.  If you don't pay your property

19  taxes, we don't have the authority to put a lien on your

20  property.  The county does that.  We are the beneficiary

21  of that constitutionally-provided arrangement, but we're

22  not a taxing authority.

23  Q    So you don't consider yourself subject to things like

24  First Amendments?

25  A    Well, I think as any kind of entity, whether we are a

1  government entity or not, we believe that our patrons are

2  protected by the First Amendment.  We believe that the

3  people who expect the library to contain material they

4  want, and have a right, we think under constitutional law

5  to have access to that, we are protected by the First

6  Amendment, the patrons and the organization that serves

7  them.

8  Q    Okay.  But is CALS, itself, bound by the First

9  Amendment?

10  A    Well, I'm not aware of how we would be in the

11  position, if I'm right, that we're not a governmental

12  entity, that we would be in the position of somehow being

13  able to enforce or impose a governmental restriction of

14  the sort that the First Amendment precludes.

15  Q    So it's no?

16  A    Maybe you can help me out.

17  Q    Sure.

18  A    That the library could engage in unconstitutional

19  acts of the First Amendment, so that we would be prevented

20  from doing that?  I mean, give me a -- help me with some

21  illustration of how that might come into play.

22  Q    Sure.  Just generally speaking, does CALS have

23  speaking events, where speakers come and present topics?

24  A    Yes.

25  Q    So let's take, for example, one of those speakers

1   comes up and is speaking, and then, you know, starts

2   talking about some viewpoint that --

3   A     Right.

4   Q     -- that CALS made and the library may disagree with

5   and say, all right, you're out of here, you don't get to

6   speak anymore.  I think that would be, pretty clearly, a

7   viewpoint-based discrimination?

8   A     Yes.  Yes.

9   Q     Is CALS allowed to do that based on the viewpoint?

10  A     Well, the public library has been held to be a

11  limited public forum in scores and scores of cases, so we

12  believe that under that doctrine, if we allow certain

13  things, certain speakers, we can't pick and choose based

14  on content.

15        So, yes, in that instance that you just described,

16  and subject to that doctrine of limited public forum --

17  the library can decide, for example, that we're not going

18  to allow people to post things on our bulletin board, for

19  whatever reason.

20  Q     Right.

21  A     But if we allow some people to post things on our

22  bulletin board, then everybody can.  For example, you

23  could probably go out to the Perry County Library in some

24  interval and find that people have posted things for the

25  Republican Party Committee of Perry County or a variety of

1    other things like that.

2          The library has rules about how long you can have

3    that up and a forum of what you can put up, but the

4    library doesn't police the content of that.  So I guess in

5    your hypothetical, yes, the library would be prevented

6    from exercising some sort of content-based, even as a

7    limited public forum would be prevented from doing

8    something of that sort.

9    Q    And the reason I'm trying to tease this out a little

10   bit, so thank you for kind of going into this hypothetical

11   with me, is -- and because the First Amendment only

12   applies to government action, it does not apply to private

13   action, and my understanding earlier is you said the

14   lib -- that CALS was not a public entity or a part of --

15   A    It is not a government entity.

16   Q    Okay.

17   A    It is a -- it is a -- it is governed by certain

18   public rules and regulations because it uses public money,

19   but it's not a government entity in the sense that the

20   City of Little Rock is, the State of Arkansas is, the

21   Department of Education, for example, of the Executive

22   Branch of the Arkansas State Government, et cetera.

23   Q    Okay.  And so -- I mean, the only reason that you're

24   saying that it would be, you know, bound by the First

25   Amendment, is because it collects some real estate tax

1   revenue?  Or not even collect.  It's given that, I think
2   is what you said earlier, by the county government.
3   A    Well, I think what I've said is that under doctrine
4   it says a public library is not quite a town square, but
5   it is a limited public forum, then we have to follow that
6   interpretation application of the First Amendment to say
7   that I can't go out to the library and take down -- let's
8   say my hypothetical, the Democratic Party of Perry
9   County's Committee notices and leave out the Republican
10  Party's notices.
11  Q    Okay.
12  A    So in that sense we are bound by the First Amendment,
13  you're correct, but we are not an arm of the government in
14  the way that the Department of Education is in the State
15  of Arkansas.
16  Q    And as you know we have to be precise as lawyers on
17  this side, and so I feel -- and I'm not trying to nitpick.
18  You said in the way.  I mean, is there a different way in
19  which --
20  A    Well, I think I -- I mean, obviously I've read the
21  briefs, I've read the opinion.
22  Q    Sure.
23  A    I've read -- I was at the oral argument.  I mean, I
24  understand you would like to say that my library is
25  engaged in government speech and we don't, as our lawyers

1   have made clear, and I think at this point the court has

2   made clear, we don't think that's the role of the library.

3       We're not putting out books as some sort of director

4   from the State of Arkansas, or from the City of Little

5   Rock or Pulaski County or Perry County.  That's not the

6   public library as an institution of, you know, 175 years

7   in the United States.  It's publicly funded, but it's not

8   engaged in government speech.

9       It's not -- you know, if that were the case,

10  hypothetically, the people who have advanced this bill

11  should just give us a list, every biannual legislative

12  session, of books that would be appropriate for the

13  publicly-funded library to collect and no others and then,

14  you know -- that's the logical extension of your argument.

15  Q    Sure.  But I'm asking a question that I think it's a

16  step before --

17  A    All right.

18  Q    -- the government speech part.

19      You said that CALS and the public libraries are not a

20  government entity in the same way, or in the same manner

21  as, you know, city, county governments.

22      Is there another way in which they are connected?

23  A    If you said, Nate, are you a government employee, I

24  mean, I work for an entity that's publicly funded, so in

25  that sense I have an obligation to transparency and to

1    comply with the laws that govern public records, public

2    meetings.  I have an obligation in the kind of ways that I

3    think all public servants do, to be fiscally responsible

4    and good stewards of the public money.  It's not my money;

5    it's the taxpayers' money and I have to spend it

6    accordingly.

7         So in that sense, yes, we are acting on behalf of the

8    community to collect books and other items that the

9    community has a right to see, read, peruse, review, and we

10   are serving in that collective role with government money

11   in a way that, you know, some people might think of as a

12   government adjacent activity.

13   Q    Okay.  I'll move on from that line with -- well, I

14   say move on, but it is the next point in my outline, it's

15   somewhat related.

16        So we did get an organizational chart.  I won't put

17   that into the record here.  Well, I might as well put it

18   into the record here, so we're all operating from the same

19   thing.

20   A    It would help me.

21   Q    Yes.  That's unfair, you don't need to have to

22   memorize all of this.

23   A    Thank you.

24   Q    All right.  I'll mark this as Exhibit 1.

25        (Exhibit No. 1 was marked & attached hereto.)

1    Sorry it is small.  That is how it came through.

2 A    I don't think that's your fault.

3         MR. ADAMS:  Just by way of a heads-up, I

4       may need to take a short break in a little

5       while.

6         MR. WATSON:  Do we want to take one now?

7         MR. ADAMS:  No.

8 BY MR. WATSON:

9 Q    The only thing I wanted to ask you about,

10 Mr. Coulter, is the top box here, CALS' Board of Trustees.

11 First of all, it has you as the Executive Director.  I was

12 going through the Articles of Incorporation and it

13 mentioned president, vice president, secretary, treasurer

14 of CALS, but I don't see them on this chart.  Where would

15 they fit?

16 A    Those are the officers of the board, so they would be

17 the leadership of the -- the executive leadership, I

18 guess, of the Board of Trustees, so they would be subsumed

19 in that first box.

20 Q    Okay.  And then how does a person become a member on

21 the board?

22 A    In that agreement that I described earlier that the

23 various municipalities and counties had to adopt by

24 ordinance and they each explicitly adopted the ordinance

25 in toto, it sets out the 13 board members and the

1   Q   Okay.  And when we were talking earlier about

2   litigation that CALS has been involved in, it was a pretty

3   limited number.  So what are those expenses going to?

4   A   Well, I think one of the reasons why I can tell you

5   that we're not involved in lawsuits, is because we hire

6   lawyers to give us advice and make choices that prevent,

7   eliminate -- you know, we're spending money on lawyers

8   prophylactically, rather than paying lawyers like John and

9   Bettina to litigate.

10   Q   Fair enough.

11   A   But, obviously, we have --

12             MS. BROWNSTEIN:  I'm not getting paid, for

13        the record.

14   A   -- we have 300 and some odd employees.  We have

15   compliance issues with all sorts of employment

16   regulations, so we are regularly communicating with the

17   employment counsel.  We have certain obligations for our

18   pension plan that we have to talk to lawyers about

19   regularly.  Obviously we're obligated under workers'

20   compensation and from time to time we have employees who

21   have accidents and all sorts of things that organizations

22   the size of ours would encounter that have implications

23   that prudent management seeks counsel for.

24   Q   Okay.  And does CALS have an in-house counsel?

25   A   No.

1  Q    Now, I want to transition into some of CALS'

2  policies.  So I'm marking this as Exhibit No. 3.

3    (Exhibit No. 3 was marked & attached hereto.)

4      So, Mr. Coulter, what document have I just handed

5  you?

6  A    This is the Board's Policy No. 300, which sets forth

7  the criteria for how the library collects materials.

8  Q    Okay.  And having policies about the selection of

9  library materials, is that a common practice among

10  libraries?

11  A    Yes.

12  Q    Are you aware of any libraries in Arkansas who don't

13  have such a practice or such a policy?

14  A    No.

15  Q    I just have a couple of questions specifically about

16  this.  So on the second page, CALS' 2, the first bullet

17  point under selection of criteria -- I'll give you a

18  moment to read that, if you'd like.

19  A    You're looking at:  "Selectors respond to community

20  interests by careful consideration of patron requests for

21  purchases --

22  Q    Yes, sir.

23  A    -- use patterns for existing materials, purchase

24  trends of similar materials by peer libraries, and any

25  other source of information indicating community

1 interests"?

2 Q     The phrase, "community interest," is used there.

3 What does that mean?

4 A     I think that means if there is an interest in the

5 community in reading or having, in the collection, certain

6 material, because there's been an expressed interest in

7 having that available.  That's what that refers to.

8       Obviously, there are a number of subcommunities

9 within our service area who have different interests in

10 books about fauna or butterflies or doll collections, et

11 cetera.

12 Q     Okay.  So the last bullet point there, and I'll read

13 it.  It says:  "CALS' staff is encouraged to recommend

14 titles and subjects to be purchased for their branches

15 based on the knowledge of their patrons' needs and

16 interests."

17       Is there a difference between that criteria and the

18 first one we just read or are those sort of saying the

19 same thing?

20 A     Well, they are overlapping.  I think with regard to

21 the first bullet point, it's probably more of an

22 indication of the people for whom, if you pull out the

23 Exhibit 1, who are tasked with the responsibility for

24 essentially collecting the materials, those people.

25 That's -- that's their sole job, is to keep one -- and you

1    library branch managers and the assistant managers about

2    what their community, their neighborhood, their users

3    want.

4        And I guess it's obviously possible that some books

5    might continue to circulate reasonably well in some

6    branches, but not others.

7    Q    But at the end of the day, it's pretty much the

8    discretion of the -- and I forgot the title of her

9    position.

10   A    The collection development manager.

11   Q    It's in her discretion?

12   A    In consultation with her staff and the branch

13   managers.  She's also the authority on the policy of

14   where -- and obviously it's a rolling exercise, to some

15   extent, you know, like painting the Brooklyn Bridge or

16   Golden Gate Bridge.  You know, you start here and by the

17   time you get to the other end, you may need to go back and

18   start painting again on the other end, so it's a process

19   that goes on constantly.

20   Q    Right.  All right.  You can set that one aside.  I'm

21   going to move on to the reorganization policy that you

22   mentioned just a little bit ago.  This is Bates No. 5 on

23   CALS production, if anybody on Zoom wants to take a look.

24       (Exhibit No. 4 was marked & attached hereto.)

25       All right.  Mr. Coulter, what have I just handed you?

1   A     CALS Board policy 301, styled "Reconsideration of
2   Library Materials."
3   Q     And is this, again, a common policy libraries have?
4   A     Yes.
5   Q     Are you aware of any library in Arkansas that does
6   not have a policy like this?
7   A     No.
8   Q     I also see revisions were made, you know, somewhat
9   recently, in September of '23.
10  A     Yes.
11  Q     Are you aware of what those revisions entailed?
12  A     Yes.  That, again, would have been as a result of our
13  anticipating the implementation of Act 372 and our review
14  of the policies that we thought were going to be
15  implicated in that enactment.
16        In part, because this is a shorter policy and I am
17  able to look at it and tell you a couple of things that I
18  can readily identify that were modified, we prepared a
19  modification in July.  Obviously the court's order of
20  July 29th affected the enactment -- the effective dates of
21  Sections 1 and 5, but, nevertheless, we went ahead and
22  made some -- what we thought were improvements,
23  clarifications to board policy recommended to the board
24  and they approved them, as you see there, on
25  September 28th.

1    Q      Right.

2    A      Some things that we thought were products of the

3    effort we'd made to review it, as often happens, you know,

4    when you're forced to look at something carefully and

5    that's what we did.

6    Q      So when you said you made changes to it because of

7    Act 372, was this to come into compliance with Act 372?

8    A      Well, by the time these changes were made,

9    recommended and adopted, 372, for our purposes that

10   relates to this, had been enjoined.

11   Q      Right.

12   A      So in the event that injunction is dissolved or

13   reversed on appeal, then obviously we'd go back to where

14   we were in July of 2023 with regard to anticipating

15   implementation.  But what changes were recommended and

16   approved by the board in September of last year, were just

17   changes that we believed, independently of the enjoined

18   Act, made some sense.

19          For example, I think we had a policy.  There's an

20   administrative procedure referred to here, Administrative

21   Procedure 301, which I think was produced, that works hand

22   in glove with this policy of the board.  And I think we

23   had some confusion between the various boards and

24   administrative documents about how clear it was, that you

25   had to be a cardholder and a resident of the system to

1  request reconsideration.

2      Just on that point, it became -- again, we were

3  concerned because of Ms. Chilcoat's email.  We were a bit

4  concerned because of the things that I've discussed

5  earlier that were obviously happening around the state.

6      We were concerned about the legislative hearing

7  process and the testimony of the sponsors, that there

8  might well be people who traveled around and filed

9  requests for reconsideration without regard to whether

10  that was their library or not, and as I recall in the

11  house judiciary committee, the lead senate sponsor was

12  asked would that be a problem and he said he didn't

13  believe so.

14      So we were anticipating there might be a group of

15  crusaders that might go library to library and file these

16  requests and we, in part, on the advice suggested in

17  Jennifer Chilcoat's email, and on our reflection, thought

18  there's no reason why somebody from Blytheville, Arkansas

19  can swoop into Little Rock and start filing requests, so

20  we made it clear that you had to be a current cardholder

21  in good standing who lives in the service area in order to

22  file one of these.

23      I think we also specified that a little bit of the

24  process would be that there would be three library

25  professionals.  The statute uses that number.  I think we

1    had in practice that there were typically three people in

2    a committee that would serve the process of looking at the

3    content that had been challenged and then making a

4    recommendation to the executive director.

5        So we were largely doing what the statute spelled

6    out, but we wanted to make clear that the cardholder had

7    to be somebody in the service area and we also -- or that

8    had a card.  You can have a card and you don't live in the

9    service area if you pay the annual non-resident fee.  So

10   that would qualify as well.

11       But we also specified the time for appealing the

12   decision and we set out -- I think this was a

13   board-initiated addition, that the item wouldn't be

14   reviewed again for five years once it had been reviewed.

15   So those were the changes that were made, as I can recall

16   off the top of my head.

17   Q    Thank you for that.

18   A    One of the things I just now recalled.

19   Q    Okay.

20   A    Ms. Chilcoat's email highlighted the issue of whether

21   or not, under Act 372, a library should allow something to

22   remain in circulation pending the review process, and,

23   again, because she had warned people that there were going

24   to be a number of these challenges once the statute went

25   into effect, she had suggested that you might need to take

1   a count of how many books you might either pull because
2   they're under review.
3       In some instances, if you had a small staff, would
4   you have to buy books if you kept them in the circulation
5   while you're reviewing them?  Those kinds of issues were
6   rolling around in that memo and in the conversations
7   people were having in our library, so we set out that
8   during the pendency of the review, that it would stay --
9   it would remain in the circulation.
10  Q    As I read through this policy, I don't see any limit
11  on what the basis of reconsideration requests would be.
12  Is that right?
13  A    Yes.  And in the statute, as you're well aware, it
14  just said someone affected by the material could challenge
15  it as inappropriate, and as you also know, inappropriate
16  is not defined.  So in one of our conversations we were
17  trying to describe for -- because the legislature hadn't
18  provided any content or direction, what does it mean to be
19  affected by?  So I think we were going to have come up
20  with some sort of criteria to determine whether you were,
21  in fact, affected by.
22      For example, am I affected by, because I live in
23  Blytheville, but I just don't like Gender Queer?  I've
24  heard it's a book that people are offended by, so I'm
25  going to drive to Little Rock and ask that they take it

1   out.  Am I affected by because I'm a parent of a

2   fourteen-year-old or twelve-year-old, or an eight-year-old

3   who lives in the service area and who might see that book?

4       There was no guidance what constituted affected by

5   and that was the language used in the statute.  Likewise,

6   with regard to appropriateness of it, we didn't have any

7   guidance on that, so we -- because of the ruling, we

8   didn't have to contend with that.

9   Q    Sure.  And you mentioned the word appropriate being

10   used in the statute, and we don't have to get into, you

11   know, what does the statute exactly mean.

12   A    I don't know.

13   Q    There is, of course, a discrepancy between the

14   Defendants and the Plaintiffs on that issue.  If

15   appropriate just meant appropriate under the library's own

16   criteria of selection, would you be bringing this case on

17   that issue specifically?

18   A    Well, that was not the conversation that was had by

19   the sponsors that promoted this legislation.  In fact,

20   when I sat through the committee hearing, it was clear to

21   me it wasn't going to be governed by what our

22   consideration is, our collection criteria.

23       In fact, what was abundantly clear to me was that the

24   sponsor was motivated because his constituents, the ones

25   he was listening to and moved by, were exceedingly

1    displeased with the outcome of the standard

2    reconsideration process that was going on in Leslie, Cabot

3    or Jonesboro, or Saline County, and they didn't like those

4    outcomes, so their solution was to change the process to

5    not have it end in the library board, and to essentially

6    turn it over to the elected officials.

7         And the chief sponsor in the senate said, and I think

8    you indicated in oral argument on the 25th of July that

9    this process was, in effect, created to allow elected

10   officials, who, as the sponsor has said over and over, are

11   accountable to the public.  The library board is not

12   accountable, he says over and over, and that's where we

13   want this process to end.

14        That was the view of the proponents, so that's why we

15   were concerned.  We're saying, in essence, we don't have

16   any guideline in the statute, the statute does not say

17   that it will be the library's criteria for selection that

18   goes to the elected body that's going to make the decision

19   that specifies the things, including the recommendation

20   from the county judge or the mayor and other items, but

21   none of those include the selection criteria of the

22   library.

23        So I think it's fair our inference was, and I think

24   the judge has, at least, so far agreed, that it was not

25   going to be based on the criteria of the library and I

1   think the reason, as a practical conclusion that's

2   supported by the context, is if you were content to have

3   that be the criteria that govern these reconsiderations,

4   then the system was working well.

5       I mean, libraries were reviewing their requests as

6   they got them and they were applying their criteria as

7   they had adopted them, and I think in most instances, as

8   this was true in the scattering of reconsideration

9   requests since I'd been there, those items were remaining

10  in the collection because they were, in fact, consistent

11  with the selection criteria.

12      So the takeaway is that the political process turned

13  a different direction.  We don't like those outcomes, we

14  want a different body to decide and, in fact, we want one

15  that is clearly influenced by popular opinion in these

16  communities.

17      And I think your answer, and the state senator's

18  answer in committee, was that's the way it ought to work

19  in America, and if people don't like the books that get

20  pulled out of the library or relocated or put in the smut

21  room by their county quorum court, then they just elect

22  different people to the county quorum court.  So that's

23  what drove us there .

24  Q   And I certainly appreciate all those concerns, and I

25  know there's the disagreement on interpretation, but if

1   that was the interpretation, what I said, that the reason

2   that it could be withdrawn or removed from the general

3   circulation, and the only basis for that was the library's

4   own criteria of selection, would you be challenging that

5   one issue?

6   A    Well, I think it -- we've challenged it and I think

7   that's where we are, is what we're doing because that's --

8   that's not clear.  I mean, if the State of Arkansas, the

9   Attorney General was to willing to enter a consent

10  judgment saying that only the criteria of the library

11  would be considered, not any of the things that are

12  specified in the statute and not any of the things that

13  have been heralded by the sponsors of the statute, then

14  maybe that would resolve this dispute if we were

15  confident.

16       But I think it's obvious, too, if you look at what's

17  happening in Crawford County, look at what's happened in

18  Saline County, these people in the quorum court who didn't

19  ask for this -- and I understand Judge Keith said this was

20  a headache he didn't want.

21       They know the political pressure is going to come to

22  get these books out, regardless of what the selection

23  criteria may say.  Whatever the selection criteria was in

24  April of 1956 and reflected in Policy 300, is not going to

25  matter if there are a bunch of people clamoring to remove

1    these books and they believe it's their obligation to
2    preserve their way of life and their values and they're
3    going to impose on these quorum court members.
4        Watch the meetings in the Quorum Court in Saline
5    County, where people were haranguing the quorum court
6    members, that you have an obligation as a Christian to get
7    this out of the collection, et cetera.  That's the focus
8    of where we are.
9        If someone is willing in the state to say to the
10   Defendants, no, no, you and Judge Brooks have construed
11   this wrong, we're fine to just let the criteria be what's
12   applied, then we might be in a different place, but that's
13   a hypothetical and I don't think it's going to come to
14   pass.
15   Q    All right.  Just so we're clear, if that hypothetical
16   existed, the answer would be, no, you would not have
17   challenged it, the interpretation?
18   A    Well, I don't know how we go back to make a
19   hypothetical apply.  If I hadn't heard the testimony, if
20   the state senator had hadn't gone on Conduit News and
21   other places that they've had him and said what he said
22   over and over and over about we want these elected
23   officials to decide, and I hadn't been paying attention,
24   and had been on the dark side of Pluto or whatever it is
25   and didn't know that there was enormous political

1  pressure, not just in this jurisdiction, but all over this

2  country by groups called Moms for Liberty and others to

3  bring these fights to the doorstep of the heretofore

4  fairly low-profile public libraries across the country,

5  you know, maybe.

6      If your stipulation or your hypothetical is if I

7  don't live in the real world I live in and I had been

8  living in that real world, I had been paying attention,

9  and I take people for their -- I take people at their

10 word.  If he says this is what we're about, then I think

11 that's what they're about.

12 Q    Okay.  Thank you for that.

13     Does the board set these policies, the

14 reconsideration policies?

15 A    Correct, but not the administrative procedure

16 policies.

17              MR. WATSON:  And I'll have to go back and

18              check.  I'm not sure we got 301, but I might

19              have missed that.

20              MR. ADAMS:  We'll go back and check.

21              MR. WATSON:  Because I didn't notice any

22              policy related to reconsideration --

23              administrative policy or procedure, excuse me.

24 A    I can tell you that essentially 301 just spells out

25 what the form will have on it, and details the sorts of

1   mechanics of how this operates.  I think it also contains

2   provisions about how -- again, some of this was

3   enlightened -- if there was a silver lining from Act 372,

4   it did prompt us to think about structuring, a little more

5   formally, the way we review these things and I think what

6   we set up in that policy that we should produce --

7   administrative procedure we should produce, not a policy.

8   Set out that there would be three or four standing

9   committees comprised of the people in collection

10  development and they would form rotating members to

11  comprise of these committees.  So it goes into that, kind

12  of in detail, just for the purposes of executing this

13  policy.

14  Q    And we can set this policy aside.

15       A couple of times you mentioned Ms. Chilcoat's email.

16  Did she ever send a follow-up email withdrawing the

17  previous email that you've been mentioning?

18  A    Yes.

19  Q    Okay.  And in that email, withdrawing the previous

20  email, did she go into any additional detail about why she

21  was withdrawing it?

22  A    No.  I saw the email late one morning, early one

23  afternoon.  I had a series of meetings and then I came

24  back to my desk and saw that there was an email saying

25  please consider my previous email withdrawn and delete and

1    been left post-Shipley, the law that was redone by Act 372

2    essentially prohibited disseminating or distributing

3    things that were harmful to minors, so in some ways we had

4    to make some sort of decision about that, at least

5    implicitly.

6         In the real world, as you know, and anybody else who

7    will come to my libraries, we don't take people of any

8    age, when they come in the door, and say, hey, would you

9    like to read Gender Queer, how about this Barbara

10   Kingsolver novel, it's got some sex in it?  That's not the

11   way it goes.

12        And the way we read the statute, you didn't have to

13   do that after 372 was enacted.  You just had to have it in

14   your library somewhere and you have to be able to keep all

15   the five-year-olds away from any book that might have

16   something of a sexual nature, that might somewhere,

17   someday, somehow by some combination of a zealous

18   prosecutor and a determination that a five-year-old is

19   being harmed by having access to a book that would clearly

20   not be a problem for a sixteen-year-old.

21   Q    Are you familiar with CALS' Internet Use Disclaimer

22   and Public Computer Use Policies?

23   A    I'm generally aware that we have one.  I haven't

24   reviewed it.

25   Q    I'm not going to really spend time on asking

1  questions specifically about this document, but just in

2  candor, I'll let you take a look at it.

3  A    All right.

4  Q    This is going to be Exhibit 7.

5     (Exhibit No. 7 was marked & attached hereto.)

6  A    Okay.

7  Q    And, also, I pulled this off of CALS' website.

8  A    Okay.

9  Q    And this is really just going to be a hyperlink to

10  the next point I make.  So in that last paragraph, it

11  says:  "CALS complies with the Children's Internet

12  Protection Act, which requires that schools and libraries,

13  which receive discounted Internet access through the

14  E-Rate program must filter obscene and harmful content."

15     Did I read that correctly?

16  A    Yes.

17  Q    To your knowledge, does CALS comply with the

18  Children's Internet Protection Act?

19  A    Absolutely.  That's a condition of taking that

20  federal money.  The Supreme Court ruled that that was a

21  constitutionally-permissible condition for Congress to put

22  on the E-Rate subsidy.

23     Most libraries, perhaps all in Arkansas, have made

24  that tradeoff and we have vendor software that is running

25  on all of our computers that restricts access to things

1  that are protected speech for you or me, but might be
2  considered harmful to children.
3      In other words, you can't go sit down in one of our
4  terminals and pull up things that you have a right to look
5  at as a matter of looking at pornography as an adult and
6  we -- we have software that gets updates and is installed
7  on all those devices.
8  Q   And you, perhaps, can see where I'm going with this.
9  Again, it's a statute, so it doesn't really need to be in
10 the record, but I have a copy for you, if you want to take
11 a look at it, and I'll mark it as Exhibit No. 8.
12    (Exhibit No. 8 was marked & attached hereto.)
13      This is a kind of long statute.  I'm obviously not
14 going to have you read the whole thing, but if you would
15 flip to Subsection F(7).  It's on the second to the last
16 page.  It's got definitions.
17      And, again, walking through the entire thing, I'll
18 represent to you that these are the definitions for the
19 Children's Internet Protection Act.
20 A   I'm sorry, is it F(7)?
21 Q   I believe it's F(7), but it's on the second to the
22 last page.
23 A   Page 6, at the bottom?
24 Q   Yes, sir.
25 A   Okay, I got it.  I couldn't find the F, but I see the

1   Plaintiffs in this case, is that they believe they have a
2   right to read books that would be considered problematic
3   to me as a parent of a five-year-old, and what the Act
4   does, is tell me, as the Library Director, you can't
5   provide those books to the Crawford County Plaintiff or
6   the woman who was a Central High junior or senior.  You
7   can't do that because you're running the risk, in doing
8   that, of having your staff or you be criminally charged
9   because that book might be considered harmful to minors
10  under Arkansas law.
11  Q    Sure.  But right now I'm asking you about CALS'
12  implementation of the Children's Internet Protection Act,
13  and my reading of this statute and I think the way it --
14  well, my reading doesn't matter.  I'm asking a factual
15  question about how CALS is implementing it.
16                  MR. ADAMS:  I'm going to object because I
17                  don't think -- I mean, do we -- have we put
18                  anything into evidence about how the CIPA
19                  definition is actually interpreted?
20                  MR. WATSON:  Well, that's a legal question.
21                  MR. ADAMS:  Right.
22                  MR. WATSON:  Well, I'm asking about the
23                  implementation, what CALS does, and I'm trying
24                  to -- I poorly phrased it a couple of times, but
25                  can I ask the question and then you can see

1          if --

2                    MR. ADAMS:  Okay, go ahead.

3     BY MR. WATSON:

4     Q    Okay.  So in CALS' implementation of the Children's

5     Internet Protection Act, if a website or something on the

6     Internet is harmful to a five-year-old, does that mean

7     it's blocked for everyone?

8     A    It's blocked for everyone, period.

9     Q    Okay.  That's all I'm asking.

10    A    We don't make the determination, as your statute

11    requires of us, whether it's being blocked for a minor who

12    is five or a minor of sixteen, because the way the law is

13    written and applied and implemented by us in pursuit of

14    that, or in compliance with that, is it applies to every

15    minor, and, therefore, we don't have to try to make that

16    determination the way we do under Act 372 because we know

17    material on our shelves with sexual content is going to

18    arguably be harmful to some five-year-olds.

19         What -- what problem I have with that, is I can't

20    tell my staff, with any degree of confidence, you are okay

21    because of the way they changed the law.  Before it was

22    changed I could because it required us to aggressively

23    push the content, which we don't do no matter what the

24    content is.

25         Some child wants to know where the books are on

1   sharks, we try to find what they want, but we don't push

2   books.  The way the statute stood before a year ago, and

3   the way some of us suggested to the general assembly that

4   they leave it, we could live with because we didn't have

5   to make a determination.

6       But what they did, contrary to at least one

7   explanation I've heard from the sponsor who has it, by my

8   view, exactly backwards, they weren't content with just

9   having it prohibit the promoting, distributing,

10  disseminating something that was harmful to minors.  They

11  want it to be if it's in your space, if it's made

12  available.

13      So we take that and we take the Arkansas Supreme

14  Court certified ruling in response to Judge Eisele and

15  that harmful to minor statute applies to everybody who's a

16  minor, so that's recipe for chaos, at best.

17      Contrast that to CIPA, it's a bright line.  We want

18  the money, the Supreme Court has said if you want that

19  money you have to block access to all content, whether it

20  might not be deemed harmful to a five-year-old or a

21  sixteen-year-old.  It doesn't matter in that analysis

22  because we're blocking all of it.

23      And we know, and as the Rehnquist plurality opinion,

24  whatever it is says, that's infringing upon the

25  constitutional rights of some adults and they had some

1    their right to read these books and for the library to

2    have those books on their shelves.

3        Their right to read and their right to access those

4    is impaired by the overbroad and vague provision that

5    essentially turns over, to elected officials, who, for the

6    reasons I described earlier, are going to be vulnerable to

7    political pressure and there's nothing in the statute, as

8    I noted, that says that they would use the selection

9    criteria that the library has set forth, that they would

10   use whatever they deemed to be community values.

11       And as a practical matter, and somebody who's been

12   around politics a little bit in my life, the people who

13   are the most animated about subjects in politics, often

14   times get the most response from elected officials, and if

15   you're an elected official and the criteria is not the

16   kinds of things you've been asking me questions about,

17   literary content, whether it's of significance

18   artistically to people in the community, but their only

19   issue is I don't want my phone to keep ringing, I don't

20   want people to keep emailing me about why I'm enabling the

21   library to groom people, or why I'm doing things that

22   allow obscenity in the library, so I'm just going to tell

23   the library that they should move this, relocate this,

24   withdraw this, et cetera.  That's what the statute,

25   because of its constitutional defects is going to permit

1   and that's what we're objecting to.

2   Q    And are you aware of anyone who has said that they

3   intend to you, you know, lodge a challenge because of

4   Section 5?

5   A    No, but, again, it's a little like I was describing

6   earlier with regard to the list that came from

7   Ms. Chilcoat.  People don't have to spell out what may

8   motivate them if they're hearing about it, reading about

9   it, and, perhaps, they're getting their information from

10  social media about these topics and they get motivated

11  because they're being told things about what the library

12  is doing, a lot of which is misinformation, or at least

13  not an accurate depiction of what goes on in the library.

14       And, you know, what I do know, is during the

15  timeframe, this somewhat high-profile debate, at least in

16  social media, we had people who would contact our

17  libraries and start asking about books that happen to be

18  on these lists.

19       We had a patron in Maumelle who left a note in their

20  book return box saying she had checked out 53 books, I

21  think it was, that she believed were inappropriate and

22  that those books she would not be returning until we vowed

23  to take those out of the collection.

24       That was some time in the timeframe of June of last

25  year.  So did she say, in her demand letter, I'm doing

1   this because I've been following SB 81 and Act 372, no,

2   but do I think those things happen just coincidentally,

3   probably not.

4   Q    All right.  And with her, are you aware of whether

5   she would have been able to lodge a challenge under

6   Maumelle's --

7   A    Yes.  Yes.

8   Q    Would she have been able to lodge a challenge?

9   A    Sure.  Sure.

10  Q    Okay.  That's all I've got.

11                MR. MCLELLAND:  I've got some questions,

12            but I do want -- I need to review my outline.

13            Do we want to take a break for lunch?

14                MR. ADAMS:  Sure, let's take a lunch break.

15            (Lunch recess was taken.)

16                     EXAMINATION

17  BY MR. MCLELLAND:

18  Q    Mr. Coulter, good afternoon.  You realize that you're

19  still under oath?

20  A    Yes.

21  Q    And just so we have this on the record, you and I

22  know each other outside the context of this litigation; is

23  that right?

24  A    Yes.

25  Q    And does knowing each other in any way affect your

1  are accountable to the values that librarians strive to

2  uphold regarding the freedom to read and intellectual

3  freedom.  Obviously, issues of privacy and individuality,

4  all of which we think are relates to the point of trying

5  to maintain a diverse collection for the entire community,

6  and trying to do what we can to resist efforts to sensor

7  by using the government to restrict what some people in

8  the community might read.

9      So we think we're accountable to the values that

10  librarians uphold and libraries as a public institution

11  upholds, and I think we're accountable to the community to

12  be good stewards with their money and try to get as many

13  books as we can for them to circulate.

14      And as some of the testimony has indicated, to follow

15  the guidelines about making sure, as much as we can, that

16  things are in age appropriate places and that we are

17  providing assistance to adults and children who ask for

18  some guidance about what their particular topic of

19  interest is.  We want to provide service too.

20      So we're accountable in all those ways that I think

21  is a broader accountability than, perhaps, others in the

22  community might have.

23  Q    Okay.  And I think you might be anticipating my next

24  question.  So when I hear the word accountable, I

25  generally think like you report to someone who holds you

1   accountable.  Is there anyone that the board reports to?

2   A    Well, in essence, the board serves at the pleasure of

3   the appointing entities.  In our case, there is seven

4   Little Rock representatives.  There are two from Pulaski

5   County, and there is a single member from Maumelle,

6   Sherwood, Jacksonville and Perry County.

7        So in each of those cases, those individuals who are

8   appointed by those municipalities and county governments

9   are representing those entities that appoint them, so they

10  would be accountable to the communities that appoint them

11  in the first instance.

12       But they obviously serve the system.  So let's say

13  I'm the representative from Maumelle, but I'm accountable

14  to the entire service area.  So they don't report in the

15  way that I report to the board.  The board doesn't report

16  to the county judge or the mayor of Maumelle, but the

17  board is certainly serving at the pleasure of those

18  individuals they -- we don't have a provision, that I'm

19  aware of, that would allow someone in one of those

20  positions of appointing a board member to recall the board

21  member, but the board terms are three years and if someone

22  who's appointed didn't uphold those obligations to

23  represent, in this case, let's say Maumelle again, then I

24  would assume, in theory, that someone else would be

25  appointed.

1   Q      That's all I've got.  Thank you.

2   A      Thank you.

3   Q      As much fun as it's been, nothing from me.

4                  MR. ADAMS:  Anybody on the Zoom?

5                  (WHEREUPON, at 3:30 p.m.,the

6                   above deposition concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

STATE OF ARKANSAS }
3                          }
COUNTY OF FAULKNER}

4
RE:   ORAL DEPOSITION OF DONALD NATHAN COULTER, ESQ.

5
I, Michelle R. Satterfield, CCR, a Notary Public in and
6   for Faulkner County, Arkansas, do hereby certify that the
transcript of the foregoing deposition accurately reflects
7   the testimony given; and that the foregoing was
transcribed by me, or under my supervision, on my Eclipse
8   computerized transcription system from my machine
shorthand notes taken at the time and place set out on the
9   caption hereto, the witness having been duly cautioned and
sworn, or affirmed, to tell the truth, the whole truth and
10  nothing but the truth.
I FURTHER CERTIFY that I am neither counsel for, related
11  to, nor employed by any of the parties to the action in
which this proceeding was taken; and, further that I am
12  not a relative or employee of any attorney or counsel
employed by the parties hereto, nor financially
13  interested, or otherwise, in the outcome of this action.
In accordance with the Arkansas Rules of Civil Procedure,
14  Rule 30(e), review of the foregoing transcript by the
witness was not requested by the deponent or any party
15  thereto.
GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 11th
16  day of April 2024.

17

18

19

20
                            _____
21                          Michelle R. Satterfield, CCR
                            LS Certificate No. 570
22                          Notary Public in and for
                            Faulkner County, Arkansas
23

24

25