**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

FAYETTEVILLE PUBLIC LIBRARY, a political subdivision
in the City of Fayetteville, State of Arkansas; et al.                    Plaintiffs

Case No. 5:23-cv-05086-TLB

CRAWFORD COUNTY, ARKANSAS; et al.                                    Defendants

BRIEF IN SUPPORT OF THE PROSECUTING ATTORNEYS'
MOTION FOR SUMMARY JUDGMENT

For purposes of this dispute, Arkansas Act 372 of 2023 does two things. First, it prohibits furnishing to a minor an item that is obscene to minors. Some of the Plaintiffs believe they have a constitutional right to provide that type of content; other Plaintiffs, who are adults, believe such a law violates their constitutional right to view that type of content because it may be moved to a different location in stores and libraries they patronize; and other Plaintiffs, who are minors, believe they have a constitutional right to view the regulated content. But the Supreme Court has long held that obscenity is not protected by the Constitution and that States may regulate it in just the way Act 372 does.

Second, Act 372 allows people to hold libraries accountable to the library's own rules for selecting materials for the public. Only the Plaintiffs who are public libraries challenge this law, apparently believing they have a constitutional right to discard laws that apply to them and to not follow their own rules. But the curation of a public libraries' materials is government speech, which falls outside First Amendment analysis. Thus, the State may impose whatever rules it wishes on libraries' selection criteria, including creating an avenue for people to hold public libraries accountable to the libraries' own rules.

## Facts

During the 2023 Regular Session, the Arkansas General Assembly passed Act 372, and the Governor signed it into law. *See* Ark. Act 372 of 2023. As relevant here, the law does two things. First, Section 1 of the Act criminalizes furnishing to a minor an item that is obscene to minors. Ark. Code Ann. § 5-27-212. Second, Section 5 of the Act allows people to hold public libraries accountable to their own rules for selecting materials to provide to library patrons. *Id.* § 13-2-106. The Act was set to go into effect on August 1, 2023. *See* Ark. Att'y Gen. Op. 2023-031. But the Court preliminarily enjoined Sections 1 and 5 on July 29, 2023. *See* Doc. 53.

### 1. Section 1: Furnishing to children items obscene to them.

Section 1 of Act 372, which the Plaintiffs call the Availability Provision, makes it illegal for a person to "knowingly . . . [f]urnish[], present[], provide[], make[] available, give[], lend[], show[], advertise[], or distribute[] to a minor an item that is harmful to minors" if the person "know[s] the character of the item involved." Ark. Code Ann. § 5-27-212(b)(1).

The word "item" is given a limited definition in Act 372, applying only to "a material or performance that depicts or describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, as those terms as defined in § 5-68-501." *Id.* § 1(a)(4)(A). Thus, the Plaintiffs misread the law when they claim that the word "'item' encompasses every form of expressive material." Doc. 75, at ¶ 63.

The phrase "harmful to minors" means materials that are obscene to minors and that lack any literary, artistic, or scientific value to them. Or as the statute puts it:

> any description, exhibition, presentation, or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when the material or performance, taken as a whole, has the following characteristics:
>
> > (A) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or

performance has a predominant tendency to appeal to a prurient interest in sex to minors;

(B) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance depicts or describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse in a manner that is patently offensive to prevailing standards in the adult community with respect to what is suitable for minors; and

(C) The material or performance lacks serious literary, scientific, medical, artistic, or political value for minors.

Ark. Code Ann. § 5-68-501(2); *see also id.* § 5-27-212(a)(1). Indeed, this "variable obscenity" statute is almost identical to the law that was held constitutional by the U.S. Supreme Court in *Ginsberg v. New York*, 390 U.S. 629 (1968), and another law upheld by the Eighth Circuit in *Upper Midwest Bookseller Ass'n v. City of Minneapolis*, 780 F.2d 1389 (1985).

The Plaintiffs do not identify any item obscene to minors that they want to or do possess.[1]

Moreover, at least one Library Plaintiff—the Central Arkansas Library System (CALS)— already applies the "harmful to minors" definition in the context of the Children's Internet Protection Act (CIPA). *See* 20 U.S.C. § 9134(f)(7)(B)–(C); Ex. 1, at 78:17–19 (Coulter Depo.). In doing so, CALS blocks harmful websites for every patron, including older minors, even if the website is only harmful for younger minors. Ex. 1, at 87:4–8 (Coulter Depo.). CALS hasn't challenged the constitutionality of CIPA; it just "block[s] all of" the harmful content because it "want[s] the money." *Id.* 88:17–22.

---

[1] *See* Ex. 11, at 4–6 (CALS Written Disc. Resp.); Ex. 12, at 1–2 (FPL Written Disc. Resp.); Ex. 13, at 4–5 (ESCPL Written Disc. Resp.); Ex. 14, at 6, 8 (Wordsworth Written Disc. Resp.); Ex. 15, at 6–8 (Pearl's Written Disc. Resp.); Ex. 16, at 6–9 (FTRF Written Disc. Resp.); Ex. 17, at 6–9 (CBLDF Written Disc. Resp.); Ex. 18, at 6–8 (Authors Guild Written Disc. Resp.); Ex. 19, at 6–9 (ABA Written Disc. Resp.); Ex. 20, at 6–9 (AAP Written Disc. Resp.); Ex. 21, at 4–6 (ArLA Written Disc. Resp.); Ex. 22, at 3–4 (Webb Written Disc. Resp.); Ex. 23, at 5–6 (AAAL Written Disc. Resp.); Ex. 24, at 2 (Farrell Written Disc. Resp.); Ex. 25, at 2 (Miel Partain Written Disc. Resp.); Ex. 26, at 2 (Madeline Partain Written Disc. Resp.); Ex. 27, at 2 (Caplinger Written Disc. Resp.).

2. **Section 5: Setting minimum standards for policies that public libraries already have.**

Similarly, the scope of Section 5, which the Plaintiffs call the Challenge Procedure, is more limited than the Plaintiffs argue. Only the Library Plaintiffs challenge Section 5. Doc. 75, at ¶¶ 99–106.

Section 5 involves several components, but it boils down to two relevant steps. First, public libraries must "establish" "a written policy . . . for the selection, relocation, and retention of physical materials that are available to the public." Ark. Code Ann. § 13-2-106(a). This is nothing new; libraries already have established criteria of selection, which they craft and implement at their discretion. *See* Ex. 2, at 1–4 (CALS Production); Ex. 3, at 1–15 (FPL Production); Ex. 4, at 1–3 (ESCPL Production); Ex. 5, at 1–4 (Webb Production); Ex. 1, at 42:12–14 (Coulter Depo.) (stating the he is not "aware of any libraries in Arkansas who don't have [a selection] policy").

Second, public libraries must establish "a written policy for addressing challenged material that is physically present in the library and available to the public." *Id.* § 13-2-106(b). Again, this is something libraries already do, at their discretion. *See* Ex. 2, at 5 (CALS Production); Ex. 3, at 16–17 (FPL Production); Ex. 4, at 4–5 (ESCPL Production); Ex. 5, at 6–8 (Webb Production); Ex. 1, at 54:5–7 (Coulter Depo.) (stating that he is not "aware of any library in Arkansas that does not have a [reconsideration] policy"); *see also* Ex. 6, at 106:13–15 (White Depo.).

Section 5 merely sets a procedural floor for a library's challenge policy. Ark. Code Ann. § 13-2-106(c). Those minimum procedural requirements require:

- The policy to allow "[a] person affected by the material" to "challenge the appropriateness of the material." *Id.* § 13-2-106(c)(1).

- The policy to provide an initial informal discussion with the librarian, which leads to a formal written request for review. *Id.* § 13-2-106(c)(3)–(4).

- The library to establish a committee to review formal challenges, and the committee must review the material "in its entirety," without taking "portions . . . out of context," to "determine if the material being challenged meets the criteria of selection." *Id.* § 13-2-106(c)(7). The *only* determination the committee is allowed to make is if the challenged material meets the criteria of selection. *Id.* It cannot go beyond the criteria of selection to "withdraw[] [materials] solely for the viewpoints expressed." *Id.* at 13-2-106(c)(7)(B)(i).

- The committee to explain its decision in writing. *Id.* 13-2-106(c)(11)(B).

- If the committee determines that the material does not meet the criteria of selection, "the material being challenged shall be relocated within the library's collection to an area that is not accessible to minors under eighteen (18) years of age." *Id.* § 13-2-106(c)(11)(A).

- If the committee determines that the material meets the criteria of selection, the challenger "may appeal the committee's decision to the governing body of the" library. *Id.* § 13-2-106(c)(12)(A). The executive head of the governing body will present the governing body with three things for the governing body's review of the library committee's decision: (1) the formal request submitted by the challenger; (2) the challenged material, and (3) the library committee's written explanation of its decision. *Id.* § 13-2-106(c)(12)(B)(i).

On appeal, the governing body is limited to reviewing whether the library committee's decision about the material being appropriate under the criteria of selection was correct. This is inherent in the term "appeal," which is "the submission of a . . . *decision*" by the library committee to the governing body. *Appeal*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added). It is not the submission of something *undecided* by the library board. This is exactly how County Judge Keith interprets the law. Ex. 7, at 72:13–74:23 (Keith Depo.).

In other words, Section 5 allows people affected by a library's failure to follow its own selection criteria to bring that failure to the library's attention. And if the library fails to follow its own rules, the challenger may appeal to the appropriate governing body to make it do so. The Plaintiffs are in favor of this interpretation. Ex. 1, at 61:24–64:11 (Coulter Depo.).

The Library Plaintiffs, however, did not sue any libraries, which are the entities that will adopt the selection criteria and challenge policies. Nor did they sue their own governing bodies,

5

who will hear appeals from their decisions. Under Section 5, no Defendant is charged with establishing or implementing any policies or reviewing the Library Plaintiffs' decisions.

Further, there are two things that libraries already do, unrelated to Section 5. First, without Section 5's guardrails, it appears that, under *existing* policies, some of the Library Plaintiffs will deliberately, instead of "automatically," "include[] or exclude" materials based on "[t]he race religion, nationality, gender, gender expression, sexual orientation, or political views of an author; the use of frank or coarse language; the controversial content of an item; or the endorsement or disapproval of an individual or group in the community." Ex. 3, at 2 (FPL Production). And "[i]ndividual bias and interest must not be allowed to dominate material withdrawal," but it is apparently allowed to influence the decision in a more minor way. Ex. 3, at 4 (FPL Production).  Some of the libraries related to the Plaintiffs explicitly discriminate against religious minorities, "exclud[ing] [materials] from the collections" if the material "is of a religious nature not of general interest." Ex. 5, at 3 (Webb Production). Again, all this has nothing to do with Section 5; it's what the Plaintiffs are doing *without* Section 5's guardrails.

Second, the Library Plaintiffs' current challenge procedures are similar to Section 5's minimum requirements: they start with an informal discussion, move to a formal review by a library committee, and give only the challenger a right to appeal the decision. *See* Ex. 3, at 16–17 (FPL Production); Ex. 5, at 6–7 (Webb Production); *see also* Ex. 2, at 5 (CALS Production) (providing the same, except for the informal discussion); Ex. 4, at 4–5 (ESCPL Production) (providing the same, except for the informal discussion and allowing a supporter of keeping the book in circulation to appeal). Currently, the Library Plaintiffs' policies do not provide any limit on the reasons a person may challenge a material. *See* Ex. 3, at 16–17 (FPL Production); Ex. 2, at 5 (CALS

Production); Ex. 1, at 58:10–13 (Coulter Depo.) (confirming that a patron can challenge any material for any reason). Thus, they provide more rights to potential challengers than Section 5 requires.

The Plaintiffs are unaware of anyone who intends to challenge material because of Section 5.[2]

### 3. Crawford County

Throughout this litigation, the Plaintiffs have tried to distract from the text of Act 372 by pointing to events that occurred in Crawford County *before* Act 372 was even proposed in the legislature. Ex. 7, at 74:24–75:3 (Keith Depo.). What has happened in Crawford County has nothing to do with Act 372. Ex. 7, at 75:4–8, 80:15–17, 96:20–25 (Keith Depo.); Ex. 6, at 107:3–6 (White Depo.). And it is irrelevant for a facial challenge. *See infra* at 8.

## Legal Standard

The Defendants' motion for summary judgment should be granted if they "show[] [that] there is no genuine dispute regarding any material fact and that [they are] entitled to judgment as a matter of law." *McGowen, Hurst, Clark & Smith, P.C. v. Commerce Bank*, 11 F.4th 702, 710 (8th Cir. 2021). Once the Defendants show an initial entitlement to summary judgment, the Plaintiffs must "show a genuine dispute" exists by "identify[ing] 'specific facts' that are in dispute, thus 'show[ing] that there is [more than] some metaphysical doubt as to the material facts.'" *Id.* (second and third alterations in original) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). "If, taking the record as a whole, a reasonable fact finder could not find for the nonmovant, there is no genuine dispute of material fact." *Id.* And even if there is a dispute, the

---

[2] *See* Ex. 11, at 7 (CALS Written Disc. Resp.); Ex. 12, at 3 (FPL Written Disc. Resp.); Ex. 13, at 6 (ESCPL Written Disc. Resp.); Ex. 21, at 7 (ArLA Written Disc. Resp.); Ex. 22, at 6 (Webb Written Disc. Resp.); Ex. 23, at 8 (AAAL Written Disc. Resp.); Ex. 1, at 120:2–5 (Coulter Depo.).

Court simply views the record in favor of the nonmovant. *Westwater v. Church*, 60 F.4th 1124, 1129 (8th Cir. 2023).

Moreover, the Plaintiffs bring a facial challenge to Act 372. *See* Doc. 75, at ¶ 1. "Facial challenges are disfavored," requiring the Court to "speculat[e]" and "risk . . . premature[ly] interpret[ing]" the law. *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 912 (8th Cir. 2017) (quoting *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 685 (8th Cir. 2012)). It is the Plaintiffs' burden to show they are entitled to a prescription for this "strong medicine." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Thus, the Plaintiffs "must show that there is no set of circumstances under which the laws would be valid." *Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017). Thus, facts related to the Plaintiffs are irrelevant to the Court's facial determination. *See Phelps-Roper*, 697 F.3d at 693 ("[I]n this facial challenge we do not look to one particular set of circumstances.").

## Argument

The Defendants' motion for summary judgment should be granted for two reasons: the Court lacks jurisdiction and the Plaintiffs claims fail on the merits.

### 1. The Plaintiffs lack standing, and this case is not ripe for judicial review.

Standing under Article III of the U.S. Constitution is a threshold jurisdictional issue that the Plaintiffs have the burden of establishing. *Ojogwu v. Rodenburg L. Firm*, 26 F.4th 457, 461 (8th Cir. 2022). Under Article III, the Plaintiffs must show: (1) "an injury in fact that is concrete, particularized, and actual or imminent," (2) "the injury was caused by the defendant"—i.e., traceable, and (3) "the injury would likely be redressed by judicial relief." *Id.* (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2022)). Failure to allege any one of these requirements independently defeats the Court's jurisdiction.

Ripeness is similar because "[t]he doctrines of standing and ripeness 'originate' from the same Article III limitation." *Susan B. Anthony List*, 573 U.S. at 157 n.5 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)). The difference is that "[r]ipeness is peculiarly a question of timing and is governed by the situation at the time of review, rather than the situation at the time of the events under review." *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013) (citing *Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000)). It is the Plaintiffs' burden to show their case is ripe for review by showing "both 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608 (8th Cir. 2022) (quoting *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022)). A case is unfit for review if it "would . . . benefit from further factual development [or] poses a purely legal question . . . contingent on future possibilities." *Id.* (quoting *Sch. of the Ozarks*, 41 F.4th at 998).

In this case, the standing and ripeness issues "essentially 'boil down to the same question,'" so the analysis collapses together. *Religious Sisters*, 55 F.4th at 608 (quoting *Sch. of the Ozarks*, 41 F.4th at 998).

### 1.1.   For Section 1, because the Plaintiffs cannot identify any item they possess or want to possess that is "harmful to minors," they have not established an injury in fact and their claim is not ripe.

Because the Plaintiffs seek to forestall a future enforcement of Section 1, they must show that the "injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). This means they must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

9

The Plaintiffs have not identified any item that they possess or wish to possess that is "harmful to minors" under Section 1. Instead, they claim that Section 1 is too "vague" for them to know what items are "harmful to minors." *See supra* note 1. But they have not challenged the definition of "harmful to minors" as vague. *See* Doc. 75. That's for good reason: Arkansas's definition of "harmful to minors" "precisely tracks the Supreme Court-approved definitions." Doc. 53, at 27. Thus, it's not vague. *Ginsberg v. New York*, 390 U.S. 629, 642 (1968).

The Plaintiffs try to avoid this fundamental problem by naming a few books that someone (not them) "may" find "harmful to minors," including innocuous titles like *The Adventures of Captain Underpants*. *See* Doc. 42-1. Even more telling is that the Patron Plaintiffs have rejected knowing about any item that might be covered by Section 1 that they want to view. Ex. 8, at 48:11–22 (Miel Partain Depo.); Ex. 9, at 34:19–35:1 (Madeline Partain Depo.); Ex. 10, at 56:7–15 (Caplinger Depo.).

This case is thus a far cry from cases where courts have found standing. In *Virginia v. American Booksellers Ass'n, Inc.*, the plaintiffs asserted a specific interpretation of "harmful to minors" and that interpretation would have covered "as much as one half of their inventory." 484 U.S. 383, 390–92 (1988). In fact, they identified "a total of 16 books that they believed were . . . covered" by their interpretation. *Id.* at 390. The Supreme Court held that the plaintiffs had demonstrated a sufficient likelihood of injury because they, "if their interpretation of the statute [was] correct," would be subject to penalty. *Id.* at 392.

In contrast, the Plaintiffs here refuse to identify any book *they believe* is subject to regulation under Section 1. Instead, they assert that someone, somewhere might believe that items like *The Adventures of Captain Underpants* contain nudity, sexual conduct, sexual excitement, or sadomasochistic abuse with a predominate tendency to sexually excite minors. But that sort of vague

assertion does not establish an injury in fact. Article III requires more. Thus, the Plaintiffs have not shown an injury in fact, and the Court lacks Article III jurisdiction.

Similarly, this challenge is not ripe: there is no guarantee that the Plaintiffs will be prosecuted because they will not identify any books that are subject to regulation.

### 1.2.    For Section 5, the Plaintiffs have not established any element of Article III standing and their claims are not ripe.

*The Plaintiffs fail to show an injury in fact.* The Plaintiffs' alleged injury regarding Section 5 is "wholly speculative" and thus not an injury in fact. *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 719 (8th Cir. 2021) (quoting *Susan B. Anthony List*, 573 U.S. at 160). In *Mitchell v. Dakota County Social Services*, former Minnesota residents challenged Minnesota statutes as facially unconstitutional and claimed they had standing "because they might one day return to Minnesota." 959 F.3d 887, 896 (8th Cir. 2020). This single-step hypothetical was too speculative to establish an injury in fact, so the court lacked jurisdiction. *Id.*

Here, the Library Plaintiffs give the Court a five-step hypothetical that supposedly establishes an injury in fact. According to the Plaintiffs, *if* someone challenges library materials under a library's established guidelines; *and if* the review process ultimately relocates the library material; *and if* that decision violated the statute by relocating the library material based on viewpoint; *and if* that library material happens to be something that a Plaintiff wants to view; *and if* the library material is not outside of First Amendment protection; *then* the Library Plaintiffs will have to relocate the material. That is far beyond the one-level of speculation in *Mitchell*, and it is insufficient to establish an injury in fact.

*The alleged injury is not traceable to the Defendants.* "Traceability requires proof of causation, showing that the injury resulted from the actions of the defendant and not from the independent action of some third party not before the court . . . ." *McGowen, Hurst, Clark & Smith,*

*P.C. v. Com. Bank*, 11 F.4th 702, 709 (8th Cir. 2021) (quoting *Miller v. Thurston*, 967 F.3d 727, 735 (8th Cir. 2020)). Here, the problem boils down to this: It is the libraries' own policies—not actions by the Defendants—that dictate what materials may be moved under Section 5. And the Defendants are not the parties who will review on appeal the Library Plaintiffs' decisions.

Thus, if an injury every occurs, it will result from application of *the library's* selection criteria or the Library Plaintiffs' governing bodies, not from the State's Prosecutors or from Crawford County or from County Judge Keith. The Plaintiffs' alleged injury is thus not traceable to the Defendants.

*The Court cannot redress the Plaintiffs' alleged injury.* "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). Here, the Plaintiffs seek to enjoin the Defendants from implementing the Section 5. Doc. 75, at 32. As explained above, the Defendants do not implement Section 5. And "[i]n the absence of any specific party" to enjoin, an injunction cannot "simply operate 'on the legal rules in the abstract.'" *California*, 141 S. Ct. at 2115 (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1486 (2018) (Thomas, J., concurring)). Thus, an injunction in this case cannot redress the alleged injury. That leaves the request for declaratory relief. Doc. 75, at 32. But a "declaratory judgment . . . is the very kind of relief that cannot alone supply" Article III's requirement that the "remedy . . . will redress the individual plaintiffs' injuries." *California*, 141 S. Ct. at 2116.

There is no remedy the Court can order that will redress the Plaintiffs' alleged injuries.

## 2.  The Plaintiffs' challenges to Section 1 fail on the merits.

The Supreme Court has "long held that obscene speech—sexually explicit material that violates fundamental notions of decency—is not protected by the First Amendment." *United States v. Williams*, 553 U.S. 285, 287 (2008). That is no less true when States regulate the availability of material that is obscene as to children. *See Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (explaining that States have "an independent interest in the well-being of [their] youth"). Indeed, it is "well settled" that States "can adopt more stringent" laws when regulating obscene material's availability to minors than when regulating its availability to adults. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975). Thus, statutes regulating the furnishing of obscene materials to minors are subject to the lowest level of judicial scrutiny—rational-basis review. *Ginsberg*, 390 U.S. at 641.

### 2.1.  The Eighth Circuit has squarely held that laws like Section 1 do not restrict adults' rights.

The Plaintiffs' first claim is that Section 1 violates adults' First Amendment rights by causing "a chilling effect upon the exercise of [those] rights . . . in that [Section 1] inhibit[s] and discourage[s] the browsing, possession, sale and distribution of" certain items because the adults may have to go to "a segregated 'adults only' section." Doc. 75, at ¶¶ 86–89.

The Eighth Circuit, however, has already spoken: the Plaintiff's claim must fail. In *Upper Midwest Bookseller Ass'n v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1985), the Eighth Circuit "approved" a Minneapolis ordinance "similar to Section 1." Doc. 53, at 34. "[T]he ordinance [made] it unlawful for any person knowingly to display for commercial purposes any material that is 'harmful to minors' unless that material [was] in a sealed wrapper." *Upper Midwest*, 780 F.2d at 1390. And the sealed wrapper had to have "an opaque cover" if the material's "cover, covers, or packaging, standing alone, [was] harmful to minors." *Id.* Alternatively, a bookseller could

13

comply by "physically segregat[ing] the proscribed material" behind "a sign reading 'Adults Only—you must be 18 to enter,'" and booksellers had to "enforce[] these restrictions," "so that minors [could not] be present or [could not] view the material." *Id.* at 1391. The *Upper Midwest* plaintiffs alleged that "the ordinance [was] overbroad because [it] impermissibly limit[ed] access of adults to materials that are constitutionally protected as to them." *Id.* The Eighth Circuit upheld the ordinance, "[f]inding a total absence of the 'substantial overbreadth' necessary to facially invalidate" the law. *Id.* at 1398.

The Plaintiffs here make the exact same claim that was rejected in *Upper Midwest*—that is, Section 1 violates adults' rights because adults might have to view some items in a different location then they currently do. In fact, the adult Plaintiffs admit that if Section 1 were in effect there would be nothing stopping them from viewing regulated books. Ex. 10, at 54:20 (Caplinger Depo.) ("I would have access.").

Thus, just like in *Upper Midwest*, "[a]dults are still free . . . to view . . . or to peruse the material in adults only bookstores or in segregated sections of ordinary retail establishments. More significantly, adults are still able to view any of the material in a free and unfettered fashion by purchasing it." 780 F.2d at 1395. The restrictions on adults are thus "minimal" and "merely an incidental effect of the permissible regulation." *Id.* Moreover, the law "imposes no content limitations on the creators of the regulated materials," which "continue to be available to all adults." *Id.* at 1397. Therefore, Section 1 "is narrowly tailored to achieve its purpose." *Id.*

Although Eighth Circuit law is settled on this point, a different district court in 2004 ignored *Upper Midwest* to hold that a law similar to Section 1 was "overbroad" as to "adults." *Shipley, Inc. v. Long*, 454 F. Supp. 2d 819, 831 (E.D. Ark. 2004). It did so without analysis or direction from a higher court. *See* Bryan A. Garner et al., *The Law of Judicial Precedent* 29 (1st ed. 2016)

14

("Lower courts are bound even by old and crumbling high-court precedent—until the high court itself changes direction.").[3] And it did so by citing a case that did "not attempt to decide the constitutional issues." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).

The Court should therefore follow *Upper Midwest*, which squarely deals with a claim exactly like the Plaintiffs' claim that Section 1 violates adults' First Amendment rights.

### 2.2.   Section 1 does not restrict the rights of older minors because States are allowed to (and routinely do) treat all minors as a class.

Next, the Plaintiffs urge that Section 1 violates the First Amendment rights of "older minors" because they will not be able to view "material [that] may be 'harmful' only to younger minors, based on their developmental maturity." Doc. 75, at ¶¶ 89–91.

It bears repeating that the Plaintiffs bring a facial challenge to Act 372. To succeed, the Plaintiffs must show that Section 1's overbreadth is "both 'real' and 'substantial' in relation to its 'plainly legitimate sweep.'" *Twin Oaks*, 864 F.3d at 912 (quoting *Minn. Majority v. Mansky*, 708 F.3d 1051, 1056 (8th Cir. 2013)). And if "third parties will [not] be affected in any manner differently from" the Plaintiffs, then a facial challenge is "inappropriate to entertain." *Id.* But the Plaintiffs don't speculate about Section 1's effect on anyone other than themselves, so the Court should "limit [its] analysis to the [law's] application to [the Plaintiffs]." *Twin Oaks*, 864 F.3d at 912.

Multiple binding and precedential cases have approved laws like Section 1, including the Supreme Court in *Ginsberg*, the Eighth Circuit in *Upper Midwest*, and the Tenth Circuit in *M.S. News Co. v. Casado*, 721 F.2d 1281 (10th Cir. 1983). Each of those cases upheld the challenged

---

[3] *See also Xiong v. State*, 195 F.3d 424, 426 (8th Cir. 1999) ("Eighth Circuit holdings on issues bind all district courts in the circuit and district courts must follow those holdings until reversed by the Eighth Circuit en banc or the Supreme Court."), *abrogated on other grounds by Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28 (2002).

laws without a hint of concern that all minors were treated equally. Section 1's one-size-fits-all approach to variable obscenity is constitutional for two reasons.

First, variable obscenity categorically falls outside minors' First Amendment rights. *See Ginsberg*, 390 U.S. at 638, 641 (holding that the challenged regulation did not violate "minors' constitutional protected freedoms" because the regulation "simply adjusts the definition of obscenity," which is "not protected expression"); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (stating that the law in *Ginsberg* regulated "unprotected speech"). The law often treats minors as a single class, even in areas of fundamental rights. *See, e.g.*, U.S. Const. amend. XXVI (setting the minimum voting age to 18 years of age); *Thompson v. Oklahoma*, 487 U.S. 815, 840–41, 845–48 (1988) (compiling laws in every State that prohibit minors from serving on a jury, purchasing obscenity, and gambling). Some minors undoubtedly have the developmental capacity to engage in the regulated conduct as a minor, but States have never been required to make that minor-by-minor determination.

Second, if States were not allowed to treat minors as a class, there would be bedlam. States would have to deal with "confusion and difficulty" in "mak[ing] the differential obscenity determinations for each of the 'minor' age subgroups." *Shipley*, 454 F. Supp. 2d at 829. The only so-called solution is to "prohibit only those materials which are harmful to the older mature minors," which would "distort the obvious objectives of the statute." *Id.* After all, it is these "older minors" who will soon be adults. *Id.* Moreover, there is no constitutional reason the subcategorization should stop at "older minors" (whatever that means) because *any* bright-line age limit will be somewhat over- and underinclusive. If the Plaintiffs are right that "developmental maturity" is all that matters, Doc. 75, at ¶ 90, then State will be required to regulate immature 17-year-olds differently than mature 17-year-olds. That makes no sense—practically or constitutionally.

The caselaw in support of the Plaintiffs is sparse, and the binding caselaw in support of them is nonexistent. The Plaintiffs' have primarily relied on a *Shipley, Inc. v. Long*, a 2004 decision from the Eastern District of Arkansas. There the district court ignored *Ginsberg*, *Upper Midwest*, and *M.S. News* in favor of reading the tea leaves of a Supreme Court opinion that expressly did "not attempt to decide the constitutional issues." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). That saga started in the Fourth Circuit with a challenge to a Virginia statute that regulated material that was "harmful to juveniles," which was defined substantially similar to Section 1. *Id.* at 386. At trial, the court didn't reach the issue of whether a State might be required to treat older minors and younger minors differently. *Am. Booksellers Ass'n v. Strobel*, 617 F. Supp. 699, 707 (E.D. Va. 1985). Then, on appeal, the Fourth Circuit didn't discuss the issue either, but in a footnote, it gratuitously included that the panel "also question[ed] whether an older minor's first amendment rights can be limited by the standards applicable to younger juveniles." *Am. Booksellers Ass'n, Inc. v. Virginia*, 802 F.2d 691, 695 n.7 (4th Cir. 1986). But because that issue was not ruled on by the trial court, it was not on appeal. *E.g.*, *United States v. Brown*, 360 F.3d 828, 833 n.3 (8th Cir. 2004) (stating that "fail[ing] to obtain a ruling on [an] issue" means that the "issue has not been preserved for appellate review").

That brings us to the Supreme Court's opinion in the case. The Court acknowledged that the plaintiffs had originally sued, in part, over the constitutionality of "restrict[ing] access by mature juveniles to works that are 'harmful' only to younger children" but that the lower courts "did not determine the issue." *Am. Booksellers*, 484 U.S. at 389, 392. Thus, the only issue on appeal was "the nature of the First Amendment 'spillover' burden to adults." *Id.* at 394. So not only was the Court "not attempt[ing] to decide the constitutional issues presented"—that is, the effect on *adults*—it did not even have the older-younger minor issue before it. *Id.* at 393.

*Shipley*'s reliance on the Virginia saga of cases was improper. It is *Ginsberg* and *Upper Midwest* that control here.

### 2.3.   Section 1 is not a prior restraint because it does not bar speech from occurring.

Next, the Plaintiffs claim that Section 1 imposes a prior restraint because of the law's "unreasonable obligations." Doc. 75, at ¶¶ 95–96. A law is only a prior restraint if it "bar[s]" future speech, instead of merely "penalizing past speech." *SOB, Inc. v. Cnty. of Benton*, 317 F.3d 856, 866 (8th Cir. 2003) (emphasis added) (quoting *Alexander v. United States*, 509 U.S. 544, 554 (1993)). Section 1 doesn't bar any speech, much less future speech. Instead, speakers may say or publish anything they wish—even content that is obscene to minors. It is only conduct *after* the speech that is proscribed—that is, furnishing that content to a minor. Ark. Code Ann. § 5-27-212f(b); *see Upper Midwest*, 780 F.2d at 1397 (upholding an ordinance that "with[held] offensive expression from the young 'without restricting the expression at its source,'" which meant that the minimal effect on adults was constitutionally "[in]significant" (quoting *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978))). The law does not "freeze[]" the Plaintiffs' speech beforehand, so it is not a prior restraint. *See CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 439, 559 (1976)).

Even if Section 1 could be construed as a prior restraint, prior restraints are not per se unconstitutional when related to minors. *See, e.g.*, *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1134 (8th Cir. 1999) (high school); *Bystrom ex rel. Bystrom v. Fridley High Sch., Ind. Sch. Dist. No. 14*, 822 F.2d 747, 750 (8th Cir. 1987) (same). Instead, the question is whether the alleged restraint on minors is otherwise "consistent with the First Amendment." *Bystrom*, 822 F.2d at 749. For the reasons explained, Section 1 is constitutional.

### 2.4.   Section 1 is not vague because the challenged terms are understandable to a person of ordinary intelligence.

To analyze the Plaintiffs' vagueness challenge, the Court must only consider "the particular facts at issue" in this case because "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010). There is "no exception" to that rule "for . . . speech." *Id.* at 20. Instead, a law is not vague if "a person of ordinary intelligence" has "fair notice of what is prohibited" and so long as the law does not "authorize[] or encourage[] seriously discriminatory enforcement." *Id.* at 18. The law need not give "perfect clarity and precise guidance," even if it "restrict[s] expressive activity." *Id.* at 19.

The Plaintiffs only challenge three terms as vague—"presents," "provides," and "makes available." Doc. 75, at ¶ 97. They are not vague for two reasons.

First, laws with "knowledge requirement[s] . . . reduce[] any potential for vagueness." *Humanitarian Law Project*, 561 U.S. at 21; *see also Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018). Section 1 includes two such requirements: (1) knowledge that the relevant item is obscene as to minors and (2) knowingly "present[ing], provid[ing], [or] mak[ing] available" the item "to a minor." Ark. Code Ann. § 5-27-212(b).

Second, people of ordinary intelligence can understand the terms "presents," "provides," and "makes available"; there's "no guess[ing]" required. *Duhe*, 902 F.3d at 864 (alteration in original) (quoting *Cameron v. Johnson*, 390 U.S. 611, 616 (1968)). They need only look to the "ordinary meaning" of these terms. *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019). The dictionary defines the terms as:

- "Presents" means "to offer to view";

- "Provides" means "to supply or make available"; and

- "Make available" means to make "accessible" or "attainable."[4]

Notably, the term "make available" is so understandable that the First Circuit, with no additional explanation, used it as a definition for "provide." *United States v. Gelin*, 712 F.3d 612, 619 (1st Cir. 2013).

The nail in the Plaintiffs' vagueness claim is that they have implicitly admitted the constitutionality of a separate Arkansas statute that uses the word "present" and uses other terms to cover almost identical conduct to what they challenge as vague here. *See, e.g.*, Doc. 23, at 37; Ark. Code Ann. § 5-68-502 ("[s]ell, furnish, present, distribute, allow to view, or otherwise disseminate" (emphases added)).

### 3.   The Plaintiffs' challenges to Section 5 fail on the merits.

Only the Library Plaintiffs bring claims against Section 5. Doc. 75, at ¶¶ 99–106. Each of these three claims fails on its own terms, but they also fail as a group for two reasons: (1) the curation of library materials is government speech and (2) the Library Plaintiffs cannot use the Constitution in opposition to their limited powers.

### 3.1.   The curation of library materials is government speech.

The selection of library materials is government speech, which is not limited by the First Amendment's Free Speech Clause, so the "rules against viewpoint discrimination" do not apply. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022). In fact, the Supreme Court has already "appl[ied] the government speech doctrine to 'a public library's exercise of judgment in selecting the material it provides to its patrons." *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 330 (1st Cir. 2009) (citing *United States v. Am. Library Ass'n*, 539 U.S. 194 (2003) (plurality opinion)).

---

[4] Definitions are from Merriam-Webster Online, https://www.merriam-webster.com/.

Courts weigh three factors to determine whether speech is government speech: (1) "the history of the expression at issue," (2) "the public's likely perception as to who (the government or a private person) is speaking," and (3) "the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 142 S. Ct. at 1589–90. All three factors weigh in favor of library curation being governing speech.

*First, Arkansas public libraries are creatures of the State, so the State has historically had the right to modify public libraries' collections.* Cities and counties in Arkansas "are creatures of the legislature," so they "have no inherent powers" but "have only the power bestowed upon them by statute or the Arkansas Constitution." *White Cnty. v. Cities of Judsonia, Kensett, & Pangburn*, 251 S.W.3d 275, 279 (Ark. 2007). Thus, the State, "at its pleasure, may modify or withdraw all such powers." *Pritchett v. City of Hot Springs*, 514 S.W.3d 447, 449 (Ark. 2017) (quoting *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178–79 (1907)).

Among counties' and municipalities' limited powers is the power to establish public libraries. *See* Ark. Code Ann. § 13-2-401 (county libraries); *id.* § 13-2-501 (city libraries); *id.* §§ 13-2-407, 13-2-903 (regional libraries). Thus, Section 5 is an unremarkable use of the State's right to modify that limited power. Ark. Code Ann. § 13-2-106 (codifying Section 5 in the "Libraries" chapter of the Arkansas Code). As the Supreme Court has explained, States have "broad discretion to decide what material to provide to their [libraries'] patrons" and by no means are required "to provide universal coverage." *Am. Library Ass'n*, 539 U.S. at 204 (plurality opinion) (cleaned up). Instead, the States are free to include what they believe to be "requisite and appropriate." *Id.* (cleaned up). And when "selecting the material it provides to its [libraries'] patrons," States can make "content-based" decisions, *id.* at 205, and even viewpoint-based ones. *Shurtleff*, 142 S. Ct. at 1589.

The Plaintiffs' own filings, testimony, and discovery responses confirm what the law makes clear: Libraries are "governmental agenc[ies]" that engage in "government[al] actions." Ex. 5, at 34 (Webb Production); *see also* Ex. 6, at 101:4 (White Depo.) (calling the Crawford County Public Library System "a county department"). They call themselves in the Amended Complaint a "political subdivision," Doc. 75, at ¶ 12; "a municipal public library," *id.* at ¶ 13; and "a body . . . politic," *id.* ¶ 14.[5] They acknowledge that the governing bodies of the municipalities creating the libraries hold ultimate control. *See* Ex. 1, at 158:2–6 (Coulter Depo.) (explaining that the CALS Library Board "serves at the pleasure of the appointing entities"—that is, counties and cities); Ex. 4, at 31 (ESCPL Production) (placing the Madison County and Carrol County Quorum Courts at the pinnacle of the organizational chart). Libraries are publicly funded. Ex. 1, at 28:20–22 (Coulter Depo.). Their employees are "government employee[s]." Ex. 1, at 34:23–35:12 (Coulter Depo.). They are subject to constitutional restraints on government entities and must comply with the Arkansas Freedom of Information Act. Ex. 1, at 28:22–23, 33:12 (Coulter Depo.).

Libraries are creatures of the State. They may only exercise the power given to them. In sum, the State's ability to curate public libraries' collections has been long established. Thus, this factor supports that the selection of library materials is government speech.

*Second, there is no risk that the State's curation of library materials will be perceived as private speech.* As explained above, even a general understanding of the structure of Arkansas's government and Supreme Court caselaw—indeed, the Plaintiffs' own words at the top of this page—belies the perception that *public* libraries are engaged in *private* speech when they curate

---

[5] *See Body politic, Black's Law Dictionary* (11th ed. 2019) ("A group of people regarded in a political (rather than private) sense and organized under a common governmental authority.").

material for their collection. Thus, there is no risk that a library's selection of materials will be perceived as private speech.

*Third, the State takes an active role in curating libraries' materials and even provides protection from viewpoint discrimination.* It is important to identify what Section 5 does, instead of what the Plaintiffs claim it does. It directs libraries to adopt "a written policy to establish guidelines for the selection, relocation, and retention of physical materials that are available." Ark. Code Ann. § 13-2-106(a). Then, a library's challenge policy should allow "affected" people to "challenge the appropriateness of" publicly available material. *Id.* § 13-2-106(c)(1). Next, the library's review committee must determine whether the challenged material is "appropriate" under the library's own "criteria of selection." *Id.* § 5(c)(7)(A). The governing body's review of the library committee's decision must likewise be limited to the library's criteria of selection, which will be addressed in the committee's written decision. *See supra* at 4–7.

Although it constitutionally could be, Section 5 is not an unbounded expedition into every conceivable meaning of the word "appropriate." It does not ban any books. It does not discriminate based on viewpoint. Instead, it provides Arkansas citizens the opportunity to hold public libraries accountable to their own rules for the selection of materials. The Plaintiffs admit that they have no issue with the correct interpretation of the law. Ex. 1, at 61:24–64:11 (Coulter Depo.).

At the end of the day, public libraries exercising authority delegated by the State will still be selecting what materials to have for their patrons, just like before Act 372. The curation of library materials is wholly under state control and outside First Amendment analysis. The Court can end its inquiry here and rule against the Plaintiffs.

### 3.2. The Library Plaintiffs cannot wield the Constitution to give themselves more power than the State has granted them.

As explained, the Library Plaintiffs are subdivisions of the State. The Supreme Court has long held that "[a] political subdivision . . . is a subordinate unit of government created by the State to carry out delegated governmental functions," so, unlike "[a] private corporation [that] enjoys constitutional protections, . . . a political subdivision . . . 'has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.'" *Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (quoting *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40 (1933)). This principle applies to all of the claims the Library Plaintiffs are asserting against Section 5. *See Coleman v. Miller*, 307 U.S. 433, 441 (1939) ("Being but creatures of the State, municipal corporations have no standing to invoke . . . the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator.").

Therefore, the Court should grant summary judgment in favor of the Defendants on all of the claims against Section 5.

### 3.3. Section 5 is not a prior restraint because it does not bar speech from occurring.

The Plaintiffs' first challenge to Section 5 is that it is a prior restraint because material might be removed from circulation during a challenge. Doc. 75, at ¶ 99–101. What they fail to acknowledge in their complaint is that whether libraries keep materials in circulation during a challenge has nothing to do with Section 5. Libraries already have discretion to remove material from circulation during a challenge. Section 5 doesn't change that. This, again, shows why a facial challenge is inappropriate.

Even so, Section 5 is not a prior restraint. As explained above, government action is only a prior restraint if it bars future speech, not if it penalizes past speech. *SOB, Inc.*, 317 F.3d at 866.

But Section 5 does not bar future speech or penalize past speech. It provides no penalty at all. In other words, it does not "freeze[]" speech from occurring, so it is not a prior restraint. *Davis*, 510 U.S. at 1317 (quoting *Stuart*, 427 U.S. at 559); *see also Upper Midwest*, 780 F.2d at 1397 (upholding an ordinance that "with[held] offensive expression from the young 'without restricting the expression at its source,'" which meant that the minimal effect on adults was constitutionally "[in]significant" (quoting *Pacifica Found.*, 438 U.S. at 749)).

Again like Section 1, the legal basis for Plaintiffs' assertion that Section 5 is a prior restraint is unclear; they just say that it is one. Doc. 75, ¶¶ 90–101.

Section 5 is not a prior restraint, and the Court should grant summary judgment in the Defendants' favor.

### 3.4.  Section 5 is not vague because the challenged terms are understandable to a person of ordinary intelligence.

Next, the Plaintiffs argue that Section 5 is vague based on the word "appropriateness" and the phrase "not accessible to a minor." Doc. 75, at ¶ 102. Section 5 need not give "perfect clarity and precise guidance" as to the meanings of these. *Humanitarian Law Project*, 561 U.S. at 19. All that is required is that "a person of ordinary intelligence" has "fair notice of what is prohibited." *Id.* at 18.

As explained above, the Plaintiffs are incorrect that "appropriateness" is a free-ranging inquiry into the personal tastes of potential challengers, library committees, or governmental bodies. The only permissible reason material can be relocated in a library is "if the material being challenged meets the criteria of selection" adopted by the library. Ark. Code Ann. § 13-2-106(c)(7)(A).

Moreover, the Library Plaintiffs' existing policies use the word "appropriate," or its derivatives, **27 times**. Ex. 2, at 1, 3, 6, 7, 15, 18, 19, 23, 25 (CALS Production); Ex. 3, at 3, 4, 5, 10, 17,

19, 20 (FPL Production); Ex. 4, at 6, 8 (ESCPL Production). And Plaintiff Webb's library even allows patrons to "request reconsideration of the appropriateness of the material." Ex. 5, at 7 (Webb Production). The Plaintiffs cannot now claim that the word "appropriate" in Section 5 is too vague from them to understand, while freely using it elsewhere.

"Not accessible to a minor" is also not vague. It means that the area must not be "capable of being used" by minors or not "available" to minors.[6] These are all common words, and the Plaintiffs should have no difficulty understanding them.

### 3.5.   The Plaintiffs' challenge related to judicial review is a subpart of their prior-restraint claim, so it fails for the same reasons.

Finally, the Plaintiffs claim that Section 5 violates due process because it allegedly "re-liev[es] local governments of their constitutional obligation to obtain judicial review prior to im-posing a final restrain on expression." Doc. 75, at ¶ 106. Although unclear from their complaint, it appears from the preliminary-injunction briefing that this is only a subpart of the prior-restraint claim. *See* Doc. 23, at 30–33. As explained above, Section 5 is not a prior restraint, so this claim fails.

### Conclusion

For these reasons, the Court should grant the Defendants' motion for summary judgment.

---

[6] *Accessible*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/accessible.

Respectfully submitted,

TIM GRIFFIN
Attorney General

By:    Noah P. Watson
        Ark. Bar No. 2020251
        Deputy Attorney General

        John Payne
        Ark. Bar No. 97097
        Deputy Attorney General

        Christine A. Cryer
        Ark. Bar No. 2001082
        Senior Assistant Attorney General

        Arkansas Attorney General's Office
        323 Center Street, Suite 200
        Little Rock, Arkansas 72201
        (501) 682-1019
        (501) 682-2591 fax
        noah.watson@arkansasag.gov
        john.payne@arkansasag.gov
        christine.cryer@arkansasag.gov

        *Attorneys for Defendants*