IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FAYETTEVILLE PUBLIC LIBRARY, a political subdivision in the City of Fayetteville, State of Arkansas; et al. PLAINTIFFS

v. NO. 5:23-CV-05086

CRAWFORD COUNTY, ARKANSAS; et al DEFENDANTS

DECLARATION OF DEBORAH CALDWELL-STONE

I, Deborah Caldwell-Stone, pursuant to 28 U.S.C.§ 1746, do declare:

1. I am the Executive Director and Secretary of the Freedom to Read Foundation ("FTRF"), a plaintiff in this action. I make this declaration in support of plaintiffs' motion for summary judgment.

2. FTRF is a nonprofit membership organization established in 1969 by the American Library Association ("ALA") to promote and defend First Amendment rights, to foster libraries as institutions fulfilling the promise of the First Amendment for every citizen, to support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, and to set legal precedent for the freedom to read on behalf of all citizens. FTRF's membership includes organizations, libraries, librarians, and library patrons.

3. The American Library Association is the sole accrediting body for library and information science (LIS) schools in the United States and most degreed librarians are trained by ALA-accredited institutions. ALA accredits 67 programs at 63 institutions in the United States

(including Arkansas), Canada, and Puerto Rico. As part of their training, LIS students and library professionals are taught the ALA's Code of Ethics, and chief among the obligations laid out therein is the librarian's duty to support intellectual freedom and resist all efforts to censor library resources or limit access to information based on viewpoint. Similarly, the ALA's Library Bill of Rights, the policy intended to guide the provision of library service to library users, is unequivocal in its condemnation of censorship and other attempts to limit information based on viewpoint or preference.

4. Library policies that restrict access to resources for any reason must be carefully formulated and administered to ensure they do not violate established principles of intellectual freedom. This caution is reflected in multiple ALA policies. The core function of public libraries is to provide all patrons with access to a broad spectrum of information and ideas that are of interest to them and to provide access to all points of view on current and historical issues.

5. Section 1 of Act 372 of 2023 ("Act 372") prohibits making books that are "harmful to minors" available to minors, forcing a large quantity of constitutionally protected materials to be restricted from adults and older minors. Section 5 of Act 372 allows for a procedure to challenge the "appropriateness" of books by any "person affected by the material," which will result in challenges based on the viewpoint of the materials in the library.

6. Any public library contains hundreds of books with sexually related narrative, pictorial content, or subject matters that are constitutionally protected but might be incorrectly considered by some to be "harmful to minors" or "inappropriate." These books fall in many literary genres, such as fiction, non-fiction, romance, photography, health, art, and new releases. Examples include contemporary bestsellers like "It Ends With Us," and the "Bridgerton" series; literary classics such

as “Lolita,” “Sanctuary,” and “Portnoy’s Complaint;” and prizewinners such as “The Bluest Eye,” “To Kill a Mockingbird,” and “The Absolutely True Diary of a Part-Time Indian.”

**Library Patrons**

7. FTRF’s members who are library patrons in Arkansas will suffer irreparable injury if Sections 1, which limits the availability of books “harmful to minors,” and Section 5, which allows books to be challenged on the basis of “appropriateness” go into effect because they will be deprived of access to books that they would like to peruse, read, or check out, and which would otherwise be available.

8. Library patrons generally become acquainted with books when they are readily visible. While many patrons come into libraries asking for a specific title, many more discover a new title while browsing. Hiding those titles, as Act 372 necessitates, would be a great disserve to library users. The prominent display of books shelved or displayed on a table in an orderly, easily accessible manner in an atmosphere conducive to browsing is essential for the success of libraries’ mission to connect books with readers, and central for the ability of readers to find books.

**Library Members**

9. FTRF members in Arkansas will suffer irreparable injury if Section 1 goes into effect because the libraries that are members of FTRF or at which FTRF members work, carry materials that, though constitutionally protected, could be incorrectly deemed harmful to minors and therefore subject to Section 1. These same materials might be challenged as inappropriate pursuant to Section 5 at significant cost to the libraries.

10. FTRF member libraries fear that they and their employees may be at risk of prosecution under Section 1 for permitting minors to view or access constitutionally protected material which

might be deemed "harmful to minors" for any minor under the meaning of the statute. They do not know how to determine what books may cross this vague line, which does not distinguish between older and younger minors. FTRF member libraries also do not know how to apply the vague standards of Section 5 which allows any "person affected by the material" in their collections to challenge the "appropriateness" of the material. In recent months, even picture books for young children have been targeted for removal from libraries based on the themes contained in those books and disagreement with their viewpoints.

11. To comply with Section 1 and Section 5 of Act 372, libraries are faced with untenable choices.

a. The library could bar all patrons under the age of 18 from entering the library facility. This would alter the purpose and actions of libraries, many of which hold events for children and have constructed rooms for children. This would also prevent older minors from perusing materials constitutionally protected as to them.

b. A library could limit its inventory to books or other items not regulated by Section 1, however, that would curtail the availability of many books, including some bestsellers, and thus, this alternative is not practically feasible. In addition, this alternative would create practical difficulties in ordering new books because libraries rarely have the opportunity to review books before ordering them. In making collection decisions, librarians rely on third party sources such as professional journals, established book review sources, awards list, and bestseller lists. This alternative would also restrict the ability of adults and older minors to peruse and read materials constitutionally protected as to them. This would violate the statements of professional values discussed above, which are unequivocal in

their condemnation of censorship and other attempts to limit information based on viewpoint or preference.

c. Alternatively, the library could place all materials that could be "harmful to minors" behind a counter or closed stacks if feasible given the diversity in size and architectural design. However, given the large number of constitutionally protected books involved, that may entail a restructuring of the library facility to ensure space. Even assuming member libraries could identify and afford to cordon off space to securely segregate material for adults only to avoid liability under the statute, most do not have enough staff to review quickly and efficiently every item in the collection to determine whether that item might subsequently be deemed harmful to a younger minor by a prosecutor, or challenged as inappropriate, and therefore must be placed in the segregated adults only room. For libraries with large collections that are constantly being added to and weeded by staff, a library might need an entire department of employees charged with screening materials to be sure they can be placed in the general section of the libraries. Many libraries could not undertake such a task without shutting down core services. Further, separating items behind a counter or in some other way would restrict the ability of adults and older minors to peruse and select materials constitutionally protected as to them. Such a result would violate ALA statements of professional values.

d. The library could also designate a room "adults only." This would, like the "behind the counter" option, potentially involve costly renovations and burden employees with the separation of books. FTRF's library members are also frequently visited by families that include children too young to be left unattended while a parent or

older sibling peruses the collection, either as a matter of library policy or parental judgment. In such a case, the chaperoning parent or older minor-sibling would be unable to access books segregated in an area of the library where the younger minor is prohibited from entering. Further, this new room would be difficult to monitor necessitating keys or electronic access (which would also entail additional costs) and would be confusing to patrons. That kind of segregation would also lead to a drop in readership of those constitutionally protected books, as many adults would be hesitant to go into the "adults only" room. As with the other alternatives, this would restrict the ability of adults and older minors to peruse materials constitutionally protected as to them and would violate ALA principles.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of May, 2024.

/s/ *Deborah Caldwell-Stone*
Deborah Caldwell-Stone