**In The Matter Of:**

*Fayetteville Public Library, et al v.*
*Crawford County, Arkansas, et al*

---

*Leta Jo Caplinger, Esq.*
*December 11, 2023*
*CERTIFIED COPY*

---

*Michelle Satterfield, CCR*
*1955 Little River Drive*
*Conway, Arkansas  72034*
*(501)336-7414*
*Satterfield@conwaycorp.net*

## Page 1

1       IN THE UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF ARKANSAS
2            FAYETTEVILLE DIVISION

3 FAYETTEVILLE PUBLIC LIBRARY, a political
  subdivision in the City of Fayetteville,
4 State of Arkansas; EUREKA SPRINGS CARNEGIE
  PUBLIC LIBRARY; CENTRAL ARKANSAS LIBRARY
5 SYSTEM; NATE COULTER, OLIVIA FARRELL;
  JENNIE KIRBY, as parent and next friend of
6 HAYDEN KIRBY; LETA CAPLINGER; ADAM WEBB;
  ARKANSAS LIBRARY ASSOCIATION; ADVOCATES FOR
7 ALL ARKANSAS LIBRARIES; PEARLS BOOKS, LLC,
  d/b/a WORDSWORTH BOOKS; AMERICAN BOOKSELLERS
8 ASSOCIATION; ASSOCIATION OF AMERICAN PUBLISHERS,
  INC.; COMIC BOOK LEGAL DEFENSE FUND; FREEDOM TO
9 READ FOUNDATION,                  PLAINTIFFS

10 vs.                NO. 5:23-CV-05086-TLB

11 CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH, in his
  official capacity as Crawford County Judge;
12 TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
  MATT DURRETT; JEFF PHILLIPS; WILL JONES; TERESA
13 HOWELL; BEN HALE; CONNIE MITCHELL; DAN TURNER;
  JANA BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE HUNTER;
14 DANIEL SHUE; JEFF ROGERS; DAVID ETHREDGE; TOM TATUM,
  II; DREW SMITH; REBECCA REED MCCOY; MICHELLE C.
15 LAWRENCE; DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
  CAROL CREWS; KEVIN HOLMES; CHRIS WALTON; and CHUCK
16 GRAHAM, each and in his or her official capacity as a
  prosecuting attorney for the State of Arkansas, DEFENDANTS

17

18              ORAL DEPOSITION

19                 OF

20           LETA JO CAPLINGER, ESQ.

21

22

23 ***** THE ABOVE-STYLED MATTER was reported by Michelle R.
  Satterfield, CCR, LS Certificate No. 570, at the Wahlmeier
24 Law Firm, located at 1101 Walnut, Van Buren, Arkansas,
  commencing on the 11th day of December 2023, at 9:08 a.m.
25 *****

## Page 2

1          A P P E A R A N C E S

2 MR. SAMUEL S. MCLELLAND
  Attorney at Law
3 PPGMR Law, PLLC
  201 East Markham Street, Suite 201
4 Little Rock, Arkansas 72201
  sam@ppgmrlaw.com
5
  *** For Crawford County, Arkansas, and County Judge
6     Chris Keith, in his official capacity ***

7 MR. NOAH WATSON
  Senior Assistant Attorney General
8 323 Center Street, Suite 200
  Little Rock, Arkansas 72201
9 Noah.Watson@ArkansasAG.gov

10 *** For the State of Arkansas Prosecuting Attorneys ***

11 MR. GENTRY C. WAHLMEIER
  Attorney at Law
12 Wahlmeier Law Firm, P.A.
  1101 Walnut/P.O. Box 1811 - 72957
13 Van Buren, Arkansas 72956
  gentry@wahlmeierlaw.com
14
        *** For Crawford County ***
15
  MS. BETTINA E. BROWNSTEIN
16 Attorney at Law
  Bettina E. Brownstein Law Firm
17 904 West 2nd Street, Suite 2
  Little Rock, Arkansas 72201
18 bettinabrownstein@gmail.com

19 *** For the Plaintiffs, Olivia Farrell, Jennie Kirby,
  Hayden Kirby and Leta Caplinger ***
20 *** On Behalf of the Arkansas Civil
    Liberties Union Foundation, Inc. ***
21
  MR. JOHN T. ADAMS
22 Attorney at Law
  Fuqua Campbell,
23 Riviera Tower - 3700 Cantrell Road, Suite 205
  Little Rock, Arkansas 72202
24
  *** For The Plaintiffs, Central Arkansas Library System,
25 Nate Coulter and the Eureka Springs Carnegie Public

## Page 3

1     A P P E A R A N C E S (CONTINUED)

2 MR. VINCENT O. CHADICK
  Attorney at Law
3 Quattlebaum, Grooms & Tull, PLLC
  4100 Corporate Center Drive, Suite 310
4 Springdale, Arkansas 72762
           (VIA TEAMS)
5 *** For the Plaintiff, Fayetteville Public Library ***

6 MR. BEN SEEL
  Attorney at Law
7 Democracy Forward Foundation
  P.O. Box 34554
8 Washington, DC 20043
  bseel@democracyforward.org
9            (VIA TEAMS)
  *** For the Arkansas Library Association, Advocates for
10 All Arkansas Libraries and Adam Webb, in his individual
  capacity ***
11
  MS. REBECCA HUGHES PARKER
12 Attorney at Law
  Dentons US, LLP
13 1221 Avenue of the Americas
  New York, NY 10020
14 rebeccahughes.parker@dentons.com
           (VIA TEAMS)
15 *** For the Plaintiffs, Pearl's Books, LLC; Wordsworth
  Community Bookstore, LLC; American Booksellers
16 Association; Association of American Publishers, Inc.;
  Authors Guild, Inc; comic Book Legal Defense Fund; and
17 Freedom to Read Foundation ***

18 MR. ORLANDO ECONOMOS
  Attorney at Law
19 Democracy Forward Foundation
  P.O. Box 34554
20 Washington, D.C. 20043
  oce6@georgetown.edu
21           (VIA TEAMS)
  *** For the Arkansas Library Association, Advocates for
22 Arkansas Libraries and Adam Webb, in his individual
  capacity ***

## Page 4

1          I N D E X

2 TOPIC                        PAGE

3 APPEARANCES                  2-3

4 STIPULATIONS                 5

5 WITNESS SWORN: Leta Jo Caplinger, Esq.     6

6      Examination by Mr. McLelland      8

7      Examination by Mr. Watson       46

8      Examination by Ms. Brownstein    65

9      Examination by Mr. Adams       68

10      Examination by Ms. Parker      71

11      Further Examination by Mr. McLelland   71,80

12      Further Examination by Mr. Watson    75

13 REPORTER'S CERTIFICATE           82

14         E X H I B I T S

15 NUMBER         DESCRIPTION         PAGE

16 Deft's 1   Copy of Complaint        21

17 Deft's 2   Copy of Senate Bill 81     32

18 Deft's 3   Bates Nos. CrawfordCo_000023-000030   39

19 Deft's 4   Bates Nos. CrawfordCo_000003-000004   42
    (COPIES OF EXHIBITS SCANNED INTO ETRANSCRIPT)

21          * * * * *

Page 5

1        ANSWERS AND DEPOSITION OF LETA JO CAPLINGER,
2    ESQ., a witness produced at the request of the DEFENDANTS,
3    was taken in the above-styled and numbered cause on the
4    11th day of December 2023, before Michelle R. Satterfield,
5    CCR, a Notary Public in and for Faulkner County, Arkansas,
6    at the offices of the Wahlmeier Law Firm, P.A., located at
7    1101 Walnut, Van Buren, Arkansas, at 9:08 a.m., pursuant
8    to the agreement hereinafter set forth.
9
10
11
12            S T I P U L A T I O N S
13        IT IS STIPULATED AND AGREED by and between the
14    parties through their respective counsel that the
15    deposition of Leta Jo Caplinger, Esq. may be taken at the
16    time and place designated pursuant to the Federal Rules of
17    Civil Procedure.
18                    * * * * *
19
20
21
22
23
24
25

Page 6

1        LETA JO CAPLINGER, ESQ.,
2    the witness hereinbefore named, having been previously
3    cautioned and sworn, or affirmed, to tell the truth, the
4    whole truth, and nothing but the truth, testified as
5    follows:
6        **MR. MCLELLAND:** Good morning,
7    Ms. Caplinger.
8        Before we get started, I just want to
9    confirm that all counsel that's appearing
10    remotely can hear me and that we can hear you,
11    so if we could do like a quick sound check to
12    make sure.
13        Rebecca, can you hear us?
14        **MS. HUGHES:** Yes, I can hear you, thank
15    you.
16        **MR. MCLELLAND:** Vince?
17        **MR. CHADICK:** Yes.
18        **MR. MCLELLAND:** Ben?
19        **MR. SEEL:** Yes, I can hear you, thanks.
20        **MR. MCLELLAND:** Okay.  And Orlando?
21        **MR. ECONOMOS:** Yes.
22        **MR. MCLELLAND:** Okay.  Great, we can hear
23    everyone.
24        Because we have so many people attending,
25    both in person and remotely, the court reporter

Page 7

1    has asked us to go around and introduce
2    ourselves and who we're representing.
3        If during the course of this deposition,
4    the folks that appearing, via Teams, need to
5    make an objection or need to chime in, chime in,
6    but state your name as well at some point,
7    either at the beginning or a couple of words in
8    to your objection or statement.  That way the
9    court reporter can keep a clean record.
10        I'll start off and we can just go around
11    the room.  I'm Sam McLelland.  I'm representing
12    Crawford County in this matter.
13        **MR. WATSON:** Noah Watson with the Arkansas
14    Attorney General's Offices representing the
15    prosecuting attorneys.
16        **MR. WAHLMEIER:** I'm Gentry Wahlmeier.  I
17    represent Crawford County.
18        **MR. ADAMS:** I'm John Adams.  I relationship
19    the Central Arkansas Library System, Nate
20    Coulter, and the Eureka Springs Carnegie Public
21    Library.
22        **MS. BROWNSTEIN:** I'm Bettina Brownstein.  I
23    represent Jennie Kirby, Hayden Kirby, Olivia
24    Farrell, and Leta Caplinger.
25        **MR. MCLELLAND:** Rebecca, who do you

Page 8

1    represent?
2        **MS. HUGHES:** Rebecca Hughes Parker.  We
3    represent Pearl's Books, Wordsworth Community
4    Bookstore, American Booksellers Association,
5    Association of American Publishers, Authors
6    Guild, Comic Book Legal Defense Fund, and the
7    Freedom to Read Foundation.
8        **MR. MCLELLAND:** Thank you.  Vince, who are
9    you representing?
10        **MR. CHADICK:** Vincent Chadick representing
11    Fayetteville Public Library.
12        **MR. MCLELLAND:** Ben?
13        **MR. SEEL:** Good morning, I'm Ben Seel.  I
14    representing Adam Webb, Arkansas Library
15    Association, and Advocates for All Arkansas
16    Libraries.
17        **MR. ECONOMOS:** Likewise, I'm Orlando
18    Economos with Democracy Forward.  I'm
19    representing Advocates for All Arkansas
20    Libraries, Arkansas Library Association and Adam
21    Webb.
22        **MR. MCLELLAND:** Great.  Thanks everyone for
23    doing that.  I appreciate it.
24                **EXAMINATION**
25    **BY MR. MCLELLAND:**

Page 9

1  Q   All right.  Ms. Caplinger, we'll get started.  Can
2  you spell your name for us?
3  A   Yes, my first name is Leta; L-E-T-A.  My last name is
4  Caplinger; C-A-P-L-I-N-G-E-R.
5  Q   Thank you.  Have you ever given a deposition before?
6  A   No.
7  Q   So do you understand that your testimony today is
8  under oath?
9  A   Yes.
10 Q   It's the same oath that you would be under if we were
11 in the court.
12 A   Yes.
13 Q   During the course of this deposition I'm going to do
14 my best not to speak over you, and I'll ask the same to
15 you, not to speak over me, so our court reporter here can
16 get a clean record.  Okay?
17 A   (Witness nods head in the affirmative.)
18 Q   I know that you and I, we tend to speak somewhat
19 fast, or we get excited and speak fast.  If you could,
20 just be mindful that our court reporter is trying take
21 down everything that we're saying.
22     Is there any reason why your testimony today wouldn't
23 be the truth, or the whole truth?
24 A   No.
25 Q   What do you do for a living, Ms. Caplinger?

Page 10

1  A   I am an attorney.
2  Q   And how long have you been an attorney?
3  A   I have been an attorney since 1996.
4  Q   Okay.  And where do you practice?
5  A   Where do I practice?
6  Q   Where do you practice?
7  A   Here in Crawford County, Sebastian County, mainly,
8  but the State of Arkansas.
9  Q   Okay.  And have you practiced here the entire time?
10 A   Yes.
11 Q   Okay.  Before you were a lawyer, what did you do?
12 A   Well, I was in retail.  I worked at Penney's, I
13 worked at Publishers Bookstore in Little Rock when it was
14 there, I worked at TG&Y.
15 Q   When you worked in the bookstore in Little Rock, what
16 did you do?
17 A   I was the children's book manager.
18 Q   What did your job duties entail?
19 A   I selected and purchased the children's books for the
20 children's department and I arranged and kept it orderly
21 and I helped clients select books -- or helped customers
22 select books.
23 Q   Did you go to school for that?
24 A   No.
25 Q   Did you have any training associated with that

Page 11

1  position?
2  A   No.  I have a degree in management.
3  Q   And where is that degree from?
4  A   Harding University.
5  Q   How long did you hold that job in Little Rock?
6  A   I think close to three years.
7  Q   And why did you leave that job?
8  A   We moved here to Fort Smith.
9  Q   Okay.  So where did you go to law school?
10 A   University of Arkansas at Fayetteville.
11 Q   So Harding and the University of Arkansas are the
12 only two --
13 A   Yes.
14 Q   -- places of higher education you've gone?
15 A   Yes.
16 Q   Okay.  Where did you go to high school?
17 A   David Hickman in Colombia, Missouri.
18 Q   Were you born in Missouri?
19 A   No.
20 Q   Where were you born?
21 A   Maryland.
22 Q   When did you move to Missouri?
23 A   We moved to Missouri in 1974.
24 Q   Okay.  And when did you move to Arkansas?
25 A   Well, other than attending college, I moved to

Page 12

1  Arkansas, let me think.  I think it was 1982 or '3.
2  Q   And have you lived here since?
3  A   Yes, I've lived in the State of Arkansas since --
4  with the exception of one year in Arizona.
5  Q   Okay.  What were you doing in Arizona?
6  A   My husband's job took us there.
7  Q   Okay.
8  A   But I worked for a bookstore.
9  Q   What did you do -- what bookstore did you --
10 A   It was Scribner's Bookstore.
11 Q   In Arizona?
12 A   In Arizona.
13 Q   And what did you --
14 A   In Scottsdale.
15 Q   -- do there?
16 A   We were starting -- they were opening a bookstore, so
17 basically arranged books and then assisted customers with
18 book selection.
19 Q   Did you have any training associated with any -- any
20 formal training -- did you have any formal training that
21 was required before you took that position?
22 A   No.
23 Q   Did you receive any formal training in association
24 with that position?
25 A   No.

Page 13

1 Q   And how long did you hold that job in Arizona?
2 A   A year.
3 Q   When you arranged the books in Arizona -- or with
4 that bookstore in Arizona, rather, any particular focus,
5 like children's books?
6 A   No, it was just storewide.
7 Q   All right. I'm going to get into kind of the lawsuit
8 now. It's -- you've brought this lawsuit against Crawford
9 County and a host of other prosecuting attorney
10 defendants. What is your understanding or reason --
11 what's your reason for bringing this lawsuit?
12 A   I am a library patron. I believe in the purpose of
13 libraries. I have used libraries since I was a small
14 child. They're very important to me personally, libraries
15 are important to me professionally, because without law
16 libraries where would we be?
17      It is -- it came to my awareness, through media, that
18 book -- libraries were being attacked around the country,
19 and then when I saw it happening here, I chose to get
20 involved.
21 Q   When you say you chose to get involved, how did you
22 do that?
23 A   I read an article, and I think it was the Press
24 Argus-Courier, which is the Van Buren newspaper, and saw
25 that these things were going on about book selection in

Page 14

1 the library, and so I spoke with the library director, who
2 at that time was Deidre -- and I cannot pronounce her last
3 name.
4      And we spoke for about an hour and then she put me in
5 touch with some other people who were -- have been
6 involved in dealing with the situation from the beginning,
7 and I have been involved since that time.
8 Q   And approximately when was that conversation with
9 Deidre?
10 A   It was in -- I think it was in February or March.
11 Q   So in approximately February or March you spoke with
12 Deidre; is that correct?
13 A   Yes.
14 Q   And what did you speak about?
15 A   What was going on, the situation in general.
16 Q   When you say, "the situation," what do you mean?
17 A   I wanted to speak with her because she was in charge
18 of the library, about the particular situation, what was
19 happening, who was involved in opposing the book
20 selection, what had been happening in general because I
21 had not been involved until that time and it had been
22 going on for several months, and we just talked in general
23 about the issues with the quorum court, the Crawford
24 County Quorum Court, and the library board, and then what
25 types of book were being targeted.

Page 15

1 Q   You said that you spoke with -- you just said that
2 you spoke with Deidre about the, quote, "particular
3 situation," that was occurring for several months here in
4 Crawford County --
5 A   Yes.
6 Q   -- is that right?
7      First, what particular situation? What are the
8 details of that situation that you're referencing? When
9 you say particular situation, what do you mean?
10 A   Well, I wanted to get a more factual basis than what
11 I had read in the newspaper, that was more particular
12 about what was happening with the library board and
13 meetings of the library board, and then what was happening
14 at meetings with the Crawford County Quorum Court
15 concerning the library and the library board.
16 Q   And when you say the library board, you're
17 referencing the Crawford County Library Board?
18 A   Yes, the Crawford County Library Board.
19 Q   And only that library board?
20 A   Yes.
21 Q   And you said that that particular situation, which
22 you've just described, had been going on for several
23 months?
24 A   Yes.
25 Q   To your knowledge when did it begin?

Page 16

1 A   I believe October and November. I know it --
2 definitely things were going on in November. It may have
3 started a little bit earlier than that, though, like
4 October.
5 Q   Of 20 --
6 A   2022.
7 Q   Okay. So in 2022, this particular situation arises
8 regarding the Library Board here in Crawford County and
9 the Quorum Court here in Crawford County; is that correct?
10 A   Yes.
11 Q   And you wanted to get a more factual basis regarding
12 the books that they were moving; is that correct?
13 A   And the activities -- well, the actual things that
14 were going on. I wanted more information than what had
15 been available in the newspaper article.
16 Q   And what did that newspaper article say?
17 A   Well, I'm trying to remember. It basically said that
18 they were having problems, that people had been
19 complaining about book selection at the library and I
20 think that's basically the gist of what I read about it.
21 Q   And so you went and met with Ms. Grzymala to figure
22 out the specifics of the issues related to those books?
23 A   Yes. Before -- I wanted to have a more factual basis
24 to make a decision about whether I wanted to be involved
25 or not.

Page 17

1 Q   Understood.  And I think that you said Ms. Grzymala
2 then directed you somewhere to get involved; is that
3 right?
4 A   Yes.
5 Q   Where?
6 A   She contacted, at that time -- members at that time.
7 They were called the AR/OK Advocates for Equality.
8 They're now called the American Advocates for Equality,
9 and they were a group that was kind of coordinating the
10 public dissent to the situation.
11 Q   Was it through this American Advocates for Equality
12 that you first came to know about Act 372?
13 A   I'm not sure.  At that time I may have been aware of
14 it before, but I certainly looked into it more after I got
15 involved with them.
16 Q   And when did you get involved with them?
17 A   Again, it would have been around the same time that I
18 talked with Deidre.
19 Q   So February or March?
20 A   February or March, yes.
21 Q   Okay.
22       MS. BROWNSTEIN: You're talking about 19 --
23       THE WITNESS: 2023, yes.
24 BY MR. MCLELLAND:
25 Q   Yeah, that's actually a helpful point.  I'll go

Page 18

1 through a quick timeline --
2 A   Sure.
3 Q   -- and you can confirm or correct me.  I have it in
4 October or November of 2022, there is a particular
5 situation that arises with the Crawford County Library
6 System.  You read -- then you read a newspaper article
7 some time at the end of 2022, beginning of 2023, and then
8 in February or March you speak with Deidre, who is in
9 charge of the Crawford County Library System, in February
10 or March of 2023 you speak with the American Advocates for
11 Equality.  Is that timeline correct?
12 A   Yes.
13 Q   Okay.  What did the American Advocates for
14 Equality -- how did they direct you to get involved?
15 A   They explained what they had been doing about
16 appearing at library board meetings and quorum court
17 meetings, some of that history, and invited me to attend
18 library board meetings and quorum court meetings and
19 explained, you know, a little bit about the members of the
20 group.  It wasn't really organized at that time, you know.
21 They had a name and they had people who were putting
22 things together.
23 Q   Did you ever attend a meeting?
24 A   Yes.
25 Q   How many meetings?

Page 19

1 A   Oh, let's see here --
2       MS. BROWNSTEIN: I'm going to -- a meeting
3 of what?  Please clarify.
4       MR. MCLELLAND: Yeah, I can clarify.
5 BY MR. MCLELLAND:
6 Q   Did you ever attend a meeting of the American
7 Advocates for Equality?
8 A   Yes.
9 Q   And how many meetings did you attend?
10 A   I think I've attended three or four by now.
11 Q   Were they in person?
12 A   In person, yes.
13 Q   And so what I'm -- I understand your testimony, but
14 maybe you can help me out.  I'm just struggling to figure
15 out how your meeting with the American Advocates for
16 Equality got you to being a Plaintiff in this lawsuit.
17 Maybe I misunderstood your testimony, but I was --
18 I'd asked you how you came to be a Plaintiff in this
19 lawsuit and you began to explain the particular situation,
20 Deidre and the --
21 A   Right.
22 Q   -- and the advocates --
23 A   Right.
24 Q   Can you connect --
25 A   Yes.

Page 20

1 Q   -- the dots for me?
2 A   Yes.
3       MS. BROWNSTEIN: Let him finish.
4       THE WITNESS: Okay.
5 BY MR. MCLELLAND:
6 Q   Can you connect the dots to how you ended up being a
7 Plaintiff in this lawsuit for me?
8 A   After talking with them, they informed me that they
9 were being -- looking into the possibility of filing a
10 couple of lawsuits and I spoke with Mr. Adams on the
11 phone.
12 Q   I don't want to know the contents of that --
13 A   Right, that's --
14 Q   -- and I see your attorney -- yeah, I want to be
15 clear.  I understand you spoke with Mr. Adams.  I do not
16 want to know the contents of that --
17 A   That's right, but that's how --
18 Q   Understood.
19       MR. ADAMS: He probably wants to know the
20 content of that.
21       MR. MCLELLAND: Oh, yes, I want to know,
22 but I respect the privilege.
23       THE WITNESS: I understand.
24 BY MR. MCLELLAND:
25 Q   And so, again, not knowing the contents of the

1 conversation you had with Mr. Adams, approximately how
2 many times did you speak with Mr. Adams?
3 **A    Maybe three times at that point, at least two.**
4 Q    Okay.  Not knowing the contents, just the number, did
5 you speak -- did you ever speak with any other attorney
6 that is on this lawsuit?
7 **A    No.**
8 Q    Okay.
9          MS. BROWNSTEIN: A timeframe?
10 BY MR. MCLELLAND:
11 Q    Beginning in October of 2022, until July of 2023.
12 **A    There is a possibility that at a quorum court meeting**
13 **I might have directed a comment to Mr. Wahlmeier or he**
14 **might have heard a comment, but it was not a one-on-one**
15 **conversation.**
16 Q    Okay.  I'm going to give you an exhibit here.
17          MR. MCLELLAND: For the people online, it's
18          just a copy of the Complaint, if you want to
19          pull it up for your own benefit.  We'll mark
20          this as Defendant's Exhibit 1.
21 (Defendant's Exhibit 1 was marked & attached hereto)
22      Ms. Caplinger, do you recognize the document that I
23 just handed you that I've marked as Defendant's Exhibit 1?
24 **A    Yes.**
25 Q    Okay.  And what is it a copy of?

1 **A    It is a copy of the Complaint originating this case.**
2 Q    And do you see your name appearing in the caption of
3 the first page?
4 **A    Yes, I do.**
5 Q    Do you see at the top where it says that this is Case
6 No. 5:23-cv-05086-TLB?
7 **A    Yes, I do.**
8 Q    Okay.  If you will flip to Page 25 of the Complaint,
9 I'm going to spend a little time walking through this
10 Complaint against Crawford County in this case.  It
11 states, in Paragraph 78, that over the past year a dispute
12 about materials in the Crawford County Library led to the
13 departure of the Library Executive Director.
14      Who was that person?
15 **A    At that time the Library Director was Deidre**
16 **Grzymala.**
17 Q    Okay.  The next sentence:  "In a November 10, 2022
18 letter, Crawford County residents, Jeffrey and Tammi
19 Hamby, alleged that the then CCL Director Deidre Grzymala,
20 and her employees were 'normalizing and equating
21 homosexual and transsexual lifestyles with heterosexual
22 family units' and sought greater participation in material
23 selection."
24      Have you reviewed a copy of that -- or have you ever
25 seen a copy of that letter?

1 **A    Yes.**
2 Q    Did you review that letter in preparation for today's
3 deposition?
4 **A    I have not.**
5 Q    Okay.  The next paragraph states that in December of
6 2022, Defendant Chris Keith appointed Tammi Hamby and two
7 others to the Crawford County Library Board of Directors,
8 forming a majority block on the five-member board.  On
9 January 10th, the Crawford County Library staff announced
10 that all branches of the Crawford County Library had,
11 quote, "moved there LGBTQ children's books out of the
12 children's section and into a new area within the
13 respective adult sections."
14      What is your knowledge of the movement of books that
15 are referenced in that January 10th announcement?
16 **A    Well, a -- in the main library they have created what**
17 **they're calling a Social Section and it has moved close to**
18 **200 books that would have been in the juvenile or the**
19 **young adult section to that particular section.**
20 Q    Let's unpack that for a little bit.  When did the
21 Social Section first come to be?
22 **A    I don't know specifically.**
23 Q    Is it safe to say, based upon your allegations,
24 though, that by January 10th --
25 **A    Yes.**

1 Q    -- they had it moved?
2          MS. BROWNSTEIN: I'm going to object.
3          These are not just her allegations that you're
4          reading.
5          MR. MCLELLAND: Okay.
6          MS. BROWNSTEIN: I mean, there are many
7          Plaintiffs in this case.
8          MR. MCLELLAND: Okay.  And I'll just note
9          for the record that only Ms. Caplinger has been
10          found to have standing.
11          MS. BROWNSTEIN: Well, that's a legal
12          question that's not a subject of this
13          deposition, so I just want to make it clear that
14          these allegations cannot just be attributed to
15          Ms. Caplinger.
16          MR. MCLELLAND: Okay, objection noted.
17 BY MR. MCLELLAND:
18 Q    Ms. Caplinger, are you aware -- by the end of January
19 of 2023, was the Social Section in effect in the Crawford
20 County Library System?
21 **A    Yes.**
22 Q    Was it in effect by January 10th?
23 **A    I do not know.**
24 Q    Who created the Social Section?
25 **A    Deidre Grzymala.**

1  Q   Okay.  And you said that the social section moved
2  books that would be in the young adult section or the --
3  A   Yes.
4  Q   -- juvenile section; is that correct?
5      And moved them to another section?
6  A   Another part of the library, which is -- you know,
7  libraries are set up in sections.  You know, they have
8  Dewey Decimal and Library of Congress numbers that usually
9  are subject oriented, and so they created what they're
10 calling the Social Section to put these books in that had
11 been challenged from the quorum court.
12 Q   They were challenged --
13 A   Or at the -- at the quorum court's direction.  These
14 books had been challenged in general and the quorum court
15 asked Ms. Deidre Grzymala to do something with them and
16 that -- suggested moving them to another area in the
17 library.
18 Q   When you say challenged, the books were challenged,
19 challenged by whom?
20 A   Well, there were several people who -- the library
21 has a challenge system.  Anybody who thinks that a book
22 should not be in the library can challenge that book for
23 whatever reason.  Some of those books had been challenged by
24 individuals.  Some of those individuals had apparently
25 contacted the quorum court, as did Tammi Hamby and her

1  husband.  So the quorum court wanted to find some sort of
2  temporary solution, is my understanding.
3  Q   You also said -- speaking of the temporary solution,
4  I believe you just gave testimony, a moment ago, that said
5  that the quorum court directed Deidre to make the Social
6  Section; is that correct?
7  A   Indirectly.
8  Q   Indirectly.  How do you mean?
9  A   They asked if she could move them to another part of
10 the library.
11 Q   Okay.  And who, on the quorum court, asked that?
12 A   I do not know.
13 Q   Okay.  So Deidre moved these books at the direction
14 of the quorum court; is that correct?
15 A   Yes.
16 Q   And where did she move them to?  Where are they now
17 located?
18 A   Okay.  Physically?
19 Q   That's fine, yes.
20 A   Okay.  When you go to the main branch of the Crawford
21 County Library --
22 Q   And when you say main branch, you mean here in Van
23 Buren?
24 A   The one in Van Buren.
25 Q   Okay.

1  A   There is a foyer.  You walk into the library and on
2  the -- let me make sure I get my directions right.  On the
3  left is the checkout counter and the librarian's desk.  On
4  the right is the children's books section, which is
5  actually a separate room.  Then you go on into the library
6  past that desk and there are several tables set up in a
7  row and there is a bookshelf.  The first bookshelf you
8  come into where they show the new books, whether they're
9  adult's or children's fiction and nonfiction, on the back
10 of that bookshelf or stack is where the social section has
11 been placed.
12 Q   And I believe you said earlier that the main branch
13 of the library, the Social Section houses about 200 books?
14 A   I think, approximately.
15 Q   Okay.
16 A   There may have been more added since I last counted.
17 Q   So you walk in the library, you go past the
18 children's section that's on the right, the checkout
19 counter is on your left.  The first shelving section on my
20 left houses, on one side, the new books, and the other
21 side, it houses the social section; is that correct?
22 A   Yes, and other books as well.
23 Q   And other books as well.  To access that social
24 section shelf, is there a physical door --
25 A   No.

1  Q   -- or barrier that prevents -- or physical barrier
2  that prevents me going into that social section?
3  A   No.
4  Q   Are you aware of any policy, by the Crawford County
5  Library System, that designates the social section as
6  adults only?
7  A   The library has a policy that children under the age
8  of ten should be accompanied by an adult.  There is a sign
9  in that section indicating that policy.
10 Q   I understand the policy of -- the policy of children
11 under ten being accompanied by an adult.  Are you aware
12 whether that policy is specific to the social section or
13 is it a general policy?
14 A   It's a general policy.
15 Q   Meaning it applies to the entire library?
16 A   Yes.
17 Q   Do you know if it applies at all the branches or is
18 it just here at the main branch?
19 A   I believe it applies to the library system as a
20 whole.
21 Q   But are you -- and I appreciate the insight on the
22 policy related to 10-year-olds, but are you aware of any
23 policy that says explicitly the social section is for
24 those 18 years and older only?
25 A   No.

1 Q   Are you aware of any reason why a 17-year-old could
2 not access the social section if they were -- if they were
3 able to get to the main library branch here in Van Buren
4 and were able to get through the main door?  Are you aware
5 of any reason why that 17-year-old would be prevented from
6 going into the social section?
7 A   No.
8 Q   I know we've spoken a lot about the social section so
9 far, and the particular situation here in Crawford County,
10 but it's my understanding that your lawsuit is seeking to
11 enjoin a statute that was passed by the State of Arkansas?
12 A   Yes.
13 Q   Okay.  What is the name of that statute?
14 A   I don't know --
15 Q   Sorry, let me rephrase.  What's the act number, if
16 you know?
17 A   I believe it was Act 372 of the 2023 legislature.
18 Q   When was Act 372 signed into law; do you know?
19 A   Not specifically.
20 Q   So Act 372 was passed in 2023?
21 A   Yes.
22 Q   Signed into law at some point in 2023.  You are
23 seeking to -- it's my understanding that you are seeking
24 to enjoin that act on its face.  It's what I'll call
25 facial challenge.

1        MS. BROWNSTEIN: I'm going to object.  She
2     is an attorney, but she's not a civil rights
3     attorney and anything that's asking her legal
4     questions, I'm going to object to.  She's here
5     as a fact witness.
6 BY MR. MCLELLAND:
7 Q   Ms. Caplinger, can you please go to Page 2?  And to
8 be clear, for the record Page 2 of Defendant's Exhibit 1.
9    Have you turned there, Ms. Caplinger?
10 A   Yes.
11 Q   Defendant's Exhibit 1 is a copy of the Complaint you
12 filed in this lawsuit.  Did you review this Complaint
13 prior to your deposition?
14 A   Not specifically.
15 Q   What do you mean by that?
16 A   I have read this.  I did not specifically review it
17 for -- just for today.
18 Q   Understood.  Did you review it before it was filed?
19 A   Yes.
20 Q   Are the allegations -- will you please review
21 Paragraph 1 of the Complaint, and I'm going to read it as
22 well.  It states that this action concerns whether
23 Arkansas may enforce parts of the recently enacted Act 372
24 of 2023, a vague, sweeping law that restrains public
25 libraries and booksellers in Arkansas from making,

1 available, constitutionally protected books and other
2 media to their patrons and customers.
3     Specifically, Plaintiffs seek to preliminarily and
4 permanently enjoin an enforcement of and declare facially
5 unconstitutional and void Sections 1 and 5 of Act 372 as
6 violations of their rights under the First and Fourteenth
7 Amendments of the U.S. Constitution.
8     Did I read that right, Ms. Caplinger?
9 A   Yes, you did.
10 Q   And is that your allegation against all Defendants in
11 this case?
12 A   Yes.
13 Q   And so where it says declare facially
14 unconstitutional, that's your allegation?
15        MS. BROWNSTEIN: Again, note my objection
16     for asking any kind of legal analysis or
17     conclusion from this witness who is here as a
18     fact witness.
19 BY MR. MCLELLAND:
20 Q   I understood -- I believe my question was does your
21 allegation state declare facially unconstitutional?  Is
22 that what that states?
23 A   Yes.
24 Q   Okay.  So your allegation in Paragraph 1 is what I'm
25 referencing.  Section 1 of Act 372, what does it do?

1 A   Do you have a copy of the statute?
2 Q   I do.  We'll put this in as Defendant's Exhibit 2.
3 (Defendant's Exhibit 2 was marked & attached hereto)
4        MS. BROWNSTEIN: Excuse me, do you need
5     more water?
6 BY MR. MCLELLAND:
7 Q   Oh, yeah, and I should have said this at the
8 beginning.  If you need a break at any time, please let
9 your attorney know and --
10 A   Sure.
11 Q   -- let us know and we can take a break.
12    Do you want to take a break now for water?
13 A   Yeah, if you don't mind.
14        MR. MCLELLAND: Okay.  We'll go off the
15     record.
16     (Brief recess was taken.)
17 BY MR. MCLELLAND:
18 Q   All right, we're back on the record.  Ms. Caplinger,
19 I was about to introduce what we've titled Defendant's
20 Exhibit 2, which is a copy of Act 372.  You have a copy of
21 that in your hands, correct?
22 A   I do.
23 Q   The top of Defendant's Exhibit 2, do you see where it
24 states Case No. 5:23-cv-05086-TLB?
25 A   Yes.

1 Q   And it says Document 2-1?

2 A   Yes.

3 Q   Okay.  Before going on the break I asked you what

4 Section 1 of Act 372 does based upon your allegations in

5 Paragraph 1 of your Complaint.  What does -- and you asked

6 for a copy of this act.  What does Section 1 do, according

7 to Act 372?

8         MS. BROWNSTEIN: Note my objection to any

9         attempt to hold her to a legal understanding of

10        this act.

11 BY MR. MCLELLAND:

12 Q   Yeah, agreed.  I just want to know what is your

13 understanding of Section 1 that you're trying to stop in

14 this lawsuit.

15 A   Well, there are a great deal of definitions in

16 Section 1 and it describes that the act of furnishing a

17 harmful item to a minor --

18 Q   And where are you referencing that definition?  You

19 can use the page number at the bottom.

20 A   Okay, on Page 2.

21 Q   Line number?

22 A   Line No. 14.

23 Q   Okay.

24 A   No, not 14, Line No. 26.

25 Q   Okay.  Page 2, Line No. 26?

1 A   Yes.

2 Q   I'm there.

3 A   So it describes how a person commits furnishing a

4 harmful item to a minor.

5 Q   And that is what you're trying to stop in this

6 lawsuit.

7 A   What we're trying to stop was the application of this

8 to librarians.

9 Q   The application of Section 1?

10 A   Yes.

11 Q   To librarians?

12 A   Yes.

13 Q   And what does Section 1 do to librarians?

14 A   In and of itself it provides the description of a

15 crime.  Section 2 specifically applies it to libraries.

16 Q   So Section 1 creates -- defines a crime of furnishing

17 harmful material to a minor?  Is that your testimony?

18 A   Yes.

19 Q   Okay.  And you're saying that Section 2 then applies

20 it to the librarians?

21 A   Yes, the library, specifically the public library.

22 Q   Okay.  Are you asserting, in this lawsuit, that

23 Section 1 applies to Crawford County?

24 A   Yes.

25 Q   Okay.  Are you asserting that Section 5 applies to

1 Crawford County in this lawsuit?

2 A   Yes.

3 Q   What does Section 5 do to Crawford County?

4 A   It creates the requirements for challenging materials

5 in the library, and it adds the qualification that if the

6 person is not happy with the library's decision about a

7 challenged piece of material, they can appeal that

8 decision to the executive head of the city -- county or

9 city, which would be the quorum court or the city

10 directors, and then they make the final determination.

11 That's -- I'm sorry, would be on Page 9, Sub 12, Sub A,

12 starting on Line 8 and then going down.

13 Q   So Act 372 would require Crawford County to implement

14 this challenge procedure?

15 A   Yes.

16 Q   And it would require this appeal process as well?

17 A   Yes.

18 Q   Are you aware whether Crawford County is able to

19 deviate from this?  I'll rephrase.

20 A   Okay.

21 Q   You said that this would require Crawford County to

22 create a challenge policy; is that right?

23 A   The Crawford County Library?

24 Q   Yes.

25 A   Yes.

1 Q   Thank you.  Do you see on Page 7, Line 15 and 16, and

2 I'm going to read this and if I don't read it correctly,

3 please correct me.

4     Line 15 begins: "A written policy adopted by a

5 county or municipal library under Subsection B of this

6 section shall provide, at a minimum, the following:"  And

7 then it lists subpoints.

8 A   I was on the wrong page.  Just a moment.

9 Q   That's okay.  Do you see on Page 7, Line 15, where it

10 states: "A written policy adopted by a county or

11 municipal library under Subsection B of this section shall

12 provide, at a minimum, the following," and then it lists

13 subparts?  Do you see where I stated Line 15 and 16?

14 A   I'm on the wrong page again.  I don't have a Page 7.

15 I have 6 and I have 8.  I apologize.

16 Q   That's okay.

17         MS. BROWNSTEIN: I'll hand it to her.

18 A   Now, if you don't mind, let me take a look at this

19 for a second.

20 Q   Yeah, go ahead.

21 A   Okay.

22 Q   And I read that correctly?

23 A   Yes.

24 Q   Okay.  Did Act 372 ever go into effect?  Was it ever

25 the law in Arkansas?

1 A  It was enjoined, so it has not yet gone into effect,
2 as far as the sections we have challenged.
3 Q  Okay.  And that is Section 1 and Section 5?
4 A  Yes.
5 Q  So Section 1 and Section 5 aren't in effect right
6 now?
7 A  No.
8 Q  When was it enjoined?  If I was to tell you --
9 A  When the judge signed the order.
10 Q  Yeah, I think we can be candid here.
11 A  Sorry.
12 Q  You remember testifying at the preliminary injunction
13 hearing?
14 A  Yes, I did.
15 Q  That was July 25th of 2023?
16 A  Yes.
17 Q  Okay.  Judge Brooks issued his order some days later
18 and enjoined the act, so this act has never gone into
19 effect in Arkansas?
20 A  Those sections.
21 Q  Those sections have not gone into effect in Arkansas?
22 A  Yes.
23 Q  Including here in Crawford County?
24 A  Yes.
25 Q  Okay.  Do you remember testifying at the preliminary

1 injunction hearing on July 25th?
2 A  I do.
3 Q  What was the nature of your testimony?
4 A  You have a transcript.  I'm -- I'm not sure.  I can't
5 quote exactly.
6 Q  If I was to tell you that your testimony -- would you
7 agree with me that your testimony was in relation to
8 authenticating Minutes from the Library Board of Crawford
9 County and the Quorum Court of Crawford County?
10 A  Yes.
11 Q  Okay.  Do you remember giving testimony, at the
12 preliminary injunction hearing, that in authenticating
13 those documents, that you attended those meetings?
14 A  I had attended some of those meetings.
15 Q  Yes, you attended some of them and I believe that you
16 attended some in person and some virtually?
17 A  Yes.
18 Q  Do you know specifically which ones you attended in
19 person and which ones you attended virtually?
20 A  Not off the top of my head.  I attended the very
21 first quorum court meeting that I went to in person.  I
22 made a statement to the quorum court.
23 Q  What date was that?
24 A  I'm sorry, it was the next meeting.  It was probably
25 March or April.

1 Q  Of?
2 A  Of 2023.
3 Q  Okay.  And so your first meeting was in approximately
4 March or April of 2023?
5 A  Yes.
6 Q  Did you ever attend any library board meetings?
7 A  Yes.
8 Q  Did you attend them both virtually and in person?
9 A  Yes.
10 Q  Do you remember when your first library meeting was?
11 A  It would have been in March or April.
12 Q  March or April of 2023?
13 A  Yes.
14 Q  Earlier you talked about Ms. Grzymala moving the
15 books in the Crawford County Library System.  Do you
16 remember giving testimony about that topic?
17 A  Yes.
18 Q  And you said she did so at the indirect direction of
19 the quorum court.  Do you remember testimony to that
20 effect?
21 A  Yes.
22 Q  Okay.  I'm going to introduce Defendant's Exhibit --
23 I think we're up to 3.
24 (Defendant's Exhibit 3 was marked & attached hereto)
25     Take a moment to review this.  It's listed as Bates

1 stamp Crawford County 23 to Crawford County 30.
2 A  Okay.
3 Q  Specifically 27 and 28.
4 A  Okay.
5 Q  Take your time.
6 A  Okay.
7 Q  Did you attend the December 19th meeting?
8 A  I did not.
9 Q  Okay.  You referenced earlier that Ms. Grzymala had
10 been indirectly told to move the books in the social
11 section.  Do you remember that testimony?
12 A  Yes.
13 Q  Are the Minutes written here on Page 27 to 28 the --
14 at least part of the indirect --
15 A  Yes.
16     MS. BROWNSTEIN:  Let him finish the
17       question.
18 Q  -- direction to Ms. Grzymala?
19 A  Yes.
20 Q  Okay.  So looks like the Crawford County Quorum
21 Court -- let me find it, sorry.
22     Okay.  So it states here on these Minutes that Justin
23 Peppas -- I hope I'm saying that right -- stated that
24 nobody was asking for her job, just a compromise in the
25 situation.  Ms. Grzymala stated that she was more than

1  willing to make a compromise.  I did have them take the
2  LGBT books out of the children's section and make an LGB
3  section for itself, so that families who want to check out
4  those books can go over there and check them out, and for
5  the ones that don't want to see it, it's not in the
6  children's section.
7      Do you see where I read that?
8  A   Yes.
9  Q   In this Minutes entry, are you aware in the sentence
10  where it says I did have them take the LGBT books out, who
11  the I is referencing?  Is that Justin Peppas or is that
12  Ms. Grzymala?
13  A   I believe it's referencing Ms. Grzymala.
14  Q   Okay.  So Ms. Grzymala instructed them, whoever they
15  are, to take the books out of the children's section and
16  make an LGB section for itself, so families who want to
17  check out those books can go over there and check them
18  out, and for the ones that don't want to see it, it's not
19  in the children's section.  Is that what the sentence
20  says?
21  A   That's what the Minutes say, yes.
22  Q   Yeah, that's what the Minutes say, that's fair.
23      Okay.  So those Minutes are from December 19th of
24  2022.  We'll make that Defendant's 4 for the Crawford
25  County Library Minutes from January 10th, 2023.

1  (Defendant's Exhibit 4 was marked & attached hereto)
2      Take a minute to review them.  The page numbers on
3  the bottom should have be Crawford County 3 to Crawford
4  County 4.
5  A   Okay.
6  Q   Do you see at the top where it says January 10th,
7  2023?
8  A   Yes.
9  Q   Will you flip over to the next page, Crawford County
10  Bates stamped 4, Line D.  Does it state:  "Compromise with
11  Quorum Court - Outlined by Grzymala, the library has
12  agreed to put the books in an Adult Section labeled S and
13  have color labels on books requiring parental guidance"?
14  A   That's what the Minutes say, yes.
15  Q   Where it says that they're in an Adult Section
16  labeled S, is that referencing the Social Section?
17  A   Yes.
18  Q   We talked about this earlier, but is the social
19  section restricted to those only 18 and older?
20  A   No.
21  Q   Okay.  Is there any Crawford County Library policy
22  that requires parental guidance as it says in the Minutes?
23  A   Yes.
24  Q   Okay.  What is that policy?
25  A   That children under the age of ten should be

1  accompanied by adult.
2  Q   And that policy, though, is for the entire library?
3  A   It's for the entire library.
4  Q   Does it apply to the children's section?
5  A   I assume it does.
6  Q   Does it apply to the young adult section?
7  A   I would assume it does.
8  Q   It applies to the social section?
9  A   Yes, it's specifically referenced again at the social
10  section.
11  Q   But it applies -- that policy applies library-wide?
12  A   Yes.
13      MR. MCLELLAND:  All right.  Can we take
14  about a 10-minute break?
15      MS. BROWNSTEIN:  Sure.
16      MR. MCLELLAND:  I think I'm almost done.  I
17  just want to go over my notes and then I will
18  pass the witness.  Let's come back at 10:32.
19      (Brief recess was taken.)
20  BY MR. MCLELLAND:
21  Q   All right.  Ms. Caplinger, we're back on the record.
22  You understand that your testimony is still under oath?
23  A   Yes.
24  Q   I just have a few more questions for you.  We've
25  referenced, a couple of times in this deposition, a

1  general policy that 10-year-olds and younger must be
2  accompanied by a parent.
3      Are you aware when that policy came to be?
4  A   I have no idea.
5  Q   Okay.  Do you remember discussing earlier the
6  location of the social section in the main branch of the
7  Crawford County Library here in Van Buren?
8  A   Yes.
9  Q   And when you described it to me, you told me that on
10  the right-hand-side there's a children's section?
11  A   Yes.
12  Q   What's it -- can you describe it?  Is it just one
13  shelf, is it --
14  A   It is --
15  Q   -- several shelves?
16      MS. BROWNSTEIN:  You've got to let him
17  finish.
18      THE WITNESS:  I'm sorry.
19  BY MR. MCLELLAND:
20  Q   No, you're okay.  Is it several sections, one
21  section; can you just describe the children's section?
22  A   It is a room and probably about -- well, it's a --
23  it's a large room.  It has glassed-in windows and it has
24  multiple shelves.
25  Q   Can people in the general adult section see into the

Page 45

1 children's section through those glass walls?
2 A  Yes.
3 Q  Okay.  And the children in the children's section can
4 see out --
5 A  Yes.
6 Q  -- into the general adult section?
7 A  Yes.
8 Q  Is there any -- you described it as its own room with
9 glass walls; is that correct?
10  The children's section is its own room in the library
11 with glass walls; is that correct?
12 A  Yes.
13 Q  Okay.  Is there a door to that room, or is it just an
14 open area?
15 A  I believe there's a door.
16 Q  Okay.  If you will pull -- if you can reference
17 Defendant's Exhibit 1 and turn to Page 25, and if you'll
18 review Paragraphs 78, 79, 80, 81 and 82.  If you'll just
19 review those and let me know when you're done.
20 A  Okay.
21 Q  Okay.  Earlier there was an objection on the record
22 that the allegations in the Complaint were perhaps not
23 yours or were the combination of others.  You've reviewed
24 Paragraphs 78, 79, 80, 81 and 82 of the Complaint.
25  Are these allegations yours, and if not, which ones

Page 46

1 are not yours?
2 A  None them are specifically mine.
3 Q  Okay.  So you're not making -- so you're not
4 asserting Paragraph 78, 79, 80, 81 or 82 against Crawford
5 County?
6 A  No, they go against Crawford County.
7 Q  Okay.
8 A  I'm saying I did not specifically write them.
9 Q  And I understand that you didn't specifically write
10 them.  I'm assuming your attorney wrote them, but are
11 these words, written in these paragraphs, reflective of
12 your allegations against Crawford County?
13 A  Yes.
14 Q  Okay.  Are you aware whether there are any -- are
15 there any areas in the Crawford County Library System --
16 at any of its branches, are there any sections at those
17 branches that are restricted to those 18 and older?
18 A  Not that I'm aware of.
19 Q  Okay.  We'll pass the witness.
20  MR. CHADICK:  This is Vincent Chadick for
21 Fayetteville Public Library and I have no
22 questions.
23  MR. MCLELLAND:  Okay.  We'll let Noah go.
24  EXAMINATION
25 BY MR. WATSON:

Page 47

1 Q  I've got a couple of questions here, Ms. Caplinger.
2  Thank you for your time today.  I'll try and be
3 quick, especially for a fellow Harding University
4 graduate, I'm making this as painless as possible.
5  So, first, I want to go back to something we talked
6 about quite a while ago.  You mentioned that you've had
7 two experiences working in bookstores.  One was in Little
8 Rock and another one was out in Arizona.  I believe it was
9 Scottsdale?
10 A  Yes.
11 Q  In both of those I believe you said that you were
12 involved in selecting what materials came into the
13 selection of the collection of the library -- excuse me,
14 of the bookstore.
15 A  At the first one.
16 Q  At the first one?
17 A  At Publisher's Bookstore I did.
18 Q  Okay.  And that was with the children's books?
19 A  Yes, specifically.
20 Q  Okay.  How did you make that decision, if you
21 remember?
22 A  Well, there -- at that time, this was in the '80s,
23 there were multiple reviews of books that would be
24 published, that would give you an indication of the
25 quality of the book by author or illustrator for

Page 48

1 children's books.
2  Also, that was still a time when traveling book
3 salesmen came through, and so we would meet with the books
4 salesmen and they would show us copies of books that they
5 were highlighting that year, whether they were -- usually
6 new books of some sort or the other.
7 Q  And did you accept or select every book that was
8 presented to you?
9 A  No.
10 Q  All right.  So you had to make some sort of decision?
11 A  Yes.
12 Q  And what did you base that decision on, like what
13 criteria?
14 A  Well, I based the criteria on what I knew about the
15 author, what I knew about the illustrator, how well those
16 books by those authors or illustrators might have sold in
17 the past, and trying to have a variety of books for the
18 different ages and different interests of children.
19 Q  So you would consider things like local interests,
20 specifically in your community in Little Rock, as opposed
21 to, you know, Washington, D.C. or something?
22 A  Well, I -- based on sales, I considered the community
23 and things that would also encourage children to read.
24 Q  Okay.  And do you recall ever not selecting a book
25 based on the subject matter or material within it?

1  A    No.

2  Q    Might you have if a certain -- if something was ever

3  given to you?  Like was there a balance to that?

4        MS. BROWNSTEIN: I want to object --

5  BY MR. WATSON:

6  Q    That was a bad question.  Just forget it, it was a

7  poorly-worded question.

8        Was there any limit to what -- what you might

9  consider appropriate for children in the content that

10 would have caused you not to select a material?

11 A    I don't know that I ever considered that.

12 Q    Okay.  It just never crossed your mind?

13 A    (Witness shaking head from side to side.)

14 Q    All right.  Then I will move on to a little more

15 recent and move to Act 372, which, as we mentioned, is

16 what this lawsuit is about.

17       So Mr. McLelland was asking you questions

18 specifically about Section 1, which is furnishing to a

19 minor material that is harmful to a minor.  That's what

20 that criminalizes.  You said, I believe, that you were

21 challenging that to stop its application to librarians.

22 Do you recall that?

23 A    Yes.

24 Q    Is that the only reason you're challenging Section 1?

25 A    Well, it also applies to booksellers.

1  Q    So you're also challenging it for that purpose?

2  A    Yes.

3  Q    Okay.  And what specifically -- well, are you a

4  librarian?

5  A    I am not.

6  Q    Are you a bookseller?

7  A    I am not.

8  Q    Okay.  So how does Section 1 affect you, I guess I'm

9  still trying to get to?

10 A    As a patron of the library and as a patron of

11 bookstores, my husband and I are both avid readers and

12 have been for years, and so we regularly looked for new

13 books, and old books as well that we might not have that

14 we would like to read by classic authors.

15       So if books were segregated in an effort to keep them

16 away from the prying eyes of children, that, again, would

17 influence our ability to see those books that would not be

18 necessarily improper for an adult to read, or have a, you

19 know, difficult subject matter, which some of these books

20 are related to difficult subject matters, and it would,

21 depending upon how booksellers and librarians react to

22 these statutes, affect the -- the amount of books there

23 are for me to read or to find.

24 Q    So you just said depending upon how the librarians

25 and booksellers react.  Are you aware of how they would

1  react if the law went into effect?

2  A    Based upon the experience that I've had so far with

3  the Crawford County Library System, yes, they would react

4  with fear.  They are afraid of being arrested, they are

5  afraid of the conflict, and negative publicity that has

6  been generated so far.  They are concerned about their

7  financial support and the public support because they are

8  a publically-supported, taxpayer-funded organization.  So

9  I know that they are very, very concerned about how this

10 will affect them should it go into effect.

11       I'm not as aware of how booksellers might react,

12 however, based on my shopping experience at

13 Books-A-Million, they would have to probably remodel the

14 store or something to add closed-off sections to the --

15 the store, which is basically, you know, a huge, open

16 space.

17 Q    So you mentioned that librarians would be afraid of

18 several things, and you mentioned earlier you were not a

19 librarian, so how are you -- how do you know they would be

20 afraid of, you know, arrests, publicity, their finances?

21 A    From the discussions that I've heard at the library

22 board meetings, from discussions that I had with

23 Ms. Grzymala, from discussions at the advocates meetings.

24 There are actually some librarians who belong to that

25 group.

1        And so there's just been general discussion of how

2  they're concerned it will affect their ability to choose

3  books.  And then, of course, the targeting of librarians

4  by groups, like the River Valley City Elders, who would

5  use the statute as an excuse to bring attention and create

6  publicity for them as somehow standing up for the

7  community.

8  Q    So I know you mentioned earlier, to Mr. McLelland,

9  that you're aware that Section 2, which -- well, what it

10 amends -- at one point, provided an exemption for

11 librarians from prosecution for certain crimes --

12 A    Yes.

13 Q    -- and that Section 2 would remove that exemption.

14 Did I understand correctly that that's what you said?

15       MS. BROWNSTEIN: I've got to renew my

16       objection to asking for her legal understanding

17       for what the effect of act -- of the act is.

18 A    Yes.

19 Q    Okay.  And I will represent to you that that is also

20 my understanding, that Section 2 removes that exemption.

21       Are you aware that that is not being challenged in

22 this case?

23 A    What's not been challenged?

24 Q    Section 2, the removal of the exemption has not been

25 challenged.

Page 53

1  A  Yes.

2  Q  Okay.  And, also, with bookstores, you mentioned that

3  they would have to remodel.  You no longer work at a

4  bookstore, correct?

5  A  Uh-huh.

6  Q  Or the Books-A-Million specifically that you had

7  mentioned?

8  A  No.

9  Q  So that's just your best guess about what they would

10  have to do?

11        MS. BROWNSTEIN: I object to the form of

12        the question.  You can answer.

13  A  Yes.

14  Q  Okay.

15  A  Based upon my experience in that industry and

16  retailing.

17  Q  Have you spoken to anyone at Books-A-Million?

18  A  I have not.

19  Q  Okay.  You also mentioned that you believe that

20  Section 1 might inhibit your ability to access certain

21  books, and then later on you said -- you were talking

22  about having to remodel and move things.  Are those two

23  connected?

24  A  Yes, they are connected.  If, based on fear and

25  trying to avoid controversy, the libraries choose the

Page 54

1  option of moving those sections to another room or even a

2  locked area, then that would impede my access to those

3  books.

4        I would have to ask the librarian for access, which,

5  again, it -- one, I don't like having to ask the librarian

6  for access to books that are not wrong for me to look at,

7  no matter what else is in there.

8        People's understanding, because unfortunately there's

9  been a great deal of push in the community that somehow

10  these books are obscene and that they are going to cause

11  people to harm children and I have not found that to be

12  accurate, but that is the public perception.

13  Q  So you would still have access to those books,

14  though, if things were rearranged like you were

15  describing?

16  A  I hope so.

17  Q  Okay.  So I'm just trying to understand that, because

18  at first you said it would impede your access, but now

19  you've said you'd still have access to it?

20  A  Technically I would have access.  The difficulty of

21  that access, I do not know what it would be.

22  Q  Okay.  So it's just a guess at this point?

23  A  Yes.

24  Q  Okay.  I also want to come back to the statement you

25  said that from what you've been able to tell, these books

Page 55

1  and materials, whatever, are not obscene, right?

2  A  Yes.

3  Q  So I'm not asking for your opinion about what it

4  means, but you have had a chance to look over Section 1, I

5  believe, today or in the past?

6  A  Yes.

7  Q  Are there any books, that you are aware of, that you

8  wanted to have access to, that would fall under Section 1?

9  A  I don't know.

10  Q  Okay.  Are there any other materials you might check

11  out at a library that fall under Section 1?

12  A  I don't know.

13  Q  Okay.  And would any books from bookstores that you

14  might want to purchase fall under Section 1?

15  A  I don't know.

16  Q  I'm just making sure I check all the boxes.  And

17  other materials you might purchase from a bookstore that

18  would fall under Section 1?

19  A  I don't know.

20  Q  So as we sit here today, you're unaware of anything

21  that you would want to access that is regulated by Section

22  1?

23  A  The problem is application by those in charge of

24  providing those items.

25  Q  So it's not the law itself, it is just how that may

Page 56

1  be applied?

2  A  It's both.  The law exists, then people try to apply

3  it.  So if the law didn't exist, there wouldn't be a

4  problem with the application.

5  Q  Fair enough.  I'm just making sure I understand.  But

6  you just told me that there's nothing you know of that you

7  want to access that falls under Section 1.  So I'm just

8  confused about how the law is a problem, as opposed to the

9  application.  I'm just trying to figure that one out.

10  A  The reason I do not know, is because if this is

11  interpreted widely, they might choose books, even classic

12  books, that are of a very mature subject matter, shall we

13  say, that I might choose to want to read at some point in

14  the future.  You know, I don't know what I'm going to want

15  to read next year.

16  Q  And when you say "they," who do you mean?

17  A  The purchasers of such books or the library personnel

18  who choose such books.

19  Q  Okay.  And I think that's all I'll ask about

20  Section 1.  I promise I'm getting close to wrapping up.

21  A  You're fine.

22  Q  I'd like to, very quickly, move on to Section 5,

23  which is the section that's certain procedures that

24  libraries must adopt.  Are you aware of any current

25  requirements regarding library challenges to books that

1  exist?

2 A  Yes, under -- the library has a policy to allow

3  patrons to challenge a book and that policy ends with the

4  librarian's decision. So it is not as complicated as it

5  would be under this statute if the statute went into

6  effect.

7      The statute also brings in people who are not

8  qualified, in my opinion, to make a decision about these

9  books by referring it to the city directors and the quorum

10  court. They have limited time, and certainly for the

11  quorum court, it's not in their job description in any

12  way, shape or form, whether they have adequate education

13  to make those decisions, and the political implications of

14  the pressure that could be placed upon them to not return

15  a book.

16      I believe that's why the statute has been written

17  this way, because it's putting public pressure on the

18  elected officials. Otherwise there's no reason for it to

19  be that way. It's always been a judicial question. It is

20  a jury question whether a book is obscene or not.

21      This changes all of that and puts people who have far

22  better things to do, as far as the public's interest to

23  take care of, rather than completely reading any book that

24  the person who's challenging it does not accept the

25  librarian's decision.

1 Q  And just for clarification purposes, I assume you're

2  speaking about the Crawford County Library?

3 A  The Crawford County Library has a policy, yes.

4 Q  Okay. Are you aware of any other library's --

5 A  It's my understanding --

6 Q  -- policy?

7 A  -- that it's part of the standards of the ALA, the

8  American Library Association, that libraries have such

9  policies.

10 Q  So if I understand you correctly, it is not -- the

11  problem is not that there is some challenge procedure,

12  it's just the specific one laid out in this act?

13 A  Yes.

14 Q  Okay.

15 A  The library -- again, the library has such a policy.

16  It has worked fine for all the years that they've had it.

17  People may or may not be happy, but it has worked.

18 Q  Okay. And are you aware of anything that limits the

19  librarian's decision-making? Is there anything that

20  limits that decision, or can they do whatever they want?

21 A  Well, I believe they would want to try to apply the

22  statute to their decision in determining if something is

23  harmful.

24 Q  And to be clear, outside of Act 372, is there --

25 A  No.

1 Q  -- is there anything that --

2 A  I mean --

3 Q  -- cancel's librarian's decisions, that you're aware

4  of?

5 A  I mean, the -- again, the American Library

6  Association has standards for books to be placed in

7  libraries, so they already have standards in general.

8  Outside of Act 372, that's what they use.

9 Q  Okay. So there's no legal requirements that you're

10  aware of?

11 A  No.

12 Q  And then you also said you had concern with the

13  elected officials making these --

14 A  Yes.

15 Q  -- decisions under Act 372?

16 A  Yes.

17 Q  Can you explain to me why you have those concerns?

18 A  Based on my attendance at the quorum court meetings,

19  it has been apparent to me, in my personal opinion, that

20  there are some who have already decided, for whatever

21  reason, against the library. Some of them are just

22  completely mean about the subject. They're not very

23  professional how they handle their meetings or the

24  subject.

25      I am acquainted with two of the members that were

1  JPs. One of them that I know of is an education -- has a

2  Ph.D in education. He has been superintendent of

3  different public schools in this area, and I believe that

4  he would probably be qualified, based upon his education

5  and ability, if -- and this is a hypothetical.

6 Q  Of course.

7 A  Let's say five people show up and they challenge 20

8  books, the librarian says these books are fine. Because

9  they now have this procedure, they take all 20 of these

10  books to the quorum court, which does not yet have a

11  procedure, I believe, on how to handle that because it

12  hasn't gone into effect yet.

13      But they would have to create a policy. All of the

14  JPs, to my understanding, are part time. They have other

15  jobs or they are retired, so within their job, reading 20

16  books and providing a summary or whatever that they would

17  need to do, it takes time.

18      Most people do not read quickly. In this room I

19  would assume most people read fairly quickly and

20  comprehend what they read. That is not true of every one

21  and I'm not saying it as a criticism. It's just not true.

22      So they would have to have the time to read the

23  books. Then they would have to make their decision based

24  upon the statute, which they would have to interpret or

25  have it interpreted for them and then make that decision.

Page 61

1   There is nothing in this decision that prevents them
2   from public input by phone calls, showing up at meetings,
3   putting pressure on anybody to not approve a particular
4   book or type of book, and then they make that decision.
5       Again, they are two-year officials.  It's possible
6   books would be challenged near the end of the election
7   cycle, so one group would start the challenges and another
8   group would have to finish them.
9       It's just extremely complicated when it actually
10  comes to the idea of application and I believe it is
11  fraught with all sorts of negative possibilities that will
12  affect all public libraries in general.
13  Q   And I really am coming to a close here very soon, I
14  think.
15      So a lot of what we've been talking about regarding
16  Section 5 has been policy implications about, oh, that's
17  difficult to implement, or I don't think these people
18  should be the ones looking at it.
19      How does Section 5, how would it affect you if it was
20  implemented, to your knowledge?
21  A   Books would be removed from the library or the
22  bookstores.
23  Q   Are you aware that Section 5 does not require removal
24  of books from the library and bookstores?
25  A   When the challenge is done, if the challenge is

Page 62

1   upheld, they would be removed.
2   Q   I don't believe that Section 5 actually requires
3   removal, but let me see here.
4   A   Under 2, Line 20 on Page 7, it says:  "The county or
5   municipal library shall decide if material being
6   challenged shall remain available throughout the challenge
7   process."
8   Q   So you're saying that it would be removed during the
9   challenge process?
10  A   No, I'm saying that it could be removed during the
11  challenge process, and then after the challenge, it would
12  be removed from the library.
13  Q   So I believe --
14  A   Because what would be the point of it staying?  For
15  somebody else to challenge it?
16  Q   I believe on Page 8, this is Lines 32 through 35, we
17  don't have to necessarily get into the weeds here, which
18  I'm afraid I might be doing, but it does say, specifically
19  at 33 and 34, that the material being challenged shall be
20  located within the library's collection to an area that is
21  not accessible to minors under the age of 18.
22      So assume with me for a moment that the material is
23  not being removed at the end of the day.  Assume that that
24  is how the law operates.  How would it affect you then?
25      MS. BROWNSTEIN: I'm going to object that

Page 63

1   this is an assumption which may not be, in fact,
2   true.
3   A   It says on Page 9, Line 30, the decision of the
4   governing body of the county or city under subdivision of
5   this section is final and a meeting shall be a public
6   meeting of the record submitted.
7   Q   Yes, ma'am.  But it is my fault, I got too much into
8   the specific text.  But just assume with me that at the
9   end of the day, all that happened to the material is it
10  was relocated to a separate section of the library that
11  was not accessible to minors under the age of 18 years.
12  How would that affect you?
13  A   Well, then, I would have to have access to that area
14  of the library.
15  Q   Are you over 18 years old?
16  A   I am.
17  Q   And I don't mean that sarcastically, just for the
18  record.
19  A   Again, if it's moved to a locked area, then that
20  access is restricted.  It's not free and available to
21  wandering up and down the aisles catching a title.  If you
22  have to go into a closed room and have permission to go
23  into that closed room, that has a chilling effect upon
24  people going into that room.
25  Q   Okay.  But you, specifically, would that impede you

Page 64

1   from going and seeing those documents?
2   A   No.
3   Q   And are you aware -- has anyone told you that they
4   want to challenge a library material or item under Act
5   372?
6   A   No.
7   Q   Okay.  I really appreciate your time and candor.
8   Thank you.  That's all I have.
9       MS. BROWNSTEIN: Let's take a break because
10      I probably have a few things I'd like to clear
11      up.
12      MR. MCLELLAND: Okay, that's fine, and I'm
13      going to have just a few follow-ups, just like
14      three or four questions.
15      MS. BROWNSTEIN: Do you want to do it know?
16      MR. ADAMS: Yeah, why don't you do yours
17      now?
18  BY MR. MCLELLAND:
19  Q   All right.  I'll just clean up.
20      Ms. Caplinger, you just spoke with Mr. Watson over
21  here regarding Act 372; is that correct?
22  A   Yes.
23  Q   During your testimony with him, do you remember
24  giving testimony that the library here in Crawford County
25  currently has a challenge policy?

Page 65

1 A  Yes.

2 Q  Okay.  Have you ever challenged a book?

3 A  No.

4 Q  Okay.  You also said that right now here in Crawford

5 County, that the librarian's decision is final regarding a

6 book.  What I am confused about is, is it book selection,

7 book placement; what is it final about?

8 A  All of those things.

9 Q  Okay.  Book selection, book placement?

10 A  Yes.

11 Q  Okay.  If a librarian decides to place a book in an

12 area of the library that a patron does not like, do they

13 have any recourse to overturn that, or do they have any

14 procedure by which to overturn the librarian's decision?

15 A  Other than the challenge decision as it is now, no.

16       MR. MCLELLAND:  Okay.  I think I'm good.

17       We'll go ahead and take a break.

18       (Brief recess was taken.)

19            EXAMINATION

20 BY MS. BROWNSTEIN:

21 Q  All right.  Ms. Caplinger, you were asked some

22 questions, by Mr. Watson, about if under Act 372, Sections

23 1 and 5, whether if material deemed inappropriate for

24 minors was in a room that was not locked, how that would

25 affect you and your ability to access that material.

Page 66

1       So I'm going to ask that even if material that was

2 deemed inappropriate for minors under the act were placed

3 in a separate room, that even if it was not locked, would

4 that affect the way you think you should be able to use

5 the library as a patron?

6 A  Yes.

7       MR. WATSON:  Object to form.

8       MR. WAHLMEIER:  Object to form.

9       MR. MCLELLAND:  I'm also going to make the

10  same objection.

11 BY MS. BROWNSTEIN:

12 Q  You may answer.

13 A  Yes, because the main way that I use the library is

14 by walking up and down the shelves and picking something

15 out if I don't have something in mind already.  So I would

16 have to -- if I'm looking for something and it's in the

17 adult section that might have been deemed harmful and has

18 been moved, I might think the library doesn't have it.

19       So if I then had to go and peruse that room all the

20 time to find out the entire library's contents, that would

21 add that extra time.  It also -- again, there's a stigma

22 attached because people would see me going in and out of

23 that room.

24       I'm not saying that ultimately I would not go in that

25 room, but there is a -- would be a stigma attached because

Page 67

1 of the perception that the books located in those areas

2 are not just inappropriate, but somehow pornographic or

3 obscene.

4 Q  Do you think, from your experience using the library

5 and the way it is laid out, would other people using the

6 library, the patrons be able to see if you did want to

7 access or look at or peruse or go into a room that was

8 separate from the rest of the library as --

9 A  The library is --

10       MR. MCLELLAND:  I'm going to object to

11  form.

12 A  The library is fairly open, and so anybody who would

13 be in there in that general area, would notice someone had

14 gone into that room.  And currently the way it's laid out,

15 if people wanted to, they could stake out the tables and

16 watch people come and go from that section.

17 Q  And why would that concern you, that other patrons or

18 other people would be able -- would know what you are

19 looking at, in terms of library materials?

20 A  Because it's nobody else's business.  I'm an adult

21 and I can read whatever I want to read and it's the rights

22 of an adult to read whatever they want to read that's not,

23 you know, illegal, shall we say, "or interfered with by

24 the rights of children," quote, unquote, to not see this

25 material or have access to this material that might be

Page 68

1 harmful, and I just don't think that's appropriate.

2       I think parents should decide what's appropriate for

3 their child, and I don't think that that right should

4 trump the right that I have to peruse the entire library

5 and to choose whatever I want to read out of whatever

6 section of the library I want to.

7 Q  What about librarians -- would you have any concern

8 that librarians would know if you were looking at or

9 reading or picking up a book or going into that if there

10 were a room that was not locked, but -- but -- but books

11 were placed there under the act because they were deemed

12 inappropriate to minors?

13 A  Well, I would assume that they can see people coming

14 and going from whatever area of the library, if they were

15 either in the library or from their desk, depending upon

16 where this room would be located.

17 Q  And would that concern you?

18 A  Again, it's -- it's the stigma more than the idea

19 of -- you know, again it's -- it's not -- other than

20 knowing that a book is checked out to whom, it's not the

21 librarian's business what I'm reading either.

22       MS. BROWNSTEIN:  Okay.  I don't have

23  anything further.

24            EXAMINATION

25 BY MR. ADAMS:

Page 69

1  Q   I have a few questions.  Ms. Caplinger, we -- I would
2  like to talk a little more about the Section 5 book
3  challenge procedure and how that would work if that went
4  into effect.
5      So we talked about the fact that there's a stage of
6  the challenge procedure under Section 5 of the act inside
7  the library, and then an appeal to the local governing
8  body.
9      So in this case, you know, for your library, the
10  appeals would go to the Crawford County Quorum Court.  Is
11  that your understanding of how the appeals would work?
12  A   That is my understanding.
13  Q   Okay.  And we talked about there's both references to
14  possibly removal in one place, but certainly moving
15  library materials to an area inaccessible to minors under
16  the age of 18, right?
17  A   Yes.
18  Q   Okay.  So if -- if one of the books, say, on the
19  current list of 200 books -- well, let's start with this:
20  Are you broadly familiar with the books on the current
21  social section?
22  A   Broadly.
23  Q   Okay.  Are there any of those books, which if
24  challenged and moved to an area under, you know,
25  inaccessible to minors under the age of 18, that you would

Page 70

1  be interested in filing an appeal with the quorum court to
2  reverse that decision of the library committee under --
3  under Section 5 to -- to move the book to an area
4  inaccessible to minors under the age of 18?
5  A   Well, I might be interested, but there's no provision
6  for that in the law.
7  Q   Okay.  But it's something that you -- you would like
8  to be able to have a say in the case that books are
9  segregated under Section 5 and you would have no say?
10  A   Yes.
11  Q   Say that there's a book that you thought was
12  inappropriate and should be placed in that area
13  inaccessible to minors under the age of 18, does that give
14  you the right to --
15  A   Yes.
16  Q   -- go to the quorum court and try to get that change
17  made?
18  A   The library -- it does.
19  Q   Okay.  Is that part of what you think is
20  constitutionally wrong with Section 5 of Act 372?
21  A   Among many others.
22  Q   Okay.  I wanted to get -- get that point out.
23      MR. ADAMS:  Let me look at my notes real
24      quick, but I think that may be all.  Thank you.
25      EXAMINATION

Page 71

1  BY MS. PARKER:
2  Q   This is Rebecca Hughes Parker.  I just want to ask
3  you, Ms. Caplinger, you testified before about the stigma
4  of going into a separate room restricted to adults and
5  that it might impede your ability to peruse books and I
6  wanted to ask if that would apply to bookstores, as well
7  as libraries?
8  A   Yes, it would probably apply even more because access
9  would be more limited because of the amount of employees
10  on the floor.
11  Q   Thank you.
12  A   You're welcome.
13      MR. MCLELLAND:  Anybody else online need to
14      ask a question?
15      Okay.  Any follow-up from you?
16      I have some follow-up, just a few
17      questions.
18      MR. WATSON:  So you go first.
19      FURTHER EXAMINATION
20  BY MR. MCLELLAND:
21  Q   I just have some follow-up.  Ms. Caplinger, in your
22  testimony with your attorney, Ms. Brownstein, you said
23  that you select books in the library, and I'm assuming
24  that's the Crawford County Library, by walking up and down
25  the aisle, unless you have something in mind.

Page 72

1      Do you remember giving that testimony?
2  A   Yes.
3  Q   When you have something in mind, does that -- are
4  you -- what are you referring to when you say that, like a
5  particular book?
6  A   Well, yeah, if I come to the library looking for a
7  particular book and I know what section it would probably
8  be in, then I would just go to that section and look for
9  it and I would probably also be perusing the shelf because
10  I rarely just checkout one book.
11  Q   If you didn't know which section that particular book
12  was in, what would you do?
13  A   I would look in the card catalog.
14  Q   Okay.
15  A   Which I do not like to use because it is very
16  challenging.  It does not lay -- again, I love
17  old-fashioned card catalogs, you have to understand, but
18  it doesn't -- it's harder to read, it's harder to see what
19  section the books have been placed in for some reason, so
20  it's not as easy to do, but that is available.
21  Q   So you would consult the card catalog.  If that
22  didn't assist you in finding the book, what would you do
23  then?
24  A   I might ask the librarian.
25  Q   Okay.  We've used the word stigma a lot in our

Page 73

1 testimony this afternoon, both by counsel and by you.
2 When you say the word stigma, what is your definition of
3 the word stigma?
4 **A    That people might look down on or ostracize somebody**
5 **that they know something about that they don't like.**
6 Q    And based upon that definition, you would feel that
7 ostracization on yourself?
8 **A    Yes.**
9 Q    Okay.  We talked -- you also talked with
10 Ms. Brownstein about the library layout of this potential
11 adults-only section.  Do you remember that testimony?
12 **A    Yes.**
13 Q    To your knowledge, has Crawford County rearranged its
14 libraries, any branch, to conform with Act 372?
15 **A    No.**
16 Q    Okay.  In your testimony with Mr. Adams you said that
17 you would be interested in an appeal, an appeal to -- if a
18 librarian moved a book and you challenged it or appealed
19 it, you would be interested in an appeal.
20     Do you remember giving testimony about that?
21 **A    Yes.**
22 Q    When you said you were interested in an appeal, were
23 you meaning an appeal to the quorum court or an appeal
24 above the quorum court?
25 **A    According to the statute there is no appeal above the**

Page 74

1 **quorum court.**
2 Q    Okay.  So when you say you'd be interested in an
3 appeal, it would be an --
4 **A    Yes.**
5 Q    -- appeal to the quorum court?
6     Okay.  Are you aware of any -- I know you just said
7 that according to the statute -- I mean, according to Act
8 372 --
9 **A    Yes.**
10 Q    According to Act 372, there is no process laid out in
11 the act by which you could appeal a determination by the
12 Crawford County Quorum Court.
13     Is that your understanding?
14 **A    That is my understanding.**
15 Q    Are you aware of any law that would prohibit -- are
16 you aware of any law that would prohibit an appeal of
17 Crawford County's decision that was made under Act 372?
18 **A    As far as I know there is no statute.  I don't**
19 **believe there's any case law yet, either, because the**
20 **statute has been enjoined and that opportunity has not yet**
21 **been made available.**
22 Q    You also said that the library -- right now the
23 library's movement of books is subject to a final
24 determination by the librarian.
25     Do you remember giving testimony to that effect?

Page 75

1 **A    Yes.**
2 Q    Is there any law that allows you -- I'm going to ask
3 you two questions, but first is there any law that allows
4 you to appeal that decision, that you're aware of?
5 **A    Not that I'm aware of.**
6 Q    And I'm going to ask the inverse.  Is there any law
7 that prohibits an appeal of that decision, that you're
8 aware of?
9 **A    Not that I'm aware of.**
10     MR. MCLELLAND:  Okay.  I'm good.
11     **FURTHER EXAMINATION**
12 BY MR. WATSON:
13 Q    Just one last question about this appeal thing.  Are
14 you aware of any Crawford County library -- I understand
15 that's not the only library system you're familiar with,
16 which is more than I'm familiar with, at least before this
17 litigation, so that's impressive.  Kudos to that.
18 **A    I use my library.**
19 Q    That's good.  When I was very young I used the
20 library all the time and I have, unfortunately, gotten out
21 of that habit.
22     Okay.  We're getting way off topic, so we'll pull it
23 together.
24     So if the librarian makes a decision about a book
25 that has been challenged, are you aware of any way to

Page 76

1 reverse that decision?  Are you able to challenge it,
2 essentially?
3 **A    Yeah.**
4     MS. BROWNSTEIN:  Are you talking about the
5     present?
6     MR. WATSON:  Presently.
7 **A    Yes.**
8 Q    You are?
9 **A    Yes, that has been done.**
10 Q    It has been?
11 **A    I have seen it done.**
12 Q    Have you done it?
13 **A    No, I did not.**
14 Q    Okay.  What was the outcome of that?
15 **A    Those books were returned to the library shelf.**
16 Q    Okay.
17 **A    The shelf that they should have been on in the first**
18 **place.  They had been moved to the social section and they**
19 **were returned to the juvenile section.**
20 Q    So in that situation, they never left the collection,
21 it was just the placement?
22 **A    Yes.**
23 Q    Okay.  Do you recall what books those were?
24 **A    One was them was about a llama, and the other one was**
25 **about families, I believe my family, your family,**

Page 77

1 something like that. They were both children's picture
2 books.
3 Q  Do you recall why those were initially challenged and
4 moved to the social section?
5 A  It's my understanding --
6       MR. MCLELLAND: Object to form, but go
7   ahead.
8 A  It's my understanding that the one about the llama
9 was removed because it was perceived to have LGBTQ
10 content. The other book, my family, our family, was moved
11 for the same reason because it had pictures, and these
12 were illustration pictures of a family with two men and a
13 family with two women.
14 Q  You said those were ultimately moved back to the
15 children's section?
16 A  Yes.
17 Q  Was the librarian -- what was the librarian's
18 determination?  Why did the librarian return those to
19 the --
20 A  Actually, it was the library board that returned
21 them, not the librarian.
22 Q  Okay.
23 A  So they had been removed by the librarian, and then
24 it was challenged to the library board and the library
25 board voted to return them, and that's in the minutes of

Page 78

1 one of these meetings.
2 Q  Okay.  Just a couple of quick questions about your
3 access to the books that we've kind of danced around here
4 several times.  You mentioned that are there currently
5 sections in the library that house certain types of books.
6 I assume fantasy here, historical fiction there, you know,
7 nonfiction there, whatever.
8       Could anyone see you walk to those sections
9 currently?
10 A  Yes.
11 Q  Okay.  And when you select a book and you -- can
12 people see that?  Do you hide the covers or could people
13 see what books you're carrying?
14 A  I assume if they're interested people can see what
15 I'm carrying.
16 Q  And when you check those books out, are librarians
17 able to see what titles you've checked out?
18 A  Most of the time I use the self-checkout, so other
19 than referring to the list for books that need to be
20 returned, they wouldn't know.
21 Q  Okay.  And to your knowledge, are the librarians able
22 to look at the system to see who's checked out what before
23 the --
24 A  Yes.
25 Q  -- returns have come due?

Page 79

1 A  Yes.
2 Q  How is that different than someone seeing you look at
3 this, you know, potential new section that is restricted?
4 A  Because of the publicity about that section.
5 Q  Okay.
6 A  The negative publicity about that section, because
7 there have been efforts made to create negative publicity
8 about that section, and that's.
9       Why.  I mean, nobody has complained about the
10 historical fiction section.
11 Q  Fair.  And, also, I believe that -- I just want to
12 make sure I heard you correctly.  You said that you
13 weren't saying you ultimately wouldn't go into any such
14 section that existed?
15 A  I still might do that, but I would have to make a
16 decision about it.  It would not just be as automatic as I
17 walk in and wander around the library like I normally do.
18 You know, I might want to look and see if anybody was
19 watching the door.  That's silly and it's embarrassing as
20 an adult to even have to think that.
21 Q  Okay.  Mr. Adams also asked you a question about if
22 certain -- kind of a hypothetical about if the act went
23 into effect, and what if some of the social section books
24 were ultimately put into this restricted area that we've
25 been talking about.  Earlier you testified that you were

Page 80

1 not aware of any challenges that someone would make, but
2 let's assume that there was one.
3       Are you aware, beforehand, of any of these social
4 section books, how the librarian's committee under the act
5 would make a determination?
6 A  No.
7 Q  Okay.  And are you aware how the elected officials
8 would ultimately make a determination on any specific
9 book?
10 A  No.
11       MR. WATSON: Okay.  That's all I've got.
12       MR. MCLELLAND: I've just got one follow-up
13   before we switch over y'all, if that's okay.
14       MS. BROWNSTEIN: I don't have anything.
15       MR. ADAMS: Go ahead.
16       MR. MCLELLAND: Okay.
17       FURTHER EXAMINATION
18 BY MR. MCLELLAND:
19 Q  You just gave testimony, Ms. Caplinger, to Mr. Watson
20 regarding some books in the social section, one about a
21 llama and one about my family, your family.
22       Do you remember that testimony?
23 A  Yes.
24 Q  I just want to clean that up for the record, make
25 sure I understand you.

Page 81

1 A   Okay.

2 Q   I understood your testimony to be this, and correct

3 me if I'm wrong:  That those two books, the llama book and

4 the my family, your family book were moved into the social

5 section by Ms. Grzymala; is that right?

6 A   That's my understanding.

7 Q   Then somebody in the community challenged that --

8 that placement.  They challenged the placement of those

9 books under the current policy; is that right?

10 A   Yes.

11 Q   And then the Library Board of Crawford County

12 ultimately decided to move those books, to move them out

13 of the social section and back into the children's

14 section?

15 A   Yes.

16 Q   Okay.  That's all I've got on that.  That's it.

17 Thank you.

18 A   Thank you.

19       (WHEREUPON, at 2:49 p.m., the

20       above deposition concluded.)

21

22

23

24

25

Page 82

1           C E R T I F I C A T E

2

STATE OF ARKANSAS }

3                   }

COUNTY OF FAULKNER }

4

RE:  ORAL DEPOSITION OF LETA JO CAPLINGER, ESQ.

5

I, Michelle R. Satterfield, CCR, a Notary Public in and

6 for Faulkner County, Arkansas, do hereby certify that the
transcript of the foregoing deposition accurately reflects

7 the testimony given; and that the foregoing was
transcribed by me, or under my supervision, on my Eclipse

8 computerized transcription system from my machine
shorthand notes taken at the time and place set out on the

9 caption hereto, the witness having been duly cautioned and
sworn, or affirmed, to tell the truth, the whole truth and

10 nothing but the truth.

I FURTHER CERTIFY that I am neither counsel for, related

11 to, nor employed by any of the parties to the action in
which this proceeding was taken; and, further that I am

12 not a relative or employee of any attorney or counsel
employed by the parties hereto, nor financially

13 interested, or otherwise, in the outcome of this action.
In accordance with the Arkansas Rules of Civil Procedure,

14 Rule 30(e), review of the foregoing transcript by the
witness was not requested by the deponent or any party

15 thereto.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 27th

16 day of December 2023.

17

18

19

20

21                       _____
                        Michelle R. Satterfield, CCR

22                       LS Certificate No. 570
                        Notary Public in and for

23                       Faulkner County, Arkansas

24

25

## A

35:5

**ability (6)**
50:17;52:2;53:20;
60:5;65:25;71:5

**able (11)**
29:3,4;35:18;54:25;
66:4;67:6,18;70:8;
76:1;78:17,21

**above (3)**
73:24,25;81:20

**accept (2)**
48:7;57:24

**access (21)**
27:23;29:2;53:20;
54:2,4,6,13,18,19,20,
21;55:8,21;56:7;63:13,
20;65:25;67:7,25;
71:8;78:3

**accessible (2)**
62:21;63:11

**accompanied (4)**
28:8,11;43:1;44:2

**according (5)**
33:6;73:25;74:7,7,
10

**accurate (1)**
54:12

**acquainted (1)**
59:25

**Act (40)**
17:12;29:15,17,18,
20,24;30:23;31:5,25;
32:20;33:4,6,7,10,16;
35:13;36:24;37:18,18;
49:15;52:17,17;58:12,
24;59:8,15;64:4,21;
65:22;66:2;68:11;
69:6;70:20;73:14;
74:7,10,11,17;79:22;
80:4

**action (1)**
30:22

**activities (1)**
16:13

**actual (1)**
16:13

**actually (6)**
17:25;27:5;51:24;
61:9;62:2;77:20

**Adam (2)**
8:14,20

**Adams (13)**
7:18,18;20:10,15,19;
21:1,2;64:16;68:25;
70:23;73:16;79:21;
80:15

**add (2)**
51:14;66:21

**added (1)**
27:16

**adds (1)**

**adequate (1)**
57:12

**adopt (1)**
56:24

**adopted (2)**
36:4,10

**adult (16)**
23:13,19;25:2;28:8,
11;42:12,15;43:1,6;
44:25;45:6;50:18;
66:17;67:20,22;79:20

**adults (2)**
28:6;71:4

**adult's (1)**
27:9

**adults-only (1)**
73:11

**Advocates (11)**
8:15,19;17:7,8,11;
18:10,13;19:7,15,22;
51:23

**affect (10)**
50:8,22;51:10;52:2;
61:12,19;62:24;63:12;
65:25;66:4

**affirmative (1)**
9:17

**affirmed (1)**
6:3

**afraid (5)**
51:4,5,17,20;62:18

**afternoon (1)**
73:1

**Again (15)**
17:17;20:25;31:15;
36:14;43:9;50:16;
54:5;58:15;59:5;61:5;
63:19;66:21;68:18,19;
72:16

**against (7)**
13:8;22:10;31:10;
46:4,6,12;59:21

**age (8)**
28:7;42:25;62:21;
63:11;69:16,25;70:4,
13

**ages (1)**
48:18

**ago (2)**
26:4;47:6

**agree (1)**
38:7

**agreed (2)**
33:12;42:12

**ahead (4)**
36:20;65:17;77:7;
80:15

**aisle (1)**
71:25

**aisles (1)**
63:21

**ALA (1)**

**allegation (4)**
31:10,14,21,24

**allegations (8)**
23:23;24:3,14;
30:20;33:4;45:22,25;
46:12

**alleged (1)**
22:19

**allow (1)**
57:2

**allows (2)**
75:2,3

**almost (1)**
43:16

**always (1)**
57:19

**Amendments (1)**
31:7

**amends (1)**
52:10

**American (10)**
8:4,5;17:8,11;18:10,
13;19:6,15;58:8;59:5

**Among (1)**
70:21

**amount (2)**
50:22;71:9

**analysis (1)**
31:16

**announced (1)**
23:9

**announcement (1)**
23:15

**apologize (1)**
36:15

**apparent (1)**
59:19

**apparently (1)**
25:24

**appeal (18)**
35:7,16;69:7;70:1;
73:17,17,19,22,23,23,
25;74:3,5,11,16;75:4,
7,13

**appealed (1)**
73:18

**appeals (2)**
69:10,11

**appearing (4)**
6:9;7:4;18:16;22:2

**application (7)**
34:7,9;49:21;55:23;
56:4,9;61:10

**applied (1)**
56:1

**applies (11)**
28:15,17,19;34:15,
19,23,25;43:8,11,11;
49:25

**apply (6)**
43:4,6;56:2;58:21;
71:6,8

**appointed (1)**
23:6

**appreciate (3)**
8:23;28:21;64:7

**appropriate (3)**
49:9;68:1,2

**approve (1)**
61:3

**approximately (5)**
14:8,11;21:1;27:14;
39:3

**April (4)**
38:25;39:4,11,12

**AR/OK (1)**
17:7

**area (16)**
23:12;25:16;45:14;
54:2;60:3;62:20;
63:13,19;65:12;67:13;
68:14;69:15,24;70:3,
12;79:24

**areas (2)**
46:15;67:1

**Argus-Courier (1)**
13:24

**arises (2)**
16:7;18:5

**Arizona (8)**
12:4,5,11,12;13:1,3,
4;47:8

**Arkansas (18)**
7:13,19;8:14,15,19,
20;10:8;11:10,11,24;
12:1,3;29:11;30:23,25;
36:25;37:19,21

**around (2)**
7:1,10;13:18;17:17;
78:3;79:17

**arranged (1)**
10:20;12:17;13:3

**arrested (1)**
51:4

**arrests (1)**
51:20

**article (4)**
13:23;16:15,16;18:6

**asserting (3)**
34:22,25;46:4

**assist (1)**
72:22

**assisted (1)**
12:17

**associated (2)**
10:25;12:19

**Association (7)**
8:4,5,15,20;12:23;
58:8;59:6

**assume (11)**
43:5,7;58:1;60:19;
62:22,23;63:8;68:13;
78:6,14;80:2

**assuming (2)**
46:10;71:23

**assumption (1)**
63:1

**attached (6)**
21:21;32:3;39:24;
42:1;66:22,25

**attacked (1)**
13:18

**attempt (1)**
33:9

**attend (7)**
18:17,23;19:6,9;
39:6,8;40:7

**attendance (1)**
59:18

**attended (8)**
19:10;38:13,14,15,
16,18,19,20

**attending (2)**
6:24;11:25

**attention (1)**
52:5

**Attorney (12)**
7:14;10:1,2,3;13:9;
20:14;21:5;30:2,3;
32:9;46:10;71:22

**attorneys (1)**
7:15

**attributed (1)**
24:14

**authenticating (2)**
38:8,12

**author (2)**
47:25;48:15

**Authors (3)**
8:5;48:16;50:14

**automatic (1)**
79:16

**available (6)**
16:15;31:1;62:6;
63:20;72:20;74:21

**avid (1)**
50:11

**avoid (1)**
53:25

**aware (36)**
17:13;24:18;28:4,
11,22;29:1,4;35:18;
41:9;44:3;46:14,18;
50:25;51:11;52:9,21;
55:7;56:24;58:4,18;
59:3,10;61:23;64:3;
74:6,15,16;75:4,5,8,9,
14,25;80:1,3,7

**awareness (1)**
13:17

**away (1)**
50:16

## B

**back (8)**
27:9;32:18;43:18,
21;47:5;54:24;77:14;

81:13

**bad (1)**
49:6
**balance (1)**
49:3
**barrier (2)**
28:1,1
**base (1)**
48:12
**based (13)**
23:23;33:4;48:14,
22,25;51:2,12;53:15,
24;59:18;60:4,23;73:6
**basically (4)**
12:17;16:17,20;
51:15
**basis (3)**
15:10;16:11,23
**Bates (2)**
39:25;42:10
**beforehand (1)**
80:3
**began (1)**
19:19
**begin (1)**
15:25
**beginning (5)**
7:7;14:6;18:7;21:11;
32:8
**begins (1)**
36:4
**belong (1)**
51:24
**Ben (3)**
6:18;8:12,13
**benefit (1)**
21:19
**best (2)**
9:14;53:9
**better (1)**
57:22
**Bettina (1)**
7:22
**bit (3)**
16:3;18:19;23:20
**block (1)**
23:8
**board (20)**
14:24;15:12,13,15,
16,17,18,19;16:8;
18:16,18;23:7,8;38:8;
39:6;51:22;77:20,24,
25;81:11
**body (2)**
63:4;69:8
**Book (44)**
8:6;10:17;12:18;
13:18,25;14:19,25;
16:19;25:21,22;47:23;
48:2,7,24;57:3,15,20,
23;61:4,4;65:2,6,6,7,9,
9,11;68:9,20;69:2;
70:3,11;72:5,7,10,11,

22;73:18;75:24;77:10;
78:11;80:9;81:3,4
**Books (97)**
8:3;10:19,21,22;
12:17;13:3,5;16:12,22;
23:11,14,18;25:2,10,
14,18,23;26:13;27:4,8,
13,20,22,23;31:1;
39:15;40:10;41:2,4,10,
15,17;42:12,13;47:18,
23;48:1,3,4,6,16,17;
50:13,13,15,17,19,22;
52:3;53:21;54:3,6,10,
13,25;55:7,13;56:11,
12,17,18,25;57:9;59:6;
60:8,8,10,16,23;61:6,
21,24;67:1;68:10;
69:18,19,20,23;70:8;
71:5,23;72:19;74:23;
76:15,23;77:2;78:3,5,
13,16,19;79:23;80:4,
20;81:3,9,12
**Books-A-Million (3)**
51:13;53:6,17
**bookseller (1)**
50:6
**Booksellers (6)**
8:4;30:25;49:25;
50:21,25;51:11
**bookshelf (3)**
27:7,7,10
**Bookstore (12)**
8:4;10:13,15;12:8,9,
10,16;13:4;47:14,17;
53:4;55:17
**bookstores (7)**
47:7;50:11;53:2;
55:13;61:22,24;71:6
**born (2)**
11:18,20
**both (8)**
6:25;39:8;47:11;
50:11;56:2;69:13;
73:1;77:1
**bottom (2)**
33:19;42:3
**boxes (1)**
55:16
**branch (7)**
26:20,22;27:12;
28:18;29:3;44:6;73:14
**branches (4)**
23:10;28:17;46:16,
17
**break (7)**
32:8,11,12;33:3;
43:14;64:9;65:17
**Brief (3)**
32:16;43:19;65:18
**bring (1)**
52:5
**bringing (1)**
13:11

**brings (1)**
57:7
**broadly (2)**
69:20,22
**Brooks (1)**
37:17
**brought (1)**
13:8
**Brownstein (30)**
7:22,22;17:22;19:2;
20:3;21:9;24:2,6,11;
30:1;31:15;32:4;33:8;
36:17;40:16;43:15;
44:16;49:4;52:15;
53:11;62:25;64:9,15;
65:20;66:11;68:22;
71:22;73:10;76:4;
80:14
**Buren (5)**
13:24;26:23,24;
29:3;44:7
**business (2)**
67:20;68:21

## C

**call (1)**
29:24
**called (2)**
17:7,8
**calling (2)**
23:17;25:10
**calls (1)**
61:2
**came (6)**
13:17;17:12;19:18;
44:3;47:12;48:3
**can (36)**
6:10,10,13,14,19,22;
7:9,10;9:1,15;18:3;
19:4,14,24;20:6;25:22;
30:7;32:11;33:19;
35:7;37:10;41:4,17;
43:13;44:12,21,25;
45:3,16;53:12;58:20;
59:17;67:21;68:13;
78:11,14
**cancel's (1)**
59:3
**candid (1)**
37:10
**candor (1)**
64:7
**CAPLINGER (22)**
6:1,7;7:24;9:1,4,25;
21:22;24:9,15,18;30:7,
9;31:8;32:18;43:21;
47:1;64:20;65:21;
69:1;71:3,21;80:19
**C-A-P-L-I-N-G-E-R (1)**
9:4
**caption (1)**
22:2

**card (3)**
72:13,17,21
**care (1)**
57:23
**Carnegie (1)**
7:20
**carrying (2)**
78:13,15
**case (10)**
22:1,5,10;24:7;
31:11;32:24;52:22;
69:9;70:8;74:19
**catalog (2)**
72:13,21
**catalogs (1)**
72:17
**catching (1)**
63:21
**cause (1)**
54:10
**caused (1)**
49:10
**cautioned (1)**
6:3
**CCL (1)**
22:19
**Central (1)**
7:19
**certain (6)**
49:2;52:11;53:20;
56:23;78:5;79:22
**certainly (3)**
17:14;57:10;69:14
**CHADICK (5)**
6:17;8:10,10;46:20,
20
**challenge (21)**
25:21,22;29:25;
35:14,22;57:3;58:11;
60:7;61:25,25;62:6,9,
11,11,15;64:4,25;
65:15;69:3,6;76:1
**challenged (23)**
25:11,12,14,18,18,
19,23;35:7;37:2;52:21,
23,25;61:6;62:6,19;
65:2;69:24;73:18;
75:25;77:3,24;81:7,8
**challenges (3)**
56:25;61:7;80:1
**challenging (6)**
35:4;49:21,24;50:1;
57:24;72:16
**chance (1)**
55:4
**change (1)**
70:16
**changes (1)**
57:21
**charge (3)**
14:17;18:9;55:23
**check (8)**
6:11;41:3,4,17,17;

55:10,16;78:16
**checked (3)**
68:20;78:17,22
**checkout (3)**
27:3,18;72:10
**child (2)**
13:14;68:3
**children (10)**
28:7,10;42:25;45:3;
48:18,23;49:9;50:16;
54:11;67:24
**children's (24)**
10:17,19,20;13:5;
23:11,12;27:4,9,18;
41:2,6,15,19;43:4;
44:10,21;45:1,3,10;
47:18;48:1;77:1,15;
81:13
**chilling (1)**
63:23
**chime (2)**
7:5,5
**choose (2)**
52:2;53:25;56:11,
13,18;68:5
**chose (2)**
13:19,21
**Chris (1)**
23:6
**city (6)**
35:8,9,9;52:4;57:9;
63:4
**civil (1)**
30:2
**clarification (1)**
58:1
**clarify (2)**
19:3,4
**classic (2)**
50:14;56:11
**clean (4)**
7:9;9:16;64:19;
80:24
**clear (5)**
20:15;24:13;30:8;
58:24;64:10
**clients (1)**
10:21
**close (4)**
11:6;23:17;56:20;
61:13
**closed (2)**
63:22,23
**closed-off (1)**
51:14
**collection (2)**
47:13;62:20;76:20
**college (1)**
11:25
**Colombia (1)**
11:17
**color (1)**
42:13

**combination (1)**
45:23
**Comic (1)**
8:6
**coming (2)**
61:13;68:13
**comment (2)**
21:13,14
**commits (1)**
34:3
**committee (2)**
70:2;80:4
**Community (6)**
8:3;48:20,22;52:7;
54:9;81:7
**complained (1)**
79:9
**complaining (1)**
16:19
**Complaint (10)**
21:18;22:1,8,10;
30:11,12,21;33:5;
45:22,24
**completely (2)**
57:23;59:22
**complicated (2)**
57:4;61:9
**comprehend (1)**
60:20
**compromise (3)**
40:24;41:1;42:10
**concern (4)**
59:12;67:17;68:7,17
**concerned (3)**
51:6,9;52:2
**concerning (1)**
15:15
**concerns (2)**
30:22;59:17
**concluded (1)**
81:20
**conclusion (1)**
31:17
**confirm (2)**
6:9;18:3
**conflict (1)**
51:5
**conform (1)**
73:14
**confused (2)**
56:8;65:6
**Congress (1)**
25:8
**connect (2)**
19:24;20:6
**connected (2)**
53:23,24
**consider (2)**
48:19;49:9
**considered (2)**
48:22;49:11
**Constitution (1)**
31:7

**constitutionally (2)**
31:1;70:20
**consult (1)**
72:21
**contacted (2)**
17:6;25:25
**content (3)**
20:20;49:9;77:10
**contents (5)**
20:12,16,25;21:4;
66:20
**controversy (1)**
53:25
**conversation (3)**
14:8;21:1,15
**coordinating (1)**
17:9
**copies (1)**
48:4
**copy (10)**
21:18,25;22:1,24,25;
30:11;32:1,20,20;33:6
**correctly (5)**
36:2,22;52:14;
58:10;79:12
**Coulter (1)**
7:20
**counsel (2)**
6:9;73:1
**counted (1)**
27:16
**counter (2)**
27:3,19
**country (1)**
13:18
**County (64)**
7:12,17;10:7,7;13:9;
14:24;15:4,14,17,18;
16:8,9;18:5,9;22:10,
12,18;23:7,9,10;24:20;
26:21;28:4;29:9;
34:23;35:1,3,8,13,18,
21,23;36:5,10;37:23;
38:9,9;39:15;40:1,1,
20;41:25;42:3,4,9,21;
44:7;46:5,6,12,15;
51:3;58:2,3;62:4;63:4;
64:24;65:5;69:10;
71:24;73:13;74:12;
75:14;81:11
**County's (1)**
74:17
**couple (5)**
7:7;20:10;43:25;
47:1;78:2
**course (4)**
7:3;9:13;52:3;60:6
**court (38)**
6:25;7:9;9:11,15,20;
14:23,24;15:14;16:9;
18:16,18;21:12;25:11,
14,25;26:1,5,11,14;
35:9;38:9,21,22;39:19;

40:21;42:11;57:10,11;
59:18;60:10;69:10;
70:1,16;73:23,24;74:1,
5,12
**court's (1)**
25:13
**covers (1)**
78:12
**Crawford (59)**
7:12,17;10:7;13:8;
14:23;15:4,14,17,18;
16:8,9;18:5,9;22:10,
12,18;23:7,9,10;24:19;
26:20;28:4;29:9;
34:23;35:1,3,13,18,21,
23;37:23;38:8,9;
39:15;40:1,1,20;41:24;
42:3,3,9,21;44:7;46:4,
6,12,15;51:3;58:2,3;
64:24;65:4;69:10;
71:24;73:13;74:12,17;
75:14;81:11
**create (4)**
35:22;52:5;60:13;
79:7
**created (3)**
23:16;24:24;25:9
**creates (2)**
34:16;35:4
**crime (2)**
34:15,16
**crimes (1)**
52:11
**criminalizes (1)**
49:20
**criteria (2)**
48:13,14
**criticism (1)**
60:21
**crossed (1)**
49:12
**current (4)**
56:24;69:19,20;81:9
**currently (4)**
64:25;67:14;78:4,9
**customers (3)**
10:21;12:17;31:2
**cycle (1)**
61:7

**D**

**danced (1)**
78:3
**date (1)**
38:23
**David (1)**
11:17
**day (2)**
62:23;63:9
**days (1)**
37:17
**DC (1)**

48:21
**deal (2)**
33:15;54:9
**dealing (1)**
14:6
**December (3)**
23:5;40:7;41:23
**decide (2)**
62:5;68:2
**decided (2)**
59:20;81:12
**decides (1)**
65:11
**Decimal (1)**
25:8
**decision (26)**
16:24;35:6,8;47:20;
48:10,12;57:4,8,25;
58:20,22;60:23,25;
61:1,4;63:3;65:5,14,
15;70:2;74:17;75:4,7,
24;76:1;79:16
**decision-making (1)**
58:19
**decisions (3)**
57:13;59:3,15
**declare (3)**
31:4,13,21
**deemed (2)**
65:23;66:2,17;68:11
**Defendant (1)**
23:6
**defendants (2)**
13:10;31:10
**Defendant's (14)**
21:20,21,23;30:8,11;
32:2,3,19,23;39:22,24;
41:24;42:1;45:17
**Defense (1)**
8:6
**defines (1)**
34:16
**definitely (1)**
16:2
**definition (3)**
33:18;73:2,6
**definitions (1)**
33:15
**degree (2)**
11:2,3
**Deidre (13)**
14:2,9,12;15:2;
17:18;18:8;19:20;
22:15,19;24:25;25:15;
26:5,13
**Democracy (1)**
8:18
**department (1)**
10:20
**departure (1)**
22:13
**depending (3)**
50:21,24;68:15

**deposition (8)**
7:3;9:5,13;23:3;
24:13;30:13;43:25;
81:20
**describe (2)**
44:12,21
**described (3)**
15:22;44:9;45:8
**describes (2)**
33:16;34:3
**describing (1)**
54:15
**description (2)**
34:14;57:11
**designates (1)**
28:5
**desk (3)**
27:3,6;68:15
**details (1)**
15:8
**determination (6)**
35:10;74:11,24;
77:18;80:5,8
**determining (1)**
58:22
**deviate (1)**
35:19
**Dewey (1)**
25:8
**different (4)**
48:18,18;60:3;79:2
**difficult (3)**
50:19,20;61:17
**difficulty (1)**
54:20
**direct (1)**
18:14
**directed (3)**
17:2;21:13;26:5
**direction (4)**
25:13;26:13;39:18;
40:18
**directions (1)**
27:2
**director (4)**
14:1;22:13,15,19
**Directors (3)**
23:7;35:10;57:9
**discussing (1)**
44:5
**discussion (1)**
52:1
**discussions (3)**
51:21,22,23
**dispute (1)**
22:11
**dissent (1)**
17:10
**document (2)**
21:22;33:1
**documents (2)**
38:13;64:1
**done (6)**

43:16;45:19;61:25;
76:9,11,12
**door (5)**
27:24;29:4;45:13,
15;79:19
**dots (2)**
20:1,6
**down (6)**
9:21;35:12;63:21;
66:14;71:24;73:4
**due (1)**
78:25
**during (5)**
7:3;9:13;62:8,10;
64:23
**duties (1)**
10:18

**E**

**earlier (10)**
16:3;27:12;39:14;
40:9;42:18;44:5;
45:21;51:18;52:8;
79:25
**easy (1)**
72:20
**ECONOMOS (3)**
6:21;8:17,18
**education (5)**
11:14;57:12;60:1,2,
4
**effect (17)**
24:19,22;36:24;
37:1,5,19,21;39:20;
51:1,10;52:17;57:6;
60:12;63:23;69:4;
74:25;79:23
**effort (1)**
50:15
**efforts (1)**
79:7
**either (4)**
7:7;68:15,21;74:19
**Elders (1)**
52:4
**elected (3)**
57:18;59:13;80:7
**election (1)**
61:6
**else (3)**
54:7;62:15;71:13
**else's (1)**
67:20
**embarrassing (1)**
79:19
**employees (2)**
22:20;71:9
**enacted (1)**
30:23
**encourage (1)**
48:23
**end (5)**

18:7;24:18;61:6;
62:23;63:9
**ended (1)**
20:6
**ends (1)**
57:3
**enforce (1)**
30:23
**enforcement (1)**
31:4
**enjoin (3)**
29:11,24;31:4
**enjoined (4)**
37:1,8,18;74:20
**enough (1)**
56:5
**entail (1)**
10:18
**entire (6)**
10:9;28:15;43:2,3;
66:20;68:4
**entry (1)**
41:9
**Equality (7)**
17:7,8,11;18:11,14;
19:7,16
**equating (1)**
22:20
**especially (1)**
47:3
**ESQ (1)**
6:1
**essentially (1)**
76:2
**Eureka (1)**
7:20
**even (6)**
54:1;56:11;66:1,3;
71:8;79:20
**everyone (2)**
6:23;8:22
**exactly (1)**
38:5
**EXAMINATION (8)**
8:24;46:24;65:19;
68:24;70:25;71:19;
75:11;80:17
**exception (1)**
12:4
**excited (1)**
9:19
**Excuse (3)**
32:4;47:13;52:5
**Executive (2)**
22:13;35:8
**exemption (4)**
52:10,13,20,24
**exhibit (14)**
21:16,20,21,23;30:8,
11;32:2,3,20,23;39:22,
24;42:1;45:17
**exist (2)**
56:3;57:1

**existed (1)**
79:14
**exists (1)**
56:2
**experience (4)**
51:2,12;53:15;67:4
**experiences (1)**
47:7
**explain (2)**
19:19;59:17
**explained (2)**
18:15,19
**explicitly (1)**
28:23
**extra (1)**
66:21
**extremely (1)**
61:9
**eyes (1)**
50:16

**F**

**face (1)**
29:24
**facial (1)**
29:25
**facially (3)**
31:4,13,21
**fact (4)**
30:5;31:18;63:1;
69:5
**factual (3)**
15:10;16:11,23
**fair (3)**
41:22;56:5;79:11
**fairly (2)**
60:19;67:12
**fall (2)**
55:8,11,14,18
**falls (1)**
56:7
**familiar (3)**
69:20;75:15,16
**families (3)**
41:3,16;76:25
**family (11)**
22:22;76:25,25;
77:10,10,12,13;80:21,
21;81:4,4
**fantasy (1)**
78:6
**far (7)**
29:9;37:2;51:2,6;
57:21,22;74:18
**Farrell (1)**
7:24
**fast (2)**
9:19,19
**fault (1)**
63:7
**Fayetteville (3)**
8:11;11:10;46:21

**fear (2)**
51:4;53:24
**February (6)**
14:10,11;17:19,20;
18:8,9
**feel (1)**
73:6
**fellow (1)**
47:3
**few (5)**
43:24;64:10,13;
69:1;71:16
**fiction (3)**
27:9;78:6;79:10
**figure (3)**
16:21;19:14;56:9
**filed (2)**
30:12,18
**filing (2)**
20:9;70:1
**final (5)**
35:10;63:5;65:5,7;
74:23
**finances (1)**
51:20
**financial (1)**
51:7
**find (5)**
26:1;40:21;50:23;
66:20
**finding (1)**
72:22
**fine (5)**
26:19;56:21;58:16;
60:8;64:12
**finish (4)**
20:3;40:16;44:17;
61:8
**first (18)**
9:3;15:7;17:12;22:3;
23:21;27:7,19;31:6;
38:21;39:3,10;47:5,15,
16;54:18;71:18;75:3;
76:17
**five (1)**
60:7
**five-member (1)**
23:8
**flip (2)**
22:8;42:9
**floor (1)**
71:10
**focus (1)**
13:4
**folks (1)**
7:4
**following (2)**
36:6,12
**follows (1)**
6:5
**follow-up (4)**
71:15,16,21;80:12
**follow-ups (1)**

64:13
**forget (1)**
49:6
**form (6)**
53:11;57:12;66:7,8;
67:11;77:6
**formal (3)**
12:20,20,23
**forming (1)**
23:8
**Fort (1)**
11:8
**Forward (1)**
8:18
**found (2)**
24:10;54:11
**Foundation (1)**
8:7
**four (2)**
19:10;64:14
**Fourteenth (1)**
31:6
**foyer (1)**
27:1
**fraught (1)**
61:11
**free (1)**
63:20
**Freedom (1)**
8:7
**Fund (1)**
8:6
**furnishing (4)**
33:16;34:3,16;49:18
**further (4)**
68:23;71:19;75:11;
80:17
**future (1)**
56:14

**G**

**gave (2)**
26:4;80:19
**general (13)**
14:15,20,22;25:14;
28:13,14;44:1,25;45:6;
52:1;59:7;61:12;67:13
**General's (1)**
7:14
**generated (1)**
51:6
**Gentry (1)**
7:16
**gist (1)**
16:20
**given (2)**
9:5;49:3
**giving (6)**
38:11;39:16;64:24;
72:1;73:20;74:25
**glass (3)**
45:1,9,11

**glassed-in (1)**
44:23
**Good (5)**
6:6;8:13;65:16;
75:10,19
**governing (2)**
63:4;69:7
**graduate (1)**
47:4
**Great (4)**
6:22;8:22;33:15;
54:9
**greater (1)**
22:22
**group (5)**
17:9;18:20;51:25;
61:7,8
**groups (1)**
52:4
**Grzymala (16)**
16:21;17:1;22:16,
19;24:25;25:15;39:14;
40:9,18,25;41:12,13,
14;42:11;51:23;81:5
**guess (3)**
50:8;53:9;54:22
**guidance (2)**
42:13,22
**Guild (1)**
8:6

**H**

**habit (1)**
75:21
**Hamby (3)**
22:19;23:6;25:25
**hand (1)**
36:17
**handed (1)**
21:23
**handle (2)**
59:23;60:11
**hands (1)**
32:21
**happened (1)**
63:9
**happening (5)**
13:19;14:19,20;
15:12,13
**happy (2)**
35:6;58:17
**harder (2)**
72:18,18
**Harding (3)**
11:4,11;47:3
**harm (1)**
54:11
**harmful (7)**
33:17;34:4,17;
49:19;58:23;66:17;
68:1
**Hayden (1)**

7:23
**head (4)**
9:17;35:8;38:20;
49:13
**hear (6)**
6:10,10,13,14,19,22
**heard (3)**
21:14;51:21;79:12
**hearing (3)**
37:13;38:1,12
**help (1)**
19:14
**helped (2)**
10:21,21
**helpful (1)**
17:25
**hereinbefore (1)**
6:2
**hereto (4)**
21:21;32:3;39:24;
42:1
**heterosexual (1)**
22:21
**Hickman (1)**
11:17
**hide (1)**
78:12
**high (1)**
11:16
**higher (1)**
11:14
**highlighting (1)**
48:5
**historical (2)**
78:6;79:10
**history (1)**
18:17
**hold (3)**
11:5;13:1;33:9
**homosexual (1)**
22:21
**hope (2)**
40:23;54:16
**host (1)**
13:9
**hour (1)**
14:4
**house (1)**
78:5
**houses (3)**
27:13,20,21
**huge (1)**
51:15
**HUGHES (4)**
6:14;8:2,2;71:2
**husband (2)**
26:1;50:11
**husband's (1)**
12:6
**hypothetical (2)**
60:5;79:22

**I**

**idea (3)**
44:4;61:10;68:18
**illegal (1)**
67:23
**illustration (1)**
77:12
**illustrator (2)**
47:25;48:15
**illustrators (1)**
48:16
**impede (4)**
54:2,18;63:25;71:5
**implement (2)**
35:13;61:17
**implemented (1)**
61:20
**implications (2)**
57:13;61:16
**important (2)**
13:14,15
**impressive (1)**
75:17
**improper (1)**
50:18
**inaccessible (4)**
69:15,25;70:4,13
**inappropriate (5)**
65:23;66:2;67:2;
68:12;70:12
**Including (1)**
37:23
**indicating (1)**
28:9
**indication (1)**
47:24
**indirect (2)**
39:18;40:14
**Indirectly (1)**
26:7,8;40:10
**individuals (2)**
25:24,24
**industry (1)**
53:15
**influence (1)**
50:17
**information (1)**
16:14
**informed (1)**
20:8
**inhibit (1)**
53:20
**initially (1)**
77:3
**injunction (3)**
37:12;38:1,12
**input (1)**
61:2
**inside (1)**
69:6
**insight (1)**

28:21
**instructed (1)**
41:14
**interest (1)**
57:22
**interested (7)**
70:1,5;73:17,19,22;
74:2;78:14
**interests (2)**
48:18,19
**interfered (1)**
67:23
**interpret (1)**
60:24
**interpreted (2)**
56:11;60:25
**into (37)**
13:7;17:14;20:9;
23:12;27:1,5,8;28:2;
29:6,18,22;36:24;37:1,
18,21;44:25;45:6;
47:12;51:1,10;57:5;
60:12;62:17;63:7,22,
23,24;67:7,14;68:9;
69:4;71:4;79:13,23,24;
81:4,13
**introduce (3)**
7:1;32:19;39:22
**inverse (1)**
75:6
**invited (1)**
18:17
**involved (12)**
13:20,21;14:6,7,19,
21;16:24;17:2,15,16;
18:14;47:12
**issued (1)**
37:17
**issues (2)**
14:23;16:22
**item (3)**
33:17;34:4;64:4
**items (1)**
55:24

**J**

**January (7)**
23:9,15,24;24:18,22;
41:25;42:6
**Jeffrey (1)**
22:18
**Jennie (1)**
7:23
**JO (1)**
6:1
**job (8)**
10:18;11:5,7;12:6;
13:1;40:24;57:11;
60:15
**jobs (1)**
60:15
**John (1)**

7:18
**JPs (2)**
60:1,14
**judge (2)**
37:9,17
**judicial (1)**
57:19
**July (3)**
21:11;37:15;38:1
**jury (1)**
57:20
**Justin (2)**
40:22;41:11
**juvenile (1)**
23:18;25:4;76:19

**K**

**keep (2)**
7:9;50:15
**Keith (1)**
23:6
**kept (1)**
10:20
**kind (5)**
13:7;17:9;31:16;
78:3;79:22
**Kirby (1)**
7:23,23
**knew (2)**
48:14,15
**knowing (3)**
20:25;21:4;68:20
**knowledge (5)**
15:25;23:14;61:20;
73:13;78:21
**Kudos (1)**
75:17

**L**

**labeled (2)**
42:12,16
**labels (1)**
42:13
**laid (4)**
58:12;67:5,14;74:10
**large (1)**
44:23
**last (4)**
9:3;14:2;27:16;
75:13
**later (2)**
37:17;53:21
**law (19)**
11:9;13:15;29:18,
22;30:24;36:25;51:1;
55:25;56:2,3,8;62:24;
70:6;74:15,16,19;75:2,
3,6
**lawsuit (14)**
13:7,8,11;19:16,19;
20:7;21:6;29:10;

30:12;33:14;34:6,22;
35:1;49:16
**lawsuits (1)**
20:10
**lawyer (1)**
10:11
**lay (1)**
72:16
**layout (1)**
73:10
**least (3)**
21:3;40:14;75:16
**leave (1)**
11:7
**led (1)**
22:12
**left (4)**
27:3,19,20;76:20
**Legal (7)**
8:6;24:11;30:3;
31:16;33:9;52:16;59:9
**legislature (1)**
29:17
**LETA (3)**
6:1;7:24;9:3
**L-E-T-A (1)**
9:3
**letter (3)**
22:18,25;23:2
**LGB (2)**
41:2,16
**LGBT (2)**
41:2,10
**LGBTQ (2)**
23:11;77:9
**librarian (14)**
50:4;51:19;54:4,5;
60:8;65:11;72:24;
73:18;74:24;75:24;
77:17,18,21,23
**librarians (15)**
34:8,11,13,20;49:21;
50:21,24;51:17,24;
52:3,11;68:7,8;78:16,
21
**librarian's (10)**
27:3;57:4,25;58:19;
59:3;65:5,14;68:21;
77:17;80:4
**Libraries (17)**
8:16,20;13:13,13,14,
16,18;25:7;30:25;
34:15;53:25;56:24;
58:8;59:7;61:12;71:7;
73:14
**Library (125)**
7:19,21;8:11,14,20;
13:12;14:1,1,18,24;
15:12,13,15,15,16,17,
18,19;16:8,19;18:5,9,
16,18;22:12,13,15;
23:7,9,10,16;24:20;
25:6,8,17,20,22;26:10,

21;27:1,5,13,17;28:5,
7,15,19;29:3;34:21,21;
35:5,23;36:5,11;38:8;
39:6,10,15;41:25;
42:11,21;43:2,3;44:7;
45:10;46:15,21;47:13;
50:10;51:3,21;55:11;
56:17,25;57:2;58:2,3,
8,15,15;59:5,21;61:21,
24;62:5,12;63:10,14;
64:4,24;65:12;66:5,13,
18;67:4,6,8,9,12,19;
68:4,6,14,15;69:7,9,
15;70:2,18;71:23,24;
72:6;73:10;74:22;
75:14,15,18;76:15;
77:20,24,24;78:5;
79:17;81:11
**library's (5)**
35:6;58:4;62:20;
66:20;74:23
**library-wide (1)**
43:11
**lifestyles (1)**
22:21
**Likewise (1)**
8:17
**limit (1)**
49:8
**limited (2)**
57:10;71:9
**limits (2)**
58:18,20
**Line (12)**
33:21,22,24,25;
35:12;36:1,4,9,13;
42:10;62:4;63:3
**Lines (1)**
62:16
**list (2)**
69:19;78:19
**listed (1)**
39:25
**lists (2)**
36:7,12
**litigation (1)**
75:17
**Little (11)**
10:13,15;11:5;16:3;
18:19;22:9;23:20;
47:7;48:20;49:14;69:2
**lived (2)**
12:2,3
**living (1)**
9:25
**llama (4)**
76:24;77:8;80:21;
81:3
**local (2)**
48:19;69:7
**located (4)**
26:17;62:20;67:1;
68:16

**location (1)**
44:6
**locked (5)**
54:2;63:19;65:24;
66:3;68:10
**long (3)**
10:2;11:5;13:1
**longer (1)**
53:3
**look (11)**
36:18;54:6;55:4;
67:7;70:23;72:8,13;
73:4;78:22;79:2,18
**looked (2)**
17:14;50:12
**looking (6)**
20:9;61:18;66:16;
67:19;68:8;72:6
**looks (1)**
40:20
**lot (3)**
29:8;61:15;72:25
**love (1)**
72:16

**M**

**ma'am (1)**
63:7
**main (9)**
23:16;26:20,22;
27:12;28:18;29:3,4;
44:6;66:13
**mainly (1)**
10:7
**majority (1)**
23:8
**makes (1)**
75:24
**making (6)**
30:25;46:3;47:4;
55:16;56:5;59:13
**management (1)**
11:2
**manager (1)**
10:17
**many (6)**
6:24;18:25;19:9;
21:2;24:6;70:21
**March (10)**
14:10,11;17:19,20;
18:8,10;38:25;39:4,11,
12
**mark (1)**
21:19
**marked (5)**
21:21,23;32:3;
39:24;42:1
**Maryland (1)**
11:21
**material (16)**
22:22;34:17;35:7;
48:25;49:10,19;62:5,

19,22;63:9;64:4;65:23,
25;66:1;67:25,25
**materials (8)**
22:12;35:4;47:12;
55:1,10,17;67:19;
69:15
**matter (5)**
7:12;48:25;50:19;
54:7;56:12
**matters (1)**
50:20
**mature (1)**
56:12
**may (10)**
16:2;17:13;27:16;
30:23;55:25;58:17,17;
63:1;66:12;70:24
**maybe (3)**
19:14,17;21:3
**MCLELLAND (48)**
6:6,16,18,20,22;
7:11,25;8:8,12,22,25;
17:24;19:4,5;20:5,21,
24;21:10,17;24:5,8,16,
17;30:6;31:19;32:6,14,
17;33:11;43:13,16,20;
44:19;46:23;49:17;
52:8;64:12,18;65:16;
66:9;67:10;71:13,20;
75:10;77:6;80:12,16,
18
**mean (13)**
14:16;15:9;24:6;
26:8,22;30:15;56:16;
59:2,5,22;63:17;74:7;
79:9
**Meaning (2)**
28:15;73:23
**means (1)**
55:4
**media (2)**
13:17;31:2
**meet (1)**
48:3
**meeting (12)**
18:23;19:2,6,15;
21:12;38:21,24;39:3,
10;40:7;63:5,6
**meetings (17)**
15:13,14;18:16,17,
18,18,25;19:9;38:13,
14;39:6;51:22,23;
59:18,23;61:2;78:1
**members (3)**
17:6;18:19;59:25
**men (1)**
77:12
**mentioned (9)**
47:6;49:15;51:17,
18;52:8;53:2,7,19;78:4
**met (1)**
16:21
**might (23)**

21:13,14;48:16;
49:2,8;50:13;51:11;
53:20;55:10,14,17;
56:11,13;62:18;66:17,
18;67:25;70:5;71:5;
72:24;73:4;79:15,18
**mind (6)**
32:13;36:18;49:12;
66:15;71:25;72:3
**mindful (1)**
9:20
**mine (1)**
46:2
**minimum (2)**
36:6,12
**minor (5)**
33:17;34:4,17;
49:19,19
**minors (9)**
62:21;63:11;65:24;
66:2;68:12;69:15,25;
70:4,13
**minute (1)**
42:2
**Minutes (11)**
38:8;40:13,22;41:9,
21,22,23,25;42:14,22;
77:25
**Missouri (4)**
11:17,18,22,23
**misunderstood (1)**
19:17
**moment (4)**
26:4;36:8;39:25;
62:22
**months (2)**
14:22;15:3,23
**more (16)**
15:10,11;16:11,14,
23;17:14;27:16;32:5;
40:25;43:24;49:14;
68:18;69:2;71:8,9;
75:16
**morning (2)**
6:6;8:13
**Most (3)**
60:18,19;78:18
**move (5)**
11:22,24;26:9,16;
40:10;49:14,15;53:22;
56:22;70:3;81:12,12
**moved (18)**
11:8,23,25;23:11,17;
24:1;25:1,5;26:13;
63:19;66:18;69:24;
73:18;76:18;77:4,10,
14;81:4
**movement (2)**
23:14;74:23
**moving (5)**
16:12;25:16;39:14;
54:1;69:14
**much (1)**

63:7
**multiple (2)**
44:24;47:23
**municipal (3)**
36:5,11;62:5
**must (2)**
44:1;56:24

**N**

**name (8)**
7:6;9:2,3,3;14:3;
18:21;22:2;29:13
**named (1)**
6:2
**Nate (1)**
7:19
**nature (1)**
38:3
**near (1)**
61:6
**necessarily (2)**
50:18;62:17
**need (7)**
7:4,5;32:4,8;60:17;
71:13;78:19
**negative (4)**
51:5;61:11;79:6,7
**new (6)**
23:12;27:8,20;48:6;
50:12;79:3
**newspaper (5)**
13:24;15:11;16:15,
16;18:6
**next (5)**
22:17;23:5;38:24;
42:9;56:15
**Noah (2)**
7:13;46:23
**nobody (3)**
40:24;67:20;79:9
**nods (1)**
9:17
**None (1)**
46:2
**nonfiction (2)**
27:9;78:7
**normalizing (1)**
22:20
**normally (1)**
79:17
**note (3)**
24:8;31:15;33:8
**noted (1)**
24:16
**notes (2)**
43:17;70:23
**notice (1)**
67:13
**November (4)**
16:1,2;18:4;22:17
**number (4)**
21:4;29:15;33:19,21

**numbers (2)**
25:8;42:2

**O**

**oath (3)**
9:8,10;43:22
**object (10)**
24:2;30:1,4;49:4;
53:11;62:25;66:7,8;
67:10;77:6
**objection (8)**
7:5,8;24:16;31:15;
33:8;45:21;52:16;
66:10
**obscene (4)**
54:10;55:1;57:20;
67:3
**occurring (1)**
15:3
**October (4)**
16:1,4;18:4;21:11
**off (4)**
7:10;32:14;38:20;
75:22
**Offices (1)**
7:14
**officials (4)**
57:18;59:13;61:5;
80:7
**old (2)**
50:13;63:15
**older (3)**
28:24;42:19;46:17
**old-fashioned (1)**
72:17
**Olivia (1)**
7:23
**one (28)**
12:4;26:24;27:20;
44:12,20;47:7,8,15,16;
52:10;54:5;56:9;
58:12;60:1,20;61:7;
69:14,18;72:10;75:13;
76:24,24;77:8;78:1;
80:2,12,20,21
**one-on-one (1)**
21:14
**ones (6)**
38:18,19;41:5,18;
45:25;61:18
**online (1)**
21:17;71:13
**only (8)**
11:12;15:19;24:9;
28:6,24;42:19;49:24;
75:15
**open (3)**
45:14;51:15;67:12
**opening (1)**
12:16
**operates (1)**
62:24

**opinion (3)**
55:3;57:8;59:19
**opportunity (1)**
74:20
**opposed (2)**
48:20;56:8
**opposing (1)**
14:19
**option (1)**
54:1
**order (2)**
37:9,17
**orderly (1)**
10:20
**organization (1)**
51:8
**organized (1)**
18:20
**oriented (1)**
25:9
**originating (1)**
22:1
**Orlando (1)**
6:20;8:17
**ostracization (1)**
73:7
**ostracize (1)**
73:4
**others (3)**
23:7;45:23;70:21
**Otherwise (1)**
57:18
**ourselves (1)**
7:2
**out (31)**
16:22;19:14,15;
23:11;41:2,3,4,10,15,
17,18;45:4;47:8;
55:11;56:9;58:12;
66:15,20,22;67:5,14,
15;68:5,20;70:22;
74:10;75:20;78:16,17,
22;81:12
**outcome (1)**
76:14
**Outlined (1)**
42:11
**outside (2)**
58:24;59:8
**over (11)**
9:14,15;22:11;41:4,
17;42:9;43:17;55:4;
63:15;64:20;80:13
**overturn (2)**
65:13,14
**own (3)**
21:19;45:8,10

**P**

**page (20)**
22:3,8;30:7,8;33:19,
20,25;35:11;36:1,8,9,

14,14;40:13;42:2,9;
45:17;62:4,16;63:3
**painless (1)**
47:4
**Paragraph (6)**
22:11;23:5;30:21;
31:24;33:5;46:4
**Paragraphs (3)**
45:18,24;46:11
**parent (1)**
44:2
**parental (2)**
42:13,22
**parents (1)**
68:2
**Parker (3)**
8:2;71:1,2
**part (6)**
25:6;26:9;40:14;
58:7;60:14;70:19
**participation (1)**
22:22
**particular (16)**
13:4;14:18;15:2,7,9,
11,21;16:7;18:4;
19:19;23:19;29:9;
61:3;72:5,7,11
**parts (1)**
30:23
**pass (2)**
43:18;46:19
**passed (2)**
29:11,20
**past (5)**
22:11;27:6,17;
48:17;55:5
**patron (5)**
13:12;50:10,10;
65:12;66:5
**patrons (4)**
31:2;57:3;67:6,17
**Pearl's (1)**
8:3
**Penney's (1)**
10:12
**people (27)**
6:24;14:5;16:18;
18:21;21:17;25:20;
44:25;54:11;56:2;
57:7,21;58:17;60:7,18,
19;61:17;63:24;66:22;
67:5,15,16,18;68:13;
73:4;78:12,12,14
**People's (1)**
54:8
**Peppas (2)**
40:23;41:11
**perceived (1)**
77:9
**perception (2)**
54:12;67:1
**perhaps (1)**
45:22

**permanently (1)**
31:4
**permission (1)**
63:22
**person (11)**
6:25;19:11,12;
22:14;34:3;35:6;
38:16,19,21;39:8;
57:24
**personal (1)**
59:19
**personally (1)**
13:14
**personnel (1)**
56:17
**peruse (4)**
66:19;67:7;68:4;
71:5
**perusing (1)**
72:9
**PhD (1)**
60:2
**phone (2)**
20:11;61:2
**physical (2)**
27:24;28:1
**Physically (1)**
26:18
**picking (1)**
66:14;68:9
**picture (1)**
77:1
**pictures (2)**
77:11,12
**piece (1)**
35:7
**place (3)**
65:11;69:14;76:18
**placed (7)**
27:11;57:14;59:6;
66:2;68:11;70:12;
72:19
**placement (5)**
65:7,9;76:21;81:8,8
**places (1)**
11:14
**Plaintiff (3)**
19:16,18;20:7
**Plaintiffs (2)**
24:7;31:3
**Please (5)**
19:3;30:7,20;32:8;
36:3
**pm (1)**
81:19
**point (9)**
7:6;17:25;21:3;
29:22;52:10;54:22;
56:13;62:14;70:22
**policies (1)**
58:9
**policy (28)**
28:4,7,9,10,10,12,13,

14,22,23;35:22;36:4,
10;42:21,24;43:2,11;
44:1,3;57:2,3;58:3,6,
15;60:13;61:16;64:25;
81:9
**political (1)**
57:13
**poorly-worded (1)**
49:7
**pornographic (1)**
67:2
**position (3)**
11:1;12:21,24
**possibilities (1)**
61:11
**possibility (2)**
20:9;21:12
**possible (2)**
47:4;61:5
**possibly (1)**
69:14
**potential (2)**
73:10;79:3
**practice (3)**
10:4,5,6
**practiced (1)**
10:9
**preliminarily (1)**
31:3
**preliminary (3)**
37:12,25;38:12
**preparation (1)**
23:2
**present (1)**
76:5
**presented (1)**
48:8
**Presently (1)**
76:6
**Press (1)**
13:23
**pressure (3)**
57:14,17;61:3
**prevented (1)**
29:5
**prevents (3)**
28:1,2;61:1
**previously (1)**
6:2
**prior (1)**
30:13
**privilege (1)**
20:22
**probably (9)**
20:19;38:24;44:22;
51:13;60:4;64:10;
71:8;72:7,9
**problem (4)**
55:23;56:4,8;58:11
**problems (1)**
16:18
**procedure (7)**
35:14;58:11;60:9,

11;65:14;69:3,6
**procedures (1)**
56:23
**process (5)**
35:16;62:7,9,11;
74:10
**professional (1)**
59:23
**professionally (1)**
13:15
**prohibit (2)**
74:15,16
**prohibits (1)**
75:7
**promise (1)**
56:20
**pronounce (1)**
14:2
**prosecuting (2)**
7:15;13:9
**prosecution (1)**
52:11
**protected (1)**
31:1
**provide (2)**
36:6,12
**provided (1)**
52:10
**provides (1)**
34:14
**providing (2)**
55:24;60:16
**provision (1)**
70:5
**prying (1)**
50:16
**Public (13)**
7:20;8:11;17:10;
30:24;34:21;46:21;
51:7;54:12;57:17;
60:3;61:2,12;63:5
**publically-supported (1)**
51:8
**publicity (6)**
51:5,20;52:6;79:4,6,
7
**public's (1)**
57:22
**published (1)**
47:24
**Publishers (2)**
8:5;10:13
**Publisher's (1)**
47:17
**pull (3)**
21:19;45:16;75:22
**purchase (2)**
55:14,17
**purchased (1)**
10:19
**purchasers (1)**
56:17
**purpose (2)**

13:12;50:1
**purposes (1)**
58:1
**push (1)**
54:9
**put (5)**
14:4;25:10;32:2;
42:12;79:24
**puts (1)**
57:21
**putting (3)**
18:21;57:17;61:3

**Q**

**qualification (1)**
35:5
**qualified (2)**
57:8;60:4
**quality (1)**
47:25
**quick (5)**
6:11;18:1;47:3;
70:24;78:2
**quickly (3)**
56:22;60:18,19
**quite (1)**
47:6
**quorum (34)**
14:23,24;15:14;
16:9;18:16,18;21:12;
25:11,13,14,25;26:1,5,
11,14;35:9;38:9,21,22;
39:19;40:20;42:11;
57:9,11;59:18;60:10;
69:10;70:1,16;73:23,
24;74:1,5,12
**quote (4)**
15:2;23:11;38:5;
67:24

**R**

**rarely (1)**
72:10
**rather (2)**
13:4;57:23
**react (5)**
50:21,25;51:1,3,11
**Read (29)**
8:7;13:23;15:11;
16:20;18:6,6,30:16,21;
31:8;36:2,2,2;41:7;
48:23;50:14,18,23;
56:13,15;60:18,19,20,
22;67:21,21,22,22;
68:5;72:18
**readers (1)**
50:11
**reading (5)**
24:4;57:23;60:15;
68:9,21
**real (1)**

70:23
**really (3)**
18:20;61:13;64:7
**rearranged (2)**
54:14;73:13
**reason (12)**
9:22;13:10,11;
25:23;29:1,5;49:24;
56:10;57:18;59:21;
72:19;77:11
**Rebecca (4)**
6:13;7:25;8:2;71:2
**recall (4)**
48:24;49:22;76:23;
77:3
**receive (1)**
12:23
**recent (1)**
49:15
**recently (1)**
30:23
**recess (3)**
32:16;43:19;65:18
**recognize (1)**
21:22
**record (11)**
7:9;9:16;24:9;30:8;
32:15,18;43:21;45:21;
63:6,18;80:24
**recourse (1)**
65:13
**reference (1)**
45:16
**referenced (4)**
23:15;40:9;43:9,25
**references (1)**
69:13
**referencing (7)**
15:8,17;31:25;
33:18;41:11,13;42:16
**referring (3)**
57:9;72:4;78:19
**reflective (1)**
46:11
**regarding (7)**
16:8,11;56:25;
61:15;64:21;65:5;
80:20
**regularly (1)**
50:12
**regulated (1)**
55:21
**related (3)**
16:22;28:22;50:20
**relation (1)**
38:7
**relationship (1)**
7:18
**relocated (1)**
63:10
**remain (1)**
62:6
**remember (16)**

16:17;37:12,25;
38:11;39:10,16,19;
40:11;44:5;47:21;
64:23;72:1;73:11,20;
74:25;80:22
**remodel (3)**
51:13;53:3,22
**remotely (2)**
6:10,25
**removal (4)**
52:24;61:23;62:3;
69:14
**remove (1)**
52:13
**removed (8)**
61:21;62:1,8,10,12,
23;77:9,23
**removes (1)**
52:20
**renew (1)**
52:15
**rephrase (2)**
29:15;35:19
**reporter (4)**
6:25;7:9;9:15,20
**represent (5)**
7:17,23;8:1,3;52:19
**representing (7)**
7:2,11,14;8:9,10,14,
19
**require (4)**
35:13,16,21;61:23
**required (1)**
12:21
**requirements (3)**
35:4;56:25;59:9
**requires (2)**
42:22;62:2
**requiring (1)**
42:13
**residents (1)**
22:18
**respect (1)**
20:22
**respective (1)**
23:13
**rest (1)**
67:8
**restrains (1)**
30:24
**restricted (6)**
42:19;46:17;63:20;
71:4;79:3,24
**retail (1)**
10:12
**retailing (1)**
53:16
**retired (1)**
60:15
**return (3)**
57:14;77:18,25
**returned (4)**
76:15,19;77:20;

78:20
**returns (1)**
78:25
**reverse (2)**
70:2;76:1
**review (9)**
23:2;30:12,16,18,20;
39:25;42:2;45:18,19
**reviewed (2)**
22:24;45:23
**reviews (1)**
47:23
**right (31)**
9:1;13:7;15:6;17:3;
19:21,23;20:13,17;
27:2,4,18;31:8;32:18;
35:22;37:5;40:23;
43:13,21;48:10;49:14;
55:1;64:19;65:4,21;
68:3,4;69:16;70:14;
74:22;81:5,9
**right-hand-side (1)**
44:10
**rights (4)**
30:2;31:6;67:21,24
**River (1)**
52:4
**Rock (5)**
10:13,15;11:5;47:8;
48:20
**room (23)**
7:11;27:5;44:22,23;
45:8,10,10,13;54:1;
60:18;63:22,23,24;
65:24;66:3,19,23,25;
67:7,14;68:10,16;71:4
**row (1)**
27:7

## S

**safe (1)**
23:23
**sales (1)**
48:22
**salesmen (2)**
48:3,4
**Sam (1)**
7:11
**same (5)**
9:10,14;17:17;
66:10;77:11
**sarcastically (1)**
63:17
**saw (2)**
13:19,24
**saying (9)**
9:21;34:19;40:23;
46:8;60:21;62:8,10;
66:24;79:13
**school (3)**
10:23;11:9,16
**schools (1)**

60:3
**Scottsdale (2)**
12:14;47:9
**Scribner's (1)**
12:10
**Sebastian (1)**
10:7
**second (1)**
36:19
**section (124)**
23:12,17,19,19,21;
24:19,24;25:1,2,4,5,
10;26:6;27:4,10,13,18,
19,21,24;28:2,5,9,12,
23;29:2,6,8;31:25;
33:4,6,13,16;34:9,13,
15,16,19,23,25;35:3;
36:6,11;37:3,3,5,5;
40:11;41:2,3,6,15,16,
19;42:12,15,16,19;
43:4,6,8,10;44:6,10,21,
21,25;45:1,3,6;49:18,
24;50:8;52:9,13,20,24;
53:20;55:4,8,11,14,18,
21;56:7,20,22,23;
61:16,19,23;62:2;63:5,
10;66:17;67:16;68:6;
69:2,6,21;70:3,9,20;
72:7,8,11,19;73:11;
76:18,19;77:4,15;79:3,
4,6,8,10,14,23;80:4,20;
81:5,13,14
**sections (13)**
23:13;25:7;31:5;
37:2,20,21;44:20;
46:16;51:14;54:1;
65:22;78:5,8
**seeing (2)**
64:1;79:2
**seek (1)**
31:3
**seeking (3)**
29:10,23,23
**SEEL (3)**
6:19;8:13,13
**segregated (2)**
50:15;70:9
**select (6)**
10:21,22;48:7;
49:10;71:23;78:11
**selected (1)**
10:19
**selecting (2)**
47:12;48:24
**selection (8)**
12:18;13:25;14:20;
16:19;22:23;47:13;
65:6,9
**self-checkout (1)**
78:18
**sentence (3)**
22:17;41:9,19
**separate (5)**

27:5;63:10;66:3;
67:8;71:4
**set (2)**
25:7;27:6
**several (9)**
14:22;15:3,22;
25:20;27:6;44:15,20;
51:18;78:4
**shaking (1)**
49:13
**shall (8)**
36:6,11;56:12;62:5,
6,19;63:5;67:23
**shape (1)**
57:12
**shelf (5)**
27:24;44:13;72:9;
76:15,17
**shelves (3)**
44:15,24;66:14
**shelving (1)**
27:19
**shopping (1)**
51:12
**show (3)**
27:8;48:4;60:7
**showing (1)**
61:2
**side (4)**
27:20,21;49:13,13
**sign (1)**
28:8
**signed (3)**
29:18,22;37:9
**silly (1)**
79:19
**sit (1)**
55:20
**situation (16)**
14:6,15,16,18;15:3,
7,8,9,21;16:7;17:10;
18:5;19:19;29:9;
40:25;76:20
**small (1)**
13:13
**Smith (1)**
11:8
**Social (32)**
23:17,21;24:19,24;
25:1,10;26:5;27:10,13,
21,23;28:2,5,12,23;
29:2,6,8;40:10;42:16,
18;43:8,9;44:6;69:21;
76:18;77:4;79:23;
80:3,20;81:4,13
**sold (1)**
48:16
**solution (2)**
26:2,3
**somebody (3)**
62:15;73:4;81:7
**somehow (3)**
52:6;54:9;67:2

**someone (3)**
67:13;79:2;80:1
**somewhat (1)**
9:18
**somewhere (1)**
17:2
**soon (1)**
61:13
**Sorry (6)**
29:15;35:11;37:11;
38:24;40:21;44:18
**sort (3)**
26:1;48:6,10
**sorts (1)**
61:11
**sought (1)**
22:22
**sound (1)**
6:11
**space (1)**
51:16
**speak (11)**
9:14,15,18,19;14:14,
17;18:8,10;21:2,5,5
**speaking (2)**
26:3;58:2
**specific (4)**
28:12;58:12;63:8;
80:8
**specifically (20)**
23:22;29:19;30:14,
16;31:3;34:15,21;
38:18;40:3;43:9;46:2,
8,9;47:19;48:20;
49:18;50:3;53:6;
62:18;63:25
**specifics (1)**
16:22
**spell (1)**
9:2
**spend (1)**
22:9
**spoke (8)**
14:1,4,11;15:1,2;
20:10,15;64:20
**spoken (2)**
29:8;53:17
**Springs (1)**
7:20
**stack (1)**
27:10
**staff (1)**
23:9
**stage (1)**
69:5
**stake (1)**
67:15
**stamp (1)**
40:1
**stamped (1)**
42:10
**standards (3)**
58:7;59:6,7

**standing (2)**
24:10;52:6
**start (3)**
7:10;61:7;69:19
**started (3)**
6:8;9:1;16:3
**starting (2)**
12:16;35:12
**state (6)**
7:6;10:8;12:3;29:11;
31:21;42:10
**stated (3)**
36:13;40:23,25
**statement (3)**
7:8;38:22;54:24
**states (7)**
22:11;23:5;30:22;
31:22;32:24;36:10;
40:22
**statute (14)**
29:11,13;32:1;52:5;
57:5,5,7,16;58:22;
60:24;73:25;74:7,18,
20
**statutes (1)**
50:22
**staying (1)**
62:14
**stigma (7)**
66:21,25;68:18;
71:3;72:25;73:2,3
**still (6)**
43:22;48:2;50:9;
54:13,19;79:15
**stop (4)**
33:13;34:5,7;49:21
**store (2)**
51:14,15
**storewide (1)**
13:6
**struggling (1)**
19:14
**Sub (2)**
35:11,11
**subdivision (1)**
63:4
**subject (9)**
24:12;25:9;48:25;
50:19,20;56:12;59:22,
24;74:23
**submitted (1)**
63:6
**subparts (1)**
36:13
**subpoints (1)**
36:7
**Subsection (2)**
36:5,11
**suggested (1)**
25:16
**summary (1)**
60:16
**superintendent (1)**

60:2
support (2)
51:7,7
sure (11)
6:12;17:13;18:2;
27:2;32:10;38:4;
43:15;55:16;56:5;
79:12;80:25
sweeping (1)
30:24
switch (1)
80:13
sworn (1)
6:3
System (12)
7:19;18:6,9;24:20;
25:21;28:5,19;39:15;
46:15;51:3;75:15;
78:22

**T**

tables (2)
27:6;67:15
talk (1)
69:2
talked (9)
14:22;17:18;39:14;
42:18;47:5;69:5,13;
73:9,9
talking (6)
17:22;20:8;53:21;
61:15;76:4;79:25
Tammi (3)
22:18;23:6;25:25
targeted (1)
14:25
targeting (1)
52:3
taxpayer-funded (1)
51:8
Teams (1)
7:4
Technically (1)
54:20
temporary (2)
26:2,3
ten (3)
28:8,11;42:25
tend (1)
9:18
terms (1)
67:19
testified (3)
6:4;71:3;79:25
testifying (2)
37:12,25
testimony (26)
9:7,22;19:13,17;
26:4;34:17;38:3,6,7,
11;39:16,19;40:11;
43:22;64:23,24;71:22;
72:1;73:1,11,16,20;

74:25;80:19,22;81:2
TG&Y (1)
10:14
thanks (2)
6:19;8:22
though (4)
16:3;23:24;43:2;
54:14
thought (1)
70:11
three (4)
11:6;19:10;21:3;
64:14
throughout (1)
62:6
timeframe (1)
21:9
timeline (2)
18:1,11
times (4)
21:2,3;43:25;78:4
title (1)
63:21
titled (1)
32:19
titles (1)
78:17
today (6)
9:7,22;30:17;47:2;
55:5,20
today's (1)
23:2
together (2)
18:22;75:23
told (4)
40:10;44:9;56:6;
64:3
took (2)
12:6,21
top (4)
22:5;32:23;38:20;
42:6
topic (2)
39:16;75:22
touch (1)
14:5
training (5)
10:25;12:19,20,20,
23
transcript (1)
38:4
transsexual (1)
22:21
traveling (1)
48:2
true (3)
60:20,21;63:2
trump (1)
68:4
truth (5)
6:3,4,4;9:23,23
try (4)
47:2;56:2;58:21;

70:16
trying (10)
9:20;16:17;33:13;
34:5,7;48:17;50:9;
53:25;54:17;56:9
turn (1)
45:17
turned (1)
30:9
two (10)
11:12;21:3;23:6;
47:7;53:22;59:25;
75:3;77:12,13;81:3
two-year (1)
61:5
type (1)
61:4
types (2)
14:25;78:5

**U**

ultimately (6)
66:24;77:14;79:13,
24;80:8;81:12
unaware (1)
55:20
unconstitutional (3)
31:5,14,21
under (37)
9:8,10;28:7,11;31:6;
36:5,11;42:25;43:22;
55:8,11,14,18;56:7;
57:2,5;59:15;62:4,21;
63:4,11;64:4;65:22;
66:2;68:11;69:6,15,24,
25;70:2,3,4,9,13;
74:17;80:4;81:9
Understood (5)
17:1;20:18;30:18;
31:20;81:2
unfortunately (2)
54:8;75:20
units' (1)
22:22
University (4)
11:4,10,11;47:3
unless (1)
71:25
unpack (1)
23:20
unquote (1)
67:24
up (16)
20:6;21:19;25:7;
27:6;39:23;52:6;
56:20;60:7;61:2;
63:21;64:11,19;66:14;
68:9;71:24;80:24
upheld (1)
62:1
upon (12)
23:23;33:4;50:21,

24;51:2;53:15;57:14;
60:4,24;63:23;68:15;
73:6
use (8)
33:19;52:5;59:8;
66:4,13;72:15;75:18;
78:18
used (3)
13:13;72:25;75:19
using (2)
67:4,5
usually (2)
25:8;48:5

**V**

vague (1)
30:24
Valley (1)
52:4
Van (5)
13:24;26:22,24;
29:3;44:7
variety (1)
48:17
via (1)
7:4
Vince (2)
6:16;8:8
Vincent (2)
8:10;46:20
violations (1)
31:6
virtually (3)
38:16,19;39:8
void (1)
31:5
voted (1)
77:25

**W**

Wahlmeier (4)
7:16,16;21:13;66:8
walk (4)
27:1,17;78:8;79:17
walking (3)
22:9;66:14;71:24
walls (3)
45:1,9,11
wander (1)
79:17
wandering (1)
63:21
wants (1)
20:19
Washington (1)
48:21
watch (1)
67:16
watching (1)
79:19
water (2)

32:5,12
Watson (12)
7:13,13;46:25;49:5;
64:20;65:22;66:7;
71:18;75:12;76:6;
80:11,19
way (10)
7:8;57:12,17,19;
66:4,13;67:5,14;75:22,
25
Webb (2)
8:14,21
weeds (1)
62:17
welcome (1)
71:12
weren't (1)
79:13
what's (5)
13:11;29:15;44:12;
52:23;68:2
WHEREUPON (1)
81:19
whole (3)
6:4;9:23;28:20
who's (2)
57:24;78:22
widely (1)
56:11
willing (1)
41:1
windows (1)
44:23
within (4)
23:12;48:25;60:15;
62:20
without (1)
13:15
witness (12)
6:2;9:17;17:23;20:4,
23;30:5;31:17,18;
43:18;44:18;46:19;
49:13
women (1)
77:13
word (3)
72:25;73:2,3
words (2)
7:7;46:11
Wordsworth (1)
8:3
work (3)
53:3;69:3,11
worked (7)
10:12,13,14,15;12:8;
58:16,17
working (1)
47:7
wrapping (1)
56:20
write (2)
46:8,9
written (5)

36:4,10;40:13;
46:11;57:16
**wrong (5)**
36:8,14;54:6;70:20;
81:3
**wrote (1)**
46:10

## Y

**y'all (1)**
80:13
**year (5)**
12:4;13:2;22:11;
48:5;56:15
**years (6)**
11:6;28:24;50:12;
58:16;63:11,15
**young (4)**
23:19;25:2;43:6;
75:19
**younger (1)**
44:1

## 1

**1 (34)**
21:20,21,23;30:8,11,
21;31:5,24,25;33:4,5,
6,13,16;34:9,13,16,23;
37:3,5;45:17;49:18,24;
50:8;53:20;55:4,8,11,
14,18,22;56:7,20;
65:23
**10 (1)**
22:17
**10:32 (1)**
43:18
**10-minute (1)**
43:14
**10th (6)**
23:9,15,24;24:22;
41:25;42:6
**10-year-olds (2)**
28:22;44:1
**12 (1)**
35:11
**14 (2)**
33:22,24
**15 (4)**
36:1,4,9,13
**16 (2)**
36:1,13
**17-year-old (2)**
29:1,5
**18 (10)**
28:24;42:19;46:17;
62:21;63:11,15;69:16,
25;70:4,13
**19 (1)**
17:22
**1974 (1)**
11:23

**1982 (1)**
12:1
**1996 (1)**
10:3
**19th (2)**
40:7;41:23

## 2

**2 (15)**
30:7,8;32:2,3,20,23;
33:20,25;34:15,19;
52:9,13,20,24;62:4
**2:49 (1)**
81:19
**20 (5)**
16:5;60:7,9,15;62:4
**200 (3)**
23:18;27:13;69:19
**2022 (8)**
16:6,7;18:4,7;21:11;
22:17;23:6;41:24
**2023 (15)**
17:23;18:7,10;
21:11;24:19;29:17,20,
22;30:24;37:15;39:2,4,
12;41:25;42:7
**2-1 (1)**
33:1
**23 (1)**
40:1
**25 (2)**
22:8;45:17
**25th (2)**
37:15;38:1
**26 (2)**
33:24,25
**27 (2)**
40:3,13
**28 (2)**
40:3,13

## 3

**3 (4)**
12:1;39:23,24;42:3
**30 (2)**
40:1;63:3
**32 (1)**
62:16
**33 (1)**
62:19
**34 (1)**
62:19
**35 (1)**
62:16
**372 (24)**
17:12;29:17,18,20;
30:23;31:5,25;32:20;
33:4,7;35:13;36:24;
49:15;58:24;59:8,15;
64:5,21;65:22;70:20;
73:14;74:8,10,17

## 4

**4 (4)**
41:24;42:1,4,10

## 5

**5 (16)**
31:5;34:25;35:3;
37:3,5;56:22;61:16,19,
23;62:2;65:23;69:2,6;
70:3,9,20
**5:23-cv-05086-TLB (2)**
22:6;32:24

## 6

**6 (1)**
36:15

## 7

**7 (4)**
36:1,9,14;62:4
**78 (5)**
22:11;45:18,24;46:4
**79 (3)**
45:18,24;46:4

## 8

**8 (3)**
35:12;36:15;62:16
**80 (3)**
45:18,24;46:4
**80s (1)**
47:22
**81 (3)**
45:18,24;46:4
**82 (3)**
45:18,24;46:4

## 9

**9 (2)**
35:11;63:3