# In The Matter Of:

*Fayetteville Public Library, et al v.*
*Crawford County, Arkansas, et al*

---

*Madeline Anne Partain*
*March 15, 2024*
*CERTIFIED ORIGINAL/COPY*

---

*Michelle Satterfield, CCR*
*1955 Little River Drive*
*Conway, Arkansas  72034*
*(501)336-7414*
*Satterfield@conwaycorp.net*

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
 2               FAYETTEVILLE DIVISION

 3   FAYETTEVILLE PUBLIC LIBRARY, a political
     subdivision in the City of Fayetteville,
 4   State of Arkansas; EUREKA SPRINGS CARNEGIE
     PUBLIC LIBRARY; CENTRAL ARKANSAS LIBRARY
 5   SYSTEM; NATE COULTER; OLIVIA FARRELL;
     HAYDEN KIRBY;MIEL PARTAIN, in her own capacity
 6   and as parent and next friend of MADELINE PARTAIN;
     LETA CAPLINGER; ADAM WEBB;
 7   ARKANSAS LIBRARY ASSOCIATION; ADVOCATES FOR
     ALL ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
 8   WORDSWORTH COMMUNITY BOOKSTORE, LLC, d/b/a
     WORDSWORTH BOOKS; AMERICAN BOOKSELLERS ASSOCIATION;
 9   ASSOCIATION OF AMERICAN PUBLISHERS,INC.; AUTHORS
     GUILD, INC.; COMIC BOOK LEGAL DEFENSE FUND
10   and FREEDOM TO READ FOUNDATION,        PLAINTIFFS

11   vs.                        NO. 5:23-CV-05086-TLB

12   CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH, in his
     official capacity as Crawford County Judge;
13   TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
     MATT DURRETT; JEFF PHILLIPS; WILL JONES; TERESA
14   HOWELL; BEN HALE; CONNIE MITCHELL; DAN TURNER;
     JANA BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE HUNTER;
15   DANIEL SHUE; JEFF ROGERS; DAVID ETHREDGE; TOM TATUM,
     II; DREW SMITH; REBECCA REED MCCOY; MICHELLE C.
16   LAWRENCE; DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
     CAROL CREWS; KEVIN HOLMES; CHRIS WALTON; and CHUCK
17   GRAHAM, each and in his or her official capacity as a
     prosecuting attorney for the State of Arkansas, DEFENDANTS
18

19

20              ORAL DEPOSITION

21                     OF

22            MADELINE ANNE PARTAIN

23   ***** THE ABOVE-STYLED MATTER was reported by Michelle R.
     Satterfield, CCR, LS Certificate No. 570, at the Wahlmeier
24   Law Firm, located at 1101 Walnut, Van Buren, Arkansas,
     commencing on the 15th day of March 2023, at 8:24 a.m.
25   *****
```

Page 2

```
 1           A P P E A R A N C E S

 2   MR. SAMUEL S. MCLELLAND
     Attorney at Law
 3   PPGMR Law, PLLC
     201 East Markham Street, Suite 201
 4   Little Rock, Arkansas  72201
     sam@ppgmrlaw.com
 5
 6   *** For Crawford County, Arkansas, and County Judge
         Chris Keith, in his official capacity ***

 7   MR. NOAH WATSON
     MS. CHRISTINE A. CRYER
 8   Senior Assistant Attorneys General
     323 Center Street, Suite 200
 9   Little Rock, Arkansas  72201
     Noah.Watson@ArkansasAG.gov
10   Christine.cryer@ArkansasAG.gov

11   *** For the State of Arkansas Prosecuting Attorneys ***

12   MS. BETTINA E. BROWNSTEIN
     Attorney at Law
13   Bettina E. Brownstein Law Firm
     904 West 2nd Street, Suite 2
14   Little Rock, Arkansas  72201
     bettinabrownstein@gmail.com
15
     *** For the Plaintiffs, Olivia Farrell, Jennie Kirby,
16   Hayden Kirby and Leta Caplinger ***
     *** On Behalf of the Arkansas Civil
17     Liberties Union Foundation, Inc. ***

18   MR. JOHN T. ADAMS
     Attorney at Law
19   Fuqua Campbell, P.A.
     Riviera Tower - 3700 Cantrell Road, Suite 205
20   Little Rock, Arkansas 72202

21   *** For The Plaintiffs, Central Arkansas Library System,
     Nate Coulter and the Eureka Springs Carnegie Public
22   Library ***

23            (CONTINUED ON NEXT PAGE)

24

25
```

Page 3

```
 1      A P P E A R A N C E S (CONTINUED)

 2   MR. BENJAMIN M. SEEL
     Attorney at Law
 3   Democracy Forward Foundation
     P.O. Box 34554
 4   Washington, DC  20043
     bseel@democracyforward.org
 5                        (VIA TEAMS)
     *** For the Arkansas Library Association, Advocates for
 6   All Arkansas Libraries and Adam Webb, in his individual
     capacity ***
 7
     MS. REBECCA HUGHES PARKER
 8   Attorney at Law
     Dentons US, LLP
 9   1221 Avenue of the Americas
     New York, NY  10020
10   rebeccahughes.parker@dentons.com
                          (VIA TEAMS)
11   *** For the Plaintiffs, Pearl's Books, LLC; Wordsworth
     Community Bookstore, LLC; American Booksellers
12   Association; Association of American Publishers, Inc.;
     Authors Guild, Inc; Comic Book Legal Defense Fund; and
13   Freedom to Read Foundation ***

14   MR. PHILIP A. ELMORE
     Attorney at Law
15   Quattlebaum, Grooms & Tull, PLLC
     4100 Corporate Center Drive, Suite 310
16   Springdale, Arkansas  72762
     pelmore@qgtlaw.com
17                       (VIA TEAMS)
     *** For the Plaintiff, Fayetteville Public Library ***
18

19

20

21

22

23

24

25
```

Page 4

```
 1              I N D E X

 2     TOPIC                                    PAGE

 3   APPEARANCES                                2-3

 4   STIPULATIONS                                5

 5   WITNESS SWORN:  Madeline Anne Partain       6

 6        Examination by Mr. McLelland           6

 7        Examination by Mr. Watson             29

 8        Examination by Ms. Brownstein         37

 9        Examination by Mr. Adams              48

10        Further Examination by Ms. McLelland  41;49;52

11        Further Examination by Mr. Watson     47;56

12        Further Examination by Ms. Brownstein  51

13   REPORTER'S CERTIFICATE                     57

14            E X H I B I T S

15   NUMBER          DESCRIPTION                PAGE

16   Deft's 1   Copy of Amended Complaint-Document 75    7
          (COPY OF EXHIBIT SCANNED INTO ETRANSCRIPT)
17

18              * * * * *

19

20

21

22

23

24

25
```

Page 5

1       ANSWERS AND DEPOSITION OF MADELINE ANNE PARTAIN,
2   a witness produced at the request of the DEFENDANTS, was
3   taken in the above-styled and numbered cause on the
4   15th day of March 2023, before Michelle R. Satterfield,
5   CCR, a Notary Public in and for Faulkner County, Arkansas,
6   at the offices of the Wahlmeier Law Firm, P.A., located at
7   1101 Walnut, Van Buren, Arkansas, at 8:24 a.m., pursuant
8   to the agreement hereinafter set forth.
9
10
11
12       S T I P U L A T I O N S
13       IT IS STIPULATED AND AGREED by and between the
14  parties through their respective counsel that the
15  deposition of Madeline Anne Partain may be taken at the
16  time and place designated pursuant to the Federal Rules of
17  Civil Procedure.
18                    *  *  *  *  *
19
20
21
22
23
24
25

Page 6

1       MADELINE ANNE PARTAIN,
2   the witness hereinbefore named, having been previously
3   cautioned and sworn, or affirmed, to tell the truth, the
4   whole truth, and nothing but the truth, testified as
5   follows:
6           EXAMINATION
7   BY MR. MCLELLAND:
8   Q   Good morning, Ms. Partain. Can you state your name
9   for the record?
10  A   Madeline Partain.
11  Q   And how old are you?
12  A   Seventeen.
13  Q   Okay. And when will you turn 18?
14  A   June 7th.
15  Q   Okay, cool. So you're a senior?
16  A   Yes.
17  Q   Okay. Where do you go to school?
18  A   Van Buren High School.
19  Q   And before you went to Van Buren High School, where
20  did you go; what school did you go to before high school?
21  A   Butterfield Middle School.
22  Q   Okay. Is that here in Crawford County?
23  A   Yes.
24  Q   Have you lived in Crawford County your whole life?
25  A   Yes.

Page 7

1   Q   Do you work?
2   A   Yes.
3   Q   What do you do for a job?
4   A   I work at Baked on Main on Main Street.
5   Q   Okay. What is that?
6   A   It's a bakery.
7   Q   Okay. How long have you had that job?
8   A   A few months. Before that I worked at the business
9   that is connected to it.
10  Q   Okay. What business is that?
11  A   The Meat Station.
12  Q   Okay. Are they owned by the same owner?
13  A   It's a couple that owns it.
14  Q   Okay. I'm going to introduce Defendant's 1.
15      MR. MCLELLAND: For those attending on
16      Teams, this is just the Complaint, if y'all want
17      to pull it up.
18      MS. BROWNSTEIN: Is that the Amended
19      Complaint or the Complaint?
20      MR. MCLELLAND: Sorry, the Amended
21      Complaint. Thank you for keeping me straight.
22      This is Document 75 for those in attendance
23      on Teams.
24   (Defendant's Exhibit 1 marked & attached hereto.)
25  BY MR. MCLELLAND:

Page 8

1   Q   Ms. Partain, I've handed you a copy of the Amended
2   Complaint that is marked Defendant's 1 that was filed in
3   this case in March. Do you see, at the top of that
4   document, where it says Document 75?
5   A   Yes.
6   Q   Okay. And do you see, on the first page there, kind
7   of in the -- in kind of the first quarter it says Miel
8   Partain? Am I saying that right?
9   A   Miel.
10  Q   Miel Partain.
11      Your mother suing in her own capacity and as parent
12  and next friend of Madeline Partain. Do you see that?
13  A   Yes.
14  Q   Okay. Why did you join -- why are you bringing this
15  lawsuit?
16  A   I believe everyone has a right to read any book they
17  choose.
18  Q   Okay. And what is your understanding of the lawsuit?
19  A   That books deemed inappropriate would be relocated.
20  Q   Okay. And what is -- what's your basis for -- strike
21  that.
22      Are you seeking to stop Act 372 from going into
23  effect in this case?
24  A   Yes.
25  Q   Have you read Act 372?

Page 9

1  A  Yes.
2  Q  Okay.  And is it your understanding that by
3  stopping -- and if I get this wrong, please correct me.
4      Is it your understanding that by stopping Act 372,
5  you will -- that books deemed inappropriate won't be
6  relocated?
7  A  Yes.
8  Q  Okay.  Are you aware that this lawsuit was pending --
9  has been pending since last summer?
10 A  Yes.
11 Q  Okay.  And, also, I forgot to -- I just jumped right
12 in, I apologize.  If at any point you need a break during
13 this, just let me know and we're happy to take a break.
14     And Michelle here is going to try to take down
15 everything that you and I are saying and we've done a good
16 job thus far, so we both can keep doing that.  So I'm not
17 going to try to talk over you and I'm going to ask you to
18 try not to talk over me, so that way we can get a clean
19 record, because the transcript will be succinct in that
20 way.  Sorry, I forgot to tell you that at the beginning.
21     Back to Act 372.  So you were aware that the lawsuit
22 was pending last summer, correct?
23 A  Yes.
24 Q  Okay.  And what made you want to join the lawsuit as
25 a Plaintiff?

Page 10

1  A  I feel that it would hinder my ability to checkout
2  books that I would be interested in reading.
3  Q  What books are you interested in reading?
4  A  Books that -- with LGBT themes that would be -- that
5  have been already relocated.
6  Q  When you say already relocated, what are referring
7  to?
8  A  Into the Social Section.
9  Q  Okay.
10 A  Sorry.
11 Q  So you're referring to Crawford County's --
12 A  Yes.
13 Q  -- use of its Social Section?
14 A  Yes.
15 Q  Okay.  So what's your understanding of the Social
16 Section?
17 A  The criteria is unclear, but I have looked at it and
18 most -- the overwhelming majority of the books put in the
19 Social Section have LGBT+ themes.
20 Q  And how do you know that?
21 A  Because I -- how do I know that?
22 Q  Yeah, how do you know that the overwhelming majority
23 of the books in the Social Section are LGBTQ themed?
24     And I'm not trying to play like a gotcha or I'm --
25 I'm just curious.  Did you read them all, have you looked

Page 11

1  did you go check them all out?  Like how did you come to
2  acquire that information?
3  A  I went and I looked at the section.
4  Q  Okay.  Have you looked at all of the Social Sections
5  in the Crawford County Library System?
6  A  No.
7  Q  Okay.  Are you aware that there are five branches of
8  the Crawford County Library System?
9  A  Yes.
10 Q  Okay.  Are you aware that -- are you aware that all
11 five have a Social Section?
12 A  Yes.
13 Q  Okay.  If I was to tell you that there was a branch
14 of the Crawford County Library System that did not have a
15 Social Section, would that surprise you?
16 A  Yes.
17 Q  Okay.  In this lawsuit, are you in any way seeking to
18 get rid of the Social Section?
19 A  Yes.
20 Q  Okay.  So if the judge rules in your favor in this
21 case based upon, you know, the claims that you've brought,
22 and he rules in your favor, it's your desire that the
23 Social Section will be removed?
24 A  Yes.
25 Q  Okay.  Do you know who created the Social Section; do

Page 12

1  you know how it came to be?
2      Do you know who -- do you know how the Social Section
3  came to be?
4  A  Somewhat.
5  Q  Okay.  What's your understanding?
6  A  I know that a letter was written to the Quorum Court,
7  I believe, and I actually attended the first library board
8  meeting about it.
9  Q  When was that library board meeting?
10 A  January of 2023.
11 Q  Was that your first library board meeting to go to?
12 A  Yes.
13 Q  And do you remember -- at that library board meeting,
14 do you remember the specific date that it was, by chance?
15 A  January 10th.
16     MR. MCLELLAND:  Let's go off the record.
17     (Off the record - technical difficulty)
18 BY MR. MCLELLAND:
19 Q  I believe right before we got disconnected I had
20 asked you about attending the library board meeting here
21 in Crawford County in January of 2023.
22     Do you remember the specific date that that meeting
23 took place?
24 A  January 10th.
25 Q  Okay.  And do you remember Grzymala -- Ms. Deidre

Page 13

1 Grzymala speaking at that meeting?

2 A   Probably.

3 Q   It's okay if you don't.

4       Do you remember what was said at the January 10th

5 meeting about the Social Section?

6 A   Not specifically.

7 Q   Do you remember what was generally said about it?

8 A   I know they were discussing creating it.

9 Q   Okay.  Do you remember who stated -- do you remember

10 who spoke about creating the Social Section at the

11 January 10th meeting?

12 A   No.

13 Q   Did your mom attend that meeting with you?

14 A   No.

15 Q   Okay.  Which branch of the Crawford County Library

16 System do you primarily use?

17 A   The Van Buren Branch.

18 Q   Have you used any other branch?

19 A   No.

20 Q   Okay.  When you use the Van Buren Branch, do you go

21 to the Social Section?

22 A   Yes.

23 Q   Do you check out books from the Social Section?

24 A   I have not yet.

25 Q   Okay.  Is there a reason why you've not checked out

Page 14

1 books from the Social Section, a particular reason?

2 A   No.  It can be uncomfortable, though.

3 Q   Okay.  When you say it can be uncomfortable, you mean

4 it can be uncomfortable to go to the Social Section?

5 A   Yes.  It's directly next to the librarian's desk and

6 with all of the controversy around it, it can be

7 uncomfortable to know that they can see me and see what

8 I'm getting and know that they probably have opinions and

9 might be judging me, even.

10 Q   Okay.  And so you said that at the January 10th

11 meeting were discussing creating the Social

12 Section.  Do you know who determined which books went into

13 the Social Section?

14 A   I do not.

15 Q   Do you know who physically moved the books from --

16 who physically moved the books to the Social Section?

17 A   I would assume the librarians.

18 Q   Do you know why the Social Section was created?

19 A   Because certain people believe the content in those

20 books are inappropriate for younger people.

21 Q   And do you know who -- are there any -- is there any

22 person in particular you're referring to when you say

23 certain people?

24 A   I'm not positive who decides what goes into the

25 Social Section.

Page 15

1 Q   Well, no, let me rephrase.  You said that there were.

2 I asked you why the Social Section was created and you

3 said because certain people believe that the material in

4 the Social Section is not appropriate for children.  Do

5 you remember us -- do you remember saying something to

6 that effect?

7 A   Yes.

8 Q   When you say that there are certain people who

9 believe that the material is not appropriate, are you

10 referring to any particular person when you say certain

11 people?

12 A   No, not specifically.

13 Q   Okay.  Do you remember earlier, right before we got

14 cut off, you said there was a letter written to the Quorum

15 Court.  Do you remember saying that?

16 A   Yes.

17 Q   What letter are you referring to?

18 A   Written by -- it was -- I think it was Tammi Hamby.

19 It may have been her husband.  I'm not positive.  Stating

20 that there were graphic books that featured something to

21 the effect of alternative lifestyles, referring to LGBT+

22 relationships.

23 Q   Have you reviewed any of the pleadings in this case

24 that -- yeah, have you reviewed any of the pleadings in

25 this case, the things that were filed of record?

Page 16

1 A   I don't believe so.

2 Q   Okay.  A pleading -- you may not know.  A pleading is

3 a document like the one I've handed you as Exhibit 1 that

4 has a document stamp on it at the top, where it says

5 Document 75.

6       Have you ever reviewed any documents that have other

7 document stamps on it?

8 A   Yes.

9 Q   Okay.  What documents were those?  Do you remember

10 what they were called?

11 A   I don't know.

12 Q   That's okay.  How many times have you gone to the

13 Social Section at the Van Buren Branch, approximately?

14 A   Once.

15 Q   Okay.  How often do you go to the Van Buren Branch in

16 general; like not just the Social Section, but go to the

17 library in general?

18 A   Not often.

19 Q   Okay.  In the last six months, how many times have

20 you been, approximately?

21 A   Probably two to three times.

22 Q   And when you go, what do you do, or what did you do?

23 A   Looked at books.

24 Q   Okay.  And I know that may sound like a crazy

25 question, but I'm just trying to figure out what all --

1 what you know and don't know. I don't know you and so I'm
2 just trying to figure out what you know and what you don't
3 know.
4     When you went to go look at books, did you see -- did
5 you see the Social Section when you went to go look at
6 books?
7 A    The last I time I went, yes.
8 Q    Did you see anybody in the Social Section when you
9 went?
10 A    No.
11 Q    Do you know if children -- and by children, let me be
12 clear. Do you know if people under the age of 18 can go
13 into the Social Section?
14 A    They can.
15 Q    Okay. Have you seen anybody under the age of -- or
16 have you seen anybody that appears to you to be under 18
17 go to the Social Section when you've been at the library?
18 A    No one other than myself.
19 Q    Okay. Are you aware whether Crawford County has ever
20 implemented, meaning put into effect, Act 372? Are you
21 aware of whether Crawford County ever put Act 372 into
22 effect?
23 A    I'm not.
24 Q    Okay. If you will turn with me to Page 25 of
25 Defendant's Exhibit 1, looking at Paragraph 80.

1     MR. MCLELLAND: And for those listening
2     online, we're on Page 25 of Document 75,
3     paragraph 80.
4 BY MR. MCLELLAND:
5 Q    All right. If you would, just take a moment to read
6 Paragraph 80 and then it continues on to the next page.
7 A    Okay.
8 Q    Ms. Partain, this Paragraph 80 talks about Jeff and
9 Tammi Hamby sending a letter to the Crawford County or
10 sending a letter -- sorry, let me rephrase.
11     This paragraph talks about Jeff and Tammi Hamby
12 sending a letter in November of 2022. Is that the letter
13 that you were referencing earlier that you and I were
14 talking about?
15 A    Yes.
16 Q    Okay. Have you ever spoken with Ms. Hamby or
17 Mr. Hamby?
18 A    No.
19 Q    Okay. Do you know if Tammi Hamby -- are you aware
20 that Tammi Hamby is on the Library Board here in Crawford
21 County?
22 A    Yes.
23 Q    Okay. Do you know how she got onto the Library
24 Board?
25 A    No.

1 Q    Okay. If we'll look at Paragraph 81.
2 A    Okay.
3 Q    So this says that Ms. Hamby was appointed by Judge
4 Chris Keith to the Library Board in December. Do you see
5 that?
6 A    Yes.
7 Q    Okay. And then it announced on January 10th, which
8 is, I think, when the meeting was, that the Crawford
9 County Library had moved their -- had, quote, "moved their
10 LGBTQ children's books out of the children's section into
11 a new area within their respective adult sections."
12     Do you see that?
13 A    Yes.
14 Q    Okay. Where it says that the books have been moved
15 into the respective adults' area, the books weren't moved
16 into an adults only area, were they, where only adults
17 could go?
18 A    No.
19 Q    Okay. Paragraph 82, have you read Who Believes What,
20 Exploring the World's Major Religions?
21 A    No.
22 Q    Have you read All About Anxiety?
23 A    No.
24 Q    Okay. Do you know whether those books are housed at
25 the Crawford County -- let me be specific.

1     Do you know whether those books are housed at the Van
2 Buren Branch of the Crawford County Library System?
3 A    No.
4 Q    Okay. And I'm assuming because you don't go to the
5 other branches, are you aware whether those two books are
6 housed at any of the other branches of the Crawford County
7 Library System?
8 A    No.
9 Q    Okay. How are -- it says here that approximately 263
10 books have been placed in the Social Sections of the CCL
11 branches.
12     Are you aware of whether there are approximately 263
13 books?
14 A    There is definitely less than that amount in the Van
15 Buren Branch.
16 Q    Okay. But you haven't been to the other branches, I
17 guess, to see the other ones?
18 A    No.
19 Q    Okay. Paragraph 83, if you want to take a second to
20 review that.
21 A    Okay.
22 Q    Okay. And it says here that Crawford County, through
23 its attorney, declined to do so. Instead, Crawford County
24 insisted that it was within its rights to protect children
25 from exposure to materials that might harm their innocence

Page 21

1 by segregating materials that, in Crawford County's
2 judgment, quote, "might", be harmful to some minors.
3     Do you see that?
4 A   Yes.
5 Q   Did anybody at the Library Board Meeting, on January
6 10th, say anything to that effect?
7 A   Yes.
8 Q   Okay.  Who said it?
9 A   **I'm not positive of names.**
10 Q   Okay.  But there were just people who said things
11 similar to this?
12 A   **As in the Library Board or the public?**
13 Q   Both.
14 A   **Yes, several.**
15 Q   Okay.  As far as people who -- non-board members who
16 spoke, do you remember who said anything to that effect at
17 the January 10th meeting?
18 A   **I didn't know them.**
19 Q   Okay.  So you don't know their names?
20 A   **No.**
21 Q   As far as the library board members, do you remember
22 anybody saying anything to that effect?
23 A   **No.**
24 Q   Okay.  Paragraph 84 -- and you can go ahead and read
25 85 as well.  We'll just do those together.

Page 22

1 A   **Okay.**
2 Q   And I think I asked you this earlier, but now that
3 we've had a moment to go through your Complaint, the --
4 are you aware of whether Crawford County ever implemented
5 Act 372?
6 A   **No.**
7 Q   Okay.  So you're not aware whether it did or did not
8 implement it?
9 A   **No.**
10 Q   Okay.  So if Crawford County had implemented Act 372,
11 you wouldn't know?  You wouldn't know if that was true or
12 not?
13 A   **Correct.**
14     **MR. MCLELLAND:** Okay.  Let's take a quick
15     break.  Let me go over my notes.  I don't think
16     I've got much more.
17     (Brief recess was taken.)
18 **BY MR. MCLELLAND:**
19 Q   Ms. Partain, do you realize that you're still under
20 oath to give true testimony?
21 A   **Yes.**
22 Q   Okay.  How did you get involved in this lawsuit?
23 A   **My mother was contacted.**
24 Q   Okay.  Who contacted your mother?
25 A   **I'm not sure of the name.**

Page 23

1 Q   Okay.  And that's -- and I'll ask her about that.
2 A   **Okay.**
3 Q   I don't -- and after this person contacted your
4 mother, what did she say to you about the lawsuit?
5 A   **She explained it to me and asked if I wanted to**
6 **become a plaintiff.**
7 Q   And what did you say?
8 A   **Yes.**
9 Q   Good answer.  All right.  So your mother said -- or
10 your mother told you about the lawsuit and you said, yeah,
11 I want to join as a plaintiff; is that right?
12 A   **Yes.**
13 Q   And I think we talked about this earlier.  I just
14 want to make sure we're clear.  You joined the lawsuit so
15 that you can -- because you don't -- you joined the
16 lawsuit because you want to make sure that people who want
17 to check out books can check out books; is that right?
18 A   **Yes.**
19 Q   And if you need to clarify, feel free to of why --
20 why did you join the lawsuit?
21 A   **I believe minors should have access to read the books**
22 **that they want to read.**
23 Q   Has Crawford County ever prevented you -- or let me
24 rephrase.
25     Has Crawford County Library System ever prevented you

Page 24

1 from checking out a book?
2 A   **No.**
3 Q   And are you aware -- well, when you joined the
4 lawsuit, are you aware that there are other people from
5 Crawford County that are a part of the lawsuit?
6 A   **Yes.**
7 Q   Do you know Leta Caplinger?
8 A   **I know the name.**
9 Q   Have you ever met her?
10 A   **No.**
11 Q   Have you ever talked to her?
12 A   **No.**
13 Q   Are you aware that there's another lawsuit involving
14 the Social Section currently going on?
15 A   **Yes.**
16 Q   Okay.  What do you know about that lawsuit?
17 A   **They're trying to get rid of the Social Section.**
18 Q   And is that what you're trying to do in this case?
19 A   **No.**
20 Q   Okay.  Do you remember earlier saying that you wanted
21 the Social Section overturned?
22 A   **Yes.**
23 Q   Okay.  And now you're telling me that you don't want
24 the Social Section overturned; is that right?
25 A   **I personally do.  That's not what this case is about.**

1 Q   Okay.  So earlier when you said that, were you
2 mistaken?
3 A   About this case's involvement in that?
4 Q   Yeah.  Earlier when you said that you brought this
5 case -- earlier we were discussing that you brought this
6 case because you wanted to see the Social Section
7 overturned and now you've stated to me that this case
8 doesn't involve the Social Section and I believe my --
9       MR. MCLELLAND: What was my question?  Can
10      you read back my earlier question?
11      (Previous questions read back.)
12      MR. MCLELLAND: I remember what it was now.
13 BY MR. MCLELLAND:
14 Q   All right.  So you remember we discussed earlier that
15 you said that you wanted the -- you brought this lawsuit
16 to try to overturn the Social Section and now you're
17 saying that this case is not about the Social Section.  Is
18 that right?
19 A   Yes, I misspoke.
20 Q   Okay.  That's what I was looking for.  Thank you.
21 When did you realize that you had misspoken?
22 A   Now.
23 Q   All right.  If you'll look at Paragraph 80 with me --
24 I'm sorry, 85.
25 A   Okay.

1 Q   So if you'll see it says, "On information and belief,
2 Crawford County intends to adopt a policy that materials
3 containing LGBTQ themes or discussing other 'social
4 issues' might harm the innocence of children and that on
5 that basis any such materials must be segregated based on
6 the viewpoint contained therein once Act 372 goes into
7 effect."
8 Did I read that right?
9 A   Yes.
10 Q   So are you asserting, in this case, that -- so what
11 information and belief do you have that leads you to
12 believe this?
13      MS. BROWNSTEIN: First I need to register
14      an objection.  Obviously Madeline Partain is not
15      an attorney.  This was drafted by an attorney.
16      Yes, she did read the Complaint, but she is a
17      17-year-old minor and not an attorney, and on
18      that basis I'm going to object to anything that
19      asks her to understand the legalese in this
20      Complaint.
21      MR. MCLELLAND: Okay, objection noted.
22      MS. BROWNSTEIN: You may answer.
23 BY MR. MCLELLAND:
24 Q   And I'll repeat the question.  What information and
25 belief do you have that Crawford County intends to adopt a

1 policy as outlined in Paragraph 85?
2 A   Can you rephrase the question?
3 Q   Yes.  Do you have any information -- do you have any
4 information, or do you have any beliefs that Crawford
5 County intends to adopt a policy that materials containing
6 LGBTQ themes will be segregated on that viewpoint?
7 A   They already have with the Social Section.
8 Q   Okay.  And if I misstate this, correct me, but I'm
9 just trying to understand your testimony.  So it's your
10 position that because Crawford County created the Social
11 Section, it will, in the future, should Act 372 go into
12 effect, further segregate LGBTQ material?
13 A   Yes.
14 Q   Okay.  And it's your position that Crawford County
15 cannot segregate books on -- cannot segregate books
16 containing LGBTQ themes -- it's your position that
17 Crawford County cannot segregate books based upon LGBTQ
18 viewpoints expressed in that book?
19 A   Cannot or should not?
20 Q   Cannot.
21      MS. BROWNSTEIN: I'm going to object again.
22      That's asking her to give a legal opinion.
23      MR. MCLELLAND: Are you instructing her not
24      to answer?
25      MS. BROWNSTEIN: No, you may answer, but,

1 again, qualifying she's not an attorney, whether
2 or not they can or cannot segregate LGBTQ books,
3 but I -- I think her question is should not --
4      MR. MCLELLAND: And that's my next
5 question.
6      MS. BROWNSTEIN: Okay.
7 A   I believe they have the ability to.
8 Q   But that they should not?
9 A   Yeah, I don't think that's right.
10 Q   Okay.  And why is that not right?
11 A   Because everyone -- I don't think they should get to
12 decide who can read what.
13 Q   So how would Act 372 allow Crawford County to decide
14 who gets to read what?
15      MS. BROWNSTEIN: Again, I need to object
16      here.  She can answer, so far as you understand
17      she is not qualified as an attorney to render a
18      legal opinion as to what they can or cannot do.
19      You may answer if you understand.
20 A   They would decide what challenged books would be
21 inaccessible to minors.
22 Q   In the Van Buren Branch of the Crawford County
23 Library, in its Social Section are there books in that
24 Social Section that do not have LGBTQ themes?
25 A   Yes.

1 Q   Okay.  Do you know what themes those books contain,
2 the non-LGBTQ books?
3 A   **What themes they contain?**
4 Q   Yeah, if they don't contain LGBTQ themes, what themes
5 do they contain?
6 A   **I'm not sure.**
7 Q   Okay.  You just know that they're not LGBTQ themes?
8 A   **Yes.**
9        MR. MCLELLAND: All right.  I'll pass.
10         **EXAMINATION**
11 BY MR. WATSON:
12 Q   Good morning, Ms. Partain.  Thank you for being here.
13 I'm Noah Watson.  I know -- well, first of all, do you
14 need a break or are you still good?
15 A   **I'm good.**
16 Q   All right.  Awesome.  So first of all I want to
17 commend you.  I know when I was a senior in high school I
18 would not want to be here talking to some random men
19 answering a lot of questions, so thank you first of all.
20     And second of all, I will be a random man asking you
21 questions, so I'll go ahead and do that.  I shouldn't have
22 too many because Mr. McLelland took care of most of it.
23     So in your conversations with Mr. McLelland, you were
24 mostly talking about Crawford County and the Social
25 Section?

1 A   **Uh-huh.**
2 Q   Did I understand your testimony correctly at this
3 point?
4 A   **Yes.**
5 Q   So this lawsuit is actually challenging two pieces of
6 Act 372, and one of those is about the libraries and
7 policies they can have, and another piece of it is a
8 criminal law that makes it illegal to give minors items
9 that are so-called harmful to minors as defined under the
10 statute.
11     Are you aware of that part of the challenge?
12 A   **Yes.**
13         MS. BROWNSTEIN: And I'm going to object to
14     the characterization of Section 1.  I don't
15     think it's as full as what the --
16         MR. WATSON: Sure --
17         MS. BROWNSTEIN: -- Act and neither Section
18     1 or Section 5 would require.  So with that
19     objection, you may answer.
20         MR. WATSON: I'm just trying to get an
21     overview here --
22         MS. BROWNSTEIN: No, I understand, but I
23     wanted to register that objection.
24 BY MR. WATSON:
25 Q   But you're aware of the two challenges that are

1 happening in the lawsuit?
2 A   **Yes.**
3 Q   Okay.  And I want to focus most of my time on asking
4 you about that first piece -- or the piece that I had just
5 mentioned, the criminal provision.
6     Why are you -- in this case, why are you part of this
7 case challenging that section of the law?
8 A   **I don't think it's the responsibility of the person**
9 **providing the books to regulate what minors read.**
10 Q   So are you aware -- I guess this would have been a
11 better question to start with.
12     Are you aware of what the law is aimed at, about what
13 items and books are covered by the law?
14 A   **Yes.**
15 Q   You are.  So what is your understanding of what --
16 Section 1 is how we've been referring to it.  So when I
17 say Section 1, if you don't know what I'm talking about,
18 just say, hey, what are you talking about, explain that to
19 me again.
20     And that goes for anything I say.  Please feel free,
21 because I want to make sure we're on the same page and,
22 you know, answering the same questions.
23         MS. BROWNSTEIN: Man, you talk fast.
24     Can you get this down?
25         MR. WATSON: I will slow down.

1 BY MR. WATSON:
2 Q   So what is your understanding of what Section 1
3 covers, what items?
4 A   **The themes in the books, to my understanding, is what**
5 **would be deemed inappropriate or contain LGBT themes.**
6 Q   Okay.  So my understanding of the law, that is mostly
7 the Section 5 piece, and I will read from the statute, or
8 a portion of it.
9         MR. WATSON: And, Bettina, I will note your
10     objection to the fact that I will not be reading
11     the entire statute, so no worries, but, also, so
12     we all know.
13 BY MR. WATSON:
14 Q   The law is targeted at what is called items and
15 giving those items to minors, if those items are harmful
16 to minors.  And the way it describes items is this:  So
17 item means a material or performance that depicts or
18 describes nudity, sexual conduct, sexual excitement, or
19 sadomasochistic abuse.
20     So, sorry, that's awkward.  A random man asking
21 random questions, I understand, but when I just read
22 those, none of those dealt with LGBTQ themes.  And, again,
23 I understand this is a pretty unclear question.  Are there
24 any --
25         MR. WATSON: Go ahead.

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al

CERTIFIED ORIGINAL/COPY

Madeline Anne Partain
March 15, 2024

Page 33

1      MS. BROWNSTEIN: Are you finished with the
2 question? I need to object. I object to your
3 characterization that it does not deal with
4 LGBTQ theme. It does not state LGBT -- I can't
5 even say it, but it does not mean it does not --
6 will not deal with it.
7 BY MR. WATSON:
8 Q   Okay. Based on your understanding, do all books that
9 deal with LGBTQ themes deal with nudity, sexual conduct,
10 sexual excitement or sadomasochistic abuse?
11 A   No.
12 Q   Okay. And, again, I apologize, this is an
13 uncomfortable question. Are there any books, specifically
14 that you are aware of, that would fall under this category
15 of books that you know you would want to read?
16 A   Yes.
17 Q   There are. Okay. What are those books?
18 A   I can't think of specific titles at the moment, off
19 the top of my head.
20     Ones that I have read, gosh, a specific author is
21 Colleen Hoover and John Green.
22 Q   And what about their books -- and I understand that
23 you don't -- if you think of any titles as we go along,
24 feel free to come back to that.
25     What about their books includes, you know, that list

1 of things that I just mentioned?
2     Just forget I asked that question and let me rephrase
3 it. The books of theirs that you've read, is the entire
4 book or most of the book even dealing with these things
5 that I named; nudity, sexual conduct, sexual excitement
6 and sadomasochistic abuse?
7 A   Is your question if -- can you rephrase the question?
8 Q   Yeah. So in a book there might be -- you know, their
9 themes, kind of the literature term for theme and
10 sometimes those themes are the entire book is about that
11 one thing. Sometimes it might just be a few pages in the
12 book deal with that and it's just something that pops up a
13 couple of times.
14     So I'm asking of the books that you've read of
15 theirs, which category does that fall in? Is it something
16 that the entire book is about, or is it something that
17 just appears in a few pages?
18 A   It appears.
19 Q   Okay. So it's safe to say that you have not
20 previously read any books that are dedicated to discussing
21 these topics?
22 A   No.
23 Q   Okay. And do you intend or are there any books that
24 you are aware of, that you want to read, that are
25 predominantly concerned with those topics?

1 A   No.
2 Q   Okay. I hope that's the end of the awkward questions
3 that I have. You know, there's my warning, but if it
4 comes up again, I'm sorry.
5     So now I want to go back, very quickly, to Section 5.
6 So this is about the library specifically. Are you aware
7 of anyone -- so part of the way that Section 5 is set up,
8 it allows certain people to challenge books that are in
9 the library's collection.
10     Are you aware of that?
11 A   Yes.
12 Q   Are you aware of anyone who has said that they want
13 to challenge a book in the library's collection?
14 A   No one specifically, no.
15 Q   When you say no one specifically -- and we have to be
16 very technical. So when you say no one specifically, are
17 you aware of someone generally?
18 A   I imagine Tammi Hamby would, considering she is of
19 the belief that books -- certain books shouldn't be
20 available to minors.
21 Q   But you're unaware of her ever saying that she
22 planned on challenging a book --
23 A   No.
24 Q   -- you're just making an assumption?
25 A   Yes.

1 Q   Sorry. Are you just making an assumption about her?
2 A   Yes.
3 Q   And when Mr. McLelland asked you about going to the
4 Social Section -- I think he asked you something like how
5 does that injure you or how does that harm you and I am
6 going to paraphrase, but I don't remember your answer.
7 Please correct me if I'm wrong. I think you said that you
8 haven't checked anything out from the Social Section
9 because it is uncomfortable, the librarians might see you
10 because the section is right next to the librarian's desk.
11     Do you remember saying something like that?
12 A   Yes.
13 Q   So are you saying that you would not be injured, or
14 you wouldn't feel injured if that Social Section was not
15 there, if you could go somewhere else in the library and
16 pick out the book?
17     MS. BROWNSTEIN: I'm going to object. She
18 never used the word injured.
19 BY MR. WATSON:
20 Q   Okay. I think the question did and we don't have to
21 go back, but at the very least you said it would be
22 uncomfortable to go to the Social Section, right, or
23 currently is?
24 A   Yes.
25 Q   Okay. I guess my question is what is the difference

Page 37

1 between going to the Social Section and feeling
2 uncomfortable, versus checking the book out? I mean,
3 would you still feel uncomfortable at that point if you go
4 to the librarian's desk with the book, even if they hadn't
5 seen you in the Social Section and the Social Section
6 didn't exist, because the librarian would still see it at
7 that point, right?
8 **A   There, I believe, is a way to check out a book**
9 **without the librarian, to do it yourself.**
10 Q   Do you know any more about that process?
11 **A   I don't, but I'm aware of it.**
12 Q   Then I won't ask you any more details about that.
13   All right. I think that is all that I have. Thank
14 you for your time.
15 **A   You're welcome.**
16          EXAMINATION
17 BY MS. BROWNSTEIN:
18 Q   I have a few questions or maybe just a couple.
19 **A   All right. If you wanted to read -- and you're 17**
20 **years old, right, you're a minor?**
21   **Would you want to be able to read a book, even if it**
22 **was predominantly about some of the subjects that**
23 **Mr. Watson stated, sadomasochism, all LGBTQ theme or**
24 **others? Would you want -- would you want to be prevented**
25 **from being able to check out a book even if it were**

Page 38

1 **predominantly about the LGBTQ themes or sadomasochism or**
2 **sex or other things that Mr. Watson mentioned?**
3   **Do you understand my question?**
4      **MR. WATSON:** I'm going to object. I don't
5      know if this is technically an objection, but I
6      did not mention LGBTQ themes, so a
7      mischaracterization of the question.
8 BY MS. BROWNSTEIN:
9 Q   Okay. Let's put it this way: If a book were
10 predominately about LGBTQ themes, sadomasochism, sex, race
11 whatever it is, would you want to be prevented from
12 accessing that book at the public library in Crawford
13 County because of your age?
14 **A   No.**
15 Q   Okay. Do you think you should be able to, at your
16 age, choose what books that you want to read without the
17 county government or the library board or the librarian
18 telling you what you can read? Do you think you should be
19 able to read these books that have these themes?
20 **A   Yes.**
21 Q   Okay. You said it was uncomfortable for you to go
22 into what is now the Social Section because it is right
23 next to where the librarian's desk is; is that right?
24 **A   Yes.**
25 Q   When you go into the Social Section in the Crawford

Page 39

1 County Library, is what you are looking at in the Social
2 Section, would that be visible to other patrons in the
3 library?
4 **A   Yes.**
5 Q   Okay. How do you feel about other patrons being able
6 to see you looking at books that are in the Social Section
7 now?
8 **A   It is uncomfortable.**
9 Q   Why is that?
10 **A   Because of the controversy around the books that I**
11 **would be looking at.**
12 Q   Do you think you should be able to browse in the
13 library and look at books without other patrons being able
14 to see what you're looking at?
15 **A   Yes.**
16 Q   Or checking out; is that right?
17 **A   Yes.**
18 Q   And you're aware there's an automatic checkout desk
19 or machine at the library?
20 **A   Yes.**
21 Q   The main library of the Crawford County Library; is
22 that right?
23 **A   Yes.**
24 Q   And you went to the Library Board Meeting on January
25 10th, 2023; is that right?

Page 40

1 **A   Yes.**
2 Q   Were there people at that library board meeting that
3 were voicing objections to certain kinds of books?
4 **A   Many.**
5 Q   Many people were there?
6 **A   Yes.**
7 Q   And what kinds of objections were they voicing?
8 **A   That LGBT specifically would be targeted and taken**
9 **away from minors.**
10 Q   Okay. Based on your -- what you saw and heard at
11 that library board meeting, would you believe that these
12 people might be likely to challenge a book if they were
13 able to challenge a book based on the LGBTQ theme in that
14 book?
15 **A   Yes.**
16 Q   Okay. And so if Act 372, which you've challenged,
17 went into effect and members of the public were allowed to
18 challenge certain books based on their appropriateness for
19 minors to be able to read those books, based on what you
20 saw at the library board meeting, do you think that those
21 people would be likely to challenge books under Act 372?
22      **MR. MCLELLAND:** I'm going to object to
23      form.
24 BY MS. BROWNSTEIN:
25 Q   I know it's a difficult question. The people that

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
Madeline Anne Partain
March 15, 2024

1 you saw at the library board meeting were -- were voicing
2 objections to certain books based on LGBTQ themes; is that
3 correct?
4 A Yes.
5 Q Okay. So if they had the ability to challenge books
6 under Act 372 and 372 went into effect, would you, in
7 fact, think they would be the ones that would be likely to
8 challenge those books?
9 A Yes.
10 Q Based on the fact that they had LGBTQ themes in them?
11 A Yes.
12 Q Okay. And those -- just because a book wasn't
13 entirely based on LGBTQ content, but only a portion of
14 that book was, had something to do with LGBTQ themes, do
15 you still think it should be available to a minor like you
16 at 17 years old?
17 A Yes.
18 Q So it doesn't matter to you if the whole book had to
19 do with LGBTQ or only a portion of it did?
20 A No.
21 Q Okay. I think that's all I have.
22        FURTHER EXAMINATION
23 BY MR. MCLELLAND:
24 Q Ms. Partain, where we're at in the deposition right
25 now, is I'm going to get to ask some follow-up questions

1 and then they may ask some follow-up questions and slowly
2 we're going to whittle our way down to no more questions,
3 but now we get to do the round-robin and we all get to
4 follow up, so bear with us as we go back around the table
5 and I'm going to ask you some follow-up questions.
6 A All right.
7 Q Do you remember talking with Mr. Watson about -- I
8 think it was Colleen Hollier and John Green books?
9 A Colleen Hoover.
10 Q Hoover, thank you, and John Green?
11 A Yes.
12 Q What are the title of those books that you were
13 referencing?
14 A A Colleen Hoover book is It Ends with Us. Another
15 one is It Starts with Us.
16 Q What are those books about?
17 A A woman struggling to -- It Ends with Us is about a
18 woman struggling to get out of a abusive relationship and
19 It Starts with Us is a sequel to the book about her
20 bettering herself and moving on with her life.
21 Q Any specific John Green books that you remember the
22 title of?
23 A Looking for Alaska.
24 Q Okay. What is that book about?
25 A It's a romance story about a man and a woman in

1 college.
2 Q Okay. Do you know if Crawford County Library System
3 has these three books; It Ends with Us, It Starts with Us,
4 and Looking for Alaska? Do you know if it has, in its
5 collection, those three books?
6 A I'm not sure, but I would imagine they do. I have
7 more books if you would like them.
8 Q Yeah. Are there any books by Colleen Hoover or John
9 Green, that you were referencing, that are in the Crawford
10 County Library's collection?
11 A An Abundance of Katherines is a John Green book.
12 Q Okay. And what's that about?
13 A It's another romance novel.
14 Q And when you were talking to Mr. Watson about Colleen
15 Hoover, John Green and their books potentially being
16 implicated by Act 372, do you believe that Act 372 would
17 implicate An Abundance of Katherines, this John Green book
18 that Crawford County Library System has in its collection?
19 A I think it's a possibility.
20 Q Okay. And why do you think it's a possibility?
21 A It's in the Social Section already.
22 Q Okay. Do you know why it was put in the Social
23 Section?
24 A I do not.
25 Q Do you know who determined that that book should go

1 in the Social Section?
2 A I do not.
3 Q We've all talked -- all the lawyers are getting hung
4 up on this uncomfortableness that you feel in the Social
5 Section, and I'm going to circle back on it and I
6 apologize to belabor the point.
7    So you feel uncomfortable going to the Social
8 Section; is that correct?
9 A Yes.
10 Q Imagine with me that the Social Section did not exist
11 and that An Abundance of Katherines was on a different
12 shelf in a different part of the library and you went and
13 picked up the book, you took it to the librarian to check
14 it out, would you feel uncomfortable at that moment with
15 that librarian?
16 A We already answered that. There's an automatic
17 checkout. I wouldn't have to go to a librarian if I
18 didn't feel comfortable with it.
19 Q Assume that the automatic checkout system was down.
20 A I suppose it could be uncomfortable.
21 Q Okay. Have you ever used the automated checkout
22 system?
23 A No.
24 Q Okay. You spoke with your counsel, Ms. Brownstein.
25 She asked you something to the effect of at your age do

Page 45

1 you believe that you ought to be able to check out
2 material based upon -- or she said something to the effect
3 of at your age do you believe that you ought to be able to
4 check out material kind of regardless of its subject
5 matter. Do you remember discussing that with her?
6 A Yes.
7 Q And you said that somebody my age -- or you said yes
8 to the fact that somebody at your age ought to be able to
9 check out materials regardless of the subject matter.
10 Do you have an opinion as to what age checking out a
11 book might be inappropriate?
12 A I don't think I'm the person that should be deciding
13 that.
14 Q You said that somebody at your age at 17 should be
15 able to check out a book kind of regardless of its
16 content. Should somebody at 16?
17 A Well, yes.
18 Q Should somebody at 15?
19 A I suppose around age nine or ten, maybe.
20 Q Okay. And before age nine or ten -- well, never
21 mind.
22 I need to clear something up. You were discussing,
23 with Ms. Brownstein, about the January 10th Library Board
24 Meeting that you attended, and you said that during that
25 meeting there were people targeting LGBTQ material and

Page 46

1 then I missed a word, and then I caught you saying, and
2 taking away that material for minors.
3 Do you remember saying that to Ms. Brownstein?
4 A Something to that effect.
5 Q Okay. Has the LGBTQ material that is housed within
6 the Crawford County Library System been taken away from
7 minors?
8 A Not yet.
9 Q Okay. At the January 10th meeting, did the Library
10 Board speak about book challenges?
11 A Not that I remember.
12 Q Okay. Are you aware -- when you talked to
13 Mr. Watson, you talked about challenging -- that you
14 believed that Ms. Hamby would challenge books in the
15 future. Do you remember talking to him about that?
16 A Yes.
17 Q Okay. Are you aware whether Ms. Hamby has ever
18 challenged a book?
19 A No.
20 Q Okay. If I was -- would it surprise you if Ms. Hamby
21 stated under oath that she never advocated for books to be
22 removed from the library?
23 A Yes.
24 MR. MCLELLAND: Okay. I'll pass.
25 FURTHER EXAMINATION

Page 47

1 BY MR. WATSON:
2 Q All right. Just a few follow-up questions.
3 First, when you were speaking with your counsel a
4 moment ago, you were talking about you don't think it's
5 right for librarians to be choosing what books you can
6 read. Before that you said you'd only been to the library
7 three times or so in the last six months. Where do you
8 normally get books to read?
9 A Either online or I buy them from bookstores or I buy
10 them online.
11 Q And when you first said online, were you speaking
12 about purchasing or checking out through like an online
13 library system or something else?
14 A Both.
15 Q Okay. And how often do you read, or how many books
16 do you read per month? Maybe a year is better; you're in
17 school.
18 A It depends. I guess per year. A fair amount. I
19 don't ...
20 Q That's fair. It doesn't matter. When you get older
21 like me -- last question, I think, unless it spawns --
22 MS. BROWNSTEIN: Listen to the question.
23 Don't be disarmed by his charm.
24 BY MR. WATSON:
25 Q So there's been a couple of questions about your --

Page 48

1 you saying you think you should be able to check out books
2 regardless of the subject matter, based on age. Do you
3 remember answering some of those questions?
4 A Yes.
5 Q Do you have the same view about going to see movies,
6 R-rated movies?
7 A Yes.
8 MR. WATSON: Okay. That's it.
9 EXAMINATION
10 BY MR. ADAMS:
11 Q I think I just have one follow-up question, but it's
12 going to require a little wind-up and context, or one
13 follow-up topic, let's say.
14 When we talked about book challenges under Section 5
15 of Act 372, if it were to go into effect, one of the
16 topics that came up was how that would work and who would
17 be deciding and that sort of thing. So we talked about
18 the fact that those challenges would go up, in the
19 Crawford County case, to the Crawford County Quorum Court,
20 specifically received by the county judge. Maybe I'm
21 saying more than was said before, but I'm trying to
22 summarize fairly what Section 5 of the Act provides.
23 So the question for you specifically is: Have you
24 ever expressed any concern about the relocation of
25 Crawford County Library books based on themes to the

Page 49

1  county judge?

2  A   Yes.

3  Q   And did you express that concern in person or in

4  writing?

5  A   Writing.

6  Q   Okay.  And when was that writing, roughly?

7  A   December of 2022.

8  Q   Okay.  And was that an email?

9  A   Yes.

10 Q   Okay.  Can you summarize the email in one or two

11 sentences?

12 A   I told Mr. Gilstrap that I don't believe it's right

13 to segregate or relocate books with LGBTQ themes simply

14 because they contain those themes.

15 Q   Thank you.  And I guess the last question is have you

16 provided that email to Ms. Brownstein, so that we can

17 produce it in this case?

18 A   Yes.

19      MS. BROWNSTEIN:  And if I can find a

20      printer.

21      MR. ADAMS:  That's all I have.

22          FURTHER EXAMINATION

23 BY MR. MCLELLAND:

24 Q   Okay.  I've got a follow-up on that, not with

25 Mr. Watson, but with Mr. Adams.  You said that you emailed

Page 50

1  County Judge Gilstrap; is that right?

2  A   Yes.

3  Q   Did he respond?

4  A   No.

5  Q   Are you aware that the County Judge at Crawford

6  County is no longer Judge Gilstrap?

7  A   Yes.

8  Q   And who is the current county judge?

9  A   Mr. Keith.

10 Q   Have you expressed -- the concerns that you expressed

11 in the December of 2022 email, have you expressed those

12 concerns to Judge Keith?

13 A   No.

14 Q   Have you expressed those concerns to anyone on the

15 Library Board?

16 A   No.

17 Q   Have you expressed those concerns to the current

18 Library Director Charlene McDonnough?

19 A   No.

20 Q   Have you expressed those concerns to the former

21 interim Library Director Eva White?

22 A   No.

23 Q   Have you expressed those concerns to former Library

24 Director Deidre Grzymala?

25 A   No.

Page 51

1      MR. MCLELLAND:  Okay.  That's it.

2          FURTHER EXAMINATION

3  BY MS. BROWNSTEIN:

4  Q   During your last visit to the Van Buren Branch of the

5  Crawford County Library, did you speak to the librarians?

6  A   Yes.

7  Q   And what did you talk to them about?

8  A   I asked them who could check out books from the

9  Social Section.

10 Q   And why did you ask this question?  Was that the only

11 question you asked or did you ask other questions?

12 A   I asked them what -- if any minor could check out of

13 the current Social Section and they told me any child

14 under 11 needs to have a parent or guardian with them at

15 all times.

16 Q   Why did you ask these questions; what motivation did

17 you have for asking these questions?

18 A   Because those books were moved into the Adult Section

19 of the library.

20 Q   And?

21 A   And they contained LGBTQ themes.

22 Q   And so why did you ask the librarian these questions;

23 what motivated you to?

24 A   I felt they were -- I'm not sure I understand the

25 question.

Page 52

1  Q   So you asked why.  What were you seeking?  What

2  information were you seeking from the librarians when you

3  asked these questions?  That's probably a better way to

4  ask it.

5  A   If any minor could check out books from the section.

6  Q   Okay.  And what was the response?

7  A   Any child under the age of 11 needs to have a parent

8  with them at all times.

9  Q   So do you feel you got an answer to your question?

10 A   No.

11 Q   Nothing else.  Thank you.

12 A   Okay.

13         FURTHER EXAMINATION

14 BY MR. MCLELLAND:

15 Q   I have a follow-up on that.  You said that you talked

16 with the librarians at the Crawford County Library

17 System's Van Buren Branch?

18 A   Yes.

19 Q   When was that; when did you have that conversation?

20 A   Two days ago.

21 Q   Do you know the name of the librarian you spoke to?

22 A   I don't.

23 Q   How do you know that she was -- was it a he or a she?

24 A   She.

25 Q   Okay.  How do you know that she's a librarian?

1 A  She was behind the librarian's desk.

2 Q  So you assumed that because she was behind the

3 circulation desk, she was a librarian?

4 A  She worked there.

5 Q  Okay.  But you don't know her title or anything?

6 A  No.

7 Q  Okay.  And you asked if minors could check out books

8 from the Social Section; is that right?

9 A  Yes.

10 Q  And the answer that they gave you was that a child

11 under eleven must have a parent at all times in the

12 library?

13 A  Yes.

14 Q  Parent or guardian?

15 A  Yes.

16 Q  Are you aware that that policy is a general policy to

17 the library system?

18 Q  Okay.  Are you aware that the policy states that it's

19 ten years of age and younger, or if it's eleven years of

20 age and younger?

21 A  It's under eleven.

22 Q  Okay.  So they told you it was under eleven years of

23 age?

24 A  Yes.

25

1 Q  Not under ten years of age?

2 A  Yes.

3 Q  Okay.  So if I was to tell you that Crawford County

4 Library System's policy is that children ten years of age

5 and younger have to be accompanied by an adult, that would

6 be incorrect?

7 A  Under eleven.  Not eleven and under.  Under eleven,

8 so ten and under, yes.

9     MR. ADAMS: Yeah, I'm confused by the

10     question too.  Isn't ten and under the same as

11     under eleven?

12     THE WITNESS: Yes.

13     MR. MCLELLAND: Say that again.

14     MR. ADAMS: Isn't ten and under the same as

15     under eleven?

16     MR. MCLELLAND: No, what about a ten and

17     half month old?  I mean, a ten and a half year

18     old.

19     THE WITNESS: They told me under eleven.

20 BY MR. MCLELLAND:

21 Q  Under eleven?

22 A  Yes.

23 Q  Okay.  And you are aware that that's a general

24 policy?

25 A  Yes.

1 Q  It doesn't apply specifically to the Social Section?

2 A  Yes.

3 Q  Are you aware that a minor has to have parental

4 consent to get a library card in the Crawford County

5 Library System?

6 A  Yes.

7 Q  And are you aware that they have to have that library

8 card to check out any material in the Crawford County

9 Library System?

10 A  Yes.

11 Q  Okay.  So do you have a Crawford County Library card?

12 A  Yes.

13 Q  If you did not have a Crawford County Library card,

14 could you check out a book?

15 A  No.

16 Q  You said that you spoke to the librarian two days ago

17 about these checkout policies.  What prompted you to ask

18 them?

19 A  There's a sign in the Social Section that says minors

20 must be to complete.

21 Q  And does it define minors; does it give an age?

22 A  I don't remember.

23 Q  Okay.  Are you aware whether those signs are located

24 anywhere else in the Crawford County Van Buren Branch?

25 A  Not that I saw.

1 Q  Okay.  So if I was to say that there was sworn

2 testimony that those signs are located on the front door,

3 that testimony would be wrong?

4 A  Can you repeat the question?

5 Q  If I had sworn testimony that said that there are

6 signs on the Van Buren branches' front door that say that

7 children ten and under must be accompanied by an adult,

8 that testimony would be wrong?

9 A  I'm not sure.

10 Q  Okay.  That's all I've got.

11     MS. BROWNSTEIN: Nothing further.

12     MR. ADAMS: Nothing further.

13     FURTHER EXAMINATION

14 BY MR. WATSON:

15 Q  Just one quick question.  When you went to go talk to

16 the librarian, was that your idea?

17 A  Yes.

18 Q  Okay.  That's all.

19     (WHEREUPON, at 10:04 a.m., the

20     above deposition concluded.)

21

22

23

24

25

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al

**CERTIFIED ORIGINAL/COPY**

**Madeline Anne Partain**
**March 15, 2024**

Page 57

1          C E R T I F I C A T E

2

STATE OF ARKANSAS }

3                                              }
COUNTY OF FAULKNER}

4

RE:   ORAL DEPOSITION OF MADELINE ANNE PARTAIN

5

I, Michelle R. Satterfield, CCR, a Notary Public in and
6    for Faulkner County, Arkansas, do hereby certify that the
transcript of the foregoing deposition accurately reflects
7    the testimony given; and that the foregoing was
transcribed by me, or under my supervision, on my Eclipse
8    computerized transcription system from my machine
shorthand notes taken at the time and place set out on the
9    caption hereto, the witness having been duly cautioned and
sworn, or affirmed, to tell the truth, the whole truth and
10   nothing but the truth.

I FURTHER CERTIFY that I am neither counsel for, related
11   to, nor employed by any of the parties to the action in
which this proceeding was taken; and, further that I am
12   not a relative or employee of any attorney or counsel
employed by the parties hereto, nor financially
13   interested, or otherwise, in the outcome of this action.

In accordance with the Arkansas Rules of Civil Procedure,
14   Rule 30(e), review of the foregoing transcript by the
witness was not requested by the deponent or any party
15   thereto.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 24th
16   day of March 2024.

17

18

19

20

21                          Michelle R. Satterfield, CCR
                            LS Certificate No. 570
22                          Notary Public in and for
                            Faulkner County, Arkansas
23

24

25

## A

**ability (3)**
10:1;28:7;41:5
**able (14)**
37:21,25;38:15,19;
39:5,12,13;40:13,19;
45:1,3,8,15;48:1
**above (1)**
56:20
**Abundance (3)**
43:11,17;44:11
**abuse (3)**
32:19;33:10;34:6
**abusive (1)**
42:18
**access (1)**
23:21
**accessing (1)**
38:12
**accompanied (2)**
54:5;56:7
**acquire (1)**
11:2
**Act (20)**
8:22,25;9:4,21;
17:20,21;22:5,10;26:6;
27:11;28:13;30:6,17;
40:16,21;41:6;43:16,
16;48:15,22
**actually (2)**
12:7;30:5
**ADAMS (6)**
48:10;49:21,25;
54:9,14;56:12
**adopt (3)**
26:2,25;27:5
**adult (4)**
19:11;51:18;54:5;
56:7
**adults (2)**
19:16,16
**adults' (1)**
19:15
**advocated (1)**
46:21
**affirmed (1)**
6:3
**again (8)**
27:21;28:1,15;
31:19;32:22;33:12;
35:4;54:13
**age (20)**
17:12,15;38:13,16;
44:25;45:3,7,8,10,14,
19,20;48:2;52:7;53:20,
21,24;54:1,4;55:21
**ago (3)**
47:4;52:20;55:16
**ahead (3)**
21:24;29:21;32:25
**aimed (1)**
31:12
**Alaska (2)**
42:23;43:4
**allow (1)**
28:13
**allowed (1)**
40:17
**allows (1)**
35:8
**along (1)**
33:23
**alternative (1)**
15:21
**Amended (3)**
7:18,20;8:1
**amount (2)**
20:14;47:18
**ANNE (1)**
6:1
**announced (1)**
19:7
**answered (1)**
44:16
**Anxiety (1)**
19:22
**apologize (3)**
9:12;33:12;44:6
**appears (3)**
17:16;34:17,18
**apply (1)**
55:1
**appointed (1)**
19:3
**appropriate (2)**
15:4,9
**appropriateness (1)**
40:18
**approximately (4)**
16:13,20;20:9,12
**area (3)**
19:11,15,16
**around (4)**
14:6;39:10;42:4;
45:19
**asserting (1)**
26:10
**assume (2)**
14:17;44:19
**assumed (1)**
53:2
**assuming (1)**
20:4
**assumption (2)**
35:24;36:1
**attached (1)**
7:24
**attend (1)**
13:13
**attendance (1)**
7:22
**attended (2)**
12:7;45:24
**attending (2)**

**attorney (6)**
20:23;26:15,15,17;
28:1,17
**author (1)**
33:20
**automated (1)**
44:21
**automatic (3)**
39:18;44:16,19
**available (2)**
35:20;41:15
**aware (36)**
9:8,21;11:7,10,10;
17:19,21;18:19;20:5,
12;22:4,7;24:3,4,13;
30:11,25;31:10,12;
33:14;34:24;35:6,10,
12,17;37:11;39:18;
46:12,17;50:5;53:16,
19;54:23;55:3,7,23
**away (3)**
40:9;46:2,6
**Awesome (1)**
29:16
**awkward (2)**
32:20;35:2

## B

**Back (8)**
9:21;25:10,11;
33:24;35:5;36:21;
42:4;44:5
**Baked (1)**
7:4
**bakery (1)**
7:6
**based (14)**
11:21;26:5;27:17;
33:8;40:10,13,18,19;
41:2,10,13;45:2;48:2,
25
**basis (3)**
8:20;26:5,18
**bear (1)**
42:4
**become (1)**
23:6
**beginning (1)**
9:20
**behind (2)**
53:1,2
**belabor (1)**
44:6
**belief (4)**
26:1,11,25;35:19
**beliefs (1)**
27:4
**Believes (1)**
19:19
**better (3)**
31:11;47:16;52:3

**bettering (1)**
42:20
**Bettina (1)**
32:9
**board (20)**
12:7,9,11,13,20;
18:20,24;19:4;21:5,12,
21;38:17;39:24;40:2,
11,20;41:1;45:23;
46:10;50:15
**book (38)**
8:16;24:1;27:18;
34:4,4,8,10,12,16;
35:13,22;36:16;37:2,4,
8,21,25;38:9,12;40:12,
13,14;41:12,14,18;
42:14,19,24;43:11,17,
25;44:13;45:11,15;
46:10,18;48:14;55:14
**books (85)**
8:19;9:5;10:2,3,4,18,
23;13:23;14:1,12,15,
16,20;15:20;16:23;
17:4,6;19:10,14,15,24;
20:1,5,10,13;23:17,17,
21;27:15,15,17;28:2,
20,23;29:1,2;31:9,13;
32:4;33:8,13,15,17,22,
25;34:3,14,20,23;35:8,
19,19;38:16,19;39:6,
10,13;40:3,18,19,21;
41:2,5,8;42:8,12,16,
21;43:3,5,7,8,15;
46:14,21;47:5,8,15;
48:1,25;49:13;51:8,18;
52:5;53:7
**bookstores (1)**
47:9
**both (3)**
9:16;21:13;47:14
**branch (13)**
11:13;13:15,17,18,
20;16:13,15;20:2,15;
28:22;51:4;52:17;
55:24
**branches (5)**
11:7;20:5,6,11,16
**branches' (1)**
56:6
**break (4)**
9:12,13;22:15;29:14
**Brief (1)**
22:17
**bringing (1)**
8:14
**brought (4)**
11:21;25:4,5,15
**BROWNSTEIN (24)**
7:18;26:13,22;
27:21,25;28:6,15;
30:13,17,22;31:23;
33:1;36:17;37:17;
38:8;40:24;44:24;

**7:15;12:20**

**45:23;46:3;47:22;**
49:16,19;51:3;56:11
**browse (1)**
39:12
**Buren (13)**
6:18,19;13:17,20;
16:13,15;20:2,15;
28:22;51:4;52:17;
55:24;56:6
**business (2)**
7:8,10
**Butterfield (1)**
6:21
**buy (2)**
47:9,9

## C

**called (2)**
16:10;32:14
**came (3)**
12:1,3;48:16
**Can (28)**
6:8;9:16,18;14:2,3,4,
6,7;17:12,14;21:24;
23:15,17;25:9;27:2;
28:2,12,16,18;30:7;
31:24;34:7;38:18;
47:5;49:10,16,19;56:4
**capacity (1)**
8:11
**Caplinger (1)**
24:7
**card (4)**
55:4,8,11,13
**care (1)**
29:22
**case (16)**
8:3,23;11:21;15:23,
25;24:18,25;25:5,6,7,
17;26:10;31:6,7;
48:19;49:17
**case's (1)**
25:3
**category (2)**
33:14;34:15
**caught (1)**
46:1
**cautioned (1)**
6:3
**CCL (1)**
20:10
**certain (10)**
14:19,23;15:3,8,10;
35:8,19;40:3,18;41:2
**challenge (10)**
30:11;35:8,13;
40:12,13,18,21;41:5,8;
46:14
**challenged (3)**
28:20;40:16;46:18
**challenges (4)**
30:25;46:10;48:14,

18
**challenging (4)**
30:5;31:7;35:22;
46:13
**chance (1)**
12:14
**characterization (2)**
30:14;33:3
**Charlene (1)**
50:18
**charm (1)**
47:23
**check (18)**
11:1;13:23;23:17,
17;37:8,25;44:13;45:1,
4,9,15;48:1;51:8,12;
52:5;53:7;55:8,14
**checked (2)**
13:25;36:8
**checking (5)**
24:1;37:2;39:16;
45:10;47:12
**checkout (6)**
10:1;39:18;44:17,
19,21;55:17
**child (3)**
51:13;52:7;53:10
**children (7)**
15:4;17:11,11;
20:24;26:4;54:4;56:7
**children's (2)**
19:10,10
**choose (2)**
8:17;38:16
**choosing (1)**
47:5
**Chris (1)**
19:4
**circle (1)**
44:5
**circulation (1)**
53:3
**claims (1)**
11:21
**clarify (1)**
23:19
**clean (1)**
9:18
**clear (3)**
17:12;23:14;45:22
**collection (5)**
35:9,13;43:5,10,18
**Colleen (6)**
33:21;42:8,9,14;
43:8,14
**college (1)**
43:1
**comfortable (1)**
44:18
**commend (1)**
29:17
**Complaint (8)**
7:16,19,19,21;8:2;

22:3;26:16,20
**complete (1)**
55:20
**concern (2)**
48:24;49:3
**concerned (1)**
34:25
**concerns (6)**
50:10,12,14,17,20,
23
**concluded (1)**
56:20
**conduct (3)**
32:18;33:9;34:5
**confused (1)**
54:9
**connected (1)**
7:9
**consent (1)**
55:4
**considering (1)**
35:18
**contacted (2)**
22:23,24;23:3
**contain (6)**
29:1,3,4,5;32:5;
49:14
**contained (2)**
26:6;51:21
**containing (3)**
26:3;27:5,16
**content (3)**
14:19;41:13;45:16
**context (1)**
48:12
**continues (1)**
18:6
**controversy (2)**
14:6;39:10
**conversation (1)**
52:19
**conversations (1)**
29:23
**cool (1)**
6:15
**copy (1)**
8:1
**correctly (1)**
30:2
**counsel (2)**
44:24;47:3
**County (56)**
6:22,24;11:5,8,14;
12:21;13:15;17:19,21;
18:9,21;19:9,25;20:2,
6,22,23;22:4,10;23:23,
25;24:5;26:2,25;27:5,
10,14,17;28:13,22;
29:24;38:13,17;39:1,
21;43:2,10,18;46:6;
48:19,19,20,25;49:1;
50:1,5,6,8;51:5;52:16;
54:3;55:4,8,11,13,24

**County's (2)**
10:11;21:1
**couple (4)**
7:13;34:13;37:18;
47:25
**Court (3)**
12:6;15:15;48:19
**covered (1)**
31:13
**covers (1)**
32:3
**Crawford (52)**
6:22,24;10:11;11:5,
8,14;12:21;13:15;
17:19,21;18:9,20;19:8,
25;20:2,6,22,23;21:1;
22:4,10;23:23,25;24:5;
26:2,25;27:4,10,14,17;
28:13,22;29:24;38:12,
25;39:21;43:2,9,18;
46:6;48:19,19,25;50:5;
51:5;52:16;54:3;55:4,
8,11,13,24
**crazy (1)**
16:24
**created (4)**
11:25;14:18;15:2;
27:10
**creating (3)**
13:8,10;14:11
**criminal (2)**
30:8;31:5
**criteria (1)**
10:17
**curious (1)**
10:25
**current (3)**
50:8,17;51:13
**currently (2)**
24:14;36:23
**cut (1)**
15:14

**D**

**date (2)**
12:14,22
**days (2)**
52:20;55:16
**deal (5)**
33:3,6,9,9;34:12
**dealing (1)**
34:4
**dealt (1)**
32:22
**December (3)**
19:4;49:7;50:11
**decide (3)**
28:12,13,20
**decides (1)**
14:24
**deciding (2)**
45:12;48:17

**declined (1)**
20:23
**dedicated (1)**
34:20
**deemed (3)**
8:19;9:5;32:5
**Defendant's (4)**
7:14,24;8:2;17:25
**define (1)**
55:21
**defined (1)**
30:9
**definitely (1)**
20:14
**Deidre (2)**
12:25;50:24
**depends (1)**
47:18
**depicts (1)**
32:17
**deposition (2)**
41:24;56:20
**describes (2)**
32:16,18
**desire (1)**
11:22
**desk (7)**
14:5;36:10;37:4;
38:23;39:18;53:1,3
**details (1)**
37:12
**determined (2)**
14:12;43:25
**difference (1)**
36:25
**different (2)**
44:11,12
**difficult (1)**
40:25
**difficulty (1)**
12:17
**directly (1)**
14:5
**Director (3)**
50:18,21,24
**disarmed (1)**
47:23
**disconnected (1)**
12:19
**discussed (1)**
25:14
**discussing (7)**
13:8;14:11;25:5;
26:3;34:20;45:5,22
**Document (8)**
7:22;8:4,4;16:3,4,5,
7;18:2
**documents (2)**
16:6,9
**done (1)**
9:15
**door (2)**
56:2,6

**down (5)**
9:14;31:24,25;42:2;
44:19
**drafted (1)**
26:15
**during (3)**
9:12;45:24;51:4

**E**

**earlier (10)**
15:13;18:13;22:2;
23:13;24:20;25:1,4,5,
10,14
**effect (16)**
8:23;15:6,21;17:20,
22;21:6,16,22;26:7;
27:12;40:17;41:6;
44:25;45:2;46:4;48:15
**Either (1)**
47:9
**eleven (11)**
53:11,20,22,23;54:7,
7,7,11,15,19,21
**else (4)**
36:15;47:13;52:11;
55:24
**email (4)**
49:8,10,16;50:11
**emailed (1)**
49:25
**end (1)**
35:2
**Ends (3)**
42:14,17;43:3
**entire (4)**
32:11;34:3,10,16
**entirely (1)**
41:13
**Eva (1)**
50:21
**even (6)**
14:9;33:5;34:4;37:4,
21,25
**everyone (2)**
8:16;28:11
**EXAMINATION (10)**
6:6;29:10;37:16;
41:22;46:25;48:9;
49:22;51:2;52:13;
56:13
**excitement (3)**
32:18;33:10;34:5
**Exhibit (3)**
7:24;16:3;17:25
**exist (2)**
37:6;44:10
**explain (1)**
31:18
**explained (1)**
23:5
**Exploring (1)**
19:20

**exposure (1)**
20:25
**express (1)**
49:3
**expressed (9)**
27:18;48:24;50:10,
10,11,14,17,20,23

**F**

**fact (5)**
32:10;41:7,10;45:8;
48:18
**fair (2)**
47:18,20
**fairly (1)**
48:22
**fall (2)**
33:14;34:15
**far (4)**
9:16;21:15,21;28:16
**fast (1)**
31:23
**favor (2)**
11:20,22
**featured (1)**
15:20
**feel (12)**
10:1;23:19;31:20;
33:24;36:14;37:3;
39:5;44:4,7,14,18;52:9
**feeling (1)**
37:1
**felt (1)**
51:24
**few (5)**
7:8;34:11,17;37:18;
47:2
**figure (2)**
16:25;17:2
**filed (2)**
8:2;15:25
**find (1)**
49:19
**finished (1)**
33:1
**first (11)**
8:6,7;12:7,11;26:13;
29:13,16,19;31:4;47:3,
11
**five (2)**
11:7,11
**focus (1)**
31:3
**follow (1)**
42:4
**follows (1)**
6:5
**follow-up (8)**
41:25;42:1,5;47:2;
48:11,13;49:24;52:15
**forget (1)**
34:2

**forgot (2)**
9:11,20
**form (1)**
40:23
**former (2)**
50:20,23
**free (3)**
23:19;31:20;33:24
**friend (1)**
8:12
**front (2)**
56:2,6
**full (1)**
30:15
**further (9)**
27:12;41:22;46:25;
49:22;51:2;52:13;
56:11,12,13
**future (2)**
27:11;46:15

**G**

**gave (1)**
53:10
**general (4)**
16:16,17;53:16;
54:23
**generally (2)**
13:7;35:17
**gets (1)**
28:14
**Gilstrap (3)**
49:12;50:1,6
**giving (1)**
32:15
**goes (3)**
14:24;26:6;31:20
**Good (8)**
6:8;9:15;23:9;29:12,
14,15
**gosh (1)**
33:20
**gotcha (1)**
10:24
**government (1)**
38:17
**graphic (1)**
15:20
**Green (8)**
33:21;42:8,10,21;
43:9,11,15,17
**Grzymala (3)**
12:25;13:1;50:24
**guardian (2)**
51:14;53:14
**guess (5)**
20:17;31:10;36:25;
47:18;49:15

**H**

**half (2)**

54:17,17
**Hamby (12)**
15:18;18:9,11,16,17,
19,20;19:3;35:18;
46:14,17,20
**handed (2)**
8:1;16:3
**happening (1)**
31:1
**happy (1)**
9:13
**harm (3)**
20:25;26:4;36:5
**harmful (3)**
21:2;30:9;32:15
**head (1)**
33:19
**heard (1)**
40:10
**hereinbefore (1)**
6:2
**hereto (1)**
7:24
**herself (1)**
42:20
**hey (1)**
31:18
**High (4)**
6:18,19,20;29:17
**hinder (1)**
10:1
**Hollier (1)**
42:8
**Hoover (6)**
33:21;42:9,10,14;
43:8,15
**hope (1)**
35:2
**housed (4)**
19:24;20:1,6;46:5
**hung (1)**
44:3
**husband (1)**
15:19

**I**

**idea (1)**
56:16
**illegal (1)**
30:8
**imagine (3)**
35:18;43:6;44:10
**implement (1)**
22:8
**implemented (3)**
17:20;22:4,10
**implicate (1)**
43:17
**implicated (1)**
43:16
**inaccessible (1)**
28:21

**inappropriate (5)**
8:19;9:5;14:20;32:5;
45:11
**includes (1)**
33:25
**incorrect (1)**
54:6
**information (7)**
11:2;26:1,11,24;
27:3,4;52:2
**injure (1)**
36:5
**injured (3)**
36:13,14,18
**innocence (2)**
20:25;26:4
**insisted (1)**
20:24
**Instead (1)**
20:23
**instructing (1)**
27:23
**intend (1)**
34:23
**intends (3)**
26:2,25;27:5
**interested (2)**
10:2,3
**interim (1)**
50:21
**into (18)**
8:22;10:8;14:12,24;
17:13,20,21;19:10,15,
16;26:6;27:11;38:22,
25;40:17;41:6;48:15;
51:18
**introduce (1)**
7:14
**involve (1)**
25:8
**involved (1)**
22:22
**involvement (1)**
25:3
**involving (1)**
24:13
**issues' (1)**
26:4
**item (1)**
32:17
**items (7)**
30:8;31:13;32:3,14,
15,15,16

**J**

**January (13)**
12:10,15,21,24;13:4,
11;14:10;19:7;21:5,
17;39:24;45:23;46:9
**Jeff (2)**
18:8,11
**job (3)**

7:3;7:9;16
**John (8)**
33:21;42:8,10,21;
43:8,11,15,17
**join (4)**
8:14;9:24;23:11,20
**joined (3)**
23:14,15;24:3
**judge (2)**
11:20;19:3;48:20;
49:1;50:1,5,6,8,12
**judging (1)**
14:9
**judgment (1)**
21:2
**jumped (1)**
9:11
**June (1)**
6:14

**K**

**Katherines (3)**
43:11,17;44:11
**keep (1)**
9:16
**keeping (1)**
7:21
**Keith (3)**
19:4;50:9,12
**kind (5)**
8:6,7;34:9;45:4,15
**kinds (2)**
40:3,7

**L**

**last (8)**
9:9,22;16:19;17:7;
47:7,21;49:15;51:4
**law (6)**
30:8;31:7,12,13;
32:6,14
**lawsuit (19)**
8:15,18;9:8,21,24;
11:17;22:22;23:4,10,
14,16,20;24:4,5,13,16;
25:15;30:5;31:1
**lawyers (1)**
44:3
**leads (1)**
26:11
**least (1)**
36:21
**legal (2)**
27:22;28:18
**legalese (1)**
26:19
**less (1)**
20:14
**Leta (1)**
24:7
**letter (7)**

12:6;15:14,17;18:9,
10,12,12
**LGBT (4)**
10:4;32:5;33:4;40:8
**LGBT+ (2)**
10:19;15:21
**LGBTQ (28)**
10:23;19:10;26:3;
27:6,12,16,17;28:2,24;
29:4,7;32:22;33:4,9;
37:23;38:1,6,10;40:13;
41:2,10,13,14,19;
45:25;46:5;49:13;
51:21
**librarian (12)**
37:6,9;38:17;44:13,
15,17;51:22;52:21,25;
53:3;55:16;56:16
**librarians (6)**
14:17;36:9;47:5;
51:5;52:2,16
**librarian's (5)**
14:5;36:10;37:4;
38:23;53:1
**libraries (1)**
30:6
**Library (63)**
11:5,8,14;12:7,9,11,
13,20;13:15;16:17;
17:17;18:20,23;19:4,9;
20:2,7;21:5,12,21;
23:25;28:23;35:6;
36:15;38:12,17;39:1,3,
13,19,21,21,24;40:2,
11,20;41:1;43:2,18;
44:12;45:23;46:6,9,22;
47:6,13;48:25;50:15,
18,21,23;51:5,19;
52:16;53:12,17;54:4;
55:4,5,7,9,11,13
**library's (3)**
35:9,13;43:10
**life (2)**
6:24;42:20
**lifestyles (1)**
15:21
**likely (3)**
40:12,21;41:7
**list (1)**
33:25
**Listen (1)**
47:22
**listening (1)**
18:1
**literature (1)**
34:9
**little (1)**
48:12
**lived (1)**
6:24
**located (2)**
55:23;56:2
**long (1)**

7:7
**longer (1)**
50:6
**look (5)**
17:4,5;19:1;25:23;
39:13
**looked (5)**
10:17,25;11:3,4;
16:23
**looking (8)**
17:25;25:20;39:1,6,
11,14;42:23;43:4
**lot (1)**
29:19

## M

**machine (1)**
39:19
**MADELINE (4)**
6:1,10;8:12;26:14
**Main (3)**
7:4,4;39:21
**Major (1)**
19:20
**majority (2)**
10:18,22
**makes (1)**
30:8
**making (2)**
35:24;36:1
**man (4)**
29:20;31:23;32:20;
42:25
**many (6)**
16:12,19;29:22;
40:4,5;47:15
**March (1)**
8:3
**marked (2)**
7:24;8:2
**material (10)**
15:3,9;27:12;32:17;
45:2,4,25;46:2,5;55:8
**materials (6)**
20:25;21:1;26:2,5;
27:5;45:9
**matter (5)**
41:18;45:5,9;47:20;
48:2
**may (8)**
15:19;16:2,24;
26:22;27:25;28:19;
30:19;42:1
**maybe (4)**
37:18;45:19;47:16;
48:20
**McDonnough (1)**
50:18
**MCLELLAND (30)**
6:7;7:15,20,25;
12:16,18;18:1,4;22:14,
18;25:9,12,13;26:21,

23;27:23;28:4;29:9,22,
23;36:3;40:22;41:23;
46:24;49:23;51:1;
52:14;54:13,16,20
**mean (4)**
14:3;33:5;37:2;
54:17
**meaning (1)**
17:20
**means (1)**
32:17
**Meat (1)**
7:11
**meeting (22)**
12:8,9,11,13,20,22;
13:1,5,11,13;14:11;
19:8;21:5,17;39:24;
40:2,11,20;41:1;45:24,
25;46:9
**members (3)**
21:15,21;40:17
**men (1)**
29:18
**mention (1)**
38:6
**mentioned (3)**
31:5;34:1;38:2
**met (1)**
24:9
**Michelle (1)**
9:14
**Middle (1)**
6:21
**Miel (3)**
8:7,9,10
**might (9)**
14:9;20:25;21:2;
26:4;34:8,11;36:9;
40:12;45:11
**mind (1)**
45:21
**minor (6)**
26:17;37:20;41:15;
51:12;52:5;55:3
**minors (16)**
21:2;23:21;28:21;
30:8,9;31:9;32:15,16;
35:20;40:9,19;46:2,7;
53:7;55:19,21
**mischaracterization (1)**
38:7
**missed (1)**
46:1
**misspoke (1)**
25:19
**misspoken (1)**
25:21
**misstate (1)**
27:8
**mistaken (1)**
25:2
**mom (1)**
13:13

**moment (5)**
18:5;22:3;33:18;
44:14;47:4
**month (2)**
47:16;54:17
**months (3)**
7:8;16:19;47:7
**more (6)**
22:16;37:10,12;
42:2;43:7;48:21
**morning (2)**
6:8;29:12
**most (4)**
10:18;29:22;31:3;
34:4
**mostly (2)**
29:24;32:6
**mother (6)**
8:11;22:23,24;23:4,
9,10
**motivated (1)**
51:23
**motivation (1)**
51:16
**moved (7)**
14:15,16;19:9,9,14,
15;51:18
**movies (2)**
48:5,6
**moving (1)**
42:20
**much (1)**
22:16
**must (4)**
26:5;53:11;55:20;
56:7
**myself (1)**
17:18

## N

**name (4)**
6:8;22:25;24:8;
52:21
**named (2)**
6:2;34:5
**names (2)**
21:9,19
**need (7)**
9:12;23:19;26:13;
28:15;29:14;33:2;
45:22
**needs (2)**
51:14;52:7
**neither (1)**
30:17
**new (1)**
19:11
**next (6)**
8:12;14:5;18:6;28:4;
36:10;38:23
**nine (2)**
45:19,20

**Noah (1)**
29:13
**non-board (1)**
21:15
**none (1)**
32:22
**non-LGBTQ (1)**
29:2
**normally (1)**
47:8
**note (1)**
32:9
**noted (1)**
26:21
**notes (1)**
22:15
**novel (1)**
43:13
**November (1)**
18:12
**nudity (3)**
32:18;33:9;34:5

## O

**oath (2)**
22:20;46:21
**object (9)**
26:18;27:21;28:15;
30:13;33:2,2;36:17;
38:4;40:22
**objection (6)**
26:14,21;30:19,23;
32:10;38:5
**objections (3)**
40:3,7;41:2
**Obviously (1)**
26:14
**off (4)**
12:16,17;15:14;
33:18
**often (3)**
16:15,18;47:15
**old (5)**
6:11;37:20;41:16;
54:17,18
**older (1)**
47:20
**Once (2)**
16:14;26:6
**one (13)**
16:3;17:18;30:6;
34:11;35:14,15,16;
42:15;48:11,12,15;
49:10;56:15
**ones (2)**
20:17;33:20;41:7
**online (5)**
18:2;47:9,10,11,12
**only (6)**
19:16,16;41:13,19;
47:6;51:10
**onto (1)**

18:23
**opinion (3)**
27:22;28:18;45:10
**opinions (1)**
14:8
**others (1)**
37:24
**ought (3)**
45:1,3,8
**out (30)**
11:1;13:23,25;
16:25;17:2;19:10;
23:17,17;24:1;36:8,16;
37:2,8,25;39:16;42:18;
44:14;45:1,4,9,10,15;
47:12;48:1;51:8,12;
52:5;53:7;55:8,14
**outlined (1)**
27:1
**over (3)**
9:17,18;22:15
**overturn (1)**
25:16
**overturned (3)**
24:21,24;25:7
**overview (1)**
30:21
**overwhelming (2)**
10:18,22
**own (1)**
8:11
**owned (1)**
7:12
**owner (1)**
7:12
**owns (1)**
7:13

**P**

**page (5)**
8:6;17:24;18:2,6;
31:21
**pages (2)**
34:11,17
**Paragraph (11)**
17:25;18:3,6,8,11;
19:1,19;20:19;21:24;
25:23;27:1
**paraphrase (1)**
36:6
**parent (5)**
8:11;51:14;52:7;
53:11,14
**parental (1)**
55:3
**part (5)**
24:5;30:11;31:6;
35:7;44:12
**PARTAIN (12)**
6:1,8,10;8:1,8,10,12;
18:8;22:19;26:14;
29:12;41:24

**particular (3)**
14:1,22;15:10
**pass (2)**
29:9;46:24
**patrons (3)**
39:2,5,13
**pending (3)**
9:8,9,22
**people (19)**
14:11,19,20,23;15:3,
8,11;17:12;21:10,15;
23:16;24:4;35:8;40:2,
5,12,21,25;45:25
**per (2)**
47:16,18
**performance (1)**
32:17
**person (6)**
14:22;15:10;23:3;
31:8;45:12;49:3
**personally (1)**
24:25
**physically (2)**
14:15,16
**pick (1)**
36:16
**picked (1)**
44:13
**piece (4)**
30:7;31:4,4;32:7
**pieces (1)**
30:5
**place (1)**
12:23
**placed (1)**
20:10
**Plaintiff (3)**
9:25;23:6,11
**planned (1)**
35:22
**play (1)**
10:24
**pleading (2)**
16:2,2
**pleadings (2)**
15:23,24
**please (3)**
9:3;31:20;36:7
**point (5)**
9:12;30:3;37:3,7;
44:6
**policies (2)**
30:7;55:17
**policy (8)**
26:2;27:1,5;53:16,
16,19;54:4,24
**pops (1)**
34:12
**portion (3)**
32:8;41:13,19
**position (3)**
27:10,14,16
**positive (3)**

14:24;15:19;21:9
**possibility (2)**
43:19,20
**potentially (1)**
43:15
**predominantly (3)**
34:25;37:22;38:1
**predominately (1)**
38:10
**pretty (1)**
32:23
**prevented (4)**
23:23,25;37:24;
38:11
**Previous (1)**
25:11
**previously (2)**
6:2;34:20
**primarily (1)**
13:16
**printer (1)**
49:20
**Probably (4)**
13:2;14:8;16:21;
52:3
**process (1)**
37:10
**produce (1)**
49:17
**prompted (1)**
55:17
**protect (1)**
20:24
**provided (1)**
49:16
**provides (1)**
48:22
**providing (1)**
31:9
**provision (1)**
31:5
**public (3)**
21:12;38:12;40:17
**pull (1)**
7:17
**purchasing (1)**
47:12
**put (5)**
10:18;17:20,21;
38:9;43:22

**Q**

**qualified (1)**
28:17
**qualifying (1)**
28:1
**quarter (1)**
8:7
**quick (2)**
22:14;56:15
**quickly (1)**
35:5

**Quorum (3)**
12:6;15:14;48:19
**quote (2)**
19:9;21:2

**R**

**race (1)**
38:10
**random (4)**
29:18,20;32:20,21
**read (34)**
8:16,25;10:25;18:5;
19:19,22;21:24;23:21,
22;25:10,11;26:8,16;
28:12,14;31:9;32:7,21;
33:15,20;34:3,14,20,
24;37:19,21;38:16,18,
19;40:19;47:6,8,15,16
**reading (3)**
10:2,3;32:10
**realize (2)**
22:19;25:21
**reason (2)**
13:25;14:1
**received (1)**
48:20
**recess (1)**
22:17
**record (5)**
6:9;9:19;12:16,17;
15:25
**referencing (3)**
18:13;42:13;43:9
**referring (7)**
10:6,11;14:22;
15:10,17,21;31:16
**regardless (4)**
45:4,9,15;48:2
**register (2)**
26:13;30:23
**regulate (1)**
31:9
**relationship (1)**
42:18
**relationships (1)**
15:22
**Religions (1)**
19:20
**relocate (1)**
49:13
**relocated (4)**
8:19;9:6;10:5,6
**relocation (1)**
48:24
**remember (28)**
12:13,14,22,25;13:4,
7,9,9;15:5,5,13,15;
16:9;21:16,21;24:20;
25:12,14;36:6,11;42:7,
21;45:5;46:3,11,15;
48:3;55:22
**removed (2)**

11:23;46:22
**render (1)**
28:17
**repeat (2)**
26:24;56:4
**rephrase (5)**
15:1;18:10;23:24;
27:2;34:2,7
**require (2)**
30:18;48:12
**respective (2)**
19:11,15
**respond (1)**
50:3
**response (1)**
52:6
**responsibility (1)**
31:8
**review (1)**
20:20
**reviewed (2)**
15:23,24;16:6
**rid (2)**
11:18;24:17
**right (36)**
8:8,16;9:11;12:19;
15:13;18:5;23:9,11,17;
24:24;25:14,18,23;
26:8;28:9,10;29:9,16;
36:10,22;37:7,13,19,
20;38:22,23;39:16,22,
25;41:24;42:6;47:2,5;
49:12;50:1;53:8
**rights (1)**
20:24
**romance (2)**
42:25;43:13
**roughly (1)**
49:6
**round-robin (1)**
42:3
**R-rated (1)**
48:6
**rules (2)**
11:20,22

**S**

**sadomasochism (3)**
37:23;38:1,10
**sadomasochistic (3)**
32:19;33:10;34:6
**safe (1)**
34:19
**same (6)**
7:12;31:21,22;48:5;
54:10,14
**saw (4)**
40:10,20;41:1;55:25
**saying (14)**
8:8;9:15;15:5,15;
21:22;24:20;25:17;
35:21;36:11,13;46:1,3;

48:1,21
**school (8)**
6:17,18,19,20,20,21;
29:17;47:17
**second (2)**
20:19;29:20
**Section (82)**
10:8,13,16,19,23;
11:3,11,15,18,23,25;
12:2;13:5,10,21,23;
14:1,4,12,13,16,18,25;
15:2,4;16:13,16;17:5,
8,13,17;19:10;24:14,
17,21,24;25:6,8,16,17;
27:7,11;28:23,24;
29:25;30:14,17,18;
31:7,16,17;32:2,7;
35:5,7;36:4,8,10,14,
22;37:1,5,5;38:22,25;
39:2,6;43:21,23;44:1,
5,8,10;48:14,22;51:9,
13,18;52:5;53:8;55:1,
19
**Sections (3)**
11:4;19:11;20:10
**seeking (4)**
8:22;11:17;52:1,2
**segregate (6)**
27:12,15,15,17;28:2;
49:13
**segregated (2)**
26:5;27:6
**segregating (1)**
21:1
**sending (3)**
18:9,10,12
**senior (2)**
6:15;29:17
**sentences (1)**
49:11
**sequel (1)**
42:19
**set (1)**
35:7
**Seventeen (1)**
6:12
**several (1)**
21:14
**sex (2)**
38:2,10
**sexual (6)**
32:18,18;33:9,10;
34:5,5
**shelf (1)**
44:12
**sign (1)**
55:19
**signs (3)**
55:23;56:2,6
**similar (1)**
21:11
**simply (1)**
49:13

**six (2)**
16:19;47:7
**slow (1)**
31:25
**slowly (1)**
42:1
**so-called (1)**
30:9
**Social (68)**
10:8,13,15,19,23;
11:4,11,15,18,23,25;
12:2;13:5,10,21,23;
14:1,4,11,13,16,18,25;
15:2,4;16:13,16;17:5,
8,13,17;20:10;24:14,
17,21,24;25:6,8,16,17;
26:3;27:7,10;28:23,24;
29:24;36:4,8,14,22;
37:1,5,5;38:22,25;
39:1,6;43:21,22;44:1,
4,7,10;51:9,13;53:8;
55:1,19
**somebody (5)**
45:7,8,14,16,18
**someone (1)**
35:17
**sometimes (2)**
34:10,11
**Somewhat (1)**
12:4
**somewhere (1)**
36:15
**Sorry (8)**
7:20;9:20;10:10;
18:10;25:24;32:20;
35:4;36:1
**sort (1)**
48:17
**sound (1)**
16:24
**spawns (1)**
47:21
**speak (2)**
46:10;51:5
**speaking (3)**
13:1;47:3,11
**specific (6)**
12:14,22;19:25;
33:18,20;42:21
**specifically (11)**
13:6;15:12;33:13;
35:6,14,15,16;40:8;
48:20,23;55:1
**spoke (5)**
13:10;21:16;44:24;
52:21;55:16
**spoken (1)**
18:16
**stamp (1)**
16:4
**stamps (1)**
16:7
**start (1)**

31:11
**Starts (3)**
42:15,19;43:3
**state (2)**
6:8;33:4
**stated (4)**
13:9;25:7;37:23;
46:21
**states (1)**
53:19
**Stating (1)**
15:19
**Station (1)**
7:11
**statute (3)**
30:10;32:7,11
**still (5)**
22:19;29:14;37:3,6;
41:15
**stop (1)**
8:22
**stopping (2)**
9:3,4
**story (1)**
42:25
**straight (1)**
7:21
**Street (1)**
7:4
**strike (1)**
8:20
**struggling (2)**
42:17,18
**subject (3)**
45:4,9;48:2
**subjects (1)**
37:22
**succinct (1)**
9:19
**suing (1)**
8:11
**summarize (2)**
48:22;49:10
**summer (2)**
9:9,22
**suppose (2)**
44:20;45:19
**sure (9)**
22:25;23:14,16;
29:6;30:16;31:21;
43:6;51:24;56:9
**surprise (2)**
11:15;46:20
**sworn (3)**
6:3;56:1,5
**System (16)**
11:5,8,14;13:16;
20:2,7;23:25;43:2,18;
44:19,22;46:6;47:13;
53:17;55:5,9
**System's (2)**
52:17;54:4

**T**

**table (1)**
42:4
**talk (5)**
9:17,18;31:23;51:7;
56:15
**talked (8)**
23:13;24:11;44:3;
46:12,13;48:14,17;
52:15
**talking (9)**
18:14;29:18,24;
31:17,18;42:7;43:14;
46:15;47:4
**talks (2)**
18:8,11
**Tammi (6)**
15:18;18:9,11,19,20;
35:18
**targeted (2)**
32:14;40:8
**targeting (1)**
45:25
**Teams (2)**
7:16,23
**technical (2)**
12:17;35:16
**technically (1)**
38:5
**telling (2)**
24:23;38:18
**ten (11)**
45:19,20;53:20;
54:1,4,8,10,14,16,17;
56:7
**term (1)**
34:9
**testified (1)**
6:4
**testimony (7)**
22:20;27:9;30:2;
56:2,3,5,8
**theirs (2)**
34:3,15
**theme (2)**
33:4;34:9;37:23;
40:13
**themed (1)**
10:23
**themes (28)**
10:4;19;26:3;27:6,
16;28:24;29:1,3,4,4,7;
32:4,5,22;33:9;34:9,
10;38:1,6,10,19;41:2,
10,14;48:25;49:13,14;
51:21
**therein (1)**
26:6
**though (1)**
14:2
**three (4)**

16:21;43:3,5;47:7
**thus (1)**
9:16
**times (8)**
16:12,19,21;34:13;
47:7;51:15;52:8;53:11
**title (3)**
42:12,22;53:5
**titles (2)**
33:18,23
**together (1)**
21:25
**told (5)**
23:10;49:12;51:13;
53:23;54:19
**took (2)**
12:23;29:22;44:13
**top (3)**
8:3;16:4;33:19
**topic (1)**
48:13
**topics (3)**
34:21,25;48:16
**transcript (1)**
9:19
**true (2)**
22:11,20
**truth (3)**
6:3,4,4
**try (4)**
9:14,17,18;25:16
**trying (8)**
10:24;16:25;17:2;
24:17,18;27:9;30:20;
48:21
**turn (2)**
6:13;17:24
**two (7)**
16:21;20:5;30:5,25;
49:10;52:20;55:16

**U**

**unaware (1)**
35:21
**unclear (2)**
10:17;32:23
**uncomfortable (14)**
14:2,3,4,7;33:13;
36:9,22;37:2,3;38:21;
39:8;44:7,14,20
**uncomfortableness (1)**
44:4
**under (27)**
17:12,15,16;22:19;
30:9;33:14;40:21;
41:6;46:21;48:14;
51:14;52:7;53:11,22,
23;54:1,7,7,7,8,10,11,
14,15,19,21;56:7
**unless (1)**
47:21
**up (10)**

7:17;34:12;35:4,7;
42:4;44:4,13;45:22;
48:16,18
**upon (3)**
11:21;27:17;45:2
**use (3)**
10:13;13:16,20
**used (3)**
13:18;36:18;44:21

## V

**Van (13)**
6:18,19;13:17,20;
16:13,15;20:1,14;
28:22;51:4;52:17;
55:24;56:6
**versus (1)**
37:2
**view (1)**
48:5
**viewpoint (2)**
26:6;27:6
**viewpoints (1)**
27:18
**visible (1)**
39:2
**visit (1)**
51:4
**voicing (3)**
40:3,7;41:1

## W

**warning (1)**
35:3
**WATSON (23)**
29:11,13;30:16,20,
24;31:25;32:1,9,13,25;
33:7;36:19;37:23;
38:2,4;42:7;43:14;
46:13;47:1,24;48:8;
49:25;56:14
**way (9)**
9:18,20;11:17;
32:16;35:7;37:8;38:9;
42:2;52:3
**welcome (1)**
37:15
**weren't (1)**
19:15
**what's (4)**
8:20;10:15;12:5;
43:12
**WHEREUPON (1)**
56:19
**White (1)**
50:21
**whittle (1)**
42:2
**whole (3)**
6:4,24;41:18
**wind-up (1)**

48:12
**within (3)**
19:11;20:24;46:5
**without (3)**
37:9;38:16;39:13
**witness (3)**
6:2;54:12,19
**woman (3)**
42:17,18,25
**word (2)**
36:18;46:1
**work (3)**
7:1,4;48:16
**worked (2)**
7:8;53:4
**World's (1)**
19:20
**worries (1)**
32:11
**writing (3)**
49:4,5,6
**written (3)**
12:6;15:14,18
**wrong (4)**
9:3;36:7;56:3,8

## Y

**y'all (1)**
7:16
**year (3)**
47:16,18;54:17
**years (7)**
37:20;41:16;53:20,
20,23;54:1,4
**younger (4)**
14:20;53:20,21;54:5

## 1

**1 (10)**
7:14,24;8:2;16:3;
17:25;30:14,18;31:16,
17;32:2
**10:04 (1)**
56:19
**10th (11)**
12:15,24;13:4,11;
14:10;19:7;21:6,17;
39:25;45:23;46:9
**11 (2)**
51:14;52:7
**15 (1)**
45:18
**16 (1)**
45:16
**17 (3)**
37:19;41:16;45:14
**17-year-old (1)**
26:17
**18 (3)**
6:13;17:12,16

## 2

**2022 (3)**
18:12;49:7;50:11
**2023 (3)**
12:10,21;39:25
**25 (2)**
17:24;18:2
**263 (2)**
20:9,12

## 3

**372 (19)**
8:22,25;9:4,21;
17:20,21;22:5,10;26:6;
27:11;28:13;30:6;
40:16,21;41:6,6;43:16,
16;48:15

## 5

**5 (6)**
30:18;32:7;35:5,7;
48:14,22

## 7

**75 (4)**
7:22;8:4;16:5;18:2
**7th (1)**
6:14

## 8

**80 (5)**
17:25;18:3,6,8;
25:23
**81 (1)**
19:1
**82 (1)**
19:19
**83 (1)**
20:19
**84 (1)**
21:24
**85 (3)**
21:25;25:24;27:1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FAYETTEVILLE PUBLIC LIBRARY, a political
subdivision in the City of Fayetteville, State of
Arkansas; EUREKA SPRINGS CARNEGIE PUBLIC
LIBRARY; CENTRAL ARKANSAS LIBRARY
SYSTEM; NATE COULTER; OLIVIA FARRELL;
HAYDEN KIRBY; MIEL PARTAIN, in her own
capacity and as parent and next friend of MADELINE
PARTAIN; LETA CAPLINGER; ADAM WEBB;
ARKANSAS LIBRARY ASSOCIATION;
ADVOCATES FOR ALL ARKANSAS LIBRARIES;
PEARL'S BOOKS, LLC; WORDSWORTH
COMMUNITY BOOKSTORE LLC d/b/a
WORDSWORTH BOOKS; AMERICAN
BOOKSELLERS ASSOCIATION; ASSOCIATION OF
AMERICAN PUBLISHERS, INC.; AUTHORS
GUILD, INC.; COMIC BOOK LEGAL DEFENSE                        PLAINTIFFS
FUND; and FREEDOM TO READ FOUNDATION

v.                              NO. 5:23-CV-05086-TLB

CRAWFORD COUNTY, ARKANSAS; CHRIS
KEITH, in his official capacity as Crawford County
Judge; TODD MURRAY; SONIA FONTICIELLA;
DEVON HOLDER; MATT DURRETT; JEFF
PHILLIPS; WILL JONES; TERESA HOWELL; BEN
HALE, CONNIE MITCHELL, DAN TURNER, JANA
BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE
HUNTER; DANIEL SHUE; JEFF ROGERS; DAVID
ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; TONY
ROGERS; NATHAN SMITH; CAROL CREWS;
KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each in his or her official capacity as a
prosecuting attorney for the State of Arkansas              DEFENDANTS



## FIRST AMENDED COMPLAINT

Plaintiffs, Fayetteville Public Library, a political subdivision in the City of Fayetteville, State of Arkansas; Eureka Springs Carnegie Public Library; Central Arkansas Library System; Nate Coulter; Olivia Farrell; Hayden Kirby; Miel Partain, as parent and next friend of Madeline Partain; Leta Caplinger; Adam Webb; Arkansas Library Association; Advocates for All Arkansas Libraries; Pearl's Books, LLC; Wordsworth Community Bookstore, LLC d/b/a WordsWorth Books; American Booksellers Association; Association of American Publishers, Inc.; Authors Guild, Inc.; Comic Book Legal Defense Fund; and Freedom to Read Foundation, Inc., by their undersigned attorneys,[1] and for their First Amended Complaint against Defendants Crawford County, Arkansas; Chris Keith, in his capacity as the Crawford County Judge; Todd Murray; Sonia Fonticiella; Devon Holder; Matt Durrett; Jeff Phillips; Will Jones; Teresa Howell; Ben Hale; Connie Mitchell; Dan Turner; Jana Bradford; Frank Spain; Tim Blair; Kyle Hunter; Daniel Shue; Jeff Rogers; David Ethredge; Tom Tatum, II; Drew Smith; Rebecca Reed McCoy; Michelle C. Lawrence; Debra Buschman; Tony Rogers; Nathan Smith; Carol Crews; Kevin Holmes; Chris Walton; and Chuck Graham, each in his or her official capacity as a prosecuting attorney for the State of Arkansas, state:

## INTRODUCTION

1. This action concerns whether Arkansas may enforce parts of the recently enacted Act 372 of 2023 ("Act 372"), a vague, sweeping law that restrains public libraries and booksellers

---

[1] Plaintiffs Fayetteville Public Library, Eureka Springs Carnegie Public Library, Central Arkansas Library System, Nate Coulter, Olivia Farrell, Hayden Kirby, Miel Partain, Madeline Partain, Leta Caplinger, Adam Webb, Arkansas Library Association, Advocates for All Arkansas Libraries, and Freedom to Read Foundation are referred to herein, collectively, as the "Library Plaintiffs." Pearl's Books, LLC, Wordsworth Community Bookstore, LLC, American Booksellers Association, Association of American Publishers, Inc., the Authors Guild, Inc. and Comic Book Legal Defense Fund are referred to herein, collectively, as the "Bookseller Plaintiffs."

in Arkansas from making available constitutionally protected books and other media to their patrons and customers. Specifically, Plaintiffs seek to preliminarily and permanently enjoin enforcement of, and declare facially unconstitutional and void, Sections 1 and 5 of Act 372 as violations of their rights under the First and Fourteenth Amendments to the U.S. Constitution.[2]

2.      Section 1 of Act 372 makes it a criminal offense, punishable by imprisonment for up to a year, to make available, provide, or show to a minor an item that meets the definition of "harmful to minors" (the "Availability Provision"). This will necessarily force libraries and bookstores to confine to a secure "adults only" area—and so to segregate from their general patrons and customers—any item that might be deemed harmful to the youngest minor, even if there is no constitutional basis for limiting its availability to older minors or adults. Where libraries and booksellers lack the space or resources to construct "adults only" areas, their only choice will be to remove all materials which might be deemed harmful to their youngest, least developed patrons or customers.

3.      By so broadly regulating the display of protected materials that are constitutionally protected as to older minors and adults, the Availability Provision violates the First and Fourteenth Amendments because it imposes a content-based restriction on speech that (a) is not narrowly tailored, (b) is overly broad, and (c) is vaguely worded.

4.      Arkansas knows that it cannot directly prohibit libraries and booksellers from making books and other items available to their patrons and customers on such a sweeping basis, as its prior attempt to limit the availability of material deemed harmful to minors (in a nearly identical law) was struck down by an Arkansas federal court as "facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution because such provisions

_____

[2] A copy of Act 372 is attached as Exhibit 1 to this Complaint.

are overbroad and impose unconstitutional prior restraints on the availability and display of constitutionally protected, non-obscene materials to both adults and older minors." *Shipley, Inc. v. Long*, 454 F. Supp. 2d 819, 831 (E.D. Ark. 2004).

5.      What Arkansas cannot permissibly do directly through the Availability Provision, it likewise cannot not do indirectly through Section 5 of Act 372, which requires that public libraries establish a process through which any "person affected by [a] material" in their collection can challenge the "appropriateness" of that material's inclusion in the library's main collection (the "Challenge Procedure"). Like the Availability Provision, the Challenge Procedure will force public libraries to segregate into a secure, "adults only" area a substantial amount of material that is protected as to adults and older minors but which someone may allege is inappropriate for the public library's youngest, least mature reader. For smaller libraries that lack the space and staff to create this secure, "adults only" area, their only choice—compelled by Act 372—will be to remove entirely all materials that might be inappropriate for the youngest, least developed child readers.

6.      The Challenge Procedure thus violates the First and Fourteenth Amendment in that it (a) imposes an unconstitutional prior restraint on constitutionally protected material; (b) is unconstitutionally vague; and (c) lacks any judicial review of a decision to remove materials from a library's main collection.

7.      The constitutional harms created by the Challenge Procedure have already become evident. Specifically, Crawford County has acted to segregate constitutionally protected materials in the Crawford County Library, and its attorney defended the decision to segregate those materials with reference to its impending obligation under Act 372 to create an area inaccessible to minors.

4

8.      Governor Sanders signed Act 372 on March 31, 2023, and it was scheduled to go into effect on August 1, 2023. Plaintiffs bring this action to safeguard their fundamental rights and the rights of their members under the First and Fourteenth Amendments to the U.S. Constitution to disseminate, receive, and peruse constitutionally protected books, magazines, and other printed or audiovisual media. Act 372 forces bookstores and libraries to self-censor in a way that is antithetical to their core purposes. As further explained below, the Court should strike down the parts of the Act that violate the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this action (a) under 28 U.S.C. § 1331 because this action arises under federal law and (b) under 28 U.S.C. §§ 1343(a)(3) and (a)(4) because Plaintiffs seek to vindicate their federal civil rights under the First and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983.

10.     Plaintiffs seek remedies in this action under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because multiple Defendants reside in this district and all Defendants are residents of the State in which this district is located.

## PARTIES

12.     The Fayetteville Public Library ("FPL") is a municipal public library and political subdivision in the City of Fayetteville, formed pursuant to Arkansas law to provide library services to local residents. Some of the materials in FPL's collection, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate for minors and therefore subject to the Challenge Procedure. To comply with the

Availability Provision and Challenge Procedure, FPL will have to change the physical layout of its libraries in ways that will materially alter the intentionally welcome and open atmosphere the library strives to create. If FPL declines to make these burdensome changes, or even if it does but fails to segregate a single title in its large collection, it puts itself at risk of violating the Availability Provision and being charged with a crime.  FPL's First Amendment rights, and the rights of its patrons, will be adversely affected unless Sections 1 and 5 of Act 372 are enjoined. FPL sues on its own behalf, and on behalf of its library patrons and readers of library materials.

13.     Eureka Springs Carnegie Public Library ("ESCPL") is a municipal public library formed pursuant to Arkansas law to provide library services to local residents. Some of the materials in the ESCPL's collection, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate for minors and therefore subject to the Challenge Procedure. To comply with the Availability Provision and Challenge Procedure, ESCPL will have to change the physical layout of its libraries in ways that will materially alter the intentionally welcome and open atmosphere the library strives to create. If ESCPL declines to make these burdensome changes, or even if it does but fails to segregate a single title in its large collection, it puts itself at risk of violating the Availability Provision and being charged with a crime. ESCPL's First Amendment rights, and the rights of its patrons, will be adversely affected unless provisions of Act 372 are enjoined. ESCPL sues on its own behalf, and on behalf of its library patrons and readers of library materials.

14.     Central Arkansas Library System ("CALS") is a body corporate and politic formed under Arkansas law under an interlocal agreement among the City of Little Rock, Pulaski County, Perry County, the City of Jacksonville, the City of Sherwood, and the City of Maumelle to provide library services to local residents. Some of the hundreds of thousands of materials in the CALS

collection, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate for minors and therefore subject to the Challenge Procedure. To comply with the Availability Provision and Challenge Procedure, CALS will have to change the physical layout of its libraries in ways that will materially alter the intentionally welcome and open atmosphere the library strives to create. If CALS declines to make these burdensome changes, or even if it does but fails to segregate a single title in its large collection, it puts itself at risk of violating the Availability Provision and being charged with a crime. CALS's First Amendment rights, and the rights of its patrons, will be adversely affected unless Sections 1 and 5 of Act 372 are enjoined. CALS sues on its own behalf, and on behalf of its library patrons and readers of library materials.

15.    Nate Coulter is a resident of Little Rock and the Director of CALS. He is suing on his own behalf and on behalf of CALS's Board. Mr. Coulter faces the prospect of criminal liability if he engages in conduct that is constitutionally protected by the First Amendment but nevertheless violates Act 372.

16.    Olivia Farrell is an adult resident of Little Rock and a CALS patron and WordsWorth Books customer. Olivia will be injured if the Availability Provision or the Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

17.    Hayden Kirby is a resident of Little Rock and a CALS patron. Although she recently turned eighteen, she was seventeen on the date Act 372 was set to take effect. She will be injured if the Availability Provision or Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

18.     Miel Partain is an adult resident of Crawford County and a patron of the Crawford County Library System.  Miel will be injured if the Availability Provision or the Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

19.     Miel Partain is the parent and next friend of Madeline Partain. Madeline Partain is a seventeen-year-old resident of Crawford County and a Crawford County Library patron. Her constitutional rights will be adversely affected unless Act 372 is permanently enjoined. Madeline will be injured if the Availability Provision or Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

20.     Leta Caplinger is an adult resident of Crawford County and a patron of the Crawford County Library System.  Leta will be injured if the Availability Provision or the Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

21.     Adam Webb is an American Library Association-accredited Librarian and Certified Public Library Administrator. He lives in Garland County and has worked at the Garland County Library ("GCL") for more than sixteen years, including, since 2019, as GCL's Executive Director. In his capacity as the Executive Director of GCL, Mr. Webb plans and directs the provision of library services, which means that he is primarily responsible for ensuring that GCL complies with Act 372. Mr. Webb believes that some of the approximately 160,000 items in GCL's collection, though constitutionally protected, could be deemed harmful to minors or inappropriate for minors and therefore subject to the Availability Provision or Challenge Procedure. Mr. Webb is also concerned about criminal liability arising from GCL's practice of offering volunteer

8

positions to students in Garland County, many of whom are under 18 years of age, because those volunteers must have access to GCL's entire collection to do their work. Mr. Webb does not believe that GCL will be able to make the drastic and prohibitively expensive changes to its floor plan that would be necessary to fully segregate all possible covered materials in the library's collection. Accordingly, Mr. Webb is concerned that—in the course of his work and consistent with best practices for library administration—he might be charged with a misdemeanor offense for violating Act 372. Mr. Webb will thus be irreparably injured if the Availability Provision and Challenge Procedure are not enjoined. Mr. Webb sues on his own behalf and in his individual capacity.

22.     The Arkansas Library Association ("ArLA") is an Arkansas nonprofit corporation formed under Section 501(c)(3) of the Internal Revenue Code as a professional association for libraries and individuals who work in them throughout Arkansas. Its mission is to further the professional development of all library staff members; to foster communication and cooperation among librarians, trustees, and friends of libraries; to increase the visibility of libraries among the general public and funding agencies; and to serve as an advocate for librarians and libraries. ArLA has more than 400 members, comprised of both individuals employed by libraries and public library facilities located all across Arkansas, including in Crawford County. There exists at least one active and dues paying member of ArLA in each judicial district in Arkansas in which Act 372 will be enforced. ArLA sues on its own behalf and on behalf of its members. ArLA suffers irreparable injury to the interest of its members, as well as independently to its own organization interest. The First and Fourteenth Amendment rights of ArLA members and their patrons will thus be infringed unless the Availability Provision and Challenge Procedure are enjoined for all the following reasons:

9

a.      ArLA suffers irreparable injury to the interests of its members because many of its member libraries or its member librarians' workplaces carry materials that, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate and therefore subject to the Challenge Procedure.

b.      Most of the libraries that are members of ArLA or at which ArLA members work serve small local communities. These libraries maintain their collections on open shelves, organized by type of book and subject matter, which patrons may access without requesting assistance from library staff. These libraries also serve patrons that range in age from toddlers to the elderly. Many of these libraries do not have the financial or staff resources to review their entire collections, such that they can identify material that will need to be physically segregated under Act 372. Similarly, many of them lack the physical space or financial resources to restructure their library to provide the segregated space they would need to prevent any risk of availability to minors. Accordingly, many of ArLA's individual members will be at risk of criminal prosecution once Act 372 goes into effect.

c.      Many of ArLA's library-members also have in their collection only a single copy of books that are likely to be challenged, meaning that, during the review required by the Challenge Procedure, the libraries will be forced to purchase an additional copy or the book will be unavailable to patrons. Moreover, ArLA's member-libraries are frequently visited by families that include children too young to be left unattended while the parents peruse, either as a matter of library policy or parental judgment. In such a case, the chaperoning parent would be unable to access books segregated in an area of the library where their children are prohibited from entering.

10

d.      On information and belief, families will be less inclined to visit ArLA member-libraries if Act 372 prevents them from perusing books together. Indeed, on information and belief, adult visitors to ArLA member-libraries will generally be less inclined to peruse books available only in an adults-only sections, as those books will be stigmatized and less attractive to many readers.

e.      ArLA is also injured by the Challenge Procedure's viewpoint discrimination between those who support and oppose the availability of particular books. If the Challenge Procedure permitted participation by those who favor keeping a challenged book in circulation, ArLA or its members would participate to advocate for books remaining available. Similarly, if the Challenge Procedure allowed appeals from a library's decision to segregate or remove a challenged book, ArLA or its members would avail themselves of that recourse.

f.      ArLA also suffers irreparable injury in its own right and to its organizational interests because, to counteract the harm that ArLA's members will suffer, it has been forced to divert organizational resources—including staff time and money—to respond to Act 372 through public education campaigns, and development of training materials to help its members understand what compliance with Act 372 would require. The Availability Provision and Challenge Procedure thus impede ArLA's overall mission by forcing ArLA to divert resources from projects and activities in which it would have otherwise engaged.

23.     Advocates for All Arkansas Libraries ("AAAL") is a nonprofit corporation formed under Arkansas law as a membership organization whose mission is to advocate for the preservation and improvement of libraries and library services across the state, and to educate the public, state leaders, and legislators of the value and importance of libraries in Arkansas. Its dues-

11

paying members are libraries, library staff, and library patrons, including both adult and minor patrons. AAAL sues on behalf of itself and its 118 members. AAAL suffers irreparable injury to the interests of its members, as well as independently to its own organizational interests, for the following reasons:

      a.    AAAL suffers irreparable injury to the interests of its members because, many of the libraries that are members of AAAL or at which AAAL members work, carry materials that, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate and therefore subject to the Challenge Procedure.

      b.    AAAL's library-members also serve patrons of all ages, from small children to older adults. Few have the financial or staff resources to review their entire collections, such that they can identify and segregate material that might be covered by the Availability Provision. Accordingly, many of AAAL's individual members will be at risk of criminal prosecution once the Availability Provision goes into effect.

      c.    Moreover, many of these smaller libraries have only a single copy of some of the books that are likely to be challenged, meaning that, during the pendency of the challenge process, the libraries will be forced to purchase an additional copy or the book will be unavailable to the patrons. AAAL's member-libraries are also frequently visited by families that include children too young to be left unattended while the parents peruse, either as a matter of library policy or parental judgment. In such a case, the chaperoning parent would be unable to access books segregated in an area of the library where their children are prohibited from entering.

d.     On information and belief, families will be less inclined to visit AAAL member-libraries if Act 372 prevents them from perusing books together. Indeed, on information and belief, adult visitors to AAAL member-libraries will generally be less inclined to peruse books available only in an adults-only sections, as those books will be stigmatized and less attractive to many readers.

e.     AAAL is also injured by the Challenge Procedure's viewpoint discrimination between those who support and oppose the availability of different books. The Challenge Procedure does not require a library review committee to hear the reasons of a person wanting to keep a challenged material in circulation. It does not permit such a person to appeal a library's decision to segregate the material to a local government body. If the Challenge Procedure permitted participation by those who favor keeping a challenged book in circulation, AAAL's members would participate to share that view. Similarly, if the Challenge Procedure allowed appeals from a library's decision to segregate or remove a challenged book, AAAL or its members would avail themselves of that recourse.

f.     AAAL also suffers irreparable injury in its own right and to its organizational interests because, prior to enactment of the Availability Provision, AAAL focused its organizational resources on developing educational programming on library services for library para-professionals and providing consultation services to library directors regarding best practices for library management. Since the Availability Provision was signed into law, however, AAAL has been consumed by the need to respond to the legitimate concerns of its members about Act 372's requirements, including both the high financial costs that AAAL's member-libraries face to comply with the law, as well as the

13

potential that AAAL members will face criminal liability. AAAL has thus diverted organizational resources, including staff time and money, to develop training and educational resources for its members about the steps library staff must take to comply with Act 372. For instance, AAAL has hired an attorney to help develop model policies that member libraries can use in implementing the processes required by the Challenge Procedure. These expenses, which AAAL would not have otherwise incurred or would have spent on other organizational priorities, cannot be recouped.

24.    Pearl's Books, LLC is an independent bookstore that sells new books and gifts just off the downtown square in Fayetteville, Arkansas. Pearl's Books also hosts reading and writing events for readers of all ages.

25.    Wordsworth Community Bookstore LLC, d/b/a WordsWorth Books, is an independent bookstore that sells new books and gifts in the historic Heights neighborhood in Little Rock, Arkansas. WordsWorth Books sells books for people of all ages, and regularly hosts author events and children's story time events.

26.    The American Booksellers Association ("ABA") was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed. ABA represents over 2,100 member companies operating in over 2,500 locations. ABA's core members are key participants in their communities' local economy and culture. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, and local-first advocacy. The ABA has 17 members located in Arkansas who are subject to Act 372.

27.    The Association of American Publishers ("AAP"), a not-for-profit organization, represents the leading book, journal, and education publishers in the United States on matters of

law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. AAP's members range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States, including critically acclaimed, award-winning literature for adults, young adults, and children. AAP represents an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment.

28.    The Authors Guild, Inc. ("Guild") was founded in 1912 and is a national non-profit association of more than 10,000 professional, published writers of all genres, 32 of whom are located in Arkansas. The Guild counts historians, biographers, academicians, journalists, and other writers of non-fiction and fiction as members. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression, and taxation. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The ability to write on topics of their choosing and to have their work available through bookstores and libraries is vital to their ability to make a living in their chosen profession.

29.    The Comic Book Legal Defense Fund ("CBLDF") is a nonprofit organization dedicated to protecting the legal rights of the comic arts community. With a membership that includes creators, publishers, retailers, educators, librarians, and fans, the CBLDF has defended dozens of First Amendment cases in courts across the United States and let important educational initiatives promoting comics literacy and free expression.

15

30.     Freedom to Read Foundation ("FTRF") is a nonprofit membership organization established in 1969 by the American Library Association to promote and defend First Amendment rights, to foster libraries as institutions fulfilling the promise of the First Amendment for every citizen, to support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, and to set legal precedent for the freedom to read on behalf of all citizens. FTRF's membership includes organizations, libraries, librarians, and library patrons. FTRF members in Arkansas will suffer irreparable injury because many of the libraries that are members of FTRF or at which FTRF members work, carry materials that, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision. These same materials might be challenged as inappropriate pursuant to the Challenge Procedure at significant cost to the libraries. FTRF's members who are library patrons in Arkansas will suffer irreparable injury if the Availability and Challenge Provisions go into effect because they will be deprived of access to books that they would like to peruse, read, or check out, and which would otherwise be available.

31.     Crawford County, Arkansas is a county organized under the laws of the State of Arkansas. It oversees the Crawford County Library ("CCL"). On information and belief, it is the policy of Crawford County to implement Act 372 to the fullest extent possible.

32.     Chris Keith is the County Judge for Crawford County, Arkansas. He is being sued in his official capacity only, as the chief executive of the local government body responsible for overseeing the CCL under the laws of the State of Arkansas. Judge Keith serves as the chief executive of Crawford County, and in that capacity, appointed a majority of the Crawford County Library Board of Directors. He is responsible for the implementation of Act 372, including the Challenge Procedure, in Crawford County. Actions that Judge Keith has taken or will take to

implement Act 372 in Crawford County are made under color of law and are attributable to Crawford County.

33. Todd Murray is the Prosecuting Attorney for the First Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

34. Sonia Fonticiella is the Prosecuting Attorney for the Second Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

35. Devon Holder is the Prosecuting Attorney for the Third Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

36. Matt Durrett is the Prosecuting Attorney for the Fourth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

37. Jeff Phillips is the Prosecuting Attorney for the Fifth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

38. Will Jones is the Prosecuting Attorney for the Sixth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

39. Teresa Howell is the Prosecuting Attorney for the Seventh Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

40.     Ben Hale is the Prosecuting Attorney for the Eighth Judicial District - North. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

41.     Connie Mitchell is the Prosecuting Attorney for the Eighth Judicial District – South. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

42.     Dan Turner is the Prosecuting Attorney for the Ninth Judicial District – East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

43.     Jana Bradford is the Prosecuting Attorney for the Ninth Judicial District – West. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

44.     Frank Spain is the Prosecuting Attorney for the Tenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

45.     Tim Blair is the Prosecuting Attorney for the Eleventh Judicial District – East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

46.     Kyle Hunter is the Prosecuting Attorney for the Eleventh Judicial District – West. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

47.     Daniel Shue is the Prosecuting Attorney for the Twelfth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

48.     Jeff Rogers is the Prosecuting Attorney for the Thirteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

49.     David Ethredge is the Prosecuting Attorney for the Fourteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

50.     Tom Tatum, II is the Prosecuting Attorney for the Fifteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

51.     Drew Smith is the Prosecuting Attorney for the Sixteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

52.     Rebecca Reed Mccoy is the Prosecuting Attorney for the Seventeenth Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

53.     Michelle C. Lawrence is the Prosecuting Attorney for the Eighteenth Judicial District – East. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

19

54.   Debra Buschman is the Prosecuting Attorney for the Eighteenth Judicial District –
West. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas,
a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

55.   Tony Rogers is the Prosecuting Attorney for the Nineteenth Judicial District – East.
He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a
position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

56.   Nathan Smith is the Prosecuting Attorney for the Nineteenth Judicial District –
East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas,
a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

57.   Carol Crews is the Prosecuting Attorney for the Twentieth Judicial District. She is
sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position
in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

58.   Kevin Holmes is the Prosecuting Attorney for the Twenty-first Judicial District. He
is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position
in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

59.   Chris Walton is the Prosecuting Attorney for the Twenty-second Judicial District.
He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a
position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

60.   Chuck Graham is the Prosecuting Attorney for the Twenty-second Judicial District.
He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a
position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

61.   On information and belief, Defendants will each exercise their discretion and legal
authority to implement and enforce Act 372 when it goes into effect on August 1, 2023.

## FACTUAL ALLEGATIONS

### The Availability Provision

62.    As discussed in the Introduction above, Section 1 of Act 372 (to be codified at Ark.

Code Ann. § 5-27-212(b)(1)) establishes a Class A misdemeanor criminal offense for making

available to a minor an item "harmful to minors." Under the Availability Provision,

> [a] person commits furnishing a harmful item to a minor if, knowing the character
> of the item involved, the person knowingly. . . [f]urnishes, presents, provides,
> makes available, gives, lends, shows, advertises, or distributes to a minor an item
> that is harmful to minors.

63.    The term "item" encompasses every form of expressive material that one could

expect to find in a public library or bookstore, including books, magazines, and motion pictures.

*See* Ark. Code Ann. § 5-27-212(a)(4)(B) (eff. August 1, 2023).

64.    Act 372's definition of "harmful to minors" is incorporated from Arkansas' variable

obscenity statute, which defines the term to mean:

> that quality of any description, exhibition, presentation, or representation, in
> whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic
> abuse, when the material or performance, taken as a whole, has the following
> characteristics:
>
> (A) The average person eighteen (18) years of age or older applying contemporary
> community standards would find that the material or performance has a
> predominant tendency to appeal to a prurient interest in sex to minors;
>
> (B) The average person eighteen (18) years of age or older applying contemporary
> community standards would find that the material or performance depicts or
> describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse in a
> manner that it patently offensive to prevailing standards in the adult community
> with respect to what it suitable for minors; and
>
> (C) The material or performance lacks serious literary, scientific, medical, artistic,
> or political value for minors.

Ark. Code Ann. § 5-68-501(2).

65.     An earlier 2003 statute, Ark. Code Ann. § 5-68-502, made it a Class B misdemeanor to: "[d]isplay material that is harmful to minors in such a way that the material is exposed to the view of a minor as part of the invited general public," Ark. Code Ann. § 5-68-502(1)(A) (the "Display Provision").

66.     In a 2004 case brought by some of the Plaintiffs to this action, the United States District Court for the Eastern District of Arkansas (Eisele, J.) found that the Display Provision was "facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution because such provisions are overbroad and impose unconstitutional prior restraints on the availability and display of constitutionally protected, non-obscene materials to both adults and older minors." *Shipley, Inc.*, 454 F. Supp. 2d at 831. The Court entered a declaratory judgment that the Display Provision was void and of no effect. *Id.*

67.     Nevertheless, Arkansas has enacted a content-based restriction very similar to the one found void in *Shipley*. The Availability Provision seeks to criminalize "mak[ing] available," "providing[ing]" or "show[ing]", in a retail establishment or library, material harmful to minors of any age, *i.e.* from newborns to 17-year-olds – the same category of material the State cannot, consistent with the First Amendment, criminalize "display[ing]."

68.     There is no available narrowing construction that may be employed to reduce the scope of the Availability Provision's sweeping regulation of expressive material. The Arkansas Supreme Court has definitively interpreted the definition of "minor" in the context of "harmful to minor" laws to refer to all minors, not just younger minors. *See Shipley, Inc. v. Long*, 359 Ark. 208, 216, 195 S.W.3d 911, 915 (2004) (addressing a certified question from the federal court and finding that "[b]ecause the statute defines a minor as 'any person under the age of eighteen,' the

statute is obviously intended to protect *all* minors from exposure to material deemed 'harmful to minors.'").

69.     The Availability Provision of Act 372 regulates the display and dissemination of constitutionally protected non-obscene materials. It is not narrowly drawn to further a legitimate government purpose and violates the First and Fourteenth Amendments in that it:

      a.     imposes an unconstitutional prior restraint on the availability, display, distribution, receipt, and perusal of constitutionally protected, non-obscene material to both adults and older minors;

      b.     is unconstitutionally overbroad; and

      c.     is unconstitutionally vague.

**The Challenge Procedure**

70.     Section 5 of Act 372 (Ark. Code Ann. § 13-2-106) provides that Arkansas public libraries must establish a policy governing the selection, relocation, and retention of physical materials that are available to the public. This policy must provide a method whereby a library employee or a "person affected by the material to be challenged" can challenge the "appropriateness" of material in the library.

71.     The Challenge Procedure begins with an informal meeting between the challenger and the library staff. If the challenger is unsatisfied by the outcome of the meeting, he or she may submit a formal written challenge seeking an internal review by a committee of library employees.

72.     The Challenge Procedure does not define "appropriateness" or set forth criteria beyond "appropriateness" for libraries to use in deciding whether to relocate challenged materials from the main collection to an area inaccessible to minors.

23

73.     This administrative process includes an opportunity for the challenger to present his or her case in person. There is no provision permitting those who believe the material should remain available in the main collection to present a countervailing case. The committee then votes to determine whether the material should be relocated to an adults-only section of the library. The challenger receives a written summary of the reasons for the committee's decision in a "reasonable" but unspecified amount of time.

74.     The Challenge Procedure fails to define "not accessible to minors" or set forth any criteria to be used in evaluating whether that standard has been met.

75.     If the committee decides to relocate the material, the Challenge Procedure provides no appeal or other recourse to anyone who believes the material should remain available in the main collection. If the committee decides not to relocate the material, the challenger may elect to appeal to the city board or quorum court of the city or county primarily supporting the public library.

76.     That local governing body is directed to consider five pieces of information before rendering its decision: (1) the material being challenged; (2) the challenger's request that the material be relocated; (3) the committee's decision; (4) a written summary of the reasons for the committee's decision; (5) a recommendation from the executive head of the county or city if the executive chooses to include one.

77.     The Challenge Procedure has no requirement that the local governing body publicly explain or document its reasons for approving or reversing the decision of the library committee. There is no limit on the number of materials appeals that a quorum court or city council must hear. Act 372 requires a decision of the city board or quorum court within 30 days and describes that decision as "final."

78. Under the Challenge Procedure as set forth in the statute, libraries may choose to leave materials available pending a challenge or remove the materials while the process plays out. Unless libraries purchase additional copies of the materials for use by the review committees and local governing bodies, the library will be forced provide its copies to reviewers and the materials will be unavailable to library patrons for an indefinite period of time as a result of the Challenge Procedure.

79. The Challenge Procedure of Act 372 violates the First and Fourteenth Amendment in that it:

     a. imposes an unconstitutional prior restraint on the availability, display, distribution, receipt, and perusal of constitutionally protected, non-obscene material to both adults and older minors;

     b. is a de facto licensing scheme that relieves local governing bodies of their responsibility to seek judicial review before imposing a final restraint on expression, denies aggrieved library patrons an adequate opportunity to obtain prompt judicial review of local governing bodies' orders to relocate library materials to an area that is not accessible to minors under the age of eighteen years, and vests undue discretion in local governing bodies to make these decisions without objective criteria or a record of their reasoning; and

     c. is unconstitutionally vague.

**Crawford County**

80. Over the past year, a dispute about materials in the Crawford County Library ("CCL") led to the departure of the library's executive director. In a November 10, 2022, letter, Crawford County residents Jeffrey and Tammi Hamby alleged that the then-CCL Director Deidre Grzymala and her employees were "normalizing and equating homosexual and transexual

lifestyles with heterosexual lifestyles with heterosexual family units" and sought greater participation in material selection.

81.     In December 2022, Defendant Chris Keith appointed Tammi Hamby and two others to CCL Board of Directors, forming a majority bloc on the five-member board. On January 10, CCL staff announced that all branches of the CCL had "moved their LGBTQ children's books out of the children's section into a new area within their respective adult sections."[3]

82.     Approximately 263 books have been placed in "Social Sections" of the CCL branches. In addition to books with LGBTQ themes and authors, the Social Sections contain children's books such as "Who Believes What? Exploring the World's Major Religions" and "All About Anxiety."

83.     When some Crawford County residents demanded that CCL stop segregating books containing LGBTQ themes, Crawford County, through its attorney, declined to do so. Instead, Crawford County insisted that it was within its rights to "protect[] children from exposure to materials that might harm their innocence" by segregating materials that, in Crawford County's judgment, "might" be harmful to some minors.[4]

84.     The letter from Crawford County has also signaled that more changes are coming to CCL. It previewed, through its lawyer, that "Act 372 will make it necessary to continue modifying and changing the library system's policies and procedures." The County Attorney

---

[3] Tomas Saccente, *Crawford County Library Board Looks to Create New A Public Comment Policy After Increased Engagement At Meetings*, N.W. Ark. Democrat Gazette (May 14, 2023), https://tinyurl.com/29mvtzbp.

[4] The response letter is attached to this Complaint at Exhibit 2.[5] The letter to the CCL is attached to this Complaint as Exhibit 3.

wrote to the CCL that among its "obligations to come into compliance with the new laws by August 1, 2023" is "creat[ing] a section that is not accessible to those under eighteen."[5]

85.    On information and belief, Crawford County intends to adopt a policy that materials containing LGBTQ themes or discussing other "social issues" might harm the innocence of children and that, on that basis, any such materials *must* be segregated based on the viewpoint contained therein once Act 372 goes into effect.

### CLAIMS FOR RELIEF

### COUNT I – ALL PLAINTIFFS
### RESTRICTIONS ON ADULT ACCESS
### TO CONSTITUTIONALLY PROTECTED MATERIALS

86.    Under the First and Fourteenth Amendments to the U.S. Constitution, adults have the right to view, browse through and purchase material protected by the First Amendment to the U.S. Constitution, including material with sexual content that is not obscene. Booksellers have the constitutional right freely to display and disseminate such materials to adults. Adult bookstore customers and library patrons have the right to view such materials.

87.    It is not possible, under the Availability Provision, to restrict the display of materials covered by the Availability Provision to juveniles without also restricting such access by adults. The Availability Provision effectively requires booksellers, other retailers and librarians either to: (a) remove from their shelves and place in a segregated "adults only" section (or to remove from the establishment entirely) substantial amounts of constitutionally-protected matter because it may be "harmful" to younger or less mature readers, or (b) have an establishment carrying only material not "harmful" to any child, in both cases thereby restricting the voluntary viewing by, access to and sale of such material to adults.

---

[5] The letter to the CCL is attached to this Complaint as Exhibit 3.

88.     In addition, such adults-only sections carry opprobrium and discourage many persons from entering therein. The restrictions of the Availability Provision have a chilling effect upon the exercise of rights guaranteed by the First and Fourteenth Amendments of the Constitution in that they inhibit and discourage the browsing, possession, sale and distribution of materials, the possession, sale and distribution of which are and ought to be protected under the U.S. Constitution.

## COUNT II – ALL PLAINTIFFS
## RESTRICTIONS ON OLDER MINORS' ACCESS
## TO CONSTITUTIONALLY PROTECTED MATERIALS

89.     Under the First and Fourteenth Amendments to the U.S. Constitution, minors have the right to view and purchase any material that is not obscene as to them.

90.     The Availability Provision is unconstitutional because it prohibits retail establishments and libraries from displaying any material with sexual content that contains visual or written representations of material "harmful to minors" and from allowing all minors to view such material, despite the fact that such material may be "harmful" only to younger minors, based on their developmental maturity.

91.     The Availability Provision severely inhibits and effectively precludes access by older, more mature, minors to material constitutionally protected as to them. Thus, the Availability Provision violates plaintiffs' right of free expression under the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT III – ALL PLAINTIFFS
## RESTRICTION ON SPEECH
## (PRIOR RESTRAINT)

92.     The Availability Provision requires the removal of constitutionally protected materials from readily viewed and accessible areas and proscribes having these materials

28

accessible to minors. The Availability Provision forces people and organizations that trade in material covered by the provision and to which minors are lawfully entitled to exclude minors from their establishment, to place such material out of the reach of minors, or simply not to carry such constitutionally protected non-obscene materials.

93.     Many bookstore customers and library patrons will not enter an adults-only section or will have to specifically request an item that has been held behind a counter to make it inaccessible to minors.

94.     The restrictions imposed by the Availability Provision necessarily will result in the removal from circulation and accessibility of large quantities of materials constitutionally protected as to adults and as to older minors in violation of the First and Fourteenth Amendments to the U.S. Constitution. The restrictions imposed by the Availability Provision will entail substantial monitoring costs for libraries, booksellers and other retailers. Further, in light of the difficulty of determining what material is harmful to minors, Plaintiffs' First Amendment rights will be chilled because they will restrict access to any material that could potentially be implicated by the statute.

95.     The Availability Provision imposes unreasonable obligations on merchants selling printed materials, encourages such merchants to exclude from their establishments all persons under the age of 18, and restricts and chills the rights of the plaintiffs to make available and the rights of adults and persons under the age of 18 to view, browse through and purchase materials that are constitutionally protected as to minors or as to adults.

96.     The Availability Provision imposes unreasonable obligations on libraries and other establishments to review their many books to ensure that they are not knowingly "making

29

available" material that may be deemed harmful to minors by allowing persons under the age of 18 to browse the bookshelves unmonitored.

## COUNT IV – ALL PLAINTIFFS
## DUE PROCESS
## (VAGUENESS)

97.     The Availability Provision contains language purporting to describe criminalized acts which is vague and indefinite and subject to different meanings such that it fails to provide adequate notice to booksellers and librarians of violations of the Availability Provision, including the meaning of "presents," "provides," and "makes available" in Ark. Code Ann. § 5-27-212(b)(1).

98.     The Availability Provision is unconstitutionally vague because it fails to provide clear notice as to what acts are criminalized, in violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT V – LIBRARY PLAINTIFFS
## RESTRICTION ON SPEECH
## (PRIOR RESTRAINT)

99.     The Challenge Procedure permits libraries to remove materials from circulation for long periods of time while materials challenges are pending.

100.    Because any person "affected by" a library item can mount a challenge to its availability to minors under the Challenge Procedure, Act 372 effectively empowers any person "affected by" library materials to cause those materials to be unavailable to library patrons for a time while the challenges are processed.

101.    The Challenge Procedure creates an unconstitutional prior restraint on First Amendment-protected activity.

### COUNT VI – LIBRARY PLAINTIFFS
### DUE PROCESS
### (VAGUENESS)

102.    The Challenge Procedure contains language purporting to describe mandated acts, which are vague and indefinite and subject to different meanings such that it fails to provide adequate notice to librarians and library patrons of violation of the Challenge Procedure, including the meaning of "appropriateness" and "not accessible to a minor" in section Ark. Code Ann. § 13-2-106 (eff. August 1, 2023).

103.    By delegating unfettered discretion to quorum courts and city councils to decide whether materials are "appropriate" without any definite procedural safeguards or standards, the Challenge Procedure violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

104.    The Challenge Procedure is unconstitutionally vague because it fails to provide fair notice as to what acts are mandated, in violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

### COUNT VII – LIBRARY PLAINTIFFS
### DUE PROCESS
### (LACK OF JUDICIAL REVIEW)

105.    Under Act 372, local government bodies will have 30 days to decide an appeal if the committee of librarians votes not to relocate a library item to an area inaccessible to minors. The city council or quorum court must approve or reverse the decision of the committee of librarians to keep material in the main collection. According to the Act, that decision of the local government body is "final."

106.    By relieving local governments of their constitutional obligation to obtain judicial review prior to imposing a final restraint on expression, and by precluding a judicial determination

31

of whether an item may be removed from the library's main collection, the Challenge Procedure violates the First Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

## IRREPARABLE HARM

107.   There is no adequate remedy at law for the violation of Plaintiffs' constitutional rights, and unless the requested injunctive and declaratory relief is granted, plaintiffs and their members will suffer immediate and irreparable loss. The very existence of the Availability Provision and the Challenge Procedure has a chilling effect upon the exercise of Plaintiffs' constitutional rights, causing Plaintiffs irreparable personal and economic injury every day that they are in effect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment in their favor and against Defendants, and each of them, as follows:

1.   That the Court enter a permanent injunction enjoining the Defendants, and each of them, and the Defendants' agents, attorneys, servants, employees, and other representatives, from enforcing the Availability Provision and the Challenge Procedure in any manner whatsoever;

2.   That the Court enter a declaratory judgment that the Availability Provision and the Challenge Procedure are unconstitutional, void and of no effect;

3.   That Plaintiffs be awarded the costs of this action;

4.   That Plaintiffs recover of Defendants their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

5.   That Plaintiffs be granted such other and further relief the Court deems proper.

Respectfully submitted,

/s/ John T. Adams
David M. Fuqua
Ark. Bar No. 80048
John T. Adams
Ark. Bar No. 2005013
Attorneys for Central Arkansas Library System,
Nate Coulter, and the Eureka Springs Carnegie
Public Library
FUQUA CAMPBELL, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Telephone: (501) 374-0200
E-Mail: dfuqua@fc-lawyers.com
E-Mail: jadams@fc-lawyers.com

Bettina Brownstein
Ark. Bar No. 85019
BETTINA E. BROWNSTEIN LAW FIRM
Attorney for Olivia Farrell, Miel Partain,
Madeline Partain, Hayden Kirby, and Leta
Caplinger
904 West 2nd Street, Suite 2
Little Rock, AR 72201
Telephone: (501) 920-1764
E-Mail: bettinabrownstein@gmail.com
On Behalf of the Arkansas Civil Liberties
Union Foundation, Inc.

Michael A. Bamberger*
Kristen Rodriguez*
Rebecca Hughes Parker*
Attorneys for Pearl's Books, LLC, Wordsworth
Community Bookstore LLC, American
Booksellers Association, Association of
American Publishers, Inc., Authors Guild, Inc.
Comic Book Legal Defense Fund, and Freedom
to Read Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
E-Mail: michael.bamberger@dentons.com
E-Mail: kristen.rodriguez@dentons.com
E-Mail: rebeccahughes.parker@dentons.com

Vincent O. Chadick
Ark. Bar No. 94075
Brandon B. Cate
Ark. Bar No. 2001203
Glenn V. Larkin
Ark. Bar No. 2020149
Attorneys for Fayetteville Public Library
QUATTLEBAUM, GROOMS & TULL
PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
E-Mail: bcate@qgtlaw.com
E-Mail: vchadick@qgtlaw.com
E-Mail: glarkin@qgtlaw.com

Will Bardwell*
Ben Seel*
Aman George*
Orlando Economos*
Jeffrey B. Dubner*
Attorneys for the Arkansas Library
Association, Advocates for All Arkansas
Libraries, and Adam Webb, in his individual
capacity
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34554
Washington, DC 20043
Telephone: (202) 448-9090
E-Mail: wbardwell@democracyforward.org
E-Mail: bseel@democracyforward.org
E-Mail: ageorge@democracyforward.org
E-Mail: oeconomos@democracyforward.org
E-Mail: jdubner@democracyforward.org
* Admitted pro hac vice