**In The Matter Of:**

*Fayetteville Public Library, et al v.*
*Crawford County, Arkansas, et al*

---

*Miel Ann Delorey Partain*
*March 15, 2024*
*CERTIFIED ORIGINAL/COPY*

---

*Michelle Satterfield, CCR*
*1955 Little River Drive*
*Conway, Arkansas 72034*
*(501)336-7414*
*Satterfield@conwaycorp.net*

Original File Miel Ann Delorey Partain.txt

Min-U-Script® with Word Index

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
Miel Ann Delorey Partain
March 15, 2024

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF ARKANSAS
 2            FAYETTEVILLE DIVISION

 3  FAYETTEVILLE PUBLIC LIBRARY, a political
    subdivision in the City of Fayetteville,
 4  State of Arkansas; EUREKA SPRINGS CARNEGIE
    PUBLIC LIBRARY; CENTRAL ARKANSAS LIBRARY
 5  SYSTEM; NATE COULTER; OLIVIA FARRELL;
    HAYDEN KIRBY;MIEL PARTAIN, in her own capacity
 6  and as parent and next friend of MADELINE PARTAIN;
    LETA CAPLINGER; ADAM WEBB;
 7  ARKANSAS LIBRARY ASSOCIATION; ADVOCATES FOR
    ALL ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
 8  WORDSWORTH COMMUNITY BOOKSTORE, LLC, d/b/a
    WORDSWORTH BOOKS; AMERICAN BOOKSELLERS ASSOCIATION;
 9  ASSOCIATION OF AMERICAN PUBLISHERS,INC.; AUTHORS
    GUILD, INC.; COMIC BOOK LEGAL DEFENSE FUND
10  and FREEDOM TO READ FOUNDATION,        PLAINTIFFS

11  vs.                    NO. 5:23-CV-05086-TLB

12  CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH, in his
    official capacity as Crawford County Judge;
13  TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
    MATT DURRETT; JEFF PHILLIPS; WILL JONES; TERESA
14  HOWELL; BEN HALE; CONNIE MITCHELL; DAN TURNER;
    JANA BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE HUNTER;
15  DANIEL SHUE; JEFF ROGERS; DAVID ETHREDGE; TOM TATUM,
    II; DREW SMITH; REBECCA REED MCCOY; MICHELLE C.
16  LAWRENCE; DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
    CAROL CREWS; KEVIN HOLMES; CHRIS WALTON; and CHUCK
17  GRAHAM, each and in his or her official capacity as a
    prosecuting attorney for the State of Arkansas, DEFENDANTS

18

19

20                 ORAL DEPOSITION

21                        OF

22             MIEL ANN DELOREY PARTAIN

23  ***** THE ABOVE-STYLED MATTER was reported by Michelle R.
    Satterfield, CCR, LS Certificate No. 570, at the Wahlmeier
24  Law Firm, located at 1101 Walnut, Van Buren, Arkansas,
    commencing on the 15th day of March 2023, at 10:16 a.m.
25  *****
```

Page 2

```
 1            A P P E A R A N C E S

 2  MR. SAMUEL S. MCLELLAND
    Attorney at Law
 3  PPGMR Law, PLLC
    201 East Markham Street, Suite 201
 4  Little Rock, Arkansas  72201
    sam@ppgmrlaw.com
 5
    *** For Crawford County, Arkansas, and County Judge
 6      Chris Keith, in his official capacity ***

 7  MR. NOAH WATSON
    MS. CHRISTINE A. CRYER
 8  Senior Assistant Attorneys General
    323 Center Street, Suite 200
 9  Little Rock, Arkansas  72201
    Noah.Watson@ArkansasAG.gov
10  Christine.cryer@ArkansasAG.gov

11  *** For the State of Arkansas Prosecuting Attorneys ***

12  MS. BETTINA E. BROWNSTEIN
    Attorney at Law
13  Bettina E. Brownstein Law Firm
    904 West 2nd Street, Suite 2
14  Little Rock, Arkansas  72201
    bettinabrownstein@gmail.com
15
    *** For the Plaintiffs, Olivia Farrell, Jennie Kirby,
16  Hayden Kirby and Leta Caplinger ***
    *** On Behalf of the Arkansas Civil
17      Liberties Union Foundation, Inc. ***

18  MR. JOHN T. ADAMS
    Attorney at Law
19  Fuqua Campbell, P.A.
    Riviera Tower - 3700 Cantrell Road, Suite 205
20  Little Rock, Arkansas 72202
    jadams@fc-lawyers.com
21
    *** For The Plaintiffs, Central Arkansas Library System,
22  Nate Coulter and the Eureka Springs Carnegie Public
    Library ***
23
             (CONTINUED ON NEXT PAGE)
24

25
```

Page 3

```
 1        A P P E A R A N C E S (CONTINUED)

 2  MR. BENJAMIN M. SEEL
    Attorney at Law
 3  Democracy Forward Foundation
    P.O. Box 34554
 4  Washington, DC  20043
    bseel@democracyforward.org
 5                    (VIA TEAMS)
    *** For the Arkansas Library Association, Advocates for
 6  All Arkansas Libraries and Adam Webb, in his individual
    capacity ***
 7
    MS. REBECCA HUGHES PARKER
 8  Attorney at Law
    Dentons US, LLP
 9  1221 Avenue of the Americas
    New York, NY  10020
10  rebeccahughes.parker@dentons.com
                      (VIA TEAMS)
11  *** For the Plaintiffs, Pearl's Books, LLC; Wordsworth
    Community Bookstore, LLC; American Booksellers
12  Association; Association of American Publishers, Inc.;
    Authors Guild, Inc; Comic Book Legal Defense Fund; and
13  Freedom to Read Foundation ***

14  MR. PHILIP A. ELMORE
    Attorney at Law
15  Quattlebaum, Grooms & Tull, PLLC
    4100 Corporate Center Drive, Suite 310
16  Springdale, Arkansas  72762
    pelmore@qgtlaw.com
17                    (VIA TEAMS)
    *** For the Plaintiff, Fayetteville Public Library ***
18

19

20

21

22

23

24

25
```

Page 4

```
 1               I N D E X

 2    TOPIC                                       PAGE

 3  APPEARANCES                                    2-3

 4  STIPULATIONS                                     5

 5  WITNESS SWORN:  Miel Ann Delorey Partain         6

 6        Examination by Mr. McLelland               6

 7        Examination by Mr. Watson                 46

 8        Examination by Ms. Brownstein             52

 9        Examination by Mr. Adams                  56

10        Further Examination by Mr. McLelland   57, 69

11        Further Examination by Mr. Watson         65

12        Further Examination by Mr. Adams          68

13  REPORTER'S CERTIFICATE                          70

14             E X H I B I T S

15  NUMBER          DESCRIPTION                    PAGE

16  Deft's 1   Copy of Amended Complaint-Document 75   10
       (COPY OF EXHIBIT SCANNED INTO ETRANSCRIPT)
17

18                 * * * * *

19

20

21

22

23

24

25
```

Page 5

1          ANSWERS AND DEPOSITION OF MIEL ANN DELOREY
2 PARTAIN, witness produced at the request of the
3 DEFENDANTS, was taken in the above-styled and numbered
4 cause on the 15th day of March 2023, before Michelle R.
5 Satterfield, CCR, a Notary Public in and for Faulkner
6 County, Arkansas, at the offices of the Wahlmeier Law
7 Firm, P.A., located at 1101 Walnut, Van Buren, Arkansas,
8 at 10:16 a.m., pursuant to the agreement hereinafter set
9 forth.
10
11
12
13         S T I P U L A T I O N S
14         IT IS STIPULATED AND AGREED by and between the
15 parties through their respective counsel that the
16 deposition of Miel Ann Delorey Partain may be taken at the
17 time and place designated pursuant to the Federal Rules of
18 Civil Procedure.
19          * * * * *
20
21
22
23
24
25

Page 6

1        MIEL ANN DELOREY PARTAIN,
2 the witness hereinbefore named, having been previously
3 cautioned and sworn, or affirmed, to tell the truth, the
4 whole truth, and nothing but the truth, testified as
5 follows:
6        **EXAMINATION**
7 **BY MR. MCLELLAND:**
8 Q   Good morning, Ms. Partain. Can you state your name
9 for the record, please?
10 A   **Miel Ann Delorey Partain.**
11 Q   All right. Have you ever given a deposition before?
12 A   **Yes.**
13 Q   When did you give a deposition?
14 A   **I don't recall the year it was.**
15 Q   What was the case about?
16 A   **It was a car accident that I was involved in.**
17 Q   Gotcha. So you understand that you're under oath,
18 just like you would be in a court of law?
19 A   **Uh-huh.**
20 Q   Is that a yes?
21 A   **Yes.**
22 Q   And you brought me to my next point. I'm going to
23 do -- Ms. Michelle here is taking down everything we say,
24 so I'll be good not to talk over you. I'll ask you to do
25 the same favor.

Page 7

1   If you need me to repeat a question, please let me
2 know. If you need me to rephrase a question, please let
3 me know.
4   Is there anything preventing -- and you understand
5 that you're under oath. Is there anything that would
6 prevent you from telling the truth today?
7 A   **No.**
8 Q   Okay. What do you do for a living?
9 A   **I work for the Girl Scouts Council; Girl Scouts**
10 **Diamonds of Arkansas, Oklahoma and Texas.**
11 Q   Okay. And so I think Girl Scouts cookie season just
12 ended; is that right?
13 A   **We're in the middle of it.**
14 Q   Okay. Well, good. Noble work; I will say that's
15 noble work.
16      **MS. BROWNSTEIN:** That's exactly what we
17 said.
18 **BY MR. MCLELLAND:**
19 Q   How long you been doing that?
20 A   **Two years.**
21 Q   And what did you do before that?
22 A   **I was a paralegal.**
23      **MS. BROWNSTEIN:** Oh, okay.
24 **BY MR. MCLELLAND:**
25 Q   For a law firm?

Page 8

1 A   **Yes.**
2 Q   Okay. Here or in Oklahoma?
3 A   **Here.**
4 Q   Okay. What law firm?
5 A   **Hopkins & Holmes.**
6 Q   And how long were you a paralegal?
7 A   **Two years there. I'm sorry, not two years, one year**
8 **there.**
9 Q   Okay. And then at another firm before that?
10 A   **In Fort Smith, yes.**
11 Q   And regardless of the firm, how long were you a
12 paralegal?
13 A   **In law firms?**
14 Q   Yes.
15 A   **About three years and I worked for the circuit**
16 **clerk's office before that.**
17 Q   Okay. Are you from Crawford County?
18 A   **Not originally.**
19 Q   Where are you from originally?
20 A   **I was a born in Iowa.**
21 Q   And what brought you to Arkansas?
22 A   **A relationship.**
23 Q   You will not be alone in that in this case.
24      **MS. BROWNSTEIN:** There's a lot of
25   migration.

1      **MR. MCLELLAND:** A lot of migration due to
2      relationships, so you're not alone in that.
3   **BY MR. MCLELLAND:**
4   Q   And how long have you lived in Crawford County?
5   A   **Since 1998.  Or Crawford County?**
6   Q   Yes.
7   A   **Since 2008.**
8   Q   And in Arkansas since 1998?
9   A   **Yes.**
10  Q   Where did you live before Crawford County?
11  A   **Barling, Sebastian County.**
12  Q   Okay.  And you were in attendance this morning in
13      your daughter's deposition; is that correct?
14  A   **Correct.**
15  Q   And you've brought claims both on behalf of yourself
16      and on behalf of her; is that right?
17  A   **Yes.**
18  Q   During today's deposition there may be points in time
19      where I will ask you to speak on your daughter's behalf,
20      and if you are able to, I'll ask you to since you are
21      bringing claims on her behalf.  Is that okay?
22  A   **Okay.**
23  Q   If you don't know the answer or if it's something
24      that I need to discuss with her, that's fine, and you can
25      refer me to her, but if you know the answer, I would

1      respectfully ask that you respond, since you are bringing
2      claims on her behalf.  And I'll try to delineate those
3      moments if they come up today.
4   A   **Okay.**
5   Q   I'll start where we always start.  I'll mark this as
6      Defendant's 1.  This is the Amend Complaint, as
7      Ms. Brownstein corrected me earlier.
8      (Defendant's 1 was marked & attached hereto.)
9      Ms. Partain, do you have any other children?
10  A   **Yes.**
11  Q   And how old are they?
12  A   **Thirty, twenty-nine, twenty-eight and twenty-three.**
13  Q   And then your youngest daughter is seventeen?
14  A   **Uh-huh.**
15      **MS. BROWNSTEIN:** You have to answer out
16      loud.
17  A   **Yes.**
18  Q   Your four other children, do they live in Crawford
19      County?
20  A   **None of them live in Crawford County any longer.**
21  Q   Okay.  What's your understanding of the lawsuit that
22      you've brought?
23  A   **To stop Act 372 from going into effect.**
24  Q   Okay.  And are you specifically seeking that Crawford
25      County not enforce Act 372?

1   A   **Anywhere.**
2   Q   Anywhere within the State of Arkansas?
3   A   **Correct.**
4   Q   Okay.  Do you know if Crawford County has ever
5      implemented Act 372?
6   A   **I believe they briefly tried to do -- take the steps**
7      **that they thought were complying with the Act.**
8   Q   But they didn't enforce it?
9   A   **Briefly they did; that's my understanding.**
10  Q   That's your understanding.  And I think you said that
11      they tried to take steps; is that right, to enforce it?
12  A   **I believe that they were taking the steps that Act**
13      **372 would have required of them.**
14  Q   Okay.  And what were those steps?
15  A   **Taking the materials that were deemed harmful to**
16      **children and putting them kind of in an area that was**
17      **inaccessible to minors.**
18  Q   All right.  So steps that Crawford County took in
19      implementing Act 372, was that they took materials that
20      they deemed inappropriate for children and moved it to an
21      area that was inaccessible to minors; is that right?  And
22      if I mischaracterize, please correct me.
23  A   **That's my understanding.**
24  Q   That's okay.  I'm not trying -- the only thing I want
25      to know about, is what you know and I'm not trying to play

1      gotcha.  I just want to understand what you know and your
2      testimony is today.
3      So based upon your understanding, what -- what was
4      the area that was -- was the area that is inaccessible to
5      minors, does that have a name?
6   A   **I do not know if it had a different -- I know what**
7      **they call that collection of books at this point.**
8   Q   What do they call it?
9   A   **The Social Section.**
10  Q   Okay.
11  A   **I don't know if it had a different name when they**
12      **were kind of under lock and key, so to speak.**
13  Q   What do you mean by under lock and key?
14  A   **Like inaccessible to minors, being -- and I don't**
15      **know -- I don't have a huge understanding of what they did**
16      **briefly.**
17  Q   Okay.  And so if I was to say that -- well, I'll
18      rephrase it another way.  So when did you first become
19      aware of the Social Section?
20  A   **Around December of 2022, the same time that my**
21      **daughter did.**
22  Q   Okay.  And were you aware that she sent an email to
23      then County Judge Gilstrap?
24  A   **No.**
25  Q   Okay.  Did you ever send any email to County Judge

Page 13

1 Gilstrap?

2 A   I did not.

3 Q   Did you send any -- did you send any communication,
4 meaning email, text, phone call, in-person communication,
5 to then County Judge Gilstrap?

6 A   I did not.

7 Q   Okay.  Did you send any communication to the Library
8 Board about the Social Section?

9 A   I did not.

10 Q   Did you send any communication to then Library
11 Director Deidre Grzymala about the Social Section?

12 A   I did not.

13 Q   Okay.  And I'm just trying to, again, figure out what
14 did and didn't happen.  So you first become aware in
15 December of 2022.  How did you become aware?

16 A   I believe social media and just talking to friends,
17 that this was starting to happen in Crawford County.

18 Q   And what did you think about it?

19 A   I thought it was terrible.

20 Q   Why did you think it was terrible?

21 A   Because I believe children -- older children should
22 have access to any book that they would like to borrow
23 from the library, and that it's not up to the library or
24 the government or the library staff or the library board
25 or another citizen to decide what the youth of the

Page 14

1 community can or cannot borrow from the library or look at
2 in the library.

3 Q   All right.  So you used -- in your statement right
4 then you used two different kind of terms of, and, again,
5 I'm just trying to understand what you mean.  You said
6 older children should be able to checkout material from
7 the library.  What is your definition of older children?

8 A   Sixth grade and up.

9 Q   Do you have a -- what's that, like 12 or so?

10 A   Twelve-ish.

11 Q   So between 12 and 18?

12 A   Uh-huh.

13 Q   And what about -- so you believe that older children,
14 those 12 through 18 as you've defined, should be able to
15 checkout books from the library without the government
16 interfering.

17     Do you have any opinion as to children younger than
18 12?

19 A   I believe it's up to the children and their parents,
20 their caregivers.

21 Q   Okay.  And I think I know the answer to this, but
22 just to make a clean record, you also said, towards the
23 end of that testimony, that the government shouldn't
24 interfere with what the youth read.

25     When you say youth, are you referring to 12 to

Page 15

1 18-year-olds, or 11 and younger?

2 A   Any of them.

3 Q   Okay.  So anybody under the age of 18?

4 A   Yes.

5 Q   Okay.  Have you ever spoken to Tammi Hamby?

6 A   No.

7 Q   Have you ever spoken to Rebecka Virden?

8 A   No.

9 Q   Have you ever spoken to Nina Prater?

10 A   Yes.

11 Q   Okay.  When you spoke with Ms. Prater, did you
12 discuss the Social Section?

13 A   No.

14 Q   Did you discuss her lawsuit that she's involved in?

15 A   No, I haven't spoken to her in years.  We spoke on
16 different terms.

17 Q   I understand; that helps me out.

18     Have you ever spoken Samantha Rowlett?

19 A   No.

20 Q   Okay.  Are you aware that Rebecka Virden, Nina Prater
21 and Samantha Rowlett are involved in a lawsuit dealing
22 with the Social Section?

23 A   Yes.

24 Q   Okay.  What's your understanding of that lawsuit?

25 A   I don't have a great understanding of that lawsuit.

Page 16

1 Q   Okay, that's fine.  Have you spoken to your fellow
2 Co-Plaintiff, Leta Caplinger?

3 A   No.

4 Q   Do you know Leta Caplinger?

5 A   I know of her.

6 Q   Okay.  Have you ever attended a library board meeting
7 here in Crawford County?

8 A   I've watched bits and pieces.  I've watched
9 streaming, and then I've watched again after the fact when
10 people have posted pieces of it on social media.

11 Q   Do you know whose social media account those clips
12 are posted from?

13 A   No.

14 Q   Okay.  So when you watched the recordings afterwards,
15 are you watching the entire recording, or are you just
16 watching clips on social media?

17 A   It depended on the meeting.  I did watch some of the
18 meetings in real time, on like streaming, but then I also
19 watched clips after the fact.

20 Q   Gotcha.  And do you know which particular meetings
21 you watched?

22 A   No.

23 Q   Okay.  Did you know that your -- are you aware that
24 your daughter attended the January 10th Library Board
25 Meeting here in Crawford County?

1 **A  Yes.**

2 Q  Were you aware of that before today?

3 **A  Yes.**

4 Q  Okay.  Did you encourage her to go to that meeting?

5   I'll rephrase; let me rephrase.  Did she ask your

6 permission to go to that meeting or did she have to ask

7 your permission?

8 **A  She didn't have to ask.  She did tell me she was**

9 **going.**

10 Q  Okay.  And you didn't go with her?

11 **A  No.**

12 Q  Was there a reason you didn't go with her?

13 **A  It was packed.  I wanted to go, but by the time I got**

14 **there people were saying they're not letting any more**

15 **people in the room.  They were overflowing out of the**

16 **space.**

17 Q  I will agree with you, it was full.

18   Did you try to go to any other library board meetings

19 in person?

20 **A  No.**

21 Q  Do you know who created the Social Section?

22 **A  No.**

23 Q  Okay.  Do you know who physically moved the books

24 into the Social Section?

25 **A  I would imagine the library staff, but, no, I don't**

1 **have firsthand knowledge.**

2 Q  I understand.  Do you know who gave -- I'm trying to

3 think how to phrase this.  There's been some testimony in

4 this case, and some record evidence kind of in both cases,

5 about how Deidre Grzymala, the former Library Director

6 kind of created the Social Section.

7   Are you aware who Deidre Grzymala is?

8 **A  No, I just know the name.**

9 Q  Okay.  Have you read any articles about her on social

10 media?

11 **A  No.**

12 Q  Okay.  You don't know how the books that are in the

13 Social Section were determined to be put in the Social

14 Section?

15 **A  I do not know.**

16 Q  Okay.  Do you know what type of books are in the

17 Social Section?

18 **A  I don't have a complete knowledge of every type of**

19 **book, but I have seen the Social Section and it's very**

20 **largely LGBTQ-themed books.**

21 Q  Are there other types of books besides LGBTQ themed?

22 **A  I can't say definitively whether there are or not.  I**

23 **didn't see any personally, but I also didn't pick up every**

24 **single ...**

25 Q  Every single book?

1 **A  Right.**

2 Q  Sorry, I'm not trying to nitpick.  I'm just trying to

3 make a clean record.

4   So when did you first physically see the Social

5 Section?

6 **A  Earlier this week.**

7 Q  And, actually, let me clarify.  When I say physically

8 saw the Social Section, I'm referring to the Social

9 Section at the Van Buren Branch.  Is that the Social

10 Section you saw this week?

11 **A  Correct.**

12 Q  Have you seen any of the other Social Sections?

13 **A  No, I don't go to any of the other.**

14 Q  Library branches?

15 **A  Right, correct.**

16 Q  Are you aware that Crawford County has five?

17 **A  I was -- well, I do know that they have five**

18 **branches.**

19 Q  Okay.  And do you know if all five have a Social

20 Section?

21 **A  I do not know that.**

22 Q  Okay.  So you saw the Social Section in the Van Buren

23 Branch for the first time this week.  What prompted you to

24 go take a look at the Social Section?

25 **A  I wanted to be familiar with it and see where it was**

1 **and my daughter wanted me to go with her.**

2 Q  And do you remember, in attending your daughter's

3 deposition earlier, she talked about asking the librarians

4 about minors checking out books from the Social Section?

5 **A  Yes.**

6 Q  Do you remember her talking about that?

7 **A  Yes.**

8 Q  Did you speak to any of the librarians when you went

9 to look at the Social Section?

10 **A  No.**

11 Q  Did you speak to anyone, besides your daughter, when

12 you went to the Van Buren Branch?

13 **A  I spoke to them, but not about the Social Section.**

14 Q  Okay.  What did you speak to them about?

15 **A  My account.**

16 Q  Okay.  Your library account.  Is that what you're

17 referring to?

18 **A  Correct, yes.**

19 Q  How long have you had your library card for the

20 Crawford County Library System?

21 **A  I think just about as long as we've lived here.**

22 Q  Oh, okay.  And I'm not trying to hold you to an exact

23 date.  I just --

24 **A  It's one of the first things we do when we move**

25 **somewhere, is get a library card.**

Page 21

1 Q   I understand.
2       And when you got your library card when you moved
3 here -- and when you moved here, how old was your
4 daughter?
5 A   One and a half.
6 Q   Okay.  And at what age did she get her library card;
7 do you know?
8 A   I don't remember.
9 Q   Okay.  Did she get it when she was a minor?
10 A   Yes.
11 Q   When she went to get it when she was a minor, did you
12 have to give parental consent to her getting a library
13 card?
14 A   I believe so.
15 Q   Okay.
16 A   And it's connected to my card.
17 Q   Gotcha.  How often do you go to the Van Buren Branch
18 of the Crawford County Library System?
19 A   Not very often.
20 Q   In the past year, so let's just say 2023, how often,
21 on average, did you go, total?
22 A   Five times total.
23 Q   Okay.  And when you go, do you checkout material, do
24 you go play some of the puzzles, read the newspaper?  What
25 do you do when you go?

Page 22

1 A   We usually go look at material.  We've used their
2 meeting room for Girl Scout activities.  I've brought my
3 troop there to speak to the librarians.  Not in 2023,
4 though.
5 Q   When's the last time that you checked out material
6 from the Crawford County Library System?
7 A   Two days ago.
8 Q   And before that?
9 A   Probably 2020.
10 Q   And when you checked out material two days ago, did
11 you use the automated self-checkout or did you checkout
12 with somebody behind the circulation desk?
13 A   Somebody behind the circulation desk.
14 Q   And were any of those materials you checked out from
15 the Social Section?
16 A   No.
17 Q   Okay.  If you want to flip over to Page 25 and we can
18 look at Paragraph 81, and I guess to save time, if you
19 want to go ahead and look at Paragraphs 80 through 85 and
20 read those and let me know when you're done.
21 A   Okay.
22 Q   Okay.  If you'll flip over to Page 25 and down to
23 Paragraph No. 80 at the bottom.  Do you see where it says
24 "In a November 10, 2022 letter, Crawford County residents,
25 Jeffrey and Tammi Hamby, alleged that the then-CCL

Page 23

1 Director Deidre Grzymala and her employees were, quote,
2 'normalizing and equating homosexual and transsexual
3 lifestyles with heterosexual lifestyles, with heterosexual
4 family units' and sought greater participation in material
5 selection."
6       Did I read that correctly?
7 A   Yes.
8 Q   Have you seen this November 10th letter that Jeff and
9 Tammi Hamby sent?
10 A   Yes.
11 Q   And how did you see it?
12 A   Social media.
13 Q   Okay.  Who posted it?
14 A   I do not know.
15 Q   Do you remember when you saw it on social media?
16 A   Around December of '22.
17 Q   Okay.  Did the post that showed the letter have any
18 type of comments below it?
19 A   I'm certain that it did.
20 Q   Did you read any of them?
21 A   I'm certain that I did.
22 Q   Do you recall any of them?
23 A   I do not.
24 Q   Did the posts have any type of -- kind of caption,
25 like it said something below the letter; do you recall,

Page 24

1 like maybe explaining what this was or giving their
2 opinion about what they were posting?
3 A   I'm sure it was somebody giving their opinion.
4 Q   Got it.  And you don't recall what it said?
5 A   I don't recall.
6 Q   Okay.  When you read it -- so some time in December
7 of 2022, you think you saw the letter posted on social
8 media and you read it.  What did you think about it?
9 A   I was disgusted by it.
10 Q   Okay.  Why; what about it was disgusting to you?
11 A   A few things.  Number one, I have people close to me,
12 whom I love dearly and who are in the LGBTQ community, and
13 they were making them sound like an abnormal section of
14 our society and, number two, I don't think it's anybody's
15 business except the parent, the caregiver of a child, what
16 books their children are exposed to.
17 Q   Okay.  Then on to the next paragraph in Paragraph 81.
18 It says that in December of 2022 County Judge Chris Keith
19 appointed Tammi Hamby to the Library Board of Directors.
20 Do you know anybody else on the Library Board besides
21 Tammi Hamby?
22 A   No.
23 Q   Okay.  Do you know -- and then on the next line it
24 says, "On January 10, CCL staff announced that all
25 branches of the CCL had, quote, 'moved their LGBTQ

1 children's books out of the children's section into a new
2 area within their respective adult sections.'
3 Is this sentence referring to the Social Section?
4 A  I believe so.
5 Q  Okay.  You've only ever seen the Social Section at
6 the Van Buren Branch, right?
7 A  Correct.
8 Q  And is that Social Section in Van Buren restricted to
9 only -- is it restricted in a way in which only those 18
10 years or older can go into it?
11 A  No.
12 Q  Okay.  So the Social Section is in the Adult Section
13 of the library; is that right?
14 A  Correct.
15 Q  But it's not adults only?
16 A  Correct.
17 Q  Okay.  And then in Paragraph 82, it says that there
18 are approximately 263 books that have been placed in the
19 Social Section of the Crawford County Library Branch.
20 Are you aware of whether or not there are
21 approximately 263 books in the Social Sections across the
22 five branches?
23 A  I do not know.
24 Q  Okay.  And then it says that the books there in the
25 Social Section contains books such as Who Believes What?

1 Exploring the World's Major Religions and All About
2 Anxiety.
3 Have you ever read either of those two books?
4 A  No.
5 Q  Has your daughter ever read either of those two
6 books?
7 A  Not to my knowledge.
8 Q  Okay.  And I don't know if I asked this, I can't
9 remember, have you ever checked out a book from the Social
10 Section?
11 A  No.
12 Q  But you've gone to the Social Section?
13 A  Correct.
14 Q  Okay.  Skip to Paragraph 84.  It says that the letter
15 from Crawford County also signaled that more changes are
16 coming to the Crawford County Library System.  It
17 previewed, through its lawyers, that, quote, "Act 372 will
18 make it necessary to continue modifying and changing the
19 library system's policies and procedures."
20 And the County Attorney wrote to the Crawford County
21 Library System that among its, quote, "obligations to come
22 into compliance with the new laws by August 1st, 2023,"
23 is, quote, "creating a section that is not accessible to
24 those under eighteen, end quote."
25 Did I read that right?

1 A  Yes.
2 Q  So earlier you and I were talking about -- or you
3 stated that Crawford County had taken steps to implement
4 Act 372.  Do you remember saying that?
5 A  I believe they did.
6 Q  And is it your understanding that the creation of the
7 Social Section was a step in the direction of implementing
8 Act 372?
9 A  I don't know.  I believe so.
10 Q  Yeah, and I'm just asking what you believe or what
11 your understanding is.  I'm not trying to --
12 A  Again, I don't know.
13 Q  Okay.
14 A  I don't know.
15 Q  Okay.  And then on Paragraph 85, it says: "On
16 information and belief, Crawford County intends to adopt a
17 policy that materials containing LGBTQ themes or
18 discussing other, quote,'social issues' might harm the
19 innocence of children and that on that basis any such
20 materials must be segregated based on the viewpoint
21 contained therein once Act 372 goes into effect. "
22 Do you have any information or belief that you can
23 share with me that Crawford County would adopt a policy
24 that materials containing LGBTQ themes would be
25 sequestered pursuant to Act 372?

1 A  I do think they would.
2 Q  Okay.  And why do you think that?
3 A  Because they've already done it by creating the
4 Social Section.
5 Q  Okay.  So if we were going to make a list of
6 information and beliefs that you have that show that
7 Crawford County would implement Act 372, in your opinion
8 one of them would be that the Social Section is one of the
9 pieces of evidence; is that right?
10 A  Yeah.
11 Q  Is there anything else that you have that -- as far
12 as evidentiary that you would -- on your list that you
13 would put that would show Crawford County would segregate
14 LGBTQ material?
15 A  They appointed a woman who wrote the letter to the
16 Library Board.
17 Q  Okay.  So the woman that you're referring to is Tammi
18 Hamby?
19 A  Tammi Hamby.
20 Q  Okay.  Is there anything else?
21 A  Just that they already have.
22 Q  Right, through the Social Section.  And, again, I'm
23 not trying to play gotcha or be difficult.  I'm just
24 trying to understand what --
25 MS. BROWNSTEIN: Yes, he is.

BY MR. MCLELLAND:

Q   I'm just trying to understand the list of your
information and belief that you would have.

MR. MCLELLAND: Go ahead.

MS. BROWNSTEIN: I'm not objecting. I'm
just saying, yes, he is.

Just listen. He's very disarming. Listen
to what he says.

BY MR. MCLELLAND:

Q   So the Social Section, appointing Tammi to the
Crawford County Library Board. Anything else that you can
think of that would substantiate that Crawford County
would intend to adopt a policy to segregate LGBTQ
material?

A   No.

Q   Okay. Why do you think that appointing Tammi Hamby
to the Board would indicate that Crawford County would
segregate LGBTQ materials?

A   Because they already knew how she felt about it
before they appointed her to the board.

Q   Okay. And is your understanding of, quote, "how she
felt about it" based upon your reading of her letter?

A   Correct.

Q   Okay. Have you ever spoken to her about her beliefs
on this topic?

A   No.

Q   Have you ever spoken to anyone about -- have you ever
spoken to anyone else about Tammi Hamby's beliefs on the
topic --

A   Other than getting -- other than getting, you know,
summaries of how the meetings went, which kind of lend
themselves to Tammi Hamby's beliefs.

Q   In her role as Library Board Member and as Chair, and
correct me if I'm wrong, I just want to make sure I
understand, her statements at those meetings and summaries
given to you by others are how you formed your opinion
about her beliefs on the --

A   And her letter.

Q   And her letter are how you formed your beliefs about
her beliefs?

A   Correct.

Q   Okay. If Tammi Hamby was not on the Board of the
Crawford County Library System, and Tammi Hamby had not
wrote the letter, and Jeff Hamby hadn't wrote a letter and
Deidre Grzymala had not moved books into the Social
Section and the Social Section had not been created, would you
still have the same concern that Crawford County would
adopt a policy to segregate LGBTQ material based upon Act
372?

A   Would or could?

Q   Do you have a concern that they would?

MS. BROWNSTEIN: I'm going to object to the
question. It's so convoluted I'm not quite sure
what you're asking her.

BY MR. MCLELLAND:

Q   Okay. You believe that Crawford County would
segregate LGBTQ material based upon the Social Section and
Tammi Hamby being on the Board; is that right?

A   Yes, I do.

Q   And are those the only reasons why you believe that?

A   That I?

Q   Believe that Crawford County would adopt a policy to
segregate LGBTQ materials?

A   Other than my personal feelings of the community that
I live in.

Q   I want to know about that. That's why I asked it
that way. In my previous question I removed the Social
Section, I removed Tammi Hamby, I removed all of the
concerns. Now, I wanted to know if you still had those
concerns about the books being sequestered. So if there's
personal beliefs of concern, then I want to know about
those.

A   I can only guess. I mean, I can't speak to what
others would do. I just feel like there's a really high
probability right now because of everything that has taken

place.

Q   Okay. And when you say high probability based upon
everything that's taken place, what do you mean?

A   The letter, the meetings, the fact that there is a
Social Section at all.

Q   Okay. So in Paragraph 85 it talks about that
Crawford County intends to adopt a policy that will
segregate LGBTQ-themed material based upon that viewpoint.
Do you believe that Crawford County should segregate
materials based upon the LGBTQ viewpoints?

A   No, I do not.

Q   And why do you believe that?

A   Because I don't think it's up to the government or
the library board or other citizens to decide what a child
has access to.

Q   Okay.

A   Or anyone.

Q   Do you know if people can request for books to be
moved into the Social Section?

A   Currently?

Q   Yes.

A   I do not know.

Q   Do you know if people can request for material to be
moved out of the Social Section?

A   I do not know.

1 Q    Okay.  If somebody in the community -- let's just
2 assume Tammi Hamby -- or let's just say Jeff Hamby wanted
3 to request a book to be placed into the Social Section.
4 Do you know the procedure by which he would do that?
5 A    I do not know.
6 Q    Okay.  If you prevail in this lawsuit and win and are
7 successful, what is your understanding of what will happen
8 to the Social Section?
9 A    I don't know what would happen.  I don't know if they
10 would be allowed to leave it as is.  What would I like to
11 see happen?
12 Q    So I'll get there, but I was just curious if you
13 understood what would happen, if you had any understanding
14 at all.
15 A    I don't know that that's ever been stated.  I don't
16 know.
17 Q    Okay.  If you prevail in this lawsuit, what would you
18 like to see happen to the Social Section?
19 A    I would like to see all of those books go back to the
20 respective sections that they were in before.
21 Q    Okay.  And is there any portion of your Complaint
22 that asks for the Social Section books to be moved back?
23 A    I do not know.
24 Q    You don't know.  Have you read the Complaint?
25 A    Yes.

1 Q    Okay.  And are you aware if there's any portion that
2 asks for the Social Section books to be placed back?
3      And if you need to take time to review the Complaint,
4 you can take the time to do so.
5 A    Okay.  Let me do that.
6 Q    Yeah.
7 A    So you're asking if this Complaint specifically says
8 Crawford County Social Section books must be returned?
9 Q    Flip to the first page of the Complaint, please.
10 A    Okay.
11 Q    Do you see your name stated in the caption?
12 A    Yes.
13 Q    So your Complaint -- I'm asking does your Complaint,
14 that you have in your hand that you're reviewing now, does
15 it ask for the Social Section books to be placed back to
16 where they were before they were in the Social Section?
17 A    Specifically Crawford County?
18 Q    Yes.
19 A    Because I'm not aware of any other.
20      I mean, am I --
21 Q    I'll repeat the question and I'll make the record
22 clear.
23      So you've reviewed the Complaint?
24 A    Uh-huh.
25 Q    Is that a yes?

1 A    Yes.
2 Q    Does the Complaint, in any way, ask for the Social
3 Section to be -- does the Complaint, in any way, ask for
4 the books housed in the Social Section to be moved back to
5 their location where they were before they were in the
6 Social Section?
7      MS. BROWNSTEIN:  And I'm going to object
8      again.  It's a Complaint drafted by lawyers, she
9      is not an attorney.
10      Subject to that objection, she may answer.
11 A    Yes, I believe by doing away with the availability
12 provision, that that would require it.
13 Q    Okay.  So if the court enjoins Act 372's availability
14 provision, it's your understanding that the Social Section
15 would be disbanded?
16      MS. BROWNSTEIN:  Again, renew my objection.
17 A    That's my understanding.
18 Q    Okay.  You've never checked out a book from the
19 Social Section, and I don't know if I've ever asked this
20 earlier.  Has your daughter ever checked out a book from
21 the Social Section?
22 A    Not that I'm aware of.
23 Q    Have you ever been denied the ability to checkout a
24 book from the Crawford County Library System regardless of
25 where it's located?

1 A    Yes.
2 Q    Okay.  And when was that?
3 A    In 2020.
4 Q    And why were you denied the ability to checkout the
5 book?
6 A    Because I owed money.
7 Q    Was the money owed for late returns?
8 A    Yes.
9 Q    Okay.  I understand.
10      MS. BROWNSTEIN:  There's a reason she
11      doesn't use the libraries --
12 A    For the record, it was not my fault.
13 Q    The record is noted.
14      So you've been denied the ability to checkout a book
15 due to unpaid late fee charges?
16 A    Correct.
17 Q    With that reasoning aside, have you ever been denied
18 the ability to checkout a book for any other reason?
19 A    No.
20 Q    Are you aware if your daughter has ever been denied
21 to checkout a book from the --
22 A    I am not aware.
23 Q    Do you know anybody who has been denied the ability
24 to checkout a book from the Crawford County Library System
25 for a reason other than late fees?

1 A   No.
2 Q   Okay.  Are you aware of any specific titles of books
3 in the Social Section?
4 A   Yes.
5 Q   Okay.  And what are the titles of those books?
6 A   Boy kisses boy, An Abundance of Katherines.  Those
7 are the only two I can recall.
8 Q   Have you ever read either of those two books?
9 A   No.
10 Q   And how do you know that they are located in the
11 Social Section?
12 A   I saw them in the Social Section when I went to the
13 Van Buren Library.
14 Q   When you went two days ago?
15 A   Yes.
16 Q   Okay.  Did you take either of these books off the
17 shelves and thumb through them?
18 Q   Okay.  Do you have an understanding of what these
19 books are about?
20 A   Okay.  Do you have an understanding of what these
21 A   The Abundance of Katherines I vaguely do because my
22 daughter explained it to me.
23 Q   Okay.  And what's it about?
24 A   Just a young couple in a relationship.
25 Q   Okay.  And do you know what boy kisses boy is about?

1 A   No.
2 Q   Okay.
3       MS. BROWNSTEIN: I think I could guess from
4       the title.
5       MR. MCLELLAND: I won't ask anybody to
6       engage in speculation.
7 BY MR. MCLELLAND:
8 Q   When did you first become aware of this lawsuit?
9 A   December of 2022.  This lawsuit?
10 Q   This lawsuit.
11 A   I'm sorry, my brain was jumping forward trying to
12 finish your sentence.
13 Q   That's okay.
14 A   Last summer.
15 Q   And how did you become aware?
16 A   A Facebook group.
17 Q   What Facebook group?
18 A   American Advocates for Equality.
19 Q   And when did you join that Facebook group?
20 A   I don't know.
21 Q   Do you have to be invited to join it?
22 A   I don't know.  I don't recall.
23 Q   Do you know how many members that are a part of the
24 group?
25 A   I don't know.

1 Q   Do you know if Samantha Rowlett serves on the
2 leadership board of that group?
3 A   I believe she does.
4 Q   Okay.  Have you ever interacted with Ms. Rowlett in
5 relationship to this group?
6 A   I've never interacted with her at all.
7 Q   So you found out about this lawsuit through the
8 American Advocates for Equality.
9     Do you serve in any type of leadership role with that
10 organization?
11 A   No.
12 Q   Okay.  Do you ever make posts on the Facebook page?
13 A   No, I think I've commented on one thing.
14 Q   Okay.  Do you remember what you commented on?
15 A   Yes.
16 Q   What was it?
17 A   Somebody made fun of an outfit that Governor Huckabee
18 wore and I told them that I thought that was tacky and
19 that we should not be attacking the way somebody looks.
20       MR. MCLELLAND: We can go off the record
21       for a second.
22         (Off the record.)
23 BY MR. MCLELLAND:
24 Q   So you made a comment related to a post someone had
25 made about the Governor's outfit and you had said that we

1 shouldn't make comments about appearance and that was a
2 low blow; is that right?
3 A   Yes.
4 Q   Do you know what America Advocates for Equality, what
5 they're advocating for?  I know what the name of the
6 organization is, but do you know what other specific thing
7 that they're advocating for?
8 A   Equal rights for the LGBTQ community.
9 Q   Okay.  Equal rights specifically to that community or
10 are there other communities that they're advocating rights
11 for?
12 A   I'm uncertain.
13 Q   Okay.  Do you know when the group was started?
14 A   I believe -- I don't know for certain.  I believe
15 shortly after January of 2023.
16 Q   Okay.  And do you know who started it?
17 A   I don't know for certain.
18 Q   Okay.  If you had to guess, do you know?
19 A   My guess is Samantha Rowlett.
20 Q   Okay.  So you're not for sure, but if you had to
21 assume, you'd guess maybe Samantha?
22       MS. BROWNSTEIN: Don't guess.
23 BY MR. MCLELLAND:
24 Q   And I think you said this earlier.  You don't know
25 how you -- or you didn't have to request to join that

1 group; is that right?

2 A  I don't know.

3 Q  Okay.  So you learned about this lawsuit through

4 American Advocates for Equality in the summer.  Why didn't

5 you join the lawsuit then?

6 A  Well, I didn't know that it could be helpful.  If I

7 had thought I could be helpful, I guess I would have

8 reached out, but it seemed like it was ...

9 Q  I understand.  And I'm not trying to point fingers or

10 anything or say why didn't you do it then.  I'm just

11 curious how you came to know -- or how you came to get

12 involved, which is actually my next question.

13    So you found out about it in the summer.  How did you

14 learn how to get involved?

15 A  Mandy Steele is somebody that I share a lot of the

16 same belief system with and she -- we kind of know each

17 other casually as acquaintances through kind of being

18 around the same groups and we're both part of Free Mom

19 Hugs.

20 Q  Okay.

21 A  And she reached out to me and said, you know, she had

22 seen that I had seemed to have the same -- and I posted

23 about my daughter online and, you know, being proud of her

24 for starting a gay-straight alliance at her school and she

25 said that it would be helpful if Madeline was interested

1 in joining as a Plaintiff.

2 Q  Okay.  So you know Mandy Steele through Free Mom

3 Hugs?

4 A  Well, I knew her before that, but we know that we

5 seem to have a lot of the same belief system and I'm not

6 close with her, but I would call her an acquaintance and

7 she had said if that was something that Madeline would be

8 interested in, that she certainly could put her in touch

9 with people.

10 Q  So she reached out to you about your daughter getting

11 involved?

12 A  Correct.

13 Q  And did Mandy ever speak with your daughter directly?

14 A  No.

15 Q  Okay.  Did you speak to your daughter about joining

16 the lawsuit after Mandy reached out to you?

17 A  I told her that the lawsuit existed, which she

18 already knew, and that, you know, there was a chance that

19 if she wanted to be a of it, that she could be.

20 Q  So Mandy tells you about how to get connected in the

21 lawsuit.  Do you know what happens next?  Like did you

22 talk -- and I'm not trying to breach any type of

23 privilege, but did you then speak to Ms. Brownstein or any

24 of the other attorneys?

25 A  Yes.

1 Q  Okay.  I don't want to know the contents of your

2 conversation, but I would like to know when you spoke to

3 Ms. Brownstein.

4 A  I would have to look back on my records.

5 Q  Was it the fall, the spring?

6 A  Winter.

7 Q  Okay.  So maybe December or January?

8 A  Uh-huh.

9 Q  Okay.  And so to be clear, December of '23, January

10 of '24; is that correct?

11 A  Uh-huh.

12 Q  Is that a yes?

13 A  Yes.  I'm so sorry.

14 Q  You're fine.

15 A  Madeline is better at this than I am.

16 Q  No, you're fine.

17    Okay.  And did you speak just to Ms. Brownstein?

18 A  No.

19 Q  Okay.  Who else was involved in that conversation?

20 And I don't want to know the contents.  I just want to

21 know who else was there.

22 A  Mr. Adams.  Well, not when I spoke with her.

23 Q  Okay.  When did you speak with Mr. Adams?

24 A  December.

25 Q  Okay.  Was anybody else involved in that

1 conversation?

2 A  Madeline.

3 Q  Okay.  Anybody else?

4 A  No.

5 Q  Okay.  Did you speak by phone or Teams or in person?

6 A  By phone.

7 Q  Okay.

8 A  And then in person.

9 Q  Okay.  So you spoke, in December of '23, with

10 Mr. Adams and then at some point thereafter you then spoke

11 with Ms. Brownstein?

12 A  Pretty quickly after.  I think maybe even the same

13 day or the next day.

14 Q  Is that kind of the whole story of how you ended up

15 in this lawsuit?

16 A  Uh-huh.

17 Q  Yes?

18 A  Yes.  So sorry.

19 Q  You're okay.  All right.  Have you attended any of

20 the Crawford County Quorum Court Meetings?

21 A  No.

22 Q  And you've never attended any of the library board

23 meetings?

24 A  Correct.

25 Q  You've just seen the library board meetings after the

Page 45

1 fact?

2 A   **And the quorum court meetings.**

3 Q   And the quorum court meetings. You knew where I was

4 going. So you've seen the quorum court meetings kind of

5 after the fact as well?

6 A   **Correct.**

7 Q   Are they recordings or are they snipits of video

8 recordings?

9 A   **Both, people that were in the room.**

10 Q   Recorded it and then maybe posted it?

11 A   **Uh-huh.**

12 Q   Is that a yes?

13 A   **Yes.**

14 Q   When you see those posts, are those primarily in this

15 American Advocates for Equality group?

16 A   **I don't know.**

17 Q   All right. Have you ever heard, in the community or

18 conversations with people, that the Social Section was a,

19 quote, "kind of compromise between people who maybe sought

20 to have books removed and people who didn't want to have

21 books removed"? Have you ever heard anyone say that

22 before?

23 A   **No.**

24         **MR. MCLELLAND:** Okay. I think I'll pass.

25         **MR. WATSON:** Do you want to take a break or

Page 46

1     keep going?

2         **THE WITNESS:** Break.

3         (Brief recess was taken.)

4         **EXAMINATION**

5 **BY MR. WATSON:**

6 Q   Mrs. Partain, I'm Noah Watson. I'm with the Attorney

7 General's Office and we're representing the prosecuting

8 attorneys in this case.

9     First of all, thank you for being here today. I

10 appreciate your time. I know that is a labor-intensive

11 thing to be a part of a lawsuit and it's not your normal

12 job, so you have to find extra time to do it, so, again,

13 thanks for being here and answering some of our questions.

14     So the Act that has been challenged, there are two

15 parts. There's the criminal provision, which I'll call

16 Section 1, and there's what we call the Challenge

17 Provision, which is Section 5. I might use one of those

18 terms. If at any point I use one or the other and you

19 forget, just say, hey, please explain what you're talking

20 about. I'm happy to do that. And if you have any

21 questions, feel free to interrupt me. I want to make sure

22 we're on the same page.

23     So I want to start off with the Criminal Provision,

24 Section 1. It should be fairly straightforward. What is

25 your understanding of what -- items is the word the

Page 47

1 statute uses. I know we're talking about books mostly.

2 Items actually covers a little bit more than that, so I

3 might use one or the other.

4     So what is your understanding about what types of

5 books or items are covered under Section 1?

6 A   **That they would harm -- be harmful to minors. I**

7 **don't really know what that definition of be harmful**

8 **entails specifically.**

9 Q   And that's totally fair. It's sort of a technical,

10 legal definition, so I certainly don't expect you to

11 understand the ins and outs of it.

12     And I read this one section to your daughter and I'll

13 read it to you, also, because my next question is I'm

14 going to ask you is there any books or items that you are

15 aware of that fall under the definition, and, again, with

16 the caveat that I know you're not a lawyer and you haven't

17 spent the time that, you know, the lawyers and judges have

18 spent on this.

19     So the statute defines item as a material or a

20 performance that depicts or describes nudity, sexual

21 conduct, sexual excitement, or sadomasochistic abuse, and

22 also as part of the harmful minor's definition, those

23 traits have to be the predominant trait of the work.

24     So are there any books or items, that you are aware

25 of, that you would like to read or plan on reading that

Page 48

1 fit that definition as you understand it?

2         **MS. BROWNSTEIN:** I object, again, that

3     that's -- she's not an attorney and with that

4     objection she cannot possibly understand what

5     that -- well, she could opine about what legally

6     would be considered harmful to minors are not

7     under that definition. With that objection, you

8     may answer.

9 A   **Can you ask it again?**

10 Q   Let me take a step back to try and address some of

11 this. Do you understand what nudity is?

12 A   **Yes.**

13 Q   Do you understand what sexual conduct is?

14 A   **Yes.**

15 Q   Do you understand what sexual excitement is?

16 A   **Yes.**

17 Q   And do you understand what sadomasochistic abuse is?

18 A   **Yes.**

19 Q   Okay. So of those topics, are you aware of any book

20 or materials you want to read or view that is

21 predominantly about one of those topics?

22 A   **No.**

23 Q   Okay. So I want to move on to follow up on some of

24 the stuff that Mr. McLelland was asking you about Section

25 5 and the library piece of this.

1 What is your understanding of how Section 5 works?
2 A   The challenge section?
3 Q   Yes, ma'am.
4 A   That anybody would be able to challenge for a book to
5 be put into the sequestered area.
6 Q   And what is your understanding of the sequestered
7 area and how would that operate?
8 A   That whoever the deciding body is would decide if a
9 book met the definition of harmful to minors, and those
10 books would be put into an area that could not be accessed
11 by anybody under the age of 18.
12 Q   Okay.  So you would still be able to access it, for
13 example, and other adults?
14 A   Correct.
15 Q   Okay.  Are you aware of any books that you would be
16 unable to access because of the challenge provision?
17 A   No.  Me personally, no.
18 Q   Okay.  So in your own words, how does Section 5, the
19 challenge provision, how does that affect you if you're
20 able to access any of the books or materials that you
21 would want to anyways?
22 A   Well, my children are an extension of me and if they
23 don't have access to it, then it affects my home, my
24 household, and, also, I think that there would be a stigma
25 for anybody going into these special areas, whatever it

1 was named, because I think people would be paying
2 attention.
3 Q   Okay.  And explain that stigma to me a little more.
4 A   I think if you take this collection of books and put
5 it in a separate area that you have to be 18 and or and
6 everybody understands what that area is, that they're
7 going to be paying attention to who's going in it.  They
8 may assume things about those people, whether they're
9 correct or not, that it could make the people feel
10 uncomfortable, that it could make people, whether they are
11 old enough to go in it or not, feel like if there's
12 something in that room that interests you or that you
13 relate to or the characters look like you, that somehow
14 you're bad, you're wrong, you're not normal like the rest
15 of us that aren't going in that room.
16 Q   And I don't recall if Mr. McLelland asked you about
17 the current Social Section, but I do remember your
18 daughter mentioned some of the similar terms about it
19 being uncomfortable to be seen in there.
20 Do you have a -- does the same stigma apply to the
21 current Social Section?
22 A   Yes.
23 Q   So there's no difference between what it is now and
24 what could exist?
25 MS. BROWNSTEIN: I'm going to object.  It

1 calls for speculation.
2 MR. MCLELLAND: I'm also going to object to
3 the form.
4 BY MR. WATSON:
5 Q   So in how you think you would perceive it, how it
6 would affect you, do you see a potential difference
7 between the current Social Section and the -- what would
8 be implemented?
9 The sequestered section, I think, is the word you
10 used under Section 5 of the challenge --
11 MS. BROWNSTEIN: I'm going to, again,
12 object.  It calls for speculation.
13 MR. MCLELLAND: Object to form.
14 MS. BROWNSTEIN: You may answer.  Sorry.
15 A   I -- with the attention that the current Social
16 Section has received, I don't think that the reaction from
17 people would be different than it is now.  I think it has
18 already created the situation that I described.
19 Q   So at the end of your answer to that question in
20 explaining this to me, you started talking about how other
21 people may also feel -- well, never mind.  Just forget I
22 said anything there.
23 Other than the stigma, is there any other way that
24 this Section 5, the challenge provision, would affect you.
25 And, also, just setting aside your children, just

1 specifically you?
2 A   Me personally?
3 Q   Yes.
4 A   Not that comes to mind immediately.
5 Q   I think that's all that I've got for now.  Thank you
6 again.
7 EXAMINATION
8 BY MS. BROWNSTEIN:
9 Q   I have a few questions.  So do you have
10 grandchildren?
11 A   Yes.
12 Q   What are their ages?
13 A   Ten, seven.  I'm sorry, just turned eight last month,
14 and then two newborns.
15 Q   Well, do you take the ones that are not newborns to
16 the library?
17 A   Yes.
18 Q   And if Act 372 passed and went into effect.  Excuse
19 me, it passed.  If it went into effect and you wanted to
20 take your children to the library and there was this
21 sequestered area, do you know if you would be able to
22 take -- go into that area with your grandchildren that are
23 under the age of ten?
24 A   Not -- not with them.
25 Q   Okay.  So would you able to go in it if you had them

1 with you and you didn't want to leave them behind in
2 another section of the library?
3 **A** **No.**
4 **Q** Would you be able to go in?
5 **A** **No.**
6 **Q** So would you -- you would not be able to go in and
7 browse for books for them if they were with you if Act 372
8 went into effect?
9 **A** **Correct.**
10 **Q** Okay. Do you know who appointed Tammi Hamby to the
11 Library Board?
12 **A** **Judge Keith.**
13 **Q** The County Judge?
14 **A** **Correct.**
15 **Q** Okay. And you have, as I understand it, watched
16 videos of both quorum court and library board meetings; is
17 that right?
18 **A** **Correct.**
19 **Q** After the fact, after they occurred?
20 **A** **Correct.**
21 **Q** Did that include videos where you heard Judge Keith
22 speaking?
23 **A** **I'm not certain.**
24 **Q** Okay. How about other quorum court board members?
25 **A** **Yes.**

1 **Q** And what was -- was there a particular attitude
2 expressed by quorum court members about what books should
3 be included in the Social Section or not?
4 **A** **I didn't hear their specific opinions, but I do know**
5 **that they were not letting people who were opposed to the**
6 **Social Section speak.**
7 **Q** Do you have any opinion as to what the attitude of
8 the majority of the quorum court would be if Act 372 went
9 into effect, as to what types of books would be put into
10 the sequestered sections?
11 **MR. MCLELLAND:** Objection. Calls for
12 opinion and speculation.
13 **BY MS. BROWNSTEIN:**
14 **Q** You may answer.
15 **A** **I think that the majority of the books would be LGBTQ**
16 **themed and would look a lot like the current Social**
17 **Section.**
18 **Q** Okay. And that's based on what you saw and heard
19 that occurred in the quorum court meetings --
20 **A** **Correct.**
21 **Q** Based on what you have seen and heard at both quorum
22 court meetings and library board meetings, do you have an
23 opinion as to whether there would be challenges to books
24 based on their LGBTQ content?
25 **A** **Challenges?**

1 **Q** Challenges under Section 5 of Act 372?
2 **A** **Yes.**
3 **Q** Okay. And what do you think the challenges would be
4 based on generally, what point of view?
5 **A** **People thinking that depicting homosexual**
6 **relationships or family styles is not normal, or that it's**
7 **harmful to children to see that kind of thing.**
8 **Q** The way that Section 5 of Act 372 is written at
9 present, and if it goes into effect, there will be
10 challenges allowed by members of the public. But there is
11 no provision for people, once a book is challenged and
12 objected to, there is no provision for members of the
13 public to oppose that point of view that might want to
14 keep a book as a part of the general book population and
15 not put into a segregated section.
16 Do you understand what I'm saying?
17 **A** **Yes.**
18 **Q** And would you, as a library card member, even though
19 you might owe money --
20 **A** **That is settled.**
21 **Q** As a library card member and a user, would you want
22 to be able to have input into whether or not a book should
23 be successfully challenged and put into the segregated
24 adults-only section?
25 **A** **Absolutely, I would want a say.**

1 **Q** And so would you consider that a problem with the Act
2 as written, that it does not provide further opportunity
3 for citizens, such as you, to oppose books being
4 segregated?
5 **A** **Yes, that's a problem.**
6 **MS. BROWNSTEIN:** Okay. That's all I have.
7 Pass the witness.
8 **EXAMINATION**
9 **BY MR. ADAMS:**
10 **Q** I want to follow up on one thing that Mr. Watson was
11 asking you about with respect to this definition of
12 harmful to minors.
13 And, again, this is sort of personal, but I'm not
14 going to get into the individual books. Have you, as an
15 adult, read a book, read a novel, let's say -- let's kind
16 of narrow it down that way. Read a novel that included a
17 description of sexual activity?
18 **A** **Yes.**
19 **Q** Are any of those novels books that you would not give
20 to a nine-year-old because the sexual content is
21 inappropriate for them?
22 **A** **All of them.**
23 **Q** Okay. And more generally, would you expect that the
24 local community standards in this area would find that
25 materials in some of the novels that you've read to be

Page 57

1 unacceptable for nine-years-olds?
2 A   Yes.
3 Q   Are some of those same books, in your view, okay for
4 Madeline as a 17-year-old to read?
5 A   Yes.
6 Q   So you can imagine a situation, based on a book that
7 you've read, that you would think would be inappropriate
8 to hand to a nine-year-old, maybe a grandkid of yours, but
9 that you would buy and give to Madeline if it had
10 sufficient literary merit?
11 A   Yes.
12       MR. ADAMS: That's all I have.
13       FURTHER EXAMINATION
14 BY MR. MCLELLAND:
15 Q   Ms. Partain, this is the part I think I told your
16 daughter, where we kind of go round-robin and eventually
17 we will run out of questions.
18    I just have some follow up from your conversation
19 with your attorney. You have two grandchildren, correct?
20 A   Four.
21 Q   Sorry, you have four grandchildren, one of which is
22 ten years old and eight years old and then two are
23 newborns?
24 A   Correct.
25 Q   Okay. And do you currently take the ten and

Page 58

1 eight-year-old to the Crawford County Library?
2 A   On occasion.
3 Q   How often?
4 A   More so in the summer when I'm babysitting them.
5 Q   Gotcha. Do you know if their parent takes them to
6 the library?
7 A   I don't know, but they live in Oklahoma.
8 Q   When you take your ten-year-old and eight-year-old
9 grandchild to the Crawford County Library, do you take
10 them primarily to the Van Buren Branch?
11 A   Yes.
12 Q   And what's a typical visit like?
13 A   We usually try to do it when they're having
14 activities for kids and we visit the children's area and
15 we look at books, maybe they do puzzles. It just depends.
16 A lot of it is because they're having -- they're hosting
17 things for kids.
18 Q   If your grandchildren were with you and you wanted to
19 go to the Social Section to pick out a book, could you
20 take your grandchildren with you?
21 A   No.
22 Q   Why not?
23 A   Oh, the Social Section?
24 Q   Yes.
25 A   Yes.

Page 59

1 Q   Okay. If your ten-year-old or eight-year-old
2 grandchild wanted to go to the Social Section to pick out
3 a book, could you go with them?
4 A   Yes.
5 Q   Has your ten-year-old or eight-year-old grandchild
6 ever been to the Social Section?
7 A   Not with me, no.
8 Q   Okay. But if they wanted to go, or you wanted to go,
9 you could go together?
10 A   To the Social Section, yes.
11 Q   To the Social Section. Thank you.
12    You talked about, with Ms. Brownstein, there were
13 some quorum court meeting videos and library board meeting
14 videos. Do you remember discussing that with her?
15 A   Yes.
16 Q   Those videos that you've seen of the meetings, let's
17 talk about the quorum court first. Did you watch the
18 entirety of the meeting?
19 A   No.
20 Q   Was it like one long video that you skipped around or
21 was it multiple video clips?
22 A   Multiple video clips.
23 Q   Okay. For the library board, did you watch the
24 entire library board meeting and skip around or were they
25 library board meeting clips?

Page 60

1 A   Well, the person was live streaming it, so I watched
2 the majority of it. I don't know that I got the entire
3 beginning and the entire end.
4 Q   And do you remember which library board meeting was
5 streamed?
6 A   No.
7 Q   Do you remember which quorum court meeting the video
8 clips were from?
9 A   No.
10 Q   Do you know if they were all from the same quorum
11 court meeting?
12 A   Well, I've seen parts of multiple meetings on a day
13 that it was happening, like almost in real time because
14 somebody was there.
15 Q   So you were watching these video clips in kind of
16 real time?
17 A   Almost real time, the same evening.
18 Q   Okay. So the clips that you watched appeared to be
19 from all of the same quorum court meeting?
20 A   No.
21 Q   Okay. They were from different meetings?
22 A   Yes.
23 Q   Do you know which quorum court meeting the videos
24 displayed?
25 A   I do not.

1 Q   Okay.  You said that at one of the meetings the
2 quorum court didn't let the opposition, that those opposed
3 to the Social Section speak.
4      Do you remember saying that?
5 A   Yes.
6 Q   Do you remember which meeting that was?
7 A   No.
8 Q   But you know that it occurred?
9 A   Yes, I watched it.
10 Q   Did you recognize any of the people who were opposing
11 the Social Section that weren't allowed to speak?
12 A   No.  They were allowed to choose one representative
13 to speak for the group.
14 Q   And that person wasn't allowed to -- the
15 representative of the opposition was not allowed to speak;
16 is that correct?
17 A   One person was allowed to speak.
18 Q   Oh, one person was allowed to speak?
19 A   Uh-huh.
20 Q   The rest were not?
21 A   Correct.
22 Q   Okay.  People in favor of the Social Section, were
23 they allowed only one representative to speak?
24 A   I don't remember anybody in favor being there.
25 Q   Okay.  That's not what occurred?

1 A   I don't know.  I didn't see that.  That may have
2 occurred.  I don't know.  I don't remember hearing about
3 anybody from the side that was for the Social Section
4 being there to express their opinion.
5 Q   Okay.  That could have happened, but you don't know
6 because the meeting was broken up into video clips; is
7 that right?
8 A   Yeah.  And there were quorum court members speaking
9 who were for the Social Section.
10 Q   Do you remember which specific members were for the
11 Social Section?
12 A   No.
13 Q   Okay.  How did you know that they were quorum court
14 members?
15 A   Because they were behind the bar.
16 Q   Okay.  Do you remember, in the quorum court meetings
17 that you saw the video clips from, was it ever
18 discussed -- was the library system's funding ever
19 discussed?
20 A   Yes.  I don't know the details.
21 Q   Okay.  Do you remember anything that was said about
22 the library board funding, aside from the term funding or
23 library?
24 A   It was at risk of being lost.
25 Q   At risk of being defunded?  Is that a way to put it?

1 A   Yes.
2 Q   Do you remember who said that the library was at risk
3 of being defunded?
4 A   No.
5 Q   Are you aware of how the Crawford County Library gets
6 its funding?
7 A   Vaguely.
8 Q   Okay.  What's your understanding?
9 A   That it's all part of the budgetary process for the
10 county and it comes from taxes.
11 Q   Okay.  Are you aware if the Crawford County Quorum
12 Court has ever withheld funding from the library?
13 A   I'm not aware.
14      MR. ADAMS:  To my understanding it's pretty
15      broad, relevant standards, but I don't think the
16      funding has come up in this litigation.  Has it?
17      MR. MCLELLAND:  Well, it came up during her
18      testimony with Bettina, which is why I was
19      following up on it, but I don't have much more
20      on it.  I don't think I have another question on
21      it at all, actually.
22 BY MR. MCLELLAND:
23 Q   Okay.  So that's on the quorum court.  On the library
24 board, you saw a live stream of it; is that right?
25 A   Correct.

1 Q   And you don't recall which meeting that was?
2 A   No.  It was early 2023 and it may have been a special
3 meeting, but I'm not positive.
4 Q   Do you remember any specific topics that were
5 discussed during that meeting?
6 A   The Social Section.
7 Q   Okay.  And do you remember what was said about it or
8 what was happening in relation to the Social Section?
9 A   They just had many community members lined up to give
10 their opinion.
11 Q   About what?
12 A   The creation of a Social Section.
13 Q   Okay.  Was it opinion about a Social Section in
14 general, or was it about books in the Social Section?
15 A   Specific books in the Social Section.
16 Q   Were people speaking to have books placed into the
17 Social Section or taken out of the Social Section?
18 A   Both.
19 Q   Okay.  Did the board take any type of vote in
20 relation to books being housed in or outside of the social
21 section?
22 A   I don't recall.
23 Q   Okay.  Do you remember discussing, with Mr. Adams,
24 things in relation to the topic of harmful to minors and
25 local community standards?

1  A   Yes.
2  Q   And there's kind of a delineation between a
3  nine-year-old and a seventeen-year-old receiving certain
4  material.  Do you remember discussing that?
5  A   Yes.
6  Q   Can a nine-year-old go to the Social Section in the
7  Crawford County Library System?
8  A   They can.
9  Q   Can a seventeen-year-old go to the Social Section in
10  the Crawford County Library System?
11  A   They can.
12        MR. MCLELLAND:  Okay.  That's all I have.
13        FURTHER EXAMINATION
14  BY MR. WATSON:
15  Q   All right.  I think I have three buckets of
16  questions.  I think it's only going to be three questions,
17  maybe four.
18        With your grandchildren, are you able to go to the
19  library without your grandchildren?
20  A   Yes.
21  Q   Okay.  Earlier you were discussing the fact that the
22  challenge provision -- that concerning the challenge
23  provision, it does not include a requirement that
24  libraries allow people who want to keep a book in general
25  circulation to raise that issue.

1  A   Correct.
2  Q   At the same time the challenge does not -- it allows
3  libraries to have something like that.  So if a library
4  included a provision that allowed someone who wanted to
5  keep a book in circulation, you wouldn't have an issue
6  with that application of the policy?
7  A   I would still have an issue.
8  Q   What would your issue be?
9  A   I don't -- rephrase the question.  I'm not sure I
10  understand it completely.
11  Q   Sure.  So specifically about the issue with people
12  want to keep the item in general circulation and the fact
13  that they might not be able to raise that objection, if a
14  library allowed them to raise that objection, that
15  wouldn't be an issue any more for you?
16        I guess I'm asking would that still be an issue --
17  A   Yes.  Yes.
18  Q   And why would that be an issue?
19  A   Because I don't think that any of the books, LGBTQ or
20  anything, should be in their own special area.  I don't
21  think there should be a special section created for any of
22  them.
23  Q   So I'm going to try and make sure we're on the same
24  page.  So the concern would be with all the other stuff,
25  not with the specific fact that someone could like try and

1  pull it back into general circulation, right, like that
2  would not be an issue any more?
3        MS. BROWNSTEIN:  I'm going to object.  It's
4     a confusing question.
5  A   I think there's a glaring issue with the fact that
6  there's not like a counter -- that you can't counter
7  challenge a challenge.
8  Q   Right.
9  A   That aside, I don't like it anyway.  I would still
10  have an issue.  The whole process doesn't belong, in my
11  opinion.
12  Q   And that's the designation I was trying to make and
13  was not doing well, so thank you for highlighting that.
14        If a library chose to do, that would kind of remedy
15  the issue, right, that it chose to allow someone to
16  challenge in the opposite direction?
17  A   No.  For me it would not remedy the issue.
18  Q   Not the whole issue, not the sequestering of some
19  books.
20  A   Is that one tiny step better?  Maybe.
21  Q   Okay.
22  A   Do I think that it should exist at all?  No.
23  Q   Fair enough.  I'll move on from that.
24        And then the last question I wanted to ask you is
25  Mr. Adams asked about some books that you previously read

1  and whether or not they included, you know, some depiction
2  of --
3  A   Salacious material?
4  Q   Salacious material, yes.
5        Have any of those previous books you've read included
6  this salacious material as the predominant topic?
7  A   No.
8        MR. WATSON:  All right.  That's all I've
9     got.
10        MS. BROWNSTEIN:  I don't have anything
11     further.
12        FURTHER EXAMINATION
13  BY MR. ADAMS:
14  Q   This is going to get really technical and it's on a
15  point that Noah just asked.
16        Say that a ten-year-old did read that novel that
17  included a depiction of sexuality, might that be the main
18  thing that a ten-year-old remembered from a book that
19  included a description of sexual activity, as opposed
20  to --
21        MS. BROWNSTEIN:  You're my co-counsel, but
22     I feel like --
23        MR. MCLELLAND:  Yeah, I will object to the
24     form.
25        MR. ADAMS:  Okay.  I think we're going to

Page 69

1    end up parsing the definition of harmful to
2    minors a little fine, but I will withdraw the
3    question.
4         **MR. MCLELLAND:** I just have one follow-up.
5    I didn't cut you off?
6         **MR. ADAMS:** No, go ahead.
7         **MR. MCLELLAND:** Okay.
8         **FURTHER EXAMINATION**
9    **BY MR. MCLELLAND:**
10   Q    So you remember talking to Mr. Watson about the
11   challenge and counter challenge and the counter counter
12   challenge and the reverse counter challenge just a little
13   bit ago?
14   A    Yes.
15   Q    Are you aware of what the Crawford County Library
16   System's current book challenge policy is?
17   A    No.
18   Q    Okay.  So you're not aware how a book is challenged
19   at all in the Crawford County Library System?
20   A    No.
21   Q    Okay.  That's all I have.
22        **MR. ADAMS:** That's it.
23        (WHEREUPON, at 12:05 p.m., the
24        above deposition concluded.)
25

Page 70

1              C E R T I F I C A T E
2
   STATE OF ARKANSAS }
3
   COUNTY OF FAULKNER }
4
   RE:   ORAL DEPOSITION OF MIEL ANN DELOREY PARTAIN
5
   I, Michelle R. Satterfield, CCR, a Notary Public in and
6  for Faulkner County, Arkansas, do hereby certify that the
   transcript of the foregoing deposition accurately reflects
7  the testimony given; and that the foregoing was
   transcribed by me, or under my supervision, on my Eclipse
8  computerized transcription system from my machine
   shorthand notes taken at the time and place set out on the
9  caption hereto, the witness having been duly cautioned and
   sworn, or affirmed, to tell the truth, the whole truth and
10 nothing but the truth.
   I FURTHER CERTIFY that I am neither counsel for, related
11 to, nor employed by any of the parties to the action in
   which this proceeding was taken; and, further that I am
12 not a relative or employee of any attorney or counsel
   employed by the parties hereto, nor financially
13 interested, or otherwise, in the outcome of this action.
   In accordance with the Arkansas Rules of Civil Procedure,
14 Rule 30(e), review of the foregoing transcript by the
   witness was not requested by the deponent or any party
15 thereto.
   GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 25th
16 day of March 2024.
17
18
19
20
21              _____
                Michelle R. Satterfield, CCR
22              LS Certificate No. 570
                Notary Public in and for
23              Faulkner County, Arkansas
24
25

## A

**ability (5)**
35:23;36:4,14,18,23
**able (13)**
9:20;14:6,14;49:4,
12,20;52:21,25;53:4,6;
55:22;65:18;66:13
**abnormal (1)**
24:13
**above (1)**
69:24
**Absolutely (1)**
55:25
**Abundance (2)**
37:6,21
**abuse (2)**
47:21;48:17
**access (6)**
13:22;32:15;49:12,
16,20,23
**accessed (1)**
49:10
**accessible (1)**
26:23
**accident (1)**
6:16
**account (3)**
16:11;20:15,16
**acquaintance (1)**
42:6
**acquaintances (1)**
41:17
**across (1)**
25:21
**Act (21)**
10:23,25;11:5,7,12,
19;26:17;27:4,8,21,25;
28:7;30:23;35:13;
46:14;52:18;53:7;
54:8;55:1,8;56:1
**activities (2)**
22:2;58:14
**activity (2)**
56:17;68:19
**actually (4)**
19:7;41:12;47:2;
63:21
**Adams (12)**
43:22,23;44:10;
56:9;57:12;63:14;
64:23;67:25;68:13,25;
69:6,22
**address (1)**
48:10
**adopt (6)**
27:16,23;29:13;
30:23;31:12;32:7
**adult (3)**
25:2,12;56:15
**adults (2)**
25:15;49:13

**adults-only (1)**
55:24
**Advocates (5)**
38:18;39:8;40:4;
41:4;45:15
**advocating (3)**
40:5,7,10
**affect (3)**
49:19;51:6,24
**affects (1)**
49:23
**affirmed (1)**
6:3
**afterwards (1)**
16:14
**again (14)**
13:13;14:4;16:9;
27:12;28:22;35:8,16;
46:12;47:15;48:2,9;
51:11;52:6;56:13
**age (4)**
15:3;21:6;49:11;
52:23
**ages (1)**
52:12
**ago (4)**
22:7,10;37:14;69:13
**agree (1)**
17:17
**ahead (3)**
22:19;29:4;69:6
**alleged (1)**
22:25
**alliance (1)**
41:24
**allow (2)**
65:24;67:15
**allowed (11)**
33:10;55:10;61:11,
12,14,15,17,18,23;
66:4,14
**allows (1)**
66:2
**almost (2)**
60:13,17
**alone (2)**
8:23;9:2
**always (1)**
10:5
**Amend (1)**
10:6
**America (1)**
40:4
**American (4)**
38:18;39:8;41:4;
45:15
**among (1)**
26:21
**ANN (2)**
6:1,10
**announced (1)**
24:24
**Anxiety (1)**

26:2
**anyways (1)**
49:21
**appearance (1)**
40:1
**appeared (1)**
60:18
**application (1)**
66:6
**apply (1)**
50:20
**appointed (4)**
24:19;28:15;29:20;
53:10
**appointing (2)**
29:10,16
**appreciate (1)**
46:10
**approximately (2)**
25:18,21
**area (4)**
11:16,21;12:4,4;
25:2;49:5,7,10;50:5,6;
52:21,22;56:24;58:14;
66:20
**areas (1)**
49:25
**Arkansas (4)**
7:10;8:21;9:8;11:2
**Around (5)**
12:20;23:16;41:18;
59:20,24
**articles (1)**
18:9
**aside (4)**
36:17;51:25;62:22;
67:9
**assume (3)**
33:2;40:21;50:8
**attached (1)**
10:8
**attacking (1)**
39:19
**attendance (1)**
9:12
**attended (4)**
16:6,24;44:19,22
**attending (1)**
20:2
**attention (3)**
50:2,7;51:15
**attitude (2)**
54:1,7
**Attorney (5)**
26:20;35:9;46:6;
48:3;57:19
**attorneys (2)**
42:24;46:8
**August (1)**
26:22
**automated (1)**
22:11
**availability (2)**

35:11,13
**average (1)**
21:21
**aware (27)**
12:19,22;13:14,15;
15:20;16:23;17:2;
18:7;19:16;25:20;
34:1,19;35:22;36:20,
22;37:2;38:8,15;47:15,
24;48:19;49:15;63:5,
11,13;69:15,18
**away (1)**
35:11

## B

**babysitting (1)**
58:4
**back (8)**
33:19,22;34:2,15;
35:4;43:4;48:10;67:1
**bad (1)**
50:14
**bar (1)**
62:15
**Barling (1)**
9:11
**based (13)**
12:3;27:20;29:22;
30:23;31:7;32:2,8,10;
54:18,21,24;55:4;57:6
**basis (1)**
27:19
**become (5)**
12:18;13:14,15;
38:8,15
**beginning (1)**
60:3
**behalf (5)**
9:15,16,19,21;10:2
**behind (4)**
22:12,13;53:1;62:15
**belief (5)**
27:16,22;29:3;
41:16;42:5
**beliefs (8)**
28:6;29:24;30:3,7,
12,14,15;31:21
**Believes (1)**
25:25
**belong (1)**
67:10
**below (2)**
23:18,25
**besides (3)**
18:21;20:11;24:20
**better (2)**
43:15;67:20
**Bettina (1)**
63:18
**bit (2)**
47:2;69:13
**bits (1)**

16:8
**blow (1)**
40:2
**Board (30)**
13:8,24;16:6,24;
17:18;24:19,20;28:16;
29:11,17,20;30:8,17;
31:8;32:14;39:2;
44:22,25;53:11,16,24;
54:22;59:13,23,24,25;
60:4;62:22;63:24;
64:19
**body (1)**
49:8
**book (29)**
13:22;18:19,25;
26:9;33:3;35:18,20,24;
36:5,14,18,21,24;
48:19;49:4,9;55:11,14,
14,22;56:15;57:6;
58:19;59:3;65:24;
66:5;68:18;69:16,18
**books (58)**
12:7;14:15;17:23;
18:12,16,20,21;20:4;
24:16;25:1,18,21,24,
25;26:3,6;30:20;
31:20;32:18;33:19,22;
34:2,8,15;35:4;37:2,5,
8,16,20;45:20,21;47:1,
5,14,24;49:10,15,20;
50:4;53:7;54:2,9,15,
23;56:3,14,19;57:3;
58:15;64:14,15,16,20;
66:19;67:19,25;68:5
**born (1)**
8:20
**borrow (2)**
13:22;14:1
**both (7)**
9:15;18:4;41:18;
45:9;53:16;54:21;
64:18
**bottom (1)**
22:23
**Boy (4)**
37:6,6,25,25
**brain (1)**
38:11
**Branch (7)**
19:9,23;20:12;
21:17;25:6,19;58:10
**branches (4)**
19:14,18;24:25;
25:22
**breach (1)**
42:22
**break (2)**
45:25;46:2
**Brief (1)**
46:3
**briefly (3)**
11:6,9;12:16

**bringing (2)**
9:21;10:1
**broad (1)**
63:15
**broken (1)**
62:6
**brought (5)**
6:22;8:21;9:15;
10:22;22:2
**BROWNSTEIN (28)**
7:16,23;8:24;10:7,
15;28:25;29:5;31:2;
35:7,16;36:10;38:3;
40:22;42:23;43:3,17;
44:11;48:2;50:25;
51:11,14;52:8;54:13;
56:6;59:12;67:3;
68:10,21
**browse (1)**
53:7
**buckets (1)**
65:15
**budgetary (1)**
63:9
**Buren (8)**
19:9,22;20:12;
21:17;25:6,8;37:13;
58:10
**business (1)**
24:15
**buy (1)**
57:9

## C

**call (6)**
12:7,8;13:4;42:6;
46:15,16
**calls (3)**
51:1,12;54:11
**came (3)**
41:11,11;63:17
**Can (19)**
6:8;9:24;14:1;22:17;
25:10;27:22;29:11;
31:23;32:18,23;34:4;
37:7;39:20;48:9;57:6;
65:6,8,9,11
**Caplinger (2)**
16:2,4
**caption (2)**
23:24;34:11
**car (1)**
6:16
**card (8)**
20:19,25;21:2,6,13,
16;55:18,21
**caregiver (1)**
24:15
**caregivers (1)**
14:20
**case (4)**
6:15;8:23;18:4;46:8

**cases (1)**
18:4
**casually (1)**
41:17
**cautioned (1)**
6:3
**caveat (1)**
47:16
**CCL (2)**
24:24,25
**certain (6)**
23:19,21;40:14,17;
53:23;65:3
**certainly (2)**
42:8;47:10
**Chair (1)**
30:8
**Challenge (18)**
46:16;49:2,4,16,19;
51:10,24;65:22,22;
66:2;67:7,7,16;69:11,
11,12,12,16
**challenged (4)**
46:14;55:11,23;
69:18
**challenges (5)**
54:23,25;55:1,3,10
**chance (1)**
42:18
**changes (1)**
26:15
**changing (1)**
26:18
**characters (1)**
50:13
**charges (1)**
36:15
**checked (6)**
22:5,10,14;26:9;
35:18,20
**checking (1)**
20:4
**checkout (10)**
14:6,15;21:23;
22:11;35:23;36:4,14,
18,21,24
**child (2)**
24:15;32:14
**children (17)**
10:9,18;11:16,20;
13:21,21;14:6,7,13,17,
19;24:16;27:19;49:22;
51:25;52:20;55:7
**children's (3)**
25:1,1;58:14
**choose (1)**
61:12
**chose (2)**
67:14,15
**Chris (1)**
24:18
**circuit (1)**
8:15

**circulation (6)**
22:12,13;65:25;
66:5,12;67:1
**citizen (1)**
13:25
**citizens (2)**
32:14;56:3
**claims (2)**
9:15,21;10:2
**clarify (1)**
19:7
**clean (2)**
14:22;19:3
**clear (2)**
34:22;43:9
**clerk's (1)**
8:16
**clips (11)**
16:11,16,19;59:21,
22,25;60:8,15,18;62:6,
17
**close (2)**
24:11;42:6
**co-counsel (1)**
68:21
**collection (2)**
12:7;50:4
**coming (1)**
26:16
**comment (1)**
39:24
**commented (2)**
39:13,14
**comments (2)**
23:18;40:1
**communication (4)**
13:3,4,7,10
**communities (1)**
40:10
**community (10)**
14:1;24:12;31:14;
33:1;40:8,9;45:17;
56:24;64:9,25
**Complaint (12)**
10:6;33:21,24;34:3,
7,9,13,13,23;35:2,3,8
**complete (1)**
18:18
**completely (1)**
66:10
**compliance (1)**
26:22
**complying (1)**
11:7
**compromise (1)**
45:19
**concern (4)**
30:22;31:1,21;66:24
**concerning (1)**
65:22
**concerns (2)**
31:19,20
**concluded (1)**

69:24
**conduct (2)**
47:21;48:13
**confusing (1)**
67:4
**connected (2)**
21:16;42:20
**consent (1)**
21:12
**consider (1)**
56:1
**considered (1)**
48:6
**contained (1)**
27:21
**containing (2)**
27:17,24
**contains (1)**
25:25
**content (2)**
54:24;56:20
**contents (2)**
43:1,20
**continue (1)**
26:18
**conversation (4)**
43:2,19;44:1;57:18
**conversations (1)**
45:18
**convoluted (1)**
31:3
**cookie (1)**
7:11
**Co-Plaintiff (1)**
16:2
**corrected (1)**
10:7
**correctly (1)**
23:6
**Council (1)**
7:9
**counter (6)**
67:6,6;69:11,11,11,
12
**County (56)**
8:17;9:4,5,10,11;
10:19,20,25;11:4,18;
12:23,25;13:5,17;16:7,
25;19:16;20:20;21:18;
22:6,24;24:18;25:19;
26:15,16,20,20;21:18;
16,23;28:7,13;29:11,
12,17;30:18,22;31:6,
12;32:7,9;34:8,17;
35:24;36:24;44:20;
53:13;58:1,9;63:5,10,
11;65:7,10;69:15,19
**couple (1)**
37:24
**court (24)**
6:18;35:13;44:20;
45:2,3,4;53:16,24;
54:2,8,19,22;59:13,17;

60:7,11,19,23;61:2;
62:8,13,16;63:12,23
**covered (1)**
47:5
**covers (1)**
47:2
**Crawford (48)**
8:17;9:4,5,10;10:18,
20,24;11:4,18;13:17;
16:7,25;19:16;20:20;
21:18;22:6,24;25:19;
26:15,16,20;27:3,16,
23;28:7,13;29:11,12,
17;30:18,22;31:6,12;
32:7,9;34:8,17;35:24;
36:24;44:20;58:1,9;
63:5,11;65:7,10;69:15,
19
**created (5)**
17:21;18:6;30:21;
51:18;66:21
**creating (2)**
26:23;28:3
**creation (2)**
27:6;64:12
**criminal (2)**
46:15,23
**curious (2)**
33:12;41:11
**current (6)**
50:17,21;51:7,15;
54:16;69:16
**Currently (2)**
32:20;57:25
**cut (1)**
69:5

## D

**date (1)**
20:23
**daughter (17)**
10:13;12:21;16:24;
20:1,11;21:4;26:5;
35:20;36:20;37:22;
41:23;42:10,13,15;
47:12;50:18;57:16
**daughter's (3)**
9:13,19;20:2
**day (3)**
44:13,13;60:12
**days (3)**
22:7,10;37:14
**dealing (1)**
15:21
**dearly (1)**
24:12
**December (10)**
12:20;13:15;23:16;
24:6,18;38:9;43:7,9,
24;44:9
**decide (3)**
13:25;32:14;49:8

**deciding (1)**
49:8
**deemed (2)**
11:15,20
**Defendant's (2)**
10:6,8
**defined (1)**
14:14
**defines (1)**
47:19
**definition (10)**
14:7;47:7,10,15,22;
48:1,7;49:9;56:11;
69:1
**definitively (1)**
18:22
**defunded (2)**
62:25;63:3
**Deidre (5)**
13:11;18:5,7;23:1;
30:20
**delineate (1)**
10:2
**delineation (1)**
65:2
**DELOREY (2)**
6:1,10
**denied (6)**
35:23;36:4,14,17,20,
23
**depended (1)**
16:17
**depends (1)**
58:15
**depicting (1)**
55:5
**depiction (2)**
68:1,17
**depicts (1)**
47:20
**deposition (6)**
6:11,13;9:13,18;
20:3;69:24
**described (1)**
51:18
**describes (1)**
47:20
**description (2)**
56:17;68:19
**designation (1)**
67:12
**desk (2)**
22:12,13
**details (1)**
62:20
**determined (1)**
18:13
**Diamonds (1)**
7:10
**difference (2)**
50:23;51:6
**different (6)**
12:6,11;14:4;15:16;

51:17;60:21
**difficult (1)**
28:23
**direction (2)**
27:7;67:16
**directly (1)**
42:13
**Director (3)**
13:11;18:5;23:1
**Directors (1)**
24:19
**disarming (1)**
29:7
**disbanded (1)**
35:15
**discuss (3)**
9:24;15:12,14
**discussed (3)**
62:18,19;64:5
**discussing (5)**
27:18;59:14;64:23;
65:4,21
**disgusted (1)**
24:9
**disgusting (1)**
24:10
**displayed (1)**
60:24
**done (2)**
22:20;28:3
**down (3)**
6:23;22:22;56:16
**drafted (1)**
35:8
**due (2)**
9:1;36:15
**During (3)**
9:18;63:17;64:5

**E**

**earlier (7)**
10:7;19:6;20:3;27:2;
35:20;40:24;65:21
**early (1)**
64:2
**effect (7)**
10:23;27:21;52:18,
19;53:8;54:9;55:9
**eight (2)**
52:13;57:22
**eighteen (1)**
26:24
**eight-year-old (4)**
58:1,8;59:1,5
**either (4)**
26:3,5;37:8,16
**else (9)**
24:20;28:11,20;
29:11;30:3;43:19,21,
25;44:3
**email (3)**
12:22,25;13:4

**employees (1)**
23:1
**encourage (1)**
17:4
**end (5)**
14:23;26:24;51:19;
60:3;69:1
**ended (2)**
7:12;44:14
**enforce (3)**
10:25;11:8,11
**engage (1)**
38:6
**enjoins (1)**
35:13
**enough (2)**
50:11;67:23
**entails (1)**
47:8
**entire (4)**
16:15;59:24;60:2,3
**entirety (1)**
59:18
**Equal (2)**
40:8,9
**Equality (5)**
38:18;39:8;40:4;
41:4;45:15
**equating (1)**
23:2
**even (2)**
44:12;55:18
**evening (1)**
60:17
**eventually (1)**
57:16
**everybody (1)**
50:6
**evidence (2)**
18:4;28:9
**evidentiary (1)**
28:12
**exact (1)**
20:22
**exactly (1)**
7:16
**EXAMINATION (8)**
6:6;46:4;52:7;56:8;
57:13;65:13;68:12;
69:8
**example (1)**
49:13
**except (1)**
24:15
**excitement (2)**
47:21;48:15
**Excuse (1)**
52:18
**exist (2)**
50:24;67:22
**existed (1)**
42:17
**expect (2)**

47:10;56:23
**explain (2)**
46:19;50:3
**explained (1)**
37:22
**explaining (2)**
24:1;51:20
**Exploring (1)**
26:1
**exposed (1)**
24:16
**express (1)**
62:4
**expressed (1)**
54:2
**extension (1)**
49:22
**extra (1)**
46:12

**F**

**Facebook (4)**
38:16,17,19;39:12
**fact (10)**
16:9,19;32:4;45:1,5;
53:19;65:21;66:12,25;
67:5
**fair (2)**
47:9;67:23
**fairly (1)**
46:24
**fall (2)**
43:5;47:15
**familiar (1)**
19:25
**family (2)**
23:4;55:6
**far (1)**
28:11
**fault (1)**
36:12
**favor (3)**
6:25;61:22,24
**fee (1)**
36:15
**feel (6)**
31:24;46:21;50:9,
11;51:21;68:22
**feelings (1)**
31:14
**fees (1)**
36:25
**fellow (1)**
16:1
**felt (2)**
29:19,22
**few (2)**
24:11;52:9
**figure (1)**
13:13
**find (2)**
46:12;56:24

**fine (5)**
9:24;16:1;43:14,16;
69:2
**fingers (1)**
41:9
**finish (1)**
38:12
**firm (4)**
7:25;8:4,9,11
**firms (1)**
8:13
**first (9)**
12:18;13:14;19:4,
23;20:24;34:9;38:8;
46:9;59:17
**firsthand (1)**
18:1
**fit (1)**
48:1
**five (5)**
19:16,17,19;21:22;
25:22
**flip (3)**
22:17,22;34:9
**follow (3)**
48:23;56:10;57:18
**following (1)**
63:19
**follows (1)**
6:5
**follow-up (1)**
69:4
**forget (2)**
46:19;51:21
**form (3)**
51:3,13;68:24
**formed (2)**
30:11,14
**former (1)**
18:5
**Fort (1)**
8:10
**forward (1)**
38:11
**found (2)**
39:7;41:13
**four (4)**
10:18;57:20,21;
65:17
**Free (3)**
41:18;42:2;46:21
**friends (1)**
13:16
**full (1)**
17:17
**fun (1)**
39:17
**funding (6)**
62:18,22,22;63:6,12,
16
**further (6)**
56:2;57:13;65:13;
68:11,12;69:8

## G

**gave (1)**
18:2
**gay-straight (1)**
41:24
**general (5)**
55:14;64:14;65:24;
66:12;67:1
**generally (2)**
55:4;56:23
**General's (1)**
46:7
**gets (1)**
63:5
**Gilstrap (3)**
12:23;13:1,5
**Girl (4)**
7:9,9,11;22:2
**given (2)**
6:11;30:11
**giving (2)**
24:1,3
**glaring (1)**
67:5
**goes (2)**
27:21;55:9
**Good (3)**
6:8,24;7:14
**Gotcha (6)**
6:17;12:1;16:20;
21:17;28:23;58:5
**government (4)**
13:24;14:15,23;
32:13
**Governor (1)**
39:17
**Governor's (1)**
39:25
**grade (1)**
14:8
**grandchild (3)**
58:9;59:2,5
**grandchildren (8)**
52:10,22;57:19,21;
58:18,20;65:18,19
**grandkid (1)**
57:8
**great (1)**
15:25
**greater (1)**
23:4
**group (10)**
38:16,17,19,24;39:2,
5;40:13;41:1;45:15;
61:13
**groups (1)**
41:18
**Grzymala (5)**
13:11;18:5,7;23:1;
30:20
**guess (9)**

22:18;31:23;38:3;
40:18,19,21,22;41:7;
66:16

## H

**half (1)**
21:5
**Hamby (16)**
15:5;22:25;23:9;
24:19,21;28:18,19;
29:16;30:17,18,19;
31:8,18;33:2,2;53:10
**Hamby's (2)**
30:3,7
**hand (2)**
34:14;57:8
**happen (7)**
13:14,17;33:7,9,11,
13,18
**happened (1)**
62:5
**happening (2)**
60:13;64:8
**happens (1)**
42:21
**happy (1)**
46:20
**harm (2)**
27:18;47:6
**harmful (6)**
11:15;47:6,7,22;
48:6;49:9;55:7;56:12;
64:24;69:1
**hear (1)**
54:4
**heard (5)**
45:17,21;53:21;
54:18,21
**hearing (1)**
62:2
**helpful (3)**
41:6,7,25
**helps (1)**
15:17
**hereinbefore (1)**
6:2
**hereto (1)**
10:8
**heterosexual (2)**
23:3,3
**hey (1)**
46:19
**high (2)**
31:24;32:2
**highlighting (1)**
67:13
**hold (1)**
20:22
**Holmes (1)**
8:5
**home (1)**
49:23

**homosexual (2)**
23:2;55:5
**Hopkins (1)**
8:5
**hosting (1)**
58:16
**housed (2)**
35:4;64:20
**household (1)**
49:24
**Huckabee (1)**
39:17
**huge (1)**
12:15
**Hugs (2)**
41:19;42:3

## I

**imagine (2)**
17:25;57:6
**immediately (1)**
52:4
**implement (2)**
27:3;28:7
**implemented (2)**
11:5;51:8
**implementing (2)**
11:19;27:7
**inaccessible (4)**
11:17,21;12:4,14
**inappropriate (3)**
11:20;56:21;57:7
**include (2)**
53:21;65:23
**included (7)**
54:3;56:16;66:4;
68:1,5,17,19
**indicate (1)**
29:17
**individual (1)**
56:14
**information (4)**
27:16,22;28:6;29:3
**innocence (1)**
27:19
**in-person (1)**
13:4
**input (1)**
55:22
**ins (1)**
47:11
**intend (1)**
29:13
**intends (2)**
27:16;32:7
**interacted (2)**
39:4,6
**interested (2)**
41:25;42:8
**interests (1)**
50:12
**interfere (1)**

14:24
**interfering (1)**
14:16
**interrupt (1)**
46:21
**into (26)**
10:23;17:24;25:1,
10;26:22;27:21;30:20;
32:19;33:3;49:5,10,25;
52:18,19,22;53:8;54:9,
9;55:9,15,22,23;56:14;
62:6;64:16;67:1
**invited (1)**
38:21
**involved (8)**
6:16;15:14,21;
41:12,14;42:11;43:19,
25
**Iowa (1)**
8:20
**issue (14)**
65:25;66:5,7,8,11,
15,16,18;67:2,5,10,15,
17,18
**issues' (1)**
27:18
**item (2)**
47:19;66:12
**items (5)**
46:25;47:2,5,14,24

## J

**January (5)**
16:24;24:24;40:15;
43:7,9
**Jeff (3)**
23:8;30:19;33:2
**Jeffrey (1)**
22:25
**job (1)**
46:12
**join (4)**
38:19,21;40:25;41:5
**joining (2)**
42:1,15
**Judge (7)**
12:23,25;13:5;
24:18;53:12,13,21
**judges (1)**
47:17
**jumping (1)**
38:11

## K

**Katherines (2)**
37:6,21
**keep (5)**
46:1;55:14;65:24;
66:5,12
**Keith (3)**
24:18;53:12,21

**key (2)**
12:12,13
**kids (2)**
58:14,17
**kind (18)**
11:16;12:12;14:4;
18:4,6;23:24;30:6;
41:16,17;44:14;45:4,
19;55:7;56:15;57:16;
60:15;65:2;67:14
**kisses (2)**
37:6,25
**knew (4)**
29:19;42:4,18;45:3
**knowledge (3)**
18:1,18;26:7

## L

**labor-intensive (1)**
46:10
**largely (1)**
18:20
**last (4)**
22:5;38:14;52:13;
67:24
**late (3)**
36:7,15,25
**law (4)**
6:18;7:25;8:4,13
**laws (1)**
26:22
**lawsuit (18)**
10:21;15:14,21,24,
25;33:6,17;38:8,9,10;
39:7;41:3,5;42:16,17,
21;44:15;46:11
**lawyer (1)**
47:16
**lawyers (3)**
26:17;35:8;47:17
**leadership (2)**
39:2,9
**learn (1)**
41:14
**learned (1)**
41:3
**leave (2)**
33:10;53:1
**legal (1)**
47:10
**legally (1)**
48:5
**lend (1)**
30:6
**Leta (2)**
16:2,4
**letter (13)**
22:24;23:8,17,25;
24:7;26:14;28:15;
29:22;30:13,14,19;
32:4
**letting (2)**

17:14;54:5

**LGBTQ (16)**
18:21;24:12,25;
27:17,24;28:14;29:13,
18;30:23;31:7,13;
32:10;40:8;54:15,24;
66:19

**LGBTQ-themed (2)**
18:20;32:8

**librarians (3)**
20:3,8;22:3

**libraries (3)**
36:11;65:24;66:3

**Library (74)**
13:7,10,23,23,24,24;
14:1,2,7,15;16:6,24;
17:18,25;18:5;19:14;
20:16,19,20,25;21:2,6,
12,18;22:6;24:19,20;
25:13,19;26:16,19,21;
28:16;29:11;30:8,18;
32:14;35:24;36:24;
37:13;44:22,25;48:25;
52:16,20;53:2,11,16;
54:22;55:18,21;58:1,6,
9;59:13,23,24,25;60:4;
62:18,22,23;63:2,5,12,
23;65:7,10,19;66:3,14;
67:14;69:15,19

**lifestyles (2)**
23:3,3

**line (1)**
24:23

**lined (1)**
64:9

**list (3)**
28:5,12;29:2

**Listen (2)**
29:7,7

**literary (1)**
57:10

**litigation (1)**
63:16

**little (4)**
47:2;50:3;69:2,12

**live (3)**
9:10;10:18,20;
31:15;58:7;60:1;63:24

**lived (2)**
9:4;20:21

**living (1)**
7:8

**local (2)**
56:24;64:25

**located (2)**
35:25;37:10

**location (1)**
35:5

**lock (2)**
12:12,13

**long (5)**
7:19;8:6,11;9:4;
20:19,21;59:20

**longer (1)**
10:20

**look (10)**
14:1;19:24;20:9;
22:1,18,19;43:4;50:13;
54:16;58:15

**looks (1)**
39:19

**lost (1)**
62:24

**lot (6)**
8:24;9:1;41:15;42:5;
54:16;58:16

**loud (1)**
10:16

**love (1)**
24:12

**low (1)**
40:2

### M

**ma'am (1)**
49:3

**Madeline (6)**
41:25;42:7;43:15;
44:2;57:4,9

**main (1)**
68:17

**Major (1)**
26:1

**majority (3)**
54:8,15;60:2

**making (1)**
24:13

**Mandy (5)**
41:15;42:2,13,16,20

**many (2)**
38:23;64:9

**mark (1)**
10:5

**marked (1)**
10:8

**material (17)**
14:6;21:23;22:1,5,
10;23:4;28:14;29:14;
30:23;31:7;32:8,23;
47:19;65:4;68:3,4,6

**materials (12)**
11:15,19;22:14;
27:17,20,24;29:18;
31:13;32:10;48:20;
49:20;56:25

**may (9)**
9:18;35:10;48:8;
50:8;51:14,21;54:14;
62:1;64:2

**maybe (10)**
24:1;40:21;43:7;
44:12;45:10,19;57:8;
58:15;65:17;67:20

**MCLELLAND (28)**
6:7;7:18,24;9:1,3;

29:1,4,9;31:5;38:5,7;
39:20,23;40:23;45:24;
48:24;50:16;51:2,13;
54:11;57:14;63:17,22;
65:12;68:23;69:4,7,9

**mean (5)**
12:13;14:5;31:23;
32:3;34:20

**meaning (1)**
13:4

**media (8)**
13:16;16:10,11,16;
18:10;23:12,15;24:8

**meeting (21)**
16:6,17,25;17:4,6;
22:2;59:13,13,18,24,
25;60:4,7,11,19,23;
61:6;62:6;64:1,3,5

**meetings (21)**
16:18,20;17:18;
30:6,10;32:4;44:20,23,
25;45:2,3,4;53:16;
54:19,22,22;59:16;
60:12,21;61:1;62:16

**Member (3)**
30:8;55:18,21

**members (9)**
38:23;53:24;54:2;
55:10,12;62:8,10,14;
64:9

**mentioned (1)**
50:18

**merit (1)**
57:10

**met (1)**
49:9

**Michelle (1)**
6:23

**middle (1)**
7:13

**MIEL (2)**
6:1,10

**might (7)**
27:18;46:17;47:3;
55:13,19;66:13;68:17

**migration (1)**
8:25;9:1

**mind (2)**
51:21;52:4

**minor (2)**
21:9,11

**minors (11)**
11:17,21;12:5,14;
20:4;47:6;48:6;49:9;
56:12;64:24;69:2

**minor's (1)**
47:22

**mischaracterize (1)**
11:22

**modifying (1)**
26:18

**Mom (2)**
41:18;42:2

**moments (1)**
10:3

**money (3)**
36:6,7;55:19

**month (1)**
52:13

**more (9)**
17:14;26:15;47:2;
50:3;56:23;58:4;
63:19;66:15;67:2

**morning (2)**
6:8;9:12

**mostly (1)**
47:1

**move (3)**
20:24;48:23;67:23

**moved (10)**
11:20;17:23;21:2,3;
24:25;30:20;32:19,24;
33:22;35:4

**Mrs (1)**
46:6

**much (1)**
63:19

**multiple (3)**
59:21,22;60:12

**must (1)**
27:20;34:8

### N

**name (6)**
6:8;12:5,11;18:8;
34:11;40:5

**named (2)**
6:2;50:1

**narrow (1)**
56:16

**necessary (1)**
26:18

**need (4)**
7:1,2;9:24;34:3

**new (2)**
25:1;26:22

**newborns (3)**
52:14,15;57:23

**newspaper (1)**
21:24

**next (7)**
6:22;24:17,23;
41:12;42:21;44:13;
47:13

**Nina (2)**
15:9,20

**nine-year-old (4)**
56:20;57:8;65:3,6

**nine-years-olds (1)**
57:1

**nitpick (1)**
19:2

**Noah (2)**
46:6;68:15

**Noble (2)**

7:14,15

**None (1)**
10:20

**normal (3)**
46:11;50:14;55:6

**normalizing (1)**
23:2

**noted (1)**
36:13

**novel (3)**
56:15,16;68:16

**novels (2)**
56:19,25

**November (2)**
22:24;23:8

**nudity (3)**
47:20;48:11

**Number (2)**
24:11,14

### O

**oath (2)**
6:17;7:5

**object (9)**
31:2;35:7;48:2;
50:25;51:2,12,13;67:3;
68:23

**objected (1)**
55:12

**objecting (1)**
29:5

**objection (7)**
35:10,16;48:4,7;
54:11;66:13,14

**obligations (1)**
26:21

**occasion (1)**
58:2

**occurred (5)**
53:19;54:19;61:8,
25;62:2

**off (5)**
37:16;39:20,22;
46:23;69:5

**office (2)**
8:16;46:7

**often (4)**
21:17,19,20;58:3

**Oklahoma (3)**
7:10;8:2;58:7

**old (5)**
10:11;21:3;50:11;
57:22,22

**older (5)**
13:21;14:6,7,13;
25:10

**once (2)**
27:21;55:11

**one (22)**
8:7;20:24;21:5;
24:11;28:8,8;39:13;
46:17,18;47:3,12;

48:21;56:10;57:21;
59:20;61:1,12,17,18,
23;67:20;69:4

**ones (1)**
52:15

**online (10)**
41:23

**only (10)**
11:24;25:5,9,9,15;
31:10,23;37:7;61:23;
65:16

**operate (1)**
49:7

**opine (1)**
48:5

**opinion (12)**
14:17;24:2,3;28:7;
30:11;54:7,12,23;62:4;
64:10,13;67:11

**opinions (1)**
54:4

**opportunity (1)**
56:2

**oppose (2)**
55:13;56:3

**opposed (3)**
54:5;61:2;68:19

**opposing (1)**
61:10

**opposite (1)**
67:16

**opposition (2)**
61:2,15

**organization (2)**
39:10;40:6

**originally (2)**
8:18,19

**others (2)**
30:11;31:24

**out (23)**
10:15;13:13;15:17;
17:15;20:4;22:5,10,14;
25:1;26:9;32:24;
35:18,20;39:7;41:8,13,
21;42:10,16;57:17;
58:19;59:2;64:17

**outfit (2)**
39:17,25

**outs (1)**
47:11

**outside (1)**
64:20

**over (4)**
6:24;22:17,22;50:5

**overflowing (1)**
17:15

**owe (1)**
55:19

**owed (2)**
36:6,7

**own (2)**
49:18;66:20

## P

**packed (1)**
17:13

**Page (6)**
22:17,22;34:9;
39:12;46:22;66:24

**Paragraph (8)**
22:18,23;24:17,17;
25:17;26:14;27:15;
32:6

**Paragraphs (1)**
22:19

**paralegal (3)**
7:22;8:6,12

**parent (2)**
24:15;58:5

**parental (1)**
21:12

**parents (1)**
14:19

**parsing (1)**
69:1

**part (7)**
38:23;41:18;46:11;
47:22;55:14;57:15;
63:9

**PARTAIN (6)**
6:1,8,10;10:9;46:6;
57:15

**participation (1)**
23:4

**particular (2)**
16:20;54:1

**parts (2)**
46:15;60:12

**pass (2)**
45:24;56:7

**passed (2)**
52:18,19

**past (1)**
21:20

**paying (2)**
50:1,7

**people (25)**
16:10;17:14,15;
24:11;32:18,23;42:9;
45:9,18,19,20;50:1,8,9,
10;51:17,21;54:5;55:5,
11;61:10,22;64:16;
65:24;66:11

**perceive (1)**
51:5

**performance (1)**
47:20

**permission (2)**
17:6,7

**person (7)**
17:19;44:5,8;60:1;
61:14,17,18

**personal (3)**
31:14,21;56:13

**personally (3)**
18:23;49:17;52:2

**phone (3)**
13:4;44:5,6

**phrase (1)**
18:3

**physically (3)**
17:23;19:4,7

**pick (3)**
18:23;58:19;59:2

**piece (1)**
48:25

**pieces (3)**
16:8,10;28:9

**place (2)**
32:1,3

**placed (5)**
25:18;33:3;34:2,15;
36:2

**Plaintiff (1)**
42:1

**plan (1)**
47:25

**play (3)**
11:25;21:24;28:23

**please (6)**
6:9;7:1,2;11:22;
34:9;46:19

**pm (1)**
69:23

**point (8)**
6:22;12:7;41:9;
44:10;46:18;55:4,13;
68:15

**points (1)**
9:18

**policies (1)**
26:19

**policy (8)**
27:17,23;29:13;
30:23;31:12;32:7;
66:6;69:16

**population (1)**
55:14

**portion (2)**
33:21;34:1

**positive (1)**
64:3

**possibly (1)**
48:4

**post (2)**
23:17;39:24

**posted (6)**
16:10,12;23:13;
24:7;41:22;45:10

**posting (1)**
24:2

**posts (3)**
23:24;39:12;45:14

**potential (1)**
51:6

**Prater (3)**
15:9,11,20

**predominant (2)**
47:23;68:6

**predominantly (1)**
48:21

**present (1)**
55:9

**Pretty (2)**
44:12;63:14

**prevail (2)**
33:6,17

**prevent (1)**
7:6

**preventing (1)**
7:4

**previewed (1)**
26:17

**previous (2)**
31:17;68:5

**previously (2)**
6:2;67:25

**primarily (2)**
45:14;58:10

**privilege (1)**
42:23

**probability (2)**
31:25;32:2

**Probably (1)**
22:9

**problem (2)**
56:1,5

**procedure (1)**
33:4

**procedures (1)**
26:19

**process (2)**
63:9;67:10

**prompted (1)**
19:23

**prosecuting (1)**
46:7

**proud (1)**
41:23

**provide (1)**
56:2

**provision (13)**
35:12,14;46:15,17,
23;49:16,19;51:24;
55:11,12;65:22,23;
66:4

**public (2)**
55:10,13

**pull (1)**
67:1

**pursuant (1)**
27:25

**put (10)**
18:13;28:13;42:8;
49:5,10;50:4;54:9;
55:15,23;62:25

**putting (1)**
11:16

**puzzles (2)**
21:24;58:15

## Q

**quickly (1)**
44:12

**quite (1)**
31:3

**Quorum (22)**
44:20;45:2,3,4;
53:16,24;54:2,8,19,21;
59:13,17;60:7,10,19,
23;61:2;62:8,13,16;
63:11,23

**quote (8)**
23:1;24:25;26:17,
21,23,24;29:21;45:19

**quote'social (1)**
27:18

## R

**raise (3)**
65:25;66:13,14

**reached (2)**
41:8,21;42:10,16

**reaction (1)**
51:16

**read (26)**
14:24;18:9;21:24;
22:20;23:6,20;24:6,8;
26:3,5,25;33:24;37:8;
47:12,13,25;48:20;
56:15,15,16,25;57:4,7;
67:25;68:5,16

**reading (2)**
29:22;47:25

**real (4)**
16:18;60:13,16,17

**really (3)**
31:24;47:7;68:14

**reason (4)**
17:12;36:10,18,25

**reasoning (1)**
36:17

**reasons (1)**
31:10

**Rebecka (2)**
15:7,20

**recall (10)**
6:14;23:22,25;24:4,
5;37:7;38:22;50:16;
64:1,22

**received (1)**
51:16

**receiving (1)**
65:3

**recess (1)**
46:3

**recognize (1)**
61:10

**record (9)**
6:9;14:22;18:4;19:3;
34:21;36:12,13;39:20,

22
**Recorded (1)**
45:10
**recording (1)**
16:15
**recordings (3)**
16:14;45:7,8
**records (1)**
43:4
**refer (1)**
9:25
**referring (5)**
14:25;19:8;20:17;
25:3;28:17
**regardless (2)**
8:11;35:24
**relate (1)**
50:13
**related (1)**
39:24
**relation (3)**
64:8,20,24
**relationship (3)**
8:22;37:24;39:5
**relationships (2)**
9:2;55:6
**relevant (1)**
63:15
**Religions (1)**
26:1
**remedy (2)**
67:14,17
**remember (24)**
20:2,6;21:8;23:15;
26:9;27:4;39:14;
50:17;59:14;60:4,7;
61:4,6,24;62:2,10,16,
21;63:2;64:4,7,23;
65:4;69:10
**remembered (1)**
68:18
**removed (5)**
31:17,18,18;45:20,
21
**renew (1)**
35:16
**repeat (2)**
7:1;34:21
**rephrase (5)**
7:2;12:18;17:5,5;
66:9
**representative (3)**
61:12,15,23
**representing (1)**
46:7
**request (4)**
32:18,23;33:3;40:25
**require (1)**
35:12
**required (1)**
11:13
**requirement (1)**
65:23

**residents (1)**
22:24
**respect (1)**
56:11
**respectfully (1)**
10:1
**respective (2)**
25:2;33:20
**respond (1)**
10:1
**rest (2)**
50:14;61:20
**restricted (2)**
25:8,9
**returned (1)**
34:8
**returns (1)**
36:7
**reverse (1)**
69:12
**review (1)**
34:3
**reviewed (1)**
34:23
**reviewing (1)**
34:14
**right (29)**
6:11;7:12;9:16;
11:11,18,21;14:3,3;
19:1,15;25:6,13;26:25;
28:9,22;31:8,25;40:2;
41:1;44:19;45:17;
53:17;62:7;63:24;
65:15;67:1,8,15;68:8
**rights (3)**
40:8,9,10
**risk (3)**
62:24,25;63:2
**role (2)**
30:8;39:9
**room (5)**
17:15;22:2;45:9;
50:12,15
**round-robin (1)**
57:16
**Rowlett (5)**
15:18,21;39:1,4;
40:19
**run (1)**
57:17

**S**

**sadomasochistic (2)**
47:21;48:17
**Salacious (3)**
68:3,4,6
**Samantha (5)**
15:18,21;39:1;
40:19,21
**same (16)**
6:25;12:20;30:22;
41:16,18,22;42:5;

44:12;46:22;50:20;
57:3;60:10,17,19;66:2,
23
**save (1)**
22:18
**saw (9)**
19:8,10,22;23:15;
24:7;37:12;54:18;
62:17;63:24
**saying (5)**
17:14;27:4;29:6;
55:16;61:4
**school (1)**
41:24
**Scout (1)**
22:2
**Scouts (3)**
7:9,9,11
**season (1)**
7:11
**Sebastian (1)**
9:11
**second (1)**
39:21
**Section (114)**
12:9,19;13:8,11;
15:12,22;17:21,24;
18:6,13,14,17,19;19:5,
8,9,10,20,22,24;20:4,9,
13;22:15;24:13;25:1,3,
5,8,12,12,19,25;26:10,
12,23;27:7;28:4,8,22;
29:10;30:21,21;31:7,
18;32:5,19,24;33:3,8,
18,22;34:2,8,15,16;
35:3,4,6,14,19,21;37:3,
11,12;45:18;46:16,17,
24;47:5,12;48:24;49:1,
2,18;50:17,21;51:7,9,
10,16,24;53:2;54:3,6,
17;55:1,8,15,24;58:19,
23;59:2,6,10,11;61:3,
11,22;62:3,9,11;64:6,
8,12,13,14,15,17,17,
21;65:6,9;66:21
**Sections (4)**
19:12;25:21;33:20;
54:10
**sections' (1)**
25:2
**seeking (1)**
10:24
**seem (1)**
42:5
**seemed (2)**
41:8,22
**segregate (8)**
28:13;29:13,18;
30:23;31:7,13;32:8,9
**segregated (4)**
27:20;55:15,23;56:4
**selection (1)**
23:5

**self-checkout (1)**
22:11
**send (5)**
12:25;13:3,3,7,10
**sent (2)**
12:22;23:9
**sentence (2)**
25:3;38:12
**separate (1)**
50:5
**sequestered (7)**
27:25;31:20;49:5,6;
51:9;52:21;54:10
**sequestering (1)**
67:18
**serve (1)**
39:9
**serves (1)**
39:1
**setting (1)**
51:25
**settled (1)**
55:20
**seven (1)**
52:13
**seventeen (1)**
10:13
**seventeen-year-old (2)**
65:3,9
**sexual (7)**
47:20,21;48:13,15;
56:17,20;68:19
**sexuality (1)**
68:17
**share (2)**
27:23;41:15
**shelves (1)**
37:17
**shortly (1)**
40:15
**show (2)**
28:6,13
**showed (1)**
23:17
**side (1)**
62:3
**signaled (1)**
26:15
**similar (1)**
50:18
**single (2)**
18:24,25
**situation (2)**
51:18;57:6
**Sixth (1)**
14:8
**Skip (2)**
26:14;59:24
**skipped (1)**
59:20
**Smith (1)**
8:10
**snipits (1)**

45:7
**Social (102)**
12:9,19;13:8,11,16;
15:12,22;16:10,11,16;
17:21,24;18:6,9,13,13,
17,19;19:4,8,8,9,12,19,
22,24;20:4,9,13;22:15;
23:12,15;24:7;25:3,5,
8,12,19,21,25;26:9,12;
27:7;28:4,8,22;29:10;
30:20,21;31:7,17;32:5,
19,24;33:3,8,18,22;
34:2,8,15,16;35:2,4,6,
14,19,21;37:3,11,12;
45:18;50:17,21;51:7,
15;54:3,6,16;58:19,23;
59:2,6,10,11;61:3,11,
22;62:3,9,11;64:6,8,
12,13,14,15,17,17,20;
65:6,9
**society (1)**
24:14
**somebody (8)**
22:12,13;24:3;33:1;
39:17,19;41:15;60:14
**somehow (1)**
50:13
**someone (4)**
39:24;66:4,25;67:15
**somewhere (1)**
20:25
**sorry (8)**
8:7;19:2;38:11;
43:13;44:18;51:14;
52:13;57:21
**sort (2)**
47:9;56:13
**sought (2)**
23:4;45:19
**sound (1)**
24:13
**space (1)**
17:16
**speak (21)**
9:19;12:12;20:8,11,
14;22:3;31:23;42:13,
15,23;43:17,23;44:5;
54:6;61:3,11,13,15,17,
18,23
**speaking (3)**
53:22;62:8;64:16
**special (4)**
49:25;64:2;66:20,21
**specific (7)**
37:2;40:6;54:4;
62:10;64:4,15;66:25
**specifically (7)**
10:24;34:7,17;40:9;
47:8;52:1;66:11
**speculation (4)**
38:6;51:1,12;54:12
**spent (2)**
47:17,18

**spoke (7)**
15:11,15;20:13;
43:2,22;44:9,10
**spoken (9)**
15:5,7,9,15,18;16:1;
29:24;30:2,3
**spring (1)**
43:5
**staff (3)**
13:24;17:25;24:24
**standards (3)**
56:24;63:15;64:25
**start (3)**
10:5,5;46:23
**started (3)**
40:13,16;51:20
**starting (2)**
13:17;41:24
**state (2)**
6:8;11:2
**stated (3)**
27:3;33:15;34:11
**statement (1)**
14:3
**statements (1)**
30:10
**statute (2)**
47:1,19
**Steele (2)**
41:15;42:2
**step (3)**
27:7;48:10;67:20
**steps (6)**
11:6,11,12,14,18;
27:3
**stigma (4)**
49:24;50:3,20;51:23
**still (6)**
30:22;31:19;49:12;
66:7,16;67:9
**stop (1)**
10:23
**story (1)**
44:14
**straightforward (1)**
46:24
**stream (1)**
63:24
**streamed (1)**
60:5
**streaming (3)**
16:9,18;60:1
**stuff (2)**
48:24;66:24
**styles (1)**
55:6
**Subject (1)**
35:10
**substantiate (1)**
29:12
**successful (1)**
33:7
**successfully (1)**

55:23
**sufficient (1)**
57:10
**summaries (2)**
30:6,10
**summer (4)**
38:14;41:4,13;58:4
**sure (8)**
24:3;30:9;31:3;
40:20;46:21;66:9,11,
23
**sworn (1)**
6:3
**System (13)**
20:20;21:18;22:6;
26:16,21;30:18;35:24;
36:24;41:16;42:5;
65:7,10;69:19
**system's (3)**
26:19;62:18;69:16

**T**

**tacky (1)**
39:18
**talk (3)**
6:24;42:22;59:17
**talked (2)**
20:3;59:12
**talking (7)**
13:16;20:6;27:2;
46:19;47:1;51:20;
69:10
**talks (1)**
32:6
**Tammi (17)**
15:5;22:25;23:9;
24:19,21;28:17,19;
29:10,16;30:3,7,17,18;
31:8,18;33:2;53:10
**taxes (1)**
63:10
**Teams (1)**
44:5
**technical (2)**
47:9;68:14
**telling (1)**
7:6
**tells (1)**
42:20
**Ten (4)**
52:13,23;57:22,25
**ten-year-old (5)**
58:8;59:1,5;68:16,
18
**term (1)**
62:22
**terms (4)**
14:4;15:16;46:18;
50:18
**terrible (2)**
13:19,20
**testified (1)**

6:4
**testimony (4)**
12:2;14:23;18:3;
63:18
**Texas (1)**
7:10
**thanks (1)**
46:13
**themed (2)**
18:21;54:16
**themes (2)**
27:17,24
**then-CCL (1)**
22:25
**thereafter (1)**
44:10
**therein (1)**
27:21
**thinking (1)**
55:5
**Thirty (1)**
10:12
**though (2)**
22:4;55:18
**thought (4)**
11:7;13:19;39:18;
41:7
**three (3)**
8:15;65:15,16
**thumb (1)**
37:17
**times (1)**
21:22
**tiny (1)**
67:20
**title (1)**
38:4
**titles (2)**
37:2,5
**today (5)**
7:6;10:3;12:2;17:2;
46:9
**today's (1)**
9:18
**together (1)**
59:9
**told (3)**
39:18;42:17;57:15
**took (2)**
11:18,19
**topic (4)**
29:25;30:4;64:24;
68:6
**topics (3)**
48:19,21;64:4
**total (2)**
21:21,22
**totally (1)**
47:9
**touch (1)**
42:8
**towards (1)**
14:22

**trait (1)**
47:23
**traits (1)**
47:23
**transsexual (1)**
23:2
**tried (2)**
11:6,11
**troop (1)**
22:3
**truth (4)**
6:3,4,4;7:6
**try (6)**
10:2;17:18;48:10;
58:13;66:23,25
**trying (16)**
11:24,25;13:13;
14:5;18:2;19:2,2;
20:22;27:11;28:23,24;
29:2;38:11;41:9;
42:22;67:12
**turned (1)**
52:13
**Twelve-ish (1)**
14:10
**twenty-eight (1)**
10:12
**twenty-nine (1)**
10:12
**twenty-three (1)**
10:12
**Two (16)**
7:20;8:7,7;14:4;
22:7,10;24:14;26:3,5;
37:7,8,14;46:14;52:14;
57:19,22
**type (7)**
18:16,18;23:18,24;
39:9;42:22;64:19
**types (3)**
18:21;47:4;54:9
**typical (1)**
58:12

**U**

**unable (1)**
49:16
**unacceptable (1)**
57:1
**uncertain (1)**
40:12
**uncomfortable (2)**
50:10,19
**under (13)**
6:17;7:5;12:12,13;
15:3;26:24;47:5,15;
48:7;49:11;51:10;
52:23;55:1
**understands (1)**
50:6
**understood (1)**
33:13

**units' (1)**
23:4
**unpaid (1)**
36:15
**up (16)**
10:3;13:23;14:8,19;
18:23;32:13;44:14;
48:23;56:10;57:18;
62:6;63:16,17,19;64:9;
69:1
**upon (7)**
12:3;29:22;30:23;
31:7;32:2,8,10
**use (5)**
22:11;36:11;46:17,
18;47:3
**used (4)**
14:3,4;22:1;51:10
**user (1)**
55:21
**uses (1)**
47:1
**usually (2)**
22:1;58:13

**V**

**vaguely (1)**
37:21;63:7
**Van (8)**
19:9,22;20:12;
21:17;25:6,8;37:13;
58:10
**video (8)**
45:7;59:20,21,22;
60:7,15;62:6,17
**videos (6)**
53:16,21;59:13,14,
16;60:23
**view (4)**
48:20;55:4,13;57:3
**viewpoint (2)**
27:20;32:8
**viewpoints (1)**
32:10
**Virden (2)**
15:7,20
**visit (2)**
58:12,14
**vote (1)**
64:19

**W**

**watch (3)**
16:17;59:17,23
**watched (10)**
16:8,8,9,14,19,21;
53:15;60:1,18;61:9
**watching (3)**
16:15,16;60:15
**WATSON (8)**
45:25;46:5,6;51:4;

**56:10;65:14;68:8;**
**69:10**
**way (10)**
12:18;25:9;31:17;
35:2,3;39:19;51:23;
55:8;56:16;62:25
**week (3)**
19:6,10,23
**weren't (1)**
61:11
**What's (6)**
10:21;14:9;15:24;
37:23;58:12;63:8
**When's (1)**
22:5
**WHEREUPON (1)**
69:23
**whole (4)**
6:4;44:14;67:10,18
**who's (1)**
50:7
**whose (1)**
16:11
**win (1)**
33:6
**Winter (1)**
43:6
**withdraw (1)**
69:2
**withheld (1)**
63:12
**within (2)**
11:2;25:2
**without (2)**
14:15;65:19
**witness (3)**
6:2;46:2;56:7
**woman (2)**
28:15,17
**word (2)**
46:25;51:9
**words (1)**
49:18
**wore (1)**
39:18
**work (4)**
7:9,14,15;47:23
**worked (1)**
8:15
**works (1)**
49:1
**World's (1)**
26:1
**written (2)**
55:8;56:2
**wrong (2)**
30:9;50:14
**wrote (4)**
26:20;28:15;30:19,
19

**Y**

**year (3)**
6:14;8:7;21:20
**years (8)**
7:20;8:7,7,15;15:15;
25:10;57:22,22
**young (1)**
37:24
**younger (2)**
14:17;15:1
**youngest (1)**
10:13
**youth (3)**
13:25;14:24,25

**1**

**1 (5)**
10:6,8;46:16,24;
47:5
**10 (2)**
22:24;24:24
**10th (2)**
16:24;23:8
**11 (1)**
15:1
**12 (5)**
14:9,11,14,18,25
**12:05 (1)**
69:23
**17-year-old (1)**
57:4
**18 (6)**
14:11,14;15:3;25:9;
49:11;50:5
**18-year-olds (1)**
15:1
**1998 (2)**
9:5,8
**1st (1)**
26:22

**2**

**2008 (1)**
9:7
**2020 (2)**
22:9;36:3
**2022 (6)**
12:20;13:15;22:24;
24:7,18;38:9
**2023 (5)**
21:20;22:3;26:22;
40:15;64:2
**22 (1)**
23:16
**23 (2)**
43:9;44:9
**24 (1)**
43:10
**25 (2)**
22:17,22
**263 (2)**
25:18,21

**3**

**372 (17)**
10:23,25;11:5,13,19;
26:17;27:4,8,21,25;
28:7;30:24;52:18;
53:7;54:8;55:1,8
**372's (1)**
35:13

**5**

**5 (8)**
46:17;48:25;49:1,
18;51:10,24;55:1,8

**8**

**80 (2)**
22:19,23
**81 (2)**
22:18;24:17
**82 (1)**
25:17
**84 (1)**
26:14
**85 (3)**
22:19;27:15;32:6

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FAYETTEVILLE PUBLIC LIBRARY, a political
subdivision in the City of Fayetteville, State of
Arkansas; EUREKA SPRINGS CARNEGIE PUBLIC
LIBRARY; CENTRAL ARKANSAS LIBRARY
SYSTEM; NATE COULTER; OLIVIA FARRELL;
HAYDEN KIRBY; MIEL PARTAIN, in her own
capacity and as parent and next friend of MADELINE
PARTAIN; LETA CAPLINGER; ADAM WEBB;
ARKANSAS LIBRARY ASSOCIATION;
ADVOCATES FOR ALL ARKANSAS LIBRARIES;
PEARL'S BOOKS, LLC; WORDSWORTH
COMMUNITY BOOKSTORE LLC d/b/a
WORDSWORTH BOOKS; AMERICAN
BOOKSELLERS ASSOCIATION; ASSOCIATION OF
AMERICAN PUBLISHERS, INC.; AUTHORS                        PLAINTIFFS
GUILD, INC.; COMIC BOOK LEGAL DEFENSE
FUND; and FREEDOM TO READ FOUNDATION

v.                              NO. 5:23-CV-05086-TLB

CRAWFORD COUNTY, ARKANSAS; CHRIS
KEITH, in his official capacity as Crawford County
Judge; TODD MURRAY; SONIA FONTICIELLA;
DEVON HOLDER; MATT DURRETT; JEFF
PHILLIPS; WILL JONES; TERESA HOWELL; BEN
HALE, CONNIE MITCHELL, DAN TURNER, JANA
BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE
HUNTER; DANIEL SHUE; JEFF ROGERS; DAVID
ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; TONY
ROGERS; NATHAN SMITH; CAROL CREWS;
KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each in his or her official capacity as a
prosecuting attorney for the State of Arkansas            DEFENDANTS



## FIRST AMENDED COMPLAINT

Plaintiffs, Fayetteville Public Library, a political subdivision in the City of Fayetteville, State of Arkansas; Eureka Springs Carnegie Public Library; Central Arkansas Library System; Nate Coulter; Olivia Farrell; Hayden Kirby; Miel Partain, as parent and next friend of Madeline Partain; Leta Caplinger; Adam Webb; Arkansas Library Association; Advocates for All Arkansas Libraries; Pearl's Books, LLC; Wordsworth Community Bookstore, LLC d/b/a WordsWorth Books; American Booksellers Association; Association of American Publishers, Inc.; Authors Guild, Inc.; Comic Book Legal Defense Fund; and Freedom to Read Foundation, Inc., by their undersigned attorneys,[1] and for their First Amended Complaint against Defendants Crawford County, Arkansas; Chris Keith, in his capacity as the Crawford County Judge; Todd Murray; Sonia Fonticiella; Devon Holder; Matt Durrett; Jeff Phillips; Will Jones; Teresa Howell; Ben Hale; Connie Mitchell; Dan Turner; Jana Bradford; Frank Spain; Tim Blair; Kyle Hunter; Daniel Shue; Jeff Rogers; David Ethredge; Tom Tatum, II; Drew Smith; Rebecca Reed McCoy; Michelle C. Lawrence; Debra Buschman; Tony Rogers; Nathan Smith; Carol Crews; Kevin Holmes; Chris Walton; and Chuck Graham, each in his or her official capacity as a prosecuting attorney for the State of Arkansas, state:

## INTRODUCTION

1.     This action concerns whether Arkansas may enforce parts of the recently enacted Act 372 of 2023 ("Act 372"), a vague, sweeping law that restrains public libraries and booksellers

---

[1] Plaintiffs Fayetteville Public Library, Eureka Springs Carnegie Public Library, Central Arkansas Library System, Nate Coulter, Olivia Farrell, Hayden Kirby, Miel Partain, Madeline Partain, Leta Caplinger, Adam Webb, Arkansas Library Association, Advocates for All Arkansas Libraries, and Freedom to Read Foundation are referred to herein, collectively, as the "Library Plaintiffs." Pearl's Books, LLC, Wordsworth Community Bookstore, LLC, American Booksellers Association, Association of American Publishers, Inc., the Authors Guild, Inc. and Comic Book Legal Defense Fund are referred to herein, collectively, as the "Bookseller Plaintiffs."

2

in Arkansas from making available constitutionally protected books and other media to their patrons and customers. Specifically, Plaintiffs seek to preliminarily and permanently enjoin enforcement of, and declare facially unconstitutional and void, Sections 1 and 5 of Act 372 as violations of their rights under the First and Fourteenth Amendments to the U.S. Constitution.[2]

2.     Section 1 of Act 372 makes it a criminal offense, punishable by imprisonment for up to a year, to make available, provide, or show to a minor an item that meets the definition of "harmful to minors" (the "Availability Provision"). This will necessarily force libraries and bookstores to confine to a secure "adults only" area—and so to segregate from their general patrons and customers—any item that might be deemed harmful to the youngest minor, even if there is no constitutional basis for limiting its availability to older minors or adults. Where libraries and booksellers lack the space or resources to construct "adults only" areas, their only choice will be to remove all materials which might be deemed harmful to their youngest, least developed patrons or customers.

3.     By so broadly regulating the display of protected materials that are constitutionally protected as to older minors and adults, the Availability Provision violates the First and Fourteenth Amendments because it imposes a content-based restriction on speech that (a) is not narrowly tailored, (b) is overly broad, and (c) is vaguely worded.

4.     Arkansas knows that it cannot directly prohibit libraries and booksellers from making books and other items available to their patrons and customers on such a sweeping basis, as its prior attempt to limit the availability of material deemed harmful to minors (in a nearly identical law) was struck down by an Arkansas federal court as "facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution because such provisions

---

[2] A copy of Act 372 is attached as Exhibit 1 to this Complaint.

are overbroad and impose unconstitutional prior restraints on the availability and display of constitutionally protected, non-obscene materials to both adults and older minors." *Shipley, Inc. v. Long*, 454 F. Supp. 2d 819, 831 (E.D. Ark. 2004).

5.      What Arkansas cannot permissibly do directly through the Availability Provision, it likewise cannot not do indirectly through Section 5 of Act 372, which requires that public libraries establish a process through which any "person affected by [a] material" in their collection can challenge the "appropriateness" of that material's inclusion in the library's main collection (the "Challenge Procedure"). Like the Availability Provision, the Challenge Procedure will force public libraries to segregate into a secure, "adults only" area a substantial amount of material that is protected as to adults and older minors but which someone may allege is inappropriate for the public library's youngest, least mature reader. For smaller libraries that lack the space and staff to create this secure, "adults only" area, their only choice—compelled by Act 372—will be to remove entirely all materials that might be inappropriate for the youngest, least developed child readers.

6.      The Challenge Procedure thus violates the First and Fourteenth Amendment in that it (a) imposes an unconstitutional prior restraint on constitutionally protected material; (b) is unconstitutionally vague; and (c) lacks any judicial review of a decision to remove materials from a library's main collection.

7.      The constitutional harms created by the Challenge Procedure have already become evident. Specifically, Crawford County has acted to segregate constitutionally protected materials in the Crawford County Library, and its attorney defended the decision to segregate those materials with reference to its impending obligation under Act 372 to create an area inaccessible to minors.

4

8. Governor Sanders signed Act 372 on March 31, 2023, and it was scheduled to go into effect on August 1, 2023. Plaintiffs bring this action to safeguard their fundamental rights and the rights of their members under the First and Fourteenth Amendments to the U.S. Constitution to disseminate, receive, and peruse constitutionally protected books, magazines, and other printed or audiovisual media. Act 372 forces bookstores and libraries to self-censor in a way that is antithetical to their core purposes. As further explained below, the Court should strike down the parts of the Act that violate the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action (a) under 28 U.S.C. § 1331 because this action arises under federal law and (b) under 28 U.S.C. §§ 1343(a)(3) and (a)(4) because Plaintiffs seek to vindicate their federal civil rights under the First and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983.

10. Plaintiffs seek remedies in this action under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

11. Venue is proper in this district under 28 U.S.C. § 1391(b) because multiple Defendants reside in this district and all Defendants are residents of the State in which this district is located.

## PARTIES

12. The Fayetteville Public Library ("FPL") is a municipal public library and political subdivision in the City of Fayetteville, formed pursuant to Arkansas law to provide library services to local residents. Some of the materials in FPL's collection, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate for minors and therefore subject to the Challenge Procedure. To comply with the

Availability Provision and Challenge Procedure, FPL will have to change the physical layout of its libraries in ways that will materially alter the intentionally welcome and open atmosphere the library strives to create. If FPL declines to make these burdensome changes, or even if it does but fails to segregate a single title in its large collection, it puts itself at risk of violating the Availability Provision and being charged with a crime.  FPL's First Amendment rights, and the rights of its patrons, will be adversely affected unless Sections 1 and 5 of Act 372 are enjoined. FPL sues on its own behalf, and on behalf of its library patrons and readers of library materials.

13.    Eureka Springs Carnegie Public Library ("ESCPL") is a municipal public library formed pursuant to Arkansas law to provide library services to local residents. Some of the materials in the ESCPL's collection, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate for minors and therefore subject to the Challenge Procedure. To comply with the Availability Provision and Challenge Procedure, ESCPL will have to change the physical layout of its libraries in ways that will materially alter the intentionally welcome and open atmosphere the library strives to create. If ESCPL declines to make these burdensome changes, or even if it does but fails to segregate a single title in its large collection, it puts itself at risk of violating the Availability Provision and being charged with a crime. ESCPL's First Amendment rights, and the rights of its patrons, will be adversely affected unless provisions of Act 372 are enjoined. ESCPL sues on its own behalf, and on behalf of its library patrons and readers of library materials.

14.    Central Arkansas Library System ("CALS") is a body corporate and politic formed under Arkansas law under an interlocal agreement among the City of Little Rock, Pulaski County, Perry County, the City of Jacksonville, the City of Sherwood, and the City of Maumelle to provide library services to local residents. Some of the hundreds of thousands of materials in the CALS

collection, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate for minors and therefore subject to the Challenge Procedure. To comply with the Availability Provision and Challenge Procedure, CALS will have to change the physical layout of its libraries in ways that will materially alter the intentionally welcome and open atmosphere the library strives to create. If CALS declines to make these burdensome changes, or even if it does but fails to segregate a single title in its large collection, it puts itself at risk of violating the Availability Provision and being charged with a crime. CALS's First Amendment rights, and the rights of its patrons, will be adversely affected unless Sections 1 and 5 of Act 372 are enjoined. CALS sues on its own behalf, and on behalf of its library patrons and readers of library materials.

15.    Nate Coulter is a resident of Little Rock and the Director of CALS. He is suing on his own behalf and on behalf of CALS's Board. Mr. Coulter faces the prospect of criminal liability if he engages in conduct that is constitutionally protected by the First Amendment but nevertheless violates Act 372.

16.    Olivia Farrell is an adult resident of Little Rock and a CALS patron and WordsWorth Books customer. Olivia will be injured if the Availability Provision or the Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

17.    Hayden Kirby is a resident of Little Rock and a CALS patron. Although she recently turned eighteen, she was seventeen on the date Act 372 was set to take effect. She will be injured if the Availability Provision or Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

18.     Miel Partain is an adult resident of Crawford County and a patron of the Crawford County Library System.  Miel will be injured if the Availability Provision or the Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

19.     Miel Partain is the parent and next friend of Madeline Partain. Madeline Partain is a seventeen-year-old resident of Crawford County and a Crawford County Library patron. Her constitutional rights will be adversely affected unless Act 372 is permanently enjoined. Madeline will be injured if the Availability Provision or Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

20.     Leta Caplinger is an adult resident of Crawford County and a patron of the Crawford County Library System.  Leta will be injured if the Availability Provision or the Challenge Procedure goes into effect because she will be deprived of access to books that she would like to peruse, read, check out, or buy, and which would otherwise be available.

21.     Adam Webb is an American Library Association-accredited Librarian and Certified Public Library Administrator. He lives in Garland County and has worked at the Garland County Library ("GCL") for more than sixteen years, including, since 2019, as GCL's Executive Director. In his capacity as the Executive Director of GCL, Mr. Webb plans and directs the provision of library services, which means that he is primarily responsible for ensuring that GCL complies with Act 372. Mr. Webb believes that some of the approximately 160,000 items in GCL's collection, though constitutionally protected, could be deemed harmful to minors or inappropriate for minors and therefore subject to the Availability Provision or Challenge Procedure. Mr. Webb is also concerned about criminal liability arising from GCL's practice of offering volunteer

8

positions to students in Garland County, many of whom are under 18 years of age, because those volunteers must have access to GCL's entire collection to do their work. Mr. Webb does not believe that GCL will be able to make the drastic and prohibitively expensive changes to its floor plan that would be necessary to fully segregate all possible covered materials in the library's collection. Accordingly, Mr. Webb is concerned that—in the course of his work and consistent with best practices for library administration—he might be charged with a misdemeanor offense for violating Act 372. Mr. Webb will thus be irreparably injured if the Availability Provision and Challenge Procedure are not enjoined. Mr. Webb sues on his own behalf and in his individual capacity.

22.     The Arkansas Library Association ("ArLA") is an Arkansas nonprofit corporation formed under Section 501(c)(3) of the Internal Revenue Code as a professional association for libraries and individuals who work in them throughout Arkansas. Its mission is to further the professional development of all library staff members; to foster communication and cooperation among librarians, trustees, and friends of libraries; to increase the visibility of libraries among the general public and funding agencies; and to serve as an advocate for librarians and libraries. ArLA has more than 400 members, comprised of both individuals employed by libraries and public library facilities located all across Arkansas, including in Crawford County. There exists at least one active and dues paying member of ArLA in each judicial district in Arkansas in which Act 372 will be enforced. ArLA sues on its own behalf and on behalf of its members. ArLA suffers irreparable injury to the interest of its members, as well as independently to its own organization interest. The First and Fourteenth Amendment rights of ArLA members and their patrons will thus be infringed unless the Availability Provision and Challenge Procedure are enjoined for all the following reasons:

a.      ArLA suffers irreparable injury to the interests of its members because many of its member libraries or its member librarians' workplaces carry materials that, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate and therefore subject to the Challenge Procedure.

b.      Most of the libraries that are members of ArLA or at which ArLA members work serve small local communities. These libraries maintain their collections on open shelves, organized by type of book and subject matter, which patrons may access without requesting assistance from library staff. These libraries also serve patrons that range in age from toddlers to the elderly. Many of these libraries do not have the financial or staff resources to review their entire collections, such that they can identify material that will need to be physically segregated under Act 372. Similarly, many of them lack the physical space or financial resources to restructure their library to provide the segregated space they would need to prevent any risk of availability to minors. Accordingly, many of ArLA's individual members will be at risk of criminal prosecution once Act 372 goes into effect.

c.      Many of ArLA's library-members also have in their collection only a single copy of books that are likely to be challenged, meaning that, during the review required by the Challenge Procedure, the libraries will be forced to purchase an additional copy or the book will be unavailable to patrons. Moreover, ArLA's member-libraries are frequently visited by families that include children too young to be left unattended while the parents peruse, either as a matter of library policy or parental judgment. In such a case, the chaperoning parent would be unable to access books segregated in an area of the library where their children are prohibited from entering.

10

d. On information and belief, families will be less inclined to visit ArLA member-libraries if Act 372 prevents them from perusing books together. Indeed, on information and belief, adult visitors to ArLA member-libraries will generally be less inclined to peruse books available only in an adults-only sections, as those books will be stigmatized and less attractive to many readers.

e. ArLA is also injured by the Challenge Procedure's viewpoint discrimination between those who support and oppose the availability of particular books. If the Challenge Procedure permitted participation by those who favor keeping a challenged book in circulation, ArLA or its members would participate to advocate for books remaining available. Similarly, if the Challenge Procedure allowed appeals from a library's decision to segregate or remove a challenged book, ArLA or its members would avail themselves of that recourse.

f. ArLA also suffers irreparable injury in its own right and to its organizational interests because, to counteract the harm that ArLA's members will suffer, it has been forced to divert organizational resources—including staff time and money—to respond to Act 372 through public education campaigns, and development of training materials to help its members understand what compliance with Act 372 would require. The Availability Provision and Challenge Procedure thus impede ArLA's overall mission by forcing ArLA to divert resources from projects and activities in which it would have otherwise engaged.

23. Advocates for All Arkansas Libraries ("AAAL") is a nonprofit corporation formed under Arkansas law as a membership organization whose mission is to advocate for the preservation and improvement of libraries and library services across the state, and to educate the public, state leaders, and legislators of the value and importance of libraries in Arkansas. Its dues-

paying members are libraries, library staff, and library patrons, including both adult and minor patrons. AAAL sues on behalf of itself and its 118 members. AAAL suffers irreparable injury to the interests of its members, as well as independently to its own organizational interests, for the following reasons:

a.   AAAL suffers irreparable injury to the interests of its members because, many of the libraries that are members of AAAL or at which AAAL members work, carry materials that, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision, or inappropriate and therefore subject to the Challenge Procedure.

b.   AAAL's library-members also serve patrons of all ages, from small children to older adults. Few have the financial or staff resources to review their entire collections, such that they can identify and segregate material that might be covered by the Availability Provision. Accordingly, many of AAAL's individual members will be at risk of criminal prosecution once the Availability Provision goes into effect.

c.   Moreover, many of these smaller libraries have only a single copy of some of the books that are likely to be challenged, meaning that, during the pendency of the challenge process, the libraries will be forced to purchase an additional copy or the book will be unavailable to the patrons. AAAL's member-libraries are also frequently visited by families that include children too young to be left unattended while the parents peruse, either as a matter of library policy or parental judgment. In such a case, the chaperoning parent would be unable to access books segregated in an area of the library where their children are prohibited from entering.

d.      On information and belief, families will be less inclined to visit AAAL member-libraries if Act 372 prevents them from perusing books together. Indeed, on information and belief, adult visitors to AAAL member-libraries will generally be less inclined to peruse books available only in an adults-only sections, as those books will be stigmatized and less attractive to many readers.

e.      AAAL is also injured by the Challenge Procedure's viewpoint discrimination between those who support and oppose the availability of different books. The Challenge Procedure does not require a library review committee to hear the reasons of a person wanting to keep a challenged material in circulation. It does not permit such a person to appeal a library's decision to segregate the material to a local government body. If the Challenge Procedure permitted participation by those who favor keeping a challenged book in circulation, AAAL's members would participate to share that view. Similarly, if the Challenge Procedure allowed appeals from a library's decision to segregate or remove a challenged book, AAAL or its members would avail themselves of that recourse.

f.      AAAL also suffers irreparable injury in its own right and to its organizational interests because, prior to enactment of the Availability Provision, AAAL focused its organizational resources on developing educational programming on library services for library para-professionals and providing consultation services to library directors regarding best practices for library management. Since the Availability Provision was signed into law, however, AAAL has been consumed by the need to respond to the legitimate concerns of its members about Act 372's requirements, including both the high financial costs that AAAL's member-libraries face to comply with the law, as well as the

potential that AAAL members will face criminal liability. AAAL has thus diverted organizational resources, including staff time and money, to develop training and educational resources for its members about the steps library staff must take to comply with Act 372. For instance, AAAL has hired an attorney to help develop model policies that member libraries can use in implementing the processes required by the Challenge Procedure. These expenses, which AAAL would not have otherwise incurred or would have spent on other organizational priorities, cannot be recouped.

24.     Pearl's Books, LLC is an independent bookstore that sells new books and gifts just off the downtown square in Fayetteville, Arkansas. Pearl's Books also hosts reading and writing events for readers of all ages.

25.     Wordsworth Community Bookstore LLC, d/b/a WordsWorth Books, is an independent bookstore that sells new books and gifts in the historic Heights neighborhood in Little Rock, Arkansas. WordsWorth Books sells books for people of all ages, and regularly hosts author events and children's story time events.

26.     The American Booksellers Association ("ABA") was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed. ABA represents over 2,100 member companies operating in over 2,500 locations. ABA's core members are key participants in their communities' local economy and culture. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, and local-first advocacy. The ABA has 17 members located in Arkansas who are subject to Act 372.

27.     The Association of American Publishers ("AAP"), a not-for-profit organization, represents the leading book, journal, and education publishers in the United States on matters of

law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. AAP's members range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States, including critically acclaimed, award-winning literature for adults, young adults, and children. AAP represents an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment.

28.     The Authors Guild, Inc. ("Guild") was founded in 1912 and is a national non-profit association of more than 10,000 professional, published writers of all genres, 32 of whom are located in Arkansas. The Guild counts historians, biographers, academicians, journalists, and other writers of non-fiction and fiction as members. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression, and taxation. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The ability to write on topics of their choosing and to have their work available through bookstores and libraries is vital to their ability to make a living in their chosen profession.

29.     The Comic Book Legal Defense Fund ("CBLDF") is a nonprofit organization dedicated to protecting the legal rights of the comic arts community. With a membership that includes creators, publishers, retailers, educators, librarians, and fans, the CBLDF has defended dozens of First Amendment cases in courts across the United States and let important educational initiatives promoting comics literacy and free expression.

30.     Freedom to Read Foundation ("FTRF") is a nonprofit membership organization established in 1969 by the American Library Association to promote and defend First Amendment rights, to foster libraries as institutions fulfilling the promise of the First Amendment for every citizen, to support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, and to set legal precedent for the freedom to read on behalf of all citizens. FTRF's membership includes organizations, libraries, librarians, and library patrons. FTRF members in Arkansas will suffer irreparable injury because many of the libraries that are members of FTRF or at which FTRF members work, carry materials that, though constitutionally protected, could be deemed harmful to minors and therefore subject to the Availability Provision. These same materials might be challenged as inappropriate pursuant to the Challenge Procedure at significant cost to the libraries. FTRF's members who are library patrons in Arkansas will suffer irreparable injury if the Availability and Challenge Provisions go into effect because they will be deprived of access to books that they would like to peruse, read, or check out, and which would otherwise be available.

31.     Crawford County, Arkansas is a county organized under the laws of the State of Arkansas. It oversees the Crawford County Library ("CCL"). On information and belief, it is the policy of Crawford County to implement Act 372 to the fullest extent possible.

32.     Chris Keith is the County Judge for Crawford County, Arkansas. He is being sued in his official capacity only, as the chief executive of the local government body responsible for overseeing the CCL under the laws of the State of Arkansas. Judge Keith serves as the chief executive of Crawford County, and in that capacity, appointed a majority of the Crawford County Library Board of Directors. He is responsible for the implementation of Act 372, including the Challenge Procedure, in Crawford County. Actions that Judge Keith has taken or will take to

16

implement Act 372 in Crawford County are made under color of law and are attributable to Crawford County.

33.     Todd Murray is the Prosecuting Attorney for the First Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

34.     Sonia Fonticiella is the Prosecuting Attorney for the Second Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

35.     Devon Holder is the Prosecuting Attorney for the Third Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

36.     Matt Durrett is the Prosecuting Attorney for the Fourth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

37.     Jeff Phillips is the Prosecuting Attorney for the Fifth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

38.     Will Jones is the Prosecuting Attorney for the Sixth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

39.     Teresa Howell is the Prosecuting Attorney for the Seventh Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

40.     Ben Hale is the Prosecuting Attorney for the Eighth Judicial District - North. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

41.     Connie Mitchell is the Prosecuting Attorney for the Eighth Judicial District – South. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

42.     Dan Turner is the Prosecuting Attorney for the Ninth Judicial District – East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

43.     Jana Bradford is the Prosecuting Attorney for the Ninth Judicial District – West. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

44.     Frank Spain is the Prosecuting Attorney for the Tenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

45.     Tim Blair is the Prosecuting Attorney for the Eleventh Judicial District – East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

46.     Kyle Hunter is the Prosecuting Attorney for the Eleventh Judicial District – West. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

47.     Daniel Shue is the Prosecuting Attorney for the Twelfth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

48.     Jeff Rogers is the Prosecuting Attorney for the Thirteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

49.     David Ethredge is the Prosecuting Attorney for the Fourteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

50.     Tom Tatum, II is the Prosecuting Attorney for the Fifteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

51.     Drew Smith is the Prosecuting Attorney for the Sixteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

52.     Rebecca Reed Mccoy is the Prosecuting Attorney for the Seventeenth Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

53.     Michelle C. Lawrence is the Prosecuting Attorney for the Eighteenth Judicial District – East. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

54.    Debra Buschman is the Prosecuting Attorney for the Eighteenth Judicial District –
West. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas,
a position in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

55.    Tony Rogers is the Prosecuting Attorney for the Nineteenth Judicial District – East.
He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a
position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

56.    Nathan Smith is the Prosecuting Attorney for the Nineteenth Judicial District –
East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas,
a position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

57.    Carol Crews is the Prosecuting Attorney for the Twentieth Judicial District. She is
sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position
in which she acts under color of law to enforce Arkansas's criminal laws, like Act 372.

58.    Kevin Holmes is the Prosecuting Attorney for the Twenty-first Judicial District. He
is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position
in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

59.    Chris Walton is the Prosecuting Attorney for the Twenty-second Judicial District.
He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a
position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

60.    Chuck Graham is the Prosecuting Attorney for the Twenty-second Judicial District.
He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a
position in which he acts under color of law to enforce Arkansas's criminal laws, like Act 372.

61.    On information and belief, Defendants will each exercise their discretion and legal
authority to implement and enforce Act 372 when it goes into effect on August 1, 2023.

## FACTUAL ALLEGATIONS

### The Availability Provision

62.     As discussed in the Introduction above, Section 1 of Act 372 (to be codified at Ark.

Code Ann. § 5-27-212(b)(1)) establishes a Class A misdemeanor criminal offense for making

available to a minor an item "harmful to minors." Under the Availability Provision,

> [a] person commits furnishing a harmful item to a minor if, knowing the character
> of the item involved, the person knowingly. . . [f]urnishes, presents, provides,
> makes available, gives, lends, shows, advertises, or distributes to a minor an item
> that is harmful to minors.

63.     The term "item" encompasses every form of expressive material that one could

expect to find in a public library or bookstore, including books, magazines, and motion pictures.

*See* Ark. Code Ann. § 5-27-212(a)(4)(B) (eff. August 1, 2023).

64.     Act 372's definition of "harmful to minors" is incorporated from Arkansas' variable

obscenity statute, which defines the term to mean:

> that quality of any description, exhibition, presentation, or representation, in
> whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic
> abuse, when the material or performance, taken as a whole, has the following
> characteristics:
>
> (A) The average person eighteen (18) years of age or older applying contemporary
> community standards would find that the material or performance has a
> predominant tendency to appeal to a prurient interest in sex to minors;
>
> (B) The average person eighteen (18) years of age or older applying contemporary
> community standards would find that the material or performance depicts or
> describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse in a
> manner that it patently offensive to prevailing standards in the adult community
> with respect to what it suitable for minors; and
>
> (C) The material or performance lacks serious literary, scientific, medical, artistic,
> or political value for minors.

Ark. Code Ann. § 5-68-501(2).

21

65.     An earlier 2003 statute, Ark. Code Ann. § 5-68-502, made it a Class B misdemeanor

to: "[d]isplay material that is harmful to minors in such a way that the material is exposed to the

view of a minor as part of the invited general public," Ark. Code Ann. § 5-68-502(1)(A) (the

"Display Provision").

66.     In a 2004 case brought by some of the Plaintiffs to this action, the United States

District Court for the Eastern District of Arkansas (Eisele, J.) found that the Display Provision

was "facially unconstitutional under the First and Fourteenth Amendments to the United States

Constitution because such provisions are overbroad and impose unconstitutional prior restraints

on the availability and display of constitutionally protected, non-obscene materials to both adults

and older minors." *Shipley, Inc.*, 454 F. Supp. 2d at 831. The Court entered a declaratory judgment

that the Display Provision was void and of no effect. *Id.*

67.     Nevertheless, Arkansas has enacted a content-based restriction very similar to the

one found void in *Shipley*. The Availability Provision seeks to criminalize "mak[ing] available,"

"providing[ing]" or "show[ing]", in a retail establishment or library, material harmful to minors

of any age, *i.e.* from newborns to 17-year-olds – the same category of material the State cannot,

consistent with the First Amendment, criminalize "display[ing]."

68.     There is no available narrowing construction that may be employed to reduce the

scope of the Availability Provision's sweeping regulation of expressive material. The Arkansas

Supreme Court has definitively interpreted the definition of "minor" in the context of "harmful

to minor" laws to refer to all minors, not just younger minors. *See Shipley, Inc. v. Long*, 359 Ark.

208, 216, 195 S.W.3d 911, 915 (2004) (addressing a certified question from the federal court and

finding that "[b]ecause the statute defines a minor as 'any person under the age of eighteen,' the

statute is obviously intended to protect *all* minors from exposure to material deemed 'harmful to minors.'").

69.     The Availability Provision of Act 372 regulates the display and dissemination of constitutionally protected non-obscene materials. It is not narrowly drawn to further a legitimate government purpose and violates the First and Fourteenth Amendments in that it:

     a.     imposes an unconstitutional prior restraint on the availability, display, distribution, receipt, and perusal of constitutionally protected, non-obscene material to both adults and older minors;

     b.     is unconstitutionally overbroad; and

     c.     is unconstitutionally vague.

**The Challenge Procedure**

70.     Section 5 of Act 372 (Ark. Code Ann. § 13-2-106) provides that Arkansas public libraries must establish a policy governing the selection, relocation, and retention of physical materials that are available to the public. This policy must provide a method whereby a library employee or a "person affected by the material to be challenged" can challenge the "appropriateness" of material in the library.

71.     The Challenge Procedure begins with an informal meeting between the challenger and the library staff. If the challenger is unsatisfied by the outcome of the meeting, he or she may submit a formal written challenge seeking an internal review by a committee of library employees.

72.     The Challenge Procedure does not define "appropriateness" or set forth criteria beyond "appropriateness" for libraries to use in deciding whether to relocate challenged materials from the main collection to an area inaccessible to minors.

23

73.    This administrative process includes an opportunity for the challenger to present his or her case in person.  There is no provision permitting those who believe the material should remain available in the main collection to present a countervailing case. The committee then votes to determine whether the material should be relocated to an adults-only section of the library. The challenger receives a written summary of the reasons for the committee's decision in a "reasonable" but unspecified amount of time.

74.    The Challenge Procedure fails to define "not accessible to minors" or set forth any criteria to be used in evaluating whether that standard has been met.

75.    If the committee decides to relocate the material, the Challenge Procedure provides no appeal or other recourse to anyone who believes the material should remain available in the main collection. If the committee decides not to relocate the material, the challenger may elect to appeal to the city board or quorum court of the city or county primarily supporting the public library.

76.    That local governing body is directed to consider five pieces of information before rendering its decision: (1) the material being challenged; (2) the challenger's request that the material be relocated; (3) the committee's decision; (4) a written summary of the reasons for the committee's decision; (5) a recommendation from the executive head of the county or city if the executive chooses to include one.

77.    The Challenge Procedure has no requirement that the local governing body publicly explain or document its reasons for approving or reversing the decision of the library committee. There is no limit on the number of materials appeals that a quorum court or city council must hear. Act 372 requires a decision of the city board or quorum court within 30 days and describes that decision as "final."

78.     Under the Challenge Procedure as set forth in the statute, libraries may choose to leave materials available pending a challenge or remove the materials while the process plays out. Unless libraries purchase additional copies of the materials for use by the review committees and local governing bodies, the library will be forced provide its copies to reviewers and the materials will be unavailable to library patrons for an indefinite period of time as a result of the Challenge Procedure.

79.     The Challenge Procedure of Act 372 violates the First and Fourteenth Amendment in that it:

a.      imposes an unconstitutional prior restraint on the availability, display, distribution, receipt, and perusal of constitutionally protected, non-obscene material to both adults and older minors;

b.      is a de facto licensing scheme that relieves local governing bodies of their responsibility to seek judicial review before imposing a final restraint on expression, denies aggrieved library patrons an adequate opportunity to obtain prompt judicial review of local governing bodies' orders to relocate library materials to an area that is not accessible to minors under the age of eighteen years, and vests undue discretion in local governing bodies to make these decisions without objective criteria or a record of their reasoning; and

c.      is unconstitutionally vague.

**Crawford County**

80.     Over the past year, a dispute about materials in the Crawford County Library ("CCL") led to the departure of the library's executive director. In a November 10, 2022, letter, Crawford County residents Jeffrey and Tammi Hamby alleged that the then-CCL Director Deidre Grzymala and her employees were "normalizing and equating homosexual and transexual

lifestyles with heterosexual lifestyles with heterosexual family units" and sought greater participation in material selection.

81.    In December 2022, Defendant Chris Keith appointed Tammi Hamby and two others to CCL Board of Directors, forming a majority bloc on the five-member board. On January 10, CCL staff announced that all branches of the CCL had "moved their LGBTQ children's books out of the children's section into a new area within their respective adult sections."[3]

82.    Approximately 263 books have been placed in "Social Sections" of the CCL branches. In addition to books with LGBTQ themes and authors, the Social Sections contain children's books such as "Who Believes What? Exploring the World's Major Religions" and "All About Anxiety."

83.    When some Crawford County residents demanded that CCL stop segregating books containing LGBTQ themes, Crawford County, through its attorney, declined to do so. Instead, Crawford County insisted that it was within its rights to "protect[] children from exposure to materials that might harm their innocence" by segregating materials that, in Crawford County's judgment, "might" be harmful to some minors.[4]

84.    The letter from Crawford County has also signaled that more changes are coming to CCL. It previewed, through its lawyer, that "Act 372 will make it necessary to continue modifying and changing the library system's policies and procedures." The County Attorney

---

[3] Tomas Saccente, *Crawford County Library Board Looks to Create New A Public Comment Policy After Increased Engagement At Meetings*, N.W. Ark. Democrat Gazette (May 14, 2023), https://tinyurl.com/29mvtzbp.

[4] The response letter is attached to this Complaint at Exhibit 2.[5] The letter to the CCL is attached to this Complaint as Exhibit 3.

wrote to the CCL that among its "obligations to come into compliance with the new laws by August 1, 2023" is "creat[ing] a section that is not accessible to those under eighteen."[5]

85.     On information and belief, Crawford County intends to adopt a policy that materials containing LGBTQ themes or discussing other "social issues" might harm the innocence of children and that, on that basis, any such materials *must* be segregated based on the viewpoint contained therein once Act 372 goes into effect.

### CLAIMS FOR RELIEF

### COUNT I – ALL PLAINTIFFS
### RESTRICTIONS ON ADULT ACCESS
### TO CONSTITUTIONALLY PROTECTED MATERIALS

86.     Under the First and Fourteenth Amendments to the U.S. Constitution, adults have the right to view, browse through and purchase material protected by the First Amendment to the U.S. Constitution, including material with sexual content that is not obscene. Booksellers have the constitutional right freely to display and disseminate such materials to adults. Adult bookstore customers and library patrons have the right to view such materials.

87.     It is not possible, under the Availability Provision, to restrict the display of materials covered by the Availability Provision to juveniles without also restricting such access by adults. The Availability Provision effectively requires booksellers, other retailers and librarians either to: (a) remove from their shelves and place in a segregated "adults only" section (or to remove from the establishment entirely) substantial amounts of constitutionally-protected matter because it may be "harmful" to younger or less mature readers, or (b) have an establishment carrying only material not "harmful" to any child, in both cases thereby restricting the voluntary viewing by, access to and sale of such material to adults.

---

[5] The letter to the CCL is attached to this Complaint as Exhibit 3.

88.     In addition, such adults-only sections carry opprobrium and discourage many persons from entering therein. The restrictions of the Availability Provision have a chilling effect upon the exercise of rights guaranteed by the First and Fourteenth Amendments to the Constitution in that they inhibit and discourage the browsing, possession, sale and distribution of materials, the possession, sale and distribution of which are and ought to be protected under the U.S. Constitution.

**COUNT II – ALL PLAINTIFFS**
**RESTRICTIONS ON OLDER MINORS' ACCESS**
**TO CONSTITUTIONALLY PROTECTED MATERIALS**

89.     Under the First and Fourteenth Amendments to the U.S. Constitution, minors have the right to view and purchase any material that is not obscene as to them.

90.     The Availability Provision is unconstitutional because it prohibits retail establishments and libraries from displaying any material with sexual content that contains visual or written representations of material "harmful to minors" and from allowing all minors to view such material, despite the fact that such material may be "harmful" only to younger minors, based on their developmental maturity.

91.     The Availability Provision severely inhibits and effectively precludes access by older, more mature, minors to material constitutionally protected as to them. Thus, the Availability Provision violates plaintiffs' right of free expression under the First and Fourteenth Amendments to the U.S. Constitution.

**COUNT III – ALL PLAINTIFFS**
**RESTRICTION ON SPEECH**
**(PRIOR RESTRAINT)**

92.     The Availability Provision requires the removal of constitutionally protected materials from readily viewed and accessible areas and proscribes having these materials

28

accessible to minors. The Availability Provision forces people and organizations that trade in material covered by the provision and to which minors are lawfully entitled to exclude minors from their establishment, to place such material out of the reach of minors, or simply not to carry such constitutionally protected non-obscene materials.

93.    Many bookstore customers and library patrons will not enter an adults-only section or will have to specifically request an item that has been held behind a counter to make it inaccessible to minors.

94.    The restrictions imposed by the Availability Provision necessarily will result in the removal from circulation and accessibility of large quantities of materials constitutionally protected as to adults and as to older minors in violation of the First and Fourteenth Amendments to the U.S. Constitution. The restrictions imposed by the Availability Provision will entail substantial monitoring costs for libraries, booksellers and other retailers. Further, in light of the difficulty of determining what material is harmful to minors, Plaintiffs' First Amendment rights will be chilled because they will restrict access to any material that could potentially be implicated by the statute.

95.    The Availability Provision imposes unreasonable obligations on merchants selling printed materials, encourages such merchants to exclude from their establishments all persons under the age of 18, and restricts and chills the rights of the plaintiffs to make available and the rights of adults and persons under the age of 18 to view, browse through and purchase materials that are constitutionally protected as to minors or as to adults.

96.    The Availability Provision imposes unreasonable obligations on libraries and other establishments to review their many books to ensure that they are not knowingly "making

available" material that may be deemed harmful to minors by allowing persons under the age of 18 to browse the bookshelves unmonitored.

### COUNT IV – ALL PLAINTIFFS
### DUE PROCESS
### (VAGUENESS)

97.     The Availability Provision contains language purporting to describe criminalized acts which is vague and indefinite and subject to different meanings such that it fails to provide adequate notice to booksellers and librarians of violations of the Availability Provision, including the meaning of "presents," "provides," and "makes available" in Ark. Code Ann. § 5-27-212(b)(1).

98.     The Availability Provision is unconstitutionally vague because it fails to provide clear notice as to what acts are criminalized, in violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

### COUNT V – LIBRARY PLAINTIFFS
### RESTRICTION ON SPEECH
### (PRIOR RESTRAINT)

99.     The Challenge Procedure permits libraries to remove materials from circulation for long periods of time while materials challenges are pending.

100.    Because any person "affected by" a library item can mount a challenge to its availability to minors under the Challenge Procedure, Act 372 effectively empowers any person "affected by" library materials to cause those materials to be unavailable to library patrons for a time while the challenges are processed.

101.    The Challenge Procedure creates an unconstitutional prior restraint on First Amendment-protected activity.

## COUNT VI – LIBRARY PLAINTIFFS
### DUE PROCESS
### (VAGUENESS)

102.   The Challenge Procedure contains language purporting to describe mandated acts, which are vague and indefinite and subject to different meanings such that it fails to provide adequate notice to librarians and library patrons of violation of the Challenge Procedure, including the meaning of "appropriateness" and "not accessible to a minor" in section Ark. Code Ann. § 13-2-106 (eff. August 1, 2023).

103.   By delegating unfettered discretion to quorum courts and city councils to decide whether materials are "appropriate" without any definite procedural safeguards or standards, the Challenge Procedure violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

104.   The Challenge Procedure is unconstitutionally vague because it fails to provide fair notice as to what acts are mandated, in violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT VII – LIBRARY PLAINTIFFS
### DUE PROCESS
### (LACK OF JUDICIAL REVIEW)

105.   Under Act 372, local government bodies will have 30 days to decide an appeal if the committee of librarians votes not to relocate a library item to an area inaccessible to minors. The city council or quorum court must approve or reverse the decision of the committee of librarians to keep material in the main collection. According to the Act, that decision of the local government body is "final."

106.   By relieving local governments of their constitutional obligation to obtain judicial review prior to imposing a final restraint on expression, and by precluding a judicial determination

31

of whether an item may be removed from the library's main collection, the Challenge Procedure violates the First Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

## IRREPARABLE HARM

107.   There is no adequate remedy at law for the violation of Plaintiffs' constitutional rights, and unless the requested injunctive and declaratory relief is granted, plaintiffs and their members will suffer immediate and irreparable loss. The very existence of the Availability Provision and the Challenge Procedure has a chilling effect upon the exercise of Plaintiffs' constitutional rights, causing Plaintiffs irreparable personal and economic injury every day that they are in effect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment in their favor and against Defendants, and each of them, as follows:

1.   That the Court enter a permanent injunction enjoining the Defendants, and each of them, and the Defendants' agents, attorneys, servants, employees, and other representatives, from enforcing the Availability Provision and the Challenge Procedure in any manner whatsoever;

2.   That the Court enter a declaratory judgment that the Availability Provision and the Challenge Procedure are unconstitutional, void and of no effect;

3.   That Plaintiffs be awarded the costs of this action;

4.   That Plaintiffs recover of Defendants their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

5.   That Plaintiffs be granted such other and further relief the Court deems proper.

Respectfully submitted,

/s/ John T. Adams

David M. Fuqua
Ark. Bar No. 80048
John T. Adams
Ark. Bar No. 2005013
Attorneys for Central Arkansas Library System,
Nate Coulter, and the Eureka Springs Carnegie
Public Library
FUQUA CAMPBELL, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Telephone: (501) 374-0200
E-Mail: dfuqua@fc-lawyers.com
E-Mail: jadams@fc-lawyers.com

Bettina Brownstein
Ark. Bar No. 85019
BETTINA E. BROWNSTEIN LAW FIRM
Attorney for Olivia Farrell, Miel Partain,
Madeline Partain, Hayden Kirby, and Leta
Caplinger
904 West 2nd Street, Suite 2
Little Rock, AR 72201
Telephone: (501) 920-1764
E-Mail: bettinabrownstein@gmail.com
On Behalf of the Arkansas Civil Liberties
Union Foundation, Inc.

Michael A. Bamberger*
Kristen Rodriguez*
Rebecca Hughes Parker*
Attorneys for Pearl's Books, LLC, Wordsworth
Community Bookstore LLC, American
Booksellers Association, Association of
American Publishers, Inc., Authors Guild, Inc.
Comic Book Legal Defense Fund, and Freedom
to Read Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
E-Mail: michael.bamberger@dentons.com
E-Mail: kristen.rodriguez@dentons.com
E-Mail: rebeccahughes.parker@dentons.com

Vincent O. Chadick
Ark. Bar No. 94075
Brandon B. Cate
Ark. Bar No. 2001203
Glenn V. Larkin
Ark. Bar No. 2020149
Attorneys for Fayetteville Public Library
QUATTLEBAUM, GROOMS & TULL
PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
E-Mail: bcate@qgtlaw.com
E-Mail: vchadick@qgtlaw.com
E-Mail: glarkin@qgtlaw.com

Will Bardwell*
Ben Seel*
Aman George*
Orlando Economos*
Jeffrey B. Dubner*
Attorneys for the Arkansas Library
Association, Advocates for All Arkansas
Libraries, and Adam Webb, in his individual
capacity
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34554
Washington, DC 20043
Telephone: (202) 448-9090
E-Mail: wbardwell@democracyforward.org
E-Mail: bseel@democracyforward.org
E-Mail: ageorge@democracyforward.org
E-Mail: oeconomos@democracyforward.org
E-Mail: jdubner@democracyforward.org
* *Admitted pro hac vice*