**In The Matter Of:**

*Fayetteville Public Library, et al v.*
*Crawford County, Arkansas, et al*

---

*Eva Doyce White*
*March 26, 2024*
*CERTIFIED ORIGINAL/COPY*

---

*Michelle Satterfield, CCR*
*1955 Little River Drive*
*Conway, Arkansas  72034*
*(501)336-7414*
*Satterfield@conwaycorp.net*

Original File Eva Doyce White.txt
**Min-U-Script® with Word Index**

---

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF ARKANSAS
 2                    FAYETTEVILLE DIVISION

 3   FAYETTEVILLE PUBLIC LIBRARY, a political
     subdivision in the City of Fayetteville,
 4   State of Arkansas; EUREKA SPRINGS CARNEGIE
     PUBLIC LIBRARY; CENTRAL ARKANSAS LIBRARY
 5   SYSTEM; NATE COULTER; OLIVIA FARRELL;
     HAYDEN KIRBY;MIEL PARTAIN, in her own capacity
 6   and as parent and next friend of MADELINE PARTAIN;
     LETA CAPLINGER; ADAM WEBB;
 7   ARKANSAS LIBRARY ASSOCIATION; ADVOCATES FOR
     ALL ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
 8   WORDSWORTH COMMUNITY BOOKSTORE, LLC, d/b/a
     WORDSWORTH BOOKS; AMERICAN BOOKSELLERS ASSOCIATION;
 9   ASSOCIATION OF AMERICAN PUBLISHERS,INC.; AUTHORS
     GUILD, INC.; COMIC BOOK LEGAL DEFENSE FUND
10   and FREEDOM TO READ FOUNDATION,            PLAINTIFFS

11   vs.                          NO. 5:23-CV-05086-TLB

12   CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH, in his
     official capacity as Crawford County Judge;
13   TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
     MATT DURRETT; JEFF PHILLIPS; WILL JONES; TERESA
14   HOWELL; BEN HALE; CONNIE MITCHELL; DAN TURNER;
     JANA BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE HUNTER;
15   DANIEL SHUE; JEFF ROGERS; DAVID ETHREDGE; TOM TATUM,
     II; DREW SMITH; REBECCA REED MCCOY; MICHELLE C.
16   LAWRENCE; DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
     CAROL CREWS; KEVIN HOLMES; CHRIS WALTON; and CHUCK
17   GRAHAM, each and in his or her official capacity as a
     prosecuting attorney for the State of Arkansas, DEFENDANTS

18

19

20                    ORAL DEPOSITION

20                          OF

21                     EVA DOYCE WHITE

22

23   ***** THE ABOVE-STYLED MATTER was reported by Michelle R.
     Satterfield, CCR, LS Certificate No. 570, at Crawford
24   County District Court, located at 301 Mt. Vista Boulevard,
     Van Buren, Arkansas, commencing on the 26th day of March
25   2024, at 9:20 a.m.  *****
```

---

Page 2

```
 1               A P P E A R A N C E S

 2   MR. JOHN T. ADAMS
     Attorney at Law
 3   Fuqua Campbell, P.A.
     Riviera Tower - 3700 Cantrell Road, Suite 205
 4   Little Rock, Arkansas  72201
     jadams@fc-lawyers.com
 5
     *** For the Plaintiffs, Central Arkansas Library System,
 6   Nate Coulter and the Eureka Springs Carnegie Public
     Library ***
 7
     MR. NOAH WATSON
 8   Senior Assistant Attorney General
     323 Center Street, Suite 200
 9   Little Rock, Arkansas  72201
     Noah.Watson@ArkansasAG.gov
10
     *** For the State of Arkansas Prosecuting Attorneys ***
11
     MS. BETTINA E. BROWNSTEIN
12   Attorney at Law
     Bettina E. Brownstein Law Firm
13   904 West 2nd Street, Suite 2
     Little Rock, Arkansas  72201
14   bettinabrownstein@gmail.com

15   *** For the Plaintiffs, Olivia Farrell, Jennie Kirby,
     Hayden Kirby and Leta Caplinger ***
16   *** On Behalf of the Arkansas Civil
         Liberties Union Foundation, Inc. ***
17
     MR. SAMUEL S. MCLELLAND
18   Attorney at Law
     PPGMR Law, PLLC
19   201 East Markham Street, Suite 201
     Little Rock, Arkansas 72201
20   sam@ppgmrlaw.com

21   *** For Crawford County, Arkansas, and County Judge
         Chris Keith, in his official capacity ***
22

23

24

25
```

---

Page 3

```
 1          A P P E A R A N C E S (CONTINUED)

 2   MR. BENJAMIN M. SEEL
     Attorney at Law
 3   Democracy Forward Foundation
     P.O. Box 34554
 4   Washington, DC  20043
     bseel@democracyforward.org
 5                              (VIA ZOOM)
     *** For the Arkansas Library Association, Advocates for
 6   All Arkansas Libraries and Adam Webb, in his individual
     capacity ***
 7
     MR. MICHAEL A. BAMBERGER
 8   Attorney at Law
     Dentons US, LLP
 9   1221 Avenue of the Americas
     New York, NY  10020
10   michael.bamberger@dentons.com
                                 (VIA ZOOM)
11   *** For the Plaintiffs, Pearl's Books, LLC; Wordsworth
     Community Bookstore, LLC; American Booksellers
12   Association; Association of American Publishers, Inc.;
     Authors Guild, Inc; Comic Book Legal Defense Fund; and
13   Freedom to Read Foundation ***

14   MR. GLENN V. LARKIN
     Attorney at Law
15   Quattlebaum, Grooms & Tull, PLLC
     4100 Corporate Center Drive, Suite 310
16   Springdale, Arkansas  72762
     glarkin@qgtlaw.com
17                              (VIA ZOOM)
     *** For the Plaintiff, Fayetteville Public Library ***
18
     ALSO PRESENT:
19   Leta Joe Caplinger, Plaintiff

20

21

22

23

24

25
```

---

Page 4

```
 1               I N D E X
```

```
 2   TOPIC                                          PAGE

 3   APPEARANCES                                    2-3

 4   STIPULATIONS                                   5

 5   WITNESS SWORN:  Eva Doyce White                6

 6        Examination by Mr. Adams                  6

 7        Examination by Mr. Watson                 98

 8        Examination by Mr. McLelland              107

 9        Examination by Ms. Brownstein             121

10        Further Examination by Mr. Adams          113

11        Further Examination by Mr. Watson         122

12   WITNESS SIGNATURE PAGE                         124

13   ERRATA SHEET                                   125

14   REPORTER'S CERTIFICATE                         126

15             E X H I B I T S

16   NUMBER           DESCRIPTION                   PAGE

17   Exhibit 1    Copy of Act 372                   9

18   Exhibit 2    ALA's Code of Professional Ethics 18

19   Exhibit 3    Library Bill of Rights            21

20   Exhibit 4    Bates Nos. CrawfordCo_000069-000072  27

21   Exhibit 5    Hamby Letter Dated 11/10/22       41

22   Exhibit 6    Bates Nos. CrawfordCo_000060-000066  58

23   Exhibit 7    Email Dated From Jennifer Chilcoat 74

24   Exhibit 8    Bates No. CrawfordCo_000068       118

25   Exhibit 9    Bates No. CrawfordCo_000067       118
```

Page 5

1  ANSWERS AND DEPOSITION OF EVA DOYCE WHITE, a
2  witness produced at the request of the PLAINTIFFS, was
3  was taken in the above-styled and numbered cause on the
4  26th day of March 2024, before Michelle R. Satterfield,
5  CCR, a Notary Public in and for Faulkner County, Arkansas,
6  at the Offices of the Crawford County District Court,
7  Located 301 Mt. Vista, Van Buren, Arkansas, at 9:20 a.m.,
8  pursuant to the agreement hereinafter set forth.
9
10  S T I P U L A T I O N S
11  IT IS STIPULATED AND AGREED by and between the
12  parties through their respective counsel that the
13  deposition of Eva Doyce White may be taken at the time and
14  place designated pursuant to the Federal Rules of Civil
15  Procedure.
16  * * * * *
17
18
19
20
21
22
23
24
25

Page 6

1  EVA DOYCE WHITE,
2  the witness hereinbefore named, having been previously
3  cautioned and sworn, or affirmed, to tell the truth, the
4  whole truth, and nothing but the truth, testified as
5  follows:
6  **EXAMINATION**
7  **BY MR. ADAMS:**
8  Q  Ms. White, thank you for being here today. My name
9  is John Adams and I represent three of the Plaintiffs in a
10  case that's called Fayetteville Public Library versus
11  Crawford County, Arkansas.
12  Are you familiar with this case?
13  A  Yes.
14  Q  Okay. With me is my cocounsel, Bettina Brownstein,
15  and also with us today are Noah Watson, from the Attorney
16  General's Offices, and Crawford County's Lawyer, Sam
17  McLelland.
18  **MS. BROWNSTEIN:** And Leta.
19  **BY MR. ADAMS:**
20  Q  Oh, and one of the other Plaintiffs in this case, and
21  Bettina's client, Leta, is here as well. I don't know if
22  y'all have met.
23  A  Yes, we have.
24  Q  But we can get into that a little bit later.
25  Can you please state your full name for the record?

Page 7

1  A  Eva Doyce White.
2  Q  Okay. Have you ever had your deposition taken
3  before?
4  A  No.
5  Q  Okay. In that case it's probably helpful for me to
6  go over some of the rules and things that may be a little
7  counterintuitive because all of the words that we are
8  speaking is being written down by the court reporter, so
9  it's important to answer out loud. When I ask you
10  questions, we like to nod or shake our head no, but that's
11  not something that she can write down, so sometimes I may
12  pause or ask you to give -- you know, give your answer out
13  loud.
14  Sometimes people, also, will anticipate the end of a
15  question that I'm asking and start speaking before I'm
16  finished, and I do that when I'm on the other side of the
17  table, so I certainly don't blame you for that, we get
18  impatient, but it also helps the court reporter a lot if
19  we can try not to speak over each other.
20  Do you have any other questions about this today?
21  A  No.
22  Q  Have you been sworn in?
23  A  Yes.
24  Q  I want to make sure you got sworn in. Everything
25  you're going to say is under oath, like it would be in

Page 8

1  court.
2  So let's go ahead and get started. I'm going to talk
3  about five things basically with you today. So I'll give
4  you kind of an outline. I know you probably like books,
5  so I'll give you the table of contents for this
6  deposition.
7  I'm first I'm going to talk about the case generally
8  and just give, you know, a little, I guess, introduction
9  to how we got here and see if you have any questions about
10  that and talk about some of the terms that are going to
11  come up, I think, over and over, so we can maybe use a
12  shorthand and speed some of the latter part of the
13  deposition along.
14  In the second part I'm going to ask you about your
15  background. I understand you were the library director,
16  so I want to know about what all you studied and did and
17  thought about that job over the course of your career.
18  Third, I'm going to ask you some questions about
19  library principles and librarianship, specifically we're
20  going to talk about the American Library Association Code
21  of Conduct and Bill of Rights and your views on what's
22  stated in those documents, so sort of building off what we
23  talked about in the second part with your experience.
24  Chapter four is probably going to be the longest
25  because it's where we're going to get into the facts of

1 the last year or so here in Crawford County and ask you
2 what you know about what happened with the library and the
3 events that led to this lawsuit.
4      And then, finally, I want to turn back to the law,
5 which is the subject of the lawsuit and ask some questions
6 about that and your feel on that.  So let's start with
7 this:  I'm going to enter Exhibit 1 into our record and it
8 is Act 372 of 2023.
9      (Exhibit No. 1 was marked & attached hereto.)
10      Ms. White, have you read this law before?
11 A   Yes.
12 Q   Okay.  When did you first read it; do you remember?
13 A   When it came out.
14 Q   Okay.  You said came out.  Do you remember if that
15 was when it was filed or when it was passed by the
16 legislature and signed by the governor?
17 A   When it was passed.
18 Q   Okay.  And I can tell you that my clients filed suit
19 to ask a judge to declare that two sections of this law
20 violate the First Amendment.  The first is Section 1 of
21 the Act.
22      So you see where it says, at the bottom of the first
23 page, furnishing a harmful item to a minor?
24 A   Yes.
25 Q   And then if you flip to the second page, on Line 26

1 it says, "A person commits furnishing a harmful item to a
2 minor if knowing the character of the item involved, the
3 person knowingly," and then it goes on from there.
4 A   Yes.
5 Q   And then if you flip to the third page, on Line 9 it
6 says, "Furnishing a harmful item to a minor is a Class A
7 misdemeanor."
8 A   Yes.
9 Q   Okay.  So when we talk about Section 1 of the Act,
10 we're talking about that criminal prohibition on
11 furnishing items harmful to a minor.
12 A   Yes.
13 Q   Okay.  Thanks.  The other section that we allege
14 violates the First Amendment is Section 5 of the Act.  So
15 if you will flip with me to Page 7.  Do you see Section 5
16 there?
17 A   Yes.
18 Q   And it's titled, "Establishment of Guidelines for
19 Selection, Relocation and Retention of Materials."
20 A   Yes.
21 Q   So I will hold off on getting into the details of
22 this section, but when I talk about Section 5, you'll know
23 what I mean.  I'm talking about the part of Act 372 that
24 sets forth state law about libraries' guidelines for the
25 selection, relocation and retention of materials?

1 A   Yes.
2 Q   Okay.  So far I'm going to be talking about Act 372
3 generally, Section 1 of Act 372, and Section 5 of Act 372.
4      Do you have any questions for me at this point?
5 A   No.
6 Q   Okay.  Thank you.  So that's the end of the
7 introduction.  Let's move on to talk about your employment
8 and educational background.  Are you currently employed?
9 A   Yes.
10 Q   Where are you employed?
11 A   Crawford County Library System.
12 Q   And what is your position?
13 A   I'm the advisor to the new director.
14 Q   Okay.  How many hours a week is that job?
15 A   It varies.
16 Q   Okay.  And how long have you been in that position?
17 A   Since February the 5th.
18 Q   Okay.  Of this year?
19 A   Yes.
20 Q   And I guess in the intervening six or seven weeks,
21 how many hours a week would you say you work, on average,
22 n that position?
23 A   I just started part time.
24 Q   Okay.
25 A   So 40 hours a week up until last week.

1 Q   Okay.  So there's been a lot to do?
2 A   Yes.
3 Q   And if you will, tell me the name of the current
4 Director.
5 A   Charlene McDonnough; McDonnough.
6 Q   Okay.  And what was your job before February 5th of
7 this year?
8 A   I was the Director of the Crawford County Library
9 System, interim.
10 Q   Okay.  You were the Interim Director.  And what were
11 the dates of your term as Interim Director?
12 A   From February the 27th of '23.
13 Q   Okay.
14 A   To February the 5th of '24.
15 Q   Okay.  What did you do before you were the Interim
16 Director?
17 A   I was retired.
18 Q   Okay.  And how long were you retired?
19 A   Two years, approximately.
20 Q   Okay.  So you retired in 2021?
21 A   Yes, in January of 2021.
22 Q   Okay.  And you were the permanent director of the
23 Crawford County Library System until January of 2021?
24 A   Yes, I was.
25 Q   And when did you start as the Director?

Page 13

1  A  Let's see, it was in 2013.

2  Q  Okay.

3  A  In July, I believe.

4  Q  And what did you do before that?

5  A  I was retired for one year.

6  Q  You keep -- you keep unsuccessfully retiring, I take

7  it?

8  A  Yes.

9  Q  Okay.  What did you do from 2012, prior?

10  A  I was retired for one year and then I was the

11  Director of the Crawford County Library System since 1999

12  to that point.

13  Q  Okay.  So from 1999 --

14  A  July.

15  Q  July of 1999?

16  A  Yes.

17  Q  To some time in 2012?

18  A  Yes.

19  Q  So you were also the Director of the Crawford County

20  Library?

21  A  I think it was September, but it might have been

22  August.

23  Q  Okay.  We won't hold you to that.  What did you do

24  before July of 1999?

25  A  I was the Director of the North Arkansas Regional

Page 14

1  Library in Harrison for a year and a half.

2  Q  Okay.  So the beginning of '98 or so to '22?

3  A  Uh-huh.

4  Q  Okay.  And what about before that?

5  A  I was the Assistant Librarian at North Arkansas

6  Community College in Harrison.

7  Q  And what years did you do that?

8  A  I was there nine years.

9  Q  Okay.  So until '89 or so, till '98?

10  A  Uh-huh.

11  Q  What about before that?

12  A  I was the School Librarian at Western Grove before

13  that.

14  Q  Okay.  And I think that gets back 40 years or so.  I

15  guess we'll stop there.

16  Did you obtain a college degree?

17  A  I have, actually, four.

18  Q  Okay.  Tell me about your four college degrees.

19  A  Start at the beginning?

20  Q  Sure, we'll do this one in forward order, since we've

21  gone backwards, I guess?

22  A  Okay.  I got my BA at Arkansas Polytechnic College.

23  Q  Okay.

24  A  In 1966, January.

25  Q  And does that go by another name now, Arkansas

Page 15

1  Polytechnic?

2  A  Arkansas Tech.

3  Q  And that's in Russellville?

4  A  Yes.

5  Q  Okay.  What about degree number two?

6  A  Let's see, while I was a school librarian I had a

7  couple of children, and so while I was home, part of the

8  time I got my Electromechanical Degree at the vo-tech

9  school in Harrison.

10  Q  Okay.

11  A  That was when computers were starting and I needed to

12  know about it if I was going to be a librarian.

13  Q  Okay.  What about number three?

14  A  I got my Masters in Educational Research, I believe

15  is the title.

16  Q  Okay.

17  A  From the University of Arkansas.

18  Q  Okay.  And what year was that, roughly?

19  A  I can't remember.

20  Q  Okay.  We'll go on to number four.

21  A  I got my MLS at the Texas Woman's University.

22  Q  And was that in connection with you becoming the

23  Director of the North Arkansas Regional Library?

24  A  Well, I was employed at that time with -- at the

25  college, and if I went up any higher at the college, I had

Page 16

1  to have that degree.

2  Q  Okay.  So this was in the '90s, roughly?

3  A  Yes.

4  Q  Okay.  That helps me understand your background and

5  how you got to where you are.

6  A  Right.

7  Q  Thank you.  Before we leave your educational

8  background, are you a member of any library professional

9  organizations, or are there professional organizations?

10  A  Well, I just joined the AAAL, whatever it is.

11  Q  Yeah.  Is it the Advocates for All Arkansas

12  Libraries?

13  A  That's it.  I have not rejoined any of those, but I

14  was when I was.

15  Q  But at one point you were a member of all?

16  A  Yes, most of the time.  When I was a director

17  somewhere, I was a member of those.

18  Q  Have you ever joined the Arkansas Library

19  Association?

20  A  Yes.

21  Q  Okay.  And I guess when you join the Arkansas Library

22  Association, is that a membership personal to you or is

23  that --

24  A  Yes.

25  Q  Okay.  Is it also possible for a library itself to be

1  a member of the Arkansas Library Association?
2  A   It wasn't at that point.
3  Q   Okay.  Would you say most of the time when you were
4  an active librarian -- I guess you still are to some
5  extent, but most of the time that you've been an active
6  librarian, you've been a member --
7  A   After I left the school, the K through 12 school, I
8  have been a member of those organizations.
9  Q   Okay.  So when I say ArLA, does that sound familiar?
10 A   Yes.
11 Q   Okay.  That's what I sometimes hear people call the
12 Arkansas Library Association.
13     Okay.  What about the American Library Association?
14 A   I have been a member of the American Library
15 Association.
16 Q   Are you currently a member of the American Library
17 Association?
18 A   No.
19 Q   Okay.  And would you say most of the time, when you
20 were the director of the library, you were a member of the
21 American Library Association as well?
22 A   I wouldn't say most of the time, but several years.
23 Q   Okay.
24 A   It's pretty expensive.
25 Q   Oh, it's a lot of dues to pay?

1  A   Yeah.
2  Q   Okay.  Well, I guess in that vein, let's go on to
3  chapter three then, and talk about some documents that the
4  American Library Association put out and I'll ask for your
5  perspective on these.
6      Let's start with the ALA Code of Ethics, and this
7  we'll mark as Exhibit 2.
8      (Exhibit No. 2 was marked & attached hereto.)
9      And I'll represent to you I just got this from the
10 ALA's website.  Have you ever read this document before,
11 Ms. White?
12 A   If I have I don't remember it.
13 Q   Okay.  I'm going to read some parts of it, starting
14 about three-quarters of the way down on the first page,
15 and I'll ask you to confirm if I've read it accurately and
16 then we'll talk about some of it.
17     I want to start a little before that, about
18 two-thirds of the way down.  "We significantly influence
19 or control the selection, organization, preservation and
20 dissemination of information.  In a political system
21 grounded in an informed citizenry, we are members of a
22 profession explicitly committed to intellectual freedom
23 and the freedom of access to information.  We have a
24 special obligation to ensure the free flow of information
25 and ideas to present and future generations."

1      So, Ms. White, did I accurately read that paragraph?
2  A   Yes.
3  Q   Do you agree with the ideas in that paragraph?
4  A   Yes.
5  Q   Are there any that you have qualms about or feel like
6  you want to qualify?
7  A   No.
8  Q   Okay.  The next paragraph says:  "The principles of
9  this Code are expressed in broad statements to guide
10 ethical decision making.  There statements provide a
11 framework; they cannot and do not dictate conduct to cover
12 particular situations."
13     Did I read that correctly?
14 A   Yes.
15 Q   So No. 1 says:  "We provide the highest level of
16 service to all library users through appropriate and
17 usefully organized resources; equitable service policies,
18 equitable access; and accurate, unbiased, and courteous
19 responses to all requests."
20     Did I read that correctly?
21 A   Yes.
22 Q   And do you agree with that as a part of your personal
23 ethics?
24 A   Yes.
25 Q   Thank you.

1      No. 2:  "We uphold the principles of intellectual
2  freedom and resist all efforts to censor library
3  resources."
4      Do you agree with that principle?
5  A   Yes.
6  Q   No. 6:  "We do not advance private interests at the
7  expense of library users, colleagues or our employing
8  institutions."
9      Do you agree with that principle in the Code of
10 Ethics?
11 A   Yes.
12 Q   Thank you.  No. 7, the next one says:  "We
13 distinguish between our personal convictions and
14 professional duties and do not allow our personal beliefs
15 to interfere with fair representation of the aims of our
16 institutions or the provision of access to their
17 information resources."
18     Do you agree with No. 7?
19 A   Yes.
20 Q   Thank you.  Okay.  Is there anything else that you
21 want to say about these from your experience?  Have they
22 ever come up in ways that are particularly relevant to
23 you?
24     Do you remember -- I guess you said you didn't
25 remember reading these in particular, but I'm curious if

1  these ever came up in your discussions with people you
2  were in charge of, for example, and you wanted to explain
3  why you thought that they ought to respond to a question a
4  certain way or a treat a library patron a certain way?
5  Did you ever refer to these?
6  **A   I have not at this particular one, no.**
7  Q   Okay.  Let's go on to the ALA Library Bill of Rights,
8  which I'll give you a copy of and, again, represent that I
9  got this last night from the American Library
10  Association's website, as you'll see on the URL timestamp.
11          MR. MCLELLAND: Are you marking this as 3?
12          MR. ADAMS: I will mark it as 3.
13          MR. MCLELLAND: Okay.
14          MR. ADAMS: Thank you.
15  (Exhibit No. 3 was marked & attached hereto.)
16  **BY MR. ADAMS:**
17  Q   So, similarly, I want to ask for you to look at some
18  of these with me and tell me whether they reflect the
19  values that you brought to being a librarian and still
20  bring to this day.
21  **A   Okay.**
22  Q   The Library Bill of Rights Preamble says:  "The
23  American Library Association affirms that all libraries
24  are forums for information and ideas, that the following
25  basic policies should guide their services:"

1      "No. I.  Books and other library resources should be
2  provided for the interest, information, and enlightenment
3  of all people of the community the library serves.
4  Materials should not be excluded because of the origin,
5  background, or views of those contributing to their
6  creation."
7      Do you agree with principle one?
8  **A   Yes.**
9  Q   Do you have any caveats or --
10  **A   No.**
11  Q   -- some personal reactions to that that we may need
12  to know?
13  **A   No.**
14  Q   Thank you.  "No. II.  Libraries should provide
15  materials and information presenting all points of view on
16  current and historical issues.  Materials should not be
17  proscribed or removed because of partisan or doctrinal
18  disapproval."
19      Do you agree with No. II?
20  **A   Yes.**
21  Q   "No. III.  Libraries should challenge censorship in
22  the fulfillment of their responsibility to provide
23  information and enlightenment."
24      Do you agree with No. III?
25  **A   Yes.**

1  Q   "No. IV.  Libraries should cooperate with all persons
2  and groups concerned with resisting abridgment of free
3  expression and free access to ideas."  Do you agree with
4  No. IV?
5  **A   Yes.**
6  Q   Okay.  Thank you.  Are you familiar with Crawford
7  County's policies for selecting and weeding materials?
8  **A   Yes, but I can't quote them.**
9  Q   Well, I don't need you to quote them, but I guess I
10  want to ask a general question about them, which is would
11  you say they're consistent with or informed by the
12  principles that we just read from the Code of Ethics in
13  the Library Bill of Rights?
14  **A   Yes.**
15  Q   Okay.  Can you describe how; what that connection is?
16  **A   We try to provide something for everyone.**
17  Q   Okay.  Do the principles inform how you organize the
18  material in the library?
19  **A   I suppose.**
20  Q   Okay.  Can you tell me how?
21  **A   We use the Dewey Decimal System.**
22  Q   Okay.  And so what does that do for the patrons using
23  the Dewey Decimal System?
24  **A   It organizes the nonfiction books in subject order.**
25  Q   And are the fiction books organized by subject?

1  **A   No, they are organized by author's last name.**
2  Q   Are there different sections for genres, in any case?
3  **A   Yes.**
4  Q   So what are the major genre categories?
5  **A   The ones that sticks out is Western fiction.**
6  Q   Okay.
7  **A   Large print.**
8  Q   Do any of your libraries have a young adult, or YA
9  Section?
10  **A   Yes.**
11  Q   Do all of your libraries have a Children's Section?
12  **A   Yes.**
13  Q   Okay.  And do the YA Sections all include fiction and
14  nonfiction?
15  **A   No.  We, in some of our libraries, put the YA**
16  **nonfiction with the adult.**
17  Q   Okay.  So some of the YA Sections are just fiction?
18  **A   Uh-huh.**
19  Q   The Children's Sections, do they all have some
20  fiction and some nonfiction?
21  **A   Yes.**
22  Q   Okay.  And just -- this may be sort of obvious, but
23  it helps us to have the librarians explaining it for the
24  judge and for the record.
25      What do the patrons get out of books being organized

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
Eva Doyce White
March 26, 2024

Page 25

1  in the way you've described?
2  A   They are able to find --
3       MR. MCLELLAND: Objection; calls for an
4     opinion. This witness here is a fact witness
5     only, not as an expert on library science. You
6     can answer if you understand.
7  A   Would you repeat the question?
8  Q   What do the patrons get out of the organization
9  system that you just described for the Crawford County
10 libraries?
11 A   They are able to find what they need.
12 Q   Okay. So the physical location of books sometimes
13 matters?
14 A   Yes.
15 Q   Because the patrons browse?
16 A   Yes.
17 Q   Okay. They may not know, when they show up, a
18 particular book they're looking for, but they might go to
19 the history section in the -- what is that, the 300s of
20 the Dewey Decimals, so they can know what they're looking
21 for?
22 A   Now, repeat that.
23 Q   So say you were looking for a history book -- like am
24 I getting that right; is that the 300s of the Dewey
25 Decimal System?

Page 26

1  A   No.
2  Q   So which series is history?
3  A   Nine hundred.
4  Q   Nine hundred. Social science is in 300?
5  A   Yes.
6  Q   Okay. Yeah, that's the problem.
7       So if I knew I wanted a history book, I could go to
8  the 900s and browse?
9       MR. MCLELLAND: Object to form on that one.
10 BY MR. ADAMS:
11 Q   Oh, one of the ground rules that I forgot to mention,
12 is that you can ask for a break at anytime. We'll try not
13 to go for more than an hour or two without letting
14 everyone stretch their legs and all that sort of thing.
15 The only rule is that we ask you to answer a question if
16 there's one on the table before we break.
17 A   Okay.
18 Q   So please ask.
19 A   Okay.
20 Q   Okay. I think that's all of chapter three, too.
21     So part of why I raised the idea of a break, even
22 though we haven't been going very long, is because chapter
23 four, as I said, is going to be the long one, where we
24 kind of get into the weeds.
25 A   Okay, let's break.

Page 27

1  Q   Okay. Let's take a five-minute break.
2       (Brief recess was taken.)
3  BY MR. ADAMS:
4  Q   Okay. Ms. White, so now, like I said, we're going to
5  talk about the events of the last few years and what's
6  happened with the Crawford County Library and there's a
7  lot of ground that I want to cover and I may end up
8  bouncing around, so I apologize for that now because I
9  want to find out what you know about a good amount of what
10 happened.
11      MR. MCLELLAND: John, before you get
12    into -- just so I can make a standing objection
13    for the record. It is Crawford County's
14    position that the events of the Social Section
15    are outside the bounds of this lawsuit, as this
16    is a facial challenge only if Act 372 is
17    relevant and necessary to decide this case.
18      I think with that, then I just make a
19    standing objection for the record.
20      MR. ADAMS: Okay, thank you.
21    (Exhibit No. 4 was marked & attached hereto.)
22 BY MR. ADAMS:
23 Q   I'm going to enter Exhibit 4 into the record, which
24 is four pages provided by Crawford County in discovery in
25 this case. The four pages all have to deal with

Page 28

1  reconsideration of library materials.
2       Can I ask you to look through those, so we're on the
3  same page? For clarity in the record, we're talking about
4  Crawford County Bates Nos. 69 through 72.
5  A   Okay.
6  Q   Okay. So let's start with the back, Page 72. This
7  has a date revised of September 13th, 2022, correct?
8  A   Yes.
9  Q   Do you recognize this policy?
10 A   Yes.
11 Q   Were you involved in drafting this policy?
12 A   No.
13 Q   Do you know who was involved in drafting this policy?
14 A   Well, let me back up. I probably was, yes, at some
15 point.
16 Q   Okay.
17 A   But not 9/13/22.
18 Q   Okay. Because that was during your retired period?
19 A   Right.
20 Q   Or one of your retired periods?
21 A   Right.
22 Q   Okay. Have you ever been involved in preparing a
23 Reconsideration of Library Materials Policy?
24 A   Yes.
25 Q   And was this policy approved by the Crawford County

1  Library System Board at any point, any version of this
2  policy?
3  **A    Yes.**
4  Q    Okay.  How many versions, in your career at Crawford
5  County, do you think you've worked with?
6  **A    One.**
7  Q    Okay.  And it was prior to this one?
8  **A    Yes.**
9  Q    And do you remember how it might have differed from
10  this one?
11  **A    No.**
12  Q    Okay.  With respect to the ultimate decision-making
13  body, do you remember if the prior policy vested that
14  authority in the Library Board?
15  **A    Yes.**
16  Q    Okay.  Did the prior policy limit the people who
17  couldn't make a challenge to a library book, either to
18  residents of the community or library cardholders or some
19  other category, other than just --
20  **A    I don't remember that.**
21  Q    Okay.  Let's look to the previous page, Page 71.
22  This is a Patron's Request for Reconsideration of Library
23  Materials.  So are you familiar with this form?
24  **A    Yes.**
25  Q    How many of these would you estimate you received in

1  your time with the Crawford County Library?
2  **A    Prior to the last year, probably between 10 and 20.**
3  Q    Okay.  And how many of those resulted in a library
4  material -- I guess it could be a book or other library
5  material being removed from the library?
6  **A    None.**
7  Q    How many of those requests resulted in a library
8  material being relocated to a different section of the
9  library?
10  **A    One or two.**
11  Q    Okay.  And do you remember the nature of the
12  relocation, like from what section into what section?
13  **A    Usually it went from a lower section to an adult**
14  **section.**
15  Q    Okay.  Then on Page 70 is another form titled,
16  "Challenge of Materials in the Crawford County Library."
17  Do you recognize this form?
18  **A    Not really, no.**
19  Q    Okay.  So now we're down to the last page, Page 69,
20  which says Reconsideration of Library Materials.  It
21  doesn't have a date revised on it, so I don't know if this
22  policy has been adopted.
23  Do you know if this form of the reconsideration
24  policy has been adopted by the Board?  And if you need to
25  take a minute to read it, that's fine.

1  **A    Thank you.  No, I don't know.**
2  Q    Okay.  The last sentence on this page reads:  "A
3  member who votes with the majority shall write a summary
4  of the reasons for the majority's decision within 15 days
5  of the committee meeting where the challenger," and then
6  it ends.  Are you aware of any more to this policy?
7  **A    I'm sure there's more.**
8  Q    Okay.  We'll follow up with the attorneys about
9  whether there might be a part of that document left off.
10  Do you recognize that language, "A member who votes
11  with the majority shall write a summary of the reasons for
12  the majority's decision within 15 days of the committee
13  meeting"?
14  **A    I believe this was discussed at a board meeting this**
15  **past year.**
16  Q    Okay.
17  **A    I'm not sure that it was ever adopted.**
18  Q    Okay.  Do you remember the circumstances of that
19  board meeting?
20  **A    It was trying to answer this 372 draft of -- to be in**
21  **compliance if it went into law.**
22  Q    Okay.  So this draft policy on Page 69 was what the
23  Crawford County Library was considering to come into
24  compliance with Act 372?
25  **A    Right.**

1  Q    And I guess when I say Board in this context, I'm
2  talking about the Crawford County Library Board, right?
3  **A    Yes.**
4  Q    Okay.  And do you remember what month that board
5  meeting was?
6  **A    I don't.**
7  Q    Okay.  And I guess I apologize because I don't
8  remember precisely how you answered the question.  Do you
9  not remember or do you think this policy was not adopted
10  by the Board?
11  **A    I really can't answer that question.**
12  Q    Okay.  Totally fine.  I just want to make sure I
13  understood.
14  Okay.  Did you know Deidre Grzymala before she became
15  the Director?
16  **A    Yes.**
17  Q    How long have you known her?
18  **A    She was an employee of the Crawford County Library**
19  **System.**
20  Q    Okay.  For how long?
21  **A    I can't remember.**
22  Q    Okay.  Did she become the director at your
23  retirement?
24  **A    No.**
25  Q    Who was the director when you retired?

1 A   Dr. George Fowler.

2 Q   Okay.  And how long was Dr. Fowler the Director?

3 A   A year and a half.

4 Q   So from January of '22 until?

5 A   July of '20 ...

6 Q   July of 2022?

7 A   Yes, I guess.

8 Q   Okay.  So Deidre Grzymala became the Director in July

9 of 2022?

10 A   Yes.

11 Q   And when was her last day as Director?

12 A   It was the week before I became the interim Director.

13 Q   Which I think you said was?

14 A   February 27th.

15 Q   Okay.  So July from -- July of 2022 to February of

16 2023, Ms. Grzymala was the Director of the Library System?

17 A   You're correct.

18 Q   Okay.  Now, has the Crawford County Library System

19 existed in its present form as long as you've been

20 involved with it?

21 A   Yes.  I became the first director.

22 Q   I see.

23    Okay.  So at the time you became the Director in July

24 of 1999, a unified Crawford County Library System had just

25 been formed?

1 A   That's correct.

2 Q   Okay.  And how many board members were there at that

3 time?

4 A   Five.

5 Q   And were there five the whole time that you were

6 involved?

7 A   Yes.

8 Q   Okay.  And how do members get appointed to the

9 Crawford County Library Board?

10 A   Up until lately we recommended to the judge who we

11 would like to have appointed and he -- and he would

12 appoint that person.

13 Q   Okay.  When you took the job in 1999, you wouldn't

14 have been in a position to recommend the directors at that

15 point, right?

16 A   No, they were.

17 Q   So let's talk about the period from 2000 to 2020,

18 just so it's before the current controversy.  For the next

19 few questions, let's just talk about that 20-year period.

20 A   Okay.

21 Q   You, as the Library Director, as a matter of practice

22 would recommend library board members to the county judge?

23 A   Correct.

24 Q   And then just mechanically at that point what

25 happens, the county judge does what?

1 A   He would usually take my recommendation and appoint

2 who I recommended.

3 Q   Okay.  And does the quorum court have to act on that?

4 A   Yes.

5 Q   Okay.  And is that a straight majority vote to

6 confirm?

7 A   Yes.

8 Q   So you say usually.  Was there any time, in that same

9 20-year period from 2000 to 2020, in which a county judge

10 of Crawford County didn't take your advice about who to

11 appoint?

12 A   No.

13 Q   Okay.  And how would you decide on which kind of

14 people to appoint, or to suggest for appointment?

15 A   I would usually ask my branch managers or maybe the

16 former board member, or maybe I knew somebody in the

17 community myself that was one of our supporters.

18 Q   Okay.

19 A   And those would be the things that I would consider.

20 Q   Okay.  Did you have an opinion about Ms. Grzymala's

21 appointment in 2022?  Did you think it was a good idea?

22 A   I wasn't asked.

23 Q   Okay.  But I'm asking you now.

24 A   State the question again.

25 Q   Did you have an opinion, in the summer of 2022, about

1 Deidre Grzymala's qualifications?  Did you think she was a

2 good person for the job?

3 A   Yes.

4 Q   Did you talk to her about what the job would require?

5 A   No.

6 Q   Did you talk to her at any point in 2022?

7 A   Yes.

8 Q   Okay.  How many times would you say you talked to

9 her?

10 A   Well, personally once, and as a member of the

11 foundation and the friends of the library, several.

12 Q   Okay.  And when you say the foundation, I take it

13 that there's a --

14 A   Crawford County Library Foundation, and the Van Buren

15 Friends of the Library.

16 Q   Okay.  And if I understand libraries correctly, these

17 are nongovernmental 501(c)(3)s that are supporting

18 organizations that --

19 A   That's correct.

20 Q   -- help fund and support the libraries' mission?

21 A   Correct.

22 Q   And you're involved with those groups and you stayed

23 involved after your --

24 A   That's correct.

25 Q   Okay.  So you talked to Deidre in that capacity?

1 A   Yes.

2 Q   Okay.  Did she ever ask your advice about how to deal
3 with any problems that came up, especially given your long
4 tenure and experience in the role?

5 A   Not really.

6 Q   Okay.  So who chose Ms. Grzymala to be the Director?

7 A   The Board, the Crawford County Library Board.

8 Q   Okay.  Does the county judge or quorum court have any
9 role in that process?

10 A   No.

11 Q   Okay.  Can the library board fire the library
12 director?

13 A   Yes.

14 Q   Can the county judge fire the library director?

15 A   No.

16 Q   Okay.  When did you first become aware of a
17 controversy about books in the library in 2022?

18 A   It was probably August or September.

19 Q   Okay.  And what did you learn at that point?

20 A   That some people did not agree with some of the books
21 that were in the library.

22 Q   Okay.  How did you learn of that?

23 A   By some emails.

24 Q   Okay.  Who sent you the emails?

25 A   Patrons of the library.

1 Q   And were they patrons that were --

2 A   And also Charlene Fite.

3 Q   And was she a state representative at the time?

4 A   Yes.

5 Q   Is she still a state representative from this area?

6 A   At this point, yes.

7 Q   Okay.  And what did Representative Fite email you
8 about?

9 A   She wanted to know who was in charge since I was not
10 there.

11 Q   And what did you say?

12 A   She wanted to know who was in charge of the library
13 since I was not there.

14 Q   And did you respond to her email?

15 A   I gave her Ms. Grzymala's name.

16 Q   Okay.  Did Ms. Fite list any books or categories of
17 books that she was particularly concerned about?

18 A   No.  She just wanted to know that, so I knew there
19 was something up.

20 Q   Okay.  And that was roughly when, if you can
21 remember?

22 A   Maybe September or August, I don't remember.

23 Q   Okay.

24 A   And there was another patron that emailed me about
25 some books.

1 Q   Do you remember who that patron was?

2 A   No, I don't.

3 Q   Okay.  And did that patron specify some books?

4 A   Yes.

5 Q   Do you remember which books?

6 A   Well, some children's books that dealt with LGBTQ.

7 Q   And do you know if those were books that were
8 acquired during your time as the Library Director?

9 A   They were not.

10 Q   Okay.  So they were acquired after you were the
11 Library Director?

12 A   Yes.

13 Q   Okay.  Do you happen to know if they were acquired
14 during Ms. Grzymala's tenure, or the prior director?

15 A   I cannot be sure, no.

16 Q   Okay.  Well, I won't ask you to speculate.

17       So this other patron may or may not have specified
18 titles, but you know that it was -- that was the subject
19 matter that the patron was concerned about?

20 A   She did not say titles.

21 Q   Okay.  Do you know a man named Dr. Jeff Hamby?

22 A   No.

23 Q   You've never met him?

24 A   No.

25 Q   Do you know who he is?

1 A   Yes.

2 Q   How did you first become aware of him?

3 A   He's a doctor.  I knew he was a doctor from a long
4 time ago.

5 Q   Okay.  How did you first become aware of him in the
6 context of the library?

7 A   He spoke at the Quorum Court.

8 Q   Do you remember which meeting that was?

9 A   It was in December.

10 Q   Were you there?

11 A   No.

12 Q   So how do you know he spoke?

13 A   It was all over the media.

14 Q   Okay.  I guess the same question about Tammi Hamby;
15 did you know her?

16 A   Not before she become a board member.

17 Q   Okay.  So what did you read in December about the
18 Hambys and the board meeting?

19 A   That they had spoken at the Quorum Court and were
20 concerned about the books in the library.

21 Q   Are you familiar with a letter that they sent
22 expressing their concerns about the books in the library?

23 A   Yes.

24 Q   Have you read that letter?

25 A   I can't remember whether I read it or not.

1 Q   Okay.  Well, let's look at it.  You can tell us if it
2 rings a bell or not.
3       (Exhibit No. 5 was marked & attached hereto.)
4 Q   If you will, read over that please.
5 A   No, I have not read this letter.
6 Q   Okay.  This letter talks about several things.
7 There's one thing in particular I want to ask about your
8 knowledge with respect to the Crawford County Library and
9 it's the third line in the second paragraph.  It says:
10 "Then they made a public display in the front of the
11 library with these books."
12       I guess I should back up and say what they say for
13 context, is that books having to do with Alternative
14 lifestyles, which they also describe as a progressive,
15 woke ideology normalizing and equating homosexual and
16 transsexual lifestyles with heterosexual family units.
17       Are you aware of any public display of such books in
18 the Crawford County Library during your tenure?
19 A   No.
20 Q   Are you aware of any such display after your tenure?
21 A   No.
22 Q   Are you aware of any display, for example, a Gay
23 Pride Month display in June in any public library
24 anywhere?
25 A   No.

1 Q   Okay.  Does the way that the Hambys expressed their
2 concern about books in this letter, express the same
3 thoughts in the email that you described before about the
4 patrons' concerns about books that had been acquired by
5 the library?
6 A   Repeat that.
7 Q   When you talked before about -- other than a
8 letter -- or the email, pardon me, from Representative
9 Fite, you said you received a letter from another patron
10 that was concerned about children's books with LGBTQ
11 themes.
12       Was the concern in that email similar to the concern
13 being expressed by the Hambys here?
14 A   Yes.
15 Q   Okay.  This letter starts:  "Our parental rights and
16 religious liberties are being subverted by a progressive,
17 woke ideology driven by the library director and her
18 employees.  Many professionals would still consider this
19 behavior child abuse."
20       Did I read that correctly?
21 A   Yes.
22 Q   Are you familiar with the particular books they were
23 concerned about?
24 A   No.
25 Q   Okay.  You don't know which books they were talking

1 about here?
2 A   No.
3 Q   When you became the interim Director, did you see any
4 books in the children's section of the Crawford County
5 Library that you would consider child abuse to have in
6 that section?
7 A   No.
8 Q   Did you see any books in any of the children's
9 sections of any of the Crawford County libraries that you
10 would consider inappropriate for the children's section?
11       MR. MCLELLAND: Objection to the extent it
12       seeks a legal opinion on that term of art,
13       inappropriate, but continue.
14       MR. WATSON: And object to the form.  Can
15       we please get the timeline that you're talking
16       about in this question?
17 BY MR. ADAMS:
18 Q   I'm saying at the time you returned as the interim
19 Director in February of 2023, did you become aware of any
20 books in any branch of the Crawford County Library, in the
21 children's sections of those libraries that you thought
22 should not be there?
23 A   No.
24 Q   Okay.  I guess I should specify.  Is that because
25 books that you might have thought were inappropriate had

1 been moved to the adult section of the library or because
2 you thought they were appropriate to be in the children's
3 section?
4 A   The books had been moved.
5 Q   The books had been moved?
6 A   Yes.
7 Q   Okay.  So were there some books that were moved to
8 the adult's section of the Crawford County Library that
9 you thought were inappropriate to have in the children's
10 section?
11 A   No.
12 Q   Okay.  We'll come back to this when we're talking
13 about the rest of what happened.  I guess tell me anything
14 else you remember about the media reports, or anything
15 else you heard about that December 2022 Quorum Court Board
16 meeting.
17 A   I just heard that there was a long discussion about
18 it and that as a result there was a compromise made.
19 Q   Okay.  Had you heard any discussion about a possible
20 compromise before that meeting?
21 A   Yes.
22 Q   And do you remember who you spoke about that with or
23 heard about it from?
24 A   The Board President at the time.
25 Q   Okay.  Who was that?

Page 45

1 A **Jami Balkman.**
2 Q Okay. Jami. And I'm sorry, please spell --
3 A **B-A-L-K-M-A-N.**
4 Q So tell me about that communication? Was it in
5 person or by email or by phone?
6 A **She sent me an email. She said she had been harassed**
7 **and worse, and that she was going to the Quorum Court**
8 **meeting to try to come to a compromise.**
9 Q Okay. Did she say who had harassed her or is Jami a
10 him or her?
11 A **It's a her.**
12 Q Okay.
13 A **Members of the community, her pastor.**
14 Q Do you know where she goes to church?
15 A **Not really, no.**
16 Q Okay. And she didn't say in the email?
17 A **I don't remember.**
18 Q Okay. Did she specify?
19 A **She had been called into her employer's office. She**
20 **was a schoolteacher.**
21 Q Does she teach at a private school or a public
22 school?
23 A **Public.**
24 Q Was it the principal's office?
25 A **Superintendent.**

Page 46

1 Q Called into the superintendent's office. And what
2 did the superintendent say?
3 A **I don't know. I have no idea.**
4 Q But the superintendent brought up her decision making
5 as a member of the Crawford County Library Board in the
6 context of her employment?
7 A **He talked to her about something about the library.**
8 **I have no idea what.**
9 Q But she wasn't happy about it --
10 A **But she mentioned it. She mentioned it in this**
11 **email, and she had gotten some threats.**
12 Q Did she say what the threats were?
13 A **No.**
14 Q Okay. Do you remember any description of the people
15 that she gave that were engaged in the harassment and
16 threats?
17 A **I don't remember that part.**
18 Q Okay. Did you have an idea, when she sent you that
19 email, about who that might be?
20 A **No.**
21 Q Okay. So how long, before the December 2022 Quorum
22 Court meeting, was that email?
23 A **The day of.**
24 Q Oh, okay. Did you talk to Deidre Grzymala in advance
25 of the Quorum Court meeting about a possible compromise?

Page 47

1 A **No.**
2 Q Did you talk to Grzymala about a possible compromise
3 at any point in December or January prior to -- or early
4 February, prior to you becoming the interim Director?
5 A **I don't remember having a conversation about it, no.**
6 Q Do you remember having a conversation with any of the
7 members of the board about the --
8 A **Only Ms. Balkman.**
9 Q Okay. Did you talk to her again after, or did you
10 have any communications with her after the Quorum Court
11 meeting about how it went and how she felt about what was
12 decided?
13 A **I don't think I talked to her afterwards. She**
14 **resigned that day.**
15 Q Did anyone else resign that day?
16 A **Two others.**
17 Q This was on the day of the Quorum Court meeting?
18 A **The day after.**
19 Q Who were the other ones that resigned?
20 A **Ms. Porter and --**
21 Q It's all right, we can look it up.
22 A **Mavis. I can't remember her last name right now.**
23 Q So the three of them resigned. Did you ever talk to
24 Ms. Porter or Mavis about why?
25 A **No.**

Page 48

1 Q And Ms. Balkman didn't follow up with you after that?
2 A **We spoke at one point over the phone, I think, but I**
3 **don't remember, other than that she had done what she**
4 **thought was right and it went from there.**
5 Q Was she kind of believed to be out of the soup at
6 that point?
7 A **Yes.**
8 Q Okay. Do you remember the first time you heard or
9 read that Deidre Grzymala would be departing as the
10 Director of the Library?
11 A **I was at the board meeting on January the 22nd, I**
12 **believe, and she thought that she was going to be let go.**
13 Q Did she say why and what gave her that impression?
14 A **She had met with the library attorney.**
15 Q And who was that; do you know?
16 A **I'm terrible with names.**
17 Q Was it Gentry Wahlmeier?
18 A **Yes.**
19 Q Okay. And what did Deidre say that Gentry said?
20 A **He was offering her money to quit.**
21 Q Okay. At any point, in your entire career, has
22 anyone voluntarily taken another job, resigned from
23 employment at an employer where you were, and then also
24 got severance for levering voluntarily?
25 A **No.**

Page 49

1  Q   So that didn't happen at the Crawford County Library,
2  if it didn't happen anywhere, right?
3       MR. MCLELLAND: Object to form.
4  BY MR. ADAMS:
5  Q   No one has ever got severance at the Crawford County
6  Library for voluntarily leaving the job?
7  A   No.
8  Q   Are you aware of a separation agreement that
9  Ms. Grzymala signed with Crawford County?
10 A   I know there was one.  I don't know what was in it.
11 Q   And do you know if that agreement was with the
12 Library Board, given that you were the Director again
13 starting in February?
14 A   It was not.
15 Q   Who was her separation agreement with?
16 A   The county judge and quorum court.
17 Q   I guess I'm trying to make sure I understand because
18 you told me, I think, that your understanding is the
19 library board hires and fires the director and the county
20 judge cannot hire and fire the director?
21 A   That's correct.
22 Q   Okay.  So there were three new directors of the
23 Crawford County Library Board in January of 2023, correct?
24 A   Yes.
25 Q   Okay.  And one of them was Tammi Hamby?

Page 50

1  A   Yes.
2  Q   And were you familiar with her views from any way,
3  besides the media reports that you described about the --
4  A   No.
5  Q   Okay.  So you never heard any more about her views.
6  What about the other two members of the board; did you
7  know anything about them?
8  A   I had met the young lady that was appointed, Amanda.
9  She is a member of the First Baptist Church where I go.
10 Q   Okay.
11 A   Not at the time of this.  She was when she was young,
12 I'll put it that way.
13 Q   Okay.  And were you familiar with any of her views?
14 A   No.
15 Q   Did you know her to --
16 A   No.
17 Q   And the third member you didn't know at all?
18 A   No.
19 Q   Okay.  So after the January board meeting, when
20 Deidre told you that Mr. Wahlmeier offered her money to
21 resign, what was the next you heard about the departure or
22 possible opening there?
23 A   I think Deidre told me that he had upped the amount.
24 Q   Okay.  Did she tell you how much?
25 A   No.

Page 51

1  Q   Okay.  And what's the next thing you heard after
2  that?
3  A   I think it was at the next quorum court where they
4  announced her departure.
5  Q   Okay.  Let me back up.  Did you attend any library
6  board meetings in 2022?
7  A   Let's see.  One, I think.
8  Q   Okay.  Did you attend any Crawford County Quorum
9  Court meetings in 2022?
10 A   No.
11 Q   So so far we've got you at a couple of library board
12 meetings and a quorum court meeting in early 2023?
13 A   Uh-huh.
14 Q   It sounds like you're getting plugged back in?
15 A   I was concerned.
16 Q   Okay.  Can you tell me about those concerns?
17 A   Yes, I was very upset because I could see that what I
18 had built up in the 20 years that I was there was going
19 down the drain.
20 Q   That sounds hard.  Can you tell me about -- I mean,
21 obviously the library itself was kind of your baby after
22 20 years?
23 A   Yes.
24 Q   So what had you built up specifically and what was
25 going down the drain?

Page 52

1  A   When I came in 1999, it was a very needy library
2  system.  During that twenty years we built three new
3  buildings -- four new buildings and remodeled the rest,
4  did an expansion on one, went from a $300,000.00 budget to
5  over a million.  It became a thriving library system and I
6  think it's one of the best in the state, and there was no
7  concern for what they were doing to the library system.
8  They were only pushing their own agendas and there was two
9  sides.
10 Q   Okay.  Let's unpack that a little.  When you say they
11 were pushing their agendas on the library system, and
12 there are two sides, can you describe the groups, I guess?
13 If you don't want to name names, I won't make you name
14 names, but tell me what your concerns were.
15 A   Well, you know what the concern of the Hambys was.
16 Q   Okay.  We see that in their letter.
17     Okay.  What's the other side?
18 A   They stirred up a stink.
19 Q   Okay.  Who is they?
20 A   The Hambys, and their cohorts, the Elders of -- the
21 River Valley Elders.
22 Q   Okay.
23 A   There was pushback from the LGBTQ community and
24 others that were concerned.
25 Q   Okay.

1 A   **The library was caught in the middle.**
2 Q   And what were you concerned would happen to the
3 library?
4 A   **Well, there was threats that they would -- it would**
5 **be closed.**
6 Q   Who was threatening that?
7 A   **Mrs. Hamby.**
8 Q   Okay.  Did she threaten that in public or to you
9 privately or both?
10 A   **A board meeting January the 10th.**
11 Q   Okay.  Presumably that was an or else statement,
12 right, it wouldn't be closed unless?  So what was the
13 unless?
14 A   **Things changed in the library system to fit her**
15 **agenda.**
16 Q   Okay.  Has she since tried to close the library?
17 A   **I don't know.**
18 Q   Okay.
19 A   **I can only speculate.**
20 Q   Okay.  But you're not -- it's still open as of today?
21 She has not successfully closed the library?
22 A   **She has not.**
23 Q   Okay.  Now, from February of last year to February of
24 this year, you were the acting director, right?
25 A   **Uh-huh.**

1 Q   And for what part of that time?  I'm going to premise
2 this question on something I read in documents.  For some
3 part of that time I understand Tammi Hamby was the chair
4 of the library board.
5 A   **Until this January.**
6 Q   Okay.  So for ten or eleven of the twelve months that
7 you were the interim Director most recently?
8 A   **The whole time.**
9 Q   Okay.  So the whole time she was in --
10 A   **Until January.**
11 Q   She was the board chair?
12 A   **Yes.**
13 Q   Did you talk to her, other than as part of the
14 monthly board meetings?
15 A   **Yes.**
16 Q   How often would you say you spoke with her?
17 A   **I took her around to the libraries, introduced her to**
18 **everybody, showed her the libraries because she's never**
19 **been in one.**
20 Q   So when was that?
21 A   **Right after she took -- right after I took my job and**
22 **we were together that -- most of the day that day and we**
23 **spoke.**
24 Q   Okay.
25 A   **Other than that --**

1 Q   Did she become the board chair on January 10th of
2 2023?
3 A   **It was before that.  That was her first meeting, I**
4 **think.**
5 Q   Okay.  But at some point -- I mean, I understand she
6 was appointed by Judge Keith.
7 A   **Correct.**
8 Q   And he took office on January 1st, 2023?
9 A   **Yes.**
10 Q   So it was at some point in January?
11 A   **Correct.**
12 Q   Okay.  What I'm circling around, is Tammi hadn't been
13 in any of the libraries or in some of the libraries
14 between -- at any point before late -- later in February
15 of 2023?
16 A   **She told me she had a card when her kids were small.**
17 Q   Okay.
18 A   **She did not have one when she was appointed the board**
19 **chairman.**
20 Q   Do you know how old her kids are now?
21 A   **They're grown.**
22 Q   Okay.  So it had been many years since she, herself,
23 had been a patron?
24 A   **I have no idea.  I don't know how long.**
25 Q   Okay.  But Ms. Grzymala, the Director from

1 January 1st to February 27th of 2023, hadn't shown Board
2 Chair Hamby around prior to you returning?
3 A   **No.**
4 Q   Did either Grzymala or Hamby describe any
5 interactions between the two of them at the time?
6 A   **They spoke, I know that.**
7 Q   Okay.
8 A   **But I don't know what was said.**
9 Q   Okay.  So starting in late February of 2023, you were
10 taking Ms. Hamby around.  Was this kind of one trip or
11 multiple trips?
12 A   **One trip.**
13 Q   And did the Social Sections exist at that time?
14 A   **Yes.**
15 Q   Okay.  And you talked about her agenda.  Did she
16 express any feeling about the Social Section?
17 A   **We didn't talk about it.**
18 Q   You didn't talk about the Social Section at all?
19 A   **No.**
20 Q   Okay.  Did you talk about her agenda as expressed in
21 this letter of November 10th of 2022 at all?
22 A   **No.**
23 Q   Okay.  What about later in your interactions during
24 2023 with her, did you talk about LGBTQ material?
25 A   **In a roundabout way.**

Page 57

1 Q    Can you tell me about that?
2 A    It was mostly -- I did not have any interaction with
3 her except at board meetings.  We talked about what was on
4 the agenda.
5 Q    Okay.
6 A    And that -- and I did point out that she had an
7 agenda in some of those meetings.
8 Q    Okay.
9 A    And it was not what libraries were about.
10 Q    How did she respond to that?
11 A    Usually with silence.
12 Q    Okay.  Can you spell out, so it's clear in the
13 record, what the difference is between her agenda and what
14 libraries are about, in your view?
15        MR. MCLELLAND:  Objection, to the extent
16    that it calls for an opinion.  You can go ahead.
17 A    Repeat the question.
18 Q    I'm not going to be able to quote your words
19 directly, but you said you expressed that Ms. Hamby's
20 agenda was not what the libraries are about.
21    Can you tell us, as plainly as you can for the record
22 in just a few sentences, what the differences between her
23 agenda and what libraries are about?
24        MR. MCLELLAND:  Same objection.
25 A    Her -- she wants to limit what is offered in

Page 58

1 libraries.  We try to have something for everyone.
2 Q    Okay.  Why don't we talk a little more about these
3 social sections?  When's the first time you saw one?
4 A    When I became the Director of the Crawford County
5 Library System on February 27th.
6    (Exhibit No. 6 was marked & attached hereto.)
7 Q    Okay.  I'm going to give you Exhibit No. 6.
8 A    Could we take another small break?
9 Q    That would be great.
10        (Brief recess was taken.)
11 BY MR. ADAMS:
12 Q    I can represent, and I think that Mr. McLelland can
13 confirm that this is the list of the books in the Crawford
14 County Social Section that we got in discovery in this
15 case.
16 A    Yes.
17 Q    Okay.  So I want to first, as quickly as we can, I
18 guess, just run through and talk about what the
19 abbreviations mean.  So on the first line there's a book
20 and it says -- the Call Number is S YA MCNEIL, so McNeil
21 is the name of the author?
22 A    Yes.
23 Q    And YA stands for young adult?
24 A    Yes.
25 Q    And what does S stand for?

Page 59

1 A    Social Section.
2 Q    Okay.  Two lines down, "S E EWERT," what does the E
3 stand for there?
4 A    Easy.
5 Q    Easy?
6 A    It's an easy read.
7 Q    Okay.  So the one right below that, "S 306.766
8 MAR,"so I learned from my mistake earlier that that's in
9 the Social Sciences, and prior to being placed in the
10 Social Section, which I understand the S indicates, that
11 book would have been shelved in the regular adult
12 nonfiction?
13 A    That's what it looks like, yes.
14 Q    All right.
15 A    It might be a typo.  I don't know.
16 Q    You're not sure?
17 A    No.
18 Q    Okay.  Well, look three lines down from that.
19 There's another one, which is Abuse: an encyclopedia of
20 causes, consequences, and treatments, also in the Social
21 Sciences Section in the Mountainburg Public Library.
22    Does that look like it was probably --
23 A    Adult Section.
24 Q    -- in the regular Adult Section before?
25 A    Yes.

Page 60

1 Q    So it when it says S-J, what does the J stand for?
2 A    Juvenile.
3 Q    Okay.  It looks like five lines up from the bottom
4 there was another one that may have been in the regular
5 nonfiction section, a book by Jane Fonda called Being a
6 Teen.
7    Does that look correct?
8 A    Yes.
9 Q    What is the 600 series of the Dewey Decimal System?
10 A    That's usually sports, I think.
11 Q    All right.  I'm not going to go through all of these,
12 but it looks like there's at least some of these books
13 that were not, prior to being placed in the Social
14 Section, in a children's or juvenile or YA section.  They
15 were on the regular adult shelves.  Is that --
16 A    That's the way I see it.
17 Q    Okay.  And let me ask about a few of these books in
18 particular that I, at least, became familiar with over the
19 course of the last few years.
20    Are you familiar with And Tango Makes Three?
21 A    No.
22 Q    Okay.  Are you familiar with Ace of Hearts?
23 A    No.
24 Q    Are you familiar with Bye Bye Binary?
25 A    I've heard of it.

1 Q   Okay.  But you don't think you've looked through it
2 or anything?
3 A   I don't think so.
4 Q   I guess if you don't mind, tell me if there's any
5 books that you remember having looked through or read?
6 You don't have to look at every line, but if you will,
7 just skim it.
8 A   My Two Dads.
9 Q   Okay.  Do you know that one?
10 A   I think I have skimmed it, yes.
11 Q   Okay.
12 A   The original to the Anne of Green Gables, but I
13 haven't read that -- I don't have any idea about that one.
14 Q   Let's see, Anne:  An adaptation of Anne of Green
15 Gables (Sort Of).
16      Do you know who selected the books that would go in
17 the Social Section?
18 A   The branch managers.
19 Q   Okay.  And do you know what criteria they used to
20 select the books that would go in the Social Section?
21 A   They told me that they were given a list of words to
22 search by subject.  I don't know what that list of words
23 was.
24 Q   Okay.  Did they tell you who gave them the list of
25 words?

1 A   Deidre.
2 Q   Did you ever talk to Deidre about that list of words?
3 A   No.
4 Q   Okay.  What's your understanding, generally, about
5 what these books on the list have in common?
6 A   They either have sex or LGBTQ.
7 Q   There's only one that stands out in the list to me as
8 maybe not fitting that test and it's on the last page,
9 nine up from the bottom, and it's Who Believes What?
10 Exploring the World's Major Religions.  Do you know why
11 that's on the list?
12 A   I have no idea.
13 Q   If you searched for books that had sexual content in
14 the regular adult section, would you expect to have more
15 or fewer than this list?
16 A   More.
17 Q   Okay.  So did you get any sense, from talking to the
18 branch managers, about how the books that we identified
19 earlier, that were moved from the regular adult
20 shelves to the special Social Section shelves were chosen?
21 A   No.
22 Q   Is it your understanding that any book that mentions
23 LGBTQ themes would be placed in the Social Section?  For
24 example, if a book condemned homosexuality, would it have
25 been placed in the Social Section?

1 A   Don't know.
2 Q   Okay.  During your time as the interim Library
3 Director, were any of the books added to the Social
4 Section?
5 A   No.
6 Q   Were any books taken out of the Social Section?
7 A   No.
8 Q   Why is that?
9 A   Our lawyer advised us not to.
10 Q   Did you any have concerns about new acquisitions
11 during that period?  So if there was book that the normal
12 selection criteria might have suggested would have been a
13 good acquisition, but that you thought might end up in the
14 Social Section, based on the criteria used before, did you
15 have any concerns about acquiring books during the year
16 that you were the interim --
17 A   Of course.
18 Q   So how did you deal with those concerns?
19 A   Pretty much didn't order any.
20 Q   Okay.  Would you have had concerns about ordering
21 books that were opposed to homosexuality or transgender
22 identity?
23 A   Probably.
24 Q   Okay.  So you just avoided these topics completely?
25 A   Pretty much.

1 Q   Okay.  Are you aware of any books that are not in the
2 Social Section, but that involve LGBTQ issues?
3 A   Yes.
4 Q   Can you --
5 A   We did not put adults -- we did not take anything out
6 of the adult section, that I know of.
7 Q   Well, it seems like before, at least, there were some
8 that seemed like they might have been taken out?
9 A   See, I don't know what the criteria was, but I know
10 that there are still some in the adult section that deal
11 with that topic.
12 Q   And how do you know that?
13 A   Because it's been brought up.
14 Q   Okay.  Who brought it up?
15 A   Several people.
16 Q   And were they opposed to the continued presence of
17 those books in the regular adult section?
18 A   They assumed that they were in the lower sections,
19 instead of in the adult sections.
20 Q   They assumed -- so they expressed concern about --
21 A   Yes.
22 Q   Do you remember which books in particular?
23 A   Gender Queer.
24 Q   That's a famous one.  And do you remember who raised
25 that issue with you?

1  A  **No.**
2  Q  Okay.  But somebody said they thought it was in which
3  section?
4  A  **In the children's section.**
5  Q  Okay.
6  A  **At one point.**
7  Q  And do you know which branch or branches that book is
8  in?
9  A  **Van Buren.**
10  Q  And it's in what section?
11  A  **It's in the adult section.**
12  Q  I understand that book to be a graphic memoir?
13  A  **Yes.**
14  Q  So which section is it in now?
15  A  **It's in the biographies.**
16  Q  But just with the regular adult biographies and
17  autobiographies?
18  A  **Yes.**
19  Q  Okay.  Did the library board express any concern
20  about that?
21  A  **No.**
22  Q  Okay.
23  A  **They probably don't know it.**
24  Q  Okay.  Did the library ever adopt a formal policy for
25  the administration of the Social Section?

1  A  **No.**
2  Q  Okay.  Are you aware of any general instructions, or
3  did you give any general instructions to the staff about
4  how to administer the Social Section?
5  A  **No.**
6  Q  Had they been given such instructions before you took
7  office?
8  A  **I don't know.**
9  Q  Okay.  Do you think the materials in the Social
10  Section have been selected based on the opinions in those
11  books?
12  A  **Yes.**
13  Q  Can you tell from a distance that a book is part of
14  the Social Section?
15  A  **Yes.**
16  Q  How?
17  A  **It has green tape over the call number.**
18  Q  Okay.  Did you work in the Van Buren Branch when you
19  were the acting Director?
20  A  **My office is in the Van Buren Branch.**
21  Q  And do you still have an office now that you're --
22  A  **Yes, I have part of an office, yes.**
23  Q  And is it still there?
24  A  **Yes.**
25  Q  Okay.  Did you get any complaints, during your time

1  as the interim Director, about the inclusion of any
2  materials in that section?
3  A  **Yes.**
4  Q  Did you take any action in response to those
5  complaints?
6  A  **No.**
7  Q  Okay.
8  A  **I guess I need to clarify that.**
9  Q  Okay.
10  A  **There were some requests for reconsideration and the**
11  **board dealt with those.**
12  Q  And do you remember when that was?
13  A  **That was probably March or May.  May, I think.**
14  Q  Of 2023?
15  A  **Uh-huh.**
16  Q  Okay.  And did those -- did the board take any action
17  to move the books?
18  A  **Yes.**
19  Q  So they moved them back to the regular collection?
20  A  **Yes.**
21  Q  Do you remember which books those were?
22  A  **No, I don't.**
23  Q  Okay.  Back when we were talking about library
24  principles and how you lay out books in the library and we
25  talked about grouping books by subject matter, so that

1  people browsing could find things they were interested in,
2  is the Social Section consistent with that principle of
3  grouping books by subject matter for browsing purposes?
4       **MR. MCLELLAND:** Objection.  It calls for an
5  opinion.  You can respond.
6  A  **Repeat the question again.**
7  Q  Do you remember when we talked about the Library Bill
8  of Rights and the Code of Ethics, and then we also talked
9  about one application of the Code of Ethics on helping
10  people find material that is of interest to them and one
11  of the ways in which librarians do that, is by grouping
12  books and other library materials by subject matter.
13    Is the Social Section consistent with those
14  principles of helping library patrons find materials by
15  grouping them by subject matter?
16  A  **No.**
17       **MR. MCLELLAND:** Same objection.
18  Q  Did you ever express an opinion to the Library Board
19  or the County Judge or anyone on the Quorum Court about
20  the Social Section?
21  A  **Of course.**
22  Q  Okay.  What did you say?
23  A  **That it created a problem.**
24  Q  Okay.  And what's the nature of the problem?
25  A  **The nature is that it goes against library**

1 principles.

2 Q Okay. Do you think Deidre Grzymala would have

3 created the Social Section without having gone to that

4 December 2022 meeting and heard from the Quorum Court?

5 A That's subjective. I can't -- can't answer that.

6 Q What do you think the Quorum Court's view of the

7 Social Section is?

8         MR. MCLELLAND: Object to form.

9         MR. WATSON: Objection to form.

10 A I'm not answering it. I can't -- I can't judge the

11 Quorum Court, their thoughts.

12 Q Okay. But you read news reports about the

13 December 12th, 2022 meeting?

14 A Yes.

15 Q And what did those reports say; do you remember?

16 A Not really, no.

17 Q Okay. Did Judge Keith appointing Tammi Hamby to the

18 Library Board to replace one of the three members that

19 resigned immediately after the December 2022 meeting send

20 a message to you?

21         MR. MCLELLAND: Object to form.

22 A Yes.

23 Q What was the message?

24 A That he did not care about the library or was

25 ignorant of what he had done.

1 Q Let me ask this simply. Did you interpret the

2 message as saying anything in particular about the Social

3 Section?

4 A Not to me, no.

5 Q Okay. I've been meaning to come back to talk about

6 the Social Section a little bit, but I think at this point

7 we can go on to talk a little bit about Act 372, if

8 everybody is okay to keep going for a little while.

9 A It's fine.

10 Q All right. So let's turn back to Exhibit 1 and Act

11 372. We talked, in the beginning, about how the

12 Plaintiffs, who Ms. Brownstein and I represent, are

13 challenging, under the First Amendment, two of the

14 sections of this law.

15    Do you remember that?

16 A Yes, I do.

17 Q So let's start with Section 1, the criminal part of

18 the statute. Do you know what it means for an item to be

19 harmful to minors?

20 A Very broad.

21 Q Okay. Well, tell me broadly what it means.

22 A It needs to be defined as how it harms them.

23 Q Okay. Had you seen this definition before you read

24 this statute, of, quote, harmful to minors"? Do you

25 remember having read it before?

1 A I wasn't looking for it, so, no, I don't remember.

2 Q Okay. Yeah, it's not -- it's cross-referenced in

3 this statute and it refers to a previous statute.

4    So if you look on Page 2 of the Act: "Harmful to

5 minors means the same as defined in Arkansas Code Section

6 5-68-501."

7    So I'm going to read that section to you now.

8 "Harmful to minors means that quality of any description,

9 exhibition, presentation, or representation in whatever

10 form of nudity, sexual conduct, sexual excitement or

11 sadomasochistic abuse when the material or performance

12 taken as a whole has the following characteristics:

13    (A) The average person 18 years of age or older

14 applying contemporary community standards would find that

15 the material or performance has a predominant tendency to

16 appeal to a prurient interest in sex to minors; (B) The

17 average person 18 years of age or older applying

18 contemporary community standards would find the material

19 or performance depicts or describes nudity, sexual

20 content, sexual excitement, or sadomasochistic abuse in a

21 matter that is patently offensive to prevailing standards

22 in the adult community with respect to what is suitable

23 for minors; and (C) the material or performance lacks

24 serious literary, scientific, medical, artistic, or

25 political value for minors."

1    Okay. Did that definition make sense to you?

2 A It's still not clear.

3 Q Okay. What's not clear about it?

4 A It depends on somebody's opinion.

5 Q Okay. So you're not sure what would fall under that

6 and what wouldn't?

7 A No.

8 Q Okay. But as a broad category, it has to do with

9 what in order to be harmful to minors?

10 A Whatever the older generation thinks about that

11 subject.

12 Q Okay. But I mean, could it be harmful to minors in

13 terms of teaching them to be dishonest?

14         MR. MCLELLAND: Object to form.

15 A Don't know.

16 Q Okay. So you can see at the bottom this draft is

17 dated March 15th, 2023, and the last page, it was approved

18 by the sponsor of Senator Sullivan on March 30th, 2023.

19    You were the interim Director of the Crawford County

20 Library on March 30th, 2023, right?

21 A Correct.

22 Q So is that about the time you heard about this law

23 and read it?

24 A Don't know. I heard a whole lot about it before.

25 Q How did you hear about it?

1 A **In the media.**
2 Q Okay.
3 A **Talking to other librarians. We were very concerned.**
4 Q What were you concerned about?
5 A **Mostly because I was going to become a criminal if I**
6 **gave somebody a book that I didn't know what was in it.**
7 Q Okay. Well, after it was passed, did you try to
8 figure out which books would be considered harmful to
9 minors in the library collection?
10 A **No.**
11 Q It was just not possible for you to make that
12 determination?
13 A **No.**
14 Q Do you remember which other librarians you talked to
15 or got emails or had any other communications with about
16 this?
17 A **There were several, no.**
18 Q Okay. How about the state librarian; did you get any
19 communications from the state library about how to
20 interpret this law?
21 A **Yes.**
22 Q Do you remember when that was?
23 A **Right about this time, or a little later.**
24 Q Okay. And what's the name of the State Librarian?
25 A **Jennifer Chilcoat.**

1 Q Okay. Did you get an email from Jennifer Chilcoat?
2 A **I did.**
3 Q All right. Let's do this as Exhibit 7.
4 (Exhibit No. 7 was marked & attached hereto.)
5 If you will flip through that and tell me if this is
6 the email that you just mentioned?
7 A **Yes.**
8 Q Okay. So you got this email when it went out?
9 A **Yes.**
10 Q So this starts out: "Dear Public Library Directors,
11 As you all know Senate Bill 81, now Act 372 and linked
12 below, has been signed by Governor Sanders. Unless
13 something happens between now and August 1st, that Act
14 will be State Law," and it goes on to talk about the
15 different sections of the Act below.
16 Do you remember reading this on the third page of
17 Exhibit 7, where Ms. Chilcoat summarizes Section 1, the
18 harmful to minor section of Act 372?
19 A **What does it start with?**
20 Q Section 1, Harmful to Minors.
21 A **Okay. Yes, I remember.**
22 Q Okay. Do you remember when it says conviction of a
23 class A misdemeanor carries a maximum sentence of up to 12
24 months in jail and a maximum fine of $2,500?
25 A **Yes.**

1 Q That might have gotten your attention?
2 A **Yes.**
3 Q Okay. After that it says: "In order to be convicted
4 of furnishing a harmful item to a minor, however, there is
5 a process, just like that of any criminal charge; you
6 can't be hauled off to jail on a citizen's arrest."
7 Did that make you feel better?
8 A **No.**
9 Q Have you ever heard of a criminal referral? Have you
10 ever gotten a visit from the police about any of the books
11 in your library?
12 A **No.**
13 Q Okay. Now, this guide doesn't actually include the
14 definition of what's harmful to minors from what I see.
15 Do you see that in here?
16 A **Right.**
17 Q Do you remember looking it up, since as we saw
18 before, it's cross-referenced in the law, it's not
19 actually set forth in the law, what the definition of
20 harmful to minors is.
21 A **I don't remember looking it up, no.**
22 Q Okay. So this definition of harmful to minors, it's
23 got those three factors that we talked about, but there's
24 also this general description, which means the quality of
25 any description, exhibition, presentation or

1 representation in whatever form of nudity, sexual conduct,
2 sexual excitement and it goes on.
3 So the definition of harmful to minors is not -- it
4 doesn't cover every type of content, right, it specifies
5 certain kind of content?
6 A **Right.**
7 Q Have you ever read a book that you think is too
8 sexually explicit for a ten-year-old, but might be
9 appropriate for a seventeen-year-old to read?
10 A **Yes.**
11 Q Do you think the community standards in Crawford
12 County would back you up on that assessment of the book?
13 A **Don't know.**
14 Q But if you had to guess, if you were forced as a
15 librarian to figure out whether a book might be considered
16 harmful to minors on this ground, because it included a
17 description of sexual conduct, do you think it's possible
18 that the consensus in Crawford County, is that there's at
19 least some book that you've read that would be too
20 sexually explicit for a ten-year-old, but most adults
21 would think a seventeen-year-old could handle it?
22 **MR. MCLELLAND:** Object to form.
23 A **Possibly.**
24 Q Is it possible that any of those books are in the
25 Crawford County Library System?

1  A   Possibly.
2  Q   Did you take any steps, after this law was passed,
3  but before it was scheduled to go into effect on
4  August 1st, to try to minimize the criminal exposure of
5  you or the other Crawford County librarians under this
6  statute?
7  A   No.
8  Q   Okay.  Are you aware of the lawsuit to try to get the
9  law blocked?
10  A   Yes.
11  Q   All right.  Let's turn to Section 5, which is going
12  to get a little more in the weeds here.  So I'm going to
13  be looking at two things at the same time.
14      First, let's turn back to Exhibit 1, which is the
15  text of the law itself, which starts on Page 7 of
16  Exhibit 1.
17      It starts out in Subsection A:  "Each county or
18  municipal library shall have a written policy to establish
19  guidelines for the selection, relocation and retention of
20  physical materials that are available to the public."
21      Okay.  So prior to Act 372, did the Crawford County
22  Library have written policies to establish guidelines for
23  the selection, relocation and retention of physical
24  materials?
25  A   Yes.

1  Q   Subsection C says:  "A written policy adopted by a
2  county or municipal library under Subsection B shall
3  provide, at a minimum, the following:  (1) A person
4  affected by the material to be challenged or an employee
5  of the county or municipal library may challenge the
6  appropriateness of the material in the county or municipal
7  library."
8      What I'd like to focus on there is a person affected
9  by the material.  Did your policy before, to the best of
10  your recollection, limit who could challenge materials to
11  cardholders or members of the community or any other
12  smaller group than any human on the planet?
13  A   I think that the contract policy we had anybody
14  could, but I'm not sure.
15  Q   Okay.  Do you know what that means when it says a
16  person affected by the material?  What would it take for a
17  person to be affected by a book in your collection?
18  A   They'd have to read it first.
19  Q   Okay.  Fair enough.
20      "(2)The county or municipal library shall decide if
21  material being challenged shall remain available
22  throughout the challenge process."
23      Did your policy before, as far as you remember,
24  leaving a book on the shelves while it was being
25  challenged or taking it off the shelves, or did it say?

1  A   We have a policy.
2  Q   All right.  Let's look at it.  That's a good point.
3      So we're looking at Crawford 72 on Exhibit 4.  Let's
4  look at Roman Numeral V.  What does that say?
5  A   "The materials under consideration will remain in the
6  library's collection pending the outcome of the Patron's
7  request."
8  Q   All right.  Now, let's turn to Page 69, the first
9  page of Exhibit 4, which we talked about before that we
10  understand to be the draft policy.
11  A   Okay.
12  Q   Does it say on this page whether the book will remain
13  in circulation.?
14          MS. BROWNSTEIN: Is this the one with the
15      missing page?
16  BY MR. ADAMS:
17  Q   Well, anyway, do you remember how the Crawford County
18  Library was going to handle that if Section 5 went into
19  effect?
20  A   No, I don't.  This one that was approved on
21  9/13/2022, we don't know if that part was changed or not,
22  do we?
23  Q   No, we we're going to find out.  I think we got the
24  total draft policy.
25  A   It was changed from the form that was before it.

1  Q   Well, the one on page -- I guess I understood you to
2  say that the one on Page 69 was never adopted because the
3  law didn't go into effect; is that correct?
4  A   That's not the one I'm talking about.
5  Q   But you're saying the one before the one that was
6  adopted in 2022?
7  A   Yes.
8  Q   Yes.  So I don't think we know because that would
9  have been the one that you would have been responsible for
10  overseeing?
11  A   Right.
12  Q   Okay.  So Section 5 would add to the Arkansas code we
13  were talking about, Subsection C of 13-2-106, where it
14  says a written policy adopted by a county or municipal
15  library shall provide, at a minimum, the following and
16  then we just talked about Subsection 2.
17      Subsection 3 says:  "Before a person can file a
18  challenge, the person shall request a meeting with the
19  librarian of the county or municipal library."
20      Did anyone do that while you were the interim
21  librarian?
22  A   No.
23  Q   Subsection 5 says:  "After a meeting requested under
24  C3 of this section occurs, if the person who requested the
25  meeting wants to formally challenge the appropriateness of

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
Eva Doyce White
March 26, 2024

Page 81

1  the material that was the subject of the meeting, the
2  person shall complete and submit the request for
3  reconsideration using the form or other method provided
4  under Subdivision (c)(4)(B) of the section to challenge
5  the material that was the subject of the meeting."
6      It goes on to say:  "In conducting the review of the
7  material being challenged, the librarian of the county or
8  municipal library shall select a committee of library
9  personnel."
10  Q  Did you think about that, who might be on your
11  committee if this had gone into effect?
12  A  No.
13  Q  Okay.  And why not?
14  A  Because I was hoping it wouldn't be.
15  Q  Okay.
16  A  Put it into effect, so I'd have to do it and I wasn't
17  going to stay that long.
18  Q  Okay.  The thing that jumps out to me, anyway, about
19  what would have happened if this law had gone into effect,
20  is down near the bottom of Page 8, it talks about the
21  decision the library committee has to make.
22      "The committee established under subdivision
23  (c)(6)(A) of this section shall vote to determine whether
24  the material being challenged shall be relocated within
25  the library's collection to an area that is not accessible

Page 82

1  to minors under the age of 18 years."
2      Did I read that correctly?
3  A  Yes.
4  Q  Do you remember reading that after the law was
5  passed?
6  A  Yes.
7  Q  Do any of the Crawford County Library branches, or
8  did they, at that time, pardon me, have an area that is
9  not accessible to minors under the age of 18 years?
10  A  No.
11  Q  Can a minor freely browse the shelves in Crawford
12  County libraries?
13  A  Yes.
14  Q  Coming back to Jennifer Chilcoat's email of
15  April 20th, 2023, if you don't mind, Exhibit 7.  So turn
16  to Page 5, toward the end of her discussion on Section 5
17  on guidelines for selection and relocation and retention
18  of materials, there's a second paragraph that starts out:
19  "You will need to meet with your board and likely your
20  library's attorney to discuss what you will do in the
21  event the items go through the challenge process with the
22  outcome that they need to be, quote, "relocated within the
23  library's collection to an area that is not accessible to
24  minors under the age of 18 years."
25      Chilcoat goes on to write, "I don't know of any

Page 83

1  library that currently has an area that they monitor for
2  who goes into it, so that is going to be problematic for
3  everyone.  One minimalist possibility might be purchase
4  carts to hold the relocated materials, so that persons 18
5  and over can request access."
6      Did you or anyone, on behalf of the Crawford County
7  Library, take any of these steps to prepare to have an
8  area that was in accessible to minors under the age of 18?
9  A  No.
10  Q  Okay.  And was that -- was that, again, because you
11  knew this lawsuit was going on and you hoped that the law
12  would not go into effect?
13  A  I didn't know how to do it.
14  Q  Okay.  Well, tell me about that.  What do you mean
15  you didn't know how to do it?
16  A  Our libraries are open floor plans.  I don't know how
17  to make that happen without structural changes.
18  Q  Okay.
19  A  We don't have the money for that.
20  Q  That was my next question.  Would those structural
21  changes be cost prohibitive?
22  A  Probably.
23  Q  Would those structural changes be consistent with the
24  goal of providing an open browsing experience?
25  A  No.

Page 84

1  Q  Did you discuss this not accessible section language,
2  with other folks inside the library and talk about what
3  you might do if this did go into effect?
4  A  Not really, no.
5  Q  Did you discuss it with the board?
6  A  No.
7  Q  Did they ask you about it?
8  A  No.  I'll have to back up on that.  Yeah, they did
9  discuss it some.
10  Q  Are you talking about the board?
11  A  The board.
12  Q  What did they say?
13  A  Didn't come up with an answer.
14  Q  Okay.  I guess I should circle back just with one
15  question, and say did you talk about the possibility of
16  criminal prosecution with anybody?  Again, referring to
17  Section 1 of this Act?
18  A  I talked to my staff about it, yes.
19  Q  Can you tell me about that discussion?
20  A  They were very upset that they were going to be under
21  this law that made them a criminal if they gave a book
22  that they had not read to a person or a minor and then
23  somebody challenged that book and then they would be under
24  criminal charges for it, and so we discussed it a little,
25  but, you know, we couldn't see beyond that.

1 Q   Okay.  So you didn't know what was going to happen?
2 A   No.
3 Q   And you hoped the law wouldn't go into effect?
4 A   Right.
5 Q   When you described the concern of the librarians, you
6 talked about a book being challenged in connection with
7 criminal liability.  So as we went through the text,
8 Section 1 is the criminal section and Section 5, I'll just
9 represent to you, doesn't talk about harmful to minors.
10     On the middle of Page 7, "(c)(1), a person affected
11 by the material to be challenged or an employee of the
12 county or municipal library may challenge the
13 appropriateness of material available in the county or
14 municipal library."
15     So do you read that as connected with the criminal
16 prohibition?  So if a book is found to be inappropriate,
17 that it might also subject you to criminal liability?
18 A   Of course.
19 Q   Do you understand Section 5 to permit the relocation
20 of books from the adult section, just the regular adult
21 section, either nonfiction or a novel just on the shelves,
22 to an area inaccessible to minors under the age of 18?
23 A   It's possible.
24 Q   Okay.  So it doesn't just apply to children's books
25 or young adult books?

1 A   Not if minors could get to them.
2 Q   Okay.  Do you think the Social Sections are currently
3 inaccessible to minors under the age of 18?
4 A   No.
5 Q   So they would have to be further segregated in some
6 way?
7 A   Right.
8 Q   One other thing that stands out about this procedure
9 that Act 372 sets forth for county libraries like yours,
10 is that the committee of librarians seemingly may have to
11 read all of a novel or a nonfiction book.
12     So if you look in the middle of Page 8, subsection
13 (7)(b), it says material being challenged, and then at
14 romanette ii, "Shall be reviewed in its entirety and shall
15 not have selected portions taken out of context."
16     Would your expectation be, in the course of a normal
17 book challenge, like if someone challenged kind of a long
18 book -- I mean, say it's a classic book that might get
19 challenged, like Lady Chatterley's Lover or something and
20 it's spicey, but it's also a book that's going to take, I
21 don't know how long, at least five or ten hours to read,
22 right, if you're a normally fast reader, would your
23 library employees, if you had to put three of them on this
24 committee, is that something they can do on the clock?
25     Can they sit there and read Lady Chatterley's Lover,

1 or are they expected to that on their free time?  How does
2 that work, in your experience, with book challenges?
3 A   Usually it would be outside of work time because they
4 have duties to do at work that they have to do.
5 Q   Okay.
6 A   I mean, we can't shut down the library to read a book
7 and there's -- some of my libraries just have two people.
8 Q   So would that limit the volume of these challenges
9 that you could realistically be expected to process?
10 A   It would definitely be a chore.
11 Q   Okay.  Going back to Jennifer Chilcoat's email, I
12 think it's the page before the one you're on right now.
13 The one that starts out, "This one is going to give you
14 some heartburn."
15 A   Okay.
16 Q   I'm going to read No. 1.  "If your current policy
17 makes a promise about how quickly you'll be able to
18 respond to book challenges, I strongly advise you to amend
19 that portion of your policy, as you are making amendments
20 to comply with this law.  There are locations where
21 certain citizens are marking their calendars for this law
22 to take affect, so they can begin filing scores of
23 challenges.  If your policy currently promises you will
24 consider all the challenges within, say, 30 days, you will
25 not be able to process 40 challenges in 30 days,

1 especially considering that the Act rightly says that any
2 material being challenged, quote, 'shall be viewed in its
3 entirety and shall not have selected portions taken out of
4 context,' unquote.
5     Do you remember reading that part?
6 A   Yes.
7 Q   What was your reaction to her statement that there
8 are locations where certain citizens are marking their
9 calendar for this law to take affect, so they can begin
10 filing scores of challenges?  Was that consistent with
11 your --
12 A   My county is one of them.  We have 17 challenges
13 waiting to be done when this law goes into effect.
14 Q   Okay.  So how long would you have estimated that be
15 to process, if you had to guess?
16 A   Most of them are children's books, so it won't take
17 long, but there are some others that would take longer.
18 Q   Yeah, that makes sense.  It would depend on if it's a
19 picture book and you can flip through it and decide pretty
20 quickly.
21 A   But some of the juvenile are 600 pages long, like
22 Harry Potter.
23 Q   Yeah.  I want to follow up on that.  So this book has
24 a final decision being made by the library committee --
25 not a final decision, but a decision being made by the

1 library committee and if the library committee -- let's
2 find this language.
3    This is on Page 9, subsection 12(A). "If the
4 committee established under subdivision (c)(6)(A) of this
5 section decides not to relocate the material being
6 challenged, the person who submitted the request under
7 subdivision (c)5 of this section may appeal the
8 committee's decision to the governing body of the county
9 or city by filing a written appeal to the executive head
10 of the governing body of the county or city within five
11 working days of the committee's decision or written
12 receipt of the committee's decision."
13    Do you remember reading this when the law came out?
14 A   Uh-huh.
15 Q   So what stood out to you about that?
16 A   Not a very long time.
17 Q   They don't have long to make the appeal; they just
18 have five days.
19    Before, under Crawford County's policy, where would
20 appeals from the librarian's decision about the placement
21 or inclusion of a book in the collection, like where would
22 it have gone?
23 A   Well, we didn't make that decision.  The board made
24 the decision.
25 Q   Oh, I see.  It just went straight to the board?

1 A   Well, I tried to deal with it, but if they filled out
2 the form, it went straight to the board.
3 Q   There was no librarian committee?
4 A   No.
5 Q   So under Section 5 of Act 372, does the library board
6 play any role in this process?
7 A   No.
8 Q   So for your library, where would that appeal have
9 gone after the committee?
10 A   To the judge.
11 Q   Okay.  And what would the county judge do with it?
12 A   Rule.
13 Q   Would he rule by himself or?
14 A   I can't remember whether the Quorum Court was
15 involved or not.
16 Q   Well, let's go down to (B)(ii).  "In addition to the
17 information required to be provided, the executive head of
18 the county or city may include -- oh, this is not
19 going to make sense without reading (B)(i), I'm sorry.
20    "If a person appeals the decision of a committee
21 under subdivision (c)(12), the executive head of the
22 county or city shall present the material being
23 challenged, the request submitted by the person under
24 subdivision (c)(5), the committee's decision under
25 (c)(11)(A) and the summary prepared under subdivision

1 (c)(11)(B)."
2    So a whole bunch of stuff that the library committee
3 prepared to the governing body of the county or city.
4    So does that sound like it goes to the Quorum Court?
5 A   Uh-huh.
6 Q   And then romanette ii says the executive head may
7 include his are her recommendation regarding the appeal.
8    "(C)(1)the members of the governing body shall review
9 the information submitted to them under this subdivision
10 and shall make a decision on the appeal within 30 days."
11    So a library committee has to look at the entire
12 material, and if somebody challenged a book and the
13 library committee decided that it should be relocated to
14 an area inaccessible to minors under the age of 18, is
15 there any right for anyone in the community to appeal that
16 decision to the Quorum Court?
17 A   No.
18 Q   Okay.  When you read this law, what did you think it
19 was trying to achieve by having the appeals go to the
20 Quorum Court, in your case, instead of to the Library
21 Board?
22 A   It's taking our job as a librarian and giving it to
23 somebody who has no earthly idea what to do.
24 Q   Well, how do you think the Quorum Court would make
25 the decision, if they have no earthly idea?

1 A   Somebody will tell them.
2 Q   Okay.  In the case of Crawford County, who is that
3 somebody?
4    MR. MCLELLAND: Objection to form.
5 A   I don't know who it would be.
6 Q   Okay.  We're going to take a ten-minute break and
7 then try to get you out of here.  Okay?
8 A   Okay.
9    (Brief recess was taken.)
10 BY MR. ADAMS:
11 Q   Okay.  Thank you, Ms. White.  I have a few more
12 questions.  One is in general about how you would expect a
13 library with areas inaccessible to minors under age 18 to
14 work.  You've talked about the physical barriers, the
15 possible expense of that, the issues with browsing.
16    One of the issues that some of the Plaintiffs in our
17 case raised, is that they are -- they are adults that like
18 to browse with minors in tow.  You sometimes get parents
19 coming in the library and they have their kids and they're
20 walking around looking at different books and things like
21 that.
22    Do you think it might be a deterrent to them using
23 the library if some section of the books were carved off
24 and some area inaccessible to minors under the age of 18?
25 A   It could be.

Page 93

1    MR. MCLELLAND: Object to form.
2    MR. WATSON: Object to form.
3  BY MR. ADAMS:
4  Q  Were you involved in the process of hiring the
5  permanent director that --
6  A  Is taking my place?
7  Q  Yes.
8  A  Yeah.
9  Q  Okay.  And please remind me, what did you say her
10  name is?
11  A  Charlene McDonnough.
12  Q  Did you talk to her about the Social Section?
13  A  We encouraged her to look at things as they have
14  happened and be aware of what was going on before she took
15  the job.
16  Q  So you said, "We encouraged her"?
17  A  The Board and me.
18  Q  The Board and you encouraged her to look at what has
19  happened.  Did you give her any more guidance than that
20  about what she might expect?
21  A  Not before she was hired.
22  Q  Okay.  What about after she was hired?
23  A  That is my job as advisor.
24  Q  I see.  To advise her?
25  A  On what is going on and what may happen.

Page 94

1  Q  Can you tell me what advice about what has gone on
2  with respect to the Social Section and what might happen?
3  A  That's not really a concern as much as some of the
4  other things that have gone on.  During my interim thing,
5  we've had all kinds of problems.
6  Q  What are the other problems?
7  A  The amount of time that it has taken for me to answer
8  the FOIs that I get, the staff problems that we have
9  because staff morale is horrible.
10  Q  Well, tell me about that.  Staff morale is horrible
11  as a result of -- I mean, what are the primary causes?
12  A  We're under fire.
13  Q  Okay.
14  A  We have all kinds of problems because of this.
15  Q  Okay.
16  A  The Social Section is just setting there.
17  Q  But the problems are ongoing?
18  A  Yes.  And we're still in the middle of these two
19  factions.
20  Q  Is the possibility of Act 372 going into effect part
21  of those discussions with the new director,
22  Ms. McDonnough?
23  A  We haven't discussed it a whole lot.  I've had her to
24  read it and she's asked some questions.
25  Q  Okay.

Page 95

1  A  We haven't spent a lot of time on it.
2  Q  You haven't done more planning for it --
3  A  No, we don't plan on planning.
4  Q  Okay.  You'll cross that bridge when you get to it?
5  A  Right.
6  Q  Okay.  We talked before about how your attendance at
7  Quorum Court meetings seems to have gone up from 2022 to
8  2023.
9  A  It's required.
10  Q  When you're the Director it's required?
11  A  Yes.
12  Q  I see.  Now, that you're an advisor, is it still
13  required?
14  A  I'm going with her, yes.
15  Q  So part of your mentoring of the new director is --
16  A  I did not go to the last one.
17  Q  Okay.  But, in general, the expectation has been that
18  you'll be there?
19  A  They expect me to be there.
20  Q  Okay.
21  A  And things go wrong if I'm not there.
22  Q  I see.  I can see how your experience is valuable.
23  You talked before about you've gotten 17 challenges?
24  A  That's what's backed up.
25  Q  That's the current backlog?

Page 96

1  A  Right.
2  Q  And they're being handled under the --
3  A  Because we cannot move in or we cannot move out.
4  Q  Oh, I see.  So it isn't just Social Section books?
5  A  Yeah, it is.
6  Q  Were the challenges specific to the Social Section?
7  Because as I understood it, prior to the existence of the
8  Social Section you could just challenge the inclusion of a
9  book in the library's collection?
10  A  You still can, but you can't in the Social Section.
11  Q  I see.  So these 17 are specific requests to put
12  something in the Social Section?
13  A  Or out.
14  Q  I see.  And so your response to those challengers is
15  on the advice of counsel we're not moving them?
16  A  Right.
17  Q  Okay.  I believe you said you were not at the
18  December 2022 Quorum Court meeting?
19  A  I was not.
20  Q  Have library materials been discussed at any Quorum
21  Court meetings that you've attended since then?
22  A  Not materials.
23  Q  Can you explain that?  Is there something else --
24  A  We got a grant from the American Library Association
25  to replace doors at the Alma Branch, because they are

1 noncompliant for the ADA. One member of the Quorum Court
2 got an email from somebody that said that if we got that
3 grant, we would be required to buy these certain types of
4 materials in order for us to spend the money.
5 Q   Did they specify what kind of materials the American
6 Library Association would require you to buy?
7 A   No.
8 Q   And it was never specified in the Quorum Court or
9 anywhere else what this was about?
10 A   No, they just refused to pass the money to do the
11 grant money. They refused to appropriate it at that
12 meeting until they found out what the grant said about
13 that.
14 Q   And which justice of the peace was that that held up
15 the grant?
16 A   Peppas.
17 Q   Okay. Has Act 372 been discussed at all?
18 A   No.
19 Q   Has this lawsuit been discussed at all?
20 A   No.
21 Q   Has the other lawsuit been discussed at all?
22 A   No.
23         MR. MCLELLAND: Object to form.
24 BY MR. ADAMS:
25 Q   Virden versus Crawford County, the one to have the

1 Social Section books moved out that's different from this
2 lawsuit, that hasn't been discussed either?
3 A   No.
4 Q   Are you familiar with Justice Peppas' view about the
5 appropriateness of LGBTQ books in the children's section?
6 A   No.
7 Q   Okay. That's all. Thank you.
8 A   Okay.
9         EXAMINATION
10 BY MR. WATSON:
11 Q   All right. Ms. White, I'm Noah Watson. I know we
12 met earlier. Hopefully I can keep things short and we can
13 keep moving. Thank you for being here.
14     I want to generally ask what I call three buckets.
15 One is going to be about the Crawford County Library
16 System and its history that you've been a part of and
17 contributed to. The second one is going to be more
18 specifically about the materials, items, books generally
19 in the collection, and then I'm going reserve a third
20 category of miscellaneous questions that I might be able
21 to work in somewhere else, but I might have to just put
22 there.
23     So starting with kind of the history, the Crawford
24 County Library System, did I hear you say earlier that it
25 was created in 1999 when you came on?

1 A   Yes.
2 Q   So were you the first executive director of the
3 system?
4 A   Yes. We were a part of a regional system before
5 then.
6 Q   And so how did that change occur, like what process
7 happened separating from the regional system, if you
8 recall?
9 A   Well, we were asked to leave the system because they
10 did -- Washington County did not think we were paying our
11 part of the regional system.
12 Q   Okay. And so did Crawford County get like voted out
13 of the regional system?
14 A   Something like that.
15 Q   Okay. And at that point what happened?
16 A   The county made it our system, vote it in and make
17 the rules on how it would operate and that sort of thing.
18 Q   And when you say voted in, are you talking about the
19 Quorum Court voted to create the system?
20 A   Yes, there's an interlocal agreement.
21 Q   And as part of that, does the system have a
22 explicitly set out set number of powers?
23 A   We have a handbook and rules to go by and all that,
24 yes.
25 Q   Are you aware of -- well, in your tenure as Executive

1 Director, did the Crawford County Library System ever --
2 was it ever a plaintiff in a lawsuit?
3 A   No.
4 Q   Are you aware if you had the authority to initiate
5 that sort of lawsuit?
6 A   I don't think it's mentioned.
7 Q   And when you say it's not mentioned, it's not
8 mentioned in the handbook?
9 A   In the interlocal agreement.
10 Q   Okay. And I'm just making sure that we're on the
11 same. As far as you're aware, the Crawford County Library
12 System does not have authority to initiate a lawsuit?
13 A   I don't know.
14 Q   I want to just make sure I understand the reporting
15 structure of the library system. Could you walk me
16 through that, just starting at the bottom of the staff and
17 then who they report to and then all the way up the chain?
18 A   The staff is under the Crawford County Library
19 Director, I'm under the Board.
20 Q   And does the Board report to anyone?
21 A   No.
22 Q   Other than I guess that you did mention earlier -- is
23 it the county judge who appoints members to the board?
24 A   They have -- they have to approve our budget.
25 Q   Okay. They, being the Quorum Court?

1  A   Yes.

2  Q   Okay.  So you would agree that the Crawford County

3  Library System is part of the government structure?

4  A   It is a county department, I guess you would call us.

5  Q   Okay.  Just making sure we're on the same page there.

6  A   We might not be recognized as that, but, yes.

7  Q   What do you mean by you might not be recognized as

8  that?

9  A   Well, they only recognize us when it is something

10  they want, not us.

11  Q   Okay.  Understood.  So that is the end of the first

12  category, so I'm going to move on to a couple of questions

13  about the collection of books generally and materials.

14      Earlier you mentioned, when Mr. Adams was going

15  through Section 5 on Page 7, "Each county or municipal

16  library shall have a written policy to establish

17  guidelines for the selection, relocation and retention of

18  physical materials that are available to the public."

19      Did I understand you to say that Crawford County

20  Library System has such policies?

21  A   Yes.

22  Q   Okay.  And what are those policies based on?  And

23  specifically I'm talking about selection, because there's

24  three here.  So what is the basis for the policy of

25  selection?

1      That question probably doesn't make a lot of sense,

2  so let me just rewind and start over here.

3      What is the selection policy for the Crawford County

4  Library?

5  A   It's rather lengthy, so I can't tell you.

6  Q   Fair enough.  Does it identify specific genres of

7  books that are allowed, versus not allowed?

8  A   No.

9  Q   Now, if you turn one page over to Page 8, and this is

10  going to be what's starting on Line 10.  It's talking

11  about the library committee that is eventually reviewing a

12  challenged material.  It says:  "The committee established

13  under subdivision (c)(6)(A) of this section shall

14  determine if the material being challenged meets the

15  criteria of selection."

16      Are you aware of any material, in the Crawford County

17  Library System, that does not meet the criteria of

18  selection that Crawford County Library System has adopted?

19  A   No.

20  Q   Okay.  That is the only question I wanted to ask you

21  about Section 5.  I want to quickly ask a question about

22  Section 1.  This is the criminal provision.

23      Specifically, if you look at Page 2, starting on Line

24  11, this is partially describing the items that are not

25  allowed to be furnished to minors.  "Item" means a

1  material or performance that depicts or describes nudity,

2  sexual conduct, sexual excitement or sadomasochistic

3  abuse."

4      When you were talking with Mr. Adams earlier and he

5  read the long definition of harmful to minors, it included

6  those same topics, but it also included that the item be

7  taken as a whole in relation to those topics.

8      So I'm going to ask these one at a time.  First of

9  all, do you understand the terms that I just read; nudity,

10  sexual conduct, sexual excitement, or sadomasochistic

11  abuse?

12  A   Yes.

13  Q   And I suspect I know the answer to this, but I just

14  want to make sure it's on the record, does the Crawford

15  County Library System, to your knowledge, have any books

16  that are, as a whole, about any of those topics?

17  A   Yes.

18  Q   Okay.  Are you aware of any of those books, as we sit

19  here?

20  A   We have lots of art books that have nudity in it.

21  Q   And those are predominately about nudity in them?

22  A   No, they're about art.

23  Q   Okay.  I mean, we don't have to go into this whole

24  legal definition.  I know you're not a lawyer and this is

25  kind of our fight; we have the fight about the words in

1  the statute.  But one of the reasons a material would not

2  count as harmful to minors, is if it is -- it had

3  literary, scientific, medical, artistic or political value

4  to minors.

5      Are you aware of any books, other than these art

6  books, that would fit in this description that's about --

7  predominantly about nudity, sexual conduct, sexual

8  excitement or sadomasochistic abuse?

9  A   Adult books, yes.  In the adult section we have some

10  that would be in one of these categories.

11  Q   Okay.  And of those books, are they -- is it just a

12  few pages in the books that involve those topics, or is it

13  the whole work?

14  A   We have thousands of books.  I would imagine that it

15  could be either.

16  Q   Okay.  It's okay if your answer is you're not aware.

17  I'm just trying to figure out what the world of books

18  there are, and if you're not aware, that's okay.  Or am I

19  misunderstanding your answer?

20  A   Well, we have Fifty Shades of Grey, if that makes any

21  sense to you.

22  Q   Okay.  If there are any other books that you're aware

23  of, other than that, it would be helpful to know, but if

24  Fifty Shades of Grey is the outer limit -- I mean, I'm

25  just trying to figure out what the boundaries of the --

1      **MS. BROWNSTEIN:** I'm going to object to the
2    form. It's a very confusing question you're
3    asking. I'm confused.
4 **A  I have not read all the books in this library. I**
5 **have no idea what's there, and there could be, but we try**
6 **to go by the community's view of what our library should**
7 **be. That's what librarians do and, therefore, we try to**
8 **provide what our public wants.**
9 Q  Okay. And I won't ask about any more specific books,
10 because I know y'all have a huge collection and I wouldn't
11 expect you to know every book, especially just off the top
12 of your head.
13     In Exhibit 7, it's going to be the third page under
14 Sections 2 and 3, Ms. Chilcoat says: "I will eat several
15 hats if anyone finds an item in one of their libraries
16 that has been judicially found by a court to be obscene."
17     Do you have any reason to disagree with that about
18 the Crawford County Library System?
19 **A  Where is that?**
20 Q  So it's going to be in the middle of Sections 2 and
21 3, that heading.
22 **A  Read it again.**
23 Q  Yes, ma'am. "So I will eat several hats if anyone
24 finds an item in one of their libraries that has been
25 judicially found by a court to be obscene."

1     Do you have any reason to disagree with that?
2 **A  No, I do not.**
3 Q  Okay. And this will be the last question on this
4 topic, and it's a step back. So with the policy for
5 selection, is there any other limit on -- well, let me
6 establish this first.
7     Is it the executive director who makes those
8 purchases for new books coming into the library?
9 **A  We have several people that do that.**
10 Q  Okay. Is there any other limits on what books may be
11 brought into the library, other than that policy?
12 **A  No.**
13 Q  So it's at the discretion of the people making the
14 decision?
15 **A  Right.**
16 Q  The last one I want to come to, I only have two
17 questions here and I'm not sure it will extend further
18 than this, but hopefully it's just two. I'm going to make
19 it just one, actually.
20     Sorry, I think out loud, so I apologize for that.
21     **MS. BROWNSTEIN:** No kidding.
22 **BY MR. WATSON:**
23 Q  Earlier with Mr. Adams you were detailing a number of
24 problems that -- I think that's the word you used;
25 problems or issues. You mentioned the ADA grant and that

1 issue, the competing factions is, I believe, a term that
2 you've used, and morale in the library.
3     I think what you said is that all of those issues are
4 not really related to Act 372. Did I understand you
5 correctly when you said that?
6 **A  Yes.**
7 Q  Thank you. That's all I've got. I appreciate you.
8           **EXAMINATION**
9 **BY MR. MCLELLAND:**
10 Q  Good afternoon, Ms. White. I've just got a couple of
11 questions as well, and then I'm sure Mr. Adams and the
12 Plaintiffs will have a couple of follow-ups.
13     What's your understanding of the lawsuit that you're
14 giving this deposition in?
15 **A  Explain that, please.**
16 Q  You're giving a deposition today right now, right?
17 **A  Yes.**
18 Q  And it's in a lawsuit?
19 **A  Right.**
20 Q  What's your understanding of that lawsuit?
21 **A  Well, I think I understand it.**
22 Q  Okay. What is it? I'm just trying to see what's
23 your understanding of what the lawsuit is, if you could
24 explain it to me.
25 **A  It's trying to set limits on what libraries can do.**

1 Q  Okay.
2 **A  And how they do it, and also making it a criminal**
3 **offense if we allow an item to a minor that somebody can**
4 **object to.**
5 Q  Okay. And those parameters are set forth in a
6 specific Act; is that right?
7 **A  Act 372.**
8 Q  Act 372; is that correct?
9 **A  Yes.**
10 Q  And are you aware that Crawford County is involved in
11 this lawsuit?
12 **A  Yes.**
13 Q  Are you aware that Crawford County is involved in a
14 second lawsuit that's titled Virden versus Crawford
15 County, et al?
16 **A  Yes, sir.**
17 Q  And in this lawsuit, is it your understanding that
18 the Plaintiffs are trying to stop Section 1 and Section 5
19 of Act 372 from going into effect?
20 **A  Yes.**
21 Q  Okay. Did Crawford County Library System ever
22 implement Section 5 of Act 372?
23 **A  No.**
24 Q  Do you recall discussing the Social Section with
25 Mr. Adams earlier?

Page 109

1 A   Yes.
2 Q   Do you know when the Social Section was created?
3 A   **Immediately after the December meeting of the Quorum**
4 **Court.**
5 Q   And it's my understanding that by the time the
6 January 10th meeting rolled around for the Library Board,
7 I believe Diedre stated at that meeting that the Social
8 Section had been created.
9     Is that your understanding?
10 A   Yes.
11 Q   So the Social Section -- is it fair to say, and
12 correct me if I'm wrong, is it fair to say that the Social
13 Section was made some time between that December Quorum
14 Court meeting and that January 10th Library Board meeting?
15 A   Yes.
16 Q   And you described the Social Section as a compromise.
17 Do you remember that?
18 A   Yes.
19 Q   It was a compromise between two factions; is that
20 right? I think that's what you said earlier?
21 A   No.
22 Q   Oh, okay. What was it a compromise between?
23 A   **It was a compromise between the county government and**
24 **the library.**
25 Q   Okay. And what was the county government seeking in

Page 110

1 the -- typically in a compromise one side is seeking one
2 thing and the other side is seeking another. So what was
3 the county government seeking?
4 A   **Removal of the books.**
5 Q   Okay. And what was the library seeking?
6 A   **To not remove them.**
7 Q   Okay. And the compromise that was created, was it --
8 A   **To move it.**
9 Q   Was it to just move it; is that right?
10 A   Yes.
11 Q   And not remove the books; is that correct?
12 A   **Right.**
13 Q   And the movement of the books resulted in the
14 creation of the Social Section; is that correct?
15 A   **That's correct.**
16 Q   Okay. If the Social Section was to be removed and
17 disbanded through, you know, litigation or other means, do
18 you have any concern of what would happen to the library?
19 A   **Removed or disbanded, that's two different terms.**
20 Q   I'll rephrase. If the Social Section has to be
21 disbanded and the books that are in the Social Section
22 currently throughout all the five branches, the books that
23 are there go back to the place that they were before they
24 were in the Social Section, do you have any concern about
25 what would happen to the library in such a case?

Page 111

1 A   **I shouldn't have, but, yes, I do.**
2 Q   Okay. What are those concerns?
3 A   **That the fact -- one of the factions would try to**
4 **shut us down.**
5 Q   Okay. Is it fair to summarize your testimony -- is
6 it fair to summarize your testimony to say that the Social
7 Section was a compromise designed to try to keep the
8 library doors open?
9 A   Yes.
10 Q   And do you remember talking earlier about the
11 specific -- you talked about some of the books kind of in
12 the Social Section with Mr. Adams, about how they were
13 identifiable from a distance and how they have the green
14 label.
15     Do you remember discussing that with him?
16 A   Yes.
17 Q   Are there any other books, in the Crawford County
18 Library System, that use spine labels?
19 A   Yes.
20 Q   And is one of those categories of books large print?
21 A   Yes.
22 Q   Westerns?
23 A   Yes.
24 Q   YA?
25 A   Yes.

Page 112

1 Q   Mystery?
2 A   No.
3 Q   Okay.
4 A   **Well, maybe, yeah, one branch or the other.**
5 Q   Yeah, that's fair; that's fair.
6     Do you remember discussing one of these exhibits with
7 Mr. Adams that he said was a letter from Ms. Hamby? Do
8 you remember discussing that with him?
9 A   Yes.
10 Q   Did she ever -- did Ms. Hamby ever show you this
11 letter?
12 A   No.
13 Q   Did she send this letter to you?
14 A   No.
15 Q   Did this letter ever come up in conversation between
16 the two of you?
17 A   No.
18 Q   Okay. And Tammi Hamby was appointed to the Library
19 Board; is that correct?
20 A   Yes.
21 Q   And when she was appointed, she was made Chairman; is
22 that right?
23 A   Yes.
24 Q   Do you know if Ms. Hamby, as Chairman of the Library
25 Board, has a vote --

## Page 113

1 A  No.

2 Q  -- on that Board?  She does not?

3 A  No.

4 Q  Okay.  Do you remember discussing the ALA grant with
5 Mr. Adams just a few minutes ago?

6 A  Yes.

7 Q  Did the Crawford County Quorum Court -- was that
8 grant ultimately approved?

9 A  Yes.

10 Q  And the funding was given to the library?

11 A  Yes, the next week.

12 Q  Okay.  And do you know -- the meeting that that money
13 was approved at, were you in attendance?

14 A  Yes.

15 Q  Was that an emergency meeting?

16 A  Yes.

17        MR. MCLELLAND: That's all I've got.

18        FURTHER EXAMINATION

19 BY MR. ADAMS:

20 Q  Okay.  I have a few follow-ups.  I'll start with
21 follow-ups on Mr. Watson's questions.

22    He asked you to read a section of Jennifer Chilcoat's
23 guidance from Exhibit 7, which you may want to look at
24 again, where it says, "I will eat several hats if anyone
25 finds an item in one of your libraries that has been

## Page 114

1 judicially found by a court to be obscene."

2    Do you recall what Sections 2 and 3 that that
3 discussion is about had to do with?

4 A  No.

5 Q  Do you recall if they have to do with harmful to
6 minors, or a different definition of obscenity?

7 A  I don't know.

8 Q  Okay.  The other thing he brought up, is that the
9 definition of harmful to minors talks about the work taken
10 as a whole, and so a book might include a passage about
11 sex, but not predominantly be about sex and you brought
12 up, in that context, Fifty Shades of Grey, which I've not
13 read and I'm not going to ask you if you did.

14 A  I didn't either.

15 Q  I wasn't going to ask.  But I do understand it was a
16 bestseller about a dozen years ago and it has a lot to do
17 with sex.

18 A  Yes.

19 Q  There's lot of sex in it, and it was in a lot of
20 demand, right?

21 A  We had several copies and had to buy more.

22 Q  Okay.  So a lot of people in Crawford County wanted
23 to read that book, correct?

24 A  Yes.

25 Q  If a seventeen-year-old brought that up to the

## Page 115

1 counter and wanted to check it, would you check it out to
2 them?

3 A  Probably.

4 Q  If a ten-year-old brought it up to the counter and
5 wanted to check it out, would you check it out to them?

6 A  No.

7 Q  Okay.  Is it currently in an area of the Crawford
8 County Library inaccessible to minors under the age of 18?

9 A  No.

10        MR. ADAMS: And I'll just state for the
11        record that Judge Chris Keith and Miel Partain,
12        who are both parties to the case, are here.

13 BY MR. ADAMS:

14 Q  Okay.  I think that's all I had on Mr. Watson's
15 questions.

16    Okay.  So the follow-ups on Mr. McLelland's
17 questions, I guess the one -- the one sort of mismatch
18 between what I understood from your testimony and from
19 what your testimony -- from your talk with me and from
20 what you told him, not that they're necessarily
21 inconsistent, but I want to make sure that I see how they
22 fit together.

23    You were admirably reluctant to speculate about the
24 motives of the Quorum Court when you spoke to me.  When
25 you spoke to Mr. McLelland, you also described the Social

## Page 116

1 Section as a compromise, not between two competing
2 factions of the county, but between librarians who had
3 made an assessment of what books belonged in the library
4 and the Quorum Court, who wanted some of those books taken
5 out of the library, right?

6 A  Right.

7 Q  So the compromise was rather than take them out,
8 we're going to create a new special section for those
9 books.  Did I understand that correctly?

10 A  Yes.

11 Q  Okay.  So it seems like buried in there is the
12 understanding that the county government wanted -- the
13 Quorum Court specifically wanted some of the books in the
14 county library taken out of the library?

15 A  Yes.

16 Q  And can you say, in a sentence, what those books have
17 in common?

18 A  LGBTQ.

19 Q  Even shorter than a sentence; five letters.

20    I guess I wanted to ask again about, specifically,
21 the nature of the LGBTQ books, because it seems to me that
22 if there was a book that addressed the existence of
23 same-sex couples, for example, but was making an argument,
24 for example, prior to the Obergefell decision that the
25 Supreme Court handed down that said that same-sex couples

1 have a right to get married, if it was arguing that
2 same-sex couples shouldn't have a right to get married,
3 for whatever reason, it certainly seems, from this letter
4 that the Hambys sent to the JPs, that they wouldn't have
5 any objection to that being in the collection, right?
6           MR. MCLELLAND: Object to form.
7 A  I don't know.
8 Q  You don't know?
9 A  Don't know.
10 Q  Their stated objection is to normalizing and equating
11 homosexual and transsexual lifestyles with heterosexual
12 family units, right?
13 A  Uh-huh.
14 Q  So if there's a book that happens to touch on the
15 existence of same-sex couples, but stigmatizes or refuses
16 to equate them with same-sex couples, presumably that
17 would not be a problem to Dr. and Ms. Hamby, right?
18           MR. MCLELLAND: Object to form.
19           MR. WATSON: Object to form.
20 A  I don't know what they think.
21 Q  Okay.  Fair enough.  I guess the other question you
22 gave a flat answer to that I think was consistent, was the
23 library didn't take any measures to implement Act 372; is
24 that correct?
25 A  Yes.

1 Q  Do you recall ever getting some advice in writing
2 from Gentry Wahlmeier about Act 372?
3 A  The only thing that I remember getting from him about
4 that was his letter that he would no longer be our lawyer
5 because of it.
6 Q  Okay. I don't want to get that in the record, just
7 to make sure we're talking about the same thing, so I
8 think -- are we on 7 or 8.
9           MS. BROWNSTEIN: Eight.
10           MR. ADAMS: Okay.  Exhibit 8.
11      (Exhibit No. 8 was marked & attached hereto.)
12 Q  Is this the letter you're talking about?
13 A  Yes.
14 Q  Okay.
15      (Exhibit No. 9 was marked & attached hereto.)
16      Exhibit 9 is a letter Mr. Wahlmeier sent the same
17 day.  Do you mind reading that and telling us if you've
18 seen that one?
19 A  No, I had not seen it.
20 Q  So you've never seen this one?
21 A  No.
22 Q  Okay.  So I'm looking at the one now that is directed
23 to Mr. Cain and Mr. Meadors.
24 A  I've never seen it.
25 Q  You've never seen it.  Do you know who Mr. Cain and

1 Mr. Meadors are?
2 A  I've heard of Mr. Meadors and I don't know Mr. Cain.
3 Q  What have you heard about Mr. Meadors?
4 A  He was a lawyer that did a Cedarville thing with
5 Harry Potter; never met him.
6 Q  Yep, 20 years ago, the Counts case.
7      Do you know of any current connection he has to the
8 library disputes?
9 A  What?
10 Q  Do you know of any current connection he has to the
11 library disputes?
12 A  Yes, he's the lawyer for the Virden case.
13 Q  Okay.  Good.  So this letter was from Gentry
14 Wahlmeier to Mr. Cain and Mr. Meadors, who were the
15 attorneys for the Plaintiffs in the Virden lawsuit.
16 A  Yeah.
17 Q  And it said this firm represents Crawford County's
18 Quorum Court and the Quorum Court is in receipt of your
19 email dated May 18th.  The email also contains a draft
20 Complaint of a civil case in the Western District of
21 Arkansas.  Do you see that?
22 A  Uh-huh.
23 Q  Okay.  Mr. Wahlmeier makes reference to the balancing
24 test between the freedom of an unbounded First Amendment
25 and protecting children from exposure to material that

1 might harm their innocence.  Do you see that part?
2 A  Yes.
3 Q  And in the beginning of the third paragraph it says:
4 "This balancing test is coming to the forefront of the
5 national conversation.  At the state level, Act 372 passed
6 the legislature and is going into effect shortly.  It's
7 effect will be to require libraries to have a section that
8 is inaccessible to minors.  Quorum Courts across the state
9 will hear appeals on relocation of books within county
10 library systems.  The State Legislature's Act 372 will
11 make it necessary to continue modifying and changing the
12 library system's policies and procedures."
13      Do you see that?
14 A  I see it.
15 Q  So when he says continue modifying and changing the
16 library system's policies and procedures, that suggests to
17 me that there were some modifications that were in effect
18 before.
19      Do you have a sense, based on this letter, what
20 modifications he was talking about?
21 A  Well, I assume, and this is an assumption, that he
22 was talking about our Social Section.
23 Q  Okay.  And in the middle of the final paragraph, it
24 says, "When the conversation began that sexualized
25 material was in the children's section of the libraries

1  within the system, justices simply stated that a
2  compromise should be reached."
3      Is that -- is that how you read that?
4  A   Yeah.
5  Q   So is that compromise about the Social Section?
6  A   I have no idea.
7  Q   Okay.  And finally he says, "No direction or
8  supervision was implemented."
9      Is it accurate to say that no supervision of the
10  libraries was done by the Quorum Court?
11 A   You know the story.
12 Q   I guess we'll leave it at that.  Thank you.
13          EXAMINATION
14 BY MS. BROWNSTEIN:
15 Q   I have one or two.  You said that the library's
16  responsibility is to provide what the community wants; is
17  that right?
18 A   Yes.
19 Q   And is that all members of the community?
20 A   Yes.
21 Q   Not just one faction or another?
22 A   No.
23 Q   And you also said that you were concerned that there
24  would be a faction trying to shut the library down?
25 A   Yes.

1  Q   And is that in the context of Act 372?
2  A   No.
3  Q   Is that what's happening now?
4          MR. MCLELLAND: Object to form.
5  BY MS. BROWNSTEIN:
6  Q   You're concerned that a faction of the community is
7  trying to shut the library down; is that right?
8  A   That's my fear.
9  Q   And what faction is that?
10 A   The same one that's tried to shut it down before.
11 Q   And what faction was that?
12 A   Ms. Hamby and the elders.
13 Q   And is it your concern that the Quorum Court, the
14  government was going along with that?
15 A   I don't know.
16 Q   Is that your concern, that they would?
17 A   Yes.
18 Q   Thanks.  I have nothing further.
19          FURTHER EXAMINATION
20 BY MR. WATSON:
21 Q   A very quick question.  Earlier you were talking to
22  Mr. Adams and using the example of Fifty Shades of Grey.
23  I'll continue that example without giving away whether or
24  not it actually falls under the definition, but for these
25  purposes, let's use that.

1      You said that if a seventeen-year-old came up with
2  Fifty Shades of Grey, that you would let them check it
3  out; if it was a ten-year-old you'd probably say no.
4  A   That's my personal opinion.
5  Q   And so if you were the person that had the checkout
6  desk, though, you would make that call?
7  A   I would make that call, or at least talk to their
8  parents before I let them do it.
9  Q   Sure.  Is there any library policy about that?
10 A   No.
11 Q   And so it just differs from librarian to librarian?
12 A   Yes.
13 Q   Okay.  Thank you.
14          MR. MCLELLAND: Reserve all for trial.
15      Read and sign.
16          MR. ADAMS: I think we're done.  Thank you.
17      (WHEREUPON, at 1:15 pm, the
18      above deposition concluded.)
19
20
21
22
23
24
25

1  STYLE OF CASE: Fayetteville Public Library, et al vs.
2  Crawford County, et al
3  WITNESS: Eva Doyce White
4
5          SIGNATURE PAGE FOR WITNESS
6
7      I hereby certify that I have read the above and
8  foregoing transcript of my testimony, and that this
9  transcript, together with any corrections as shown on the
10  following page, is a true record of my testimony given at
11  this deposition.
12
13  _____    _____
14  WITNESS SIGNATURE
15
16
17      I certify that this deposition transcript was signed
18  in the presence of _____ on the
19  _____ day of _____, 2024.
20
21
22                     _____
23               NOTARY PUBLIC
24  MY COMMISSION EXPIRES:
25  _____

Page 125

1       ERRATA SHEET OF EVA DOYCE WHITE

2  PAGE #/LINE #    CORRECTION    REASON FOR CORRECTION

3 _____

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 126

1      C E R T I F I C A T E

2

3  STATE OF ARKANSAS }

    COUNTY OF FAULKNER }

4

    RE:  ORAL DEPOSITION OF EVA DOYCE WHITE

5

6  I, Michelle R. Satterfield, CCR, a Notary Public in and
for Faulkner County, Arkansas, do hereby certify that the

7  transcript of the foregoing deposition accurately reflects
the testimony given; and that the foregoing was

8  transcribed by me, or under my supervision, on my Eclipse
computerized transcription system from my machine

9  shorthand notes taken at the time and place set out on the
caption hereto, the witness having been duly cautioned and

10  sworn, or affirmed, to tell the truth, the whole truth and
nothing but the truth.

11  I FURTHER CERTIFY that I am neither counsel for, related
to, nor employed by any of the parties to the action in

12  which this proceeding was taken; and, further that I am
not a relative or employee of any attorney or counsel

13  employed by the parties hereto, nor financially
interested, or otherwise, in the outcome of this action.

14  In accordance with the Arkansas Rules of Civil Procedure,
Rule 30(e), review of the foregoing transcript by the

15  witness was not requested by the deponent or any party
thereto.

16  GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 4th day
of April 2024.

17

18

19

20

21          _____
           Michelle R. Satterfield, CCR

22           LS Certificate No. 570
           Notary Public in and for

23           Faulkner County, Arkansas

24

25

**$**

**$2,500 (1)**
74:24
**$300,000.00 (1)**
52:4

**A**

**AAAL (1)**
16:10
**abbreviations (1)**
58:19
**able (6)**
25:2,11;57:18;
87:17,25;98:20
**above (2)**
123:18;124:7
**abridgment (1)**
23:2
**abuse (8)**
42:19;43:5;59:19;
71:11,20;103:3,11;
104:8
**access (5)**
18:23;19:18;20:16;
23:3;83:5
**accessible (5)**
81:25;82:9,23;83:8;
84:1
**accurate (2)**
19:18;121:9
**accurately (2)**
18:15;19:1
**Ace (1)**
60:22
**achieve (1)**
91:19
**acquired (4)**
39:8,10,13;42:4
**acquiring (1)**
63:15
**acquisition (1)**
63:13
**acquisitions (1)**
63:10
**across (1)**
120:8
**Act (36)**
9:8,21;10:9,14,23;
11:2,3,3;27:16;31:24;
35:3;70:7,10;71:4;
74:11,13,15,18;77:21;
84:17;86:9;88:1;90:5;
94:20;97:17;107:4;
108:6,7,8,19,22;
117:23;118:2;120:5,
10;122:1
**acting (2)**
53:24;66:19
**action (2)**
67:4,16

**active (2)**
17:4,5
**actually (5)**
14:17;75:13,19;
106:19;122:24
**ADA (2)**
97:1;106:25
**ADAMS (31)**
6:7,9,19;21:12,14,
16;26:10;27:3,20,22;
43:17;49:4;58:11;
79:16;92:10;93:3;
97:24;101:14;103:4;
106:23;107:11;
108:25;111:12;112:7;
113:5,19;115:10,13;
118:10;122:22;123:16
**adaptation (1)**
61:14
**add (1)**
80:12
**added (1)**
63:3
**addition (1)**
90:16
**addressed (1)**
116:22
**administer (1)**
66:4
**administration (1)**
65:25
**admirably (1)**
115:23
**adopt (1)**
65:24
**adopted (9)**
30:22,24;31:17;
32:9;78:1;80:2,6,14;
102:18
**adult (23)**
24:8,16;30:13;44:1;
58:23;59:11,23,24;
60:15;62:14,19;64:6,
10,17,19;65:11,16;
71:22;85:20,20,25;
104:9,9
**adults (3)**
64:5;76:20;92:17
**adult's (1)**
44:8
**advance (2)**
20:6;46:24
**advice (5)**
35:10;37:2;94:1;
96:15;118:1
**advise (2)**
87:18;93:24
**advised (1)**
63:9
**advisor (3)**
11:13;93:23;95:12
**Advocates (1)**
16:11

**affect (2)**
87:22;88:9
**affected (5)**
78:4,8,16,17;85:10
**affirmed (1)**
6:3
**affirms (1)**
21:23
**afternoon (1)**
107:10
**afterwards (1)**
47:13
**again (10)**
21:8;35:24;47:9;
49:12;68:6;83:10;
84:16;105:22;113:24;
116:20
**against (1)**
68:25
**age (12)**
71:13,17;82:1,9,24;
83:8;85:22;86:3;
91:14;92:13,24;115:8
**agenda (8)**
53:15;56:15,20;
57:4,7,13,20,23
**agendas (2)**
52:8,11
**ago (4)**
40:4;113:5;114:16;
119:6
**agree (11)**
19:3,22;20:4,9,18;
22:7;19,24;23:3;37:20;
101:2
**agreement (5)**
49:8,11,15;99:20;
100:9
**ahead (2)**
8:2;57:16
**aims (1)**
20:15
**al (3)**
108:15;124:1,2
**ALA (3)**
18:6;21:7;113:4
**ALA's (1)**
18:10
**allege (1)**
10:13
**allow (2)**
20:14;108:3
**allowed (3)**
102:7,7,25
**Alma (1)**
96:25
**along (2)**
8:13;122:14
**alternative (1)**
41:13
**Amanda (1)**
50:8
**amend (1)**

87:18
**Amendment (4)**
9:20;10:14;70:13;
119:24
**amendments (1)**
87:19
**American (10)**
8:20;17:13,14,16,21;
18:4;21:9,23;96:24;
97:5
**amount (2)**
27:9;50:23;94:7
**Anne (3)**
61:12,14,14
**announced (1)**
51:4
**answered (1)**
32:8
**anticipate (1)**
7:14
**apologize (3)**
27:8;32:7;106:20
**appeal (8)**
71:16;89:7,9,17;
90:8;91:7,10,15
**appeals (4)**
89:20;90:20;91:19;
120:9
**application (1)**
68:9
**apply (1)**
85:24
**applying (2)**
71:14,17
**appoint (4)**
34:12;35:1,11,14
**appointed (7)**
34:8,11;50:8;55:6,
18;112:18,21
**appointing (1)**
69:17
**appointment (2)**
35:14,21
**appoints (1)**
100:23
**appreciate (1)**
107:7
**appropriate (4)**
19:16;44:2;76:9;
97:11
**appropriateness (4)**
78:6;80:25;85:13;
98:5
**approve (1)**
100:24
**approved (5)**
28:25;72:17;79:20;
113:8,13
**approximately (1)**
12:19
**April (1)**
82:15
**area (10)**

87:18
**Amendment (4)**

38:5;81:25;82:8,23;
83:1,8;85:22;91:14;
92:24;115:7
**areas (1)**
92:13
**arguing (1)**
117:1
**argument (1)**
116:23
**Arkansas (16)**
6:11;13:25;14:5,22,
25;15:2,17,23;16:11,
18,21;17:1,12;71:5;
80:12;119:21
**ArLA (1)**
17:9
**around (7)**
27:8;54:17;55:12;
56:2,10;92:20;109:6
**arrest (1)**
75:6
**art (4)**
43:12;103:20,22;
104:5
**artistic (2)**
71:24;104:3
**assessment (2)**
76:12;116:3
**Assistant (1)**
14:5
**Association (13)**
8:20;16:19,22;17:1,
12,13,15,17,21;18:4;
21:23;96:24;97:6
**Association's (1)**
21:10
**assume (1)**
120:21
**assumed (2)**
64:18,20
**assumption (1)**
120:21
**attached (9)**
9:9;18:8;21:15;
27:21;41:3;58:6;74:4;
118:11,15
**attend (2)**
51:5,8
**attendance (2)**
95:6;113:13
**attended (1)**
96:21
**attention (1)**
75:1
**Attorney (3)**
6:15;48:14;82:20
**attorneys (2)**
31:8;119:15
**August (5)**
13:22;37:18;38:22;
74:13;77:4
**author (1)**
58:21

**authority (3)**
29:14;100:4,12
**author's (1)**
24:1
**autobiographies (1)**
65:17
**available (4)**
77:20;78:21;85:13;
101:18
**average (3)**
11:21;71:13,17
**avoided (1)**
63:24
**aware (24)**
31:6;37:16;40:2,5;
41:17,20,22;43:19;
49:8;64:1;66:2;77:8;
93:14;99:25;100:4,11;
102:16;103:18;104:5,
16,18,22;108:10,13
**away (1)**
122:23

**B**

**BA (1)**
14:22
**baby (1)**
51:21
**back (20)**
9:4;14:14;28:6,14;
41:12;44:12;51:5,14;
67:19,23;70:5,10;
76:12;77:14;82:14;
84:8,14;87:11;106:4;
110:23
**backed (1)**
95:24
**background (5)**
8:15;11:8;16:4,8;
22:5
**backlog (1)**
95:25
**backwards (1)**
14:21
**balancing (2)**
119:23;120:4
**Balkman (3)**
45:1;47:8;48:1
**B-A-L-K-M-A-N (1)**
45:3
**Baptist (1)**
50:9
**barriers (1)**
92:14
**based (4)**
63:14;66:10;101:22;
120:19
**basic (1)**
21:25
**basically (1)**
8:3
**basis (1)**

101:24
**Bates (1)**
28:4
**became (9)**
32:14;33:8,12,21,23;
43:3;52:5;58:4;60:18
**become (8)**
32:22;37:16;40:2,5,
16;43:19;55:1;73:5
**becoming (2)**
15:22;47:4
**began (1)**
120:24
**begin (2)**
87:22;88:9
**beginning (4)**
14:2,19;70:11;120:3
**behalf (1)**
83:6
**behavior (1)**
42:19
**beliefs (1)**
20:14
**Believes (1)**
62:9
**bell (1)**
41:2
**belonged (1)**
116:3
**below (3)**
59:7;74:12,15
**besides (1)**
50:3
**best (2)**
52:6;78:9
**bestseller (1)**
114:16
**better (1)**
75:7
**Bettina (1)**
6:14
**Bettina's (1)**
6:21
**beyond (1)**
84:25
**Bi (1)**
90:19
**Bii (1)**
90:16
**Bill (6)**
8:21;21:7,22;23:13;
68:7;74:11
**Binary (1)**
60:24
**biographies (2)**
65:15,16
**bit (3)**
6:24;70:6,7
**blame (1)**
7:17
**blocked (1)**
77:9
**Board (62)**

29:1,14;30:24;
31:14,19;32:1,2,4,10;
34:2,9,22;35:16;37:7,
7,11;40:16,18;44:15,
24;46:5;47:7;48:11;
49:12,19,23;50:6,19;
51:6,11;53:10;54:4,11,
14;55:1,18;56:1;57:3;
65:19;67:11,16;68:18;
69:18;82:19;84:5,10,
11;89:23,25;90:2,5;
91:21;93:17,18;
100:19,20,23;109:6,
14;112:19,25;113:2
**body (5)**
29:13;89:8,10;91:3,
8
**book (44)**
25:18,23;26:7;
29:17;30:4;58:19;
59:11;60:5;62:22,24;
63:11;65:7,12;66:13;
73:6;76:7,12,15,19;
78:17,24;79:12;84:21,
23;85:6,16;86:11,17,
18,18,20;87:2,6,18;
88:19,23;89:21;91:12;
96:9;105:11;114:10,
23;116:22;117:14
**books (100)**
8:4;22:1;23:24,25;
24:25;25:12;37:17,20;
38:16,17,25;39:3,5,6,
7;40:20,22;41:11,13,
17;42:2,4,10,22,25;
43:4,8,20,25;44:4,5,7;
58:13;60:12,17;61:5,
16,20;62:5,13,18;63:3,
6,15,21;64:1,17,22;
66:11;67:17,21,24,25;
68:3,12;73:8;75:10;
76:24;85:20,24,25;
88:16;92:20,23;96:4;
98:1,5,18;101:13;
102:7;103:15,18,20;
104:5,6,9,11,12,14,17,
22;105:4,9;106:8,10;
110:4,11,13,21,22;
111:11,17,20;116:3,4,
9,13,16,21;120:9
**both (2)**
53:9;115:12
**bottom (6)**
9:22;60:3;62:9;
72:16;81:20;100:16
**bouncing (1)**
27:8
**boundaries (1)**
104:25
**bounds (1)**
27:15
**branch (9)**
35:15;43:20;61:18;

62:18;65:7;66:18,20;
96:25;112:4
**branches (3)**
65:7;82:7;110:22
**break (7)**
26:12,16,21,25;27:1;
58:8;92:6
**bridge (1)**
95:4
**Brief (3)**
27:2;58:10;92:9
**bring (1)**
21:20
**broad (3)**
19:9;70:20;72:8
**broadly (1)**
70:21
**brought (9)**
21:19;46:4;64:13,
14;106:11;114:8,11,
25;115:4
**Brownstein (9)**
6:14,18;70:12;
79:14;105:1;106:21;
118:9;121:14;122:5
**browse (4)**
25:15;26:8;82:11;
92:18
**browsing (4)**
68:1,3;83:24;92:15
**buckets (1)**
98:14
**budget (2)**
52:4;100:24
**building (1)**
8:22
**buildings (2)**
52:3,3
**built (3)**
51:18,24;52:2
**bunch (1)**
91:2
**Buren (4)**
36:14;65:9;66:18,20
**buried (1)**
116:11
**buy (3)**
97:3,6;114:21
**Bye (2)**
60:24,24

**C**

**c1 (1)**
85:10
**c11A (1)**
90:25
**c11B (1)**
91:1
**c12 (1)**
90:21
**C1the (1)**
91:8

**C3 (1)**
80:24
**c4B (1)**
81:4
**c5 (2)**
89:7;90:24
**c6A (3)**
81:23;89:4;102:13
**Cain (4)**
118:23,25;119:2,14
**calendar (1)**
88:9
**calendars (1)**
87:21
**call (7)**
17:11;58:20;66:17;
98:14;101:4;123:6,7
**called (4)**
6:10;45:19;46:1;
60:5
**calls (3)**
25:3;57:16;68:4
**came (8)**
9:13,14;21:1;37:3;
52:1;89:13;98:25;
123:1
**can (54)**
6:24,25;7:11,19;
8:11;9:18;23:15,20;
25:6,20;26:12;27:12;
28:2;37:11,14;38:20;
41:1;43:14;47:21;
51:16,20;52:12;53:19;
57:1,12,16,21,21;
58:12,12,17;64:4;
66:13;68:5;70:7;
72:16;80:17;82:11;
83:5;84:19;86:24,25;
87:22;88:9,19;94:1;
95:22;96:10,23;98:12,
12;107:25;108:3;
116:16
**capacity (1)**
36:25
**card (1)**
55:16
**cardholders (2)**
29:18;78:11
**care (1)**
69:24
**career (3)**
8:17;29:4;48:21
**carries (1)**
74:23
**carts (1)**
83:4
**carved (1)**
92:23
**case (18)**
6:10,12,20;7:5;8:7;
24:2;27:17,25;58:15;
91:20;92:2,17;110:25;
115:12;119:6,12,20;

124:1
**categories (4)**
24:4;38:16;104:10;
111:20
**category (4)**
29:19;72:8;98:20;
101:12
**caught (1)**
53:1
**causes (2)**
59:20;94:11
**cautioned (1)**
6:3
**caveats (1)**
22:9
**Cedarville (1)**
119:4
**censor (1)**
20:2
**censorship (1)**
22:21
**certain (6)**
21:4;4;76:5;87:21;
88:8;97:3
**certainly (2)**
7:17;117:3
**certify (2)**
124:7,17
**chain (1)**
100:17
**chair (4)**
54:3,11;55:1;56:2
**chairman (3)**
55:19;112:21,24
**challenge (14)**
22:21;27:16;29:17;
30:16;78:5,10,22;
80:18,25;81:4;82:21;
85:12;86:17;96:8
**challenged (17)**
78:4,21,25;81:7,24;
84:23;85:6,11;86:13,
17,19;88:2;89:6;
90:23;91:12;102:12,14
**challenger (1)**
31:5
**challengers (1)**
96:14
**challenges (10)**
87:2,8,18,23,24,25;
88:10,12;95:23;96:6
**challenging (1)**
70:13
**change (1)**
99:6
**changed (3)**
53:14;79:21,25
**changes (3)**
83:17,21,23
**changing (2)**
120:11,15
**Chapter (4)**
8:24;18:3;26:20,22

**character (1)**
10:2
**characteristics (1)**
71:12
**charge (4)**
21:2;38:9,12;75:5
**charges (1)**
84:24
**Charlene (3)**
12:5;38:2;93:11
**Chatterley's (2)**
86:19,25
**check (5)**
115:1,1,5,5;123:2
**checkout (1)**
123:5
**Chilcat (5)**
73:25;74:1,17;
82:25;105:14
**Chilcoat's (3)**
82:14;87:11;113:22
**child (2)**
42:19;43:5
**children (2)**
15:7;119:25
**Children's (16)**
24:11,19;39:6;
42:10;43:4,8,10,21;
44:2,9;60:14;65:4;
85:24;88:16;98:5;
120:25
**chore (1)**
87:10
**chose (1)**
37:6
**chosen (1)**
62:20
**Chris (1)**
115:11
**church (2)**
45:14;50:9
**circle (1)**
84:14
**circling (1)**
55:12
**circulation (1)**
79:13
**circumstances (1)**
31:18
**citizenry (1)**
18:21
**citizens (2)**
87:21;88:8
**citizen's (1)**
75:6
**city (5)**
89:9,10;90:18,22;
91:3
**civil (1)**
119:20
**clarify (1)**
67:8
**clarity (1)**

28:3
**Class (2)**
10:6;74:23
**classic (1)**
86:18
**clear (3)**
57:12;72:2,3
**client (1)**
6:21
**clients (1)**
9:18
**clock (1)**
86:24
**close (1)**
53:16
**closed (3)**
53:5,12,21
**cocounsel (1)**
6:14
**Code (9)**
8:20;18:6;19:9;20:9;
23:12;68:8,9;71:5;
80:12
**cohorts (1)**
52:20
**colleagues (1)**
20:7
**collection (12)**
67:19;73:9;78:17;
79:6;81:25;82:23;
89:21;96:9;98:19;
101:13;105:10;117:5
**College (6)**
14:6,16,18,22;15:25,
25
**Coming (4)**
82:14;92:19;106:8;
120:4
**COMMISSION (1)**
124:24
**commits (1)**
10:1
**committed (1)**
18:22
**committee (20)**
31:5,12;81:8,11,21,
22;86:10,24;88:24;
89:1,1,4;90:3,9,20;
91:2,11,13;102:11,12
**committee's (4)**
89:8,11,12;90:24
**common (2)**
62:5;116:17
**communication (1)**
45:4
**communications (3)**
47:10;73:15,19
**Community (15)**
14:6;22:3;29:18;
35:17;45:13;52:23;
71:14,18,22;76:11;
78:11;91:15;121:16,
19;122:6

**community's (1)**
105:6
**competing (2)**
107:1;116:1
**Complaint (1)**
119:20
**complaints (2)**
66:25;67:5
**complete (1)**
81:2
**completely (1)**
63:24
**compliance (2)**
31:21,24
**comply (1)**
87:20
**compromise (16)**
44:18,20;45:8;
46:25;47:2;109:16,19,
22,23;110:1;7;111:7;
116:1,7;121:2,5
**computers (1)**
15:11
**concern (13)**
42:2,12,12;52:7,15;
64:20;65:19;85:5;
94:3;110:18,24;
122:13,16
**concerned (13)**
23:2;38:17;39:19;
40:20;42:10,23;51:15;
52:24;53:2;73:3,4;
121:23;122:6
**concerns (9)**
40:22;42:4;51:16;
52:14;63:10,15,18,20;
111:2
**concluded (1)**
123:18
**condemned (1)**
62:24
**Conduct (8)**
8:21;19:11;71:10;
76:1,17;103:2,10;
104:7
**conducting (1)**
81:6
**confirm (3)**
18:15;35:6;58:13
**confused (1)**
105:3
**confusing (1)**
105:2
**connected (1)**
85:15
**connection (5)**
15:22;23:15;85:6;
119:7,10
**consensus (1)**
76:18
**consequences (1)**
59:20
**consider (5)**

35:19;42:18;43:5,
10;87:24
**consideration (1)**
79:5
**considered (2)**
73:8;76:15
**considering (2)**
31:23;88:1
**consistent (6)**
23:11;68:2,2,13;
83:23;88:10;117:22
**contains (1)**
119:19
**contemporary (2)**
71:14,18
**content (4)**
62:13;71:20;76:4,5
**contents (1)**
8:5
**context (7)**
32:1;40:6;41:13;
46:6;86:15;114:12;
122:1
**context' (1)**
88:4
**continue (4)**
43:13;120:11,15;
122:23
**continued (1)**
64:16
**contract (1)**
78:13
**contributed (1)**
98:17
**contributing (1)**
22:5
**control (1)**
18:19
**controversy (2)**
34:18;37:17
**conversation (5)**
47:5,6;112:15;
120:5,24
**convicted (1)**
75:3
**conviction (1)**
74:22
**convictions (1)**
20:13
**cooperate (1)**
23:1
**copies (1)**
114:21
**copy (1)**
21:8
**corrections (1)**
124:9
**correctly (7)**
19:13,20;36:16;
42:20;82:2;107:5;
116:9
**cost (1)**
83:21

**counsel (1)**
96:15
**count (1)**
104:2
**counter (2)**
115:1,4
**counterintuitive (1)**
7:7
**Counts (1)**
119:6
**County (110)**
6:11;9:1;11:11;12:8,
23;13:11,19;25:9;27:6,
24;28:4,25;29:5;30:1,
16;31:23;32:2,18;
33:18,24;34:9,22,25;
35:9,10;36:14;37:7,8,
14;41:8,18;43:4,9,20;
44:8;46:5;49:1,5,9,16,
19,23;51:8;58:4,14;
68:19;72:19;76:12,18,
25;77:5,17,21;78:2,5,
6,20;79:17;80:14,19;
81:7;82:7,12;83:6;
85:12,13;86:9;88:12;
89:8,10;90:11,18,22;
91:3;92:2;97:25;
98:15,24;99:10,12,16;
100:1,11,18,23;101:2,
4,15,19;102:3,16,18;
103:15;105:18;108:10,
13,15,21;109:23,25;
110:3;111:17;113:7;
114:22;115:8;116:2,
12,14;120:9;124:2
**County's (5)**
6:16;23:7;27:13;
89:19;119:17
**couple (5)**
15:7;51:11;101:12;
107:10,12
**couples (5)**
116:23,25;117:2,15,
16
**course (6)**
8:17;60:19;63:17;
68:21;85:18;86:16
**court (46)**
7:8,18;8:1;35:3;
37:8;40:7,19;44:15;
45:7;46:22,25;47:10,
17;49:16;51:3,9,12;
68:19;69:4,11;90:14;
91:4,16,20,24;95:7;
96:18,21;97:1,8;99:19;
100:25;105:16,25;
109:4,14;113:7;114:1;
115:24;116:4,13,25;
119:18,18;121:10;
122:13
**courteous (1)**
19:18
**Courts (1)**
120:8
**Court's (1)**
69:6
**cover (3)**
19:11;27:7;76:4
**Crawford (78)**
6:11,16;9:1;11:11;
12:8,23;13:11,19;23:6;
25:9;27:6,13,24;28:4,
25;29:4;30:1,16;
31:23;32:2,18;33:18,
24;34:9;35:10;36:14;
37:7;41:8,18;43:4,9,
20;44:8;46:5;49:1,5,9,
23;51:8;58:4,13;
72:19;76:11,18,25;
77:5,21;79:3,17;82:7,
11;83:6;89:19;92:2;
97:25;98:15,23;99:12;
100:1,11,18;101:2,19;
102:3,16,18;103:14;
105:18;108:10,13,14,
21;111:17;113:7;
114:22;115:7;119:17;
124:2
**create (2)**
99:19;116:8
**created (6)**
68:23;69:3;98:25;
109:2,8;110:7
**creation (2)**
22:6;110:14
**criminal (15)**
10:10;70:17;73:5;
75:5,9;77:4;84:16,21,
24;85:7,8,15,17;
102:22;108:2
**criteria (6)**
61:19;63:12,14;
64:9;102:15,17
**cross (1)**
95:4
**cross-referenced (2)**
71:2;75:18
**curious (1)**
20:25
**current (7)**
12:3;22:16;34:18;
87:16;95:25;119:7,10
**currently (7)**
11:8;17:16;83:1;
86:2;87:23;110:22;
115:7

**D**

**Dads (1)**
61:8
**date (2)**
28:7;30:21
**dated (2)**
72:17;119:19
**dates (1)**
120:8
**day (11)**
21:20;33:11;46:23;
47:14,15,17,18;54:22,
22;118:17;124:19
**days (7)**
31:4,12;87:24,25;
89:11,18;91:10
**deal (5)**
27:25;37:2;63:18;
64:10;90:1
**dealt (2)**
39:6;67:11
**Dear (1)**
74:10
**December (11)**
40:9,17;44:15;
46:21;47:3;69:4,13,19;
96:18;109:3,13
**decide (4)**
27:17;35:13;78:20;
88:19
**decided (2)**
47:12;91:13
**decides (1)**
89:5
**Decimal (4)**
23:21,23;25:25;60:9
**Decimals (1)**
25:20
**decision (21)**
19:10;31:4,12;46:4;
81:21;88:24,25,25;
89:8,11,12,20,23,24;
90:20,24;91:10,16,25;
106:14;116:24
**decision-making (1)**
29:12
**declare (1)**
9:19
**defined (2)**
70:22;71:5
**definitely (1)**
87:10
**definition (11)**
70:23;72:1;75:14,
19,22;76:3;103:5,24;
114:6,9;122:24
**degree (4)**
14:16;15:5,8;16:1
**degrees (1)**
14:18
**Deidre (12)**
32:14;33:8;36:1,25;
46:24;48:9,19;50:20,
23;62:1,2;69:2
**demand (1)**
114:20
**departing (1)**
48:9
**department (1)**
101:4
**departure (2)**
12:11
**day (11)**
50:21;51:4
**depend (1)**
88:18
**depends (1)**
72:4
**depicts (2)**
71:19;103:1
**deposition (8)**
7:2;8:6,13;107:14,
16;123:18;124:11,17
**describe (4)**
23:15;41:14;52:12;
56:4
**described (7)**
25:1,9;42:3;50:3;
85:5;109:16;115:25
**describes (2)**
71:19;103:1
**describing (1)**
102:24
**description (6)**
46:14;71:8;75:24,
25;76:17;104:6
**designed (1)**
111:7
**desk (1)**
123:6
**detailing (1)**
106:23
**details (1)**
10:21
**determination (1)**
73:12
**determine (2)**
81:23;102:14
**deterrent (1)**
92:22
**Dewey (5)**
23:21,23;25:20,24;
60:9
**dictate (1)**
19:11
**Diedre (1)**
109:7
**differed (1)**
29:9
**difference (1)**
57:13
**differences (1)**
57:22
**different (7)**
24:2;30:8;74:15;
92:20;98:1;110:19;
114:6
**differs (1)**
123:11
**directed (1)**
118:22
**direction (1)**
121:7
**directly (1)**
57:19
**director (56)**
**depend (1)**
8:15;11:13;12:4,8,
10,11,16,22,25;13:11,
19,25;15:23;16:16;
17:20;32:15,22,25;
33:2,8,11,12,16,21,23;
34:21;37:6,12,14;39:8,
11,14;42:17;43:3,19;
47:4;48:10;49:12,19,
20;53:24;54:7;55:25;
58:4;63:3;66:19;67:1;
72:19;93:5;94:21;
95:10,15;99:2;100:1,
19;106:7
**directors (3)**
34:14;49:22;74:10
**disagree (2)**
105:17;106:1
**disapproval (1)**
22:18
**disbanded (3)**
110:17,19,21
**discovery (2)**
27:24;58:14
**discretion (1)**
106:13
**discuss (4)**
82:20;84:1,5,9
**discussed (8)**
31:14;84:24;94:23;
96:20;97:17,19,21;
98:2
**discussing (5)**
108:24;111:15;
112:6,8;113:4
**discussion (5)**
44:17,19;82:16;
84:19;114:3
**discussions (2)**
21:1;94:21
**dishonest (1)**
72:13
**display (5)**
41:10,17,20,22,23
**disputes (2)**
119:8,11
**dissemination (1)**
18:20
**distance (2)**
66:13;111:13
**distinguish (1)**
20:13
**District (1)**
119:20
**doctor (2)**
40:3,3
**doctrinal (1)**
22:17
**document (2)**
18:10;31:9
**documents (3)**
8:22;18:3;54:2
**done (6)**
48:3;69:25;88:13;

95:2;121:10;123:16
**doors (2)**
96:25;111:8
**down (17)**
7:8,11;18:14,18;
30:19;51:19,25;59:2,
18;81:20;87:6;90:16;
111:4;116:25;121:24;
122:7,10
**DOYCE (3)**
6:1;7:1;124:3
**dozen (1)**
114:16
**Dr (4)**
33:1,2;39:21;117:17
**draft (6)**
31:20,22;72:16;
79:10,24;119:19
**drafting (2)**
28:11,13
**drain (2)**
51:19,25
**driven (1)**
42:17
**dues (1)**
17:25
**during (11)**
28:18;39:8,14;
41:18;52:2;56:23;
63:2,11,15;66:25;94:4
**duties (2)**
20:14;87:4

**E**

**earlier (12)**
59:8;62:19;98:12,
24;100:22;101:14;
103:4;106:23;108:25;
109:20;111:10;122:21
**early (2)**
47:3;51:12
**earthly (2)**
91:23,25
**Easy (3)**
59:4,5,6
**eat (3)**
105:14,23;113:24
**educational (3)**
11:8;15:14;16:7
**effect (15)**
77:3;79:19;80:3;
81:11,16,19;83:12;
84:3;85:3;88:13;
94:20;108:19;120:6,7,
17
**efforts (1)**
20:2
**Eight (1)**
118:9
**either (7)**
29:17;56:4;62:6;
85:21;98:2;104:15;

114:14
**Elders (3)**
52:20,21;122:12
**Electromechanical (1)**
15:8
**eleven (1)**
54:6
**else (8)**
20:20;44:14,15;
47:15;53:11;96:23;
97:9;98:21
**email (19)**
38:7,14;42:3,8,12;
45:5,6,16;46:11,19,22;
74:1,6,8;82:14;87:11;
97:2;119:19,19
**emailed (1)**
38:24
**emails (3)**
37:23,24;73:15
**emergency (1)**
113:15
**employed (3)**
11:8,10;15:24
**employee (3)**
32:18;78:4;85:11
**employees (2)**
42:18;86:23
**employer (1)**
48:23
**employer's (1)**
45:19
**employing (1)**
20:7
**employment (3)**
11:7;46:6;48:23
**encouraged (3)**
93:13,16,18
**encyclopedia (1)**
59:19
**end (3)**
7:14;11:6;27:7;
63:13;82:16;101:11
**ends (1)**
31:6
**engaged (1)**
46:15
**enlightenment (2)**
22:2,23
**enough (3)**
78:19;102:6;117:21
**ensure (1)**
18:24
**enter (2)**
9:7;27:23
**entire (2)**
48:21;91:11
**entirety (2)**
86:14;88:3
**equate (1)**
117:16
**equating (2)**
41:15;117:10

**equitable (2)**
19:17,18
**especially (3)**
37:3;88:1;105:11
**establish (4)**
77:18,22;101:16;
106:6
**established (3)**
81:22;89:4;102:12
**Establishment (1)**
10:18
**estimate (1)**
29:25
**estimated (1)**
88:14
**et (3)**
108:15;124:1,2
**ethical (1)**
19:10
**Ethics (6)**
18:6;19:23;20:10;
23:12;68:8,9
**EVA (3)**
6:1;7:1;124:3
**even (2)**
26:21;116:19
**event (1)**
82:21
**events (3)**
9:3;27:5,14
**eventually (1)**
102:11
**everybody (2)**
54:18;70:8
**everyone (4)**
23:16;26:14;58:1;
83:3
**EWERT (1)**
59:2
**EXAMINATION (6)**
6:6;98:9;107:8;
113:18;121:13;122:19
**example (7)**
21:2;41:22;62:24;
116:23,24;122:22,23
**except (1)**
57:3
**excitement (6)**
71:10,20;76:2;
103:2,10;104:8
**excluded (1)**
22:4
**executive (7)**
89:9;90:17,21;91:6;
99:2,25;106:7
**Exhibit (5)**
9:7,9;18:7,8;21:15;
27:21,23;41:3;58:6,7;
70:10;74:3,4,17;77:14,
16;79:3,9;82:15;
105:13;113:23;118:10,
11,15,16
**exhibition (2)**

71:9;75:25
**exhibits (1)**
112:6
**exist (1)**
56:13
**existed (1)**
33:19
**existence (3)**
96:7;116:22;117:15
**expansion (1)**
52:4
**expect (5)**
62:14;92:12;93:20;
95:19;105:11
**expectation (2)**
86:16;95:17
**expected (2)**
87:1,9
**expense (2)**
20:7;92:15
**expensive (1)**
17:24
**experience (6)**
8:23;20:21;37:4;
83:24;87:2;95:22
**expert (1)**
25:5
**EXPIRES (1)**
124:24
**explain (4)**
21:2;96:23;107:15,
24
**explaining (1)**
24:23
**explicit (2)**
76:8,20
**explicitly (2)**
18:22;99:22
**Exploring (1)**
62:10
**exposure (2)**
77:4;119:25
**express (4)**
42:2;56:16;65:19;
68:18
**expressed (6)**
19:9;42:1,13;56:20;
57:19;64:20
**expressing (1)**
40:22
**expression (1)**
23:3
**extend (1)**
106:17
**extent (3)**
17:5;43:11;57:15

**F**

**facial (1)**
27:16
**fact (2)**
25:4;111:3

**faction (1)**
121:21,24;122:6,9,
11
**factions (5)**
94:19;107:1;109:19;
111:3;116:2
**factors (1)**
75:23
**facts (1)**
8:25
**fair (10)**
20:15;78:19;102:6;
109:11,12;111:5,6;
112:5,5;117:21
**fall (1)**
72:5
**falls (1)**
122:24
**familiar (13)**
6:12;17:9;23:6;
29:23;40:21;42:22;
50:2,13;60:18,20,22,
24;98:4
**family (2)**
41:16;117:12
**famous (1)**
64:24
**far (3)**
11:2;51:11;78:23;
100:11
**fast (1)**
86:22
**Fayetteville (2)**
6:10;124:1
**fear (1)**
122:8
**February (15)**
11:17;12:6,12,14;
33:14,15;43:19;47:4;
49:13;53:23,23;55:14;
56:1,9;58:5
**feel (3)**
9:6;19:5;75:7
**feeling (1)**
56:16
**felt (1)**
47:11
**few (9)**
27:5;34:19;57:22;
60:17,19;92:11;
104:12;113:5,20
**fewer (1)**
62:15
**fiction (5)**
23:25;24:5,13,17,20
**Fifty (5)**
104:20,24;114:12;
122:22;123:2
**fight (2)**
103:25,25
**figure (4)**
73:8;76:15;104:17,
25

**file (1)**
80:17
**filed (2)**
9:15,18
**filing (3)**
87:22;88:10;89:9
**filled (1)**
90:1
**final (3)**
88:24,25;120:23
**finally (2)**
9:4;121:7
**find (10)**
25:2,11;27:9;68:1,
10,14;71:14,18;79:23;
89:2
**finds (3)**
105:15,24;113:25
**fine (4)**
30:25;32:12;70:9;
74:24
**finished (1)**
7:16
**fire (4)**
37:11,14;49:20;
94:12
**fires (1)**
49:19
**firm (1)**
119:17
**first (26)**
8:7;9:12,20,20,22;
10:14;18:14;33:21;
37:16;40:2,5;48:8;
50:9;55:3;58:3,17,19;
70:13;77:14;78:18;
79:8;99:2;101:11;
103:8;106:6;119:24
**fit (3)**
53:14;104:6;115:22
**Fite (4)**
38:2,7,16;42:9
**fitting (1)**
62:8
**five (9)**
8:3;34:4,5;60:3;
86:21;89:10,18;
110:22;116:19
**five-minute (1)**
27:1
**flat (1)**
117:22
**flip (5)**
9:25;10:5,15;74:5;
88:19
**floor (1)**
83:16
**flow (1)**
18:24
**focus (1)**
78:8
**FOIs (1)**
94:8

**folks (1)**
84:2
**follow (3)**
31:8;48:1;88:23
**following (5)**
21:24;71:12;78:3;
80:15;124:10
**follows (1)**
6:5
**follow-ups (4)**
107:12;113:20,21;
115:16
**Fonda (1)**
60:5
**forced (1)**
76:14
**forefront (1)**
120:4
**foregoing (1)**
124:8
**forgot (1)**
26:11
**form (27)**
26:9;29:23;30:15,
17,23;33:19;43:14;
49:3;69:8,9,21;71:10;
72:14;76:1,22;79:25;
81:3;90:2;92:4;93:1,2;
97:23;105:2;117:6,18,
19;122:4
**formal (1)**
65:24
**formally (1)**
80:25
**formed (1)**
33:25
**former (1)**
35:16
**forth (4)**
10:24;75:19;86:9;
108:5
**forums (1)**
21:24
**forward (1)**
14:20
**found (5)**
85:16;97:12;105:16,
25;114:1
**foundation (3)**
36:11,12,14
**four (8)**
8:24;14:17,18;
15:20;26:23;27:24,25;
52:3
**Fowler (2)**
33:1,2
**framework (1)**
19:11
**free (4)**
18:24;23:2,3;87:1
**freedom (4)**
18:22,23;20:2;
119:24

**freely (1)**
82:11
**friends (2)**
36:11,15
**front (1)**
41:10
**fulfillment (1)**
22:22
**full (1)**
6:25
**fund (1)**
36:20
**funding (1)**
113:10
**furnished (1)**
102:25
**furnishing (5)**
9:23;10:1,6,11;75:4
**further (5)**
86:5;106:17;113:18;
122:18,19
**future (1)**
18:25

**G**

**Gables (2)**
61:12,15
**gave (7)**
38:15;46:15;48:13;
61:24;73:6;84:21;
117:22
**Gay (1)**
41:22
**Gender (1)**
64:23
**general (6)**
23:10;66:2,3;75:24;
92:12;95:17
**generally (6)**
8:7;11:3;62:4;98:14,
18;101:13
**General's (1)**
6:16
**generation (1)**
72:10
**generations (1)**
18:25
**genre (1)**
24:4
**genres (2)**
24:2;102:6
**Gentry (4)**
48:17,19;118:2;
119:13
**George (1)**
33:1
**gets (1)**
14:14
**given (6)**
37:3;49:12;61:21;
66:6;113:10;124:10
**giving (4)**

91:22;107:14,16;
122:23
**goal (1)**
83:24
**goes (10)**
10:3;45:14;68:25;
74:14;76:2;81:6;
82:25;83:2;88:13;91:4
**good (7)**
27:9;35:21;36:2;
63:13;79:2;107:10;
119:13
**governing (4)**
89:8,10;91:3,8
**government (6)**
101:3;109:23,25;
110:3;116:12;122:14
**governor (2)**
9:16;74:12
**grant (8)**
96:24;97:3,11,12,15;
106:25;113:4,8
**graphic (1)**
65:12
**great (1)**
58:9
**Green (4)**
61:12,14;66:17;
111:13
**Grey (5)**
104:20,24;114:12;
122:22;123:2
**ground (3)**
26:11;27:7;76:16
**grounded (1)**
18:21
**group (1)**
78:12
**grouping (4)**
67:25;68:3,11,15
**groups (3)**
23:2;36:22;52:12
**Grove (1)**
14:12
**grown (1)**
55:21
**Grzymala (11)**
32:14;33:8,16;37:6;
46:24;47:2;48:9;49:9;
55:25;56:4;69:2
**Grzymala's (4)**
35:20;36:1;38:15;
39:14
**guess (32)**
8:8;11:20;14:15,21;
16:21;17:4;18:2;
20:24;23:9;30:4;32:1,
7;33:7;40:14;41:12;
43:24;44:13;49:17;
52:12;58:18;61:4;
67:8;76:14;80:1;
84:14;88:15;100:22;
101:4;115:17;116:20;

117:21;121:12
**guidance (2)**
93:19;113:23
**guide (3)**
19:9;21:25;75:13
**Guidelines (6)**
10:18,24;77:19,22;
82:17;101:17

**H**

**half (2)**
14:1;33:3
**Hamby (15)**
39:21;40:14;49:25;
53:7;54:3;56:2,4,10;
69:17;112:7,10,18,24;
117:17;122:12
**Hambys (6)**
40:18;42:1,13;
52:15,20;117:4
**Hamby's (1)**
57:19
**handbook (2)**
99:23;100:8
**handed (1)**
116:25
**handle (2)**
76:21;79:18
**handled (1)**
96:2
**happen (10)**
39:13;49:1,2;53:2;
83:17;85:1;93:25;
94:2;110:18,25
**happened (9)**
9:2;27:6,10;44:13;
81:19;93:14,19;99:7,
15
**happening (1)**
122:3
**happens (3)**
34:25;74:13;117:14
**happy (1)**
46:9
**harassed (2)**
45:6,9
**harassment (1)**
46:15
**hard (1)**
51:20
**harm (1)**
120:1
**harmful (24)**
9:23;10:1,6,11;
70:19,24;71:4,8;72:9,
12;73:8;74:18,20;75:4,
14,20,22;76:3,16;85:9;
103:5;104:2;114:5,9
**harms (1)**
70:22
**Harrison (3)**
14:1,6;15:9

**Fayetteville Public Library, et al v.**
**Crawford County, Arkansas, et al**
CERTIFIED ORIGINAL/COPY
**Eva Doyce White**
March 26, 2024

**Harry (2)**
88:22;119:5
**hats (3)**
105:15,23;113:24
**hauled (1)**
75:6
**head (6)**
7:10;89:9;90:17,21;
91:6;105:12
**heading (1)**
105:21
**hear (4)**
17:11;72:25;98:24;
120:9
**heard (15)**
44:15,17,19,23;48:8;
50:5,21;51:1;60:25;
69:4;72:22,24;75:9;
119:2,3
**heartburn (1)**
87:14
**Hearts (1)**
60:22
**held (1)**
97:14
**help (1)**
36:20
**helpful (2)**
7:5;104:23
**helping (2)**
68:9,14
**helps (3)**
7:18;16:4;24:23
**hereby (1)**
124:7
**hereinbefore (1)**
6:2
**hereto (9)**
9:9;18:8;21:15;
27:21;41:3;58:6;74:4;
118:11,15
**herself (1)**
55:22
**heterosexual (2)**
41:16;117:11
**higher (1)**
15:25
**highest (1)**
19:15
**himself (1)**
90:13
**hire (1)**
49:20
**hired (2)**
93:21,22
**hires (1)**
49:19
**hiring (1)**
93:4
**historical (1)**
22:16
**history (6)**
25:19,23;26:2,7;

98:16,23
**hold (3)**
10:21;13:23;83:4
**home (1)**
15:7
**homosexual (2)**
41:15;117:11
**homosexuality (2)**
62:24;63:21
**hoped (2)**
83:11;85:3
**Hopefully (2)**
98:12;106:18
**hoping (1)**
81:14
**horrible (2)**
94:9,10
**hour (1)**
26:13
**hours (4)**
11:14,21,25;86:21
**huge (1)**
105:10
**human (1)**
78:12
**hundred (2)**
26:3,4

## I

**idea (12)**
26:21;35:21;46:3,8,
18;55:24;61:13;62:12;
91:23,25;105:5;121:6
**ideas (4)**
18:25;19:3;21:24;
23:3
**identifiable (1)**
111:13
**identified (1)**
62:18
**identify (1)**
102:6
**identity (1)**
63:22
**ideology (2)**
41:15;42:17
**ignorant (1)**
69:25
**II (4)**
22:14,19;86:14;91:6
**III (2)**
22:21,24
**imagine (1)**
104:14
**immediately (2)**
69:19;109:3
**impatient (1)**
7:18
**implement (2)**
108:22;117:23
**implemented (1)**
121:8

**important (1)**
7:9
**impression (1)**
48:13
**inaccessible (7)**
85:22;86:3;91:14;
92:13,24;115:8;120:8
**inappropriate (5)**
43:10,13,25;44:9;
85:16
**include (5)**
24:13;75:13;90:18;
91:7;114:10
**included (3)**
76:16;103:5,6
**inclusion (3)**
67:1;89:21;96:8
**inconsistent (1)**
115:21
**indicates (1)**
59:10
**influence (1)**
18:18
**inform (1)**
23:17
**information (10)**
18:20,23,24;20:17;
21:24;22:2,15,23;
90:17;91:9
**informed (2)**
18:21;23:11
**initiate (2)**
100:4,12
**innocence (1)**
120:1
**inside (1)**
84:2
**instead (2)**
64:19;91:20
**institutions (2)**
20:8,16
**instructions (3)**
66:2,3,6
**intellectual (2)**
18:22;20:1
**interaction (1)**
57:2
**interactions (2)**
56:5,23
**interest (3)**
22:2;68:10;71:16
**interested (1)**
68:1
**interests (1)**
20:6
**interfere (1)**
20:15
**interim (15)**
12:9,10,11,15;33:12;
43:3,18;47:4;54:7;
63:2,16;67:1;72:19;
80:20;94:4
**interlocal (2)**

99:20;100:9
**interpret (2)**
70:1;73:20
**intervening (1)**
11:20
**into (29)**
6:24;8:25;9:7;10:21;
26:24;27:12,23;30:12;
31:21,23;45:19;46:1;
77:3;79:18;80:3;
81:11,16,19;83:2,12;
84:3;85:3;88:13;
94:20;103:23;106:8,
11;108:19;120:6
**introduced (1)**
54:17
**introduction (2)**
8:8;11:7
**involve (2)**
64:2;104:12
**involved (12)**
10:2;28:11,13,22;
33:20;34:6;36:22,23;
90:15;93:4;108:10,13
**issue (2)**
64:25;107:1
**issues (6)**
22:16;64:2;92:15,
16;106:25;107:3
**item (12)**
9:23;10:1,2,6;70:18;
75:4;102:25;103:6;
105:15,24;108:3;
113:25
**items (4)**
10:11;82:21;98:18;
102:24
**IV (2)**
23:1,4

## J

**jail (2)**
74:24;75:6
**Jami (3)**
45:1,2,9
**Jane (1)**
60:5
**January (17)**
12:21,23;14:24;
33:4;47:3;48:11;
49:23;50:19;53:10;
54:5,10;55:1,8,10;
56:1;109:6,14
**Jeff (1)**
39:21
**Jennifer (5)**
73:25;74:1;82:14;
87:11;113:22
**job (12)**
8:17;11:14;12:6;
34:13;36:2,4;48:22;
49:6;54:21;91:22;

93:15,23
**John (2)**
6:9;27:11
**join (1)**
16:21
**joined (2)**
16:10,18
**JPs (1)**
117:4
**judge (18)**
9:19;24:24;34:10,
22,25;35:9;37:8,14;
49:16,20;55:6;68:19;
69:10,17;90:10,11;
100:23;115:11
**judicially (3)**
105:16,25;114:1
**July (10)**
13:3,14,15,24;33:5,
6,8,15,15,23
**jumps (1)**
81:18
**June (1)**
41:23
**justice (2)**
97:14;98:4
**justices (1)**
121:1
**Juvenile (2)**
60:2,14;88:21

## K

**keep (6)**
13:6,6;70:8;98:12,
13;111:7
**Keith (3)**
55:6;69:17;115:11
**kidding (1)**
106:21
**kids (3)**
55:16,20;92:19
**kind (12)**
8:4;26:24;35:13;
48:5;51:21;56:10;
76:5;86:17;97:5;
98:23;103:25;111:11
**kinds (2)**
94:5,14
**knew (5)**
26:7;35:16;38:18;
40:3;83:11
**knowing (1)**
10:2
**knowingly (1)**
10:3
**knowledge (2)**
41:8;103:15
**known (1)**
32:17

## L

**label (1)**
111:14
**labels (1)**
111:18
**lacks (1)**
71:23
**lady (3)**
50:8;86:19,25
**language (3)**
31:10;84:1;89:2
**Large (2)**
24:7;111:20
**last (17)**
9:1;11:25;21:9;24:1;
27:5;30:2,19;31:2;
33:11;47:22;53:23;
60:19;62:8;72:17;
95:16;106:3,16
**late (2)**
55:14;56:9
**lately (1)**
34:10
**later (4)**
6:24;55:14;56:23;
73:23
**latter (1)**
8:12
**law (26)**
9:4,10,19;10:24;
31:21;70:14;72:22;
73:20;74:14;75:18,19;
77:2,9,15;80:3;81:19;
82:4;83:11;84:21;
85:3;87:20,21;88:9,13;
89:13;91:18
**lawsuit (19)**
9:3,5;27:15;77:8;
83:11;97:19,21;98:2;
100:2,5,12;107:13,18,
20,23;108:11,14,17;
119:15
**Lawyer (6)**
6:16;63:9;103:24;
118:4;119:4,12
**lay (1)**
67:24
**learn (2)**
37:19,22
**learned (1)**
59:8
**least (6)**
60:12,18;64:7;
76:19;86:21;123:7
**leave (3)**
16:7;99:9;121:12
**leaving (2)**
49:6;78:24
**led (1)**
9:3
**left (2)**
17:7;31:9
**legal (2)**
43:12;103:24

**legislature (2)**
9:16;120:6
**Legislature's (1)**
120:10
**legs (1)**
26:14
**lengthy (1)**
102:5
**Leta (2)**
6:18,21
**letter (20)**
40:21,24;41:5,6;
42:2,8,9,15;52:16;
56:21;112:7,11,13,15;
117:3;118:4,12,16;
119:13;120:19
**letters (1)**
116:19
**letting (1)**
26:13
**level (2)**
19:15;120:5
**levering (1)**
48:24
**LGBTQ (10)**
39:6;42:10;52:23;
56:24;62:6,23;64:2;
98:5;116:18,21
**liability (2)**
85:7,17
**liberties (1)**
42:16
**Librarian (17)**
14:5,12;15:6,12;
17:4,6;21:19;73:18,24;
76:15;80:19,21;81:7;
90:3;91:22;123:11,11
**librarians (9)**
24:23;68:11;73:3,
14;77:5;85:5;86:10;
105:7;116:2
**librarian's (1)**
89:20
**librarianship (1)**
8:19
**Libraries (32)**
16:12;21:23;22:14,
21;23:1;24:8,11,15;
25:10;36:16;43:9,21;
54:17,18;55:13,13;
57:9,14,20,23;58:1;
82:12;83:16;86:9;
87:7;105:15,24;
107:25;113:25;120:7,
25;121:10
**libraries' (2)**
10:24;36:20
**Library (212)**
6:10;8:15,19,20;9:2;
11:11;12:8,23;13:11,
20;14:1;15:23;16:8,18,
21,25;17:1,12,13,14,
16,20,21;18:4;19:16;

20:2,7;21:4,7,9,22,23;
22:1,3;23:13,18;25:5;
27:6;28:1,23;29:1,14,
17,18,22;30:1,3,4,5,7,
9,16,20;31:23;32:2,18;
33:16,18,24;34:9,21,
22;36:11,14,15;37:7,
11,11,14,17,21,25;
38:12;39:8,11;40:6,20,
22;41:8,11,18,23;42:5,
17;43:5,20;44:1,8;
46:5,7;48:10,14;49:1,
6,12,19,23;51:5,11,21;
52:1,5,7,11;53:1,3,14,
16,21;54:4;58:5;
59:21;63:2;65:19,24;
67:23,24;68:7,12,14,
18,25;69:18,24;72:20;
73:9,19;74:10;75:11;
76:25;77:18,22;78:2,5,
7,20;79:18;80:15,19;
81:8,8,21;82:7;83:1,7;
84:2;85:12,14;86:23;
87:6;88:24;89:1,1;
90:5,8;91:2,11,13,20;
92:13,19,23;96:20,24;
97:6;98:15,24;100:1,
11,15,18;101:3,16,20;
102:4,11,17,18;
103:15;105:4,6,18;
106:8,11;107:2;
108:21;109:6,14,24;
110:5,18,25;111:8,18;
112:18,24;113:10;
115:8;116:3,5,14,14;
117:23;119:8,11;
120:10,12,16;121:24;
122:7;123:9;124:1
**library's (6)**
79:6;81:25;82:20,
23;96:9;121:15
**lifestyles (3)**
41:14,16;117:11
**likely (1)**
82:19
**limit (6)**
29:16;57:25;78:10;
87:8;104:24;106:5
**limits (2)**
106:10;107:25
**Line (7)**
9:25;10:5;41:9;
58:19;61:6;102:10,23
**lines (2)**
59:2,18;60:3
**linked (1)**
74:11
**list (10)**
38:16;58:13;61:21,
22,24;62:2,5,7,11,15
**literary (2)**
71:24;104:3
**litigation (1)**

110:17
**little (12)**
6:24;7:6;8:8;18:17;
52:10;58:2;70:6,7,8;
73:23;77:12;84:24
**location (1)**
25:12
**locations (2)**
87:20;88:8
**long (22)**
11:16;12:18;26:22,
23;32:17,20;33:2,19;
37:3;40:3;44:17;
46:21;55:24;81:17;
86:17,21;88:14,17,21;
89:16,17;103:5
**longer (2)**
88:17;118:4
**longest (1)**
8:24
**look (18)**
21:17;28:2;29:21;
41:1;47:21;59:18,22;
60:7;61:6;71:4;79:2,4;
86:12;91:11;93:13,18;
102:23;113:23
**looked (2)**
61:1,5
**looking (10)**
25:18,20,23;71:1;
75:17,21;77:13;79:3;
92:20;118:22
**looks (3)**
59:13;60:3,12
**lot (12)**
7:18;12:1;17:25;
27:7;72:24;94:23;
95:1;102:1;114:16,19,
19,22
**lots (1)**
103:20
**loud (3)**
7:9,13;106:20
**Lover (2)**
86:19,25
**lower (2)**
30:13;64:18

**M**

**ma'am (1)**
105:23
**major (2)**
24:4;62:10
**majority (3)**
31:3,11;35:5
**majority's (2)**
31:4,12
**Makes (6)**
60:20;87:17;88:18;
104:20;106:7;119:23
**making (8)**
19:10;46:4;87:19;

100:10;101:5;106:13;
108:2;116:23
**man (1)**
39:21
**managers (3)**
35:15;61:18;62:18
**many (10)**
11:14,21;29:4,25;
30:3,7;34:2;36:8;
42:18;55:22
**March (4)**
67:13;72:17,18,20
**mark (2)**
18:7;21:12
**marked (9)**
9:9;18:8;21:15;
27:21;41:3;58:6;74:4;
118:11,15
**marking (3)**
21:11;87:21;88:8
**married (2)**
117:1,2
**MARso (1)**
59:8
**Masters (1)**
15:14
**material (33)**
23:18;30:4,5,8;
56:24;68:10;71:11,15,
18,23;78:4,6,9,16,21;
81:1,5,7,24;85:11,13;
86:13;88:2;89:5;
90:22;91:12;102:12,
14,16;103:1;104:1;
119:25;120:25
**Materials (28)**
10:19,25;22:4,15,16;
23:7;28:1,23;29:23;
30:16,20;66:9;67:2;
68:12,14;77:20,24;
78:10;79:5;82:18;
83:4;96:20,22;97:4,5;
98:18;101:13,18
**matter (7)**
34:21;39:19;67:25;
68:3,12,15;71:21
**matters (1)**
25:13
**Mavis (2)**
47:22,24
**maximum (2)**
74:23,24
**may (21)**
7:6,11;22:11;24:22;
25:17;27:7;39:17,17;
60:4;67:13,13;78:5;
85:12;86:10;89:7;
90:18;91:6;93:25;
106:10;113:23;119:19
**maybe (6)**
8:11;35:15,16;
38:22;62:8;112:4
**McDonnough (4)**

12:5,5;93:11;94:22

**McLelland (27)**
6:17;21:11,13;25:3;
26:9;27:11;43:11;
49:3;57:15,24;58:12;
68:4,17;69:8,21;72:14;
76:22;92:4;93:1;
97:23;107:9;113:17;
115:25;117:6,18;
122:4;123:14

**McLelland's (1)**
115:16

**McNeil (2)**
58:20,20

**Meadors (5)**
118:23;119:1,2,3,14

**mean (12)**
10:23;51:20;55:5;
58:19;72:12;83:14;
86:18;87:6;94:11;
101:7;103:23;104:24

**meaning (1)**
70:5

**means (8)**
70:18,21;71:5,8;
75:24;78:15;102:25;
110:17

**measures (1)**
117:23

**mechanically (1)**
34:24

**media (4)**
40:13;44:14;50:3;
73:1

**medical (2)**
71:24;104:3

**meet (2)**
82:19;102:17

**meeting (36)**
31:5,13,14,19;32:5;
40:8,18;44:16,20;45:8;
46:22,25;47:11,17;
48:11;50:19;51:12;
53:10;55:3;69:4,13,19;
80:18,23,25;81:1,5;
96:18;97:12;109:3,6,7,
14,14;113:12,15

**meetings (8)**
51:6,9,12;54:14;
57:3,7;95:7;96:21

**meets (1)**
102:14

**member (18)**
16:8,15,17;17:1,6,8,
14,16,20;31:3,10;
35:16;36:10;40:16;
46:5;50:9,17;97:1

**members (12)**
18:21;34:2,8,22;
45:13;47:7;50:6;
69:18;78:11;91:8;
100:23;121:19

**membership (1)**

16:22

**memoir (1)**
65:12

**mention (2)**
26:11;100:22

**mentioned (8)**
46:10,10;74:6;
100:6,7,8;101:14;
106:25

**mentions (1)**
62:22

**mentoring (1)**
95:15

**message (3)**
69:20,23;70:2

**met (6)**
6:22;39:23;48:14;
50:8;98:12;119:5

**method (1)**
81:3

**middle (6)**
53:1;85:10;86:12;
94:18;105:20;120:23

**Miel (1)**
115:11

**might (27)**
13:21;25:18;29:9;
31:9;43:25;46:19;
59:15;63:12,13;64:8;
75:1;76:8,15;81:10;
83:3;84:3;85:17;
86:18;92:22;93:20;
94:2;98:20,21;101:6,7;
114:10;120:1

**million (1)**
52:5

**mind (3)**
61:4;82:15;118:17

**minimalist (1)**
83:3

**minimize (1)**
77:4

**minimum (2)**
78:3;80:15

**minor (9)**
9:23;10:2,6,11;
74:18;75:4;82:11;
84:22;108:3

**minors (36)**
70:19,24;71:5,8,16,
23,25;72:9,12;73:9;
74:20;75:14,20,22;
76:3,16;82:1,9,24;
83:8;85:9,22;86:1,3;
91:14;92:13,18,24;
102:25;103:5;104:2,4;
114:6,9;115:8;120:8

**minute (1)**
30:25

**minutes (1)**
113:5

**miscellaneous (1)**
98:20

**misdemeanor (2)**
10:7;74:23

**mismatch (1)**
115:17

**missing (1)**
79:15

**mission (1)**
36:20

**mistake (1)**
59:8

**misunderstanding (1)**
104:19

**MLS (1)**
15:21

**modifications (2)**
120:17,20

**modifying (2)**
120:11,15

**money (7)**
48:20;50:20;83:19;
97:4,10,11;113:12

**monitor (1)**
83:1

**month (2)**
32:4;41:23

**monthly (1)**
54:14

**months (2)**
54:6;74:24

**morale (3)**
94:9,10;107:2

**more (14)**
26:13;31:6,7;50:5;
58:2;62:14,16;77:12;
92:11;93:19;95:2;
98:17;105:9;114:21

**most (9)**
16:16;17:3,5,19,22;
54:7,22;76:20;88:16

**mostly (2)**
57:2;73:5

**motives (1)**
115:24

**Mountainburg (1)**
59:21

**move (7)**
11:7;67:17;96:3,3;
101:12;110:8,9

**moved (7)**
44:1,4,5,7;62:19;
67:19;98:1

**movement (1)**
110:13

**moving (2)**
96:15;98:13

**Mrs (1)**
53:7

**much (4)**
50:24;63:19,25;94:3

**multiple (1)**
56:11

**municipal (11)**
77:18;78:2,5,6,20;

80:14,19;81:8;85:12,
14;101:15

**myself (1)**
35:17

**Mystery (1)**
112:1

## N

**name (12)**
6:8,25;12:3;14:25;
24:1;38:15;47:22;
52:13,13;58:21;73:24;
93:10

**named (2)**
6:2;39:21

**names (3)**
48:16;52:13,14

**national (1)**
120:5

**nature (4)**
30:11;68:24,25;
116:21

**near (1)**
81:20

**necessarily (1)**
115:20

**necessary (2)**
27:17;120:11

**need (7)**
22:11;23:9;25:11;
30:24;67:8;82:19,22

**needed (1)**
15:11

**needs (1)**
70:22

**needy (1)**
52:1

**new (9)**
11:13;49:22;52:2,3;
63:10;94:21;95:15;
106:8;116:8

**news (1)**
69:12

**next (8)**
19:8;20:12;34:18;
50:21;51:1,3;83:20;
113:11

**night (1)**
21:9

**nine (4)**
14:8;26:3,4;62:9

**Noah (2)**
6:15;98:11

**nod (1)**
7:10

**noncompliant (1)**
97:1

**None (1)**
30:6

**nonfiction (8)**
23:24;24:14,16,20;
59:12;60:5;85:21;

86:11

**nongovernmental (1)**
36:17

**normal (2)**
63:11;86:16

**normalizing (2)**
41:15;117:10

**normally (1)**
86:22

**North (3)**
13:25;14:5;15:23

**Nos (1)**
28:4

**NOTARY (1)**
124:23

**novel (2)**
85:21;86:11

**November (1)**
56:21

**nudity (8)**
71:10,19;76:1;
103:1,9,20,21;104:7

**number (7)**
15:5,13,20;58:20;
66:17;99:22;106:23

**Numeral (1)**
79:4

## O

**oath (1)**
7:25

**Obergefell (1)**
116:24

**Object (16)**
26:9;43:14;49:3;
69:8,21;72:14;76:22;
93:1,2;97:23;105:1;
108:4;117:6,18,19;
122:4

**Objection (12)**
25:3;27:12,19;
43:11;57:15,24;68:4,
17;69:9;92:4;117:5,10

**obligation (1)**
18:24

**obscene (3)**
105:16,25;114:1

**obscenity (1)**
114:6

**obtain (1)**
14:16

**obvious (1)**
24:22

**obviously (1)**
51:21

**occur (1)**
99:6

**occurs (1)**
80:24

**off (7)**
8:22;10:21;31:9;
75:6;78:25;92:23;

105:11

**offense (1)**
108:3

**offensive (1)**
71:21

**offered (2)**
50:20;57:25

**offering (1)**
48:20

**office (8)**
45:19,24;46:1;55:8;
66:7,20,21,22

**Offices (1)**
6:16

**often (1)**
54:16

**old (1)**
55:20

**older (3)**
71:13,17;72:10

**once (1)**
36:10

**one (87)**
6:20;13:5,10;14:20;
16:15;20:12;21:6;
22:7;26:9,11,16,23;
28:20;29:6,7,10;30:10;
35:17;41:7;48:2;49:5,
10,25;51:7;52:4,6;
54:19;55:18;56:10,12;
58:3;59:7,19;60:4;
61:9,13;62:7;64:24;
65:6;68:9,10;69:18;
79:14,20;80:1,2,4,5,5,
9;83:3;84:14;86:8;
87:12,13,13;88:12;
92:12,16;95:16;97:1,
25;98:15,17;102:9;
103:8;104:1,10;
105:15,24;106:16,19;
110:1,1;111:3,20;
112:4,6;113:25;
115:17,17;118:18,20,
22;121:15,21;122:10

**ones (2)**
24:5;47:19

**ongoing (1)**
94:17

**only (11)**
25:5;26:15;27:16;
47:8;52:8;53:19;62:7;
101:9;102:20;106:16;
118:3

**open (4)**
53:20;83:16,24;
111:8

**opening (1)**
50:22

**operate (1)**
99:17

**opinion (9)**
25:4;35:20,25;
43:12;57:16;68:5,18;

72:4;123:4

**opinions (1)**
66:10

**opposed (2)**
63:21;64:16

**order (6)**
14:20;23:24;63:19;
72:9;75:3;97:4

**ordering (1)**
63:20

**organization (2)**
18:19;25:8

**organizations (4)**
16:9,9;17:8;36:18

**organize (1)**
23:17

**organized (4)**
19:17;23:25;24:1,25

**organizes (1)**
23:24

**origin (1)**
22:4

**original (1)**
61:12

**others (3)**
47:16;52:24;88:17

**ought (1)**
21:3

**out (49)**
7:9,12;9:13,14;18:4;
24:5,25;25:8;27:9;
48:5;57:6,12;62:7;
63:6;64:5,8;67:24;
73:8;74:8,10;76:15;
77:17;79:23;81:18;
82:18;86:8,15;87:13;
88:3;89:13,15;90:1;
92:7;96:3,13;97:12;
98:1;99:12,22;104:17,
25;106:20;115:1,5,5;
116:5,7,14;123:3

**outcome (2)**
79:6;82:22

**outer (1)**
104:24

**outline (1)**
8:4

**outside (2)**
27:15;87:3

**over (14)**
7:6,19;8:11,11,17;
40:13;41:4;48:2;52:5;
60:18;66:17;83:5;
102:2,9

**overseeing (1)**
80:10

**own (1)**
52:8

---

## P

**page (39)**
9:23,25;10:5,15;

18:14;28:3,6;29:21,21;
30:15,19,19;31:2,22;
62:8;71:4;72:17;
74:16;77:15;79:8,9,12,
15;80:1,2;81:20;
82:16;85:10;86:12;
87:12;89:3;101:5,15;
102:9,9,23;105:13;
124:5,10

**pages (4)**
27:24,25;88:21;
104:12

**paragraph (7)**
19:1,3,8;41:9;82:18;
120:3,23

**parameters (1)**
108:5

**pardon (2)**
42:8;82:8

**parental (1)**
42:15

**parents (2)**
92:18;123:8

**part (26)**
8:12,14,23;10:23;
11:23;15:7;19:22;
26:21;31:9;46:17;
54:1,3,13;66:13,22;
70:17;79:21;88:5;
94:20;95:15;98:16;
99:4,11,21;101:3;
120:1

**Partain (1)**
115:11

**partially (1)**
102:24

**particular (9)**
19:12;20:25;21:6;
25:18;41:7;42:22;
60:18;64:22;70:2

**particularly (2)**
20:22;38:17

**parties (1)**
115:12

**partisan (1)**
22:17

**parts (1)**
18:13

**pass (1)**
97:10

**passage (1)**
114:10

**passed (6)**
9:15,17;73:7;77:2;
82:5;120:5

**past (1)**
31:15

**pastor (1)**
45:13

**patently (1)**
71:21

**patron (8)**
21:4;38:24;39:1,3,

17,19;42:9;55:23

**patrons (7)**
23:22;24:25;25:8,
15;37:25;38:1;68:14

**patrons' (1)**
42:4

**Patron's (2)**
29:22;79:6

**pause (1)**
7:12

**pay (1)**
17:25

**paying (1)**
99:10

**peace (1)**
97:14

**pending (1)**
79:6

**people (15)**
7:14;17:11;21:1;
22:3;29:16;35:14;
37:20;46:14;64:15;
68:1,10;87:7;106:9,13;
114:22

**Peppas (1)**
97:16

**Peppas' (1)**
98:4

**performance (5)**
71:11,15,19,23;
103:1

**period (5)**
28:18;34:17,19;
35:9;63:11

**periods (1)**
28:20

**permanent (2)**
12:22;93:5

**permit (1)**
85:19

**person (21)**
10:1,3;34:12;36:2;
45:5;71:13,17;78:3,8,
16,17;80:17,18,24;
81:2;84:22;85:10;
89:6;90:20,23;123:5

**personal (6)**
16:22;19:22;20:13,
14;22:11;123:4

**personally (1)**
36:10

**personnel (1)**
81:9

**persons (2)**
23:1;83:4

**perspective (1)**
18:5

**phone (2)**
45:5;48:2

**physical (5)**
25:12;77:20,23;
92:14;101:18

**picture (1)**

17,19;42:9;55:23

**patrons (7)**
23:22;24:25;25:8,
15;37:25;38:1;68:14

88:19

**place (2)**
93:6;110:23

**placed (4)**
59:9;60:13;62:23,25

**placement (1)**
89:20

**plainly (1)**
57:21

**plaintiff (1)**
100:2

**Plaintiffs (7)**
6:9,20;70:12;92:16;
107:12;108:18;119:15

**plan (1)**
95:3

**planet (1)**
78:12

**planning (2)**
95:2,3

**plans (1)**
83:16

**play (1)**
90:6

**please (7)**
6:25;26:18;41:4;
43:15;45:2;93:9;
107:15

**plugged (1)**
51:14

**pm (1)**
123:17

**point (23)**
11:4;13:12;16:15;
17:2;28:15;29:1;
34:15,24;36:6;37:19;
38:6;47:3;48:2,6,21;
55:5,10,14;57:6;65:6;
70:6;79:2;99:15

**points (1)**
22:15

**police (1)**
75:10

**policies (8)**
19:17;21:25;23:7;
77:22;101:20,22;
120:12,16

**policy (33)**
28:9,11,13,23,25;
29:2,13,16;30:22,24;
31:6,22;32:9;65:24;
77:18;78:1,9,13,23;
79:1,10,24;80:14;
87:16,19,23;89:19;
101:16,24;102:3;
106:4,11;123:9

**political (3)**
18:20;71:25;104:3

**Polytechnic (2)**
14:22;15:1

**Porter (2)**
47:20,24

**portion (1)**

87:19
**portions (2)**
86:15;88:3
**position (5)**
11:12,16,22;27:14;
34:14
**possibility (3)**
83:3;84:15;94:20
**possible (10)**
16:25;44:19;46:25;
47:2;50:22;73:11;
76:17,24;85:23;92:15
**Possibly (2)**
76:23;77:1
**Potter (2)**
88:22;119:5
**powers (1)**
99:22
**practice (1)**
34:21
**Preamble (1)**
21:22
**precisely (1)**
32:8
**predominant (1)**
71:15
**predominantly (2)**
104:7;114:11
**predominately (1)**
103:21
**premise (1)**
54:1
**prepare (1)**
83:7
**prepared (2)**
90:25;91:3
**preparing (1)**
28:22
**presence (2)**
64:16;124:18
**present (3)**
18:25;33:19;90:22
**presentation (2)**
71:9;75:25
**presenting (1)**
22:15
**preservation (1)**
18:19
**President (1)**
44:24
**Presumably (2)**
53:11;117:16
**pretty (4)**
17:24;63:19,25;
88:19
**prevailing (1)**
71:21
**previous (2)**
29:21;71:3
**previously (1)**
6:2
**Pride (1)**
41:23

**primary (1)**
94:11
**principal's (1)**
45:24
**principle (4)**
20:4,9;22:7;68:2
**principles (8)**
8:19;19:8;20:1;
23:12,17;67:24;68:14;
69:1
**print (2)**
24:7;111:20
**prior (14)**
13:9;29:7,13,16;
30:2;39:14;47:3,4;
56:2;59:9;60:13;
77:21;96:7;116:24
**private (2)**
20:6;45:21
**privately (1)**
53:9
**probably (14)**
7:5;8:4,24;28:14;
30:2;37:18;59:22;
63:23;65:23;67:13;
83:22;102:1;115:3;
123:3
**problem (4)**
26:6;68:23,24;
117:17
**problematic (1)**
83:2
**problems (8)**
37:3;94:5,6,8,14,17;
106:24,25
**procedure (1)**
86:8
**procedures (2)**
120:12,16
**process (10)**
37:9;75:5;78:22;
82:21;87:9,25;88:15;
90:6;93:4;99:6
**profession (1)**
18:22
**professional (3)**
16:8,9;20:14
**professionals (1)**
42:18
**progressive (2)**
41:14;42:16
**prohibition (2)**
10:10;85:16
**prohibitive (1)**
83:21
**promise (1)**
87:17
**promises (1)**
87:23
**proscribed (1)**
22:17
**prosecution (1)**
84:16

**protecting (1)**
119:25
**provide (9)**
19:10,15;22:14,22;
23:16;78:3;80:15;
105:8;121:16
**provided (4)**
22:2;27:24;81:3;
90:17
**providing (1)**
83:24
**provision (2)**
20:16;102:22
**prurient (1)**
71:16
**Public (14)**
6:10;41:10,17,23;
45:21,23;53:8;59:21;
74:10;77:20;101:18;
105:8;124:1,23
**purchase (1)**
83:3
**purchases (1)**
106:8
**purposes (2)**
68:3;122:25
**pushback (1)**
52:23
**pushing (2)**
52:8,11
**put (8)**
18:4;24:15;50:12;
64:5;81:16;86:23;
96:11;98:21

**Q**

**qualifications (1)**
36:1
**qualify (1)**
19:6
**quality (2)**
71:8;75:24
**qualms (1)**
19:5
**Queer (1)**
64:23
**quick (1)**
122:21
**quickly (4)**
58:17;87:17;88:20;
102:21
**quit (1)**
48:20
**quorum (41)**
35:3;37:8;40:7,19;
44:15;45:7;46:21,25;
47:10,17;49:16;51:3,8,
12;68:19;69:4,6,11;
90:14;91:4,16,20,24;
95:7;96:18,20;97:1,8;
99:19;100:25;109:3,
13;113:7;115:24;

116:4,13;119:18,18;
120:8;121:10;122:13
**quote (6)**
23:8,9;57:18;70:24;
82:22;88:2

**R**

**raised (3)**
26:21;64:24;92:17
**rather (2)**
102:5;116:7
**reached (1)**
121:2
**reaction (1)**
88:7
**reactions (1)**
22:11
**read (50)**
9:10,12;18:10,13,15;
19:1,13,20;23:12;
30:25;40:17,24,25;
41:4,5;42:20;48:9;
54:2;59:6;61:5,13;
69:12;70:23,25;71:7;
72:23;76:7,9,19;78:18;
82:2;84:22;85:15;
86:11,21,25;87:6,16;
91:18;94:24;103:5,9;
105:4,22;113:22;
114:13,23;121:3;
123:15;124:7
**reader (1)**
86:22
**reading (7)**
20:25;74:16;82:4;
88:5;89:13;90:19;
118:17
**reads (1)**
31:2
**realistically (1)**
87:9
**really (8)**
30:18;32:11;37:5;
45:15;69:16;84:4;
94:3;107:4
**reason (3)**
105:17;106:1;117:3
**reasons (3)**
31:4,11;104:1
**recall (5)**
99:8;108:24;114:2,
5;118:1
**receipt (2)**
89:12;119:18
**received (2)**
29:25;42:9
**recently (1)**
54:7
**recess (3)**
27:2;58:10;92:9
**recognize (4)**
28:9;30:17;31:10;

101:9
**recognized (2)**
101:6,7
**recollection (1)**
78:10
**recommend (2)**
34:14,22
**recommendation (2)**
35:1;91:7
**recommended (2)**
34:10;35:2
**reconsideration (7)**
28:1,23;29:22;
30:20,23;67:10;81:3
**record (13)**
6:25;9:7;24:24;
27:13,19,23;28:3;
57:13,21;103:14;
115:11;118:6;124:10
**refer (1)**
21:5
**reference (1)**
119:23
**referral (1)**
75:9
**referring (1)**
84:16
**refers (1)**
71:3
**reflect (1)**
21:18
**refused (2)**
97:10,11
**refuses (1)**
117:15
**regarding (1)**
91:7
**Regional (6)**
13:25;15:23;99:4,7,
11,13
**regular (10)**
59:11,24;60:4,15;
62:14,19;64:17;65:16;
67:19;85:20
**rejoined (1)**
16:13
**related (1)**
107:4
**relation (1)**
103:7
**relevant (2)**
20:22;27:17
**Religions (1)**
62:10
**religious (1)**
42:16
**relocate (1)**
89:5
**relocated (5)**
30:8;81:24;82:22;
83:4;91:13
**Relocation (9)**
10:19,25;30:12;

77:19,23;82:17;85:19;
101:17;120:9
**reluctant (1)**
115:23
**remain (3)**
78:21;79:5,12
**remember (61)**
9:12,14;15:19;
18:12;20:24,25;29:9,
13,20;30:11;31:18;
32:4,8,9,21;38:21,22;
39:1,5;40:8,25;44:14,
22;45:17;46:14,17;
47:5,6,22;48:3,8;61:5;
64:22,24;67:12,21;
68:7;69:15;70:15,25;
71:1;73:14,22;74:16,
21,22;75:17,21;78:23;
79:17;82:4;88:5;
89:13;90:14;109:17;
111:10,15;112:6,8;
113:4;118:3
**remind (1)**
93:9
**remodeled (1)**
52:3
**Removal (1)**
110:4
**remove (2)**
110:6,11
**removed (4)**
22:17;30:5;110:16,
19
**repeat (5)**
25:7,22;42:6;57:17;
68:6
**rephrase (1)**
110:20
**replace (2)**
69:18;96:25
**report (2)**
100:17,20
**reporter (2)**
7:8,18
**reporting (1)**
100:14
**reports (4)**
44:14;50:3;69:12,15
**represent (6)**
6:9;18:9;21:8;58:12;
70:12;85:9
**representation (3)**
20:15;71:9;76:1
**representative (4)**
38:3,5,7;42:8
**represents (1)**
119:17
**Request (7)**
29:22;79:7;80:18;
81:2;83:5;89:6;90:23
**requested (2)**
80:23,24
**requests (4)**

19:19;30:7;67:10;
96:11
**require (1)**
36:4;97:6;120:7
**required (5)**
90:17;95:9,10,13;
97:3
**Research (1)**
15:14
**reserve (2)**
98:19;123:14
**residents (1)**
29:18
**resign (2)**
47:15;50:21
**resigned (5)**
47:14,19,23;48:22;
69:19
**resist (1)**
20:2
**resisting (1)**
23:2
**resources (4)**
19:17;20:3,17;22:1
**respect (4)**
29:12;41:8;71:22;
94:2
**respond (5)**
21:3;38:14;57:10;
68:5;87:18
**response (2)**
67:4;96:14
**responses (1)**
19:19
**responsibility (2)**
22:22;121:16
**responsible (1)**
80:9
**rest (2)**
44:13;52:3
**result (2)**
44:18;94:11
**resulted (3)**
30:3,7;110:13
**Retention (6)**
10:19,25;77:19,23;
82:17;101:17
**retired (8)**
12:17,18,20;13:5,10;
28:18,20;32:25
**retirement (1)**
32:23
**retiring (1)**
13:6
**returned (1)**
43:18
**returning (1)**
56:2
**review (2)**
81:6;91:8
**reviewed (1)**
86:14
**reviewing (1)**

102:11
**revised (2)**
28:7;30:21
**rewind (1)**
102:2
**Right (57)**
16:6;25:24;28:19,
21;31:25;32:2;34:15;
47:21,22;48:4;49:2;
53:12,24;54:21,21;
59:7,14;60:11;70:10;
72:20;73:23;74:3;
75:16;76:4,6;77:11;
79:2,8;80:11;85:4;
86:7,22;87:12;91:15;
95:5;96:1,16;98:11;
106:15;107:16,16,19;
108:6;109:20;110:9,
12;112:22;114:20;
116:5,6;117:1,2,5,12,
17;121:17;122:7
**rightly (1)**
88:1
**Rights (6)**
8:21;21:7,22;23:13;
42:15;68:8
**rings (1)**
41:2
**River (1)**
52:21
**role (1)**
37:4,9;90:6
**rolled (1)**
109:6
**Roman (1)**
79:4
**romanette (2)**
86:14;91:6
**roughly (3)**
15:18;16:2;38:20
**roundabout (1)**
56:25
**rule (3)**
26:15;90:12,13
**rules (4)**
7:6;26:11;99:17,23
**run (1)**
58:18
**Russellville (1)**
15:3

## S

**sadomasochistic (5)**
71:11,20;103:2,10;
104:8
**Sam (1)**
6:16
**same (14)**
28:3;35:8;40:14;
42:2;57:24;68:17;
71:5;77:13;100:11;
101:5;103:6;118:7,16;

122:10
**same-sex (5)**
116:23,25;117:2,15,
16
**Sanders (1)**
74:12
**saw (2)**
58:3;75:17
**saying (3)**
43:18;70:2;80:5
**scheduled (1)**
77:3
**School (7)**
14:12;15:6,9;17:7,7;
45:21,22
**schoolteacher (1)**
45:20
**science (2)**
25:5;26:4
**Sciences (2)**
59:9,21
**scientific (2)**
71:24;104:3
**scores (2)**
87:22;88:10
**search (1)**
61:22
**searched (1)**
62:13
**second (7)**
8:14,23;9:25;41:9;
82:18;98:17;108:14
**Section (129)**
9:20;10:9,13,14,15,
22,22;11:3,3;24:9,11;
25:19;27:14;30:8,12,
12,13,14;43:4,6,10;
44:1,3,8,10;56:16,18;
58:14;59:1,10,21,23,
24;60:5,14,14;61:17,
20;62:14,20,23,25;
63:4,6,14;64:2,6,10,
17;65:3,4,10,11,14,25;
66:4,10,14;67:2;68:2,
13,20;69:3,7;70:3,6,
17;71:5,7;74:17,18,20;
77:11;79:18;80:12,24;
81:4,23;82:16;84:1,17;
85:8,8,8,19,20,21;89:5,
7;90:5;92:23;93:12;
94:2,16;96:4,6,8,10,
12;98:1,5;101:15;
102:13,21,22;104:9;
108:18,18,22,24;
109:2,8,11,13,16;
110:14,16,20,21,24;
111:7,12;113:22;
116:1,8;120:7,22,25;
121:5
**sections (17)**
9:19;24:2,13,17,19;
43:9,21;56:13;58:3;
64:18,19;70:14;74:15;

86:2;105:14,20;114:2
**seeking (5)**
109:25;110:1,2,3,5
**seeks (1)**
43:12
**seemed (1)**
64:8
**seemingly (1)**
86:10
**seems (5)**
64:7;95:7;116:11,
21;117:3
**segregated (1)**
86:5
**select (2)**
61:20;81:8
**selected (4)**
61:16;66:10;86:15;
88:3
**selecting (1)**
23:7
**Selection (14)**
10:19,25;18:19;
63:12;77:19,23;82:17;
101:17,23,25;102:3,
15,18;106:5
**Senate (1)**
74:11
**Senator (1)**
72:18
**send (2)**
69:19;112:13
**sense (7)**
62:17;72:1;88:18;
90:19;102:1;104:21;
120:19
**sent (6)**
37:24;40:21;45:6;
46:18;117:4;118:16
**sentence (4)**
31:2;74:23;116:16,
19
**sentences (1)**
57:22
**separating (1)**
99:7
**separation (2)**
49:8,15
**September (4)**
13:21;28:7;37:18;
38:22
**series (2)**
26:2;60:9
**serious (1)**
71:24
**serves (1)**
22:3
**service (2)**
19:16,17
**services (1)**
21:25
**set (5)**
75:19;99:22,22;

107:25;108:5

**sets (2)**
10:24;86:9
**setting (1)**
94:16
**seven (1)**
11:20
**seventeen-year-old (4)**
76:9,21;114:25;
123:1
**several (10)**
17:22;36:11;41:6;
64:15;73:17;105:14,
23;106:9;113:24;
114:21
**severance (2)**
48:24;49:5
**sex (6)**
62:6;71:16;114:11,
11,17,19
**sexual (14)**
62:13;71:10,10,19,
20;76:1,2,17;103:2,2,
10,10;104:7,7
**sexualized (1)**
120:24
**sexually (2)**
76:8,20
**Shades (5)**
104:20,24;114:12;
122:22;123:2
**shake (1)**
7:10
**shall (21)**
31:3,11;77:18;78:2,
20,21;80:15,18;81:2,8,
23,24;86:14,14;88:2,3;
90:22;91:8,10;101:16;
102:13
**shelved (1)**
59:11
**shelves (7)**
60:15;62:20,20;
78:24,25;82:11;85:21
**short (1)**
98:12
**shorter (1)**
116:19
**shorthand (1)**
8:12
**shortly (1)**
120:6
**show (2)**
25:17;112:10
**showed (1)**
54:18
**shown (2)**
56:1;124:9
**shut (5)**
87:6;111:4;121:24;
122:7,10
**side (4)**
7:16;52:17;110:1,2

**sides (2)**
52:9,12
**sign (1)**
123:15
**SIGNATURE (2)**
124:5,14
**signed (4)**
9:16;49:9;74:12;
124:17
**significantly (1)**
18:18
**silence (1)**
57:11
**similar (1)**
42:12
**similarly (1)**
21:17
**simply (2)**
70:1;121:1
**sit (2)**
86:25;103:18
**situations (1)**
19:12
**six (1)**
11:20
**S-J (1)**
60:1
**skim (1)**
61:7
**skimmed (1)**
61:10
**small (2)**
55:16;58:8
**smaller (1)**
78:12
**Social (58)**
26:4;27:14;56:13,
16,18;58:3,14;59:1,9,
10,20;60:13;61:17,20;
62:20,23,25;63:3,6,14;
64:2;65:25;66:4,9,14;
68:2,13,20;69:3,7;
70:2,6;86:2;93:12;
94:2,16;96:4,6,8,10,
12;98:1;108:24;109:2,
7,11,12,16;110:14,16,
20,21,24;111:6,12;
115:25;120:22;121:5
**somebody (10)**
35:16;65:2;73:6;
84:23;91:12,23;92:1,3;
97:2;108:3
**somebody's (1)**
72:4
**someone (1)**
86:17
**sometimes (5)**
7:11,14;17:11;
25:12;92:18
**somewhere (2)**
16:17;98:21
**sorry (3)**
45:2;90:19;106:20

**sort (7)**
8:22;24:22;26:14;
61:15;99:17;100:5;
115:17
**sound (2)**
17:9;91:4
**sounds (2)**
51:14,20
**soup (1)**
48:5
**speak (1)**
7:19
**speaking (2)**
7:8,15
**special (3)**
18:24;62:20;116:8
**specific (6)**
96:6,11;102:6;
105:9;108:6;111:11
**specifically (7)**
8:19;51:24;98:18;
101:23;102:23;116:13,
20
**specified (2)**
39:17;97:8
**specifies (1)**
76:4
**specify (4)**
39:3;43:24;45:18;
97:5
**speculate (3)**
39:16;53:19;115:23
**speed (1)**
8:12
**spell (2)**
45:2;57:12
**spend (1)**
97:4
**spent (1)**
95:1
**spicey (1)**
86:20
**spine (1)**
111:18
**spoke (9)**
40:7;12;44:22;48:2;
54:16,23;56:6;115:24,
25
**spoken (1)**
40:19
**sponsor (1)**
72:18
**sports (1)**
60:10
**staff (7)**
66:3;84:18;94:8,9,
10;100:16,18
**stand (3)**
58:25;59:3;60:1
**standards (4)**
71:14,18,21;76:11
**standing (2)**
27:12,19

**stands (3)**
58:23;62:7;86:8
**start (11)**
7:15;9:6;12:25;
14:19;18:6,17;28:6;
70:17;74:19;102:2;
113:20
**started (2)**
8:2;11:23
**starting (8)**
15:11;18:13;49:13;
56:9;98:23;100:16;
102:10,23
**starts (6)**
42:15;74:10;77:15,
17;82:18;87:13
**state (14)**
6:25;10:24;35:24;
38:3,5;52:6;73:18,19,
24;74:14;115:10;
120:5,8,10
**stated (4)**
8:22;109:7;117:10;
121:1
**statement (2)**
53:11;88:7
**statements (2)**
19:9,10
**statute (6)**
70:18,24;71:3,3;
77:6;104:1
**stay (1)**
81:17
**stayed (1)**
36:22
**step (1)**
106:4
**steps (2)**
77:2;83:7
**sticks (1)**
24:5
**stigmatizes (1)**
117:15
**still (12)**
17:4;21:19;38:5;
42:18;53:20;64:10;
66:21,23;72:2;94:18;
95:12;96:10
**stink (1)**
52:18
**stirred (1)**
52:18
**stood (1)**
89:15
**stop (2)**
14:15;108:18
**story (1)**
121:11
**straight (3)**
35:5;89:25;90:2
**stretch (1)**
26:14
**strongly (1)**

**87:18**
**structural (3)**
83:17,20,23
**structure (2)**
100:15;101:3
**studied (1)**
8:16
**stuff (1)**
91:2
**STYLE (1)**
124:1
**Subdivision (9)**
81:4,22;89:4,7;
90:21,24,25;91:9;
102:13
**subject (13)**
9:5;23:24,25;39:18;
61:22;67:25;68:3,12,
15;72:11;81:1,5;85:17
**subjective (1)**
69:5
**submit (1)**
81:2
**submitted (3)**
89:6;90:23;91:9
**Subsection (9)**
77:17;78:1,2;80:13,
16,17,23;86:12;89:3
**subverted (1)**
42:16
**successfully (1)**
53:21
**suggest (1)**
35:14
**suggested (1)**
63:12
**suggests (1)**
120:16
**suit (1)**
9:18
**suitable (1)**
71:22
**Sullivan (1)**
72:18
**summarize (2)**
111:5,6
**summarizes (1)**
74:17
**summary (3)**
31:3,11;90:25
**summer (1)**
35:25
**Superintendent (3)**
45:25;46:2,4
**superintendent's (1)**
46:1
**supervision (2)**
121:8,9
**support (1)**
36:20
**supporters (1)**
35:17
**supporting (1)**

36:17
**suppose (1)**
23:19
**Supreme (1)**
116:25
**sure (19)**
7:24;14:20;31:7,17;
32:12;39:15;49:17;
59:16;72:5;78:14;
100:10,14;101:5;
103:14;106:17;
107:11;115:21;118:7;
123:9
**suspect (1)**
103:13
**sworn (3)**
6:3;7:22,24
**System (45)**
11:11;12:9,23;
13:11;18:20;23:21,23;
25:9,25;29:1;32:19;
33:16,18,24;52:2,5,7,
11;53:14;58:5;60:9;
76:25;98:16,24;99:3,4,
7,9,11,13,16,19,21;
100:1,12,15;101:3,20;
102:17,18;103:15;
105:18;108:21;
111:18;121:1
**systems (1)**
120:10
**system's (2)**
120:12,16

**T**

**table (3)**
7:17;8:5;26:16
**talk (35)**
8:2,7,10,20;10:9,22;
11:7;18:3,16;27:5;
34:17,19;36:4,6;46:24;
47:2,9,23;54:13;56:17,
18,20,24;58:2,18;62:2;
70:5,7;74:14;84:2,15;
85:9;93:12;115:19;
123:7
**talked (22)**
8:23;36:8,25;42:7;
46:7;47:13;56:15;
57:3;67:25;68:7,8;
70:11;73:14;75:23;
79:9;80:16;84:18;
85:6;92:14;95:6,23;
111:11
**talking (24)**
10:10,23;11:2;28:3;
32:2;42:25;43:15;
44:12;62:17;67:23;
73:3;80:4,13;84:10;
99:18;101:23;102:10;
103:4;111:10;118:7,
12;120:20,22;122:21

**talks (3)**
41:6;81:20;114:9
**Tammi (6)**
40:14;49:25;54:3;
55:12;69:17;112:18
**Tango (1)**
60:20
**tape (1)**
66:17
**teach (1)**
45:21
**teaching (1)**
72:13
**Tech (1)**
15:2
**Teen (1)**
60:6
**telling (1)**
118:17
**ten (2)**
54:6;86:21
**tendency (1)**
71:15
**ten-minute (1)**
92:6
**tenure (5)**
37:4;39:14;41:18,
20;99:25
**ten-year-old (4)**
76:8,20;115:4;123:3
**term (3)**
12:11;43:12;107:1
**terms (4)**
8:10;72:13;103:9;
110:19
**terrible (1)**
48:16
**test (3)**
62:8;119:24;120:4
**testified (1)**
6:4
**testimony (6)**
111:5,6;115:18,19;
124:8,10
**Texas (1)**
15:21
**Thanks (2)**
10:13;122:18
**themes (2)**
42:11;62:23
**therefore (1)**
105:7
**Third (8)**
8:18;10:5;41:9;
50:17;74:16;98:19;
105:13;120:3
**though (2)**
26:22;123:6
**thought (10)**
8:17;21:3;43:21,25;
44:2,9;48:4,12;63:13;
65:2
**thoughts (2)**

42:3;69:11
**thousands (1)**
104:14
**threaten (1)**
53:8
**threatening (1)**
53:6
**threats (4)**
46:11,12,16;53:4
**three (14)**
6:9;15:13;18:3;
26:20;47:23;49:22;
52:2;59:18;60:20;
69:18;75:23;86:23;
98:14;101:24
**three-quarters (1)**
18:14
**thriving (1)**
52:5
**throughout (2)**
78:22;110:22
**till (1)**
14:9
**timeline (1)**
43:15
**times (1)**
36:8
**timestamp (1)**
21:10
**title (1)**
15:15
**titled (3)**
10:18;30:15;108:14
**titles (2)**
39:18,20
**today (6)**
6:8,15;7:20;8:3;
53:20;107:16
**together (3)**
54:22;115:22;124:9
**told (6)**
49:18;50:20,23;
55:16;61:21;115:20
**took (7)**
34:13;54:17,21,21;
55:8;66:6;93:14
**top (1)**
105:11
**topic (2)**
64:11;106:4
**topics (5)**
63:24;103:6,7,16;
104:12
**total (1)**
79:24
**Totally (1)**
32:12
**touch (1)**
117:14
**tow (1)**
92:18
**toward (1)**
82:16

**transcript (3)**
124:8,9,17
**transgender (1)**
63:21
**transsexual (2)**
41:16;117:11
**treat (1)**
21:4
**treatments (1)**
59:20
**trial (1)**
123:14
**tried (3)**
53:16;90:1;122:10
**trip (2)**
56:10,12
**trips (1)**
56:11
**true (1)**
124:10
**truth (3)**
6:3,4,4
**try (13)**
7:19;23:16;26:12;
45:8;58:1;73:7;77:4,8;
92:7;105:5,7;111:3,7
**trying (10)**
31:20;49:17;91:19;
104:17,25;107:22,25;
108:18;121:24;122:7
**turn (7)**
9:4;70:10;77:11,14;
79:8;82:15;102:9
**twelve (1)**
54:6
**twenty (1)**
52:2
**two (23)**
9:19;12:19;15:5;
26:13;30:10;47:16;
50:6;52:8,12;56:5;
59:2;61:8;70:13;
77:13;87:7;94:18;
106:16,18;109:19;
110:19;112:16;116:1;
121:15
**two-thirds (1)**
18:18
**type (1)**
76:4
**types (1)**
97:3
**typically (1)**
110:1
**typo (1)**
59:15

**U**

**ultimate (1)**
29:12
**ultimately (1)**
113:8

**unbiased (1)**
19:18
**unbounded (1)**
119:24
**under (37)**
7:25;70:13;72:5;
77:5;78:2;79:5;80:23;
81:4,22;82:1,9,24;
83:8;84:20,23;85:22;
86:3;89:4,6,19;90:5,
21,23,24,25;91:9,14;
92:13,24;94:12;96:2;
100:18,19;102:13;
105:13;115:8;122:24
**understood (5)**
32:13;80:1;96:7;
101:11;115:18
**unified (1)**
33:24
**units (2)**
41:16;117:12
**University (2)**
15:17,21
**unless (3)**
53:12,13;74:12
**unpack (1)**
52:10
**unquote (1)**
88:4
**unsuccessfully (1)**
13:6
**up (42)**
8:11;11:25;15:25;
20:22;21:1;25:17;
27:7;28:14;31:8;
34:10;37:3;38:19;
41:12;46:4;47:21;
48:1;51:5,18,24;52:18;
60:3;62:9;63:13;
64:13,14;74:23;75:17,
21;76:12;84:8,13;
88:23;95:7,24;97:14;
100:17;112:15;114:8,
12,25;115:4;123:1
**uphold (1)**
20:1
**upped (1)**
50:23
**upset (2)**
51:17;84:20
**URL (1)**
21:10
**use (4)**
8:11;23:21;111:18;
122:25
**used (4)**
61:19;63:14;106:24;
107:2
**usefully (1)**
19:17
**users (2)**
19:16;20:7
**using (4)**

23:22;81:3;92:22;
122:22
**Usually (7)**
30:13;35:1,8,15;
57:11;60:10;87:3

## V

**Valley (1)**
52:21
**valuable (1)**
95:22
**value (2)**
71:25;104:3
**values (1)**
21:19
**Van (4)**
36:14;65:9;66:18,20
**varies (1)**
11:15
**vein (1)**
18:2
**version (1)**
29:1
**versions (1)**
29:4
**versus (4)**
6:10;97:25;102:7;
108:14
**vested (1)**
29:13
**view (5)**
22:15;57:14;69:6;
98:4;105:6
**viewed (1)**
88:2
**views (5)**
8:21;22:5;50:2,5,13
**violate (1)**
9:20
**violates (1)**
10:14
**Virden (4)**
97:25;108:14;
119:12,15
**visit (1)**
75:10
**volume (1)**
87:8
**voluntarily (3)**
48:22,24;49:6
**vote (4)**
35:5;81:23;99:16;
112:25
**vo-tech (1)**
15:8
**voted (3)**
99:12,18,19
**votes (2)**
31:3,10
**vs (1)**
124:1

## W

**Wahlmeier (6)**
48:17;50:20;118:2,
16;119:14,23
**waiting (1)**
88:13
**walk (1)**
100:15
**walking (1)**
92:20
**wants (4)**
57:25;80:25;105:8;
121:16
**Washington (1)**
99:10
**Watson (9)**
6:15;43:14;69:9;
93:2;98:10,11;106:22;
117:19;122:20
**Watson's (2)**
113:21;115:14
**way (12)**
18:14,18;21:4,4;
25:1;42:1;50:2,12;
56:25;60:16;86:6;
100:17
**ways (2)**
20:22;68:11
**website (2)**
18:10;21:10
**weeding (1)**
23:7
**weeds (2)**
26:24;77:12
**week (6)**
11:14,21,25,25;
33:12;113:11
**weeks (1)**
11:20
**Western (3)**
14:12;24:5;119:20
**Westerns (1)**
111:22
**what's (16)**
8:21;27:5;51:1;
52:17;62:4;68:24;
72:3;73:24;75:14;
95:24;102:10;105:5;
107:13,20,22;122:3
**When's (1)**
58:3
**WHEREUPON (1)**
123:17
**WHITE (11)**
6:1,8;7:1;9:10;
18:11;19:1;27:4;
92:11;98:11;107:10;
124:3
**whole (13)**
6:4;34:5;54:8,9;
71:12;72:24;91:2;

94:23;103:7,16,23;
104:13;114:10
**within (9)**
31:4,12;81:24;
82:22;87:24;89:10;
91:10;120:9;121:1
**without (5)**
26:13;69:3;83:17;
90:19;122:23
**witness (6)**
6:2;25:4,4;124:3,5,
14
**woke (2)**
41:15;42:17
**Woman's (1)**
15:21
**word (1)**
106:24
**words (7)**
7:7;57:18;61:21,22,
25;62:2;103:25
**work (9)**
11:21;66:18;87:2,3,
4;92:14;98:21;104:13;
114:9
**worked (1)**
29:5
**working (1)**
89:11
**world (1)**
104:17
**World's (1)**
62:10
**worse (1)**
45:7
**write (4)**
7:11;31:3,11;82:25
**writing (1)**
118:1
**written (8)**
7:8;77:18,22;78:1;
80:14;89:9,11;101:16
**wrong (2)**
95:21;109:12

## Y

**YA (8)**
24:8,13,15,17;58:20,
23;60:14;111:24
**y'all (2)**
6:22;105:10
**year (13)**
9:1;11:18;12:7;13:5,
10;14:1;15:18;30:2;
31:15;33:3;53:23,24;
63:15
**years (18)**
12:19;14:7,8,14;
17:22;27:5;51:18,22;
52:2;55:22;60:19;
71:13,17;82:1,9,24;
114:16;119:6

**Yep (1)**
119:6
**young (5)**
24:8;50:8,11;58:23;
85:25

## 1

**1 (18)**
9:7,9,20;10:9;11:3;
19:15;70:10,17;74:17,
20;77:14,16;78:3;
84:17;85:8;87:16;
102:22;108:18
**1:15 (1)**
123:17
**10 (2)**
30:2;102:10
**10th (5)**
53:10;55:1;56:21;
109:6,14
**11 (1)**
102:24
**12 (2)**
17:7;74:23
**12A (1)**
89:3
**12th (1)**
69:13
**13-2-106 (1)**
80:13
**13th (1)**
28:7
**15 (2)**
31:4,12
**15th (1)**
72:17
**17 (3)**
88:12;95:23;96:11
**18 (13)**
71:13,17;82:1,9,24;
83:4,8;85:22;86:3;
91:14;92:13,24;115:8
**18th (1)**
119:19
**1966 (1)**
14:24
**1999 (8)**
13:11,13,15,24;
33:24;34:13;52:1;
98:25
**1st (4)**
55:8;56:1;74:13;
77:4

## 2

**2 (9)**
18:7,8;20:1;71:4;
80:16;102:23;105:14,
20;114:2
**20 (5)**
30:2;33:5;51:18,22;

119:6
**2000 (2)**
34:17;35:9
**2012 (2)**
13:9,17
**2013 (1)**
13:1
**2020 (2)**
34:17;35:9
**2021 (3)**
12:20,21,23
**2022 (19)**
28:7;33:6,9,15;
35:21,25;36:6;37:17;
44:15;46:21;51:6,9;
56:21;69:4,13,19;80:6;
95:7;96:18
**2023 (17)**
9:8;33:16;43:19;
49:23;51:12;55:2,8,15;
56:1,9,24;67:14;72:17,
18,20;82:15;95:8
**2024 (1)**
124:19
**20th (1)**
82:15
**20-year (2)**
34:19;35:9
**22 (2)**
14:2;33:4
**22nd (1)**
48:11
**23 (1)**
12:12
**24 (1)**
12:14
**26 (1)**
9:25
**27th (4)**
12:12;33:14;56:1;
58:5
**2The (1)**
78:20

## 3

**3 (7)**
21:11,12,15;80:17;
105:14,21;114:2
**30 (3)**
87:24,25;91:10
**300 (1)**
26:4
**300s (2)**
25:19,24
**306.766 (1)**
59:7
**30th (2)**
72:18,20
**372 (27)**
9:8;10:23;11:2,3,3;
27:16;31:20,24;70:7,
11;74:11,18;77:21;

86:9;90:5;94:20;
97:17;107:4;108:7,8,
19,22;117:23;118:2;
120:5,10;122:1

**4**

**4 (4)**
27:21,23;79:3,9
**40 (3)**
11:25;14:14;87:25

**5**

**5 (18)**
10:14,15,22;11:3;
41:3;77:11;79:18;
80:12,23;82:16,16;
85:8,19;90:5;101:15;
102:21;108:18,22
**501c3s (1)**
36:17
**5-68-501 (1)**
71:6
**5th (3)**
11:17;12:6,14

**6**

**6 (3)**
20:6;58:6,7
**600 (2)**
60:9;88:21
**69 (5)**
28:4;30:19;31:22;
79:8;80:2

**7**

**7 (13)**
10:15;20:12,18;
74:3,4,17;77:15;82:15;
85:10;101:15;105:13;
113:23;118:8
**70 (1)**
30:15
**71 (1)**
29:21
**72 (3)**
28:4,6;79:3
**7b (1)**
86:13

**8**

**8 (6)**
81:20;86:12;102:9;
118:8,10,11
**81 (1)**
74:11
**89 (1)**
14:9

**9**

**9 (4)**
10:5;89:3;118:15,16
**9/13/2022 (1)**
79:21
**9/13/22 (1)**
28:17
**900s (1)**
26:8
**90s (1)**
16:2
**98 (2)**
14:2,9

1   State of Arkansas      *As Engrossed:  S2/15/23 S2/21/23 H3/13/23*
2   94th General Assembly              A Bill
3   Regular Session, 2023                                    SENATE BILL 81
4
5   By: Senators D. Sullivan, *Stone*
6   By: Representatives Gonzales, *Bentley*
7
8                        **For An Act To Be Entitled**
9           AN ACT TO AMEND THE LAW *CONCERNING LIBRARIES AND*
10          *OBSCENE MATERIALS MADE AVAILABLE TO MINORS; TO AMEND*
11          *THE LAW CONCERNING* THE POSSESSION, SALE,
12          DISTRIBUTION, OR FURNISHING OF OBSCENE MATERIALS; TO
13          CREATE THE OFFENSE OF FURNISHING A HARMFUL ITEM TO A
14          MINOR; TO AMEND THE CRIMINAL CODE IN RELATION TO
15          OBSCENE MATERIALS LOANED BY A *LIBRARY; TO ALLOW A*
16          *PARENT OR LEGAL GUARDIAN OF A MINOR TO ACCESS THE*
17          *MINOR'S LIBRARY RECORDS;* TO PROVIDE FOR A CIVIL CAUSE
18          OF ACTION AGAINST GOVERNMENTAL ENTITIES THAT POSSESS,
19          SELL, OR DISTRIBUTE OBSCENE *MATERIALS; TO AMEND THE*
20          *LAW CONCERNING THE PROCESS FOR CHALLENGING MATERIALS*
21          *INCLUDED IN A LIBRARY;* AND FOR OTHER PURPOSES.
22
23
24                              **Subtitle**
25                  *TO AMEND THE LAW CONCERNING LIBRARIES AND*
26                  *OBSCENE MATERIALS; TO CREATE THE OFFENSE*
27                  *OF FURNISHING A HARMFUL ITEM TO A MINOR;*
28                  *AND TO AMEND THE LAW CONCERNING OBSCENE*
29                  *MATERIALS LOANED BY A LIBRARY.*
30
31
32   BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:
33
34          SECTION 1.  Arkansas Code Title 5, Chapter 27, Subchapter 2, is amended
35   to add an additional section to read as follows:
36          <u>5-27-212.  Furnishing a harmful item to a minor — Failure to report.</u>



1     (a)  As used in this section:

2         (1)  "Harmful to minors" means *the same as defined in § 5-68-501*;

3         (2)  "Internet" means the combination of computer facilities and

4 electromagnetic transmission media, and related equipment and software,

5 comprising the interconnected worldwide network of computer networks that

6 employ the Transmission Control Protocol/Internet Protocol (TCP/IP) or any

7 successor protocol to transmit information;

8         (3)  "Internet website" means a location where material placed in

9 a computer server-based file archive is publicly accessible over the internet

10 using hypertext transfer protocol or any successor protocol; and

11         (4)(A)  "Item" means a material or performance that depicts or

12 *describes nudity, sexual conduct, sexual excitement, or sadomasochistic*

13 *abuse, as those terms are defined in § 5-68-501.*

14         (B)  "Item" includes without limitation:

15         (i)  A book, leaflet, pamphlet, magazine, booklet,

16 picture, drawing, photograph, film, negative, slide, motion picture, figure,

17 object, article, novelty device, recording, transcription, live or recorded

18 telephone message, or other similar item whether tangible or intangible;

19         (ii)  A performance, exhibition, transmission, or

20 dissemination of any of the items listed in subdivision (a)(4)(B)(i) of this

21 section; and

22         (iii)  A live performance or exhibition that depicts

23 *nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, as those*

24 *terms are defined in § 5-68-501, to the public or an audience of one (1)* or

25 more persons.

26    (b)  A person commits furnishing a harmful item to a minor if, knowing

27 the character of the item involved, the *person knowingly*:

28         (1)  *Furnishes*, presents, provides, makes available, gives,

29 lends, shows, advertises, or distributes to a minor an item that is harmful

30 to minors; or

31         (2)  *Transmits* or sends to a person that he or she believes to be

32 a minor by means of electronic mail, personal messaging, or any other direct

33 internet communication an item that is harmful to minors when the person

34 knows or believes at the time of the transmission that a minor in this state

35 will receive the item.

36    (c)(1)  Subdivision (b)(1) of this section does not apply to the

1    transmission or sending of items over the internet.
2              (2)  Subdivision (b)(2) of this section does not apply to:
3                   (A)  Posting material on an internet website, bulletin
4    board, or newsgroup; or
5                   (B)  Sending material via a mailing list, listserv, or
6    other method of internet communication in which a message is sent to an
7    internet address and then retransmitted to one (1) or more subscribers, that
8    is not administered by the sender.
9         (d)  Furnishing a harmful item to a minor is a Class A misdemeanor.
10
11        SECTION 2.  Arkansas Code § 5-68-308(c), concerning defenses to state
12   standards that define and regulate obscenity, is amended to read as follows:
13        (c)  No employee, director, or trustee of a bona fide ~~school,~~ museum,
14   ~~or public~~ *library,* acting within the scope of his or her regular employment,
15   is liable to prosecution for a violation of this subchapter for disseminating
16   a writing, film, slide, drawing, or other visual reproduction that is *claimed*
17   to be obscene.
18
19        SECTION 3.  Arkansas Code § 5-68-405 is amended to read as follows:
20        5-68-405.  Possession, sale, or distribution.
21        (a)  ~~Any person that, with knowledge of its contents,~~ A person that
22   knowingly sends or causes to be sent or brings or causes to be brought into
23   this state for sale or commercial distribution, or in this state prepares,
24   publishes, sells, exhibits, loans at a library, or commercially distributes,
25   or gives away or offers to give away or has in the person's possession with
26   ~~intent~~ the purpose to sell or commercially distribute or to exhibit or to
27   give away, ~~any~~ obscene printed or written matter or material other than
28   mailable matter, or any mailable matter known by the person to have been
29   judicially found to be obscene under this subchapter, or that knowingly
30   informs another of when, where, how, or from whom or by what means any of
31   these things can be purchased or obtained, upon conviction is guilty of a
32   Class D felony.
33        (b)  ~~Any person that, with knowledge of its contents,~~ A person that
34   knowingly has in the person's possession ~~any~~ obscene printed or written
35   matter or material other than mailable matter, or any mailable matter known
36   by that person to have been judicially found to be obscene under this

1   subchapter, <u>upon conviction</u> is guilty of a Class A misdemeanor.

2

3       SECTION 4.   Arkansas Code § 6-25-105 is amended to read as follows:

4       6-25-105. Establishment of guidelines for selection, ~~removal~~

5   <u>relocation</u>, and retention of materials.

6       (a)   Media centers shall have written policies to establish guidelines

7   for the selection, ~~removal~~ <u>relocation</u>, and retention of <u>physical</u> materials

8   <u>that are available to the public</u>.

9       (b)   The school district shall have a written policy for addressing

10  challenged material <u>that is physically present in the library and available</u>

11  <u>to the public and meets the requirements stated in subsection (c) of this</u>

12  <u>section</u>.

13      <u>(c)   A written policy adopted by a school district under subsection (b)</u>

14  <u>of this section shall provide, at a minimum, the following:</u>

15          <u>(1)   A parent or guardian of a student affected by the material</u>

16  <u>to be challenged or an employee of the school district may challenge the</u>

17  <u>appropriateness of material available in the school district's media center;</u>

18          <u>(2)   The school district shall decide if material being</u>

19  <u>challenged shall remain available throughout the challenge process;</u>

20          <u>(3)   Before a person can file a challenge, the person shall</u>

21  <u>request a conference through the principal's office with a licensed media</u>

22  <u>center employee;</u>

23          <u>(4)   Before a conference under subdivision (c)(3) of this section</u>

24  <u>occurs, the school district shall provide a copy of the following to a person</u>

25  <u>who requests a conference under subdivision (c)(3) of this section:</u>

26              <u>(A)   The written policy adopted by a school district under</u>

27  <u>subsection (b) of this section; and</u>

28              <u>(B)   A form or other method by which a person may request a</u>

29  <u>reconsideration of the appropriateness of the material being challenged;</u>

30          <u>(5)   After the conference requested under subdivision (c)(3) of</u>

31  <u>this section occurs, if the person who requested the conference wants to</u>

32  <u>formally challenge the appropriateness of the material that was the subject</u>

33  <u>of the conference, the person shall complete and submit the request for</u>

34  <u>reconsideration using the form or other method provided under subdivision</u>

35  <u>(c)(4)(B) of this section to challenge the material that was the subject of</u>

36  <u>the conference;</u>

1      (6)(A)  In conducting a review of material being challenged, the
2  principal of the school district shall select a committee of licensed
3  personnel.
4      (B)  The principal or his or her designee shall be a member
5  of the committee and may serve as the chair of the committee established
6  under subdivision (c)(6)(A) of this section.
7      (C)  At least one (1) member of the committee established
8  under subdivision (c)(6)(A) of this section shall be a media specialist.
9      (D)  The committee members who are not the principal or a
10  media specialist shall be licensed personnel with curriculum knowledge
11  appropriate for the material being challenged and be representative of
12  diverse viewpoints;
13      (7)(A)  The committee established under subdivision (c)(6)(A) of
14  this section shall determine if the material being challenged meets the
15  criteria of selection.
16      (B)  Material being challenged:
17      (i)  Shall not be withdrawn solely for the viewpoints
18  expressed within the material; and
19      (ii)  Shall be reviewed in its entirety and shall not
20  have selected portions taken out of context;
21      (8)  The school district shall convene a meeting of the committee
22  established under subdivision (c)(6)(A) of this section after allowing a
23  reasonable time for the committee members to adequately review the material
24  being challenged and the request submitted under subdivision (c)(5) of this
25  section by the person challenging the appropriateness of the material;
26      (9)  The committee established under subdivision (c)(6)(A) of
27  this section shall allow the person who submitted the request under
28  subdivision (c)(5) of this section to present his or her request to the
29  committee;
30      (10)  After hearing from the person who submitted the request
31  under subdivision (c)(5) of this section, the committee established under
32  subdivision (c)(6)(A) of this section shall meet to discuss the material
33  being challenged;
34      (11)(A)  The committee established under subdivision (c)(6)(A) of
35  this section shall vote to determine whether the material being challenged
36  shall be relocated within the media center's collection to an area that is

1   *not accessible to minors under the age of eighteen (18) years.*

2   *(B) A member of the committee established under*

3   *subdivision (c)(6)(A) of this section who votes with the majority under*

4   *subdivision (c)(11)(A) of this section shall write a summary of the reasons*

5   *for the majority's decision.*

6   *(C) Notice of the committee's decision under subdivision*

7   *(c)(11)(A) of this section and the summary prepared under subdivision*

8   *(c)(11)(B) of this section shall be given by hand or by certified mail to the*

9   *person who submitted the request under subdivision (c)(5) of this section;*

10   *(12)(A) If the committee established under subdivision (c)(6)(A)*

11   *of this section decides not to relocate the material being challenged, the*

12   *person who submitted the request under subdivision (c)(5) of this section may*

13   *appeal the committee's decision to the board of directors for the school*

14   *district by filing a written appeal to the superintendent within five (5)*

15   *working days of the committee's decision or written receipt of the*

16   *committee's decision.*

17   *(B)(i) If a person appeals the decision of a committee*

18   *under this subdivision (c)(12), the superintendent shall present the material*

19   *being challenged, the request submitted by the person under subdivision*

20   *(c)(5) of this section, the committee's decision under subdivision (c)(11)(A)*

21   *of this section, and the summary prepared under subdivision (c)(11)(B) of*

22   *this section to the board of directors within fifteen (15) days of the*

23   *committee's decision.*

24   *(ii) In addition to the information required to be*

25   *provided under subdivision (c)(12)(B)(i) of this section, the superintendent*

26   *may also include the administration's recommendation regarding the appeal*

27   *submitted under this subdivision (c)(12).*

28   *(C)(i) The members of the board of directors shall review*

29   *the information submitted to them under this subdivision (c)(12) and shall*

30   *make a decision on the appeal within thirty (30) days of receiving the*

31   *information.*

32   *(ii) The decision of a board of directors under*

33   *subdivision (c)(12)(C)(i) of this section is final; and*

34   *(13) A meeting held regarding a challenge or an appeal submitted*

35   *under a written policy adopted by a school district under subsection (b) of*

36   *this section shall be a public meeting and the records submitted and*

1   considered at a meeting shall be public records under the Freedom of
2   Information Act of 1967, § 25-19-101 et seq.
3
4       SECTION 5.  Arkansas Code Title 13, Chapter 2, Subchapter 1, is amended
5   to add an additional section to read as follows:
6       13-2-106. Establishment of guidelines for selection, relocation, and
7   retention of materials.
8       (a)  Each county or municipal library shall have a written policy to
9   establish guidelines for the selection, relocation, and retention of physical
10  materials that are available to the public.
11      (b)  A county or municipal library shall have a written policy for
12  addressing challenged material that is physically present in the library and
13  available to the public and meets the requirements stated in subsection (c)
14  of this section.
15      (c)  A written policy adopted by a county or municipal library under
16  subsection (b) of this section shall provide, at a minimum, the following:
17          (1)  A person affected by the material to be challenged or an
18  employee of the county or municipal library may challenge the appropriateness
19  of material available in the county or municipal library;
20          (2)  The county or municipal library shall decide if material
21  being challenged shall remain available throughout the challenge process;
22          (3)  Before a person can file a challenge, the person shall
23  request a meeting with the librarian of the county or municipal library;
24          (4)  Before a meeting under subdivision (c)(3) of this section
25  occurs, the county or municipal library shall provide a copy of the following
26  to a person who requests a meeting under subdivision (c)(3) of this section:
27              (A)  The written policy adopted by the county or municipal
28  library under subsection (b) of this section; and
29              (B)  A form or other method by which a person may request a
30  reconsideration of the appropriateness of the material being challenged;
31          (5)  After the meeting requested under subdivision (c)(3) of this
32  section occurs, if the person who requested the meeting wants to formally
33  challenge the appropriateness of the material that was the subject of the
34  meeting, the person shall complete and submit the request for reconsideration
35  using the form or other method provided under subdivision (c)(4)(B) of this
36  section to challenge the material that was the subject of the meeting;

1         (6)(A)  In conducting a review of material being challenged, the
2    librarian of the county or municipal library shall select a committee of
3    library personnel.
4              (B)  The librarian or his or her designee shall be a member
5    of the committee and may serve as the chair of the committee established
6    under subdivision (c)(6)(A) of this section.
7              (C)  The committee members who are not the librarian shall
8    have knowledge appropriate for the material being challenged and be
9    representative of diverse viewpoints;
10        (7)(A)  The committee established under subdivision (c)(6)(A) of
11   this section shall determine if the material being challenged meets the
12   criteria of selection.
13              (B)  Material being challenged:
14                   (i)  Shall not be withdrawn solely for the viewpoints
15   expressed within the material; and
16                   (ii)  Shall be reviewed in its entirety and shall not
17   have selected portions taken out of context;
18        (8)  The county or municipal library shall convene a meeting of
19   the committee established under subdivision (c)(6)(A) of this section after
20   allowing a reasonable time for the committee members to adequately review the
21   material being challenged and the request submitted under subdivision (c)(5)
22   of this section by the person challenging the appropriateness of the
23   material;
24        (9)  The committee established under subdivision (c)(6)(A) of
25   this section shall allow the person who submitted the request under
26   subdivision (c)(5) of this section to present his or her request to the
27   committee;
28        (10)  After hearing from the person who submitted the request
29   under subdivision (c)(5) of this section, the committee established under
30   subdivision (c)(6)(A) of this section shall meet to discuss the material
31   being challenged;
32        (11)(A)  The committee established under subdivision (c)(6)(A) of
33   this section shall vote to determine whether the material being challenged
34   shall be relocated within the library's collection to an area that is not
35   accessible to minors under the age of eighteen (18) years.
36              (B)  A member of the committee established under

1  *subdivision (c)(6)(A) of this section who votes with the majority under*
2  *subdivision (c)(11)(A) of this section shall write a summary of the reasons*
3  *for the majority's decision.*
4  *(C)  Notice of the committee's decision under subdivision*
5  *(c)(11)(A) of this section and the summary prepared under subdivision*
6  *(c)(11)(B) of this section shall be given by hand or by certified mail to the*
7  *person who submitted the request under subdivision (c)(5) of this section;*
8  *(12)(A)  If the committee established under subdivision (c)(6)(A)*
9  *of this section decides not to relocate the material being challenged, the*
10  *person who submitted the request under subdivision (c)(5) of this section may*
11  *appeal the committee's decision to the governing body of the county or city*
12  *by filing a written appeal to the executive head of the governing body of the*
13  *county or city within five (5) working days of the committee's decision or*
14  *written receipt of the committee's decision.*
15  *(B)(i)  If a person appeals the decision of a committee*
16  *under this subdivision (c)(12), the executive head of the county or city*
17  *shall present the material being challenged, the request submitted by the*
18  *person under subdivision (c)(5) of this section, the committee's decision*
19  *under subdivision (c)(11)(A) of this section, and the summary prepared under*
20  *subdivision (c)(11)(B) of this section to the governing body of the county or*
21  *city within fifteen (15) days of the committee's decision.*
22  *(ii)  In addition to the information required to be*
23  *provided under subdivision (c)(12)(B)(i) of this section, the executive head*
24  *of the county or city may also include his or her recommendation regarding*
25  *the appeal submitted under this subdivision (c)(12).*
26  *(C)(i)  The members of the governing body of the county or*
27  *city shall review the information submitted to them under this subdivision*
28  *(c)(12) and shall make a decision on the appeal within thirty (30) days of*
29  *receiving the information.*
30  *(ii)  The decision of the governing body of the*
31  *county or city under subdivision (c)(12)(C)(i) of this section is final; and*
32  *(13)  A meeting held regarding a challenge or an appeal submitted*
33  *under a written policy adopted by a county or city library under subsection*
34  *(b) of this section shall be a public meeting and the records submitted and*
35  *considered at a meeting shall be public records under the Freedom of*
36  *Information Act of 1967, § 25-19-101 et seq.*

1        *(d)  As used in this section:*
2            *(1)  "Executive head of the county or city" means:*
3                *(A)  For a county library, the executive head of the*
4    *county;*
5                *(B)  For a city library, the executive head of the city;*
6    *and*
7                *(C)  For a library that is funded by both a county and a*
8    *city, the executive head of the county or city that provides the majority of*
9    *the funding for the library; and*
10           *(2)  "Governing body of the county or city" means:*
11               *(A)  For a county library, the county;*
12               *(B)  For a city library, the city; and*
13               *(C)  For a library that is funded by both a county and a*
14   *city, the county or city that provides the majority of the funding for the*
15   *library.*
16
17       *SECTION 6.  Arkansas Code § 13-2-704 is amended to read as follows:*
18       *13-2-704. Disclosure permitted.*
19       *(a)  A library may disclose personally identifiable information*
20   *concerning any patron to:*
21           *(1)  The patron;*
22           *(2)  Any person with the informed, written consent of the patron;*
23           *(3)  A law enforcement agency or civil court, under a search*
24   *warrant; or*
25           *(4)  Any person, including without limitation the patron, who has*
26   *received an automated telephone notification or other electronic*
27   *communication for overdue materials or reserve materials if the person making*
28   *the request can verify the telephone number or email address to which the*
29   *notice was sent.*
30       *(b)  A library may disclose confidential library records to:*
31           *(1)  The patron; and*
32           *(2)  The parent or legal guardian of a patron who is younger than*
33   *eighteen (18) years of age.*
34
35                           */s/D. Sullivan*
36                           ***APPROVED: 3/30/23***

EXHIBIT

2

PENGAD 800-631-6989

# Professional Ethics

ALA's Code of Ethics is the responsibility of the Committee on Professional Ethics
(/groups/committees/ala/ala-profethic) (COPE). The Code of Ethics is the document that translates the
values of intellectual freedom that define the profession of librarianship into broad principles that may be
used by individual members of that profession as well as by others employed in a library as a framework for
dealing with situations involving ethical conflicts.

- Copyright: An Interpretation of the *Code of Ethics* (http://www.ala.org/tools/ethics/copyright)
  (amended January 29, 2019)
- Conflicts of Interest Q&A (http://www.ala.org/tools/ethics/conflictsofinterestqa) (amended April 30,
  2019)
- Enforcement of the *Code of Ethics* Q&A (http://www.ala.org/tools/ethics/enforcementqa) (amended
  January 28, 2019)
- Ethics and Social Media Q&A (http://www.ala.org/tools/ethics/socialmediaqa) (amended January 28,
  2019)
- Speech in the Workplace Q&A (http://www.ala.org/tools/ethics/workplacespeechqa) (amended April
  30, 2019)

## Code of Ethics

As members of the American Library Association, we recognize the importance of codifying and making
known to the profession and to the general public the ethical principles that guide the work of librarians,
other professionals providing information services, library trustees and library staffs.

Ethical dilemmas occur when values are in conflict. The American Library Association Code of Ethics states
the values to which we are committed, and embodies the ethical responsibilities of the profession in this
changing information environment.

We significantly influence or control the selection, organization, preservation, and dissemination of
information. In a political system grounded in an informed citizenry, we are members of a profession
explicitly committed to intellectual freedom and the freedom of access to information. We have a special
obligation to ensure the free flow of information and ideas to present and future generations.

The principles of this Code are expressed in broad statements to guide ethical decision making. These
statements provide a framework; they cannot and do not dictate conduct to cover particular situations.

1. We provide the highest level of service to all library users through appropriate and usefully
   organized resources; equitable service policies; equitable access; and accurate, unbiased, and
   courteous responses to all requests.
2. We uphold the principles of intellectual freedom and resist all efforts to censor library resources.
3. We protect each library user's right to privacy and confidentiality with respect to information sought
   or received and resources consulted, borrowed, acquired or transmitted.
4. We respect intellectual property rights and advocate balance between the interests of information
   users and rights holders.

5. We treat co-workers and other colleagues with respect, fairness, and good faith, and advocate conditions of employment that safeguard the rights and welfare of all employees of our institutions.

6. We do not advance private interests at the expense of library users, colleagues, or our employing institutions.

7. We distinguish between our personal convictions and professional duties and do not allow our personal beliefs to interfere with fair representation of the aims of our institutions or the provision of access to their information resources.

8. We strive for excellence in the profession by maintaining and enhancing our own knowledge and skills, by encouraging the professional development of co-workers, and by fostering the aspirations of potential members of the profession.

9. We affirm the inherent dignity and rights of every person. We work to recognize and dismantle systemic and individual biases; to confront inequity and oppression; to enhance diversity and inclusion; and to advance racial and social justice in our libraries, communities, profession, and associations through awareness, advocacy, education, collaboration, services, and allocation of resources and spaces.

Adopted at the 1939 Midwinter Meeting by the ALA Council; amended June 30, 1981; June 28, 1995; January 22, 2008; and June 29, 2021.

# Library Bill of Rights

The American Library Association affirms that all libraries are forums for information and ideas, and that the following basic policies should guide their services.

I. Books and other library resources should be provided for the interest, information, and enlightenment of all people of the community the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation.

II. Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

III. Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.

IV. Libraries should cooperate with all persons and groups concerned with resisting abridgment of free expression and free access to ideas.

V. A person's right to use a library should not be denied or abridged because of origin, age, background, or views.

VI. Libraries which make exhibit spaces and meeting rooms available to the public they serve should make such facilities available on an equitable basis, regardless of the beliefs or affiliations of individuals or groups requesting their use.

VII. All people, regardless of origin, age, background, or views, possess a right to privacy and confidentiality in their library use. Libraries should advocate for, educate about, and protect people's privacy, safeguarding all library use data, including personally identifiable information.

Adopted June 19, 1939, by the ALA Council; amended October 14, 1944; June 18, 1948; February 2, 1961; June 27, 1967; January 23, 1980; January 29, 2019.

Inclusion of "age" reaffirmed January 23, 1996.

Although the Articles of the *Library Bill of Rights* are unambiguous statements of basic principles that should govern the service of all libraries, questions do arise concerning application of these principles to specific library practices. See the documents designated by the Intellectual Freedom Committee as Interpretations of the Library Bill of Rights (http://www.ala.org/advocacy/intfreedom/librarybill/interpretations).



EXHIBIT

3

PENGAD 800-631-6989

Policy Name: **Reconsideration of Library Materials**

The Crawford County Library System welcomes recommendations and suggestions regarding the Library's collection.

A patron who is 18 or older or library employee can make a written challenge of an item by following the process listed below.

I. The patron making the request must have a current and valid CCLS Library Card and must first read/view the material they are challenging.

II. Prior to filing a challenge, the person making the challenge shall request a meeting with the librarian of the county. A meeting should be granted within 30 days. At the time the meeting is requested a copy of our policy and form for challenging shall be provided to the person challenging. These can be picked up by the challenger in person at the library or they can request it be emailed to them and they will provide their email address.

III. At that meeting or within 15 days of the meeting the form should be filed, or the process must be restarted.

IV. A committee shall be established by the librarian or their designee, of library personnel, which may include paid and volunteer positions. The committee shall be composed of an odd number of members ranging from 5-9. After allowing a reasonable time for the committee to review the request and the material the challenger shall be allowed to present in person his or her request to the committee. (The entire process shall not take longer than 60 days from the time the challenge was submitted on paper until the meeting).

V. After hearing from the person who submitted the request the committee shall meet in private to discuss the material being challenged. This committee should use the following criteria to determine if the material should be moved.

1. Shall not be withdrawn solely for the viewpoints expressed within the materials; and
2. Shall be reviewed in its entirety and shall not have selected portions taken out of context:

VI. The committee shall vote to determine whether the material shall be relocated within the library's collection to an area that is not accessible to minors under the age of 18 years. A member who votes with the majority shall write a summary of the reasons for the majority's decision within 15 days of the committee meeting where the challenger



EXHIBIT
4
PENGAD 800-631-6989

## CHALLENGE OF MATERIALS IN THE CRAWFORD COUNTY LIBRARY

Date _____

Name of Complainant _____

Address_____

City_____ State_____ Zip Code _____

County_____

School District_____

Phone Number_____

The type of item you are challenging.  Book  Audio  Video  Magazine  Newspaper  Computer Program
Other _____

Title of Item _____

Publisher/Distributor/Producer _____ Date of Publication _____

What brought this item to your attention? _____

Is your objection to this item based upon your own exposure and reaction to it, upon complaints about it
made directly to you by others, or upon reports you have heard about it? _____

Have you read, viewed, or listened to this item in its entirety? _____

Please describe your complaint in 3-5 sentences.

_____
_____
_____
_____

Date of meeting with librarian. _____

CrawfordCo_000070

**PATRON'S REQUEST FOR RECONSIDERATION OF LIBRARY MATERIALS**

{Important notice: This request form becomes public information immediately upon submission and in accordance with the Freedom of Information Act is open to full public disclosure.}

Title _____

Author, composer, producer, artist, publisher, etc. _____

Request initiated by _____

Library Card # _____ Telephone # _____

Address _____ City _____ State _____ Zip_____

Complainant represents: _____ Self

_____ Organization; Organization Name: _____

1. Did you read, view, or listen to the entire work? _____

2. What do you believe is the theme or purpose of this work? _____
   _____

3. For what age group would you recommend this material? _____

4. To what in the work do you object? (Please be specific, cite exact pages and scenes, and continue on the back if necessary) _____
   _____
   _____
   _____

5. What do you feel might be the result of reading, viewing, or listening to this work?
   _____

6. Do you believe this item serves any of the following purposes?
   a. Promotes understanding of other cultures and lifestyles? _____ Yes _____ No
   b. Promotes discussion of societal issues? _____ Yes _____ No

7. In its place, what material of equal value would you recommend? _____
   _____

8. What would you prefer the library to do about the material?
   _____ Reclassify for older age group (if Juvenile)
   _____ Withdraw it from the library


_____    _____

Signature of the complainant                                    Date

_____

Name of Staff member receiving this form: _____
Date received: _____

Code: _____ __ **HD**
Date Approved: _____
Date Revised:_____ 9/13/2022

Policy Name: <u>**Reconsideration of Library Materials**</u>

The Crawford County Library System welcomes recommendations and suggestions regarding the Library's collection. However, the choice of reading materials is an individual matter, and no single person may be allowed to exercise censorship or restrict access to Library materials by persons outside their household. Only parents or guardians have the right to guide, direct, or restrict the reading, listening and viewing choices of their own minor children.

I. A patron will make a written challenge of an item by completing the Patron Request for Reconsideration Form in full, and turning it into the Library Director on duty. (Appendix B1)

II. The patron making the request must have a current and valid CCLS Library Card, and must first read/view the material they are challenging.

III. The local branch director will provide this policy; the form; and the date, time, and location of the next board meeting to anyone requesting a reconsideration.

IV. The County Library Director will be notified immediately of the request for reconsideration.

V. The material(s) under consideration will remain in the library's collection pending the outcome of the Patron's request, and the County Director shall notify the Board of Trustees and the Crawford County Library System legal representative of the challenge before the next regular meeting.

VI. Any item may only be evaluated for reconsideration once in a twelve-month period. One single patron may not challenge more than three items in a twelve-month period.

VII. At the next Board meeting, the county library board will first read the material being challenged, then decide whether the library material will be retained in the library's collection, removed, or, upon recommendation by the local branch director, placed in a different collection within the library. If the requestor is not present, the Board does not need to consider the petition.

VIII. The County Library Board will determine the disposition of the material.

IX. Written notification of the action taken by the county board will be sent to the requestor.

To: Crawford County JP Board, County Judge and County Judge Elect

From: Dr. Jeffrey Hamby and Tamara Hamby

Date: November 10, 2022

Re: Van Buren Public Library

We are concerned about the agenda that is being pushed by the Van Buren Public Library, aiming education of alternative lifestyles to prepubescent children. We have friends and employees that choose to live alternative lifestyles that we love dearly. We do not agree with that lifestyle but acknowledge their right to live the way they choose to live. We are not trying to infringe on those rights in any way. Our issue is with the constitutional rights of parents and our religious liberties being infringed upon by this progressive woke ideology normalizing and equating homosexual and transsexual lifestyles with heterosexual family units. And doing this without parental consent or the ability to opt out.

They have purchased, with taxpayer money, several books about alternative lifestyles that are aimed at prepubescent children. Some of these books are available in board book form which tells you the age they are targeting. (Book titles are included with this letter) Then they made a public display in the front of the library with these books. This represents an agenda to indoctrinate our community but especially our children with this content. The statement was made at the recent library meeting that the Crawford County area was the least educated area in the state concerning alternative lifestyles and that needed to be changed. They intend to start with our children.

Parents should be allowed to educate their children as they see fit on ideas and beliefs about sexuality. Efforts to expose children to age-inappropriate content and make parental notification and opt-out difficult or impossible undermine parents' constitutional right to control their children's education on sensitive topics such as human sexuality. Public libraries should not become a place where children are exposed to radical sexual ideology.

The increased prevalence of transgender ideology in culture and education has narrowed the treatment options for children with gender dysphoria. If normalized, then a true gender dysphoric pubertal or pre-pubertal child cannot seek appropriate therapy to correct this aberrant behavior.

Exposing our pre-pubertal children to colorful picture books equating homosexual and transsexual behavior to and as normal as heterosexual parenting without the consent of the parents, subverts our God given rights as parents and discriminates against us based for our religious beliefs.

Our parental rights and religious liberties are being subverted by a progressive woke ideology driven by the library director and her employees. Many professionals would still consider this behavior child abuse! And this board-certified Family physician in this community for over 25 years is one of them. Case law in Arkansans would also support our legal right to remove those people who desire to sexualize our children. Basically, in Arkansas you as a JP Board and County Judge are responsible for hiring people to represent the values of our community. These books are not required to be purchased by the library. The books in our library are purchased at the director's discretion. Combating the premature sexualization of children by adults requires focused attention from both lawmakers and courageous parents.

We are asking you to take the steps needed to ensure that this agenda is not sponsored by our tax money.



EXHIBIT

5

EXHIBIT
6
PENGAD 800-631-6989

| BrowseTitle | BrowseAuthor | CallNumber | HomeBranchName |
|---|---|---|---|
| #MurderFunding | McNeil, Gretchen, Author | S YA MCNEIL | Cedarville Public Library |
| 19 love songs | Levithan, David, Author | SYA LEVITHAN | Van Buren Public Library |
| 10,000 dresses | Ewert, Marcus author. | S E EWERT | Alma Public Library |
| The ABC's of LGBT+ | Hardell, Ash, Author. | S 306.766 MAR | Mountainburg Public Library |
| The ABC's of LGBT+ | Hardell, Ash, author. | SYA 306.766 MAR | Van Buren Public Library |
| An abundance of Katherines | Green, John, 1977- author. | SYA GREEN | Van Buren Public Library |
| Abuse : an encyclopedia of causes, consequences, and treatments | | S 362.03 SKA | Mountainburg Public Library |
| Ace of hearts | Augustine, Myriad, Author | SYA AUGUSTINE | Van Buren Public Library |
| Adventures with my daddies | Peter, Gareth, author. | S E PETER | Van Buren Public Library |
| Alice Austen lived here | Gino, Alex, author. | S J GINO | Van Buren Public Library |
| All about anxiety | Lewis, Carrie, (Children's author) Author | S J 155.4 LEW | Alma Public Library |
| All boys aren't blue : a memoir-manifesto | Johnson, George M. 1985- Author (George Matthew) | SYA 92 JOHNSON | Van Buren Public Library |
| All moms | Ellis, Sarah Kate, author. | S E ELLIS | Van Buren Public Library |
| All of us | Berger, Carin, author, illustrator. | S E BERGER | Alma Public Library |
| Am I blue? : coming out from the silence | | S YA AM | Mountainburg Public Library |
| Am I safe here? : LGBTQ teens and bullying in schools | Short, Donn, author. | SYA 306.76 SHO | Van Buren Public Library |
| And Tango makes three | Richardson, Justin, 1963- author. | S E RICHARDSON | Alma Public Library |
| And Tango makes three | Richardson, Justin, 1963- Author | S E RICHARDSON | Mountainburg Public Library |
| Anne : an adaptation of Anne of Green Gables (sort of) | Gros, Kathleen, Author Artist | SJGN GROS | Van Buren Public Library |
| Anne of Greenville | Tamaki, Mariko, Author | SYA TAMAKI | Van Buren Public Library |
| Answers in the pages | Levithan, David, author. | S J LEVITHAN | Van Buren Public Library |
| Antique bakery | Yoshinaga, Fumi, 1971- Writer Artist Author | SYA YOSHINAGA | Van Buren Public Library |
| Are we there yet? | Levithan, David, author. | SYA LEVITHAN | Van Buren Public Library |
| Aristotle and Dante discover the secrets of the universe | Salenz, Benjamin Alire, Author | SYA SAENZ | Van Buren Public Library |
| Aristotle and Dante discover the secrets of the universe | Salenz, Benjamin Alire, Author | S YA SAENZ | Mountainburg Public Library |
| The art of running away | Kleckner, Sabrina, Author | SJ KLECKNER | Van Buren Public Library |
| The art of starving | Miller, Sam J., Author | SYA MILLER | Van Buren Public Library |
| The art of starving | Miller, Sam J., Author | S YA MILLER | Mountainburg Public Library |
| The arts | Dufresne, Emilie Author | SJ 306.76 DUF | Van Buren Public Library |
| Baby & Solo | Posthuma, Lisabeth, Author | SYA POSTHUMA | Van Buren Public Library |
| Baby teeth : a novel in verse | Grehan, Meg, Author | SYA GREHAN | Van Buren Public Library |
| The Bane chronicles | Clare, Cassandra, author. | S YA CLARE | Cedarville Public Library |
| Batcat. [1] | Ramm, Meggie, author, illustrator. | S JGN RAMM | Van Buren Public Library |
| Be amazing : a history of pride | Desmond Is Amazing, Author | SJ 306.76 DES | Van Buren Public Library |
| Being a teen : everything teen girls and boys should know about relationships, sex, love, health, identity & more | Fonda, Jane, 1937- author. | S 618.2 FON | Mountainburg Public Library |
| Belle of the ball | Costa, Mari, author, artist. | S YAGN COSTA | Van Buren Public Library |
| The best liars in Riverview | Thompson, Lin, author. | SJ THOMPSON | Van Buren Public Library |
| Beyond magenta : transgender teens speak out | Kuklin, Susan, Author Photographer | SYA 306.76 KUK | Van Buren Public Library |
| Beyond magenta : transgender teens speak out | Kuklin, Susan, Author Photographer | S 306.76 KUK | Mountainburg Public Library |

| | | | |
|---|---|---|---|
| The big book of pride flags | Jessica Kingsley Publishers, Author | SJ 306.76 BIG | Van Buren Public Library |
| Big wig | Hillman, Jonathan, 1988- Author | SE HILLMAN | Van Buren Public Library |
| The black flamingo | Atta, Dean, Author | SYA ATTA | Van Buren Public Library |
| Blackwater | Arroyo, Jeannette, Author Artist | SYAGN ARROYO | Van Buren Public Library |
| Blended families | Simons, Rae, 1957- author. | SJ 306.87 SIM | Van Buren Public Library |
| Blue Lily, Lily Blue | Stiefvater, Maggie, 1981- author. | S YA STIEFVATER | Cedarville Public Library |
| The bone spindle | Vedder, Leslie, Author | S YA VEDDER | Mountainburg Public Library |
| Born ready : the true story of a boy named Penelope | Patterson, Jodie, 1970- author. | S J 306 PAT | Van Buren Public Library |
| Both can be true | Machias, Jules, author, illustrator. | S YA MACHIAS | Van Buren Public Library |
| Both can be true | Machias, Jules, author, illustrator. | S J MACHIAS | Alma Public Library |
| Boy meets boy | Levithan, David, author. | SYA | Van Buren Public Library |
| Boys & sex : young men on hookups, love, porn, consent, and navigating the new masculinity | Orenstein, Peggy Author | S 305.235 ORE | Mountainburg Public Library |
| Burn our bodies down | Power, Rory, Author | S YA POWER | Cedarville Public Library |
| Bye bye, binary | Geron, Eric, Author | SE GERON | Van Buren Public Library |
| Bye bye, binary | Geron, Eric, Author | SE GERON | Van Buren Public Library |
| Call down the hawk | Stiefvater, Maggie, 1981- Author | S YA STIEFVATER | Cedarville Public Library |
| Celebrity families | Stewart, Sheila, 1975- author. | SJ 306.85 STE | Van Buren Public Library |
| The Chandler legacies | Nazemian, Abdi, Author | SYA NAZEMIAN | Van Buren Public Library |
| Change | Dufresne, Emilie Author | SJ 306.76 DUF | Van Buren Public Library |
| Check, please! Book 1, #Hockey | Ukazu, Ngozi, artist, author. | S YAGN UKAZU | Mountainburg Public Library |
| A church for all | Pitman, Gayle E., Author | SE PITMAN | Van Buren Public Library |
| Cinderella is dead | Bayron, Kalynn Author | SYA BAYRON | Van Buren Public Library |
| Cinderelliot : a scrumptious fairytale | Ceilley, Mark, Author | SE CEILLEY | Van Buren Public Library |
| The Civil War of Amos Abernathy | Leali, Michael, Author | SYA LEALI | Van Buren Public Library |
| Clap when you land | Acevedo, Elizabeth, Author | S YA ACEVEDO | Cedarville Public Library |
| Coming back | Zabarsky, Jessi, 1988- Author Artist | SYAGN ZABARSKY | Van Buren Public Library |
| The confidence code for girls : taking risks, messing up, & becoming your amazingly imperfect, totally powerful self | Kay, Katty, author. | S J 305.235 KAY | Alma Public Library |
| Cool for the summer | Adler, Dahlia, author. | SYA ADLER | Van Buren Public Library |
| Crooked kingdom | Bardugo, Leigh, author. | S YA BARDUGO | Cedarville Public Library |
| Daddy & Dada | Brockington, Ryan, author. | S E BROCKINGTON | Alma Public Library |
| Daddy & Dada | Brockington, Ryan, author. | S E BROCKINGTON | Van Buren Public Library |
| Dead end girls | Heard, Wendy, Author | SYA HEARD | Van Buren Public Library |
| Different kinds of fruit | Lukoff, Kyle, Author | SJ LUKOFF | Van Buren Public Library |
| The dream thieves | Stiefvater, Maggie, 1981- author. | S YA STIEFVATER | Cedarville Public Library |
| Ellen outside the lines | Sass, A. J., author. | SJ SASS | Van Buren Public Library |
| The every body book : the LGBTQ+ inclusive guide for kids about sex, gender, bodies, and families | Simon, Rachel E., Author | SJ 306.7 SIM | Van Buren Public Library |
| Every day | Levithan, David, author. | SYA LEVITHAN | Van Buren Public Library |
| Every you, every me | Levithan, David, author. | SYA LEVITHAN | Van Buren Public Library |

CrawfordCo_000061

| | | | |
|---|---|---|---|
| Everybody counts | Roskifte, Kristin, Author Illustrator | S J 513.2 ROS | Alma Public Library |
| The falling in love montage | Smyth, Ciara, (Young adult author) Author | S YA SMYTH | Mountainburg Public Library |
| Fancy white trash | Geerling, Marjetta, author. | S YA GEERLING | Mountainburg Public Library |
| The fighting infantryman : the story of Albert D. J. Cashier, transgender Civil War soldier | Sanders, Rob, author. | S J 92 CASHIER | Van Buren Public Library |
| Firekeeper's daughter | Boulley, Angeline, Author | S YA BOULLEY | Mountainburg Public Library |
| The first to die at the end | Silvera, Adam, 1990- Author | SYA SILVERA TBDE 1 | Van Buren Public Library |
| The five stages of Andrew Brawley | Hutchinson, Shaun David, author. | SYA HUTCHINSON | Van Buren Public Library |
| The fourth suit | Harris, Neil Patrick, 1973- Author | SJ HARRIS | Van Buren Public Library |
| Fun home : a family tragicomic | Bechdel, Alison, 1960- Author | S 92 BECHDEL | Mountainburg Public Library |
| Funny girl : funniest. stories. ever. | | S J 152.43 FUN | Alma Public Library |
| Gay & lesbian history for kids : the century-long struggle for LGBT rights, with 21 activities | Pohlen, Jerome. | SJ 323.3 POH | Van Buren Public Library |
| Gay and lesbian parents | Fields, Julianna, author. | SJ 306.874 FIE | Van Buren Public Library |
| Gay marriage | | SJ 306.84 GAY | Van Buren Public Library |
| Gay power! : the Stonewall Riots and the gay rights movement, 1969 | Kuhn, Betsy, author. | S YA 306.76 KUH | Cedarville Public Library |
| Gay rights | Kafka, Tina, 1950- author. | SJ 323.3 KAF | Van Buren Public Library |
| Gemini bites | Ryan, Patrick, 1965- author. | SYA RYAN | Van Buren Public Library |
| Geography Club | Hartinger, Brent, author. | S J HARTINGER | Alma Public Library |
| The girl from the sea | Ostertag, Molly, Author | S YA OSTERTAG | Mountainburg Public Library |
| Girls & sex : navigating the complicated new landscape | Orenstein, Peggy, Author | S 306.708 ORE | Mountainburg Public Library |
| The girl's guide to relationships, sexuality & consent : tools to help teens stay safe, empowered & confident | Aguirre, Leah, Author | SYA 305.235 AGU | Van Buren Public Library |
| Goodbye stranger | Stead, Rebecca, author. | SJ STEAD | Van Buren Public Library |
| Greywaren | Stiefvater, Maggie, 1981- Author | S YA STIEFVATER | Cedarville Public Library |
| Growing up trans : in our own words | | S J 305.2 GRO | Alma Public Library |
| Growing up trans : in our own words | | S J 305.2 GRO | Van Buren Public Library |
| Guts | Telgemeier, Raina, Author Artist | S JGN TELGEMEIER | Alma Public Library |
| Hazel's theory of evolution | Bigelow, Lisa Jenn, Author | SJ BIGELOW | Van Buren Public Library |
| Heartbreak boys | Green, Simon James, author. | SYA GREEN | Van Buren Public Library |
| The henna wars | Jaigirdar, Adiba, Author | S YA JAIGIRDAR | Mountainburg Public Library |
| Her royal highness | Hawkins, Rachel, 1979- Author | S YA HAWKINS | Mountainburg Public Library |
| The hips on the drag queen go swish, swish, swish | Lil Miss Hot Mess, Author | SE LIL HOT MESS | Van Buren Public Library |
| Hold me closer : the Tiny Cooper story : a musical in novel form (or, a novel in musical form) | Levithan, David, author. | SYA LEVITHAN | Van Buren Public Library |
| Honestly Ben | Konigsberg, Bill, Author | S YA KONIGSBERG | Mountainburg Public Library |
| Ho'onani : hula warrior | Gale, Heather (Children's author), author. | S E GALE | Van Buren Public Library |
| House of Nutter : the rebel tailor of Savile Row | Richardson, Lance, 1984- Author | S 92 NUTTER | Mountainburg Public Library |
| How they met, and other stories | Levithan, David, Author | SYA LEVITHAN | Van Buren Public Library |
| How to succeed in witchcraft | Brophy, Aislinn, Author | SYA BROPHY | Van Buren Public Library |

| Hurricane child | Callender, Kacen, Author | S J CALLENDER | Alma Public Library |
|---|---|---|---|
| I promised not to tell : raising a transgender child | Evans, Cheryl B., Author | S 306.76 EVA | Mountainburg Public Library |
| If I can give you that | Bulla, Michael Gray, author. | SYA BULLA | Van Buren Public Library |
| If you're a drag queen and you know it | Lil Miss Hot Mess, Author | SJ 782.42 LIL | Van Buren Public Library |
| I'll fix Anthony | Viorst, Judith, author. | SE VIORST | Van Buren Public Library |
| I'm in love with the villainess. Manga 1 | Aonoshimo, Artist Author Illustrator | SYAGN AONOSHIMO | Van Buren Public Library |
| I'm in love with the villainess. Manga 4 | Inori, author. | SYAGN INORI | Van Buren Public Library |
| I'm in love with the villainess. Vol. 2 | Inori, author. | SYAGN INORI | Van Buren Public Library |
| I'm in love with the villainess. Vol. 3 | Inori, Author | SYAGN AONOSHIMO | Van Buren Public Library |
| In our mothers' house | Polacco, Patricia, author. | S E POLACCO | Mountainburg Public Library |
| The incredible magic of being | Erskine, Kathryn, Author | S J ERSKINE | Mountainburg Public Library |
| The incredible magic of being | Erskine, Kathryn, Author | SJ ERSKINE | Van Buren Public Library |
| A is for activist | Nagara, Innosanto, Author Illustrator | SJ 303.3 HAG | Van Buren Public Library |
| It feels good to be yourself : a book about gender identity | Thorn, Theresa, Author | SJ 305.3 THO | Van Buren Public Library |
| It's not like it's a secret | Sugiura, Misa, author. | SYA SUGIURA | Van Buren Public Library |
| Jack (not Jackie) | Silverman, Erica, Author | S E SILVERMAN | Mountainburg Public Library |
| The journey to Max : an adoption story | Garcia-Halenar, Christopher, Author | SJ 362.7 GAR | Van Buren Public Library |
| Julialn at the wedding | Love, Jessica, author, illustrator. | S E LOVE | Van Buren Public Library |
| Julialn is a mermaid | Love, Jessica, author, illustrator. | S E LOVE | Van Buren Public Library |
| Kind like Marsha : learning from LGBTQ+ leaders | Prager, Sarah, 1986- Author | SJ 306.76 PRA | Van Buren Public Library |
| King & King | Haan, Linda de, 1965- author. | S E HAAN | Alma Public Library |
| King and the dragonflies | Callender, Kacen, Author | S J CALLENDER | Alma Public Library |
| Last chance dance | Wilson, Lakita, author. | SYA WILSON | Ralph D Graf Library of Mulberry |
| Leah on the offbeat | Albertalli, Becky, author. | SYA ALBERTALLI | Van Buren Public Library |
| A lesson in vengeance | Lee, Victoria, (Author of young adult fantasy) Author | S YA LEE | Mountainburg Public Library |
| LGBTQ : the survival guide for lesbian, gay, bisexual, transgender, and questioning teens | Huegel, Kelly, 1974- author. | SYA 306.766 HUE | Van Buren Public Library |
| Like me : a story about disability and discovering God's image in every person | Wifler, Laura, author. | S E WILFER | Van Buren Public Library |
| The list of things that will not change | Stead, Rebecca, Author | SJ STEAD | Van Buren Public Library |
| The list of things that will not change | Stead, Rebecca, Author | S J STEAD | Alma Public Library |
| The long run | Acker, James, author. | SYA ACKER | Van Buren Public Library |
| The lost Book of the White | Clare, Cassandra, Author | SYA CLARE | Van Buren Public Library |
| The lost Book of the White | Clare, Cassandra, Author | S YA CLARE | Cedarville Public Library |
| The lost Book of the White | Clare, Cassandra, Author | S YA CLARE | Mountainburg Public Library |
| Love is the higher law | Levithan, David, Author | SYA LEVITHAN | Van Buren Public Library |
| Love makes a family | Beer, Sophie, Author Illustrator | SE BEER | Van Buren Public Library |
| Love, Violet | Wild, Charlotte Sullivan, Author | SE WILD | Van Buren Public Library |
| Loveless | Oseman, Alice, Author | S YA OSEMAN | Mountainburg Public Library |
| The lucky list | Lippincott, Rachael, Author | S YA LIPPINCOTT | Mountainburg Public Library |
| Magic misfits : the second story | Harris, Neil Patrick, 1973- author. | SJ HARRIS | Van Buren Public Library |

| Title | Author | Call Number | Library |
|---|---|---|---|
| Mama and Mommy and me in the middle | LaCour, Nina, Author | SE LACOUR | Van Buren Public Library |
| Me & my dysphoria monster : an empowering story to help children cope with gender dysphoria | Dale, Laura Kate, author. | S E DALE | Van Buren Public Library |
| The meaning of pride | Thor, Rosiee, Author | SJ 306.76 THO | Van Buren Public Library |
| Melissa | Gino, Alex, Author | S J GINO | Mountainburg Public Library |
| Melissa | Gino, Alex, Author | SJ GINO | Van Buren Public Library |
| A million to one | Jaigirdar, Adiba, author. | SYA JAIGIRDAR | Van Buren Public Library |
| The minor third | Harris, Neil Patrick, 1973- Author | SJ HARRIS | Van Buren Public Library |
| Mister Impossible | Stiefvater, Maggie, 1981- Author | S YA STIEFVATER | Cedarville Public Library |
| Mockingbird | Erskine, Kathryn, author. | SJ ERSKINE | Van Buren Public Library |
| Moonflower | Callender, Kacen, Author | S J CALLENDER | Alma Public Library |
| More happy than not | Silvera, Adam, 1990- author. | SYA SILVERA | Van Buren Public Library |
| Morris Micklewhite and the tangerine dress | Baldacchino, Christine, 1977- author. | S J BALDACCHINO | Van Buren Public Library |
| The mother of a movement : Jeanne Manford, ally, activist, and co-founder of PFLAG | Sanders, Rob, 1958- author. | S J 306.76 SAN | Van Buren Public Library |
| My grandparents | Harrington, Claudia, 1957- author. | S E HARRINGTON | Alma Public Library |
| My Maddy | Pitman, Gayle E., Author | S E PITMAN | Alma Public Library |
| My military mom | Harrington, Claudia, 1957- author. | S E HARRINGTON | Alma Public Library |
| My mom and dad | Harrington, Claudia, 1957- author. | S E HARRINGTON | Alma Public Library |
| My parents won't stop talking! | Hunsinger, Emma, Author Illustrator | S E HUNSINGER | Alma Public Library |
| My rainbow | Neal, Trinity, author. | S E NEAL | Van Buren Public Library |
| My shadow is pink | Stuart, Scott, Author Illustrator | S E STUART | Alma Public Library |
| My shadow is pink | Stuart, Scott, Author Illustrator | S E STUART | Mountainburg Public Library |
| My two dads | Harrington, Claudia, 1957- author. | S E HARRINGTON | Alma Public Library |
| My two homes | Harrington, Claudia, 1957- author. | S E HARRINGTON | Alma Public Library |
| My two moms | Harrington, Claudia, 1957- author. | S E HARRINGTON | Alma Public Library |
| No one owns the colors | Davy, Gianna, author. | S E DAVY | Van Buren Public Library |
| Noah's Song | Jaclyn Osborn, author. | SYA OSBORN | Van Buren Public Library |
| Nobody passes : rejecting the rules of gender and conformity | | S 306.76 NOB | Mountainburg Public Library |
| Not my problem | Smyth, Ciara (Young adult author), author. | S YA SMYTH | Mountainburg Public Library |
| The ooze | McAdam, Tash, Author | S YA MCADAM | Cedarville Public Library |
| Parenting your transgender teen : positive parenting strategies for raising transgender, nonbinary, and gender nonforming teens | Triska, Andrew Maxwell, Author | S 305.2 TRI | Mountainburg Public Library |
| Pink, blue, and you! : questions for kids about gender stereotypes | Gravel, Elise, Author Illustrator | SJ 305.3 GRA | Van Buren Public Library |
| Pink is for boys | Pearlman, Robb, Author | SE PEARLMAN | Van Buren Public Library |
| Planning perfect | Neil, Haley, author. | SYA NEIL | Van Buren Public Library |

CrawfordCo_000064

| Title | Author | Call Number | Library |
|---|---|---|---|
| The pledge | Dietrich, Cale, author. | SYA DIETRICH | Van Buren Public Library |
| Pride : the celebration and the struggle | Stevenson, Robin, 1968- Author | SJ 306.7 STE | Van Buren Public Library |
| Prince & knight | Haack, Daniel, Author | SE HAACK | Van Buren Public Library |
| Prom kings | Correia, Tony, Author | SYA CORREIA | Van Buren Public Library |
| The pronoun book : she, he, they, and me! | Corrigan, Cassandra Jules, Author | SJ 425.55 COR | Van Buren Public Library |
| Queerfully and wonderfully made : a guide for LGBTQ+ Christian teens | Finke, Leigh, Author Editor | SYA 248.8 QUE | Van Buren Public Library |
| The raven king | Stiefvater, Maggie, 1981- author. | S YA STIEFVATER | Cedarville Public Library |
| The realm of possibility | Levithan, David, author. | SYA LEVITHAN | Van Buren Public Library |
| The red scrolls of magic | Clare, Cassandra, author. | S YA CLARE | Mountainburg Public Library |
| The red scrolls of magic | Clare, Cassandra, author. | S YA CLARE | Cedarville Public Library |
| The red scrolls of magic | Clare, Cassandra, author. | SYA CLARE | Van Buren Public Library |
| Release | Ness, Patrick, 1971- author. | S YA NESS | Mountainburg Public Library |
| Riley can't stop crying | Boulay, Stelphanie, 1987- Author | S J BOULAY | Alma Public Library |
| Ruin and rising | Bardugo, Leigh author. | S YA BARDUGO | Cedarville Public Library |
| Sasaki and Miyano. 01 | Harusono, Sho, Author Artist | SYAGN HARUSONO | Van Buren Public Library |
| Sasaki and Miyano. 02 | Harusono, Sho, Author Illustrator | SYAGN HARUSONO | Van Buren Public Library |
| Sasaki and Miyano. 03 | Harusono, Sho, Author Artist | SYAGN HARUSONO | Van Buren Public Library |
| Sasaki and Miyano. 04 | Harusono, Sho, Author | SYAGN HARUSONO | Van Buren Public Library |
| Sasaki and Miyano. 05 | Harusono, Sho, author. | SYAGN HARUSONO | Van Buren Public Library |
| Sasaki and Miyano. 06 | Harusono, Sho, Author Artist | SYAGN HARUSONO | Van Buren Public Library |
| Saving Montgomery Sole | Tamaki, Mariko author. | SYA TAMAKI | Van Buren Public Library |
| Sawkill Girls | Legrand, Claire, 1986- Author | S YA LEGRAND | Cedarville Public Library |
| The scapegracers | Clarke, Hannah Abigail, Author | SYA CLARKE | Van Buren Public Library |
| The severed thread | Vedder, Leslie, author. | SYA VEDDER | Van Buren Public Library |
| Shadow and bone | Bardugo, Leigh author. | S YA BARDUGO | Cedarville Public Library |
| Sharice's big voice : a native kid becomes a congresswoman | Davids, Sharice, 1980- Author | SJ 92 DAVIDS | Van Buren Public Library |
| She drives me crazy | Quindlen, Kelly, Author | S YA QUINDLE | Mountainburg Public Library |
| She loves you, she loves you not-- : a novel | Peters, Julie Anne, author. | SYA PETERS | Van Buren Public Library |
| Siege and storm | Bardugo, Leigh, Author | S YA BARDUGO | Cedarville Public Library |
| Simon vs. the Homo sapiens agenda | Albertalli, Becky, Author | S YA ALBERTALLI | Cedarville Public Library |
| Simon vs. the Homo sapiens agenda | Albertalli, Becky, Author | S YA ALBERTALLI | Mountainburg Public Library |
| Simon vs. the Homo sapiens agenda | Albertalli, Becky, Author | SYA ALBERTALLI | Van Buren Public Library |
| Simon vs. the Homo sapiens agenda : Epic Reads editions | Albertalli, Becky, Author | SYA ALBERTALLI | Van Buren Public Library |
| Six of crows | Bardugo, Leigh author. | S YA BARDUGO | Cedarville Public Library |
| Small town pride | Stamper, Phil, Author | SYA STAMPER | Van Buren Public Library |
| Some girls do | Dugan, Jennifer, Author | SYA DUGAN | Van Buren Public Library |
| Someday | Levithan, David, author. | SYA LEVITHAN | Van Buren Public Library |
| Squad | Tokuda-Hall, Maggie, Author | S YAGN TOKUDA-HALL | Mountainburg Public Library |
| Stranger at the gate : to be gay and Christian in America | White, Mel, 1940- Author | S 92 WHITE | Mountainburg Public Library |
| Take me with you when you go | Levithan, David, Author | SYA LEVITHAN | Van Buren Public Library |
| Tale of the Shadow King | Haack, Daniel, Author | SE HAACK | Van Buren Public Library |
| The tea dragon festival | O'Neill, Kay, (Cartoonist) Author Artist Illustrator | S JGN O'NEILL | Alma Public Library |

CrawfordCo_000065

| Title | Author | Call Number | Library |
|---|---|---|---|
| The Tea Dragon Society | O'Neill, Kay, (Cartoonist) Author Artist Illustrator | S JGN O'NEILL | Alma Public Library |
| The Tea Dragon Society | O'Neill, Kay, (Cartoonist) Author Artist Illustrator | S JGN O'NEILL | Mountainburg Public Library |
| The Tea Dragon tapestry | O'Neill, Kay, (Cartoonist) Author Illustrator | S JGN O'NEILL | Alma Public Library |
| Tea Dragon. Volume 2, The Tea Dragon Festival | O'Neill, Kay, (Cartoonist) Author Illustrator | S JGN O'NEILL | Mountainburg Public Library |
| Tell me how you really feel | Safi, Aminah Mae, Author | S YA SAFI | Mountainburg Public Library |
| These violent delights | Gong, Chloe Author | S YA GONG | Cedarville Public Library |
| These witches don't burn | Sterling, Isabel, Author | S YA STERLING | Mountainburg Public Library |
| This book is gay | Dawson, Juno, Author | SYA 306.76 DAW | Van Buren Public Library |
| This coven won't break | Sterling, Isabel, Author | S YA STERLING | Mountainburg Public Library |
| This is why they hate us | Aceves, Aaron H., author. | SYA ACEVES | Van Buren Public Library |
| This little rainbow : a love-is-love primer | Holub, Joan, Author | S E HOLUB | Alma Public Library |
| This little rainbow : a love-is-love primer | Holub, Joan, Author | S E HOLUB | Alma Public Library |
| This poison heart | Bayron, Kalynn Author | SYA BAYRON | Van Buren Public Library |
| The times I knew I was gay | Crewes, Eleanor, Author Artist | S 92 CREWES | Mountainburg Public Library |
| To break a covenant | Ames, Alison, author. | SYA AMES | Van Buren Public Library |
| Together : a first conversation about love | Madison, Megan, author. | S E MADISON | Alma Public Library |
| Tuesday is Daddy's day | Kreloff, Elliot, author, illustrator. | S E KRELOFF | Alma Public Library |
| 'Twas the night before Pride | McClintick, Joanna, Author | SE MCCLIN-TICK | Van Buren Public Library |
| Two boys kissing | Levithan, David, author. | SYA LEVITHAN | Van Buren Public Library |
| The (un)popular vote | Sanchez, Jasper, Author | SYA SANCHEZ | Van Buren Public Library |
| Uncle Bobby's wedding | Brannen, Sarah S., Author | SE BRANNEN | Van Buren Public Library |
| Unclobber : rethinking our misuse of the Bible on homosexuality | Martin, Colby, Author | S 220.8 MAR | Mountainburg Public Library |
| What are your words? : a book about pronouns | Locke, Katherine Author | SE LOCKE | Van Buren Public Library |
| What is a family? | Stewart, Sheila, 1975- author. | SJ 306.85 STE | Van Buren Public Library |
| What makes you beautiful | Liang, Bridget, 1989- Author | SYA LIANG | Van Buren Public Library |
| When you reach me | Stead, Rebecca, author. | SJ STEAD | Van Buren Public Library |
| Who believes what? : exploring the world's major religions | Wills, Anna, 1978- Author | S J 200 WIL | Alma Public Library |
| The wicked bargain | Novoa, Gabe Cole, author. | SYA NOVOA | Van Buren Public Library |
| Wide awake | Levithan, David, author. | SYA LEVITHAN | Van Buren Public Library |
| With or without you | Farrey, Brian, author. | SYA FARREY | Van Buren Public Library |
| You do you : figuring out your body, dating, and sexuality | Mirk, Sarah Author | SYA 306.70835 MIR | Van Buren Public Library |
| You should see me in a crown | Johnson, Leah, (Young adult author) Author | S YA JOHNSON | Mountainburg Public Library |
| You should see me in a crown | Johnson, Leah, (Young adult author) Author | S YA JOHNSON | Cedarville Public Library |
| You're welcome, universe | Gardner, Whitney, Author Illustrator | SYA GARDNER | Van Buren Public Library |

CrawfordCo_000066



EXHIBIT

7

PENGAD 800-831-6989

**From:** "Chilcoat, Jennifer (ASLIB)" <Jennifer.Chilcoat@ade.arkansas.gov>
**Date:** April 20, 2023 at 1:27:22 PM CDT
**To:**





**Subject: Senate Bill 81 / Act 372**

CAUTION: This is an EXTERNAL email originated from outside the CALS organization. Do not click links or open attachments unless you recognize the sender.

Dear Public Library Directors,

As you all know, Senate Bill 81, now Act 372 and linked below, has been signed by Governor Sanders. Unless something happens between now and **August 1\***, that Act will be State Law. There is always talk of litigation with these types of legislation, but I have no crystal ball to say whether and when that could happen in this case. We need to at least be prepared for it to take effect.

I know that many of you have questions and are looking for guidance. I can walk you through the most basic particulars of the law, but how you ultimately plan to respond to this law is something that you will need to work with your board and your attorney (be that a county attorney or otherwise) to determine. Every building, every board, and every community is different, so there is not a one-size-fits-all solution. If you are a county or municipal library, you will need to make sure that you are prepared to conform to the new law, effective August 1.

*Of course you need to read law fully*, but here are what I regard as the major points:

### Section 1: Harmful to Minors

Act 372 states that a person who, *knowing the character of the item involved,* provides a minor with material that meets the already-existing definition of "harmful to minors" as defined in Arkansas Code 5-68-501 (https://law.justia.com/codes/arkansas/2015/title-5/subtitle-6/chapter-68/subchapter-5/section-5-68-501/) commits the offense of furnishing a harmful item to a minor. This does not include transmitting or sending of items over the internet.

This has the potential to be scary, and certainly no one expected to be on the wrong end of a criminal proceeding when they took this job. I have a hard time envisioning this law leading to any charges, and an even harder time imagining convictions. However, I do want to give you all the facts. Per Act 372, furnishing a harmful item to a minor is a Class A misdemeanor. *Conviction* of a Class A misdemeanor carries a maximum sentence of up to 12 months in jail and a maximum fine of $2,500. In order to be convicted of furnishing a harmful item to a minor, however, there is a process just like that of any criminal charge; you can't be hauled off to jail on a citizen's arrest. Someone has to go through the process of filing charges against you, and the Prosecuting Attorney has to move forward with the charge. Then a judge has to find you guilty and impose a sentence and/or fine. I'm sure we all have a variety of opinions about how likely it is that an accusation would go all the way to result in a conviction, so I'll leave it there.

### Sections 2 and 3: Obscenity

This small section removes employees of a "school library" and a "public library" from the list of people who can't be charged with disseminating obscene materials. "Obscene" is a legal standard with a very high bar. I will eat several hats if anyone finds an item in one of your libraries that has been "judicially found" by a court to be obscene. While the penalty for disseminating obscenity is steep—a Class D felony carrying up to six years in prison and a fine up to $10,000—I think it's highly unlikely we'll see this used to any effect.

### Section 4: Guidelines for Selection, Relocation, and Retention of Materials (School Libraries)

This section deals exclusively with school library media centers, so I'm going to skip it for the purposes of this email.

### Section 5: Guidelines for Selection, Relocation, and Retention of Materials (Public Libraries)

This one's going to give you some heartburn. If you are a county or municipal library, this will govern how you respond when someone challenges materials in your library. I do have two pieces of solid advice for you to act on ASAP:

1. If your current policy makes a promise about how quickly you'll be able to respond to book challenges, I strongly advise you to amend that portion of your policy as you are making amendments to comply with this law. There are locations where certain citizens are marking their calendars for this law to take effect so they can begin filing scores of challenges. If your policy currently promises that you will consider all challenges within, say, 30 days, you will not be able to process 40 challenges in 30 days, especially considering that the Act rightly says that any material being challenged "shall be viewed in its entirety and shall not have selected portions taken out of context." If you don't make this adjustment, you could get into a situation where you are accused of breaking your own policy, and you don't want that. The Act simply states that you should allow "a reasonable time for the committee members to adequately review the material being challenged and the request submitted."

2. The Act states that "the county or municipal library shall decide if material being challenged shall remain available throughout the challenge process." You need to be sure that your policy states which route you will take. With possible backlogs of challenged materials to review, removing materials while they await review could mean that those materials will be off of your shelves (and housed in your already-crowded office or workroom) for a long time. Discuss with your board what course you want to take, but be sure that this issue is addressed in your policy.

The Act requires certain other things that may not be in your current policy:

- Those interested in challenging materials must first meet with the librarian, where they will receive a copy of the policy and a challenge form.
- The individual making the challenge shall be allowed to present their request to the review committee. You might want to make it clear in your policy that they are allowed to present the request, but they are not part of the review committee.
- Your review committee must be made up of library personnel; board members would technically not be allowed.
- Any meetings to discuss challenges will have to be open to the public, and all records submitted and considered at a meeting will be considered public records.
- Appeals of decisions about challenged materials will have to go to your "governing body of the county or city," not to your library board or other

entity.

If you are flummoxed as to how to even begin rewriting your policy to incorporate the new law, you would have the option to state that the library will comply with Act 372 of 2023, then go back in and state the parts of your policy that are not included in the Act, making sure to include the items I warned you about: timeframe for response and the location of materials that are under review. You will need to be sure that you also include a challenge form.

You will need to meet with your board, and likely your library's attorney, to discuss what you will do in the event that items go through the challenge process with the outcome that they need to be "relocated within the library's collection to an area that is not accessible to minors under the age of eighteen (18) years." I don't know of any library that currently has an area that they monitor for who goes into it, so this is going to be problematic for everyone. One minimalist possibility might be to purchase carts to hold the relocated materials, so that persons 18 and over can request access. Again, there are no one-size-fits all answers.

As you meet with your board members and attorney, you may want to have a discussion about the legal impact of several terms that we (who are not attorneys!) don't quite know how to interpret:

- The Act says that a "person affected" by the material my challenge it, but no definition of "affected" is given.
- The Act practically barely mentions removal or withdrawal of materials, except where it says that material "shall not be withdrawn solely for the viewpoints expressed within the material." Everywhere else, there is only reference made to decisions to relocate materials. You'll need to discuss with your board and attorney the ramifications of this wording.

On the plus side, this section of the Act is explicitly limited to refer only to physical materials, not eBooks.

Section 6: Disclosure of Library Records

This section says that a parent or legal guardian of a patron who is under eighteen (18) is entitled to see that minor's library record. Your policy will likely need to be changed to comply with this.


I dearly hope that this is helpful. Again, be sure that you read the law (linked below) to ensure you are familiar with all aspects of it, and let me know what questions you may have.

**\*Unless bills contain an Emergency Clause, they become effective 90 days after the legislature adjourns "sine die."  That adjournment has not occurred yet—it is scheduled for May 1.  Therefore, the law will become effective on August 1.**

https://www.arkleg.state.ar.us/Acts/FTPDocument?
path=%2FACTS%2F2023R%2FPublic%2F&file=372.pdf&ddBienniumSession=2023%2F2023R

 *Jennifer Chilcoat*
*Director, Arkansas State Library*
*A Division of the Arkansas Department of Education*
*900 W. Capitol Ave., Suite 100*
*Little Rock, AR  72201*

**Please note email address change: jennifer.chilcoat@ade.arkansas.gov**

*www.library.arkansas.gov*

**From:** "Chilcoat, Jennifer (ASLIB)" <Jennifer.Chilcoat@ade.arkansas.gov>
**Date:** April 20, 2023 at 3:59:38 PM CDT
**To:**





**Subject: Re: Senate Bill 81 / Act 372**

CAUTION: This is an EXTERNAL email originated from outside the CALS organization. Do not click links or open attachments unless you recognize the sender.

I ask that you please disregard and delete my previous email and any technical assistance contained in it. The new law still needs to be reviewed, and my email was premature.

I will follow up with you at a later date with further information, once we have had adequate time to review the law.

Thank you.

**Jennifer Chilcoat**
*Director, Arkansas State Library*
*A Division of the Arkansas Department of Education*
*900 W. Capitol Ave., Suite 100*
*Little Rock, AR 72201*

**Please note email address change: jennifer.chilcoat@ade.arkansas.gov**

*www.library.arkansas.gov*



WAHLMEIER LAW FIRM, P.A.

**Gentry C. Wahlmeier**

P.O. Box 1811
Van Buren, AR 72957

PH: (479) 431-3366
FAX: (479) 763-3987
EMAIL: gentry@wahlmeierlaw.com

May 23, 2023

CCLS Board &
Director Eva White

Re:   Resignation per Act 372 Changes

Dear Board Members and Director White:

In our last general meeting I provided each of you with a summary of Act 372. The act adds A.C.A. § 13-2-106 to the laws of our State. That addition creates a requirement for the System to create or amend the policy for selection, relocation, and retention of physical materials. It has come to my attention that a conflict of interest may be created upon the enactment of Act 372 on August 1, 2023.

My letter only covered those items that are pertinent to the Library System. Continuing with the addition of A.C.A. § 13-2-106, beyond the challenge meeting, the law explains that the challenger may appeal to the County Judge and Quorum Court if the System's committee does not "find" for them. Pursuant to the rules of ethics that govern the practice of law, I am unable to advise both. Thus, I must resign. I will stay on in an advisory capacity until the end of June. As a Board, I advise that you hire new counsel.

Please remember that there are currently pending obligations to come into compliance with the new laws by August 1, 2023. Specifically, you must create a section that is not accessible to those under eighteen (18) and create a policy for challenging physical materials.

Sincerely,

Gentry C. Wahlmeier



EXHIBIT

8



**Gentry C. Wahlmeier**

WAHLMEIER LAW FIRM, P.A.

P.O. Box 1811
Van Buren, AR 72957

PH: (479) 431-3366
FAX: (479) 763-3987
EMAIL: gentry@wahlmeierlaw.com

May 23, 2023

Via Email Only:
Terrence Cain
Via Email: terrencecain@windstream.net

Brian Meadors
Via Email: brianmeadors@gmail.com

Re: May 18 Email to Quorum Court of Crawford County

Mr. Cain and Mr. Meadors,

This Firm represents Crawford County's Quorum Court. The Quorum Court is in receipt of your email dated May 18, 2023. That email also contains a draft Complaint of a civil case in the Western District of Arkansas.

Acting as the legislative branch of a County is a task that comes with greater difficulty than one would think. The balancing test between the freedom of an unbounded First Amendment and protecting children from exposure to materials that might harm their innocence exposes the core of the phrase *"rational minds may differ."* You even stated in your email that "Where we disagree... is how best to protect children."

This balancing test is coming to the forefront of the national conversation. At the state level, Act 372 passed the legislature and is going into effect shortly. Its effect will be to require libraries to have a section that is inaccessible to minors. Quorum Courts across the State will hear appeals on relocation of books within county library systems. The State legislature's Act 372 will make it necessary to continue modifying and changing the library system's policies and procedures.

The Quorum Court of Crawford County has made no laws that violate the First Amendment to the Constitution of the United States. Expanding that out to include case law from the Supreme Court, the Quorum Court of Crawford County has not violated any legal precedent. When the conversation began that sexualized material was in the children's section of the libraries within the System, Justices simply stated that a compromise should be reached. No ordinance was passed proclaiming that books should be moved. No direction or supervision was implemented.

Cordially,

Gentry Wahlmeier

EXHIBIT
9

PENGAD 800-631-6989

Licensed in Arkansas and Oklahoma