**In The Matter Of:**

*Fayetteville Public Library, et al v.*
*Crawford County, Arkansas, et al*

---

*County Judge Christopher Lee Keith*
*March 26, 2024*
*CERTIFIED ORIGINAL/COPY*

---

*Michelle Satterfield, CCR*
*1955 Little River Drive*
*Conway, Arkansas 72034*
*(501)336-7414*
*Satterfield@conwaycorp.net*

Original File Judge Christopher Lee Keith.txt
Min-U-Script® with Word Index

## Page 1

1       IN THE UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF ARKANSAS
2              FAYETTEVILLE DIVISION

3 FAYETTEVILLE PUBLIC LIBRARY, a political
  subdivision in the City of Fayetteville,
4 State of Arkansas; EUREKA SPRINGS CARNEGIE
  PUBLIC LIBRARY; CENTRAL ARKANSAS LIBRARY
5 SYSTEM; NATE COULTER; OLIVIA FARRELL;
  HAYDEN KIRBY; MIEL PARTAIN, in her own capacity
6 and as parent and next friend of MADELINE PARTAIN;
  LETA CAPLINGER; ADAM WEBB;
7 ARKANSAS LIBRARY ASSOCIATION; ADVOCATES FOR
  ALL ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
8 WORDSWORTH COMMUNITY BOOKSTORE, LLC, d/b/a
  WORDSWORTH BOOKS; AMERICAN BOOKSELLERS ASSOCIATION;
9 ASSOCIATION OF AMERICAN PUBLISHERS, INC.; AUTHORS
  GUILD, INC.; COMIC BOOK LEGAL DEFENSE FUND
10 and FREEDOM TO READ FOUNDATION,        PLAINTIFFS

11 vs.             NO. 5:23-CV-05086-TLB

12 CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH, in his
  official capacity as Crawford County Judge;
13 TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
  MATT DURRETT; JEFF PHILLIPS; WILL JONES; TERESA
14 HOWELL; BEN HALE; CONNIE MITCHELL; DAN TURNER;
  JANA BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE HUNTER;
15 DANIEL SHUE; JEFF ROGERS; DAVID ETHREDGE; TOM TATUM,
  II; DREW SMITH; REBECCA REED MCCOY; MICHELLE C.
16 LAWRENCE; DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
  CAROL CREWS; KEVIN HOLMES; CHRIS WALTON; and CHUCK
17 GRAHAM, each and in his or her official capacity as a
  prosecuting attorney for the State of Arkansas, DEFENDANTS

18

19

20             ORAL DEPOSITION

21                OF

22      JUDGE CHRISTOPHER LEE KEITH

23 ***** THE ABOVE-STYLED MATTER was reported by Michelle R.
  Satterfield, CCR, LS Certificate No. 570, at the Wahlmeier
24 Law Firm, located at 1101 Walnut, Van Buren, Arkansas,
  commencing on the 26th day of March 2024, at 2:33 p.m.
25 *****

## Page 2

1       A P P E A R A N C E S

2 MR. JOHN T. ADAMS
  Attorney at Law
3 Fuqua Campbell, P.A.
  Riviera Tower - 3700 Cantrell Road, Suite 205
4 Little Rock, Arkansas  72201
  jadams@fc-lawyers.com
5
  *** For the Plaintiffs, Central Arkansas Library System,
6 Nate Coulter and the Eureka Springs Carnegie Public
  Library ***
7
  MR. NOAH WATSON
8 Senior Assistant Attorney General
  323 Center Street, Suite 200
9 Little Rock, Arkansas  72201
  Noah.Watson@ArkansasAG.gov
10
  *** For the State of Arkansas Prosecuting Attorneys ***
11
  MS. BETTINA E. BROWNSTEIN
12 Attorney at Law
  Bettina E. Brownstein Law Firm
13 904 West 2nd Street, Suite 2
  Little Rock, Arkansas  72201
14 bettinabrownstein@gmail.com

15 *** For the Plaintiffs, Olivia Farrell, Jennie Kirby,
  Hayden Kirby and Leta Caplinger ***
16 *** On Behalf of the Arkansas Civil
    Liberties Union Foundation, Inc. ***
17
  MR. SAMUEL S. MCLELLAND
18 Attorney at Law
  PPGMR Law, PLLC
19 201 East Markham Street, Suite 201
  Little Rock, Arkansas 72201
20 sam@ppgmrlaw.com

21 *** For Crawford County, Arkansas, and County Judge
  Chris Keith, in his official capacity ***
22

23

24

25

## Page 3

1    A P P E A R A N C E S (CONTINUED)

2 MR. BENJAMIN M. SEEL
  Attorney at Law
3 Democracy Forward Foundation
  P.O. Box 34554
4 Washington, DC  20043
  bseel@democracyforward.org
5              (VIA ZOOM)
  *** For the Arkansas Library Association, Advocates for
6 All Arkansas Libraries and Adam Webb, in his individual
  capacity ***
7
  MR. MICHAEL A. BAMBERGER
8 Attorney at Law
  Dentons US, LLP
9 1221 Avenue of the Americas
  New York, NY  10020
10 michael.bamberger@dentons.com
              (VIA ZOOM)
11 *** For the Plaintiffs, Pearl's Books, LLC; Wordsworth
  Community Bookstore, LLC; American Booksellers
12 Association; Association of American Publishers, Inc.;
  Authors Guild, Inc; Comic Book Legal Defense Fund; and
13 Freedom to Read Foundation ***

14 MR. GLENN V. LARKIN
  Attorney at Law
15 Quattlebaum, Grooms & Tull, PLLC
  4100 Corporate Center Drive, Suite 310
16 Springdale, Arkansas  72762
  glarkin@qgtlaw.com
17             (VIA ZOOM)
  *** For the Plaintiff, Fayetteville Public Library ***
18
  ALSO PRESENT:
19 Leta Joe Caplinger, Plaintiff
  Miel Ann Delorey Partain, Plaintiff
20

21

22

23

24

25

## Page 4

1         I N D E X

2   TOPIC                           PAGE

3 APPEARANCES                        2-3

4 STIPULATIONS                       5

5 WITNESS SWORN:  Judge Christopher Lee Keith     6

6       Examination by Mr. Adams          6

7       Examination by Mr. Watson        69

8       Examination by Mr. McLelland     74

9       Further Examination by Mr. Adams   85

10      Further Examination by Mr. Watson   92

11      Further Examination by Mr. McLelland  94

12 WITNESS SIGNATURE PAGE              97

13 ERRATA SHEET                      98

14 REPORTER'S CERTIFICATE              99

15       E X H I B I T S

16 NUMBER       DESCRIPTION           PAGE

17 Exhibit 1    Copy of Act 372         40

18 Exhibit 5    Hamby Letter dated 11/10/22   15

19 Exhibit 8    Bates No. CrawfordCo_000068   62

20 Exhibit 9    Bates No. CrawfordCo_000067   87

21 Exhibit 10   Bates Nos. CrawfordCo_000023-000030   10

22 Exhibit 11   Bates Nos. CrawfordCo_000036-000039   38
     (COPIES OF EXHIBITS SCANNED INTO ETRANSCRIPT)

23

24

25

Page 5

Page 7

1     JUDGE CHRISTOPHER LEE KEITH,

2  the witness hereinbefore named, having been previously

3  cautioned and sworn, or affirmed, to tell the truth, the

4  whole truth, and nothing but the truth, testified as

5  follows:

6          **EXAMINATION**

7  **BY MR. ADAMS:**

8  Q   Good afternoon, Judge Keith.

9  **A   Good afternoon.**

10  Q   Thank you for being here.

11  **A   Absolutely.**

12  Q   I'm going to start with a little bit of just general

13  background about this process.  Have you ever had your

14  deposition taken before?

15  **A   I have.**

16  Q   And what kind of case was that?

17  **A   That was the Virden case.**

18  Q   Oh, okay.  Have you had any other depositions besides

19  that?

20  **A   No, sir.**

21  Q   Okay.  So that was your first one?

22  **A   Yes, sir.**

23  Q   Well, maybe this is going to be a bit of a recap

24  then, but I'm going to go over a few things.

25  **A   Okay.**

Page 6

1     ANSWERS AND DEPOSITION OF JUDGE CHRISTOPHER

2  LEE KEITH a witness produced at the request of the

3  PLAINTIFFS, was taken in the above-styled and numbered

4  cause on the 26th day of March 2024, before Michelle R.

5  Satterfield, CCR, a Notary Public in and for Faulkner

6  County, Arkansas, at the offices of the Wahlmeier Law

7  Firm, Located 1101 Walnut, Van Buren, Arkansas, at 2:33

8  p.m., pursuant to the agreement hereinafter set forth.

9

10       S T I P U L A T I O N S

11     IT IS STIPULATED AND AGREED by and between the

12  parties through their respective counsel that the

13  deposition of Judge Christopher Lee Keith may be taken at

14  the time and place designated pursuant to the Federal

15  Rules of Civil Procedure.

16        * * * * *

17

18

19

20

21

22

23

24

25

Page 8

1  Q   In order to make things workable for our Court

2  Reporter, Ms. Satterfield, it makes it helpful if we don't

3  talk over each other, which I can be bad about if I'm

4  hurrying to get to the next question, and sometimes people

5  want to anticipate the question, but it helps her get all

6  of our words down.

7  **A   Sure.**

8  Q   The other thing that helps her get all of our words

9  down, is if we don't say uh-huh or just nod or shake our

10  heads, which we also just do out of habit because that's a

11  normal conversational thing, but she's got to get our

12  words on paper.

13     And then, finally, breaks, you know, I think we want

14  to get it done quickly, but if at some point you ever want

15  a break, that's also totally fine.

16  **A   Well, I had a glass of water at lunch.**

17  Q   If you need one, yeah.  We're not going to make it

18  into a contest of bladders.

19     The only thing I ask is if there's a question on the

20  table, we ask you to answer that and then we can take a

21  break and move on.

22  **A   Okay.**

23  Q   Okay.  Let's kind of dive right in.  What's your

24  current job?

25  **A   I'm the Crawford County Judge.**

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
County Judge Christopher Lee Keith
March 26, 2024

Page 9

1  Q   Okay.  And when were you elected?
2  A   I was elected in June of 2022.  I took office January
3  1st of 2023.
4  Q   Okay.  And how long is your term?
5  A   Four years.
6  Q   Okay.  What are the duties and responsibilities of
7  the County Judge?
8  A   I'm the executive of the County, the administrator
9  over all the County, the road department, county
10  buildings, county inventory and so forth.
11  Q   Okay.  Is it fair to say that you can set policy for
12  the County about discretionary decisions you make?
13  A   I can bring it before the Quorum Court and they set
14  it.
15  Q   Okay.  But there are certain decisions that are just
16  delegated to you as the chief executive of the County,
17  though, right?
18  A   Yes.
19  Q   I mean, ultimately what you decide goes for hiring
20  and firing decisions and things of that nature?
21  A   Correct.
22  Q   Okay.  Did you learn about library controversy at all
23  between June, when it sounded like you won the runoff in
24  June of 2022, and January 1st of 2023?  I take it that's
25  when you took office?

Page 10

1  A   Yes.
2  Q   Did you learn about any library controversies?
3  A   The only controversy that I knew about was when it
4  was brought up in the December meeting, December of 2022
5  meeting at the Quorum Court.
6  Q   Did you attend that meeting?
7  A   I did.
8  Q   Why don't we talk about --
9        MR. ADAMS:  Sam, just for ease, can we use
10  the same exhibit numbers?
11        MR. MCLELLAND:  Okay.
12        MR. ADAMS:  So I'm going to introduce a new
13  one, which I guess will be Exhibit 10.
14  (Exhibit No. 10 was marked & attached hereto.)
15  BY MR. ADAMS:
16  Q   Let me show you Exhibit 10, which the County produced
17  in discovery in this case and it is the Quorum Court
18  Journal of Procedures for that December 19th, 2022
19  meeting.  If you wouldn't mind taking a look at that,
20  please.
21  A   Okay.
22  Q   So I guess maybe let's start at the end.
23  A   Okay.
24  Q   It says Chris Keith, County Judge, and is that your
25  signature on Page 30?

Page 11

1  A   That's for the January meeting, not December.
2  Q   My thought when I read that, was that these were
3  just --
4  A   This was just the approval --
5  Q   -- a Journal of Procedures prepared --
6  A   This was just the approval at the January meeting in
7  December of --
8  Q   Okay.  But you signed it to indicate that the Quorum
9  Court had adopted these as an accurate description of what
10  happened at the meeting on December 19th, 2022?
11  A   Correct.
12  Q   You weren't the Judge yet, but you said you were in
13  attendance --
14  A   Yes.
15  Q   -- as County Judge Elect, right?
16  A   Yes.
17  Q   Okay.  So I guess I want to go through and talk
18  about, maybe not all of it, but a lot of what the long
19  narrative that starts on Page 24 and runs through 28 says
20  about this discussion about the library.
21  A   Okay.
22  Q   So the first thing, at the top of Page 24 it says:
23  "Justice Peppas made the motion, second by Justice Atwell
24  to the quorum to let Dr. Hamby speak for 15 minutes,
25  unanimous voice vote was taken to allow this time."

Page 12

1     Do you know Dr. Hamby?
2  A   I do.
3  Q   How long have you known him?
4  A   Several years.
5  Q   Okay.  How did you meet him?
6  A   I used to go to church with him, he's my doctor.
7  Q   Okay.  Which church did you go to with him?
8  A   Butterfield Assembly.
9  Q   Does Dr. Hamby have any other roles, I guess, besides
10  being a local?  I take it he's a physician?
11  A   Uh-huh.
12  Q   Does he have any other prominent local roles?
13  A   Not to my knowledge, no.
14  Q   Okay.  Is he a member of the River Valley Elders?
15  A   Not to my knowledge.
16  Q   What do you remember about his presentation, just
17  from your memory or having your memory refreshed by these
18  minutes?
19  A   Just from what I remember of it, when they were
20  speaking of some of these books that they disagreed with
21  in the library, and it was my understanding, in the
22  December meeting when this was brought up, that it was
23  about not necessarily homosexual content, but pornographic
24  content.
25  Q   That is what you thought it was about, that it was

1 about pornographic content?

2 A   Yes, sir.

3 Q   Okay.  Is that still your understanding about the

4 nature of the objection to the books?

5 A   At that meeting, yes, sir.

6 Q   But as you sit here today, is that still your

7 understanding about what they objected to?

8 A   What they objected to in that meeting, yes, I do.

9 Q   Okay.  Have you checked out any of the books?  Not

10 necessarily checked out in the sense of removed for

11 circulation, but have you looked at any of the books that

12 they were taking issue with at this time?

13 A   No, I have not.

14 Q   Okay.  Well, let's look to the next page then.

15 A   Okay.

16 Q   And about twelve sentences down, it says If You're a

17 Drag Queen and You Know It, Pink Blue and You, The Meaning

18 of Pride, The Big Book of Pride Flags, Uncle Bobby's

19 Wedding and Bye Bye Binary.

20     Did they say those book names there?  Does that ring

21 a bell?

22 A   I don't recall if they named them.

23 Q   Okay.

24 A   I'm sure they did if it's in the minutes.

25 Q   Okay.  So these books are currently in the Crawford

1 County Social Section because our client went by this

2 morning and found them, or three of them, in the Van Buren

3 Branch, so I'm going to ask you to take a look at them.

4         MR. MCLELLAND: I'm just going to make a

5         standing objection for the record that this case

6         is a facial challenge of the statute and that

7         any questions beyond the four corners of Act 372

8         is not relevant, impermissible and can't be

9         considered, and that the Social Section is its

10         own independent issue at play in the Western

11         District in front of Judge Holmes.  Please,

12         continue.

13 BY MR. ADAMS:

14 Q   Okay.  This book is Uncle Bobby's Wedding from the

15 Van Buren Library.  I'm going to ask you to quickly flip

16 through it.

17 A   Do you want me to read it?

18 Q   I guess read the words if you can skim them.  We

19 don't want to necessarily take all afternoon, but I think

20 it's a short enough kid's picture book that it would only

21 take less than five minutes to read.

22 A   Okay.

23 Q   Okay.  Having seen this book, is it your

24 understanding now that this is pornographic?

25 A   No, there's no porn in there.

1 Q   Okay.  So what's the objection to this book, you

2 know, as best as you can understand?

3 A   I don't know.  That's a question for Dr. Hamby and

4 Ms. Hamby and not me.  I'm not going to assume what their

5 thoughts are.

6 Q   Okay.  What is Uncle Bobby's Wedding about?

7 A   It's about two gentlemen getting married.

8 Q   Okay.  Do you have any sense for how Dr. Hamby and

9 Tammi Hamby feel about two gentleman getting married?

10         MR. MCLELLAND: Object to form.

11 A   I assume they didn't like the book.

12 Q   Okay.

13 A   Was that named in here?  I see it.

14 Q   Let me pull out Exhibit 5.  This is a letter from

15 Dr. Hamby and Tammi Hamby addressed to the Quorum Court,

16 the County Judge, and the County Judge Elect.

17     So who would have been the County Judge Elect in

18 November of 2022?

19 A   Me.

20 Q   Did you receive that letter in November of 2022?  Was

21 that forwarded to you?

22 A   I don't know if it was in November, but I had seen it

23 at some point, yes.

24 Q   Had you seen it prior to this December meeting of the

25 Quorum Court, as best as you can remember?

1 A   I do not recall if I seen it before that or not.

2 Q   Okay.  Well, I hate to make this last too long, but

3 we're going to talk about that a little bit too.

4     This letter starts out with:  "We are concerned about

5 the agenda that is being pushed by the Van Buren Public

6 Library aiming education of alternative lifestyles to

7 prepubescent children."

8     And then farther down in that paragraph, "Our issue

9 is with the constitutional rights of parents and our

10 religious liberties being infringed upon by this

11 progressive woke ideology normalizing and equating

12 homosexual and transsexual lifestyles with heterosexual

13 family units."

14     So does that refresh your memory about the Hambys'

15 views?

16 A   Yes.

17 Q   Do you recall having been made aware of those views

18 before today?

19 A   Before today?

20 Q   Yes.

21 A   Yes.  I mean, I've seen the letter since then.

22 Q   Okay.  The fifth paragraph says:  "Exposing our

23 pre-pubertal children to colorful picture books equating

24 homosexual and transsexual behavior to and as normal as

25 heterosexual parenting without the consent of the parents

Page 17

1 subverts our God given rights as parents and discriminates
2 against us based on our religious beliefs."
3      Is that what that says?
4 A   I see that, yes.
5 Q   Okay. The following sentence says: "Our parental
6 rights and religious liberties are being subverted by a
7 progressive woke ideology driven by the library director
8 and her employees."
9      So let's talk about that for a minute. Who was the
10 library director at the time?
11 A   Deidre Grzymala.
12 Q   Okay. Do you agree with the Hambys that at the time,
13 in November of 2022, Ms. Grzymala was driving a
14 progressive, woke etiology?
15 A   I wouldn't say I agree. I didn't know that she was
16 or wasn't.
17 Q   You just didn't know?
18 A   No.
19 Q   Okay. And based on what you found out since then, do
20 you know whether she was or was not?
21 A   No.
22 Q   Okay. Who else do you remember speaking at that
23 December 19th, 2022 meeting, just offhand?
24 A   I don't. I mean, I just remember this discussion
25 going on and I'm not sure who spoke or who didn't speak at

Page 18

1 it.
2 Q   Do you remember Representative Fite speaking at it?
3 A   No. Like I said, that's been a year and a half ago.
4 Q   Yeah, we've slept since then.
5 A   Yes.
6 Q   Turn to Page 27?
7 A   Okay.
8 Q   You'll see 10 or 12 lines down where it says: "(10)
9 Representative Charlene Fite. I am not here to speak as
10 an elected official, but as a mother, grandmother and
11 citizen. To me the criteria here, is if my neighborhood
12 gave my child a book and I looked at that book and I
13 thought this person is grooming my child, this person is
14 trying to convince my child to do something that is not in
15 my child's best interest. This is wrong and I'm going to
16 take this to the law enforcement agency and show them that
17 my child is being groomed. Why is that different than if
18 the library that uses my money as a taxpayer gives my
19 child a book, which I consider grooming my child? There
20 is a difference between fiction and nonfiction and a
21 difference between information and advocacy."
22      Do you recall her saying that?
23 A   Vaguely.
24 Q   Okay. So farther down that page, Deidre Grzymala,
25 the Director of the Crawford County Library System, spoke

Page 19

1 addressing that some of the books are new, some of them I
2 ordered myself, but I also ordered books on men and women
3 of God. I have, also, a whole bag of books that are
4 Christian and I consider myself a Christian as well."
5      This may not be an exact quote, but it says: "I --
6 and I believe this is Deidre Grzymala speaking. "I did
7 have them take all the LGBT books out of the children's
8 section and make an LGB section for itself, so families
9 who do want to checkout those books can go over there and
10 check them out, and for the ones that don't want to see
11 it, it's not in the children's section."
12      Does that sound familiar?
13 A   I do not remember her saying that. The only thing
14 that I knew that was said at that December meeting, was a
15 compromise being made to move them to a different section.
16 I did not know she had already done it.
17 Q   Okay. So what did you understand at the time when
18 you were at that meeting?
19 A   Well, my understanding at the time is, you know, even
20 though some of them may have been directed to
21 homosexuality, that my understanding was that there was
22 pornography in them too.
23 Q   Okay. But you don't know which specific books that
24 was in reference to?
25 A   I do not.

Page 20

1 Q   Okay. So would you say the Quorum Court had a role
2 in the creation of the Social Section?
3 A   No.
4 Q   Who created the Social Section?
5 A   Deidre Grzymala did.
6 Q   It was described as a compromise. So what were the
7 two positions that resulted in a compromise?
8 A   They said that there needed to be a compromise made,
9 you know, for people that didn't want their children to
10 see it, and she took it upon herself to create the whole
11 Social Section on her own without anybody overseeing her.
12 Q   Particularly when we talk about compromise, we talk
13 about one position and then a different position and then
14 the two positions somehow meet in the middle.
15 A   Yeah.
16 Q   So what were the two positions that were on the other
17 side?
18 A   Well, if you're referring to what was told earlier,
19 there's a little discretion, is I never once heard anybody
20 say banned books. The only thing I heard say was there
21 needed to be a compromise made.
22 Q   When you talked about earlier, you were at the latter
23 portion of the deposition earlier of Ms. Eva White?
24 A   Correct.
25 Q   And we talked about this very issue?

Page 21

1 A   Correct.
2 Q   What the two sides were that were being compromised
3 on?
4 A   Correct.
5 Q   And what did you hear Ms. Eva say?
6 A   That they were -- that they wanted some of the books
7 removed and that there was a compromise made to move them
8 to a different section instead of removing them.
9 Q   Okay.  But your understanding at the time was that
10 there was actual pornography in the library?
11 A   Yes.
12 Q   Should there be actual pornography anywhere in the
13 Van Buren Library?
14         MR. MCLELLAND: Objection.  Calls for an
15     opinion.
16 BY MR. ADAMS:
17 Q   I would like your opinion about that.
18 A   Not for children, no.
19 Q   What about for adults?
20 A   That's their own discretion as an adult.
21 Q   Okay.  When you say something is pornography, does
22 that, in your mind, involve meeting a constitutional
23 standard for obscenity?
24         MR. MCLELLAND: Objection, to the extent it
25     seeks a legal opinion.  You can respond.

Page 22

1 A   I don't understand the question.
2 Q   Do you know the legal definition of obscenity?
3 A   When I speak of pornography, I'm talking about
4 pornographic pictures that people can see.
5 Q   It's difficult to define pornography famously, but do
6 you have a definition?
7 A   Of unclothed people doing sexual acts.
8 Q   Okay.  Could it be a description of that in words?
9 It wouldn't have to be a picture to be pornography.
10 A   What I'm speaking of is pictures.
11 Q   Okay.
12 A   Can I add something to that?
13 Q   Sure, go ahead.
14 A   When I say that it's at their own discretion, I'm not
15 talking about pictures for adults.  There should not be
16 any pornographic Playboy or anything like that in the
17 libraries.
18 Q   Okay.  So what --
19 A   I'm saying if it's a romance novel or something that
20 has it --
21 Q   Okay.
22 A   -- that's at the adult's discretion.
23 Q   Okay.  But you understood there was pornography in
24 the children's section of the Van Buren Library?
25 A   That was my understanding.

Page 23

1 Q   Okay.  And your understanding, as of December 19,
2 2022, was that some of that was being moved to the adult
3 section?
4 A   Correct.
5 Q   I guess that's where I got confused, because if you
6 think it's something like a Playboy --
7 A   It was moved to a different section, yes, whatever
8 that section would be.
9 Q   What you have in mind is something like a Playboy,
10 which is pornographic --
11 A   Playboy, animated porn, whatever you --
12 Q   Okay.  Well, whatever it is, a visual representation
13 of --
14 A   Correct.
15 Q   -- sexual activity?
16 A   Yes, that's correct.
17 Q   I guess I'm confused by based on what you're
18 expressing your views of what ought to be happening in the
19 library.  Why is just moving that from the children's
20 section to the adult section a satisfactory compromise if
21 it doesn't have any place in a library?
22 A   That was their compromise at the time, not mine.
23 They made the compromise to move it away from the
24 children's section, so children could not get ahold of it
25 without parental supervision.

Page 24

1 Q   When you became the County Judge, did you investigate
2 that further?
3 A   No.
4 Q   Why?
5 A   Because that's the Library Board's position to do
6 that.
7 Q   Okay.  In your view is there a distinction to be made
8 between younger minors and older minors, so something
9 could be out of reach to a young child, say a
10 ten-year-old, but that might be appropriate to give or to
11 lend or to let them look at in the case of like a
12 seventeen-year-old?
13         MR. MCLELLAND: Object to the extent that
14     it seeks an opinion.  You can respond.
15 A   I think if a child is still living in your home, 18
16 or younger, then you should have a parental right to let
17 them see that or not.
18 Q   So you wouldn't draw a distinction between the ten
19 and the seventeen-year-old for the purpose of what we're
20 talking about here?
21 A   No.
22 Q   Okay.  Setting aside all the legality with the Virden
23 lawsuit and everything to do with the Constitution, do you
24 think the Social Section is a good compromise to the
25 dispute that was going on when you took office?

Page 25

1 A   I don't know that it's a good compromise, but it was
2 a compromise made at the time for the constituents of the
3 County, is my understanding, and now we are where we are
4 with the situation.
5 Q   Which is where?
6 A   In a lawsuit over it.
7 Q   Fair enough.  Do you believe that you have the right
8 to tell the library director to do something with respect
9 to the books in the library?
10 A   No.
11 Q   Do you have the right to fire the library director?
12 A   No, that's the Library Board's position.
13 Q   Okay.  Do you have funding responsibilities for the
14 library?
15 A   We do, the Quorum Court does.
16 Q   Does that funding responsibility come with authority
17 to exercise it in a manner consistent with your
18 constituents' wishes?
19 A   The Quorum Court has that authority.  I have no vote
20 on the Quorum Court.  I'm just the Chairman.
21 Q   Okay.  Does the Quorum Court have the responsibility
22 to exercise its funding authority in a way that expresses
23 the values of the people of Crawford County?
24 A   Yes.
25 Q   Can you vote to break a tie?

Page 26

1 A   Yes, but then it only takes two-thirds of the council
2 to overturn my veto.
3 Q   Has that happened yet?
4 A   No, sir.
5 Q   Okay.  If you asked the Library Board to make a
6 policy change, do you think they would?
7 A   I think they would take it under advisement, maybe.
8 Q   So could the Quorum Court cut the budget of the
9 Crawford County Library?
10 A   Cut it, no, but they could vote to not appropriate
11 certain funds.
12 Q   Has that possibility ever come up in any of the
13 meetings you've been a part of?
14 A   Only with the ALA grant, and as soon as that
15 happened, then I called an emergency meeting the very next
16 week to get it corrected.
17 Q   Okay.  While we're on that, just tell me that story;
18 what happened in your own words?
19 A   Well, they -- they voted to table the issue until
20 they got more information on the specifics of the grant.
21 Q   Okay.  What was the concern?
22 A   That there was certain obligations that were
23 connected with the grant.
24 Q   Okay.  And the grant was to do what?
25 A   Put electric doors in the Alma Library.

Page 27

1 Q   And what was discovered during the week?
2 A   That there was none.
3 Q   Okay.  So the grant was accepted and the doors were
4 put in?
5 A   Yes, sir.
6 Q   Okay.  Thank you.
7 A   Yes.
8 Q   Have you ever personally visited the Social Section?
9 A   No.
10 Q   Who made the claim that led you to the understanding
11 that there was pornography in the children's section?
12 A   That was just my understanding from the conversation
13 that was made at the December meeting.
14 Q   Okay.  Did you have that understanding before the
15 December meeting?
16 A   No, sir.
17 Q   Okay.  And you don't remember who made those claims
18 specifically; it was just the general impression that you
19 got?
20 A   Yes, sir.
21 Q   Did you find those claims credible?  I mean, did that
22 seem likely to you, that if you walked into the children's
23 section of the Van Buren Library, that you would find --
24 A   I assumed, from what I understood from it, that it
25 was a possibility, yes.

Page 28

1 Q   So you believed that might be the case?
2 A   Right.
3 Q   Okay.  Let's go back to the Hambys.  So you said
4 you've known Dr. Hamby for a while and he's been your
5 personal physician?
6 A   Yes.
7 Q   And you knew him from church?
8 A   Yes.
9 Q   And you've known him for about how many years?
10 A   I don't know, several; ten, twelve years.
11 Q   I mean, how well do you know him?  Do you see him
12 once a month, once a week?
13 A   Every six months.
14 Q   So you're not close friends, but you're known to each
15 other?
16 A   Right.
17 Q   Like would his cell number be in your cellphone?
18 A   No, I do not have his cellphone number.  I have his
19 office number.
20 Q   What about Tammi?
21 A   I do have Tammi's.
22 Q   As of roughly when?
23 A   When she was being requested for me to put her on the
24 Library Board.
25 Q   I'm going to ask you to say that question again, not

Page 29

1 in a passive voice. Who requested that she be put on the
2 Library Board?
3 A   A constituent of the County.
4 Q   Did you know much about Ms. Hamby, besides what she
5 said in that letter and at the December 19th, 2022 Quorum
6 Court meeting?
7 A   Such as?
8 Q   Like I mean, literally anything? Had you socialized
9 with her, knew her hobbies, general habits --
10 A   No.
11 Q   -- anything like that?
12 A   No.
13 Q   Okay. So I guess you went to church with her and her
14 husband for a while?
15 A   Correct.
16 Q   Okay. Did you know anything about her professional
17 background?
18 A   Not other than running their business.
19 Q   What is their business?
20 A   A physician's business.
21 Q   Okay. So Ms. Hamby works in that business, too?
22 A   Correct.
23 Q   Did she contact you with her interest in the position
24 or did someone else recommend her? I'm still a little
25 vague.

Page 30

1 A   I don't remember who it was, but someone else
2 recommended her and I contacted her.
3 Q   Okay. And you called her and asked if she was
4 interested?
5 A   Correct.
6 Q   And tell me about that conversation. What did you
7 all talk about?
8 A   She just said, yes, she would be interested in
9 filling the position for the Van Buren Board.
10 Q   Was that before or after that December meeting?
11 A   It was after.
12 Q   So I guess we heard from Ms. White earlier today.
13 After that December 12th meeting, three of the five
14 members of the Board resigned?
15 A   Correct.
16 Q   Did they tell you why they resigned?
17 A   No. The only one that I spoke to specifically about
18 it was Ms. Balkman at the time, and she was resigning just
19 because she was catching so much grief from different
20 people over the position.
21 Q   Okay.
22 A   So, yeah, within my first ten days of office, this
23 was thrown in my lap.
24 Q   Yeah. There are a lot of references in the media
25 reports about this and by Ms. White today, about the River

Page 31

1 Valley City Elders. Do you know about that group?
2 A   Very little about them.
3 Q   Do you know who their leadership is?
4 A   No, I do not.
5 Q   Are they based in this County, because River Valley
6 seems like a broad, geographic designation to me, so I
7 don't know?
8 A   To my understanding they usually have their meetings
9 in the Fort Smith area.
10 Q   Okay. Do you know how often they meet?
11 A   I do not.
12 Q   So when you were campaigning for the County Judge
13 position, for example, did you speak to them?
14 A   I did on one occasion. They asked me to come have a
15 forum, yeah.
16 Q   So, roughly, was that in the spring of '22, something
17 like that?
18 A   Yeah.
19 Q   Tell me about the forum.
20        MR. MCLELLAND: I'm going to object that
21        this is beyond the scope of the Social Section,
22        the Act 372. I don't know what --
23        MR. ADAMS: Okay. I'll move on pretty
24        quickly, but I would like to hear about the
25        forum.

Page 32

1 A   Oh, they just asked, as in any forum, you know,
2 what -- what your political opinions would be in certain
3 areas. There was no nothing out of the question, though.
4 Q   What do you mean by out of the question?
5 A   Well, I mean, like radical or anything.
6 Q   Specifically did anything come up about the library?
7 A   No.
8 Q   So it wasn't a topic of conversation at that forum?
9 A   No, sir.
10 Q   Okay. So who invited you the to the forum, I guess?
11 A   A gentleman named John Riordan.
12 Q   Is he someone you knew before?
13 A   I just know him from coming to some of the Quorum
14 Court meetings. That's all I know of him.
15 Q   Okay. How many people were at that forum, roughly?
16 A   I don't know; 40, 50-ish.
17 Q   Was it men and women?
18 A   Yes.
19 Q   Okay. What about Ms. Hamby made you think she was a
20 good candidate for the Library Board?
21 A   I just knew of them being business people in the
22 community, and as far as having to deal with the money and
23 stuff, that I felt like she would be a good administrator
24 as far as money.
25 Q   Okay. Were there concerns about dealing with money?

Page 33

1 A   No.  I mean, not to my knowledge before.  Like I say,
2 this was in my first 10 days, so.
3 Q   Okay.  Again, I sort of apologize for jumping around.
4 A   No, you're fine.
5 Q   What's your understanding about why Deidre Grzymala
6 left the position of director of the libraries?
7 A   I don't really know where that agreement come.  That
8 was between their attorney at the time and the board
9 chairman and her.
10 Q   The board chairman was who?
11 A   Tammi Hamby.
12 Q   And you never got a report on why it is the director
13 of the library resigned less than a year into her term?
14 A   Not any specifics, no.
15 Q   Well, did you get any general sense for why?
16 A   I was just under the impression that that was the
17 agreement that they came up with because of everything
18 that was going on, that they agreed that she would move
19 on.
20 Q   But if she was being asked to leave, essentially that
21 would indicate some dissatisfaction with her performance
22 on the part of the board, or the board chairman, as you
23 specifically say.
24    Did the Board Chairman, Ms. Hamby, ever explain to
25 you why she was dissatisfied with Ms. Grzymala's

Page 34

1 performance?
2 A   Well, I think that -- from my understanding, that --
3 after looking into things in the past, there were some
4 discrepancies, as far as looking at misuse of money and
5 stuff, and to my understanding we had grounds to terminate
6 her, but she had already threatened legal against us, so
7 this was the compromise or solution they came up with, for
8 her to leave, instead of spending thousands and thousands
9 on legalities.
10 Q   Okay.  I mean, how much was the severance?
11 A   Forty something.  I don't know right off the top of
12 my head; 47, 48,000.
13 Q   And that seemed like a better deal than fighting her
14 on leaving, is what you're saying?
15 A   Uh-huh.
16 Q   Did you get to the bottom of what the financial
17 discrepancies were that apparently would have given --
18 A   I think it was just some -- from my understanding it
19 was misuse of credit cards and stuff, just some of the
20 funding being used for wrong things.
21 Q   Misuse of the credit card, meaning what; like for her
22 personal expenses?
23 A   Not necessarily just hers, but for others that was
24 using it for gas and stuff.
25 Q   Well, that sounds like a crime.

Page 35

1 A   Uh-huh.
2 Q   Did you report that to the authorities?
3 A   No.
4 Q   Is any of the evidence that Ms. Grzymala oversaw
5 misappropriation of library money something that I could
6 find in any written document anywhere?
7 A   No, not to my knowledge.
8 Q   How many people would know that?
9 A   I'm sure the library director now would know it or
10 the library board.
11 Q   And did you ever write Ms. Grzymala a job
12 recommendation after she left?
13 A   I did, but I don't recall who it was to.
14 Q   Was it a positive recommendation?
15 A   Yes.
16 Q   If you just signed a 47 or $48,000 severance check to
17 her to avoid litigation, with the understanding that she
18 may have or did, in fact, misappropriate money from the
19 library, can you help me understand why you would have
20 written her a positive job recommendation?
21 A   Because that was part of the agreement.
22 Q   It was part of the agreement?
23 A   Yes.
24 Q   That you would give her a positive job
25 recommendation?

Page 36

1 A   Yeah, that she would leave with that severance pay if
2 I would give her a good recommendation.
3 Q   Okay.  Do you know if Ms. Grzymala was ever
4 confronted with these accusations or any evidence that she
5 misappropriated any money?
6 A   I do not know.  I did not confront her.
7 Q   Well, who did you learn about that from at the time?
8 A   From the library board chairman.
9 Q   So Ms. Hamby told you that?
10 A   Correct.
11 Q   Did you learn about it from anybody else?
12 A   No.
13 Q   Did Ms. Hamby show you any documents to provide
14 details on what --
15 A   No.
16 Q   Who were the other two people that you appointed, in
17 January of 2022, to the Library Board?
18 A   Kaelin Schaper in Alma and Amanda -- I cannot
19 remember her last name in the Cedarville area.
20 Q   Okay.  How did you know them?  Let's start with
21 Kaelin Schaper.
22 A   They were referenced by constituents as well.  I did
23 not know them.
24 Q   Do you remember which constituents?
25 A   I do not.

1 Q    Did you talk to anyone at the library about these
2 recommendations before you made -- before you appointed
3 any of the three of those folks to the board?
4 A    **No.**
5 Q    Okay. Have you since consulted the library director
6 or any of the incumbent board members or anyone else at
7 the library about board selection?
8 A    **Just recently. I mean, they asked me to extend a**
9 **board member to a second term.**
10 Q    Who is that board member?
11 A    **I can't think of their --**
12 Q    So when you say they asked, is it the other board
13 members asked you to extend one of their own?
14 A    **No, the library director.**
15 Q    The library director. So who is that director?
16 A    **Ms. Eva and Charlene, the new director.**
17 Q    Okay. And did you accept that recommendation?
18 A    **I did.**
19 Q    Okay. Where did the money for Ms. Grzymala's
20 severance come from?
21 A    **The library.**
22 Q    The library fund?
23 A    **Correct, yes.**
24 Q    Okay. Which is -- which is provided by --
25 A    **The millage.**

1 Q    -- the dedicated library property tax millage?
2 A    **Yes.**
3 Q    I think we have a document to help us understand
4 that, so we'll put that in.
5          MR. ADAMS: So this is 11.
6     (Exhibit No. 11 was marked & attached hereto.)
7 BY MR. ADAMS:
8 Q    Okay. So this is the February 21st, 2023 Quorum
9 Court Journal of Procedures signed on March 14th. If you
10 don't mind, take a look at that and confirm that we got
11 the right one.
12 A    **I'm sure it is, yeah.**
13 Q    Okay. So on Page 38, Item 5, it says Ordinance No.
14 2023-11, "An Ordinance Providing Payment of Severance to
15 the Director of the Crawford County Library System; and
16 For Other Purposes. On motion by Justice Shaffer to amend
17 and read by title only (to change the payout fund from the
18 County General Fund to Library Fund 3008 and to pay
19 Mrs. Grzymala's health and dental benefit premiums thru
20 September 1, 2023, also out of Library Fund 3008.) First
21 by Justice Peppas, second by Justice Morgan. It was read
22 by title only as amended."
23    So there was no discussion and then it passed. Does
24 that all sound correct?
25 A    **Yeah.**

1 Q    Okay. Why did it have to get changed from the County
2 General Fund to the Library Fund specifically?
3 A    **After speaking with the county treasurer and the**
4 **country clerk, they said that's where she is paid from,**
5 **from the library fund, and that's where it needed to come**
6 **from.**
7 Q    Okay. Fair enough.
8    Let's go back and talk about the Social Section a
9 little bit. So we talked about how it was created.
10 What's your current understanding of what kind of books
11 are in it?
12 A    **Well, when it was created by a certain someone, it**
13 **was created -- directed towards LGBTQ books.**
14 Q    Okay. Is it your understanding that the books in
15 this section are in favor of acceptance of LGBTQ people or
16 critical of LGBTQ people?
17 A    **Rephrase the question. I don't understand what you**
18 **said.**
19 Q    Are the books in the Social Section generally
20 positive or negative about LGBTQ?
21 A    **As far as the community or?**
22 Q    No, I'm talking about the book themselves.
23 A    **Well, I would say that it's in favor of, of it.**
24 Q    So, for example, one that came up at the library,
25 Uncle Bobby's Wedding, you looked at it earlier?

1 A    **Yeah.**
2 Q    Would you say that's generally normalizing gay
3 couples?
4 A    **Yes.**
5 Q    All right. Why don't we -- I'd like to take a break.
6 A    **Okay.**
7 Q    And while we are on our break, please take a look at
8 these other two books I brought.
9       (Brief recess was taken.)
10 BY MR. ADAMS:
11 Q    Okay. So, Judge Keith, while we were on break did
12 you have a chance to look at Bye Bye Binary and The Big
13 Book of Pride Flags?
14 A    **Yes, I did.**
15 Q    And did you find any pornography in those books?
16 A    **No, I did not.**
17 Q    Okay. Thank you.
18    Okay. Judge Keith, I am showing you what we've
19 previously marked as Exhibit 1 in Eva White's deposition.
20 This is a copy of Act 372 of 2023.
21    Do you see it says, in the upper left, "State of
22 Arkansas, 94th General Assembly, Regular Session, 2023,
23 and By Senators D. Sullivan, Stone"?
24    Do you know Senator Sullivan?
25 A    **I do not.**

1 Q   You've never met Dan Sullivan?

2 A   No, sir.

3 Q   Okay.  What about Representative Gonzalez, have you

4 ever met him?

5 A   No, sir.

6 Q   What about Representative Bentley, have you ever met

7 her?

8 A   No, sir.

9 Q   Okay.  What about Current State Library Board Member,

10 Jason Rapert, have you ever met him?

11 A   No, sir.

12 Q   Okay.  Have you ever had any communications with any

13 of those people I just mentioned?

14 A   No, sir.

15 Q   Okay.  You've never talked to them on the phone or

16 emailed with them or anything?

17 A   No, sir.

18 Q   Okay.  So what's your impression of what this lawsuit

19 is about, the Fayetteville Public Library versus Crawford

20 County?

21 A   Well, my impression -- which I've not read through

22 the whole thing, but my impression was on Section 1 and 5.

23 Q   Right.  So what are we, on the Plaintiffs' side,

24 asking?

25 A   I don't remember which is which, but I know one, you

1 know, that you could hold directors criminally responsible

2 for giving children certain materials, and then the other

3 one was if a book was challenged and it didn't get the

4 approval, then it would come to myself and to the Quorum

5 Court to make the determination on it.

6 Q   Okay.  We're going to get into Section 5 about that

7 whole procedure in some detail, but let me pause on

8 Section 1 for a second.

9 A   Okay.

10 Q   Are you aware of any criminal investigation of anyone

11 for violating Section 1?

12 A   No, sir.

13 Q   In the course of discussions about this, have you

14 heard anyone say that anyone ought to be criminally

15 investigated for this?

16 A   No, sir, other than just giving certain content to

17 minors, but my understanding was it was pornographic

18 material to minors.

19 Q   Did you hear any specific accusations that that had

20 been done here in Crawford County?

21 A   No.

22 Q   Okay.  So you don't know -- you didn't hear anybody

23 accuse anybody else of giving harmful-to-minors material?

24 A   No, sir.

25 Q   All right.  Let's go on to Section 5.  So you

1 understand that if a library review committee denies a

2 book challenge, meaning a request to move a book to an

3 area that's inaccessible to minors under the age of 18,

4 the person that challenged the book can appeal to, quote,

5 "The executive head of the governing body of the county,"

6 right?

7 A   Yes.

8 Q   So who is that in the case of Crawford County?

9 A   Well, the executive head would be myself.

10 Q   Okay.  Let's look at the statute there.  We're on

11 Page 9 of the Act that passed.  We're looking at 9,

12 starting at Line 15, and I'll read it and you can tell me

13 if I read it correctly.

14     "If a person appeals the decision of a committee

15 under this subdivision (c)(12), the executive head of the

16 county or city shall present the material being

17 challenged, the request submitted by the person under

18 subdivision (c)(5) of this section, the committee's

19 decision under subdivision (c)(11)(A) of this section, and

20 the summary prepared under subdivision (c)(11)(B) of this

21 section to the governing body of the county or city within

22 fifteen days of the committee's decision."

23     All right.  Do you know what all that means?

24 A   Well, they would bring it to me and then I would have

25 to give it to the committee to make a decision on the book

1 challenge.

2 Q   You'd have to bring it to who to make a decision on

3 the book challenge?

4 A   I'm assuming the Quorum Court.

5 Q   Okay.  And what all do you have to give the Quorum

6 Court when they're making the decision?

7 A   I'm assuming just the challenge and I don't know what

8 all you'd have to give them.

9 Q   Well, it says the material being challenged.

10 A   Okay.  So I'd have to give them a copy of the

11 material being challenged.

12 Q   Okay.  A request submitted by the person, so that's

13 what's the challenger thinks should happen and why.

14 A   Okay.

15 Q   The committee's decision.  So could you be receiving

16 a decision to move something to the area that's

17 inaccessible to minors under the age of 18?

18 A   I'm assuming you could be.

19 Q   I guess as I read this statute, if the library

20 committee decides to move it to an area inaccessible to

21 minors under the age of 18, there's no appeal?

22 A   Okay.  You've probably read more into this than I

23 have, so you tell me the law.

24 Q   It's possible.  A summary prepared under subdivision

25 (c)(11)(B) of this section to the governing body, so

1 that's, you know, the summary of the decision that the
2 library committee made.
3     And then it says in Subpart 2 there, "In addition to
4 the information required to be provided under subdivision
5 (c)(12)(B) (i) of this section, the executive head of the
6 county or city receiving may also include his or her
7 recommendation regarding the appeal submitted under this
8 subdivision (c)(12)."
9     Does that make sense?
10 A   Yes, sir.
11 Q   Okay.  So let's say Act 372 went into effect and
12 there were book challenges.  So this would be your role to
13 essentially present the issue to the Quorum Court and you
14 could make your own recommendations, right?
15 A   Right.
16 Q   Essentially to move the book or not move the book,
17 right?
18 A   Uh-huh.
19 Q   Okay.  It says:  "The members of the governing body
20 of the county or city shall review the information
21 submitted to them under this subdivision (c)(12) and shall
22 make a decision on the appeal within 30 days of receiving
23 the information."
24     Now, is there anything in there that requires the
25 members of the Quorum Court to read the entirety of a book

1 before making a decision about whether or not it would be
2 moved?
3 A   I don't see anything specific about that.  You're
4 just supposed to provide them with the materials.
5 Q   Okay.  Say it was a, you know, a novel of good
6 length, a two or 300-page novel, it could even be a YA
7 novel that's relatively easy to read, in terms of its
8 vocabulary and things of that nature.
9     Is 30 days a reasonable amount of time to expect all
10 the members of the Quorum Court to have formed an informed
11 judgment about whether or not that book ought to be moved?
12 A   If they read fast.
13 Q   Okay.  How often does the Quorum Court meet right
14 now?
15 A   Once a month.
16 Q   Have you ever had to table a discussion because the
17 members were not prepared to address the issue because
18 they wanted to read up more on it?
19 A   Yes.
20 Q   Does the Quorum Court have particularly busy times of
21 year when it's hard to get through all the paperwork that
22 it needs to do?
23 A   The end of the year budget time.
24 Q   Okay.  As far as you understand it, is the Quorum
25 Court's decision final?  If someone is trying to get a

1 book moved and if the Quorum Court decides to move that
2 book, is there any appeal set forth in the statute?
3 A   Not that I see in this section, no.
4 Q   Okay.  Have you ever worked in a library yourself?
5 A   No, sir.
6 Q   Has any other member of the Quorum Court, to your
7 knowledge, worked in the library?
8 A   Not to my knowledge.
9 Q   Okay.  I guess you said you haven't visited the
10 Social Sections of the library; is that correct?
11 A   That's correct.
12 Q   Have you visited the libraries at all since you took
13 office?
14 A   The only one that I visited was the Alma Library when
15 they were -- when they tabled about the ALA grant for the
16 door.  I went to look at the doors there.
17 Q   Okay.  What did you learn?
18 A   I learned that they needed electric doors in there.
19 Q   And they got it?
20 A   They did.
21 Q   Okay.  Let's kind of back up.  Now, that we've set
22 forth the process for what would happen if this law goes
23 into effect, what is this whole Section 5 challenge about?
24 So turn back to Page 7, if you would, please, and follow
25 with me on Line 17.

1     "A person affected by the material to be challenged,
2 or an employee of the county or municipal library may
3 challenge the appropriateness of material available in the
4 county or municipal library."
5     What do you think makes a book appropriate or
6 inappropriate to be in the library's main collection?
7          MR. MCLELLAND: Objection to the extent it
8     seeks an opinion.  Go ahead.
9 A   I don't know.  That's a different thing for different
10 people.
11 Q   What is it for you?
12 A   I don't go to libraries, so it's nothing for me.
13 Q   Why do you think the legislature of Arkansas wanted
14 to give you a unique role in making recommendations,
15 public recommendations about whether books should be in a
16 library's main collection?
17          MR. MCLELLAND: Object to form.
18 A   I think that's because the Quorum Court is the head
19 of the county, so they seen it fit that that's where it
20 needed to go to beyond the library board.
21 Q   And the members of the Quorum Court have an up or
22 down vote, right?
23 A   Yes.
24 Q   And you have, perhaps, also, an up or down vote, in
25 that you make a recommendation in a sense, right?

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
County Judge Christopher Lee Keith
March 26, 2024

1 A  Yeah, but I wouldn't.

2 Q  You wouldn't ever make a recommendation about a book?

3 A  No, I have no vote and that's their discretion to

4 decide that.

5 Q  But the statute explicitly gives you the right to

6 chime in?

7 A  Sure.

8 Q  And you're elected as the chief executive of the

9 whole county, right?

10 A  Uh-huh.

11 Q  And we talked about earlier, how because you're

12 elected by the whole county to be the chief executive,

13 that reflects a mandate, right?

14 A  Right.

15 Q  That you would expect -- people, in turn, would

16 expect you to reflect certain things that they want to see

17 done, right?

18 A  Right.

19 Q  Is book selection not one of those things?

20 A  Book selection could make you or break you.

21 Q  Explain that.

22 A  That means it's best just to let the Quorum Court do

23 their position on it.

24 Q  That's a lot of let this cup pass from me --

25 A  Yeah.

1 Q  Fair enough.

2        MS. BROWNSTEIN:  You probably have the

3    makings -- off the record.

4        (Off-the-record discussion.)

5 BY MR. ADAMS:

6 Q  So, Judge, is it your testimony that if Act 372 goes

7 into effect, you don't plan to ever make a recommendation

8 about whether a book stays in --

9 A  I'm not saying -- I'm not saying I never would, but

10 chances are, for the most part, I probably wouldn't,

11 unless I just felt really compelled.

12 Q  Okay.  Well, let's just talk about one of these

13 because it took you two minutes to read this book and we

14 talked about what seems to me, anyway, and you can tell me

15 if you disagree, the only really relevant thing about this

16 book, for the purposes of its placement, is that it

17 normalizes gay marriage?

18 A  Uh-huh.

19 Q  If you substituted -- if Uncle Bobby, in Uncle

20 Bobby's Wedding, was marrying a woman, would this book be

21 in the Social Section?

22        MR. MCLELLAND:  Objection; form.

23 A  Not in the way that the director set it up, no.

24 Q  Okay.  Just in terms of everybody's commonsense, I

25 think that seems apparent.

1     So if this book got challenged -- say we lose this

2 lawsuit, Act 372 goes into effect, somebody challenges

3 this book.  It's already happened, so it's not a crazy

4 hypothetical to assume someone would do it again, and then

5 the library committee said, no, we think that's a fine

6 kid's book and it can stay where it was before last year,

7 in the kid's section of the Van Buren Library, instead of

8 over in the adult section, or if Act 372 goes into effect,

9 more segregated than it is now, right, like in a place

10 where kids couldn't get to it?

11 A  Right.

12 Q  So then that decision came to you and you -- in that

13 case do you think you would simply pass this book along

14 with the librarian's recommendation that it stay in the

15 children's section, or would you make a recommendation

16 about whether it stays in the children's section or it

17 gets put in the area inaccessible to minors under the age

18 of 18?

19        MR. WATSON:  Object to form.

20 A  I would give it to them and let them make their

21 recommendation on it.

22 Q  Okay.  And based on that December 2022 meeting, do we

23 have any sense for how that vote might go?

24 A  Not overall.  I've only seen a couple of different

25 JPs' names in here and there's 13 of them.

1 Q  Okay.  Do you think there's any way for the library

2 staff to predict, in that case, what the Quorum Court is

3 going to decide about a book being appropriate or

4 inappropriate?

5        MR. MCLELLAND:  Object to form.

6 A  I don't think they could predict it.  They could

7 probably assume with their own opinions.

8 Q  But I guess by predict I mean --

9 A  And that's what a lot of these questions are, is pure

10 assumption.

11 Q  Okay.  Fair enough.  But I just mean better than a

12 coin flip.  If they're trying to essentially save the

13 Quorum Court a lot of work by putting books where the

14 Quorum Court is going to want them to go at the end of the

15 day, they're going to make their own assumptions.

16     Is that going to be better or worse than a coin flip,

17 based on just what they know about the values of the

18 people in the Quorum Court?

19        MR. MCLELLAND:  Object to form.

20 A  I'm sure they would take that into consideration when

21 they make their decision.

22 Q  So they would take -- they would take what into

23 consideration?  When you say "that," can you flush that

24 out for me?

25 A  What you just said, you know, what they feel like the

Page 53

1  Quorum Court would vote on it.
2  Q    And what evidence would they have to try to determine
3  what the Quorum Court would --
4  A    I don't know.
5            MR. WATSON: Object to form.
6  BY MR. ADAMS:
7  Q    Okay. So you don't have a personal opinion about
8  whether this book is appropriate for children?
9            MR. MCLELLAND: I want the record to
10           reflect he's showing Uncle Bobby's Wedding.
11 BY MR. ADAMS:
12 Q    Oh, yep, I'm still showing Uncle Bobby's Wedding.
13 A    No.
14 Q    Okay. So now you think it's appropriate, nor
15 inappropriate, you just don't have an opinion?
16 A    Right.
17           THE WITNESS: Back to your comment.
18           MS. BROWNSTEIN: Yeah.
19 BY MR. ADAMS:
20 Q    When we were discussing pornography a little earlier,
21 you said something similar to what the Arkansas Supreme
22 Court has said, which is that all minors are going to get
23 treated equally, anybody under 18 shouldn't have access to
24 anything that's -- I think in that context we were talking
25 about pornography, right?

Page 54

1  A    Right.
2  Q    Is it possible that appropriateness under this
3  Section 5 process would be different? Like could there be
4  a book that you think is appropriate for a ten-year-old,
5  but not for a seventeen-year-old?
6  A    I think it all depends on what you describe as
7  pornography. I mean, there's no definition in here.
8  Q    There's no definition of pornography and I'm not
9  aware of any definition of appropriate either.
10 A    Yeah.
11 Q    So ultimately the statute just means that appropriate
12 means what the Quorum Court thinks it means. So you get a
13 recommendation about that, so your opinion matters, and
14 none of the rest of ours does, frankly.
15 A    Okay.
16 Q    That's the way the statute works.
17           MR. WATSON: Object to form;
18           mischaracterizing the statute.
19 BY MR. ADAMS:
20 Q    Is it possible that a book could be appropriate --
21 again, I'm not talking about pornography anymore. I'm
22 talking about appropriate, which means something
23 different, I think, unless you want to tell me that you
24 think appropriate here means non-pornographic?
25 A    Well, what's defined as appropriate?

Page 55

1  Q    I mean, again, it's your judgment about what's
2  appropriate, is what this statute calls for.
3  A    I mean, I don't know. I mean, if this passes and the
4  time that it comes, then I don't know what the decision
5  will be at that time. I don't know what people would
6  consider appropriate and not appropriate.
7  Q    Okay. Fair enough. I guess my question about the
8  ages, is, again, it's not about pornography. It's just
9  about do you think there could be a difference between
10 what's appropriate for a seventeen-year-old and what's
11 appropriate for a ten-year-old?
12     I'm not talking about pornography. I'm just saying
13 is your judgment about whether a book is appropriate, in
14 the sense that Section 5 means it --
15 A    Right.
16 Q    -- that you have to make a judgment about whether
17 something should be accessible to minors under the age of
18 18.
19 A    Do I think there's a difference?
20 Q    Well, could there be a difference, or is it just, in
21 your mind, like it was with the pornography --
22 A    In general or under my roof?
23 Q    Well, I mean, I guess as to your judgment about where
24 things ought to be in the library.
25 A    I think your child is your child until 18 and they're

Page 56

1  living under your roof and you need to make judgment calls
2  for them children, whether it be 10 or 17.
3  Q    Okay. But in terms of where books are in the
4  library, I guess it -- there are specific decisions to be
5  made often about where in the library books go, right, and
6  if Act 372 goes into effect, there's two places books can
7  be in the library, just where they are now, where we heard
8  testimony today, generally available to anyone. In the
9  normal course of affairs, anybody can just walk around,
10 right?
11 A    Right.
12 Q    Obviously young minors have to be attended, but if
13 you're an eleven-year-old you can just walk around the
14 library and look at whatever book you want?
15 A    Yeah.
16 Q    Or Act 372 provides for the creation of places in the
17 library that are inaccessible to minors under the age of
18 18?
19 A    Uh-huh.
20 Q    So the Quorum Court and you would be faced with the
21 possibility of making a recommendation of the Quorum
22 Court, if you saw fit --
23 A    Of a book challenge?
24 Q    Right.
25 A    Okay.

1  Q    Would be making a decision about whether to put a
2  book behind that desk or in that locked room or whatever
3  that makes it inaccessible to minors under the age of 18,
4  right?  Are you still with me?
5  A    Uh-huh.
6  Q    So I guess one of the quirks about the law that I'm
7  trying to figure out how you would approach, as a
8  policymaker under this statute, is is it possible that you
9  would look at a book and say, well, it's appropriate in my
10 view for this book to be available to a
11 seventeen-year-old, but not to a ten-year-old?
12 A    Uh-huh.
13 Q    Or is the principle that you said that it's really
14 just any minor should have their parent's permission?
15 A    Correct.
16 Q    Like applied to this appropriateness --
17 A    Correct.
18 Q    -- challenge too?
19 A    Correct.
20 Q    Okay.  And I don't know if you heard this part of Eva
21 White's deposition this morning, so you can tell me if you
22 did or not.  I know you came in at some point during it,
23 but one of the things that I asked her about was what
24 would be involved in creating an area of all the libraries
25 inaccessible to minors under the age of 18.

1  A    Uh-huh.
2  Q    And I'll represent that she said it would be very
3  expensive because libraries have open floor plans --
4  A    Right.
5  Q    -- to -- to create segregated areas that are
6  inaccessible to minors under the age of 18, part of that,
7  I think, is architectural and part may be a human
8  resources challenge because if there's a part that you
9  wall off and you want to let the adults through, but not
10 the minors --
11       MR. MCLELLAND: Can we take a break?
12       MR. ADAMS: Yeah.
13       MR. MCLELLAND: Sorry.
14       MS. BROWNSTEIN: Sorry.
15 BY MR. ADAMS:
16 Q    Ms. White testified, and other plaintiffs in this
17 case have offered their opinions, librarians, that that
18 would be quite expensive; in fact, cost prohibitive.
19     Is it your sense, as the chief person responsible for
20 the finances of Crawford County, that that would, in fact,
21 be the case?
22 A    I'm sure it would be, yes.
23 Q    Okay.  Have you looked at that if -- because we could
24 lose this lawsuit and you could be having to create those
25 shortly.  Have you looked at the fiscal impact of this

1  law?
2  A    No, I have not.
3  Q    Is that because you think we're going to win?
4  A    No.  No, honestly until you just said that, I haven't
5  thought of that aspect of it.
6  Q    Okay.  But you might now?
7  A    Yes.
8  Q    Okay.  Look, I mean, it's an honest -- I wasn't
9  trying to be flippant.
10 A    No, I understand.
11 Q    It's just an honest question and I don't know what --
12 how people are going to deal with this.
13 A    Yeah.
14       MR. ADAMS: Yeah, it sounds like there's a
15       few folks wanting to chime in, so maybe it's
16       good for my side to caucus.  Just give us like
17       five minutes.
18       MR. MCLELLAND: Sure.
19       (Brief recess was taken.)
20 BY MR. ADAMS:
21 Q    Judge Keith, I have just a handful, I think, of some
22 follow-ups to make sure I understood what you were talking
23 about before.
24 A    Okay.
25 Q    I want to turn you back to the December 19th

1  narrative, which was Exhibit 10.
2  A    Yes, sir.
3  Q    If you look on Page 24, Item 4 is comments from John
4  Riordan.
5  A    Yes, sir.
6  Q    He says:  "I am a citizen of Rudy and I would like to
7  make a comment on the library situation, which I am here
8  on behalf of the River Valley City Elders."
9     Is he the same person that invited you to talk to
10 that group during the campaign?
11 A    That's correct.
12 Q    Okay.  And at that forum, were either of the Hambys
13 there?
14 A    No, sir.
15 Q    Or any other people you've appointed to the Crawford
16 County Library Board there?
17 A    No, sir.
18 Q    Were any people who recommended that you appoint
19 anyone to the Crawford County Library Board there?
20 A    No, sir.
21 Q    Okay.  And while we were talking about constituent
22 recommendations, I guess you said that constituents had
23 recommended various board members that you did appoint to
24 the Board?
25 A    Correct.

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
County Judge Christopher Lee Keith
March 26, 2024

1 Q   But you couldn't remember who made those
2 recommendations to you?
3 A   No, sir, I don't.
4 Q   If Act 372 goes into effect and you're faced with the
5 decision about whether to make a recommendation to the
6 Quorum Court about whether a book gets moved or not moved
7 to the segregated area, would you probably also listen to
8 constituent recommendations?
9       MR. WATSON: Object to form.
10 A   I'm sure they would, to make their decision on.
11 Q   You're sure the Quorum Court members would listen to
12 constituent recommendations about which way to vote?
13 A   Yeah.
14 Q   Okay.  But would you --
15 A   They represent their constituents.
16 Q   Okay.  Well, do you represent the citizens of
17 Crawford County?
18 A   I do.
19 Q   Okay.  So would you listen to constituents'
20 recommendations about making a recommendation on library
21 materials?
22       MR. MCLELLAND: Object to form.
23 A   If there was a very strong opinion on it.
24 Q   Okay.
25 A   Like I said earlier, I'm not going to say that I

1 would never make an opinion on it, but I'm not going to
2 say that I would either.
3 Q   You just have to make that decision?
4 A   Correct?
5 Q   At the time?
6 A   Assumption, again.
7 Q   Let's look at Exhibit 8.  That's a recommendation or
8 that's a letter from the county attorney.  Who is that
9 letter to?
10 A   It is to the Crawford County Library Board and
11 Director Eva White.
12 Q   Okay.  Have you ever seen that letter before?
13 A   I have not.
14 Q   Okay.  It says at the end: "Specifically you must
15 create a section that is not accessible to those under 18
16 and create a policy for challenging physical materials."
17     That's goes back to what we were talking about
18 before.  And has the -- has the library budgetary process
19 gone through with that and looked at what it would cost to
20 create a section in each of the library branches that is
21 not accessible to those under 18?
22 A   I don't know if they have or not.
23 Q   Okay.  But you're not aware that they've asked for
24 extra funding to account for that construction or
25 anything?

1 A   No, sir.
2 Q   Okay.  Let's also look at 9.
3 A   Okay.
4 Q   This is a different letter of the same day from
5 Gentry Wahlmeier.  This one is addressed to Terrence Cain
6 and Brian Meadors.
7     And the second paragraph says:  "Acting as the
8 legislative branch of a county is a task that comes with a
9 greater difficulty than one would think.  The balancing
10 test between the freedom of an unbounded First Amendment
11 and protecting children from exposure to materials that
12 might harm their innocence exposes the core of the phrase
13 'rational minds may differ'."
14     Is it your understanding that the materials in the
15 Social Section are, quote, "materials that might harm
16 children's innocence"?
17 A   No, I -- I don't know if it would or not.
18 Q   Okay.  It goes on to say --
19 A   Apparently Deidre did, though, because she put them
20 there.
21 Q   Deidre thought that the books in the Social Section
22 might harm the innocence of children?
23 A   Well, I mean, I can't speculate --
24       MR. MCLELLAND: Object to form.
25 A   -- on her opinion, but they're there because they

1 were put there by the director.
2 Q   Okay.  But in, at least, some of these cases, it
3 seems like the picture is a little more complicated
4 because the books were specifically asked to be moved.
5     Like the three books that we looked at before that
6 you said that you didn't think were pornographic, you
7 didn't take a position on whether they were appropriate or
8 not for kids?
9 A   Right.
10 Q   From what I remember.  But what happened was -- well,
11 let's look back here.  Let's look at the December 19th,
12 2022 minutes again, and, again, reading 10 lines down.
13 A   Which page are we on?
14 Q   Crawford County 25.  And I believe this is still John
15 Riordan talking, if the numbering is correct, and he says:
16 "I'd just like to note that four citizens in Crawford
17 County requested the Library Board to reconsider six books
18 in the library board at the November board meeting.  The
19 three library board members present voted down their
20 request and didn't address their concern.  These books
21 were," and the final three were The Big Book of Pride
22 Flags, Uncle Bobby's Wedding and Bye Bye Binary.
23     There's certain persons employed by Crawford County
24 Library System that are ordering and promoting these books
25 to our children.  I do not want my children or anyone

1 else's children to be exposed to these books seeking to
2 take away their innocence."
3     So it's the same phrase that Gentry used.
4 A   Uh-huh.
5 Q   So it seems that the county attorney was adopting the
6 analysis of Mr. Riordan in his request that these books be
7 taken out of the children's section?
8         MR. MCLELLAND: Object to form.
9 BY MR. ADAMS:
10 Q   Do you disagree with what I just said?
11 A   I don't disagree or agree with it.  I don't know.
12 They could have the same wording, for all I know.
13     To my knowledge Mr. Riordan and Mr. Wahlmeier don't
14 know each other, to my knowledge.
15 Q   Well, that wasn't my question.  I'm just asking if
16 they used the same wording for the same issue --
17 A   There's a few -- same wording in there, yes.
18 Q   Okay.  So who was the library director at the time,
19 assuming Mr. Riordan is correct about this, that the
20 library staff and the library board members refused to
21 move these six books that they mentioned?
22 A   That would have been -- Deidre Grzymala was the
23 Director.
24 Q   So it's at least not true with respect to all of the
25 books in the Social Section that Deidre made an

1 independent judgment about the appropriatenesses of those
2 books?  Do you agree with what I just said?
3 A   I think in my opinion --
4         MR. MCLELLAND: Object to form.
5         MR. WATSON: Object to form.
6         MR. MCLELLAND: Go ahead.
7 A   In my opinion, at the time Deidre took her
8 conversation from the December meeting, she directed this
9 Social Section towards LGBTQ and that's where the Social
10 Section was directed.  It was off of her authorization of
11 what she thought should be put in there.
12 Q   I want to focus on a few more parts of these
13 December 19, 2022 minutes.
14 A   Okay.
15 Q   In Section 6, sort of near the bottom of Page 25, it
16 says: "Jami Ann Balkman spoke to the quorum --
17 A   Yes.
18 Q   She had been serving on the Library Board for nine
19 years and has been the chairperson for the last five.  Our
20 Library Board is a neutral political entity and we don't
21 take a political stand in any way.  Legally the right to
22 determine what a child looks at is solely with the parent
23 and it's not the library responsibly (sic), and other
24 thing we are charged with is the First Amendment rights of
25 everyone in our community.  I have talked with several

1 people and Dr. Hamby and also Justice Johnson.  I think
2 that there is a way that a compromise can be found.  When
3 they brought the books to us on reconsideration, there is
4 criteria that we are supposed to follow and those books,
5 they didn't.  It was very difficult with the board, but we
6 were trying to avoid any censorship and be very, very
7 careful about that and our library millage we are talking
8 about has not asked for an increase in our millage since
9 1998.  I don't know of any of our departments in the
10 county that has the same funding as they in 1998, but we
11 try to be careful.  If someone come and tried to sue us
12 for censorship, we would not survive it, so we try to walk
13 that fine line of what values most of the people need and
14 still represent everyone in the community, so we try to be
15 neutral repeatedly.  So what I'm asking for is a
16 compromise.  When we didn't remove them from the shelf,
17 which is what we were asked to do, that is censorship."
18     So she was the board chair at the time?
19 A   Correct.
20 Q   And she's describing the compromise as between -- it
21 sounds like to me -- you can tell me if you have a
22 different interpretation of that.  It sounds like she's
23 describing a compromise as between complete removal of the
24 books and leaving the books where they are.
25 A   That's what it sounds like, yes.

1 Q   Okay.  So who was in favor of complete removal of the
2 books?
3 A   As far as the Quorum Court?
4 Q   As far as anyone?
5 A   I don't know.
6 Q   Okay.  Well, she mentioned someone just prior to
7 that.  That's why I asked.
8 A   Dr. Hamby?
9 Q   And Justice Johnson.  Do know whether they were in
10 favor of the removal of the books?
11 A   I don't know.  Justice Johnson is no longer with us.
12 Q   Like is he -- is he with God or no longer on the
13 Quorum Court?
14 A   No, he's not on the Quorum Court anymore.
15 Q   Two ways to go with that.
16 A   Yeah, that's true; that's true.
17 Q   All right.  If you'll pardon me for a second, I want
18 to look at some notes.
19     One thing I asked Ms. White this morning was that --
20 was about the appointment of library board members and she
21 told me that from approximately the year 2000 to the year
22 2020, every one of her recommendations to the county judge
23 was accepted and appointed to the library board and you
24 decided to go a different route.
25     Can you explain why you decided not to do it the way

Page 69

1  it had been done in the past?
2  A   Sure.  Well, for one, three members resigning at the
3  same time is pretty unprecedented, so I had to deal with
4  that, and for the ones that were recommended to me, I did
5  not feel that they could -- that they would represent our
6  constituents well, so that's why I decided to go a
7  different route.
8  Q   So do you remember who those three were that the
9  library staff recommend?
10  A   I do not, not off the top of my head.
11  Q   When you say you didn't feel like would represent the
12  constituents well, what does that mean?
13  A   I just didn't feel like -- like Tammi, for example,
14  she had a business administrative profession, so I figured
15  that she could represent in that manner.
16  Q   Okay.
17  A   And the other two were avid users of the library and
18  their families, and they knew the library system, the
19  other two that I appointed.
20  Q   I see.  Were the three that the library staff
21  recommended not avid users of the library?
22  A   Not to my knowledge.
23  Q   Did you know that Ms. Hamby was an avid user of the
24  library?
25  A   I knew that she had had a membership at one point,

Page 70

1  yes.
2  Q   Okay.  One of the accusations in the Hamby letter,
3  for example, is that the current library staff was
4  ordering these books, which were harmful to the innocence
5  of minors.
6       Is that a fair summary?
7  A   Uh-huh.
8  Q   So why would Deidre Grzymala order books if she
9  thought they were harmful to the innocence of minors?
10  A   I don't know.
11  Q   Okay.  Do you think being a library user is required
12  to be a good library board member?
13       MR. MCLELLAND:  Objection.  Calls for an
14       opinion.  You may answer.
15  A   I don't think it's required, but it certainly helps
16  to know the system.
17  Q   Okay.  And I'm not sure we went into this at the
18  beginning.  Historically, how much have you used the
19  Crawford County Library System?
20  A   I have not.
21  Q   Have you ever had a card?
22  A   No.
23  Q   Okay.  I think that's all I have.
24  A   Thank you.
25       EXAMINATION

Page 71

1  BY MR. WATSON:
2  Q   I just have a couple of questions following up.
3  Hopefully it will be very quick.
4  A   Yes, sir.
5  Q   First, I just want to quickly go back to yours and
6  Mr. Adams discussion of pornography in the library and
7  after that December meeting it was your understanding that
8  there might have been some materials that were
9  pornographic in the library.
10  A   Yes, sir.
11  Q   Did I understand you correctly that you weren't aware
12  of any specific book that met that description, though?
13  A   No, sir, I was not.
14  Q   Okay.  Next, you and Mr. Adams talked a lot about
15  Exhibit 1, which is Act 372, and some of the specifics of
16  how that operates.
17       First of all, Judge Keith, are you a lawyer?
18  A   No, sir.
19  Q   So any of your comments on the operation of the Act
20  were you giving a legal opinion?
21  A   No, sir.
22  Q   With that caveat, I'm going to do the same thing that
23  I am sort of saying doesn't matter.  So if you could pull
24  Exhibit 1 out and I just want to ask a couple of questions
25  about that.

Page 72

1  A   Okay.
2  Q   So Page 7 is where I'm going to start.
3  A   Okay.
4  Q   So in your conversation with Mr. Adams, there was a
5  lot of focus on the word appropriateness, which is Line 18
6  on Page 7.  It may not be a total surprise, since there's
7  a lawsuit, Mr. Adams and I have a slightly different
8  interpretation of how the statute works.
9       Since he took you through his interpretation, I just
10  want to take you through mine and see if that changes any
11  of your opinions.
12  A   Okay.
13  Q   So if we look at Subsection 8, it starts there on
14  Line 8, and I'll just read it.  So each county or
15  municipal library shall have a written policy to establish
16  guidelines for the selection, relocation, and retention of
17  physical materials that are available to the public.
18       Did I read that correctly?
19  A   Yes, sir.
20  Q   Then if you will skip to Page 8.  Once again, I'm
21  going to start on Line 10.  In between what I just read
22  and Line 10, though, tell me if this characterization is
23  correct.  If a person comes and challenges a book, the
24  appropriateness, then it goes eventually to a library
25  committee who will review that and then make a

1 determination.

2     Is that more or less how you understand that?

3 A  Yes, sir.

4 Q  So starting at Line 10 on Page 8, it says that that

5 committee established under subdivision (c)(6)(A) of this

6 section shall determine if the material being challenged

7 meets the criteria of selection.

8     Do you see any other basis that the committee is

9 allowed to make its decision on, other than the criteria

10 of selection that the library established?

11 A  No, sir.

12       MS. BROWNSTEIN: I object to the form.  I

13     mean, obviously it's not as you stated.

14       MR. MCLELLAND: What was the question on

15     the table?  I knew you objected.

16       MR. WATSON: So the question was do you

17     see, in the Act, any other basis for the

18     committee -- the library committee to, you know,

19     place a book, move a book from the general

20     circulation to what is later described as an

21     area prohibited from access for minors?

22       MS. BROWNSTEIN: I object to form.  On the

23     other -- any other basis other than what?

24 BY MR. WATSON:

25 Q  Other than the criteria of selection in Line 10

1 through 12 on Page 8.

2 A  Are you waiting on me?

3 Q  I think so.

4 A  So what was the question?

5 Q  So are there any other reasons that this library

6 committee may move a material, other than what's in Lines

7 10 through 12, being that the challenged material meets

8 the criteria of selection that was established, as we just

9 read, by the libraries in Subsection A?

10 A  No, sir.

11 Q  Okay.  So then on Page 9, Line 8, this is (12)(A).

12 This is the provision -- and I'll give you a moment to

13 read over that, but that's the part that there's an appeal

14 up to the Quorum Court.

15 A  Okay.

16 Q  Based on what we just discussed, what do you think

17 the basis of the review of the Quorum Court would be?

18 A  Well, I think it should be based on the same things,

19 the criteria of selection.

20 Q  So you don't think the Quorum Court could just

21 change, essentially, everything that happened before in

22 the process and go a totally different way?

23 A  No.

24 Q  And then my last question, you know, a lot of the

25 factual issues that we talked about with Ms. Grzymala and

1 the competing factions and all of that, did that predate

2 Act 372?

3 A  Yes.

4 Q  And this morning when we were deposing Ms. White, I

5 asked her if she thought all of these issues were

6 unrelated to Act 372 and she said yes.

7     Do you agree with that?

8 A  I do agree with that.

9 Q  That's all I have.  Thank you.

10       MR. MCLELLAND: I need a break and then

11     I'll ask my questions.

12     (Brief recess was taken.)

13           EXAMINATION

14 BY MR. MCLELLAND:

15 Q  Judge Keith, I've got a couple of follow-up questions

16 and then that may prompt some questions from the other

17 attorneys and then we're going to go round-robin until we

18 run out of questions.

19 A  Okay.

20 Q  I'm going to start back kind of towards the beginning

21 of you and Mr. Adams' conversation.

22     Is the Crawford County Quorum Court responsible for

23 implementing library policy?

24 A  No, sir.

25 Q  Okay.  In the creation of the Social Section, who

1 selected the books that were moved to the Social Section?

2 A  Deidre Grzymala, which was the Library Director at

3 the time.

4 Q  Are you aware whether she made that -- or do you know

5 if she made those determinations for those books based

6 upon Act 372?

7 A  No, she did not.

8 Q  She did not?

9 A  She did not.

10 Q  Act 372 wasn't a factor in her decision?

11 A  Correct.

12 Q  Do you remember discussing the severance agreement

13 with Mr. Adams earlier that dealt with Deidre?

14 A  Yes.

15 Q  Okay.  Were you aware that at the time that

16 Deidre's -- were you aware that she was represented by an

17 attorney in those negotiations?

18 A  Yes.

19 Q  And did you participate in any of those negotiations

20 individually?

21 A  No.

22 Q  Okay.  Are you aware that in this case -- well,

23 you're aware in this case that you filed -- or your

24 attorneys filed an Affidavit on your behalf that stated

25 that Crawford County would implement Act 372.

1      Do you remember signing that Affidavit?
2 A   **Uh-huh.**
3 Q   Is that a yes?
4 A   **Yes.**
5 Q   So Crawford County has to implement Act 372; is that
6 correct?
7 A   **Correct.**
8 Q   Do you know what would happen if Crawford County
9 didn't implement Act 372?
10      **MR. WATSON:** Object to form.
11 A   **You mean if it was state law?**
12 Q   I'm sorry, let me clarify. So Act 372, if it was to
13 go into effect and the Plaintiffs did not prevail in this
14 case, Act 372 goes into effect and Crawford County chose
15 to not -- if it had a choice, if Crawford County even had
16 a choice and it chose not to implement Act 372, do you
17 know what would happen in such a situation?
18      **MR. WATSON:** Object to form.
19 A   **Then the state would come after us.**
20 Q   And by come after us, what do you mean?
21 A   **Well, I don't know exactly what it would be. I mean,**
22 **they'd sue us, they'd come after us making us implement**
23 **it.**
24      **And I might add to that, just like any other library**
25 **system in the state.**

1 Q   And what do you mean by any other library --
2 A   **If they chose not to implement it, too, then the**
3 **state would come after them as well, just like us.**
4 Q   That's your understanding?
5 A   **Yes.**
6 Q   And has any other library system been sued in this
7 case?
8 A   **No.**
9 Q   So Crawford County is the only library system that's
10 a Defendant in this case?
11 A   **Yes, sir.**
12 Q   Are you aware that there are library systems suing
13 Crawford County in this case?
14 A   **Yes.**
15 Q   Do you know any of the specific library systems that
16 are suing?
17 A   **No, not exactly.**
18 Q   Okay. But you're aware that there are library
19 systems that are Plaintiffs in this case?
20 A   **Correct, yes.**
21 Q   Okay. If you'll turn to Exhibit 1, and if you'll
22 turn to Page 9, Line 22 through 25. This is about the
23 recommendation that you may make if this law was to go
24 into effect. It states: "In addition to the information
25 required to be provided under subdivision (c)(12)(B)(i) of

1 this section, the executive head of the county or city may
2 also include his or her recommendation regarding the
3 appeal submitted under this subdivision (c)(12)."
4      Did I read that right?
5 A   **Yes.**
6 Q   So is it correct to say that -- is it your
7 understanding that you have to provide a recommendation
8 that includes material as set forth in (c)(12)(B)(i)?
9 A   **Correct.**
10 Q   But that you can include -- is it your understanding
11 that you can include information in addition to that
12 information, based upon the first few words of that
13 section?
14 A   **As far as my recommendation?**
15 Q   Yes, as far as the recommendation you make.
16 A   **Yes.**
17 Q   So you include information beyond that of what's in
18 section (c)(12)(B)(i)?
19 A   **Yeah, I see that. I was -- I don't know. I don't**
20 **know if you could add any more to that or not.**
21 Q   Do you know what -- besides the information in
22 Section (C)(12) (B)(i), we'll call that the baseline
23 recommendation. Beyond just the baseline, could you put
24 more information in there if you wanted to?
25 A   **Well, I mean, it doesn't specify in there what you**

1 **could base your recommendation off of.**
2 Q   Okay. So you're not sure, really, what would go into
3 your recommendation, beyond just the kind of baseline --
4 A   **Right.**
5 Q   -- of what's required?
6 A   **Right, there's no criteria for it.**
7 Q   Okay. Do you have any thoughts on Act 372?
8 A   **Honestly, I would just assume not have it.**
9 Q   And is there a reason why you'd rather not have this
10 law?
11 A   **Because -- especially for Section 5, it's going to be**
12 **nothing but a headache for us if book challenges come up**
13 **and it's going to be constant litigation from here on out**
14 **for us, for money that we don't have.**
15 Q   And has Crawford County -- to your knowledge, has
16 Crawford County taken any steps to implement Act 372?
17 A   **No, sir.**
18 Q   When Deidre Grzymala created the Social Section as a
19 compromise, was --
20      **MS. BROWNSTEIN:** Object to the -- assumes a
21 conclusion not entirely complete in the
22 evidence.
23      **MR. MCLELLAND:** Okay, I'll rephrase.
24      **MS. BROWNSTEIN:** You don't have to
25 rephrase.

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
County Judge Christopher Lee Keith
March 26, 2024

1  MR. MCLELLAND: I think the evidence is in.
2  But when --
3  MS. BROWNSTEIN: I object to the contention
4  that Ms. Grzymala is responsible for the
5  so-called compromise.
6  BY MR. MCLELLAND:
7  Q  Okay. Who created the Social Section?
8  A  Deidre Grzymala.
9  Q  Are you aware of when she created it?
10 A  Apparently between the December meeting and the
11 January Quorum Court meetings.
12 Q  So kind of in the first few weeks of January? Is
13 that fair to say?
14 A  Yeah, end of December, first of January.
15 Q  Okay. At that time, were you aware of whether Act
16 372 was even a bill at that time?
17 A  No, never heard of it. At that time.
18 Q  At that time, right. So is it fair to say when the
19 compromise was made in that late December, early January
20 period, was Act 372 a part of that compromise?
21 A  No, sir.
22 Q  Okay. Do you have to have a library card to be
23 elected judge of this county?
24 A  No, sir.
25 Q  What requirements are there to be elected judge?

1  A  To be elected by the majority of the citizens of the
2  county.
3  Q  Okay. Do you think having a library in the community
4  is a good thing?
5  A  Absolutely.
6  Q  Why do you say that?
7  A  I think it's great for future economic development
8  and it's a good learning experience for not only children,
9  but for adults to go to to get materials they need.
10 Q  Do you have any concern that Act 372 would place
11 potential -- do you have any concern that Act 372 might
12 infringe upon the benefits that you just described for the
13 library system?
14 MR. WATSON: Object to form.
15 A  Financially, yes.
16 Q  Speaking of finances, are you aware that in this
17 case -- are you aware that in this case that Plaintiffs
18 could have the ability to ask for their attorneys' fees?
19 A  Yes.
20 Q  And if they were to request their attorneys' fees in
21 this case, where would the money for that come from?
22 A  Well, it would have to come out of either county
23 general or it could possibly come out of a portion of the
24 library fund as well.
25 Q  Do you know if any other -- would any other library

1  system in the state be required to -- do you know if any
2  other library system in the state would be required to
3  chip in to pay for those attorneys' fees?
4  A  No.
5  Q  Okay.
6  A  No.
7  Q  Let's flip over to the Gentry letter?
8  A  I've got both of them right here.
9  Q  Actually before we get to that, do you remember
10 talking about how Act 372 would potentially open up the
11 library to kind of never-ending litigation?
12 A  Yes.
13 Q  Okay. If you'll flip over to the Quorum Court
14 minutes on the 19th, on Page 26, I think it's Plaintiff's
15 10, and kind of towards the top, I think this is
16 Ms. Balkman speaking still at the behest of Justice
17 Johnson at that meeting.
18    She states there: "If someone come and tried to sue
19 us for censorship, we would not survive it, so we try to
20 walk that fine line of what the values of most of the
21 people need and still represent everyone in our
22 community."
23    Did I read that correctly?
24 A  Yes.
25 Q  And do you remember her giving that statement at the

1  December Quorum Court meeting?
2  A  I do.
3  Q  Are her concerns about the budget -- when she says
4  that we could not survive -- well, actually, let me back
5  up.
6     If you go to Page 25, at the bottom it says: "When
7  they brought the books to us on reconsideration, there is
8  criteria that we are supposed to follow and those books,
9  they didn't, it was very difficult with the board, but we
10 were trying to avoid any censorship and be very, very
11 careful about that and our library millage that we are
12 talking about has not asked for an increase in our millage
13 since 1998."
14    Did I read that right?
15 A  Yes.
16 Q  So is it your understanding that the library has not
17 received a millage increase since 1998?
18 A  Correct.
19 Q  So when Ms. Balkman talked about we would not survive
20 it, do you know what she was referencing?
21 A  Yeah, she was talking about the cost of litigation.
22 Q  And the cost of that?
23 A  The cost of it, yes.
24 Q  And then if we go to the Gentry letter, do you
25 remember discussing the innocence of children between the

1 Quorum Court minutes with John Riordan, I believe said
2 those words at the Quorum Court meeting, and Gentry
3 Wahlmeier said those words in a letter. Do you remember
4 discussing that with Mr. Adams?
5 A I do.
6 Q Okay. Do you know whether Gentry consulted
7 Mr. Riordan in preparation of that letter?
8 A I do not. It's highly unlikely.
9 Q Why do you think it's highly unlikely?
10 A Because I don't think they know each other well
11 enough to -- it's my assumption that they don't know each
12 other well enough to coerce like that.
13 Q Okay. Judge Keith, is there anything else that you
14 would like to state for the record because I think I'm
15 done? I want to make sure that all of your words have
16 been said.
17 A Yeah, I would just like to say that, you know, I --
18 and this is my opinion, and the way I think most people
19 feel in Crawford County is, you know, I feel like because
20 of the litigation we're going through, we were targeted to
21 be put as a Defendant on this case and I don't think it's
22 fair that Crawford County has to pay these legal fees
23 because you're just -- it's taking money and sales tax
24 dollars out of our county's pocket that we can't afford.
25     And it's not fair that, you know, the Plaintiffs

1 don't have to, but if we lose, then we have to pay
2 attorney fees and that's not right. That's all I have to
3 say.
4         MR. MCLELLAND: With that, I'll pass.
5         FURTHER EXAMINATION
6 BY MR. ADAMS:
7 Q I'm going to return to Page 26 of the Crawford County
8 General Procedures where Sam was leading you through the
9 questions about what Ms. Balkman said.
10     I mean, you testified you thought that was about
11 litigation expenses that might lead to the closure of the
12 library?
13 A Uh-huh.
14 Q I'm going to read on Page 26, ten lines down.
15 "Justice Peppas stated that we as a quorum are not
16 neutral. We belong to certain parties and I am a
17 conservative and I have had constituents that are prepared
18 to have a ballot measure take place to reduce the millage,
19 and you said you have not had a millage increase since
20 1998, but we are not necessarily neutral up here and if
21 they want to go ahead and make that move, it will be up to
22 the people and no one wants that to happen. Ms. Balkman
23 stated that she hopes for a compromise and not to go that
24 route. Justice Peppas stated that this was not going to
25 go away."

1     So is that description about litigation costs leading
2 to the library closing or a millage vote leading to a
3 reduction in the funding of the libraries?
4 A Well, I think what she was referring to -- and I
5 still say I think what she was referring to before Justice
6 Peppas said that, that she was talking about being neutral
7 and not discriminating and we would not be able to survive
8 that because there would be litigation brought against us.
9 Q And what's Justice Peppas' view about neutrality?
10 A I'm sorry?
11 Q What does Justice Peppas say about neutrality?
12 A Well, he says just the opposite after she made that
13 comment.
14 Q Okay. When you said if Crawford County didn't
15 implement Act 372 the state would come after us. I'm not
16 sure I understand what that means. Like who specifically
17 is the state in that case?
18 A Well, I don't know exactly what the entity would be
19 of the state, but you know, we would be breaking state law
20 and they would be coming to enforce it upon us, they as
21 the state.
22 Q Okay. So let's look at Exhibit 9 again, which Sam
23 asked you about just now. It says the Quorum Court is in
24 receipt of your email dated May 18th, 2023. What did that
25 email from Brian Meadors and Terrence Cain say; do you

1 remember?
2 A Off the top of my head I'm not sure what it says.
3 Q The second sentence of the first paragraph says:
4 "That email also contains a draft Complaint of a civil
5 case in the Western District of Arkansas."
6 A Uh-huh.
7 Q Are you familiar with when lawyers send a draft
8 complaint, what does that mean?
9 A No, I don't know.
10 Q Did Brian Meadors and Terrence Cain file a lawsuit
11 against Crawford County?
12 A They are the attorneys on that lawsuit, yes.
13 Q Do you remember when they filed that lawsuit?
14 A No. It was the summer of last year.
15 Q Okay. So had they filed it on May 18th, when they
16 sent the email, from what you can tell?
17 A To my knowledge, no.
18 Q Okay. If it's a draft complaint, at least, my
19 assumption -- I don't -- I don't remember the day they
20 filed it either.
21     But in the normal course of affairs, if there's a
22 draft complaint going around and that's what people are
23 talking about, they're not talking about the one that's
24 actually been filed.
25 A Okay.

Page 89

1 Q So it sounds to me as though they had sent the County
2 a demand of some sort and said we're going to sue you
3 unless you do something and then they sued the county over
4 what, like why did they sue the county?
5 A Over the Social Section being created.
6 Q Okay. So then the second paragraph is Gentry's
7 explanation of the legal basis for what the County had
8 done, and it includes that language that I quoted to you a
9 little while ago, that it involved protecting children
10 from exposure to materials that might harm their
11 innocence, mirroring some language we heard from a Quorum
12 Court member.
13 A Are you talking about John Riordan?
14 Q Correct.
15 A He's not a Quorum Court member.
16 Q Oh, okay. Mirroring some language from someone that
17 had asked for books to be moved. Okay?
18 A Okay.
19 Q Fair enough. Then the next paragraph said: "This
20 balancing test is coming to the forefront of the national
21 conversation. At the state level, Act 372 passed the
22 legislature and is going into effect shortly. Its effect
23 will be to require libraries to have a section that is
24 inaccessible to minors."
25 Skipping down to the end, "Act 372 will make it

Page 90

1 necessary to continue modifying and changing the library
2 system's policies and procedures."
3 A Uh-huh.
4 Q To me that makes it sound as though the creation of
5 the Social Section started a process, which Act 372 was
6 going to continue, and I'll explain what I mean by that.
7 A Okay.
8 Q So Act 372 requires certain books, in the case of
9 successful challenges, to be moved to an area of a library
10 inaccessible to minors under the age of 18 based on
11 whether they're appropriate. Okay? And that's all it
12 says, right?
13 A Okay.
14 Q The creation of the Social Section was the library
15 segregating books? It was not to an area inaccessible to
16 minors under the age of 18, but it had started a process
17 of deciding which books were somehow appropriate --
18 MR. WATSON: Object to form.
19 Q -- to be in the children's section.
20 We talked about some examples of some books that were
21 found to be inappropriate for the children's section
22 according to somebody, right?
23 A Yes, sir.
24 Q So when people in Crawford County saw the upcoming
25 implementation of Act 372 as connected to the creation of

Page 91

1 the Social Section, is it fair to say that this letter
2 helped create that impression that they were --
3 A No, I mean --
4 MR. MCLELLAND: Object to form; object to
5 characterization. You can go ahead.
6 A You say citizens of Crawford County see that they're
7 connected. What -- what citizens?
8 Q The Plaintiffs in this lawsuit. There are three of
9 them. Two of them are in this room.
10 A Well, it wasn't even a thing in December when the
11 compromise was made to make the Social Section.
12 Q Right.
13 A So how could the two be connected?
14 Q Well, I guess I put that question to you. This is
15 your lawyer writing this and saying they're going to
16 continue modifying --
17 A He's just saying continued modifications because they
18 had already moved the Social Section, so, you know, I
19 can't say what his wording is, but he just means that
20 there's going to be more to come.
21 Q Okay. Are you aware that Jonesboro and Craighead
22 County voters reduced the millage assigned to their
23 libraries in a recent election?
24 A I have heard that Jonesboro has in the past, but
25 that's all I've heard of.

Page 92

1 Q Were you aware of that in December of 2022?
2 A No, I was not.
3 Q Okay. And do you remember when and how you became
4 aware of that?
5 A Not until all this litigation started in later
6 spring, early summer is when I knew.
7 Q Okay. Did you hear Eva White, earlier today, say
8 that she's worried about that happening here?
9 A Yes.
10 Q Are you worried about that happening here?
11 A I think it's a possibility.
12 Q Okay. And do you have an opinion about what would
13 make more or less likely for that kind of vote to happen
14 here?
15 A No, I don't. I mean, I just think that, you know,
16 you got to understand that Crawford County is a very
17 conservative county of the majority and if there's certain
18 things lost here that the majority does not approve of,
19 then I think there's a chance that they could bring that
20 to a vote.
21 Q Okay.
22 A Do I want that? No, I don't. I want our library
23 system to stay intact.
24 Q So when you say certain things lost here, do you have
25 something in mind?

Page 93

1  A   Well, I'm talking about the -- the lawsuits we have.
2  Q   Okay. That's all I have. Thank you, Judge.
3  A   Thank you.
4          FURTHER EXAMINATION
5  BY MR. WATSON:
6  Q   So when you said that the state would come after us
7  if you didn't implement Act 372, do you have any specific
8  basis for that belief, other than just -- well, do you
9  have any specific basis for that belief?
10  A   I don't. I just assume that, you know, if we don't
11  implement the state law, then we're basically breaking
12  state law and they will come after us to implement it.
13  Q   Well, it sounded like, and tell me if I'm wrong, it
14  sounded like the biggest issue you had when your attorney
15  asked, you know, something -- I don't remember the
16  question, but your response was we would just rather not
17  have Act 372 or something like that.
18  A   Uh-huh.
19  Q   I think your reasoning for that was mostly based on
20  funding or exclusively based on funding. Could you -- is
21  that correct?
22  A   Well, I think part of it is funding, but no I mean,
23  as far as -- especially on Section 5, we don't want that
24  responsibility to be put on our backs as the judge in the
25  Quorum Court.

Page 94

1  Q   And are you aware of any other laws in which the
2  state has passed that set a requirement for counties, but
3  did not provide funding?
4          MR. MCLELLAND: Object to form.
5  A   I'm sorry?
6  Q   Are you aware of any other laws, state laws that set
7  requirements for counties?
8  A   Yeah, I'm sure there are several of them.
9  Q   Does the state provide funding for all of those laws?
10  A   No.
11  Q   And then the last thing I wanted to ask goes back to
12  kind of the open question that Mr. McLelland asked you
13  about your thoughts in general about the potential effects
14  of this lawsuit.
15  A   Yes.
16  Q   Do you have any particular concerns or is it
17  especially bothersome that, you know, two of the
18  Plaintiffs are libraries that may, you know, end up
19  cutting funding for your library from other parts of the
20  state?
21          MS. BROWNSTEIN: I object to the form. I'm
22          not quite sure I understand the question.
23  BY MR. WATSON:
24  Q   Did you understand the question?
25  A   Yes, I do I have an objection of them --

Page 95

1  Q   Particularly being other libraries?
2  A   Them being Plaintiffs and us being the Defendant and
3  having to suck money out of our county, yes, I do have a
4  complaint.
5  Q   Okay. That's all I've got.
6  A   Okay.
7          FURTHER EXAMINATION
8  BY MR. MCLELLAND:
9  Q   Just a few more. Will you flip to those infamous
10  December 19th, 2022 minutes that we've discussed all day.
11  Page 26. I'm going to be on the top line.
12  A   Okay.
13  Q   And this is Ms. Balkman speaking. At the second
14  line, it says: "If someone come and tried to sue us for
15  censorship, we would not survive it."
16      I'm going to stop there.
17  A   Okay.
18  Q   Is it your understanding reading that beginning
19  sentence, that Ms. Balkman was stating that a lawsuit
20  involving censorship would harm or would affect the
21  libraries' funding?
22  A   Yes.
23  Q   Okay. I'm going to keep reading for completion. "If
24  someone come and tried to sue us for censorship, we would
25  not survive it, so we try to walk a fine line of what the

Page 96

1  values of most of the people need and still represent
2  everyone in our community."
3      Did I read that correctly?
4  A   Yes.
5  Q   So as you read this, it's your understanding that
6  Ms. Balkman was stating that lawsuits involving censorship
7  would be detrimental to the funding of the Crawford County
8  Library System?
9  A   Yes.
10  Q   Do you remember discussing the Gentry letter, or the
11  Wahlmeier Law Firm letter, to be more formal here, with
12  Mr. Adams just a moment ago and you stated that Gentry's
13  kind of characterization of this -- of both the Social
14  Section and Act 372, was that Act 372 is going to cause,
15  quote, "more to come." Do you remember saying those
16  words; there's more to come?
17  A   Yes.
18  Q   Okay. When you say that there's more to come, what
19  do you mean by that?
20  A   Well, I meant that, you know, we've already created
21  the Social Section. It's already been created, not due to
22  Act 372, but with the implementation of 372, then that's
23  going to cause us to continue to modify things.
24  Q   So the Social Section and Act 372 are not connected?
25  A   No, sir.

Page 97

1 Q   Okay.  Do you remember discussing how Craighead
2 County and Jonesboro had decreased their millage?  Do you
3 remember discussing that with Mr. Adams?
4 A   Yes.
5 Q   Is Jonesboro a codefendant in this case?
6 A   No.
7 Q   Is Craighead County a defendant in this case?
8 A   No.
9 Q   Is Saline County a defendant in this case?
10 A   No.
11 Q   Is there any other -- Arkansas has 75 counties.  One
12 has been sued in this case.  Of the 74 remaining counties,
13 is any other a defendant in this case?
14 A   No, sir.
15       MR. MCLELLAND: I'll reserve for trial.
16    I have to say it, otherwise I'll waive it.
17       MR. ADAMS: I think that's all we have.
18       MR. MCLELLAND: We'll read and sign.
19       MR. ADAMS: Thank you very much.
20    (WHEREUPON, at 5:38 p.m., the
21    above deposition concluded.)

Page 98

1 STYLE OF CASE: Fayetteville Public Library, et al vs.
2 Crawford County, Arkansas, et al
3 WITNESS: Judge Christopher Lee Keith

5       SIGNATURE PAGE FOR WITNESS

7    I hereby certify that I have read the above and
8 foregoing transcript of my testimony, and that this
9 transcript, together with any corrections as shown on the
10 following page, is a true record of my testimony given at
11 this deposition.

13 _____   _____
14   WITNESS SIGNATURE

17    I certify that this deposition transcript was signed
18 in the presence of _____ on the
19 _____ day of _____, 2024.

22       _____
23       NOTARY PUBLIC
24 MY COMMISSION EXPIRES:
25 _____

Page 99

1       ERRATA SHEET OF JUDGE CHRISTOPHER LEE KEITH
2 PAGE #/LINE #      CORRECTION      REASON FOR CORRECTION

Page 100

1       C E R T I F I C A T E
3 STATE OF ARKANSAS }
   COUNTY OF FAULKNER}
4
   RE:  ORAL DEPOSITION OF JUDGE CHRISTOPHER LEE KEITH
5
6 I, Michelle R. Satterfield, CCR, a Notary Public in and
   for Faulkner County, Arkansas, do hereby certify that the
7 transcript of the foregoing deposition accurately reflects
   the testimony given; and that the foregoing was
   transcribed by me, or under my supervision, on my Eclipse
8 computerized transcription system from my machine
   shorthand notes taken at the time and place set out on the
   caption hereto, the witness having been duly cautioned and
   sworn, or affirmed, to tell the truth, the whole truth and
10 nothing but the truth.
   I FURTHER CERTIFY that I am neither counsel for, related
11 to, nor employed by any of the parties to the action in
   which this proceeding was taken; and, further that I am
12 not a relative or employee of any attorney or counsel
   employed by the parties hereto, nor financially
13 interested, or otherwise, in the outcome of this action.
   In accordance with the Arkansas Rules of Civil Procedure,
14 Rule 30(e), review of the foregoing transcript by the
   witness was not requested by the deponent or any party
   thereto.
15 GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 31st
   day of March 2024.

21       _____
         Michelle R. Satterfield, CCR
22       LS Certificate No. 570
         Notary Public in and for
23       Faulkner County, Arkansas

**$**

**$48,000 (1)**
35:16

**A**

**ability (1)**
82:18
**able (1)**
87:7
**above (2)**
97:21;98:7
**Absolutely (2)**
7:11;82:5
**accept (1)**
37:17
**acceptance (1)**
39:15
**accepted (2)**
27:3;68:23
**access (2)**
53:23;73:21
**accessible (3)**
55:17;62:15,21
**according (1)**
90:22
**account (1)**
62:24
**accurate (1)**
11:9
**accusations (3)**
36:4;42:19;70:2
**accuse (1)**
42:23
**Act (43)**
14:7;31:22;40:20;
43:11;45:11;50:6;
51:2,8;56:6,16;61:4;
71:15,19;73:17;75:2,6;
76:6,10,25;77:5,9,12,
14,16;80:7,16;81:15,
20;82:10,11;83:10;
87:15;89:21,25;90:5,8,
25;93:7,17;96:14,14,
22,24
**Acting (1)**
63:7
**activity (1)**
23:15
**acts (1)**
22:7
**actual (2)**
21:10,12
**Actually (2)**
83:9;84:4;88:24
**ADAMS (31)**
7:7;10:9,12,15;
14:13;21:16;31:23;
38:5,7;40:10;50:5;
53:6,11,19;54:19;
58:12,15;59:14,20;

65:9;71:6,14;72:4,7;
76:13;85:4;86:6;
96:12;97:3,17,19
**Adams' (1)**
75:21
**add (3)**
22:12;77:24;79:20
**addition (3)**
45:3;78:24;79:11
**address (2)**
46:17;64:20
**addressed (2)**
15:15;63:5
**addressing (1)**
19:1
**administrative (1)**
69:14
**administrator (2)**
9:8;32:23
**adopted (1)**
11:9
**adopting (1)**
65:5
**adult (4)**
21:20;23:2,20;51:8
**adults (4)**
21:19;22:15;58:9;
82:9
**adult's (1)**
22:22
**advisement (1)**
26:7
**advocacy (1)**
18:21
**affairs (2)**
56:9;88:21
**affect (1)**
95:20
**affected (1)**
48:1
**Affidavit (2)**
76:24;77:1
**affirmed (1)**
7:3
**afford (1)**
85:24
**afternoon (3)**
7:8,9;14:19
**again (11)**
28:25;33:3;51:4;
54:21;55:1,8;62:6;
64:12,12;72:20;87:22
**against (4)**
17:2;34:6;87:8;
88:11
**age (11)**
43:3;44:17,21;
51:17;55:17;56:17;
57:3,25;58:6;90:10,16
**agency (1)**
18:16
**agenda (1)**
16:5

**ages (1)**
55:8
**ago (3)**
18:3;89:9;96:12
**agree (6)**
17:12,15;65:11;
66:2;75:7,8
**agreed (1)**
33:18
**agreement (5)**
33:7,17;35:21,22;
76:12
**ahead (5)**
22:13;48:8;66:6;
86:21;91:5
**ahold (1)**
23:24
**aiming (1)**
16:6
**al (2)**
98:1,2
**ALA (2)**
26:14;47:15
**allow (1)**
11:25
**allowed (1)**
73:9
**Alma (3)**
26:25;36:18;47:14
**along (1)**
51:13
**alternative (1)**
16:6
**Amanda (1)**
36:18
**amend (1)**
38:16
**amended (1)**
38:22
**Amendment (2)**
63:10;66:24
**amount (1)**
46:9
**analysis (1)**
65:6
**animated (1)**
23:11
**Ann (1)**
66:16
**anticipate (1)**
8:5
**anymore (2)**
54:21;68:14
**apologize (1)**
33:3
**apparent (1)**
50:25
**apparently (3)**
34:17;63:19;81:10
**appeal (7)**
43:4;44:21;45:7,22;
47:2;74:13;79:3
**appeals (1)**

43:14
**applied (1)**
57:16
**appoint (2)**
60:18,23
**appointed (5)**
36:16;37:2;60:15;
68:23;69:19
**appointment (1)**
68:20
**approach (1)**
57:7
**appropriate (23)**
24:10;26:10;48:5;
52:3;53:8,14;54:4,9,
11,20,22,24,25;55:2,6,
6,10,11,13;57:9;64:7;
90:11,17
**appropriateness (5)**
48:3;54:2;57:16;
72:5,24
**appropriatenesses (1)**
66:1
**approval (3)**
11:4,6;42:4
**approve (1)**
92:18
**approximately (1)**
68:21
**architectural (1)**
58:7
**area (11)**
31:9;36:19;43:3;
44:16,20;51:17;57:24;
61:7;73:21;90:9,15
**areas (2)**
32:3;58:5
**Arkansas (6)**
40:22;48:13;53:21;
88:5;97:11;98:2
**around (4)**
33:3;56:9,13;88:22
**aside (1)**
24:22
**aspect (1)**
59:5
**Assembly (2)**
12:8;40:22
**assigned (1)**
91:22
**assume (6)**
15:4,11;51:4;52:7;
80:8;93:10
**assumed (1)**
27:24
**assumes (1)**
80:20
**assuming (4)**
44:4,7,18;65:19
**assumption (4)**
52:10;62:6;85:11;
88:19
**assumptions (1)**

52:15
**attached (2)**
10:14;38:6
**attend (1)**
10:6
**attendance (1)**
11:13
**attended (1)**
56:12
**attorney (6)**
33:8;62:8;65:5;
76:17;86:2;93:14
**attorneys (3)**
75:17;76:24;88:12
**attorneys' (3)**
82:18,20;83:3
**Atwell (1)**
11:23
**authorities (1)**
35:2
**authority (3)**
25:16,19,22
**authorization (1)**
66:10
**available (4)**
48:3;56:8;57:10;
72:17
**avid (3)**
69:17,21,23
**avoid (3)**
35:17;67:6;84:10
**aware (21)**
16:17;42:10;54:9;
62:23;71:11;76:4,15,
16,22,23;78:12,18;
81:9,15;82:16,17;
91:21;92:1,4;94:1,6
**away (3)**
23:23;65:2;86:25

**B**

**back (12)**
28:3;39:8;47:21,24;
53:17;59:25;62:17;
64:11;71:5;75:20;
84:4;94:11
**background (2)**
7:13;29:17
**backs (1)**
93:24
**bad (1)**
8:3
**bag (1)**
19:3
**balancing (1)**
63:9;89:20
**Balkman (9)**
30:18;66:16;83:16;
84:19;86:9,22;95:13,
19;96:6
**ballot (1)**
86:18

**banned (1)**
20:20
**base (1)**
80:1
**based (13)**
17:2,19;23:17;31:5;
51:22;52:17;74:16,18;
76:5;79:12;90:10;
93:19,20
**baseline (3)**
79:22,23;80:3
**basically (1)**
93:11
**basis (7)**
73:8,17,23;74:17;
89:7;93:8,9
**became (2)**
24:1;92:3
**beginning (3)**
70:18;75:20;95:18
**behalf (2)**
60:8;76:24
**behavior (1)**
16:24
**behest (1)**
83:16
**behind (1)**
57:2
**belief (2)**
93:8,9
**beliefs (1)**
17:2
**bell (1)**
13:21
**belong (1)**
86:16
**benefit (1)**
38:19
**benefits (1)**
82:12
**Bentley (1)**
41:6
**besides (4)**
7:18;12:9;29:4;
79:21
**best (4)**
15:2,25;18:15;49:22
**better (3)**
34:13;52:11,16
**beyond (6)**
14:7;31:21;48:20;
79:17,23;80:3
**Bi (1)**
79:22
**Big (3)**
13:18;40:12;64:21
**biggest (1)**
93:14
**bill (1)**
81:16
**Binary (5)**
13:19;40:12;64:22
**bit (4)**

7:12,23;16:3;39:9
**bladders (1)**
8:18
**Blue (1)**
13:17
**Board (40)**
26:5;28:24;29:2;
30:9,14;32:20;33:8,10,
22,22,24;35:10;36:8,
17;37:3,6,7,9,10,12;
41:9;48:20;60:16,19,
23,24;62:10;64:17,18,
18,19;65:20;66:18,20;
67:5,18;68:20,23;
70:12;84:9
**Board's (2)**
24:5;25:12
**Bobby (1)**
50:19
**Bobby's (8)**
13:18;14:14;15:6;
39:25;50:20;53:10,12;
64:22
**body (4)**
43:5,21;44:25;45:19
**Book (54)**
13:18,20;14:14,20,
23;15:1,11;18:12,12,
19;39:22;40:13;42:3;
43:2,2,4,25;44:3;
45:12,16,16,25;46:11;
47:1,2;48:5;49:2,19,
20;50:8,13,16,20;51:1,
3,6,13;52:3;53:8;54:4,
20;55:13;56:14,23;
57:2,9,10;61:6;64:21;
71:12;72:23;73:19,19;
80:12
**books (54)**
12:20;13:4,9,11,25;
16:23;19:1,2,3,7,9,23;
20:20;21:6;25:9;
39:10,13,14,19;40:8,
15;48:15;52:13;56:3,5,
6;63:21;64:4,5,17,20,
24;65:1,6,21,25;66:2;
67:3,4,24,24;68:2,10;
70:4,8;76:1,5;84:7,8;
89:17;90:8,15,17,20
**both (2)**
83:8;96:13
**bothersome (1)**
94:17
**bottom (3)**
34:16;66:15;84:6
**Branch (2)**
14:3;63:8
**branches (1)**
62:20
**break (9)**
8:15,21;25:25;40:5,
7,11;49:20;58:11;
75:10

**breaking (2)**
87:19;93:11
**breaks (1)**
8:13
**Brian (3)**
63:6;87:25;88:10
**Brief (3)**
40:9;59:19;75:12
**bring (4)**
9:13;43:24;44:2;
92:19
**broad (1)**
31:6
**brought (6)**
10:4;12:22;40:8;
67:3;84:7;87:8
**BROWNSTEIN (9)**
50:2;53:18;58:14;
73:12,22;80:20,24;
81:3;94:21
**budget (3)**
26:8;46:23;84:3
**budgetary (1)**
62:18
**buildings (1)**
9:10
**Buren (8)**
14:2,15;16:5;21:13;
22:24;27:23;30:9;51:7
**business (6)**
29:18,19,20,21;
32:21;69:14
**busy (1)**
46:20
**Butterfield (1)**
12:8
**Bye (6)**
13:19,19;40:12,12;
64:22,22

## C

**c11A (1)**
43:19
**c11B (2)**
43:20;44:25
**c12 (5)**
43:15;45:8,21;79:3,
22
**c12B (1)**
45:5
**c12Bi (3)**
78:25;79:8,18
**c5 (1)**
43:18
**c6A (1)**
73:5
**Cain (3)**
63:5;87:25;88:10
**call (1)**
79:22
**called (2)**
26:15;30:3

**Calls (4)**
21:14;55:2;56:1;
70:13
**came (5)**
33:17;34:7;39:24;
51:12;57:22
**campaign (1)**
60:10
**campaigning (1)**
31:12
**can (32)**
8:3,20;9:11,13;10:9;
14:18;15:2,25;19:9;
21:25;22:4,12;24:14;
25:25;35:19;43:4,12;
50:14;51:6;52:23;
56:6,9,13;57:21;58:11;
67:2,21;68:25;79:10,
11;88:16;91:5
**candidate (1)**
32:20
**card (3)**
34:21;70:21;81:22
**cards (1)**
34:19
**careful (3)**
67:7,11;84:11
**case (31)**
7:16,17;10:17;14:5;
24:11;28:1;43:8;
51:13;52:2;58:17,21;
76:22,23;77:14;78:7,
10,13,19;82:17,17,21;
85:21;87:17;88:5;
90:8;97:5,7,9,12,13;
98:1
**cases (1)**
64:2
**catching (1)**
30:19
**caucus (1)**
59:16
**cause (2)**
96:14,23
**cautioned (1)**
7:3
**caveat (1)**
71:22
**Cedarville (1)**
36:19
**cell (1)**
28:17
**cellphone (2)**
28:17,18
**censorship (9)**
67:6,12,17;83:19;
84:10;95:15,20,24;
96:6
**certain (13)**
9:15;26:11,22;32:2;
39:12;42:2,16;49:16;
64:23;86:16;90:8;
92:17,24

**certainly (1)**
70:15
**certify (2)**
98:7,17
**chair (1)**
67:18
**Chairman (6)**
25:20;33:9,10,22,24;
36:8
**chairperson (1)**
66:19
**challenge (10)**
14:6;43:2;44:1,3,7;
47:23;48:3;56:23;
57:18;58:8
**challenged (9)**
42:3;43:4,17;44:9,
11;48:1;51:1;73:6;
74:7
**challenger (1)**
44:13
**challenges (5)**
45:12;51:2;72:23;
80:12;90:9
**challenging (1)**
62:16
**chance (2)**
40:12;92:19
**chances (1)**
50:10
**change (3)**
26:6;38:17;74:21
**changed (1)**
39:1
**changes (1)**
72:10
**changing (1)**
90:1
**characterization (3)**
72:22;91:5;96:13
**charged (1)**
66:24
**Charlene (2)**
18:9;37:16
**check (2)**
19:10;35:16
**checked (1)**
13:9,10
**checkout (1)**
19:9
**chief (4)**
9:16;49:8,12;58:19
**child (11)**
18:12,13,14,17,19,
19;24:9,15;55:25,25;
66:22
**children (16)**
16:7,23;20:9;21:18;
23:24;42:2,5;53:8;56:2;
63:11,22;64:25,25;
65:1;82:8;84:25;89:9
**children's (13)**
19:7,11;22:24;

23:19,24;27:11,22;
51:15,16;63:16;65:7;
90:19,21
**child's (1)**
18:15
**chime (2)**
49:6;59:15
**chip (1)**
83:3
**choice (2)**
77:15,16
**chose (3)**
77:14,16;78:2
**Chris (1)**
10:24
**Christian (2)**
19:4,4
**CHRISTOPHER (2)**
7:1;98:3
**church (4)**
12:6,7;28:7;29:13
**circulation (2)**
13:11;73:20
**citizen (2)**
18:11;60:6
**citizens (5)**
61:16;64:16;82:1;
91:6,7
**City (7)**
31:1;43:16,21;45:6,
20;60:8;79:1
**civil (1)**
88:4
**claim (1)**
27:10
**claims (2)**
27:17,21
**clarify (1)**
77:12
**clerk (1)**
39:4
**client (1)**
14:1
**close (1)**
28:14
**closing (1)**
87:2
**closure (1)**
86:11
**codefendant (1)**
97:5
**coerce (1)**
85:12
**coin (2)**
52:12,16
**collection (2)**
48:6,16
**colorful (1)**
16:23
**coming (3)**
32:13;87:20;89:20
**comment (3)**
53:17;60:7;87:13

**comments (2)**
60:3;71:19
**COMMISSION (1)**
98:24
**committee (12)**
43:1,14,25;44:20;
45:2;51:5;72:25;73:5,
8,18,18;74:6
**committee's (3)**
43:18,22;44:15
**commonsense (1)**
50:24
**communications (1)**
41:12
**community (7)**
32:22;39:21;66:25;
67:14;82:3;83:22;96:2
**compelled (1)**
50:11
**competing (1)**
75:1
**Complaint (5)**
88:4,8,18,22;95:4
**complete (3)**
67:23;68:1;80:21
**completion (1)**
95:23
**complicated (1)**
64:3
**compromise (24)**
19:15;20:6,7,8,12,
21;21:7;23:20,22,23;
24:24;25:1,2;34:7;
67:2,16,20,23;80:19;
81:5,19,20;86:23;
91:11
**compromised (1)**
21:2
**concern (4)**
26:21;64:20;82:10,
11
**concerned (1)**
16:4
**concerns (3)**
32:25;84:3;94:16
**concluded (1)**
97:21
**conclusion (2)**
80:21
**confirm (1)**
38:10
**confront (1)**
36:6
**confronted (1)**
36:4
**confused (2)**
23:5,17
**connected (5)**
26:23;90:25;91:7,
13;96:24
**consent (1)**
16:25
**conservative (2)**

86:17;92:17
**consider (3)**
18:19;19:4;55:6
**consideration (2)**
52:20,23
**considered (1)**
14:9
**consistent (1)**
25:17
**constant (1)**
80:13
**constituent (4)**
29:3;60:21;61:8,12
**constituents (8)**
25:2;36:22,24;
60:22;61:15;69:6,12;
86:17
**constituents' (2)**
25:18;61:19
**Constitution (1)**
24:23
**constitutional (2)**
16:9;21:22
**construction (1)**
62:24
**consulted (2)**
37:5;85:6
**contact (1)**
29:23
**contacted (1)**
30:2
**contains (1)**
88:4
**content (4)**
12:23,24;13:1;42:16
**contention (1)**
81:3
**contest (1)**
8:18
**context (1)**
53:24
**continue (5)**
14:12;90:1,6;91:16;
96:23
**continued (1)**
91:17
**controversies (1)**
10:2
**controversy (2)**
9:22;10:3
**conversation (7)**
27:12;30:6;32:8;
66:8;72:4;75:21;89:21
**conversational (1)**
8:11
**convince (1)**
18:14
**copy (2)**
40:20;44:10
**core (1)**
63:12
**corners (1)**
14:7

**corrected (1)**
26:16
**corrections (1)**
98:9
**correctly (5)**
43:13;71:11;72:18;
83:23;96:3
**cost (5)**
58:18;62:19;84:21,
22,23
**costs (1)**
87:1
**council (1)**
26:1
**counties (4)**
94:2,7;97:11,12
**country (1)**
39:4
**County (89)**
8:25;9:7,8,9,9,10,12,
16;10:16,24;11:15;
14:1;15:16,16,17;
18:25;24:1;25:3,23;
26:9;29:3;31:5,12;
38:15,18;39:1,3;41:20;
42:20;43:5,8,16,21;
45:6,20;48:2,4,19;
49:9,12;58:20;60:16,
19;61:17;62:8,10;
63:8;64:14,17,23;65:5;
67:10;68:22;70:19;
72:14;75:22;76:25;
77:5,8,14,15;78:9,13;
79:1;80:15,16;81:23;
82:2,22;85:19,22;86:7;
87:14;88:11;89:1,3,4,
7;90:24;91:6,22;92:16,
17;95:3;96:7;97:2,7,9;
98:2
**county's (1)**
85:24
**couple (4)**
51:24;71:2,24;75:15
**couples (1)**
40:3
**course (3)**
42:13;56:9;88:21
**Court (57)**
8:1;9:13;10:5,17;
11:9;15:15,25;20:1;
25:15,19,20,21;26:8;
29:6;32:14;38:9;42:5;
44:4,6;45:13,25;46:10,
13,20;47:1,6;48:18,21;
49:22;52:2,13,14,18;
53:1,3,22;54:12;56:20,
22;61:6,11;68:3,13,14;
74:14,17,20;75:22;
81:11;83:13;84:1;
85:1,2;87:23;89:12,15;
93:25
**Court's (1)**
46:25

**Craighead (3)**
91:21;97:1,7
**Crawford (38)**
8:25;13:25;18:25;
25:23;26:9;38:15;
41:19;42:20;43:8;
58:20;60:15,19;61:17;
62:10;64:14,16,23;
70:19;75:22;76:25;
77:5,8,14,15;78:9,13;
80:15,16;85:19,22;
86:7;87:14;88:11;
90:24;91:6;92:16;
96:7;98:2
**crazy (1)**
51:3
**create (7)**
20:10;58:5,24;
62:15,16,20;91:2
**created (10)**
20:4;39:9,12,13;
80:18;81:7,9;89:5;
96:20,21
**creating (1)**
57:24
**creation (6)**
20:2;56:16;75:25;
90:4,14,25
**credible (1)**
27:21
**credit (2)**
34:19,21
**crime (1)**
34:25
**criminal (1)**
42:10
**criminally (2)**
42:1,14
**criteria (9)**
18:11;67:4;73:7,9,
25;74:8,19;80:6;84:8
**critical (1)**
39:16
**cup (1)**
49:24
**current (3)**
8:24;39:10;41:9;
70:3
**currently (1)**
13:25
**cut (2)**
26:8,10
**cutting (1)**
94:19

# D

**Dan (1)**
41:1
**dated (1)**
87:24
**day (5)**
52:15;63:4;88:19;

95:10;98:19

**days (5)**
30:22;33:2;43:22;
45:22;46:9

**deal (4)**
32:22;34:13;59:12;
69:3

**dealing (1)**
32:25

**dealt (1)**
76:13

**December (29)**
10:4,4,18;11:1,7,10;
12:22;15:24;17:23;
19:14;23:1;27:13,15;
29:5;30:10,13;51:22;
59:25;64:11;66:8,13;
71:7;81:10,14,19;84:1;
91:10;92:1;95:10

**decide (3)**
9:19;49:4;52:3

**decided (3)**
68:24,25;69:6

**decides (2)**
44:20;47:1

**deciding (1)**
90:17

**decision (21)**
43:14,19,22,25;44:2,
6,15,16;45:1,22;46:1,
25;51:12;52:21;55:4;
57:1;61:5,10;62:3;
73:9;76:10

**decisions (4)**
9:12,15,20;56:4

**decreased (1)**
97:2

**dedicated (1)**
38:1

**Defendant (6)**
78:10;85:21;95:2;
97:7,9,13

**define (1)**
22:5

**defined (1)**
54:25

**definition (5)**
22:2,6;54:7,8,9

**Deidre (15)**
17:11;18:24;19:6;
20:5;33:5;63:19,21;
65:22,25;66:7;70:8;
76:2,13;80:18;81:8

**Deidre's (1)**
76:16

**delegated (1)**
9:16

**demand (1)**
89:2

**denies (1)**
43:1

**dental (1)**
38:19

**department (1)**
9:9

**departments (1)**
67:9

**depends (1)**
54:6

**deposing (1)**
75:4

**deposition (7)**
7:14;20:23;40:19;
57:21;97:21;98:11,17

**depositions (1)**
7:18

**describe (1)**
54:6

**described (3)**
20:6;73:20;82:12

**describing (2)**
67:20,23

**description (4)**
11:9;22:8;71:12;
87:1

**designation (1)**
31:6

**desk (1)**
57:2

**detail (1)**
42:7

**details (1)**
36:14

**determination (2)**
42:5;73:1

**determinations (1)**
76:5

**determine (3)**
53:2;66:22;73:6

**detrimental (1)**
96:7

**development (1)**
82:7

**differ' (1)**
63:13

**difference (5)**
18:20,21;55:9,19,20

**different (17)**
18:17;19:15;20:13;
21:8;23:7;30:19;48:9,
9;51:24;54:3,23;63:4;
67:22;68:24;69:7;
72:7;74:22

**difficult (3)**
22:5;67:5;84:9

**difficulty (1)**
63:9

**directed (4)**
19:20;39:13;66:8,10

**director (20)**
17:7,10;18:25;25:8,
11;33:6,12;35:9;37:5,
14,15,15,16;38:15;
50:23;62:11;64:1;
65:18,23;76:2

**directors (1)**

42:1

**disagree (3)**
50:15;65:10,11

**disagreed (1)**
12:20

**discovered (1)**
27:1

**discovery (1)**
10:17

**discrepancies (2)**
34:4,17

**discretion (5)**
20:19;21:20;22:14,
22;49:3

**discretionary (1)**
9:12

**discriminates (1)**
17:1

**discriminating (1)**
87:7

**discussed (2)**
74:16;95:10

**discussing (7)**
53:20;76:12;84:25;
85:4;96:10;97:1,3

**discussion (6)**
11:20;17:24;38:23;
46:16;50:4;71:6

**discussions (1)**
42:13

**dispute (1)**
24:25

**dissatisfaction (1)**
33:21

**dissatisfied (1)**
33:25

**distinction (2)**
24:7,18

**District (2)**
14:11;88:5

**dive (1)**
8:23

**doctor (1)**
12:6

**document (2)**
35:6;38:3

**documents (1)**
36:13

**dollars (1)**
85:24

**done (7)**
8:14;19:16;42:20;
49:17;69:1;85:15;89:8

**door (1)**
47:16

**doors (4)**
26:25;27:3;47:16,18

**down (12)**
8:6,9;13:16;16:8;
18:8,24;48:22,24;
64:12,19;86:14;89:25

**Dr (9)**
11:24;12:1,9;15:3,8,

15;28:4;67:1;68:8

**draft (4)**
88:4,7,18,22

**Drag (1)**
13:17

**draw (1)**
24:18

**driven (1)**
17:7

**driving (1)**
17:13

**due (1)**
96:21

**during (3)**
27:1;57:22;60:10

**duties (1)**
9:6

## E

**earlier (10)**
20:18,22,23;30:12;
39:25;49:11;53:20;
61:25;76:13;92:7

**early (2)**
81:19;92:6

**ease (1)**
10:9

**easy (1)**
46:7

**economic (1)**
82:7

**education (1)**
16:6

**effect (12)**
45:11;47:23;50:7;
51:2,8;56:6;61:4;
77:13,14;78:24;89:22,
22

**effects (1)**
94:13

**either (5)**
54:9;60:12;62:2;
82:22;88:20

**Elders (3)**
12:14;31:1;60:8

**Elect (3)**
11:15;15:16,17

**elected (8)**
9:1,2;18:10;49:8,12;
81:23,25;82:1

**election (1)**
91:23

**electric (2)**
26:25;47:18

**eleven-year-old (1)**
56:13

**else (7)**
17:22;29:24;30:1;
36:11;37:6;42:23;
85:13

**else's (1)**
65:1

**email (4)**
87:24,25;88:4,16

**emailed (1)**
41:16

**emergency (1)**
26:15

**employed (1)**
64:23

**employee (1)**
48:2

**employees (1)**
17:8

**end (7)**
10:22;46:23;52:14;
62:14;81:14;89:25;
94:18

**enforce (1)**
87:20

**enforcement (1)**
18:16

**enough (9)**
14:20;25:7;39:7;
50:1;52:11;55:7;
85:11,12;89:19

**entirely (1)**
80:21

**entirety (1)**
45:25

**entity (2)**
66:20;87:18

**equally (1)**
53:23

**equating (2)**
16:11,23

**especially (3)**
80:11;93:23;94:17

**essentially (3)**
33:20;45:13,16;
52:12;74:21

**establish (1)**
72:15

**established (3)**
73:5,10;74:8

**et (2)**
98:1,2

**etiology (1)**
17:14

**Eva (7)**
20:23;21:5;37:16;
40:19;57:20;62:11;
92:7

**even (5)**
19:19;46:6;77:15;
81:16;91:10

**eventually (1)**
72:24

**everybody's (1)**
50:24

**everyone (4)**
66:25;67:14;83:21;
96:2

**evidence (5)**
35:4;36:4;53:2;

80:22;81:1
**exact (1)**
19:5
**exactly (3)**
77:21;78:17;87:18
**EXAMINATION (6)**
7:6;70:25;75:13;
86:5;93:4;95:7
**example (4)**
31:13;39:24;69:13;
70:3
**examples (1)**
90:20
**exclusively (1)**
93:20
**executive (9)**
9:8;16;43:5,9,15;
45:5;49:8,12;79:1
**exercise (2)**
25:17,22
**exhibit (13)**
10:10,13,14,16;
15:14;38:6;40:19;
60:1;62:7;71:15,24;
78:21;87:22
**expect (3)**
46:9;49:15,16
**expenses (2)**
34:22;86:11
**expensive (2)**
58:3,18
**experience (1)**
82:8
**EXPIRES (1)**
98:24
**explain (4)**
33:24;49:21;68:25;
90:6
**explanation (1)**
89:7
**explicitly (1)**
49:5
**exposed (1)**
65:1
**exposes (1)**
63:12
**Exposing (1)**
16:22
**exposure (2)**
63:11;89:10
**expresses (1)**
25:22
**expressing (1)**
23:18
**extend (2)**
37:8,13
**extent (3)**
21:24;24:13;48:7
**extra (1)**
62:24

**F**

**faced (2)**
56:20;61:4
**facial (1)**
14:6
**fact (3)**
35:18;58:18,20
**factions (1)**
75:1
**factor (1)**
76:10
**factual (1)**
74:25
**fair (13)**
9:11;25:7;39:7;50:1;
52:11;55:7;70:6;
81:13,18;85:22,25;
89:19;91:1
**familiar (1)**
19:12;88:7
**families (2)**
19:8;69:18
**family (1)**
16:13
**famously (1)**
22:5
**far (10)**
32:22,24;34:4;
39:21;46:24;68:3,4;
79:14,15;93:23
**farther (2)**
16:8;18:24
**fast (1)**
46:12
**favor (4)**
39:15,23;68:1,10
**Fayetteville (2)**
41:19;98:1
**February (1)**
38:8
**feel (7)**
15:9;52:25;69:5,11,
13;85:19,19
**fees (5)**
82:18,20;83:3;
85:22;86:2
**felt (2)**
32:23;50:11
**few (7)**
7:24;59:15;65:17;
66:12;79:12;81:12;
95:9
**fiction (1)**
18:20
**fifteen (1)**
43:22
**fifth (1)**
16:22
**fighting (1)**
34:13
**figure (1)**
57:7
**figured (1)**
69:14

**file (1)**
88:10
**filed (6)**
76:23,24;88:13,15,
20,24
**filling (1)**
30:9
**final (2)**
46:25;64:21
**finally (1)**
8:13
**finances (2)**
58:20;82:16
**financial (1)**
34:16
**Financially (1)**
82:15
**find (4)**
27:21,23;35:6;40:15
**fine (6)**
8:15;33:4;51:5;
67:13;83:20;95:25
**fire (1)**
25:11
**firing (1)**
9:20
**Firm (1)**
96:11
**first (13)**
7:21;11:22;30:22;
33:2;38:20;63:10;
66:24;71:5,17;79:12;
81:12,14;88:3
**fiscal (1)**
58:25
**fit (2)**
48:19;56:22
**Fite (2)**
18:2,9
**five (4)**
14:21;30:13;59:17;
66:19
**Flags (3)**
13:18;40:13;64:22
**flip (6)**
14:15;52:12,16;
83:7,13;95:9
**flippant (1)**
59:9
**floor (1)**
58:3
**flush (1)**
52:23
**focus (2)**
66:12;72:5
**folks (2)**
37:3;59:15
**follow (3)**
47:24;67:4;84:8
**following (3)**
17:5;71:2;98:10
**follows (1)**
7:5

**follow-up (1)**
75:15
**follow-ups (1)**
59:22
**forefront (1)**
89:20
**foregoing (1)**
98:8
**form (23)**
15:10;48:17;50:22;
51:19;52:5,19;53:5;
54:17;61:9,22;63:24;
65:8;66:4,5;73:12,22;
77:10,18;82:14;90:18;
91:4;94:4,21
**formal (1)**
96:11
**formed (1)**
46:10
**Fort (1)**
31:9
**forth (4)**
9:10;47:2,22;79:8
**Forty (1)**
34:11
**forum (8)**
31:15,19,25;32:1,8,
10,15;60:12
**forwarded (1)**
15:21
**found (4)**
14:2;17:19;67:2;
90:21
**Four (3)**
9:5;14:7;64:16
**frankly (1)**
54:14
**freedom (1)**
63:10
**friends (1)**
28:14
**front (1)**
14:11
**fund (9)**
37:22;38:17,18,18,
20;39:2,2,5;82:24
**funding (15)**
25:13,16,22;34:20;
62:24;67:10;87:3;
93:20,20,22;94:3,9,19;
95:21;96:7
**funds (1)**
26:11
**further (4)**
24:2;86:5;93:4;95:7
**future (1)**
82:7

**G**

**gas (1)**
34:24
**gave (1)**

18:12
**gay (2)**
40:2;50:17
**general (12)**
7:12;27:18;29:9;
33:15;38:18;39:2;
40:22;55:22;73:19;
82:23;86:8;94:13
**generally (3)**
39:19;40:2;56:8
**gentleman (2)**
15:9;32:11
**gentlemen (1)**
15:7
**Gentry (7)**
63:5;65:3;83:7;
84:24;85:2,6;96:10
**Gentry's (2)**
89:6;96:12
**geographic (1)**
31:6
**gets (2)**
51:17;61:6
**given (3)**
17:1;34:17;98:10
**gives (2)**
18:18;49:5
**giving (5)**
42:2,16,23;71:20;
83:25
**glass (1)**
8:16
**God (3)**
17:1;19:3;68:12
**goes (12)**
9:19;47:22;50:6;
51:2,8;56:6;61:4;
62:17;63:18;72:24;
77:14;94:11
**Gonzalez (1)**
41:3
**Good (12)**
7:8,9;24:24;25:1;
32:20,23;36:2;46:5;
59:16;70:12;82:4,8
**governing (4)**
43:5;21;44:25;45:19
**grandmother (1)**
18:10
**grant (6)**
26:14,20,23,24;27:3;
47:15
**great (1)**
82:7
**greater (1)**
63:9
**grief (1)**
30:19
**groomed (1)**
18:17
**grooming (2)**
18:13,19
**grounds (1)**

34:5
**group (2)**
31:1;60:10
**Grzymala (16)**
17:11,13;18:24;
19:6;20:5;33:5;35:4,
11;36:3;65:22;70:8;
74:25;76:2;80:18;
81:4,8
**Grzymala's (3)**
33:25;37:19;38:19
**guess (19)**
10:13,22;11:17;
12:9;14:18;23:5,17;
29:13;30:12;32:10;
44:19;47:9;52:8;55:7,
23;56:4;57:6;60:22;
91:14
**guidelines (1)**
72:16

### H

**habit (1)**
8:10
**habits (1)**
29:9
**half (1)**
18:3
**Hamby (21)**
11:24;12:1,9;15:3,4,
8,9,15,15;28:4;29:4,
21;32:19;33:11,24;
36:9,13;67:1;68:8;
69:23;70:2
**Hambys (3)**
17:12;28:3;60:12
**Hambys' (1)**
16:14
**handful (1)**
59:21
**happen (6)**
44:13;47:22;77:8,
17;86:22;92:13
**happened (7)**
11:10;26:3,15,18;
51:3;64:10;74:21
**happening (3)**
23:18;92:8,10
**hard (1)**
46:21
**harm (5)**
63:12,15,22;89:10;
95:20
**harmful (2)**
70:4,9
**harmful-to-minors (1)**
42:23
**hate (1)**
16:2
**head (9)**
34:12;43:5,9,15;
45:5;48:18;69:10;

79:1;88:2
**headache (1)**
80:12
**heads (1)**
8:10
**health (1)**
38:19
**hear (5)**
21:5;31:24;42:19,
22;92:7
**heard (10)**
20:19,20;30:12;
42:14;56:7;57:20;
81:17;89:11;91:24,25
**help (2)**
35:19;38:3
**helped (1)**
91:2
**helpful (1)**
8:2
**helps (3)**
8:5,8;70:15
**hereby (1)**
98:7
**hereinbefore (1)**
7:2
**hereto (2)**
10:14;38:6
**herself (1)**
20:10
**heterosexual (2)**
16:12,25
**highly (2)**
85:8,9
**hiring (1)**
9:19
**Historically (1)**
70:18
**hobbies (1)**
29:9
**hold (1)**
42:1
**Holmes (1)**
14:11
**home (1)**
24:15
**homosexual (3)**
12:23;16:12,24
**homosexuality (1)**
19:21
**honest (2)**
59:8,11
**honestly (2)**
59:4;80:8
**Hopefully (1)**
71:3
**hopes (1)**
86:23
**human (1)**
58:7
**hurrying (1)**
8:4
**husband (1)**

29:14
**hypothetical (1)**
51:4

### I

**ideology (2)**
16:11;17:7
**impact (1)**
58:25
**impermissible (1)**
14:8
**implement (11)**
76:25;77:5,9,16,22;
78:2;80:16;87:15;
93:7,11,12
**implementation (2)**
90:25;96:22
**implementing (1)**
75:23
**impression (6)**
27:18;33:16;41:18,
21,22;91:2
**inaccessible (11)**
43:3;44:17,20;
51:17;56:17;57:3,25;
58:6;89:24;90:10,15
**inappropriate (4)**
48:6;52:4;53:15;
90:21
**include (5)**
45:6;79:2,10,11,17
**includes (2)**
79:8;89:8
**increase (4)**
67:8;84:12,17;86:19
**incumbent (1)**
37:6
**independent (2)**
14:10;66:1
**indicate (2)**
11:8;33:21
**individually (1)**
76:20
**infamous (1)**
95:9
**information (11)**
18:21;26:20;45:4,
20,23;78:24;79:11,12,
17,21,24
**informed (1)**
46:10
**infringe (1)**
82:12
**infringed (1)**
16:10
**innocence (8)**
63:12,16,22;65:2;
70:4,9;84:25;89:11
**instead (3)**
21:8;34:8;51:7
**intact (1)**
92:23

**interest (2)**
18:15;29:23
**interested (2)**
30:4,8
**interpretation (3)**
67:22;72:8,9
**into (21)**
8:18;27:22;33:13;
34:3;42:6;44:22;
45:11;47:23;50:7;
51:2,8;52:20,22;56:6;
61:4;70:17;77:13,14;
78:24;80:2;89:22
**introduce (1)**
10:12
**inventory (1)**
9:10
**investigate (1)**
24:1
**investigated (1)**
42:15
**investigation (1)**
42:10
**invited (2)**
32:10;60:9
**involve (1)**
21:22
**involved (2)**
57:24;89:9
**involving (2)**
95:20;96:6
**issue (9)**
13:12;14:10;16:8;
20:25;26:19;45:13;
46:17;65:16;93:14
**issues (2)**
74:25;75:5
**Item (2)**
38:13;60:3

### J

**Jami (1)**
66:16
**January (9)**
9:2,24;11:1,6;36:17;
81:11,12,14,19
**Jason (1)**
41:10
**job (4)**
8:24;35:11,20,24
**John (5)**
32:11;60:3;64:14;
85:1;89:13
**Johnson (4)**
67:1;68:9,11;83:17
**Jonesboro (4)**
91:21,24;97:2,5
**Journal (3)**
10:18;11:5;38:9
**JPs' (1)**
51:25
**JUDGE (26)**

7:1,8;8:25;9:7;
10:24;11:12,15;14:11;
15:16,16,17;24:1;
31:12;40:11,18;50:6;
59:21;68:22;71:17;
75:15;81:23,25;85:13;
93:2,24;98:3
**judgment (7)**
46:11;55:1,13,16,23;
56:1;66:1
**jumping (1)**
33:3
**June (3)**
9:2,23,24
**Justice (14)**
11:23,23;38:16,21,
21;67:1;68:9,11;
83:16;86:15,24;87:5,9,
11

### K

**Kaelin (3)**
36:18,21
**keep (1)**
95:23
**KEITH (10)**
7:1,8;10:24;40:11,
18;59:21;71:17;75:15;
85:13;98:3
**kids (2)**
51:10;64:8
**kid's (3)**
14:20;51:6,7
**kind (12)**
7:16;8:23;39:10;
47:21;75:20;80:3;
81:12;83:11,15;92:13;
94:12;96:13
**knew (10)**
10:3;19:14;28:7;
29:9;32:12,21;69:18,
25;73:15;92:6
**knowledge (11)**
12:13,15;33:1;35:7;
47:7,8;65:13,14;69:22;
80:15;88:17
**known (4)**
12:3;28:4,9,14

### L

**language (3)**
89:8,11,16
**lap (1)**
30:23
**last (7)**
16:2;36:19;51:6;
66:19;74:24;88:14;
94:11
**late (1)**
81:19
**later (2)**

73:20;92:5
**latter (1)**
20:22
**law (12)**
18:16;44:23;47:22;
57:6;59:1;77:11;
78:23;80:10;87:19;
93:11,12;96:11
**laws (4)**
94:1,6,6,9
**lawsuit (12)**
24:23;25:6;41:18;
51:2;58:24;72:7;
88:10,12,13;91:8;
94:14;95:19
**lawsuits (2)**
93:1;96:6
**lawyer (2)**
71:17;91:15
**lawyers (1)**
88:7
**lead (1)**
86:11
**leadership (1)**
31:3
**leading (3)**
86:8;87:1,2
**learn (5)**
9:22;10:2;36:7,11;
47:17
**learned (1)**
47:18
**learning (1)**
82:8
**least (3)**
64:2;65:24;88:18
**leave (1)**
33:20;34:8;36:1
**leaving (2)**
34:14;67:24
**led (1)**
27:10
**LEE (2)**
7:1;98:3
**left (3)**
33:6;35:12;40:21
**legal (6)**
21:25;22:2;34:6;
71:20;85:22;89:7
**legalities (1)**
34:9
**legality (1)**
24:22
**Legally (1)**
66:21
**legislative (1)**
63:8
**legislature (2)**
48:13;89:22
**lend (1)**
24:11
**length (1)**
46:6

**less (4)**
14:21;33:13;73:2;
92:13
**letter (17)**
15:14,20;16:4,21;
29:5;62:8,9,12;63:4;
70:2;83:7;84:24;85:3,
7;91:1;96:10,11
**level (1)**
89:21
**LGB (1)**
19:8
**LGBT (1)**
19:7
**LGBTQ (5)**
39:13,15,16,20;66:9
**liberties (2)**
16:10;17:6
**librarians (1)**
58:17
**librarian's (1)**
51:14
**libraries (12)**
22:17;33:6;47:12;
48:12;57:24;58:3;
74:9;87:3;89:23;
91:23;94:18;95:1
**libraries' (1)**
95:21
**library (135)**
9:22;10:2;11:20;
12:21;14:15;16:6;
17:7,10;18:18,25;
21:10,13;22:24;23:19,
21;24:5;25:8,9,11,12,
14;26:5,9,25;27:23;
28:24;29:2;32:6,20;
33:13;35:5,9,10,19;
36:8,17;37:1,5,7,14,15,
21,22;38:1,15,18,20;
39:2,5,24;41:9,19;
43:1;44:19;45:2;47:4,
7,10,14;48:2,4,20;
51:5,7;52:1;55:24;
56:4,5,7,14,17;60:7,16,
19;61:20;62:10,18,20;
64:17,18,19,24;65:18,
20,20;66:18,20,23;
67:7;68:20,23;69:9,17,
18,20,21,24;70:3,11,
12,19;71:6,9;72:15,24;
73:10,18;74:5;75:23;
76:2;77:24;78:1,6,9,
12,15,18;81:22;82:3,
13,24,25;83:2,11;
84:11,16;86:12;87:2;
90:1,9,14;92:22;94:19;
96:8;98:1
**library's (2)**
48:6,16
**lifestyles (2)**
16:6,12
**likely (2)**

27:22;92:13
**Line (15)**
43:12;47:25;67:13;
72:5,14,21,22;73:4,25;
74:11;78:22;83:20;
95:11,14,25
**lines (4)**
18:8;64:12;74:6;
86:14
**listen (3)**
61:7,11,19
**literally (1)**
29:8
**litigation (9)**
35:17;80:13;83:11;
84:21;85:20;86:11;
87:1,8;92:5
**little (9)**
7:12;16:3;20:19;
29:24;31:2;39:9;
53:20;64:3;89:9
**living (2)**
24:15;56:1
**local (2)**
12:10,12
**locked (1)**
57:2
**long (4)**
9:4;11:18;12:3;16:2
**longer (2)**
68:11,12
**look (20)**
10:19;13:14;14:3;
24:11;38:10;40:7,12;
43:10;47:16;56:14;
57:9;59:8;60:3;62:7;
63:2;64:11,11;68:18;
72:13;87:22
**looked (7)**
13:11;18:12;39:25;
58:23,25;62:19;64:5
**looking (3)**
34:3,4;43:11
**looks (1)**
66:22
**lose (3)**
51:1;58:24;86:1
**lost (2)**
92:18,24
**lot (8)**
11:18;30:24;49:24;
52:9,13;71:14;72:5;
74:24
**lunch (1)**
8:16

**M**

**main (2)**
48:6,16
**majority (3)**
82:1;92:17,18
**makes (4)**

8:2;48:5;57:3;90:4
**making (7)**
44:6;46:1;48:14;
56:21;57:1;61:20;
77:22
**makings (1)**
50:3
**mandate (1)**
49:13
**manner (2)**
25:17;69:15
**many (3)**
28:9;32:15;35:8
**March (1)**
38:9
**marked (3)**
10:14;38:6;40:19
**marriage (1)**
50:17
**married (2)**
15:7,9
**marrying (1)**
50:20
**material (11)**
42:18,23;43:16;
44:9,11;48:1,3;73:6;
74:6,7;79:8
**materials (11)**
42:2;46:4;61:21;
62:16;63:11,14,15;
71:8;72:17;82:9;89:10
**matter (1)**
71:23
**matters (1)**
54:13
**may (16)**
19:5;20:35:18;45:6;
48:2;58:7;63:13;
70:14;72:6;74:6;
75:16;78:23;79:1;
87:24;88:15;94:18
**maybe (5)**
7:23;10:22;11:18;
26:7;59:15
**MCLELLAND (35)**
10:11;14:4;15:10;
21:14,24;24:13;31:20;
48:7,17;50:22;52:5,19;
53:9;58:11,13;59:18;
61:22;63:24;65:8;
66:4,6;70:13;73:14;
75:10,14;80:23;81:1,6;
86:4;91:4;94:4,12;
95:8;97:15,18
**Meadors (3)**
63:6;87:25;88:10
**mean (34)**
9:19;16:21;17:24;
27:21;28:11;29:8;
32:4,5;33:1;34:10;
37:8;52:8,11;54:7;
55:1,3,3,23;59:8;
63:23;69:12;73:13;

77:11,20,21;78:1;
79:25;86:10;88:8;
90:6;91:3;92:15;
93:22;96:19
**Meaning (3)**
13:17;34:21;43:2
**means (10)**
43:23;49:22;54:11,
12,12,22,24;55:14;
87:16;91:19
**meant (1)**
96:20
**measure (1)**
86:18
**media (1)**
30:24
**meet (4)**
12:5;20:14;31:10;
46:13
**meeting (29)**
10:4,5,6,19;11:1,6,
10;12:22;13:5,8;
15:24;17:23;19:14,18;
21:22;26:15;27:13,15;
29:6;30:10,13;51:22;
64:18;66:8;71:7;
81:10;83:17;84:1;85:2
**meetings (4)**
26:13;31:8;32:14;
81:11
**meets (2)**
73:7;74:7
**member (8)**
12:14;37:9,10;41:9;
47:6;70:12;89:12,15
**members (14)**
30:14;37:6,13;
45:19,25;46:10,17;
48:21;60:23;61:11;
64:19;65:20;68:20;
69:2
**membership (1)**
69:25
**memory (3)**
12:17,17;16:14
**men (2)**
19:2;32:17
**mentioned (3)**
41:13;65:21;68:6
**met (5)**
41:1,4,6,10;71:12
**middle (1)**
20:14
**might (12)**
24:10;28:1;51:23;
59:6;63:12,15,22;71:8;
77:24;82:11;86:11;
89:10
**millage (12)**
37:25;38:1;67:7,8;
84:11,12,17;86:18,19;
87:2;91:22;97:2
**mind (6)**

10:19;21:22;23:9;
38:10;55:21;92:25

**minds (1)**
63:13

**mine (2)**
23:22;72:10

**minor (1)**
57:14

**minors (22)**
24:8,8;42:17,18;
43:3;44:17,21;51:17;
53:22;55:17;56:12,17;
57:3,25;58:6,10;70:5,
9;73:21;89:24;90:10,
16

**minute (1)**
17:9

**minutes (11)**
11:24;12:18;13:24;
14:21;50:13;59:17;
64:12;66:13;83:14;
85:1;95:10

**mirroring (2)**
89:11,16

**misappropriate (1)**
35:18

**misappropriated (1)**
36:5

**misappropriation (1)**
35:5

**mischaracterizing (1)**
54:18

**misuse (3)**
34:4,19,21

**modifications (1)**
91:17

**modify (1)**
96:23

**modifying (2)**
90:1;91:16

**moment (2)**
74:12;96:12

**money (13)**
18:18;32:22,24,25;
34:4;35:5,18;36:5;
37:19;80:14;82:21;
85:23;95:3

**month (2)**
28:12;46:15

**months (1)**
28:13

**more (16)**
26:20;44:22;46:18;
51:9;64:3;66:12;73:2;
79:20,24;91:20;92:13;
95:9;96:11,15,16,18

**Morgan (1)**
38:21

**morning (4)**
14:2;57:21;68:19;
75:4

**most (5)**
50:10;67:13;83:20;

85:18;96:1

**mostly (1)**
93:19

**mother (1)**
18:10

**motion (2)**
11:23;38:16

**move (16)**
8:21;19:15;21:7;
23:23;31:23;33:18;
43:2;44:16,20;45:16,
16;47:1;65:21;73:19;
74:6;86:21

**moved (12)**
23:2,7;46:2,11;47:1;
61:6,6;64:4;76:1;
89:17;90:9;91:18

**moving (1)**
23:19

**Mrs (1)**
38:19

**much (5)**
29:4;30:19;34:10;
70:18;97:19

**municipal (3)**
48:2,4;72:15

**must (1)**
62:14

**myself (4)**
19:2,4;42:4;43:9

## N

**name (1)**
36:19

**named (4)**
7:2;13:22;15:13;
32:11

**names (2)**
13:20;51:25

**narrative (2)**
11:19;60:1

**national (1)**
89:20

**nature (3)**
9:20;13:4;46:8

**near (1)**
66:15

**necessarily (5)**
12:23;13:10;14:19;
34:23;86:20

**necessary (1)**
90:1

**need (7)**
8:17;56:1;67:13;
75:10;82:9;83:21;96:1

**needed (5)**
20:8,21;39:5;47:18;
48:20

**needs (1)**
46:22

**negative (1)**
39:20

**negotiations (2)**
76:17,19

**neighborhood (1)**
18:11

**neutral (5)**
66:20;67:15;86:16,
20;87:6

**neutrality (2)**
87:9,11

**never-ending (1)**
83:11

**new (3)**
10:12;19:1;37:16

**next (5)**
8:4;13:14;26:15;
71:14;89:19

**nine (1)**
66:18

**nod (1)**
8:9

**none (2)**
27:2;54:14

**nonfiction (1)**
18:20

**non-pornographic (1)**
54:24

**nor (1)**
53:14

**normal (4)**
8:11;16:24;56:9;
88:21

**normalizes (1)**
50:17

**normalizing (2)**
16:11;40:2

**NOTARY (1)**
98:23

**note (1)**
64:16

**notes (1)**
68:18

**novel (4)**
22:19;46:5,6,7

**November (5)**
15:18,20,22;17:13;
64:18

**number (3)**
28:17,18,19

**numbering (1)**
64:15

**numbers (1)**
10:10

## O

**Object (27)**
15:10;24:13;31:20;
48:17;51:19;52:5,19;
53:5;54:17;61:9,22;
63:24;65:8;66:4,5;
73:12,22;77:10,18;
80:20;81:3;82:14;
90:18;91:4,4;94:4,21

**objected (3)**
13:7,8;73:15

**objection (9)**
13:4;14:5;15:1;
21:14,24;48:7;50:22;
70:13;94:25

**obligations (1)**
26:22

**obscenity (2)**
21:23;22:2

**Obviously (2)**
56:12;73:13

**occasion (1)**
31:14

**off (7)**
34:11;50:3;58:9;
66:10;69:10;80:1;88:2

**offered (1)**
58:17

**offhand (1)**
17:23

**office (6)**
9:2,25;24:25;28:19;
30:22;47:13

**official (1)**
18:10

**Off-the-record (1)**
50:4

**often (3)**
31:10;46:13;56:5

**older (1)**
24:8

**once (5)**
20:19;28:12,12;
46:15;72:20

**one (26)**
7:21;8:17;10:13;
20:13;30:17;31:14;
37:13;38:11;39:24;
41:25;42:3;47:14;
49:19;50:12;57:6,23;
63:5,9;68:19,22;69:2,
25;70:2;86:22;88:23;
97:11

**ones (2)**
19:10;69:4

**only (15)**
8:19;10:3;14:20;
19:13;20:20;26:1,14;
30:17;38:17,22;47:14;
50:15;51:24;78:9;82:8

**open (3)**
58:3;83:10;94:12

**operates (1)**
71:16

**operation (1)**
71:19

**opinion (17)**
21:15,17,25;24:14;
48:8;53:7,15;54:13;
61:23;62:1;63:25;
66:3,7;70:14;71:20;
85:18;92:12

**opinions (4)**
32:2;52:7;58:17;
72:11

**opposite (1)**
87:12

**order (2)**
8:1;70:8

**ordered (2)**
19:2,2

**ordering (2)**
64:24;70:4

**Ordinance (1)**
38:13,14

**others (1)**
34:23

**otherwise (1)**
97:16

**ought (4)**
23:18;42:14;46:11;
55:24

**ours (1)**
54:14

**out (22)**
8:10;13:9,10;15:14;
16:4;17:19;19:7,10;
24:9;32:3,4;38:20;
52:24;57:7;65:7;
71:24;75:18;80:13;
82:22,23;85:24;95:3

**over (12)**
7:24;8:3;9:9;19:9;
25:6;30:20;51:8;
74:13;83:7,13;89:3,5

**overall (1)**
51:24

**oversaw (1)**
35:4

**overseeing (1)**
20:11

**overturn (1)**
26:2

**own (9)**
14:10;20:11;21:20;
22:14;26:18;37:13;
45:14;52:7,15

## P

**Page (26)**
10:25;11:19,22;
13:14;18:6,24;38:13;
43:11;47:24;60:3;
64:13;66:15;72:2,6,20;
73:4;74:1,11;78:22;
83:14;84:6;86:7,14;
95:11;98:5,10

**paid (1)**
39:4

**paper (1)**
8:12

**paperwork (1)**
46:21

**paragraph (6)**

16:8,22;63:7;88:3;
89:6,19
**pardon (1)**
68:17
**parent (1)**
66:22
**parental (3)**
17:5;23:25;24:16
**parenting (1)**
16:25
**parents (3)**
16:9,25;17:1
**parent's (1)**
57:14
**part (12)**
26:13;33:22;35:21,
22;50:10;57:20;58:6,7,
8;74:13;81:20;93:22
**participate (1)**
76:19
**particular (1)**
94:16
**Particularly (3)**
20:12;46:20;95:1
**parties (1)**
86:16
**parts (2)**
66:12;94:19
**pass (3)**
49:24;51:13;86:4
**passed (4)**
38:23;43:11;89:21;
94:2
**passes (1)**
55:3
**passive (1)**
29:1
**past (3)**
34:3;69:1;91:24
**pause (1)**
42:7
**pay (5)**
36:1;38:18;83:3;
85:22;86:1
**Payment (1)**
38:14
**payout (1)**
38:17
**people (28)**
8:4;20:9;22:4,7;
25:23;30:20;32:15,21;
35:8;36:16;39:15,16;
41:13;48:10;49:15;
52:18;55:5;59:12;
60:15,18;67:1,13;
83:21;85:18;86:22;
88:22;90:24;96:1
**Peppas (6)**
11:23;38:21;86:15,
24;87:6,11
**Peppas' (1)**
87:9
**performance (2)**

33:21;34:1
**perhaps (1)**
48:24
**period (1)**
81:20
**permission (1)**
57:14
**person (10)**
18:13,13;43:4,14,17;
44:12;48:1;58:19;
60:9;72:23
**personal (3)**
28:5;34:22;53:7
**personally (1)**
27:8
**persons (1)**
64:23
**phone (1)**
41:15
**phrase (2)**
63:12;65:3
**physical (2)**
62:16;72:17
**physician (2)**
12:10;28:5
**physician's (1)**
29:20
**picture (4)**
14:20;16:23;22:9;
64:3
**pictures (3)**
22:4,10,15
**Pink (1)**
13:17
**place (5)**
23:21;51:9;73:19;
82:10;86:18
**placement (1)**
50:16
**places (2)**
56:6,16
**plaintiffs (8)**
58:16;77:13;78:19;
82:17;85:25;91:8;
94:18;95:2
**Plaintiffs' (1)**
41:23
**Plaintiff's (1)**
83:14
**plan (1)**
50:7
**plans (1)**
58:3
**play (1)**
14:10
**Playboy (4)**
22:16;23:6,9,11
**please (4)**
10:20;14:11;40:7;
47:24
**pm (1)**
97:20
**pocket (1)**

85:24
**point (4)**
8:14;15:23;57:22;
69:25
**policies (1)**
90:2
**policy (5)**
9:11;26:6;62:16;
72:15;75:23
**policymaker (1)**
57:8
**political (3)**
32:2;66:20,21
**porn (2)**
14:25;23:11
**pornographic (9)**
12:23;13:1;14:24;
22:4,16;23:10;42:17;
64:6;71:9
**pornography (19)**
19:22;21:10,12,21;
22:3,5,9,23;27:11;
40:15;53:20,25;54:7,8,
21;55:8,12,21;71:6
**portion (2)**
20:23;82:23
**position (11)**
20:13,13;24:5;
25:12;29:23;30:9,20;
31:13;33:6;49:23;64:7
**positions (3)**
20:7,14,16
**positive (4)**
35:14,20,24;39:20
**possibility (4)**
26:12;27:25;56:21;
92:11
**possible (4)**
44:24;54:2,20;57:8
**possibly (1)**
82:23
**potential (2)**
82:11;94:13
**potentially (1)**
83:10
**predate (1)**
75:1
**predict (3)**
52:2,6,8
**premiums (1)**
38:19
**preparation (1)**
85:7
**prepared (5)**
11:5;43:20;44:24;
46:17;86:17
**pre-pubertal (1)**
16:23
**prepubescent (1)**
16:7
**presence (1)**
98:18
**present (3)**

43:16;45:13;64:19
**presentation (1)**
12:16
**pretty (2)**
31:23;69:3
**prevail (1)**
77:13
**previously (2)**
7:2;40:19
**Pride (4)**
13:18,18;40:13;
64:21
**principle (1)**
57:13
**prior (2)**
15:24;68:6
**probably (5)**
44:22;50:2,10;52:7;
61:7
**procedure (1)**
42:7
**Procedures (5)**
10:18;11:5;38:9;
86:8;90:2
**process (7)**
7:13;47:22;54:3;
62:18;74:22;90:5,16
**produced (1)**
10:16
**profession (1)**
69:14
**professional (1)**
29:16
**progressive (3)**
16:11;17:7,14
**prohibited (1)**
73:21
**prohibitive (1)**
58:18
**prominent (1)**
12:12
**promoting (1)**
64:24
**prompt (1)**
75:16
**property (1)**
38:1
**protecting (2)**
63:11;89:9
**provide (5)**
36:13;46:4;79:7;
94:3,9
**provided (3)**
37:24;45:4;78:25
**provides (1)**
56:16
**Providing (1)**
38:14
**provision (1)**
74:12
**Public (6)**
16:5;41:19;48:15;
72:17;98:1,23

**pull (2)**
15:14;71:23
**pure (1)**
52:9
**purpose (1)**
24:19
**Purposes (2)**
38:16;50:16
**pushed (1)**
16:5
**Put (14)**
26:25;27:4;28:23;
29:1;38:4;51:17;57:1;
63:19;64:1;66:11;
79:23;85:21;91:14;
93:24
**putting (1)**
52:13

---

**Q**

**Queen (1)**
13:17
**quick (1)**
71:3
**quickly (4)**
8:14;14:15;31:24;
71:5
**quirks (1)**
57:6
**quite (2)**
58:18;94:22
**Quorum (59)**
9:13;10:5,17;11:8,
24;15:15,25;20:1;
25:15,19,20,21;26:8;
29:5;32:13;38:8;42:4;
44:4,5;45:13,25;46:10,
13,20,24;47:1,6;48:18,
21;49:22;52:2,13,14,
18;53:1,3;54:12;56:20,
21;61:6,11;66:16;68:3,
13,14;74:14,17,20;
75:22;81:11;83:13;
84:1;85:1,2;86:15;
87:23;89:11,15;93:25
**quote (4)**
19:5;43:4;63:15;
96:15
**quoted (1)**
89:8

---

**R**

**radical (1)**
32:5
**Rapert (1)**
41:10
**rather (2)**
80:9;93:16
**rational (1)**
63:13
**reach (1)**

24:9
**read (29)**
11:2;14:17,18,21;
38:17,21;41:21;43:12,
13;44:19,22;45:25;
46:7,12,18;50:13;
72:14,18,21;74:9,13;
79:4;83:23;84:14;
86:14;96:3,5;97:18;
98:7
**reading (3)**
64:12;95:18,23
**really (5)**
33:7;50:11,15;
57:13;80:2
**reason (1)**
80:9
**reasonable (1)**
46:9
**reasoning (1)**
93:19
**reasons (1)**
74:5
**recall (5)**
13:22;16:1,17;
18:22;35:13
**recap (1)**
7:23
**receipt (1)**
87:24
**receive (1)**
15:20
**received (1)**
84:17
**receiving (3)**
44:15;45:6,22
**recent (1)**
91:23
**recently (1)**
37:8
**recess (3)**
40:9;59:19;75:12
**recommend (2)**
29:24;69:9
**recommendation (26)**
35:12,14,20,25;36:2;
37:17;45:7;48:25;
49:2;50:7;51:14,15,21;
54:13;56:21;61:5,20;
62:7;78:23;79:2,7,14,
15,23;80:1,3
**recommendations (10)**
37:2;45:14;48:14,
15;60:22;61:2,8,12,20;
68:22
**recommended (5)**
30:2;60:18,23;69:4,
21
**reconsider (1)**
64:17
**reconsideration (2)**
67:3;84:7
**record (5)**

14:5;50:3;53:9;
85:14;98:10
**reduce (1)**
86:18
**reduced (1)**
91:22
**reduction (1)**
87:3
**reference (1)**
19:24
**referenced (1)**
36:22
**references (1)**
30:24
**referencing (1)**
84:20
**referring (3)**
20:18;87:4,5
**reflect (2)**
49:16;53:10
**reflects (1)**
49:13
**refresh (1)**
16:14
**refreshed (1)**
12:17
**refused (1)**
65:20
**regarding (2)**
45:7;79:2
**Regular (1)**
40:22
**relatively (1)**
46:7
**relevant (2)**
14:8;50:15
**religious (3)**
16:10;17:2,6
**relocation (1)**
72:16
**remaining (1)**
97:12
**remember (30)**
12:16,19;15:25;
17:22,24;18:2;19:13;
27:17;30:1;36:19,24;
41:25;61:1;64:10;
69:8;76:12;77:1;83:9,
25;84:25;85:3;88:1,13,
19;92:3;93:15;96:10,
15;97:1,3
**removal (3)**
67:23;68:1,10
**remove (1)**
67:16
**removed (2)**
13:10;21:7
**removing (1)**
21:8
**repeatedly (1)**
67:15
**Rephrase (3)**
39:17;80:23,25

**report (2)**
33:12;35:2
**Reporter (1)**
8:2
**reports (1)**
30:25
**represent (9)**
58:2;61:15,16;
67:14;69:5,11,15;
83:21;96:1
**representation (1)**
23:12
**Representative (4)**
18:2,9;41:3,6
**represented (1)**
76:16
**request (6)**
43:2,17;44:12;
64:20;65:6;82:20
**requested (3)**
28:23;29:1;64:17
**require (1)**
89:23
**required (7)**
45:4;70:11,15;
78:25;80:5;83:1,2
**requirement (1)**
94:2
**requirements (2)**
81:25;94:7
**requires (2)**
45:24;90:8
**reserve (1)**
97:15
**resigned (3)**
30:14,16;33:13
**resigning (2)**
30:18;69:2
**resources (1)**
58:8
**respect (2)**
25:8;65:24
**respond (2)**
21:25;24:14
**response (1)**
33:20
**responsibilities (2)**
9:6;25:13
**responsibility (3)**
25:16,21;93:24
**responsible (4)**
42:1;58:19;75:22;
81:4
**responsibly (1)**
66:23
**rest (1)**
54:14
**resulted (1)**
20:7
**retention (1)**
72:16
**return (1)**
86:7

**review (4)**
43:1;45:20;72:25;
74:17
**right (52)**
8:23;9:17;11:15;
24:16;25:7,11;28:2,16;
34:11;38:11;40:5;
41:23;42:25;43:6,23;
45:14,15,17;46:13;
48:22,25;49:5,9,13,14,
17,18;51:9,11;53:16,
25;54:1;55:15;56:5,10,
11,24;57:4;58:4;64:9;
66:21;68:17;79:4;
80:4,6;81:18;83:8;
84:14;86:2;90:12,22;
91:12
**rights (4)**
16:9;17:1,6;66:24
**ring (1)**
13:20
**Riordan (9)**
32:11;60:4;64:15;
65:6,13,19;85:1,7;
89:13
**River (4)**
12:14;30:25;31:5;
60:8
**road (1)**
9:9
**role (3)**
20:1;45:12;48:14
**roles (2)**
12:9,12
**romance (1)**
22:19
**roof (2)**
55:22;56:1
**room (2)**
57:2;91:9
**roughly (3)**
28:22;31:16;32:15
**round-robin (1)**
75:17
**route (3)**
68:24;69:7;86:24
**Rudy (1)**
60:6
**run (1)**
75:18
**running (1)**
29:18
**runoff (1)**
9:23
**runs (1)**
11:19

---

**S**

---

**sales (1)**
85:23
**Saline (1)**
97:9

**Sam (3)**
10:9;86:8;87:22
**same (12)**
10:10;60:9;63:4;
65:3,12,16,16,17;
67:10;69:3;71:22;
74:18
**satisfactory (1)**
23:20
**Satterfield (1)**
8:2
**save (1)**
52:12
**saw (2)**
56:22;90:24
**saying (11)**
18:22;19:13;22:19;
34:14;50:9,9;55:12;
71:23;91:15,17;96:15
**Schaper (2)**
36:18,21
**scope (1)**
31:21
**second (9)**
11:23;37:9;38:21;
42:8;63:7;68:17;88:3;
89:6;95:13
**Section (76)**
14:1,9;19:8,8,11,15;
20:2,4,11;21:8;22:24;
23:3,7,8,20,20,24;
24:24;27:8,11,23;
31:21;39:8,15,19;
41:22;42:6,8,11,25;
43:18,19,21;44:25;
45:5;47:3,23;50:21;
51:7,8,15,16;54:3;
55:14;62:15,20;63:15,
21;65:7,25;66:9,10,15;
73:6;75:25;76:1;79:1,
13,18,22;80:11,18;
81:7;89:5,23;90:5,14,
19,21;91:1,11,18;
93:23;96:14,21,24
**Sections (1)**
47:10
**seeking (1)**
65:1
**seeks (3)**
21:25;24:14;48:8
**seem (1)**
27:22
**seemed (1)**
34:13
**seems (5)**
31:6;50:14,25;64:3;
65:5
**segregated (3)**
51:9;58:5;61:7
**segregating (1)**
90:15
**selected (1)**
76:1

**selection (9)**
37:7;49:19,20;
72:16;73:7,10,25;74:8,
19
**Senator (1)**
40:24
**Senators (1)**
40:23
**send (1)**
88:7
**sense (8)**
13:10;15:8;33:15;
45:9;48:25;51:23;
55:14;58:19
**sent (2)**
88:16;89:1
**sentence (3)**
17:5;88:3;95:19
**sentences (1)**
13:16
**September (1)**
38:20
**serving (1)**
66:18
**Session (1)**
40:22
**set (8)**
9:11,13;47:2,21;
50:23;79:8;94:2,6
**Setting (1)**
24:22
**seventeen-year-old (5)**
24:12,19;54:5;
55:10;57:11
**Several (4)**
12:4;28:10;66:25;
94:8
**severance (6)**
34:10;35:16;36:1;
37:20;38:14;76:12
**sexual (2)**
22:7;23:15
**Shaffer (1)**
38:16
**shake (1)**
8:9
**shall (5)**
43:16;45:20,21;
72:15;73:6
**shelf (1)**
67:16
**short (1)**
14:20
**shortly (2)**
58:25;89:22
**show (3)**
10:16;18:16;36:13
**showing (3)**
40:18;53:10,12
**shown (1)**
98:9
**sic (1)**
66:23

**side (3)**
20:17;41:23;59:16
**sides (1)**
21:2
**sign (1)**
97:18
**signature (3)**
10:25;98:5,14
**signed (4)**
11:8;35:16;38:9;
98:17
**signing (1)**
77:1
**similar (1)**
53:21
**simply (1)**
51:13
**sit (1)**
13:6
**situation (3)**
25:4;60:7;77:17
**six (3)**
28:13;64:17;65:21
**skim (1)**
14:18
**skip (1)**
72:20
**Skipping (1)**
89:25
**slept (1)**
18:4
**slightly (1)**
72:7
**Smith (1)**
31:9
**so-called (1)**
81:5
**Social (30)**
14:1,9;20:2,4,11;
24:24;27:8;31:21;
39:8,19;47:10;50:21;
63:15,21;65:25;66:9,9;
75:25;76:1;80:18;
81:7;89:5;90:5,14;
91:1,11,18;96:13,21,
24
**socialized (1)**
29:8
**solely (1)**
66:22
**solution (1)**
34:7
**somebody (2)**
51:2;90:22
**somehow (2)**
20:14;90:17
**someone (12)**
29:24;30:1;32:12;
39:12;46:25;51:4;
67:11;68:6;83:18;
89:16;95:14,24
**sometimes (1)**
8:4

**soon (1)**
26:14
**Sorry (5)**
58:13,14;77:12;
87:10;94:5
**sort (4)**
33:3;66:15;71:23;
89:2
**sound (3)**
19:12;38:24;90:4
**sounded (3)**
9:23;93:13,14
**sounds (6)**
34:25;59:14;67:21,
22,25;89:1
**speak (5)**
11:24;17:25;18:9;
22:3;31:13
**speaking (9)**
12:20;17:22;18:2;
19:6;22:10;39:3;
82:16;83:16;95:13
**specific (8)**
19:23;42:19;46:3;
56:4;71:12;78:15;
93:7,9
**specifically (8)**
27:18;30:17;32:6;
33:23;39:2;62:14;
64:4;87:16
**specifics (3)**
26:20;33:14;71:15
**specify (1)**
79:25
**speculate (1)**
63:23
**spending (1)**
34:8
**spoke (4)**
17:25;18:25;30:17;
66:16
**spring (2)**
31:16;92:6
**staff (5)**
52:2;65:20;69:9,20;
70:3
**stand (1)**
66:21
**standard (1)**
21:23
**standing (1)**
14:5
**start (6)**
7:12;10:22;36:20;
72:2,21;75:20
**started (3)**
90:5,16;92:5
**starting (2)**
43:12;73:4
**starts (3)**
11:19;16:4;72:13
**State (22)**
40:21;41:9;77:11,

19,25;78:3;83:1,2;
85:14;87:15,17,19,19,
21;89:21;93:6,11,12;
94:2,6,9,20
**stated (6)**
73:13;76:24;86:15,
23,24;96:12
**statement (1)**
83:25
**states (2)**
78:24;83:18
**stating (2)**
95:19;96:6
**statute (11)**
14:6;43:10;44:19;
47:2;49:5;54:11,16,18;
55:2;57:8;72:8
**stay (3)**
51:6,14;92:23
**stays (2)**
50:8;51:16
**steps (1)**
80:16
**still (12)**
13:3,6;24:15;29:24;
53:12;57:4;64:14;
67:14;83:16,21;87:5;
96:1
**Stone (1)**
40:23
**stop (1)**
95:16
**story (1)**
26:17
**strong (1)**
61:23
**stuff (4)**
32:23;34:5,19,24
**STYLE (1)**
98:1
**subdivision (11)**
43:15,18,19,20;
44:24;45:4,8,21;73:5;
78:25;79:3
**submitted (5)**
43:17;44:12;45:7,
21;79:3
**Subpart (1)**
45:3
**Subsection (2)**
72:13;74:9
**substituted (1)**
50:19
**subverted (1)**
17:6
**subverts (1)**
17:1
**successful (1)**
90:9
**suck (1)**
95:3
**sue (7)**
67:11;77:22;83:18;

89:2,4;95:14,24
**sued (3)**
78:6;89:3;97:12
**suing (2)**
78:12,16
**Sullivan (3)**
40:23,24;41:1
**summary (4)**
43:20;44:24;45:1;
70:6
**summer (2)**
88:14;92:6
**supervision (1)**
23:25
**supposed (3)**
46:4;67:4;84:8
**Supreme (1)**
53:21
**Sure (21)**
8:7;13:24;17:25;
22:13;35:9;38:12;
49:7;52:20;58:22;
59:18,22;61:10,11;
69:2;70:17;80:2;
85:15;87:16;88:2;
94:8,22
**surprise (1)**
72:6
**survive (7)**
67:12;83:19;84:4,
19;87:7;95:15,25
**sworn (1)**
7:3
**System (14)**
18:25;38:15;64:24;
69:18;70:16,19;77:25;
78:6,9;82:13;83:1,2;
92:23;96:8
**systems (3)**
78:12,15,19
**system's (1)**
90:2

## T

**table (4)**
8:20;26:19;46:16;
73:15
**tabled (1)**
47:15
**talk (12)**
8:3;10:8;11:17;16:3;
17:9;20:12,12;30:7;
37:1;39:8;50:12;60:9
**talked (11)**
20:22,25;39:9;
41:15;49:11;50:14;
66:25;71:14;74:25;
84:19;90:20
**talking (21)**
22:3,15;24:20;
39:22;53:24;54:21,22;
55:12;59:22;60:21;

62:17;64:15;67:7;
83:10;84:12,21;87:6;
88:23,23;89:13;93:1
**Tammi (5)**
15:9,15;28:20;
33:11;69:13
**Tammi's (1)**
28:21
**targeted (1)**
85:20
**task (1)**
63:8
**tax (2)**
38:1;85:23
**taxpayer (1)**
18:18
**ten (4)**
24:18;28:10;30:22;
86:14
**ten-year-old (4)**
24:10;54:4;55:11;
57:11
**term (3)**
9:4;33:13;37:9
**terminate (1)**
34:5
**terms (3)**
46:7;50:24;56:3
**Terrence (3)**
63:5;87:25;88:10
**test (2)**
63:10;89:20
**testified (3)**
7:4;58:16;86:10
**testimony (4)**
50:6;56:8;98:8,10
**though (8)**
9:17;19:20;32:3;
63:19;71:12;72:22;
89:1;90:4
**thought (9)**
11:2;12:25;18:13;
59:5;63:21;66:11;
70:9;75:5;86:10
**thoughts (3)**
15:5;80:7;94:13
**thousands (2)**
34:8,8
**threatened (1)**
34:6
**three (10)**
14:2;30:13;37:3;
64:5,19,21;69:2,8,20;
91:8
**thrown (1)**
30:23
**thru (1)**
38:19
**tie (1)**
25:25
**times (1)**
46:20
**title (2)**

38:17,22
**today (7)**
13:6;16:18,19;
30:12,25;56:8;92:7
**together (1)**
98:9
**told (3)**
20:18;36:9;68:21
**took (8)**
9:2,25;20:10;24:25;
47:12;50:13;66:7;72:9
**top (6)**
11:22;34:11;69:10;
83:15;88:2;95:11
**topic (1)**
32:8
**total (1)**
72:6
**totally (2)**
8:15;74:22
**towards (4)**
39:13;66:9;75:20;
83:15
**transcript (3)**
98:8,9,17
**transsexual (2)**
16:12,24
**treasurer (1)**
39:3
**treated (1)**
53:23
**trial (1)**
97:15
**tried (4)**
67:11;83:18;95:14,
24
**true (4)**
65:24;68:16,16;
98:10
**truth (3)**
7:3,4,4
**try (6)**
53:2;67:11,12,14;
83:19;95:25
**trying (7)**
18:14;46:25;52:12;
57:7;59:9;67:6;84:10
**Turn (6)**
18:6;47:24;49:15;
59:25;78:21,22
**twelve (2)**
13:16;28:10
**two (17)**
15:7,9;20:7,14,16;
21:2;36:16;40:8;46:6;
50:13;56:6;68:15;
69:17,19;91:9,13;
94:17
**two-thirds (1)**
26:1

---

**U**

---

**ultimately (2)**
9:19;54:11
**unanimous (1)**
11:25
**unbounded (1)**
63:10
**Uncle (9)**
13:18;14:14;15:6;
39:25;50:19,19;53:10,
12;64:22
**unclothed (1)**
22:7
**under (31)**
26:7;33:16;43:3,15,
17,19,20;44:17,21,24;
45:4,7,21;51:17;53:23;
54:2;55:17,22;56:1,17;
57:3,8,25;58:6;62:15,
21;73:5;78:25;79:3;
90:10,16
**understood (3)**
22:23;27:24;59:22
**unique (1)**
48:14
**units (1)**
16:13
**unless (3)**
50:11;54:23;89:3
**unlikely (2)**
85:8,9
**unprecedented (1)**
69:3
**unrelated (1)**
75:6
**up (20)**
10:4;12:22;26:12;
32:6;33:17;34:7;
39:24;46:18;47:21;
48:21,24;50:23;71:2;
74:14;80:12;83:10;
84:5;86:20,21;94:18
**upcoming (1)**
90:24
**upon (6)**
16:10;20:10;76:6;
79:12;82:12;87:20
**upper (1)**
40:21
**use (1)**
10:9
**used (5)**
12:6;34:20;65:3,16;
70:18
**user (2)**
69:23;70:11
**users (2)**
69:17,21
**uses (1)**
18:18
**using (1)**
34:24
**usually (1)**
31:8

**ultimately (2)**

**V**

---

**vague (1)**
29:25
**Vaguely (1)**
18:23
**Valley (4)**
12:14;31:1,5;60:8
**values (5)**
25:23;52:17;67:13;
83:20;96:1
**Van (8)**
14:2,15;16:5;21:13;
22:24;27:23;30:9;51:7
**various (1)**
60:23
**versus (1)**
41:19
**veto (1)**
26:2
**view (3)**
24:7;57:10;87:9
**views (3)**
16:15,17;23:18
**violating (1)**
42:11
**Virden (2)**
7:17;24:22
**visited (4)**
27:8;47:9,12,14
**visual (1)**
23:12
**vocabulary (1)**
46:8
**voice (2)**
11:25;29:1
**vote (13)**
11:25;25:19,25;
26:10;48:22,24;49:3;
51:23;53:1;61:12;
87:2;92:13,20
**voted (2)**
26:19;64:19
**voters (1)**
91:22
**vs (1)**
98:1

---

**W**

---

**Wahlmeier (4)**
63:5;65:13;85:3;
96:11
**waiting (1)**
74:2
**waive (1)**
97:16
**walk (5)**
56:9,13;67:12;
83:20;95:25
**walked (1)**
27:22

**wall (1)**
58:9
**wants (1)**
86:22
**water (1)**
8:16
**WATSON (14)**
51:19;53:5;54:17;
61:9;66:5;71:1;73:16,
24;77:10,18;82:14;
90:18;93:5;94:23
**way (10)**
25:22;50:23;52:1;
54:16;61:12;66:21;
67:2;68:25;74:22;
85:18
**ways (1)**
68:15
**Wedding (8)**
13:19;14:14;15:6;
39:25;50:20;53:10,12;
64:22
**week (3)**
26:16;27:1;28:12
**weeks (1)**
81:12
**weren't (2)**
11:12;71:11
**Western (2)**
14:10;88:5
**What's (14)**
8:23;15:1;33:5;
39:10;41:18;44:13;
54:25;55:1,10,10;74:6;
79:17;80:5;87:9
**WHEREUPON (1)**
97:20
**White (8)**
20:23;30:12,25;
58:16;62:11;68:19;
75:4;92:7
**White's (2)**
40:19;57:21
**whole (8)**
7:4;19:3;20:10;
41:22;42:7;47:23;
49:9,12
**win (1)**
59:3
**wishes (1)**
25:18
**within (3)**
30:22;43:21;45:22
**without (3)**
16:25;20:11;23:25
**witness (3)**
7:2;53:17;98:3,5,14
**woke (3)**
16:11;17:7,14
**woman (1)**
50:20
**women (2)**
19:2;32:17

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY
County Judge Christopher Lee Keith
March 26, 2024

**won (1)**
9:23
**word (1)**
72:5
**wording (4)**
65:12,16,17;91:19
**words (11)**
8:6,8,12;14:18;22:8;
26:18;79:12;85:2,3,15;
96:16
**work (1)**
52:13
**workable (1)**
8:1
**worked (2)**
47:4,7
**works (3)**
29:21;54:16;72:8
**worried (2)**
92:8,10
**worse (1)**
52:16
**write (1)**
35:11
**writing (1)**
91:15
**written (3)**
35:6,20;72:15
**wrong (3)**
18:15;34:20;93:13

## Y

**YA (1)**
46:6
**year (8)**
18:3;33:13;46:21,
23;51:6;68:21,21;
88:14
**years (5)**
9:5;12:4;28:9,10;
66:19
**yep (1)**
53:12
**young (2)**
24:9;56:12
**younger (2)**
24:8,16

## 1

**1 (8)**
38:20;40:19;41:22;
42:8,11;71:15,24;
78:21
**10 (15)**
10:13,14,16;18:8,8;
33:2;56:2;60:1;64:12;
72:21,22;73:4,25;74:7;
83:15
**11 (2)**
38:5,6
**12 (3)**

18:8;74:1,7
**12A (1)**
74:11
**12th (1)**
30:13
**13 (1)**
51:25
**14th (1)**
38:9
**15 (2)**
11:24;43:12
**17 (2)**
47:25;56:2
**18 (17)**
24:15;43:3;44:17,
21;51:18;53:23;55:18,
25;56:18;57:3,25;
58:6;62:15,21;72:5;
90:10,16
**18th (2)**
87:24;88:15
**19 (2)**
23:1;66:13
**1998 (5)**
67:9,10;84:13,17;
86:20
**19th (8)**
10:18;11:10;17:23;
29:5;59:25;64:11;
83:14;95:10
**1st (2)**
9:3,24

## 2

**2 (1)**
45:3
**2000 (1)**
68:21
**2020 (1)**
68:22
**2022 (17)**
9:2,24;10:4,18;
11:10;15:18,20;17:13,
23;23:2;29:5;36:17;
51:22;64:12;66:13;
92:1;95:10
**2023 (7)**
9:3,24;38:8,20;
40:20,22;87:24
**2023-11 (1)**
38:14
**2024 (1)**
98:19
**21st (1)**
38:8
**22 (2)**
31:16;78:22
**24 (3)**
11:19,22;60:3
**25 (4)**
64:14;66:15;78:22;
84:6

**26 (4)**
83:14;86:7,14;95:11
**27 (1)**
18:6
**28 (1)**
11:19

## 3

**30 (3)**
10:25;45:22;46:9
**3008 (2)**
38:18,20
**300-page (1)**
46:6
**372 (41)**
14:7;31:22;40:20;
45:11;50:6;51:2,8;
56:6,16;61:4;71:15;
75:2,6;76:6,10,25;
77:5,9,12,14,16;80:7,
16;81:16,20;82:10,11;
83:10;87:15;89:21,25;
90:5,8,25;93:7,17;
96:14,14,22,22,24
**38 (1)**
38:13

## 4

**4 (1)**
60:3
**40 (1)**
32:16
**47 (2)**
34:12;35:16
**48,000 (1)**
34:12

## 5

**5 (10)**
15:14;38:13;41:22;
42:6,25;47:23;54:3;
55:14;80:11;93:23
**5:38 (1)**
97:20
**50-ish (1)**
32:16

## 6

**6 (1)**
66:15

## 7

**7 (3)**
47:24;72:2,6
**74 (1)**
97:12
**75 (1)**
97:11

## 8

**8 (7)**
62:7;72:13,14,20;
73:4;74:1,11

## 9

**9 (6)**
43:11,11;63:2;
74:11;78:22;87:22
**94th (1)**
40:22

1   State of Arkansas    *As Engrossed:    S2/15/23 S2/21/23 H3/13/23*
2   94th General Assembly                   A Bill
3   Regular Session, 2023                                    SENATE BILL 81
4
5   By: Senators D. Sullivan, *Stone*
6   By: Representatives Gonzales, *Bentley*
7
8                       **For An Act To Be Entitled**
9           AN ACT TO AMEND THE LAW *CONCERNING LIBRARIES AND*
10          *OBSCENE MATERIALS MADE AVAILABLE TO MINORS; TO AMEND*
11          *THE LAW CONCERNING* THE POSSESSION, SALE,
12          DISTRIBUTION, OR FURNISHING OF OBSCENE MATERIALS; TO
13          CREATE THE OFFENSE OF FURNISHING A HARMFUL ITEM TO A
14          MINOR; TO AMEND THE CRIMINAL CODE IN RELATION TO
15          OBSCENE MATERIALS LOANED BY A *LIBRARY; TO ALLOW A*
16          *PARENT OR LEGAL GUARDIAN OF A MINOR TO ACCESS THE*
17          *MINOR'S LIBRARY RECORDS;* TO PROVIDE FOR A CIVIL CAUSE
18          OF ACTION AGAINST GOVERNMENTAL ENTITIES THAT POSSESS,
19          SELL, OR DISTRIBUTE OBSCENE *MATERIALS; TO AMEND THE*
20          *LAW CONCERNING THE PROCESS FOR CHALLENGING MATERIALS*
21          *INCLUDED IN A LIBRARY;* AND FOR OTHER PURPOSES.
22
23
24                              **Subtitle**
25          *TO AMEND THE LAW CONCERNING LIBRARIES AND*
26          *OBSCENE MATERIALS; TO CREATE THE OFFENSE*
27          *OF FURNISHING A HARMFUL ITEM TO A MINOR;*
28          *AND TO AMEND THE LAW CONCERNING OBSCENE*
29          *MATERIALS LOANED BY A LIBRARY.*

EXHIBIT
1

30
31
32   BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:
33
34          SECTION 1.  Arkansas Code Title 5, Chapter 27, Subchapter 2, is amended
35   to add an additional section to read as follows:
36          5-27-212.  Furnishing a harmful item to a minor — Failure to report.



1    (a)  As used in this section:

2        (1)  "Harmful to minors" means *the same as defined in § 5-68-501*;

3        (2)  "Internet" means the combination of computer facilities and

4    electromagnetic transmission media, and related equipment and software,

5    comprising the interconnected worldwide network of computer networks that

6    employ the Transmission Control Protocol/Internet Protocol (TCP/IP) or any

7    successor protocol to transmit information;

8        (3)  "Internet website" means a location where material placed in

9    a computer server-based file archive is publicly accessible over the internet

10   using hypertext transfer protocol or any successor protocol; and

11       (4)(A)  "Item" means a material or performance that depicts or

12   *describes nudity, sexual conduct, sexual excitement, or sadomasochistic*

13   *abuse, as those terms are defined in § 5-68-501.*

14           (B)  "Item" includes without limitation:

15               (i)  A book, leaflet, pamphlet, magazine, booklet,

16   picture, drawing, photograph, film, negative, slide, motion picture, figure,

17   object, article, novelty device, recording, transcription, live or recorded

18   telephone message, or other similar item whether tangible or intangible;

19               (ii)  A performance, exhibition, transmission, or

20   dissemination of any of the items listed in subdivision (a)(4)(B)(i) of this

21   section; and

22               (iii)  A live performance or exhibition that depicts

23   *nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, as those*

24   *terms are defined in § 5-68-501, to the public or an audience of one (1) or*

25   more persons.

26       (b)  A person commits furnishing a harmful item to a minor if, knowing

27   the character of the item involved, the *person knowingly*:

28       (1)  *Furnishes*, presents, provides, makes available, gives,

29   lends, shows, advertises, or distributes to a minor an item that is harmful

30   to minors; or

31       (2)  *Transmits* or sends to a person that he or she believes to be

32   a minor by means of electronic mail, personal messaging, or any other direct

33   internet communication an item that is harmful to minors when the person

34   knows or believes at the time of the transmission that a minor in this state

35   will receive the item.

36       (c)(1)  Subdivision (b)(1) of this section does not apply to the

1     transmission or sending of items over the internet.
2                (2)  Subdivision (b)(2) of this section does not apply to:
3                     (A)  Posting material on an internet website, bulletin
4     board, or newsgroup; or
5                     (B)  Sending material via a mailing list, listserv, or
6     other method of internet communication in which a message is sent to an
7     internet address and then retransmitted to one (1) or more subscribers, that
8     is not administered by the sender.
9           (d)  Furnishing a harmful item to a minor is a Class A misdemeanor.
10
11          SECTION 2.  Arkansas Code § 5-68-308(c), concerning defenses to state
12    standards that define and regulate obscenity, is amended to read as follows:
13          (c)  No employee, director, or trustee of a bona fide ~~school,~~ museum,
14    ~~or public~~ *library,* acting within the scope of his or her regular employment,
15    is liable to prosecution for a violation of this subchapter for disseminating
16    a writing, film, slide, drawing, or other visual reproduction that is *claimed*
17    to be obscene.
18
19          SECTION 3.  Arkansas Code § 5-68-405 is amended to read as follows:
20          5-68-405.  Possession, sale, or distribution.
21          (a)  ~~Any person that, with knowledge of its contents,~~ A person that
22    knowingly sends or causes to be sent or brings or causes to be brought into
23    this state for sale or commercial distribution, or in this state prepares,
24    publishes, sells, exhibits, loans at a library, or commercially distributes,
25    or gives away or offers to give away or has in the person's possession with
26    ~~intent~~ the purpose to sell or commercially distribute or to exhibit or to
27    give away, ~~any~~ obscene printed or written matter or material other than
28    mailable matter, or any mailable matter known by the person to have been
29    judicially found to be obscene under this subchapter, or that knowingly
30    informs another of when, where, how, or from whom or by what means any of
31    these things can be purchased or obtained, upon conviction is guilty of a
32    Class D felony.
33          (b)  ~~Any person that, with knowledge of its contents,~~ A person that
34    knowingly has in the person's possession ~~any~~ obscene printed or written
35    matter or material other than mailable matter, or any mailable matter known
36    by that person to have been judicially found to be obscene under this

1  subchapter, <u>upon conviction</u> is guilty of a Class A misdemeanor.
2
3      SECTION 4. Arkansas Code § 6-25-105 is amended to read as follows:
4      6-25-105. Establishment of guidelines for selection, ~~removal~~
5  <u>relocation</u>, and retention of materials.
6      (a) Media centers shall have written policies to establish guidelines
7  for the selection, ~~removal~~ <u>relocation</u>, and retention of <u>physical</u> materials
8  <u>that are available to the public.</u>
9      (b) The school district shall have a written policy for addressing
10  challenged material <u>that is physically present in the library and available</u>
11  <u>to the public and meets the requirements stated in subsection (c) of this</u>
12  <u>section.</u>
13      <u>(c) A written policy adopted by a school district under subsection (b)</u>
14  <u>of this section shall provide, at a minimum, the following:</u>
15          <u>(1) A parent or guardian of a student affected by the material</u>
16  <u>to be challenged or an employee of the school district may challenge the</u>
17  <u>appropriateness of material available in the school district's media center;</u>
18          <u>(2) The school district shall decide if material being</u>
19  <u>challenged shall remain available throughout the challenge process;</u>
20          <u>(3) Before a person can file a challenge, the person shall</u>
21  <u>request a conference through the principal's office with a licensed media</u>
22  <u>center employee;</u>
23          <u>(4) Before a conference under subdivision (c)(3) of this section</u>
24  <u>occurs, the school district shall provide a copy of the following to a person</u>
25  <u>who requests a conference under subdivision (c)(3) of this section:</u>
26              <u>(A) The written policy adopted by a school district under</u>
27  <u>subsection (b) of this section; and</u>
28              <u>(B) A form or other method by which a person may request a</u>
29  <u>reconsideration of the appropriateness of the material being challenged;</u>
30          <u>(5) After the conference requested under subdivision (c)(3) of</u>
31  <u>this section occurs, if the person who requested the conference wants to</u>
32  <u>formally challenge the appropriateness of the material that was the subject</u>
33  <u>of the conference, the person shall complete and submit the request for</u>
34  <u>reconsideration using the form or other method provided under subdivision</u>
35  <u>(c)(4)(B) of this section to challenge the material that was the subject of</u>
36  <u>the conference;</u>

(6)(A)  In conducting a review of material being challenged, the principal of the school district shall select a committee of licensed personnel.

(B)  The principal or his or her designee shall be a member of the committee and may serve as the chair of the committee established under subdivision (c)(6)(A) of this section.

(C)  At least one (1) member of the committee established under subdivision (c)(6)(A) of this section shall be a media specialist.

(D)  The committee members who are not the principal or a media specialist shall be licensed personnel with curriculum knowledge appropriate for the material being challenged and be representative of diverse viewpoints;

(7)(A)  The committee established under subdivision (c)(6)(A) of this section shall determine if the material being challenged meets the criteria of selection.

(B)  Material being challenged:

(i)  Shall not be withdrawn solely for the viewpoints expressed within the material; and

(ii)  Shall be reviewed in its entirety and shall not have selected portions taken out of context;

(8)  The school district shall convene a meeting of the committee established under subdivision (c)(6)(A) of this section after allowing a reasonable time for the committee members to adequately review the material being challenged and the request submitted under subdivision (c)(5) of this section by the person challenging the appropriateness of the material;

(9)  The committee established under subdivision (c)(6)(A) of this section shall allow the person who submitted the request under subdivision (c)(5) of this section to present his or her request to the committee;

(10)  After hearing from the person who submitted the request under subdivision (c)(5) of this section, the committee established under subdivision (c)(6)(A) of this section shall meet to discuss the material being challenged;

(11)(A)  The committee established under subdivision (c)(6)(A) of this section shall vote to determine whether the material being challenged shall be relocated within the media center's collection to an area that is

1  *not accessible to minors under the age of eighteen (18) years.*
2  *(B) A member of the committee established under*
3  *subdivision (c)(6)(A) of this section who votes with the majority under*
4  *subdivision (c)(11)(A) of this section shall write a summary of the reasons*
5  *for the majority's decision.*
6  *(C) Notice of the committee's decision under subdivision*
7  *(c)(11)(A) of this section and the summary prepared under subdivision*
8  *(c)(11)(B) of this section shall be given by hand or by certified mail to the*
9  *person who submitted the request under subdivision (c)(5) of this section;*
10  *(12)(A) If the committee established under subdivision (c)(6)(A)*
11  *of this section decides not to relocate the material being challenged, the*
12  *person who submitted the request under subdivision (c)(5) of this section may*
13  *appeal the committee's decision to the board of directors for the school*
14  *district by filing a written appeal to the superintendent within five (5)*
15  *working days of the committee's decision or written receipt of the*
16  *committee's decision.*
17  *(B)(i) If a person appeals the decision of a committee*
18  *under this subdivision (c)(12), the superintendent shall present the material*
19  *being challenged, the request submitted by the person under subdivision*
20  *(c)(5) of this section, the committee's decision under subdivision (c)(11)(A)*
21  *of this section, and the summary prepared under subdivision (c)(11)(B) of*
22  *this section to the board of directors within fifteen (15) days of the*
23  *committee's decision.*
24  *(ii) In addition to the information required to be*
25  *provided under subdivision (c)(12)(B)(i) of this section, the superintendent*
26  *may also include the administration's recommendation regarding the appeal*
27  *submitted under this subdivision (c)(12).*
28  *(C)(i) The members of the board of directors shall review*
29  *the information submitted to them under this subdivision (c)(12) and shall*
30  *make a decision on the appeal within thirty (30) days of receiving the*
31  *information.*
32  *(ii) The decision of a board of directors under*
33  *subdivision (c)(12)(C)(i) of this section is final; and*
34  *(13) A meeting held regarding a challenge or an appeal submitted*
35  *under a written policy adopted by a school district under subsection (b) of*
36  *this section shall be a public meeting and the records submitted and*

1  considered at a meeting shall be public records under the Freedom of
2  Information Act of 1967, § 25-19-101 et seq.
3
4      SECTION 5.  Arkansas Code Title 13, Chapter 2, Subchapter 1, is amended
5  to add an additional section to read as follows:
6      13-2-106. Establishment of guidelines for selection, relocation, and
7  retention of materials.
8      (a)  Each county or municipal library shall have a written policy to
9  establish guidelines for the selection, relocation, and retention of physical
10  materials that are available to the public.
11      (b)  A county or municipal library shall have a written policy for
12  addressing challenged material that is physically present in the library and
13  available to the public and meets the requirements stated in subsection (c)
14  of this section.
15      (c)  A written policy adopted by a county or municipal library under
16  subsection (b) of this section shall provide, at a minimum, the following:
17          (1)  A person affected by the material to be challenged or an
18  employee of the county or municipal library may challenge the appropriateness
19  of material available in the county or municipal library;
20          (2)  The county or municipal library shall decide if material
21  being challenged shall remain available throughout the challenge process;
22          (3)  Before a person can file a challenge, the person shall
23  request a meeting with the librarian of the county or municipal library;
24          (4)  Before a meeting under subdivision (c)(3) of this section
25  occurs, the county or municipal library shall provide a copy of the following
26  to a person who requests a meeting under subdivision (c)(3) of this section:
27              (A)  The written policy adopted by the county or municipal
28  library under subsection (b) of this section; and
29              (B)  A form or other method by which a person may request a
30  reconsideration of the appropriateness of the material being challenged;
31          (5)  After the meeting requested under subdivision (c)(3) of this
32  section occurs, if the person who requested the meeting wants to formally
33  challenge the appropriateness of the material that was the subject of the
34  meeting, the person shall complete and submit the request for reconsideration
35  using the form or other method provided under subdivision (c)(4)(B) of this
36  section to challenge the material that was the subject of the meeting;

1        (6)(A)   In conducting a review of material being challenged, the
2    librarian of the county or municipal library shall select a committee of
3    library personnel.
4            (B)   The librarian or his or her designee shall be a member
5    of the committee and may serve as the chair of the committee established
6    under subdivision (c)(6)(A) of this section.
7            (C)   The committee members who are not the librarian shall
8    have knowledge appropriate for the material being challenged and be
9    representative of diverse viewpoints;
10        (7)(A)   The committee established under subdivision (c)(6)(A) of
11    this section shall determine if the material being challenged meets the
12    criteria of selection.
13           (B)   Material being challenged:
14                (i)   Shall not be withdrawn solely for the viewpoints
15    expressed within the material; and
16                (ii)   Shall be reviewed in its entirety and shall not
17    have selected portions taken out of context;
18        (8)   The county or municipal library shall convene a meeting of
19    the committee established under subdivision (c)(6)(A) of this section after
20    allowing a reasonable time for the committee members to adequately review the
21    material being challenged and the request submitted under subdivision (c)(5)
22    of this section by the person challenging the appropriateness of the
23    material;
24        (9)   The committee established under subdivision (c)(6)(A) of
25    this section shall allow the person who submitted the request under
26    subdivision (c)(5) of this section to present his or her request to the
27    committee;
28        (10)   After hearing from the person who submitted the request
29    under subdivision (c)(5) of this section, the committee established under
30    subdivision (c)(6)(A) of this section shall meet to discuss the material
31    being challenged;
32        (11)(A)   The committee established under subdivision (c)(6)(A) of
33    this section shall vote to determine whether the material being challenged
34    shall be relocated within the library's collection to an area that is not
35    accessible to minors under the age of eighteen (18) years.
36           (B)   A member of the committee established under

1   subdivision (c)(6)(A) of this section who votes with the majority under
2   subdivision (c)(11)(A) of this section shall write a summary of the reasons
3   for the majority's decision.
4                    (C)   Notice of the committee's decision under subdivision
5   (c)(11)(A) of this section and the summary prepared under subdivision
6   (c)(11)(B) of this section shall be given by hand or by certified mail to the
7   person who submitted the request under subdivision (c)(5) of this section;
8                    (12)(A)   If the committee established under subdivision (c)(6)(A)
9   of this section decides not to relocate the material being challenged, the
10  person who submitted the request under subdivision (c)(5) of this section may
11  appeal the committee's decision to the governing body of the county or city
12  by filing a written appeal to the executive head of the governing body of the
13  county or city within five (5) working days of the committee's decision or
14  written receipt of the committee's decision.
15                       (B)(i)   If a person appeals the decision of a committee
16  under this subdivision (c)(12), the executive head of the county or city
17  shall present the material being challenged, the request submitted by the
18  person under subdivision (c)(5) of this section, the committee's decision
19  under subdivision (c)(11)(A) of this section, and the summary prepared under
20  subdivision (c)(11)(B) of this section to the governing body of the county or
21  city within fifteen (15) days of the committee's decision.
22                             (ii)   In addition to the information required to be
23  provided under subdivision (c)(12)(B)(i) of this section, the executive head
24  of the county or city may also include his or her recommendation regarding
25  the appeal submitted under this subdivision (c)(12).
26                          (C)(i)   The members of the governing body of the county or
27  city shall review the information submitted to them under this subdivision
28  (c)(12) and shall make a decision on the appeal within thirty (30) days of
29  receiving the information.
30                             (ii)   The decision of the governing body of the
31  county or city under subdivision (c)(12)(C)(i) of this section is final; and
32                    (13)   A meeting held regarding a challenge or an appeal submitted
33  under a written policy adopted by a county or city library under subsection
34  (b) of this section shall be a public meeting and the records submitted and
35  considered at a meeting shall be public records under the Freedom of
36  Information Act of 1967, § 25-19-101 et seq.

1      *(d)*  *As used in this section:*
2            *(1)*  *"Executive head of the county or city" means:*
3                  *(A)*  *For a county library, the executive head of the*
4      *county;*
5                  *(B)*  *For a city library, the executive head of the city;*
6      *and*
7                  *(C)*  *For a library that is funded by both a county and a*
8      *city, the executive head of the county or city that provides the majority of*
9      *the funding for the library; and*
10           *(2)*  *"Governing body of the county or city" means:*
11                 *(A)*  *For a county library, the county;*
12                 *(B)*  *For a city library, the city; and*
13                 *(C)*  *For a library that is funded by both a county and a*
14     *city, the county or city that provides the majority of the funding for the*
15     *library.*
16
17     *SECTION 6.  Arkansas Code § 13-2-704 is amended to read as follows:*
18     *13-2-704. Disclosure permitted.*
19     *(a)*  *A library may disclose personally identifiable information*
20     *concerning any patron to:*
21           *(1)*  *The patron;*
22           *(2)*  *Any person with the informed, written consent of the patron;*
23           *(3)*  *A law enforcement agency or civil court, under a search*
24     *warrant; or*
25           *(4)*  *Any person, including without limitation the patron, who has*
26     *received an automated telephone notification or other electronic*
27     *communication for overdue materials or reserve materials if the person making*
28     *the request can verify the telephone number or email address to which the*
29     *notice was sent.*
30     *(b)*  *A library may disclose confidential library records to:*
31           *(1)*  *The patron; and*
32           *(2)*  *The parent or legal guardian of a patron who is younger than*
33     *eighteen (18) years of age.*
34
35                           */s/D. Sullivan*
36                           ***APPROVED: 3/30/23***

To: Crawford County JP Board, County Judge and County Judge Elect

From: Dr. Jeffrey Hamby and Tamara Hamby

Date: November 10, 2022

Re: Van Buren Public Library

We are concerned about the agenda that is being pushed by the Van Buren Public Library, aiming education of alternative lifestyles to prepubescent children. We have friends and employees that choose to live alternative lifestyles that we love dearly. We do not agree with that lifestyle but acknowledge their right to live the way they choose to live. We are not trying to infringe on those rights in any way. Our issue is with the constitutional rights of parents and our religious liberties being infringed upon by this progressive woke ideology normalizing and equating homosexual and transsexual lifestyles with heterosexual family units. And doing this without parental consent or the ability to opt out.

They have purchased, with taxpayer money, several books about alternative lifestyles that are aimed at prepubescent children. Some of these books are available in board book form which tells you the age they are targeting. (Book titles are included with this letter) Then they made a public display in the front of the library with these books. This represents an agenda to indoctrinate our community but especially our children with this content. The statement was made at the recent library meeting that the Crawford County area was the least educated area in the state concerning alternative lifestyles and that needed to be changed. They intend to start with our children.

Parents should be allowed to educate their children as they see fit on ideas and beliefs about sexuality. Efforts to expose children to age-inappropriate content and make parental notification and opt-out difficult or impossible undermine parents' constitutional right to control their children's education on sensitive topics such as human sexuality. Public libraries should not become a place where children are exposed to radical sexual ideology.

The increased prevalence of transgender ideology in culture and education has narrowed the treatment options for children with gender dysphoria. If normalized, then a true gender dysphoric pubertal or pre-pubertal child cannot seek appropriate therapy to correct this aberrant behavior.

Exposing our pre-pubertal children to colorful picture books equating homosexual and transsexual behavior to and as normal as heterosexual parenting without the consent of the parents, subverts our God given rights as parents and discriminates against us based for our religious beliefs.

Our parental rights and religious liberties are being subverted by a progressive woke ideology driven by the library director and her employees. Many professionals would still consider this behavior child abuse! And this board-certified Family physician in this community for over 25 years is one of them. Case law in Arkansans would also support our legal right to remove those people who desire to sexualize our children. Basically, in Arkansas you as a JP Board and County Judge are responsible for hiring people to represent the values of our community. These books are not required to be purchased by the library. The books in our library are purchased at the director's discretion. Combating the premature sexualization of children by adults requires focused attention from both lawmakers and courageous parents.

We are asking you to take the steps needed to ensure that this agenda is not sponsored by our tax money.



EXHIBIT
5



**Gentry C. Wahlmeier**

P.O. Box 1811
Van Buren, AR 72957

PH: (479) 431-3366
FAX: (479) 763-3987
EMAIL: gentry@wahlmeierlaw.com

WAHLMEIER LAW FIRM, P.A.

May 23, 2023

CCLS Board &
Director Eva White

Re:    Resignation per Act 372 Changes

Dear Board Members and Director White:

In our last general meeting I provided each of you with a summary of Act 372. The act adds A.C.A. § 13-2-106 to the laws of our State. That addition creates a requirement for the System to create or amend the policy for selection, relocation, and retention of physical materials. It has come to my attention that a conflict of interest may be created upon the enactment of Act 372 on August 1, 2023.

My letter only covered those items that are pertinent to the Library System. Continuing with the addition of A.C.A. § 13-2-106, beyond the challenge meeting, the law explains that the challenger may appeal to the County Judge and Quorum Court if the System's committee does not "find" for them. Pursuant to the rules of ethics that govern the practice of law, I am unable to advise both. Thus, I must resign. I will stay on in an advisory capacity until the end of June. As a Board, I advise that you hire new counsel.

Please remember that there are currently pending obligations to come into compliance with the new laws by August 1, 2023. Specifically, you must create a section that is not accessible to those under eighteen (18) and create a policy for challenging physical materials.

Sincerely,

Gentry C. Wahlmeier



EXHIBIT

8

Licensed in Arkansas and Oklahoma



**Gentry C. Wahlmeier**

WAHLMEIER LAW FIRM, P.A.

P.O. Box 1811
Van Buren, AR 72957

PH: (479) 431-3366
FAX: (479) 763-3987
EMAIL: gentry@wahlmeierlaw.com

May 23, 2023

Via Email Only:
Terrence Cain
Via Email: terrencecain@windstream.net

Brian Meadors
Via Email: brianmeadors@gmail.com

Re: May 18 Email to Quorum Court of Crawford County

Mr. Cain and Mr. Meadors,

This Firm represents Crawford County's Quorum Court. The Quorum Court is in receipt of your email dated May 18, 2023. That email also contains a draft Complaint of a civil case in the Western District of Arkansas.

Acting as the legislative branch of a County is a task that comes with greater difficulty than one would think. The balancing test between the freedom of an unbounded First Amendment and protecting children from exposure to materials that might harm their innocence exposes the core of the phrase *"rational minds may differ."* You even stated in your email that "Where we disagree… is how best to protect children."

This balancing test is coming to the forefront of the national conversation. At the state level, Act 372 passed the legislature and is going into effect shortly. Its effect will be to require libraries to have a section that is inaccessible to minors. Quorum Courts across the State will hear appeals on relocation of books within county library systems. The State legislature's Act 372 will make it necessary to continue modifying and changing the library system's policies and procedures.

The Quorum Court of Crawford County has made no laws that violate the First Amendment to the Constitution of the United States. Expanding that out to include case law from the Supreme Court, the Quorum Court of Crawford County has not violated any legal precedent. When the conversation began that sexualized material was in the children's section of the libraries within the System, Justices simply stated that a compromise should be reached. No ordinance was passed proclaiming that books should be moved. No direction or supervision was implemented.

Cordially,

Gentry Wahlmeier

EXHIBIT
9
PENGAD 800-631-6989

Licensed in Arkansas and Oklahoma

CrawfordCo_000067

CRAWFORD COUNTY, ARKANSAS

QUORUM COURT JOURNAL OF PROCEDURES

Judge Gilstrap reconvened from the November 21, 2022, Quorum Court regular meeting at 7:00 p.m. and with no further changes to the November 21, 2022, Quorum Court meeting and none heard Justice Peppas moved to approve, second by Justice Atwell.

---

DECEMBER 19, 2022

The Quorum Court of Crawford County, Arkansas met Decemer 19, 2022, for the twelfth regular meeting of the year. The meeting was held at 7:00 p.m. in the Circuit Courtroom I, 300 Main Street., Van Buren, Arkansas. Judge Gilstrap presiding. Gentry Wahlmeier, Prosecuting Attorney legal counsel was present. Roll was called. Members present were, Justice Awell, Carolan, DeCroo, Johnson, Meyers, Morrison, Peppas, Perry, Pinkerton, Shaffer, Wahlmeier, Woodruff.

The minutes of 11/21/2022 Regular meeting was presented. Justice Peppas moved to approve, second by Justice Woodruff and unanimous voice vote to approve as written.

The minutes of the 11/21/2022 CCARP Committee was presented. Justice Peppas moved to approve, second by Justice Pinkerton and unanimous voice vote to approve as written.

The minutes of the 11/21/2022 Budget Committee was presented. Justice Peppas moved to approve, second by Justice Wahlmeier and unanimous voice vote to approve as written.

REPORTS: Justice Atwell moved to approve, second by Justice Peppas and unanimous voice vote to approve all reports.

COMMITTEE REPORTS: Justice Shaffer gave an update on the Mountainburg Water Project, stating that the state has come thru with their portion of the funding and just waiting on the feds portion. Last month we extended the time limit for the CCARP money for the Mountainburg Water Project to February 28, 2023, for the $2.5 million dollars.



EXHIBIT
10

PENGAD 800-631-6989

COMMENTS FROM THE PUBLIC: Justice Peppas made the motion, second by Justice Atwell to the quorum to let Dr. Hamby speak for 15 minutes, unanimous voice vote was taken to allow this time. (1) Dr. Hamby spoke briefly on some material that was being displayed at our county library on LGBT in which our county tax dollars are being used. Today is simply about who is openly responsible for teaching our children morality, do the parents still hold that right or is up to the state, question their identity is not up to the state or their rights to. It is no more to teach someone else child my religion against the wishes of their parents' than to teach my child that a man can become a woman as you so identify. Ask yourself as leaders of our community is teaching our child that they may be queer or homosexual or a drag queen the best use of our limited tax resources. Not to just have these LGBT books in our county library, but to display them during queer history month. Every child that enters and sees this display thinks it is approved and accepted by our society. The mainstream medical community agrees have the right to appoint that releasing this information to children is harmful. The county judge and quorum court have the right to appoint a director of the county library that is directly connected to the community they serve. There is a simple way to fix this, Judge you need to meet with Diedra and there is a coalition that will purchase these books from the library, all we ask is we do not use any of the library fund to repurchase anymore, we ask you to protect our children from the sexualation (2) Sherry Marshall wished to congratulate Judge Gilstrap on his retirement and Justice Pinkerton for her new position as Mayor of Cedarville, also Justice Perry who will become our new Sherriff come January 1, 2023. I also would like to encourage you to not forget our problems at Uniontown on the use of tanzanite, hoping you might be able to do an ordinance concerning this matter. I do hope that we can come up with a compromise on our Library. We have worked to long and hard to have this great Library system. (3) Monica McCumber: addressed the quorum about a compromise that might could be met without having the books being removed and let parents be parents when they see their children in the library. I think there are policies about the age of children being by their self, supervised or unsupervised. I think there is a thing about the government not managing our children and let that happen in the way it can. Public libraries are there for the whole. I think we need a broad variety of books. I also think focusing on the kids there are things that the quorum court can do additionally take away your focus on the books and let the library to allow these books to be there, if they need to be moved to another area, great, whatever it takes to make them available to kids that might want to see them. Why not let the quorum court allow some more money for the sheriff to do public education on safe use in the community to education children on guns. There are other things that this group can do to protect these children in more sustainable way. I just ask for that and thank you. (4) John Riordan: I am a citizen of Rudy, and I would like to make a comment on the library situation, which I am here on behalf of the River Valley City Elders which is a Christian organization made of members of many denominations. We are here to encourage what is good and against any unrighteousness and here tonight as a lifelong citizen of Crawford County, as a father of six children and husband. I think there is a lot of people here tonight that don't approve of some of the books in the public library. My wife has taken our kids to the library many times and she has been telling me about inappropriate books on display in the children's section. About a month and a half ago she went there, and this book was on display in the children's section. It's the "hips of a drag queen that goes switch switch", Little Miss Hot Mess. There has books

CrawfordCo_000024

promoting homosexual lifestyles, gender confusion, glorifying drag queens that are highlighted on displays. This are some of the first books that someone notices when one starts looking for books that are in the children section. So these books have not just purchased and made available in local libraries, but these books have been promoted and put in a location where our children would grab them first. I believe the library system is promoting parental rights and parental judgement as to if and when the parent would want subject their children to such literature. We want to encourage our citizens and children to things that are noble that would reflect our community values. We do not want our libraries to be an institution to be used by activists who seek to use their positions to socially engineer our community and pervert parental authority. I just like to note that four citizens in Crawford County requested the library board to reconsider six books in the library at the November board meeting. The three library board members present voted down their request and didn't address their concern. These books were If you're a Drag Queen and You Know It, Pink Blue and You, The Meaning of Pride, The big book of Pride Flag, Uncle Bobby's Wedding and Bye Bye Binary. There are certain persons employed by the Crawford County Library system that are ordering and promoting these books to our children. As a parent of six children and living in this county, I do not want my children or anyone else children to be exposed to these books seeking to take away their innocents. As a taxpayer of this county, I do not want my taxpayer money spent on purchasing this material. We all want a library that we can enjoy without worrying about how we are going to protect our children from these destructed books. I am asking the Quorum Court to exercise its roll and I will second Dr. Hamby's in his effort to come to a reasonable solution for this problem. This does not represent the will of the people of Crawford County and does not represent what I want as a citizen. Also, I would like to say to research on this issue it has come clear that the citizens need to get involved supporting our library system and encouraging them to pursue a better direction and better standard. I encourage that to the people here tonight, it is a very important issue and a serious one, please remember the very strong statement that Jesus made for those who would lead the little ones to believe in him. I would hope you would exercise your authority and take some action. (5) Our Quorum Court Attorney Gentry Wahlmeier stated that the library system is a county entity funded by a milage that was passed by the voters of Crawford County. That milage generates revenue that is budgeted to the library, so the revenue can only be used for the purpose of the library. So, the Quorum Courts roll as always is as the legislative branch to appropriate its money, so directly answering Justice Morrison question the Quorum Court can appropriate any percentage of that milage to the budget that has been requested by the library system. (6) Justice Johnson requested that the chairperson of the Library Board speak on behalf of the library. Jami Ann Balkman spoke to the quorum that she had been serving on the Library Board for nine years and has been the chairperson for the last five. Our Library board is a neutral political entity, and we don't take a political stand in any way. Legally the right to determine what a child looks at is solely with the parent it's not the library responsibly and the other thing we are charged with is the first amendment rights of everyone in our community, before tonight I have talked with several people and Dr. Hamby, also Justice Johnson I think there is a way that a compromise can be found. When they brought the books to us on reconsideration there is criteria that we are supposed to follow and those books, they didn't, it was very difficult with the board, but we were trying to avoid any censorship and be very, very careful about that and our library milage that we are talking about has not ask for an increase in our milage since 1998. I don't know of

any of our departments in the county that has the same funding as they did in 1998, but we try to be very careful. If someone come and tried to sue us for censorship, we would not survive it, so we try to walk that fine line of what the values of most of the people need and still represent everyone in our community. So, we try to be neutral repeatedly, so what I am asking for is a compromise. When we didn't remove them from the self, which that was what we were asked to do, that is censorship. I think there is room for a compromise and if we could get the parties together if that makes any sense. I don't think anybody on our board wants to in any way offend anyone in our community. We have asked our employees about how they display things and since I have made that request, these changes have been made and I hope this will help with any of these issues that we have had. Justice Peppas stated that we as a quorum are not neutral, we belong to certain parties and I am conservative and I have had constituents that are prepared to have a ballot measure take place to reduce the milage and you said you have not had a milage increase since 1998, but we are not necessarily neutral up here and if they want to go ahead and make that move it will be up to the people and no one wants that to happen. Mrs. Balkman stated that she hopes for a compromise and not go that route, Justice Peppas stated that this was not going to go away. Mrs. Balkman said that would permanently close our library, she would hate to see that happen because the library provides so many programs. The library provides food and a warm place for the children. There is room for compromise, like many people in this room and up here on this court, I am on my way off the board, this is the last thing as a member of the board is to come and answer questions tonight. What I am asking of the interested parties make an appointment with our library director and remaining board members to come to a compromise before it comes to shutting the doors that are going to put some people out in the cold and the heat, I am just asking for a compromise even if it means sitting down with the people that you don't agree with. I have asked them to make all further displays neutral and not to have groupings of the same topics and to spread them out, so they don't provide the imagine of an agenda or in anyway an appointed message. We can't say we can never put these books on display, but we can certainly do it in a way that is much more diverse and continue to provide neutral stand with the library. Justice Wahlmier asked if there had been books removed from our library, because it is happening all over the country. Mrs. Balkman stated that not within her nine years, but that doesn't mean that it hasn't happened. We did have a lot of people come forth over Harry Potter, but I do know we have had some challenges at times, within the nine years we have only had 6 individuals to challenge. Justice Walhmeir stated that he new that some states had band some books due to racial slurs, so obviously community standards in which Minnesota and California have taken state action due to racial slurs. Its not that every book must be in the library, it kind of comes back to us as a community to make that decision. Mrs. Balkman stated that the regular library board meeting will be the second Tuesday of every month, we typically do one at each of the five libraries, starting in alphabetical order. We were discussing that we might try to have the next one in Van Buren concerning the larger than usual crowd at the January meeting, but I don't think that has been finalized. Justice Perry wanted to know if this was just in the Van Buren library or in all libraries? Mrs. Balkman stated that there was several in the Alma library because I know we have a patron that comes to the Alma Library quite a bit. (7) Lady did not give her name to where the microphone picked it up, ask if the library was taking government funding or grants or if there were any government funds that they would have to answer to as far as the criteria of what can and can't be excepted. Second question is

have to answer to as far as the criteria of what can and can't be excepted. Second question is how many Christian books are in the children's section or is there any. Judge Gilstrap stated that the library did receive some ARP money which was federal dollars. (8) Mrs. Odom, that uses the Alma library stated that she uses the library quite frequently and she has the right to be able to do this and pick a subject and be able to learn about it. In which I have found out that people are different and that's ok. I have learned to support my kids and not break that bond forever. Things that helped us is some of these books that showed my kids it was ok to be different and you are not broken. (9) Paul Barker, the term censor can raise emotions, many of us here agree that some of the books are not appropriate to put in our library and if they got there, we would want them removed. The word censorship was brought up does not need to scare us away from making decisions, I appreciate that prospective. I can't speak for everyone, but the concern here is books orientated to children which are advocacy as opposed to information. (10) Representative Charlene Fite, I am not here to speak as an elected official but as a mother, grandmother and citizen. To me the criteria here is if my neighbor gave my child a book and I looked at that book and I thought this person is grooming my child, this person is trying to convince my child to do something that is not in my child's best interest. This is wrong and I am going to take this to the law enforcement agency and show them that my child is being groomed. Why is that different than if the library that uses my money as a taxpayer gives my child a book which I consider is grooming my child. There is a difference between fiction and nonfiction and a difference between information and advocacy. (11) Tammy Wilson, I was one of the ones at the library board meeting and also one that has challenged the book and we have asked them several questions about different things, and they wouldn't give us an answer on anything. We even ask if they couldn't anything because of the first amendment then why do you have a form to challenge the book. Every book that I have looked at said new, so I ask why all of a sudden, these new books were being ordered and are they all being requested, in which I did not get an answer on that. Then we had another man ask where you draw the line, is it prognathy or just because it says its okay to order, where do you draw the line and they wouldn't answer that question. He said let's compromise not necessarily band them but take them out the children section and put them into the adult section and they really weren't really wanting to compromise that night, so we were just shut down. (12) Diedre Grzymala, director of the Crawford County Library System spoke addressing that some of these books are new, some of them I ordered myself, but I also ordered books on men and women of God. I have also a whole bag of books that are Christian and I consider myself a Christian as well. I grew up here and in church, also this is my hometown, I also went to school and graduated. I have worked very hard on my master's degree in librarian, and I have been a librarian for almost eight years. This is my life and my career. Justice Peppas stated that nobody was asking for her job just a compromise in this situation. Mrs. Grzymala stated she was more than willing to make a compromise. I did have them take the LGBT books out of the children section and make an LGB section for itself, so families that who want to check out those books can go over there and check them out and for the ones that don't want to see it its not in the children's section. Now none of that was discussed in our library board meeting and the meetings are recorded, to hear that recording you can, but there was no compromise mentioned at that board meeting. We want to provide the opportunity to everyone and that is how we stay neutral in the libraries for everyone. I want to explain the display, there was no LGBT display, these books were on the new bookshelf and table, so we have three shelves full

shelf, and they are put out at random. Justice Morrison ask if there was a meeting schedule for a compromise. Mrs. Grzymala stated that there was a board meeting schedule for January 10, 2023. I think moving forward we will be very particular in our selection. Justice Walhmeier asked if these were still in the children's section and Mrs. Grzymala stated that yes they were and Justice Walhmeier asked if she had the power to move them out of the children's section and Mrs. Grzymala stated yes and Justice Walhmeier asked if she was going to do that tomorrow and Mrs. Grzymala stated that she sure could. Judge Gilstrap stated that would start the compromise. Judge Gilstrap stated that this was not an issue that just needs to stop it needs to be followed through even after the transfer of elected officials. Next library board meeting will be held on the second Tuesday of January, starting at 4:30 p.m. at the Van Buren complex.

JUDGES NOTES: (1) Lots of projects we are working with currently one being the new 911 Call Center, also the remodel of Division II and III, new roof on the Circuit Clerk complex, taking bids on having new windows to be installed and the painting of the courthouse. Chris Keith will be taking on the position as the new County Judge come January 1, 2023, wish him the best. Looking forward to the progress of the port and I-49.

CALL FOR OLD BUSINESS:

CALL FOR NEW BUSINESS:

1. ORDINANCE NO. 2022-79: AN APPROPRIATION ORDINANCE AMENDING THE BUDGET ORDINANCE NUMBER 2021-52 TO APPROPRIATE ADDITIONAL FUNDS AND APPROVE ADDITIONAL EXPENDITURES TO THE CRAWFORD COUNTY 2022 BUDGET FOR VARIOUS DEPARTMENTS; TRANSFERS AND FOR OTHER PURPOSES: On motion by Justice Shaffer to place Ordinance No. 2022-79 as amended on the floor by title only, first by Justice DeCroo, second by Justice Pinkerton Ordinance No. 2022-79 was presented. After reading by title only as amended, Justice Peppas moved to approve, seconded by Justice Perry. There was no discussion by the court. Roll call vote 13 yeas.

2. ORDINANCE NO. 2022-80: AN APPROPRIATION ORDINANCE TO ESTABLISH THE ANNUAL OPERATING BUDGET FOR CALENDAR YEAR 2023. On motion by Justice Shaffer to place Ordinance No. 2022-80 on the floor by title only, first by Justice Atwell, second by Justice Peppas Ordinance No. 2022-80 was presented. After reading by title only, Justice Peppas moved to approve, second by Justice Atwell. There was no discussion by the court, roll call vote, 13 yeas.

of kid's books and on the top, we sit the new ones. It is six months that they stay on the new shelf, and they are put out at random. Justice Morrison ask if there was a meeting schedule for a compromise. Mrs. Grzymala stated that there was a board meeting schedule for January 10, 2023. I think moving forward we will be very particular in our selection. Justice Walhmeier asked if these were still in the children's section and Mrs. Grzymala stated that yes they were and Justice Walhmeier asked if she had the power to move them out of the children's section and Mrs. Grzymala stated yes and Justice Walhmeier asked if she was going to do that tomorrow and Mrs. Grzymala stated that she sure could. Judge Gilstrap stated that would start the compromise. Judge Gilstrap stated that this was not an issue that just needs to stop it needs to be followed through even after the transfer of elected officials. Next library board meeting will be held on the second Tuesday of January, starting at 4:30 p.m. at the Van Buren complex.

JUDGES NOTES: (1) Lots of projects we are working with currently one being the new 911 Call Center, also the remodel of Division II and III, new roof on the Circuit Clerk complex, taking bids on having new windows to be installed and the painting of the courthouse. Chris Keith will be taking on the position as the new County Judge come January 1, 2023, wish him the best. Looking forward to the progress of the port and I-49.

CALL FOR OLD BUSINESS:

CALL FOR NEW BUSINESS:

1. ORDINANCE NO. 2022-79: AN APPROPRIATION ORDINANCE AMENDING THE BUDGET ORDINANCE NUMBER 2021-52 TO APPROPRIATE ADDITIONAL FUNDS AND APPROVE ADDITIONAL EXPENDITURES TO THE CRAWFORD COUNTY 2022 BUDGET FOR VARIOUS DEPARTMENTS; TRANSFERS AND FOR OTHER PURPOSES: On motion by Justice Shaffer to place Ordinance No. 2022-79 as amended on the floor by title only, first by Justice DeCroo, second by Justice Pinkerton Ordinance No. 2022-79 was presented. After reading by title only as amended, Justice Peppas moved to approve, seconded by Justice Perry. There was no discussion by the court. Roll call vote 13 yeas.

2. ORDINANCE NO. 2022-80: AN APPROPRIATION ORDINANCE TO ESTABLISH THE ANNUAL OPERATING BUDGET FOR CALENDAR YEAR 2023. On motion by Justice Shaffer to place Ordinance No. 2022-80 on the floor by title only, first by Justice Atwell, second by Justice Peppas Ordinance No. 2022-80 was presented. After reading by title only, Justice Peppas moved to approve, second by Justice Atwell. There was no discussion by the court, roll call vote, 13 yeas.

ANNOUNCEMENTS: (1) Justice Shaffer presented plaques to the following up on their retirement with the county:
(1) Jo Wester, County Clerk – 3 years and 4 months
(2) Beverly Pyle, County Treasurer – 12 years
(3) Raymond Harvey, Justice of Peace #5 – 6 years
(4) Paul Johnson, Justice of Peace #7 -4 years
(5) Chase DeCroo, Justice of Peace #3 – 4 years
(6) Daniel Perry, Justice of Peace #9 – 4 years
(7) Debbie Pinkerton, Justice of Peace #1- 1 year
(8) Dennis Gilstrap, County Judge – 6 years

(2) Elaine Stanfield, it has been a fun six years and an interesting journey, thank you for letting me go along with you. New incoming Justice Morgan Morgan is going to be closing with the song "God Bless America".

RECESSED: On motion by Justice Peppas and second by Justice Morrison meeting was recessed at 7:40 p.m.

DATE ___1- 18 - 2023___

CHRIS KEITH, COUNTY JUDGE

ATTEST: STACEY SHELLY COUNTY CLERK

CRAWFORD COUNTY, ARKANSAS

QUORUM COURT JOURNAL OF PROCEDURES

FEBRUARY 21, 2023



The Quorum Court of Crawford County, Arkansas met February 21, 2023, for
the second regular meeting of the year. The meeting was held at 7:00 p.m. in the Circuit
Courtroom I, 300 Main St., Van Buren, Arkansas. Judge Chris Keith presiding. Gentry
Wahlmeier, Prosecuting Attorney legal counsel was present. Roll was called. Members present
were Justice's Arnold, Atwell, Carolan, Cox, Jennings, Martin, Morgan, Myers,
Peppas, Shaffer, Wahlmeier, Woodruff with Justice Morrison, District 4, vacant.

The following minutes of 1/17/2023 meetings were presented, American Rescue, Personal,
Budget, and Regular Quorum Court. Justice Atwell moved to approve, second by Justice
Morgan and unanimous voice vote to approve as written.

REPORTS: Justice Peppas moved to approve, second by Justice Atwell and unanimous voice
vote to approve all reports as written.

Also Judge Chris Keith ask Prosecuting Attorney Kevin Holmes to address the quorum on the
county legislative audit for 2021. Mr. Holmes stated that there was one finding and it was in
the County Clerk's office. The finding was that an e-mail had been sent to change an
employee's banking information which turned out to be fraud. The amount was over $1,000.00
and a police report was made to the Van Buren Police Department at that time. Prosecuting
Attorney Kevin Holmes followed up on the finding and found that there was no criminal intent.
The County Clerk's office only excepts in person and signed to make any changes on a bank
account from that day forward. I did respond back to the legislative audit that no criminal intent
was found.

COMMITTEE REPORTS: In the previous years past all 13 justices have been on all the
committees but I think we are going to back that off and place 5 justices on each committee.
This can be started next month in March.

COMMENTS FROM THE PUBLIC: Justice Shaffer made the motion to strike the one
retentive per group because I wanted to be sure every one is allowed to speak. Also make a
motion to move Comments from the Public after the ordinances and before announcements,
second by Justice Carolan, unanimous voice vote

JUDGES NOTES: (1) The bids for the Crawford/Franklin County Silver Bridge that we are
parting with Franklin County, the state has opened bids hopefully we will get started on that
soon. (2) Pointer Trail East, drainage project will be opening the bids on that on March 2,
2023. (3) Mike Moxley, (Republican), Election Chairman, introduced John Paul William,
Commissioner (Republican) and Memory Boucher, Commissioner (Democrat). Mr. Moxley
explained to the quorum what all the election commission does regarding all elections and

the training of all the poll workers. Mr. Moxley announced that our election coordinator, Tim Walker will be retiring on March 3, 2023 and we are looking to find a replacement.(3)Justice Atwell has agreed to represent the Quorum Court at the April 22, 2023, Association of Arkansas Counties meeting in Little Rock, Arkansas.

CALL FOR OLD BUSINESS:

CALL FOR NEW BUSINESS:

1. ORDINANCE NO. 2023-7: AN ORDINANCE SETTING THE CALENDAR OF QUORUM COURT MEETINGS FOR MARCH AND NOVEMBER OF 2023. On motion by Justice Shaffer to place Ordinance No. 2023-7 on the floor, Justice Woodruff moved to approve, second by Justice Atwell, Ordinance No. 2023-7 was presented. After reading in its entirety, Justice Woodruff moved to approve, second by Justice Martin. There was some discussion by the court. Roll call vote 8 yeas, 4 nays and 1 vacant. This passed due to most of the vote due to being an administrative Ordinance.

2. ORDINANCE NO. 2023-8: AN ORDINANCE PROVIDING PAYMENT OF STIPENDS TO SHERIFF OFFICE EMPLOYEES; AND FOR OTHER PURPOSES. On motion by Justice Shaffer to place Ordinance No. 2023-8 on the floor, first by Justice Woodruff, second by Justice Atwell, Ordinance No. 2023-8 was presented. After reading by title only, Justice Morgan moved to approve, second by Justice Carolan. There was some discussion by the court. Roll call vote 12 yeas, 1 vacant. Justice Wahlmeier moved to place emergency clause for roll call, second by Justice Atwell. Emergency roll call vote 12 yeas, 1 vacant.

3. ORDINANCE NO. 2023-9: AN ORDINANCE SETTING OVERTIME PAY FOR SHERIFF DEPUTIES AND JAILERS, AND FOR OTHER PURPOSES. On motion by Justice Shaffer to place Ordinance No. 2023-9 on the floor by title only, first by Justice Peppas, second by Justice Cox. Ordinance No. 2023-9 was presented. After reading by title only, Justice Atwell moved to approve, second by Justice Woodruff. There was some discussion by the court. Roll call vote 12 yeas, 1 vacant. Justice Shaffer moved to place emergency clause for roll call, second by Justice Peppas. Emergency roll call vote 12 yeas, 1 vacant.

4. ORDINANCE NO. 2023-10: AN ORDINANCE IN ADDITION TO THE PROCEDURAL ORDINANCE DEFING CITIZENS FOR PUBLIC INPUT AND FOR OTHER PURPOSE. On motion by Justice Shaffer to amend Ordinance 2023-10 (to the 5-minute speaking time per speaker at the Judge discretion to add additional time), first by Justice Atwell, second by Justice Morgan. Ordinance 2023-10 was read by title only and as amended. Justice Peppas moved to approve, second by Justice Morgan. There was no discussion by the court. Roll call 12 yeas, 1 vacant. Justice Shaffer moved to place emergency clause for roll call, second by Justice Cox. Emergency roll call vote 12 yeas, 1 vacant.

5. ORDINANCE NO. 2023-11: AN ORDINANCE PROVIDING PAYMENT OF SEVERANCE TO THE DIRECTOR OF THE CRAWFORD COUNTY LIBRARY SYSTEM; AND FOR OTHER PURPOSES. On motion by Justice Shaffer to amend and read by title only (**to change the payout fund from County General Fund to Library Fund 3008 and to pay for Mrs. Grzymala's health and dental benefit premiums thru September 1, 2023, also out of Library Fund 3008**), first by Justice Peppas, second by Justice Morgan. Ordinance 2023-11 was read by title only as amended, Justice Peppas moved to approve, second by Justice Morgan. There was no discussion by the court. Roll call call vote 12 yeas, 1 vacant. Justice Atwell moved to place emergency clause for roll call, second by Justice Peppas. Emergency roll call vote 12 yeas, 1 vacant.

6. ORDINANCE NO. 2023-12: AN APPROPRIATION ORDINANCE AMENDING THE BUDGET ORDINANCE NUMBER 2021-52 TO APPROPRIATE ADDITIONAL FUNDS AND APPROVE ADDITIONAL EXPENDITURES TO THE CRAWFORD COUNTY 2022 BUDGET FOR VARIOUS DEPARTMENTS; TRANSFERS AND FOR OTHER PURPOSES. On motion by Justice Shaffer to place Ordinance No. 2023-12 by title only, first by Justice Peppas, second by Justice Wahlmeier. Ordinance No. 2023-12 was presented. After reading by title only, Justice Peppas moved to approve, second by Justice Arnold. There was no discussion by the court. Roll call vote 12 yeas, 1 vacant.

7. ORDINANCE NO. 2023-13: AN APPROPRIATION ORDINANCE AMENDING THE BUDGET ORDINANCE NUMBER 2022-80 TO APPROPRIATE ADDITIONAL FUNDS AND APPROVE ADDITIONAL EXPENDITURES TO THE CRAWFORD COUNTY 2023 BUDGET FOR VARIOUS DEPARTMENTS; TRANSFERS AND FOR OTHER PURPOSES. On motion by Justice Shaffer to place Ordinance No. 2023-13 by title only as amended, first by Justice Atwell, second by Justice Woodruff. Ordinance No. 2023-13 was presented. After reading by title only as amended, Justice Peppas moved to approve, second by Justice Carolan. There was no discussion by the court. Roll call vote 12 yeas, 1 vacant.

8. RESOLUTION NO. 2023-2: ARKANSAS RURAL COMMUNITY GRANT PROGRAM APPLICATION FOR TURNER COMMUNITY. On motion by Justice Shaffer to amend the agenda and add Resolution No. 2023-2 on the floor. First by Justice Peppas, second by Justice Woodruff. Unanimous voice vote to approve to add Resolution No. 2023-2 to the agenda. On motion by Justice Shaffer to place Resolution No. 2023-2 on the floor by title only, first by Justice Atwell, second by Justice Myers. Resolution No. 2023-2 was presented. After reading by title only, Justice Peppas moved to approve, second by Justice Myers. There was no discussion by the court. Roll call vote 12 yeas, 1 va

COMMENTS FROM THE PUBLIC: (1) There were several individuals that addressed the quorum concerning the situation of the library. (2) Also, there was a couple that addressed the quorum concerning going back to paper ballots.

ANNOUNCEMENTS:

ADJOURN:  On motion by Justice Peppas and second by Justice Atwell meeting was adjourned at 8:35 p.m.

DATE  3-14- 2023

CHRIS KEITH, COUNTY JUDGE

ATTEST:

STACEY SHELLY, COUNTY CLERK