# In The Matter Of:

*Fayetteville Public Library, et al v.*
*Crawford County, Arkansas, et al*

---

*Donald Nathan Coulter, Esq.*
*April 1, 2024*
*CERTIFIED ORIGINAL/COPY TRANSCRIPT*

---

*Michelle Satterfield, CCR*
*1955 Little River Drive*
*Conway, Arkansas  72034*
*(501)336-7414*
*Satterfield@conwaycorp.net*

Original File Donald Nathan Coulter, Esq..txt
Min-U-Script® with Word Index

## Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FAYETTEVILLE PUBLIC LIBRARY, a political
subdivision in the City of Fayetteville,
State of Arkansas; EUREKA SPRINGS CARNEGIE
PUBLIC LIBRARY; CENTRAL ARKANSAS LIBRARY
SYSTEM; NATE COULTER; OLIVIA FARRELL;
HAYDEN KIRBY;MIEL PARTAIN, in her own capacity
and as parent and next friend of MADELINE PARTAIN;
LETA CAPLINGER; ADAM WEBB;
ARKANSAS LIBRARY ASSOCIATION; ADVOCATES FOR
ALL ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
WORDSWORTH COMMUNITY BOOKSTORE, LLC, d/b/a
WORDSWORTH BOOKS; AMERICAN BOOKSELLERS ASSOCIATION;
ASSOCIATION OF AMERICAN PUBLISHERS,INC.; AUTHORS
GUILD, INC.; COMIC BOOK LEGAL DEFENSE FUND
and FREEDOM TO READ FOUNDATION,                PLAINTIFFS

vs.                                    NO. 5:23-CV-05086-TLB

CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH, in his
official capacity as Crawford County Judge;
TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
MATT DURRETT; JEFF PHILLIPS; WILL JONES; TERESA
HOWELL; BEN HALE; CONNIE MITCHELL; DAN TURNER;
JANA BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE HUNTER;
DANIEL SHUE; JEFF ROGERS; DAVID ETHREDGE; TOM TATUM,
II; DREW SMITH; REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
CAROL CREWS; KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each and in his or her official capacity as a
prosecuting attorney for the State of Arkansas, DEFENDANTS

ORAL DEPOSITION

OF

DONALD NATHAN COULTER, ESQ.

***** THE ABOVE-STYLED MATTER was reported by Michelle R.
Satterfield, CCR, LS Certificate No. 570, at the Fuqua
Campbell, P.A., located at 3700 Cantrell Road, Suite 205,
Little Rock, Arkansas, commencing on the 1st day of April
2024, at 9:07 a.m.  *****

## Page 2

A P P E A R A N C E S

MR. JOHN T. ADAMS
Attorney at Law
Fuqua Campbell, P.A.
Riviera Tower - 3700 Cantrell Road, Suite 205
Little Rock, Arkansas  72201
jadams@fc-lawyers.com

*** For the Plaintiffs, Central Arkansas Library System,
Nate Coulter and the Eureka Springs Carnegie Public
Library ***

MR. NOAH WATSON
Senior Assistant Attorney General
Arkansas Attorney General's Offices
323 Center Street, Suite 200
Little Rock, Arkansas  72201
Noah.Watson@ArkansasAG.gov

*** For the State of Arkansas Prosecuting Attorneys ***

MS. BETTINA E. BROWNSTEIN
Attorney at Law
Bettina E. Brownstein Law Firm
904 West 2nd Street, Suite 2
Little Rock, Arkansas  72201
bettinabrownstein@gmail.com

*** For the Plaintiffs, Olivia Farrell, Jennie Kirby,
Hayden Kirby and Leta Caplinger ***
*** On Behalf of the Arkansas Civil
    Liberties Union Foundation, Inc. ***

MR. SAMUEL S. MCLELLAND
Attorney at Law
PPGMR Law, PLLC
201 East Markham Street, Suite 201
Little Rock, Arkansas 72201
sam@ppgmrlaw.com

*** For Crawford County, Arkansas, and County Judge
    Chris Keith, in his official capacity ***

## Page 3

A P P E A R A N C E S (CONTINUED)

MR. BENJAMIN M. SEEL
Attorney at Law
Democracy Forward Foundation
P.O. Box 34554
Washington, DC  20043
bseel@democracyforward.org
                            (VIA ZOOM)
*** For the Arkansas Library Association, Advocates for
All Arkansas Libraries and Adam Webb, in his individual
capacity ***

MR. MICHAEL A. BAMBERGER
Attorney at Law
Dentons US, LLP
1221 Avenue of the Americas
New York, NY  10020
michael.bamberger@dentons.com
                            (VIA ZOOM)
*** For the Plaintiffs, Pearl's Books, LLC; Wordsworth
Community Bookstore, LLC; American Booksellers
Association; Association of American Publishers, Inc.;
Authors Guild, Inc; Comic Book Legal Defense Fund; and
Freedom to Read Foundation ***

MR. GLENN V. LARKIN
MR. PHILIP A. ELMORE
Attorneys at Law
Quattlebaum, Grooms & Tull, PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas  72762
glarkin@qgtlaw.com
pelmore@qgtlaw.com
                            (VIA ZOOM)
*** For the Plaintiff, Fayetteville Public Library ***

## Page 4

I N D E X

| TOPIC | PAGE |
|---|---|
| APPEARANCES | 2-3 |
| STIPULATIONS | 5 |
| WITNESS SWORN:  Donald Nathan Coulter, Esq. | 6 |
|         Examination by Mr. Watson | 6 |
|     Examination by Mr. McLelland | 121 |
|     Examination by Mr. Adams | 149 |
|     Further Examination by Mr. Watson | 155 |
| REPORTER'S CERTIFICATE | 160 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Bates No. CALS00067 | 36 |
| Exhibit 2 | Bates No. CALS00066 | 37 |
| Exhibit 3 | Bates Nos. CALS00001-CALS00004 | 42 |
| Exhibit 4 | Bates No. CALS00005 | 53 |
| Exhibit 5 | Bates Nos. CALS00006-CALS00008 | 66 |
| Exhibit 6 | Bates Nos. CALS00009-CALS00025 | 66 |
| Exhibit 7 | CALS Internet Use Disclaimer | 78 |
| Exhibit 8 | 20 U.S.C.A. 9134 State Plans | 79 |
| Exhibit 9 | Three-Page Email Thread | 91 |
| Exhibit 10 | Two-Page Email Thread | 95 |
| Exhibit 11 | List of Thirty Books | 151 |
            (COPIES OF EXHIBITS SCANNED INTO ETRANSCRIPT)

Page 5

1    ANSWERS AND DEPOSITION OF DONALD NATHAN COULTER,
2  ESQ., a witness produced at the request of the DEFENDANTS,
3  was taken in the above-styled and numbered cause on the
4  1st day of April 2024, before Michelle R. Satterfield,
5  CCR, a Notary Public in and for Faulkner County, Arkansas,
6  at the Law Offices of the Fuqua Campbell Law Firm, located
7  at the Riviera Tower, 3700 Cantrell Road, Suite 205,
8  Little Rock, Arkansas, at 9:07 a.m., pursuant to the
9  agreement hereinafter set forth.
10        S T I P U L A T I O N S
11        IT IS STIPULATED AND AGREED by and between the
12  parties through their respective counsel that the
13  deposition of Donald Nathan Coulter, Esq. may be taken at
14  the time and place designated pursuant to the Federal
15  Rules of Civil Procedure.
16            * * * * *
17
18
19
20
21
22
23
24
25

Page 6

1        DONALD NATHAN COULTER, ESQ.
2  the witness hereinbefore named, having been previously
3  cautioned and sworn, or affirmed, to tell the truth, the
4  whole truth, and nothing but the truth, testified as
5  follows:
6            EXAMINATION
7  BY MR. WATSON:
8  Q    Good morning, Mr. Coulter.
9  A    Good morning.
10  Q    I'm Noah Watson.  I know we met earlier.  I'm
11  representing the prosecuting attorneys and I'm with the
12  Attorney General's Office.  Hopefully we won't be here too
13  long, but we will see.
14        So first of all, have you ever been deposed?
15  A    Yes.
16  Q    Okay.  When was that?  Well, actually we'll get into
17  that in just a second.  If you've been deposed, you
18  probably know the ground rules, so I will just make sure I
19  hit those real fast, so we're on the same page.
20        Yes and no -- and I understand you're an Attorney as
21  well, so I'm sure you've taken depositions, but if you
22  would respond with yeses, nos, verbal answers, no uh-huhs,
23  huh-uhs, so the court reporter can get it.
24  A    Of course.
25  Q    Also, make sure we both finish talking, so you get my

Page 7

1  question and I get your answer, so it's clear on the
2  record.  And if you don't understand a question, you need
3  me to clarify, please ask me to do that.
4  A    I will.
5  Q    And if you don't, I'll just assume that you
6  understand the question.
7  A    Fair enough.
8  Q    All right.  So you've been deposed before.  When was
9  that?
10  A    I have given one deposition in my life and I'm -- it
11  was circa 2013, '14.
12  Q    Okay.  And was that related to a case you were a
13  named plaintiff in?
14  A    Yes.
15  Q    Okay.  What case was that?
16  A    I had a dispute with an attorney who had associated
17  me in a case in Arkansas over a fee.
18  Q    All right.  And I think we can put that aside.
19        Are you from Arkansas originally?
20  A    I am.
21  Q    Okay.  What part?
22  A    I was born and raised in Nashville, Arkansas, in
23  Howard County.
24  Q    My wife is from Delight, so not too far away from --
25  A    Delight is Pike County next door.

Page 8

1  Q    Yes.  And have you lived in Arkansas your whole life?
2  A    Yes, with the exception of the seven years I was a
3  student.
4  Q    Okay.
5  A    College and law school.
6  Q    So you went to Nashville for high school?
7  A    I did.
8  Q    And where did you go to college?
9  A    Harvard.
10  Q    Harvard.  And law school?
11  A    Harvard.
12  Q    All right.  Did you obtain any other degrees?
13  A    I did.  I have a Masters in Library Science from the
14  University of Wisconsin, Milwaukee.
15  Q    Okay.  And when did you obtain that?
16  A    In 2019.
17  Q    Okay.  Mr. Coulter, where are you currently employed?
18  A    Central Arkansas Library System.
19  Q    All right.  And what is your position?
20  A    I'm the Executive Director.
21  Q    How long have you been the Executive Director?
22  A    A little over eight years.  I started in January of
23  2016.
24  Q    Okay.  Also, do you understand today that you are
25  testifying on behalf of the Central Arkansas Library

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY TRANSCRIPT
Donald Nathan Coulter, Esq.
April 1, 2024

Page 9

1 System and not on behalf of yourself?
2 A   I think that's correct.  I've been designated, I
3 guess, under Rule 30.
4 Q   Yes.  So I'll assume that you're speaking on behalf
5 of CALS, unless you say otherwise.
6 A   Well, I'm not sure about that assumption.  I'm here
7 on behalf of CALS, but I'm also a named party in the
8 lawsuit, and obviously some things I may say might be
9 related to my assessment as a librarian and not
10 necessarily on behalf of the library that I represent.
11 I'm not sure that I'm authorized to speak in every way
12 that I may speak today on behalf of the library, but I'm
13 here as the designated witness for the organization that's
14 also a Plaintiff in the lawsuit.
15 Q   Okay.  And then I will, you know, try and tease that
16 out when we get there --
17 A   Sure.
18 Q   -- but if you'd help me and try --
19 A   Sure.
20 Q   -- and to make that distinction as well.
21 A   I will.  You need to help me, too.
22 Q   I will.  We'll do some teamwork here.
23     Before you were appointed the Executive Director,
24 were you working with CALS or did you come from --
25 A   I was not.  I came from private practice.

Page 10

1 Q   Okay.  And how long were you in private practice?
2 A   I have a Arkansas license that was issued in 1985.  I
3 was clerking for a federal judge from '85 until '87, so
4 from 1987 until 2016.
5 Q   Okay.  And in private practice, what did your
6 practice center on; what areas?
7 A   I was what I called a courthouse lawyer.  I did
8 litigation on both sides of lawsuits.  Initially, in my
9 career, I was working for an insurance defense firm.  I
10 did a lot of casualty defense.  I left there and became
11 essentially a plaintiff's lawyer.  Later in my career I'd
12 take on cases as a defendant's lawyer, not for insurance
13 companies, but on cases that involved commercial disputes,
14 I would be a defendant in some of those cases.
15 Q   Okay.
16 A   I would be a defense counsel in those cases.
17 Q   Got it.  So if you would, explain to me how you went
18 from private practice to the Executive Director.  Were you
19 involved with the library as just, you know, a patron or
20 what's that history there?
21 A   Yes.  I've had a library card for longer than I can
22 remember.  I was on the Library Board of the Central
23 Arkansas Library System from approximately 2003 until
24 2009, and had, obviously, an interest in reading all my
25 life, and interest in topics that relate to libraries.

Page 11

1 When the job came open, I applied.
2 Q   So as the Executive Director, what are your duties?
3 A   Essentially my duties are to oversee the operations
4 of the library, to maintain its physical standing, its
5 financial security, to report to the board, to prepare a
6 budget for to the board, to supervise the staff and
7 supervise people down from them, to maintain the library's
8 position in the community as much as possible, keep
9 visibility to the library to remind people of the value of
10 the library, the exchange they make for paying their
11 library taxes and the benefits they derive from that.
12 From time to time, obviously, I'm asked to speak about
13 library issues and that's part of the job too.
14 Q   As Executive Director -- well, I'll just speak to
15 CALS generally.  So does CALS engage in lobbying or
16 supporting of bills or acts before they're passed?
17 A   What do you mean by lobbying?
18 Q   Yeah, just going to the legislature and saying we
19 think this is a good bill, we don't think it's a good bill
20 and offering the view of CALS.
21 A   The library, as you would imagine, has issues that
22 come before the state legislature periodically.  For all
23 the years that I've been there, and for a number of years
24 I assume before I got there, the library engaged someone
25 to keep up with legislative activities that might pertain

Page 12

1 to the funding or the issues that are core issues for the
2 public library that has to do with freedom of speech and
3 other such issues.
4     So the library has engaged people through the years
5 to monitor and report on what is being done in the
6 legislature, what bills are filed that might have an
7 implication on the library, so I would say the answer to
8 that is, yes, the library -- lobbying, I don't think
9 that's true.
10     You know, from time to time, obviously there are
11 hundreds, thousands of bills filed during legislation
12 session.  A handful of those might have some implication
13 for library funding.  For example, there are issues that
14 relate to the collection of sales tax on databases, the
15 collection of sales taxes on vendor-provided supplies.
16 That's sometimes an issue around which legislators and
17 committees ponder and decide to do something different
18 that would affect the revenue stream or the bottom line of
19 the -- the financial bottom line of the library, so we
20 would be wanting to be aware of that, but the library does
21 not enter some legislative halls with an agenda every
22 session.
23     Just for contrast, I was a member of the Arkansas
24 Bar, still a member of the Arkansas Bar Association.  They
25 had a regular lobbyist who had a committee he reported to

1 for that association. They had a package of bills in
2 every session that they would advocate for that were
3 things that their members were interested in. The library
4 has never done anything remotely approaching that.
5 Q   Did the library engage in any sort of lobbying about
6 Act 372 that's the subject of this lawsuit?
7 A   I'm not sure, again, what you call lobbying. We had
8 impact management engaged, as we've had for a number of
9 years. People who work for that organization were out
10 there reporting to us on the activities of the legislature
11 regarding SB 81.
12     I appeared in the house judiciary committee, when
13 that bill was being considered, to give my assessment of
14 what I thought the bill was, the implications of the bill
15 for the libraries in the State of Arkansas.
16     So to the extent that constitutes lobbying, we were
17 there, we had a definite viewpoint about that bill and
18 what it would do for libraries and that's obviously why
19 we're here today.
20 Q   Fair enough. And we'll get into that in a little
21 bit, so that we don't have to focus specifically on that.
22     Are there any other bills that you recall, where
23 you've gone and testified, even it it's just one-offs?
24 A   Yes, there was an ongoing effort in the general
25 assembly that probably predated my tenure, when the

1 legislature was attempting -- or people in the legislature
2 were attempting to restrict the number of special
3 elections that municipalities and other organizations,
4 including libraries, might hold, and I think I may have
5 showed up in the house committee once to testify about
6 that.
7     We took the position that we were opposed to that.
8 At least I was opposed to it, and I believe the
9 organization was on record being opposed to it because the
10 library has, for years, relied on elections, both general
11 and special elections, and we thought that was going to
12 hamper the ability of the library to get issues in front
13 of the community regarding funding the library.
14 Q   And you said you testified, and I think CALS has sort
15 of a similar position. So did you testify on your own
16 behalf or was this when you were on the board and you were
17 testifying --
18 A   I think I was out there at least once as the
19 director.
20 Q   Okay.
21 A   But I don't remember the specifics.
22 Q   That's fair enough.
23 A   I'm certainly making the board aware that I was doing
24 it, and the board was in agreement with our contention
25 that that bill was harmful to the future of the public

1 library that I represent and that I work for.
2 Q   Got it. I want to ask you a little bit about
3 litigation history with CALS. Are you aware of any prior
4 cases that CALS has been a plaintiff in?
5 A   During the period of time that I've been there, there
6 has been no litigation, either as a plaintiff or as a
7 defendant, according to my recollection, and I asked
8 several people on my staff last week if they had any
9 recollection to the contrary. They did not.
10     So this is the first lawsuit that CALS has filed
11 since I've been at the library, and it's also the first
12 lawsuit that CALS has been a party in since I've been
13 there, that was initiated since I was there.
14     The library had a couple of pending matters, I
15 believe when I arrived, that had been initiated prior to
16 my arrival, and in those cases the library was a defendant
17 and those cases were resolved, as I recall, about the time
18 I got there or shortly thereafter.
19 Q   Okay. Do you recall what those cases were about?
20 A   I do vaguely. You know, they predate my tenure, so
21 I was not intimately involved in them. I do think I
22 recall signing off on the resolution that was advised by
23 the counsel. One of them involved an ADA-compliance
24 issue, I believe, at Terry Library. The other one
25 involved regulations with regard to service animals and

1 whether a patron could bring an animal into the main
2 library.
3 Q   And in both of those CALS was a defendant --
4 A   Yes. And I believe those are the only lawsuits that
5 were ongoing when I arrived.
6 Q   Okay. Before your tenure, was CALS involved in any
7 lawsuits?
8 A   There was some other lawsuits that I was aware of
9 when I was on the board or just as a patron in the
10 community. There was a lawsuit circa 2005 or '6,
11 somewhere in there, that concerned -- the voters in the
12 jurisdiction had approved a capital millage. I think it
13 was an extension of some bonds, renewing the bonds, and
14 the authority given by the taxpayers to fund the debt
15 service.
16     The city clerk and the tax authorities interpreted
17 that ordinance that resulted from the voter referendum in
18 a way that allowed the collection by the county of the tax
19 due under that referendum and the ordinance that followed
20 in a period of time that litigants who challenged it said
21 was premature. So the question was did the library,
22 through the taxing authorities, Pulaski County Tax
23 Collector, start collecting the tax too soon.
24     As I recall I think was on the board at the time and
25 the library prevailed at the trial court level, but that

Page 17

1 was overturned at the Arkansas Supreme Court and there was
2 a period of time where the court ordered that the money
3 that had been collected too early, in effect, had to be
4 refunded or offered to taxpayers and that year that was
5 jumped the gun was put onto the backside, so that the
6 amount of money that was going to be collected over the
7 same period of time was not disturbed, but the period of
8 time for collecting it was.
9    So that's what I recall and that would have been in
10 the early 2000s, as I recall.  Again, I was on the board
11 from 2003 to 2009.
12 Q    And so CALS would have been a defendant there as
13 well?
14 A    I believe so.  I think CALS was a defendant.  They
15 certainly had an interest in it because they were -- the
16 taxing authority was collecting the money for the benefit
17 of the library under the state's constitution amendments
18 that allow property taxes for capital improvements.
19 Q    And just so we're on the same page, I'm asking this
20 as -- you as a representative of CALS.  Are you aware of
21 any case in which CALS was a plaintiff, other than this
22 one?
23 A    I saw that was your first item under the notice of
24 deposition, CALS' litigation history, which prompted me,
25 over the last several days, to ponder that and I cannot

Page 18

1 recall any.
2 Q    Okay.  Thank you.  Now, I'm going to move a little
3 bit more into this case and today, instead of the past.
4 So what is your understanding of this case?
5 A    Well, our understanding of the case is best reflected
6 in the Complaint we filed on June 2nd of last year.  The
7 case is complicated, as you know, and there are a lot of
8 things that -- can you be more precise as to what you
9 would like for me to tell you about the case?
10 Q    Sure.  What is your understanding of what you're
11 challenging; what laws and --
12 A    We're actually challenging Act 372, which, as we've
13 said in the Complaint, we believe to be unconstitutional
14 on a number of grounds, both with respect to Section 1 and
15 Section 5, that those are unconstitutional provisions.
16 Q    Okay.  And why -- so other than just thinking that
17 those are unconstitutional, why has CALS decided to bring
18 this case?
19 A    Because we sought counsel and were spending weeks,
20 months, reviewing what the implications of this statute
21 might be for our staff, for our patrons, and upon the
22 advice of counsel and based on the reaction from the
23 community, we believed that it was necessary to get a
24 judicial determination as to whether we and our lawyers
25 were correct; that is to say that this law is

Page 19

1 unconstitutional with respect to Sections 1 and 5.
2    In essence, we needed some help, some guidance and
3 determination before we -- before the Act would into
4 effect on August 1st of last year.  Without judicial
5 declaration or judicial guidance, we were going to be in a
6 situation where our lawyers and I were going to have a
7 difficult time telling our employees, particularly the
8 ones who worked in the libraries and the ones who collect
9 the materials, that it was to safe to proceed and continue
10 to do the job that they've been doing.
11 Q    Okay.  You mentioned reaction from the community.
12 Could you speak a little bit more about that?
13 A    Generally people who kept apprised of the debate over
14 SB 81 and the people I heard from, obviously this is not a
15 scientific survey, but the people I heard from were quite
16 distressed that this was indicated to them, that there was
17 an effort from the legislature to restrict what people
18 could read in the public library, to restrict what other
19 people could read in the library and people don't like
20 that.
21 Q    Sure.  That's fair enough.  Could you give a ballpark
22 on the number of community members you heard from?
23 A    Oh, you know, Arkansas is a small town.
24 Q    Yeah.
25 A    I see a lot of people.  I go to church, I go to

Page 20

1 Kroger, I go to places where I might not want to talk
2 about things I'm doing at work, but I don't really have
3 that option.
4    When I was a little younger and I'd stay up later,
5 I'd grocery shop at night, late at night, but often times,
6 in the coming and going of living in a small town, people
7 will come up to you and say, yes, we don't like this
8 legislation, we read about it here or there, we've heard
9 about it, please continue to try to represent the people
10 who care about the freedom to read and access to different
11 viewpoints.
12    So I heard that often.  I can't put a number on it.
13 There were some people who wrote me.  And obviously there
14 were some people who wrote me on the other side, a
15 handful, who said, oh, you know, you should adhere to this
16 legislation because these people are trying to protect
17 children from books that we think are harmful.
18 Q    Would you say it was a -- the distribution between
19 those two -- I'll just call them sides of the issue --
20 were approximately even or did one substantially outweigh
21 the other?
22 A    One substantially outweighed the other, but I don't
23 purport that that was some sort of scientific survey or
24 polling survey.
25 Q    Sure.

1 A   Obviously once I had been identified, through
2 statements that we may have published, posted on our
3 website and through my testimony that was reported in the
4 newspaper and local television stations, you would just
5 assume that the people who agreed with that were more
6 likely to tell me and affirm to me.
7     But I respected the people who also told me on the
8 other side, but the ratio of the people who were in the
9 former category, those who encouraged and supported what I
10 was doing far outweighed those who were bothered by it and
11 spoke -- those who were bothered by it and let me know
12 they were bothered by it.
13 Q   And this is a side, so it can be off the record.
14 Actually, let's go off the record.
15     (Off-the-record discussion.)
16 BY MR. WATSON:
17 Q   Okay.  We're back on the record.  I want to ask you
18 quickly about some of the parties who are in this case and
19 how they became part of this case.  How did this
20 collection of Plaintiffs, to your understanding, come
21 together?
22 A   Well, as I've indicated, and you are well aware,
23 there was a lot of public attention to SB 81 and
24 particularly after it was enacted a year ago.
25     People who are in this space, and that is to say the

1 librarians, booksellers, content and providers, authors,
2 obviously keep up with this regularly.  It's their job;
3 it's something that is keenly interesting to them, or of
4 interest to them.
5     And as I had concluded after seeing the amendment to
6 the bill that was refiled some time, I think, in January
7 or February, and given what I knew about the composition
8 of the general assembly, I began to realize that if they
9 proceeded along the path that they seemed bent on taking,
10 this was going to wind up in a judicial forum somewhere
11 because it was clear to me, in my opinion as a librarian
12 and as a lawyer, that this had severe constitutional
13 infirmities.
14     Obviously I'm talking to people who -- around the
15 country who are calling and asking, and I'm looking for
16 people who have similar insight to tell me what they
17 think.  That included a number of library leaders around
18 the country, it included lawyers around the country.
19     As we've indicated, I am a lawyer, so obviously I
20 have an inordinate number of friends who are attorneys and
21 care about some of the things that I might.  So we began
22 conversations.  We, being that universe of people I
23 described, and began looking at the cases that had been
24 issued.
25     In fact, there was a case that seemed pretty close on

1 point here, as you're aware now from having briefed it and
2 argued it, the case of Shipley.  So it was not hard to
3 find people who would talk to me about this subject and
4 envision what might have to be done if I turned out to be
5 correct and it was going to have to be a litigation
6 strategy.
7 Q   And who are the Defendants in this case?  You don't
8 have to name all of them, obviously.  There's a long list.
9 A   The prosecuting attorneys around the state in the
10 various -- the judicial districts, and Crawford County
11 officials, and I believe that's it.
12 Q   So why specifically, if you're aware, is Crawford
13 County a Defendant in this case out of the 75 counties in
14 Arkansas?
15 A   Well, I -- I am aware, generally, but not nearly as
16 thoroughly aware of the intricacies and the aspects of
17 that case as counsel for the Plaintiffs would be.  My
18 general impression, and, again, I'm not the lawyer in the
19 case; I'm the client and the lawyers would have a far
20 better understanding of this.
21 Q   Sure.
22 A   My general impression is that Crawford County had
23 essentially engaged in the kind of activity that Act 372,
24 we believe, was designed to facilitate, and they had been
25 doing that, as had arguably, I guess, some other libraries

1 that I was aware of just from reading the popular press at
2 the time.
3     So that's my understanding, that -- as a layperson,
4 not a lawyer, and as a citizen, that it was clear what
5 people who wanted this legislation adopted wanted to do
6 with it, and Crawford County is one iteration of that that
7 was already well underway by the time the law formally
8 signed and enacted.
9 Q   And you mentioned that you're aware of other
10 libraries.  Could you tell me what --
11 A   Well, there was a lot of attention to our neighbors
12 in Saline County.  That was drawing a lot of public
13 attention in the timeframe that we were simultaneously
14 deciding, after we lost the elective effort to prevail or
15 persuade the legislature that this was a bad deal.  That
16 was ongoing.
17     I recall, at one point, the primary sponsor of SB 81
18 showed up in the audience at one of the high-profile
19 hearings in Saline County, where they were determining
20 what to do about books that were offensive to some vocal
21 group in that county.
22 Q   Other than Saline County, are there any other library
23 systems you're aware of?
24 A   I assume your question is am I aware of other
25 counties where this kind of activity was going on?

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY TRANSCRIPT
Donald Nathan Coulter, Esq.
April 1, 2024

Page 25

1 Q   Yes.

2 A   Not offhand at the moment, although I would hear
3 things to suggest that this was going to happen or about
4 to happen, and I think one of the obvious places where we
5 learned that, or it affirmed what we had been reasonably
6 suspicious of or suspecting, was the memo that came from
7 the state library director one day saying, you know, this
8 has been enacted, and here's what the consequences are,
9 and there are going to be a lot of challenges under Act
10 372, Section 5, here's the things you need to think about
11 as you proceed with trying to set up your rules and your
12 processes for dealing with that.

13     So, although I can't tell you other specific places,
14 my firm belief, then and now, was that there were a lot of
15 people toeing up to the starting line who were eager to
16 act upon what they thought the legislature had enabled in
17 Act 372.

18 Q   Sure.  And quickly on that, it -- so you are not
19 aware of anyone who has threatened to, you know, use Act
20 372, specifically, as a sword against the libraries?

21     That was not worded well.  Let me just -- I try to go
22 out of order here, so I'll get to that question later when
23 we get to a different section.

24 A   Sure.

25 Q   So just forget that.

Page 26

1     All right.  Now, I want to talk a little bit about
2 CALS and its history, just generally.  Could you walk me
3 through the creation and history of CALS?

4 A   Yes, the Central Arkansas Library System, as it's
5 currently configured, is that what you're asking about?

6 Q   Well, as it was originally configured, if there's a
7 difference too.

8 A   Well, the original configuration, I guess, would be
9 the ancestor of CALS would be the Little Rock Public
10 Library, which was a Carnegie Library funded --
11 established in 1910.

12     For a number of years the Little Rock Library and
13 then later, the Pulaski County Library were a part of a
14 two-library system, if you will, and then at some point,
15 fairly long ago, probably about the time I was born, which
16 was very long ago, the Perry County Library also joined
17 that.

18     So as I understand it, there was essentially the
19 Little Rock Library, the Pulaski County Library, and the
20 Perry County Library, and that's essentially the
21 configuration until 1999, that time, through
22 legislation that had been passed for a lot of other
23 reasons -- it had nothing to do specifically with this
24 library system -- the library system was created
25 consisting of the libraries in Maumelle, Sherwood,

Page 27

1 Jacksonville, Little Rock, Perry County and Pulaski
2 County.

3     So, essentially, the three organizations or three
4 entities, Perry, Pulaski County and Little Rock Library
5 added Maumelle, Sherwood, Jacksonville to the system under
6 a fairly complicated statutory framework that had to be --
7 an ordinance had to be approved by the municipalities of
8 those cities and by the counties for those two counties,
9 Pulaski and Perry, to join the system, and that,
10 essentially, has been the configuration since
11 approximately 1999.

12 Q   So it was created completely by government entities?

13 A   Yes, by municipalities, by cities to create a
14 separate organization to conduct library business.  We
15 don't get our funding directly from any of those public
16 entities, and there were a number of places, over the
17 course of my tenure there, where distinctions between
18 those municipalities and county subdivisions of state
19 government, have clearly been illustrated, and, you know,
20 we're not a subdivision of state government, we're not a
21 subdivision of any of those municipalities.

22     We essentially, under the statute, have the authority
23 to run the library that those entities had.  In some
24 instances the communities deeded their real estate to the
25 organization that runs the library.  In two instances they

Page 28

1 did not.

2     So it's a hybrid.  I think it's called an interlocal
3 government agreement that essentially creates the
4 operating rules for the library, but we are not a
5 subdivision of any of those municipal or county entities.

6 Q   Okay.  And I didn't print this off.  I should have,
7 but Paragraph 14 of the Complaint says that CALS is a,
8 quote, "body politic."

9     How are you defining that, or what is your
10 understanding --

11 A   I think the language is a body politic and corporate.

12 Q   Right.

13 A   It comes right out of the statute that creates the
14 opportunity for entities to form these kinds of
15 organizations that I've described.

16 Q   So does CALS consider itself a government body of
17 sorts?

18 A   No.

19 Q   No?

20 A   We obviously are funded by government sources, namely
21 the taxing authority of the county that I described
22 earlier.  We get government funds, therefore, we are
23 subject to open records, open meetings laws.  We do things
24 in accordance with those fastidiously, but we are not a
25 governmental entity in the sense that the City of Little

Page 29

1 Rock is.
2 Q   Okay.  And you say in a sense that the City of Little
3 Rock is.  I mean, obviously CALS is not a city.  Is there
4 any other, you know, comparison in the state government
5 you can think of, because it is a little strange to be
6 able to have taxing powers and say, but we're not a
7 government entity?
8 A   We don't have the taxing power.
9 Q   Okay.
10 A   The taxing power rests in the hands of the county.
11 Q   Sure.
12 A   And under constitutional amendment, that tax revenue
13 under that authority is collected by the collector,
14 assessed and collected by the -- well, I guess it's
15 assessed by the treasurer, collected by the treasurer.
16     But -- but we, by a matter of constitutional
17 provision, get that money, but we can't collect that tax,
18 we can't enforce that.  If you don't pay your property
19 taxes, we don't have the authority to put a lien on your
20 property.  The county does that.  We are the beneficiary
21 of that constitutionally-provided arrangement, but we're
22 not a taxing authority.
23 Q   So you don't consider yourself subject to things like
24 First Amendments?
25 A   Well, I think as any kind of entity, whether we are a

Page 30

1 government entity or not, we believe that our patrons are
2 protected by the First Amendment.  We believe that the
3 people who expect the library to contain material they
4 want, and have a right, we think under constitutional law
5 to have access to that, we are protected by the First
6 Amendment, the patrons and the organization that serves
7 them.
8 Q   Okay.  But is CALS, itself, bound by the First
9 Amendment?
10 A   Well, I'm not aware of how we would be in the
11 position, if I'm right, that we're not a governmental
12 entity, that we would be in the position of somehow being
13 able to enforce or impose a governmental restriction of
14 the sort that the First Amendment precludes.
15 Q   So it's no?
16 A   Maybe you can help me out.
17 Q   Sure.
18 A   That the library could engage in unconstitutional
19 acts of the First Amendment, so that we would be prevented
20 from doing that?  I mean, give me a -- help me with some
21 illustration of how that might come into play.
22 Q   Sure.  Just generally speaking, does CALS have
23 speaking events, where speakers come and present topics?
24 A   Yes.
25 Q   So let's take, for example, one of those speakers

Page 31

1 comes up and is speaking, and then, you know, starts
2 talking about some viewpoint that --
3 A   Right.
4 Q   -- that CALS made and the library may disagree with
5 and say, all right, you're out of here, you don't get to
6 speak anymore.  I think that would be, pretty clearly, a
7 viewpoint-based discrimination?
8 A   Yes.  Yes.
9 Q   Is CALS allowed to do that based on the viewpoint?
10 A   Well, the public library has been held to be a
11 limited public forum in scores and scores of cases, so we
12 believe that under that doctrine, if we allow certain
13 things, certain speakers, we can't pick and choose based
14 on content.
15     So, yes, in that instance that you just described,
16 and subject to that doctrine of limited public forum --
17 the library can decide, for example, that we're not going
18 to allow people to post things on our bulletin board, for
19 whatever reason.
20 Q   Right.
21 A   But if we allow some people to post things on our
22 bulletin board, then everybody can.  For example, you
23 could probably go out to the Perry County Library in some
24 interval and find that people have posted things for the
25 Republican Party Committee of Perry County or a variety of

Page 32

1 other things like that.
2     The library has rules about how long you can have
3 that up and a forum of what you can put up, but the
4 library doesn't police the content of that.  So I guess in
5 your hypothetical, yes, the library would be prevented
6 from exercising some sort of content-based, even as a
7 limited public forum would be prevented from doing
8 something of that sort.
9 Q   And the reason I'm trying to tease this out a little
10 bit, so thank you for kind of going into this hypothetical
11 with me, is -- and because the First Amendment only
12 applies to government action, it does not apply to private
13 action, and my understanding earlier is you said the
14 lib -- that CALS was not a public entity or a part of --
15 A   It is not a government entity.
16 Q   Okay.
17 A   It is a -- it is a -- it is governed by certain
18 public rules and regulations because it uses public money,
19 but it's not a government entity in the sense that the
20 City of Little Rock is, the State of Arkansas is, the
21 Department of Education, for example, of the Executive
22 Branch of the Arkansas State Government, et cetera.
23 Q   Okay.  And so -- I mean, the only reason that you're
24 saying that it would be, you know, bound by the First
25 Amendment, is because it collects some real estate tax

Page 33

1 revenue? Or not even collect. It's given that, I think
2 is what you said earlier, by the county government.
3 A   Well, I think what I've said is that under doctrine
4 it says a public library is not quite a town square, but
5 it is a limited public forum, then we have to follow that
6 interpretation application of the First Amendment to say
7 that I can't go out to the library and take down -- let's
8 say my hypothetical, the Democratic Party of Perry
9 County's Committee notices and leave out the Republican
10 Party's notices.
11 Q   Okay.
12 A   So in that sense we are bound by the First Amendment,
13 you're correct, but we are not an arm of the government in
14 the way that the Department of Education is in the State
15 of Arkansas.
16 Q   And as you know we have to be precise as lawyers on
17 this side, and so I feel -- and I'm not trying to nitpick.
18 You said in the way. I mean, is there a different way in
19 which --
20 A   Well, I think I -- I mean, obviously I've read the
21 briefs, I've read the opinion.
22 Q   Sure.
23 A   I've read -- I was at the oral argument. I mean, I
24 understand you would like to say that my library is
25 engaged in government speech and we don't, as our lawyers

Page 34

1 have made clear, and I think at this point the court has
2 made clear, we don't think that's the role of the library.
3     We're not putting out books as some sort of director
4 from the State of Arkansas, or from the City of Little
5 Rock or Pulaski County or Perry County. That's not the
6 public library as an institution of, you know, 175 years
7 in the United States. It's publicly funded, but it's not
8 engaged in government speech.
9     It's not -- you know, if that were the case,
10 hypothetically, the people who have advanced this bill
11 should just give us a list, every biannual legislative
12 session, of books that would be appropriate for the
13 publicly-funded library to collect and no others and then,
14 you know -- that's the logical extension of your argument.
15 Q   Sure. But I'm asking a question that I think it's a
16 step before --
17 A   All right.
18 Q   -- the government speech part.
19     You said that CALS and the public libraries are not a
20 government entity in the same way, or in the same manner
21 as, you know, city, county governments.
22     Is there another way in which they are connected?
23 A   If you said, Nate, are you a government employee, I
24 mean, I work for an entity that's publicly funded, so in
25 that sense I have an obligation to transparency and to

Page 35

1 comply with the laws that govern public records, public
2 meetings. I have an obligation in the kind of ways that I
3 think all public servants do, to be fiscally responsible
4 and good stewards of the public money. It's not my money;
5 it's the taxpayers' money and I have to spend it
6 accordingly.
7     So in that sense, yes, we are acting on behalf of the
8 community to collect books and other items that the
9 community has a right to see, read, peruse, review, and we
10 are serving in that collective role with government money
11 in a way that, you know, some people might think of as a
12 government adjacent activity.
13 Q   Okay. I'll move on from that line with -- well, I
14 say move on, but it is the next point in my outline, it's
15 somewhat related.
16     So we did get an organizational chart. I won't put
17 that into the record here. Well, I might as well put it
18 into the record here, so we're all operating from the same
19 thing.
20 A   It would help me.
21 Q   Yes. That's unfair, you don't need to have to
22 memorize all of this.
23 A   Thank you.
24 Q   All right. I'll mark this as Exhibit 1.
25     (Exhibit No. 1 was marked & attached hereto.)

Page 36

1     Sorry it is small. That is how it came through.
2 A   I don't think that's your fault.
3         MR. ADAMS: Just by way of a heads-up, I
4     may need to take a short break in a little
5     while.
6         MR. WATSON: Do we want to take one now?
7         MR. ADAMS: No.
8 BY MR. WATSON:
9 Q   The only thing I wanted to ask you about,
10 Mr. Coulter, is the top box here, CALS' Board of Trustees.
11 First of all, it has you as the Executive Director. I was
12 going through the Articles of Incorporation and it
13 mentioned president, vice president, secretary, treasurer
14 of CALS, but I don't see them on this chart. Where would
15 they fit?
16 A   Those are the officers of the board, so they would be
17 the leadership of the -- the executive leadership, I
18 guess, of the Board of Trustees, so they would be subsumed
19 in that first box.
20 Q   Okay. And then how does a person become a member on
21 the board?
22 A   In that agreement that I described earlier that the
23 various municipalities and counties had to adopt by
24 ordinance and they each explicitly adopted the ordinance
25 in toto, it sets out the 13 board members and the

Page 37

1  organization -- the entities that appoint those 13
2  members.
3  Q   Okay.  So the participating, you know, cities and
4  counties, they're the ones who appoint?
5  A   Yes.
6  Q   All right.  That's the only question I had about
7  that, so we can set that aside.  Next, I want to move to
8  some of this funding issue that we've already discussed.
9  I'll mark this as Exhibit No. 2.
10      (Exhibit No. 2 was marked and attached hereto.)
11          MR. ADAMS: This may take a minute, so do
12      you mind if I --
13          MR. WATSON: Yeah.  Let's go ahead and jump
14      off the record for a second.
15          (Brief recess was taken.)
16  BY MR. WATSON:
17  Q   Mr. Coulter, before we took a break, I handed you
18  what is now labeled as Exhibit 2 and it is a document
19  about some income sources of CALS that was produced in
20  discovery by your attorney.  I just had a few questions
21  about this.  I know we've already discussed funding a
22  little bit, but there's a few things I had here that I
23  wanted to follow up on.
24      So this is 2012 through 2022.  There's no 2023.  Do
25  you know why that would be?

Page 38

1  A   No, other than the fact that it's -- you know, we're,
2  I guess, as of today in the first day of the second
3  quarter.  Those numbers for all of those entities might
4  not be available through the source that this was
5  generated.
6      I think this came off of our audits, which is why it
7  has some things on there, for example, Intergovernmental
8  City of Little Rock Bonds.  That is, as I understand it,
9  something the audit carries on the finances in the form of
10  funds that are coming from capital improvement bonds to
11  acquire or improve, build things that are used by the
12  library system.  That money never comes into our coffers,
13  but it's money that's benefited the library.
14      So my answer would be I believe this is the latest
15  year from which we have an audit, and that's what this was
16  generated from.
17  Q   Okay.  And I also think most of these categories are
18  pretty self-explanatory.  I do want to ask about what is
19  the second from the bottom, so miscellaneous, inc.?  What
20  is that?
21  A   Yeah, that would be sources -- in some instances we
22  get rent off of some small spaces we have on our main
23  campus.  I believe it may also come from -- although, the
24  number doesn't look like they're -- as I indicated
25  earlier, the Jacksonville, Sherwood libraries, under the

Page 39

1  terms of the agreement that the communities forged, kept
2  their actual buildings.  The Cities of Jacksonville,
3  Sherwood own those.  The system provides the books and the
4  employees to operate a public library out of the
5  Jacksonville, Sherwood libraries.
6      Little Rock, Maumelle, Perry County, they all deeded
7  their assets, real property, so we have an agreement where
8  they reimburse us for certain expenses in upkeep of their
9  buildings, their libraries in Jacksonville and Sherwood.
10  That might be what that is, although it looks like at the
11  tail end of that those numbers are different.
12      And, again, the auditors shift these categories
13  around, but I can find out, if you want to know precisely
14  what's in that.
15      In the earlier years, as you can obviously see, it
16  was a larger number that it is, which suggests to me that
17  the auditors re-categorized or reclassified that and moved
18  that somewhere else, so that if we looked, there might be
19  a corresponding increase in one of these other categories.
20  Q   Okay.  And it probably doesn't matter, but if it is
21  not what you just said, more or less, I would be -- like
22  to know.
23  A   Yeah, I'll get that.
24  Q   And then, also, just so the record is clear, the very
25  top line, tax collections, are these the property taxes --

Page 40

1  A   Yes.
2  Q   Okay.  That is the only two questions I had about
3  that one.  Are there any other sources of funding that are
4  not listed here?
5  A   No.
6  Q   Okay.
7          MR. ADAMS: Just so we have a clean record,
8      like what do you, I guess --
9          MR. WATSON: The miscellaneous inc, the
10      second from the bottom, I wasn't sure what that
11      was, especially because of kind of the
12      fluctuating numbers, it just seemed strange.  If
13      his explanation is close enough, don't worry.
14          MR. ADAMS: Okay.  We can -- I'm happy to
15      look at the underlying audits with you and you
16      and I can try to make sense of it.
17          MR. WATSON: It's going to -- let's go off
18      the record.
19          (Off-the-record discussion.)
20  BY MR. WATSON:
21  Q   Just a couple of questions about expenditures.  Does
22  CALS have a budgeted legal expense every year?
23  A   Yes.
24  Q   What is the number on that, approximately?
25  A   Approximately 75 to $175,000.00.

1 Q    Okay.  And when we were talking earlier about
2 litigation that CALS has been involved in, it was a pretty
3 limited number.  So what are those expenses going to?
4 A    Well, I think one of the reasons why I can tell you
5 that we're not involved in lawsuits, is because we hire
6 lawyers to give us advice and make choices that prevent,
7 eliminate -- you know, we're spending money on lawyers
8 prophylactically, rather than paying lawyers like John and
9 Bettina to litigate.
10 Q    Fair enough.
11 A    But, obviously, we have --
12        MS. BROWNSTEIN:  I'm not getting paid, for
13        the record.
14 A    -- we have 300 and some odd employees.  We have
15 compliance issues with all sorts of employment
16 regulations, so we are regularly communicating with the
17 employment counsel.  We have certain obligations for our
18 pension plan that we have to talk to lawyers about
19 regularly.  Obviously we're obligated under workers'
20 compensation and from time to time we have employees who
21 have accidents and all sorts of things that organizations
22 the size of ours would encounter that have implications
23 that prudent management seeks counsel for.
24 Q    Okay.  And does CALS have an in-house counsel?
25 A    No.

1 Q    Now, I want to transition into some of CALS'
2 policies.  So I'm marking this as Exhibit No. 3.
3    (Exhibit No. 3 was marked & attached hereto.)
4        So, Mr. Coulter, what document have I just handed
5 you?
6 A    This is the Board's Policy No. 300, which sets forth
7 the criteria for how the library collects materials.
8 Q    Okay.  And having policies about the selection of
9 library materials, is that a common practice among
10 libraries?
11 A    Yes.
12 Q    Are you aware of any libraries in Arkansas who don't
13 have such a practice or such a policy?
14 A    No.
15 Q    I just have a couple of questions specifically about
16 this.  So on the second page, CALS' 2, the first bullet
17 point under selection of criteria -- I'll give you a
18 moment to read that, if you'd like.
19 A    You're looking at:  "Selectors respond to community
20 interests by careful consideration of patron requests for
21 purchases --
22 Q    Yes, sir.
23 A    -- use patterns for existing materials, purchase
24 trends of similar materials by peer libraries, and any
25 other source of information indicating community

1 interests"?
2 Q    The phrase, "community interest," is used there.
3 What does that mean?
4 A    I think that means if there is an interest in the
5 community in reading or having, in the collection, certain
6 material, because there's been an expressed interest in
7 having that available.  That's what that refers to.
8        Obviously, there are a number of subcommunities
9 within our service area who have different interests in
10 books about fauna or butterflies or doll collections, et
11 cetera.
12 Q    Okay.  So the last bullet point there, and I'll read
13 it.  It says:  "CALS' staff is encouraged to recommend
14 titles and subjects to be purchased for their branches
15 based on the knowledge of their patrons' needs and
16 interests."
17        Is there a difference between that criteria and the
18 first one we just read or are those sort of saying the
19 same thing?
20 A    Well, they are overlapping.  I think with regard to
21 the first bullet point, it's probably more of an
22 indication of the people for whom, if you pull out the
23 Exhibit 1, who are tasked with the responsibility for
24 essentially collecting the materials, those people.
25 That's -- that's their sole job, is to keep one -- and you

1 can see the other bullet points indicate that they are to
2 look at reputable review sources, such as Booklist,
3 Library Journal, Publisher's Weekly, New York Times Book
4 Review, et cetera.  They do that and there's their --
5 that's their job by genre or category.
6        I think the bullet point is to say, as a matter of
7 policy, that the staff who are in the public-facing
8 positions, as opposed to those people who are in the
9 collection development department, tell us what it is you
10 hear in your neighborhood library that people want.
11        We are ultimately consumer driven, in terms of what
12 we put in the collection and if the community is
13 indicating that certain books we have are, in essence,
14 oversubscribed and we measure that by how long the hold
15 list is, how long the hold wait time is, we obviously want
16 to have a low ratio of numbers of people in line for an
17 item that we have.
18        Industry standards are considered good if you're five
19 to one, seven to one.  People waiting for a particular
20 title might have 20 copies of it behind each copy, and we
21 really have been aspiring to be below that.  Three to one,
22 four to one, below five to one, so that's what we're
23 looking at, both in terms of the collection development
24 people and this -- just the people who are on the outward
25 facing part of the library can say there are a lot of

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY TRANSCRIPT
Donald Nathan Coulter, Esq.
April 1, 2024

Page 45

1 people in here who keep asking for the Michael Patterson
2 novels.
3 Q   So you mentioned this on the second bullet point and
4 it says, "Evaluation in reputable review sources such as,"
5 and then it lists several of those, as well as various
6 websites and blogs.  Do you see that one?
7 A   Yes.
8 Q   What is the purpose of reviewing those sources?
9 A   Well, one of the purposes is so you can be ahead of
10 that consumer demand that I just described.  Those
11 industry publications that are identified there tell you,
12 as the collection development professional, what's going
13 to be published, by the publishing world, three, six, nine
14 months from now and you've got to get in line to order
15 those books.  You have to make some estimate about how
16 popular they're going to be and you want to look at the
17 other reviews, the sources that are there.
18     Obviously these people like what they do and they
19 have some interest in these materials and don't mind
20 reading through these all day, most days, trying to figure
21 out what's coming, let's get in line to order those books
22 from our suppliers, so that we have those books as soon as
23 the publisher publishes them or the authors are on book
24 tours talking about them.  We want them to be available to
25 people who can't afford to go to our friends at Wordsworth

Page 46

1 up the hill and buy a new copy or order one on Amazon.
2 Q   Okay.  We've talked in detail, you know, about a
3 couple of these.  I think we've hit all of them.  Well,
4 there are a couple of them on the next page, too, if you
5 want to go ahead and take a moment to look at those and
6 let me know when you're finished.
7 A   Okay.
8 Q   Are you aware of -- and, obviously, there will be
9 some difficulty being aware of this, because I know CALS'
10 collection is quite large, but are you aware, as we sit
11 here, of any materials in CALS' collection that do not --
12 you know, that would fall outside the bounds of this
13 selection criteria, that would not have -- that somehow
14 ended up in the collection?
15 A   No.  Of course someone would have to bring that to my
16 attention for me to know that.  As I think you indicated
17 there, there are upwards of 700,000 print items in our
18 collection, another 2 or 300,000 of other types of items,
19 so, generally, no, I'm not aware of anything that would
20 fall outside of -- and it's a pretty broad scope.  It
21 would be -- we might sit around and imagine what that
22 might be or look like, but I'm not aware of any.
23 Q   Well, we don't have to try to sit around and try to
24 imagine that, so no worries about that.
25     Who sets these policies?

Page 47

1 A   These are set by the board.
2 Q   And what does that process look like, as they're
3 setting them?
4 A   Well, if you go back to the top of the first page,
5 you'll see that there's sort of a history of when the
6 board had approved them.  I guess the earliest date there
7 might be 1991, and going back to my chronology of the
8 composition of the system, that was obviously before the
9 system was put together in its current configuration, so
10 that would have been probably the Little Rock Library,
11 Pulaski County Library and the Perry County Library.
12     So in some ways it is an archival item that comes down
13 to new boards.  Our board members serve up to two to
14 three-year terms, so obviously nobody is on the board now
15 who was on the board then.  So these are essentially
16 long-ago adopted values that expressed the library's
17 objectives in trying to provide a diverse collection for
18 the community as a whole, and to respond to consumer
19 interests in light of certain resource limitations that
20 are identified in here.
21 Q   And while we're on this first page with the dates,
22 you know, the latest revision date was in late August of
23 2023?
24 A   Yes.
25 Q   Are you aware of what those revisions entailed?

Page 48

1 A   Yes, generally we had anticipated, in the summer
2 months, that Act 372 might go into effect on August 1st,
3 so we took a look at this policy.  I think Board Policy
4 301, which deals with the request for reconsideration that
5 I think has been produced, and I'm just looking to see,
6 off the top of my head, if I can remember what might have
7 been changed on that date.  It would be reflected in the
8 minutes from that meeting.
9     I don't think it was anything substantial, but it
10 would have been clearly -- in my recollection, it would
11 have been clearly in response to the legislature's focus
12 that resulted in the Act and our attempt to be responsive
13 to that and be prepared to implement the changes that we
14 thought we could predict or see.
15     And, again, going back to Jennifer Chilcoat's, the
16 State Library's email, that alerted people to start
17 thinking about some of these things that might be in your
18 library policy.  So with those things in mind, as we
19 approached that date we made some changes -- we looked to
20 make some changes.
21     And I think August 24th is after the judicial
22 injunction on July 29th.  We must have made some changes,
23 and, again, I think these would not have been substantial,
24 that would have tweaked this in certain places.  I just
25 can't, off the top of my head, tell you what they are.

Page 49

1  I can tell you that in the course of getting ready
2  for the deposition and looking at your itemization under
3  the notice, I did have staff check.  Most of the core of
4  this data way, way back.  I found, in the library, a set
5  of minutes from the April 11th, 1956 library board meeting
6  that contained an iteration that may not have been as
7  quite as thorough or as precise as this, but it reflected
8  the same general spirit of we don't pick and choose things
9  based on whether they're popular, in a sense that they
10  might be controversial.  We do try to provide things in
11  the sense of whether people want them, and sometimes some
12  people want things that might be offensive or problematic
13  for others, and in that situation, the library staff, we
14  don't take that into account.  We have to be objective and
15  provide what the community wants and I think that value
16  predates all of us in this room and is a time-tested
17  library value.
18  Q  And I want to ask about one more section of this
19  policy.  So if you turn to what's labeled Bates No. CALS
20  00003, the Collection Maintenance section, and I'll give
21  you a minute to read it, if you'd like.
22  A  Okay.
23  Q  So as I read this, I didn't see a detailed list sort
24  of like there was for the selection criteria, and there
25  wasn't a maintenance criteria.

Page 50

1  A  Right.
2  Q  So what is that criteria?
3  A  The main question of it, is has this book circulated?
4  If it's sitting there on the shelf and no one is checking
5  it out, unless it is some sort of classic that every
6  library in America should have, despite no one checking it
7  out, perhaps, if it's in the category of something that
8  has obviously lost appeal to the community you serve and
9  its not checking out, in theory it's taking up space, a
10  finite shelf space for something else that might be wanted
11  and be read and circulate.
12  So we're not absolutely governed by the notion that
13  circulation is paramount, but we do want to be able to
14  provide, to the community who funds the library as we
15  discussed, books that are of interest and relevance to
16  them.
17  Sometimes when we weed things -- that's the library
18  term that I have to learn.  We pull things out that have
19  not been circulating, and I don't know what the criteria
20  is, but it's -- let's say if something has circulated once
21  in the last five years and it's gotten a lot of dust on
22  it, then the people whose job it is would go through and
23  decide.
24  Unless, again, it's one of these exceptional books
25  that are part of the cannon of literature that libraries

Page 51

1  should hold, it's going to get pulled and weeded to make
2  way for something else that can go on that shelf that
3  would presumably circulate.
4  You know, it's a little akin to the Walmart model of
5  if inventory is not moving let's get rid of it and put
6  something on the shelf that does move.
7  Q  So you used the term weeding a couple of times.
8  Could you define that for the record?
9  A  The professionals of the library determining, based
10  on the rough boundaries that I just described, that a book
11  should be pulled from the collection because it's just not
12  relevant anymore, and relevance is determined by whether
13  people are reading it, circulating it.
14  It could, in some exceptions, be a book gets weeded
15  because it articulates science that's been overcome by
16  scientific models.  Uranus or Pluto, one of those I was
17  taught, as a child, is one of the nine planets in the
18  solar system --
19  Q  It was Pluto, unfortunately.
20  A  -- is no longer a planet.  We could have done without
21  Uranus, but not Pluto.  So now if we have books on
22  astronomy that talk about the solar system as I was
23  taught, the solar system back when dinosaurs were roaming,
24  then we would pull that, because it's been overcome by
25  science and it's obsolete.

Page 52

1  Q  Okay.  And who is the one making those determinations
2  on weeding?
3  A  The collection development staff.
4  Q  Okay.
5  A  Leslie Blanchard is the Collection Development
6  Manager, if you have a magnifying glass and can find her
7  name.
8  Q  I will just take your word that she was on there
9  somewhere.  There was several organizational charts that
10  had subcategories and subcategories, so that's all right.
11  So does she make all the decisions for all the
12  branches?
13  A  She and her staff.  In consultation, of course, with
14  the staff.  You know, obviously the staff -- I mean, the
15  branches cover different communities.
16  You live here, you would know that the people who use
17  the branch in Otter Creek, the Oley Rooker Library, don't
18  demographically, socioeconomically reflect the group of
19  people who use the Thompson Library in Chenal, and
20  correspondingly they have different interests.
21  We have more bilingual readers who are patrons at Dee
22  Brown Library, for example, than we would at Terry,
23  probably, or Fletcher.  So there is some communication
24  between the collection development people who are in the
25  central administration, the library, and the individual

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY TRANSCRIPT
Donald Nathan Coulter, Esq.
April 1, 2024

Page 53

1 library branch managers and the assistant managers about
2 what their community, their neighborhood, their users
3 want.
4     And I guess it's obviously possible that some books
5 might continue to circulate reasonably well in some
6 branches, but not others.
7 Q   But at the end of the day, it's pretty much the
8 discretion of the -- and I forgot the title of her
9 position.
10 A   The collection development manager.
11 Q   It's in her discretion?
12 A   In consultation with her staff and the branch
13 managers.  She's also the authority on the policy of
14 where -- and obviously it's a rolling exercise, to some
15 extent, you know, like painting the Brooklyn Bridge or
16 Golden Gate Bridge.  You know, you start here and by the
17 time you get to the other end, you may need to go back and
18 start painting again on the other end, so it's a process
19 that goes on constantly.
20 Q   Right.  All right.  You can set that one aside.  I'm
21 going to move on to the reorganization policy that you
22 mentioned just a little bit ago.  This is Bates No. 5 on
23 CALS production, if anybody on Zoom wants to take a look.
24     (Exhibit No. 4 was marked & attached hereto.)
25     All right.  Mr. Coulter, what have I just handed you?

Page 54

1 A   CALS Board policy 301, styled "Reconsideration of
2 Library Materials."
3 Q   And is this, again, a common policy libraries have?
4 A   Yes.
5 Q   Are you aware of any library in Arkansas that does
6 not have a policy like this?
7 A   No.
8 Q   I also see revisions were made, you know, somewhat
9 recently, in September of '23.
10 A   Yes.
11 Q   Are you aware of what those revisions entailed?
12 A   Yes.  That, again, would have been as a result of our
13 anticipating the implementation of Act 372 and our review
14 of the policies that we thought were going to be
15 implicated in that enactment.
16     In part, because this is a shorter policy and I am
17 able to look at it and tell you a couple of things that I
18 can readily identify that were modified, we prepared a
19 modification in July.  Obviously the court's order of
20 July 29th affected the enactment -- the effective dates of
21 Sections 1 and 5, but, nevertheless, we went ahead and
22 made some -- what we thought were improvements,
23 clarifications to board policy recommended to the board
24 and they approved them, as you see there, on
25 September 28th.

Page 55

1 Q   Right.
2 A   Some things that we thought were products of the
3 effort we'd made to review it, as often happens, you know,
4 when you're forced to look at something carefully and
5 that's what we did.
6 Q   So when you said you made changes to it because of
7 Act 372, was this to come into compliance with Act 372?
8 A   Well, by the time these changes were made,
9 recommended and adopted, 372, for our purposes that
10 relates to this, had been enjoined.
11 Q   Right.
12 A   So in the event that injunction is dissolved or
13 reversed on appeal, then obviously we'd go back to where
14 we were in July of 2023 with regard to anticipating
15 implementation.  But what changes were recommended and
16 approved by the board in September of last year, were just
17 changes that we believed, independently of the enjoined
18 Act, made some sense.
19     For example, I think we had a policy.  There's an
20 administrative procedure referred to here, Administrative
21 Procedure 301, which I think was produced, that works hand
22 in glove with this policy of the board.  And I think we
23 had some confusion between the various boards and
24 administrative documents about how clear it was, that you
25 had to be a cardholder and a resident of the system to

Page 56

1 request reconsideration.
2     Just on that point, it became -- again, we were
3 concerned because of Ms. Chilcoat's email.  We were a bit
4 concerned because of the things that I've discussed
5 earlier that were obviously happening around the state.
6     We were concerned about the legislative hearing
7 process and the testimony of the sponsors, that there
8 might well be people who traveled around and filed
9 requests for reconsideration without regard to whether
10 that was their library or not, and as I recall in the
11 house judiciary committee, the lead senate sponsor was
12 asked would that be a problem and he said he didn't
13 believe so.
14     So we were anticipating there might be a group of
15 crusaders that might go library to library and file these
16 requests and we, in part, on the advice suggested in
17 Jennifer Chilcoat's email, and on our reflection, thought
18 there's no reason why somebody from Blytheville, Arkansas
19 can swoop into Little Rock and start filing requests, so
20 we made it clear that you had to be a current cardholder
21 in good standing who lives in the service area in order to
22 file one of these.
23     I think we also specified that a little bit of the
24 process would be that there would be three library
25 professionals.  The statute uses that number.  I think we

1 had in practice that there were typically three people in
2 a committee that would serve the process of looking at the
3 content that had been challenged and then making a
4 recommendation to the executive director.
5    So we were largely doing what the statute spelled
6 out, but we wanted to make clear that the cardholder had
7 to be somebody in the service area and we also -- or that
8 had a card. You can have a card and you don't live in the
9 service area if you pay the annual non-resident fee. So
10 that would qualify as well.
11    But we also specified the time for appealing the
12 decision and we set out -- I think this was a
13 board-initiated addition, that the item wouldn't be
14 reviewed again for five years once it had been reviewed.
15 So those were the changes that were made, as I can recall
16 off the top of my head.
17 Q   Thank you for that.
18 A   One of the things I just now recalled.
19 Q   Okay.
20 A   Ms. Chilcoat's email highlighted the issue of whether
21 or not, under Act 372, a library should allow something to
22 remain in circulation pending the review process, and,
23 again, because she had warned people that there were going
24 to be a number of these challenges once the statute went
25 into effect, she had suggested that you might need to take

1 a count of how many books you might either pull because
2 they're under review.
3    In some instances, if you had a small staff, would
4 you have to buy books if you kept them in the circulation
5 while you're reviewing them? Those kinds of issues were
6 rolling around in that memo and in the conversations
7 people were having in our library, so we set out that
8 during the pendency of the review, that it would stay --
9 it would remain in the circulation.
10 Q   As I read through this policy, I don't see any limit
11 on what the basis of reconsideration requests would be.
12 Is that right?
13 A   Yes. And in the statute, as you're well aware, it
14 just said someone affected by the material could challenge
15 it as inappropriate, and as you also know, inappropriate
16 is not defined. So in one of our conversations we were
17 trying to describe for -- because the legislature hadn't
18 provided any content or direction, what does it mean to be
19 affected by? So I think we were going to have come up
20 with some sort of criteria to determine whether you were,
21 in fact, affected by.
22    For example, am I affected by, because I live in
23 Blytheville, but I just don't like Gender Queer? I've
24 heard it's a book that people are offended by, so I'm
25 going to drive to Little Rock and ask that they take it

1 out. Am I affected by because I'm a parent of a
2 fourteen-year-old or twelve-year-old, or an eight-year-old
3 who lives in the service area and who might see that book?
4    There was no guidance what constituted affected by
5 and that was the language used in the statute. Likewise,
6 with regard to appropriateness of it, we didn't have any
7 guidance on that, so we -- because of the ruling, we
8 didn't have to contend with that.
9 Q   Sure. And you mentioned the word appropriate being
10 used in the statute, and we don't have to get into, you
11 know, what does the statute exactly mean.
12 A   I don't know.
13 Q   There is, of course, a discrepancy between the
14 Defendants and the Plaintiffs on that issue. If
15 appropriate just meant appropriate under the library's own
16 criteria of selection, would you be bringing this case on
17 that issue specifically?
18 A   Well, that was not the conversation that was had by
19 the sponsors that promoted this legislation. In fact,
20 when I sat through the committee hearing, it was clear to
21 me it wasn't going to be governed by what our
22 consideration is, our collection criteria.
23    In fact, what was abundantly clear to me was that the
24 sponsor was motivated because his constituents, the ones
25 he was listening to and moved by, were exceedingly

1 displeased with the outcome of the standard
2 reconsideration process that was going on in Leslie, Cabot
3 or Jonesboro, or Saline County, and they didn't like those
4 outcomes, so their solution was to change the process to
5 not have it end in the library board, and to essentially
6 turn it over to the elected officials.
7    And the chief sponsor in the senate said, and I think
8 you indicated in oral argument on the 25th of July that
9 this process was, in effect, created to allow elected
10 officials, who, as the sponsor has said over and over, are
11 accountable to the public. The library board is not
12 accountable, he says over and over, and that's where we
13 want this process to end.
14    That was the view of the proponents, so that's why we
15 were concerned. We're saying, in essence, we don't have
16 any guideline in the statute, the statute does not say
17 that it will be the library's criteria for selection that
18 goes to the elected body that's going to make the decision
19 that specifies the things, including the recommendation
20 from the county judge or the mayor and other items, but
21 none of those include the selection criteria of the
22 library.
23    So I think it's fair our inference was, and I think
24 the judge has, at least, so far agreed, that it was not
25 going to be based on the criteria of the library and I

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al

CERTIFIED ORIGINAL/COPY TRANSCRIPT

Donald Nathan Coulter, Esq.
April 1, 2024

Page 61

1 think the reason, as a practical conclusion that's
2 supported by the context, is if you were content to have
3 that be the criteria that govern these reconsiderations,
4 then the system was working well.
5     I mean, libraries were reviewing their requests as
6 they got them and they were applying their criteria as
7 they had adopted them, and I think in most instances, as
8 this was true in the scattering of reconsideration
9 requests since I'd been there, those items were remaining
10 in the collection because they were, in fact, consistent
11 with the selection criteria.
12     So the takeaway is that the political process turned
13 a different direction. We don't like those outcomes, we
14 want a different body to decide and, in fact, we want one
15 that is clearly influenced by popular opinion in these
16 communities.
17     And I think your answer, and the state senator's
18 answer in committee, was that's the way it ought to work
19 in America, and if people don't like the books that get
20 pulled out of the library or relocated or put in the smut
21 room by their county quorum court, then they just elect
22 different people to the county quorum court. So that's
23 what drove us there .
24 Q   And I certainly appreciate all those concerns, and I
25 know there's the disagreement on interpretation, but if

Page 62

1 that was the interpretation, what I said, that the reason
2 that it could be withdrawn or removed from the general
3 circulation, and the only basis for that was the library's
4 own criteria of selection, would you be challenging that
5 one issue?
6 A   Well, I think it -- we've challenged it and I think
7 that's where we are, is what we're doing because that's --
8 that's not clear. I mean, if the State of Arkansas, the
9 Attorney General was to willing to enter a consent
10 judgment saying that only the criteria of the library
11 would be considered, not any of the things that are
12 specified in the statute and not any of the things that
13 have been heralded by the sponsors of the statute, then
14 maybe that would resolve this dispute if we were
15 confident.
16     But I think it's obvious, too, if you look at what's
17 happening in Crawford County, look at what's happened in
18 Saline County, these people in the quorum court who didn't
19 ask for this -- and I understand Judge Keith said this was
20 a headache he didn't want.
21     They know the political pressure is going to come to
22 get these books out, regardless of what the selection
23 criteria may say. Whatever the selection criteria was in
24 April of 1956 and reflected in Policy 300, is not going to
25 matter if there are a bunch of people clamoring to remove

Page 63

1 these books and they believe it's their obligation to
2 preserve their way of life and their values and they're
3 going to impose on these quorum court members.
4     Watch the meetings in the Quorum Court in Saline
5 County, where people were haranguing the quorum court
6 members, that you have an obligation as a Christian to get
7 this out of the collection, et cetera. That's the focus
8 of where we are.
9     If someone is willing in the state to say to the
10 Defendants, no, no, you and Judge Brooks have construed
11 this wrong, we're fine to just let the criteria be what's
12 applied, then we might be in a different place, but that's
13 a hypothetical and I don't think it's going to come to
14 pass.
15 Q   All right. Just so we're clear, if that hypothetical
16 existed, the answer would be, no, you would not have
17 challenged it, the interpretation?
18 A   Well, I don't know how we go back to make a
19 hypothetical apply. If I hadn't heard the testimony, if
20 the state senator had hadn't gone on Conduit News and
21 other places that they've had him and said what he said
22 over and over and over about we want these elected
23 officials to decide, and I hadn't been paying attention,
24 and had been on the dark side of Pluto or whatever it is
25 and didn't know that there was enormous political

Page 64

1 pressure, not just in this jurisdiction, but all over this
2 country by groups called Moms for Liberty and others to
3 bring these fights to the doorstep of the heretofore
4 fairly low-profile public libraries across the country,
5 you know, maybe.
6     If your stipulation or your hypothetical is if I
7 don't live in the real world I live in and I had been
8 living in that real world, I had been paying attention,
9 and I take people for their -- I take people at their
10 word. If he says this is what we're about, then I think
11 that's what they're about.
12 Q   Okay. Thank you for that.
13     Does the board set these policies, the
14 reconsideration policies?
15 A   Correct, but not the administrative procedure
16 policies.
17       MR. WATSON: And I'll have to go back and
18     check. I'm not sure we got 301, but I might
19     have missed that.
20       MR. ADAMS: We'll go back and check.
21       MR. WATSON: Because I didn't notice any
22     policy related to reconsideration --
23     administrative policy or procedure, excuse me.
24 A   I can tell you that essentially 301 just spells out
25 what the form will have on it, and details the sorts of

1 mechanics of how this operates. I think it also contains
2 provisions about how -- again, some of this was
3 enlightened -- if there was a silver lining from Act 372,
4 it did prompt us to think about structuring, a little more
5 formally, the way we review these things and I think what
6 we set up in that policy that we should produce --
7 administrative procedure we should produce, not a policy.
8 Set out that there would be three or four standing
9 committees comprised of the people in collection
10 development and they would form rotating members to
11 comprise of these committees. So it goes into that, kind
12 of in detail, just for the purposes of executing this
13 policy.
14 Q    And we can set this policy aside.
15       A couple of times you mentioned Ms. Chilcoat's email.
16 Did she ever send a follow-up email withdrawing the
17 previous email that you've been mentioning?
18 A    Yes.
19 Q    Okay. And in that email, withdrawing the previous
20 email, did she go into any additional detail about why she
21 was withdrawing it?
22 A    No. I saw the email late one morning, early one
23 afternoon. I had a series of meetings and then I came
24 back to my desk and saw that there was an email saying
25 please consider my previous email withdrawn and delete and

1 that was it.
2 Q    Okay. Are there any policies related to the location
3 of materials, like, within a library itself within a
4 branch?
5 A    Yes. Yes, there is language in one of these policies
6 that says the selection criteria and the staff who are in
7 charge of that puts materials in age-appropriate locations
8 in the library.
9 Q    We should be able to move through these next two
10 pretty quickly.
11 (Exhibit Nos. 5 & 6 were marked & attached hereto.)
12 Q    All right. Mr. Coulter, I've handed you Exhibit 5.
13 What is this?
14 A    Exhibit 5 is the Board Policy 400, which sets out the
15 Rules of Conduct that people are subject to if they come
16 into our spaces.
17       MR. WATSON: And for those on the Zoom,
18       that is going to be CALS production Bates No. 6.
19 BY MR. WATSON:
20 Q    And then, Mr. Coulter, Exhibit 6, what is Exhibit No.
21 6, which starts at Bates No. 9?
22 A    Yes, this is Board Policy 401, which talks about the
23 circulation and fees, who's eligible for a card, what the
24 card entitles you to do, and what the fines may be set by
25 the director by administrative decree, I guess.

1       And then the rest of the Exhibit, Bates stamped CALS
2 10 through 25, is the manual for issuing cards in our
3 system and different types of cards, of which there are a
4 number.
5 Q    So on Exhibit No. 6, Page No. 1, which is Bates No.
6 9, that's the policy, and then the remainder, would that
7 be the administrative procedure? Would that be the
8 technical term to use?
9 A    Yeah, not exactly. That's not the way we would use
10 it. In my previous reference to Administrative Procedure
11 301, which sets forth the details of the policy for
12 reconsideration, that's a little more formal.
13       Pages 10 through 25 here are just essentially a
14 manual of how staff are trained and operate in the spaces
15 of our branches when people come in and ask for a library
16 card and how you go about verifying that they're entitled
17 to one and which type card it is.
18       When they get a card it will be coded in the library
19 system as one of these types, and this just sets out --
20 it's more in the way of an operating manual or procedure
21 for executing our board policy, than it is an
22 administrative procedure.
23 Q    Like I said, there are going to be just a few quick
24 questions here. So on Exhibit 5, if you'll turn to
25 Paragraph 20, which is Bates No. 8, it says: "Children

1 ages 11 and older are welcomed to be at the library
2 without a caregiver if their behavior complies with the
3 Rules of Conduct. Caregivers should be at least sixteen
4 years of age and attentive to the needs of the persons in
5 their care. Further information regarding caregivers and
6 child safety can be found in library's Safe Child
7 Procedure."
8       Two quick questions about that. So children ages
9 eleven and older are welcome to be at the library without
10 a caregiver. Why eleven and older? Is there any reason
11 that number was chosen?
12 A    Yeah, there was a lot of discussion. The board was
13 involved in this. This was, I think, most recently
14 revisited in probably August of '21, perhaps. Yeah, maybe
15 it was June of '21. That looks like the most recent
16 revision, and then in August of this past year, so there
17 may have been some other things that came up, but I don't
18 think those dealt with Paragraph 20.
19       Paragraph 20 was discussed, and as I recall the staff
20 recommendation coming out of the pandemic, where we had
21 significantly restricted the numbers of people in the
22 library for a while, then we let that up, and people were
23 not dropping their kids off.
24       A lot of people use the library as their aftercare
25 and we were having cases -- this has been an ongoing

1 issue, as I recall, for a number of years, where people
2 were leaving their six-year-old and the supervisor of the
3 six-year-old was his ten-year-old brother and we didn't
4 have enough staff, obviously, to maintain some confidence
5 that those children could be supervised by staff.
6      So coming out of the pandemic, where people had
7 been -- patrons and parents had been, by necessity, forced
8 to find other aftercare-type programs, we thought there
9 was an opportunity to revisit what the rules ought to be.
10     As I recall, the board's input was they wanted the
11 age lower.  They started out it was going to be 12 or
12 something and it got bumped down a little bit, but
13 essentially the decision was made by the board to allow us
14 to require someone who is under eleven to have a
15 sixteen-year-old accompany them.
16 Q    So was there anything special about the
17 eleven-year-old cutoff?  Was it just a compromise?
18 A    You know, I'm sure the people who were in that
19 discussion would say they didn't just draw it out of a
20 hat.  There was a lot of discussion.  You know, I think
21 they were thinking in terms of, all right, this is
22 probably a fourth grader, a fifth grader.  There would
23 obviously be some eight-year-olds, nine-year-olds who
24 would be mature enough that they could be left in the
25 library and engage in library-appropriate activity or not

1 give some of our staff anxiety about do we need to be
2 supervising them all the time because they might hurt
3 themselves or something might happen to them.
4      But by and large, I think the gravity of opinion was
5 that eleven is about the age where kids can take care of
6 themselves, for the most part, in a library-safe space and
7 you don't have to be constantly watching them the way you
8 might need to for the average six-year-old or
9 seven-year-old.
10 Q   So it sounds like it was just a -- a line had to be
11 drawn and that was just the best one that could be hashed
12 out by everybody?
13 A   Yes.
14 Q   All right.  And then the caregivers in the next
15 sentence being at least 16 years of age --
16 A   Yes.
17 Q   -- why that line?
18 A   Again, it was a function of sort of the collective
19 judgment of what would be an age where somebody would be
20 generally mature enough to look after some younger
21 sibling, or younger child with them.
22     And, again, we were trying to be accommodating to
23 parents who needed the library after school, we were
24 trying to be as least restrictive as possible, given the
25 concerns that the staff had and the need we have to make

1 sure that when somebody's child is in our library, that we
2 have adequate staff and are doing all we can to ensure the
3 safety of that child.
4      One of things that you will find in our selection
5 criteria that applies here, too, is the library is not in
6 loco parentis.  You know, we are not legally the parent of
7 the child while they're there, but obviously, as a
8 practical matter, and as a moral, ethical matter as people
9 who all live in this small town I described, we don't want
10 to be unable to take care of these children who are there,
11 and the judgment is that we can do that it if we don't
12 have eleven-year-olds running around the library who are
13 not with at least someone sixteen years old.
14 Q   So, again, just a line has got to be drawn and that's
15 what it ends up being?
16 A   Well, I mean, I guess you could argue a line didn't
17 have to be drawn.
18 Q   Fair enough.
19 A   But once it was the considered judgment of the staff,
20 in consultation with the board, that we ought to have a
21 line, then the question is, again, using probabilities and
22 generalities of the average child, that was the best we
23 could conclude.
24 Q   And then in Paragraph No. 21, it says:  "The police
25 department will be called if children under 12 years of

1 age are left unattended in front of the building prior to
2 regular opening time or have not been picked up by 15
3 minutes after closing time."
4      So this is going to be the same question as what
5 we've been discussing.  Why twelve years old?  Is it just
6 because once the line had to be drawn, you had to pick
7 one?
8 A   Yeah, I don't know why twelve is the number there.  I
9 just know, again, as heartbreaking as it is to our staff
10 to see these kids who have been left after the library is
11 closed, we were trying to provide them with some means of
12 motivating parents to not leave those children and leave
13 our staff driving off if that child is still there and we
14 need some way to encourage and incentivize parents to be
15 more responsible with their children.
16 Q   And I'm sure these librarians are also building
17 relationships with these kids, who a lot of times is the
18 same kids?
19 A   Absolutely they are.
20 Q   So we can set Exhibit 5 aside and move on to Exhibit
21 6.  And just as a prewarning, I'm going to ask similar
22 questions about -- you know, there's an age limit that
23 exists in this policy or operating manual, and why is that
24 the one.  So if you'll turn to Bates No. 20, that second
25 paragraph:  "Children under the age of 14, who are not

Page 73

1 accompanied by a parent or guardian, may apply for a
2 provisional card," and it goes on.
3    Why 14 as the age limit for a provisional card?
4 A   I don't remember being privy to any conversation
5 about that, the way I was in other instances, so I can't
6 give you a feel for why that became the age break, so I
7 just don't know.
8 Q   Okay.  And then two paragraphs down:  "The maximum
9 age for a provisional card is 17.  Once a patron is 18,
10 they'll have adult options available."
11    Any reason why 18 is the limit between provisional
12 and an adult card?
13 A   Well, essentially when they're 18, they're no longer
14 a minor, they're adults.
15 Q   All right.  That's all I really wanted to ask about
16 those, so you can set those aside.  Are you good?
17 A   I'm good.
18        MR. WATSON:  Anybody else need a break?
19    Okay.
20 A   It's always the court reporter, in my experience, who
21 makes that decision.
22        MR. WATSON:  Are you okay, Michelle?
23        THE COURT REPORTER:  Yes, thank you.  Why.
24 BY MR. WATSON:
25 Q   Okay.  Hopefully we're on the back end of this.  So I

Page 74

1 want to move on specifically to the challenge to Act 372,
2 now that we've been kind of hitting around it, and I want
3 to kind of take that a little more full force now.
4    So as I'm sure you're aware, and you mentioned
5 earlier, there are two sections you're challenging.
6 Section 1, which is the criminal provision, and Section 5,
7 which is setting some sort of standard for reconsideration
8 policies and how those need to look.
9    I want to start with Section 1.  So what,
10 specifically, is your understanding of what you're
11 challenging related to Section 1, and I have copies of the
12 Act, if you want to look at that?
13 A   Well, again, I think the -- the most reliable
14 indication of what we were challenging is in our Complaint
15 and in our briefing around the Motion for Preliminary
16 Injunction.
17    Generally, and speaking as a client and litigant and
18 not the lawyer on the case, as I've said earlier we did
19 not believe that we could continue to operate the library
20 in the way we have operated it if Section 1 became the
21 law, because it essentially made it a misdemeanor to have
22 books with sexual content anywhere on our shelves that
23 would, thereby, be said by some zealous prosecutor to be
24 being made available to a five-year-old in our library.
25    We believe the statute was defective on a number of

Page 75

1 levels with regard to Section 1, but obviously for not
2 treating -- or attempting to treat five-year-olds and
3 sixteen-year-olds, seventeen-year-olds as the same, for
4 purposes of coming to the library and being -- having
5 access or being subjected to some book with sexual content
6 made available.
7    And, in addition, we thought it also invited an
8 enormous amount of potential uncertainty and problems for
9 anyone responsibly trying to advise staff about their
10 exposure to criminal liability with regard to what
11 community standards -- what community decisions would
12 infuse or inform the decision as to whether or not
13 something with sexual content went afoul with the Miller
14 test as applied to children, to minors.
15    So it was fraught with peril, and it was in our view
16 obviously upsetting to librarians all over the state who
17 didn't sign on for this work with the possibility that
18 they might go to jail for doing the jobs they've been
19 doing by having books in the collection that might have
20 sexual content and might be said by some prosecutor to be
21 harmful to minors.
22 Q   So is it -- and if I'm misunderstanding, please
23 correct me.  Am I correct in understanding that it is more
24 about the consequences of potential prosecution, than it
25 is about the statute itself and what it means?

Page 76

1 A   Well, those are inexplicably linked in my view.  The
2 statute, again, means what it says with regard to treating
3 minors as the same.  It means what it says with regard to
4 reading into this process of determining whether someone
5 is in violation of Section 1 and subject to criminal
6 penalties if community standards might say that with
7 regard to a five-year-old, there is no redeeming literary
8 or societal value, and, therefore, with regard to a
9 five-year-old certain books that are very popular among
10 older minors, or certain books that are very popular among
11 adults, that have sexual content, could trigger criminal
12 liability.
13    So I'm not sure that it's -- I don't understand how
14 you can separate out that fundamental problem that we have
15 with the statute from any part of Section 1.
16 Q   Are you aware if CALS is implementing any similar
17 policy that uses the harmful to minors definition?  And
18 I'm using policy not in the specific board sense, but just
19 as a practice.
20 A   Well, I think to some extent these are not lawyers
21 making the decisions in the collection development, but to
22 some extent where we were before SB 81 was enacted, we
23 were aware that we don't have obscenity in the library.
24 No publishers are going to make it available, and we're
25 not going to collect it, and we were aware that as it had

Page 77

1  been left post-Shipley, the law that was redone by Act 372
2  essentially prohibited disseminating or distributing
3  things that were harmful to minors, so in some ways we had
4  to make some sort of decision about that, at least
5  implicitly.
6      In the real world, as you know, and anybody else who
7  will come to my libraries, we don't take people of any
8  age, when they come in the door, and say, hey, would you
9  like to read Gender Queer, how about this Barbara
10 Kingsolver novel, it's got some sex in it? That's not the
11 way it goes.
12     And the way we read the statute, you didn't have to
13 do that after 372 was enacted. You just had to have it in
14 your library somewhere and you have to be able to keep all
15 the five-year-olds away from any book that might have
16 something of a sexual nature, that might somewhere,
17 someday, somehow by some combination of a zealous
18 prosecutor and a determination that a five-year-old is
19 being harmed by having access to a book that would clearly
20 not be a problem for a sixteen-year-old.
21 Q   Are you familiar with CALS' Internet Use Disclaimer
22 and Public Computer Use Policies?
23 A   I'm generally aware that we have one. I haven't
24 reviewed it.
25 Q   I'm not going to really spend time on asking

Page 78

1  questions specifically about this document, but just in
2  candor, I'll let you take a look at it.
3  A   All right.
4  Q   This is going to be Exhibit 7.
5      (Exhibit No. 7 was marked & attached hereto.)
6  A   Okay.
7  Q   And, also, I pulled this off of CALS' website.
8  A   Okay.
9  Q   And this is really just going to be a hyperlink to
10 the next point I make. So in that last paragraph, it
11 says: "CALS complies with the Children's Internet
12 Protection Act, which requires that schools and libraries,
13 which receive discounted Internet access through the
14 E-Rate program must filter obscene and harmful content."
15     Did I read that correctly?
16 A   Yes.
17 Q   To your knowledge, does CALS comply with the
18 Children's Internet Protection Act?
19 A   Absolutely. That's a condition of taking that
20 federal money. The Supreme Court ruled that that was a
21 constitutionally-permissible condition for Congress to put
22 on the E-Rate subsidy.
23     Most libraries, perhaps all in Arkansas, have made
24 that tradeoff and we have vendor software that is running
25 on all of our computers that restricts access to things

Page 79

1  that are protected speech for you or me, but might be
2  considered harmful to children.
3      In other words, you can't go sit down in one of our
4  terminals and pull up things that you have a right to look
5  at as a matter of looking at pornography as an adult and
6  we -- we have software that gets updates and is installed
7  on all those devices.
8  Q   And you, perhaps, can see where I'm going with this.
9  Again, it's a statute, so it doesn't really need to be in
10 the record, but I have a copy for you, if you want to take
11 a look at it, and I'll mark it as Exhibit No. 8.
12     (Exhibit No. 8 was marked & attached hereto.)
13     This is a kind of long statute. I'm obviously not
14 going to have you read the whole thing, but if you would
15 flip to Subsection F(7). It's on the second to the last
16 page. It's got definitions.
17     And, again, walking through the entire thing, I'll
18 represent to you that these are the definitions for the
19 Children's Internet Protection Act.
20 A   I'm sorry, is it F(7)?
21 Q   I believe it's F(7), but it's on the second to the
22 last page.
23 A   Page 6, at the bottom?
24 Q   Yes, sir.
25 A   Okay, I got it. I couldn't find the F, but I see the

Page 80

1  7 under Definitions.
2  Q   So the definitions here of harmful to minors and
3  minor, those are going to be 7(B) and (C)?
4  A   Right.
5  Q   And I'll let you take a look at those.
6  A   Okay.
7  Q   To me that seems, you know, pretty close to what Act
8  372 sets out as its standard of harmful to minors.
9      Is there any reason -- I mean, what is the
10 difference, in your opinion, or in your view of
11 understanding, between this statutory definition that you
12 do apply, and Act 372, which you're now challenging?
13 A   Well, first of all, what this statute governs is the
14 access to things that are on the Internet via library
15 computers. Obviously, any one who can sit down at a
16 computer that's not been equipped with the device that the
17 library buys to screen and to keep access to pornography
18 off of the libraries' computer, can go to what I assume
19 are an unlimited number of sites that have protected --
20 constitutionally-protected speech that an adult is
21 entitled to look at.
22     But what the law says, is you're not entitled to do
23 that through a library Internet connection that is funded
24 by the Federal Government, in large part through this
25 E-Rate subsidy.

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY TRANSCRIPT
Donald Nathan Coulter, Esq.
April 1, 2024

Page 81

1  So we're talking about content that is on the web,
2  not content that's in the library, and what the Federal
3  Government has said, is here's this framework, if you want
4  this money to enable you to pay Internet service providers
5  with federal money, then you have to keep people, who are
6  otherwise entitled, from doing it when they're in your
7  library with regard to the content that might be harmful
8  to minors on the Internet, or somewhere out in the ether
9  space.
10  That is different from saying that books you have on
11  your shelf that are wildly popular, Fifty Shades of Grey
12  for adults, in light of Act 372, you are subjected to
13  criminal prosecution if you make that book available to a
14  five-year-old.
15  The Arkansas Supreme Court opined, when Judge Eisele
16  certified the question in Shipley, that Arkansas'
17  definition of harmful to minor statutory definition
18  applies to all minors, and, therefore, the five-year-old
19  in my library could be said to be exposed to, we are
20  making it available by just collecting it.
21  That is a material difference than we're putting on
22  our computers, that are largely funded by federal subsidy,
23  access to the Internet, a chip that screens out access to
24  things that are not in my library, things that are out
25  there everywhere in ways that would probably be -- to an

Page 82

1  old man like me, would be coarsening and frightening and
2  shocking.
3  We're happy to make that tradeoff because we don't
4  have collection development people who look at what's on
5  the Internet, believe it or not, and decide. We have
6  people that that's their job, and they pick these 700,000
7  books, weeding and buying new ones constantly, and they
8  make determinations based on whether the audience they're
9  buying them for wants those books.
10  We believe that audience has a constitutional right
11  to those books, we believe those books are not obscene, we
12  believe those books might, in some instances, as the
13  statute you're defending has been redone, might trigger
14  criminal liability for our staff.
15  That's a fundamental difference from saying you have
16  access through your computer in your home to anything you
17  want on the Internet, but you don't have access to
18  anything you want when you come in the library where the
19  computer connection is provided by the Federal Government
20  because that's the requirement the Congress of the Federal
21  Government made.
22  So we're willing to accept that tradeoff for the
23  E-Rate subsidy, and, furthermore, it's policing behavior
24  in the library for things that are not reviewed by
25  professionals and put in my library. As I've said

Page 83

1  earlier, we have requirements that put the collection that
2  they've carefully decided upon in certain places in the
3  library we think are age appropriate.
4  One of the fundamental problems with the statute, as
5  we said, and we think that the judge agreed, is that there
6  is no way I can hire enough staff to keep five-year-olds,
7  who are in there with a parent, from wandering around, and
8  there's no safe harbor, as the judge pointed out, even if
9  I'm in there with my five-year-old and I'm looking for
10  Fifty Shades of Grey and my child is nearby, I may have
11  committed the act of making available, to this minor,
12  something that some prosecutor might say was harmful.
13  So, again, it's vague, it's overbroad, it's full of
14  problems in a day-to-day, practical way for somebody who's
15  trying to run a library and keep staff from going to jail
16  or being threatened with prosecution.
17  Q  So a lot of what you were just discussing was related
18  to the conduct. My understanding of the Complaint is that
19  what's also being challenged, is the fact that it applies
20  to all minors as a class, as opposed to, you know, making
21  some sort of sub-distinction between minors.
22  But it sounds like with the Children's Internet
23  Protection Act, you -- I mean, I don't know if you could,
24  on the computer, even make such a distinction, because who
25  knows who's going to be accessing the computer, but it

Page 84

1  sounds like you apply that as minors, sweeping, like all
2  minors are --
3  A  Well, here's the point as I understand it, and,
4  again, I'm not the lawyer in the case. The Arkansas
5  Constitution -- the Arkansas Supreme Court has said that
6  the definition, by statute, that we're talking about here,
7  harmful to minors, which is obviously a national standard
8  that's been adopted in state-by-state jurisdictions, in
9  Arkansas, anyway, when Judge Eisele certified the
10  question, the Arkansas Supreme Court said that applies to
11  all minors.
12  So we didn't make that determination. Judge Brooks
13  followed that determination and, in fact, points out that
14  in some other states, I think Virginia for one, the
15  question was certified in Virginia and they said, no,
16  that's not what it means.
17  But that's not where the law sits in Arkansas when
18  Act 371 was enacted. So we have to deal with the law as
19  it stands under Arkansas and as the proponents delivered
20  it to us, and if you take the Arkansas Law as the Supreme
21  Court has declared it is, and you take the language that
22  uses that harmful to minors phrase, that applies to
23  everybody who is under the age of 18 and that becomes a
24  frightening prospect for people who work in the
25  public-facing spaces in my library.

Page 85

1    I know that because I listened to them for months as
2 this legislative debate was going on and after the law was
3 enacted.
4 Q    Okay.  So in CALS' implementation of the Children's
5 Internet Protection Act, does that apply to minors,
6 meaning 17 -- under 17 as a class?
7 A    It applies to adults.  If you go into the library and
8 you sit down at one of our computers, we are screening at
9 that computer.  Now, you may be able to go -- because I
10 think in the Supreme Court decision, Justice Rehnquist
11 says that if I come into the library and I'm an adult, I
12 have the right to go ask the library to let me get to that
13 pornography site that's on the Internet, and I believe --
14 and, again, I'm not the lawyer and you guys have studied
15 this and I have not, but I believe that the individual
16 who's an adult over 18 has the right to access that in the
17 library.
18    So they have to come ask.  There was a lot of
19 discussion and opinion about whether that was a
20 stigmatizing thing, whether they should not be required to
21 go knock on the door and say I want to get this turned off
22 on my computer, so I can look at porn.
23    But we're not talking about adults.  We're talking
24 about any minor, as Arkansas law has defined it, and
25 that's all of them.  And what we know from some of the

Page 86

1 Plaintiffs in this case, is that they believe they have a
2 right to read books that would be considered problematic
3 to me as a parent of a five-year-old, and what the Act
4 does, is tell me, as the Library Director, you can't
5 provide those books to the Crawford County Plaintiff or
6 the woman who was a Central High junior or senior.  You
7 can't do that because you're running the risk, in doing
8 that, of having your staff or you be criminally charged
9 because that book might be considered harmful to minors
10 under Arkansas law.
11 Q    Sure.  But right now I'm asking you about CALS'
12 implementation of the Children's Internet Protection Act,
13 and my reading of this statute and I think the way it --
14 well, my reading doesn't matter.  I'm asking a factual
15 question about how CALS is implementing it.
16    MR. ADAMS: I'm going to object because I
17    don't think -- I mean, do we -- have we put
18    anything into evidence about how the CIPA
19    definition is actually interpreted?
20    MR. WATSON: Well, that's a legal question.
21    MR. ADAMS: Right.
22    MR. WATSON: Well, I'm asking about the
23    implementation, what CALS does, and I'm trying
24    to -- I poorly phrased it a couple of times, but
25    can I ask the question and then you can see

Page 87

1    if --
2    MR. ADAMS: Okay, go ahead.
3 BY MR. WATSON:
4 Q    Okay.  So in CALS' implementation of the Children's
5 Internet Protection Act, if a website or something on the
6 Internet is harmful to a five-year-old, does that mean
7 it's blocked for everyone?
8 A    It's blocked for everyone, period.
9 Q    Okay.  That's all I'm asking.
10 A    We don't make the determination, as your statute
11 requires of us, whether it's being blocked for a minor who
12 is five or a minor of sixteen, because the way the law is
13 written and applied and implemented by us in pursuit of
14 that, or in compliance with that, is it applies to every
15 minor, and, therefore, we don't have to try to make that
16 determination the way we do under Act 372 because we know
17 material on our shelves with sexual content is going to
18 arguably be harmful to some five-year-olds.
19    What -- what problem I have with that, is I can't
20 tell my staff, with any degree of confidence, you are okay
21 because of the way they changed the law.  Before it was
22 changed I could because it required us to aggressively
23 push the content, which we don't do no matter what the
24 content is.
25    Some child wants to know where the books are on

Page 88

1 sharks, we try to find what they want, but we don't push
2 books.  The way the statute stood before a year ago, and
3 the way some of us suggested to the general assembly that
4 they leave it, we could live with because we didn't have
5 to make a determination.
6    But what they did, contrary to at least one
7 explanation I've heard from the sponsor who has it, by my
8 view, exactly backwards, they weren't content with just
9 having it prohibit the promoting, distributing,
10 disseminating something that was harmful to minors.  They
11 want it to be if it's in your space, if it's made
12 available.
13    So we take that and we take the Arkansas Supreme
14 Court certified ruling in response to Judge Eisele and
15 that harmful to minor statute applies to everybody who's a
16 minor, so that's recipe for chaos, at best.
17    Contrast that to CIPA, it's a bright line.  We want
18 the money, the Supreme Court has said if you want that
19 money you have to block access to all content, whether it
20 might not be deemed harmful to a five-year-old or a
21 sixteen-year-old.  It doesn't matter in that analysis
22 because we're blocking all of it.
23    And we know, and as the Rehnquist plurality opinion,
24 whatever it is says, that's infringing upon the
25 constitutional rights of some adults and they had some

Page 89

1 workaround that's acknowledged in that case.
2     But that's fundamentally different than what we're
3 talking about in the routine, ordinary lives of my staff
4 who are buying these books that we know have sexual
5 content, and we know the Arkansas law.
6     So the combination of this practice of having these
7 books that people who are 16, 26, 66 have a right to read
8 and want to read, they want their public money to be spent
9 on collecting, we have to do something. Either we don't
10 buy those books, we don't collect those books, or we don't
11 let any people under the age of 18 come into our library.
12 Q   Okay. I think I got the answer that I was looking
13 for, so I'll move on.
14     MR. ADAMS: Can we take a break?
15     MR. WATSON: Yeah, let's go ahead and take
16 a break.
17     (Brief recess was taken.)
18     MR. WATSON: All right. Next, as we're
19 starting up here, I am going to turn to the
20 Subpoena Duces Tecum, which I asked for some
21 books that you believe are subject to Act 372,
22 Section 1, and I believe Mr. Adams has an
23 objection he'd like to make.
24     MR. ADAMS: So Mr. Coulter has brought five
25 books that are in CALS' collection.

Page 90

1     THE WITNESS: I think there's six books
2 that are in CALS' collection.
3     Actually, one of them is in the collection,
4 but I had to get a copy at Target because the
5 book in the collection is so poplar that all of
6 them were checked out.
7     MR. WATSON: There's actually seven.
8     MR. ADAMS: All right. We brought more
9 than we needed. But you asked for five items in
10 CALS' collection that believes would make it or
11 its employees subject to criminal punishment
12 under Section 1 of Act 372 of 2023.
13     So for the record I want to object that the
14 court has found that Section 1 is vague in its
15 use of verbs like presents, makes available and
16 shows, so CALS can't reliably determine what
17 would make it or its employees subject to
18 criminal punishment under Section 1.
19     Also, we're, for reasons that Mr. Coulter
20 stated earlier, determining which -- which
21 materials may be harmful as to which minors, is
22 itself an added layer of complexity that renders
23 the statute difficult for CALS to interpret.
24     So Mr. Coulter brings these books as books
25 that many people could find too sexually

Page 91

1 explicit for young minors and that would expose
2 CALS' employees to criminal liability under
3 Section 1.
4     But we're not -- we're not conceding that
5 these books do violate Section 1, both because
6 of where they are and because of the content of
7 the books. That's all.
8 BY MR. WATSON:
9 Q   All right. And before we get into the specifics of
10 those books, I want to ask about a couple of emails that
11 are from you to various other people.
12     (Exhibit No. 9 was marked & attached hereto.)
13     So this first one I've labeled Exhibit 9. I'll give
14 you a chance to get familiar with that and when you're
15 comfortable, would you let me know what document you're
16 looking at, generally?
17 A   So it appears to be an email from John Chrastka to me
18 dated January 25th, 2023.
19 Q   All right. And on Page 2, it has a quoted blocked
20 portion that purports to be from you. If you would read
21 over that and let me know if, in fact, you recall sending
22 this email.
23 A   I don't recall sending it, but obviously it has --
24 it's indicating that I sent it on January 24th, so I'm
25 content to believe if we produced it, that that came from

Page 92

1 something that was in my email.
2 Q   Okay. So I'm going to read what is the --
3     MR. ADAMS: Hold on.
4     MR. WATSON: Yes, go ahead.
5     MR. ADAMS: For the record, I don't believe
6 this has been produced.
7     MR. WATSON: This is not y'all's
8 production.
9     MR. ADAMS: Right, by any party in this
10 litigation before now, right?
11     MR. WATSON: Correct.
12     MR. ADAMS: It was obtained by a FOIA?
13     MR. WATSON: It was obtained by someone
14 given by FOIA and given to me, but, yes, it was
15 through FOIA.
16     MR. ADAMS: Okay, thank you.
17 BY MR. WATSON:
18 Q   Okay. So in the second paragraph of your email, and
19 I'll just read it for the record: "Our lobbyist says that
20 the forces behind this bill sincerely believe that some
21 libraries are engaged in the distribution of harmful
22 obscenity. He says that the firm AALL has engaged --
23 agrees with that assessment. These legislatures are not
24 amenable to the fact that we are decidedly not doing
25 that."

Page 93

1    I just wanted to ask you specifically about this last
2 sentence that you are not decidedly doing that. What did
3 you mean by "that"?
4 A   We are not collecting or circulating obscenity as
5 that term has been interpreted in Miller and Ginsberg to
6 adults.
7    And part of that was at the time of this introduction
8 of this unpleasant chapter that we've all been living
9 through since late 2022, early 2023, all the talk from its
10 proponents was about obscenity, get the obscenity out of
11 the library, and you know that in the Act there is -- the
12 header is that a provision that would repeal the
13 long-standing exemption under a separate section of the --
14 of obscenity criminal code not having to do with
15 libraries.
16    And that was the -- the -- in effect, the opening
17 salvo, the conversation starter, if you will, by the
18 proponents of SB 81 to talk about repealing the obscenity
19 exclusion or exemption for libraries, schools and museums
20 and that was where my attention was focused, and at that
21 point I thought, you know, this seems to be an exercise in
22 performative politics without a lot of practical
23 implications because no library in America is collecting
24 and circulating obscenity as defined by Miller, in part,
25 because that's already a crime.

Page 94

1    Publishers don't -- even if a library wanted to, much
2 rather do it, but we certainly weren't and I don't know of
3 any library in America that has or ever would, so that
4 seemed to me to be, like I said in there, sort of an
5 academic exercise that must have been about performative
6 politics.
7 Q   You are not saying here, or are you saying here that
8 CALS does not have any items in its collection that would
9 fall under the definition of harmful to minors as you
10 understood it?
11 A   No, that's not what I'm saying there. I was talking
12 about, as I just said --
13 Q   Got it.
14 A   -- the conversation -- and, in fact, if you go, as I
15 did last night, and looked at the lead sponsor's interview
16 on Conduit News, the website platform on Facebook, again
17 when he's asked about his, at that point, recently enacted
18 SB 81 in the form of 372, he's heralding, and he wrote an
19 essay in the Democrat-Gazette and in both instances -- and
20 I'm sure this was happening elsewhere, he always leads
21 with, well, why should librarians not be subject to
22 obscenity crimes? You know, it's just like pharmacists
23 aren't exempt from negligence and none of us is exempt
24 from obscenity, they shouldn't be treated separately.
25    So all the conversation started, even after the law

Page 95

1 has been passed, is to talk about this obscenity provision
2 that got repealed in the end, not for museums,
3 interestingly enough, but just for libraries and schools,
4 that's in this far -- far away section of the code that
5 deals with the crime of selling obscenity and being
6 prosecuted for it.
7    That was, in some ways, a part of the legislative --
8 and I guess even afterwards, strategy of the proponents
9 who talk about this as though we're talking about
10 libraries are collecting and circulating obscenity, can
11 you believe that, and they're get an exemption in the law
12 that exempts them from being criminally charged with that,
13 how dare they ask for that. That was sort of the tone of
14 where these conversations were heading.
15    (Exhibit No. 10 was marked & attached hereto.)
16 Q   Okay. That's all I wanted to ask about that, and
17 I've got a similar question about this second email that
18 seems a little more specific to the legislation than the
19 one we just looked at, so I'm going to ask a similar
20 question.
21 A   I assume the source of this is the same as you
22 identified earlier?
23 Q   Yes, sir.
24 A   We have redacted the email addresses and I guess I
25 don't see a date, but it appears Exhibit 10 is an email

Page 96

1 from Bobby Roberts to various people, including me, and I
2 do have a recollection of this email at the time and I
3 think it probably would have been in the same timeframe as
4 the earlier exhibit, January, February of -- well, I do
5 see a date stamp below where he was responding evidently
6 to an email I sent on January 21st. It's the same
7 timeframe as Exhibit 9, which was the Chrastka email of
8 January 25th, I think.
9 Q   So if you turn to Page 2, the last paragraph, the
10 sentence that starts out: "And it seems clearly within
11 her prerogative to brief him on why this legislation is
12 unneeded, a solution in search of a problem that doesn't
13 exist." You're speaking specifically to a specific
14 legislation, as opposed to just general comments.
15    Am I reading that correctly?
16 A   This is, again, in the context of where the original
17 iteration of the bill, which did not look a great deal
18 like what was finally -- what resurfaced after as I
19 understood there was some effort to negotiate among
20 library leaders and representatives attended by the
21 sponsor and others.
22    I was not present at that meeting, but there was an
23 interlude between when this correspondence is taking place
24 and when they came back with the amended and superseding
25 bill, which looked significantly different in ways that

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY TRANSCRIPT
Donald Nathan Coulter, Esq.
April 1, 2024

Page 97

1 aren't necessary to go into here.
2      But what I'm saying, you know, is the information
3 that I'm being given by Robert Coon, who is identified in
4 this email, who was the impact management consultant on
5 our matters, and I'm saying, you know, if -- if Bobby
6 would be willing to talk to Jennifer Chilcoat, who had
7 been employed when Bobby was in the Library as the Deputy
8 Director under Bobby before she took the job for the
9 State, that she might suggest to the head of the
10 Department of Education that this is really in search of
11 a -- a solution in search of a nonexistent problem, again,
12 with regard to the obscenity being circulating that's not,
13 and that, again, was what the sponsor was talking about
14 most of the time, what people who were hearing about it
15 saying and -- and advocating let's stop the obscenity in
16 the library and let's certainly don't give those people in
17 the libraries an exemption of the criminal code for
18 providing obscene material. So that's, again, the context
19 for that.
20 Q   Okay. That's the only question I had about that, so
21 we can put that to the side, too, and I think that should
22 be the last paper exhibit that I've got.
23      So now let's turn to some of these books that we've
24 got here and this is the first time I'm looking at these
25 as well, so I might have some general discussion about

Page 98

1 them.
2          THE COURT REPORTER: We need to go off the
3          record for a second. My sound stopped recording
4          in real time.
5          (Brief recess was taken.)
6 BY MR. WATSON:
7 Q   All right. Mr. Coulter, you've brought some books
8 here today that are in response to our Subpoena Duces
9 Tecum, where we asked for five items in your collection
10 that you believe would make you or your employees subject
11 to criminal punishment under Section 1 of Act 372 of 2023.
12      Could you identify, first of all for the record,
13 which books you've brought?
14 A   Yes. Let me say that in response to your request, in
15 a spirit of accommodation and collegiality, I looked at
16 various lists of books that have been handed around by
17 proponents of Act 372 and groups like Moms for Liberty or
18 related to that entity and I may have inquired of our
19 people what types of books might be in this category.
20      And let me say your language, five items in CALS'
21 collection that CALS believes would make it or its
22 employees subject to criminal punishment, I'm not, again,
23 saying these would be so deemed, but I am certainly, as
24 I've said before, not able to tell my staff with
25 certitude, that I would like, these will not trigger

Page 99

1 criminal liability because they are on the shelves of the
2 library.
3      So the books that are in our collection, the copy of
4 our first book, A Court of Mist and Fury by Sarah Maas is
5 in the collection, but this is actually a copy that I
6 purchased over the weekend because all of our copies are
7 in circulation. So I'm told -- I've not read this book,
8 but I'm told it's an extremely popular series and I'm told
9 and believe, based on the sources, that it has sexual
10 content in it that might be held to be harmful to a
11 five-year-old; I'm told that the nature of that content
12 might be deemed by some people to be at odds with the
13 community values.
14      So in any event, I cannot opine comfortably to my
15 staff that this book wouldn't trigger some potential
16 criminal exposure as the Arkansas Supreme Court is
17 defining harmful to minors.
18      So that's the first book.
19 Q   Okay.
20 A   But I also will note that I believe this book is on a
21 list that we were sent by the Director of the State
22 Library recently, of some 30 books, saying that a member
23 of the Arkansas State Library Board had asked if they
24 would inquire of all the public libraries in the state as
25 to whether those libraries had, in their collection, these

Page 100

1 30 books, approximately, and this was on that list, which
2 I think we can all presume came from -- was initiated by
3 the most recent appointee of the governor to the State
4 Library Board. So in any event, it may well be one that
5 would cause possible criminal exposure.
6 Q   So, one, you said that you were told about --
7 A   Yeah, I haven't read this book.
8 Q   Okay. And so who told you --
9 A   The only book I have read, Demon Copperhead. I have
10 not read all of the -- although, I thumbed through the
11 graphic novel and I've thumbed through the books that are
12 essentially sex education titles, but I have not -- this
13 is a 600 and some odd page fantasy novel. It's not my cup
14 of tea. I haven't read it, don't expect to read it, but
15 I'm looking at -- as I said, I'm looking at these lists
16 that have been circulating from people who are proponents
17 of Act 372, in some cases ardent proponents, and in some
18 instances the same people who send me emails and claim
19 that I and my staff are groomers, et cetera.
20      So I believe that the sources I have about the
21 content, family, friends and professionals on the staff,
22 is that it contains sexual content and I think it's
23 certainly consistent with these lists that are
24 circulating, including the one from the state library.
25 Q   So with the books that you've not read, and you said

Page 101

1 you've been told that it has content, the I'm told that
2 you're referring to on that list is family, friends, and
3 CALS' staff?
4 A Yes.
5 Q And, also, you --
6 A The people I talked to about it. Obviously I haven't
7 talked to the authors that are circulating.
8 Q Okay. And you also mentioned a list with 30 books in
9 an email. Who was that from?
10 A Ms. Chilcoat sent that from the State Library a
11 couple of weeks ago asking all of the state libraries to
12 comply voluntarily with a request recently made by one of
13 her board members to tell them, the State Library Board,
14 whether you have, in your collection, the books that are
15 on that list.
16 Q Did that email purport to be related to Act 372?
17 A The email from Ms. Chilcoat did not say that this has
18 been inspired by Act 372, but I think it's a reasonable
19 inference that the environment we're operating in, which
20 includes the adoption and the litigation, I think it's a
21 reasonable inference that the person who is the
22 inspiration for that request from Ms. Chilcoat, is also
23 the person at the first state library board meeting he
24 attended and made a motion to cut off the funding for the
25 public libraries who had -- had the audacity to go to

Page 102

1 court and suggest that this statute needed some judicial
2 declaration of its constitutional infirmity.
3 So there's not anything in the email, but, again,
4 living in the real world, as I try to do most days, I
5 think it's a fair inference that that is coming from the
6 recently appointed board member.
7 Q Okay. Now, I want to walk through these, but A Court
8 of Mist and Fury you mentioned there, and some of these
9 are going to seem like some silly questions, but I'll ask
10 them for the record anyways. So this one, to your
11 understanding, contains some depictions of nudity, sexual
12 conduct, sexual excitement or sadomasochistic abuse?
13 A I don't know that it contains all those.
14 Q Or at least some of them?
15 A It contains sexual content probably in a way that
16 would be such that I wouldn't want to read it in front of
17 my six-year-old daughter if I had one.
18 Q Okay. And is the book predominantly about sexual
19 content that you just described?
20 A I have no idea. I haven't read it.
21 Q Okay. Are you aware of whether that sexual content
22 is displayed in a positive or negative light?
23 A No.
24 Q Are you aware of whether it was written with the
25 intent to sexually excite people?

Page 103

1 A No.
2 Q Okay.
3 A I mean, I think it may not have been the intent -- I
4 presume that's not the intent, but I haven't spoken to the
5 author, I haven't read the book, so I'm not really in the
6 position to make that conclusion.
7 But I, also, would point out again, that we're
8 talking about a range of potential people being around it
9 and it's thereby made available to who -- for whom it
10 might be sexually exciting, notwithstanding whatever the
11 intent of the author was.
12 And that's, again, part of the problem -- a big part
13 of the problem with regard to the statute, applying
14 harmful to minors as the Arkansas Supreme Court has read
15 that.
16 Q And do you believe that the book has some sort of,
17 you know, literary or artistic merit?
18 A Yes.
19 Q Okay. What section is this housed in in the library?
20 A This is -- I don't have the book that's in
21 circulation, but I believe this is in young adults.
22 Q All right. And we can set that one aside. Take your
23 pick of which one we go to next.
24 A I can also tell you that I'm confident that's in
25 young adult because I believe one of the books that

Page 104

1 series of the library moved from young adult based on
2 either professional staff's awareness or some requests.
3 What -- what the library staff is doing when they
4 collect materials, are looking, as I indicated earlier, at
5 book lists and industry publications before they get
6 there. Those typically have labeling on them, but we
7 don't rely on that 100 percent. We're going to make some
8 determination, our staff.
9 And when I was looking for this book, I ran across
10 information to indicate that all of that author's books
11 are in young adults, but one of them was moved by our
12 staff to the adult section, after either some observation
13 or some suggestion from somebody who had read the book and
14 our staff just concluded that it needed to be in the adult
15 section. And I think it was -- I think it was the Court
16 of Silver Flames series, maybe.
17 Q And that was moved based on the sexual content within
18 it or was it some other --
19 A Yes. Yes.
20 Q All right. We can move on to --
21 A As I told you earlier, our staff and our criteria has
22 language -- you know, we are obligated to locate things
23 that are in the collection in age appropriate parts of the
24 library, and so that was a reflection of that -- carrying
25 out that charge.

Page 105

1 Q    You can pick the next one or I can --
2 A    All right.  The next one that I picked up is a book
3 by Nikol Hasler, Sex:  An Uncensored Introduction, and
4 this is a book that is on our shelves and it is young
5 adult and it would be what I would described as a sex
6 education book.
7       In fact, there's a graphing at the bottom of this
8 paperback edition that has an image of a bird, an image of
9 a bee, so I think for old-school people like me, this is a
10 book about the birds and the bees.
11 Q    And, again, this is one of the obvious questions I
12 said I was going to ask.  Does this book -- well, first of
13 all, have you read the book?
14 A    No.  But when I just open at Chapter 5, the title is:
15 "Foreplay, Getting it on before getting it on," so I think
16 it's pretty obvious that this is about -- Chapter 3 is:
17 "Masturbation, The greatest love of all," and so forth.
18 Q    All right.  And I think it's safe to say that the
19 book is predominantly about sexual topics?
20 A    Yeah, this is just a sex education book.  "Your Body"
21 is Chapter 1.  There are images of circumcised and
22 uncircumcised penises, so that's what you would expect if
23 someone was looking for a sex education book in a library.
24 Q    And so the purpose is sex education of this book, I
25 think you've said a couple of times.  To your knowledge

Page 106

1 was it written to sexually excite young people?
2 A    As far as I would know, I think the answer to that is
3 no.
4 Q    Okay.  And do you believe it has some sort of, you
5 know, literary or artistic merit for young people?
6 A    Yes.
7 Q    Okay.  Then that's all I've got on that one.
8 A    So let's stay in that category because I think this
9 other book, It's Perfectly Normal is in the same genre, if
10 I can use a library word.  It makes me sound like I know
11 what that means.
12       This is another sex ed book, It's Perfectly Normal by
13 Robie Harris and Michael Emberley, and the subtitle is:
14 Changing Bodies, Growing Up, Sex, Gender and Sexual
15 Health.
16       And, again, I assume the question is the same as the
17 others.  If you thumb through it, there are illustrations,
18 clinical and otherwise, of male and female anatomy
19 throughout the book, and I would say it's designed to
20 answer curiosities and questions that adolescents would
21 have.
22       I would, again, not knowing the author, not having
23 read it from cover to cover, be willing to assume and
24 speculate that it's not written to sexually excite, if
25 that was your question.

Page 107

1 Q    So designed primarily for education?
2 A    Yes.
3 Q    Okay.  And along the same lines, do you believe it
4 has some literary or artistic value?
5 A    Yes, certainly for older minors.
6 Q    All right.
7 A    The next book is Looking For Alaska by John Green.
8 Q    Have you read this one?
9 A    I have not.  It's a New York Times number one best
10 selling author, but this book, I think, has been alluded
11 to, by some witnesses in the case, and in addition I have
12 been told, again, by the same circle of staff, friends, or
13 acquaintances, that it has sexual content, and, again, my
14 standard would be, for purposes of this statute, could it
15 be potentially seen as harmful to a five-year-old, I think
16 the answer is yes.
17 Q    Is, to your knowledge, the book predominantly about
18 nudity, sexual conduct, sexual excitement or
19 sadomasochistic abuse?
20 A    Don't know.
21 Q    Okay.  And I assume this would be the same answer,
22 but are you aware if those topics are displayed in a
23 positive or negative light in the book?
24 A    Don't know, I haven't read it.
25 Q    Okay.  What section of the library is this?

Page 108

1 A    This is also young adult.
2 Q    Okay.  So do you believe it has some sort of literary
3 or artistic value for young adults, at least?
4 A    Yes.  You know, young adults, I think, is a broad
5 category in the library world, probably ages 10 to 18,
6 but, again, if it's on our shelf in our young adult
7 section and a five-year-old is in that area, that
8 five-year-old, maybe having access to something that's
9 made available to that five-year-old might be deemed
10 harmful to a minor by some.
11 Q    And I think I missed this one on my list.  Are you
12 aware if the depictions of nudity, sexual conduct, sexual
13 excitement or sadomasochistic abuse, whichever it is, in
14 Looking for Alaska, are written with the intent to
15 sexually excite the reader?
16 A    No, I think the intent would not be to sexually
17 excite the reader, although I assume that in some
18 instances some people would find it sexually stimulating,
19 and that might be the reason they read it and it certainly
20 could be the reason for younger people to read it, who
21 might not otherwise appreciate the literary depth and
22 breadth of the material.
23 Q    All right.  What's your next one?
24 A    The next book is Margaret Atwood, The Handmaid's
25 Tale, the graphic novel edition of that.  It's pretty

1 obvious to thumb through that and see depictions of
2 intercourse and nude or barely-clothed female bodies.
3 Q    And when you say the graphic novel, for the record
4 what do you mean by that?
5 A    Well, that's a classification of books that
6 essentially can have what I would consider illustrations
7 or renderings and fewer words.  There are adults who read
8 graphic novels, and so this is in the graphic novel
9 section, but obviously some mature minors would read
10 graphic novels as well.
11       But, again, the same problem exists regarding Section
12 1 of Act 372 and the Arkansas Supreme Court's
13 determination that minors -- in the harmful to minors
14 statute in Arkansas applies to five-year-olds, as well as
15 to seventeen-year-olds.
16 Q    Would it be to describe a graphic novel as a long
17 comic book?
18 A    I wouldn't describe it that way for fear of offending
19 the author.  I don't really have a good grasp on the
20 origin of the genre or what they might call this
21 particular literature.
22       You know, a crotchety, old man might say or my
23 English teacher, again, might say, well, it's designed to
24 appeal to an audience of people who don't like a lot of
25 words in small print on pages and they need to see to be

1 interested in the story.  They need to see things that are
2 more visual and graphic and this book does have some very
3 graphic things involving sexual content.
4 Q    Have you read this one?
5 A    No.
6 Q    Do you have any specific instances that you know
7 about in there?  You mentioned a couple of times that
8 there's --
9 A    Well, it's, again, it's like the -- they're easier
10 than picking up the Maas book, which doesn't have any
11 images in it, to just thumb through this book or one of
12 the sex ed books and just see images of people engaged in
13 intercourse or in some form of S&M, it looks like to me.
14 Q    Are you aware if the -- you know, those topics -- and
15 I'll read them again for the record.  Nudity, sexual
16 conduct, sexual excitement or sadomasochistic abuse, if
17 they are portrayed in a positive or negative light within
18 the book?
19 A    I don't know.
20 Q    Don't know.  Okay.  And are you aware if those are
21 depicted with the intent to sexually excite people?
22 A    Don't know.
23 Q    And you said that it is in the graphic novel section.
24 Does that have like subcategories between like young
25 adults and minors --

1 A    No, graphic novel is just a category.
2       MR. ADAMS:  This is not a YA graphic.
3 BY MR. WATSON:
4 Q    Okay.  Well, there's no such thing as YA graphic,
5 right, there's just graphic and that's it?
6 A    I think there's just young adults.
7       MR. ADAMS:  My understanding is there is a
8       YA graphic.  Maybe that's -- I'm not here to
9       testify, but this one does not indicate that
10      it's in the YA section.
11 A    Maybe there is a subset of YA that's graphic novels
12 within the YA section.
13 Q    But you're unaware?
14 A    I'm unaware of that.
15 Q    And do you believe -- do you have an opinion about
16 whether or not that graphic novel has any sort of
17 literary, artistic merit for minors?
18 A    Well, you know, it's -- the author has a novel, The
19 Handmaid's Tale, which is the forerunner, I guess, of the
20 graphic novel that she also authored and I would say,
21 unequivocally, that the novel has literary value.
22       And, again, without having done anything that we've
23 done here, thumbing through it, I would be willing to say
24 that that's also the case for the graphic novel, which, I
25 think, is just another way of communicating that story.

1       You know, in so many ways, what literature is about
2 is like what a poem is about or what a piece of art is
3 about on the wall.  It's going to be interpreted
4 differently by different audiences, it's going to be seen
5 in one light maybe by the author, and may fall in a
6 different light to the reader or to the observer of the
7 art.
8       You know, one of the great books in classic books,
9 Vladimir Nabokov's, Lolita, has been reinterpreted, and,
10 you know, whether that was an intent to create a monster
11 as some sort of inditement of misogyny, there are all
12 sorts of evolving senses of whether these pieces of
13 literature are still relevant or still held in the same
14 esteem and so it's a fluid thing.
15       But I believe, to some extent, and you couldn't get a
16 consensus on which ones, but all the books in our
17 collection have some literary value or they wouldn't have
18 been published for-profit publishers, and I'm confident
19 that our staff, professionals who collect those books, do
20 a tremendous amount of research and work to figure out
21 what books should be in the collection that are going to
22 be available to the community that wants to read them.
23 Q    And I have no doubt that your librarians and staff do
24 a wonderful job doing that.  Just having to go through
25 these --

Page 113

1 A  Yeah, I think it goes without saying that they
2 collect books that I wouldn't necessarily want to read.
3 That's obvious here.  I don't plan to read any of these
4 books, except for the last two, but I also will say I know
5 that we collect books that are controversial and in a lot
6 of subjects.  It might be that some of my friends who are
7 advocates for Act 372 would be surprised to find that
8 there are books in the library that people who are on
9 opposite ends of this issue and this dispute don't
10 approve, don't like, but we're going to continue to
11 collect.
12 Q  All right.  We have two left.
13 A  The first one is a novel that's probably 25 years old
14 by Dorothy Allison, Bastard out of Carolina.  It's
15 appeared recently in a list of 100 best novels in America
16 that I saw that The Atlantic published a couple of weeks
17 ago and I have talked to people about it.
18     And it, again, contains a heartbreaking tragedy of
19 domestic, sexual abuse.  It is a highly-acclaimed book
20 that has sexual content, a lot of people want to read it,
21 but it may well be something that would be considered
22 harmful to a five-year-old if we make it available to a
23 five-year-old.
24 Q  When you say heartbreaking depictions, what did you
25 mean by heartbreaking?

Page 114

1 A  Oh, just tragically dysfunctional family settings,
2 poverty and incest and abuse.
3 Q  So, you know, the topics; nudity, sexual conduct,
4 sexual excitement or sadomasochistic abuse are displayed
5 in a negative light in this book?
6 A  Well, back to my previous soliloquy, I'm not sure
7 what the author's intent is, if the author holds up
8 something in our society that is heartbreaking or painful
9 or tragic, but reflective of reality in some parts of
10 society.  I believe they are promoting it or heralding it
11 as a virtue, but I do think they believe -- and I think
12 this is one of the fundamental values that a public
13 library endorses, that we are all collectively wiser and
14 more empathetic if we read stories that take us to see
15 things and imagine things that are not our own circle,
16 thankfully in most cases.
17     And so I think they are promoting this horror in a
18 way they think is in the long run collectively good for
19 society to raise awareness and, perhaps, to diminish the
20 reoccurrence and incidences of that kind of abuse.
21 Q  So when you say promoting, you just mean to make
22 aware?
23 A  Yeah, that's exactly what I'm saying.  Promoting
24 awareness of something that most of us, perhaps, would
25 rather not think about.

Page 115

1 Q  All right.  We can go to the last one.
2 A  This is a book by Barbara Kingsolver.  I have read
3 this, and I think it's an excellent novel.  Again, it
4 deals with tragedy.  The main character is a teenager in
5 Southwest Virginia who's been tossed around from various
6 foster care after his parents' death, and he falls victim
7 to opioids after he suffers a football injury, and he has
8 a relationship with another teenager that is sexual and
9 described in some detail throughout those parts of the
10 book that relate to that relationship.
11 Q  But the book itself is not -- is it predominantly
12 about the sexual nature of the relationship?
13 A  Well, it's about the relationship, and I would say
14 that the sexual part of the relationship is clearly a
15 significant component of that relationship.
16     But, again, that might be subject to bearing and
17 interpretation.  Somebody else might see the relationship
18 as some other psychological need that one or both of the
19 parties have, but I think it's hard to read the book and
20 not see that sexual component to the relationship.
21 Q  And you said you've read this one, so I think I'll
22 ask a little more specifically than I have with the other
23 ones.  But if you could, what ballpark percentage of the
24 book is dedicated to discussing the sexual relationship,
25 because I mean, that's the --

Page 116

1 A  Well, I don't want to hazard that guess.  It's been a
2 year or so since I read it, but I do remember, as I was
3 reading it, perhaps roughly concurrently with some of
4 these issues occupying the headlines and some of what I do
5 every day for the library, that the thought occurred to
6 me, on more than one occasion, that this book is really a
7 demonstration of what the people who are agitated and
8 adamant about trying to restrict what others can read may
9 be reacting to the -- the -- a lot of the reviewers of the
10 book said that the author was channeling Dickens,
11 Copperfield, David Copperfield.  It's another story of a
12 teenager who --
13 Q  I actually wrote that down right here because I was
14 going to follow up on that.
15 A  And so if you read Copperfield, if you read Dickens
16 19th century books, the -- level of sexual content in
17 those books, versus this early 21st century novel that's
18 award-winning, is significantly different.
19     And it is a metaphor in some ways, an allegory in
20 some ways for this issue of societal conflict that we're
21 here about.  My library -- I, the board of the library,
22 the staff, we don't set the literary guidelines, we don't
23 set the nature of stories that get told and what way
24 they're told, what words are used and how -- how
25 descriptive the sexual liaisons are in those stories.

1    We have Dickens and we have Kingsolver and we are, in
2  both instances, having those, collecting those because
3  that's what the community we live in expects from their
4  publicly-funded library.  We don't believe that someone in
5  the community who might be offended by the descriptions in
6  Kingsolver, but we'd have to look hard and long to find
7  anything in Dickens that would be comparable, should be
8  able to keep the rest of the community from having the
9  same access to Kingsolver, as they do Dickens.
10    And if the standard that it's used, as the one the
11  Supreme Court of Arkansas has decreed as harmful for
12  minors, then you might well say that both Dickens and
13  Kingsolver might be harmful to some minors.
14    But, certainly, the sexual content in Kingsolver is
15  greater and my concern, anxiety, given the way the statute
16  was reframed for Kingsolver would be far more than it is
17  for David Copperfield.
18  Q    And it sounds like the sexual content in Demon
19  Copperhead is really like developing that relationship
20  that you discussed between the main character and whoever
21  the relationship is with?
22  A    Right; right.
23  Q    So it's not necessarily -- it's not -- is it written,
24  in your opinion, to -- with the intent to sexually excite
25  people?

1  A    Again, I don't know the author's intent, but I would
2  say probably not.  It's part of the way that the author
3  believes that she should tell the story, but the question,
4  I think, from my standpoint, is might it be held by
5  somebody that for a five-year-old that has some sort of
6  sexually preeminence, that it would have to a 16-year-old
7  or you and me.
8  Q    I'm almost done with this, but what section is this
9  story in?
10  A    That's an adult novel, adult section.
11  Q    All right.  I think I'm done with Section 1 and I
12  only have about three questions written down related to
13  Section 5, because I think we covered most of that when we
14  discussed the policies at the beginning of all this.
15    So reframing Section 5 as, you know, the second part
16  of your challenge, what is your, in general, understanding
17  about why you are challenging this section?
18  A    Well, again, broadly as I said in the Complaint, we
19  think it's unconstitutional because it's -- it's vague and
20  it engenders content-based suppression of material or
21  content-based decisions by elected officials to move --
22  withdraw is one of the virtues in the statute, or remove
23  or either relocate.
24    So our objection is similar, broadly, that it's
25  unconstitutional and it makes -- deprives some people of

1  their right to read these books and for the library to
2  have those books on their shelves.
3    Their right to read and their right to access those
4  is impaired by the overbroad and vague provision that
5  essentially turns over, to elected officials, who, for the
6  reasons I described earlier, are going to be vulnerable to
7  political pressure and there's nothing in the statute, as
8  I noted, that says that they would use the selection
9  criteria that the library has set forth, that they would
10  use whatever they deemed to be community values.
11    And as a practical matter, and somebody who's been
12  around politics a little bit in my life, the people who
13  are the most animated about subjects in politics, often
14  times get the most response from elected officials, and if
15  you're an elected official and the criteria is not the
16  kinds of things you've been asking me questions about,
17  literary content, whether it's of significance
18  artistically to people in the community, but their only
19  issue is I don't want my phone to keep ringing, I don't
20  want people to keep emailing me about why I'm enabling the
21  library to groom people, or why I'm doing things that
22  allow obscenity in the library, so I'm just going to tell
23  the library that they should move this, relocate this,
24  withdraw this, et cetera.  That's what the statute,
25  because of its constitutional defects is going to permit

1  and that's what we're objecting to.
2  Q    And are you aware of anyone who has said that they
3  intend to you, you know, lodge a challenge because of
4  Section 5?
5  A    No, but, again, it's a little like I was describing
6  earlier with regard to the list that came from
7  Ms. Chilcoat.  People don't have to spell out what may
8  motivate them if they're hearing about it, reading about
9  it, and, perhaps, they're getting their information from
10  social media about these topics and they get motivated
11  because they're being told things about what the library
12  is doing, a lot of which is misinformation, or at least
13  not an accurate depiction of what goes on in the library.
14    And, you know, what I do know, is during the
15  timeframe, this somewhat high-profile debate, at least in
16  social media, we had people who would contact our
17  libraries and start asking about books that happen to be
18  on these lists.
19    We had a patron in Maumelle who left a note in their
20  book return box saying she had checked out 53 books, I
21  think it was, that she believed were inappropriate and
22  that those books she would not be returning until we vowed
23  to take those out of the collection.
24    That was some time in the timeframe of June of last
25  year.  So did she say, in her demand letter, I'm doing

1  this because I've been following SB 81 and Act 372, no,
2  but do I think those things happen just coincidentally,
3  probably not.
4  Q   All right.  And with her, are you aware of whether
5  she would have been able to lodge a challenge under
6  Maumelle's --
7  A   Yes.  Yes.
8  Q   Would she have been able to lodge a challenge?
9  A   Sure.  Sure.
10 Q   Okay.  That's all I've got.
11     MR. MCLELLAND: I've got some questions,
12 but I do want -- I need to review my outline.
13 Do we want to take a break for lunch?
14     MR. ADAMS: Sure, let's take a lunch break.
15 (Lunch recess was taken.)
16     EXAMINATION
17 BY MR. MCLELLAND:
18 Q   Mr. Coulter, good afternoon.  You realize that you're
19 still under oath?
20 A   Yes.
21 Q   And just so we have this on the record, you and I
22 know each other outside the context of this litigation; is
23 that right?
24 A   Yes.
25 Q   And does knowing each other in any way affect your

1  ability to tell the truth in today's deposition?
2  A   No.
3  Q   Okay.  Thank you.
4      You talked about this, kind of, with Mr. Watson,
5  about what was kind of going in Crawford County, Saline
6  County, and I think you mentioned Jonesboro, perhaps.
7      What's your understanding of what's going on in
8  Crawford County?
9  A   Well, I have a limited understanding compared to
10 everybody else in this room, but my understanding was that
11 about the same time that SB 81 was running its course
12 through the general assembly, there was a local
13 controversy in Crawford County over certain books that
14 people in the community brought to the attention of the
15 library and then they've engaged the quorum court in an
16 effort to get those books moved or isolated or setoff from
17 the remainder of the collection because of the citizens'
18 concerns about the content of those books.
19 Q   And if I was to say the term Social Section, would
20 you know what that meant?
21 A   Yes, just generally in the context of that dispute.
22 That was what I understood, that they had a shelf or they
23 had a location that was marked the Social Section and
24 that's where they put some of these books that were
25 causing concern and agitation.

1  Q   Okay.  And in this lawsuit that you've brought or
2  that CALS has brought as one of the Plaintiffs, are you
3  seeking any relief as to the Social Section in Crawford
4  County?
5  A   No, I don't know what -- I don't know what books were
6  actually designated for the Social Section, but my general
7  understanding is that it was the same types of books that
8  have riled other people in other locations.  That is to
9  say books that dealt with sexuality and gender, books that
10 might have had sexual content, particularly in LGBTQ+
11 context.
12     But other than that, I couldn't tell you what books
13 are in the Social Section of Crawford County as a result
14 of that controversy.
15 Q   Okay.  What relief are you seeking against Crawford
16 County in this case?
17 A   Well, the broad relief we've identified in the
18 lawsuit would be to not have the unconstitutional statute
19 used against the people who live in Crawford County, the
20 patrons of the library in Crawford County, in a way that
21 would deny them of their constitutional right to access to
22 constitutionally-protected speech.
23 Q   Are you seeking -- obviously it's in the record that
24 you're an attorney, but my understanding is that you're
25 seeking to stop Section 1 and Section 5 of Act 372?

1  A   Correct.
2  Q   And Section 1 is against prosecuting the Defendants?
3  A   Correct.
4  Q   Section 5 is against -- you're seeking to enjoin
5  Crawford County from implementing Section 5; is that
6  right?
7  A   Along with anyone else who might, under the statute,
8  remove constitutionally-protected speech under Section 5
9  because the elected body, in the case of Crawford County,
10 the Quorum Court, I understand, deems that to be
11 inappropriate.
12 Q   When you say along with anyone else, who are you
13 referring to?
14 A   Well, the other regional libraries, county libraries,
15 municipal libraries, any other entity around the state
16 that would be running a public library in a way that would
17 be considered covered or governed by Section 5 of Act 372.
18 Q   Okay.  And you put it really succinctly there at the
19 end.  So you're seeking to stop anybody that could enforce
20 Section 5 of Act 372 from enforcing Section 5 of Act 372?
21 A   Yes.
22 Q   Okay.  Why didn't CALS sue all of those entities, why
23 just Crawford County?
24 A   You'd have ask my counsel about that.  I'm not -- you
25 know, I wasn't engaged in micro details of figuring out

1 who the parties would be with respect to the specific
2 parties who are represented by Mr. Watson, or who any of
3 the parties would be with respect to Section 5 and the
4 enforcement provisions of Section 5, so that would be
5 something that I wasn't consulted about or wasn't involved
6 in any details with.
7 Q   So is it your understanding that if Judge Brooks
8 rules in your favor, all of -- let me be more specific.
9 CALS would have to implement Section 5 of Act 372; is that
10 right?
11 A   If the injunction is dissolved or set aside.
12 Q   Okay.  So it's your understanding that under the
13 current injunction, CALS is enjoined from enforcing Act
14 372?
15 A   No, we -- we are relieved from having to take steps
16 inside the library to comply with Section 5, but my
17 understanding of Section 5 is that the city board or the
18 county quorum court in the area where the particular
19 library at issue is, would be the entity that would
20 ultimately decide what goes in the library and not.  That
21 would be the elected body who are to make these decisions.
22 In our case it would be the Little Rock City Board, I
23 think, but it would be -- it would vary from county to
24 county.
25     For example, I think there's the Southeast Regional

1 Library that might serve five or six counties in Southeast
2 Arkansas.  I'm not sure.  I think the statute states that
3 whichever of those counties collects and contributes the
4 largest share of that multicounty library system's budget,
5 that county quorum court would be the one where the
6 decision would be made about what contents stays in the
7 entire system's libraries in Calhoun County or Ashley or
8 Drew or wherever it might be.
9 Q   So I think I got a little lost in that.  So CALS
10 would have to implement Section 5 of Act 372?
11 A   We wouldn't implement it.  We would have to take an
12 account of its provisions in regard to Policy 300 --
13 Q   The reconsideration policy?
14 A   -- or Policy 301 that we described this morning, the
15 process for reconsideration.  We have a process.  It -- in
16 some substantial degree it would be in compliance with the
17 enjoined statute, Section 5 of the enjoined statute,
18 except for in its current format, in its current
19 iteration, the ultimate decision rests with our board, not
20 with the City of North Little Rock.
21 Q   Gotcha.  So you would have to take steps -- in
22 implementing Act 372, you'd have to take some steps, or
23 CALS would have to take the steps to change its
24 reconsideration policy to comply with Section 5?
25 A   Yes, if Section 5 becomes the law of Arkansas, we

1 will have to take certain steps that we anticipated
2 taking, as I said, in July of 2023 if the statute had gone
3 into effect on August 1st, and if we -- if we are put back
4 into that situation, where the statute is going to be
5 implemented, then we would have to take account of that
6 and adjust our process accordingly.
7 Q   And in your -- in this lawsuit, the relief you seek
8 is to enjoin such provisions from becoming state law?  The
9 Section 5, rather, just focus on Section 5?
10 A   Right.
11 Q   Okay.  So I think in Exhibit 10 that Mr. Watson kind
12 of alluded to earlier, the email traffic between you and,
13 I think, Bobby Roberts and --
14 A   Yeah, I have it.
15 Q   It looks to me that by about January 21st of 2023,
16 you had already been emailing folks about, you know, SB 81
17 and the concerns that you had of it.
18     At what point, between SB 81 being introduced in the
19 legislature, which I think was January 19th of 2023, and
20 the day that you filed the lawsuit, when did CALS decide
21 to be a Plaintiff and bring this lawsuit?
22 A   I don't know the exact date, but I appeared in the
23 judiciary committee -- the house judiciary committee some
24 time in late February and the bill -- the bill that day
25 failed to get out of committee, so at that point there was

1 no need for litigation.
2     Within a matter of 48 hours, perhaps, some amendment
3 had been made and an additional vote or two was secured in
4 that committee and I think it passed on a voice vote
5 without a roll call the next committee meeting.
6     At that point it headed to the governor's desk and in
7 that timeframe, once we knew the governor was going to
8 sign it, there was no suspense about that, of course, we
9 were in a situation where we were starting to decide what
10 our next strategy would be.
11     So that would have been some time -- as I recall, the
12 tornado struck the same day the governor signed this Act
13 372.  I'm not sure those two facts were related, but I do
14 think that was the date that it got enacted.  It got
15 signed and it was going to be in effect in August.  So
16 from that point, then we only had a litigation strategy
17 option and we began looking at those possibilities for
18 talking to lawyers and trying to decide what we could do.
19     The board of the library was kept abreast of all
20 this.  You know, I submit monthly written reports to my
21 board every month.  Not everything in those three pages or
22 so of items that I think the board should be kept aware of
23 gets discussed at the actual board meeting because it
24 would take the board longer than they want to spend.
25     They're a little like Rotarians or a civic club.

Page 129

1  When the 1:00 hour arrives from our noon to one meeting,
2  they start to shuffling, so we try to do it in honor of
3  their time. They're all volunteering. We try to be out.
4      So they would have been apprised of the pending
5  legislation throughout the January, February time. I
6  believe it would have been in the April board meeting that
7  Mr. Adams came to address the board about what he and
8  others who were looking at this issue were pondering and
9  what their initial conclusions were.
10     I asked for permission, in that April meeting, and it
11 was granted by the board, to pursue -- continue to confer
12 with lawyers and continue to consider our options. I
13 believe when I left that board meeting, as a professional
14 courtesy I picked up the phone and contacted the Attorney
15 General, whom I've also known for a long time, and said
16 Tim, I just want you to hear this from me, it will
17 probably be reported in the paper tomorrow that my Board
18 is moving towards authorizing us to file a lawsuit, we
19 continue to explore that, but we won't go forward until we
20 get back another report from counsel and that will be at
21 the next month's board meeting, so nothing will happen
22 between now and then, depending on what the board does,
23 but you might tell who is -- if you want to, who's going
24 to likely draw this assignment in your office and we'll
25 put the lawyers in touch for sort of facilitating certain

Page 130

1  things that lawyers acting in a collegial spirit like to
2  do. I think General Griffin said give me a moment or a
3  day or whatever he said and then he reported back to me
4  that it would probably be John Payne and so that was where
5  we were in April.
6      In May we had another board meeting, our monthly
7  board meeting, and, again, John Adams addressed the Board,
8  answered questions and there was another vote and this
9  time the vote was to authorize filing of the lawsuit, and
10 all of that is reflected in the minutes that were produced
11 in response to the notice of deposition and subpoena.
12 Q   Yeah, I believe so. Thank you for kind of adding
13 context to the rest of it.
14     So it sounds like by May you authorized to bring a
15 lawsuit on behalf of CALS to stop Act 372.
16     Did you, on behalf of CALS, or you individually, have
17 any discussions with the Fayetteville Public Library
18 leadership and directors about bringing a lawsuit or
19 joining in on the lawsuit?
20 A   Yes. Somewhere in that timeframe, I don't know
21 exactly when, I would have communicated to David Johnson,
22 my counterpart at the Federal Public Library, that we
23 were -- my Board was authorizing us to continue exploring
24 the possibility of filing the lawsuit. So if I had that
25 conversation with him, it would have been, you know,

Page 131

1  approximately in April, and he said, yes, his board was
2  concerned about it and they would be talking to their
3  lawyer and keep him apprised of what we were doing, so
4  that was sort of where that conversation went.
5  Q   Do you know why Fayetteville Public Library is the
6  lead Plaintiff and not Central Arkansas Library System?
7  A   I do not. I didn't draft the Complaint.
8  Q   We talked about this a little bit, or you talked
9  about this with Mr. Watson a little bit, kind of what's
10 been going on down in Saline County in their library, and
11 I think they decreased their mileage; is that right, or
12 they were threatening to decrease their millage --
13 A   In Saline County?
14 Q   Do you know if that happened in Saline County?
15 A   I'm not aware of any change in their millage in
16 Saline County.
17 Q   Okay. But are you aware that they had some people
18 challenging books and trying to remove books from their
19 library?
20 A   Yes. Yes.
21 Q   Do you know why you didn't -- or why not sue Saline
22 County in addition to Crawford County?
23 A   I do not know that.
24 Q   Okay. You said earlier, during your deposition with
25 Mr. Watson, you alluded to County Judge Chris Keith's

Page 132

1  statement in his deposition in which he said something to
2  the effect of, you know he didn't want the headache of Act
3  372.
4      Have you reviewed Judge Keith's deposition?
5  A   Just briefly last night.
6  Q   And what all did you review; what all did you read
7  when you reviewed it?
8  A   I just read through his deposition in a fairly quick
9  fashion. It was on my computer. It was a digital
10 document and I just skimmed through it.
11 Q   Gotcha. Did you read any part of Judge Keith's
12 deposition discussing the fact that Crawford County would
13 potentially be on the hook for attorneys' fees should the
14 Plaintiffs prevail in this case?
15 A   Yes.
16 Q   And do you have any thoughts about what Judge Keith
17 said, or anything about the fact that Crawford County
18 would have to foot the legal bills in this case?
19 A   I feel his pain, and if you go back and watch the
20 brief comments I made in the house judiciary's committee's
21 hearing on SB 81, that's exactly what I told the
22 committee, that they were essentially going to be writing
23 a blank check to be covered by various counties and
24 municipalities around the state if they passed this Act
25 because it was going to inspire a lot of controversy that

1  would promote -- I think I called it a -- this is a job's
2  bill for lawyers, this is going to create a lot of
3  litigation.
4      I told them I had practiced law for 30 years and you
5  are passing something that is full of constitutional
6  uncertainties, at best, and it will trigger disputes,
7  political and legal, in counties and cities all over the
8  state. And regardless of what you think about the
9  expressed intent of the sponsors of this bill, which I
10  accepted at face value is to protect children, what you
11  are, in fact, doing, in addition to vilifying librarians,
12  you are creating an enormous litigation expense for people
13  like Judge Keith, who I guess wasn't holding office at the
14  time, but he stepped into that and that is exactly, I
15  think, what his testimony confirms, and he feels that he's
16  going to have to bear that load, pay that freight.
17  Q  So when you gave this testimony at the house
18  judiciary about a blank check, were you -- when you said
19  that, did you mean it in the context of people bringing
20  lawsuits challenging their -- I'm trying to think of how
21  to phrase this.
22      When you said the testimony about blank checks, did
23  you mean it in the context of people challenging their
24  rights being restricted under Act 372, or did you mean it
25  is a blank check for the communities having to defend the

1  law that they didn't write?
2      And I can rephrase that it if that's a --
3  A  Well, if your question is what did I mean, I'll take
4  a shot at that.
5  Q  That's fine.
6  A  You want to ask that?
7  Q  Yeah, I can. Thank you. What did you mean when you
8  said, in your testimony at the house judiciary, that they
9  were creating kind of a -- writing a blank check for
10  communities and counties to have to bear the cost of it?
11  A  So what I meant, and what I think has come to pass,
12  at least thus far the federal judge concurs, was that they
13  were setting up a process that was going to lead political
14  controversy in county after county, city after city over
15  books that some number of people who are extremely
16  motivated and extremely upset about these books, they will
17  visit the county quorum court members, they will visit the
18  city board members in libraries across the state.
19      And, inevitably, if you have been around for a while,
20  and you're sitting in the seats of those people in those
21  elected legislative bodies in both counties and city
22  level, those people are going to be influenced by these
23  vocal and aggressive opponents of certain books in the
24  library.
25      Those challenges are, to my observation, almost

1  100 percent content based. We don't like these books
2  because they contain descriptions of gender dysphoria or
3  how people react to that or how they live their lives that
4  are a part of the community that these people don't want
5  to have in books.
6      So if those things are true, as I firmly believed
7  then and I do now, the inevitable thing for the
8  politicians, these elected officials to do is to order the
9  removal or to keep these books in some sort of social
10  section, if you will.
11      That will, in turn, trigger litigation, just as it
12  did in Crawford County in the lawsuit that was filed about
13  the same time as this lawsuit, and so what I was telling
14  the legislature, is the general assembly and the state
15  treasury is not going to have to pay for these litigation
16  defense costs, in the first instance defending their
17  county or city legislative bodies.
18      And ultimately, as Judge Keith is worried,
19  apparently, that if they lose a First Amendment case, then
20  a lot of lawyers are going to line up for their Section
21  1988 attorneys' fees to be shifted on to the defendants
22  who attempted or allowed, in this case, unconstitutional
23  removal or withdrawal of books from the shelves of a
24  public library.
25      So that was what I meant and what -- what I bolstered

1  that with was the sponsor in the state senate had been
2  speaking when he introduced his bill to the committee in
3  the house and said -- he acknowledged that he had talked
4  to -- or maybe somebody asked him a question, but he
5  acknowledged, admitted to somebody on the committee that
6  he had been in consultation with the Arkansas Association
7  of Counties and the Arkansas Municipal League, both of
8  whom run, as I understand it, their risk management pools
9  or self-insurance fund for the counties and cities to pay
10  into, and then use that to pay lawyers to defend counties.
11      And what he admitted to, was that both the Arkansas
12  Municipal League and the Association of Arkansas Counties
13  were not wild -- I don't think he used that term. He said
14  they don't like this bill, but they don't believe there's
15  any constitutional problem with it, to characterize what
16  he said, and it's all in the record, so you can
17  doublecheck that.
18      And that was absolutely what I believed they would
19  say, which is, look, we don't want to be having to pay out
20  of our risk pool to cover things that we already have with
21  regard to other Title 7, other employment-type cases,
22  another whole batch of cases that are going to be
23  triggered because you're going to enable content-based
24  removal of books.
25      So in essence, whoever he talked to at the Arkansas

Page 137

1 Municipal League and Arkansas Association of Counties, was
2 telling him the same thing that I was telling the general
3 assembly that day. And so fast forward, they did not --
4 he didn't, and they didn't heed that advice. They enacted
5 this law and that's what going to happen, just like Judge
6 Keith is worried.
7     You're going to end up putting on these already
8 strapped counties the cost of, in the first instance,
9 defending your decision to remove books, and if I'm right,
10 and I think the evidence is substantial, that it's going
11 to be based, as it was in Crawford County with regard to
12 the Social Section, on content, then you're going to wind
13 up paying not only the firm that's defending you, but
14 you're going to pay the plaintiffs' lawyers who brought
15 the lawsuit.
16 Q    Something that you said and I want to parse through
17 this, and I want to make sure I understand your testimony,
18 is it your understanding that the Social Section is
19 Crawford County's attempt to implementing Act 372?
20 A    No. Obviously as I understand the facts and the
21 chronology of what's been pled in that case, and I assume
22 it's not in dispute, the creation of the Social Section
23 occurred concurrently or simultaneously in December,
24 January, early part of 2023, maybe, or late part of 2022,
25 with the runup to the legislature with this.

Page 138

1     What I also know from observation and people talking,
2 was that the senate sponsor was talking about doing this
3 in the summer of 2022. He was talking to people at the
4 state library. In fact, I was learning about that because
5 he was confusing the Central Arkansas Library System with
6 the state library and word was getting back to me.
7     Again, back to the initial Arkansas, a small town,
8 these things get around, so I was aware, in the fall of
9 2022, that these issues were coming to a head in the
10 general assembly, so I'm assuming that librarians around
11 the state were also aware of that.
12 Q    But it's your understanding that the Social Section
13 and Act 372 are separate issues?
14 A    They are two sides of the same coin. What happened
15 with the Social Section is exactly what's going to happen,
16 in my view, all over the state if Act 372 is allowed to go
17 into effect with regard to Section 5.
18 Q    Well, explain that. What do you mean? Do you think
19 that the Social Section is what will be if Section 5
20 goes --
21 A    The Social Section is a proxy for moving,
22 withdrawing, removing, isolating books that people in the
23 community find offensive and they're finding offensive
24 over the content of those books and they're going to go to
25 their elected officials in the form of their quorum court

Page 139

1 members, justice of the peace, or their city board
2 members, and they're going to complain about those books.
3     And the political realities are that those pour souls
4 who are in those lucky positions are going to have two bad
5 choices. One bad choice is to spurn the adamant, agitated
6 constituents pleas to get these books out of our library.
7     That's a bad choice. The other bad choice is to move
8 the books, do whatever, create your own social section,
9 whatever it is that you work out that's clearly content
10 based and then you're going to get sued.
11     So of the two bad choices, the politics being what
12 they are -- Judge Keith, I think, described Crawford
13 County as a very red or very conservative county. It
14 doesn't take a political pundit to figure out where this
15 is going.
16     And, again, as I said this morning, if you listen to
17 the repeated promises of the sponsor in the senate, this
18 is what he wanted. He doesn't trust library boards. They
19 don't like the outcome that happens from the library's
20 standpoint and the professionals who are making these
21 decisions about whether the book is consistent with their
22 selection criteria, so we want a do-over, we want a
23 different process. We think the process will favor us if
24 we don't like these books if you give it to these elected
25 officials.

Page 140

1     Why? Because they're going to be subjected to this
2 pressure and the state's answer and I guess the sponsor's
3 answer is it will all work out in the laundry in the long
4 run. If you don't like the results, you'll vote them out.
5     There's a lot of books in my library that I don't
6 like. It might not pass in Little Rock, but we're going
7 to keep those books because there's some people who want
8 to read those books.
9     But if you're dealing with these two bad choices, we
10 either take the books out and get sued and have to pay the
11 freight, or we leave the books in and we get excoriated
12 and treated like lepers in our communities because these
13 people who are so upset about this, I don't speculate long
14 to figure out which of those bad options most people are
15 going to take.
16 Q    So Act 372 sets forth that there has to be an adult
17 only section in the library; is that right?
18 A    Repeat the question.
19 Q    Act 372 sets forth that there has to be a section in
20 the library that is 18 years and older and --
21 A    It doesn't say that --
22         MR. ADAMS: Objection. If you want to
23     quote it --
24         MR. MCLELLAND: Yeah, let me get a copy.
25 A    Our argument is that's a consequence of the statute,

1 that to comply with the statute and to safely be able to
2 tell my staff you're not going to go to jail for having
3 Barbara Kingsolver's book in the library, or perhaps any
4 of the others that might be seen by a five-year-old.
5 Q   So let's say I'll concede to y'all's argument for a
6 moment, that if Act 372 goes into effect, there must be an
7 18 year and older section. I'll concede to that point as
8 far as like this hypothetical --
9 A   Well, the other alternative would be we just don't
10 collect these books that are deemed to be offensive by
11 some members of the community. So there's that option.
12 You can let everybody in the library, but just don't have
13 any books that some people find to be inappropriate.
14 Q   Okay. Do you understand the Social Section to be
15 adults only?
16 A   I don't know any more than I've told you, but I
17 understand it was the consequence of this dispute, that
18 they would take some books that had been objected to and
19 put them -- I don't know whether it was physically. I
20 don't know what it looked like or where it was, but they
21 were labeled the Social Section. I assume there was some
22 sort of segmentation or segregation of those materials
23 into that section.
24     Experience tells me that most public libraries in the
25 town the size of Alma or Van Buren or Mountainburg, or any

1 other towns in Crawford County might have libraries that
2 are all going to be one-room venues and it's going to be
3 hard to have a separate section with a door on it that you
4 say this is the Social Section, but I haven't been to any
5 of those libraries, so I don't know, but my guess is
6 there's a shelf somewhere that says the Social Section.
7 Q   Well, I'd be happy to represent to you that they're
8 multiroom buildings. They have a very robust library
9 system in Crawford County that they're very, very proud
10 of, as we learned last week.
11     So you don't know whether the Social Section is for
12 adults only?
13 A   No, I have no idea what the Social Section is.
14 Q   Have you ever -- one of the books that keeps coming
15 up, and in Judge Keith's deposition you may have seen it,
16 was a book called Uncle Bobby's Wedding. Have you heard
17 of that book?
18 A   I don't think I had heard of it before I skimmed
19 through that transcript.
20 Q   So you've never read it?
21 A   No.
22 Q   Okay. So you're not aware whether the Social Section
23 is adults only. Are you aware whether the Social Section
24 is segregating books based upon viewpoint? I think
25 earlier you testified that you think it is.

1 A   Yes, that would be, I think, a reasonable assumption
2 that I would be willing to make.
3 Q   Okay.
4 A   That, yes, those books are in the Social Section
5 because of the content of those books, and more
6 accurately, more precisely, because the content has been
7 objected to by some people in the community.
8     I'm unaware, in the library industry, of a category
9 that professional librarians use that's called Social
10 Section. I'm not aware, outside of this Crawford County
11 context, of that Social Section being a category of
12 classification of books or identifying books.
13 Q   Do you know who the library director was at the
14 Crawford County Library System when the Social Section was
15 created?
16 A   I think I read in the deposition who that was.
17 Q   If I was to say Deidre Grzymala, would that --
18 A   Yes.
19 Q   -- prompt you?
20 A   Yes.
21 Q   Okay. Do you know whether Ms. Grzymala has a masters
22 in library science?
23 A   I do not.
24 Q   Okay. Earlier, Mr. Coulter, you talked about, with
25 Mr. Watson, that the community's demand kind of drives the

1 decisions for what the library has as far as its content.
2     Do you remember discussing kind of how if a book is
3 really high in demand, the library will acquire more
4 copies, as far as its process of determining what's in its
5 collection?
6 A   Yeah, I think I said the customer demand.
7 Q   Okay.
8 A   If the book is something that the people want, we're
9 going try to provide it. The reference to one of the
10 books in the Sarah Maas series, A Court of Silver Flames,
11 I think it was, people want that, but we determined -- the
12 staff determined that needs to be out of the young adult
13 section and into the adult section.
14     That book, the one I brought, as I indicated, was one
15 that was so popular that we didn't have a copy available
16 when I decided to bring that, and we had to go purchase
17 one.
18     So those things all indicate some sort of consumer or
19 customer feedback loop that we were responding to when we
20 decide how many copies of a certain book, or whether to
21 collect certain books.
22     If it's a series and you're the library collection
23 development person, you know from the first series that
24 people are reading it, so you have less concern about
25 buying it on the back end because there's already been

Page 145

1 obvious consumer demand for that author's series and you
2 go ahead and buy it and you might buy more of them because
3 it's been so popular.
4     So that's the kind of feedback we're talking about.
5 Q    And I don't know if you saw this in Judge Keith's
6 deposition or not, but if there was, you know, this
7 consumer demand to have books in the library, they want
8 certain books in the library about LGBTQ families or
9 things of that nature, there is that demand, and the
10 library wants to facilitate that demand, but to do so
11 required a compromise of sorts, is it your view that, you
12 know, that's still kind of content-based restriction if
13 it's segregating that material based upon it's a LGBTQ
14 material?
15 A    Are you talking about with the Social Section?
16 Q    Yes, with the Social Section.
17 A    Again, not knowing precisely what the perimeter or
18 parameters are of the Social Section guidelines they've
19 instituted, I'm nonetheless confident that's a
20 content-based guideline. Whether they're formally reduced
21 to writing or not, I think they are clearly being erected
22 based on the community's objection to certain things.
23     If the point is -- if the community objects and you
24 take the community's objection and make content-based
25 decisions to move or segregate, I think that's going to

Page 146

1 run afoul of the constitution and I'm not sure if that
2 answers your question or not.
3 Q    Kind of. What I'm trying to square here is that, you
4 know, Crawford County's position that, you know, we are
5 trying to -- or my client is trying to come up with a
6 compromise to, you know, stave off a potential defunding
7 effort that was threatened against them, defunding the
8 library, decreasing its millage is the more proper way to
9 say that. And they're trying to prevent that and so they
10 kind of came up with this compromise based upon kind of
11 the community and it was orchestrated by then Library
12 Director Grzymala, and for me that sounds like customer
13 demand in listening to the customers of the library, but
14 I'm taking it that in your view that's not customer demand
15 and I'm trying to square that round.
16 A    In -- in my analysis that's squarely what I predicted
17 to the house judiciary committee. People don't like
18 certain books, content-based objections.
19     LGBTQ+ books. Let's say they don't like Gender
20 Queer, or pick some of these other books, All Boys Aren't
21 Blue, and they leverage their demand that those books be
22 taken out by, I guess in your case, you're telling me by
23 threatening to reduce the millage and I think you can look
24 to what happened in Jonesboro and Craighead County.
25     They had a Pride display in June of '21, a year and a

Page 147

1 half later they reduced -- the people in the community
2 objected to that, don't like that type of content in the
3 library, initiated and succeeded in reducing the millage
4 in Jonesboro and Craighead County.
5     Again, the senate sponsor was in a conference last
6 summer where he was recorded on tape saying we got their
7 attention up in Jonesboro. They had a Pride display way
8 out front and we decided, in essence, to teach them a
9 lesson, we cut the millage. That's the key to do this,
10 you cut the funding.
11     So all that tells me, is that's another lever of
12 political influence that this whole Section 5 will kick
13 wide open. If you don't take these books out, Crawford
14 County JPs, we'll fix you, we'll go -- you may like the
15 library, you may like the library in its current
16 configuration, but I'm telling you if you don't get these
17 books out, then we're going to go circulate petitions and
18 cut the millage, so that the library goes away or its
19 underfunded. And look what happened in Jonesboro, they'll
20 say.
21     So, yes, that's another example of why Section 5
22 enables that kind of political hardball to punish the
23 people in the community who want a broad collection of
24 books, and I think that's part of the reason why this
25 statute is unconstitutional. It's enabling content-based

Page 148

1 decision-making by the elected officials, rather than the
2 professionals in the library and on the library board.
3     The senate sponsor says, in one of his public
4 discussions, the library boards are not accountable. I
5 think the library boards are accountable and they are able
6 to be a lot more sensitive to the needs and readers'
7 interest for the entire community than the elected quorum
8 court members.
9 Q    The books that you brought today that you reviewed
10 with Mr. Watson, do you know if the Crawford County
11 Library System has those books?
12 A    I do not.
13 Q    Do you know if they are housed in the Social Section?
14 A    I do not.
15 Q    I don't think I have much more. Let me check.
16     All right. That's all I've got. Thank you.
17 A    Thank you.
18         MR. ADAMS: Do you have any follow-up on
19     that?
20         MR. WATSON: No, you go first. You like to
21     go last, John, I noticed that.
22         MR. ADAMS: Let us talk about Sam's
23     questions and see if there's anything we need to
24     follow up on and then we'll come back and maybe
25     we can do the whole thing.

Page 149

1    MR. WATSON: All right.
2    MR. ADAMS: We'll take a ten-minute break
3  and we'll go off the record.
4    (Brief recess was taken.)
5    EXAMINATION
6  BY MR. ADAMS:
7  Q  All right. Thank you, Nate. I'm going to ask a few
8  follow-up questions and I'm going to focus on the
9  questions that Mr. Watson asked you about the seven books
10  you brought pursuant to his Subpoena Duces Tecum and you
11  brought under protest and with the reservations that we
12  made.
13    I think he asked you, with respect to at least some
14  of them, and maybe with respect to all, whether these
15  books had an intent to excite the reader.
16    Is it your view that that analysis is likely to be
17  quite different with respect to a young minor, as opposed
18  to with respect to an older minor?
19  A  I guess if you and Mr. Watson are using excite in the
20  context of sexual excitement or sexual stimulation, you
21  know, I was once a minor and know that the interests that
22  you have in sort of exploring sexuality or exploring
23  sexually-related topics when you're 8, 10, 12, 14, 16 all
24  is a shifting focus.
25    So I think what I said was notwithstanding whatever

Page 150

1  the intent and the objective of the author was, that in
2  some instances I'm certain that in some age category of
3  minors, younger minors, the immature minors for whom sex
4  is a more novel subject, and there are fewer opportunities
5  to read about it, think about it, talk about it, that,
6  yes, it could well be sexually provocative, exciting.
7  Q  Okay. So there's another phrase in the harmful to
8  minors statute, which is predominant tendency and it's in
9  the first of the three factors. So I'll read the whole
10  factor.
11    "The average person 18 years or older applying
12  contemporary community standards would find that the
13  material or performance has the predominant tendency to
14  appeal to a prurient interest in sex to minors."
15    So I want to ask a closely-related question. So with
16  respect to, for example, The Handmaid's Tale (Graphic
17  Novel), would the average person 18 years or older likely
18  judge the predominate effect of this book as very
19  different from age five to age ten to age seventeen?
20  A  Yes. Again, you're right, it's related to my
21  previous answer. The older we get -- and this might be a
22  continuum that goes until the late stage of our life,
23  content pertaining to sex becomes less novel or
24  titillating or appealing or stands out less.
25    So you can imagine if a ten-year-old, in my wife's

Page 151

1  purview, in elementary school in Little Rock had that book
2  for some reason and opened it to one of the scenes that we
3  were thumbing through this morning, that ten-year-old
4  would find the sexual depiction the only thing they would
5  remember and think about and be looking for that book
6  again to explore, as opposed to the eighteen-year-old.
7    So, yes, I think the short answer is based on life
8  experience and based on observation, that the
9  eight-year-old, the ten-year-old is going to be much more
10  drawn to and intrigued by, interested in the sexual
11  depictions -- the depictions of sexual intercourse and
12  other things that are in The Handmaid's Tale (Graphic
13  Novel).
14  Q  But you mentioned the social critique or argument the
15  book makes. That argument is likely to be comprehensible
16  to a seventeen-year-old, so the predominant effect on the
17  seventeen-year-old might have to do with that point about
18  the structure of society, whereas the predominant effect
19  on a ten-year-old is likely to be just --
20  A  Right.
21  Q  -- the visual depictions in the book?
22  A  Right. The ten-year-old who for whatever reasons in
23  our hypothetical reads Bastard out of Carolina, would have
24  a different interest level in the social commentary
25  implicit in that book about incest or domestic sexual

Page 152

1  abuse than the eighteen-year-olds, seventeen-year-old, the
2  sixteen-year-old, the fifteen-year-old, perhaps.
3    So it is clear that, as I've to tried to make the
4  point in setting the context of Section 1 this morning,
5  that the Arkansas law in regard to harmful to minors being
6  applied to all minors across the spectrum of people who
7  are under 18 gives -- makes this challenging because while
8  Demon Copperhead is not going be appeal to prurient
9  interests of someone my age or a seventeen-year-old, it
10  may well appeal to that interest of someone for whom that
11  topic is novel and they don't have opportunities or they
12  don't have experience in dealing with that topic and they
13  also don't have any awareness, chances are, about opioid
14  addiction, foster care in Southwest Virginia and how the
15  system failed so many people.
16  Q  So I want to turn to sort of an analogous question
17  with respect to the third factor, which Mr. Watson made
18  reference to as well. Another factor in the harmful to
19  minors test says the material or performance lacks serious
20  literary, scientific, medical, artistic or political value
21  for minors, and I'm going, as a shorthand, let's just call
22  that serious value.
23    Is it for similar reasons, part of what you're
24  imagining is that books may well have serious value for an
25  older minor and the adults, but not have serious value for

Page 153

1  a younger minor?
2  A   The easy answer that is the more -- the older we are
3  the more serious we are. The older we are the more we
4  have the capacity to grasp serious things, social
5  comments, societal dysfunction, domestic dysfunction,
6  sexual abuse, sexual S&M because we have a more serious
7  view of the world. We've encountered more experiences.
8      If you're six, eight, ten, you don't have any of
9  that, so the eclipsing thing in those books where there's
10 sexual content, is going to be the sexual content because
11 they don't have the context to associate it in the picture
12 that the author likely intended, which is a part of the
13 this story that may help tell the storey, expose the
14 characters for them. For the eight-year-olds, you know,
15 that's the only story.
16 Q   Okay. I think just for the sake of clarity in the
17 record, my last question is just going to be to provide
18 some context for Exhibit 11. Can you tell us what this
19 list of 30 books is?
20     MR. WATSON: I don't think Sam ever entered
21     that.
22     MR. MCLELLAND: Yeah, I didn't. I forgot.
23     It didn't come up so.
24     (Exhibit No. 11 was marked & attached hereto.)
25 BY MR. ADAMS:

Page 154

1  Q   Oh, okay. There was a discussion about a list that
2  CALS received from the State Board of Education and we
3  wanted to just talk about what that list is. Do you mind
4  identifying Exhibit 11 for the record, please?
5  A   This is a spreadsheet that my staff, I believe,
6  again, is in person of Leslie Blanchard, who's the Collection
7  Development manager, generated, in response to a request
8  for information from the Arkansas State Library Director
9  Jennifer Chilcoat, the request from Ms. Chilcoat contained
10 a list, which she attributed to some member of the State
11 Library Board who wanted to know, with respect to the
12 libraries in the state, do you currently own a print copy
13 of this, do you currently own a digital copy of this, and
14 by this I mean, every book that's contained on that state
15 library board member's itemization.
16     There were also components, did you previously own it
17 in its print format and previously own it in it's digital
18 format?
19     With respect to these 30 items we had -- we currently
20 own print editions of -- if it's 30, there are only two
21 that Ms. Blanchard indicated, no, we don't currently have
22 in the collection, The Exact Opposite of Okay by Laura
23 Steven and Chicken Girl by Heather Smith. And I see here,
24 too, that she indicated we do not have a digital license
25 to circulate those either.

Page 155

1      With respect to every other book that's on the list,
2  we did have, currently, a copy of the printed edition in
3  our collection and that includes, as I think I mentioned
4  this morning, several of the ones I've brought here; It's
5  Perfectly Normal by Harris and Emberley, the Handmaid's
6  Tale (Graphic Novel) by Margaret Atwood and the Sarah Maas
7  book, A Court of Mist and Fury.
8  Q   Okay. Thank you for that context. I think that's
9  all I have.
10         FURTHER EXAMINATION
11 BY MR. WATSON:
12 Q   I think I have just two questions. Just a moment ago
13 Mr. Adams asked you questions about the difference between
14 older and younger minors and several questions related to
15 that.
16     Are you an expert related to children's psychological
17 development?
18 A   No.
19 Q   So that's just your observations in normal day-to-day
20 life?
21 A   I am not board certified or licensed in any sort of
22 clinical fashion. My only basis for those assessments
23 would be a combination of my own living experience as a,
24 you know, male who, as I indicated, was once a teenager
25 and a pre-teen, and I have raised three children, two of

Page 156

1  whom were males and I've been around a lot of kids in the
2  context of being a parent.
3      And have staff who obviously are involved with
4  children's library program all the time and procure books
5  for the system and I've been married for a long number of
6  years to a woman who's an elementary educator, so I have
7  some real world observation vantage point, but nothing
8  that would pass or qualify me to give expert opinion in
9  the case or to give advice to a struggling parent or
10 anybody else with regard to some psychological condition
11 of a child.
12 Q   Okay. And one final question, Mr. McLelland asked
13 you a question. I don't recall the question, but the
14 answer was that you believe library boards are
15 accountable. You know, we were talking the quorum court
16 versus the library boards.
17     What did you mean by that phrase and to whom
18 specifically are they accountable?
19 A   They are accountable to the community who has them,
20 as their representatives, making the decisions about the
21 funding of the library and about the collection in the
22 library.
23     They are accountable to everyone in the community,
24 not just those who might have political access or
25 political leverage or be politically sophisticated. They

Page 157

1 are accountable to the values that librarians strive to
2 uphold regarding the freedom to read and intellectual
3 freedom. Obviously, issues of privacy and individuality,
4 all of which we think are relates to the point of trying
5 to maintain a diverse collection for the entire community,
6 and trying to do what we can to resist efforts to sensor
7 by using the government to restrict what some people in
8 the community might read.
9     So we think we're accountable to the values that
10 librarians uphold and libraries as a public institution
11 upholds, and I think we're accountable to the community to
12 be good stewards with their money and try to get as many
13 books as we can for them to circulate.
14     And as some of the testimony has indicated, to follow
15 the guidelines about making sure, as much as we can, that
16 things are in age appropriate places and that we are
17 providing assistance to adults and children who ask for
18 some guidance about what their particular topic of
19 interest is. We want to provide service too.
20     So we're accountable in all those ways that I think
21 is a broader accountability than, perhaps, others in the
22 community might have.
23 Q    Okay. And I think you might be anticipating my next
24 question. So when I hear the word accountable, I
25 generally think like you report to someone who holds you

Page 158

1 accountable. Is there anyone that the board reports to?
2 A    Well, in essence, the board serves at the pleasure of
3 the appointing entities. In our case, there is seven
4 Little Rock representatives. There are two from Pulaski
5 County, and there is a single member from Maumelle,
6 Sherwood, Jacksonville and Perry County.
7     So in each of those cases, those individuals who are
8 appointed by those municipalities and county governments
9 are representing those entities that appoint them, so they
10 would be accountable to the communities that appoint them
11 in the first instance.
12     But they obviously serve the system. So let's say
13 I'm the representative from Maumelle, but I'm accountable
14 to the entire service area. So they don't report in the
15 way that I report to the board. The board doesn't report
16 to the county judge or the mayor of Maumelle, but the
17 board is certainly serving at the pleasure of those
18 individuals they -- we don't have a provision, that I'm
19 aware of, that would allow someone in one of those
20 positions of appointing a board member to recall the board
21 member, but the board terms are three years and if someone
22 who's appointed didn't uphold those obligations to
23 represent, in this case, let's say Maumelle again, then I
24 would assume, in theory, that someone else would be
25 appointed.

Page 159

1 Q    That's all I've got. Thank you.
2 A    Thank you.
3 Q    As much fun as it's been, nothing from me.
4     MR. ADAMS: Anybody on the Zoom?
5     (WHEREUPON, at 3:30 p.m.,the
6     above deposition concluded.)

Page 160

C E R T I F I C A T E

STATE OF ARKANSAS }
COUNTY OF FAULKNER }

RE:  ORAL DEPOSITION OF DONALD NATHAN COULTER, ESQ.

I, Michelle R. Satterfield, CCR, a Notary Public in and
for Faulkner County, Arkansas, do hereby certify that the
transcript of the foregoing deposition accurately reflects
the testimony given; and that the foregoing was
transcribed by me, or under my supervision, on my Eclipse
computerized transcription system from my machine
shorthand notes taken at the time and place set out on the
caption hereto, the witness having been duly cautioned and
sworn, or affirmed, to tell the truth, the whole truth and
nothing but the truth.
I FURTHER CERTIFY that I am neither counsel for, related
to, nor employed by any of the parties to the action in
which this proceeding was taken; and, further that I am
not a relative or employee of any attorney or counsel
employed by the parties hereto, nor financially
interested, or otherwise, in the outcome of this action.
In accordance with the Arkansas Rules of Civil Procedure,
Rule 30(e), review of the foregoing transcript by the
witness was not requested by the deponent or any party
thereto.
GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 11th
day of April 2024.


                         _____
                         Michelle R. Satterfield, CCR
                         LS Certificate No. 570
                         Notary Public in and for
                         Faulkner County, Arkansas

**$**

**$175,000.00 (1)**
40:25

**A**

**AALL (1)**
92:22
**ability (2)**
14:12;122:1
**able (13)**
29:6;30:13;50:13;
54:17;66:9;77:14;
85:9;98:24;117:8;
121:5,8;141:1;148:5
**above (1)**
159:6
**above-styled (1)**
5:3
**abreast (1)**
128:19
**absolutely (4)**
50:12;72:19;78:19;
136:18
**abundantly (1)**
59:23
**abuse (10)**
102:12;107:19;
108:13;110:16;
113:19;114:2,4,20;
152:1;153:6
**academic (1)**
94:5
**accept (1)**
82:22
**accepted (1)**
133:10
**access (19)**
20:10;30:5;75:5;
77:19;78:13,25;80:14,
17;81:23,23;82:16,17;
85:16;88:19;108:8;
117:9;119:3;123:21;
156:24
**accessing (1)**
83:25
**accidents (1)**
41:21
**accommodating (1)**
70:22
**accommodation (1)**
98:15
**accompanied (1)**
73:1
**accompany (1)**
69:15
**accordance (1)**
28:24
**according (1)**
15:7
**accordingly (2)**

35:6;127:6
**account (3)**
49:14;126:12;127:5
**accountability (1)**
157:21
**accountable (16)**
60:11,12;148:4,5;
156:15,18,19,23;
157:1,9,11,20,24;
158:1,10,13
**accurate (1)**
120:13
**accurately (1)**
143:6
**acknowledged (3)**
89:1;136:3,5
**acquaintances (1)**
107:13
**acquire (2)**
38:11;144:3
**across (4)**
64:4;104:9;134:18;
152:6
**Act (63)**
13:6;18:12;19:3;
23:23;25:9,16,17,19;
48:2,12;54:13;55:7,7,
18;57:21;65:3;74:1,
12;77:1;78:12,18;
79:19;80:7,12;81:12;
83:11,23;84:18;85:5;
86:3,12;87:5,16;89:21;
90:12;93:11;98:11,17;
100:17;101:16,18;
109:12;113:7;121:1;
123:25;124:17,20,20;
125:9,13;126:10,22;
128:12;130:15;132:2,
24;133:24;137:19;
138:13,16;140:16,19;
141:6
**acting (2)**
35:7;130:1
**action (2)**
32:12,13
**activities (2)**
11:25;13:10
**activity (4)**
23:23;24:25;35:12;
69:25
**acts (2)**
11:16;30:19
**actual (2)**
39:2;128:23
**actually (9)**
6:16;18:12;21:14;
86:19;90:3,7;99:5;
116:13;123:6
**ADA-compliance (1)**
15:23
**adamant (2)**
116:8;139:5
**ADAMS (31)**

36:3,7;37:11;40:7,
14;64:20;86:16,21;
87:2;89:14,22,24;90:8;
92:3,5,9,12,16;111:2,
7;121:14;129:7;130:7;
140:22;148:18,22;
149:2,6;153:25;
155:13;159:4
**added (2)**
27:5;90:22
**addiction (1)**
152:14
**adding (1)**
130:12
**addition (5)**
57:13;75:7;107:11;
131:22;133:11
**additional (2)**
65:20;128:3
**address (1)**
129:7
**addressed (1)**
130:7
**addresses (1)**
95:24
**adequate (1)**
71:2
**adhere (1)**
20:15
**adjacent (1)**
35:12
**adjust (1)**
127:6
**administration (1)**
52:25
**administrative (10)**
55:20,20,24;64:15,
23;65:7;66:25;67:7,10,
22
**admitted (2)**
136:5,11
**adolescents (1)**
106:20
**adopt (1)**
36:23
**adopted (6)**
24:5;36:24;47:16;
55:9;61:7;84:8
**adoption (1)**
101:20
**adult (18)**
73:10,12;79:5;
80:20;85:11,16;
103:25;104:1,12,14;
105:5;108:1,6;118:10,
10;140:16;144:12,13
**adults (19)**
73:14;76:11;81:12;
85:7,23;88:25;93:6;
103:21;104:11;108:3,
4;109:7;110:25;111:6;
141:15;142:12,23;
152:25;157:17

**advanced (1)**
34:10
**advice (5)**
18:22;41:6;56:16;
137:4;156:9
**advise (1)**
75:9
**advised (1)**
15:22
**advocate (1)**
13:2
**advocates (1)**
113:7
**advocating (1)**
97:15
**affect (2)**
12:18;121:25
**affected (7)**
54:20;58:14,19,21,
22;59:1,4
**affirm (1)**
21:6
**affirmed (2)**
6:3;25:5
**afford (1)**
45:25
**afoul (2)**
75:13;146:1
**aftercare (1)**
68:24
**aftercare-type (1)**
69:8
**afternoon (2)**
65:23;121:18
**afterwards (1)**
95:8
**again (61)**
13:7;17:10;23:18;
39:12;48:15,23;50:24;
53:18;54:3,12;56:2;
57:14,23,25;62:70:18,
22;71:14,21;72:9;
74:13;76:2;79:9,17;
83:13;84:4;85:14;
94:16;96:16;97:11,13,
18;98:22;102:3;103:7,
12;105:11;106:16,22;
107:12,13;108:6;
109:11,23;110:9,15;
111:22;113:18;115:3,
16;118:1,18;120:5;
130:7;138:7;139:16;
145:17;147:5;150:20;
151:6;154:6;158:23
**against (6)**
25:20;123:15,19;
124:2,4;146:7
**age (22)**
68:4;69:11;70:5,15,
19;72:1,22,25;73:3,6,
9;77:8;83:3;84:23;
89:11;104:23;150:2,
19,19,19;152:9;157:16

**age-appropriate (1)**
66:7
**agenda (1)**
12:21
**ages (3)**
68:1,8;108:5
**aggressive (1)**
134:23
**aggressively (1)**
87:22
**agitated (2)**
116:7;139:5
**agitation (1)**
122:25
**ago (8)**
21:24;26:15,16;
53:22;88:2;101:11;
113:17;155:12
**AGREED (4)**
5:11;21:5;60:24;
83:5
**agreement (6)**
5:9;14:24;28:3;
36:22;39:1,7
**agrees (1)**
92:23
**ahead (9)**
37:13;45:9;46:5;
54:21;87:2;89:15;
92:4;145:2
**akin (1)**
51:4
**Alaska (1)**
107:7;108:14
**alerted (1)**
48:16
**allegory (1)**
116:19
**Allison (1)**
113:14
**allow (9)**
17:18;31:12,18,21;
57:21;60:9;69:13;
119:22;158:19
**allowed (4)**
16:18;31:9;135:22;
138:16
**alluded (3)**
107:10;127:12;
131:25
**Alma (1)**
141:25
**almost (2)**
118:8;134:25
**along (4)**
22:9;107:3;124:7,12
**alternative (1)**
141:9
**although (6)**
25:2,13;38:23;
39:10;100:10;108:17
**always (2)**
73:20;94:20

**Fayetteville Public Library, et al v.**
**Crawford County, Arkansas, et al**
CERTIFIED ORIGINAL/COPY TRANSCRIPT
**Donald Nathan Coulter, Esq.**
April 1, 2024

**Amazon (1)**
46:1
**amenable (1)**
92:24
**amended (1)**
96:24
**amendment (13)**
22:5;29:12;30:2,6,9,
14,19;32:11,25;33:6,
12;128:2;135:19
**amendments (2)**
17:17;29:24
**America (5)**
50:6;61:19;93:23;
94:3;113:15
**among (4)**
42:9;76:9,10;96:19
**amount (3)**
17:6;75:8;112:20
**analogous (1)**
152:16
**analysis (3)**
88:21;146:16;
149:16
**anatomy (1)**
106:18
**ancestor (1)**
26:9
**animal (1)**
16:1
**animals (1)**
15:25
**animated (1)**
119:13
**annual (1)**
57:9
**answered (1)**
130:8
**anticipated (2)**
48:1;127:1
**anticipating (4)**
54:13;55:14;56:14;
157:23
**anxiety (2)**
70:1;117:15
**anymore (2)**
31:6;51:12
**anyways (1)**
102:10
**apparently (1)**
135:19
**appeal (6)**
50:8;55:13;109:24;
150:14;152:8,10
**appealing (2)**
57:11;150:24
**appeared (3)**
13:12;113:15;
127:22
**appears (2)**
91:17;95:25
**application (1)**
33:6

**applied (5)**
11:1;63:12;75:14;
87:13;152:6
**applies (10)**
32:12;71:5;81:18;
83:19;84:10,22;85:7;
87:14;88:15;109:14
**apply (6)**
32:12;63:19;73:1;
80:12;84:1;85:5
**applying (3)**
61:6;103:13;150:11
**appoint (4)**
37:1,4;158:9,10
**appointed (5)**
9:23;102:6;158:8,
22,25
**appointee (1)**
100:3
**appointing (2)**
158:3,20
**appreciate (2)**
61:24;108:21
**apprised (3)**
19:13;129:4;131:3
**approached (1)**
48:19
**approaching (1)**
13:4
**appropriate (7)**
34:12;59:9,15,15;
83:3;104:23;157:16
**appropriateness (1)**
59:6
**approve (1)**
113:10
**approved (5)**
16:12;27:7;47:6;
54:24;55:16
**approximately (7)**
10:23;20:20;27:11;
40:24,25;100:1;131:1
**April (7)**
5:4;49:5;62:24;
129:6,10;130:5;131:1
**archival (1)**
47:12
**ardent (1)**
100:17
**area (8)**
43:9;56:21;57:7,9;
59:3;108:7;125:18;
158:14
**areas (1)**
10:6
**arguably (2)**
23:25;87:18
**argue (1)**
71:16
**argued (1)**
23:2
**argument (7)**
33:23;34:14;60:8;

140:25;141:5;151:14,
15
**Arkansas (57)**
5:5,8;7:17,19,22;8:1,
18,25;10:2,23;12:23,
24;13:15;17:1;19:23;
23:14;26:4;32:20,22;
33:15;34:4;42:12;
54:5;56:18;62:8;
78:23;81:15;84:4,5,9,
10,17,19,20;85:24;
86:10;88:13;89:5;
99:16,23;103:14;
109:12,14;117:11;
126:2,25;131:6;136:6,
7,11,12,25;137:1;
138:5,7;152:5;154:8
**Arkansas' (1)**
81:16
**arm (1)**
33:13
**around (25)**
12:16;22:14,17,18;
23:9;39:13;46:21,23;
56:5,8;58:6;71:12;
74:2,15;83:7;98:16;
103:8;115:5;119:12;
124:15;132:24;
134:19;138:8,10;156:1
**arrangement (1)**
29:21
**arrival (1)**
15:16
**arrived (2)**
15:15;16:5
**arrives (1)**
129:1
**art (2)**
112:2,7
**Articles (1)**
36:12
**articulates (1)**
51:15
**artistic (6)**
103:17;106:5;107:4;
108:3;111:17;152:20
**artistically (1)**
119:18
**Ashley (1)**
126:7
**aside (8)**
7:18;37:7;53:20;
65:14;72:20;73:16;
103:22;125:11
**aspects (1)**
23:16
**aspiring (1)**
44:21
**assembly (7)**
13:25;22:8;88:3;
122:12;135:14;137:3;
138:10
**assessed (2)**

29:14,15
**assessment (3)**
9:9;13:13;92:23
**assessments (1)**
155:22
**assets (1)**
39:7
**assignment (1)**
129:24
**assistance (1)**
157:17
**assistant (1)**
53:1
**associate (1)**
153:11
**associated (1)**
7:16
**Association (5)**
12:24;13:1;136:6,
12;137:1
**assume (14)**
7:5;9:4;11:24;21:5;
24:24;80:18;95:21;
106:16,23;107:21;
108:17;137:21;
141:21;158:24
**assuming (1)**
138:10
**assumption (2)**
9:6;143:1
**astronomy (1)**
51:22
**Atlantic (1)**
113:16
**attached (10)**
35:25;37:10;42:3;
53:24;66:11;78:5;
79:12;91:12;95:15;
153:24
**attempt (2)**
48:12;137:19
**attempted (1)**
135:22
**attempting (3)**
14:1,2;75:2
**attended (2)**
96:20;101:24
**attention (9)**
21:23;24:11,13;
46:16;63:23;64:8;
93:20;122:14;147:7
**attentive (1)**
68:4
**Attorney (7)**
6:12,20;7:16;37:20;
62:9;123:24;129:14
**attorneys (3)**
6:11;22:20;23:9
**attorneys' (2)**
132:13;135:21
**attributed (1)**
154:10
**Atwood (2)**

108:24;155:6
**audacity (1)**
101:25
**audience (4)**
24:18;82:8,10;
109:24
**audiences (1)**
112:4
**audit (2)**
38:9,15
**auditors (2)**
39:12,17
**audits (2)**
38:6;40:15
**August (8)**
19:4;47:22;48:2,21;
68:14,16;127:3;128:15
**author (2)**
103:5,11;106:22;
107:10;109:19;
111:18;112:5;114:7;
116:10;118:2;150:1;
153:12
**authored (1)**
111:20
**authorities (2)**
16:16,22
**authority (8)**
16:14;17:16;27:22;
28:21;29:13,19,22;
53:13
**authorize (1)**
130:9
**authorized (2)**
9:11;130:14
**authorizing (2)**
129:18;130:23
**authors (3)**
22:1;45:23;101:7
**author's (4)**
104:10;114:7;118:1;
145:1
**available (17)**
38:4;43:7;45:24;
73:10;74:24;75:6;
76:24;81:13,20;83:11;
88:12;90:15;103:9;
108:9;112:22;113:22;
144:15
**average (4)**
70:8;71:22;150:11,
17
**award-winning (1)**
116:18
**aware (49)**
12:20;14:23;15:3;
16:8;17:20;21:22;
23:1,12,15,16;24:1,9,
23,24;25:19;30:10;
42:12;46:8,9,10,19,22;
47:25;54:5,11;58:13;
74:4;76:16,23,25;
77:23;102:21,24;

107:22;108:12;110:14,
20;114:22;120:2;
121:4;128:22;131:15,
17;138:8,11;142:22,
23;143:10;158:19

**awareness (4)**
104:2;114:19,24;
152:13

**away (4)**
7:24;77:15;95:4;
147:18

**B**

**back (23)**
21:17;47:4,7;48:15;
49:4;51:23;53:17;
55:13;63:18;64:17,20;
65:24;73:25;96:24;
114:6;127:3;129:20;
130:3;132:19;138:6,7;
144:25;148:24

**backside (1)**
17:5

**backwards (1)**
88:8

**bad (8)**
24:15;139:4,5,7,7,
11;140:9,14

**ballpark (2)**
19:21;115:23

**Bar (2)**
12:24,24

**Barbara (3)**
77:9;115:2;141:3

**barely-clothed (1)**
109:2

**based (20)**
18:22;31:9,13;
43:15;49:9;51:9;
60:25;82:8;99:9;
104:1,17;135:1;
137:11;139:10;
142:24;145:13,22;
146:10;151:7,8

**basis (3)**
58:11;62:3;155:22

**Bastard (2)**
113:14;151:23

**batch (1)**
136:22

**Bates (8)**
49:19;53:22;66:18,
21;67:1,5,25;72:24

**bear (2)**
133:16;134:10

**bearing (1)**
115:16

**became (5)**
10:10;21:19;56:2;
73:6;74:20

**become (1)**
36:20

**becomes (3)**
84:23;126:25;
150:23

**becoming (1)**
127:8

**bee (1)**
105:9

**bees (1)**
105:10

**began (4)**
22:8,21,23;128:17

**beginning (1)**
118:14

**behalf (10)**
8:25;9:1,4,7,10,12;
14:16;35:7;130:15,16

**behavior (2)**
68:2;82:23

**behind (2)**
44:20;92:20

**belief (1)**
25:14

**believes (3)**
90:10;98:21;118:3

**below (3)**
44:21,22;96:5

**beneficiary (1)**
29:20

**benefit (1)**
17:16

**benefited (1)**
38:13

**benefits (1)**
11:11

**bent (1)**
22:9

**best (7)**
18:5;70:11;71:22;
88:16;107:9;113:15;
133:6

**better (1)**
23:20

**Bettina (1)**
41:9

**biannual (1)**
34:11

**big (1)**
103:12

**bilingual (1)**
52:21

**bill (18)**
11:19,19;13:13,14,
14,17;14:25;22:6;
34:10;92:20;96:17,25;
127:24,24;133:2,9;
136:2,14

**bills (6)**
11:16;12:6,11;13:1,
22;132:18

**bird (1)**
105:8

**birds (1)**
105:10

**bit (14)**
13:21;15:2;18:3;
19:12;26:1;32:10;
37:22;53:22;56:3,23;
69:12;119:12;131:8,9

**Blanchard (1)**
52:5;154:6,21

**blank (5)**
132:23;133:18,22,
25;134:9

**block (1)**
88:19

**blocked (4)**
87:7,8,11;91:19

**blocking (1)**
88:22

**blogs (1)**
45:6

**Blue (1)**
146:21

**Blytheville (2)**
56:18;58:23

**Board (80)**
10:22;11:5,6;14:16,
23,24;16:9,24;17:10;
31:18,22;36:10,16,18,
21,25;47:1,6,13,14,15;
48:3;49:5;54:1,23,23;
55:16,22;60:5,11;
64:13;66:14,22;67:21;
68:12;69:13;71:20;
76:18;99:23;100:4;
101:13,13,23;102:6;
116:21;125:17,22;
126:19;128:19,21,22,
23,24;129:6,7,11,13,
17,21,22;130:6,7,7,23;
131:1;134:18;139:1;
148:2;154:2,11,15;
155:21;158:1,2,15,15,
17,20,20,21

**board-initiated (1)**
57:13

**boards (7)**
47:13;55:23;139:18;
148:4,5;156:14,16

**Board's (2)**
42:6;69:10

**Bobby (5)**
96:1;97:5,7,8;
127:13

**Bobby's (1)**
142:16

**Bodies (4)**
106:14;109:2;
134:21;135:17

**body (8)**
28:8,11,16;60:18;
61:14;105:20;124:9;
125:21

**bolstered (1)**
135:25

**bonds (4)**

16:13,13;38:8,10

**Book (77)**
44:3;45:23;50:3;
51:10,14;58:24;59:3;
75:5;77:15,19;81:13;
86:9;90:5;99:4,7,15,
18,20;100:7,9;102:18;
103:5,16,20;104:5,9,
13;105:2,4,6,10,12,13,
19,20,23,24;106:9,12,
19;107:7,10,17,23;
108:24;109:17;110:2,
10,11,18;113:19;
114:5;115:2,10,11,19,
24;116:6,10;120:20;
139:21;141:3;142:16,
17;144:2,8,14,20;
150:18;151:1,5,15,21,
25;154:14;155:1,7

**Booklist (1)**
44:2

**books (138)**
20:17;24:20;34:3,
12;35:8;39:3;43:10;
44:13;45:15,21,22;
63:1;74:22;75:19;
76:9,10;81:10;82:7,9,
11,11,12;86:2,5;87:25;
88:2;89:4,7,10,10,21,
25;90:1,24,24;91:5,7,
10;97:23;98:7,13,16,
19;99:3,22;100:1,11,
25;101:8,14;103:25;
104:10;109:5;110:12;
112:8,8,16,19,21;
113:2,4,5,8;116:16,17;
119:1,2;120:17,20,22;
122:13,16,18,24;
123:5,7,9,9,12;131:18,
18;134:15,16,23;
135:1,5,9,23;136:24;
137:9;138:22,24;
139:2,6,8,24;140:5,7,8,
10,11;141:10,13,18;
142:14,24;143:4,5,12,
12;144:10,21;145:7,8;
146:18,19,20,21;
147:13,17,24;148:9,
11;149:9,15;152:24;
153:9,19;156:4;157:13

**booksellers (1)**
22:1

**born (2)**
7:22;26:15

**both (14)**
6:25;10:8;14:10;
16:3;18:14;44:23;
91:5;94:19;115:18;
117:2,12;134:21;
136:7,11

**bothered (3)**

21:10,11,12

**bottom (6)**
12:18,19;38:19;
40:10;79:23;105:7

**bound (3)**
30:8;32:24;33:12

**boundaries (1)**
51:10

**bounds (1)**
46:12

**box (3)**
36:10,19;120:20

**Boys (1)**
146:20

**Branch (5)**
32:22;52:17;53:1,
12;66:4

**branches (5)**
43:14;52:12,15;
53:6;67:15

**breadth (1)**
108:22

**break (5)**
36:4;37:17;73:6,18;
89:14,16;121:13,14;
149:2

**Bridge (2)**
53:15,16

**Brief (6)**
37:15;89:17;96:11;
98:5;132:20;149:4

**briefed (1)**
23:1

**briefing (1)**
74:15

**briefly (1)**
132:5

**briefs (1)**
33:21

**bright (1)**
88:17

**bring (7)**
16:1;18:17;46:15;
64:3;127:21;130:14;
144:16

**bringing (2)**
59:16;130:18;
133:19

**brings (1)**
90:24

**broad (4)**
46:20;108:4;123:17;
147:23

**broader (1)**
157:21

**broadly (1)**
118:18,24

**Brooklyn (1)**
53:15

**Brooks (3)**
63:10;84:12;125:7

**brother (1)**
69:3

**Fayetteville Public Library, et al v.**
**Crawford County, Arkansas, et al**
CERTIFIED ORIGINAL/COPY TRANSCRIPT
**Donald Nathan Coulter, Esq.**
**April 1, 2024**

**brought (13)**
89:24;90:8;98:7,13;
122:14;123:1,2;
137:14;144:14;148:9;
149:10,11;155:4
**Brown (1)**
52:22
**BROWNSTEIN (1)**
41:12
**budget (2)**
11:6;126:4
**budgeted (1)**
40:22
**build (1)**
38:11
**building (2)**
72:1,16
**buildings (3)**
39:2,9;142:8
**bullet (6)**
42:16;43:12,21;
44:1,6;45:3
**bulletin (2)**
31:18,22
**bumped (1)**
69:12
**bunch (1)**
62:25
**Buren (1)**
141:25
**business (1)**
27:14
**butterflies (1)**
43:10
**buy (5)**
46:1;58:4;89:10;
145:2,2
**buying (4)**
82:7,9;89:4;144:25
**buys (1)**
80:17

**C**

**Cabot (1)**
60:2
**Calhoun (1)**
126:7
**call (5)**
13:7;20:19;109:20;
128:5;152:21
**called (7)**
10:7;28:2;64:2;
71:25;133:1;142:16;
143:9
**calling (1)**
22:15
**CALS (59)**
9:5,7,24;11:15,15,
20;14:14;15:3,4,10,12;
16:3,6;17:12,14,20,21;
18:17;26:2,3,9;28:7,
16;29:3;30:8,22;31:4,

9;32:14;34:19;36:14;
37:19;40:22;41:2,24;
49:19;53:23;54:1;
66:18;67:1;76:16;
78:11,17;86:15,23;
90:16,23;94:8;98:21;
123:2;124:22;125:9,
13;126:9,23;127:20;
130:15,16;154:2
**CALS' (18)**
17:24;36:10;42:1,
16;43:13;46:9,11;
77:21;78:7;85:4;
86:11;87:4;89:25;
90:2,10;91:2;98:20;
101:3
**came (13)**
9:25;11:1;25:6;36:1;
38:6;65:23;68:17;
91:25;96:24;100:2;
120:6;129:7;146:10
**Campbell (1)**
5:6
**campus (1)**
38:23
**can (69)**
6:23;7:18;10:21;
18:8;21:13;29:5;
30:16;31:17,22;32:2,3;
37:7;39:13,15;40:14,
16;41:4;44:1,25;45:9;
48:6;49:1;51:2;52:6;
53:20;54:18;56:19;
57:8,15;64:24;65:14;
68:6;70:5;71:2,11;
72:20;73:16;76:14;
79:8;80:15,18;83:6;
85:22;86:25,25;89:14;
95:10;97:21;100:2;
103:22,24;104:20;
105:1,1;106:10;109:6;
115:1;116:8;134:2,7;
136:16;141:12;
146:23;148:25;
150:25;153:18;157:6,
13,15
**candor (1)**
78:2
**cannon (1)**
50:25
**Cantrell (1)**
5:7
**capacity (1)**
153:4
**capital (3)**
16:12;17:18;38:10
**card (12)**
10:21;57:8,8;66:23,
24;67:16,17,18;73:2,3,
9,12
**cardholder (3)**
55:25;56:20;57:6
**cards (2)**

67:2,3
**care (7)**
20:10;22:21;68:5;
70:5;71:10;115:6;
152:14
**career (2)**
10:9,11
**careful (1)**
42:20
**carefully (2)**
55:4;83:2
**caregiver (2)**
68:2,10
**Caregivers (3)**
68:3,5;70:14
**Carnegie (1)**
26:10
**Carolina (2)**
113:14;151:23
**carries (1)**
38:9
**carrying (1)**
104:24
**case (38)**
7:12,15,17;17:21;
18:3,4,5,7,9,18;21:18,
19;22:25;23:2,7,13,17,
19;34:9;59:16;74:18;
84:4;86:1;89:1;
107:11;111:24;
123:16;124:9;125:22;
132:14,18;135:19,22;
137:21;146:22;156:9;
158:3,23
**cases (16)**
10:12,13,14,16;15:4,
16,17,19;22:23;31:11;
68:25;100:17;114:16;
136:21,22;158:7
**casualty (1)**
10:10
**categories (3)**
38:17;39:12,19
**category (10)**
21:9;44:5;50:7;
98:19;106:8;108:5;
111:1;143:8,11;150:2
**cause (2)**
5:3;100:5
**causing (1)**
122:25
**cautioned (1)**
6:3
**CCR (1)**
5:5
**center (1)**
10:6
**Central (8)**
8:18,25;10:22;26:4;
52:25;86:6;131:6;
138:5
**century (2)**
116:16,17

**certain (22)**
31:12,13;32:17;
39:8;41:17;43:5;
44:13;47:19;48:24;
76:9,10;83:2;122:13;
127:1;129:25;134:23;
144:20,21;145:8,22;
146:18;150:2
**certainly (11)**
14:23;17:15;61:24;
94:2;97:16;98:23;
100:23;107:5;108:19;
117:14;158:17
**certified (5)**
81:16;84:9,15;
88:14;155:21
**certitude (1)**
98:25
**cetera (6)**
32:22;43:11;44:4;
63:7;100:19;119:24
**challenge (6)**
58:14;74:1;118:16;
120:3;121:5,8
**challenged (5)**
16:20;57:3;62:6;
63:17;83:19
**challenges (3)**
25:9;57:24;134:25
**challenging (12)**
18:11,12;62:4;74:5,
11,14;80:12;118:17;
131:18;133:20,23;
152:7
**chance (1)**
91:14
**chances (1)**
152:13
**change (3)**
60:4;126:23;131:15
**changed (3)**
48:7;87:21,22
**changes (9)**
48:13,19,20,22;55:6,
8,15,17;57:15
**Changing (1)**
106:14
**channeling (1)**
116:10
**chaos (1)**
88:16
**chapter (4)**
93:8;105:14,16,21
**character (2)**
115:4;117:20
**characterize (1)**
136:15
**characters (1)**
153:14
**charge (2)**
66:7;104:25
**charged (2)**
86:8;95:12

**chart (2)**
35:16;36:14
**charts (1)**
52:9
**check (8)**
49:3;64:18,20;
132:23;133:18,25;
134:9;148:15
**checked (2)**
90:6;120:20
**checking (5)**
50:4,6,9
**checks (1)**
133:22
**Chenal (1)**
52:19
**Chicken (1)**
154:23
**chief (1)**
60:7
**Chilcoat (7)**
97:6;101:10,17,22;
120:7;154:9,9
**Chilcoat's (5)**
48:15;56:3,17;
57:20;65:15
**child (12)**
51:17;68:6,6;70:21;
71:1,3,7,22;72:13;
83:10;87:25;156:11
**children (14)**
20:17;67:25;68:8;
69:5;71:10,25;72:12,
15,25;75:14;79:2;
133:10;155:25;157:17
**Children's (9)**
78:11,18;79:19;
83:22;85:4;86:12;
87:4;155:16;156:4
**chip (1)**
81:23
**choice (3)**
139:5,7,7
**choices (4)**
41:6;139:5,11;140:9
**choose (2)**
31:13;49:8
**chosen (1)**
68:11
**Chrastka (2)**
91:17;96:7
**Chris (1)**
131:25
**Christian (1)**
63:6
**chronology (2)**
47:7;137:21
**church (1)**
19:25
**CIPA (2)**
86:18;88:17
**circa (2)**
7:11;16:10

**circle (2)**
107:12;114:15
**circulate (6)**
50:11;51:3;53:5;
147:17;154:25;157:13
**circulated (2)**
50:3,20
**circulating (9)**
50:19;51:13;93:4,
24;95:10;97:12;
100:16,24;101:7
**circulation (8)**
50:13;57:22;58:4,9;
62:3;66:23;99:7;
103:21
**circumcised (1)**
105:21
**cities (6)**
27:8,13;37:3;39:2;
133:7;136:9
**citizen (1)**
24:4
**citizens' (1)**
122:17
**city (17)**
16:16;28:25;29:2,3;
32:20;34:4,21;38:8;
125:17,22;126:20;
134:14,14,18,21;
135:17;139:1
**civic (1)**
128:25
**Civil (1)**
5:15
**claim (1)**
100:18
**clamoring (1)**
62:25
**clarifications (1)**
54:23
**clarify (1)**
7:3
**clarity (1)**
153:16
**class (2)**
83:20;85:6
**classic (2)**
50:5;112:8
**classification (2)**
109:5;143:12
**clean (1)**
40:7
**clear (14)**
7:1;22:11;24:4;34:1,
2;39:24;55:24;56:20;
57:6;59:20,23;62:8;
63:15;152:3
**clearly (10)**
27:19;31:6;48:10,
11;61:15;77:19;96:10;
115:14;139:9;145:21
**clerk (1)**
16:16

**clerking (1)**
10:3
**client (3)**
23:19;74:17;146:5
**clinical (2)**
106:18;155:22
**close (3)**
22:25;40:13;80:7
**closed (1)**
72:11
**closely-related (1)**
150:15
**closing (1)**
72:3
**club (1)**
128:25
**coarsening (1)**
82:1
**code (3)**
93:14;95:4;97:17
**coded (1)**
67:18
**coffers (1)**
38:12
**coin (1)**
138:14
**coincidentally (1)**
121:2
**collect (14)**
19:8;29:17;33:1;
34:13;35:8;76:25;
89:10;104:4;112:19;
113:2,5,11;141:10;
144:21
**collected (5)**
17:3,6;29:13,14,15
**collecting (10)**
16:23;17:8,16;
43:24;81:20;89:9;
93:4,23;95:10;117:2
**collection (53)**
12:14,15;16:18;
21:20;43:5;44:9,12,23;
45:12;46:10,11,14,18;
47:17;49:20;51:11;
52:3,5,24;53:10;59:22;
61:10;63:7;65:9;
75:19;76:21;82:4;
83:1;89:25;90:2,3,5,
10;94:8;98:9,21;99:3,
5,25;101:14;104:23;
112:17,21;120:23;
122:17;144:5,22;
147:23;154:6,22;
155:3;156:21;157:5
**collections (2)**
39:25;43:10
**collective (2)**
35:10;70:18
**collectively (2)**
114:13,18
**Collector (2)**
16:23;29:13

**collects (3)**
32:25;42:7;126:3
**College (2)**
8:5,8
**collegial (1)**
130:1
**collegiality (1)**
98:15
**combination (3)**
77:17;89:6;155:23
**comfortable (1)**
91:15
**comfortably (1)**
99:14
**comic (1)**
109:17
**coming (9)**
20:6;38:10;45:21;
68:20;69:6;75:4;
102:5;138:9;142:14
**commentary (1)**
151:24
**comments (3)**
96:14;132:20;153:5
**commercial (1)**
10:13
**committed (1)**
83:11
**committee (18)**
12:25;13:12;14:5;
31:25;33:9;56:11;
57:2;59:20;61:18;
127:23,23,25;128:4,5;
132:22;136:2,5;146:17
**committees (3)**
12:17;65:9,11
**committee's (1)**
132:20
**common (2)**
42:9;54:3
**communicated (1)**
130:21
**communicating (2)**
41:16;111:25
**communication (1)**
52:23
**communities (8)**
27:24;39:1;52:15;
61:16;133:25;134:10;
140:12;158:10
**community (45)**
11:8;14:13;16:10;
18:23;19:11,22;35:8,9;
42:19,25;43:2,5,44:12;
47:18;49:15;50:8,14;
53:2;75:11,11;76:6;
99:13;112:22;117:3,5,
8;119:10,18;122:14;
135:4;138:23;141:11;
143:7;145:23;146:11;
147:1,23;148:7;
150:12;156:19,23;
157:5,8,11,22

**community's (3)**
143:25;145:22,24
**companies (1)**
10:13
**comparable (1)**
117:7
**compared (1)**
122:9
**comparison (1)**
29:4
**compensation (1)**
41:20
**complain (1)**
139:2
**Complaint (7)**
18:6,13;28:7;74:14;
83:18;118:18;131:7
**completely (1)**
27:12
**complexity (1)**
90:22
**compliance (4)**
41:15;55:7;87:14;
126:16
**complicated (2)**
18:7;27:6
**complies (2)**
68:2;78:11
**comply (6)**
35:1;78:17;101:12;
125:16;126:24;141:1
**component (2)**
115:15,20
**components (1)**
154:16
**composition (2)**
22:7;47:8
**comprehensible (1)**
151:15
**comprise (1)**
65:11
**comprised (1)**
65:9
**compromise (4)**
69:17;145:11;146:6,
10
**Computer (10)**
77:22;80:16,18;
82:16,19;83:24,25;
85:9,22;132:9
**computers (4)**
78:25;80:15;81:22;
85:8
**concede (2)**
141:5,7
**conceding (1)**
91:4
**concern (3)**
117:15;122:25;
144:24
**concerned (2)**
16:11;56:3,4,6;
60:15;131:2

**concerns (4)**
61:24;70:25;122:18;
127:17
**conclude (1)**
71:23
**concluded (3)**
22:5;104:14;159:6
**conclusion (2)**
61:1;103:6
**conclusions (1)**
129:9
**concurrently (2)**
116:3;137:23
**concurs (1)**
134:12
**condition (3)**
78:19,21;156:10
**conduct (3)**
27:14;66:15;68:3;
83:18;102:12;107:18;
108:12;110:16;114:3
**Conduit (1)**
63:20;94:16
**confer (1)**
129:11
**conference (1)**
147:5
**confidence (2)**
69:4;87:20
**confident (4)**
62:15;103:24;
112:18;145:19
**configuration (5)**
26:8,21;27:10;47:9;
147:16
**configured (2)**
26:5,6
**confirms (1)**
133:15
**conflict (1)**
116:20
**confusing (1)**
138:5
**confusion (1)**
55:23
**Congress (2)**
78:21;82:20
**connected (1)**
34:22
**connection (2)**
80:23;82:19
**consensus (1)**
112:16
**consent (1)**
62:9
**consequence (2)**
140:25;141:17
**consequences (2)**
25:8;75:24
**conservative (1)**
139:13
**consider (5)**
28:16;29:23;65:25;

109:6;129:12
**consideration (2)**
42:20;59:22
**considered (9)**
13:13;44:18;62:11;
71:19;79:2;86:2,9;
113:21;124:17
**consistent (3)**
61:10;100:23;
139:21
**consisting (1)**
26:25
**constantly (3)**
53:19;70:7;82:7
**constituents (2)**
59:24;139:6
**constituted (1)**
59:4
**constitutes (1)**
13:16
**constitution (3)**
17:17;84:5;146:1
**constitutional (11)**
22:12;29:12,16;
30:4;82:10;88:25;
102:2;119:25;123:21;
133:5;136:15
**constitutionally-permissible (1)**
78:21
**constitutionally-protected (3)**
80:20;123:22;124:8
**constitutionally-provided (1)**
29:21
**construed (1)**
63:10
**consultant (1)**
97:4
**consultation (4)**
52:13;53:12;71:20;
136:6
**consulted (1)**
125:5
**consumer (6)**
44:11;45:10;47:18;
144:18;145:1,7
**contact (1)**
120:16
**contacted (1)**
129:14
**contain (2)**
30:3;135:2
**contained (3)**
49:6;154:9,14
**contains (6)**
65:1;100:22;102:11,
13,15;113:18
**contemporary (1)**
150:12
**contend (1)**
59:8
**content (52)**
22:1;31:14;32:4;
57:3;58:18;61:2;

74:22;75:5,13,20;
76:11;78:14;81:1,2,7;
87:17,23,24;88:8,19;
89:5;91:6,25;99:10,11;
100:21,22;101:1;
102:15,19,21;104:17;
107:13;110:3;113:20;
116:16;117:14,18;
119:17;122:18;
123:10;135:1;137:12;
138:24;139:9;143:5,6;
144:1;147:2;150:23;
153:10,10
**content-based (9)**
32:6;118:20,21;
136:23;145:12,20,24;
146:18;147:25
**contention (1)**
14:24
**contents (1)**
126:6
**context (16)**
61:2;96:16;97:18;
121:22;122:21;
123:11;130:13;133:19,
23;143:11;149:20;
152:4;153:11,18;
155:8;156:2
**continue (9)**
19:9;20:9;53:5;
74:19;113:10;129:11,
12,19;130:23
**continuum (1)**
150:22
**contrary (2)**
15:9;88:6
**contrast (2)**
12:23;88:17
**contributes (1)**
126:3
**controversial (2)**
49:10;113:5
**controversy (4)**
122:13;123:14;
132:25;134:14
**conversation (7)**
59:18;73:4;93:17;
94:14,25;130:25;131:4
**conversations (4)**
22:22;58:6,16;95:14
**Coon (1)**
97:3
**copies (5)**
44:20;74:11;99:6;
144:4,20
**Copperfield (5)**
116:11,11,15;
117:17;152:8
**Copperhead (2)**
100:9;117:19
**copy (11)**
44:20;46:1;79:10;
90:4;99:3,5;140:24;

144:15;154:12,13;
155:2
**core (2)**
12:1;49:3
**corporate (1)**
28:11
**correctly (2)**
78:15;96:15
**correspondence (1)**
96:23
**correspondently (1)**
52:20
**corresponding (1)**
39:19
**cost (2)**
134:10;137:8
**costs (1)**
135:16
**COULTER (17)**
5:1,13;6:1,8;8:17;
36:10;37:17;42:4;
53:25;66:12,20;89:24;
90:19,24;98:7;121:18;
143:24
**counsel (11)**
5:12;10:16;15:23;
18:19,22;23:17;41:17,
23,24;124:24;129:20
**count (1)**
58:1
**counterpart (1)**
130:22
**counties (18)**
23:13;24:25;27:8,8;
36:23;37:4;126:1,3;
132:23;133:7;134:10,
21;136:7,9,10,12;
137:1,8
**country (5)**
22:15,18,18;64:2,4
**County (89)**
5:5;7:23,25;16:18,
22;23:10,13,22;24:6,
12,19,21,22;26:13,16,
19,20;27:1,2,4,18;
28:5,21;29:10,20;
31:23,25;33:2;34:5,5,
21;39:6;47:11,11;60:3,
20;61:21,22;62:17,18;
63:5;86:5;122:5,6,8,
13;123:4,13,16,19,20;
124:5,9,14,23;125:18,
23,24;126:5,7;131:10,
13,14,16,22,22,25;
132:12,17;134:14,14,
17;135:12,17;137:11;
139:13,13;142:1,9;
143:10,14;146:24;
147:4,14;148:10;
158:5,6,8,16
**County's (3)**
33:9;137:19;146:4
**couple (14)**

15:14;40:21;42:15;
46:3,4;51:7;54:17;
65:15;86:24;91:10;
101:11;105:25;110:7;
113:16
**course (8)**
6:24;27:17;46:15;
49:1;52:13;59:13;
122:11;128:8
**court (40)**
6:23;16:25;17:1,2;
34:1;61:21,22;62:18;
63:3,4,5;73:20,23;
78:20;81:15;84:5,10,
21;85:10;88:14,18;
90:14;98:2;99:4,16;
102:1,7;103:14;
104:15;117:11;
122:15;124:10;
125:18;126:5;134:17;
138:25;144:10;148:8;
155:7;156:15
**courtesy (1)**
129:14
**courthouse (1)**
10:7
**court's (2)**
54:19;109:12
**cover (4)**
52:15;106:23,23;
136:20
**covered (3)**
118:13;124:17;
132:23
**Craighead (2)**
146:24;147:4
**Crawford (31)**
23:10,12,22;24:6;
62:17;86:5;122:5,8,13;
123:3,13,15,19,20;
124:5,9,23;131:22;
132:12,17;135:12;
137:11,19;139:12;
142:1,9;143:10,14;
146:4;147:13;148:10
**create (4)**
27:13;112:10;133:2;
139:8
**created (4)**
26:24;27:12;60:9;
143:15
**creates (2)**
28:3,13
**creating (2)**
133:12;134:9
**creation (2)**
26:3;137:22
**Creek (1)**
52:17
**crime (2)**
93:25;95:5
**crimes (1)**
94:22

**criminal (16)**
74:6;75:10;76:5,11;
81:13;82:14;90:11,18;
91:2;93:14;97:17;
98:11,22;99:1,16;
100:5
**criminally (2)**
86:8;95:12
**criteria (28)**
42:7,17;43:17;
46:13;49:24,25;50:2,
19;58:20;59:16,22;
60:17,21,25;61:3,6,11;
62:4,10,23,23;63:11;
66:6;71:5;104:21;
119:9,15;139:22
**critique (1)**
151:14
**crotchety (1)**
109:22
**crusaders (1)**
56:15
**cup (1)**
100:13
**curiosities (1)**
106:20
**current (6)**
47:9;56:20;125:13;
126:18,18;147:15
**currently (7)**
8:17;26:5;154:12,
13,19,21;155:2
**customer (4)**
144:6,19;146:12,14
**customers (1)**
146:13
**cut (4)**
101:24;147:9,10,18
**cutoff (1)**
69:17

## D

**dare (1)**
95:13
**dark (1)**
63:24
**databases (1)**
12:14
**date (8)**
47:6,22;48:7,19;
95:25;96:5;127:22;
128:14
**dated (1)**
91:18
**dates (3)**
47:21;49:4;54:20
**daughter (1)**
102:17
**David (3)**
116:11;117:17;
130:21
**day (11)**

Fayetteville Public Library, et al v.
Crawford County, Arkansas, et al
CERTIFIED ORIGINAL/COPY TRANSCRIPT
Donald Nathan Coulter, Esq.
April 1, 2024

5:4;25:7;38:2;45:20;
53:7;116:5;127:20,24;
128:12;130:3;137:3
**days (3)**
17:25;45:20;102:4
**day-to-day (2)**
83:14;155:19
**deal (3)**
24:15;84:18;96:17
**dealing (3)**
25:12;140:9;152:12
**deals (3)**
48:4;95:5;115:4
**dealt (2)**
68:18;123:9
**death (1)**
115:6
**debate (3)**
19:13;85:2;120:15
**debt (1)**
16:14
**December (1)**
137:23
**decide (11)**
12:17;31:17;50:23;
61:14;63:23;82:5;
125:20;127:20;128:9,
18;144:20
**decided (4)**
18:17;83:2;144:16;
147:8
**decidedly (2)**
92:24;93:2
**deciding (1)**
24:14
**decision (10)**
57:12;60:18;69:13;
73:21;75:12;77:4;
85:10;126:6,19;137:9
**decision-making (1)**
148:1
**decisions (9)**
52:11;75:11;76:21;
118:21;125:21;
139:21;144:1;145:25;
156:20
**declaration (2)**
19:5;102:2
**declared (1)**
84:21
**decrease (1)**
131:12
**decreased (1)**
131:11
**decreasing (1)**
146:8
**decree (1)**
66:25
**decreed (1)**
117:11
**dedicated (1)**
115:24
**Dee (1)**

52:21
**deeded (2)**
27:24;39:6
**deemed (6)**
88:20;98:23;99:12;
108:9;119:10;141:10
**deems (1)**
124:10
**defective (1)**
74:25
**defects (1)**
119:25
**defend (2)**
133:25;136:10
**defendant (7)**
10:14;15:7,16;16:3;
17:12,14;23:13
**DEFENDANTS (6)**
5:2;23:7;59:14;
63:10;124:2;135:21
**defendant's (1)**
10:12
**defending (4)**
82:13;135:16;137:9,
13
**defense (4)**
10:9,10,16;135:16
**define (1)**
51:8
**defined (3)**
58:16;85:24;93:24
**defining (2)**
28:9;99:17
**definite (1)**
13:17
**definition (7)**
76:17;80:11;81:17,
17;84:6;86:19;94:9
**definitions (4)**
79:16,18;80:1,2
**defunding (2)**
146:6,7
**degree (2)**
87:20;126:16
**degrees (1)**
8:12
**Deidre (1)**
143:17
**delete (1)**
65:25
**Delight (2)**
7:24,25
**delivered (1)**
84:19
**demand (12)**
45:10;120:25;
143:25;144:3,6;145:1,
7,9,10;146:13,14,21
**Democrat-Gazette (1)**
94:19
**Democratic (1)**
33:8
**demographically (1)**

52:18
**Demon (3)**
100:9;117:18;152:8
**demonstration (1)**
116:7
**deny (1)**
123:21
**Department (5)**
32:21;33:14;44:9;
71:25;97:10
**depending (1)**
129:22
**depicted (1)**
110:21
**depiction (2)**
120:13;151:4
**depictions (7)**
102:11;108:12;
109:1;113:24;151:11,
11,21
**deposed (3)**
6:14,17;7:8
**DEPOSITION (16)**
5:1,13;7:10;17:24;
49:2;122:1;130:11;
131:24;132:1,4,8,12;
142:15;143:16;145:6;
159:6
**depositions (1)**
6:21
**deprives (1)**
118:25
**depth (1)**
108:21
**Deputy (1)**
97:7
**derive (1)**
11:11
**describe (3)**
58:17;109:16,18
**described (14)**
22:23;28:15,21;
31:15;36:22;45:10;
51:10;71:9;102:19;
105:5;115:9;119:6;
126:14;139:12
**describing (1)**
120:5
**descriptions (2)**
117:5;135:2
**descriptive (1)**
116:25
**designated (4)**
5:14;9:2,13;123:6
**designed (4)**
23:24;106:19;107:1;
109:23
**desk (2)**
65:24;128:6
**despite (1)**
50:6
**detail (4)**
46:2;65:12,20;115:9

**detailed (1)**
49:23
**details (4)**
64:25;67:11;124:25;
125:6
**determination (10)**
18:24;19:3;77:18;
84:12,13;87:10,16;
88:5;104:8;109:13
**determinations (2)**
52:1;82:8
**determine (2)**
58:20;90:16
**determined (3)**
51:12;144:11,12
**determining (5)**
24:19;51:9;76:4;
90:20;144:4
**developing (1)**
117:19
**development (13)**
44:9,23;45:12;52:3,
5,24;53:10;65:10;
76:21;82:4;144:23;
154:7;155:17
**device (1)**
80:16
**devices (1)**
79:7
**Dickens (6)**
116:10,15;117:1,7,9,
12
**difference (6)**
26:7;43:17;80:10;
81:21;82:15;155:13
**different (23)**
12:17;20:10;25:23;
33:18;39:11;43:9;
52:15,20;61:13,14,22;
63:12;67:3;81:10;
89:2;96:25;112:4,6;
116:18;139:23;
149:17;150:19;151:24
**differently (1)**
112:4
**difficult (2)**
19:7;90:23
**difficulty (1)**
46:9
**digital (4)**
132:9;154:13,17,24
**diminish (1)**
114:19
**dinosaurs (1)**
51:23
**direction (2)**
58:18;61:13
**directly (1)**
27:15
**Director (18)**
8:20,21;9:23;10:18;
11:2,14;14:19;25:7;
34:3;36:11;57:4;

66:25;86:4;97:8;
99:21;143:13;146:12;
154:8
**directors (1)**
130:18
**disagree (1)**
31:4
**disagreement (1)**
61:25
**Disclaimer (1)**
77:21
**discounted (1)**
78:13
**discovery (1)**
37:20
**discrepancy (1)**
59:13
**discretion (2)**
53:8,11
**discrimination (1)**
31:7
**discussed (8)**
37:8,21;50:15;56:4;
68:19;117:20;118:14;
128:23
**discussing (5)**
72:5;83:17;115:24;
132:12;144:2
**discussion (8)**
21:15;40:19;68:12;
69:19,20;85:19;97:25;
154:1
**discussions (2)**
130:17;148:4
**display (2)**
146:25;147:7
**displayed (3)**
102:22;107:22;
114:4
**displeased (1)**
60:1
**dispute (6)**
7:16;62:14;113:9;
122:21;137:22;141:17
**disputes (2)**
10:13;133:6
**disseminating (2)**
77:2;88:10
**dissolved (2)**
55:12;125:11
**distinction (2)**
9:20;83:24
**distinctions (1)**
27:17
**distressed (1)**
19:16
**distributing (2)**
77:2;88:9
**distribution (2)**
20:18;92:21
**districts (1)**
23:10
**disturbed (1)**

17:7
**diverse (2)**
47:17;157:5
**doctrine (3)**
31:12,16;33:3
**document (5)**
37:18;42:4;78:1;
91:15;132:10
**documents (1)**
55:24
**doll (1)**
43:10
**domestic (3)**
113:19;151:25;
153:5
**DONALD (3)**
5:1,13;6:1
**done (8)**
12:5;13:4;23:4;
51:20;111:22,23;
118:8,11
**door (4)**
7:25;77:8;85:21;
142:3
**doorstep (1)**
64:3
**do-over (1)**
139:22
**Dorothy (1)**
113:14
**doublecheck (1)**
136:17
**doubt (1)**
112:23
**down (11)**
11:7;33:7;47:12;
69:12;73:8;79:3;
80:15;85:8;116:13;
118:12;131:10
**draft (1)**
131:7
**draw (2)**
69:19;129:24
**drawing (1)**
24:12
**drawn (5)**
70:11;71:14,17;
72:6;151:10
**Drew (1)**
126:8
**drive (1)**
58:25
**driven (1)**
44:11
**drives (1)**
143:25
**driving (1)**
72:13
**dropping (1)**
68:23
**drove (1)**
61:23
**Duces (3)**

89:20;98:8;149:10
**due (1)**
16:19
**during (5)**
12:11;15:5;58:8;
120:14;131:24
**dust (1)**
50:21
**duties (2)**
11:2,3
**dysfunction (2)**
153:5,5
**dysfunctional (1)**
114:1
**dysphoria (1)**
135:2

**E**

**eager (1)**
25:15
**earlier (23)**
6:10;28:22;32:13;
33:2;36:22;38:25;
39:15;41:1;56:5;74:5,
18;83:1;90:20;95:22;
96:4;104:4,21;119:6;
120:6;127:12;131:24;
142:25;143:24
**earliest (1)**
47:6
**early (6)**
17:3,10;65:22;93:9;
116:17;137:24
**easier (1)**
110:9
**easy (1)**
153:2
**eclipsing (1)**
153:9
**ed (2)**
106:12;110:12
**edition (3)**
105:8;108:25;155:2
**editions (1)**
154:20
**Education (10)**
32:21;33:14;97:10;
100:12;105:6,20,23,
24;107:1;154:2
**educator (1)**
156:6
**effect (14)**
17:3;19:4;48:2;
57:25;60:9;93:16;
127:3;128:15;132:2;
138:17;141:6;150:18;
151:16,18
**effective (1)**
54:20
**effort (7)**
13:24;19:17;24:14;
55:3;96:19;122:16;

146:7
**efforts (1)**
157:6
**eight (2)**
8:22;153:8
**eighteen-year-old (1)**
151:6
**eighteen-year-olds (1)**
152:1
**eight-year-old (2)**
59:2;151:9
**eight-year-olds (2)**
69:23;153:14
**Eisele (3)**
81:15;84:9;88:14
**either (8)**
15:6;58:1;89:9;
104:2,12;118:23;
140:10;154:25
**elect (1)**
61:21
**elected (16)**
60:6,9,18;63:22;
118:21;119:5,14,15;
124:9;125:21;134:21;
135:8;138:25;139:24;
148:1,7
**elections (1)**
14:3,10,11
**elective (1)**
24:14
**elementary (2)**
151:1;156:6
**eleven (4)**
68:9,10;69:14;70:5
**eleven-year-old (1)**
69:17
**eleven-year-olds (1)**
71:12
**eligible (1)**
66:23
**eliminate (1)**
41:7
**else (11)**
39:18;50:10;51:2;
73:18;77:6;115:17;
122:10;124:7,12;
156:10;158:24
**elsewhere (1)**
94:20
**email (28)**
48:16;56:3,17;
57:20;65:15,16,17,19,
20,22,24,25;91:17,22;
92:1,18;95:17,24,25;
96:2,6,7;97:4;101:9,
16,17;102:3;127:12
**emailing (2)**
119:20;127:16
**emails (2)**
91:10;100:18
**Emberley (2)**
106:13;155:5

**empathetic (1)**
114:14
**employed (2)**
8:17;97:7
**employee (1)**
34:23
**employees (9)**
19:7;39:4;41:14,20;
90:11,17;91:2;98:10,
22
**employment (2)**
41:15,17
**employment-type (1)**
136:21
**enable (2)**
81:4;136:23
**enabled (1)**
25:16
**enables (1)**
147:22
**enabling (2)**
119:20;147:25
**enacted (10)**
21:24;24:8;25:8;
76:22;77:13;84:18;
85:3;94:17;128:14;
137:4
**enactment (2)**
54:15,20
**encounter (1)**
41:22
**encountered (1)**
153:7
**encourage (1)**
72:14
**encouraged (2)**
21:9;43:13
**end (11)**
39:11;53:7,17,18;
60:5,13;73:25;95:2;
124:19;137:7;144:25
**ended (1)**
46:14
**endorses (1)**
114:13
**ends (2)**
71:15;113:9
**enforce (3)**
29:18;30:13;124:19
**enforcement (1)**
125:4
**enforcing (2)**
124:20;125:13
**engage (4)**
11:15;13:5;30:18;
69:25
**engaged (11)**
11:24;12:4;13:8;
23:23;33:25;34:8;
92:21,22;110:12;
122:15;124:25
**engenders (1)**
118:20

**English (1)**
109:23
**enjoin (2)**
124:4;127:8
**enjoined (5)**
55:10,17;125:13;
126:17,17
**enlightened (1)**
65:3
**enormous (3)**
63:25;75:8;133:12
**enough (12)**
7:7;13:20;14:22;
19:21;40:13;41:10;
69:4,24;70:20;71:18;
83:6;95:3
**ensure (1)**
71:2
**entailed (2)**
47:25;54:11
**enter (2)**
12:21;62:9
**entered (1)**
153:20
**entire (5)**
79:17;126:7;148:7;
157:5;158:14
**entities (11)**
27:4,12,16,23;28:5,
14;37:1;38:3;124:22;
158:3,9
**entitled (4)**
67:16;80:21,22;81:6
**entitles (1)**
66:24
**entity (13)**
28:25;29:7,25;30:1,
12;32:14,15,19;34:20,
24;98:18;124:15;
125:19
**environment (1)**
101:19
**envision (1)**
23:4
**equipped (1)**
80:16
**E-Rate (4)**
78:14,22;80:25;
82:23
**erected (1)**
145:21
**especially (1)**
40:11
**ESQ (3)**
5:2,13;6:1
**essay (1)**
94:19
**essence (6)**
19:2;44:13;60:15;
136:25;147:8;158:2
**essentially (2)**
10:11;11:3;23:23;
26:18,20;27:3,10,22;

28:3;43:24;47:15;
60:5;64:24;67:13;
69:13;73:13;74:21;
77:2;100:12;109:6;
119:5;133:22
**established (1)**
26:11
**estate (2)**
27:24;32:25
**esteem (1)**
112:14
**estimate (1)**
45:15
**et (6)**
32:22;43:10;44:4;
63:7;100:19;119:24
**ether (1)**
81:8
**ethical (1)**
71:8
**Evaluation (1)**
45:4
**even (9)**
13:23;20:20;32:6;
33:1;83:8,24;94:1,25;
95:8
**event (3)**
55:12;99:14;100:4
**events (1)**
30:23
**everybody (6)**
31:22;70:12;84:23;
88:15;122:10;141:12
**everyone (3)**
87:7,8;156:23
**everywhere (1)**
81:25
**evidence (2)**
86:18;137:10
**evidently (1)**
96:5
**evolving (1)**
112:12
**exact (2)**
127:22;154:22
**exactly (8)**
59:11;67:9;88:8;
114:23;130:21;
132:21;133:14;138:15
**EXAMINATION (4)**
6:6;121:16;149:5;
155:10
**example (12)**
12:13;30:25;31:17,
22;32:21;38:7;52:22;
55:19;58:22;125:25;
147:21;150:16
**exceedingly (1)**
59:25
**excellent (1)**
115:3
**except (2)**
113:4;126:18

**exception (1)**
8:2
**exceptional (1)**
50:24
**exceptions (1)**
51:14
**exchange (1)**
11:10
**excite (9)**
102:25;106:1,24;
108:15,17;110:21;
117:24;149:15,19
**excitement (6)**
102:12;107:18;
108:13;110:16;114:4;
149:20
**exciting (2)**
103:10;150:6
**exclusion (1)**
93:19
**excoriated (1)**
140:11
**excuse (1)**
64:23
**executing (2)**
65:12;67:21
**Executive (10)**
8:20,21;9:23;10:18;
11:2,14;32:21;36:11,
17;57:4
**exempt (2)**
94:23,23
**exemption (4)**
93:13,19;95:11;
97:17
**exempts (1)**
95:12
**exercise (3)**
53:14;93:21;94:5
**exercising (1)**
32:6
**Exhibit (34)**
35:24,25;37:9,10,18;
42:2,3;43:23;53:24;
66:11,12,14,20,20;
67:1,5,24;72:20,20;
78:4,5;79:11,12;91:12,
13;95:15,25;96:4,7;
97:22;127:11;153:18,
24;154:4
**exist (1)**
96:13
**existed (1)**
63:16
**existing (1)**
42:23
**exists (2)**
72:23;109:11
**expect (3)**
30:3;100:14;105:22
**expects (1)**
117:3
**expenditures (1)**

40:21
**expense (2)**
40:22;133:12
**expenses (2)**
39:8;41:3
**experience (5)**
73:20;141:24;151:8;
152:12;155:23
**experiences (1)**
153:7
**expert (2)**
155:16;156:8
**explain (2)**
10:17;138:18
**explanation (2)**
40:13;88:7
**explicit (1)**
91:1
**explicitly (1)**
36:24
**explore (2)**
129:19;151:6
**exploring (3)**
130:23;149:22,22
**expose (2)**
91:1;153:13
**exposed (1)**
81:19
**exposure (3)**
75:10;99:16;100:5
**expressed (1)**
43:6;47:16;133:9
**extension (2)**
16:13;34:14
**extent (5)**
13:16;53:15;76:20,
22;112:15
**extremely (3)**
99:8;134:15,16

**F**

**F7 (3)**
79:15,20,21
**face (1)**
133:10
**Facebook (1)**
94:16
**facilitate (2)**
23:24;145:10
**facilitating (1)**
129:25
**facing (1)**
44:25
**fact (17)**
22:25;38:1;58:21;
59:19,23;61:10,14;
83:19;84:13;91:21;
92:24;94:14;105:7;
132:12,17;133:11;
138:4
**factor (3)**
150:10;152:17,18

**factors (1)**
150:9
**facts (2)**
128:13;137:20
**factual (1)**
86:14
**failed (1)**
127:25;152:15
**Fair (8)**
7:7;13:20;14:22;
19:21;41:10;60:23;
71:18;102:5
**fairly (4)**
26:15;27:6;64:4;
132:8
**fall (5)**
46:12,20;94:9;
112:5;138:8
**falls (1)**
115:6
**familiar (2)**
77:21;91:14
**families (1)**
145:8
**family (3)**
100:21;101:2;114:1
**fantasy (1)**
100:13
**far (12)**
7:24;21:10;23:19;
60:24;95:4,4;106:2;
117:16;134:12;141:8;
144:1,4
**fashion (2)**
132:9;155:22
**fast (2)**
6:19;137:3
**fastidiously (1)**
28:24
**Faulkner (1)**
5:5
**fault (1)**
36:2
**fauna (1)**
43:10
**favor (2)**
125:8;139:23
**Fayetteville (2)**
130:17;131:5
**fear (1)**
109:18
**February (4)**
22:7;96:4;127:24;
129:5
**Federal (11)**
5:14;10:3;78:20;
80:24;81:2,5,22;82:19,
20;130:22;134:12
**fee (2)**
7:17;57:9
**feedback (2)**
144:19;145:4
**feel (3)**

33:17;73:6;132:19
**feels (1)**
133:15
**fees (3)**
66:23;132:13;
135:21
**female (2)**
106:18;109:2
**few (4)**
37:20,22;67:23;
149:7
**fewer (2)**
109:7;150:4
**fifteen-year-old (1)**
152:2
**fifth (1)**
69:22
**Fifty (2)**
81:11;83:10
**fights (1)**
64:3
**figure (4)**
45:20;112:20;
139:14;140:14
**figuring (1)**
124:25
**file (3)**
56:15,22;129:18
**filed (7)**
12:6,11;15:10;18:6;
56:8;127:20;135:12
**filing (3)**
56:19;130:9,24
**filter (1)**
78:14
**final (1)**
156:12
**finally (1)**
96:18
**finances (1)**
38:9
**financial (2)**
11:5;12:19
**find (16)**
23:3;31:24;39:13;
52:6;69:8;71:4;79:25;
88:1;90:25;108:18;
113:7;117:6;138:23;
141:13;150:12;151:4
**finding (1)**
138:23
**fine (2)**
63:11;134:5
**fines (1)**
66:24
**finish (1)**
6:25
**finished (1)**
46:6
**finite (1)**
50:10
**Firm (5)**
5:6;10:9;25:14;

92:22;137:13

**firmly (1)**
135:6

**first (38)**
6:14;15:10,11;
17:23;29:24;30:2,5,8,
14,19;32:11,24;33:6,
12;36:11,19;38:2;
42:16;43:18,21;47:4,
21;80:13;91:13;97:24;
98:12;99:4,18;101:23;
105:12;113:13;135:16,
19;137:8;144:23;
148:20;150:9;158:11

**fiscally (1)**
35:3

**fit (1)**
36:15

**five (11)**
44:18,22;50:21;
57:14;87:12;89:24;
90:9;98:9,20;126:1;
150:19

**five-year-old (19)**
74:24;76:7,9;77:18;
81:14,18;83:9;86:3;
87:6;88:20;99:11;
107:15;108:7,8,9;
113:22,23;118:5;141:4

**five-year-olds (5)**
75:2;77:15;83:6;
87:18;109:14

**fix (1)**
147:14

**Flames (2)**
104:16;144:10

**Fletcher (1)**
52:23

**flip (1)**
79:15

**fluctuating (1)**
40:12

**fluid (1)**
112:14

**focus (6)**
13:21;48:11;63:7;
127:9;149:8,24

**focused (1)**
93:20

**FOIA (3)**
92:12,14,15

**folks (1)**
127:16

**follow (5)**
33:5;37:23;116:14;
148:24;157:14

**followed (2)**
16:19;84:13

**following (1)**
121:1

**follows (1)**
6:5

**follow-up (3)**

65:16;148:18;149:8

**foot (1)**
132:18

**football (1)**
115:7

**force (1)**
74:3

**forced (2)**
55:4;69:7

**forces (1)**
92:20

**Foreplay (1)**
105:15

**forerunner (1)**
111:19

**forged (1)**
39:1

**forget (1)**
25:25

**forgot (2)**
53:8;153:22

**form (7)**
28:14;38:9;64:25;
65:10;94:18;110:13;
138:25

**formal (1)**
67:12

**formally (3)**
24:7;65:5;145:20

**format (3)**
126:18;154:17,18

**former (1)**
21:9

**for-profit (1)**
112:18

**forth (7)**
5:9;42:6;67:11;
105:17;119:9;140:16,
19

**forum (6)**
22:10;31:11,16;
32:3,7;33:5

**forward (2)**
129:19;137:3

**foster (2)**
115:6;152:14

**found (3)**
49:4;68:6;90:14

**four (2)**
44:22;65:8

**fourteen-year-old (1)**
59:2

**fourth (1)**
69:22

**framework (2)**
27:6;81:3

**fraught (1)**
75:15

**freedom (4)**
12:2;20:10;157:2,3

**freight (2)**
133:16;140:11

**friends (6)**

22:20;45:25;100:21;
101:2;107:12;113:6

**frightening (2)**
82:1;84:24

**front (4)**
14:12;72:1;102:16;
147:8

**full (3)**
74:3;83:13;133:5

**fun (1)**
159:3

**function (1)**
70:18

**fund (2)**
16:14;136:9

**fundamental (4)**
76:14;82:15;83:4;
114:12

**fundamentally (1)**
89:2

**funded (6)**
26:10;28:20;34:7,
24;80:23;81:22

**funding (10)**
12:1,13;14:13;
27:15;37:8,21;40:3;
101:24;147:10;156:21

**funds (3)**
28:22;38:10;50:14

**Fuqua (1)**
5:6

**Further (2)**
68:5;155:10

**furthermore (1)**
82:23

**Fury (3)**
99:4;102:8;155:7

**future (1)**
14:25

## G

**Gate (1)**
53:16

**gave (1)**
133:17

**Gender (6)**
58:23;77:9;106:14;
123:9;135:2;146:19

**general (19)**
13:24;14:10;22:8;
23:18,22;49:8;62:2,9;
88:3;96:14;97:25;
118:16;122:12;123:6;
129:15;130:2;135:14;
137:2;138:10

**generalities (1)**
71:22

**generally (13)**
11:15;19:13;23:15;
26:2;30:22;46:19;
48:1;70:20;74:17;
77:23;91:16;122:21;

157:25

**General's (1)**
6:12

**generated (3)**
38:5,16;154:7

**genre (3)**
44:5;106:9;109:20

**gets (3)**
51:14;79:6;128:23

**Ginsberg (1)**
93:5

**Girl (1)**
154:23

**given (9)**
7:10;16:14;22:7;
33:1;70:24;92:14,14;
97:3;117:15

**gives (1)**
152:7

**glass (1)**
52:6

**glove (1)**
55:22

**goes (12)**
53:19;60:18;65:11;
73:2;77:11;113:1;
120:13;125:20;
138:20;141:6;147:18;
150:22

**Golden (1)**
53:16

**Good (13)**
6:8,9;11:19,19;35:4;
44:18;56:21;73:16,17;
109:19;114:18;
121:18;157:12

**Gotcha (2)**
126:21;132:11

**govern (2)**
35:1;61:3

**governed (4)**
32:17;50:12;59:21;
124:17

**government (28)**
27:12,19,20;28:3,16,
20,22;29:4,7;30:1;
32:12,15,19,22;33:2,
13,25;34:8,18,20,23;
35:10,12;80:24;81:3;
82:19,21;157:7

**governmental (3)**
28:25;30:11,13

**governments (2)**
34:21;158:8

**governor (3)**
100:3;128:7,12

**governor's (1)**
128:6

**governs (1)**
80:13

**grader (2)**
69:22,22

**granted (1)**

129:11

**graphic (22)**
100:11;108:25;
109:3,8,8,10,16;110:2,
3,23;111:1,2,4,5,8,11,
16,20,24;150:16;
151:12;155:6

**graphing (1)**
105:7

**grasp (2)**
109:19;153:4

**gravity (1)**
70:4

**great (2)**
96:17;112:8

**greater (1)**
117:15

**greatest (1)**
105:17

**Green (1)**
107:7

**Grey (2)**
81:11;83:10

**Griffin (1)**
130:2

**grocery (1)**
20:5

**groom (1)**
119:21

**groomers (1)**
100:19

**ground (1)**
6:18

**grounds (1)**
18:14

**group (3)**
24:21;52:18;56:14

**groups (2)**
64:2;98:17

**Growing (1)**
106:14

**Grzymala (3)**
143:17,21;146:12

**guardian (1)**
73:1

**guess (21)**
9:3;23:25;26:8;
29:14;32:4;36:18;
38:2;40:8;47:6;53:4;
66:25;71:16;95:8,24;
111:19;116:1;133:13;
140:2;142:5;146:22;
149:19

**guidance (5)**
19:2,5;59:4,7;
157:18

**guideline (2)**
60:16;145:20

**guidelines (3)**
116:22;145:18;
157:15

**gun (1)**
17:5

**guys (1)**
85:14

**H**

**half (1)**
147:1
**halls (1)**
12:21
**hamper (1)**
14:12
**hand (1)**
55:21
**handed (5)**
37:17;42:4;53:25;
66:12;98:16
**handful (2)**
12:12;20:15
**Handmaid's (5)**
108:24;111:19;
150:16;151:12;155:5
**hands (1)**
29:10
**happen (8)**
25:3,4;70:3;120:17;
121:2;129:21;137:5;
138:15
**happened (5)**
62:17;131:14;
138:14;146:24;147:19
**happening (3)**
56:5;62:17;94:20
**happens (2)**
55:3;139:19
**happy (3)**
40:14;82:3;142:7
**haranguing (1)**
63:5
**harbor (1)**
83:8
**hard (4)**
23:2;115:19;117:6;
142:3
**hardball (1)**
147:22
**harmed (1)**
77:19
**harmful (35)**
14:25;20:17;75:21;
76:17;77:3;78:14;
79:2;80:2,8;81:7,17;
83:12;84:7,22;86:9;
87:6,18;88:10,15,20;
90:21;92:21;94:9;
99:10,17;103:14;
107:15;108:10;
109:13;113:22;117:11,
13;150:7;152:5,18
**Harris (1)**
106:13;155:5
**Harvard (3)**
8:9,10,11
**hashed (1)**

70:11
**Hasler (1)**
105:3
**hat (1)**
69:20
**hazard (1)**
116:1
**head (5)**
48:6,25;57:16;97:9;
138:9
**headache (2)**
62:20;132:2
**headed (1)**
128:6
**header (1)**
93:12
**heading (1)**
95:14
**headlines (1)**
116:4
**heads-up (1)**
36:3
**Health (1)**
106:15
**hear (4)**
25:2;44:10;129:16;
157:24
**heard (10)**
19:14,15,22;20:8,12;
58:24;63:19;88:7;
142:16,18
**hearing (5)**
56:6;59:20;97:14;
120:8;132:21
**hearings (1)**
24:19
**heartbreaking (5)**
72:9;113:18,24,25;
114:8
**Heather (1)**
154:23
**heed (1)**
137:4
**held (4)**
31:10;99:10;112:13;
118:4
**help (7)**
9:18,21;19:2;30:16,
20;35:20;153:13
**heralded (1)**
62:13
**heralding (2)**
94:18;114:10
**hereinafter (1)**
5:9
**hereinbefore (1)**
6:2
**here's (4)**
25:8,10;81:3;84:3
**hereto (10)**
35:25;37:10;42:3;
53:24;66:11;78:5;
79:12;91:12;95:15;

153:24
**heretofore (1)**
64:3
**hey (1)**
77:8
**high (3)**
8:6;86:6;144:3
**highlighted (1)**
57:20
**highly-acclaimed (1)**
113:19
**high-profile (2)**
24:18;120:15
**hill (1)**
46:1
**hire (2)**
41:5;83:6
**history (6)**
10:20;15:3;17:24;
26:2,3;47:5
**hit (2)**
6:19;46:3
**hitting (1)**
74:2
**hold (5)**
14:4;44:14,15;51:1;
92:3
**holding (1)**
133:13
**holds (2)**
114:7;157:25
**home (1)**
82:16
**honor (1)**
129:2
**hook (1)**
132:13
**Hopefully (2)**
6:12;73:25
**horror (1)**
114:17
**hour (1)**
129:1
**hours (1)**
128:2
**house (9)**
13:12;14:5;56:11;
127:23;132:20;
133:17;134:8;136:3;
146:17
**housed (2)**
103:19;148:13
**Howard (1)**
7:23
**huh-uhs (1)**
6:23
**hundreds (1)**
12:11
**hurt (1)**
70:2
**hybrid (1)**
28:2
**hyperlink (1)**

78:9
**hypothetical (9)**
32:5,10;33:8;63:13,
15,19;64:6;141:8;
151:23
**hypothetically (1)**
34:10

**I**

**idea (2)**
102:20;142:13
**identified (6)**
21:1;45:11;47:20;
95:22;97:3;123:17
**identify (2)**
54:18;98:12
**identifying (2)**
143:12;154:4
**illustrated (1)**
27:19
**illustration (1)**
30:21
**illustrations (2)**
106:17;109:6
**image (2)**
105:8,8
**images (3)**
105:21;110:11,12
**imagine (5)**
11:21;46:21,24;
114:15;150:25
**imagining (1)**
152:24
**immature (1)**
150:3
**impact (2)**
13:8;97:4
**impaired (1)**
119:4
**implement (4)**
48:13;125:9;126:10,
11
**implementation (6)**
54:13;55:15;85:4;
86:12,23;87:4
**implemented (2)**
87:13;127:5
**implementing (5)**
76:16;86:15;124:5;
126:22;137:19
**implicated (1)**
54:15
**implication (2)**
12:7,12
**implications (4)**
13:14;18:20;41:22;
93:23
**implicit (1)**
151:25
**implicitly (1)**
77:5
**impose (2)**

30:13;63:3
**impression (2)**
23:18,22
**improve (1)**
38:11
**improvement (1)**
38:10
**improvements (2)**
17:18;54:22
**inappropriate (5)**
58:15,15;120:21;
124:11;141:13
**inc (2)**
38:19;40:9
**incentivize (1)**
72:14
**incest (2)**
114:2;151:25
**incidences (1)**
114:20
**include (1)**
60:21
**included (2)**
22:17,18
**includes (2)**
101:20;155:3
**including (4)**
14:4;60:19;96:1;
100:24
**income (1)**
37:19
**Incorporation (1)**
36:12
**increase (1)**
39:19
**independently (1)**
55:17
**indicate (4)**
44:1;104:10;111:9;
144:18
**indicated (12)**
19:16;21:22;22:19;
38:24;46:16;60:8;
104:4;144:14;154:21,
24;155:24;157:14
**indicating (3)**
42:25;44:13;91:24
**indication (2)**
43:22;74:14
**inditement (1)**
112:11
**individual (2)**
52:25;85:15
**individuality (1)**
157:3
**individually (1)**
130:16
**individuals (2)**
158:7,18
**Industry (4)**
44:18;45:11;104:5;
143:8
**inevitable (1)**

135:7

**inevitably (1)**
134:19

**inexplicably (1)**
76:1

**inference (4)**
60:23;101:19,21;
102:5

**infirmities (1)**
22:13

**infirmity (1)**
102:2

**influence (1)**
147:12

**influenced (2)**
61:15;134:22

**inform (1)**
75:12

**information (6)**
42:25;68:5;97:2;
104:10;120:9;154:8

**infringing (1)**
88:24

**infuse (1)**
75:12

**in-house (1)**
41:24

**initial (2)**
129:9;138:7

**Initially (1)**
10:8

**initiated (4)**
15:13,15;100:2;
147:3

**injunction (5)**
48:22;55:12;74:16;
125:11,13

**injury (1)**
115:7

**inordinate (1)**
22:20

**input (1)**
69:10

**inquire (1)**
99:24

**inquired (1)**
98:18

**inside (1)**
125:16

**insight (1)**
22:16

**inspiration (1)**
101:22

**inspire (1)**
132:25

**inspired (1)**
101:18

**installed (1)**
79:6

**instance (4)**
31:15;135:16;137:8;
158:11

**instances (13)**

27:24,25;38:21;
58:3;61:7;73:5;82:12;
94:19;100:18;108:18;
110:6;117:2;150:2

**instead (1)**
18:3

**instituted (1)**
145:19

**institution (2)**
34:6;157:10

**insurance (2)**
10:9,12

**intellectual (1)**
157:2

**intend (1)**
120:3

**intended (1)**
153:12

**intent (14)**
102:25;103:3,4,11;
108:14,16;110:21;
112:10;114:7;117:24;
118:1;133:9;149:15;
150:1

**intercourse (3)**
109:2;110:13;
151:11

**interest (14)**
10:24,25;17:15;
22:4;43:2,4,6;45:19;
50:15;148:7;150:14;
151:24;152:10;157:19

**interested (3)**
13:3;110:1;151:10

**interesting (1)**
22:3

**interestingly (1)**
95:3

**interests (8)**
42:20;43:1,9,16;
47:19;52:20;149:21;
152:9

**Intergovernmental (1)**
38:7

**interlocal (1)**
28:2

**interlude (1)**
96:23

**Internet (18)**
77:21;78:11,13,18;
79:19;80:14,23;81:4,8,
23;82:5,17;83:22;85:5,
13;86:12;87:5,6

**interpret (1)**
90:23

**interpretation (5)**
33:6;61:25;62:1;
63:17;115:17

**interpreted (4)**
16:16;86:19;93:5;
112:3

**interval (1)**
31:24

**interview (1)**
94:15

**intimately (1)**
15:21

**into (35)**
6:16;13:20;16:1;
18:3;19:3;30:21;
32:10;35:17,18;38:12;
42:1;48:2;49:14;55:7;
56:19;57:25;59:10;
65:11,20;66:16;76:4;
85:7,11;86:18;89:11;
91:9;97:1;127:3,4;
133:14;136:10;
138:17;141:6,23;
144:13

**intricacies (1)**
23:16

**intrigued (1)**
151:10

**introduced (2)**
127:18;136:2

**introduction (2)**
93:7;105:3

**inventory (1)**
51:5

**invited (1)**
75:7

**involved (11)**
10:13,19;15:21,23,
25;16:6;41:2,5;68:13;
125:5;156:3

**involving (1)**
110:3

**isolated (1)**
122:16

**isolating (1)**
138:22

**issue (14)**
12:16;15:24;20:19;
37:8;57:20;59:14,17;
62:5;69:1;113:9;
116:20;119:19;
125:19;129:8

**issued (2)**
10:2;22:24

**issues (13)**
11:13,21;12:1,1,3,
13;14:12;41:15;58:5;
116:4;138:9,13;157:3

**issuing (1)**
67:2

**item (4)**
17:23;44:17;47:12;
57:13

**itemization (2)**
49:2;154:15

**items (11)**
35:8;46:17,18;
60:20;61:9;90:9;94:8;
98:9,20;128:22;154:19

**iteration (4)**
24:6;49:6;96:17;

126:19

**J**

**Jacksonville (7)**
27:1,5;38:25;39:2,5,
9;158:6

**jail (3)**
75:18;83:15;141:2

**January (11)**
8:22;22:6;91:18,24;
96:4,6,8;127:15,19;
129:5;137:24

**Jennifer (4)**
48:15;56:17;97:6;
154:9

**job (10)**
11:1,13;19:10;22:2;
43:25;44:5;50:22;
82:6;97:8;112:24

**jobs (1)**
75:18

**job's (1)**
133:1

**John (6)**
41:8;91:17;107:7;
130:4,7;148:21

**Johnson (1)**
130:21

**join (1)**
27:9

**joined (1)**
26:16

**joining (1)**
130:19

**Jonesboro (6)**
60:3;122:6;146:24;
147:4,7,19

**Journal (1)**
44:3

**JPs (1)**
147:14

**judge (25)**
10:3;60:20,24;
62:19;63:10;81:15;
83:5,8;84:9,12;88:14;
125:7;131:25;132:4,
11,16;133:13;134:12;
135:18;137:5;139:12;
142:15;145:5;150:18;
158:16

**judgment (4)**
62:10;70:19;71:11,
19

**judicial (7)**
18:24;19:4,5;22:10;
23:10;48:21;102:1

**judiciary (7)**
13:12;56:11;127:23,
23;133:18;134:8;
146:17

**judiciary's (1)**
132:20

**July (6)**
48:22;54:19,20;
55:14;60:8;127:2

**jump (1)**
37:13

**jumped (1)**
17:5

**June (4)**
18:6;68:15;120:24;
146:25

**junior (1)**
86:6

**jurisdiction (2)**
16:12;64:1

**jurisdictions (1)**
84:8

**Justice (2)**
85:10;139:1

**K**

**keenly (1)**
22:3

**keep (16)**
11:8,25;22:2;43:25;
45:1;77:14;80:17;
81:5;83:6,15;117:8;
119:19,20;131:3;
135:9;140:7

**keeps (1)**
142:14

**Keith (6)**
62:19;132:16;
133:13;135:18;137:6;
139:12

**Keith's (5)**
131:25;132:4,11;
142:15;145:5

**kept (5)**
19:13;39:1;58:4;
128:19,22

**key (1)**
147:9

**kick (1)**
147:12

**kids (6)**
68:23;70:5;72:10,
17,18;156:1

**kind (25)**
23:23;24:25;29:25;
32:10;35:2;40:11;
65:11;74:2,3;79:13;
114:20;122:4,5;
127:11;130:12;131:9;
134:9;143:25;144:2;
145:4,12;146:3,10,10;
147:22

**kinds (3)**
28:14;58:5;119:16

**Kingsolver (8)**
77:10;115:2;117:1,
6,9,13,14,16

**Kingsolver's (1)**

141:3
**knew (2)**
22:7;128:7
**knock (1)**
85:21
**knowing (3)**
106:22;121:25;
145:17
**knowledge (4)**
43:15;78:17;105:25;
107:17
**known (1)**
129:15
**knows (1)**
83:25
**Kroger (1)**
20:1

# L

**labeled (4)**
37:18;49:19;91:13;
141:21
**labeling (1)**
104:6
**lacks (1)**
152:19
**language (6)**
28:11;59:5;66:5;
84:21;98:20;104:22
**large (4)**
46:10;70:4;80:24
**largely (1)**
57:5;81:22
**larger (1)**
39:16
**largest (1)**
126:4
**last (22)**
15:8;17:25;18:6;
19:4;43:12;50:21;
55:16;78:10;79:15,22;
93:1;94:15;96:9;
97:22;113:4;115:1;
120:24;132:5;142:10;
147:5;148:21;153:17
**late (7)**
20:5;47:22;65:22;
93:9;127:24;137:24;
150:22
**Later (3)**
10:11;20:4;25:22;
26:13;147:1
**latest (2)**
38:14;47:22
**laundry (1)**
140:3
**Laura (1)**
154:22
**Law (27)**
5:6,6;8:5,10;18:25;
24:7;30:4;74:21;77:1;
80:22;84:17,18,20;

85:2,24;86:10;87:12,
21;89:5;94:25;95:11;
126:25;127:8;133:4;
134:1;137:5;152:5
**laws (3)**
18:11;28:23;35:1
**lawsuit (20)**
9:8,14;13:6;15:10,
12;16:10;123:1,18;
127:7,20,21;129:18;
130:9,15,18,19,24;
135:12,13;137:15
**lawsuits (6)**
10:8;16:4,7,8;41:5;
133:20
**lawyer (11)**
10:7,11,12;22:12,19;
23:18;24:4;74:18;
84:4;85:14;131:3
**lawyers (19)**
18:24;19:6;22:18;
23:19;33:16,25;41:6,7,
8,18;76:20;128:18;
129:12,25;130:1;
133:2;135:20;136:10;
137:14
**layer (1)**
90:22
**layperson (1)**
24:3
**lead (4)**
56:11;94:15;131:6;
134:13
**leaders (2)**
22:17;96:20
**leadership (3)**
36:17,17;130:18
**leads (1)**
94:20
**League (3)**
136:7,12;137:1
**learn (1)**
50:18
**learned (2)**
25:5;142:10
**learning (1)**
138:4
**least (15)**
14:8,18;60:24;68:3;
70:15,24;71:13;77:4;
88:6;102:14;108:3;
120:12,15;134:12;
149:13
**leave (5)**
33:9;72:12,12;88:4;
140:11
**leaving (1)**
69:2
**left (8)**
10:10;69:24;72:1,
10;77:1;113:12;
120:19;129:13
**legal (4)**

40:22;86:20;132:18;
133:7
**legally (1)**
71:6
**legislation (10)**
12:11;20:8,16;24:5;
26:22;59:19;95:18;
96:11,14;129:5
**legislative (8)**
11:25;12:21;34:11;
56:6;85:2;95:7;
134:21;135:17
**legislators (1)**
12:16
**legislature (13)**
11:18,22;12:6;
13:10;14:1,1;19:17;
24:15;25:16;58:17;
127:19;135:14;137:25
**legislatures (1)**
92:23
**legislature's (1)**
48:11
**lepers (1)**
140:12
**Leslie (3)**
52:5;60:2;154:6
**less (4)**
39:21;144:24;
150:23,24
**lesson (1)**
147:9
**letter (1)**
120:25
**level (4)**
16:25;116:16;
134:22;151:24
**levels (1)**
75:1
**lever (1)**
147:11
**leverage (2)**
146:21;156:25
**LGBTQ (2)**
145:8,13
**LGBTQ+ (2)**
123:10;146:19
**liability (5)**
75:10;76:12;82:14;
91:2;99:1
**liaisons (1)**
116:25
**lib (1)**
32:14
**Liberty (2)**
64:2;98:17
**librarian (2)**
9:9;22:11
**librarians (10)**
22:1;72:16;75:16;
94:21;112:23;133:11;
138:10;143:9;157:1,10
**libraries (44)**

10:25;13:15,18;
14:4;19:8;23:25;
24:10;25:20;26:25;
34:19;38:25;39:5,9;
42:10,12,24;50:25;
54:3;61:5;64:4;77:7;
78:12,23;92:21;93:15,
19;95:3,10;97:17;
99:24,25;101:11,25;
120:17;124:14,14,15;
126:7;134:18;141:24;
142:1,5;154:12;157:10
**libraries' (1)**
80:18
**Library (244)**
8:13,18,25;9:10,12;
10:19,21,22,23;11:4,9,
10,11,13,21,24;12:2,4,
7,8,13,19,20;13:3,5;
14:10,12,13;15:1,11,
14,16,24;16:2,21,25;
17:17;19:18,19;22:17;
24:22;25:7;26:4,10,10,
12,13,16,19,19,20,24,
24;27:4,14,23,25;28:4;
30:3,18;31:4,10,17,23;
32:2,4,5;33:4,7,24;
34:2,6,13;38:12,13;
39:4;42:7,9;44:3,10,
25;47:10,11,11;48:18;
49:4,5,13,17;50:6,14,
17;51:9;52:17,19,22,
25;53:1;54:2,5;56:10,
15,15,24;57:21;58:7;
60:5,11,22,25;61:20;
62:10;66:3,8;67:15,18;
68:1,9,22,24;69:25;
70:23;71:1,5,12;72:10;
74:19,24;75:4;76:23;
77:14;80:14,17,23;
81:2,7,19,24;82:18,24,
25;83:3,15;84:25;85:7,
11,12,17;86:4;89:11;
93:11,23;94:1,3;96:20;
97:7,16;99:2,22,23;
100:4,24;101:10,13,
23;103:19;104:1,3,24;
105:23;106:10;
107:25;108:5;113:8;
114:13;116:5,21,21;
117:4;119:1,9,21,22,
23;120:11,13;122:15;
123:20;124:16;125:16,
19,20;126:1,4;128:19;
130:17,22;131:5,6,10,
19;134:24;135:24;
138:4,5,6;139:6,18;
140:5,17,20;141:3,12;
142:8;143:8,13,14,22;
144:1,3,22;145:7,8,10;
146:8,11,13;147:3,15,
15,18;148:2,2,4,5,11;
154:8,11,15;156:4,14,

16,21,22
**library-appropriate (1)**
69:25
**library's (8)**
11:7;47:16;48:16;
59:15;60:17;62:3;
68:6;139:19
**library-safe (1)**
70:6
**license (2)**
10:2;154:24
**licensed (1)**
155:21
**lien (1)**
29:19
**life (8)**
7:10;8:1;10:25;63:2;
119:12;150:22;151:7;
155:20
**light (8)**
47:19;81:12;102:22;
107:23;110:17;112:5,
6;114:5
**likely (7)**
21:6;129:24;149:16;
150:17;151:15,19;
153:12
**Likewise (1)**
59:5
**limit (4)**
58:10;72:22;73:3,11
**limitations (1)**
47:19
**limited (6)**
31:11,16;32:7;33:5;
41:3;122:9
**line (16)**
12:18,19;25:15;
35:13;39:25;44:16;
45:14,21;70:10,17;
71:14,16,21;72:6;
88:17;135:20
**lines (1)**
107:3
**lining (1)**
65:3
**linked (1)**
76:1
**list (17)**
23:8;34:11;44:15;
49:23;99:21;100:1;
101:2,8,15;108:11;
113:15;120:6;153:19;
154:1,3,10;155:1
**listed (1)**
40:4
**listen (1)**
139:16
**listened (1)**
85:1
**listening (2)**
59:25;146:13
**lists (6)**

**Fayetteville Public Library, et al v.**
**Crawford County, Arkansas, et al**
CERTIFIED ORIGINAL/COPY TRANSCRIPT
**Donald Nathan Coulter, Esq.**
**April 1, 2024**

45:5;98:16;100:15,
23;104:5;120:18
**literary (12)**
76:7;103:17;106:5;
107:4;108:2,21;
111:17,21;112:17;
116:22;119:17;152:20
**literature (4)**
50:25;109:21;112:1,
13
**litigant (1)**
74:17
**litigants (1)**
16:20
**litigate (1)**
41:9
**litigation (15)**
10:8;15:3,6;17:24;
23:5;41:2;92:10;
101:20;121:22;128:1,
16;133:3,12;135:11,15
**Little (46)**
5:8;8:22;13:20;15:2;
18:2;19:12;20:4;26:1,
9,12,19;27:1,4;28:25;
29:2,5;32:9,20;34:4;
36:4;37:22;38:8;39:6;
47:10;51:4;53:22;
56:19,23;58:25;65:4;
67:12;69:12;74:3;
95:18;115:22;119:12;
120:5;125:22;126:9,
20;128:25;131:8,9;
140:6;151:1;158:4
**live (10)**
52:16;57:8;58:22;
64:7,7;71:9;88:4;
117:3;123:19;135:3
**lived (1)**
8:1
**lives (4)**
56:21;59:3;89:3;
135:3
**living (5)**
20:6;64:8;93:8;
102:4;155:23
**load (1)**
133:16
**lobbying (6)**
11:15,17;12:8;13:5,
7,16
**lobbyist (2)**
12:25;92:19
**local (2)**
21:4;122:12
**locate (1)**
104:22
**located (1)**
5:6
**location (2)**
66:2;122:23
**locations (2)**
66:7;123:8

**loco (1)**
71:6
**lodge (3)**
120:3;121:5,8
**logical (1)**
34:14
**Lolita (1)**
112:9
**long (17)**
6:13;8:21;10:1;23:8;
26:15,16;32:2;44:14,
15;79:13;109:16;
114:18;117:6;129:15;
140:3,13;156:5
**long-ago (1)**
47:16
**longer (4)**
10:21;51:20;73:13;
128:24
**long-standing (1)**
93:13
**look (28)**
38:24;40:15;44:2;
45:16;46:5,22;47:2;
48:3;53:23;54:17;
55:4;62:16,17;70:20;
74:8,12;78:2;79:4,11;
80:5,21;82:4;85:22;
96:17;117:6;136:19;
146:23;147:19
**looked (7)**
39:18;48:19;94:15;
95:19;96:25;98:15;
141:20
**looking (22)**
22:15,23;42:19;
44:23;48:5;49:2;57:2;
79:5;83:9;89:12;
91:16;97:24;100:15,
15;104:4,9;105:23;
107:7;108:14;128:17;
129:8;151:5
**looks (4)**
39:10;68:15;110:13;
127:15
**loop (1)**
144:19
**lose (1)**
135:19
**lost (3)**
24:14;50:8;126:9
**lot (29)**
10:10;18:7;19:25;
21:23;24:11,12;25:9,
14;26:22;44:25;50:21;
68:12,24;69:20;72:17;
83:17;85:18;93:22;
109:24;113:5,20;
116:9;120:12;132:25;
133:2;135:20;140:5;
148:6;156:1
**love (1)**
105:17

**low (1)**
44:16
**lower (1)**
69:11
**low-profile (1)**
64:4
**lucky (1)**
139:4
**lunch (3)**
121:13,14,15

# M

**Maas (4)**
99:4;110:10;144:10;
155:6
**magnifying (1)**
52:6
**main (5)**
16:1;38:22;50:3;
115:4;117:20
**maintain (4)**
11:4,7;69:4;157:5
**Maintenance (2)**
49:20,25
**makes (6)**
73:21;90:15;106:10;
118:25;151:15;152:7
**making (10)**
14:23;52:1;57:3;
76:21;81:20;83:11,20;
139:20;156:20;157:15
**male (2)**
106:18;155:24
**males (1)**
156:1
**man (2)**
82:1;109:22
**management (4)**
13:8;41:23;97:4;
136:8
**Manager (3)**
52:6;53:10;154:7
**managers (3)**
53:1,1,13
**manner (1)**
34:20
**manual (4)**
67:2,14,20;72:23
**many (6)**
58:1;90:25;112:1;
144:20;152:15;157:12
**Margaret (2)**
108:24;155:6
**mark (3)**
35:24;37:9;79:11
**marked (11)**
35:25;37:10;42:3;
53:24;66:11;78:5;
79:12;91:12;95:15;
122:23;153:24
**marking (1)**
42:2

**married (1)**
156:5
**Masters (2)**
8:13;143:21
**Masturbation (1)**
105:17
**material (12)**
30:3;43:6;58:14;
81:21;87:17;97:18;
108:22;118:20;145:13,
14;150:13;152:19
**materials (14)**
19:9;42:7,9,23,24;
43:24;45:19;46:11;
54:2;66:3,7;90:21;
104:4;141:22
**matter (12)**
29:16;39:20;44:6;
62:25;71:8,8;79:5;
86:14;87:23;88:21;
119:11;128:2
**matters (2)**
15:14;97:5
**mature (3)**
69:24;70:20;109:9
**Maumelle (8)**
26:25;27:5;39:6;
120:19;158:5,13,16,23
**Maumelle's (1)**
121:6
**maximum (1)**
73:8
**may (33)**
5:13;9:8,12;14:4;
21:2;31:4;36:4;37:11;
38:23;49:6;53:17;
62:23;66:24;68:17;
73:1;83:10;85:9;
90:21;98:18;100:4;
103:3;112:5;113:21;
116:8;120:7;130:6,14;
142:15;147:14,15;
152:10,24;153:13
**Maybe (13)**
30:16;62:14;64:5;
68:14;104:16;108:8;
111:8,11;112:5;136:4;
137:24;148:24;149:14
**mayor (2)**
60:20;158:16
**MCLELLAND (5)**
121:11,17;140:24;
153:22;156:12
**mean (33)**
11:17;29:3;30:20;
32:23;33:18,20,23;
34:24;43:3;52:14;
58:18;59:11;61:5;
62:8;71:16;80:9;
83:23;86:17;87:6;
93:3;103:3;109:4;
113:25;114:21;
115:25;133:19,23,24;

134:3,7;138:18;
154:14;156:17
**meaning (1)**
85:6
**means (7)**
43:4;72:11;75:25;
76:2,3;84:16;106:11
**meant (4)**
59:15;122:20;
134:11;135:25
**measure (1)**
44:14
**mechanics (1)**
65:1
**media (2)**
120:10,16
**medical (1)**
152:20
**meeting (13)**
48:8;49:5;96:22;
101:23;128:5,23;
129:1,6,10,13,21;
130:6,7
**meetings (4)**
28:23;35:2;63:4;
65:23
**member (9)**
12:23,24;36:20;
99:22;102:6;154:10;
158:5,20,21
**members (15)**
13:3;19:22;36:25;
37:2;47:13;63:3,6;
65:10;101:13;134:17,
18;139:1,2;141:11;
148:8
**member's (1)**
154:15
**memo (2)**
25:6;58:6
**memorize (1)**
35:22
**mentioned (14)**
19:11;24:9;36:13;
45:3;53:22;59:9;
65:15;74:4;101:8;
102:8;110:7;122:6;
151:14;155:3
**mentioning (1)**
65:17
**merit (3)**
103:17;106:5;
111:17
**met (1)**
6:10
**metaphor (1)**
116:19
**Michael (2)**
45:1;106:13
**Michelle (2)**
5:4;73:22
**micro (1)**
124:25

**might (84)**
9:8;11:25;12:6,12;
14:4;18:21;20:1;
22:21;23:4;30:21;
35:11,17;38:3;39:10,
18;44:20;46:21,22;
47:7;48:2,6,17;49:10,
12;50:10;53:5;56:8,14,
15;57:25;58:1;59:3;
63:12;64:18;70:2,3,8;
75:18,19,20;76:6;
77:15,16;79:1;81:7;
82:12,13;83:12;86:9;
88:20;97:9,25;98:19;
99:10,12;103:10;
108:9,19,21;109:20,
22,23;113:6;115:16,
17;117:5,12,13;118:4;
123:10;124:7;126:1,8;
129:23;140:6;141:4;
142:1;145:2;150:21;
151:17;156:24;157:8,
22,23

**mileage (1)**
131:11

**millage (8)**
16:12;131:12,15;
146:8,23;147:3,9,18

**Miller (3)**
75:13;93:5,24

**Milwaukee (1)**
8:14

**mind (4)**
37:12;45:19;48:18;
154:3

**minor (16)**
73:14;80:3;81:17;
83:11;85:24;87:11,12,
15;88:15,16;108:10;
149:17,18,21;152:25;
153:1

**minors (43)**
75:14,21;76:3,10,17;
77:3;80:2,8;81:8,18;
83:20,21;84:1,2,7,11,
22;85:5;86:9;88:10;
90:21;91:1;94:9;
99:17;103:14;107:5;
109:9,13,13;110:25;
111:17;117:12,13;
150:3,3,3,8,14;152:5,6,
19,21;155:14

**minute (2)**
37:11;49:21

**minutes (4)**
48:8;49:5;72:3;
130:10

**miscellaneous (2)**
38:19;40:9

**misdemeanor (1)**
74:21

**misinformation (1)**
120:12

**misogyny (1)**
112:11

**missed (2)**
64:19;108:11

**Mist (3)**
99:4;102:8;155:7

**misunderstanding (1)**
75:22

**model (1)**
51:4

**models (1)**
51:16

**modification (1)**
54:19

**modified (1)**
54:18

**moment (6)**
25:2;42:18;46:5;
130:2;141:6;155:12

**Moms (2)**
64:2;98:17

**money (19)**
17:2,6,16;29:17;
32:18;35:4,4,5,10;
38:12,13;41:7;78:20;
81:4,5;88:18,19;89:8;
157:12

**monitor (1)**
12:5

**monster (1)**
112:10

**month (1)**
128:21

**monthly (2)**
128:20;130:6

**months (4)**
18:20;45:14;48:2;
85:1

**month's (1)**
129:21

**moral (1)**
71:8

**more (37)**
18:3,8;19:12;21:5;
39:21;43:21;49:18;
52:21;65:4;67:12,20;
72:15;74:3;75:23;
90:8;95:18;110:2;
114:14;115:22;116:6;
117:16;125:8;141:16;
143:5,6;144:3;145:2;
146:8;148:6,15;150:4;
151:9;153:2,3,3,6,7

**morning (8)**
6:8,9;65:22;126:14;
139:16;151:3;152:4;
155:4

**most (19)**
38:17;45:20;49:3;
61:7;68:13,15;70:6;
74:13;78:23;97:14;
100:3;102:4;114:16,
24;118:13;119:13,14;

**140:14;141:24**

**Motion (2)**
74:15;101:24

**motivate (1)**
120:8

**motivated (3)**
59:24;120:10;
134:16

**motivating (1)**
72:12

**Mountainburg (1)**
141:25

**move (15)**
18:2;35:13,14;37:7;
51:6;53:21;66:9;
72:20;74:1;89:13;
104:20;118:21;
119:23;139:7;145:25

**moved (6)**
39:17;59:25;104:1,
11,17;122:16

**moving (3)**
51:5;129:18;138:21

**much (7)**
11:8;53:7;94:1;
148:15;151:9;157:15;
159:3

**multicounty (1)**
126:4

**multiroom (1)**
142:8

**municipal (5)**
28:5;124:15;136:7,
12;137:1

**municipalities (8)**
14:3;27:7,13,18,21;
36:23;132:24;158:8

**museums (2)**
93:19;95:2

**must (4)**
48:22;78:14;94:5;
141:6

## N

**Nabokov's (1)**
112:9

**name (2)**
23:8;52:7

**named (3)**
6:2;7:13;9:7

**namely (1)**
28:20

**Nashville (2)**
7:22;8:6

**Nate (2)**
34:23;149:7

**NATHAN (3)**
5:1,13;6:1

**national (1)**
84:7

**nature (5)**
77:16;99:11;115:12;

**116:23;145:9**

**nearby (1)**
83:10

**nearly (1)**
23:15

**necessarily (3)**
9:10;113:2;117:23

**necessary (2)**
18:23;97:1

**necessity (1)**
69:7

**need (21)**
7:2;9:21;25:10;
35:21;36:4;53:17;
57:25;70:1,8,25;72:14;
73:18;74:8;79:9;98:2;
109:25;110:1;115:18;
121:12;128:1;148:23

**needed (5)**
19:2;70:23;90:9;
102:1;104:14

**needs (4)**
43:15;68:4;144:12;
148:6

**negative (4)**
102:22;107:23;
110:17;114:5

**negligence (1)**
94:23

**negotiate (1)**
96:19

**neighborhood (2)**
44:10;53:2

**neighbors (1)**
24:11

**nevertheless (1)**
54:21

**New (5)**
44:3;46:1;47:13;
82:7;107:9

**News (2)**
63:20;94:16

**newspaper (1)**
21:4

**next (18)**
7:25;35:14;37:7;
46:4;66:9;70:14;
78:10;89:18;103:23;
105:1,2;107:7;108:23,
24;128:5,10;129:21;
157:23

**night (4)**
20:5,5;94:15;132:5

**Nikol (1)**
105:3

**nine (2)**
45:13;51:17

**nine-year-olds (1)**
69:23

**nitpick (1)**
33:17

**Noah (1)**
6:10

**nobody (1)**
47:14

**none (2)**
60:21;94:23

**nonetheless (1)**
145:19

**nonexistent (1)**
97:11

**non-resident (1)**
57:9

**noon (1)**
129:1

**Normal (4)**
106:9,12;155:5,19

**North (1)**
126:20

**nos (1)**
6:22;66:11

**Notary (1)**
5:5

**note (2)**
99:20;120:19

**noted (1)**
119:8

**notice (4)**
17:23;49:3;64:21;
130:11

**noticed (1)**
148:21

**notices (2)**
33:9,10

**notion (1)**
50:12

**notwithstanding (2)**
103:10;149:25

**novel (24)**
77:10;100:11,13;
108:25;109:3,8,16;
110:23;111:1,16,18,
20,21,24;113:13;
115:3;116:17;118:10;
150:4,17,23;151:13;
152:11;155:6

**novels (5)**
45:2;109:8,10;
111:11;113:15

**nude (1)**
109:2

**nudity (5)**
102:11;107:18;
108:12;110:15;114:3

**number (26)**
11:23;13:8;14:2;
18:14;19:22;20:12;
22:17,20;26:12;27:16;
38:24;39:16;40:24;
41:3;43:8;56:25;
57:24;67:4;68:11;
69:1;72:8;74:25;
80:19;107:9;134:15;
156:5

**numbered (1)**
5:3

**numbers (5)**
38:3;39:11;40:12;
44:16;68:21

**O**

**oath (1)**
121:19
**object (2)**
86:16;90:13
**objected (3)**
141:18;143:7;147:2
**objecting (1)**
120:1
**objection (5)**
89:23;118:24;
140:22;145:22,24
**objections (1)**
146:18
**objective (2)**
49:14;150:1
**objectives (1)**
47:17
**objects (1)**
145:23
**obligated (2)**
41:19;104:22
**obligation (4)**
34:25;35:2;63:1,6
**obligations (2)**
41:17;158:22
**obscene (3)**
78:14;82:11;97:18
**obscenity (16)**
76:23;92:22;93:4,
10,10,14,18,24;94:22,
24;95:1,5,10;97:12,15;
119:22
**observation (5)**
104:12;134:25;
138:1;151:8;156:7
**observations (1)**
155:19
**observer (1)**
112:6
**obsolete (1)**
51:25
**obtain (2)**
8:12,15
**obtained (2)**
92:12,13
**obvious (7)**
25:4;62:16;105:11,
16;109:1;113:3;145:1
**obviously (47)**
9:8;10:24;11:12;
12:10;13:18;19:14;
20:13;21:1;22:2,14,19;
23:8;28:20;29:3;
33:20;39:15;41:11,19;
43:8;44:15;45:18;
46:8;47:8,14;50:8;
52:14;53:4,14;54:19;

55:13;56:5;69:4,23;
71:7;75:1,16;79:13;
80:15;84:7;91:23;
101:6;109:9;123:23;
137:20;156:3;157:3;
158:12
**occasion (1)**
116:6
**occupying (1)**
116:4
**occurred (2)**
116:5;137:23
**odd (2)**
41:14;100:13
**odds (1)**
99:12
**off (20)**
15:22;21:13,14;
28:6;37:14;38:6,22;
40:17;48:6,25;57:16;
68:23;72:13;78:7;
80:18;85:21;98:2;
101:24;146:6;149:3
**offended (2)**
58:24;117:5
**offending (1)**
109:18
**offensive (5)**
24:20;49:12;138:23,
23;141:10
**offered (1)**
17:4
**offering (1)**
11:20
**offhand (1)**
25:2
**Office (3)**
6:12;129:24;133:13
**officers (1)**
36:16
**Offices (1)**
5:6
**official (1)**
119:15
**officials (11)**
23:11;60:6,10;
63:23;118:21;119:5,
14;135:8;138:25;
139:25;148:1
**Off-the-record (2)**
21:15;40:19
**often (4)**
20:5,12;55:3;119:13
**old (5)**
71:13;72:5;82:1;
109:22;113:13
**older (15)**
68:1,9,10;76:10;
107:5;140:20;141:7;
149:18;150:11,17,21;
152:25;153:2,3;155:14
**old-school (1)**
105:9

**Oley (1)**
52:17
**once (12)**
14:5,18;21:1;50:20;
57:14,24;71:19;72:6;
73:9;128:7;149:21;
155:24
**one (102)**
7:10;15:23,24;
17:22;20:20,22;24:6,
17,18;25:4,7;30:25;
36:6;39:19;40:3;41:4;
43:18,25;44:19,19,21,
22,22;45:6,9;46:1;
49:18;50:4,6,24;51:16,
17;52:1;53:20;56:22;
57:18;58:16;61:14;
62:5;65:22,22;66:5;
67:17,19;70:11;71:4;
72:7,24;77:23;79:3;
80:15;83:4;84:14;
85:8;88:6;90:3;91:13;
95:19;100:4,6,24;
101:12;102:10,17;
103:22,23,25;104:11;
105:1,2,11;106:7;
107:8,9;108:11,23;
110:4,11;111:9;112:5,
8;113:13;114:12;
115:1,18,21;116:6;
117:10;118:22;123:2;
126:5;129:1;139:5;
142:14;144:9,14,14,
17;148:3;151:2;
156:12;158:19
**one-offs (1)**
13:23
**one-room (1)**
142:2
**ones (8)**
19:8,8;37:4;59:24;
82:7;112:16;115:23;
155:4
**ongoing (4)**
13:24;16:5;24:16;
68:25
**only (22)**
16:4;32:11,23;36:9;
37:6;40:2;62:3,10;
97:20;100:9;118:12;
119:18;128:16;
137:13;140:17;
141:15;142:12,23;
151:4;153:15;154:20;
155:22
**onto (1)**
17:5
**open (5)**
11:1;28:23,23;
105:14;147:13
**opened (1)**
151:2
**opening (2)**

72:2;93:16
**operate (3)**
39:4;67:14;74:19
**operated (1)**
74:20
**operates (1)**
65:1
**operating (5)**
28:4;35:18;67:20;
72:23;101:19
**operations (1)**
11:3
**opine (1)**
99:14
**opined (1)**
81:15
**opinion (10)**
22:11;33:21;61:15;
70:4;80:10;85:19;
88:23;111:15;117:24;
156:8
**opioid (1)**
152:13
**opioids (1)**
115:7
**opponents (1)**
134:23
**opportunities (2)**
150:4;152:11
**opportunity (2)**
28:14;69:9
**opposed (8)**
14:7,8,9;44:8;83:20;
96:14;149:17;151:6
**opposite (2)**
113:9;154:22
**option (3)**
20:3;128:17;141:11
**options (3)**
73:10;129:12;
140:14
**oral (2)**
33:23;60:8
**orchestrated (1)**
146:11
**order (7)**
25:22;45:14,21;
46:1;54:19;56:21;
135:8
**ordered (1)**
17:2
**ordinance (5)**
16:17,19;27:7;
36:24,24
**ordinary (1)**
89:3
**organization (7)**
9:13;13:9;14:9;
27:14,25;30:6;37:1
**organizational (2)**
35:16;52:9
**organizations (4)**
14:3;27:3;28:15;

41:21
**origin (1)**
109:20
**original (2)**
26:8;96:16
**originally (2)**
7:19;26:6
**others (10)**
34:13;49:13;53:6;
64:2;96:21;106:17;
116:8;129:8;141:4;
157:21
**otherwise (4)**
9:5;81:6;106:18;
108:21
**Otter (1)**
52:17
**ought (3)**
61:18;69:9;71:20
**ours (1)**
41:22
**out (74)**
9:16;13:9;14:18;
23:4,13;25:22;28:13;
30:16;31:5,23;32:9;
33:7,9;34:3;36:25;
39:4,13;43:22;45:21;
50:5,7,9,18;57:6,12;
58:7;59:1;61:20;
62:22;63:7;64:24;
65:8;66:14;67:19;
68:20;69:6,11,19;
70:12;76:14;80:8;
81:8,23,24;83:8;84:13;
90:6;93:10;96:10;
103:7;104:25;112:20;
113:14;120:7,20,23;
124:25;127:25;129:3;
136:19;139:6,9,14;
140:3,4,10,14;144:12;
146:22;147:8,13,17;
150:24;151:23
**outcome (2)**
60:1;139:19
**outcomes (2)**
60:4;61:13
**outline (1)**
35:14;121:12
**outside (4)**
46:12,20;121:22;
143:10
**outward (1)**
44:24
**outweigh (1)**
20:20
**outweighed (2)**
20:22;21:10
**over (25)**
7:17;8:22;17:6,25;
19:13;27:16;60:6,10,
10,12,12;63:22,22,22;
64:1;75:16;85:16;
91:21;99:6;119:5;

122:13;133:7;134:14;
138:16,24
**overbroad (2)**
83:13;119:4
**overcome (2)**
51:15,24
**overlapping (1)**
43:20
**oversee (1)**
11:3
**oversubscribed (1)**
44:14
**overturned (1)**
17:1
**own (12)**
14:15;39:3;59:15;
62:4;114:15;139:8;
154:12,13,16,17,20;
155:23

**P**

**package (1)**
13:1
**page (13)**
6:19;17:19;42:16;
46:4;47:4,21;67:5;
79:16,22,23;91:19;
96:9;100:13
**Pages (3)**
67:13;109:25;
128:21
**paid (1)**
41:12
**pain (1)**
132:19
**painful (1)**
114:8
**painting (2)**
53:15,18
**pandemic (2)**
68:20;69:6
**paper (2)**
97:22;129:17
**paperback (1)**
105:8
**Paragraph (9)**
28:7;67:25;68:18,
19;71:24;72:25;78:10;
92:18;96:9
**paragraphs (1)**
73:8
**parameters (1)**
145:18
**paramount (1)**
50:13
**parent (7)**
59:1;71:6;73:1;83:7;
86:3;156:2,9
**parentis (1)**
71:6
**parents (4)**
69:7;70:23;72:12,14

**parents' (1)**
115:6
**parse (1)**
137:16
**part (28)**
7:21;11:13;21:19;
26:13;32:14;34:18;
44:25;50:25;54:16;
56:16;70:6;76:15;
80:24;93:7,24;95:7;
103:12,12;115:14;
118:2,15;132:11;
135:4;137:24,24;
147:24;152:23;153:12
**participating (1)**
37:3
**particular (4)**
44:19;109:21;
125:18;157:18
**particularly (3)**
19:7;21:24;123:10
**parties (6)**
5:12;21:18;115:19;
125:1,2,3
**parts (3)**
104:23;114:9;115:9
**party (5)**
9:7;15:12;31:25;
33:8;92:9
**Party's (1)**
33:10
**pass (4)**
63:14;134:11;140:6;
156:8
**passed (5)**
11:16;26:22;95:1;
128:4;132:24
**passing (1)**
133:5
**past (2)**
18:3;68:16
**path (1)**
22:9
**patron (6)**
10:19;16:1,9;42:20;
73:9;120:19
**patrons (6)**
18:21;30:1,6;52:21;
69:7;123:20
**patrons' (1)**
43:15
**patterns (1)**
42:23
**Patterson (1)**
45:1
**pay (10)**
29:18;57:9;81:4;
133:16;135:15;136:9,
10,19;137:14;140:10
**paying (5)**
11:10;41:8;63:23;
64:8;137:13
**Payne (1)**

130:4
**peace (1)**
139:1
**peer (1)**
42:24
**penalties (1)**
76:6
**pendency (1)**
58:8
**pending (3)**
15:14;57:22;129:4
**penises (1)**
105:22
**pension (1)**
41:18
**people (143)**
11:7,9;12:4;13:9;
14:1;15:8;19:13,14,15,
17,19,19,25;20:6,9,13,
14,16;21:5,7,8,25;
22:14,16,22;23:3;24:5;
25:15;30:3;31:18,21,
24;34:10;35:11;43:22,
24;44:8,10,16,19,24,
24;45:1,18,25;48:16;
49:11,12;50:22;51:13;
52:16,19,24;56:8;57:1,
23;58:7,24;61:19,22;
62:18,25;63:5;64:9,9;
65:9;66:15;67:15;
68:21,22,24;69:1,6,18;
71:8;77:7;81:5;82:4,6;
84:24;89:7,11;90:25;
91:11;96:1;97:14,16;
98:19;99:12;100:16,
18;101:6;102:25;
103:8;105:9;106:1,5;
108:18,20;109:24;
110:12,21;113:8,17,
20;116:7;117:25;
118:25;119:12,18,20,
21;120:7,16;122:14;
123:8,19;131:17;
133:12,19,23;134:15,
20,22;135:3,4;138:1,3,
22;140:7,13,14;
141:13;143:7;144:8,
11,24;146:17;147:1,
23;152:6,15;157:7
**percent (2)**
104:7;135:1
**percentage (1)**
115:23
**Perfectly (3)**
106:9,12;155:5
**performance (2)**
150:13;152:19
**performative (2)**
93:22;94:5
**perhaps (13)**
50:7;68:14;78:23;
79:8;114:19,24;116:3;
120:9;122:6;128:2;

141:3;152:2;157:21
**peril (1)**
75:15
**perimeter (1)**
145:17
**period (6)**
15:5;16:20;17:2,7,7;
87:8
**periodically (1)**
11:22
**permission (1)**
129:10
**permit (1)**
119:25
**Perry (12)**
26:16,20;27:1,4,9;
31:23,25;33:8;34:5;
39:6;47:11;158:6
**person (7)**
36:20;101:21,23;
144:23;150:11,17;
154:6
**persons (1)**
68:4
**persuade (1)**
24:15
**pertain (1)**
11:25
**pertaining (1)**
150:23
**peruse (1)**
35:9
**petitions (1)**
147:17
**pharmacists (1)**
94:22
**phone (2)**
119:19;129:14
**phrase (5)**
43:2;84:22;133:21;
150:7;156:17
**phrased (1)**
86:24
**physical (1)**
11:4
**physically (1)**
141:19
**pick (7)**
31:13;49:8;72:6;
82:6;103:23;105:1;
146:20
**picked (3)**
72:2;105:2;129:14
**picking (1)**
110:10
**picture (1)**
153:11
**piece (1)**
112:2
**pieces (1)**
112:12
**Pike (1)**
7:25

**place (3)**
5:14;63:12;96:23
**places (8)**
20:1;25:4,13;27:16;
48:24;63:21;83:2;
157:16
**plaintiff (8)**
7:13;9:14;15:4,6;
17:21;86:5;127:21;
131:6
**Plaintiffs (6)**
21:20;23:17;59:14;
86:1;123:2;132:14
**plaintiffs' (1)**
137:14
**plaintiff's (1)**
10:11
**plan (2)**
41:18;113:3
**planet (1)**
51:20
**planets (1)**
51:17
**platform (1)**
94:16
**play (1)**
30:21
**pleas (1)**
139:6
**please (5)**
7:3;20:9;65:25;
75:22;154:4
**pleasure (2)**
158:2,17
**pled (1)**
137:21
**plurality (1)**
88:23
**Pluto (4)**
51:16,19,21;63:24
**pmthe (1)**
159:5
**poem (1)**
112:2
**point (26)**
23:1;24:17;26:14;
34:1;35:14;42:17;
43:12,21;44:6;45:3;
56:2;78:10;84:3;
93:21;94:17;103:7;
127:18,25;128:6,16;
141:7;145:23;151:17;
152:4;156:7;157:4
**pointed (1)**
83:8
**points (2)**
44:1;84:13
**police (2)**
32:4;71:24
**policies (12)**
42:2,8;46:25;54:14;
64:13,14,16;66:2,5;
74:8;77:22;118:14

**policing (1)**
82:23
**Policy (36)**
42:6,13;44:7;48:3,3,
18;49:19;53:13,21;
54:1,3,6,16,23;55:19,
22;58:10;62:24;64:22,
23;65:6,7,13,14;66:14,
22;67:6,11,21;72:23;
76:17,18;126:12,13,
14,24
**politic (2)**
28:8,11
**political (13)**
61:12;62:21;63:25;
119:7;133:7;134:13;
139:3,14;147:12,22;
152:20;156:24,25
**politically (1)**
156:25
**politicians (1)**
135:8
**politics (5)**
93:22;94:6;119:12,
13;139:11
**polling (1)**
20:24
**ponder (2)**
12:17;17:25
**pondering (1)**
129:8
**pool (1)**
136:20
**pools (1)**
136:8
**poorly (1)**
86:24
**poplar (1)**
90:5
**popular (10)**
24:1;45:16;49:9;
61:15;76:9,10;81:11;
99:8;144:15;145:3
**porn (1)**
85:22
**pornography (3)**
79:5;80:17;85:13
**portion (1)**
91:20
**portrayed (1)**
110:17
**position (9)**
8:19;11:8;14:7,15;
30:11,12;53:9;103:6;
146:4
**positions (3)**
44:8;139:4;158:20
**positive (3)**
102:22;107:23;
110:17
**possibilities (1)**
128:17
**possibility (2)**

75:17;130:24
**possible (4)**
11:8;53:4;70:24;
100:5
**post (2)**
31:18,21
**posted (2)**
21:2;31:24
**post-Shipley (1)**
77:1
**potential (5)**
75:8,24;99:15;
103:8;146:6
**potentially (2)**
107:15;132:13
**pour (1)**
139:3
**poverty (1)**
114:2
**power (2)**
29:8,10
**powers (1)**
29:6
**practical (5)**
61:1;71:8;83:14;
93:22;119:11
**practice (10)**
9:25;10:1,5,6,18;
42:9,13;57:1;76:19;
89:6
**practiced (1)**
133:4
**precise (3)**
18:8;33:16;49:7
**precisely (3)**
39:13;143:6;145:17
**precludes (1)**
30:14
**predated (2)**
13:25;15:20
**predates (1)**
49:16
**predict (1)**
48:14
**predicted (1)**
146:16
**predominant (4)**
150:8,13;151:16,18
**predominantly (4)**
102:18;105:19;
107:17;115:11
**predominate (1)**
150:18
**preeminence (1)**
118:6
**Preliminary (1)**
74:15
**premature (1)**
16:21
**prepare (1)**
11:5
**prepared (2)**
48:13;54:18

**prerogative (1)**
96:11
**present (2)**
30:23;96:22
**presents (1)**
90:15
**preserve (1)**
63:2
**president (2)**
36:13,13
**press (1)**
24:1
**pressure (4)**
62:21;64:1;119:7;
140:2
**presumably (1)**
51:3
**presume (2)**
100:2;103:4
**pre-teen (1)**
155:25
**pretty (10)**
22:25;31:6;38:18;
41:2;46:20;53:7;
66:10;80:7;105:16;
108:25
**prevail (2)**
24:14;132:14
**prevailed (1)**
16:25
**prevent (2)**
41:6;146:9
**prevented (1)**
30:19;32:5,7
**previous (6)**
65:17,19,25;67:10;
114:6;150:21
**previously (3)**
6:2;154:16,17
**prewarning (1)**
72:21
**Pride (2)**
146:25;147:7
**primarily (1)**
107:1
**primary (1)**
24:17
**print (6)**
28:6;46:17;109:25;
154:12,17,20
**printed (1)**
155:2
**prior (3)**
15:3,15;72:1
**privacy (1)**
157:3
**private (5)**
9:25;10:1,5,18;
32:12
**privy (1)**
73:4
**probabilities (1)**
71:21

**probably (19)**
6:18;13:25;26:15;
31:23;39:20;43:21;
47:10;52:23;68:14;
69:22;81:25;96:3;
102:15;108:5;113:13;
118:2;121:3;129:17;
130:4
**problem (10)**
56:12;76:14;77:20;
87:19;96:12;97:11;
103:12,13;109:11;
136:15
**problematic (2)**
49:12;86:2
**problems (3)**
75:8;83:4,14
**Procedure (11)**
5:15;55:20,21;
64:15,23;65:7;67:7,10,
20,22;68:7
**proceed (2)**
19:9;25:11
**proceeded (1)**
22:9
**process (19)**
47:2;53:18;56:7,24;
57:2,22;60:2,4,9,13;
61:12;76:4;126:15,15;
127:6;134:13;139:23,
23;144:4
**processes (1)**
25:12
**procure (1)**
156:4
**produce (2)**
65:6,7
**produced (7)**
5:2;37:19;48:5;
55:21;91:25;92:6;
130:10
**production (3)**
53:23;66:18;92:8
**products (1)**
55:2
**professional (4)**
45:12;104:2;129:13;
143:9
**professionals (7)**
51:9;56:25;82:25;
100:21;112:19;
139:20;148:2
**program (2)**
78:14;156:4
**programs (1)**
69:8
**prohibit (1)**
88:9
**prohibited (1)**
77:2
**promises (1)**
139:17
**promote (1)**

133:1
**promoted (1)**
59:19
**promoting (5)**
88:9;114:10,17,21,
23
**prompt (2)**
65:4;143:19
**prompted (1)**
17:24
**proper (1)**
146:8
**property (5)**
17:18;29:18,20;
39:7,25
**prophylactically (1)**
41:8
**proponents (8)**
60:14;84:19;93:10,
18;95:8;98:17;100:16,
17
**prosecuted (1)**
95:6
**prosecuting (3)**
6:11;23:9;124:2
**prosecution (3)**
75:24;81:13;83:16
**prosecutor (4)**
74:23;75:20;77:18;
83:12
**prospect (1)**
84:24
**protect (2)**
20:16;133:10
**protected (4)**
30:2,5;79:1;80:19
**Protection (7)**
78:12,18;79:19;
83:23;85:5;86:12;87:5
**protest (1)**
149:11
**proud (1)**
142:9
**provide (9)**
47:17;49:10,15;
50:14;72:11;86:5;
144:9;153:17;157:19
**provided (2)**
58:18;82:19
**providers (2)**
22:1;81:4
**provides (1)**
39:3
**providing (2)**
97:18;157:17
**provision (6)**
29:17;74:6;93:12;
95:1;119:4;158:18
**provisional (2)**
73:2,3,9,11
**provisions (5)**
18:15;65:2;125:4;
126:12;127:8

**provocative (1)**
150:6
**proxy (1)**
138:21
**prudent (1)**
41:23
**prurient (2)**
150:14;152:8
**psychological (3)**
115:18;155:16;
156:10
**Public (39)**
5:5;12:2;14:25;
19:18;21:23;24:12;
26:9;27:15;31:10,11,
16;32:7,14,18,18;33:4,
5;34:6,19;35:1,1,3,4;
39:4;60:11;64:4;
77:22;89:8;99:24;
101:25;114:12;
124:16;130:17,22;
131:5;135:24;141:24;
148:3;157:10
**publications (2)**
45:11;104:5
**public-facing (2)**
44:7;84:25
**publicly (2)**
34:7,24
**publicly-funded (2)**
34:13;117:4
**published (4)**
21:2;45:13;112:18;
113:16
**publisher (1)**
45:23
**publishers (3)**
76:24;94:1;112:18
**Publisher's (1)**
44:3
**publishes (1)**
45:23
**publishing (1)**
45:13
**Pulaski (9)**
16:22;26:13,19;
27:1,4,9;34:5;47:11;
158:4
**pull (5)**
43:22;50:18;51:24;
58:1;79:4
**pulled (4)**
51:1,11;61:20;78:7
**pundit (1)**
139:14
**punish (1)**
147:22
**punishment (4)**
90:11,18;98:11,22
**purchase (2)**
42:23;144:16
**purchased (2)**
43:14;99:6

**purchases (1)**
42:21
**purport (2)**
20:23;101:16
**purports (1)**
91:20
**purpose (2)**
45:8;105:24
**purposes (5)**
45:9;55:9;65:12;
75:4;107:14
**pursuant (3)**
5:8,14;149:10
**pursue (1)**
129:11
**pursuit (1)**
87:13
**purview (1)**
151:1
**push (2)**
87:23;88:1
**put (21)**
7:18;17:5;20:12;
29:19;32:3;35:16,17;
44:12;47:9;51:5;
61:20;78:21;82:25;
83:1;86:17;97:21;
122:24;124:18;127:3;
129:25;141:19
**puts (1)**
66:7
**putting (3)**
34:3;81:21;137:7

**Q**

**qualify (2)**
57:10;156:8
**quarter (1)**
38:3
**Queer (3)**
58:23;77:9;146:20
**quick (3)**
67:23;68:8;132:8
**quickly (3)**
21:18;25:18;66:10
**quite (5)**
19:15;33:4;46:10;
49:7;149:17
**quorum (14)**
61:21,22;62:18;
63:3,4,5;122:15;
124:10;125:18;126:5;
134:17;138:25;148:7;
156:15
**quote (2)**
28:8;140:23
**quoted (1)**
91:19

**R**

**raise (1)**

114:19
**raised (2)**
7:22;155:25
**ran (1)**
104:9
**range (1)**
103:8
**rather (5)**
41:8;94:2;114:25;
127:9;148:1
**ratio (2)**
21:8;44:16
**react (1)**
135:3
**reacting (1)**
116:9
**reaction (2)**
18:22;19:11
**read (71)**
19:18,19;20:8,10;
33:20,21,23;35:9;
42:18;43:12,18;49:21,
23;50:11;58:10;77:9,
12;78:15;79:14;86:2;
89:7,8;91:20;92:2,19;
99:7;100:7,9,10,14,14,
25;102:16,20;103:5,
14;104:13;105:13;
106:23;107:8,24;
108:19,20;109:7,9;
110:4,15;112:22;
113:2,3,20;114:14;
115:2,19,21;116:2,8,
15,15;119:1,3;132:6,8,
11;140:8;142:20;
143:16;150:5,9;157:2,
8
**reader (4)**
108:15,17;112:6;
149:15
**readers (1)**
52:21
**readers' (1)**
148:6
**readily (1)**
54:18
**reading (12)**
10:24;24:1;43:5;
45:20;51:13;76:4;
86:13,14;96:15;116:3;
120:8;144:24
**reads (1)**
151:23
**ready (1)**
49:1
**real (10)**
6:19;27:24;32:25;
39:7;64:7,8;77:6;98:4;
102:4;156:7
**realities (1)**
139:3
**reality (1)**
114:9

**realize (2)**
22:8;121:18
**really (13)**
20:2;44:21;73:15;
77:25;78:9;79:9;
97:10;103:5;109:19;
116:6;117:19;124:18;
144:3
**reason (13)**
31:19;32:9,23;
56:18;61:1;62:1;
68:10;73:11;80:9;
108:19,20;147:24;
151:2
**reasonable (3)**
101:18,21;143:1
**reasonably (2)**
25:5;53:5
**reasons (6)**
26:23;41:4;90:19;
119:6;151:22;152:23
**recall (19)**
13:22;15:17,19,22;
16:24;17:9,10;18:1;
24:17;56:10;57:15;
68:19;69:1,10;91:21,
23;128:11;156:13;
158:20
**recalled (1)**
57:18
**re-categorized (1)**
39:17
**receive (1)**
78:13
**received (1)**
154:2
**recent (2)**
68:15;100:3
**recently (7)**
54:9;68:13;94:17;
99:22;101:12;102:6;
113:15
**recess (5)**
37:15;89:17;98:5;
121:15;149:4
**recipe (1)**
88:16
**reclassified (1)**
39:17
**recollection (4)**
15:7,9;48:10;96:2
**recommend (1)**
43:13
**recommendation (3)**
57:4;60:19;68:20
**recommended (3)**
54:23;55:9,15
**reconsideration (14)**
48:4;54:1;56:1,9;
58:11;60:2;61:8;
64:14,22;67:12;74:7;
126:13,15,24
**reconsiderations (1)**

**record (28)**
7:2;14:9;21:13,14,
17;35:17,18;37:14;
39:24;40:7,18;41:13;
51:8;79:10;90:13;
92:5,19;98:3,12;
102:10;109:3;110:15;
121:21;123:23;
136:16;149:3;153:17;
154:4
**recorded (1)**
147:6
**recording (1)**
98:3
**records (2)**
28:23;35:1
**red (1)**
139:13
**redacted (1)**
95:24
**redeeming (1)**
76:7
**redone (2)**
77:1;82:13
**reduce (1)**
146:23
**reduced (2)**
145:20;147:1
**reducing (1)**
147:3
**reference (3)**
67:10;144:9;152:18
**referendum (2)**
16:17,19
**referred (1)**
55:20
**referring (2)**
101:2;124:13
**refers (1)**
43:7
**refiled (1)**
22:6
**reflect (1)**
52:18
**reflected (5)**
18:5;48:7;49:7;
62:24;130:10
**reflection (2)**
56:17;104:24
**reflective (1)**
114:9
**reframed (1)**
117:16
**reframing (1)**
118:15
**refunded (1)**
17:4
**regard (21)**
15:25;43:20;55:14;
56:9;59:6;75:1,10;
76:2,3,7,8;81:7;97:12;
103:13;120:6;126:12;

136:21;137:11;
138:17;152:5;156:10
**regarding (5)**
13:11;14:13;68:5;
109:11;157:2
**regardless (2)**
62:22;133:8
**regional (2)**
124:14;125:25
**regular (2)**
12:25;72:2
**regularly (3)**
22:2;41:16,19
**regulations (3)**
15:25;32:18;41:16
**Rehnquist (2)**
85:10;88:23
**reimburse (1)**
39:8
**reinterpreted (1)**
112:9
**relate (3)**
10:25;12:14;115:10
**related (14)**
7:12;9:9;35:15;
64:22;66:2;74:11;
83:17;98:18;101:16;
118:12;128:13;
150:20;155:14,16
**relates (2)**
55:10;157:4
**relationship (11)**
115:8,10,12,13,14,
15,17,20,24;117:19,21
**relationships (1)**
72:17
**relevance (2)**
50:15;51:12
**relevant (2)**
51:12;112:13
**reliable (1)**
74:13
**reliably (1)**
90:16
**relied (1)**
14:10
**relief (4)**
123:3,15,17;127:7
**relieved (1)**
125:15
**relocate (2)**
118:23;119:23
**relocated (1)**
61:20
**rely (1)**
104:7
**remain (2)**
57:22;58:9
**remainder (2)**
67:6;122:17
**remaining (1)**
61:9
**remember (7)**

10:22;14:21;48:6;
73:4;116:2;144:2;
151:5
**remind (1)**
11:9
**remotely (1)**
13:4
**removal (3)**
135:9,23;136:24
**remove (5)**
62:25;118:22;124:8;
131:18;137:9
**removed (1)**
62:2
**removing (1)**
138:22
**renderings (1)**
109:7
**renders (1)**
90:22
**renewing (1)**
16:13
**rent (1)**
38:22
**reoccurrence (1)**
114:20
**reorganization (1)**
53:21
**repeal (1)**
93:12
**repealed (1)**
95:2
**repealing (1)**
93:18
**Repeat (1)**
140:18
**repeated (1)**
139:17
**rephrase (1)**
134:2
**report (7)**
11:5;12:5;129:20;
157:25;158:14,15,15
**reported (4)**
12:25;21:3;129:17;
130:3
**reporter (4)**
6:23;73:20,23;98:2
**reporting (1)**
13:10
**reports (2)**
128:20;158:1
**represent (6)**
9:10;15:1;20:9;
79:18;142:7;158:23
**representative (2)**
17:20;158:13
**representatives (3)**
96:20;156:20;158:4
**represented (1)**
125:2
**representing (2)**
6:11;158:9

**Republican (2)**
31:25;33:9
**reputable (2)**
44:2;45:4
**request (8)**
5:2;48:4;56:1;98:14;
101:11,22;154:7,9
**requests (8)**
42:20;56:9,16,19;
58:11;61:5,9;104:2
**require (1)**
69:14
**required (3)**
85:20;87:22;145:11
**requirement (1)**
82:20
**requirements (1)**
83:1
**requires (2)**
78:12;87:11
**research (1)**
112:20
**reservations (1)**
149:11
**resident (1)**
55:25
**resist (1)**
157:6
**resolution (1)**
15:22
**resolve (1)**
62:14
**resolved (1)**
15:17
**resource (1)**
47:19
**respect (13)**
18:14;19:1;125:1,3;
149:13,14,17,18;
150:16;152:17;154:11,
19;155:1
**respected (1)**
21:7
**respective (1)**
5:12
**respond (3)**
6:22;42:19;47:18
**responding (2)**
96:5;144:19
**response (7)**
48:11;88:14;98:8,
14;119:14;130:11;
154:7
**responsibility (1)**
43:23
**responsible (2)**
35:3;72:15
**responsibly (1)**
75:9
**responsive (1)**
48:12
**rest (3)**
67:1;117:8;130:13

**restrict (5)**
14:2;19:17,18;
116:8;157:7
**restricted (2)**
68:21;133:24
**restriction (2)**
30:13;145:12
**restrictive (1)**
70:24
**restricts (1)**
78:25
**rests (2)**
29:10;126:19
**result (2)**
54:12;123:13
**resulted (2)**
16:17;48:12
**results (1)**
140:4
**resurfaced (1)**
96:18
**return (1)**
120:20
**returning (1)**
120:22
**revenue (3)**
12:18;29:12;33:1
**reversed (1)**
55:13
**review (12)**
35:9;44:2,4;45:4;
54:13;55:3;57:22;
58:2,8;65:5;121:12;
132:6
**reviewed (7)**
57:14,14;77:24;
82:24;132:4,7;148:9
**reviewers (1)**
116:9
**reviewing (4)**
18:20;45:8;58:5;
61:5
**reviews (1)**
45:17
**revision (2)**
47:22;68:16
**revisions (3)**
47:25;54:8,11
**revisit (1)**
69:9
**revisited (1)**
68:14
**rid (1)**
51:5
**right (77)**
7:8,18;8:12,19;26:1;
28:12,13;30:4,11;31:3,
5,20;34:17;35:9,24;
37:6;50:1;52:10;
53:20,20,25;55:1,11;
58:12;63:15;66:12;
69:21;70:14;73:15;
78:3;79:4;80:4;82:10;

85:12,16;86:2,11,21;
89:7,18;90:8;91:9,19;
92:9,10;98:7;103:22;
104:20;105:2,18;
107:6;108:23;111:5;
113:12;115:1;116:13;
117:22,22;118:11;
119:1,3,3;121:4,23;
123:21;124:6;125:10;
127:10;131:11;137:9;
140:17;148:16;149:1,
7;150:20;151:20,22
**rights (2)**
88:25;133:24
**riled (1)**
123:8
**ringing (1)**
119:19
**risk (3)**
86:7;136:8,20
**Riviera (1)**
5:7
**Road (1)**
5:7
**roaming (1)**
51:23
**Robert (1)**
97:3
**Roberts (2)**
96:1;127:13
**Robie (1)**
106:13
**robust (1)**
142:8
**Rock (20)**
5:8;26:9,12,19;27:1,
4;29:1,3;32:20;34:5;
38:8;39:6;47:10;
56:19;58:25;125:22;
126:20;140:6;151:1;
158:4
**role (2)**
34:2;35:10
**roll (1)**
128:5
**rolling (2)**
53:14;58:6
**Rooker (1)**
52:17
**room (3)**
49:16;61:21;122:10
**Rotarians (1)**
128:25
**rotating (1)**
65:10
**rough (1)**
51:10
**roughly (1)**
116:3
**round (1)**
146:15
**routine (1)**
89:3

**Rule (1)**
9:3
**ruled (1)**
78:20
**Rules (10)**
5:15;6:18;25:11;
28:4;32:2,18;66:15;
68:3;69:9;125:8
**ruling (2)**
59:7;88:14
**run (6)**
27:23;83:15;114:18;
136:8;140:4;146:1
**running (5)**
71:12;78:24;86:7;
122:11;124:16
**runs (1)**
27:25
**runup (1)**
137:25

**S**

**S&M (2)**
110:13;153:6
**sadomasochistic (5)**
102:12;107:19;
108:13;110:16;114:4
**safe (4)**
19:9;68:6;83:8;
105:18
**safely (1)**
141:1
**safety (2)**
68:6;71:3
**sake (1)**
153:16
**sales (2)**
12:14,15
**Saline (12)**
24:12,19,22;60:3;
62:18;63:4;122:5;
131:10,13,14,16,21
**salvo (1)**
93:17
**Sam (1)**
153:20
**same (30)**
6:19;17:7,19;34:20,
20;35:18;43:19;49:8;
72:4,18;75:3;76:3;
95:21;96:3,6;100:18;
106:9,16;107:3,12,21;
109:11;112:13;117:9;
122:11;123:7;128:12;
135:13;137:2;138:14
**Sam's (1)**
148:22
**Sarah (3)**
99:4;144:10;155:6
**sat (1)**
59:20
**Satterfield (1)**

**saw (5)**
17:23;65:22,24;
113:16;145:5
**saying (21)**
11:18;25:7;32:24;
43:18;60:15;62:10;
65:24;81:10;82:15;
94:7,7,11;97:2,5,15;
98:23;99:22;113:1;
114:23;120:20;147:6
**SB (12)**
13:11;19:14;21:23;
24:17;76:22;93:18;
94:18;121:1;122:11;
127:16,18;132:21
**scattering (1)**
61:8
**scenes (1)**
151:2
**school (5)**
8:5,6,10;70:23;
151:1
**schools (3)**
78:12;93:19;95:3
**Science (4)**
8:13;51:15,25;
143:22
**scientific (4)**
19:15;20:23;51:16;
152:20
**scope (1)**
46:20
**scores (2)**
31:11,11
**screen (1)**
80:17
**screening (1)**
85:8
**screens (1)**
81:23
**search (3)**
96:12;97:10,11
**seats (1)**
134:20
**second (24)**
6:17;37:14;38:2,19;
40:10;42:16;45:3;
72:24;79:15,21;92:18;
95:17;98:3;118:15
**secretary (1)**
36:13
**Section (103)**
18:14,15;25:10,23;
49:18,20;74:6,6,9,11,
20;75:1;76:5,15;
89:22;90:12,14,18;
91:3,5;93:13;95:4;
98:11;103:19;104:12,
15;107:25;108:7;
109:9,11;110:23;
111:10,12;118:8,10,
11,13,15,17;120:4;

122:19,23;123:3,6,13,
25,25;124:2,4,5,8,17,
20,20;125:3,4,9,16,17;
126:10,17,24,25;
127:9,9;135:10,20;
137:12,18,22;138:12,
15,17,19,19,21;139:8;
140:17,19;141:7,14,
21,23;142:3,4,6,11,13,
22,23;143:4,10,11,14;
144:13,13;145:15,16,
18;147:12,21;148:13;
152:4
**Sections (3)**
19:1;54:21;74:5
**secured (1)**
128:3
**security (1)**
11:5
**seeing (1)**
22:5
**seek (1)**
127:7
**seeking (6)**
123:3,15,23,25;
124:4,19
**seeks (1)**
41:23
**seem (1)**
102:9
**seemed (4)**
22:9,25;40:12;94:4
**seems (4)**
80:7;93:21;95:18;
96:10
**segmentation (1)**
141:22
**segregate (1)**
145:25
**segregating (2)**
142:24;145:13
**segregation (1)**
141:22
**selection (15)**
42:8,17;46:13;
49:24;59:16;60:17,21;
61:11;62:4,22,23;66:6;
71:4;119:8;139:22
**Selectors (1)**
42:19
**self-explanatory (1)**
38:18
**self-insurance (1)**
136:9
**selling (2)**
95:5;107:10
**senate (7)**
56:11;60:7;136:1;
138:2;139:17;147:5;
148:3
**senator (1)**
63:20
**senator's (1)**

61:17
**send (2)**
65:16;100:18
**sending (2)**
91:21,23
**senior (1)**
86:6
**sense (11)**
28:25;29:2;32:19;
33:12;34:25;35:7;
40:16;49:9,11;55:18;
76:18
**senses (1)**
112:12
**sensitive (1)**
148:6
**sensor (1)**
157:6
**sent (4)**
91:24;96:6;99:21;
101:10
**sentence (3)**
70:15;93:2;96:10
**separate (5)**
27:14;76:14;93:13;
138:13;142:3
**separately (1)**
94:24
**September (3)**
54:9,25;55:16
**series (8)**
65:23;99:8;104:1,
16;144:10,22,23;145:1
**serious (7)**
152:19,22,24,25;
153:3,4,6
**servants (1)**
35:3
**serve (5)**
47:13;50:8;57:2;
126:1;158:12
**serves (2)**
30:6;158:2
**service (10)**
15:25;16:15;43:9;
56:21;57:7,9;59:3;
81:4;157:19;158:14
**serving (2)**
35:10;158:17
**session (4)**
12:12,22;13:2;34:12
**set (20)**
5:9;25:11;37:7;47:1;
49:4;53:20;57:12;
58:7;64:13;65:6,8,14;
66:24;72:20;73:16;
103:22;116:22,23;
119:9;125:11
**setoff (1)**
122:16
**sets (9)**
36:25;42:6;46:25;
66:14;67:11,19;80:8;

140:16,19
**setting (4)**
47:3;74:7;134:13;
152:4
**settings (1)**
114:1
**seven (5)**
8:2;44:19;90:7;
149:9;158:3
**seventeen (1)**
150:19
**seventeen-year-old (4)**
151:16,17;152:1,9
**seventeen-year-olds (2)**
75:3;109:15
**seven-year-old (1)**
70:9
**several (6)**
15:8;17:25;45:5;
52:9;155:4,14
**severe (1)**
22:12
**sex (13)**
77:10;100:12;105:3,
5,20,23,24;106:12,14;
110:12;150:3,14,23
**sexual (50)**
74:22;75:5,13,20;
76:11;77:16;87:17;
89:4;99:9;100:22;
102:11,12,15,18,21;
104:17;105:19;
106:14;107:13,18,18;
108:12,12;110:3,15,
16;113:19,20;114:3,4;
115:8,12,14,20,24;
116:16,25;117:14,18;
123:10;149:20,20;
151:4,10,11,25;153:6,
6,10,10
**sexuality (2)**
123:9;149:22
**sexually (12)**
90:25;102:25;
103:10;106:1,24;
108:15,16,18;110:21;
117:24;118:6;150:6
**sexually-related (1)**
149:23
**Shades (2)**
81:11;83:10
**share (1)**
126:4
**sharks (1)**
88:1
**shelf (8)**
50:4;10;51:2,6;
81:11;108:6;122:22;
142:6
**shelves (6)**
74:22;87:17;99:1;
105:4;119:2;135:23
**Sherwood (7)**

26:25;27:5;38:25;
39:3,5,9;158:6
**shift (1)**
39:12
**shifted (1)**
135:21
**shifting (1)**
149:24
**Shipley (2)**
23:2;81:16
**shocking (1)**
82:2
**shop (1)**
20:5
**short (2)**
36:4;151:7
**shorter (1)**
54:16
**shorthand (1)**
152:21
**shortly (1)**
15:18
**shot (1)**
134:4
**showed (2)**
14:5;24:18
**shows (1)**
90:16
**shuffling (1)**
129:2
**sibling (1)**
70:21
**side (6)**
20:14;21:8,13;
33:17;63:24;97:21
**sides (3)**
10:8;20:19;138:14
**sign (2)**
75:17;128:8
**signed (3)**
24:8;128:12,15
**significance (1)**
119:17
**significant (1)**
115:15
**significantly (3)**
68:21;96:25;116:18
**signing (1)**
15:22
**silly (1)**
102:9
**silver (3)**
65:3;104:16;144:10
**similar (9)**
14:15;22:16;42:24;
72:21;76:16;95:17,19;
118:24;152:23
**simultaneously (2)**
24:13;137:23
**sincerely (1)**
92:20
**single (1)**
158:5

**sit (6)**
46:10,21,23;79:3;
80:15;85:8
**site (1)**
85:13
**sites (1)**
80:19
**sits (1)**
84:17
**sitting (2)**
50:4;134:20
**situation (4)**
19:6;49:13;127:4;
128:9
**six (4)**
45:13;90:1;126:1;
153:8
**sixteen (3)**
68:3;71:13;87:12
**sixteen-year-old (4)**
69:15;77:20;88:21;
152:2
**sixteen-year-olds (1)**
75:3
**six-year-old (4)**
69:2,3;70:8;102:17
**size (2)**
41:22;141:25
**skimmed (2)**
132:10;142:18
**small (8)**
19:23;20:6;36:1;
38:22;58:3;71:9;
109:25;138:7
**Smith (1)**
154:23
**smut (1)**
61:20
**social (35)**
120:10,16;122:19,
23;123:3,6,13;135:9;
137:12,18,22;138:12,
15,19,21;139:8;
141:14,21;142:4,6,11,
13,22,23;143:4,9,11,
14;145:15,16,18;
148:13;151:14,24;
153:4
**societal (3)**
76:8;116:20;153:5
**society (4)**
114:8,10,19;151:18
**socioeconomically (1)**
52:18
**software (2)**
78:24;79:6
**solar (3)**
51:18,22,23
**sole (1)**
43:25
**soliloquy (1)**
114:6
**solution (3)**

60:4;96:12;97:11
**somebody (10)**
56:18;57:7;70:19;
83:14;104:13;115:17;
118:5;119:11;136:4,5
**somebody's (1)**
71:1
**someday (1)**
77:17
**somehow (3)**
30:12;46:13;77:17
**someone (16)**
11:24;46:15;58:14;
63:9;69:14;71:13;
76:4;92:13;105:23;
117:4;152:9,10;
157:25;158:19,21,24
**sometimes (3)**
12:16;49:11;50:17
**somewhat (3)**
35:15;54:8;120:15
**somewhere (9)**
16:11;22:10;39:18;
52:9;77:14,16;81:8;
130:20;142:6
**soon (2)**
16:23;45:22
**sophisticated (1)**
156:25
**Sorry (2)**
36:1;79:20
**sort (32)**
13:5;14:14;20:23;
30:14;32:6,8;34:3;
43:18;47:5;49:23;
50:5;58:20;70:18;
74:7;77:4;83:21;94:4;
95:13;103:16;106:4;
108:2;111:16;112:11;
118:5;129:25;131:4;
135:9;141:22;144:18;
149:22;152:16;155:21
**sorts (6)**
28:17;41:15,21;
64:25;112:12;145:11
**sought (1)**
18:19
**souls (1)**
139:3
**sound (2)**
98:3;106:10
**sounds (6)**
70:10;83:22;84:1;
117:18;130:14;146:12
**source (3)**
38:4;42:25;95:21
**sources (10)**
28:20;37:19;38:21;
40:3;44:2;45:4,8,17;
99:9;100:20
**Southeast (2)**
125:25;126:1
**Southwest (2)**

115:5;152:14
**space (6)**
21:25;50:9,10;70:6;
81:9;88:11
**spaces (4)**
38:22;66:16;67:14;
84:25
**speak (6)**
9:11,12;11:12,14;
19:12;31:6
**speakers (3)**
30:23,25;31:13
**speaking (7)**
9:4;30:22,23;31:1;
74:17;96:13;136:2
**special (3)**
14:2,11;69:16
**specific (7)**
25:13;76:18;95:18;
96:13;110:6;125:1,8
**specifically (13)**
13:21;23:12;25:20;
26:23;42:15;59:17;
74:1,10;78:1;93:1;
96:13;115:22;156:18
**specifics (2)**
14:21;91:9
**specified (3)**
56:23;57:11;62:12
**specifies (1)**
60:19
**spectrum (1)**
152:6
**speculate (2)**
106:24;140:13
**speech (8)**
12:2;33:25;34:8,18;
79:1;80:20;123:22;
124:8
**spell (1)**
120:7
**spelled (1)**
57:5
**spells (1)**
64:24
**spend (3)**
35:5;77:25;128:24
**spending (2)**
18:19;41:7
**spent (1)**
89:8
**spirit (3)**
49:8;98:15;130:1
**spoke (1)**
21:11
**spoken (1)**
103:4
**sponsor (13)**
24:17;56:11;59:24;
60:7,10;88:7;96:21;
97:13;136:1;138:2;
139:17;147:5;148:3
**sponsors (4)**

56:7;59:19;62:13;
133:9
**sponsor's (2)**
94:15;140:2
**spreadsheet (1)**
154:5
**spurn (1)**
139:5
**square (3)**
33:4;146:3,15
**squarely (1)**
146:16
**staff (49)**
11:6;15:8;18:21;
43:13;44:7;49:3,13;
52:3,13,14,14;53:12;
58:3;66:6;67:14;
68:19;69:4,5;70:1,25;
71:2,19;72:9,13;75:9;
82:14;83:6,15;86:8;
87:20;89:3;98:24;
99:15;100:19,21;
101:3;104:3,8,12,14,
21;107:12;112:19,23;
116:22;141:2;144:12;
154:5;156:3
**staff's (1)**
104:2
**stage (1)**
150:22
**stamp (1)**
96:5
**stamped (1)**
67:1
**standard (6)**
60:1;74:7;80:8;84:7;
107:14;117:10
**standards (4)**
44:18;75:11;76:6;
150:12
**standing (3)**
11:4;56:21;65:8
**standpoint (2)**
118:4;139:20
**stands (2)**
84:19;150:24
**start (8)**
16:23;48:16;53:16,
18;56:19;74:9;120:17;
129:2
**started (3)**
8:22;69:11;94:25
**starter (1)**
93:17
**starting (3)**
25:15;89:19;128:9
**starts (3)**
31:1;66:21;96:10
**state (44)**
11:22;13:15;23:9;
25:7;27:18,20;29:4;
32:20,22;33:14;34:4;
48:16;56:5;61:17;

62:8;63:9,20;75:16;
97:9;99:21,23,24;
100:3,24;101:10,11,
13,23;124:15;127:8;
132:24;133:8;134:18;
135:14;136:1;138:4,6,
11,16;154:2,8,10,12,14

**state-by-state (1)**
84:8

**stated (1)**
90:20

**statement (1)**
132:1

**statements (1)**
21:2

**States (3)**
34:7;84:14;126:2

**state's (2)**
17:17;140:2

**stations (1)**
21:4

**statute (49)**
18:20;27:22;28:13;
56:25;57:5,24;58:13;
59:5,10,11;60:16,16;
62:12,13;74:25;75:25;
76:2,15;77:12;79:9,13;
80:13;82:13;83:4;
84:6;86:13;87:10;
88:2,15;90:23;102:1;
103:13;107:14;
109:14;117:15;
118:22;119:7,24;
123:18;124:7;126:2,
17,17;127:2,4;140:25;
141:1;147:25;150:8

**statutory (3)**
27:6;80:11;81:17

**stave (1)**
146:6

**stay (3)**
20:4;58:8;106:8

**stays (1)**
126:6

**step (1)**
34:16

**stepped (1)**
133:14

**steps (5)**
125:15;126:21,22,
23;127:1

**Steven (1)**
154:23

**stewards (2)**
35:4;157:12

**stigmatizing (1)**
85:20

**still (6)**
12:24;72:13;112:13,
13;121:19;145:12

**stimulating (1)**
108:18

**stimulation (1)**

149:20

**STIPULATED (1)**
5:11

**stipulation (1)**
64:6

**stood (1)**
88:2

**stop (4)**
97:15;123:25;
124:19;130:15

**stopped (1)**
98:3

**storey (1)**
153:13

**stories (3)**
114:14;116:23,25

**story (7)**
110:1;111:25;
116:11;118:3,9;
153:13,15

**strange (2)**
29:5;40:12

**strapped (1)**
137:8

**strategy (4)**
23:6;95:8;128:10,16

**stream (1)**
12:18

**strive (1)**
157:1

**struck (1)**
128:12

**structure (1)**
151:18

**structuring (1)**
65:4

**struggling (1)**
156:9

**student (1)**
8:3

**studied (1)**
85:14

**styled (1)**
54:1

**subcategories (3)**
52:10,10;110:24

**subcommunities (1)**
43:8

**sub-distinction (1)**
83:21

**subdivision (3)**
27:20,21;28:5

**subdivisions (1)**
27:18

**subject (15)**
13:6;23:3;28:23;
29:23;31:16;66:15;
76:5;89:21;90:11,17;
94:21;98:10,22;
115:16;150:4

**subjected (3)**
75:5;81:12;140:1

**subjects (3)**

43:14;113:6;119:13

**submit (1)**
128:20

**Subpoena (4)**
89:20;98:8;130:11;
149:10

**Subsection (1)**
79:15

**subset (1)**
111:11

**subsidy (4)**
78:22;80:25;81:22;
82:23

**substantial (4)**
48:9,23;126:16;
137:10

**substantially (2)**
20:20,22

**subsumed (1)**
36:18

**subtitle (1)**
106:13

**succeeded (1)**
147:3

**succinctly (1)**
124:18

**sue (2)**
124:22;131:21

**sued (2)**
139:10;140:10

**suffers (1)**
115:7

**suggest (3)**
25:3;97:9;102:1

**suggested (3)**
56:16;57:25;88:3

**suggestion (1)**
104:13

**suggests (1)**
39:16

**Suite (1)**
5:7

**summer (3)**
48:1;138:3;147:6

**superseding (1)**
96:24

**supervise (2)**
11:6,7

**supervised (1)**
69:5

**supervising (1)**
70:2

**supervisor (1)**
69:2

**suppliers (1)**
45:22

**supplies (1)**
12:15

**supported (2)**
21:9;61:2

**supporting (1)**
11:16

**suppression (1)**

118:20

**Supreme (13)**
17:1;78:20;81:15;
84:5,10,20;85:10;
88:13,18;99:16;
103:14;109:12;117:11

**sure (38)**
6:18,21,25;9:6,11,
17,19;13:7;18:10;
19:21;20:25;23:21;
25:18,24;29:11;30:17,
22;33:22;34:15;40:10;
59:9;64:18;69:18;
71:1;72:16;74:4;
76:13;86:11;94:20;
114:6;121:9,9,14;
126:2;128:13;137:17;
146:1;157:15

**surprised (1)**
113:7

**survey (3)**
19:15;20:23,24

**suspecting (1)**
25:6

**suspense (1)**
128:8

**suspicious (1)**
25:6

**sweeping (1)**
84:1

**swoop (1)**
56:19

**sword (1)**
25:20

**sworn (1)**
6:3

**System (28)**
8:18;9:1;10:23;26:4,
14,24,24;27:5,9;38:12;
39:3;47:8,9;51:18,22,
23;55:25;61:4;67:3,
19;131:6;138:5;142:9;
143:14;148:11;
152:15;156:5;158:12

**systems (1)**
24:23

**system's (2)**
126:4,7

**T**

**tail (1)**
39:11

**takeaway (1)**
61:12

**Tale (5)**
108:25;111:19;
150:16;151:12;155:6

**talk (13)**
20:1;23:3;26:1;
41:18;51:22;93:18;
95:1,9;97:6;148:22;
150:5;154:3

**talked (10)**
46:2;101:6,7;
113:17;122:4;131:8,8;
136:3,25;143:24

**talking (22)**
6:25;22:14;31:2;
41:1;45:24;81:1;84:6;
85:23,23;89:3;94:11;
95:9;97:13;103:8;
128:18;131:2;138:1,2,
3;145:4,15;156:15

**talks (1)**
66:22

**tape (1)**
147:6

**Target (1)**
90:4

**tasked (1)**
43:23

**taught (2)**
51:17,23

**tax (9)**
12:14;16:16,18,22,
23;29:12,17;32:25;
39:25

**taxes (5)**
11:11;12:15;17:18;
29:19;39:25

**taxing (7)**
16:22;17:16;28:21;
29:6,8,10,22

**taxpayers (1)**
16:14;17:4

**taxpayers' (1)**
35:5

**tea (1)**
100:14

**teach (1)**
147:8

**teacher (1)**
109:23

**teamwork (1)**
9:22

**tease (2)**
9:15;32:9

**technical (1)**
67:8

**Tecum (3)**
89:20;98:9;149:10

**teenager (4)**
115:4,8;116:12;
155:24

**television (1)**
21:4

**telling (6)**
19:7;135:13;137:2,
2;146:22;147:16

**tells (2)**
141:24;147:11

**ten (2)**
150:19;153:8

**tendency (1)**
150:8,13

**Fayetteville Public Library, et al v.**
**Crawford County, Arkansas, et al**
CERTIFIED ORIGINAL/COPY TRANSCRIPT
**Donald Nathan Coulter, Esq.**
**April 1, 2024**

**ten-minute (1)**
149:2
**tenure (4)**
13:25;15:20;16:6;
27:17
**ten-year-old (6)**
69:3;150:25;151:3,
9,19,22
**term (6)**
50:18;51:7;67:8;
93:5;122:19;136:13
**terminals (1)**
79:4
**terms (6)**
39:1;44:11,23;
47:14;69:21;158:21
**Terry (2)**
15:24;52:22
**test (2)**
75:14;152:19
**testified (4)**
6:4;13:23;14:14;
142:25
**testify (3)**
14:5,15;111:9
**testifying (2)**
8:25;14:17
**testimony (9)**
21:3;56:7;63:19;
133:15,17,22;134:8;
137:17;157:14
**thankfully (1)**
114:16
**theory (2)**
50:9;158:24
**thereafter (1)**
15:18
**thereby (2)**
74:23;103:9
**therefore (4)**
28:22;76:8;81:18;
87:15
**thinking (3)**
18:16;48:17;69:21
**third (1)**
152:17
**Thompson (1)**
52:19
**thorough (1)**
49:7
**thoroughly (1)**
23:16
**though (1)**
95:9
**thought (12)**
13:14;14:11;25:16;
48:14;54:14,22;55:2;
56:17;69:8;75:7;
93:21;116:5
**thoughts (1)**
132:16
**thousands (1)**
12:11

**threatened (3)**
25:19;83:16;146:7
**threatening (2)**
131:12;146:23
**three (12)**
27:3,3;44:21;45:13;
56:24;57:1;65:8;
118:12;128:21;150:9;
155:25;158:21
**three-year (1)**
47:14
**throughout (3)**
106:19;115:9;129:5
**thumb (3)**
106:17;109:1;
110:11
**thumbed (2)**
100:10,11
**thumbing (2)**
111:23;151:3
**thus (1)**
134:12
**Tim (1)**
129:16
**timeframe (7)**
24:13;96:3,7;
120:15,24;128:7;
130:20
**times (10)**
20:5;44:3;51:7;
65:15;72:17;86:24;
105:25;107:9;110:7;
119:14
**time-tested (1)**
49:16
**titillating (1)**
150:24
**title (4)**
44:20;53:8;105:14;
136:21
**titles (2)**
43:14;100:12
**today (7)**
8:24;9:12;13:19;
18:3;38:2;98:8;148:9
**today's (1)**
122:1
**toeing (1)**
25:15
**together (2)**
21:21;47:9
**told (17)**
21:7;99:7,8,8,11;
100:6,8;101:1,1;
104:21;107:12;116:23,
24;120:11;132:21;
133:4;141:16
**tomorrow (1)**
129:17
**tone (1)**
95:13
**took (4)**
14:7;37:17;48:3;

97:8
**top (6)**
36:10;39:25;47:4;
48:6,25;57:16
**topic (3)**
152:11,12;157:18
**topics (8)**
10:25;30:23;105:19;
107:22;110:14;114:3;
120:10;149:23
**tornado (1)**
128:12
**tossed (1)**
115:5
**toto (1)**
36:25
**touch (1)**
129:25
**tours (1)**
45:24
**towards (1)**
129:18
**Tower (1)**
5:7
**town (6)**
19:23;20:6;33:4;
71:9;138:7;141:25
**towns (1)**
142:1
**tradeoff (3)**
78:24;82:3,22
**traffic (1)**
127:12
**tragedy (2)**
113:18;115:4
**tragic (1)**
114:9
**tragically (1)**
114:1
**trained (1)**
67:14
**transcript (1)**
142:19
**transition (1)**
42:1
**transparency (1)**
34:25
**traveled (1)**
56:8
**treasurer (3)**
29:15,15;36:13
**treasury (1)**
135:15
**treat (1)**
75:2
**treated (2)**
94:24;140:12
**treating (2)**
75:2;76:2
**tremendous (1)**
112:20
**trends (1)**
42:24

**trial (1)**
16:25
**tried (1)**
152:3
**trigger (6)**
76:11;82:13;98:25;
99:15;133:6;135:11
**triggered (1)**
136:23
**true (3)**
12:9;61:8;135:6
**trust (1)**
139:18
**Trustees (2)**
36:10,18
**truth (4)**
6:3,4,4;122:1
**try (15)**
9:15,18;20:9;25:21;
40:16;46:23,23;49:10;
87:15;88:1;102:4;
129:2,3;144:9;157:12
**trying (24)**
20:16;25:11;32:9;
33:17;45:20;47:17;
58:17;70:22,24;72:11;
75:9;83:15;86:23;
116:8;128:18;131:18;
133:20;146:3,5,5,9,15;
157:4,6
**turn (9)**
49:19;60:6;67:24;
72:24;89:19;96:9;
97:23;135:11;152:16
**turned (3)**
23:4;61:12;85:21
**turns (1)**
119:5
**tweaked (1)**
48:24
**twelve (2)**
72:5,8
**twelve-year-old (1)**
59:2
**two (21)**
20:19;27:8,25;40:2;
47:13;66:9;68:8;73:8;
74:5;113:4,12;128:3,
13;138:14;139:4,11;
140:9;154:20;155:12,
25;158:4
**two-library (1)**
26:14
**type (2)**
67:17;147:2
**types (5)**
46:18;67:3,19;
98:19;123:7
**typically (2)**
57:1;104:6

**U**

**uh-huhs (1)**
6:22
**ultimate (1)**
126:19
**ultimately (3)**
44:11;125:20;
135:18
**unable (1)**
71:10
**unattended (1)**
72:1
**unaware (3)**
111:13,14;143:8
**Uncensored (1)**
105:3
**uncertainties (1)**
133:6
**uncertainty (1)**
75:8
**uncircumcised (1)**
105:22
**Uncle (1)**
142:16
**unconstitutional (10)**
18:13,15,17;19:1;
30:18;118:19,25;
123:18;135:22;147:25
**under (44)**
9:3;16:19;17:17,23;
25:9;27:5,22;29:12,13;
30:4;31:12;33:3;
38:25;41:19;42:17;
49:2;57:21;58:2;
59:15;69:14;71:25;
72:25;80:1;84:19,23;
85:6;86:10;87:16;
89:11;90:12,18;91:2;
93:13;94:9;97:8;
98:11;121:5,19;124:7,
8;125:12;133:24;
149:11;152:7
**underfunded (1)**
147:19
**underlying (1)**
40:15
**understood (3)**
94:10;96:19;122:22
**underway (1)**
24:7
**unequivocally (1)**
111:21
**unfair (1)**
35:21
**unfortunately (1)**
51:19
**United (1)**
34:7
**universe (1)**
22:22
**University (1)**
8:14
**unless (3)**
9:5;50:5,24

**unlimited (1)**
80:19
**unneeded (1)**
96:12
**unpleasant (1)**
93:8
**up (41)**
11:25;14:5;20:4,7;
22:2,10;24:18;25:11,
15;31:1;32:3,3;37:23;
46:1,14;47:13;50:9;
58:19;65:6;68:17,22;
71:15;72:2;79:4;
89:19;105:2;106:14;
110:10;114:7;116:14;
129:14;134:13;
135:20;137:7,13;
142:15;146:5,10;
147:7;148:24;153:23
**updates (1)**
79:6
**uphold (3)**
157:2,10;158:22
**upholds (1)**
157:11
**upkeep (1)**
39:8
**upon (7)**
18:21;25:16;83:2;
88:24;142:24;145:13;
146:10
**upset (2)**
134:16;140:13
**upsetting (1)**
75:16
**upwards (1)**
46:17
**Uranus (2)**
51:16,21
**use (15)**
25:19;42:23;52:16,
19;67:8,9;68:24;77:21,
22;90:15;106:10;
119:8,10;136:10;143:9
**used (9)**
38:11;43:2;51:7;
59:5,10;116:24;
117:10;123:19;136:13
**users (1)**
53:2
**uses (4)**
32:18;56:25;76:17;
84:22
**using (4)**
71:21;76:18;149:19;
157:7

**V**

**vague (4)**
83:13;90:14;118:19;
119:4
**vaguely (1)**
15:20
**value (13)**
11:9;49:15,17;76:8;
107:4;108:3;111:21;
112:17;133:10;152:20,
22,24,25
**values (7)**
47:16;63:2;99:13;
114:12;119:10;157:1,9
**Van (1)**
141:25
**vantage (1)**
156:7
**variety (1)**
31:25
**various (9)**
23:10;36:23;45:5;
55:23;91:11;96:1;
98:16;115:5;132:23
**vary (1)**
125:23
**vendor (1)**
78:24
**vendor-provided (1)**
12:15
**venues (1)**
142:2
**verbal (1)**
6:22
**verbs (1)**
90:15
**verifying (1)**
67:16
**versus (2)**
116:17;156:16
**via (1)**
80:14
**vice (1)**
36:13
**victim (1)**
115:6
**view (11)**
11:20;60:14;75:15;
76:1;80:10;88:8;
138:16;145:11;
146:14;149:16;153:7
**viewpoint (4)**
13:17;31:2,9;142:24
**viewpoint-based (1)**
31:7
**viewpoints (1)**
20:11
**vilifying (1)**
133:11
**violate (1)**
91:5
**violation (1)**
76:5
**Virginia (4)**
84:14,15;115:5;
152:14
**virtue (1)**
114:11
**virtues (1)**
118:22
**visibility (1)**
11:9
**visit (2)**
134:17,17
**visual (2)**
110:2;151:21
**Vladimir (1)**
112:9
**vocal (2)**
24:20;134:23
**voice (1)**
128:4
**voluntarily (1)**
101:12
**volunteering (1)**
129:3
**vote (5)**
128:3,4;130:8,9;
140:4
**voter (1)**
16:17
**voters (1)**
16:11
**vowed (1)**
120:22
**vulnerable (1)**
119:6

**W**

**wait (1)**
44:15
**waiting (1)**
44:19
**walk (2)**
26:2;102:7
**walking (1)**
79:17
**wall (1)**
112:3
**Walmart (1)**
51:4
**wandering (1)**
83:7
**wants (6)**
49:15;53:23;82:9;
87:25;112:22;145:10
**warned (1)**
57:23
**Watch (2)**
63:4;132:19
**watching (1)**
70:7
**WATSON (45)**
6:7,10;21:16;36:6,8;
37:13,16;40:9,17,20;
64:17,21;66:17,19;
73:18,22,24;86:20,22;
87:3;89:15,18;90:7;
91:8;92:4,7,11,13,17;
98:6;111:3;122:4;
125:2;127:11;131:9,
25;143:25;148:10,20;
149:1,9,19;152:17;
153:20;155:11
**way (44)**
9:11;16:18;33:14,
18,18;34:20,22;35:11;
36:3;49:4,4;51:2;
61:18;63:2;65:5;67:9,
20;70:7;72:14;73:5;
74:20;77:11,12;83:6,
14;86:13;87:12,16,21;
88:2,3;102:15;109:18;
111:25;114:18;
116:23;117:15;118:2;
121:25;123:20;
124:16;146:8;147:7;
158:15
**ways (10)**
35:2;47:12;77:3;
81:25;95:7;96:25;
112:1;116:19,20;
157:20
**web (1)**
81:1
**website (4)**
21:3;78:7;87:5;
94:16
**websites (1)**
45:6
**Wedding (1)**
142:16
**weed (1)**
50:17
**weeded (2)**
51:1,14
**weeding (3)**
51:7;52:2;82:7
**week (2)**
15:8;142:10
**weekend (1)**
99:6
**Weekly (1)**
44:3
**weeks (3)**
18:19;101:11;
113:16
**welcome (1)**
68:9
**welcomed (1)**
68:1
**weren't (2)**
88:8;94:2
**what's (17)**
10:20;39:14;45:12,
21;49:19;62:16,17;
63:11;82:4;83:19;
108:23;122:7,7;131:9;
137:21;138:15;144:4
**whereas (1)**
151:18
**WHEREUPON (1)**
159:5
**wherever (1)**
126:8
**whichever (2)**
108:13;126:3
**whole (8)**
6:4;8:1;47:18;79:14;
136:22;147:12;
148:25;150:9
**who's (11)**
66:23;83:14,25;
85:16;88:15;115:5;
119:11;129:23;154:6;
156:6;158:22
**whose (1)**
50:22
**wide (1)**
147:13
**wife (1)**
7:24
**wife's (1)**
150:25
**wild (1)**
136:13
**wildly (1)**
81:11
**willing (7)**
62:9;63:9;82:22;
97:6;106:23;111:23;
143:2
**wind (2)**
22:10;137:12
**Wisconsin (1)**
8:14
**wiser (1)**
114:13
**withdraw (2)**
118:22;119:24
**withdrawal (1)**
135:23
**withdrawing (4)**
65:16,19,21;138:22
**withdrawn (2)**
62:2;65:25
**within (8)**
43:9;66:3,3;96:10;
104:17;110:17;
111:12;128:2
**Without (9)**
19:4;51:20;56:9;
68:2,9;93:22;111:22;
113:1;128:5
**witness (4)**
5:2;6:2;9:13;90:1
**witnesses (1)**
107:11
**woman (2)**
86:6;156:6
**wonderful (1)**
112:24
**word (6)**
52:8;59:9;64:10;
106:10;138:6;157:24
**worded (1)**

25:21
**words (4)**
79:3;109:7,25;
116:24
**Wordsworth (1)**
45:25
**work (10)**
13:9;15:1;20:2;
34:24;61:18;75:17;
84:24;112:20;139:9;
140:3
**workaround (1)**
89:1
**worked (1)**
19:8
**workers' (1)**
41:19
**working (3)**
9:24;10:9;61:4
**works (1)**
55:21
**world (8)**
45:13;64:7,8;77:6;
102:4;108:5;153:7;
156:7
**worried (2)**
135:18;137:6
**worries (1)**
46:24
**worry (1)**
40:13
**write (1)**
134:1
**writing (3)**
132:22;134:9;
145:21
**written (8)**
87:13;102:24;106:1,
24;108:14;117:23;
118:12;128:20
**wrong (1)**
63:11
**wrote (4)**
20:13,14;94:18;
116:13

**Y**

**YA (6)**
111:2,4,8,10,11,12
**y'all's (2)**
92:7;141:5
**year (13)**
17:4;18:6;19:4;
21:24;38:15;40:22;
55:16;68:16;88:2;
116:2;120:25;141:7;
146:25
**years (25)**
8:2,22;11:23,23;
12:4;13:9;14:10;
26:12;34:6;39:15;
50:21;57:14;68:4;

69:1;70:15;71:13,25;
72:5;113:13;133:4;
140:20;150:11,17;
156:6;158:21
**yeses (1)**
6:22
**York (2)**
44:3;107:9
**young (16)**
91:1;103:21,25;
104:1,11;105:4;106:1,
5;108:1,3,4,6;110:24;
111:6;144:12;149:17
**younger (7)**
20:4;70:20,21;
108:20;150:3;153:1;
155:14

**Z**

**zealous (2)**
74:23;77:17
**Zoom (3)**
53:23;66:17;159:4

**0**

**00003 (1)**
49:20

**1**

**1 (27)**
18:14;19:1;35:24,
25;43:23;54:21;67:5;
74:6,9,11,20;75:1;
76:5,15;89:22;90:12,
14,18;91:3,5;98:11;
105:21;109:12;
118:11;123:25;124:2;
152:4
**1:00 (1)**
129:1
**10 (7)**
67:2,13;95:15,25;
108:5;127:11;149:23
**100 (3)**
104:7;113:15;135:1
**11 (4)**
68:1;153:18,24;
154:4
**11th (1)**
49:5
**12 (3)**
69:11;71:25;149:23
**13 (2)**
36:25;37:1
**14 (5)**
7:11;28:7;72:25;
73:3;149:23
**15 (1)**
72:2
**16 (3)**

70:15;89:7;149:23
**16-year-old (1)**
118:6
**17 (3)**
73:9;85:6,6
**175 (1)**
34:6
**18 (12)**
73:9,11,13;84:23;
85:16;89:11;108:5;
140:20;141:7;150:11,
17;152:7
**1910 (1)**
26:11
**1956 (2)**
49:5;62:24
**1985 (1)**
10:2
**1987 (1)**
10:4
**1988 (1)**
135:21
**1991 (1)**
47:7
**1999 (2)**
26:21;27:11
**19th (2)**
116:16;127:19
**1st (4)**
5:4;19:4;48:2;127:3

**2**

**2 (7)**
37:9,10,18;42:16;
46:18;91:19;96:9
**20 (5)**
44:20;67:25;68:18,
19;72:24
**2000s (1)**
17:10
**2003 (2)**
10:23;17:11
**2005 (1)**
16:10
**2009 (2)**
10:24;17:11
**2012 (1)**
37:24
**2013 (1)**
7:11
**2016 (2)**
8:23;10:4
**2019 (1)**
8:16
**2022 (5)**
37:24;93:9;137:24;
138:3,9
**2023 (11)**
37:24;47:23;55:14;
90:12;91:18;93:9;
98:11;127:2,15,19;
137:24

**2024 (1)**
5:4
**205 (1)**
5:7
**21 (4)**
68:14,15;71:24;
146:25
**21st (3)**
96:6;116:17;127:15
**23 (1)**
54:9
**24th (2)**
48:21;91:24
**25 (3)**
67:2,13;113:13
**25th (3)**
60:8;91:18;96:8
**26 (1)**
89:7
**28th (1)**
54:25
**29th (2)**
48:22;54:20
**2nd (1)**
18:6

**3**

**3 (3)**
42:2,3;105:16
**3:30 (1)**
159:5
**30 (8)**
9:3;99:22;100:1;
101:8;133:4;153:19;
154:19,20
**300 (4)**
41:14;42:6;62:24;
126:12
**300,000 (1)**
46:18
**301 (7)**
48:4;54:1;55:21;
64:18,24;67:11;126:14
**3700 (1)**
5:7
**371 (2)**
84:18
**372 (49)**
13:6;18:12;23:23;
25:10,17,20;48:2;
54:13;55:7,7,9;57:21;
65:3;74:1;77:1,1,13;
80:8,12;81:12;87:16;
89:21;90:12;94:18;
98:11,17;100:17;
101:16,18;109:12;
113:7;121:1;123:25;
124:17,20,20;125:9,
14;126:10,22;128:13;
130:15;132:3;133:24;
137:19;138:13,16;
140:16,19;141:6

**4**

**4 (1)**
53:24
**400 (1)**
66:14
**401 (1)**
66:22
**48 (1)**
128:2

**5**

**5 (37)**
18:15;19:1;25:10;
53:22;54:21;66:11,12,
14;67:24;72:20;74:6;
105:14;118:13,15;
120:4;123:25;124:4,5,
8,17,20,20;125:3,4,9,
16,17;126:10,17,24,
25;127:9,9;138:17,19;
147:12,21
**53 (1)**
120:20

**6**

**6 (8)**
16:10;66:11,18,20,
21;67:5;72:21;79:23
**600 (1)**
100:13
**66 (1)**
89:7

**7**

**7 (4)**
78:4,5;80:1;136:21
**700,000 (2)**
46:17;82:6
**75 (2)**
23:13;40:25
**7B (1)**
80:3

**8**

**8 (4)**
67:25;79:11,12;
149:23
**81 (12)**
13:11;19:14;21:23;
24:17;76:22;93:18;
94:18;121:1;122:11;
127:16,18;132:21
**85 (1)**
10:3
**87 (1)**
10:3

## 9

**9 (5)**
66:21;67:6;91:12,
13;96:7
**9:07 (1)**
5:8



- CALS Board of Trustees
- Executive Director — Nate Coulter
- Administrative Assistant — Will Jones

**Deputy Executive Director of Finance and Operations — Jo Ipsen**
- Director of Information and Technology — Dwane Perry
- Director of Facilities and Maintenance — Glendale Hernandez
- Human Resources Manager — Candace White
- Accounting Manager — Beranda ___
- Strategic Data Manager — Carol Coffey

**Director of Public Services — Kate Matthews**
- Regional Manager — Faith Hobbs
- Regional Manager / Head of Maintenance — Ann Hollar
- Reference Library Manager — Glenn Whaley
- Collection Development Manager — Leslie Blackwell
- Technical Services Manager — Elizabeth Clemons
- Community Resources Manager — Rebecca Beyda

**Director of Programming — Ebba Samples**
- Youth Services Coordinator — Amanda Fogel
- Head of Adult Programming — Maria Chiras
- Be Mighty Coordinator — Frazier Emerson
- Outreach Coordinator — Courtney Jones

**Director of Communications and Community Engagement — Tamika Lee**
- PR Specialist — Stewart Land
- Web Designer — Jeff Nanko
- Content Creator — Bryan Golfos
- Content Writer — Bob Marks
- PR Specialist — Maria Aguilar
- Community Liaison — Hedda McDaniel

**Director of Development — Eliza Borne**
- Grants and Development Coordinator — Hannah Sexton
- Development Specialist — Linda Ellis
- Volunteer Coordinator — Polly Owens
- Development Specialist — Lilly Renfrow



PENGAD 800-631-6989

EXHIBIT
1

CALS00067

EXHIBIT
2
PENGAD 800-631-6989

CALS00066

CALS- Income Sources 2012-2022
(CALS and CALS Foundation)

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tax Collections | 14,885,876.00 | 14,961,860.00 | 15,571,007.00 | 17,973,996.00 | 16,343,108.00 | 17,124,391.00 | 17,528,053.00 | 17,800,791.00 | 18,833,855.00 | 19,207,290.00 | 22,382,146.00 |
| Intergovernmental-City of LR Bonds | 11,167,887.00 | 12,366,334.00 | 5,120,747.00 | 5,988,797.00 | 9,754,740.00 | 6,909,005.00 | 2,778,487.00 | 496,664.00 | 27,000.00 | 66,842.00 | 2,954,397.00 |
| State of Arkansas Aid | 579,540.00 | 586,480.00 | 589,724.00 | 508,282.00 | 495,414.00 | 484,112.00 | 570,595.00 | 541,471.00 | 522,888.00 | 516,638.00 | 574,390.00 |
| Fines Fees Permits | 429,613.00 | 442,416.00 | 492,639.00 | 424,073.00 | 388,846.00 | 477,350.00 | 595,869.00 | 503,854.00 | 230,951.00 | 361,577.00 | 444,705.00 |
| Gifts | 274,838.00 | 888,514.00 | 323,564.00 | 652,417.00 | 588,073.00 | 287,857.00 | 757,100.00 | 1,022,009.00 | 408,659.00 | 562,508.00 | 376,238.00 |
| Grants | 159,807.00 | 292,905.00 | 223,648.00 | 253,360.00 | 270,987.00 | 316,075.00 | 451,968.00 | 450,882.00 | 962,142.00 | 1,886,095.00 | 1,325,809.00 |
| Lease Income | - | - | - | - | - | 153,615.00 | 184,478.00 | 252,047.00 | 341,591.00 | 354,691.00 | 458,711.00 |
| Sales-Books and other | - | - | - | - | - | - | - | - | 248,459.00 | 268,075.00 | 476,976.00 |
| Misc Inc | 977,424.00 | 742,097.00 | 1,338,486.00 | 914,552.00 | 915,054.00 | 999,101.00 | 650,325.00 | 838,428.00 | 374,672.00 | 16,896.00 | 25,362.00 |
| Interest and Investment Gain/Loss | 213,301.00 | 303,121.00 | 152442 | 41,437.00 | 184,924.00 | 377,728.00 | (73,440.00) | 743,968.00 | 741,999.00 | 649,343.00 | (896,629.00) |
| | 28,688,286.00 | 30,583,727.00 | 23,812,257.00 | 26,756,914.00 | 28,941,146.00 | 27,129,234.00 | 23,443,435.00 | 22,650,114.00 | 22,692,216.00 | 23,889,955.00 | 28,122,105.00 |



# SELECTION OF LIBRARY MATERIALS

## CENTRAL ARKANSAS LIBRARY SYSTEM
### BOARD POLICY #300

BOARD APPROVAL: 3/27/91, 8/25/05, 1/28/16, 8/24/23
REVISION: 4/20/99, 8/05/05, 10/26/15, 7/25/19, 8/22/23
DIRECTOR'S RECOMMENDATION: 3/27/91
LEGAL ADVICE: NA
REFERENCE: NA

## OBJECTIVE

The objective of the Central Arkansas Library System (CALS) is to provide a balanced and broad collection of materials and resources in varied formats to enlighten, inform, entertain, and empower the diverse community of Pulaski and Perry Counties.

## SELECTION PRINCIPLES

The Board of Directors of CALS recognizes the pluralistic nature of the community and the varied backgrounds, levels of education, and needs of all citizens of all ages. The responsibility for selection of library materials is delegated to the Executive Director and under their direction to the appropriate members of staff. The Board, therefore, establishes the following principles to guide the Library in the selection process.

- Develop a well-rounded collection of current, high-demand, high-interest materials in a variety of formats to meet the needs of our patrons.

- Make available a wide diversity of points of view, subjects, opinions, and modes of expression, reflecting the diversity of the community and world we inhabit, and the diversity of reader tastes and interests. No library material will be excluded because of the race, nationality, sex, or the political, social, or religious views of its author or its intended audience.

- Provide materials to meet the recreation and information needs and interests of our patrons and organize those materials in age-appropriate collections.

- Make available current, accurate, and useful information to encourage lifelong learning by independent adult learners.

- Encourage minors to develop an interest in reading and learning by providing an outstanding collection of materials.

- Provide materials in digital/electronic formats. Changes and advances in technology make it imperative that the library adapts in order to offer the best and most complete information services.

- Provide an appropriate number of copies for each title purchased so that patrons do not need to wait an unreasonable length of time to get any item.

**EXHIBIT**

3

PENGAD 800-631-6989

CALS00001

## INTELLECTUAL FREEDOM

All patrons are free to reject any materials of which they do not approve for their use. The choice of library materials for personal use is an individual matter. No one has the right to exercise censorship to restrict the freedom of use and/or access of others. The library staff does not serve in loco parentis (in place of the parent). Parents/guardians have the final responsibility for what their children choose to borrow from library collections. Any request for reconsideration of an item in the collection must follow the procedure outlined in the "Collection Development" section of "Policies and Governance" on the CALS website.

The Library subscribes to the philosophies outlined in the following documents.

Library Bill of Rights

Freedom to Read Statement

Freedom to View Statement

Labels and Rating Systems

Free Access to Libraries for Minors

From time to time, a person may be concerned about a particular book or other material in the Library. Patrons may request that CALS reconsider the inclusion of an item in the collection, or the decision to place the item in a particular area of the collection. Any request for reconsideration of an item in the collection must follow the procedure outlined in the "Collection Development" section of "Policies and Governance" on the CALS website.

## SELECTION CRITERIA

There is no single standard that can be applied to evaluate all the materials included in the Library's collections. Each type of material will be evaluated in terms of its own qualities and merits. Some general criteria used are:

- Selectors respond to community interests by careful consideration of patron requests for purchases, use patterns for existing materials, purchase trends of similar materials by peer libraries, and any other source of information indicating community interests.
- Evaluation in reputable review sources such as: *Booklist, Library Journal, Publisher's Weekly, The New York Times Book Review, School Library Journal, Arkansas Democrat-Gazette* as well as various websites and blogs.
- Popular demand
- Accuracy and currency of information
- Authority and reputation of the author or publisher
- Artistic and literary merit
- CALS staff is encouraged to recommend titles and subjects to be purchased for their branches based on knowledge of their patrons' needs and interests.

CALS00002

- The choice of format will be made considering customer needs first, then taking into account technological developments, cost of the item, and CALS ability to acquire, process, and circulate the items in the specific format.
- The format of materials must be suitable for library use and must be appropriate to convey the subject matter. Materials with formats that do not conform or lend themselves to library use are usually excluded. This includes items with processing and storage issues, single use items, and items and services not commercially available to libraries.
- The relation of new materials to existing CALS collections shall be considered.
- All materials will be judged as a whole rather than on isolated parts or passages. Works that depict an aspect of life honestly will not be excluded because of frankness of expression, or because it is controversial. Library materials will not be marked or identified to show approval or disapproval of contents, and no catalogued book or other item will be sequestered, except for the express purpose of protecting it from injury or theft.
- Since technical systems do not exist to insure Internet conformity with CALS' Selection Policy, users of the Internet are expected to know and abide by CALS' Public Computer and Internet Use Rules and Responsibilities.
- Unsolicited gifts will be subject to the same selection policies and procedures applied to any materials added to the collection. Any materials not added to library collections will be given to the Friends of CALS book sale.

## COLLECTION MAINTENANCE

Periodic and continuous evaluation of materials in the collection is a priority of collection development and is considered of equal importance to the acquisition of new materials. Systematic and ongoing weeding of library materials is essential in order to assure an active and useful collection and the best use of available space. In addition to weeding of print materials, the discontinuation of purchasing and/or housing of older media formats will be considered when demand and availability indicate they are no longer appropriate for the collection.

Materials that are weeded may be given to the Friends of CALS or non-profit organizations for resale and/or reuse. Some items may be physically discarded due to significant damage or in a condition in which they cannot be sold or reused.

## SPECIAL COLLECTIONS

Richard C. Butler, Sr. Center for Arkansas Studies Collection

The Butler Center for Arkansas Studies exists to collect, preserve, promote, and provide access to the historical, cultural, political and societal records of Arkansas, her counties, the city of Little Rock, and the immediate region. Toward that end, the Center shall collect the literature of the state, including both fiction and nonfiction. The Research Services Division of the Butler Center for Arkansas Studies acquires and preserves documents, photographs, maps, pamphlets, media, ephemera, and other primary materials. Along with materials that focus on events within the boundaries of the state and in keeping with its founding documents, the Butler Center collects material that provides insights into Arkansas's place in broader political and bioregional contexts.

A separate genealogical collection will also be maintained in the Butler Center. The genealogy collection will have a national scope, supplemented by materials covering foreign countries and regions. The Butler Center will maintain close relationships with private genealogical organizations in an attempt to acquire holdings of such groups.

Additional guidelines for selection for this collection will be implemented and revised, as needed, by Butler Center Staff.

CALS00004

# RECONSIDERATION OF LIBRARY MATERIALS

### CENTRAL ARKANSAS LIBRARY SYSTEM
### BOARD POLICY #301

BOARD APPROVAL: 10/23/97, 1/26/05, 9/28/23
REVISION: 1/9/06, 7/25/19, 9/7/23
DIRECTOR'S RECOMMENDATION: 10/23/97
LEGAL ADVICE: 12/13/05
REFERENCE: SEE ALSO Administrative Procedure 301, FORM #301

Any current cardholder in good standing of the Central Arkansas Library System (CALS) service area who wishes to object to an item in the library's collection or to an Internet site accessed through a library computer, must complete, and sign a Request for Reconsideration of Library Materials form. All complaints will be forwarded to a committee of three (3) library professionals employed by CALS appointed by the Executive Director.

The Executive Director will communicate the committee's decision and any accompanying documentation to the cardholder within a reasonable period of time.

If the cardholder is not satisfied with the committee's decision, they may file a written appeal to the CALS Board of Directors within seven (7) days of the receipt of the committee's written decision.

The challenged item shall remain in circulation for the period of time it takes to complete the review and appeal process.

Once the review process is complete and a decision has been made on a particular item, that item will not be reviewed again for five (5) years.

All documentation regarding the request for reconsideration will be retained in the administration office for a period of five (5) years.



EXHIBIT
4

PENGAD 800-631-6989

CALS00005

# RULES OF CONDUCT
CENTRAL ARKANSAS LIBRARY SYSTEM
BOARD POLICY #400

BOARD APPROVAL: 2/22/89
REVISION: 3/29/94, 11/20/97, 1/22/98, 8/29/00, 09/28/12, 9/22/16, 7/26/18, 7/25/19, 12/17/20, 6/24/21, 8/15/23
DIRECTOR'S RECOMMENDATION: 2/22/89
LEGAL ADVICE: 3/9/93
REFERENCE: SEE ALSO Administrative Procedure 400, Administrative Procedure 401, FORM #053, FORM #054, FORM #055, FORM #056

In order to ensure that library facilities are safe, are welcoming, and provide equitable access to materials and services for all patrons, the CALS Board of Directors has adopted the following rules and regulations.

**RULES FOR USING THE CENTRAL ARKANSAS LIBRARY SYSTEM'S FACILITIES**

**Level 1: Actions that require immediate removal from the library premises**

1. Persons who break any local, state, or federal law while using library resources or facilities shall be immediately removed from the library and may be charged under appropriate ordinances, statutes, etc.

2. Persons who deface or mutilate any library property shall be immediately removed from the library. It is the policy of the Board that such persons be prosecuted under appropriate statutes. This especially applies to anyone guilty of defacing or mutilating books, periodicals, or other collections.

3. Persons carrying any weapon may not enter the library and shall be immediately removed and it is the policy of the Board that such persons be prosecuted. The only exception is for people in possession of a concealed handgun license recognized by the State of Arkansas.

4. Persons who urinate or defecate anywhere on the premises other than authorized restrooms shall be immediately removed from the library and may be charged under appropriate ordinances, statutes, etc.



PENGAD 800-631-6989

EXHIBIT

5

5. Persons engaged in sexual conduct or lewd behavior shall be immediately removed from the library and may be charged under appropriate ordinances, statutes, etc.

6. Persons engaged in fighting, abusive language, or other aggressive behavior shall be suspended from the library and may be charged under appropriate ordinances, statutes, etc.

7. Patrons whose bodily hygiene is offensive so as to constitute a nuisance to other persons shall be required to leave the building. They may reenter the library when they have eliminated the nuisance caused by their hygiene.

**Level 2: Actions that require a written copy of the rules and/or verbal warning, but if repeated are subject to further action**

8. Patrons in the library shall be engaged in using library materials, services, or facilities for their intended purpose.

9. Patrons shall not engage in harassing or threatening activities in the library.

10. All patrons must wear shoes and, as appropriate, trousers, outer shorts, pants, skirts, dresses, blouses, shirts, and/or T-shirts.

11. Patrons may eat or drink only in designated areas of the library.

12. Smoking, use of tobacco products, and electronic nicotine delivery devices are prohibited on CALS property.

13. Sleeping is not permitted in the library.

14. No animals, except service animals accompanying persons with disabilities, are allowed in the library.

15. Nonlibrary-approved solicitation in any form is forbidden.

16. Public restrooms shall not be used for bathing, shaving, or washing clothing.

17. Conversations, including cell phone conversations, that disturb other patrons or interfere with the ability of the staff to perform its duties are forbidden. Volume from earphones and other portable devices should not be so loud as to disturb others. Speakerphone and speaker functions shall not be used inside the library.

18. Littering of the building and library grounds is forbidden.

19. Patrons' personal belongings must not block access to walkways, computers, or other library resources, and must not be left unattended. Any carrying device that is allowed in the library is subject to search when the person leaves the building, in accordance with Arkansas Statute 13-2-805.

20. Children ages 11 and older are welcome to be at the library without a caregiver if their behavior complies with the Rules of Conduct. Caregivers should be at least sixteen years of age and attentive to the needs of persons in their care. Further information regarding caregivers and child safety can be found in the library's Safe Child Procedure.

21. The police department will be called if children under 12 years of age are left unattended in front of the building prior to regular opening time or have not been picked up by 15 minutes after closing time.

22. Library computer users must sign in and agree to the Rules and Responsibilities for Public Computer and Internet Use.

23. Patrons shall not enter spaces marked "Staff Only" unless they have permission from a member of the library staff.

Failure to observe the Rules of Conduct may result in suspension of library privileges. In the event of repeated offenses, the Library reserves the right to impose additional suspensions based on circumstances. Suspensions may be appealed to Library Administration.

## CIRCULATION & FEES
CENTRAL ARKANSAS LIBRARY SYSTEM
BOARD POLICY #401

BOARD APPROVAL: 6/14/89
REVISION: 12/12/93, 12/27/94, 9/26/95, 4/01/98, 1/27/00, 4/24/01, 4/25/02, 7/15/02, 2/12/03, 4/22/10, 3/28/13, 5/26/16, 1/25/18, 4/26/18, 7/25/19, 1/23/20
DIRECTOR'S RECOMMENDATION: 6/7/89
LEGAL ADVICE: NA
REFERENCE: NA

### CARD ELIGIBILITY

The Central Arkansas Library System (CALS) provides free library cards to persons residing in or paying property taxes in our taxing areas which are Pulaski County (excluding North Little Rock) and Perry County. Students who are enrolled in educational institutions in our taxing area are also eligible for CALS library cards. Those living outside of the CALS taxing area may obtain a library card by paying a non-resident fee in an amount set by the Executive Director and determined by a periodic estimation of the approximate amount of library taxes paid by the average property owner in the CALS service area.

Library administration will establish guidelines for verifying the identity and residency of library card applicants.

By applying for a library card the customer agrees to abide by all library policies and procedures.

### CHECK-OUT PRIVILEGES

To ensure the most equitable use of library resources, library administration will establish guidelines for check-out privileges including but not limited to borrowing periods, limits on number of items that may be borrowed, and conditions under which check-out privileges will be suspended.

CALS may restrict or deny check out privileges for anyone who violates library rules.

### FINES AND CHARGES

Reasonable fees and charges will be determined by the Executive Director and may be updated periodically as is necessary.

CALS reserves the right to waive any of the aforementioned rules if special circumstances make such a waiver advisable.



PENGAD 800-631-6989

**EXHIBIT**

6

## TABLE OF CONTENTS

*Operational Tasks* _____ *3*

**Library Cards and Registration** _____**3**

⊶

Verifying Addresses _____ 3

Types of Library Cards (Patron Types) _____ 4

    Individual - PTYPE 0 _____ 4

    Multi-User - PTYPE 1 _____ 4

    Adult Provisional – PTYPE 2 _____ 6

    Non-Resident – PTYPE 3 _____ 7

    Staff – PTYPE 4 _____ 8

    Student/Educator Non-Resident – PTYPE 5 _____ 8

    Child Provisional – PTYPE 6 _____ 8

    Administrative – PTYPE 13 _____ 9

    Bibliocommons Staff – PTYPE 20 _____ 9

    Tech Cards – PTYPE 26 _____ 9

        Gateway _____ 10

Online Registration _____ 10

Identification _____ 10

    Identification for Adults _____ 10

    Children and Identification _____ 11

Accuracy in Registration _____ 11

Checking for Duplicate Cards _____ 13

Renewing Expired Cards _____ 13

Purged Cards _____ 14

Change of Address, EMAIL, or Telephone Number _____ 14

CALS00010

Replacement of Lost or Stolen Cards _____ 15

Card Not Received in Mail _____ 15

Personal Identification Number (PIN) _____ 16

Registration When Sierra Not Working_____ 16

## OPERATIONAL TASKS

## LIBRARY CARDS AND REGISTRATION

Related policy: Board Policy 401

### CALS SERVICE AREA

The CALS service area is Pulaski and Perry County, excluding North Little Rock. Because the North Little Rock Library System serves NLR residents, NLR residents are typically eligible only for a CALS non-resident card. When a NLR resident pays property taxes to CALS, they are eligible for a free account.

### VERIFYING ADDRESSES

For addresses that appear to be outside our service area, do your best to verify the library to which property taxes for that address are paid. The school district to which taxes are paid does not matter for our purposes; we do not receive any funds from taxes paid to school districts. Consult with your manager and colleagues if you need assistance.

The standard procedure for verifying an address in Pulaski County is:

- Go to Pulaskicountytreasurer.net
- Select Pay Taxes/Inquiry
- Type in the patron's residential address in the Property Address field using only house number, street name, and abbreviated suffix without punctuation, e.g., 100 S ROCK ST
- Click Search
- Double click on the most recent result. Keep in mind that many people rent their home, so the name on a property may be different from the patron's
- Select View History
- You should see which library receives the property taxes

If you verify an address add/insert a NOTE into the patron record as follows. Only add this note if the address looks like it is not in our service area.

- Address verified at Pulaski County Treasurer. <initials> <date>

If you cannot find a parcel for an address, verify the address in Melissa. If it is a verified address, use Google Maps to find a building adjacent to the one you are looking up, and plug that information into Pulaski County Treasurer. It is unlikely that someone will pay property taxes to CALS while their closest neighbor pays to NLR.

## TYPES OF LIBRARY CARDS (PATRON TYPES)

### INDIVIDUAL - PTYPE 0

Any individual resident, property taxpayer, educator employed by an educational institution in our service area, or student attending an educational institution in our service area is eligible for a free library card. Individual residents and property taxpayers are assigned PTYPE 0 (individual).

- Assign PTYPE 0 (individual) to this record

Educators or students attending an educational institution in our service area but not residing in our service area are assigned PTYPE 5 (student/educator non-res). This PTYPE should be used when the student/educator's address is non-resident. If a student has an address in our service area PTYPE 0 should be used instead. See the section on PTYPE 5 below for further information.

Anyone who is not a resident, taxpayer, or educator/student attending an educational institution in our service area must pay an annual non-resident fee to register for a library card. See the section on PTYPE 3 below for instructions.

If someone is listed as the primary user on a multi-user account, that account must be in good standing for them to apply for an individual card.

***Special procedure – Individual does not live in service area but owns property in service area***

People who own property but do not reside in our service area need to present proof (e.g., a deed, a tax receipt, mortgage papers) that they pay property taxes in our service area.

- Add/Insert the "Property Address" to the patron record with the address of the property.
- If it is provided, you may add the parcel # of the property from property tax records into this field as well.

### MULTI-USER - PTYPE 1

There are two types of multi-user card: family and corporate (organizations, day-care centers, etc.). Multi-user cards allow a family or organization to have multiple cards/barcodes for a single account. This is a convenience and allows the primary account holder to receive notices about all items on the account and allows all authorized users to have consent to act for all other authorized users, except for changing the account PIN.

***Family cards***

Individuals who are at least 18 years old can create a family account. If they do not currently have a CALS card, they must be eligible for a free individual card to apply for a family card. If they already have a CALS card, their account must be in good standing. Patrons may have a family card and an individual library card. This will allow for privacy and confidentiality of library accounts when needed.

Multiple cards will be issued to one account. This is a convenience which allows the primary account holder to receive a circulation notice for all materials regardless of which card is used to check out the materials. Our software does not track which card is used to check out which items for this type of card. The person who establishes the account will be the primary account holder and is responsible for any fines or fees incurred on the

account. The card may be edited/renewed only by the primary account holder. The primary account holder's signed written consent grants access to authorized users.

The account is limited to 10 authorized users. Additional users may be added at a manager's discretion. Authorized users must reside in the same household as the primary account holder and do not have to be present at the time of application. The names of authorized users of the account will be added as additional names to the record; the primary account holder's name must be listed first. Check out limits and fine limits are the same as for an individual library account.

- Assign PTYPE 1 (multi-user) to the account

- In the primary account holder's name field, add a space after the middle name, then in all caps add the word "PRIMARY." For example:
    Jones, Susan Lee PRIMARY

- Add/Insert multiple name fields, one for each authorized user. The primary account holder's name should be first. All subsequent name fields will contain name, date of birth, and the last 4 digits of the barcode number assigned to that individual. For example:
    Smith, Johnny Doe (9-1-1991) 2248

- Add/Insert multiple barcode fields, one for each card, and tag each card with a post-it note to indicate which card is assigned to which individual before giving the patron the cards or before mailing the cards. Note that Sierra does not track which barcode is used to check out which item; the multiple cards are merely a convenience.

- Finally, ensure the primary cardholder's name is at the top of the group of names in the account.

### *Corporate/day-care center cards*

Any organization can apply for a corporate card. A corporate application form and written request are required. The request needs to be on the organization's letterhead and signed by the organization's director/person in authority.

Both request and form may be returned to any CALS location. Organizations can be issued more than one card. These cards are issued at all locations.

After issuing the card, send the application and letter to the Head of Circulation at Main. Keep copies on file at your location. Corporate cards are issued for one year and are subject to yearly review.

- Follow the same guidelines as for family multi-user cards but add/insert the organization name as the first name in the account.

Daycare center cards should be processed the same way as a corporate card. The name of the daycare center should be listed on the patron account as the card holder and names of authorized users should be added as a note in the record.

- Follow the same guidelines as for family multi-user cards but add/insert the organization name as the first name in the account.

## ADULT PROVISIONAL – PTYPE 2

This card has limited checkout privileges and is appropriate for a variety of situations: residents at temporary addresses, residents with no permanent address, patrons who request limited privileges, and as a courtesy. It is primarily intended for adult patrons. See also PTYPE 6 Child Provisional.

- Assign PTYPE 2 (provisional) to the account
- Adult Provisional cards have limited privileges
  - Patron may have a maximum of 5 physical items checked out
  - Patron may have a maximum of 10 Overdrive/Libby items checked out

### Temporary Address

While persons with temporary addresses at shelters or similar facilities in our service area may apply for a provisional card by providing CALS with documentation from the shelter or service facility where they are a temporary resident, this type of documentation is not required. A City of Little Rock Identification Card with a shelter or service facility's address can also be used to document temporary residence.

People staying at Guesthouse Inn, Baptist Hospital Medical Plaza Hotel, Arkansas Cancer Research Center, Arkansas Children's Hospital, or similar medical housing can be issued a provisional card.

Once documentation has been provided, the patron may receive their card immediately; it should not be mailed. People with temporary addresses are not eligible for Interlibrary Loan services.

### No Address

Persons residing in our service area with no fixed or temporary address may apply for a provisional card.

The patron may receive their card immediately; it should not be mailed. People with temporary addresses are not eligible for Interlibrary Loan services.

We ask, but do not require, that patrons provide some documentation of their identity, e.g., a photo ID or a picture/photocopy of same, documents with their name on them, etc. When these items are not available, managers may use their judgment to determine whether to issue a provisional card.

### Courtesy

At the discretion of a Branch Manager or the Head of the Circulation Department, a provisional card may be issued to an institution, business, or individual as a courtesy. Courtesy provisional cards expire one year from the date of issue.

Patients and their families staying at local medical hospitals (e.g., Guesthouse Inn, Baptist Hospital Medical Plaza Hotel, AR Cancer Research Center, etc.) may be issued courtesy provisional cards at a Branch Manager's or Department Head's discretion, providing they can show proof of that status. Place a note in the patron record that this proof has been provided.

# NON-RESIDENT – PTYPE 3

Anyone who is not a resident, property taxpayer, educator employed by an educational institution in our service area, or student attending an educational institution in our service area must pay an annual non-resident fee to register for and use a library card. The non-resident fee is based on the average property tax paid per parcel in our service area; for 2020 this fee is $54. This fee must be paid prior to use of the non-resident card. Payment of the fee entitles the card holder to all the benefits of an individual library card.

The following process should be used for non-resident cards.

- Confirm that the patron understands that a non-resident fee will be added to their library record.
- Add the non-resident fee to the patron's account as a manual charge. There are pre-defined manual charges for 3-month, 6-month, and annual non-resident fees which you can select from the list of pre-defined charges. The patron preferably must pay all the fee before using the card. For patrons who cannot pay the entire fee discuss the situation with your manager and colleagues and determine the best course of action, but in all cases add a manual charge to the record as evidence that the fee has been paid.
- Assign PTYPE 3 (non-resident) to the record
- Change the expiration date in the record based on the amount paid. The expiration date will block circulation privileges when the card expires.
    - 3-month: Set the expiration date to the end of the month three months from the current month. For example, if the patron pays in February the expiration date would be Feb + 1. Mar 2. Apr 3. May -- May 31st.
    - 6-month: Set the expiration date to the end of the month six months from the current month. For example, if the patron pays in February the expiration date would be Feb + 1. Mar 2, Apr 3. May 4. Jun 5. Jul 6. Aug – Aug 31st.
    - Annual: Set the expiration date to the end of the same month next year so that this aligns with the way we set dates for three- and six-month expirations. For example, if the patron pays anytime in March set the expiration date to March 31st for the next year.
- If paying by cash or with credit card, use the non-resident key on your cash register. If your cash register does not have a non-resident key consult with Accounting on which key to use.
- If the patron prefers to send a check, direct them to send their check to the Head of Circulation at the Main Library's address: 100 S Rock St, Little Rock, AR 72201. They should include their barcode number on the check. If the check does not clear, CALS will place a Bad Check Manual Block on the patron record.
- Payment of the non-resident, at whatever payment structure, must be paid in full before the card's expiration date may be extended. In other words, the non-resident fee may not be rolled into overdue or replacement fees.

The above procedure should also be used to renew a non-resident card. Remember to verify the address, telephone number, and email address when renewing the card. If the address has changed, verify that the patron is still a non-resident.

### *Multiple User Non-Resident Cards*

Non-Resident accounts may not receive multiple barcodes in the same way our resident multi-user accounts can. Do not add multiple barcodes to a non-resident account. However, a non-resident card can have multiple names associated with the account. This is a convenience and allows the primary account holder to receive notices about all items on the account and allows all authorized users to have consent to act for all other authorized users.

- Add/Insert multiple name fields, one for each authorized user. The primary account holder's name should be first.
- Do not use more than one barcode for a non-resident multi-user account. Non-residents may only have one barcode.

## STAFF – PTYPE 4

Members of CALS staff are required to use their library cards when checking out materials. For staff members living outside the CALS service area, non-resident fees are waived.

- Assign PTYPE 4 (staff) to the record
- Record the actual mailing address in the mailing address field

Employees are responsible for paying any fines or fees incurred on their library cards (e.g., overdue fines, replacement fees, lost library card, etc.), and may not override blocks on their record to their benefit.

Staff members will be blocked from checking out additional materials if they abuse these policies. Repeat offenses will not be tolerated and may result in termination of employment.

## STUDENT/EDUCATOR NON-RESIDENT – PTYPE 5

Any educator employed by an educational institution in our service area, or student attending an educational institution in our service area is eligible for a free library card; the non-resident fee is not required in this situation. This PTYPE is primarily intended for adult patrons. See also PTYPE 6 Child Provisional, which is used for school groups.

An "educator" is anyone working at an educational institution.

An "educational institution" is considered in our service area if it has one campus in our service area. For example, Pulaski Technical College has campuses in North Little Rock, Little Rock, and Benton; since there is at least one campus in our service area then this educational institution is in our service area. Determining this can be difficult for private schools with North Little Rock campuses; ask the school where their campuses are located if you need to verify they have a campus in our service area.

- Assign PTYPE 5 (student/educator non-resident) to the record only if the address of the student/educator would normally be a non-resident address. There is no need to use PTYPE 5 for a student/educator in our service area, use PTYPE 0 (individual)instead.
- Record the actual mailing address in the mailing address field.

The individual should show proof of enrollment or employment, preferably a school ID, work ID, current pay stub, or verification of employment on the educational institution's letterhead. If a patron does not have proof, set the expiration date on the account for one month in the future and ask them to bring proof on the next visit. Put a message in the patron record that student/educator status needs to be verified.

## CHILD PROVISIONAL – PTYPE 6

***Children***

Children who need or would like to obtain a library account without a parent/guardian's signature may apply for a provisional card. The child must be able to provide all required application information.

***School Groups***

Use PTYPE 6 for all school groups visiting CALS where the students receive cards. For any addresses which are not in our service area add the following NOTE when creating the record:

- Student at school in service area

Child Provisional cards have limited privileges

- Patron may have a maximum of 5 physical items checked out
- Patron may have a maximum of 10 Overdrive/Libby items checked out

## ADMINISTRATIVE – PTYPE 13

Departments and branches have cards for program collections, branch holds, and other administrative needs. Administrative cards must be issued by the head of the department or branch.

Administrative cards, including ones attached to staff members, should never be used for personal or non-library-related activity.

- Assign PTYPE 13 (administrative) to the record

## BIBLIOCOMMONS STAFF – PTYPE 20

When setting up an account in Bibliocommons, any patron with PTYPE 20 is recognized as staff and will display the CALS logo beside the username. Staff may create patron accounts with this PTYPE to be used for creating lists or shelves in Bibliocommons to promote library materials to patrons. Cards with this PTYPE should not be used to check out materials for personal use. Staff may use PTYPE 20 for cards, which might normally be PTYPE 13 (administrative) to combine the two purposes; discuss this with your manager and colleagues to determine what is most appropriate for your situation.

- Assign PTYPE 20 (Bibliocommons staff) to the record

## TECH CARDS – PTYPE 26

In partnership with schools within our service area, we offer Tech Cards to students.

- Do not manually assign PTYPE 26 to any record. These records are created annually prior to distribution of the tech cards to schools.
- Do not edit records with PTYPE 26 unless authorized to do so.

These cards are designated in Sierra as PTYPE 26 (Tech Card) and can be used to access any CALS digital resources (databases, Overdrive, Freegal, etc.).

They can also be used to make a computer reservation in the library but cannot be used to check out physical library materials. Staff should never override this check-out block. Tech Cards begin with 77653 rather than the usual 57653 of standard library cards.

Tech Cards are issued to students by their school rather than at the library. We cannot replace a lost or damaged Tech Card, but students can get a replacement through their school. The cards are not issued to individuals and do not contain identifying information beyond the name of the school or school district. All PINs for Tech Cards are set to 1234 and should not be changed by library staff.

Tech Cards are issued for the school year and will expire on September 1 of the following year. If someone is using a Tech Card which is expired, staff should direct them to their school to get a replacement rather than updating the expiration date on the card.

## GATEWAY

CALS participated in the Gateway program from 1995 to 2020, but no longer participates. Patrons from our service area may still be eligible for library cards at other libraries and should check with those libraries directly to determine what options are available.

## ONLINE REGISTRATION

A patron must be a resident of Pulaski or Perry County to apply for a library card on the CALS website. If the application is acceptable, an account is created, a block is placed on the card, and the library card is mailed to the patron. The patron must take the card to a CALS library to have the online registration block removed once their identification is verified.

If a non-resident should apply for a card online, they must take the card to a CALS library and pay the non-resident fee to have the online registration block removed.

## IDENTIFICATION

### IDENTIFICATION FOR ADULTS

Library card applicants are asked to show current (i.e., non-expired), government-issued photo identification (e.g., driver's license, passport, military or consular ID, City of Little Rock ID, Rock Region Metro ID, etc.).

This need not be an Arkansas ID, and it need not have the applicant's current address. If the address on the patron's ID matches the address on the card application, or if they provide appropriate documentation; e.g., two or more pieces of mail, a lease agreement, utility bill, or property tax assessment that includes the patron's name and address as it appears in their library record, give them their card after you finish creating the patron record. Documentation presented should be dated within the past 30 days (about 4 and a half weeks), or within a year for tax-related documents.

If a patron does not document their address when they apply for a card, mail the new card to verify their residential address, and restrict them to checkout of one item. Note, Sierra will not automatically enforce this one-item limit.

## CHILDREN AND IDENTIFICATION

Our goal is to make our resources available to all people who qualify for a card. In cases where a minor cannot furnish ID, it is up to the person in charge to see if an alternative can be found. The child must be present for on-site registration or for activation of a card obtained through online registration.

Children under the age of 14 who are not accompanied by a parent or guardian may apply for a provisional card, providing they can fill out the required information on the application form, and no other identification will be required. Mail the new card to verify their residential address.

A provisional card has limited privileges. If a parent wishes to convert the provisional card to an individual card with full privileges, they must accompany the child into any branch and sign an application form for them.

The maximum age for a provisional card for children is 17. Once a patron is 18, they will have the options available to adults. However, if a youth is 14+ AND meets ID requirements (e.g., has an ID from a public or private school, learner's permit, driver's license, etc.), they can get a regular individual card.

At times, children apply for cards as members of a school class. Students are eligible for cards if the school has a campus in our service area. In these cases, the teacher will be provided with written instructions beforehand describing how the applications should be filled out. The teacher will be asked to provide some type of identification or to verify students' addresses. Children who apply as members of a school class will be issued a provisional card unless the parent is present when they visit. In such cases, it is not necessary to mail the new card to verify their residential address. For addresses outside our service area, add/insert a note in the record indicating the card was issued as part of a class visit and include the school's name.

## ACCURACY IN REGISTRATION

The staff member entering the information from the application form should ensure all information is clear, complete, and identical to the information on the form.

When a patron's address on their application matches the address on their ID, or when they present two pieces of mail with the address on the application, give the card to the patron after you enter the application data. If the address on their ID does not match the one on the application, we verify the address by mailing the card.

Make sure the patron enters their street address in the "box" at the top of the form. That address is used when mailing the card to the patron. Because new library cards are mailed to the patron to verify their residence, post office box addresses are not acceptable in the "box." Patrons may list post office boxes in the mailing address portion of the form, directly below the address "box."

Explain to patrons that cards will be mailed to their street address. Subsequent CALS mailings will be sent to the mailing address.

Each location should have a designated person or person who later verifies the data entry accuracy of each application before it is either mailed or shredded.

***Addresses***

When entering patron addresses, use the proper postal abbreviation for all street addresses (e.g., RD or ST rather than Road or Street or Rd. or St.). Postal abbreviations do not use lower-case characters or a period. Instead, the abbreviation is in all caps: ST, RD, BLVD, CV, LP, AVE.

Be sure to spell out the city name (e.g., Little Rock, Jacksonville, rather than LR or Jax). After the city name, enter a comma, then a space, and then the state postal abbreviation (this will almost always be AR). Carefully check the spelling of the city name. Always use standard capitalization for the city (e.g., Little Rock rather than little rock or LITTLE ROCK).

Do not use the octothorpe (also known as the pound sign, the hashtag symbol, and #) in address fields.

When entering apartment/lot/etc. numbers, separate them from the main address with a comma, add a period after the abbreviation, and enter the number as one string of text (e.g., 123 Fake ST, Apt. F10).

### Names

To help avoid confusion and duplicate records, patrons must give their first, middle, and last names; middle initials are not acceptable. If a patron does not have a middle name, staff should enter NMN in the space intended for the middle name. If a patron's name does not match the name on their ID, or if staff perceive other potential for confusion, it is permissible to have more than one name field in a patron record. The first field in the record should be the patron's preferred usage. To assist with proper holds slip printing, patrons with multiple last names must be entered using hyphens between them, even if they do not regularly hyphenate them (e.g., John Quincy Public Jones's name must be listed as Public-Jones, John Quincy.).

When the address on their ID matches the address on the application, new cardholders may receive their cards immediately. Others will have their new library cards and applications mailed to them.

### Home Library

When setting a patron's home library, use only the following location codes. Note that, uams excluded, all codes are two letters.

| Brooks | mb |
|---|---|
| Children's | ch |
| Dee Brown | db |
| Fletcher | fl |
| Main | lr |
| Maumelle | ma |
| McMath | mm |
| Milam | pe |
| Nixon | nx |
| Rooker | ok |

| Sanders | sh |
|---------|------|
| Terry | te |
| Thompson | th |
| UAMS | uams |
| Williams | wm |

### Birth Dates

If a patron provides their full birth date, enter that date into the Birth Date field in the patron record.

If a patron prefers to give only their birth year, explain that we will enter their Birth Date as 01-01-birthyear (if 01-01-year is their actual birth date then use 01-02-birthyear).

If a patron declines to provide a birth date or birth year, explain that, while it is their right to do so, this will prevent them from being able to access age-restricted resources (e.g., Youth computers, laptop checkouts, etc.) and that our online catalog will consider them a "juvenile" user and prevent them from adding reviews or comments. If the patron still declines, leave the Birth Date field blank; if you have already entered a date, type "b" to blank out the date.

### Telephone Numbers

If a patron does not have a phone number, or declines to provide one, enter ten '1's, 1111111111, in the 'Home phone' field in the record.

## CHECKING FOR DUPLICATE CARDS

Sierra will check for duplicate cards, but only for identical patron names. If an applicant's name is John Doe, it will not check for J. J. Doe, Johnny Doe, John Doe Jr., John Roe, John Dow, or any other combination or misspelling.

Before issuing a new library card, check Sierra to see if the applicant has a card. Staff can do this by entering the applicant's last name (as indicated by their picture ID) and first initial. When in doubt about whether a card application is a duplicate, bring the situation to the attention of a manager.

## RENEWING EXPIRED CARDS

Most patron records expire after one year; in the case of non-resident cards the record may expire in less than one year, depending on the amount of the non-resident fee paid by the patron.

Once a card has expired, the patron is automatically blocked from all library privileges until information in the record is verified, updated if needed, and a new expiration date is manually put in the record.

When verifying account information, do not provide the information to the patron--instead of saying 'Are you still at 123 North St.?' or 'Do you still use the myname@example.com email address?', staff should ask open-ended questions like 'Can you verify your street address for me?' or 'What's your email address?', so that patrons volunteer the required information.

For individual, multi-user, provisional, student/educator non-resident, and all staff PTYPES, the new expiration date should be one year from the day the record is updated.

When verifying information in the record, the octothorpe "#" symbol should be replaced with "Apt." in all address fields. The patron's PIN, home library, and preferred notification method should be verified and updated if necessary. Check that the PTYPE is appropriate for the address of the patron.

Adult patrons should also be asked if they would like to register to vote or update their voter registration.

### *Renewing Non-Resident Cards*

For non-resident cards, set the expiration date based on the non-resident fee amount paid. Below are guidelines for 3-month, 6-month, and annual non-resident fee expiration dates. These guidelines will often give non-residents more than a literal 3, 6, or 12 months of use; that is acceptable because the guidelines provide a straightforward way to calculate the expiration date for periods of less than a year.

- 3-month: Set the expiration date to the end of the month three months from the current month. For example, if the patron pays in February the expiration date would be Feb + 1. Mar, 2. Apr, 3. May -- May 31st.
- 6-month: Set the expiration date to the end of the month six months from the current month. For example, if the patron pays in February the expiration date would be Feb + 1. Mar, 2, Apr, 3. May, 4. Jun, 5. Jul 6. Aug – Aug 31st.
- Annual: Set the expiration date to the end of the same month next year so that this aligns with the way we set dates for three- and six-month expirations. For example, if the patron pays anytime in March set the expiration date to March 31st for the next year.

## PURGED CARDS

Patron records with no fines and no activity according to the CIRC ACTIVITY field for 3 years are purged from the system.

Scanning a card that has been purged from the database will not retrieve a record. A patron presenting a card that has been purged may renew their card by entering the patron's information into a new patron record. Staff should request photo ID and then enter the patron's information as for a new card. Set the PTYPE appropriately according to whether the patron resides in our service area or not.

Because the card is simply being renewed, the patron receives full circulation privileges immediately.

Adult patrons should also be asked if they would like to register to vote or update their voter registration.

## CHANGE OF ADDRESS, EMAIL, OR TELEPHONE NUMBER

For a change of address, email, or telephone number, enter the information into the patron record immediately. Staff should ask patrons if their address, email, and/or telephone numbers have changed. This is especially important when the patron is on the phone or placing holds.

- Check the PTYPE of the patron when changing an address to ensure they still live within our service area or meet other criteria for receiving a free library card.

Address and telephone number changes can be done by telephone, if the patron has their library card number.

If an overdue notice, hold notice letter, or library card is returned by the post office for incorrect or insufficient address, this information will be entered into the patron record. If corrected information is available, the corrections will be made, and the notice re-mailed. If corrected information is not available a PMESSAGE indicating the data which needs correcting (Bad address, Bad email, Bad telephone) will be added to the patron's record and should be removed when the information is updated.

## REPLACEMENT OF LOST OR STOLEN CARDS

Patrons are allowed one free replacement library card every 12 months (with an optional free lanyard for patrons under 18, limited to supply on hand). When patrons are provided a free card, staff will document it with a note field in the patron record using the following format: 'free card mm/dd/yy xxxx' where 'xxxx' is the staff member's Sierra login.

If a patron requests an additional replacement card less than 12 months after receiving a free card, they will be charged $1.00 for that replacement. When accepting payment for replacement of a lost card, use the "overdue fine" key on the cash register.

Staff may elect to waive the replacement charge for stolen cards (be sure to enter a Message in the patron record if you have waived this charge). When issuing a replacement card, verify the patron's information and, for adult patrons, ask for photo ID.

When replacing a patron's library card, please ask them whether they use OverDrive and/or Freegal. If they do, add a note in Sierra with their old barcode, then email elibrary@cals.org with the old and new barcodes. This ensures that patrons do not lose their checkouts, holds, and wishlists in OverDrive or their wishlists and streaming playlists in Freegal. The Information Services Department will have information for the patron on how to back up any songs they downloaded under the old barcode.

## CARD NOT RECEIVED IN MAIL

If a patron reports that they have not received their library card in the mail, staff should ask the patron to show photo identification, then look up the patron record by name. If the patron record shows an Invalid Address message and the message 'Card returned to Main, please update address and email librarycard@cals.org to resend. lrxx mm/dd/yy', it is likely that the card was returned to the Main Library. Staff should ask the patron for their correct address, email, and phone number.

Library card mailings that are undeliverable due to an invalid address are returned to the Main Library. If the card was returned in the mail, update the patron record with the correct address, email, and phone number. Send an email to librarycard@cals.org that includes the p-number of the patron's record and a message that the patron information has been updated or verified as correct by the patron. Main Circulation staff will attempt to mail the card to the updated address. Add the message 'Address corrected. xxxx mm/dd/yy' to the patron record where xxxx is your Sierra login. Circulation staff will add the message 'Card remailed. Lrxx mm/dd/yy' to verify the date the card was re-mailed. These messages will alert staff to possible address fraud if the patron reports again that they did not receive the card in the mail.

It may take up to 14 days (about 2 weeks) for mail to be returned to the Main Library. If the patron record does not contain a card-returned message, check the date the record was created. If the record was created less than 14 days (about 2 weeks) previously, ask the patron to contact the library 15 days (about 2 weeks) after the record was created if the card has not arrived in the mail by that date. If the patron has not received the card at that time, update the account with a new library card number. Add the message 'Card not received. Record updated and new card mailed. xxxx mm/dd/yy' where xxxx is your Sierra login. Mail the new card to the patron.

However, a patron who does not receive their card in the mail may also receive it in person after providing appropriate documentation; e.g., two or more pieces of mail, a lease agreement, utility bill, or property tax assessment that includes the patron's name and address as it appears in their library record. The documentation presented should be dated within the past 30 days (about 4 and a half weeks), or within a year if the patron has presented a property tax assessment. Add a message to the record indicating that the patron has presented the documentation and new card issued. For example: 'Patron verified address with utility bill. New card issued. xxxx mm/dd/yy'. Send an email to librarycard@cals.org that includes the p-number of the patron record, that the address was verified with documentation and a new card given to the patron. This will allow Circulation staff to remove the returned card and discard it appropriately.

Do not remove any existing messages or notes from the patron record.

If the patron lives at an address that does not have mail delivery (this sometimes applies to patrons who live in rural areas, and in College Station, Hensley, Woodson, and Wrightsville), managers and assistant managers are permitted to bypass mailing the card and instead verify residency with appropriate documentation. In this case, the card is given to the patron at the time they sign up for it.

## PERSONAL IDENTIFICATION NUMBER (PIN)

Patrons may access their patron account using a PIN; this is required to use online account access for some systems like the self-check kiosks and the Bibliocommons catalog. Patrons who did not specify a PIN during the registration process will be prompted to create one for themselves the first time they access their records online.

Staff will see only an encrypted version of a patron's PIN when accessing the patron's record. This is done to protect patron privacy. Staff may create a PIN for the patron by following the instructions on the screen or explain or show patrons how to create PINs themselves so that they can be assured privacy.

A PIN must be between 1 and 19 alphanumeric characters.

## REGISTRATION WHEN SIERRA NOT WORKING

Take applications and place them aside for entry once Sierra is online. Be sure to note the barcode on the application. If the patron checks something out, scan the barcode and make the notation in Notepad: NEW PATRON.

Enter all the new registrations before entering the checkouts from Notepad and before checking in any items.



# Internet Use Disclaimer

In order to fulfill our mission to provide resources and services to the public, the Central Arkansas Library System (CALS) provides access to the Internet. The Internet is a global, digital network with no centralized control over its users or content. Because of the unique nature of this information resource, users should be aware of the following:

- Not all information on the Internet is accurate, complete, or current. Users are expected to use their judgment to evaluate the validity of any information retrieved.
- Users should be warned that some material available on the Internet might contain items that are illegal, inaccurate, defamatory, or potentially offensive and/or disturbing to some people.
- Restriction of a child's access to the Internet is the responsibility of the parent, guardian, or caregiver.
- CALS assumes no responsibility for any costs, liability, or damages, direct or indirect, arising from the use of its computing resources or from use of the Internet.
- Although the Library uses anti-virus software on its computers, this will not completely protect a user from computer viruses. Members of the public who wish to download files or save information from databases available at CALS onto a portable storage device should be aware of the dangers associated with viruses. CALS assumes no responsibility for loss or damage to the user's data or hardware caused by computer viruses.
- The Library cannot guarantee the security of data transmitted over the Internet and does not guarantee that any username, password, email, credit card number, financial, or any other information entered is private or secure. We recommend you do NOT use public computers for any financial, confidential, or private transaction. CALS assumes no responsibility for loss or damages arising from such activities.
- Library staff can assist with basic computer use and will assist individuals in the use of the Library's homepage and offer basic instruction in the use of sites directly linked to the Library's Homepage. Staff can provide limited assistance in using other websites and with using software. CALS provides technology classes for those who need assistance in basic computer and software skills.
- The library does not guarantee that any particular website or electronic transaction will work, or be compatible with, library equipment.

CALS complies with the Children's Internet Protection Act, which requires that schools and libraries which receive discounted internet access through the E-Rate program must filter obscene and harmful content. For more information visit https://www.fcc.gov/consumers/guides/childrens-internet-protection-act.

**POLICY INFORMATION**

Board Policy #700
Board Approval: 02/27/97
Revision: 02/21/02,
01/22/09, 10/24/19
Director's
Recommendation:
02/14/02

PENGAD 800-631-6989

**EXHIBIT**

7

# Public Computer Use

The Central Arkansas Library System (CALS) makes computers available for public access to CALS' digital resources and services. Along with the use of these computers come certain responsibilities and restrictions. The Library may institute reasonable procedures protecting the integrity and security of Library computing resources and regulating access to computers or the Internet for the benefit of our patrons. Anyone using Library computer systems expressly consents to this policy and to all CALS policies and rules. The Library may deny or withhold computer, Internet, or even library access privileges for infractions of these policies. Illegal acts involving Library computing resources may also be subject to prosecution by local, state, or federal authorities.

The following actions are prohibited on Library computing resources. Users may not:

- Engage in any activity which is obscene, harassing, or deliberately and maliciously offensive, libelous, slanderous, or defined as harmful to minors in Arkansas Code 5-68-501.
- Violate copyright laws or software licensing agreements.
- Install or use any software not currently installed and available for use on the computer.
- Deliberately attempt to alter software configurations.
- Deliberately attempt to damage computer equipment or software.
- Deliberately attempt to cause degradation of system performance or unnecessarily impede the computing activities of others.
- Intentionally use techniques or software which harass other users or infiltrate a computer or computing system and/or damage or alter the software components of a computer or computing system.
- Use Library computers to gain access to computers or computer systems for which they are not authorized.
- Use any Library computer for illegal or criminal purposes.
- Use Central Arkansas Library System computer accounts or personal codes, such as passwords.
- Use another person's library card to gain access to library computers. Patrons using someone else's library card number may be asked to discontinue their computer session and may be suspended from using the Library's computer resources.
- Have more than one active computer reservation at a time.

## Free Legal Information is Available with "Lawyers in the Library"

Little Rock, AR – The Central Arkansas Library System (CALS) and the Center for Arkansas Legal Services have once again teamed up to offer Lawyers in the Library. This free series of events provides the opportunity to hear from lawyers on several topics at no cost to the attendees.

"We are delighted to continue our collaboration with the Central Arkansas Library System,

LEARN MORE >

**NAVIGATION**

About CALS   eNewsletter

Careers   Privacy Policy

Help

100 Rock Street Little Rock, AR 72201

askcals@cals.org

© 2024 Central Arkansas Library System. All Rights Reserved.





English ∨

United States Code Annotated
   Title 20. Education
      Chapter 72. Museum and Library Services (Refs & Annos)
         Subchapter II. Library Services and Technology
            Part 1. Basic Program Requirements

20 U.S.C.A. § 9134

§ 9134. State plans

Effective: December 31, 2018
Currentness

### (a) State plan required

#### (1) In general

In order to be eligible to receive a grant under this subchapter, a State library administrative agency shall submit a State plan to the Director once every 5 years, as determined by the Director.

#### (2) Duration

The State plan shall cover a period of 5 fiscal years.

#### (3) Revisions

If a State library administrative agency makes a substantive revision to its State plan, then the State library administrative agency shall submit to the Director an amendment to the State plan containing such revision not later than April 1 of the fiscal year preceding the fiscal year for which the amendment will be effective.

### (b) Contents

The State plan shall--

#### (1) establish goals, and specify priorities, for the State consistent with the purposes of this subchapter;

#### (2) describe activities that are consistent with the goals and priorities established under paragraph (1), the purposes of this subchapter, and section 9141 of this title, that the State library administrative agency will carry out during such year using such grant;

#### (3) describe the procedures that such agency will use to carry out the activities described in paragraph (2);

EXHIBIT

PENGAD 800-631-6989

8

**(4)** describe the methodology that such agency will use to evaluate the success of the activities established under paragraph (2) in achieving the goals and meeting the priorities described in paragraph (1);

**(5)** describe the procedures that such agency will use to involve libraries and library users throughout the State in policy decisions regarding implementation of this subchapter;

**(6)** describe how the State library administrative agency will work with other State agencies and offices where appropriate to coordinate resources, programs, and activities and leverage, but not replace, the Federal and State investment in--

**(A)** programs and activities under the Elementary and Secondary Education Act of 1965 (including programs and activities under subparts 2 and 3 of part B of title II, and parts A and B of title IV, of such Act);

**(B)** early childhood education, including coordination with--

**(i)** the State's activities carried out under subsections (b)(4) and (e)(1) of section 9837 of Title 42; and

**(ii)** the activities described in the State's strategic plan in accordance with section 9837b(a)(4)(B)(i) of Title 42;

**(C)** workforce development, including coordination with--

**(i)** the activities carried out by the State workforce development board under section 101 of the Workforce Innovation and Opportunity Act;

**(ii)** the State's one-stop delivery system established under section 121(e) of such Act; and

**(iii)** the activities carried out by the State in support of adult education and literacy under title II of such Act; and

**(D)** other Federal programs and activities that relate to library services, including economic, business, and community development, health information, critical thinking skills, digital literacy skills, financial literacy and other types of literacy skills;

**(7)** provide assurances that the State will comply with subsection (f); and

**(8)** provide assurances satisfactory to the Director that such agency will make such reports, in such form and containing such information, as the Director may reasonably require to carry out this subchapter and to determine the extent to which funds provided under this subchapter have been effective in carrying out the purposes of this subchapter.

**(c) Evaluation and report**

Each State library administrative agency receiving a grant under this subchapter shall independently evaluate, and report to the Director regarding, the activities assisted under this subchapter, prior to the end of the 5-year plan.

**(d) Information**

Each library receiving assistance under this subchapter shall submit to the State library administrative agency such information as such agency may require to meet the requirements of subsection (c).

**(e) Approval**

**(1) In general**

The Director shall approve any State plan under this subchapter that meets the requirements of this subchapter and provides satisfactory assurances that the provisions of such plan will be carried out.

**(2) Public availability**

Each State library administrative agency receiving a grant under this subchapter shall make the State plan available to the public, including through electronic means.

**(3) Administration**

If the Director determines that the State plan does not meet the requirements of this section, the Director shall--

**(A)** immediately notify the State library administrative agency of such determination and the reasons for such determination;

**(B)** offer the State library administrative agency the opportunity to revise its State plan;

**(C)** provide technical assistance in order to assist the State library administrative agency in meeting the requirements of this section; and

**(D)** provide the State library administrative agency the opportunity for a hearing.

**(f) Internet safety**

**(1) In general**

No funds made available under this subchapter for a library described in section 9122(1)(A) or (B) of this title that does not receive services at discount rates under section 254(h)(6) of Title 47 may be used to purchase computers used to access the Internet, or to pay for direct costs associated with accessing the Internet, for such library unless--

**(A)** such library--

**(i)** has in place a policy of Internet safety for minors that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

**(I)** obscene;

**(II)** child pornography; or

**(III)** harmful to minors; and

**(ii)** is enforcing the operation of such technology protection measure during any use of such computers by minors; and

**(B)** such library--

**(i)** has in place a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

**(I)** obscene; or

**(II)** child pornography; and

**(ii)** is enforcing the operation of such technology protection measure during any use of such computers.

**(2) Access to other materials**

Nothing in this subsection shall be construed to prohibit a library from limiting Internet access to or otherwise protecting against materials other than those referred to in subclauses (I), (II), and (III) of paragraph (1)(A)(i).

**(3) Disabling during certain use**

An administrator, supervisor, or other authority may disable a technology protection measure under paragraph (1) to enable access for bona fide research or other lawful purposes.

**(4) Timing and applicability of implementation**

**(A) In general**

A library covered by paragraph (1) shall certify the compliance of such library with the requirements of paragraph (1) as part of the application process for the next program funding year under this subchapter following the effective date of this subsection, and for each subsequent program funding year thereafter.

**(B) Process**

**(i) Libraries with Internet safety policies and technology protection measures in place**

A library covered by paragraph (1) that has in place an Internet safety policy meeting the requirements of paragraph (1) shall certify its compliance with paragraph (1) during each annual program application cycle under this subchapter.

**(ii) Libraries without Internet safety policies and technology protection measures in place**

A library covered by paragraph (1) that does not have in place an Internet safety policy meeting the requirements of paragraph (1)--

**(I)** for the first program year after the effective date of this subsection in which the library applies for funds under this subchapter, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy that meets such requirements; and

**(II)** for the second program year after the effective date of this subsection in which the library applies for funds under this subchapter, shall certify that such library is in compliance with such requirements.

Any library covered by paragraph (1) that is unable to certify compliance with such requirements in such second program year shall be ineligible for all funding under this subchapter for such second program year and all subsequent program years until such time as such library comes into compliance with such requirements.

**(iii) Waivers**

Any library subject to a certification under clause (ii)(II) that cannot make the certification otherwise required by that clause may seek a waiver of that clause if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by that clause. The library shall notify the Director of the Institute of Museum and Library Services of the applicability of that clause to the library. Such notice shall certify that the library will comply with the requirements in paragraph (1) before the start of the third program year after the effective date of this subsection for which the library is applying for funds under this subchapter.

**(5) Noncompliance**

### (A) Use of General Education Provisions Act remedies

Whenever the Director of the Institute of Museum and Library Services has reason to believe that any recipient of funds this [1] subchapter is failing to comply substantially with the requirements of this subsection, the Director may--

(i) withhold further payments to the recipient under this subchapter,

(ii) issue a complaint to compel compliance of the recipient through a cease and desist order, or

(iii) enter into a compliance agreement with a recipient to bring it into compliance with such requirements.

### (B) Recovery of funds prohibited

The actions authorized by subparagraph (A) are the exclusive remedies available with respect to the failure of a library to comply substantially with a provision of this subsection, and the Director shall not seek a recovery of funds from the recipient for such failure.

### (C) Recommencement of payments

Whenever the Director determines (whether by certification or other appropriate evidence) that a recipient of funds who is subject to the withholding of payments under subparagraph (A)(i) has cured the failure providing the basis for the withholding of payments, the Director shall cease the withholding of payments to the recipient under that subparagraph.

## (6) Separability

If any provision of this subsection is held invalid, the remainder of this subsection shall not be affected thereby.

## (7) Definitions

In this subsection:

### (A) Child pornography

The term "child pornography" has the meaning given such term in section 2256 of Title 18.

### (B) Harmful to minors

The term "harmful to minors" means any picture, image, graphic image file, or other visual depiction that--

(i) taken as a whole and with respect to minors, appeals to a prurient interest in nudity, sex, or excretion;

**(ii)** depicts, describes, or represents, in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd exhibition of the genitals; and

**(iii)** taken as a whole, lacks serious literary, artistic, political, or scientific value as to minors.

### (C) Minor

The term "minor" means an individual who has not attained the age of 17.

### (D) Obscene

The term "obscene" has the meaning applicable to such term in section 1460 of Title 18.

### (E) Sexual act; sexual contact

The terms "sexual act" and "sexual contact" have the meanings given such terms in section 2246 of Title 18.

### CREDIT(S)

(Pub.L. 94-462, Title II, § 224, as added Pub.L. 104-208, Div. A, Title I, § 101(e) [Title VII, § 702], Sept. 30, 1996, 110 Stat. 3009-233, 3009-300; amended Pub.L. 106-554, § 1(a)(4) [Div. B, Title XVII, § 1712(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A-340; Pub.L. 108-81, Title II, § 205, Title V, § 504(f), Sept. 25, 2003, 117 Stat. 999, 1004; Pub.L. 111-340, Title II, § 204, Dec. 22, 2010, 124 Stat. 3600; Pub.L. 113-128, Title V, § 512(t)(2), July 22, 2014, 128 Stat. 1712; Pub.L. 114-95, Title IX, § 9215(aaa)(2), Dec. 10, 2015, 129 Stat. 2184; Pub.L. 115-410, § 11, Dec. 31, 2018, 132 Stat. 5417.)

### Footnotes

1    So in original. Probably should be preceded by "under".

20 U.S.C.A. § 9134, 20 USCA § 9134
Current through P.L. 118-41. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.


## Re: Gearing up a public facing campaign against SB81

John Chrastka <john.chrastka@everylibrary.org>
Wed 1/25/2023 8:18 AM
To: Nate Coulter <ncoulter@cals.org>
Cc: Adam Webb <awebb@gclibrary.com>



CAUTION: This is an EXTERNAL email originated from outside the CALS organization. Do not click links or open attachments unless you recognize the sender.

Nate,

I believe that every effort should be spent to bottle this up in Judiciary. If it jumps the fence into the rest of the legislature, all of your concerns will certainly come true. In Judiciary, we can engage at least engage all of our "unnecessary law" arguments with a smaller group.

To answer your question about why does the exemption exist in the first place, let me excerpt from the Policy Brief I sent to you all a few days ago:

Generally speaking, state obscenity laws are focused on commercial activity and public behavior. They are structured with three core components. One component defines the places of business, types of business activities, and certain behaviors that the law applies to. A second component usually provides the framework that governs materials (e.g. books, films, visual depictions, reading material) or activities (e.g. distribution, display, performance), usually by reference or incorporation of the three-part Miller Test. In all but six states, a third section sets out any exemptions from prosecution that exist for either bona fide professionals or certified institutions, or exemptions based on the legitimate non-commercial, scientific, or educational purposes of activities.

Current obscenity and harmful to minors laws in 44 states have exemptions from or defenses from prosecution under the criminal code for certain professions or particular types of workplaces. In some states, a workplace (school, university, library, museum) or activity (scientific, educational, governmental, or art) are defined as having a legitimate purpose and are therefore exempt. In other states, the term "bona fide" is used when describing which workplaces or professions are exempted from prosecution (i.e. work done at a place of employment in an official capacity). Occasionally, and usually only in statutes defining harmful to minors or pornography, law enforcement is mentioned as exempt from prosecution (and then separately from education, libraries, and museums). In the absence of more specific enumeration, the exemption is for "legitimate scientific or educational purposes".

...

The current framework of state obscenity and harmful to minors laws have been in place since the early 1960s when the Model Penal Code of 1962 created much of the existing state-by-state framework. Significant revisions were necessary following the Miller decision in 1974. Other refinements and clarifications were introduced during the uniform law movement of the early 1980s

and, when needed, in response to new Supreme Court decisions. Despite revisions and clarifications over the last 60 years, most states continue to share a common statutory consensus that educational and scientific settings should be exempted from prosecution. It has been a long-standing and settled point of law that the workforce and governing boards of these institutions should not be subjected to criminal prosecution over the books, collections, and materials in their care as well as for performances or displays at their institutions. In many states, institutions like public libraries, higher education, and museums have also been exempted specifically in the statute.

In addition to non-commercial considerations, exemptions for educational, scientific, and cultural institutions act to acknowledge their important societal role in supporting learning, research, public access, and civil discourse. These long-standing exemptions also have worked to settle issues where potentially recursive First Amendment or free expression lawsuits could disrupt the work of these institutions.

On Tue, Jan 24, 2023 at 10:16 PM Nate Coulter <ncoulter@cals.org> wrote:
I think having a way for people to express their support for their libraries and librarians would be a good thing. I'm not at all sanguine that it will make a difference in the outcome. Our legislative bodies have descended to depths of ignorance and shamelessness not seen in my lifetime.

Our lobbyist says that the forces behind this bill sincerely believe that some libraries are engaged in the distribution of harmful obscenity. He says the firm AALL has engaged agrees with that assessment. These legislators are not amenable to the fact that we are decidedly not doing that.

I'm concerned about the dilemma of having to either fight the battle over the legislators' false perception, which is inherent in the language of the MT effort you sent; or denying confidently that we are dealing in obscenity. If the latter is true, the skeptic or realist who accepts the likely passage of SB 81 might say, isn't this just an academic exercise? Our folks won't be prosecuted because it takes more than a looney tunes patron to claim we are pedaling obscenity. It takes a prosecuting attorney to contend something on our shelf is obscene under the definition of the law.

Related to that, why was the school and librarian exemption placed on the books in AR, MT, and elsewhere? Why would any prosecutor go after a library as if it were an adult smut store?

Sent from my iPhone

On Jan 24, 2023, at 11:31 AM, Adam Webb <awebb@gclibrary.com> wrote:

CAUTION: This is an EXTERNAL email originated from outside the CALS organization. Do not click links or open attachments unless you recognize the sender.

I think this is a great idea. The refrain I've heard so far from library supporters is 1) how can I help and 2) who do I need to talk to about this?

What do you think, Nate?

On Mon, Jan 23, 2023 at 4:53 PM John Chrastka <john.chrastka@everylibrary.org> wrote:

Adam and Nate,

We launched the Montana campaign against their version of SB81 this morning: https://action.everylibrary.org/mthb234

I can have a campaign set up for AAAL(or ARLA too) in 2 hours. Let me know if I should prep something that will be used. Feel free to send the MT page to others for their input and approval. Some messaging will change, of course. But the technique of talking to constituents so we can bottle this up in Judiciary is common.

John

--

John Chrastka
Executive Director
EveryLibrary and the EveryLibrary Institute
john.chrastka@everylibrary.org
312-574-0316
Schedule a call anytime at:
https://calendly.com/john-chrastka-everylibrary

--

Adam Webb | MLS
Executive Director



Bobby Roberts < >
Donald Evans < >; Anna Morshedi < >;
Nate Coulter
Skip Rutherford < >

EXHIBIT
10

CAUTION: This is an EXTERNAL email originated from outside the CALS organization. Do not click links or open attachments unless you recognize the sender.

I will give Jennifer a call Monday and see if she can visit with the new Sec. of Education and also see if she can offer any additional insight. However, since the new guy is from DeSantis Land I would not count on much help there.

I am a little rusty on what the Coalition can do but If I remember correctly it is created to work on issues so I doubt that it can spend funds on lobbying. However, there is nothing to prevent anyone from lobbying for libraries. The library friends groups have more flexibility and they can spend a limited amount of funds on lobbying. You might contact all library directors advising about the danger of this bill and encouraging them to get their friends to contact the local reps about it. If you decide to do that I would advise giving them some simple talking points.

I only skimmed the bill but I expect it is too broad and vague to pass constitutional muster. Also, I did not see a severability clause which means the whole thing will fall apart if a smart lawyer can find one unconstitutional thread to pull on. It seems to me that it is so broadly written that it would require many classics to be removed from the collection. It might be good for someone to put together a long list of popular books and movies that would be threatened and then circulate it on social media. Lastly, if it does pass, talk to the ACLU; they might make a bundle with a good lawsuit.

Let me know if I can do anything.

Bobby Roberts

On Saturday, January 21, 2023 at 11:27:13 AM CST, Nate Coulter <ncoulter@cals.org> wrote:

I've come into the office today to think a bit about this. As you can imagine, we have some employees who are upset and worried about it.

Yesterday I emailed my contacts at the AR Municipal League and the Assocation of AR Counties who, I believe, have a stake in this legislation because the city and county governments would be on the hook for the potential liability of their employees. It won't surprise you that this is a local front in a culture war that is going on in multiple jurisdictions. Our friends at Every Library, the 501 (c)(4) that advocates for public libraries out of Chicago, report that the good guys seem to have had some initial success with discouraging legislation in WY and MT similar to SB 81 that threatens criminalization of library activities.

I will defer to John Adams and Bobby Roberts here on what a ballot question committee like yours can and cannot do with respect to advocacy against the cluster of crazy bills. But we need our allies among donors, Foundation and Friends members, and patrons generally to be aware of these efforts in the...

...General Assembly.

I hope to meet next week with CALS legislative lobbyist, Robert Coon, and some other public library directors from Fayetteville and Hot Springs. When I know more I'll report further. I would like to believe that the governor's office will stay out of Dan Sullivan's crusade here and at least not support these bills. I don't expect Sarah to oppose them but maybe her folks can at least be neutral. Robert and our friends at Impact Management have good relations with the governor's office and may have some insight on this.

Bobby, would you be willing to call Jennifer Chilcoat and suggest maybe she speak to the new head of the State Dept. of Ed. about these bills? The state library is now housed within the Dept. of Ed. And it seems clearly within her prerogative to brief him on why this legislation is unneeded, a solution in search of a problem that doesn't exist. Of course, I'm operating on an assumption that may well prove to be contrary to fact: that ASL can have good faith discussions with Oliva and Sander.

Thanks for your support and vigilance.

Nate.

Central Arkansas Library System

NATE COULTER    *Executive Director*

MAIN LIBRARY    100 Rock Street, Little Rock, AR 72201
OFFICE    501.918.3033    |    FAX    501.375.7451    |    WEB    www.cals.org

FOLLOW CALS ON

EXHIBIT

11

PENGAD 800-631-6989

Library Name: **Central Arkansas Library System**

| Title | Currently Owned Print | Currently Owned Digital | Previously Owned Print | Previously Owned Digital |
|---|---|---|---|---|
| This Book Is Gay , by Juno Dawson | Yes | Yes | | |
| Out of Darkness , by Ashley Hope Perez | Yes | Yes | | |
| All Boys Aren't Blue , by George M. Johnson | Yes | Yes | | |
| It's Perfectly Normal , by Robie H. Harris and Michael Emberley | Yes | Yes | | |
| Lawn Boy , by Jonathan Evison | Yes | Yes | | |
| Jack of Hearts , by L.C. Rosen | Yes | Yes | | |
| Crank , by Ellen Hopkins | Yes | Yes | | |
| Lucky , by Alice Sebold | Yes | No | | No |
| A Court of Mist and Fury , by Sarah J. Maas | Yes | Yes | | |
| l8r g8r , by Lauren Myracle | Yes | Yes | | |
| Gender Queer , by Maia Kobabe | Yes | Yes | | |
| Milk and Honey , by Rupi Kaur | Yes | Yes | | No |
| The Handmaid's Tale: A Graphic Novel , by Margaret Atwood | Yes | No | | |
| What Girls Are Made Of , by Elana Arnold | Yes | Yes | | |
| The Perks of Being a Wallflower , by Stephen Chbosky | Yes | Yes | | |
| The Nowhere Girls , by Amy Reed | Yes | Yes | | |
| The Glass Castle , by Jeannette Walls | Yes | Yes | | |
| Damsel , by Elana Arnold | Yes | Yes | | |
| Impulse , by Ellen Hopkins | Yes | Yes | | |
| People Kill People , by Ellen Hopkins | Yes | Yes | | |
| Perfect , by Ellen Hopkins | Yes | Yes | | |
| Smoke , by Ellen Hopkins | Yes | Yes | | |
| Tilt , by Ellen Hopkins | Yes | Yes | | |
| Traffick , by Ellen Hopkins | Yes | Yes | | |
| Tricks , by Ellen Hopkins | Yes | Yes | | |
| Fallout , by Ellen Hopkins | Yes | Yes | | |
| What We Saw , by Aaron Hartzler | Yes | Yes | | |
| The Exact Opposite of Okay , by Laura Steven | No | No | No | No |
| Chicken Girl , by Heather Smith | No | No | No | No |
| Asking For It , by Louise O'Neill | Yes | Yes | | |