IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


FAYETTEVILLE PUBLIC LIBRARY, et al. a political
subdivision in the City of Fayetteville, State of
Arkansas; EUREKA SPRINGS CARNEGIE PUBLIC
LIBRARY; CENTRAL ARKANSAS LIBRARY
SYSTEM; NATE COULTER; OLIVIA FARRELL;
MIEL PARTAIN, in her own capacity and as parent and
next friend of MADELINE PARTAIN; LETA
CAPLINGER; ADAM WEBB; ARKANSAS
LIBRARY ASSOCIATION; ADVOCATES FOR ALL
ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
WORDSWORTH COMMUNITY BOOKSTORE LLC
d/b/a WORDSWORTH BOOKS; AMERICAN
BOOKSELLERS ASSOCIATION; ASSOCIATION
OF AMERICAN PUBLISHERS, INC.; AUTHORS
GUILD, INC.; COMIC BOOK LEGAL DEFENSE
FUND; FREEDOM TO READ FOUNDATION                          PLAINTIFFS


V.                          NO. 5:23-CV-05086-TLB

CRAWFORD COUNTY, ARKANSAS; CHRIS
KEITH, in his official capacity as Crawford County
Judge; TODD MURRAY; SONIA FONTICIELLA;
DEVON HOLDER; MATT DURRETT; JEFF
PHILLIPS; WILL JONES; TERESA HOWELL; BEN
HALE, CONNIE MITCHELL, DAN TURNER, JANA
BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE
HUNTER; DANIEL SHUE; JEFF ROGERS; DAVID
ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; TONY
ROGERS; JOSHUA ROBINSON; CAROL CREWS;
KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each in his or her official capacity as a
prosecuting attorney for the State of Arkansas;                 DEFENDANTS


**<u>PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT</u>**

**INTRODUCTION**

Act 372 of 2023 ("Act 372") is a vague, sweeping law that restrains public libraries and booksellers in Arkansas from making available constitutionally protected books and other materials to their patrons and customers and burdens the rights of those individuals to read and to receive information. It does so through two key provisions, Sections 1 and 5 of Act 372, which the Court previously preliminarily enjoined. *See* Prelim. Inj. Op. (hereinafter "PI Op.") (Doc. 53). Because there are no factual issues that prevent final resolution of this matter, Plaintiffs now move for summary judgment and ask the Court to permanently enjoin Sections 1 and 5 of Act 372.

**LEGAL BACKGROUND**[1]

**A. Section 1 of Act 372.**

Section 1 of Act 372 creates a new Class A misdemeanor offense for "furnishing a harmful item to a minor." Act 372 § 1. An individual is guilty of this new crime, which is punishable by imprisonment for up to one year, "if, knowing the character of the item involved, the person knowingly . . . [f]urnishes, presents, provides, makes available, gives, lends, shows, advertises, or distributes to a minor an item that is harmful to minors." *Id.* § 1(b)(1). Act 372 broadly defines "item" as "a material or performance that depicts or describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse," which encompasses every form of expressive material that could be found in a public library or bookstore, including books, magazines, and motion pictures. *See id.* § 1(a)(4)(B). Act 372 defines "harmful to minors" by cross-reference to Arkansas' variable obscenity statute. *See* Ark. Code Ann. § 5-68-501(2) (2017).[2]

---

[1] In prior filings, Plaintiffs have referred to Section 1 of Act 372 as the "Availability Provision" and to Section 5 of Act 372 as the "Challenge Procedure." *See, e.g.*, Am. Compl. (Doc. 75) at ¶¶ 2, 5. For the sake of simplicity, and to ensure common understanding, Plaintiffs refer to those sections herein as "Section 1" and "Section 5."

[2] Section 501 of Chapter 68 additionally defines "minor" to mean "any person under eighteen (18) years of age." *Id.* § 5-68-501(7).

Arkansas law does not provide a definition for "make [an item] available" to minors or explain what steps a library or bookstore can take to protect their employees from criminal liability. *See generally* Act 372; Title 5 Ark. Code Ann. Ch. 68. Nevertheless, courts that have examined this issue under Arkansas law have uniformly concluded that a prohibition on "mak[ing] available . . . to a minor an item that is harmful to minors," Act 372 § 1(b)(1), requires treating all minors the same and considering "what is harmful to a 5-year-old without regard to the fact that that may not be harmful to a 17-year-old." *See* PI Op. at 36 n. 25 (quoting July 25, 2023 Hr'g Tr. at 100:1-3); *see also Shipley, Inc. v. Long,* 195 S.W.3d 911, 915-917 (Ark. 2004) (hereinafter "*Shipley II*") (reading a 2003 Arkansas statute restricting access to materials "harmful to minors" as requiring that all minors are treated alike); *Shipley III,* 454 F.Supp.2d at 819 (enjoining the "display" provision of that predecessor statute to Act 372).

**B.      Section 5 of Act 372.**

Section 5 of Act 372 requires "[e]ach county or municipal library" in Arkansas to establish "a written policy for addressing challenged material that is physically present in the library and available to the public." *Id.* § 5(b). Specifically, Section 5 requires that public libraries must create a process through which any "person affected . . . may challenge the *appropriateness* of material available in the" public library's collection. *Id.* § 5(c)(1) (emphasis added). "There is no definition of 'appropriateness,' so any expression of ideas deemed inappropriate by the challenger is fair game." PI Op. at 15. Similarly, "Section 5 does not require a book challenger to be a patron of the library where the challenge is made," or "impose a residency requirement." *Id.*

A library may remove the challenged material from circulation while the challenge is considered, if it wishes. *See* Act 372 § 5(c)(2). The challenge will be considered, in the first instance, by the librarian (or their designee) and "a committee of library personnel" who "have

knowledge appropriate for the material being challenged" and are "representative of diverse viewpoints." *Id.* § 5(c)(6). Their task will be to review the challenged material "in its entirety," so as to "not have selected portions taken out of context," and then to "determine if the material being challenged meets the criteria of selection." *Id.* § 5(c)(7). Section 5 does not define "the criteria of selection," or explain whether that term relates in some way to the "appropriateness" standard. It does, at least, state that the challenged material "[s]hall not be withdrawn solely for the viewpoints expressed within the material." *Id.*

After reviewing the challenged material and "hearing from the person who submitted the request," the committee "shall vote to determine whether the material being challenged shall be relocated within the library's collection to an area that is not accessible to minors under the age of eighteen (18) years." *Id.* § 5(c)(9)-(11). Section 5 does not explain what makes "an area . . . not accessible to minors." *See id.* If the committee sides with the challenger, that ends the matter, and the challenged material will be "withdrawn" from general circulation and segregated in an adults-only area. Section 5 provides no opportunity for a proponent of a challenged material to seek review of the committee's segregation decision. If the challenger loses, however, Section 5 provides another bite at the apple through an appeal "to the governing body of the county or city." Act 372 § 5(c)(12)(A). If an appeal is lodged, the "executive head of the county or city" is responsible for presenting the challenge, challenged material, a copy of the committee's decision denying the challenge, and, optionally, "his or her recommendation regarding the appeal." *Id.* § 5(c)(12)(B). "Section 5 does *not* require the quorum court or city council members to adopt—or even be provided a copy of—the library's selection criteria." PI Op. at 17 (emphasis in original).

Within thirty days of receiving the information provided by the county or city executive, the county or city governing body members "meet to consider and vote on whether to censor the

material, either by withdrawing it from the library's main collection or relocating it[.]" *Id.* (citing Act 372 § 5(c)(12)(C)). No written explanation is required, even though the quorum court or city council members' decision "is final." Act 372 § 5(c)(12)(C)(ii).

**FACTUAL BACKGROUND**

## I.     The Plaintiffs.

Plaintiffs are public libraries, librarians, library patrons, booksellers, bookstore customers, and associations representing libraries, librarians, patrons, booksellers, publishers, and authors. Collectively, Plaintiffs illustrate the broad sweep of Sections 1 and 5 of Act 372 and the range of parties that will be injured if those provisions go into effect.

### A.     Public libraries, librarians, and their patrons.

Through this action, Plaintiffs bring the perspective of Arkansas' many public libraries, including Plaintiffs Fayetteville Public Library (FPL), a municipal public library serving the City of Fayetteville, Ex. 10[3] (Declaration of David Johnson ("Johnson Decl.")) ¶ 2; Eureka Springs Carnegie Public Library (ESCPL), a small, rural public library in Eureka Springs, which was created in 1910 with a grant from Andrew Carnegie, Ex. 6 (Declaration of Christina Danos ("Danos Decl.")) at ¶¶ 2, 5; and the Central Arkansas Library System (CALS), which is the largest public library system in the state and serves the City of Little Rock, Pulaski County, Perry County, the City of Jacksonville, the City of Sherwood, and the City of Maumelle through its fourteen branches, Ex. 5 (Declaration of Nate Coulter ("Coulter Decl.")) at ¶ 4; *see also* Ex. 24 (Donald Nathan Coulter Deposition Transcript ("Coulter Depo. Tr.")) at 26:1-28:5 (describing CALS' creation and legal status).

---

[3] Citations to Exhibits 1-32 in this Brief are to the exhibits attached to Plaintiffs' Motion for Summary Judgment.

4

Plaintiffs bring the perspective of many other libraries through Plaintiffs the Arkansas Library Association (ArLA), Advocates for All Arkansas Libraries (AAAL), and the Freedom to Read Foundation (FTRF), each of which has public library members. *See* Ex. 2 (Declaration of Deborah Caldwell-Stone ("Caldwell-Stone Decl.")) at ¶¶ 2, 7; Ex. 4 (Declaration of Carol Coffey ("Coffey Decl.")) at ¶¶ 6-7 (describing ArLA's 400 members, which are located in 58 of 75 counties in Arkansas and include public libraries); Ex. 17 (Declaration of Adam Webb ("Webb Decl.") at ¶ 35 n. 7 ("[B]etween AAAL and ArLA, I believe that the interests of librarians in each judicial circuit in Arkansas are represented.").

These libraries have substantial differences among them, including their geographic location, the needs of the populations they serve, and their size and resources. *Compare* Coulter Decl. at ¶¶ 4-5, *with* Danos Decl. at ¶ 6, *and* Ex. 3 (Declaration of Judy Calhoun ("Calhoun Decl.") at ¶¶ 6-7. Despite these superficial differences, public libraries in Arkansas are united around their shared belief that "[t]he core function of public libraries . . . is to provide all patrons with access to all points of view on current and historical issues," Caldwell-Stone Decl. at ¶ 4. *See, e.g.*, Johnson Decl. at ¶ 5 (expressing commitment to provide "a wide variety of materials that provoke thought" and "embrace the human experience from all viewpoints"); Danos Decl. at ¶ 4; Coulter Decl. at ¶ 7, Ex. A (CALS Board Policy # 300) at CALS00001. A corollary to this belief, and another fundamental tenet of librarianship shared by the libraries represented through Plaintiffs, is absolute refusal "to tailor their collections to reinforce the political, social, or ideological beliefs of some to the exclusion of divergent beliefs of others," Johnson Decl. at ¶ 5. *See, e.g.*, CALS Board Policy # 300 at CALS00001; Webb Decl. at ¶ 57 ("[A]nyone who walks through one of AAAL's members' doors can find something interesting to read, even if it also means that they might find a book containing ideas with which they disagree").

The wellspring of these principles is the American Library Association's (ALA) Library Bill of Rights, which "affirms that all libraries are forums for information and ideas" and provides that certain "basic policies should guide their services," including that "library resources should be provided for the interest, information, and enlightenment of all people of the community the library serves" and "should not be excluded because of the origin, background, or views of those contributing to their creation." *Id.* at ¶ 7, Ex. B (Library Bill of Rights). Libraries express their commitment to these principles through their policies for selecting materials. *See, e.g.*, Johnson Decl. at ¶ 28, Ex. F (FPL Collection Development Policy); Danos Decl. at ¶ 6, Ex. A (ECSPL Selection Policy Statement); CALS Board Policy # 300 at CALS00002; Webb Decl. at ¶ 8, Ex. C (Garland County Library (GCL) Materials Selection Policy). Those policies would be empty words, however, if not for the librarians who animate the ideals expressed in the Library Bill of Rights as they set and apply library policies. *See* Webb Decl. at ¶ 5 (expressing commitment to the ALA's Code of Ethics and Library Bill of Rights); Coulter Decl. at ¶¶ 2, 6.

The ALA Code of Ethics also makes clear that organization of a collection is an important component of "provid[ing] the highest level of service to all library users." Webb Decl. at ¶ 6, Ex. A ("ALA Code of Ethics") ¶ 1; Caldwell-Stone at ¶ 8. Plaintiffs recognize this and organize their collections "on bookshelves that are logically arranged by topic and reading ability," Danos Decl. at ¶ 6, in order to provide "library users" with "the information they need to browse the library," Webb Decl. at ¶ 57. A logically organized library is especially important for small or rural libraries, which benefit from patrons finding "locate materials of interest without requiring assistance from library staff." Coffey Decl. ¶ 12; Mryick Decl. at ¶ 6; Calhoun Decl. at ¶ 12; Ex. 12 (Declaration of John McGraw ("McGraw Decl.")) at ¶ 14.

Ultimately, fidelity to these principles "facilitate[s] learning and cultural enrichment" opportunities for patrons, *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003), like Plaintiffs Olivia Farrell, Leta Caplinger, Madeline Partain, and Miel Partain, who are patrons of their local public library, either CALS or the Crawford County Library System (CCLS), and each values their right to read and to browse freely when they visit. *See* Ex. 7 (Declaration of Olivia Farrell ("Farrell Decl.")) at ¶¶ 2, 4-5, 7 (adult patron of CALS); Ex. 19 (Leta Caplinger Deposition Transcript ("Caplinger Depo. Tr.")) at 13:12-16 (adult patron of Crawford County Library System (CCLS)); Ex. 20 (Madeline Partain Deposition Transcript ("Madeline Partain Depo. Tr.")) at 6:11-12, 8:16-17, 13:15-17 (seventeen-year-old resident of Crawford County and patron of CCLS); Ex. 21 (Miel Delorey Partain Deposition Transcript ("Miel Partain Depo. Tr.")) at 13:21-23, 20:19-25 (adult patron of CCLS).

Libraries in Arkansas, including those represented by Plaintiffs, are succeeding in their goal of providing ample and varied opportunities for the enrichment to their patrons. They have collected many hundreds of thousands of items, covering many thousands of topics. Naturally, given the volume of material and the goal of reflecting the human experience, their collections contain hundreds of books that depict or discuss sex or other subjects that might be too mature for young or immature readers. Caldwell-Stone Decl. at ¶ 6; Coffey Decl. at ¶¶ 9-10; Coulter Depo. Tr. at 98:12-99:2 (discussing books in CALS' collection that might trigger liability under Section 1); Danos Decl. at ¶ 7; Johnson Decl. at ¶¶ 7-8; Webb Decl. at ¶¶ 12-13, 33.

### B. Publishers, booksellers, and bookstore customers.

Bookstores provide another essential means of accessing enriching information and are also "key participants in their communities' local economy and culture." Ex. 8 (Declaration of David Grogan ("Grogan Decl.")) at ¶ 2. Certainly, that is true for Pearl's Books in Fayetteville,

Ex. 11 (Declaration of Daniel Jordan ("Jordan Decl.")) at ¶ 1; WordsWorth Books in Little Rock, Ex. 18 (Declaration of Kandi West ("West Decl.")) at ¶ 1-2; and the seventeen Arkansas-based independent bookstore members of the American Booksellers Association (ABA), Grogan Decl. at ¶ 2.

Booksellers are also attuned to the manner in which books are organized and displayed for the simple reason that customers "generally become acquainted with books when they are readily visible," especially for customers who are browsing without a specific title in mind. Grogan Decl. at ¶ 6. Prominently displaying books is not only "essential for [the] commercial success" of independent bookstores like Pearl's Books and WordsWorth Books, but it is "also essential to fulfill [their] goal of connecting readers with books." Jordan Decl. at ¶ 6; West Decl. at ¶ 6. Bookstores must offer choices in a wide range of genres to remain attractive to their customers,[4] which means they will almost always have at least some books that depict or discuss sex or other topics that might be considered "harmful" in the hands of a young minor. Jordan Decl. at ¶ 5; *see also* West Decl. at ¶ 5; Grogan Decl. at ¶ 5.

Of course, before a book can make its way onto the shelves of a library or bookstore, it must first be written, illustrated, and published. Plaintiffs Authors Guild (the "Guild"), Comic Book Legal Defense Fund (CBLDF), and the Association of American Publishers (AAP) collectively "represent[] an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment." Ex. 15 (Declaration of Matthew D. Stratton ("Stratton Decl.")) at ¶ 2; *see also* Ex. 14 (Declaration of Mary E. Rasenberger ("Rasenberger Decl.")) at ¶ 2; Ex. 16 (Declaration of Jeff Trexler ("Trexler Decl.")) at ¶ 2. "The ability to write on topics of their

---

[4] Ms. Farell, Ms. Caplinger, and Madeline Partain also browse and select books from local bookstores. Farrell Decl. at ¶ 9; Caplinger Depo. Tr. at 50:10-13; Madeline Partain Depo Tr. at 47:7-10.

choosing and to have their work available through bookstores and libraries is vital to their ability to make a living in their chosen profession." Rasenberger Decl. at ¶ 4.

## II.    Sections 1 and 5 will injure libraries and booksellers, as well as their employees and users.

### A.    Librarian and bookseller Plaintiffs are at risk of prosecution under Section 1, and attempts to comply with Section 1 will harm other Plaintiffs.

The threat of prosecution under Section 1 is obvious and direct for librarians, like Nate Coulter, Adam Webb, and the librarian members of ArLA, AAAL, and FTRF. *See* Coulter Depo. Tr. at 75:7-21; Webb Decl. at ¶¶ 24-25; Coffey Decl. at ¶¶ 9, 30; McGraw Decl. at ¶ 10; Caldwell-Stone Decl. at ¶ 9. Likewise, ABA and CBLDF have librarian and bookseller members who are in jeopardy of prosecution because they might, in the course of their employment, fail to prevent young minors from accessing materials with sexual content, or the like, that are generally available in the library or bookstore. Grogan Decl. at ¶ 4; Trexler Decl. at ¶¶ 4-5. Libraries, like FPL, CALS, ESCPL, and the library members of ArLA, AAAL, and FTRF, risk having their employees arrested simply for doing their jobs. *See* Caldwell-Stone Decl. at ¶¶ 9-10; Coffey Decl. at ¶¶ 9, 30; Coulter Depo. Tr. at 75: 7-14; Danos Decl. ¶¶ 15-16; Johnson Decl. at ¶¶ 10-11; Webb Decl. at ¶ 36. Bookstores, like Pearl's Books, WordsWorth Books, and the bookstore members of the ABA face the same risk. *See* Grogan Decl. at ¶ 4; Jordan Decl. ¶ 4; West Decl. ¶ 4.

Concerningly, the options librarians and booksellers have for mitigating the risk of criminal liability are untenable and harmful to other Plaintiffs. For instance, Plaintiffs could bar anyone under the age of 18 from entering their libraries or stores. But doing so would "compromise[] the mission of public libraries" and infringe on the free speech rights of young minors. PI Op. at 36 n. 26; Johnson Decl. at ¶ 12; Caldwell-Stone Decl. at ¶ 11(a). Prohibiting minors from entering is similarly untenable for bookstores and their owners, as doing so would constrict their mission,

dramatically affect their sales of children's and young adult books, and imply the store only sold "adult" or pornographic books, which would be immensely detrimental to business. Jordan Decl. at ¶ 7(a); West Decl. at ¶ 7(a); Grogan Decl. at ¶ 7(a); Trexler Decl. at ¶ 6(a).

Alternatively, a library or bookstore could limit its collection or inventory to only items not likely to be regulated by Section 1—e.g., materials without "any amount of sexual content," PI Op. at 37. However, "that would curtail the availability of many popular books, including some bestsellers," which prevents public libraries from providing patrons with materials of interest. Caldwell-Stone Decl. at ¶ 11(b); Johnson Decl. at ¶ 12. Taking that drastic step is also not commercially feasible for booksellers. *See* Jordan Decl. at ¶ 7(b); West Decl. at ¶ 7(b); Grogan Decl. at ¶ 7(b). This alternative would also make it logistically difficult to order new books because librarians and booksellers rarely have the opportunity to review books in full before ordering them." Jordan Decl. at ¶ 7(b); West Decl. at ¶ 7(b); Grogan Decl. at ¶ 7(b); Caldwell-Stone Decl. at ¶ 11(b) (noting that libraries must rely on third party sources when ordering new books).

Nor is it reasonable to expect that bookstores and libraries will respond to Section 1 by placing all "harmful" materials behind blinder racks, segregating them under a supervised checkout or circulation counter, or removing them to a physically secure, "adults-only" room.

As an initial matter, any effort to avoid liability under Section 1 would require a comprehensive review of a library's collection or a bookstore's inventory. Plaintiffs and Defendants agree that reviewing materials to determine if they might be considered harmful to young minors is an expensive and time-consuming process, given the substantial number of potentially "harmful" materials at issue.[5] Danos Decl. at ¶ 11 (estimating that reviewing ESCPL's

---

[5] In discovery, Plaintiffs asked the Prosecutor Defendants to state if any of the books on a list of twenty (20) books prepared by Plaintiffs' counsel would be considered "'harmful to minors' within the meaning of Section 1 of Act 372[.]" Ex. 25 (Prosecutor Defs.' Resp. to Pls.' Discovery Requests) at 4-5. The Prosecutor Defendants objected to

42,000 physical items would take 26 years); Caldwell-Stone at ¶ 11(c); Calhoun Decl. at ¶ 14; Coffey Decl. at ¶ 13; Coulter Decl. at ¶ 12; Johnson Decl. at ¶ 14; McGraw Decl. at ¶ 18; Ex. 13 (Declaration of Reverend John Paul Myrick ("Myrick Decl.")) at ¶ 8 (ArLA member explaining the burden to the East Central Arkansas Regional Library (ECARL)); Webb Decl. at ¶¶ 19, 38. Quite simply, a library or bookstore "cannot possibly manage to do that without shutting down its core services." *See* Danos Decl. at ¶ 11.

As it stands, libraries and bookstores display materials on open shelves and do not generally restrict where their patrons or customers may go. *See, e.g.*, Coffey Decl. at ¶ 12; Calhoun Decl. at ¶¶ 12-13; *see also* Danos Decl. at ¶ 8; Myrick Decl. at ¶¶ 6-7; Jordan Decl. at ¶¶ 2, 6; West Decl. at ¶¶ 2, 6; Coulter Decl. at ¶ 9; McGraw Decl. at ¶ 14. Thus, if the universe of potentially "harmful" materials could be identified, those materials would then need to be placed into a secure space, which many libraries and bookstores will be unable to do because of logistics, cost, or both. *See* Caldwell-Stone Decl. at ¶ 11(c); Calhoun Decl. at ¶¶ 14-16; Coffey Decl. at ¶¶ 13-17; Coulter Depo. Tr. at 141:24 - 142:6; Danos Decl. ¶¶ at 9-11; Grogan Decl. at ¶ 7(c); Jordan Decl. ¶ at 7(c); McGraw Decl. at ¶¶ 12, 15-17; Myrick Decl. at ¶¶ 8-10; Webb Decl. at ¶ 17-18, 39; West Decl. ¶ at 7(c); *see also* White Depo Tr. at 83:6-22 (acknowledging that to avoid liability under Act 372, CCLS' "open floor plans" would require "cost prohibitive" "structural changes"). Even larger libraries and library systems, like FPL and CALS, would struggle to find a secure, adults-only space to segregate potentially "harmful" material. Johnson Decl. at ¶¶ 12-14; Coulter Decl. at ¶ 10.

Pulling out potentially "harmful" books and relocating them to an adults-only space would also disrupt the logical organization of materials in the bookstore or library branch and impede the

---

Plaintiffs' interrogatory "as *unduly burdensome to the extent it seeks to require them to read and evaluate the 20 listed books* or retain experts to do so." *Id.* (emphasis added).

ability of readers to find materials of interest. *See* Caldwell-Stone Decl. at ¶ 8. The result will be a collection that is "confusing for patrons" to navigate "and not in keeping with library best practices." *See* Webb Decl. at ¶ 23. Moreover, even if libraries and booksellers do take these measures, "there is no guarantee that some material would not slip through the net(s)," meaning these efforts might be for not. *See* Johnson Decl. at ¶ 13.[6]

The high cost of the steps libraries and booksellers must take to avoid criminal liability will also be borne by patrons and customers of all ages.

Segregating materials into adults-only rooms will prevent teenagers from reading, among many other books, popular works of fiction and nonfiction because they contain descriptions of mature themes, including sexual relationships. *Compare* Madeline Partain Depo. Tr. at 33:8-20, 38:15-20, 42:7-43:21 (identifying books by Colleen Hoover and John Green as among those she enjoys reading that are likely to be segregated under Act 372); *with* Coffey Decl. at ¶ 10 (listing popular books that are likely need to be segregated under Section 1); Jordan Decl. at ¶ 5 (listing "contemporary bestsellers" available at Pearl's Books); *and* West Decl. at ¶ 5.

Minors will also be denied access to educational materials, including art and sex education books. *See* Coulter Depo. Tr. at 105:2-107:5 (identifying *Sex: An Uncensored Introduction* by Nikol Hasler and *It's Perfectly Normal* by Robie Harris as books likely to be segregated under Section 1); Coffey Decl. at ¶ 10; Webb Decl. at ¶ 12; West Decl. at ¶ 5; Jordan Decl. at ¶ 5.

Segregating potentially "harmful" materials into an adults-only room will also burden the rights of adult readers in at least two ways. First, adults will be unable to fully browse in their local library or bookstore when they are accompanied by a minor that is too young to be left unattended.

---

[6] Section 1 does not even contain an exception for parents providing books to their own children. *See* PI Op. at 14 n. 21. Like many parents, Miel Partain would like to be able to recommend books to her 17-year-old daughter without worrying that she will be jailed, if she recommends something to Madeline that would be too mature for her grandchildren. Miel Partain Depo. Tr. at 56:10-57:11.

*See, e.g.*, Farrell Decl. at ¶ 5 (noting the difficulty she would have browsing for herself when she brings the young children with whom she volunteers to the library); Miel Partain Depo. Tr. at 52:9-24 (anticipating difficulty visiting CCLS with her 10- and 8-year-old grandchildren). Many libraries in Arkansas require chaperones for children younger than 11 or 10 years old. *See* Coulter Decl. at ¶ 9, Ex. B (CALS Board Policy # 400) at CALS00008 (permitting "[c]hildren ages 11 and older . . . to be at the library without a caregiver"); Danos Decl. at ¶ 8; Webb Decl. at ¶ 15, Ex. D (GCL Patron Rules of Conduct) at WEBB 00014 ("Children ages 10 and under must be accompanied by an adult at all times" (emphasis omitted)); Johnson Decl. at ¶ 27, Ex. E (Children at the Library Policy) at FPL0020 ("Children ages 5 and under or children under the grade level of kindergarten, must be actively supervised by a parent/caregiver"). Section 1 will thus fundamentally change an experience that has been enjoyed by many parents, grandparents, and other guardians of browsing through a bookstore or library with younger children. Jordan Decl. at ¶ 2; West Decl. at ¶ 2; Coffey Decl. at ¶ 22; Webb Decl. ¶ 43.

Second, adults will be deterred from accessing materials that are identified as "harmful to minors" because those materials will be powerfully stigmatized. Farrell Decl. at ¶ 5 (testifying that browsing in an adults-only room "would signal to others that" she is "interested in reading pornography"); *see also* Caplinger Depo. Tr. at 66:24-67:3; Miel Partain Depo. Tr. at 49:23-50:15.

Plaintiffs' fear that, by entering an adults-only room, members of their community will assume they are browsing for pornography or obscenity, is well-founded. When Crawford County residents complained at a Quorum Court meeting about LGBTQ-themed books in the children's section of CCLS, Defendant Chris Keith, then the County Judge-Elect, assumed their complaints concerned actual pornography. *See* Ex. 23 (Judge Chris Keith Deposition Transcript ("Keith Depo. Tr.")) at 19:19-22 ("[E]ven though some of [the challenged books] may have been directed to

homosexuality, . . . there was pornography in them too.").[7] Prominent public officials, including officials on the State Library Board, have worked hard to cement this idea.[8] *See* Ex. 1 (Declaration of John Adams ("Adams Decl.")) at ¶ 3, Ex. A (Jason Rapert (@jasonrapert), X.com (Apr. 15, 2024, 10:55 AM), https://twitter.com/jasonrapert/status/1779931475439165655 ("Rapert Post")) (characterizing thirty popular works of fiction and nonfiction as "obscene" and "pornographic")).

The stigmatized restrictions that Section 1 requires will also cause a drop in sales for bookstores. West Decl. at ¶ 7(d); Jordan Decl. at ¶ 7(d). Likewise, library directors expect that Section 1 will cause patrons to stop using the library. Coffey Decl. at ¶ 22; Webb Decl. at ¶ 43-44; *see also* Ex. 22 (Eva Doyce White Deposition Transcript ("White Depo. Tr.")) at 92:16-25 (agreeing that segregating books "might be a deterrent to [families] using the library"); Hector Decl. at ¶ 27. And, for authors, creators in the comic book arts, and publishers, any of the bad options available to booksellers and libraries will substantially limit their ability to write on topics of their choosing, and to have their work made widely available through bookstores and libraries. Rasenberger Decl. at ¶¶ 5-6; Trexler Decl. at ¶ 7; Stratton Decl. at ¶¶ 5.

### B.    Section 5 will injure libraries, librarians, and library patrons.

By providing a new, sweeping process for any person to challenge the "appropriateness" of any book in a public library in Arkansas, and seek its removal from the library's general collection, Section 5 forces a similar set of choices on Arkansas public libraries as does Section 1:

---

[7] Specifically, Crawford County residents were complaining about the display of *If You're A Drag Queen and You Know It* by Lil' Miss Hot Mess, *Pink, Blue, and You!: Questions for Kids About Gender Stereotypes* by Elise Gravel, *The Meaning of Pride* by Rosiee Thor, *The Big Book of Pride Flags* by Jessica Kingsley, *Uncle Bobby's Wedding* by Sarah S. Brennan, and *Bye Bye, Binary* by Eric Geron. *See* Ex. 28 (the "Dec. 19, 2022 Quorum Ct. Mtg. Mins.") at CrawfordCo_000025. At the November 2022 Crawford County Library Board meeting, the Library Board had rejected a request to remove these books. *Id.*; Ex. 26 ("Nov. 8, 2022 CCLS Board Mtg. Mins.") at CrawfordCo_000001-000002. Each of those books was subsequently segregated into a "Social Section." *See* Ex. 30 (Social Section Book List).

[8] *See also* Ex. 9 (Declaration of Patty Hector ("Hector Decl.") at ¶ 12 (ArLA member recounting being "accused of endangering children," and called a "groomer" and a "pedophile" after refusing to move disfavored books).

ban all minors from entering the library; physically restructure the library to create a secure, adults-only space where inappropriate books are not "accessible" to minors; or preemptively remove any book likely to be challenged as inappropriate from their collections. Section 5 also imposes those burdens while providing even less guidance than Section 1, leaving libraries to guess at what books are not "appropriate," and whether inappropriate works have been rendered adequately "not accessible to minors."

Moreover, by prescribing mandatory procedures, Section 5 prevents libraries from relying on policies that many have successfully used to be responsive to patron feedback, including negative feedback, without allowing an overwhelming number of challenges or letting the views of a vocal few dictate the what is generally available. Danos Decl. at ¶ 18; Webb Decl. at ¶¶ 27, 31. That success is owed, in part, to the reasonable limits libraries have set on reconsideration requests, such as requiring that requesters have a current library card and/or live in the library's service area. *See id.* at ¶ 27, Ex. E (GCL Materials Reconsideration Policy); Johnson Decl. at ¶¶ 17, Ex. A (Reconsideration of Library Materials). Section 5 prevents libraries from imposing such reasonable limits. Librarians are thus concerned that even a small number of vocal activists will be able to use Section 5 to substantially increase the volume of materials challenges. Webb Decl. at ¶¶ 32-33; White Depo. Tr. at 88:7-13 (expecting "scores of challenges" at CCLS).

Section 5 especially hampers the ability of libraries to efficiently respond to frivolous, repeat, or overbroad requests, which they expect to increase if that provision takes effect. *See* Johnson Decl. at ¶ 19; Webb Decl. at ¶ 30. Prior to Act 372, libraries might have denied such requests without undertaking a resource-intensive review of each challenged book. *See, e.g.*, *id.* at ¶ 28 (rejecting request to remove "all materials with LGBTQ characters"). But Section 5 requires

challenged material to be "reviewed in its entirety," Act 372 § 5(c)(7)(B), even if the work has been previously challenged or is challenged for improper purposes.

Fairly and thoroughly processing reconsideration requests is a time and resource intensive task, even when it is done pursuant to policies setting reasonable limitations. *See* Webb Decl. at ¶ 29. The unlimited challenges invited by Section 5 will impose a crushing burden on libraries, which will be practically impossible to meet. *See* Calhoun Decl. at ¶ 11; Coffey Decl. at ¶ 11; Danos Decl. at ¶ 17; Johnson Decl. at ¶ 19; McGraw Decl. at ¶ 22; Myrick Decl. at ¶ 7; Webb Decl. at ¶ 30; Coulter Depo. Tr. at 25:9-10; White Depo. Tr. at 88:7-13; White Depo. Tr. at 86:16-87:10 (acknowledging that reviewing challenged books "would definitely be a chore").

Section 5 also deprives patrons of access to protected materials through its use of vague standards and lack of judicial oversight, which establish a scheme that tolerates, or even facilitates, restricting access to library materials on the basis of the viewpoint they express. Indeed, Crawford County's creation of the "Social Sections" in CCLS illustrate that these concerns are not hypothetical. *See* Ex. 29 ("Jan. 10, 2023 CCLS Board Mtg. Mins.") at CrawfordCo_000004 (describing the "Social Section" formation as a "[c]ompromise with [the] Quorum Court," pursuant to which CCLS would move LGBTQ-themed books from the children's section to "an Adult Section"); White Depo. Tr. at 109:22 – 111:9 (testifying that the "compromise" was an effot to avoid "[r]emoval of the books," or the library's closure). Through its attorney, Crawford County has asserted that the books were moved to the "Social Section" to "protect[] children from exposure to" "sexualized material," and connected its formation to Crawford County's forthcoming responsibilities under Section 5. *See* Ex. 31 (May 23, 2023 Response from Gentry Wahlmeier) (the "May 23, 2023 Wahlmeier Response"); Ex. 32 (May 23, 2023 letter from Gentry C. Wahlmeier to CCLS Board) (advising the CCLS Board that, to comply with Act 372, it would

need to "create a section that is not accessible to those under eighteen (18)" and a challenge procedure.

The political pressures that gave rise to the creation of the "Social Section," and caused it to be filled with books expressing locally unpopular viewpoints, have not abated. *See* White Depo. Tr. at 122:6-17 (expressing "fear" and "concern" that the Quorum Court would "go[] along with" the "faction and "shut the library down" if their censorious demands are not met). And, unlike librarians, Quorum Court members have no countervailing commitment to neutral principles of librarianship that might check their political impulses. White Depo. Tr. at 91:18-23 (noting that Section 5 assigns final say to "to somebody who has no earthly idea what to do").

The expectation that the Quorum Court will engage in viewpoint-based decision-making will trickle down and tainting other aspects of Section 5's process. *See* Keith Depo. Tr. at 52:1-21 (acknowledging that the library staff will consider how the Quorum Court might rule when making collection decisions). To appreciate the shape that the resulting viewpoint-based discrimination will take, one need only consider what most of the books in the "Social Section" have in common. As Ms. White succinctly put it: "LGBTQ." *See* White Depo. Tr. at 116:16-18. Moreover, the concern that Section 5 will facilitate viewpoint-based discrimination is hardly confined to Crawford County. *See* Hector Decl. at ¶¶ 3-18; *see also* Webb Decl. at ¶ 53, Ex. I (April 20, 2023 email from Jennifer Chilcoat (the "Chilcoat Email")) at 4 (State Library Director predicting "scores" of challenges from "certain citizens").[9]

---

[9] Ms. Chilcoat subsequently asked the recipients to "please disregard and delete [her] previous email and any technical assistance it contained." *See id.* at 8. She said her "email was premature" and that she would "follow up . . . with further information." *See id.* To date, no replacement guidance has been issued to public library directors.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To create a genuine issue of material fact, the nonmovant must "set forth specific facts, by affidavit or other evidence, showing," *Nat'l Bank of Com. of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999), "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson,* 477 U.S. at 243. A factual dispute is material only if resolution "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citing 10A Charles Alan Wright et al., Federal Practice and Procedure § 2725 (1983)).

## ARGUMENT

### I.    Plaintiffs have standing, and their claims are ripe.

To maintain an action in federal court, Plaintiffs must show: (1) the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent"; (2) that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) is likely to "be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotations omitted). Where "threatened enforcement" of a law "implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing," particularly with regards to "the doctrine's first element: injury-in-fact." *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (internal quotations and citations omitted).[10] Moreover,

---

[10] Although a Plaintiff must have standing for each asserted claim, "[i]n a multi-plaintiff suit, only one plaintiff needs to satisfy the constitutional standing requirements" for each claim. PI Op. at 20 n. 22 (citing *Horne v. Flores*, 557 U.S. 433, 446-47 (2009)); *see also Ark. United v. Thurston*, 626 F.Supp.3d 1064, 1077 n.10 (W.D. Ark. 2022) (Brooks, J.).

where "'[p]laintiffs seek preenforcement review of a criminal statute,'" they are not "'required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010) (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("*Virginia II*").

A.     **Plaintiffs have standing to bring their Section 1 claims, and those claims are ripe.**

Numerous Plaintiffs, including librarians and booksellers, have a reasonable fear that they, or their members or employees, could be prosecuted under Section 1 because they currently have materials that could be deemed "harmful" to younger minors in areas of their libraries and bookstores that are conceivably "available" to minors. Furthermore, Plaintiffs' options for removing the threat of criminal liability—which boil down to excluding children or segregating books into adults-only rooms—are logistically and financially untenable and contrary to the core purpose of community bookstores and public libraries.

The Supreme Court has found that booksellers in a predicament "very similar to this one" had standing to bring "a pre-enforcement, facial challenge to a state law criminalizing the commercial display of materials considered 'harmful to juveniles'" based on the threat of prosecution they faced. PI Op. at 20 (quoting *Virginia II*, 484 U.S. at 387). The logic of *Virginia II* applies with equal force to the librarian Plaintiffs because they "also risk criminal prosecution" on the same terms as booksellers. *Id.* at 20-21. Accordingly, the threat of prosecution under Section 1 suffices to establish an injury-in-fact, with room to spare under the "lenient" standard applicable to this pre-enforcement challenge. *Dakotans for Health*, 52 F.4th at 386 (internal quotations omitted). For the same reason, Plaintiffs' pre-enforcement challenge to Section 1 is ripe. *See Virginia II*, 484 U.S. at 393 ("We are not troubled by the pre-enforcement nature of this suit.").

The steps that librarians and booksellers must take to have any hope of avoiding criminal liability under Section 1 will also result in the segregation of materials that are constitutionally protected as to adults and older minors. Segregation of those materials will burden the ability of adults and older minors to access those works, either directly or because they will be chilled from accessing materials that have been stigmatized and identified as harmful to children. This burden constitutes a straightforward injury to the constitutional rights of Plaintiffs who are patrons or bookstore customers. *See Counts v. Cedarville Sch. Dist.*, 295 F.Supp.2d 996, 999 (W.D. Ark. 2003) (finding that impediments to access, even if "relatively small, constitute a sufficient allegation" of injury to establish standing); *see also Sund v. City of Wichita Falls*, 121 F.Supp.2d 530, 541, 550 (N.D. Tex. 2000) (finding policy permitting children's books to be segregated into an adult section was a "significant burden" on the right to freely access library materials); Mot. to Dismiss Op. (Doc. 52) at 5 (finding Ms. Caplinger's allegation that Act 372 will deprive her of accessing books she would like to peruse or read "sufficient to confer standing").

Because Plaintiffs' injuries arise from the threat of prosecution, they are caused by the Prosecutor Defendants, who will be responsible for implementing that criminal provision. *See* Prosecutor Defs.' Answer to Am. Compl. (Doc. 79) at ¶ 61 (admitting "that they will treat Act 372 as they do any other criminal law."). That is sufficient to establish that "Plaintiffs' injuries will be fairly traceable to the actions of these Defendants, and a decision in Plaintiffs' favor on Section 1 would redress their injuries." PI Op. at 21; *see also Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019) (considering traceability established where the defendants "possess the authority to enforce the complained-of provision." (internal quotations omitted)).

**B.    Plaintiffs have standing to bring their Section 5 claims, and those claims are ripe.**

As with Plaintiffs' challenge to Section 1, the undisputed facts show that Plaintiffs will be injured by Section 5, those injuries will be fairly traceable to the County Defendants, at least for some Plaintiffs, and a decision in Plaintiffs' favor on Section 5 would redress these injuries.

Plaintiffs have provided evidence of the burden and steep financial costs that libraries—like Plaintiffs FPL, CALS, ESCPL, and the library members of AAAL, ArLA, and FTRF—will incur if they have to implement Section 5 and prepare an area that is both inaccessible to minors and can house a large volume of material. [11]

Plaintiffs have also provided evidence showing that segregating books into adults-only spaces, as Section 5 will require libraries to do, burdens the ability of patrons—like Plaintiffs Leta Caplinger, Olivia Farrell, Miel Partain, and Madeline Partain—to use and enjoy the public library and to access materials that are of interest to them and appropriate for their age and maturity.

Madeline Partain, a 17-year-old patron of CCLS, has testified that she will be severely burdened by her loss of access to any book, except those that are suitable for very young library users. *See* Madeline Partain Depo. Tr. at 33:8-20, 38:15-20, 42:7-43:21. Plaintiffs Leta Caplinger and Miel Partain, who are CCLS patrons have described how their library access will be curtailed because they would feel very uncomfortable browsing through books that have been segregated into a stigmatized adults-only area. *See* Caplinger Depo. Tr. at 66:24-67:3; Miel Partain Depo. Tr. at 49:23-50:15. Plaintiff Olivia Farrell has expressed the same concern. *See* Farrell Decl. at ¶¶ 4-5. In addition, segregating books into an adults-only area will make it impossible for adults who visit their local library with young children, as Olivia Farrell and Miel Partain do, to freely browse and find selections for themselves. *See* Miel Partain Depo. Tr. at 52:9-24; Farrell Decl. at ¶ 5.

---

[11] ArLA and AAAL also suffer an injury to their organizational interests. Coffey Decl. at ¶¶ 24-32; Webb Decl. at ¶¶ 48-55; *Ark. United v. Thurston*, 626 F.Supp.3d 1064, 1078 (W.D. Ark. 2022) ("An organization may establish injury-in-fact by showing it had to divert some of the organization's resources to counteract the challenged law.").

These injuries suffice for standing purposes. *See Counts v. Cedarville Sch. Dist.*, 295 F.Supp.2d 996, 999 (W.D. Ark. 2003) (finding sufficient injury where plaintiffs' ability to access books was "burdened because the books in question are 'stigmatized,' with resulting 'stigmatization' of those who choose to read them"). And, with respect to Plaintiffs Leta Caplinger, Miel Partain, and Madeline Partain—each of whom is a Crawford County resident and patron of CCLS—their injuries are plainly traceable to Judge Keith and Crawford County, which will be responsible for overseeing and implementing the Section 5 challenge process, *see* Act 372 § 5(c)(12). *Alexis Bailly Vineyard, Inc.*, 931 F.3d at 779. "For the same reason their injuries are traceable, they would be redressed by a declaratory judgment" and an order enjoining the County Defendants from implementing Section 5. *Id.* at 780.

## II.    Section 1 of Act 372 violates the First and Fourteenth Amendments.

Section 1 should be permanently enjoined because it imposes an unconstitutional prior restraint on the availability, display, distribution, receipt, and perusal of constitutionally protected, non-obscene material to both adults and older minors, is unconstitutionally overbroad, and is unconstitutionally vague.

### A.    Section 1 violates the First and Fourteenth Amendments by imposing a content-based restriction on expressive conduct.

By imposing criminal penalties for anyone who "knowingly . . . [f]urnishes, presents, provides, makes available, gives, lends, shows, advertises, or distributes to a minor an item that is harmful to minors," Section 1 of Act 372 imposes a content-based restriction on expressive conduct, in violation of the First and Fourteenth Amendments.

Prior restraints of the sort imposed by Section 1 are "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). They may stand only when necessary for "the essential needs of the public order." *Carroll v.*

*President & Comm'rs of Princess Ann*, 393 U.S. 175, 183 (1968). Accordingly, as a content-based restriction on protected, non-obscene speech, Section 1 is "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotations omitted). The Prosecutor Defendants will be able to do so here only by showing that Section 1 survives strict scrutiny, meaning that it (1) serves a compelling governmental interest, (2) is narrowly tailored to achieve that interest, and (3) constitutes the least restrictive means of advancing that interest. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). There is no application of Section 1 that meets this standard.[12]

While the state has an interest in protecting minors from materials that are legally obscene as to them, *see Ginsberg v. New York*, 390 U.S. 629, 636-43 (1968), "the government's role in helping parents to be the guardians of their children's well-being is [not] an unbridled license to governments to regulate what minors read and view," *Interactive Dig. Software Ass'n v. St. Louis Cnty. Mo.*, 329 F.3d 954, 959-60 (8th Cir. 2003); *Counts*, 295 F.Supp.2d at 1005 (holding that school district policy, which restricted "access to the Harry Potter books to those students whose parents sign a permission slip allowing them to check out the books," did not survive strict scrutiny). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).

Nor can the state's ostensible goal of protecting minors from legally obscene material be pursued by means which effectively stifle the access of adults or older, mature minors to material

---

[12] Section 1 also fails if a lesser degree of scrutiny, even rational-basis review, applies. As the Court previously found, there is "no basis—let alone a rational one—to justify the burdens Section 1 would impose on older-minor and adult access to protected reading materials in the public library and bookstore settings." PI Op. at 37 n. 27.

they are constitutionally entitled to receive. *See Reno v. ACLU*, 521 U.S. 844, 874-75 (1997) (recognizing that "sexual expression which is indecent but not obscene is protected by the First Amendment" and that "the governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults." (internal quotations omitted)); *see also Virginia II*, 484 U.S. at 395 (finding that a "broader reading of the statute" at issue—under which *minors* meant *all minors*—"would raise correspondingly greater First Amendment questions"). Thus, a law that "reduce[s] the adult population . . . to reading only what is fit for children" is "not reasonably restricted to the evil with which it is said to deal." *Butler v. Michigan*, 352 U.S. 380, 383 (1957); *see also Shipley III*, 454 F.Supp.2d at 820, 829-30 (invalidating prohibition on the "display" of "material which is harmful to minors" because it "effectively stifles the access of adults and older minors to communications and materials they are entitled to receive and view").

To survive strict scrutiny, the law must allow for the bookseller or librarian to take into consideration the age and maturity of the specific individual whose access would be restricted. Thus, while courts have routinely found laws prohibiting the "display" or "availability" of material that is "harmful" to *all* minors to be unconstitutional, *see, e.g.*, *id.*,[13] laws that regulate only the sale of "harmful" materials to minors, *Ginsberg*, 390 U.S. at 643, or that are amenable to a narrowing construction, such as an interpretation in which "minor" covers only "a reasonable 17-year-old minor," *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 528 (Tenn.

---

[13] *See also, e.g.*, *Am. Booksellers Ass'n, Inc. v. McAuliffe,* 533 F.Supp. 50, 56 (N.D. Ga. 1981) (striking down "a public display prohibition which necessarily prevents perusal by, and limits sale to, adults"); *Tattered Cover, Inc. v. Tooley*, 696 P.2d 780, 784 (Colo. 1985) ("[T]he state cannot prevent adults from reading or having access to these materials on the ground they would be objectionable if read or seen by children."); *Am. Booksellers Ass'n, Inc. v. Superior Court of L.A. Cnty.,* 181 Cal. Rptr. 33, 37-38 (Cal. Ct. App. 1982) (finding a law requiring that unsealed "materials be placed 'beyond the reach of *any* minor'" to be overbroad where the law "provide[d] no guidelines . . . on how to accomplish this mode of inaccessibility," which would cause booksellers aiming to "plac[e] the publications outside the reach of minors" to also place them "outside the reach of many adults and certainly of minors accompanied by adults").

1993); *Am. Booksellers v. Webb*, 919 F.2d 1493, 1495 (11th Cir. 1990), have generally been upheld.

Section 1 entirely fails to regulate with the calibration required by the First Amendment because it treats all minors alike and fails to distinguish between younger, less mature minors and older, more mature minors. *See* Act 372 § 1(b). Nor can the breadth of Section 1 be reasonably in doubt given the Arkansas Supreme Court's interpretation of "a law nearly identical to Section 1 of Act 372" in *Shipley II*, 195 S.W.3d at 915. *See* PI Op. at 32. In *Shipley II*, the Arkansas Supreme Court concluded that, under Arkansas law, the use of "minors" is "obviously intended to protect *all* minors"—not just older, more mature minors—"from exposure to material deemed 'harmful to minors.'" *See Shipley II*, 195 S.W.3d at 915.

Applying the Arkansas Supreme Court's interpretation to Act 372, it is clear that Section 1 will "effectively stifle[] the access of adults and older minors to communications and material they are entitled to receive and view," and will criminally penalize librarians and booksellers who provide access to such materials to older minors, to whom the materials are constitutionally protected. *See Shipley III*, 454 F.Supp.2d at 829-30. Arkansas has long known that this type of provision "impose[s] unconstitutional prior restraints on the availability and display of constitutionally protected, non-obscene materials to both adults and older minors," and the Court should reach the same conclusion with respect to Section 1 that Judge G. Thomas Eisele did twenty years ago with respect to Act 858 of 2003. *See id.* at 831.

### B.    Section 1 is unconstitutionally broad because it will prohibit or chill a substantial amount of protected speech.

Just as Section 1 is insufficiently tailored to survive strict scrutiny, it is also unconstitutionally overbroad. A law is overbroad if it "reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455

U.S. 489, 494 (1982). The overbreadth doctrine thus prohibits restrictions on even unprotected speech where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002). In addition, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

The Court provided a perfect illustration of how Section 1's overbreadth directly imperils librarians and booksellers when it posited the following hypothetical:

> Take for example, a paperback romance novel, which contains descriptions of sex. It is unlikely young minors would be interested in reading such a book, but if for some reason it were 'made available' to them in bookstores or libraries, booksellers and librarians could possibly face penalties—depending on how that term was construed.

PI Op. at 35-36.[14] There can be no genuine dispute that, if Section 1 goes into effect, the Court's hypothetical would become terribly real for libraries and booksellers in Arkansas, which have materials in their general collections and inventories that are potentially "harmful" for young minors. Likewise, Plaintiffs have established beyond any genuine dispute that any step they might take to mitigate their exposure to criminal liability will require segregating constitutionally protected materials into an adults-only area, which will burden the freedom to read for adults and older, more mature minors.

---

[14] Although the Court's hypothetical focused on the "makes available" provision, which provides reason enough to find Section 1 overbroad, other terms in Section 1 are overbroad, as well. For instance, the terms "presents" and "shows" encompass substantially the same conduct as the term "display," which was struck down as overbroad in *Shipley III*, 454 F.Supp.2d at 831. And the "advertis[ing]" prohibition, which would prohibit bookstores and libraries from advertising any books that might be "harmful" to young minors in any location where a minor might see it, Act 372 § 1(b)(1), runs afoul of the Supreme Court's admonition that "[t]he level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71, 74 (1983) (holding unconstitutional a ban on mail advertisements that would expose children to "sensitive and important subjects such as birth control").

These burdens on the freedom to read are personal, but they are not unique to Plaintiffs. Indeed, they will be felt in a similar fashion by all readers in Arkansas. Accordingly, the Court should declare that Section 1 is overbroad on its face and enjoin the Prosecutor Defendants from enforcing it. *See Members of City Council of L.A.*, 466 U.S. at 801 (finding a law facially overbroad where there is "a realistic danger" that it will burden the First Amendment rights of nonparties).

### C.   Section 1 is void-for-vagueness because it fails to provide sufficient clarity to regulated parties or protections against arbitrary enforcement.

A law is void-for-vagueness if it "forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application," or if it enables "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to [government officials] for resolution on an ad hoc and subjective basis." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (internal citations and quotations omitted). In the First Amendment context, "the [vagueness] doctrine demands a greater degree of specificity" where "the literal scope of the [] regulation is capable of reaching expression sheltered by the First Amendment." *Stephenson*, 110 F.3d at 1308-09 (internal quotation omitted); *see also Reno*, 521 U.S. at 871-72.

As established above, there can be no dispute that Section 1 reaches a great deal of constitutionally protected expression. It fails, however, to use sufficiently specific terminology and to impose guardrails against arbitrary enforcement, as is required to pass constitutional muster. *See Stephenson*, 110 F.3d at 1308-09. Instead, Section 1 operates through a series of imprecise and undefined verbs that leave "grave uncertainty" about their meaning and scope, *Johnson v. United States*, 576 U.S. 591, 597 (2015). *See* Act 372 § 1(b)(1).

In particular, by criminalizing someone who "presents," "makes available," or "shows" material that is "harmful to minors," Section 1 fails to provide adequate notice of the conduct it

prohibits. *See* Act 372 § 1(b)(1). As the Court has observed, and Plaintiffs' evidence indisputably shows, these undefined words "leave[] librarians and booksellers unsure about whether placing books known to contain sexual content on the bookshelves may subject them to liability once a minor walks through the front door," PI Op. at 38. This uncertainty still renders Section 1 unconstitutionally vague even if one can imagine "some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602.

## III.     Section 5 of Act 372 violates the First and Fourteenth Amendments.

On its face, the challenge procedure required by Section 5 violates the Constitution in four separate ways. First, the "appropriateness" and "inaccessible to minors" standards facilitate arbitrary decision-making and are unconstitutionally vague. Second, requiring that materials deemed inappropriate be made "inaccessible to minors" cannot survive strict scrutiny. Third, assigning final decision-making authority on censorship decisions to a political body, without any mechanism for an aggrieved party to obtain prompt judicial review, effects an unconstitutional prior restraint of protected speech. Fourth, it discriminates on the basis of viewpoint by granting preferential access and procedural rights to those who favor segregating or removing library materials, while making no allowance for those who would favor continued inclusion.

### A.     Section 5's reliance on undefined terms that permit arbitrary implementation renders it unconstitutionally vague.

Successful challenges under Section 5 will result in the segregation of books that are merely inappropriate, but not necessarily obscene, "to an area that is not accessible to minors under the age of 18," which means that it regulates a great deal of protected expression. *See* Act 372 § 5(c)(1), (11)(A). Accordingly, it must meet a "stringent vagueness test" that "demands a greater degree of specificity." *Stephenson*, 110 F.3d at 1308-09. Section 5 fails to meet that stringent test. The provision "is very poorly drafted," perhaps intentionally so, PI Op. at 39, and provides

inadequate notice to those who must implement its requirements, facilitating arbitrary resolution of book challenges, as a result. *See Stephenson*, 110 F.3d at 1308-09.

Section 5 requires libraries to evaluate "the *appropriateness* of material available in the county or municipal library," Act 372 § 5(c)(1) (emphasis added), but does not define that essential term or incorporate a definition from elsewhere in the Arkansas statutory code. The Prosecutor Defendants have previously argued that evaluating the "appropriateness" of library materials requires the library to evaluate whether the challenged material is appropriate within the context of the library's "criteria of selection." *See* PI Op. at 40. That interpretation is implausible.

First, if the legislature intended "appropriateness" to be coextensive with a library's criteria of selection, it surely would have required that the selection criteria be included among the materials "the executive head of the county or city shall present" to the members of the local governing body and which those members "shall review" before rendering their final judgment on the "appropriateness" of a challenged book. *See* Act 372 § 5(c)(12)(B), (C). But Section 5 does not require that members of the local governing body even consult the library's selection criteria, let alone require that they rely on them in exercising their appellate function. Second, if "appropriateness" were merely a measure of a library's compliance with its own selection criteria, there would be no reason for the Legislature to specify that Section 5 challenges may not be decided "solely for the viewpoints expressed within the material," *see id.* § 5(c)(7)(B)(i), particularly because library selection policies facilitate decision-making that is expressly and completely viewpoint neutral.

Since Act 372 does not define "appropriateness," the Court should once again use the "ordinary dictionary meaning" of that critical term. *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 825 (8th Cir. 2017). PI Op. at 40. The dictionary defines "appropriateness" to mean

"[s]uitable for a particular person, condition, occasion, or place; fitting." *Appropriateness*, The American Heritage Dictionary of the English Language (5th ed. 2022), https://www.ahdictionary.com/word/search.html?q=appropriateness. This definition plainly makes it "difficult, if not impossible, to assess a challenged book's 'appropriateness' without considering its content, message, and/or viewpoint." PI Op. at 40.

Indeed, Section 5 invites those deciding book challenges to do so on the basis of their viewpoints in two places. First, by stating that challenged materials "[s]hall not be withdrawn *solely* for the viewpoints expressed within the material," Section 5 plainly tolerates challenges to be decided *partially or predominantly* on the basis of viewpoint. *See* Act 372 § 5(c)(7)(B)(i) (emphasis added). Second, Section 5 requires that, in selecting the library review committee for the purpose of evaluating the "appropriateness" of challenged materials, the librarian must select members who are "representative of diverse viewpoints." *Id.* § 5(c)(6)(C). Plainly, the General Assembly wanted to at least allow those involved in reviewing book challenges to bring their own viewpoint to bear when judging a book's "appropriateness."

Defendant Chris Keith, who will be responsible for administering Section 5, testified that he understands this term, if he does, to contain a subjective standard onto which individuals may graft their personal view. *See* Keith Depo. Tr. at 48:5-10 (MR. ADAMS: "What do you think makes a book appropriate or inappropriate to be in the library's main collection?" MR. KEITH: "I don't know. That's a different thing for different people."). Thus, regardless of whether the Legislature intended for members of local governing bodies to apply their personal viewpoint when rendering final judgment on book challenges, that will be the practical effect.

The use of such a vague, ambiguous, and undefined "pivotal term" leaves library patrons and staff with no meaningful guidance as to what constitutionally protected expression may be

deemed inappropriate and, perhaps by design, vests officials with "unfettered discretion" to restrict access to such materials. *Stephenson*, 110 F.3d at 1310. That is sufficient, without more, to render the scheme established by Section 5 "fatally vague." *Id.*

Section 5 contains other ambiguous terms, too. Specifically, neither "withdraw," "relocate," nor "accessible to minors" is defined in Act 372. Act 372 § 5(c)(7)(B); *id.* § 5(c)(11)(A); *id.* § 5(c)(12)(A). Although "withdraw" and "relocate" are used interchangeably in Section 5, they are susceptible to vastly different meanings. *See* PI Op. at 41 (observing that "withdraw" might mean "temporarily or for good"). Because Section 5 allows "challenges to appropriateness writ large, not just with respect to minors," the statute could arguably be read as establishing "withdrawal" as the remedy for books deemed inappropriate even for adults. *See id.* at 41-42 ("Otherwise, where would such a book—deemed broadly inappropriate for all readers, regardless of age—be placed?").[15]

Section 5's requirement that inappropriate books be "relocated . . . to an area that is not accessible to minors" is similarly impermissibly vague. *See* Act 372 § 5(c)(11)(A). Act 372 does not define what makes a space "accessible to minors," leaving libraries in a position of guessing what level of security is necessary to meet the law's requirements. Many potential measures could reduce the access minors have to "inappropriate" materials, but it is not clear what is necessary to make them legally inaccessible. For all of the foregoing reasons, the Court should strike Section 5 as impermissibly vague.

---

[15] Indeed, even the State Librarian was confounded by Section 5's unexplained use of these two, potentially synonymous terms. *See* Chilcoat Email at 5.

**B.  Section 5 imposes a content-based restriction on protected speech that is not narrowly tailored to serve a compelling state interest.**

Section 5 establishes a scheme through which government officials review the "appropriateness" of challenged library materials for continued inclusion in a library's main collection. That necessarily requires that library committees and local governing bodies take into account the content of the material they are reviewing and decide, based on that content, whether to remove it from general circulation. *See generally* Act 372 § 5. Accordingly, Section 5 imposes a content-based restriction that is "presumptively unconstitutional" and subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). It will be upheld "only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Id.* Section 5 unavoidably fails to meet its burden because (1) it does not serve a compelling governmental interest and (2) is not narrowly tailored to serve that purpose.

If Section 5 restricted its reach solely to materials that are obscene as to minors, that might further a legitimate governmental interest. *See Ginsberg*, 390 U.S. at 636-43. But Section 5 is concerned with the "appropriateness" of library materials, which is a far broader category of expression than variable obscenity. *See* Act 372 at § 5(c)(1). Thus, if "appropriateness" encompasses materials that are protected—i.e., not obscene, even for young children—then Section 5 does not serve a compelling governmental interest. *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Erznoznik*, 422 U.S. at 213-14 ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."); *Sund*, 121 F.Supp.2d at 551 (finding resolution authorizing challengers to relocate *Heather Has Two Mommies* by Lesléa

Newman and *Daddy's Roommate* by Michael Willhoite from the children's section to the adult section to be "content- and viewpoint-based restrictions on Plaintiffs' right to receive information" that were "not narrowly tailored to serve a compelling state interest").

Even if the Legislature's intent were to cabin Section 5's reach to materials that are obscene to minors, Section 5 still fails. In that scenario, the law would merely trade one fatal flaw (the lack of a compelling purpose) with another (insufficient tailoring). *See* PI Op. at 44 ("[T]his change would raise the same issues discussed with respect to Section 1 of Act 372."). Rather than narrowly targeting young minors' access to materials that would be obscene for younger minors, Section 5 also inhibits older, more mature minors and adults from accessing these materials, which are not obscene when viewed by adults and mature minors. This is so because, when books or other library materials are deemed inappropriate, they are segregated into areas that are "not accessible to minors." *See* Act 372 at § 5(c)(11)(A).

Plaintiffs have established beyond genuine dispute that the segregation of books in this manner burdens both adults and older, more mature minors in a way that violates the First Amendment. *See Butler*, 352 U.S. at 383; *see also Shipley III*, 454 F.Supp.2d at 831 (striking statute that "impose[d] unconstitutional prior restraints on the availability and display of constitutionally protected, non-obscene materials to both adults and older minors"). *Sund,* 121 F.Supp.2d at 550 (finding a "significant burden" on the ability of patrons to access materials when they were relocated within the library).

C.  **Section 5 unlawfully imposes a prior restraint on protected materials without providing a mechanism for judicial review.**

Although Section 5 does not directly regulate a library's acquisition of new materials, it nevertheless imposes a prior restraint on protected expression because it facilitates the relocation or withdrawal of disfavored materials from a library's general collection. The obvious effect of

that outcome is that patrons will be *restrained* from accessing the segregated materials *prior* to viewing, reading, or otherwise consuming them. Because Section 5 operates in this manner, it faces "a 'heavy presumption' against its constitutional validity." *Neb. Press Ass'n*, 427 U.S. at 558 (quoting *Carroll*, 393 U.S. at 181).

To overcome that presumption, Section 5 must provide for prompt judicial review. *See Freedman v. Maryland*, 380 U.S. 51, 58 (1965). The may not restrain expression "in a manner which would lend an effect of finality to the censor's determination" about a particular work's protection under the First Amendment without that determination being tested through "an adversary proceeding." *Id.* at 57-58; *see also City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.,* 541 U.S. 774 (2004). The burden of showing that the expression is unprotected and may be silenced "must rest on the censor," which must, "within a specified brief period," either allow the expression "or go to court to restrain [it]." *Freedman*, 380 U.S. at 58-59; *see also Teitel Film Corp. v. Cusack*, 390 U.S. 139, 142 (1968).

Section 5 thus fails to overcome its presumed invalidity because it provides no mechanism for judicial review, let alone a path to a "prompt judicial decision." *Id.* The statute has no "specified brief period" within which a library committee must make a decision. *See* Act 372 § 5(c)(8) (providing only that the library "shall convene" the committee "after allowing a reasonable time" for the committee to have reviewed the challenge materials). And the only review contemplated by Section 5 will be conducted by the local "governing body," which is empowered to render a "final" decision on the placement of challenged materials. *See id.* § 5(c)(12)(C)(ii).

Review by a local political body cannot function as a substitute for the sort of judicially supervised adversarial proceeding contemplated by the constitution. *See Freedman*, 380 U.S. at 57-58. Even if a local political body theoretically could stand in for a court, it cannot do so here

because the review allowed by Section 5 is sharply tilted in favor of a material's segregation. Indeed, Section 5 permits an appeal only where the library committee *declines* to segregate a challenged material. Act 372 § 5(c)(12)(A). To "ensure[] the necessary sensitivity to freedom of expression," precisely the opposite is required: the decision to *restrict* a work must be appealable. *Freedman*, 380 U.S. at 51, 57-58.

### D. Section 5 facilitates discrimination on the basis of viewpoint.

Section 5 additionally violates the First Amendment by facilitating discrimination on the basis of viewpoint in that it provides substantial rights to individuals who would censor materials through its challenge process, while affording no rights to those who would oppose censorship efforts in their local libraries. *See, e.g.,* Coffey Decl. at ¶¶ 25-26 (testifying that, if an opportunity to support a book's continued inclusion in a library were provided by Section 5, ArLA members would participate for that purpose); Webb Decl. at ¶¶ 45-46 (same for AAAL and its members); Farrell Decl. at ¶ 6. This differential treatment means that those who hold the view that a book should be withdrawn from the library's collection or segregated have a right to file a formal challenge, meet with the library, and appeal to the local government. But those who hold the opposing view and think that a book should *not* be withdrawn have no such rights. They do not even have an opportunity to comment in the process or hear the reasons for withdrawing a book.

Section 5's failure to ensure equal treatment of these opposing views and equal access for those who wish to petition their government is yet one more example of content-based discrimination that cannot survive strict scrutiny. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642-43 (1994).

### CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment.

Date: May 15, 2024

Respectfully submitted,

/s/ John T. Adams
David M. Fuqua
Ark. Bar No. 80048
John T. Adams
Ark. Bar No. 2005013
Attorneys for Central Arkansas Library System,
Nate Coulter, and the Eureka Springs Carnegie
Public Library
FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Telephone: (501) 374-0200
E-Mail: dfuqua@fc-lawyers.com
E-Mail: jadams@fc-lawyers.com

Bettina Brownstein
Ark. Bar No. 85019
BETTINA E. BROWNSTEIN LAW FIRM
Attorney for Leta Caplinger, Olivia Farrell,
Miel Partain, and Madeline Partain
904 West 2nd Street, Suite 2
Little Rock, AR 72201
Telephone: (501) 920-1764
E-Mail: bettinabrownstein@gmail.com
On Behalf of the Arkansas Civil Liberties
Union Foundation, Inc.

Ben Seel*
Will Bardwell*
Aman George*
Orlando Economos*
Attorneys for the Arkansas Library Association,
Advocates for All Arkansas Libraries, and Adam
Webb, in his individual capacity
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34554
Washington, DC 20043
Telephone: (202) 448-9090
E-Mail: bseel@democracyforward.org
E-Mail: wbardwell@democracyforward.org
E-Mail: ageorge@democracyforward.org
E-Mail: oeconomos@democracyforward.org

Vincent O. Chadick
Ark. Bar No. 94075
Brandon B. Cate
Ark. Bar No. 2001203
Glenn V. Larkin
Ark. Bar No. 2020149
Attorneys for Fayetteville Public Library
QUATTLEBAUM, GROOMS & TULL
PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
E-Mail: bcate@qgtlaw.com
E-Mail: vchadick@qgtlaw.com
E-Mail: glarkin@qgtlaw.com

Michael A. Bamberger*
Kristen Rodriguez*
Rebecca Hughes Parker*
Attorneys for Pearl's Books, LLC,
Wordsworth Community Bookstore LLC,
American Booksellers Association,
Association of American Publishers, Inc.,
Authors Guild, Inc. Comic Book Legal
Defense Fund, and Freedom to Read
Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
E-Mail: michael.bamberger@dentons.com
E-Mail: kristen.rodriguez@dentons.com
E-Mail: rebeccahughes.parker@dentons.com

* Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2024, a copy of the foregoing was served upon all counsel of record contemporaneously with its filing in the CM/ECF system.

/s/ John T. Adams
John T. Adams