IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


FAYETTEVILLE PUBLIC LIBRARY, et al. a political
subdivision in the City of Fayetteville, State of
Arkansas; EUREKA SPRINGS CARNEGIE PUBLIC
LIBRARY; CENTRAL ARKANSAS LIBRARY
SYSTEM; NATE COULTER; OLIVIA FARRELL;
MIEL PARTAIN, in her own capacity and as parent and
next friend of MADELINE PARTAIN; LETA
CAPLINGER; ADAM WEBB; ARKANSAS
LIBRARY ASSOCIATION; ADVOCATES FOR ALL
ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
WORDSWORTH COMMUNITY BOOKSTORE LLC
d/b/a WORDSWORTH BOOKS; AMERICAN
BOOKSELLERS ASSOCIATION; ASSOCIATION
OF AMERICAN PUBLISHERS, INC.; AUTHORS
GUILD, INC.; COMIC BOOK LEGAL DEFENSE
FUND; FREEDOM TO READ FOUNDATION                        PLAINTIFFS


V.                          NO. 5:23-CV-05086-TLB

CRAWFORD COUNTY, ARKANSAS; CHRIS
KEITH, in his official capacity as Crawford County
Judge; TODD MURRAY; SONIA FONTICIELLA;
DEVON HOLDER; MATT DURRETT; JEFF
PHILLIPS; WILL JONES; TERESA HOWELL; BEN
HALE, CONNIE MITCHELL, DAN TURNER, JANA
BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE
HUNTER; DANIEL SHUE; JEFF ROGERS; DAVID
ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; TONY
ROGERS; JOSHUA ROBINSON; CAROL CREWS;
KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each in his or her official capacity as a
prosecuting attorney for the State of Arkansas;          DEFENDANTS


**PLAINTIFFS' BRIEF IN RESPONSE TO COUNTY DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Plaintiffs[1] submit this brief in response to Defendants Crawford County and Judge Chris Keith's (the "County Defendants") motion for summary judgment and supporting memorandum of law.

## INTRODUCTION

Arkansas Act 372 of 2023 ("Act 372") is a vague, sweeping law that restrains public libraries in Arkansas from making constitutionally protected books and other materials accessible to their patrons, thereby burdening the First Amendment rights of those individuals to read and to receive information. Act 372 has several mechanisms for achieving its censorious ends, only one of which is at issue here. Section 5 of Act 372 ("Section 5")[2] requires that public libraries give anyone who feels "affected" by a library material the right to challenge the "appropriateness" of the material's inclusion in the library's collection, and to appeal adverse decisions to a political body that renders final, unreviewable judgment. Materials found to be inappropriate must be segregated in an adults-only space, thereby denying patrons access to materials of interest, and undermining the fundamental purpose of public libraries to create welcoming spaces for self-enrichment.

Plaintiffs contend that Section 5 violates the First and Fourteenth Amendment of the United States Constitution because it uses vague and undefined terms that permit arbitrary implementation; imposes a content-based restriction on protected speech that is not narrowly tailored to serve a compelling interest; fails to provide a mechanism for judicial review; and

---

[1] Plaintiffs are Fayetteville Public Library (FPL), Eureka Springs Carnegie Public Library (ESCPL), Central Arkansas Library System (CALS), Nate Coulter, Olivia Farrell, Miel Partain, Madeline Partain, Leta Caplinger, Adam Webb, Arkansas Library Association (ArLA), Advocates for All Arkansas Libraries (AAAL), Pearl's Books, LLC ("Pearl's Books"), WordsWorth Community Bookstore LLC ("WordsWorth Books"), American Booksellers Association (ABA), Association of American Publishers, Inc. (AAP), Authors Guild, Inc. (the "Guild"), Comic Book Legal Defense Fund (CBLDF), and Freedom to Read Foundation (FTRF).

[2] In prior filings, Plaintiffs referred to Section 5 of Act 372 as the "Challenge Procedure." *See, e.g.*, Am. Compl. (Doc. 75) at ¶ 5. For the sake of simplicity, and to ensure mutual understanding, Plaintiffs refer to that section herein as "Section 5."

1

facilitates discrimination on the basis of viewpoint. Am. Compl. (Doc. 75) at ¶¶ 99-106. Plaintiffs have sued Crawford County, Arkansas, which funds and oversees one of the county libraries charged with implementing Section 5, as well as "its chief executive," County Judge Chris Keith, who is tasked with facilitating Section 5's appeals process, Prelim. Inj. Op. (hereinafter "PI Op.") (Doc. 53) at 24. Plaintiffs seek an order declaring Section 5 unconstitutional and permanently enjoining the County Defendants from implementing it. Am. Compl. at 32 (prayer for relief).

The County Defendants now ask the Court for summary judgment on Plaintiffs' Section 5 claims, arguing that Plaintiffs lack standing to sue the County Defendants because Plaintiffs "seek a statewide remedy," which can only be redressed—according to the County Defendants—by an injunction against the State of Arkansas or the Attorney General. *See* County Defs.' Mot. for Summ. J. Br. (hereinafter "County Defs.' MSJ Br.") (Doc. 91) at 1; *see also* County Defs.' Mot. for Summ. J. (Doc. 90). The County Defendants cannot dispute, however, that Act 372 assigns responsibility for implementing Section 5 to county and municipal governments, like Crawford County, not the State of Arkansas or its Attorney General. And the undisputed facts show that multiple Plaintiffs will be injured by the County Defendants' implementation of Section 5 if it takes effect, and that those injuries can be redressed by an order of this Court declaring Section 5 unconstitutional and enjoining the County Defendants from implementing it. For all of these reasons, the County Defendants are not entitled to judgment as a matter of law and the Court should deny their motion for summary judgment.

## BACKGROUND

### A.    Section 5 of Act 372

Section 5 of Act 372 requires "[e]ach county or municipal library" in Arkansas to "have a written policy to establish guidelines for the selection, relocation, and retention of physical

materials that are available to the public." Act 372 § 5(a). Section 5 further requires public libraries to establish "a written policy for addressing challenged material that is physically present in the library and available to the public." *Id.* § 5(b). Specifically, Section 5 requires that public libraries must create a process through which any "person affected . . . may challenge the *appropriateness* of material available in the" public library's collection. *Id.* § 5(c)(1) (emphasis added). "There is no definition of 'appropriateness,' so any expression of ideas deemed inappropriate by the challenger is fair game." PI Op. at 15. Similarly, "Section 5 does not require a book challenger to be a patron of the library where the challenge is made," or "impose a residency requirement." *Id.*

Once a challenge is submitted, a library may remove the challenged material from circulation while the challenge is considered, if it wishes. *See* Act 372 § 5(c)(2). The challenge will be considered, in the first instance, by the librarian (or their designee) and "a committee of library personnel" who "have knowledge appropriate for the material being challenged" and are "representative of diverse viewpoints." *Id.* § 5(c)(6). Their task will be to review the challenged material "in its entirety," so as to "not have selected portions taken out of context," and then to "determine if the material being challenged meets the criteria of selection." *Id.* § 5(c)(7). Section 5 does not define "the criteria of selection," or explain whether that term relates in some way to the "appropriateness" standard. It does, at least, state that the challenged material "[s]hall not be withdrawn *solely* for the viewpoints expressed within the material." *Id.* (emphasis added).

After reviewing the challenged material and "hearing from the person who submitted the request," the committee "shall vote to determine whether the material being challenged shall be relocated within the library's collection to an area that is not accessible to minors under the age of eighteen (18) years." *Id.* § 5(c)(9)-(11). Section 5 does not explain what makes "an area . . . not accessible to minors." *See id.* "Somewhat confusingly," although a successful materials challenge

results in a book being segregated to an adults-only area of the library, "Section 5 is not actually limited to challenges for appropriateness as to minors." PI Op. at 16.

If the committee sides with the challenger, that ends the matter, and the challenged material will be "withdrawn" from general circulation and segregated in an adults-only area. Section 5 provides no opportunity for a proponent of a challenged material to seek review of the committee's segregation decision. If the challenger loses, however, Section 5 provides another bite at the apple through an appeal "to the governing body of the county or city." Act 372 § 5(c)(12)(A). If an appeal is lodged, the "executive head of the county or city" is responsible for presenting the challenge, challenged material, a copy of the committee's decision denying the challenge, and, optionally, "his or her recommendation regarding the appeal." *Id.* § 5(c)(12)(B). "Section 5 does *not* require the quorum court or city council members to adopt—or even be provided a copy of— the library's selection criteria." PI Op. at 17 (emphasis in original).

Within thirty days of receiving the information provided by the county or city executive, the county or city governing body members "meet to consider and vote on whether to censor the material, either by withdrawing it from the library's main collection or relocating it[.]" *Id.* (citing Act 372 § 5(c)(12)(C)). No written explanation is required, even though the quorum court or city council members' decision "is final." Act 372 § 5(c)(12)(C)(ii).

## B.    Crawford County's implementation of Section 5.

In the fall of 2022, a small but vocal group of Crawford County residents began taking action to impose their political and religious viewpoints on the Crawford County Library System's (CCLS) main collection. This faction—which included Crawford County residents Jeffrey and Tamara (Tammi) Hamby and an organization called the River Valley City Elders—objected, in particular, to a new book display at the Van Buren branch of CCLS that featured some

LGBTQ-themed children's books. *See* Nov. 8, 2022 CCLS Board Mtg. Mins. (Doc. 99-26). After unsuccessfully petitioning the CCLS Board to remove these books from the children's section, *see id.*, the Hamby's turned their attention to the Crawford County Quorum Court, the County Judge, and County Judge-Elect Chris Keith, which they asked to "take the steps needed to ensure that this agenda is not sponsored by [Crawford County's] tax money." Nov. 10, 2022 Letter from Jeffrey and Tamara Hamby (the "Hamby Letter") (Doc. 99-27).

The Hambys accused CCLS of acquiring and displaying children's books as part of an "agenda" to advertise "alternative lifestyles to prepubescent children," and "normalize[e] and equat[e] homosexual and transsexual lifestyles with heterosexual family units." *Id.* Jeffrey Hamby, members of the River Valley City Elders, and others who objected to the display of LGBTQ-themed books in CCLS also appeared at the December 19, 2022 Quorum Court meeting to state their objections to the library "promoting homosexual lifestyles, gender confusion, glorifying drag queens" to the Quorum Court. Dec. 19, 2022 Quorum Ct. Mtg. Mins. (Doc. 99-28) at CrawfordCo_000024-000028.[3]

Events unfolded quickly after the December 19, 2022 Quorum Court meeting. First, three members of the five-member CCLS Board resigned, leaving vacancies that Judge Keith quickly filled, including by appointing Tammi Hamby at the request of his constituents. Keith Dep. Tr. at 29:1-30:15, 32:19-24; County Defs.' Answer to Am. Compl. (Doc. 78) at ¶ 81. Then, on January

---

[3] The children's books the Hambys objected to on these terms included *If You're A Drag Queen and You Know It* by Lil' Miss Hot Mess, *Pink, Blue, and You!: Questions for Kids About Gender Stereotypes* by Elise Gravel, *The Meaning of Pride* by Rosiee Thor, *The Big Book of Pride Flags* by Jessica Kingsley, *Uncle Bobby's Wedding* by Sarah S. Brennan, and *Bye Bye, Binary* by Eric Geron. *See* Dec. 19, 2022 Quorum Ct. Mtg. Mins. at CrawfordCo_000025; *see also* Nov. 8, 2022 CCLS Board Mtg. Mins. at CrawfordCo_000001. At the time, Judge-Elect Keith believed, based on the discussion at the December 19 meeting, that these children's books contained pornography. *See* Judge Christopher Lee Keith Dep. Transcript ("Keith Dep. Tr.") (Doc. 99-23) at 19:19-22. Even once becoming County Judge, he did not investigate the matter further and never looked at any of these books until he was asked to do so by counsel for Plaintiffs during his deposition on March 26, 2024. *Id.* at 13:9-13. After briefly reviewing several of the books, he conceded that they do not contain pornography. *Id.* at 14:23-25.

10, 2023, the Crawford County Library Board announced that it had agreed to a "[c]ompromise with [the] Quorum Court," pursuant to which CCLS branches would move challenged books from the children's section into "an Adult Section labeled S." Jan. 10, 2023 CCLS Bd. Mtg. Mins. (Doc. 99-29) at CrawfordCo_000004. Predominantly, books containing LGBTQ themes were selected for segregation to this new "Social Section." Eva Doyce White Dep. Tr. ("White Dep. Tr.") (Doc. 99-22) at 116:16-18; *see also* Social Section Book List (Doc. 99-30). The books to which the Hambys objected in November and December 2022 were all subsequently segregated into the "Social Section." *See id*. Crawford County Library agreed to this "compromise" in order to avoid two worse outcomes that were being threatened by Crawford County: outright "[r]emoval of the books" or the library's closure. White Dep. Tr. at 109:22-111:9; Jan. 10, 2023 CCLS Bd. Mtg. Mins. at CrawfordCo_000004.

Although the "Social Section" predates Act 372, it is clear that the County Defendants viewed both policies as part of the same "national conversation" around the content of materials in public libraries. *See* May 23, 2023 Letter from Crawford County Att'y Gentry Wahlmeier to Att'ys Brian Meadors and Terrence Cain (the "May 23, 2023 Wahlmeier Response") (Doc. 99-31). Indeed, Crawford County has defended the relocation of LGBTQ-themed children's books to the "Social Section" by pointing, through its attorney, to the County's interest in "protecting children from exposure to materials that might harm their innocence" given that "sexualized material was in the children's section of the libraries." *Id.* Through Mr. Wahlmeier, Crawford County has also connected the formation of the "Social Section" to Act 372's requirement that libraries "have a section that is inaccessible to minors" and a process through which quorum courts can "hear appeals on relocation of books within county library systems." *Id.* Crawford County recognizes, however, that to comply with Act 372 it will need to go beyond the "Social Section" and create

areas in CCLS that are entirely "not accessible to those under eighteen[.]" *See* May 23, 2023 Letter from Crawford County Att'y Gentry C. Wahlmeier to the CCLS Bd. (Doc. 99-32). The County Defendants will do just that and intend to implement Section 5 if it goes into effect. *See, e.g.*, Keith Dep. Tr. at 77:5-7.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Liberty Ins. Corp. v. HNTB Corp.*, 87 F.4th 886, 888 (8th Cir. 2023) (quoting *Anderson*, 477 U.S. at 248). A factual dispute is material only if resolution "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citing 10A Charles Alan Wright et al., Federal Practice and Procedure § 2725 (1983)).

## ARGUMENT

The County Defendants' motion for summary judgment principally turns on their argument that because Plaintiffs have alleged a "statewide injury" and seek a "statewide remedy," they can establish standing only through an injunction of "a statewide Defendant." County Defs.' MSJ Br. at 4. The County Defendants do not credibly identify a "statewide defendant" Plaintiffs should

have sued instead,[4] and the inconvenient reality for the County Defendants is that the General Assembly assigned responsibility for implementing Section 5 to county and municipal governments, like Crawford County. *See* Act 372 § 5(a), (b). Accordingly, Plaintiffs correctly sued one of the entities responsible for implementing Section 5, as well as its chief executive; articulated concrete injuries that will flow from that implementation, including injuries that will be caused by the County Defendants; and ask the Court for declaratory and permanent injunctive relief to redress those injuries. The Court should thus deny the County Defendants' motion for summary judgment.

## I.    Plaintiffs have standing to sue the County Defendants.

To maintain an action in federal court, Plaintiffs must show: (1) an injury-in-fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotations omitted). In the context of a challenge where "threatened enforcement" of a law "implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing," particularly with regards to "the doctrine's first element: injury-in-fact." *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (internal quotations and citations omitted).

---

[4] The County Defendants' assertion that "enforcing Act 372 statewide" is the responsibility of "the State of Arkansas and the Attorney General" cannot be squared with the plain text of Section 5, which does not mention any state officials. *See generally* Act 372 § 5. Indeed, in his deposition, Mr. Keith was unable to explain which state entity he thought might come after Crawford County, if it failed to implement Section 5. *See* Keith Dep. Tr. at 87:14-21 ("I don't know exactly what the entity would be of the state[.]"). Counsel for the Prosecutor Defendants, a Deputy Attorney General, was similarly confused by Mr. Keith's assertion. *See id.* at 93:5-12 (MR. WATSON: "[W]hen you said the state would come after [Crawford County] if [it] didn't implement Act 372, do you have any specific basis for that belief . . . ?" MR. KEITH: "I don't.").

**A.   Plaintiffs will suffer concrete injuries that are traceable to the County Defendants' implementation of Section 5 and redressable by the relief Plaintiffs seek.**

Plaintiffs—public libraries, librarians, patrons, and associations representing each of the foregoing—will be injured by Section 5 in myriad ways. As detailed below, by mandating a new, sweeping process through which any person can challenge the "appropriateness" of library materials and seek the material's segregation to an area that is "not accessible to minors," Section 5 leaves public libraries with options for complying that are either untenable or unduly burdensome. Either choice produces the same result for library patrons, including patrons of CCLS: their access to protected information will be burdened by Section 5.

**1.   Section 5 burdens the ability of library patrons to receive protected speech.**

Segregating books into adults-only spaces, as Section 5 will require libraries to do, injures patrons, like Plaintiffs Leta Caplinger, Olivia Farrell, Miel Partain, and Madeline Partain, by burdening their ability to use and enjoy the public library and to access materials that are of interest to them and appropriate for their age and maturity. Specifically, Section 5 will prevent mature minors, like Madeline Partain, from reading popular works of fiction and nonfiction, among many other books, if they contain descriptions of mature themes, like sexual relationships. *See* Madeline Anne Partain Dep. Tr. ("Madeline Partain Dep. Tr.") (Doc. 99-20) at 33:8-21, 38:15-20, 42:7-43:21 (testifying that she is interested in books by Colleen Hoover and John Green, which she fears might be segregated under Act 372 based on their current placement in the CCLS Social Section); *see also* Social Section Book List (Doc. 99-30).[5]

---

[5] Popular works, including the titles mentioned by Madeline Partain, have been routinely characterized as containing obscenity and pornography or other inappropriate content. *See, e.g.*, Decl. of John Adams ("Adams Decl.") (Doc. 99-1) at ¶ 1, Ex. A (social media post by State Library Board member Jason Rapert containing list of books he alleges contain "obscene, pornographic or objectionable" content); *see also* Decl. of Adam Webb ("Webb Decl.") (Doc.

Section 5 will also curtail the ability of adult patrons, like Plaintiffs Leta Caplinger, Miel Partain, and Olivia Farrell, to access materials they wish to peruse and read because many such materials will be relocated to a heavily stigmatized adults-only area, where they would feel uncomfortable browsing. *See* Leta Jo Caplinger Dep. Tr. ("Caplinger Dep. Tr.") (Doc. 99-19) at 66:24-67:3; Miel Ann Delorey Partain Dep. Tr. ("Miel Partain Dep. Tr.") (Doc. 99-21) at 49:24-50:15; Decl. of Olivia Farrell ("Farrell Decl.") (Doc. 99-7) at ¶¶ 4-5. That stigma will "discourage" Ms. Farrell from entering an adults-only room to browse because she "believe[s] that would signal to others that" she is "interested in reading pornography." *Id.* at ¶ 5. Likewise, in order to enter an adults-only room, Ms. Caplinger would have to overcome the "stigma . . . of the perception that the books located in those areas are not just inappropriate, but somehow pornographic or obscene." Caplinger Dep. Tr. at 66:24-67:3. Miel Partain also understands "that there would be a stigma for anybody going into these special areas," and an alienating feeling that other library patrons can see you and will assume "that somehow you're bad, you're wrong, you're not normal like the rest of us that aren't going in that room." Miel Partain Dep. Tr. at 49:24-50:15. In addition, segregating books into an adults-only area will make it impossible for adults who visit the library with young children, like Miel Partain and Ms. Farrell do, to freely browse and find selections for themselves. *See id.* at 52:9-24; Farrell Decl. at ¶ 5.

The County Defendants do not dispute that these injuries are likely to occur if Section 5 goes into effect. *See* County Defs.' MSJ Br. at 11-12. And numerous courts, including this one, have concluded that they suffice for standing purposes. *See* PI Op. at 21-24; *Counts v. Cedarville Sch. Dist.*, 295 F.Supp.2d 996, 999 (W.D. Ark. 2003) (finding sufficient injury where plaintiffs' ability to access books was "burdened because the books in question are 'stigmatized,' with

99-17) at ¶ 13 (listing popular titles in Arkansas libraries that have been characterized as inappropriate, including *Looking for Alaska* by John Green); Decl. of Carol Coffey ("Coffey Decl.") (Doc. 99-4) at ¶ 10.

resulting 'stigmatization' of those who choose to read them"); *see also Sund v. City of Wichita Falls*, 121 F.Supp.2d 530, 541, 550 (N.D. Tex. 2000) (finding policy permitting children's books to be segregated into an adult section was a "significant burden" on the right to freely access library materials). Furthermore, with respect to Plaintiffs Leta Caplinger, Miel Partain, and Madeline Partain, their injuries are plainly traceable to the County Defendants, which will be responsible for overseeing and implementing the Section 5 challenge at CCLS, where those Plaintiffs are patrons. *See* PI Op. at 24; *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019) ("Typically, we have considered an injury to be 'fairly traceable' where 'the named defendants . . . possess the authority to enforce the complained-of provision.'" (quoting *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015))). "For the same reason their injuries are traceable, they would be redressed by a declaratory judgment" and an order enjoining the County Defendants from implementing Section 5. *See id.* at 780.

The County Defendants' argument that Plaintiffs' injuries are not redressable hangs on the argument that, because other libraries in Arkansas will also be required to implement Section 5, Plaintiffs should have sued the State of Arkansas, the Attorney General, or every library in the state in order to ensure complete relief. *See* County Defs.' MSJ Br. at 5-7. This argument is flawed in three respects. First, Plaintiffs have sued the parties responsible for implementing and enforcing Section 5 at the library system Plaintiffs Leta Caplinger, Miel Partain, and Madeline Partain patronize. Second, no state government entity is responsible for implementing or enforcing Section 5.[6] Third, even if a state level entity shared responsibility for implementing or enforcing Section 5, the County Defendants fail to explain why the existence of additional defendants, which

---

[6] As noted supra at note 4, Act 372 does not assign the Attorney General responsibility for implementing Section 5. And "[a]bsent a waiver of state sovereign immunity or a valid abrogation of sovereign immunity by Congress, federal courts may not entertain a private party's suit against a State." *EEE Mins., LLC v. North Dakota*, 81 F.4th 809, 815 (8th Cir. 2023).

Plaintiffs might have sued but did not sue, defeats Plaintiffs' standing to sue the County

Defendants. If the Court concludes that any remedial order will have no effect outside of the

Western District of Arkansas, that order would still bind the County Defendants and provide

Plaintiffs with complete relief as to the injuries caused by the County Defendants. That is enough

to satisfy the redressability prong of standing.[7] *See Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64

F.4th 932, 940 (8th Cir. 2023) ("[A] plaintiff satisfies the redressability requirement when he

shows that a favorable decision will relieve a discrete injury to himself. He need not show that a

favorable decision will relieve his every injury." (quoting *Larson v. Valente*, 456 U.S. 228, 243

n.15 (1982))).[8]

　　　If the Court once more concludes that the Plaintiffs who are CCLS patrons have standing

to pursue their Section 5 claims against the County Defendants, it can end its standing inquiry here

and deny the County Defendants' motion. *See* PI Op. at 20 n. 22 ("In a multi-plaintiff suit, only

one plaintiff needs to satisfy the constitutional standing requirements.") (citing *Horne v. Flores*,

557 U.S. 433, 446-47 (2009); *Ark. United v. Thurston*, 626 F.Supp.3d 1064, 1077 n.10 (W.D. Ark.

2022) (Brooks, J.).[9] Other Plaintiffs also have standing to sue the County Defendants, however, as

Plaintiffs describe below.

---

[7] The County Defendants' reliance on *Little Rock Fam. Plan. Servs. v. Rutledge* is also misplaced. *See* County Defs.'
MSJ Br. at 6. In that case, plaintiffs sued the state officials who were empowered to enforce an abortion restriction
through "criminal, civil, and professional sanctions upon abortion providers." *Little Rock Fam. Plan. Servs.*, 397
F.Supp.3d 1213, 1264 (E.D. Ark. 2019). Section 5 operates differently and provides responsibility for implementation
to county and municipal governments, instead of a centralized state official.

[8] Declaratory judgment will also provide Plaintiffs with sufficiently broad relief because it is presumed that public
officials "will behave in compliance with a court's interpretation of a statute—even where injunctive relief is not
available." *See Ringo v. Lombardi*, 706 F.Supp.2d 952, 957 (W.D. Mo. 2010) ("[A] complete remedy need not be
absolutely certain." (citing *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) and *Friends of the Earth, Inc. v.
Laidlaw Env'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000))).

[9] As the Court previously explained, "[i]n a multi-plaintiff suit, only one plaintiff needs to satisfy the constitutional
standing requirements." PI Op. at 20 n. 22. This simple rule of judicial economy neither raises nor lowers the standing
hurdle Plaintiffs must clear, but merely allows the Court to move on to unresolved issues once it identifies a plaintiff
that has standing to bring each claim in the case and is eligible for each form of relief requested. Accordingly, the
County Defendants are wrong when they assert that "the Court must decide" whether each and every Plaintiff has

2.   **Section 5 injures libraries by forcing them to choose between compromising their mission or incurring burdensome expenses.**

The burdens imposed by Section 5 will also be felt by the public libraries charged with implementing that law, including FPL, CALS, ESCPL, and the library members of AAAL, ArLA, and FTRF.

As an initial matter, libraries have no reasonable way to avoid the burdens of complying with Section 5. They cannot simply ban all minors from entering their branches, as that would "compromise[] the mission of public libraries" and infringe on the free speech rights of minors. PI Op. at 36 n. 26; Decl. of David Johnson ("Johnson Decl.") (Doc. 99-10) at ¶ 12 ("[B]ar[ring] patrons under the age of eighteen from entering the library . . . is totally antithetical to all FPL stands for"); Decl. of Deborah Caldwell-Stone ("Caldwell-Stone Decl.") (Doc. 99-2) at ¶ 11(a) (testifying that prohibiting minors would "alter the purpose and actions of libraries, many of which hold events for children and have constructed rooms for children").

Nor can they simply avoid collecting materials that are likely to be challenged. "[T]hat would curtail the availability of many books, including some bestsellers" and literary classics, which would interfere with the ability of public libraries to provide their patrons with materials of interest. Caldwell-Stone Decl. at ¶ 11(b); *see also* Johnson Decl. at ¶ 12. It would also require libraries to undertake a comprehensive review of their collections, which would be an expensive and time-consuming process, given the substantial number of potentially "inappropriate" materials at issue. *See* Decl. of Christina Danos ("Danos Decl.") (Doc. 99-6) at ¶ 11 (estimating that reviewing the 42,000 physical items in its collection "would take an estimated 26 years to accomplish" and result in "shutting down [their] core services"); *see also* Caldwell-Stone at

_____

asserted standing for each and every claim. County Defs.' MSJ Br. at 8. Judicial efficiency counsels against that approach here. *See Horne*, 557 U.S. at 446-47.

¶ 11(c); Coffey Decl. at ¶ 13; Decl. of Nate Coulter ("Coulter Decl.") (Doc. 99-5) at ¶ 12; Johnson Decl. at ¶ 14; Webb Decl at ¶¶ 19, 38.[10] Avoiding potentially inappropriate materials would also make ordering new books logistically difficult because libraries rely on third party sources, like book reviews and bestseller lists, that may not provide sufficient information to determine if a book contains material some might find inappropriate. Caldwell-Stone Decl. at ¶ 11(b); *see also* Donald Nathan Coulter Dep. Tr. ("Coulter Dep. Tr.") (Doc. 99-24) at 43:12-44:5, 45:8-46:1 (describing CALS' use of reputable book reviews when acquiring new materials).

Libraries fare no better if they decide to adapt to the requirements of Section 5. Libraries typically display materials on open shelves and do not generally restrict where their patrons or customers may go. *See* Coffey Decl. at ¶ 12 (noting that ArLA's member libraries typically maintain their collections on open shelves, which are designed so that patrons may access them without requiring assistance from library staff); Coulter Decl. at ¶ 9; Danos Decl. at ¶ 8.[11] But Section 5 requires that they have a designated area that is "not accessible to minors," which many libraries would struggle to establish. *See* Coulter Decl. at ¶ 10 (testifying that, across CALS, there are not currently "any rooms in which materials could be segregated and kept physically secure from younger readers that are not presently being used for some other purpose, such as a community meeting space"); Johnson Decl. at ¶¶ 12-14 (noting that FPL would have to take over a space currently in use for some important purpose, like a study room); White Depo Tr. at 83:6-22 (acknowledging that adding an adults-only area to CCLS' "open floor plan[]" would require "cost

---

[10] *See also* Decl. of Judy Calhoun ("Calhoun Decl.") (Doc. 99-3) at ¶ 14 (ArLA member explaining the difficulty the Southeast Regional Library (SEARL) would have conducting a preemptive review of its collection); Decl. of John McGraw ("McGraw Decl.") (Doc. 99-12) at ¶ 18; Decl. of Reverend John Paul Myrick ("Myrick Decl.") (Doc. 99-13) at ¶ 8 (ArLA member explaining the difficulties the East Central Arkansas Regional Library (ECARL) would have reviewing its collection preemptively).

[11] *See also* Calhoun Decl. at ¶¶ 12-13; Myrick Decl. at ¶¶ 6-7; McGraw Decl. at ¶ 14.

prohibitive" "structural changes").[12] Doing so would also be inconsistent with the goal of providing patrons with an open browsing experience and would deter patrons from visiting the library. *See* Coffey Decl. at ¶ 23; Webb Decl. at ¶ 44; *see also* White Dep. Tr. at 83:23-25 (agreeing that creating adults-only areas conflicts with the purpose of libraries).[13]

In addition to physical changes to their facilities, Section 5 will also burden the libraries' staff resources by dramatically increasing the number of challenges they will process. To be sure, many libraries have pre-existing policies for challenging materials, which ensure they are responsive to patron feedback, including negative feedback, without allowing challenges to overwhelm staff resources or dictate what materials are available for other patrons. *See* Danos Decl. at ¶ 18; Webb Decl. at ¶¶ 27, 31. That success is owed, in part, to the reasonable limits libraries have set on reconsideration requests, such as requiring that requesters have a current library card and/or live in the library's service area. *See id.* at ¶ 27, Ex. E (GCL Materials Reconsideration Policy); Johnson Decl. at ¶ 17, Ex. A (Reconsideration of Library Materials). Section 5 prevents libraries from imposing such reasonable limits, however, and requires that, at the demand of *any* person who feels affected by a book, not just residents or library patrons, library staff undertake a resource-intensive review of any book in its collection, even if that book has been challenged previously.

Section 5's requirements thus leave libraries exposed to the substantial increase in challenges that Section 5 will produce. *See* Webb Decl. at ¶ 33 (noting that Garland County Library recently received an email containing a lengthy list of purportedly "inappropriate" books in the

---

[12] *See also* Caldwell-Stone Decl. at ¶ 11(c); Calhoun Decl. at ¶¶ 14-16; Coffey Decl. at ¶¶ 13-17; Danos Decl. ¶¶ at 9-11; McGraw Decl. at ¶¶ 12, 15-17; Myrick Decl. at ¶¶ 8-10; Webb Decl. at ¶ 17-18, 39.

[13] *See also* Decl. of Patty Hector ("Hector Decl.") (Doc. 99-9) at ¶ 27 (ArLA member and former Saline County Library director observing that, if patrons "have to navigate a whole bunch of unpleasantness to find a book they like, feel judged by others in the library based on the books they are looking at, or figure out if they will get in trouble for trying to find a new romance novel while holding their young child," they "will simply stop coming to the library").

library's collection, which Mr. Webb expects the sender to challenge if Section 5 goes into effect); *see also* White Dep. Tr. at 88:7-13 (noting that Crawford County is one of the places where "certain citizens are marking their calendar for [Act 372] to take [e]ffect, so they can begin filing scores of challenges"). That burden will be too great for libraries to manage without cutting existing services. *See, e.g.*, Johnson Decl. at ¶ 19 (noting the practical impossibility of existing staff undertaking timely review of vast quantities of challenged material); White Dep. Tr. at 86:16-87:10 (acknowledging reviewing challenged books will require paying librarians to work overtime and "would definitely be a chore").

Taken together, the changes forced by Section 5 will turn librarians into content censors and expose them to significantly more complaints and harassment under the guise of Section 5 challenges. These burdens will "create more obstacles in the hiring and retention of qualified staff members." *See, e.g.*, Danos Decl. at ¶ 17 (noting the difficulty rural libraries already have finding competent workers at the wages they are able to pay); *see also* Hector Decl. at ¶ 12 (explaining that personal attacks on librarians, including with accusations that they are pedophiles who are endangering children, has been a "throughline" of the discourse on this topic).

Because compliance with Section 5 will cause libraries to take costly steps that undercut their core mission and harm their patrons, libraries have suffered an injury-in-fact. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) ("Self-censorship can itself constitute injury in fact." (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)); *Granville House, Inc. v. Dep't of Health & Hum. Servs.*, 715 F.2d 1292, 1297 (8th Cir. 1983) (nonprofit organization was injured by regulation that caused it "to withdraw from its primary mission"); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *9 (W.D. Ark. Aug. 31,

2023) (Brooks, J.) ("Economic injury associated with state regulatory requirements forms a sufficient basis for first-party standing.").[14]

Moreover, "'in the First Amendment context, litigants are permitted to challenge a statute not [only] because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" PI Op. at 21 n. 23 (quoting *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 392-93 (cleaned up)). Section 5 will cause libraries to deny protected information to their patrons, which makes them "well positioned to raise [their First Amendment] concerns" with Section 5 on behalf of their patrons. *See NetChoice, LLC*, 2023 WL 5660155, at *12. Libraries are at least as attuned to "the ways in which their [patrons] exercise their First Amendment rights" in their branches as social media companies are for their users and booksellers are for bookstore customers. *See id.*; *see also Am. Booksellers Ass'n, Inc.*, 484 U.S. at 392-93.

The County Defendants do not dispute that Section 5 will burden public libraries in this manner, or that these burdens satisfy the injury-in-fact prong of the standing analysis. *See* County Defs.' MSJ Br. at 7-11. Instead, they argue that public libraries can avoid injury by "simply choos[ing] not to implement [Section 5 of] Act 372," *id.* at 8, and these injuries are not caused by the County Defendants and will not be redressed by the relief Plaintiffs seek, *id.* at 7-11. Refusing to implement Section 5 is no option as doing so would flout state law. The County Defendants plainly understand this, which is why they intend to implement Section 5, even if they "would just assume not have it." Keith Dep. Tr. at 77:5-7, 80:7-8.

---

[14] *See also Turtle Island Foods SPC v. Soman*, 424 F. Supp. 3d 552, 565 (E.D. Ark. 2019) ("[A] sufficient injury 'is usually found if the regulation imposes costly, self-executing compliance burdens or if it chills protected First Amendment activity'" (quoting *Minnesota Citizens Concerned for Life v. FEC*, 113 F.3d 129 (8th Cir. 1997))).

The County Defendants' assertion that injuries to the Plaintiff libraries are not traceable to their conduct or redressable by this Court also fail. Because Section 5 requires that libraries entertain challenges from any affected person, and indeed prevents libraries from establishing their own reasonable limitations, implementation of Section 5 by the County Defendants will directly affect the volume and nature of materials challenges at other libraries. *See* Coulter Decl. at ¶ 21 (expressing concern about "unlimited challenges" in the context of analysis showing that, nationally, a small number of zealous people are responsible for a large volume of challenges); Webb Decl. at ¶ 32 (predicting that the same trend will play out on the local level under Act 372).

For instance, a determination by Crawford County that *Uncle Bobby's Wedding* is not appropriate and must be segregated makes it more likely that other libraries, including Plaintiffs, will receive burdensome and frivolous challenges to *Uncle Bobby's Wedding*, or similar titles. Indeed, Plaintiff Adam Webb has already received an email containing a list of allegedly "inappropriate" books, which are drawn from lists of frequently banned books, as well as "[b]ooks found to be inappropriate in the Saline County Library." *See* Webb Decl. at ¶ 33, Ex. G at WEBB 01228; *see also* Coulter Dep. Tr. at 63:15-11 (noting the role that "political pressure" from organized groups like Moms for Liberty plays in "bring[ing] these fights to the doorstep of heretofore fairly low-profile public libraries"); *id.* at 98:7-19 (looking to "various lists of books that have been handed around by proponents of Act 372 and groups like Moms for Liberty" to determine which books in CALS's collection were likely to be subject to Act 372); Adams Decl. at ¶ 1, Ex. A (list of libraries circulating purportedly "obscene, pornographic or objectionable materials," published by State Library Board member). The County Defendants' implementation of Section 5 will also negatively affect the broader environment in which librarians work and libraries seek to hire and retain qualified librarians. *See* Danos Decl. at ¶ 17; Hector Decl. at ¶ 12.

Because the County Defendants' implementation of Section 5 will contribute to the burden Section 5 imposes on the library Plaintiffs, their conduct is "fairly traceable" to the library Plaintiffs' injuries, even if is "not 'the very last step in the chain of causation.'" *See Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 954 (8th Cir. 2015) (quoting *Bennett v. Spear,* 520 U.S. 154, 168-69 (1997)). An order permanently enjoining the County Defendants' from implementing Section 5 and declaring that provision unconstitutional would also provide the library Plaintiffs with redress because it would staunch the amplifying effect of the County Defendants' conduct and allow the libraries to continue using their existing challenge policies, which have worked well for these libraries and permit patron feedback without putting the library's services at risk. *Pharm. Rsch. & Mfrs. of Am.*, 64 F.4th at 940 (finding redressability requirement satisfied where plaintiff "shows that a favorable decision will relieve a discrete injury").

Finally, because individual libraries have standing to sue the County Defendants, ArLA, AAAL, and FTRF also have associational standing on behalf of their members.[15] *See NetChoice*, 2023 WL 5660155, at *9-10. Relieving libraries of the burdens of implementing Section 5 is "central" to the "organizational purpose" of these organizations, *see* Coffey Decl. at ¶ 5; Webb Decl. at ¶ 34; Caldwell-Stone Decl. at ¶ 2, and Plaintiffs' Section 5 claims can be resolved without involving each of their members. *See NetChoice*, 2023 WL 5660155, at *10 (noting that using "evidence from representative injured members" may obviate the need for individual members to participate (quotation marks omitted)).[16] Like the association plaintiffs in *Am. Booksellers Ass'n* and *NetChoice*, ArLA and AAAL are "well positioned to raise [their First Amendment] concerns"

---

[15] Plaintiffs have not asserted that FPL, CALS, and ESCPL are membership organizations, so the Court need not consider the County Defendants' argument that they lack associational standing. *See* County Defs.' MSJ Br. at 7-8.

[16] AAAL and FTRF also members who are library patrons, Caldwell Stone Decl. at ¶ 2; Webb Decl. at ¶ 35, and have associational standing to represent the interests of those members, too.

with Section 5 on behalf of the patrons of their library members. *See NetChoice, LLC*, 2023 WL
5660155, at *12; *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 392-93.

> **3.**   **Section 5 causes injury to the distinct organizational interests of ArLA and AAAL.**

Separate from the injuries to their patron and library members, ArLA and AAAL also seek
redress for the distinct injuries that Section 5 will cause to their organizational interests. These
advocacy organizations have been or will be injured by Section 5 in at least two distinct ways.

First, ArLA and AAAL have diverted organizational resources that neither will be able to
recoup in order to counteract and respond to the threat Act 372 poses to their members. For
instance, when the General Assembly was debating Senate Bill 81, the legislation that became Act
372, ArLA dedicated organizational resources to rallying its members to attend legislative hearings
and contact their elected representatives to voice their opposition. *See* Coffey Decl. at ¶ 28. And
both ArLA and AAAL have spent time and organizational resources answering questions from
their members about Act 372, developing educational programming and training about the new
law, and providing technical advice and resources to help their library members adapt policies to
comply with Section 5, in particular. ArLA and AAAL will continue to expend organizational
resources developing training and educational materials, as long as Act 372 poses a threat to their
members. *See* Coffey Decl. at ¶¶ 27-32; Webb Decl. at ¶¶ 49-55.

It is well-established that "[a]n organization may establish injury-in-fact by showing it had
to divert some of the organization's resources to counteract the challenged law," as ArLA and
AAAL have been and will be forced to do in response to Act 372. *See Ark. United*, 626 F.Supp.3d
at 1078; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The County
Defendants characterize these injuries as speculative and unrelated to their implementation of
Section 5. *See* County Defs.' MSJ Br. at 10. However, they fail to expand on these arguments or

to call into question Plaintiffs' uncontroverted evidence showing that ArLA and AAAL have and will divert resources.

In any event, the County Defendants entirely overlook the second way in which Section 5 burdens the organizational interests of ArLA and AAAL by providing substantial rights to individuals who would censor materials through Section 5's challenge process, while affording no equivalent rights to those who would oppose censorship efforts in their local libraries. *See* Coffey Decl. at ¶¶ 25-26; Webb Decl. at ¶ 48. ArLA and AAAL have an organizational interest in advocating throughout the state for libraries to manage their collections according to the professional judgment of trained librarians, including in Crawford County where ArLA has a member. *See* Coffey Decl. at ¶ 7.[17] Section 5's disparate treatment in favor of censors thus burdens ArLA and AAAL's First Amendment rights. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642-43 (1994); *see also Boos v. Barry*, 485 U.S. 312, 318-21 (1988) (finding law that prohibited picketing on sidewalks in front of foreign embassies with signs displaying critical messages, but tolerated the same conduct if favorable messages were displayed, constituted a content-based restriction subjected to strict scrutiny). Moreover, it is undisputed that materials will be challenged at CCLS if Section 5 takes effect. *See, e.g.*, White Dep. Tr. at 88:7-13. At that point, the County Defendants have legal responsibility for administering the challenge process that will cause ArLA and AAAL's organizational injury. *Alexis Bailly Vineyard, Inc.*, 931 F.3d at 779. For the same reason, an order enjoining the County Defendants from implementing that discriminatory law and declaring it to be unconstitutional will redress these injuries. *Id.* at 780.

---

[17] The County Defendants' wrongly assert that "Plaintiffs have produced no evidence of" active members in Crawford County. County Defs.' MSJ Br. at 9. ArLA's former President, Carol Coffey, has provided the Court with sworn testimony that ArLA has members "in 58 of 75 counties in Arkansas, including Crawford County." Coffey Decl. at ¶ 7.

II.     **Collection management decisions, including those made pursuant to challenges under Section 5, are not government speech.**

In a section of their brief that purports to summarize "Undisputed Facts," the County Defendants passingly assert that the "Social Section does not amount to viewpoint discrimination because Crawford County, as a government entity, is not required to give airtime for all views when it engages in government speech." County Defs.' MSJ Br. at 12. The Court should give no consideration to this undeveloped assertion, which contains a disputed legal conclusion and not a statement of fact (let alone an undisputed one). *See* PI Op. at 44-47 (rejecting the argument that decisions made pursuant to Section 5 were protected as government speech). Indeed, to find for Plaintiffs, the Court does not even need to decide, as a matter of law, that Crawford County has already engaged in viewpoint discrimination through the "Social Section." If the Court does address this argument, however, it should once again reject any suggestion that decisions to segregate materials under Act 372 constitute government speech. *See id.*

In determining whether government speech has taken place, courts "conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). Several factors are relevant to this inquiry, including: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* The analysis must be "driven by a case's context rather than the rote application of rigid factors," however. *Id.* Otherwise, governments may assert "the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint.'" *Id.* (Alito, J., concurring) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009)).

In this case, neither the individual factors, nor the broader context provides a basis for treating a certified, trained librarian's decisions about what books go on library shelves as a form of government speech. Treating a librarian's collection decision as government speech is precisely the sort of "'dangerous misuse'" of the doctrine, *id.* (quoting *Matal* v. *Tam*, 582 U.S. 218, 235 (2017)), the Supreme Court has warned could be used to "silence or muffle the expression of disfavored viewpoints," *Matal*, 582 U.S. at 235 (urging courts to "exercise great caution before extending our government-speech precedents").

Moreover, considering the actual context in which public libraries makes decisions makes it perfectly clear that library bookshelves are not government speech. Libraries "collect books that are controversial and in a lot of subjects." Coulter Dep. Tr. at 113:4-11 (observing that CALS' collection also includes materials that express ideas that are unpopular with those who oppose Act 372). Indeed, the very idea of a public library is to establish a collection where everyone "can find something interesting to read, even if . . . they might find a book containing ideas with which they disagree," Webb Decl. at ¶ 57. *See generally id.* at ¶ 7, Ex. B (Library Bill of Rights). Treating a collection that has been curated for that purpose, and no other, as government speech would nonsensically ascribe to the government a message that "is babbling . . .  and incoherent[]." *See Matel*, 582 U.S. at 219.

Of course, "public libraries must have broad discretion to decide what material to provide to their patrons." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 195 (2003) (plurality), but that discretion has always been limited by the public's First Amendment rights, which have long been recognized as including "the right to receive, the right to read," and the "freedom of inquiry" and "of thought." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). Accordingly, the discretion afforded to libraries to determine the contents of their collections "may not be exercised in a

narrowly partisan or political manner." *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982) (Brennan, J., plurality opinion); *see also id.* at 907 (Rehnquist, J., dissenting) ("cheerfully conced[ing]" this point).

The Court should reject any such requests, especially when presented in such cursory fashion, for authorization to "contract the spectrum of available knowledge," in Arkansas' public libraries under an assertion of government speech, *Griswold*, 381 U.S. at 482.

## CONCLUSION

For the foregoing reasons, the Court should deny the County Defendants' motion for summary judgment.

Date: June 5, 2024

Respectfully submitted,

/s/ John T. Adams
David M. Fuqua
Ark. Bar No. 80048
John T. Adams
Ark. Bar No. 2005013
Attorneys for Central Arkansas Library System,
Nate Coulter, and the Eureka Springs Carnegie
Public Library
FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Telephone: (501) 374-0200
E-Mail: dfuqua@fc-lawyers.com
E-Mail: jadams@fc-lawyers.com

Bettina Brownstein
Ark. Bar No. 85019
BETTINA E. BROWNSTEIN LAW FIRM
Attorney for Leta Caplinger, Olivia Farrell,
Miel Partain, and Madeline Partain
904 West 2nd Street, Suite 2
Little Rock, AR 72201
Telephone: (501) 920-1764
E-Mail: bettinabrownstein@gmail.com
On Behalf of the Arkansas Civil Liberties
Union Foundation, Inc.

Ben Seel*
Will Bardwell*
Aman George*
Orlando Economos*
Attorneys for the Arkansas Library Association,
Advocates for All Arkansas Libraries, and Adam
Webb, in his individual capacity
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34554
Washington, DC 20043
Telephone: (202) 448-9090
E-Mail: bseel@democracyforward.org
E-Mail: wbardwell@democracyforward.org
E-Mail: ageorge@democracyforward.org
E-Mail: oeconomos@democracyforward.org

Vincent O. Chadick
Ark. Bar No. 94075
Brandon B. Cate
Ark. Bar No. 2001203
Glenn V. Larkin
Ark. Bar No. 2020149
Attorneys for Fayetteville Public Library
QUATTLEBAUM, GROOMS & TULL
PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
E-Mail: bcate@qgtlaw.com
E-Mail: vchadick@qgtlaw.com
E-Mail: glarkin@qgtlaw.com

Michael A. Bamberger*
Kristen Rodriguez*
Rebecca Hughes Parker*
Attorneys for Pearl's Books, LLC,
Wordsworth Community Bookstore LLC,
American Booksellers Association,
Association of American Publishers, Inc.,
Authors Guild, Inc. Comic Book Legal
Defense Fund, and Freedom to Read
Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
E-Mail: michael.bamberger@dentons.com
E-Mail: kristen.rodriguez@dentons.com
E-Mail: rebeccahughes.parker@dentons.com

* Admitted pro hac vice

25

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 5, 2024, a copy of the foregoing was served upon all counsel of record contemporaneously with its filing in the CM/ECF system.

<u>*/s/ John T. Adams*</u>
John T. Adams

26