IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FAYETTEVILLE PUBLIC LIBRARY, et al. a political
subdivision in the City of Fayetteville, State of
Arkansas; EUREKA SPRINGS CARNEGIE PUBLIC
LIBRARY; CENTRAL ARKANSAS LIBRARY
SYSTEM; NATE COULTER; OLIVIA FARRELL;
MIEL PARTAIN, in her own capacity and as parent and
next friend of MADELINE PARTAIN; LETA
CAPLINGER; ADAM WEBB; ARKANSAS
LIBRARY ASSOCIATION; ADVOCATES FOR ALL
ARKANSAS LIBRARIES; PEARL'S BOOKS, LLC;
WORDSWORTH COMMUNITY BOOKSTORE LLC
d/b/a WORDSWORTH BOOKS; AMERICAN
BOOKSELLERS ASSOCIATION; ASSOCIATION
OF AMERICAN PUBLISHERS, INC.; AUTHORS
GUILD, INC.; COMIC BOOK LEGAL DEFENSE
FUND; FREEDOM TO READ FOUNDATION                    PLAINTIFFS


V.                          NO. 5:23-CV-05086-TLB

CRAWFORD COUNTY, ARKANSAS; CHRIS
KEITH, in his official capacity as Crawford County
Judge; TODD MURRAY; SONIA FONTICIELLA;
DEVON HOLDER; MATT DURRETT; JEFF
PHILLIPS; WILL JONES; TERESA HOWELL; BEN
HALE, CONNIE MITCHELL, DAN TURNER, JANA
BRADFORD; FRANK SPAIN; TIM BLAIR; KYLE
HUNTER; DANIEL SHUE; JEFF ROGERS; DAVID
ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; TONY
ROGERS; JOSHUA ROBINSON; CAROL CREWS;
KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each in his or her official capacity as a
prosecuting attorney for the State of Arkansas;          DEFENDANTS


**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Neither the Prosecutor Defendants nor the County Defendants have raised factual disputes or legal arguments that defeat Plaintiffs' motion for summary judgment. *See* Pls.' Mot. for Summ. J. (Doc. 99). Accordingly, the Court should grant summary judgment on Plaintiffs' claims, declare Sections 1 and 5 of Act 372 unlawful, and permanently enjoin the Prosecutor Defendants from enforcing Section 1 and the County Defendants from implementing Section 5.

## ARGUMENT

Defendants oppose Plaintiffs' motion on jurisdictional grounds and on the merits of Plaintiffs' claims. However, neither the Prosecutor Defendants nor County Defendants point to evidence sufficient to create a genuine dispute of material fact, and their legal arguments are unavailing. As explained below and set forth in Plaintiffs' briefs supporting their motion for summary judgment and opposing Defendants' respective summary judgment cross-motions, summary judgment on each of Plaintiffs' claims is warranted. *See* Pls.' MSJ Br. (Doc. 101); Pls.' Resp. to County Defs.' MSJ (Doc. 111); Pls.' Resp. to Prosecutor Defs.' MSJ (Doc. 113).

**I.      The Court has jurisdiction to consider Plaintiffs' claims.**

**A.      Plaintiffs have standing to sue the Prosecutor Defendants and their Section 1 claims are ripe.**

The Prosecutor Defendants contend that Plaintiffs lack standing to challenge Section 1, and that those claims are not ripe, because they have not identified materials they possess or wish to read that are "harmful to minors." Prosecutor Defs.' MSJ Resp. (Doc. 107) 5-7. That assertion is flatly contradicted by the record in this case. The library and bookseller Plaintiffs, and associational Plaintiffs representing those entities, have provided uncontroverted testimony regarding the hundreds of books displayed in their collections and inventories that are likely to subject librarians and booksellers to prosecution under Section 1 because they discuss sex or other

subjects too mature for young or immature readers. *See* Pls.' Resp. to Prosecutor Defs.' MSJ at 5 n. 7 (citing undisputed evidence of books that could trigger Section 1 liability for Plaintiffs).

Plaintiffs who are adult patrons at public libraries and customers of bookstores have also provided undisputed testimony that they are interested in reading books that would be "harmful" to younger, less mature minors. *See, e.g.*, Miel Partain Dep. Tr. at 56:14-22 (testifying that she can think of novels she has read that "included a description of sexual activity," which she "would not give to a nine-year-old because the sexual content is inappropriate for them"); Caplinger Dep. Tr. at 56:10-15 (anticipating losing access to books with "mature subject matter" that she might wish to read in the future). Plaintiffs have also provided uncontroverted testimony that mature teenagers wish to read books that would be "harmful" to younger, less mature readers because they contain descriptions of mature themes, including sexual relationships. *See* Madeline Partain Dep. Tr. at 33:8-21, 38:15-20, 42:7-43:21 (describing her interest in Colleen Hoover and John Green novels, which have subject matter that might cause them to be segregated under Act 372).

The Prosecutor Defendants do not dispute that Plaintiffs have or wish to read books with mature subject matter. Rather, they argue that Plaintiffs' evidence should be discounted or ignored because Plaintiffs have not expressed sufficient certainty about the extent to which those materials meet the legal standard of "harmful to minors." *See* Prosecutor Defs.' Resp. Br. at 6. If Plaintiffs' evidence reflects uncertainty about the legal status of particular materials, however, it is only because whether a material is "harmful to minors" is a context-specific inquiry turning on, among other factors, the specific characteristics of the minor who would be receiving the information. *See Shipley, Inc. v. Long*, 454 F.Supp.2d 819, 829–30 (E.D. Ark. 2004) ("*Shipley III*").[1]

---

[1] The Prosecutor Defendants could clear this confusion up by simply taking a position on whether the books that concern Plaintiffs are, in fact, subject to regulation under Section 1. Their focus on a discovery issue the parties amicably resolved instead of providing that clarity is telling. *See* Prosecutor Defs.' MSJ Resp. at 3-4.

In any event, courts do not "require[] a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) (citing *Babbitt v. Farm Workers*, 442 U.S. 289, 301 (1979) as an example of a case that "was justiciable even though plaintiffs disavowed any intent" to violate the challenged statute); *see also 281 Care Comm. v. Arneson*, 638 F.3d 621, 629 (8th Cir. 2011) ("A First Amendment plaintiff does not always need to allege a subjective intent to violate a law in order to establish a reasonable fear of prosecution.").[2] The Court should be especially wary of adopting the Prosecutor Defendants' heightened standing test here because the Prosecutor Defendants intend to enforce Section 1, *see* Prosecutor Defs.' Answer to Am. Compl. (Doc. 79) at ¶ 61, and "the alleged danger of [Section 1] is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution," *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("*Virginia II*"). Accordingly, the Prosecutor Defendants' standing and ripeness arguments fail.

### B. Plaintiffs will suffer concrete injuries that are traceable to the County Defendants' implementation of Section 5 and redressable by the Court.

With respect to Section 5, Defendants contend that Plaintiffs lack standing to bring their claims because their asserted injuries are too speculative, Prosecutor Defs.' Resp. at 6-7, and are neither caused by the County Defendants' implementation of Section 5 nor likely to be redressed by the relief Plaintiffs seek, *id.* at 8-9; *see also* County Defs.' MSJ Resp. (Doc. 109) at 7. Here again, Defendants overlook essential facts showing that Plaintiffs are likely to be injured by the County Defendants' implementation of Section 5 and that their injuries can be redressed by an

---

[2] The Prosecutor Defendants' proposed test is especially concerning with respect to Plaintiffs' pre-enforcement challenge to Section 1 because it would permit the prosecution of a librarian or bookseller who "know[s] the character of the item involved," but has a mistaken but good faith belief that it does not meet the definition of "harmful to minors." *See* Act 372 § 1(a)-(b).

order declaring Section 5 unlawful and enjoining the County Defendants' implementation of it.

Plaintiffs have described in detail the myriad ways that they will be injured by the County Defendants' implementation of Section 5. *See* Pls.' MSJ Br. at 14-17, 21-22; Pls.' Resp. to County Defs.' MSJ at 9-21 (describing distinct injuries to libraries, patrons, and associations representing libraries and patrons); Pls.' Resp. to Prosecutor Defs.' MSJ at 7-9. In short, the challenge procedure required by Section 5 forces libraries to choose between actions that will undermine their mission, drain their limited financial and staff resources, or both. *See* Pls.' Resp. to County Defs.' MSJ at 13-20. Regardless of which bad option libraries choose, the result will be the same for library patrons, including patrons of CCLS, whose ability to browse and access information in their libraries will be greatly reduced. *See id.* at 9-12.

The Prosecutor Defendants characterize these injuries as speculative but their narrow focus on the *number* of steps in the causal chain fails to rebut Plaintiffs' uncontroverted evidence, which shows that the steps leading to their injuries are likely to occur. *See* Prosecutor Defs.' MSJ Resp. at 7-8 (describing "five hypothetical steps"). For instance, there is no question that "someone" will "challenge[] library materials under a library's selection policy," *id.* at 7, given the testimony from librarians across the state, including in Crawford County, who expect to see "scores of challenges" once Section 5 takes effect. *See, e.g.*, White Depo. Tr. at 88:7-13; *see also* Webb Decl. at ¶ 33; *id.* at ¶ 53, Ex. I at 4 (April 20, 2023 email from State Librarian predicting "scores" of challenges).

Likewise, as the events leading to Crawford County's creation of the "Social Section" show, it is not speculative to think that challenges under Section 5 will result in materials expressing disfavored viewpoints being segregated to an adults-only area. *See* Pls.' MSJ Br. at 16-17 (explaining how community outrage about the display of LGBTQ-themed books in CCLS led to those books, and many other similar books, being relocated to the "Social Section"). Indeed,

the political winds that drove that process have hardly calmed. *See* White Dep. Tr. at 122:6-17 (expressing "fear" and "concern" that the Quorum Court would "go[] along with" the "faction" and "shut the library down" if their censorious demands are not met). And the materials that will be challenged and relocated are likely to include books that the patron Plaintiffs would want to peruse, either because they are drawn to books that have already been marked as containing disfavored ideas, *see* Madeline Partain Dep. Tr. at 33:8-20, 38:15-20, 42:7-43:21 (expressing interest "Social Section" books), or because their interests are vast, *see* Caplinger Dep. Tr. at 56:14-15 (expressing uncertainty about what she will "want to read next year"). Public libraries are "designed for freewheeling inquiry" of precisely that sort. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 915 (1982) (Rehnquist, J., dissenting).[3]

The Prosecutor Defendants next argue that Plaintiffs' injuries "will result from application of the library's selection criteria by the library or its governing body on appeal, not from Crawford County or from the County Judge Keith." Prosecutor Defs.' MSJ Resp. at 8. The Court has previously rejected the argument that Section 5 requires libraries to consider challenges in light of their own selection criteria. *See* PI Op. at 40. But, even if library selection criteria set the standard under Section 5, Plaintiffs' injuries will still be caused by the County Defendants, which play a fundamental role in the implementation of Section 5, and redressed by an order enjoining them from implementing Section 5. *See id.* at 24; Pls.' MSJ Br. at 21.[4]

---

[3] The Prosecutor Defendants' fifth "hypothetical step" implicates their assertion that any viewpoint discrimination Section 5 facilitates is government speech that is beyond the reach of the First Amendment. *See* Prosecutor Defs.' MSJ Resp. at 8. The Court has previously concluded that rendering judgment on challenges brought under Section 5 is not a form of government speech. *See* PI Op. (Doc. 53) at 44-47; *see also infra* at 10-11.

[4] Plaintiffs do not rely solely on the availability of declaratory relief to support their standing. Plaintiffs have sued the parties responsible for implementing Section 5 at the library system Plaintiffs Leta Caplinger, Miel Partain, and Madeline Partain patronize and an injunction prohibiting the County Defendants from implementing Section 5 will provide clear redress to those patrons.

The County Defendants also argue that Plaintiffs' injuries are not traceable to their actions or redressable. *See* County Defs.' MSJ Resp. at 8.[5] However, they discuss only the injuries to Plaintiff Olivia Farrell—erroneously characterizing her as "illustrative of all Plaintiffs"—but ignore the injuries proven by Leta Caplinger, Miel Partain, and Madeline Partain, each of whom is a CCLS patron. *See id.* Injuries to CCLS patrons will indisputably be caused by the County Defendants and redressed by Plaintiffs' requested relief. *See* PI Op. at 24; Pls.' MSJ Br. at 21.

## II.    The Court should grant summary judgment on Plaintiffs' Section 1 claims.

### A.    Section 1 will cause libraries and booksellers to self-censor, which will deprive their patrons and customers of access to protected information.

Contrary to the Prosecutor Defendants' assertion, Prosecutor Defs.' MSJ Resp. at 9-10, Plaintiffs have previously explained that Section 1 operates as a prior restraint on protected speech because it imposes criminal penalties on anyone who "knowingly . . . [f]urnishes, presents, provides, makes available, gives, lends, shows, advertises, or distributes to a minor an item that is harmful to minors," Act 372 § 1(b). The risk of criminal liability will, predictably, cause booksellers and librarians to self-censor by excluding minors from their branches and stores, preemptively scrubbing borderline materials from their collections, or attempting to segregate those same materials. *See* Pls.' MSJ Br. at 9-14 (explaining the steps librarians and booksellers must take to avoid criminal liability and the burdens their patrons and customers will experience, as a result); *see also* Pls.' Resp. to Prosecutor Defs.' MSJ at 12-13. Regardless of which self-censoring route libraries and booksellers choose, their patrons and customers will lose their ability to access constitutionally protected information. Thus, while Section 1 penalizes librarians and booksellers for their conduct, it operates as a prior restraint because it "effectively stifles the

---

[5] Because the County Defendants incorporate the standing arguments made in their summary judgment brief by reference, *id.*, Plaintiffs incorporate their response by reference. *See* Pls.' Resp. to County MSJ at 8-21.

access of adults and older minors to communications and material they are entitled to receive and view." *See Shipley III*, 454 F.Supp.2d at 829-30.

Furthermore, although "prior restraints are not per se unconstitutional when related to minors," Prosecutor Defs.' Resp. at 10, Section 1's key flaw is that it is "not reasonably restricted to the evil with which it is said to deal." *See Butler v. Michigan*, 352 U.S. 380, 383 (1957).

**B.      Section 1 is overbroad because it impermissibly burdens the ability of both adults and older minors to access protected speech.**

In response to Plaintiffs' overbreadth claim, the Prosecutor Defendants urge the Court to separately consider the way in which Section 1 burdens adults and older minors. *See* Prosecutor Defs.' MSJ Resp. at 10. Plaintiffs have explained how Section 1 violates the First Amendment rights of each group in distinct ways, *see* Pls.' MSJ Br. at 12-14, arguments that are not overcome by the Prosecutor Defendants' organizational preferences.

As an initial matter, the Prosecutor Defendants are wrong when they contend that "[t]he Eighth Circuit has squarely held that laws like Section 1 do not restrict adults' rights." Prosecutor Defs.' MSJ Resp. at 11 (citing *Upper Midwest Bookseller Ass'n v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1985) ("*Upper Midwest*")). The Court has already found that *Upper Midwest* is "not helpful to resolving the issues at hand" because that case does not address "whether the term 'harmful to minors,' if construed broadly, burdens large amounts of speech for older minors and adults," as Section 1 does. *See* PI Op. at 34. Instead, the Court found the Supreme Court's ruling in *Virginia II* "[m]ore instructive" on the constitutionality of Section 1. *Id.* at 34-35 (citing *Virginia II*, 484 U.S. at 394). Since *Virginia II*, courts have uniformly either enjoined or substantially narrowed laws outlawing displaying or providing access to material that is harmful to minors. *See* Pls.' MSJ Br. at 24-25 (collecting cases). Section 1 cannot be saved through a narrowing construction, *see Shipley, Inc. v. Long*, 195 S.W.3d 911, 915-917 (Ark. 2004) ("*Shipley II*"), and

7

should therefore be declared overbroad because it burdens "a substantial amount" of materials that are constitutionally protected for adults. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002).

The Prosecutor Defendants further argue that "the adult Plaintiffs admit there would be nothing stopping them from viewing regulated books." Prosecutor Defs.' MSJ Resp. at 12 (citing Caplinger Dep. Tr. at 54:20). Plaintiffs do not make this admission. While adults will retain the technical ability to physically access materials segregated to an adults-only room under Section 1, the Prosecutor Defendants ignore how relocating materials will impede the ability of patrons to discover adjacent materials through browsing, as well as the powerful stigma that will attach to segregated materials, which will chill adult patrons, like Ms. Caplinger, from accessing protected materials. *See* Pls.' MSJ Br. at 13-14 (describing fear that other patrons will assume they are viewing pornography, if they peruse segregated materials); *see also Little v. Llano Cnty.*, No. 23-50224, 2024 WL 2860213, at *9 (5th Cir. 2024) (finding inability "to anonymously peruse the books in the library" burdened First Amendment rights).

The Prosecutor Defendants also argue that Section 1 is not overbroad because it does not treat all minors alike but, if it does, that does not offend the First Amendment. *See* Prosecutor Defs.' MSJ Resp. at 12-14. The Prosecutor Defendants previously conceded that Section 1 fails to distinguish between older and younger minors, however, PI Op. at 34 n. 25, which renders Section 1 unconstitutional, *see id.* at 35; *see also* Pls.' MSJ Br. at 10-12. Moreover, the fact that the definition of "harmful to minors" incorporates "contemporary community standards" does not save Section 1. *See* Prosecutor Defs.' MSJ Resp. at 2, 13. Even in communities that approve of 17-year-olds reading *The Joy of Sex*, librarians and booksellers will have to segregate that book from all minors, or else risk prosecution under Section 1 for making it available to 8-year-olds.

Nor does the First Amendment's tolerance for variable obscenity laws save Section 1, *see* Prosecutor Defs.' MSJ Resp. at 13, because the government's ability to regulate obscene materials based on the age of the recipient does not confer "an unbridled license . . . to regulate what minors read and view," *Interactive Digit. Software Ass'n v. St. Louis Cnty. Mo.*, 329 F.3d 954, 959–60 (8th Cir. 2003). Indeed, in order to ensure that laws cannot "reduce the adult population . . . to reading only what is fit for children," *Butler*, 352 U.S. at 383, the overbreadth doctrine prohibits restrictions on even unprotected speech where "a substantial amount of protected speech is prohibited or chilled in the process," *Ashcroft*, 535 U.S. at 237.[6] Enjoining enforcement of Section 1 will also not sow chaos or create difficult line drawing problems. *See* Prosecutor Defs.' MSJ Resp. at 13-14. Granting the relief Plaintiffs seek will merely restore Arkansas law to the version that has existed for the past two decades, post-*Shipley III*. Any difficulty the Prosecutor Defendants might have enforcing variable obscenity laws in the context of display prohibitions, like Section 1, is a function of the interplay between the rules set down in *Ginsberg* and *Shipley II*, both of which are binding on the Court (and the Prosecutor Defendants).

As a last-ditch effort, the Prosecutor Defendants argue that "even if Section 1 unconstitutionally restricts older minors' access," it survives constitutional scrutiny because it will permissibly regulate far greater numbers of people than it injures. *See* Prosecutor Defs.' MSJ Resp. at 14. The only support for this argument is their back-of-the-napkin guesstimate, based on national demographic data, that Section 1 will injure 6.6% of the U.S. population. *See id.* To the extent that data shows anything about how Section 1 would operate in Arkansas, however, it shows that "a substantial amount of protected speech" will be "prohibited or chilled in the process" of

---

[6] The Prosecutor Defendants' examples of laws that "treat minors as a class" illustrate that minors may sometimes be treated alike but provide no reason to conclude that Section 1 passes constitutional muster. *See* Prosecutor Defs.' MSJ Resp. at 13.

implementing Section 1. *Ashcroft*, 535 U.S. at 237. The Court should reject these arguments and grant summary judgment on Plaintiffs' overbreadth claim.

### C.    Section 1 relies on vague terms that fail to provide sufficient clarity to regulated parties or protections against arbitrary enforcement.

The Prosecutor Defendants contend that Section 1 is not vague because it uses "ordinary terms that people use and understand every day." Prosecutor Defs.' MSJ Resp. at 15. That misses the point. Plaintiffs do not complain that they are unable to provide dictionary definitions for each of the words in Section 1 but, rather, that Section 1 leaves them "unsure about whether placing books known to contain sexual content on the bookshelves may subject them to liability once a minor walks through the front door." PI Op. at 38. Nor does Section 1's "double knowledge requirement," Prosecutor Defs.' MSJ Resp. at 15, cure the infirmity because the text provides "no clarity on what affirmative steps a bookseller or librarian must take to avoid a violation." PI Op. at 39. Thus, Section 1 is vague, even if one can imagine "some conduct that clearly falls within the provision's grasp," *Johnson v. United States*, 576 U.S. 591, 602 (2015), because it enables "arbitrary and discriminatory enforcement," *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (internal citations and quotations omitted).

## III.    The Court should grant summary judgment on Plaintiffs' Section 5 claims.

### A.    The curation of library materials is not government speech.

Both the Prosecutor Defendants and County Defendants contend, as a first line defense, that Section 5 is constitutional because the object of its regulation, "the curation of library materials," is a form of government speech, which is not subject to First Amendment restrictions. *See* Prosecutor Defs.' MSJ Resp. at 16-17; County Defs.' MSJ Resp. at 6-7.[7] The Court has already

---

[7] The County Defendants argue that government speech protects their "funding decisions related to [CCLS]" and the creation of the "Social Section." *Id.* Plaintiffs are not challenging the County Defendants' creation of the "Social Section," or any funding decisions related to CCLS. Plaintiffs seek only to prevent the County Defendants from

rejected this argument, *see* PI Op. at 44-47, and should do so again for the reasons given in Plaintiffs' response to the Defendants' respective summary judgment motions, *see* Pls.' Resp. to Prosecutor Defs.' MSJ at 15-18 (distinguishing *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003) and *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314 (1st Cir. 2009)); Pls.' Resp. to County Defs.' MSJ at 22-24. In brief, the fact that public libraries are governmental or quasi-governmental entities does not convert their every activity to protected government speech. *See Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 247 (2022); *Llano Cnty.*, 2024 WL 2860213, at *7 ("[C]ollection decisions are not [government] speech" (citing *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009)). Here, neither the individual factors that courts should consider, nor the broader context in which public libraries operate provides a basis for treating a certified, trained librarian's decisions about what books go on library shelves as a form of government speech. *See* Pls.' Resp. to County Defs.' MSJ at 23; *see also* PI Op. at 11 ("[T]he public library is not to be mistaken for simply an arm of the state."). Section 5 is thus properly scrutinized under the First Amendment.

**B.    Section 5's reliance on undefined terms that permit arbitrary implementation renders it unconstitutionally vague.**

The Prosecutor Defendants erroneously argue that Section 5 is not impermissibly vague because its "terms are understandable," as shown by that the fact that some library Plaintiffs have policies that use "the word 'appropriateness.'" *See* Prosecutor Defs.' MSJ Resp. at 17. The ability of librarians to recognize key terms in Section 5, like "appropriateness" or "accessible to a minor," does not mean they can apply those terms in practice. *See* Pls.' Resp. to Prosecutor Defs.' MSJ at 22-23. Concerningly, the lack of clear guidance means those charged with implementing Section

---

implementing Section 5, including by rendering final judgment on materials challenges. Whether the County Defendants violate the First Amendment by threatening funding cuts in order to coerce CCLS to segregate disfavored materials is a question for another day.

5, like the County Defendants, have "unfettered discretion" to restrict access to materials however they see fit, which renders Section 5 "fatally vague." *See Stephenson*, 110 F.3d at 1310. Furthermore, the fact that Plaintiffs' internal policies already account for the "appropriateness" of materials in their collections only demonstrates Section 5's vagueness: it tells them that familiar concepts now mean something different. *See* PI Op. at 40-42 (rejecting argument that "appropriateness" refers to a library's selection criteria); *see also* Pls.' Resp. to Prosecutor Defs.' MSJ at 22 n.17, 23 (noting that Section 5 allows challenges to be decided *partially* on the basis of viewpoint, whereas existing library policies forbid the use of personal viewpoint).[8]

### C.  Section 5 imposes a prior restraint on protected speech.

Section 5 imposes a prior restraint on protected speech because, much like Section 1, it forces libraries to choose between a range of bad options: ban all minors from entering the library; physically restructure the library to create a secure, adults-only space where inappropriate books are not "accessible" to minors; or preemptively remove any book likely to be challenged as inappropriate from their collections. *See* Pls.' MSJ Br. at 14-15. Regardless of whether libraries preemptively self-censor to minimize the burden of voluminous challenges, or segregate materials in response to challenges, the effect will be that their patrons are restrained from accessing constitutionally protected information. *See* Pls.' Resp. to Prosecutor Defs.' MSJ at 19-20.

The Prosecutor Defendants argue that finding Section 5 to be a "prior restraint on *access*" is too novel to prevail. Prosecutor Defs.' MSJ Resp. at 18. But there is nothing novel about using the First Amendment to protect "the right of the public to receive suitable access to social, political,

---

[8] Plaintiffs allege that Section 5 "fails to provide fair notice as to what acts are mandated" and point to "appropriateness" and "not accessible to minors" as specific examples of Section 5's vagueness. *See* Am. Compl. (Doc. 75) at ¶ 104. They are not foreclosed from arguing that Section 5's inconsistent use of "withdraw" and "relocate" add to Section 5's overall vagueness, however, particularly because those terms further obscure the meaning of "appropriateness" and "not accessible to minors." *See* PI Op. at 41-42.

esthetic, moral, and other ideas and experiences." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 386-90 (1969). Moreover, the Supreme Court has stated plainly that protections for "freedom of speech" must include "*the right to receive*, the right to read and freedom of inquiry[.]" *Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965) (citation omitted) (emphasis added) (observing that "[w]ithout those peripheral rights the specific rights would be less secure"); *Llano Cnty.*, 2024 WL 2860213, at *5 (acknowledging "'the right to receive information and ideas'" (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969))). The First Amendment cannot be subverted through the deployment of novel means to achieve traditional censorship ends. *See Alexander v. United States*, 509 U.S. 544, 551 (1993) (describing prior restraint cases as typically involving government action to "seize[] *or otherwise restrain[]* materials suspected of being obscene without a prior judicial determination") (emphasis added).

    **D.**    **Section 5 imposes a content-based restriction on protected speech and also discriminates on the basis of viewpoint.**

The Prosecutor Defendants contend that Plaintiffs' "claims about Section 5's alleged content- and viewpoint-based discrimination are not properly before the Court because they were not pleaded in the complaint." Prosecutor Defs.' Resp. Br. at 15; *see also id.* at 19. Since the outset, however, Plaintiffs have alleged that Section 5: (1) will cause materials to "be segregated based on the viewpoint contained therein," Am. Compl. at ¶ 85, because it unconstitutionally "delegate[es] unfettered discretion to quorum courts and city councils to decide whether materials are 'appropriate' without any definite procedural safeguards or standards," *id.* at ¶ 103; and (2) provides special access to "any person 'affected by' a library item," *id.* at ¶ 100, while providing no opportunity for "those who believe the [challenged] material should remain available in the main collection to present a countervailing case," *id.* at ¶¶ 73, 75, which amounts to unconstitutional viewpoint discrimination for those who support the availability of different books,

*id.* at ¶¶ 22(e), 23(e).[9] Those allegations provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 507 (2002).

It would be especially inequitable to credit the Prosecutor Defendants' proclaimed surprise at this late juncture, given how prominently Plaintiffs' content- and viewpoint-based claims have been discussed throughout this case. *See O'Donnell v. Elgin, J. & E. Ry. Co.*, 338 U.S. 384, 392 (1949) (imprecise pleading "is not necessarily fatal especially when the adversary makes no objection."); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). Plaintiffs explained the legal basis for these claims in their preliminary injunction brief, *see* PI Br. (Doc. 23) at 24, the parties discussed the claims at oral argument, *see, e.g.*, July 25, 2023 Hr'g Tr. (Doc. 57) at 111:2-4, 142-43, and the Court concluded in its preliminary injunction opinion that "Plaintiffs [we]re likely to prevail on their claim that Section 5 works an unconstitutional content-based restriction on protected speech." PI Op. at 48. At no point before now have the Prosecutor Defendants—or the County Defendants—suggested they lacked notice of those claims.

Plaintiffs' viewpoint discrimination claim is also not "hypocritical." Prosecutor Defs.' MSJ Resp. at 20. Libraries do not currently make viewpoint-based collection decisions, *see* Pls.' MSJ Br. at 5, and there is no need for a countervailing view when libraries decide, for instance, to remove a book that is not circulating or is in disrepair. Section 5 both tolerates viewpoint-based decision-making and vests untrained, elected officials with final say on challenges. The inclusion of countervailing views becomes essential in that context.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' summary judgment motion.

Date: June 21, 2024

---

[9] These allegations also appear in the Complaint. *See* Compl. (Doc. 2).

Respectfully submitted,

/s/ John T. Adams
David M. Fuqua
Ark. Bar No. 80048
John T. Adams
Ark. Bar No. 2005013
Attorneys for Central Arkansas Library System,
Nate Coulter, and the Eureka Springs Carnegie
Public Library
FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Telephone: (501) 374-0200
E-Mail: dfuqua@fc-lawyers.com
E-Mail: jadams@fc-lawyers.com

Bettina Brownstein
Ark. Bar No. 85019
BETTINA E. BROWNSTEIN LAW FIRM
Attorney for Leta Caplinger, Olivia Farrell,
Miel Partain, and Madeline Partain
904 West 2nd Street, Suite 2
Little Rock, AR 72201
Telephone: (501) 920-1764
E-Mail: bettinabrownstein@gmail.com
On Behalf of the Arkansas Civil Liberties
Union Foundation, Inc.

Ben Seel*
Will Bardwell*
Aman George*
Orlando Economos*
Attorneys for the Arkansas Library Association,
Advocates for All Arkansas Libraries, and Adam
Webb, in his individual capacity
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34554
Washington, DC 20043
Telephone: (202) 448-9090
E-Mail: bseel@democracyforward.org
E-Mail: wbardwell@democracyforward.org
E-Mail: ageorge@democracyforward.org
E-Mail: oeconomos@democracyforward.org

Vincent O. Chadick
Ark. Bar No. 94075
Brandon B. Cate
Ark. Bar No. 2001203
Glenn V. Larkin
Ark. Bar No. 2020149
Attorneys for Fayetteville Public Library
QUATTLEBAUM, GROOMS & TULL
PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
E-Mail: bcate@qgtlaw.com
E-Mail: vchadick@qgtlaw.com
E-Mail: glarkin@qgtlaw.com

Michael A. Bamberger*
Kristen Rodriguez*
Rebecca Hughes Parker*
Attorneys for Pearl's Books, LLC,
Wordsworth Community Bookstore LLC,
American Booksellers Association,
Association of American Publishers, Inc.,
Authors Guild, Inc. Comic Book Legal
Defense Fund, and Freedom to Read
Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
E-Mail: michael.bamberger@dentons.com
E-Mail: kristen.rodriguez@dentons.com
E-Mail: rebeccahughes.parker@dentons.com

* Admitted pro hac vice

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2024, a copy of the foregoing was served upon all counsel of record contemporaneously with its filing in the CM/ECF system.

*/s/ John T. Adams*
John T. Adams