# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-2326
_____

L.H., on behalf of their minor children; D.J., on behalf of their minor children;
B.C., on behalf of their minor children; J.F., on behalf of their minor children

*Plaintiffs - Appellants*

v.

Independence School District

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 9, 2024
Filed: August 2, 2024

_____

Before SMITH, WOLLMAN, and GRASZ, Circuit Judges.

_____

SMITH, Circuit Judge.

Four parents of students attending schools within the Independence School District (District) filed suit on behalf of their minor children to challenge the District's policy that removes material in school libraries upon receipt of a challenge to that material, pending a formal review process. Specifically, the parents alleged

EXHIBIT 1

that the policy violates the minor children's First Amendment rights and Fourteenth Amendment due process rights. The District moved to dismiss. The district court[1] granted the motion, concluding that the parents failed to sufficiently plead the injury-in-fact element of standing because the suit is premised on a hypothetical, future challenge in which a book is automatically removed pending review. The parents appeal, and we affirm.

## I. *Background*

Pursuant to a District regulation (Board Regulation 6310), "[s]tudents or parents/guardians who find materials in the [school] library objectionable in any manner may make a formal complaint by obtaining from the Superintendent's office Form 6241 - Review of Instructional Materials." R. Doc. 1-2, at 3. "[T]he Superintendent and the librarian" will consider "[t]his written complaint . . . in weighing the educational value of that particular book . . . against the segment found objectionable to the complainant. Contingent with their decision, the material will be returned to the shelf for continued use or removed from library circulation." *Id.* Board Regulation 6310 refers to "Policy and Regulation 6241 – Controversial Materials," which was enacted in 2012. *Id.* In turn, Board Policy 6241 provides that "[d]espite the care taken to select those materials deemed to be educationally useful, occasional objections to the selection of instructional materials may be made by the public. If a challenge is made, it should be properly channeled through guidelines and procedures established by the Board." R. Doc. 1-4, at 1. Board Regulation 6241 provides:

> On occasion, honest differences of opinion may arise about books or materials used in the public schools. In order to handle questions that might arise in an impartial and orderly manner, the following procedures shall be followed:

---

[1] The Honorable Roseann A. Ketchmark, United States District Judge for the Western District of Missouri.

1. All complaints shall be reported immediately to the building principal involved, whether these come by telephone, letter, or personal conference.

2. The person making the complaint shall receive the form "Review of Instructional Materials." A copy of this form may be picked up in the administrator's office.

3. This form must be completed and returned by the person making the complaint.

4. *Media being questioned will be removed from use, pending committee study and final action by the Board of Education, unless the material questioned is a basic text.* [automatic-removal policy]

5. The Superintendent of Schools shall, within fifteen (15) days of receipt of the written request, appoint a review committee of nine people. The committee shall consist of the administrator of the building involved, three teachers, a member of the Board of Education, and four lay persons. The administrator shall serve as secretary.

6. The classroom teachers appointed shall be represented by the grade level or subject area where the media is used, another grade level or subject area, and a librarian.

7. The four lay persons appointed shall be selected from a list of eight people recommended to the Superintendent by the president of the Board of Education. Two of the four persons appointed must be parents/guardians of children in the schools.

8. Within twenty (20) days of the appointment of the committee, the committee shall meet, review the written request for reconsideration, read the questioned materials, evaluate, and prepare a written report of its findings and recommendations to the Superintendent of Schools.

9. The committee may recommend that the questioned materials be:

   a. Retained without restriction;

   b. Retained with restriction; or

   c. Not retained.

10. The Superintendent shall, at the next appointed meeting of the Board of Education, report the recommendations of the Review Committee to the Board of Education. The decision of the Board will be final.

11. The decision of the Board shall be reported to the principal of the school, to the complainant, and to other appropriate professional personnel on the next school day. The principal shall see that the decision of the Board is carried out.

12. The librarian responsible for that school shall keep on file all pertinent information concerning the questioned materials or any books or materials likely to be questioned.

R. Doc. 1-5, at 1–2 (emphasis added). "There is no notice to students or parents that a book has been challenged and no mechanism for appealing the final Board decision to remove a book." R. Doc. 1, at ¶ 32.

On April 25, 2022, the District received a parental complaint objecting to *Cats vs. Robots #1: This is War* ("*Cats vs. Robots*"). Using Form 6241, the parent, whose third-grade son had checked the book out of the elementary school library, objected to the "Non-Binary [gender identity] discussion - chapter." R. Doc. 8-5, at 1. The parent found the material "[n]ot age-appropriate" for elementary-school students. *Id.*[2]

---

[2] The discussion of non-binary gender identity in *Cats vs. Robots* "occurs on three pages (57–59) of [the] 307-page book." R. Doc. 1, at ¶ 38.

After the District received the parental complaint, it followed Board Regulation 6241. It removed the book from all library shelves, pending committee review and recommendation and a Board vote. On May 17, 2022, a review committee was appointed.[3] The review committee was composed of a member of the Board of Education, the building administrator, three teachers, and four lay persons. The review committee met on May 25, 2022, and again on June 5, 2022. "The [review] committee's majority opinion was that [the book] should not be retained in an elementary setting (K–5), but that the exclusion of the book should not extend beyond elementary level libraries." R. Doc. 8-5, at 6 (emphasis omitted). On June 6, 2022, the review committee provided its report and recommendation to the superintendent. On June 14, 2022, the review committee's recommendation was presented to the Board of Education, which voted to accept and implement the review committee's recommendation. District Superintendent Dale Herl averred that the District did not ban students from borrowing the book, purchasing the book, bringing the book to school, or discussing the book at school during their free time. Aside from the parental complaint to *Cats vs. Robots*, the District has received no other formal challenge to a book since it enacted Board Regulation 6241 in 2012.

On December 6, 2022, four parents (collectively, "plaintiffs") of students attending schools within the District filed suit on behalf of their minor children to challenge the District's automatic-removal policy. The complaint alleges that the plaintiffs' "children intend to use the library and access its materials and fear that the materials they wish to have access to will be automatically removed upon any challenge, without notice or an opportunity to appeal." R. Doc. 1, at ¶ 10; *see also id.* at ¶¶ 8, 9, 11. In their complaint, the plaintiffs stated their belief "that there will be

---

[3]This appointment occurred "one week after the deadline for appointment, which would have been on May 10, 2022 (15 days after the complaint was submitted on April 25, 2022)." R. Doc. 1, at ¶ 41.

additional challenges to books triggering the automatic-removal policy," *id.* at ¶ 48, and set forth the following rationale for that belief:

> 49. During the 2021-22 school year, 138 school districts in 32 states removed more than 2,500 books.
>
> 50. Books are frequently challenged because they contain references to sex, sexuality, or sexual themes, and challengers will incorrectly refer to these materials as "pornography."
>
> 51. Books written by or about minority, lesbian, gay, bisexual, transgender, or queer (LGBTQ) individuals are more frequently challenged on this basis than books by or about white or straight individuals.
>
> 52. Under ISD's automatic-removal policy, a parent, guardian, or student who objects to a book because it contains a discussion about "sex," a person's "sexuality," or their "race" would trigger that book's automatic removal from all library shelves pending review and a Board vote.
>
> 53. Forty-one percent of all books banned nationwide in the 2021-2022 school year were about LGBTQ characters. That includes 671 titles that explicitly address LGBTQ themes or feature protagonists or prominent secondary characters who are part of the LGBTQ community. About 9 percent of these removals—or 145 titles—targeted transgender characters and their stories.
>
> 54. Titles that contain protagonists or important secondary characters of color . . . accounted for 40 percent of all book removals in the 2021–2022 school year, or 659 unique removed titles.
>
> 55. Finally, 338 titles directly address issues of race and racism, making up 21 percent of all book removals in the 2021–2022 school year.

>       56.    While Board Policy 6241 states that "[i]nstructional materials shall not be excluded on the basis of the writer's racial, nationalistic, political, or religious views," and that "[b]ooks, or other instructional or media materials of sound factual authority, shall not be prescribed, nor removed from library shelves or classrooms on the basis of partisan or doctrinal approval or disapproval," ISD policies nevertheless require[] the automatic removal of a book upon a challenge and require only that the person complaining state that it is "objectionable in any manner."

*Id.* at ¶¶ 49–56.

The parents' complaint contained two counts brought pursuant to 42 U.S.C. § 1983. In Count I, the plaintiffs claimed that the District's automatic-removal policy violates the minor students' rights under the First Amendment to the United States Constitution by removing all student access to all challenged materials, including removals made without merit and based on viewpoint and content. In Count II, the plaintiffs claimed the automatic-removal policy violates the minor students' Fourteenth Amendment due process rights to notice and an opportunity to be heard as to the deprivation of their First Amendment rights implicated in Count I. The plaintiffs sought a preliminary injunction, as well as a corresponding permanent injunction and declaratory judgment, directing the District to cease enforcing its automatic-removal policy in violation of the "students' First and Fourteenth Amendment right to access ideas and information and due process." *Id.* at 14.

The District moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). It argued that the plaintiffs lack standing, there is no justiciable controversy, and the plaintiffs failed to state a claim upon which relief can be granted.

The district court granted the motion to dismiss for lack of standing, concluding that the "[p]laintiffs fail[ed] to demonstrate the requisite element of an

injury-in-fact." *L.H. Indep. Sch. Dist.*, No. 4:22-cv-00801, 2023 WL 3132003, at *3 (W.D. Mo. Apr. 27, 2023). According to the court, the plaintiffs did not allege that they sustained, or are in immediate danger of sustaining, a concrete and particularized harm. The court concluded that the plaintiffs' alleged injuries are hypothetical, speculative, and conjectural because they did not allege that any challenge is currently pending or that any such challenge has been threatened, nor did they allege that any book has been temporarily removed as a result of the automatic-removal policy. Instead, they alleged only one instance of the policy ever being enforced, "which their other filings make clear is an event or action they do not challenge in this lawsuit." *Id.* at *4.

In a footnote, the district court concluded that even if the plaintiffs adequately pleaded an injury in fact and causation, it would nonetheless conclude that they did not plead redressability: "Enjoining [the District] from enforcing its automatic-removal policy would not foreclose the possibility that materials would otherwise be removed or access to them restricted upon challenge at the independent discretion of District personnel pending review of some sort." *Id.* at *4 n.2. According to the court, the plaintiffs were "seek[ing] an advisory opinion . . . holding [the District] liable for potential future removal of school library materials upon hypothetical challenges to them." *Id.* This type of "opinion would not preclude future restriction of [the] [p]laintiffs' access to such materials nor ensure the protection of any alleged due process rights implicated by such restriction without [the] [p]laintiffs being granted pre- or post-removal notice or opportunity to be heard." *Id.*

## II. *Discussion*

On appeal, the plaintiffs argue that they possess "standing to challenge the District's recently enforced, written policy that mandates automatic removal of access to any library book for which a complaint is received without pre-removal notice or opportunity to be heard." Appellants' Br. at 10. "The existence of standing is a legal

-8-

issue that we review *de novo*." *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024).

"Federal court jurisdiction is restricted to cases and controversies." *Missouri v. Yellen*, 39 F.4th 1063, 1067 (8th Cir. 2022) (internal quotation marks omitted). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The 'irreducible constitutional minimum' required to establish standing involves three elements: (1) the plaintiff suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Arc of Iowa*, 94 F.4th at 710 (quoting *Spokeo, Inc.*, 578 U.S. at 338). "[S]tanding is assessed 'at the time the action commences.'" *McNaught v. Nolen*, 76 F.4th 764, 769 (8th Cir. 2023) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000)). "Plaintiffs, as the parties invoking federal court jurisdiction, bear the burden of establishing these elements." *Arc of Iowa*, 94 F.4th at 710. "However, the extent of that burden varies depending on the stage of litigation. At the dismissal stage, the plaintiffs must allege sufficient facts to support a reasonable inference that they can satisfy the elements of standing." *Yellen*, 39 F.4th at 1068 (8th Cir. 2022) (internal quotation marks omitted). "In addressing standing, the court must accept all factual allegations in the complaint as true and draw all inferences in the plaintiff's favor." *Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 621 (8th Cir. 2012) (internal quotation marks omitted).

The district court held that the plaintiffs suffered no injury in fact, but the plaintiffs maintain that they are injured by the District's automatic-removal policy because it "imminently threatens" their First Amendment right to access library materials and their Fourteenth Amendment right to due process. Appellants' Br. at 12. According to the plaintiffs, the District will "enforc[e] the policy in the future, so at any moment and without notice to students or parents, the [plaintiffs'] children can

be deprived of their ability to access materials and ideas currently available in their school library." *Id.*

"[T]he injury-in-fact requirement . . . helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). To satisfy this requirement, the plaintiff must show that he or she "ha[s] suffered an . . . invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "'Injury in fact' is an invasion of a legally cognizable right. Whether a plaintiff has shown such an injury 'often turns on the nature and source of the claim asserted.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). This typically means that "a plaintiff's standing tracks his cause of action. That is, the question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." *Id.* (citing William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 239 (1988) ("[T]he question of whether plaintiff 'stands' in a position to enforce defendant's duty is . . . . determined by looking to the substantive law upon which plaintiff relies.")). But we must not "conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting *Braden*, 588 F.3d at 591).

A "recurring issue … is determining when the threatened enforcement of a law creates an Article III injury." *Susan B. Anthony List*, 573 U.S. at 158. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Yellen*, 39 F.4th at 1068 (quoting *Susan B. Anthony List*, 573 U.S. at 158). "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite

to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158. "A plaintiff claiming an abridgment of free speech is permitted to seek pre-enforcement review 'under circumstances that render the threatened enforcement *sufficiently imminent*.'" *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022) (emphasis added) (quoting *Susan B. Anthony List*, 573 U.S. at 159). "In a pre-enforcement suit . . . , a plaintiff satisfies the injury-in-fact requirement, and thus has standing, where it alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Turtle Islands Foods*, 992 F.3d at 699 (cleaned up).

Thus, "[a] plaintiff can establish an injury in the First Amendment context in two ways: by identifying protected speech in which it would like to engage *but that is proscribed by statute*, or by self-censoring to avoid the *credible threat of prosecution*." *Sch. of the Ozarks*, 41 F.4th at 1000 (emphases added). "This is a forgiving standard, satisfied so long as the plaintiff's 'intended future conduct is arguably . . . proscribed by the statute it wishes to challenge.'" *Turtle Island Foods*, 992 F.3d at 699 (alteration in original) (quoting *Susan B. Anthony List*, 573 U.S. at 162). But the Supreme Court "ha[s] repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

The plaintiffs contend that *Parents Defending Education v. Linn Mar Community School District*, 83 F.4th 658 (8th Cir. 2023), supports their assertion of standing. In that case, an association of parents challenged a school district's policy intended to prevent bullying and harassment of students based on their gender identity. *Id.* at 664. The policy provided for punishment of students who violated it. *Id.* The association sought declaratory and injunctive relief, alleging that the policy violated, among other things, the parents' "children's rights to freedom of speech."

*Id.* The district court determined that the association "failed to establish Article III standing because [it] did not show injury, causation, or redressability on its claims." *Id.* at 665.

On appeal, we held that one of the parents "ha[d] standing to bring a claim challenging the policy based on the First Amendment" and, as a result, the association "ha[d] standing . . . to pursue the claim on behalf of a member." *Id.* at 667. We began our analysis with the general observation that "[p]arents have standing to sue when the practices and policies of a school threaten the rights and interests of their minor children." *Id.* at 666. We then examined whether any of the parents "ha[d] alleged an injury in fact sufficient to confer Article III standing." *Id.* One of the parents alleged that her child desired to state his belief that biological sex was immutable and disagree with another student's assertion about that student's gender identity. *Id.* But because of the school district's policy, the parent alleged that her child "remain[ed] silent in school 'when gender identity topics ar[o]se' to avoid violating the policy.'" *Id.*

We set forth how the parent satisfied all of the criteria for pre-enforcement review. First, the "student's proposed activity 'concern[ed] political speech' and [was] 'arguably affected with a constitutional interest.'" *Id.* at 666–67 (quoting *Susan B. Anthony List*, 573 U.S. at 161–62). "Second, the conduct in which [the parent's] child intend[ed] to engage [was] arguably proscribed by the policy," which "broadly prohibit[ed] a refusal to 'respect a student's gender identity.'" *Id.* at 667. Third, "a credible threat of enforcement" existed because the student's "course of action [was] within the plain text of [the] policy." *Id.* The policy "provide[d] that a student who violates the policy 'shall be disciplined by appropriate measures, which may include suspension and expulsion,'" and "no established practice of non-enforcement [existed] that could assuage concerns about the imposition of discipline." *Id.* "Finally,

the alleged injury [was] fairly traceable to potential enforcement of the policy by the District, and a favorable decision [would] likely redress the injury." *Id.*

This case meaningfully differs from *Linn Mar*, which concerned a policy stifling students' free speech. The present case, by contrast, *does not* concern a policy that arguably proscribes the plaintiffs' children's speech. The plaintiffs have not identified any "conduct in which [the plaintiffs'] child[ren] intend[] to engage [in that] is arguably proscribed by the [automatic-removal] policy." *Id.* at 667. In fact, for the automatic-removal policy to affect the children's conduct—their access to materials in the school library[4]—"a hypothetical, future challenge, in which a book is automatically removed pending review" must occur. Appellee's Br. at 16. As the district court observed, the "[p]laintiffs do not allege any challenge is currently pending or that any such challenge has been threatened by a potential challenger. [The] [p]laintiffs do not allege that any book is currently temporarily removed as a result of the enforcement of the policy." *L.H.*, 2023 WL 3132003, at \*4. Nor are the plaintiffs "challenging any currently removed or restricted book." Appellee's Br. at 16.[5]

Additionally, *Linn Mar* concerned "a credible threat of prosecution" in the sense that if the students expressed a certain viewpoint, they could be disciplined. *Linn Mar*, 83 F.4th at 666 (quoting *Susan B. Anthony List*, 573 U.S. at 159). This threat of discipline had a chilling effect on the students' speech and resulted in self-censorship. *See id.*; *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S.

---

[4]For purposes of this opinion, we assume that the children's "proposed activity . . . is 'arguably affected with a constitutional interest.'" *Id.* at 666–67 (quoting *Susan B. Anthony List*, 573 U.S. at 161).

[5]Filings in the district court "make clear" that the plaintiffs are not challenging the denial of access to *Cats vs. Robots*. *L.H.*, 2023 WL 3132003, at \*4.

289, 298 (1979) ("When contesting the constitutionality of a criminal statute, it is not necessary that the plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims deters the exercise of his constitutional rights." (cleaned up)). Notably, this case involves no allegation that the plaintiffs' children have engaged in self-censorship to avoid punishment as a result of the District's automatic-removal policy. Instead, "the 'imminent threat' cited by [the] [p]laintiffs is that, at some point in the future, a book *may* be challenged . . . and temporarily removed from school libraries." Appellee's Br. at 19.

In summary, the plaintiffs have failed to satisfy the requirements of pre-enforcement review, as they have not shown "circumstances that render the threatened enforcement sufficiently imminent." *Sch. of the Ozarks*, 41 F.4th at 1000 (quoting *Susan B. Anthony List*, 573 U.S. at 159). As a result, we hold that the district court correctly held that the "[p]laintiffs have not alleged they sustained, and do not allege they are in immediate danger of sustaining, a concrete and particularized harm that is actual or imminent, not conjectural or hypothetical." *L.H.*, 2023 WL 3132003, at *3 (internal quotation marks omitted).

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____