**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**FAYETTEVILLE PUBLIC LIBRARY, a political subdivision
in the City of Fayetteville, State of Arkansas;
EUREKA SPRINGS CARNEGIE PUBLIC LIBRARY;
CENTRAL ARKANSAS LIBRARY SYSTEM;
NATE COULTER; OLIVIA FARRELL; MIEL PARTAIN,
in her own capacity and as parent and next friend of
MADELINE PARTAIN; LETA CAPLINGER; ADAM WEBB;
ARKANSAS LIBRARY ASSOCIATION;
ADVOCATES FOR ALL ARKANSAS LIBRARIES;
PEARL'S BOOKS, LLC; WORDSWORTH COMMUNITY
BOOKSTORE, LLC d/b/a WORDSWORTH BOOKS;
AMERICAN BOOKSELLERS ASSOCIATION;
ASSOCIATION OF AMERICAN PUBLISHERS, INC.;
AUTHORS GUILD, INC.;
COMIC BOOK LEGAL DEFENSE FUND;
and FREEDOM TO READ FOUNDATION                    PLAINTIFFS**

**V.                      CASE NO. 5:23-CV-5086**

**CRAWFORD COUNTY, ARKANSAS; CHRIS KEITH,
in his official capacity as Crawford County Judge;
TODD MURRAY; SONIA FONTICIELLA; DEVON HOLDER;
MATT DURRETT; JEFF PHILLIPS; WILL JONES;
TERESA HOWELL; BEN HALE, CONNIE MITCHELL,
DAN TURNER, JANA BRADFORD; FRANK SPAIN;
TIM BLAIR; KYLE HUNTER; DANIEL SHUE; JEFF ROGERS;
DAVID ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C. LAWRENCE;
DEBRA BUSCHMAN; TONY ROGERS; NATHAN SMITH;
CAROL CREWS; KEVIN HOLMES; CHRIS WALTON;
and CHUCK GRAHAM, each in his or her official capacity
as a prosecuting attorney for the State of Arkansas        DEFENDANT**

## TABLE OF CONTENTS

I.    LEGAL STANDARD ............................................................................. 4

II.   DISCUSSION ..................................................................................... 5

    A.    Section 1: The Criminal Provision ............................................ 5

        1.    Overview ...................................................................... 5

        2.    Standing and Ripeness ................................................ 9

        3.    Constitutional Analysis .............................................. 12

            i. Overbreadth ........................................................... 13

            ii. Vagueness ............................................................ 21

    B.    Section 5: The Challenge Provision ......................................... 22

        1.    Overview ..................................................................... 22

        2.    Standing and Ripeness ................................................ 27

        3.    Constitutional Analysis .............................................. 31

            i. Vagueness ............................................................. 31

            ii. Content-based Restrictions .................................... 33

III.  CONCLUSION ................................................................................. 37

## <u>MEMORANDUM OPINION AND ORDER</u>

On June 2, 2023, a coalition of public libraries, library organizations, professional librarians, library patrons, booksellers, patrons of bookstores, booksellers' associations, and authors' associations challenged the constitutionality of Sections 1 and 5 of Arkansas Act 372. According to its title, Act 372 "amend[s] the law concerning libraries and obscene materials; . . . create[s] the offense of furnishing a harmful item to a minor; and . . . amend[s] the law concerning obscene materials loaned by a library." *See* Doc. 75-1 (full text of Act 372, cited herein as "Act 372 § ___"). Section 1 would impose a misdemeanor penalty of up to one year in jail on librarians, booksellers, and others who make certain media "available" to anyone under the age of eighteen.[1] Section 5 would mandate a new procedure for libraries, city councils, and county quorum courts to follow when evaluating a citizen's request to move or remove a book from a public library's permanent collection.

Plaintiffs sued two groups of defendants: Arkansas's twenty-eight prosecuting attorneys, who would enforce Section 1's criminal penalty; and Crawford County, Arkansas, one of several governmental bodies in the state that exerts fiscal and regulatory control over a public library or libraries, along with Crawford County's Chief Executive, County Judge Chris Keith, who would be responsible for implementing Section 5 in Crawford County.[2]

---

[1] Section 1 broadly targets books, magazines, motion pictures, photographs, articles, and recordings. *See* Act 372 § 1(a)(4)(B)(i).

[2] The Arkansas Attorney General represents the prosecutors and is defending both sections of the challenged law. The Court will therefore refer to the prosecutors and Attorney General's office collectively as "the State," and Crawford County and County Judge Keith collectively as "the Crawford County Defendants."

Following full briefing on all the issues and an in-person hearing, the Court preliminarily enjoined Sections 1 and 5 on July 29, 2023, three days before the law was set to take effect. *See* Doc. 53 ("Preliminary Injunction Order"). None of the Defendants took an interlocutory appeal, and the case proceeded to discovery, followed by dispositive motion practice. Though approximately seventeen months have passed since the Preliminary Injunction Order issued, nothing much has changed: Plaintiffs still have standing to sue on ripe claims, and they have sued the correct parties; Sections 1 and 5 of the Act remain vaguely worded and susceptible to multiple meanings; Section 1 violates the due process rights of professional librarians and booksellers and the First Amendment rights of library and bookstore patrons; and Section 5 empowers local elected officials to censor library books they feel are not "appropriate" for citizens to read and allows (if not encourages) content- and viewpoint-based restrictions on protected speech without any compelling governmental purpose.

Before the Court are the parties' ripe cross-motions for summary judgment. *See* Docs. 90, 93, 99. The parties are in agreement that no genuine, material disputes of fact exist and that the Court may enter judgment as a matter of law. Accordingly, and for the reasons explained below, Plaintiffs' Motion for Summary Judgment is **GRANTED**, and Defendants' Motions for Summary Judgment are **DENIED**. Defendants are **PERMANENTLY ENJOINED** from enforcing Sections 1 and 5 of Act 372.

## I.   LEGAL STANDARD

A party moving for summary judgment must establish the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. *See* Fed. R.

4

Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). The same standard applies where, as here, the parties have filed cross-motions for summary judgment. When there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). Each motion should be reviewed in its own right, however, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998).

## II.    DISCUSSION

### A.  Section 1: The Criminal Provision

#### 1.  Overview

The stated purpose of Section 1 is to define a new Class A misdemeanor offense called "furnishing a harmful item to a minor." One is guilty of this crime "if, knowing the character of the item involved, the person knowingly . . . [f]urnishes, presents, provides, makes available, gives, lends, shows, advertises, or distributes to a minor an item that is harmful to minors." Act 372 § 1(b)(1).

The terms "minor" and "harmful to minors" are separately defined in Arkansas's variable obscenity statute, found at Title 5, Chapter 68 of the criminal code. A minor is "any person under eighteen (18) years of age." Ark. Code Ann. § 5-68-501(7). The term "harmful to minors," which incorporates the Supreme Court's approved definition of

5

"obscenity," means:

> any description, exhibition, presentation, or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when the material or performance, taken as a whole, has the following characteristics:
>
> > (A) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest in sex to minors;
> >
> > (B) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance depicts or describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse in a manner that is patently offensive to prevailing standards in the adult community with respect to what is suitable for minors; and
> >
> > (C) The material or performance lacks serious literary, scientific, medical, artistic, or political value for minors.

Ark. Code Ann. § 5-68-501(2).

Prior to Act 372, it was already illegal in Arkansas to provide obscene materials to minors, but librarians were granted special immunity from prosecution if they were "acting within the scope of [their] regular employment duties." *See* Ark. Code Ann. § 5-68-308(c) (2020). Such immunity had not been questioned for nearly forty years. *See 4000 Asher, Inc. v. State*, 290 Ark. 8, 13 (1986) (declaring the immunity statute "reasonable on its face"). Up until the passage of Act 372, it appears that Arkansas's more pressing concern with respect to librarians was that they be insulated from meritless claims and time-wasting prosecutions. Times have changed.

Plaintiffs contend that Section 1 of Act 372 is unconstitutional on its face because it is overbroad and certain terms are too vague to be reasonably understood, which will

lead to arbitrary enforcement. A law is overbroad and facially invalid when "the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1157 (8th Cir. 2014) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). The librarian and bookseller Plaintiffs fear that the term "harmful to minors" could be interpreted broadly to apply to a great number of works, including ones that would be acceptable for adults and older minors to view.

Further, they worry that Section 1 does not clearly define what it means to "present," "show," or "make[ ] available" a certain book. Act 372, § 1(b)(1). They ask whether a librarian could face criminal penalties by displaying a book containing sexual content in the teen or adult section of the library if a younger minor could also visit that section—either accompanied or unaccompanied by an adult—and see or handle the book.[3] A court may declare a law void-for-vagueness if it "forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application" or if it enables "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to [government officials] for resolution on an ad hoc and subjective basis." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (internal citations and quotations omitted).

The librarian and bookseller Plaintiffs fear they could be prosecuted under

---

[3] Notably, there is no exemption for parents or guardians under Section 1. The Court surmises that if a parent were to act as a straw buyer or borrower of a book that a prosecutor deemed "harmful" to a young minor, criminal liability could attach if the parent then made the material available to her seventeen-year-old child.

Section 1 because there are currently books and other materials on library and bookstore shelves that could be deemed "harmful" to younger minors and are conceivably "available" for younger minors to view. Plaintiffs claim their options for removing the threat of criminal liability—which involve excluding children from libraries and bookstores or segregating books into adults-only rooms—are logistically and financially untenable and contrary to the core purpose of public libraries and community bookstores.

In response to Plaintiffs' overbreadth argument, the State contends that Section 1 is constitutional because it is identical in all material respects to a criminal ordinance the Eighth Circuit approved in a case called *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1985). Next, the State argues that even if Section 1 unconstitutionally restricts older minors' access to certain reading materials, the law should be deemed constitutional as to younger minors and adults, who collectively outnumber older minors and render the legitimate sweep of Section 1 more substantial than its overbreadth. Lastly, the State disagrees with Plaintiffs that lumping all minors together into a class, regardless of age or developmental maturity, is problematic and will violate older minors' constitutional right to access books that are not harmful to them. After all, the State notes, "laws often treat minors as a class," and writing a more tailored law that does not overly burden the First Amendment rights of older and/or developmentally mature minors would be too daunting a task for the legislature. (Doc. 107, p. 13).

With respect to Plaintiffs' void-for-vagueness argument, the State offers a five-sentence response that claims without explanation that the challenged terms are

8

"ordinary terms that people use and understand every day" and are not vague at all. *See id.* at p. 15. The State also encourages librarians and booksellers to take comfort in the fact that prosecutors will do nothing more than apply "contemporary community standards" when assessing whether a book is "harmful to minors"—which should quell their fears of arbitrary prosecution. *See id.* at p. 13.

### 2.  Standing and Ripeness

At the preliminary-injunction phase of these proceedings, the Court found that at least one plaintiff had standing to challenge the constitutionality of Sections 1 and 5 of Act 372 and that such challenges were ripe. *See* Doc. 53, pp. 19–24. The State, however, raises standing and ripeness again on summary judgment, arguing that Plaintiffs have failed to show that their injuries are more than speculative in nature. The State contends there is "no guarantee that the Plaintiffs will be prosecuted" under Section 1 based on making available any particular book or books that currently exist on the shelves of Arkansas's public libraries or bookstores. (Doc. 95, p. 11). These arguments fail to appreciate the nature of Plaintiffs' facial challenge to Section 1; "[w]hether a plaintiff has shown . . .  an injury often turns on the nature and source of the claim asserted." *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024) (citation omitted and cleaned up).

On a basic level, standing requires an injury in fact that is concrete and particularized and actual or imminent; in addition, such injury must be "fairly . . . traceable to the challenged action of the defendant[s]," and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). Recently, the Eighth Circuit

characterized the standing requirement for a First Amendment injury as "a forgiving standard, satisfied so long as the plaintiff's 'intended future conduct is arguably . . . proscribed by the statute it wishes to challenge.'" *L.H.*, 111 F.4th at 893 (quoting *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021)).

Here, the librarian and bookstore Plaintiffs argue—and the State agrees, *see* Doc. 95, pp. 19–20—that prosecutors *could* reasonably interpret the terms "present" or "make available" in Section 1(b)(1) to mean "make accessible." While the State helpfully offers the dictionary definitions of these terms, those definitions provide no additional insight into the actions required of Plaintiffs to conform their conduct to the law. If a book with some sexual content were placed on a shelf or otherwise displayed in the teen or adult section of the library or bookstore, the librarian or bookseller could reasonably be accused of "furnishing a harmful item to a minor" if a younger minor could access it.  The vague and undefined terms in Section 1 thus subject the librarian and bookstore Plaintiffs to a credible fear of prosecution, as they are uncertain what lengths they must go to in order to comply with the law.[4]

---

[4] The library and bookseller Plaintiffs and the associational Plaintiffs representing those entities have provided uncontroverted testimony regarding the hundreds of books displayed in their collections and inventories that are likely to subject librarians and booksellers to prosecution under Section 1 because they merely *discuss* sex. *See* Doc. 113, p. 6 n.7 (collecting Plaintiff testimony). And Plaintiffs who are adult patrons and mature-teenager patrons of public libraries and bookstores have provided undisputed testimony that they are interested in reading books that contain at least some sexual content, which, in the Arkansas Supreme Court's view, *see Shipley, Inc. v. Long*, 359 Ark. 208, 219 (2004), would qualify as material that is "harmful" to younger, less mature minors. *See, e.g.*, Doc. 99-19, pp. 14–15 (Caplinger Depo.); Doc. 99-20, p. 12 (Madeline Partain Depo.); Doc. 99-21, p. 15 (Miel Partain Depo.).

The Court observes that in a factually similar case, *Virginia v. American Booksellers Ass'n*, the Supreme Court held that booksellers in Virginia had standing to sue the Commonwealth to enjoin a law that would criminalize the commercial display of materials deemed "harmful to juveniles." 484 U.S. 383, 393 (1988). The Court was "not troubled by the pre-enforcement nature" of the suit's facial challenge. *Id.* at 387. Virginia's definition of "harmful to juveniles" was almost identical to Arkansas's definition of "harmful to minors": both statutes refer to books considered obscene to those under the age of eighteen. *Compare id.* at 387 n.2 (quoting Virginia statute defining "harmful to juveniles"), *with* Ark. Code Ann. § 5-68-501(2) (Arkansas criminal code definition of "harmful to minors").

The *Virginia* Court held that the booksellers who were subject to the law's criminal penalties had standing to sue because, "if their interpretation of the statute [was] correct, [they would] have to take significant and costly compliance measures or risk criminal prosecution." 484 U.S. at 392; *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010) (finding plaintiffs were not required to "await and undergo a criminal prosecution as the sole means of seeking relief"). Accordingly, this Court finds that the librarian and bookseller Plaintiffs have standing in the instant case—as the booksellers did in the *Virginia* case—because "[t]he State has not suggested that the newly enacted law will not be enforced . . . [and] plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them." 484 U.S. at 393.

As for the Plaintiffs who are patrons of libraries and bookstores, the Court finds they also have standing to sue on their ripe, non-speculative claims of injury attributable

to Section 1. The Arkansas Supreme Court interpreted the term "harmful to minors" to mean "materials that would arguably be 'harmful' to [younger minors], even though not 'harmful' to an older child." *Shipley, Inc. v. Long*, 359 Ark. 208, 219 (2004). It follows that to avoid criminal prosecution, librarians and booksellers will have no other choice but to burden older minors' and adults' access to books that contain even a modicum of sexual content; they will be required to place such books in areas where younger minors cannot see or reach them, whether on high shelves or in locked rooms. The State offers no legitimate governmental reason why such burdens on public access to speech are necessary or narrowly tailored to a particular purpose.

In sum, *multiple* Plaintiffs have standing to challenge Section 1—though only one plaintiff is necessary.[5]  *See Horne v. Flores*, 557 U.S. 433, 446–47 (2009).

### 3. Constitutional Analysis

The Court finds that Section 1 of Act 372 is unconstitutional for two reasons. First, it is overbroad because it regulates substantially more speech than the Constitution allows and therefore violates the First Amendment rights of Arkansans. Second, its terms

---

[5] These Plaintiffs include:

- booksellers Pearl's Books, LLC, and Wordsworth Community Bookstore, LLC, d/b/a/ WordsWorth Books;
- librarians Nate Coulter and Adam Webb;
- the American Booksellers Association as representative of its Arkansas bookseller members;
- the Arkansas Library Association, Advocates for All Arkansas Libraries, the Comic Book Legal Defense Fund, and the Freedom to Read Foundation, as representatives of their Arkansas librarian members[5]; and
- library patrons Olivia Farrell, Miel Partain (individually and as next-friend of her minor daughter Madeline Partain), and Leta Caplinger.

are so vague that they fail to provide librarians and booksellers with adequate notice of what conduct is prohibited, thus violating their due process rights.

### i. Overbreadth

A law is unconstitutionally overbroad and facially invalid when it "reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982). The overbreadth doctrine thus forbids restrictions on speech where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

Section 1 makes it a crime to "knowingly . . . furnish[ ], present[ ], provide[ ], make[ ] available, give[ ], lend[ ], show[ ], advertise[ ], or distribute to a minor an item that is harmful to minors." Act 372 § 1(b)(1). Key to the statute's interpretation and enforcement is what "harmful to minors" means. This term is defined in Arkansas's criminal code. *See* Ark. Code Ann. § 5-68-501(2). As the State points out in its briefing, Arkansas's definition tracks the Supreme Court's approved definition of obscenity for minors, taken from *Miller v. California*, 413 U.S. 15, 24 (1973), and *Ginsberg v. New York*, 390 U.S. 629, 633 (1968). However, Section 1 does not distinguish between minors of different ages and instead aggregates them into a single category: "minors."

About twenty years ago, the Arkansas legislature tried and failed to pass a statute

that was very similar to Section 1, and a federal district court deemed it unconstitutional. In 2003, the General Assembly passed Act 858, which amended Arkansas Code § 5-68-502(1) to make it a crime to "display material which is harmful to minors in such a way that minors, as part of the invited general public, will be exposed to view such material" and also to "[s]ell, furnish, present, distribute, allow to view, or otherwise disseminate to a minor, with or without consideration, any material which is harmful to minors." When Arkansas bookstore owners, booksellers' associations, librarians, and publishers challenged the law's constitutionality, the Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas, certified certain questions of statutory interpretation—in particular, the definition of "harmful to minors"—to the Arkansas Supreme Court. *See Shipley, Inc. v. Long*, 454 F. Supp. 2d 819, 820 (E.D. Ark. 2004).

Judge Eisele modeled his request after one that the U.S. Supreme Court had sent to the Virginia Supreme Court in a factually similar case. In 1985, Virginia's legislature passed a variable obscenity law that made it unlawful to knowingly display sexually explicit materials considered "harmful to juveniles" in a manner in which "juveniles may examine and peruse." *Am. Booksellers Ass'n, Inc. v. Virginia*, 792 F.2d 1261, 1263 (4th Cir. 1986). The district court for the Eastern District of Virginia permanently enjoined the law, and the Commonwealth appealed the decision to the Fourth Circuit, which affirmed. *Id.* at 1262–63. In the Fourth Circuit's view, Virginia's law was no mere time/place/manner restriction on speech; instead, it "impose[d] restrictions based on the content of publications." *Id.* at 1265. The Fourth Circuit also declined to credit the Commonwealth's assertion that "only a small percentage of the inventory in bookstores could be classified

14

as harmful to juveniles." *Id.* The court worried that "an older minor's first amendment rights [could] be limited by the standards applicable to younger juveniles" once the law was enforced. *Id.* at 1264 n.7. In other words, the Fourth Circuit did not assume that the only material subject to Virginia's regulation was the kind of pornographic material that would be considered "harmful" to the oldest of minors and therefore harmful to all minors as a class. Since Virginia's law unduly burdened both adults' and older minors' First Amendment rights to access speech, it was struck down as a content-based, overbroad regulation.

The Commonwealth appealed once again to the U.S. Supreme Court, which accepted certiorari—ostensibly to resolve a circuit split. *See Virginia v. Am. Booksellers, Inc.*, 484 U.S. 383 (1988). By the time the Supreme Court became involved, the Fourth, Eighth, and Tenth Circuits had all analyzed similar statutes restricting the display of materials considered obscene as to minors and had come to different conclusions. The Eighth and Tenth Circuits approved the laws they were asked to review, while the Fourth Circuit struck down its law down as unconstitutional.

In the Eighth Circuit case, *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, the plaintiff challenged a Minneapolis ordinance regulating how material that was "harmful to minors" was to be displayed for sale. 780 F.2d 1389, 1390 (8th Cir. 1985). The ordinance directed booksellers to place an opaque cover on any material whose "cover, covers, or packaging, standing alone, [was] harmful to minors." *Id.* None of the material would have been obscene to adults; the law "merely regulate[d] the *manner* of display of materials harmful to minors. It d[id] not forbid the display of such materials and d[id] not

15

limit their sale to adults." *Id.* at 1394 (emphasis added).

After balancing the relative burden the statute would impose on adult access to speech, the Eighth Circuit found the Minneapolis ordinance constitutional, noting that its definition of "harmful to minors" tracked the definition approved by the Supreme Court in *Ginsberg* and *Miller*, and the law's "sealed wrapper provision" imposed only a minimal burden on adults' ability to thumb through restricted materials before purchase. *Id.* at 1395. Unlike the bookseller plaintiffs in the *Virginia* case, the *Upper Midwest* plaintiff never raised—and thus the court did not consider—the argument that some materials implicated by the Minneapolis ordinance might be "harmful" to younger minors but not to older minors—and thereby infringe older minors' First Amendment rights. This concern did not seem to be on the Eighth Circuit's radar. In fact, the court observed that "any material covered by the Minneapolis ordinance [was] likely to be on the borderline between pornography and artistic expression," which implies the court was only considering the display of materials that would be harmful to *all* minors, including older minors, such as pornography. *Id.* at 1396.

A couple of years prior to the decision in *Upper Midwest*, the Tenth Circuit approved the constitutionality of a similar ordinance proscribing the display in bookstores of material that was obscene as to minors. *See M.S. News v. Casado*, 721 F.2d 1281, 1288 (10th Cir. 1983). That ordinance stated that a bookstore could comply with the law by placing the offensive material behind blinder racks, "so that the lower two-thirds of the material [was] not exposed to view." *Id.* at 1287. The Tenth Circuit also appears to have assumed without discussion that the materials subject to the ordinance would be "harmful" to older

and younger minors alike and, thus, harmful to all minors as a class. The court analogized the statute at issue to the one described in *Ginsberg*, which "proscribe[d] the sale of 'girlie magazines' to minors." *Id.* at 1286.

Returning to the Supreme Court's decision in *Virginia*, the question of what "harmful to juveniles" meant was the deciding factor in assessing the constitutionality of the subject statute. Even though the Commonwealth's Attorney General "argue[d] that the statute's coverage [was] much narrower than plaintiffs allege[d]" and would cover "only a very few 'borderline' obscene works," that explanation was not good enough for the high Court, which noted that the Virginia Attorney General's interpretation of the law "[did] not bind the state courts or local law enforcement authorities" and was not "authoritative." *Virginia*, 484 U.S. at 394, 395.

The U.S. Supreme Court therefore asked the Virginia Supreme Court, "[W]hat general standard should be used to determine the statute's reach in light of juveniles' differing ages and levels of maturity[?]" *Id.* at 395. The Virginia Supreme Court responded that "harmful to juveniles" meant only those books deemed obscene to older minors. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618, 623 (Va. 1988) ("A book will pass statutory muster . . . if it has serious value for a legitimate minority of juveniles, and in this context, a legitimate minority may consist of older, normal (not deviant) adolescents."). Upon receipt of the certified answers to the Court's questions, the Fourth Circuit's opinion was vacated and remanded. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988). Now that the universe of possible "harmful" materials was considerably narrowed, Virginia's statute was constitutional because it imposed only "a minimal burden on

17

booksellers and represent[ed] a constitutionally permissive exercise of the state's police powers." *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127– 28 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990).

In the case at bar, there is no doubt that Section 1 is overbroad because the Arkansas Supreme Court's definition of "harmful to minors" is *the opposite* of the Virginia Supreme Court's. In response to the federal district court's certified questions in *Shipley*, Arkansas's highest court explicitly rejected Virginia's "narrow[ ]" interpretation of "harmful to minors" and reasoned that a broad interpretation—which swept in books that would be considered harmful to the youngest of minors—was what the Arkansas General Assembly intended when drafting the law. The Court explained:

> If the younger minors are to be protected from "harmful" materials, surely the General Assembly did not intend for those younger children to be permitted to access materials that would arguably be "harmful" to them, even though not "harmful" to an older child. We cannot construe Arkansas' statutory law in such a way as to render it meaningless, and we will not interpret a statute to yield absurd results that are contrary to legislative intent.

*Shipley, Inc. v. Long*, 359 Ark. 208, 219 (2004).

Turning back to the case at bar, this Court finds that the Arkansas Supreme Court's responses to the certified questions in *Shipley* bind the interpretation of Act 372. In so finding, the Court disagrees with the State's assertion that the Eighth Circuit's decision in *Upper Midwest* "control[s] here." (Doc. 95, p. 18). First, the *Upper Midwest* court did not consider whether the term "harmful to minors," if construed broadly to include that which was harmful to the youngest minors, would impermissibly burden speech for older minors and adults. Instead, the court and its parties assumed that the ordinance at issue

regulated what amounted to pornography, which is, of course, obscene as to *all* minors. Second, the ordinance in *Upper Midwest* only applied to bookstores, whereas Section 1 applies to bookstores and public libraries and therefore affects much more protected speech. Third, the ordinance in *Upper Midwest* gave clear direction to booksellers about how to comply with the law, whereas Section 1 is devoid of any such guidance. Fourth, the U.S. Supreme Court decided the *Virginia* case *after Upper Midwest* and considered new questions of overbreadth that Virginia's law prompted. The U.S. Supreme Court decided that resolving those questions required certifying them to Virginia's highest court. Fifth, *after* the *Virginia* case, the Eastern District of Arkansas considered the same overbreadth questions that had been raised in *Virginia*—but not in *Upper Midwest*—and certified questions of statutory interpretation to Arkansas's highest court.[6]

Though the State would rather this Court ignore what happened after *Upper Midwest*, that bell cannot be unrung. Section 1, which incorporates the "harmful to minors" definition that was at issue in *Shipley*, is as overbroad and unconstitutional now as it was when Judge Eisele found it so. *See Shipley*, 454 F. Supp. 2d at 831.

Mindful of the Arkansas Supreme Court's broad interpretation of "harmful to minors," the legislature could have written a definition in Act 372 that hewed more closely to the approved restriction in *Virginia*—but it did not; the legislature simply incorporated the definition of "harmful to minors" from the criminal code without adornment or qualification. Since this term has been construed broadly by the Arkansas Supreme Court

---

[6] Judge Eisele did the right thing. The U.S. Supreme Court held that "it [was] essential" to "have the benefit of the law's authoritative construction from the [state's highest court]" before the facial overbreadth challenge could be decided. *Virginia*, 484 U.S. at 395.

to mean material that is obscene to the youngest of minors, it was up to the General Assembly to write a narrowly tailored law with this definition in mind. That did not happen, and the law's overbreadth should not come as a surprise to its drafters. After all, the U.S. Supreme Court in *Virginia* advised that a "broader reading" of harmful to minors "would raise correspondingly greater First Amendment questions." 484 U.S. at 395.

Given the above, the only way librarians and booksellers will be able to comply with Section 1 and still allow those under the age of eighteen to enter their facilities is to keep them away from all books with sexual content. This could be done by creating strict adults-only areas—into which would go potentially hundreds of books, from disposable paperback romance novels to classics of literature like *Romeo and Juliet*, *Ulysses*, *Catcher in the Rye*, *The Handmaid's Tale*, or *The Kite Runner*. In other words, to avoid criminal penalties under Section 1, librarians and booksellers must impose restrictions on older minors' and adults' access to vast amounts of reading material. Creating segregated "18 or older" spaces in libraries and bookstores will powerfully stigmatize the materials placed therein, thus chilling adult access to this speech. *See, e.g.*, Doc. 99-7, ¶ 5 (Farrell Decl.) (testifying that browsing in an adults-only room "would signal to others that" she is "interested in reading pornography"); Doc. 99-19, p. 18 (Caplinger Depo.) (describing stigma that would attach to adults-only area of the library and implication that the books would "not just [be] inappropriate, but somehow pornographic or obscene").

If the General Assembly's purpose in passing Section 1 was to protect younger minors from accessing inappropriate sexual content in libraries and bookstores, the law will only achieve that end at the expense of everyone else's First Amendment rights. The

law deputizes librarians and booksellers as the agents of censorship; when motivated by the fear of jail time, it is likely they will shelve only books fit for young children and segregate or discard the rest. For these reasons, Section 1 is unconstitutionally overbroad.

### ii. Vagueness

For related reasons, Section 1 is unconstitutional due to the presence of vague terms. A law must sufficiently define terms so "that ordinary people can understand what conduct is prohibited." *United States v. Washam*, 312 F.3d 926, 930 (8th Cir. 2002). Otherwise, those who attempt to interpret and comply with the law will "necessarily guess at its meaning and differ as to its application." *Stephenson*, 110 F.3d at 1308 (citations and quotations omitted). Such vagueness leads to "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to [government officials] for resolution on an ad hoc and subjective basis." *Id.*

Where "the literal scope of the . . . regulation is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Id.* at 1308–09 (quotations and citations omitted); *see also Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (with regard to a "content-based regulation of speech[,] [t]he vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech"). "[T]he failure to define the pivotal term of a regulation can render it fatally vague," particularly where the tools that courts regularly use to interpret imprecise terms, such as "the common usage of statutory language, judicial explanations of its meaning, and previous

applications of the statute to the same or similar conduct," fail to provide necessary clarity. *Stephenson*, 110 F.3d at 1309.

As the Court noted in its Preliminary Injunction Order, Section 1's use of "present," "make[ ] available," and "show" leaves librarians and booksellers unsure about whether shelving books they know contain sexual content may subject them to criminal liability. As for Section 1's "knowledge requirement," which the State believes reduces any potential for vagueness, *see* Doc. 95, p. 19, the fact is that Section 1 provides no clarity on what affirmative steps a bookseller or librarian must take to avoid a violation. The law's knowledge requirement could be met if a librarian or bookseller knew: (1) that a particular book in the adult section contained sexual content and (2) that minors were not banned from the premises. Such knowledge is not enough to cure the vagueness.

Furthermore, Section 1 remains unconstitutionally vague even if one could imagine "some conduct that clearly falls within the provision's grasp," *Johnson v. United States*, 576 U.S. 591, 602 (2015), because the law's undefined terms permit "arbitrary and discriminatory enforcement," *Stephenson*, 110 F.3d at 1308 (internal citations and quotations omitted). For all these reasons, Section 1 is void for vagueness because it would violate librarians' and booksellers' due process rights by subjecting them to criminal prosecution without clearly defining the prohibited conduct.

### B.  Section 5: The Challenge Provision

#### 1.  Overview

Plaintiffs separately challenge Section 5 of the Act, which concerns the "[e]stablishment of guidelines for selection, relocation, and retention of [library] materials."

Act 372 § 5.  First, Section 5 mandates that "[e]ach county or municipal library shall have a written policy for addressing challenged material that is physically present in the library and available to the public." *Id.* § 5(b). Many libraries already have such a policy in place, but Section 5 establishes the minimum criteria that must be included.

Next, Section 5 explains that any "person affected by . . . material" in a library's collection may "challenge the appropriateness" of that material's inclusion in the main collection. *Id.* § 5(c)(1). Material subject to challenge is not limited to sexual content, and the law does not define "appropriateness" at all. Instead, a book challenger may target any expression of ideas that he or she personally deems inappropriate. Further, Section 5 does not require that the book challenger be a patron of the library where the challenge is made. There is no Arkansas residency requirement either. All a challenger must do to initiate the challenge process is meet with a librarian to discuss the grievance. *Id.* § 5(c)(3). The librarian must then provide a copy of the library's written policy to the challenger. *Id.* § 5(c)(4)(A). If the challenger is dissatisfied with the librarian's response, he or she must fill out a form supplied by the library to explain the nature of the grievance. *Id.* § 5(c)(5). The library has discretion to decide whether to leave the book on the shelf during the pendency of a challenge or remove it from the collection. *Id.* § 5(c)(2).

Once the challenger puts the grievance in writing, Section 5 states that it must be forwarded to "a committee of library personnel" who have "knowledge appropriate for the material being challenged" and possess "diverse viewpoints." *Id.* § 5(c)(6). "The librarian or his or her designee" may chair the committee. *Id.* Other than screening for

23

"appropriateness," Section 5 offers the library committee no evaluation criteria except the following:

> Material being challenged:
>
> (i)    Shall not be withdrawn *solely* for the viewpoints expressed within the material; and
>
> (ii)   Shall be reviewed in its entirety and shall not have selected portions taken out of context.

*Id.* § 5(c)(7)(B)(i)–(ii) (emphasis added). After the library committee meets with the challenger, it then "vote[s] to determine whether the material being challenged shall be relocated within the library's collection to an area that is not accessible to minors under the age of eighteen (18) years." *Id.* § 5(c)(11)(A). However, Section 5 does not suggest how a library would create an area "that is not accessible to minors." And somewhat confusingly, despite this provision, Section 5 is not limited to challenges for appropriateness *as to minors*; as any book geared for any age reader could be challenged.

After the library committee votes on the book challenge, it must send a written summary of its decision to the challenger. If the committee segregates or "withdraw[s]" the challenged material, the challenge ends there. But if the committee rejects the challenge, Section 5 permits the challenger to "appeal the committee's decision to the governing body of the county or city" that financially supports the library "by filing a written appeal to the executive head of the governing body of the county or city." *Id.* at § 5(c)(12)(A).

24

Governing bodies, i.e., quorum courts and city councils, are then afforded wide latitude in reviewing the challenged material. They are only required to consider:

(1) the challenged material itself,

(2) the written challenge that was submitted to the library committee,

(3) the library committee's written explanation for its decision, and, if submitted,

(4) the mayor's or county judge's recommendation.

*Id.* § 5(c)(12)(B)(i)–(ii). Section 5 does *not* require the quorum court or city council members to adopt—or even be provided a copy of—the library's selection criteria, nor does it require them to read or consider the criteria. *Id.*

The quorum court or city council members meet to consider and vote on whether to censor the challenged material, either by withdrawing it from the library's main collection or relocating it to another part of the library. Their decision is final, and Section 5 does not require the governing body to issue a written explanation for its decision. *Id.* § 5(c)(12)(C).

Plaintiffs argue that Section 5 is void for vagueness because librarians, library patrons, members of local governmental bodies, and the public at large will have no meaningful way to discern what sorts of materials are "appropriate," as that undefined term appears in Section 5, or what it means to "relocate[ ] [books] . . . to an area that is not accessible to minors under the age of eighteen."[7] In Plaintiffs' view, the challenge

---

[7] Would a sign suffice, or would books need to be moved onto high shelves or behind solid partitions? Would libraries need to construct rooms with doors within their existing buildings to securely house adult and young adult books that could possibly be viewed as "harmful" to younger minors (even if younger minors would likely have no interest in these books)? Would a staff member be required to monitor the restricted area? Would

process will invite content-based restrictions on public access to library materials without regard to the First and Fourteenth Amendments. And since anyone—whether an Arkansan or an out-of-state interest group—who is "affected" by a book may raise a Section 5 challenge, libraries are likely to face exponentially more challenges than they do currently. Book challenges now are resolved by professional librarians, but Section 5 challenges may be appealed to elected officials with discretion to decide whether a book is "appropriate" without the benefit of procedural requirements or standards. They don't even have to read the books first.

Furthermore, library professionals have testified in this case that the expected influx of challenges will overwhelm library staff, who have the option of withdrawing challenged books from the shelves while they are under consideration. There is undisputed record testimony that Section 5's challenge process is likely to result in long wait periods for patrons interested in reading challenged books.

The State responds that a book's "appropriateness" need not be defined in Section 5. Instead, the State encourages Plaintiffs to trust that the local governing bodies evaluating book challenges will employ the same criteria that librarians and library committees use, rather than invent their own criteria. After all, Section 5 does not explicitly

---

patrons' driver's licenses need to be checked prior to entry? These are reasonable questions to ask, and each option comes with a steadily increasing price tag. Section 5 offers no guidance, which means the most restrictive of the options—which is also the safest to avoid criminal prosecution under Section 1—is the one librarians are most likely to implement, burdening the most speech. These restrictive options also go far beyond anything the Eighth Circuit approved in *Upper Midwest* (wrapping pornographic magazines in opaque covers) and the Tenth Circuit sanctioned in *M.S. News* (placing pornography behind blinder racks).

encourage local governing bodies to ban books or discriminate based on viewpoint, and the State insists it is well within its authority to expand cities' and counties' power to shape or control their public library collections.

### 2. *Standing and Ripeness*

The State contends that Plaintiffs' injuries under Section 5 depend on "a five-step hypothetical that supposedly establishes an injury in fact." (Doc. 95, p. 11). According to the State, the only injuries Section 5 could possibly inflict on patrons of public libraries would flow from the written selection/challenge policies of the libraries themselves—which is a problem for Plaintiffs because public libraries are not the defendants in this case. However, this argument ignores the fact that under Section 5, it is the local quorum court or city council that has the final, unappealable say as to the "appropriateness" of a challenged library book already on the shelves, and Section 5 does not require the reviewing governmental body to adopt or even be provided a copy of the library's selection criteria. *See* Act 372 § 5(c)(12)(B)(i)–(ii).

Moreover, by prescribing mandatory procedures for evaluating challenges, Section 5 actually prevents libraries from relying on policies that many have successfully used to be responsive to patron feedback, including negative feedback, without allowing an overwhelming number of challenges or letting the views of a vocal few dictate what is generally available to the public. *See* Doc. 99-6, ¶ 18 (Danos Decl.); Doc. 99-17, ¶¶ 27, 31 (Webb Decl.). That success is owed, in part, to the reasonable limits that libraries have set on reconsideration requests, such as requiring that requesters have a current library card and/or live in the library's service area. *See* Doc. 99-17, pp. 34–38 (Garland County

Library Materials Reconsideration Policy); Doc. 99-10, pp. 8–9 (Fayetteville Public Library Reconsideration Policy). Section 5 prevents libraries from imposing such reasonable limits. This leads the Court to conclude that Plaintiffs have a non-speculative fear that even a small number of vocal activists will be able to use Section 5 to substantially increase the volume of challenges to library materials.

Many libraries already have extensive written policies in place to guide the acquisition and retention of library books. *See, e.g.*, Docs. 93-2 (Central Arkansas Library System Selection Criteria), 93-3 (Fayetteville Public Library Selection Criteria), 93-4 (Eureka Springs Carnegie Public Library Selection Criteria). They are guided by common, overarching goals that are in line with the First Amendment.[8] For example, the Central Arkansas Library System states in its written policy that it strives "to provide a balanced and broad collection of materials and resources in varied formats to enlighten, inform, entertain, and empower the diverse community," (Doc. 93-2, p. 1); Fayetteville Public Library offers "a collection of materials that is diverse, inclusive, and protected by the First Amendment of the United States Constitution and the Arkansas State Constitution," (Doc. 93-3, p. 2); and Eureka Springs Library explicitly "subscribe[s] to the book selection principles contained in the Library Bill of Rights adapted by the American Library Association," while recognizing "that many books are controversial and that any given item may offend some patrons," (Doc. 93-4, p. 1).

---

[8] The Court previously described the American Library Association, the ALA's Code of Ethics and Library Bill of Rights, the training that professional librarians receive, and the historical significance and mission of public libraries in America in the introductory section of the Preliminary Injunction Order. *See* Doc. 53, pp. 6–12. For brevity, this discussion is not included here, but it provides helpful context.

But Section 5 hampers the ability of libraries to efficiently respond to frivolous, repeated, or overbroad requests, which they expect to increase if the provision takes effect. *See* Doc. 99-17, ¶ 30 (Webb Decl.). Section 5 requires library committees to "review[ ] [challenged material] in its entirety," Act 372 § 5(c)(7)(B), even if the work has been previously challenged or is challenged for improper purposes. However, a similar level of scrutiny is *not* required of elected officials at the next stage of the challenge process, *see id.* § 5(c)(12).[9] Further, the library committee's knowledge that its decision will be appealed to those tasked with funding decisions is not an insignificant factor and is likely to chill even more protected speech. *See* Doc., 99-23, p. 14 (Keith Depo.) (acknowledging that library staff is likely to "take into consideration" how the local governing body will decide the appeal).

Importantly, once a challenge is appealed to the local governing body, Section 5 provides *no criteria whatsoever* to guide the censorship decision. Instead, elected officials are free to decide on any basis they choose whether a challenged work should be

---

[9] Not only will the unlimited challenges invited by Section 5 impose a crushing burden on library staff, but there is at least a possibility, if not a likelihood, that librarians will preemptively withdraw frequently challenged books from the collection while they are under review, further chilling patron access to constitutionally protected speech. The State admits in its summary judgment response brief that carefully reviewing multiple challenged books would be a time-consuming and "unduly burdensome" affair. (Doc. 107, p. 3). During discovery, Plaintiffs identified ninety-seven books they feared would be challenged under Section 5 and asked the prosecutors to "read and evaluate" them "and answer multiple interrogatories" over a short period of time. *Id.* at pp. 3–4. Once the State objected, Plaintiffs sent a revised list of only twenty books to read in one business day; needless to say, again the prosecutors balked, citing undue burden. *See id.* The State does not appear to recognize that librarians across Arkansas would face the same sort of burdens on their time and resources if Section 5 went into effect, as the record evidence shows.

relocated to a segregated section of the library or eliminated from the collection entirely, without providing any justification to the public at large. *See id.* § 5(c)(7)(B)(i). The injury that Section 5's challenge procedure will visit upon patrons of Arkansas's public libraries is real and immediate. Section 5 removes final censorship decisions from public libraries and the professionals who run them and places them into the hands of local governing bodies whose members lack training and experience in these matters and are not bounded by similar selection constraints.

There is one final piece of evidence to consider on the matter of standing—and it is a compelling one. In December 2022, shortly before Act 372 was signed into law, Crawford County's quorum court threatened "to defund the Library if its director did not find a way to satisfy constituents' concerns about books" with LGBTQ themes. *Virden v. Crawford Cnty.*, Case No. 2:23-CV-2071, ECF 105, p. 3 (W.D. Ark. Sept. 30, 2024). These books, and perhaps others with unpopular or controversial themes, were removed from general circulation and placed in a separate section of the library. *Id.* On September 30, 2024, the Honorable P.K. Holmes, III, United States District Judge for the Western District of Arkansas, enjoined Crawford County's actions as unconstitutional and violative of the library patrons' First Amendment rights. *See id.* In so ruling, Judge Holmes observed that "public libraries have an obligation not to stigmatize disfavored viewpoints that are already in their collection." *Id.* at p. 9. He ordered the books returned to general circulation. *Id.*

This Court remains satisfied that Crawford County library patrons Plaintiffs Miel Partain (in her individual capacity and as next-friend of her minor daughter, Madeline Partain) and Leta Caplinger have standing to sue the Crawford County Defendants to

prevent enforcement of Section 5. Their injuries are not hypothetical, and their challenge is ripe for judicial review.[10]

### 3. Constitutional Analysis

#### i. Vagueness

Section 5's pivotal term, "appropriateness," is susceptible to multiple interpretations and all but guarantees that the challenge process will result in the withdrawal or relocation of books based on their content or viewpoint. As stated, any book, even one written for an adult reader, could be deemed "inappropriate" and subject to challenge under Section 5.

Though the State asks that Plaintiffs have faith that Arkansas's local elected officials will preserve, protect, and defend their First Amendment rights, the Court's view of the matter is not quite so sanguine—particularly given the cautionary tale that the *Virden* case presents. There, quorum court members directed the librarian to move children's books out of the children's section into a separate area they euphemistically

---

[10] County Defendants fail to confront the merits of Plaintiffs' challenge to Section 5 on summary judgment. Instead, their sole argument is that Plaintiffs lack standing to sue them because their lawsuit seeks statewide relief from Section 5, which Crawford County cannot provide. They suggest Plaintiffs should have sued the State of Arkansas (or perhaps *all* the counties and cities in the State). This argument is easily dispensed with. First, Crawford County Defendants cannot deny that the issuance of a permanent injunction would provide the Plaintiffs–who are Crawford County library patrons–complete relief with respect to their Section 5 injuries. *See Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 940 (8th Cir. 2023) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982))). Second, it is safe to assume that all counties and cities across Arkansas "would abide by an authoritative interpretation of the [law] . . . even though they would not be directly bound by such a determination." *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).

31

named "the social section." Judge Holmes found it "indisputable that the creation and maintenance of the social section was motivated in substantial part by a desire to impede users' access to books containing viewpoints that are unpopular or controversial in Crawford County." *Virden*, Case No. 2:23-CV-2071, ECF 105, p. 5.

Tellingly, when a Crawford County Library Board member was asked under oath why the books were moved to the social section, his answer was that the books were "inappropriate." *Id.* at p. 7. And County Judge Keith, who under Section 5 would be required to "present" to the quorum court all books "being challenged," Act 372 § 5(c)(12)(B)(i), testified in his deposition that he did not know what "appropriate" meant in the context of Section 5 but guessed it could mean "different thing[s] for different people," (Doc. 99-23, p. 13).[11]

In the absence of a statutory definition of "appropriateness," the Court turns to the dictionary, which defines it as "the state of being suitable for a particular person, condition, occasion or place." *Appropriate*, The American Heritage Dictionary (New College Ed. 1976). Given this definition, it is difficult, if not impossible, to assess a challenged book's "appropriateness" without considering its content, message, and/or viewpoint. In fact, Section 5 specifically contemplates that a library review committee or local governmental body consider the material's "viewpoint." *See* Act 372 § 5(c)(7)(B)(i). The law cautions only that a book should not be withdrawn from the library's shelves "*solely* for the viewpoints expressed within the material." *Id.* (emphasis added). Section 5 is

---

[11] The Court is not picking on County Judge Keith here. He is by no means the only county or city official who will have no clue what "appropriate" means if Section 5 takes effect.

constitutionally infirm because it "fail[s] to define the [key] term at all, and, consequently, fails to provide meaningful guidance for those who enforce it." *Stephenson*, 110 F.3d at 1310.

Other important terms in Section 5 are similarly vague. The statute uses both "withdraw" and "relocate" with respect to challenged books. *See id.* §§ 5(c)(7)(B)(i), (c)(11)(A). Obviously, withdrawing a book from the library's collection would pose a greater burden on access to protected speech than relocating the book to another section of the library, but Section 5 presents both options as though they were equivalent. Moreover, if a library committee or local governmental body elected to relocate a book instead of withdrawing it, Section 5 contemplates moving the book "to an area that is not accessible to minors under the age of eighteen (18) years"—without defining what "accessible to minors" means. *Id.* § 5(c)(11)(A). If Section 5 were to take effect, libraries would have to guess what level of security would be necessary to satisfy the law's "[in]accessib[ility]" requirements. For all of these reasons, the Court finds that Section 5 fails the "stringent vagueness test" that applies to a law that interferes with access to free speech. *Video Software Dealers Ass'n v. Webster,* 968 F.2d 684, 689–90 (8th Cir. 1992).

ii. Content-based Restrictions

In addition to its vague terms, Section 5 is unconstitutional because it unnecessarily imposes content-based restrictions on protected speech. The challenge procedure in Section 5 merits strict scrutiny. At each step in the appeal process, evaluators must consider the content of the library material to screen for "appropriateness" before deciding whether the public should be deprived access to the

material.[12] Therefore, any successful challenge would result in a content-based restriction on otherwise constitutional speech—unless the challenged book met the legal definition of obscenity, which city governments are not required to consider.

"[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based," and the courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens on speech because of its content." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642–43 (1994). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

If Section 5 is intended to protect minors, it is not narrowly tailored to that purpose. Nor is Section 5 limited to reading material that is obscene or "harmful to minors," which will significantly burden constitutionally protected speech. And even if the Court limited

---

[12] It is important to note that even with respect to obscenity, the Supreme Court has not suggested "that the question of the value of an allegedly obscene work is to be determined by reference to community standards." *Pope v. Illinois*, 481 U.S. 497, 499 (1987). A work's "value" is not subject to the artistic tastes, religious sensibilities, or "morality" of a given community.

> Just as the ideas a work represents need not obtain majority approval to merit protection, neither, insofar as the First Amendment is concerned, does the value of the work vary from community to community based on the degree of local acceptance it has won. The proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole.

*Id.* at 500–01.

"appropriateness" to mean "harmful to minors," this change would raise the same issues discussed with respect to Section 1. In the context of a public library, the term "harmful to minors" would sweep in materials that are constitutionally protected as to older minors and adults and place unjustified burdens on their access.

The State's defense of Section 5 boils down to an argument that censorship of otherwise constitutionally protected speech is acceptable because every selection decision that affects a public library's collection—from the original purchase of materials by librarians, to the books' sequestration on special shelves or behind locked doors, *to their outright removal from the collection*—is "government speech" not subject to constitutional scrutiny. *See* Doc. 107, pp. 16–17. But Section 5 has nothing to do with the library's curation decisions, so if indeed such decisions constitute government speech, the State's arguments in that regard are unavailing. First of all, no one is arguing that librarians are violating their patrons' First Amendment rights through curation decisions. Secondly, burdening access to books within a public library collection or removing books from that collection *due to content or viewpoint*—which Section 5 permits, if not encourages here—implicates the First Amendment and does not qualify as protected government speech.[13]

"The right of freedom of speech . . . includes not only the right to utter or to print, but the right to distribute, the right to receive, *the right to read* and freedom of

_____

[13] Just six months ago, the Eighth Circuit held that in the context of public school libraries—which are subject to more government restriction than public community libraries—"it is doubtful that the public would view the placement and removal of books . . . as the government speaking." *GBLT Youth in Iowa Schs. v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024).

thought . . . ." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (emphasis added and citation omitted). "[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Griswold*, 381 U.S. at 482. And when it comes to children, it is well established that "minors are entitled to a significant measure of First Amendment protection" that the government may restrict "only in relatively narrow and well-defined circumstances," which are not present here. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 212–13 (1975). It is also well established that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 213–14. Finally, when it comes to public spaces, like public libraries, "the governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults." *Reno*, 521 U.S. at 875.

The Court therefore concludes that Plaintiffs have established as a matter of law that Section 5 would permit, if not encourage, library committees and local governmental bodies to make censorship decisions based on content or viewpoint, which would violate the First Amendment. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). For the above reasons, Plaintiffs have prevailed on their claim that Section 5 works an unconstitutional content-based restriction on protected speech.

### III.    CONCLUSION

As the Supreme Court has noted, "even a law with 'a plainly legitimate sweep' may be struck down in its entirety," provided that its "unconstitutional applications substantially outweigh its constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024). Here, it is clear that there is no set of circumstances under which Sections 1 and 5 would be valid. The State has made no attempt to tailor Section 1 based on the Arkansas Supreme Court's interpretation of "harmful to minors," though the State has been on notice of the broad sweep of this definition since 2004. Similarly, Section 5 contains multiple undefined terms that invite censorship decisions on the basis of content. Plaintiffs are therefore entitled to a declaratory judgment that Sections 1 and 5 of Arkansas Act 372 are unconstitutional, void, and of no effect.

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 99) is **GRANTED**, and Defendants' Motions for Summary Judgment (Docs. 90 & 93) are **DENIED**. Defendants are **PERMANENTLY ENJOINED** from enforcing Sections 1 and 5 of Act 372.

Judgment will enter contemporaneously with this decision. If Plaintiffs wish to file a motion for attorneys' fees, they should do so by January 17, 2025.

**IT IS SO ORDERED** on this 23rd  day of December, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE